KEKER & VAN NEST LLP
STUART L. GASNER - #164675
sgasner@kvn.com
SIMONA A. AGNOLUCCI - #246943
sagnolucci@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Defendants WALTER LIEW and
USA PERFORMANCE TECHNOLOGY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WALTER LIEW, CHRISTINA LIEW, USA PERFORMANCE TECHNOLOGY, INC., and ROBERT MAEGERLE,<br><br>Defendants. | Case No. CR 11-0573-JSW (NC)<br><br>**NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW**<br><br>Date:          December 19, 2012<br>Time:         11:00 a.m.<br>Place:        Courtroom A, 15th Floor<br>Dept.:        Hon. Magistrate Judge<br>                   Nathanael Cousins |

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

**NOTICE OF MOTION**

NOTICE IS HEREBY GIVEN that on December 19, 2012, at 11:00 a.m. or as soon thereafter as the matter may be heard by the above-entitled Court, located at 450 Golden Gate Avenue, 15th Floor, San Francisco, California 94102, in Courtroom A, before the Honorable Nathanael Cousins, Defendant Walter Lian-Heen Liew ("Walter Liew") will and does move the Court for an order revoking the prior order detaining him pending trial, and releasing him on the conditions requested in this motion, or as determined by the Court.

This Motion is based on this Notice of Motion; the accompanying Memorandum of Points and Authorities, the authorities cited therein; the accompanying declarations and exhibits; argument of counsel; and any other matter that may be submitted at, prior to, or in connection with the hearing.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Walter Liew, a United States citizen with no criminal record, has now been detained pretrial for nearly sixteen months, with no end in sight.  At prior bail hearings, the Court noted that the bail question was a "close question."[1]  With new counsel in place and a substantial quantity of discovery finally provided by the Government, the time is ripe for a re-evaluation of whether there is some combination of pre-trial conditions that will reasonably assure Mr. Liew's presence at trial.  For the reasons that follow, the balance of factors now tips decidedly in favor of bail, subject to the following conditions:

- Substantial security in a form satisfactory to the Court and Pretrial Services, either by pledging a home in Singapore owned by Christina Liew, or by selling or borrowing against the home and posting $2M in cash, which represents most of the equity in that home;

- Home detention (except for trial preparation at the offices of Keker & Van Nest) with a private security guard selected by the Government or residence in a halfway

---

[1] February 28, 2012 Order (Dkt. 74) at 1.

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

1      house;

2      • Electronic monitoring; and

3      • Any further reporting or other conditions that the Court and Pretrial Services feel

4          necessary to assure Mr. Liew's presence at trial, including obtaining other sureties

5          if needed.

6      This Court has found that Mr. Liew poses no danger to the community, and has

7  recognized that white collar defendants with no prior criminal history, such as Mr. Liew, typically

8  are admitted to bail in this District.[2]  The detention of Mr. Liew was based on a view of the facts

9  that can now be put into perspective in light of a vast quantity of discovery that was produced

10 after the Court issued its protective order.  What can be seen from this new perspective is that

11 many of the Government's assumptions underlying detention were inaccurate, exaggerated,

12 speculative, or bear little real relationship to flight risk.  A fair view of the facts reveals that

13 detaining Mr. Liew is far more harsh than necessary, and there is indeed a combination of

14 conditions that can reasonably assure Mr. Liew's appearance at trial.

15 **II.    ARGUMENT**

16      **A.    Newly provided discovery underscores Mr. Liew's incentive to stay and
           defend what is essentially a *civil* trade secret case based on old technology in a
17         crowded field.**

18      The Government's charges in this case have implicitly suggested the narrative that Mr.

19 Liew was a "spy" for China who "stole trade secrets" at China's behest.  It was impossible at the

20 prior bail hearings to rebut that narrative and all it implies, because the Government had not yet

21 charged Mr. Liew with any trade secret crimes, let alone provided discovery.  Now that they have

22 brought the charges and provided the evidence that supposedly supports them, a very different

23 picture emerges.

24      As the Court will recall from the protective order motion hearing, the core of the

25 Government's case centers on alleged trade secrets belonging to DuPont relating to a "chloride

26 route" method for manufacturing titanium dioxide.  Under the protective order, documents that

27 _____

28 [2]*Id*. at 4 ("most white-collar defendants with no criminal record charged in this jurisdiction are
released on conditions.")

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

embody the alleged DuPont trade secrets should be marked as "Confidential-1" or "C-1."  Upon entry of the protective order, counsel has now been able to review carefully the single box of printed C-1 materials produced by the Government.  Surprisingly, the C-1 box is virtually devoid of the kinds of documents one would expect in a criminal case premised on "stolen" trade secrets, such as confidential DuPont documents obtained from the defendants' files or emails transmitting them to China.  Indeed, preliminary examination has revealed only two technical documents with the DuPont logo and confidentiality legends on them that were apparently found in the defendants' possession and that the Government contends contain trade secrets.[3]

Instead, the C-1 box principally consists of several kinds of materials (1) internal DuPont technical materials *obtained by the Government from DuPont in the investigation*, such as a lengthy technical manual *from 1985* relating to DuPont titanium dioxide plants (the "Basic Data document")[4]; (2) sketches and notes apparently prepared by Bob Maegerle, a consultant hired by Mr. Liew's company USAPTI and now a co-defendant, who had spent a long and successful career at DuPont before retiring in 1991 to work as a consultant[5]; (3)  design materials or specifications from Mr. Liew's companies (Performance Group and USAPTI)[6];  and (4) extensive commentary from DuPont engineers opining as to how the information in Mr. Maegerle's apparent notes and sketches "must have" come from the Basic Data document or other DuPont sources.[7]  In other words,  it appears that most of the C-1 material *was provided to the Government by DuPont to support their allegations*—initially raised in a civil case and now exported to the criminal case—that information in USAPTI's drawings and specifications *was derived from* the 1985 Basic Data document or DuPont facilities or other materials.

This is the stuff of a typical *civil* trade secret case, where a former employee (Maegerle) leaves his employer (DuPont), works as a consultant for an upstart competitor (USAPTI), and the

---

[3] *See* Declaration of Stuart L. Gasner ("Gasner Decl.") at ¶ 2; ¶ 16 Exh. A.

[4] Gasner Decl. at ¶ 3.

[5] Gasner Decl. at ¶ 3; ¶ 17 Exh. B.

[6] Gasner Decl. at ¶ 3; ¶ 18 Exh. C.

[7] Gasner Decl. at ¶ 3; ¶ 19 Exh. D.

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

former employer contends that the consultant's work for the competitor is based on misappropriated trade secrets.  In this kind of civil trade secret case (a run-of-the-mill event in Silicon Valley), the competitor often defends based on California law that strongly favors employee mobility, and permits the employee to rely on his residual knowledge even if that leads to similar results.  *See, e.g., Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1462 (2002).  The new employer/competitor often has strong defenses based on prior public disclosures of the alleged trade secrets including in patents, publications, conferences, and the like.  *See, e.g.*, *Stutz Motor Car of America, Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995) ("It is well established that disclosure of a trade secret in a patent places the information comprising the secret into the public domain"); *Aetna Bldg. Maintenance Co. v. West*, 39 Cal. 2d 198, 205 (1952) (information that is "commonly known to the trade or may easily be discovered" is not entitled to trade secret protection).  Often persuasive, too, is evidence of hard work and independent development by the new employer.  *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 490 (1974) (noting that "trade secret law does not forbid the discovery of the trade secret by fair and honest means, *e.g.* independent creation or reverse engineering").  A major factor in cases of this type is the law that makes clear that "reverse engineering" is a permissible, and indeed a desirable feature of a competitive economy.  *Id.*; *see also Chicago Lock Co. v. Fanberg*, 676 F.2d 400, 403-05 (9th Cir. 1982) (defendant's own independent reverse engineering was proper means of discovering plaintiff's trade secret).

In civil cases with this fact pattern, the plaintiff's extravagant claims of theft of the former employer's "crown jewel" technology often turn out to be far more modest that the initial rhetoric promised.  There is ample reason to believe that this pattern will be repeated here.  The Government will have an uphill battle proving beyond a reasonable doubt that features in a *27-year old* technical manual have remained trade secrets in a longstanding and crowded field.  Many of DuPont's original patents on production of TiO2 pigments were issued *in 1949, over 50 years ago.  See, e.g.* U.S. Pat. No. 2,488,439 (filed Nov. 15, 1949).[8]  Many other DuPont patents

---

[8]Gasner Decl. Exh. E.

4
NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

on titanium dioxide technology have issued over the years, publicly disclosing increasing levels of detail as to DuPont's titanium dioxide plants and processes.  *See, e.g.* U.S. Pat. Nos. 2,856,264 (dated October 14, 1958) and 5,201,949 (dated April 13, 1993).[9]  Everything disclosed in those patents lost any trade secret protection it ever had at the time of publication.  *See Stutz Motor Car*, 909 F. Supp. at 1359.  Likewise as to the information set forth in the roughly 71,677 other United States patents mentioning "titanium dioxide,"[10] as well as in foreign patents, textbooks, conferences, websites, supplier catalogues and other sources of information available to those in the field.[11]  Moreover, Bob Maegerle is a talented engineer who was entitled to practice his trade as a consultant after a long and distinguished career at DuPont, and Walter Liew and USAPTI were entitled to hire and rely upon him in designing titanium  dioxide plants to compete with many others throughout the world.[12]  While this case has the twist that USAPTI's customer is an entity allegedly owned by the Chinese government (as are many Chinese companies), not a single document marked as C-1 shows the direct transmission of any confidential DuPont document to China.  Gasner Decl. ¶ 2.

Significantly, the "C-1" materials also reveal that the Government has relied heavily on input from biased DuPont engineers in assessing what is and is not a titanium dioxide "trade secret."  It seems that the Government gave USAPTI work-product to DuPont engineers -- seemingly in disregard for any USAPTI intellectual property contained therein -- who then annotated the work-product with their thoughts as what was proprietary.  Gasner Decl. Exh. D.  The result is stunning: over and over again, the DuPont engineers characterize as wrongful certain design similarities between the USAPTI work-product and alleged DuPont "proprietary"

---

[9]Gasner Decl. Exh. E.

[10]Gasner Decl. at ¶ 6.

[11]*See* Gasner Decl. at Exhs. F-H (citing  and attaching portions of Barksdale, Jelks, TITANIUM: ITS OCCURRENCE, CHEMISTRY, AND TECHNOLOGY AT 309-39 (The Ronald Press Company 1949); European Commission, *Integrated Pollution Prevention and Control Reference Document on Best Available Techniques for the Manufacture of Large Volume Inorganic Chemicals - Solids and Others*  (August 2007)); as well as two pamphlets from the Chlorine Institute, one on "Bulk Storage of Liquid Chlorine" dated October 2005, and one on "Chlorine Vaporizing Systems" dated October 2002, as well as an excerpt from the website of Thermal Ceramics.

[12]See Gasner Decl. at ¶¶ 3, 15.

710757.02

information that is, in fact, publicly disclosed or commonplace in the industry.  One annotation, for example, claims that usage of a certain term is "unique" to a certain DuPont plant, Gasner Decl. Exh. D at C1-000307; the same term, however, is used in a European Commission monograph on best practices for titanium dioxide production.  Gasner Decl. Exh. G at 175. Another annotation notes that  a certain size "blend tank" is the same in the USAPTI document and in a DuPont plant, as well as being the size specified in the Basic Data document; both the USAPTI document and the annotation, however, refer to that size as "standard."  *See* Gasner Decl. Exh D at C1-000339. Whether ignorant of trade secret law or choosing to ignore it, the DuPont engineers apparently focused on what "looks like DuPont" rather than what would truly qualify as a trade secret.

Further, other discovery produced by the Government confirms the vast amount of development work by USAPTI and its engineers.  Just a single hard-drive seized by the Government—the backup hard drive that Mr. Liew kept in his safety deposit box— contains thousands of files with the work-product of the many engineers employed by USAPTI.  *See, e.g.,* Gasner Decl. Exh. I (first 100 pages of folder index).  Each of the folders contains nested folders containing detailed engineering work at the bottom level.  *See, e.g.*, Gasner Decl. Exh. J (example of detailed engineering work).  Interestingly, although the Government has made it sound as though the contents of the safety deposit box that was searched in July 2011 was a "treasure trove" of electronic trade secrets,[13] the folder indices show them to be nothing of the sort.  They are, rather, the kind of generic computer back-ups that any small business owner might keep, with a hodgepodge of company materials, research from public sources, family pictures and videos and back-ups of favorite music (including "oldies," "rock" and "songs of the 70's").  *See, e.g.*, Gasner Decl. Exh. I at 61, 82; *see also id.* at ¶¶ 26-27; Exhs. K, L.  And more than a year after seizing the hard-drive, the Government still has not identified *any* documents on the safety deposit box hard drive that it contends deserve C-1 treatment.  Gasner Decl. ¶ 3.

---

[13]Opp. to Defendants' Motion for Pretrial Release, (Dkt. 59) at 1, 3.

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

In short, a preliminary review of the discovery materials produced by the Government to date suggests that that at the heart of the Government's case is the issue more typically found in civil trade secret cases: whether any similarities between the USAPTI plans for the Pangang TiO2 plant and DuPont's plants or technology are the result of misappropriation of true trade secrets (the Government's and DuPont's view) or whether (as the defense contends), any similarities are non-actionable because based on previous public disclosure, independent development, proper reverse engineering, common knowledge in the field, Mr. Maegerle's or other consultants' residual knowledge, or are precluded by other defenses such as DuPont's failure to maintain confidentiality.

The Court cannot decide on this motion who is right and who is wrong on the merits of the Government's trade secret case. But it is clear that Mr. Liew will have powerful defenses to the Government's claims, and thus a strong incentive to appear at trial and to defend his conduct. The discovery that the Government has provided to date only confirms the Liews' resolve to defend themselves. *See United States v. Chen*, 820 F. Supp. 1205, 1207 (N.D. Cal. 1992) ("If the evidence against a defendant is weak, that becomes an important factor favoring release."). And that discovery also puts into perspective the Government's case, which is less the stuff of a spy novel and much more the grist of an ordinary civil trade secret case.

**B.      It is now apparent that trial remains a long way off, and preparing for trial will be nearly impossible while Mr. Liew remains incarcerated.**

Another factor that warrants reconsideration of Mr. Liew's bail status is the length of time this case will take to get to trial and the extreme difficulty of preparing for trial while Mr. Liew remains incarcerated. At the February 1, 2012 bail hearing, the Court noted that Mr. Liew's ability to defend himself while incarcerated "raises a constitutional issue," and that it "remains to be seen how Mr. Liew can access" discovery.[14] Mr. Liew has as of this writing lingered in jail for nearly sixteen months (since July 28, 2011), 8 months of it in the miserable conditions of the North Oakland County Jail, and since then at the Federal Detention Center in Dublin, California.

---

[14] Transcript of Proceedings at 46:11-13, 17-19 (February 1, 2012) (Dkt. 180) (Gasner Decl. Exh. U).

710757.02

It has become apparent since the last bail hearing that this case will involve up to *18 times as much electronic discovery as anticipated* (many of those electronic documents written in Chinese), and that the nature of the defense to the Government's trade secret allegations will require the defendant's participation in a way that is simply not possible while he is incarcerated.

Further, the Government has indicated that yet another superseding indictment is forthcoming sometime next year, this one focusing on financial issues.  This additional superseding indictment has been in the pipeline for more than six months, but is proceeding at a glacial pace, making plain that trial remains a long way off.  Gasner Decl. ¶ 7.  Taken together, all of these factors create a "perfect storm" that makes it impossible, without violating Mr. Liew's Due Process and other constitutional rights, to keep Mr. Liew detained.

"It is clear that long pretrial detentions, at least in some circumstances, can violate the Due Process Clause of the Fifth Amendment of the Constitution of the United States."  *United States v. Ailemen,* 165 F.R.D. 571, 577 (N.D. Cal. 1996).  A detention as long as Mr. Liew's also raises Constitutional issues under the Sixth Amendment's guarantee of a speedy trial, as well as the Eighth Amendment's prohibition against excessive bail.  *Id.* at 578.  In determining whether excessive detention rises to the level of a due process violation, courts must look at each case on a case-by-case basis, and "consider the length of confinement in conjunction with the extent to which the prosecution bears responsibility for the delay that has ensued."  *United States v. Gelfuso*, 838 F.2d 358, 359 (9th Cir. 1988); *United States v. Ailemen,* 165 F.R.D. 571, 591 (N.D. Cal. 1996).

Here, there has been a lengthy period of pretrial confinement (16 months and counting) and a trial date and pre-trial motions schedule have not yet been established.   Nor could they be.  The Government has not even completed providing the discovery it says it is willing to provide, let alone addressed and resolved the list of discovery disputes that exist.  Gasner Decl. ¶¶ 10-14; Exh. S.  Just the quantity of discovery to date has been staggering: the Government has produced 5 terabytes of Encase image files from some 62 seized computers and other devices.  Declaration of Joshua Maremont ("Maremont Decl.") ¶ 6.  It also has produced 19GB of email messages which, when de-duplicated, equal 110,442 individual documents.  Maremont Dec. ¶ 7.  Although

8

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

these emails would fill approximately 100 banker's boxes, they represent less than 1%, by file size, of the data produced to date by the Government as EnCase images.  In other words, the EnCase images produced to date, if processed and converted to TIFF images, could easily yield an additional 250 million pages, enough to fill another 90,909 banker's boxes.   Maremont Dec. ¶ 7.  In addition, the Government has produced 14 discs of material scanned from paper files in multiple locations.  Maremont Dec. ¶ 8.  And there is more discovery to come—up to a total of 18 terabytes, according to the Government.  Gasner Decl. ¶ 9.  Further, the status of the case against the Chinese co-defendants has yet to be resolved following the District Court's ruling that service of the Indictment would be quashed.[15]  Finally, although the Government has been stating since at least May 2012 that it intends to seek a superseding indictment against Mr. Liew on tax and other financial matters, that indictment remains at least several months away.   Gasner Decl. ¶ 7.  It appears clear that unless Mr. Liew is released on conditions soon, he will have been detained for well more than two years before the charges against him will be heard.  Delays of this magnitude "point[] strongly to a denial of due process."   *United States v. Gonzales Claudio*, 806 F.2d 334, 341 (2d Cir. 1986) ("[d]etention that has lasted for fourteen months and, without speculation, is scheduled to last considerably longer, points strongly to a denial of due process").

Turning to the other part of the due process analysis—"the extent to which the prosecution bears responsibility for the delay that has ensued," *Aileman*, 165 F.R.D. at 582—it is plain that the delays in this case are directly attributable to the prosecution.  This has been a trade secret case from the outset, starting no later than June 2011, when the FBI interviewed Jian Liu, an engineer who worked with USAPTI.  Gasner Decl. ¶ 5.  The search warrants executed in July 2011 were directed at a trade secret case.  Dkt. 48.   Yet the Government did not obtain a trade secret indictment against Mr. Liew *for over seven months*, keeping him detained during that time on the basis of peripheral obstruction of justice charges.   The Government then did not produce discovery on the trade secret case until July 2012, the vast majority of it in the form of an electronic "dump truck" of EnCase images.  Maremont Decl. ¶ 4.  Since then, the Government

---

[15] July 23, 2012 Order (Dkt. 176).

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

has failed repeatedly to provide promised materials, has failed to provide legible copies of critical documents, has refused to engage in a meaningful dialogue over discovery issues, and has done little or nothing to expedite or streamline this case so as to allow a trial in a reasonable amount of time.   Gasner Decl. ¶ 10-14.  Moreover, while the Government seized documents relevant to potential financial charges in July 2011, it still claims that any superseding indictment is still months away.

Due process and other constitutional concerns are made even more acute in this case due to the nature of the trade secret charges, the nature of the underlying evidence, and the kind of defense required in a case such as this.  The current Indictment charges that the entirety of the DuPont chloride route process for manufacturing titanium dioxide is at issue.  Superseding Indictment (Dkt. No. 64) at ¶ 14(a).  The memos from the DuPont engineers produced as part of the C-1 materials claim wrongful similarities between DuPont processes and USAPTI's in everything from plant layout to ore handling, chlorination, gas pre-cooling, condensation, oxidation, solids removal, finishing, and various aspects of budgeting for, equipping, staffing, and running a titanium dioxide plant.[16]

What Mr. Liew needs to do to defend himself against these sweeping allegations is to review the C-1 materials in detail; decipher the aspects of the titanium dioxide process that the Government alleges to be trade secrets; find in the terabytes of discovery the work-product demonstrating how USAPTI developed the feature in question; find communications with Pangang and others (many in Chinese) relating to that aspect of the project; search the Internet, technical libraries and otherwise research relevant disclosures; communicate by telephone with experts, vendors and others in the field with relevant knowledge; and otherwise engage in a collaborative process with counsel that requires both breadth of research and depth of investigation to rebut the Government's technical allegations.   Gasner Decl. ¶ 35.

---

[16]Gasner Decl. at ¶ 19; *see also* Gasner Decl. Exh. D at C1-000275 (oxidation); C1-000306 (chlorination); C1-000307 (gas pre-cooling and solids removal); C1-000331-35 (equipment); C1-000339 (oxidation); C1-000340 (filtration, drying, grinding and packer feed).

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

Since Keker & Van Nest entered its appearance in April 2012, counsel have tried mightily to accomplish the same within the constraints of his incarceration.  *See* Gasner Decl. ¶¶ 36-40. Counsel have tried to solo climb the Mt. Everest of electronic materials, but their sheer volume makes the going inordinately slow if not impassable.   There is no feasible way to load all of the documents onto a litigation support platform: just the cost of "processing" a single terabyte of the EnCase images that the Government has provided into a viewable and easily printable format (such as TIFF) would be $450,000 at current rates of $450 per gigabyte, or over $8 million for 18 terabytes.   Maremont Decl. ¶ 5.  It is possible to "restore" drives from EnCase into native format at a cost of several hundred dollars per drive, but that yields a complex folder structure (many of the headings in Chinese) that must be viewed on a computer in native format and that cannot easily be searched.  Counsel have crept a small ways up the electronic Everest by processing and printing selected batches of documents, and by  bringing a restored drive to the prison, and sitting side by side with Mr. Liew while he assists in finding relevant documents.  But that process is simply too slow and cumbersome to make substantial progress, let alone reach the summit.  *See* Gasner Decl. ¶¶ 36.

The Federal Detention Center in Dublin is approximately a 45-minute drive from the Keker & Van Nest offices in San Francisco.  After extensive paperwork and other delays, counsel is escorted into a small interview room where a face-to-face meeting can be conducted, albeit under video surveillance.  A laptop can be brought into the interview room, conditioned on executing additional paperwork (on each visit) requiring the disabling of all wireless equipment that would allow Internet access.  Given the detention center's needs for "counts" and other administrative matters, it is difficult to conduct a meeting of more than three hours in duration without lengthy interruption or skipping meals.  As a practical matter, each three hour session requires roughly six hours of attorney time (due to travel time and administrative delays), which, based on the realities of scheduling, makes it difficult to visit Mr. Liew more than once a week and effectively doubles the cost of consulting with counsel.  *See* Gasner Decl. ¶ 37.

Mr. Liew is not permitted to possess a computer while in detention, nor is he permitted under the Protective Order to possess "highly confidential" or C-1 materials.  Counsel is not

11

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

1   permitted to leave documents directly with Mr. Liew, but instead must either send the documents

2   through the United States mail or leave them for Mr. Liew in a prison drop box.   Materials left

3   for or mailed to the Detention Center often take inordinately lengthy periods of time to be

4   delivered (sometimes weeks), and there are practical limits on the quantities of materials that can

5   be printed out and mailed.  As a result of these restrictions, the collaboration between counsel and

6   client is exactly the opposite of what it should be.  Rather than having Mr. Liew—who is highly

7   motivated and uniquely qualified—wade through the terabytes of documents produced by the

8   Government (substantial portions of them in Chinese) and select documents of significance to

9   discuss with counsel, counsel must attempt to identify the important documents, print them, and

10   bring them to Dublin to review with Mr. Liew…or sit idly by while Mr. Liew tries to find them

11   on a restored drive under video surveillance.  If, upon meeting with Mr. Liew, it turns out that the

12   attorneys  have missed the mark in what they chose, or other documents or Internet resources are

13   necessary to make progress, counsel cannot simply pull up those documents on the spot.  The

14   entire conversation must be delayed until the next visit to Dublin.  Mr. Liew can achieve little

15   meaningful preparation unless counsel is physical present.  Intensive document review and

16   collaboration is, in practical effect, impossible.  *See* Gasner Decl. ¶ 38.

17        Moreover, many of the critical documents in this case are computer-aided design ("CAD")

18   or other types of files that must be analyzed on a computer in their native form, because printing

19   them out loses significant data, including many of the numbers and calculations underlying the

20   designs.  Accordingly, it is difficult if not impossible for Mr. Liew to do meaningful work on his

21   defense in between attorney visits.  And some of the work that Mr. Liew would ordinarily be

22   expected to do so as to participate in his defense—such as helping to review the more than

23   100,000 emails produced by the Government in electronic form—he cannot do at all, because

24   those emails can only be reviewed on Concordance on the Keker & Van Nest litigation support

25   network, which cannot be accessed from the detention center.  Maremont Decl. ¶ 9; *see* Gasner

26   Decl. ¶ 39.

27        Simply put, the status quo does not provide counsel or Mr. Liew a manageable way to

28   defend a case involving complex charges of trade secret theft, multiple terabytes of discovery (a

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

substantial portion of it in Chinese), and many documents that can only be meaningfully reviewed electronically.  What Mr. Liew needs to do to defend this case is to spend his every waking hour reviewing documents (including C-1 documents), doing research, and engaging in a daily back-and-forth with experts and counsel.  This is prohibitively burdensome, if not down-right impossible, in a prison setting.  The difference is fundamental and qualitative:  50 three-hour visits in the Dublin detention center interview room does not equal three 50-hour weeks in a conference room at counsel's office engaged in meaningful collaboration with full access to electronic evidence.  And it is the latter—full work weeks devoted to preparation without artificial constraints—that will be required to get this case to trial in any reasonable timeframe, given the vast quantity of electronic discovery.   *See* Gasner Decl. ¶ 40.

Under *Aileman* and similar cases, the due process analysis requires a comparison of the weight of the Defendant's and the Government's interests, and a recognition "that "the size of that [flight] risk can be reduced meaningfully through the imposition of a host of conditions." 165 F.R.D. at 599.  Weighing those interests, the conclusion is inescapable that it would be unjust, unfair and a violation of Mr. Liew's due process and other constitutional rights for him to remain locked up indefinitely under conditions where he is disabled from assisting effectively in his own defense, especially where the "size" of the Government's interest in preventing flight can be reduced by the types of conditions on release proposed here.

### C. Traditional bail considerations favor Mr. Liew's release under the proposed conditions.

In light of the two new factors discussed above—the nature of the Government's trade secret case as revealed by discovery, and the impossibility of preparing to defend against such a case while incarcerated indefinitely given the volume and nature of such discovery—the traditional considerations in evaluating bail now tip decidedly in favor of release.

#### 1. Mr. Liew's behavior prior to his arrest confirms his intention not to flee.

First, it is worth noting that Mr. Liew's behavior prior to his arrest confirms he has no intention to flee, but, rather, to stay and defend against trade secret charges he perceives to be

13

710757.02

exceedingly weak. When he was sued civilly by DuPont in April 2011,[17] he vigorously defended himself in a detailed answer and counterclaim,[18] and went so far as to meet voluntarily with DuPont's investigator, lawyers, and engineers to explain how he developed his plant designs. Gasner Decl. ¶ 8. When his house and business were subjected to a massive search on July 19, 2011,[19] Mr. Liew and his wife did not flee the United States in the nine days between the search and their arrest. This would have been ample time to effect their escape had that ever been their intention. The massive scope of the searches, coupled with the trade secret misappropriation detailed in the DuPont civil case, provided notice that Mr. and Mrs. Liew were in serious criminal trouble: as the Government put it in the opening line in one of its briefs, "Walter Liew (Liew) knew he was in trouble when the FBI appeared at his house with a search warrant on July 19, 2011."[20] Yet instead of fleeing, Mr. and Mrs. Liew stayed put in their home in Orinda, retained counsel, tried to negotiate their voluntary surrender, and, when that failed, quietly submitted to arrest at their home on July 28, 2011.[21]

These facts weigh strongly in favor of bail. *See, e.g., Ailemen*, 165 F.R.D. at 599 (ordering release of a "serious drug" crime defendant, who allegedly had committed passport fraud and traveled under false aliases, after determining that the "real risk of flight" could be substantially mitigated by the imposition of certain restrictive conditions, and considering it significant that the defendant had made "no effort" to avoid arrest despite his expectation that he would be arrested); *United States v. Sabhnani*, 493 F.3d 63, 68 (2d Cir. 2007) (holding that defendants' "failure to flee in the twelve hours between the search of their home and their arrest" militates against detention); *United States v. Sanchez,* 2011 WL 744666, at *2 (C.D. Cal. Feb. 23, 2011) (affirming

---

[17]*See* Complaint, *E.I. Du Pont De Nemours and Company v. USA Performance Technology, Inc., et al.*, CV Case No. 3:11- cv-01665-JSW (N.D.C.A.) (Dkt. 1).

[18]*See* Substituted Answer and Counterclaims to Plaintiff's Complaint, *E.I. Du Pont De Nemours and Company v. USA Performance Technology, Inc., et al.*, CV Case No. 3:11-cv-01665-JSW (N.D.C.A.) (Dkt. 35).

[19]Defendant's Bail Motion, Exhibit C (Search Warrants for 2 Crown Court, Orinda California; and 1000 Broadway, Suite 480, Oakland, California) (Dkt. 48).

[20]Govt. Opposition Brief (Dkt. 59) at 1.

[21]*See* 8/11/2011, 8/10/2011 Arrest Warrants (Dkt. 14 and 15).

14

710757.02

1    magistrate's bail order where the defendant, who faced a potential lengthy sentence and was

2    "aware of the threat of prosecution" for several years, did not attempt to flee).

3    **2.    Mr. Liew's behavior while detained augurs in favor of release.**

4    Further, the passage of time has confirmed that Mr. Liew can be trusted to comply with

5    the conditions of bail.  He has been a model prisoner, compliant in every way, and has even

6    voluntarily participated in a pilot mentoring project to help younger inmates get valuable life

7    skills.  Gasner Decl. Exh. M.  And Mrs. Liew has complied with the conditions of her bail

8    throughout, and has not made any effort to flee.

9    **3.    Mr. Liew has strong local ties, especially his relationship to his American-born eleven-year-old son Michael.**

10

11    As the Court recognized at the last bail hearing, "Mr. Liew does have substantial ties to

12    this community."[22]  He is a United States citizen who has lived in this country for over 30 thirty

13    years, and has a twelve year old son Michael, who was born here and knows only America as his

14    home.  As the Court knows, Mr. Liew moved to the United States in 1980, when he was 23 years

15    old.  He moved to Norman, Oklahoma to study at the University of Oklahoma and obtained his

16    Master's Degree in electrical engineering from that institution in 1982.  After getting his degree,

17    he moved to the Bay Area in 1982, and worked for well-known high-tech companies Advanced

18    Micro Devices and Hewlett Packard before starting his first small business—LH Performance—

19    in 1989.  He married Christina Liew in 1991 and became a United States citizen in 1993.[23]

20    In 2000, Walter and Christina had a son, Michael.  Michael is twelve years old and a 6th

21    grader at the Bentley School in Oakland, California.  The Government's sole mention of Michael

22    in the prior bail hearing was a passing reference to "the minor child" being his only family in the

23    area,[24] as if quantity of family members was the proper metric. But even a quick perusal of the

24    attached family photographs will demonstrate Michael is a thoroughly American pre-teen, with a

25    passion for his friends, the piano, video games, basketball and golf.  Gasner Decl. Exh. N.  He is a

26    _____

27    [22]Transcript of Proceedings 45:1-2 (February 1, 2012 (Dkt. 180) (Gasner Decl. Exh. U).

[23]Christina Liew also is a naturalized U.S. citizen and has lived in the United States for 19 years.

28    [24]Transcript of Proceedings at 14:21-24 (August 24, 2011) (Gasner Decl. Exh. T).

star student at the Bentley School. *Id.* Exh. O. Michael's life around his home in Orinda and his school in Oakland creates strong ties to the community and a strong incentive for Mr. Liew to adhere to the conditions of his bail.

So, too, should Mr. Liew's business at USAPTI be considered a strong tie to the community. At the time of the search in July 2011, USAPTI employed roughly 12 individuals in downtown Oakland, and USAPTI or Mr. Liew's prior companies had been there for roughly 23 years. Of course, USAPTI has been all but destroyed as a result of the Government's search (which took virtually every computer and business record on the premises), the indictment of USAPTI and Mr. Liew's detention, but it would be Orwellian for the Government to contend that these business connections no longer should be considered as ties to the community because they are no longer active.

### 4. Mr. Liew's past foreign travel, connections and transactions do not bear on his present ability to flee, or the likelihood that he would attempt to do so.

The only basis for Mr. Liew's detention to date has been the concern that even though he is a United States citizen with long-standing ties to the community and has an American-born son and no criminal record, he is a "flight risk" due to his past record of travel, foreign "connections" alleged to be stronger than his local ones, and certain transactions abroad. A careful look at the facts, however, shows that there is little realistic risk of flight, and what risk the Court may perceive can be easily addressed by conditions less drastic than detention.

*First*, Mr. Liew has shown no inclination to flee regardless of whatever foreign connections he may have. As discussed above, he had plenty of opportunities to see trouble brewing, not the least of which was on July 19, 2011 when scores of federal agents executed a surprise search warrant raid on his home and business. But Mr. Liew and his wife did <u>not</u> flee, but stayed put, ready to fight the charges—just as Mr. Liew had been fighting the civil allegations that morphed into this criminal case for the prior four months. After the searches of his home and business, he hired reputable counsel, and, fully aware that an arrest was likely to follow, tried to surrender voluntarily. When that failed, he submitted to arrest without incident. None of this suggests a man eager to flee, but, rather, a man eager to contest the charges against him.

16

*Second*, even if Mr. Liew wanted to flee the country—which he does not—there is no realistic way for him to do so.  His passport has been seized.  Under the conditions proposed here—home detention with an around-the-clock private security guard chosen by the Government and electronic monitoring—it would be virtually impossible for him to get to an airport undetected.  He has no criminal record and obviously is not the kind of person who would have criminal associates capable of smuggling him out of the country.

*Third*, while the Government has previously made much of property owned by Mr. Liew's wife in Singapore, Mrs. Liew had been arranging to buy the Singapore residence for her mother before the criminal charges came to light.  Gasner Decl. Exh. P.  Now that her mother is deceased, that property has become available to use as security for Mr. Liew's release, and the timing demonstrates that it was never intended as a way to evade the charges at issue.  Moreover, Singapore is widely known as an authoritarian state with a long history of cooperation with United States law enforcement.  Likewise with Malaysia: although Mr. Liew has family there, Malaysia is famous for its harsh law enforcement.

*Fourth*, Mr. Liew's China "connections" (such as they are) and his history of travel are equally unpersuasive grounds for reaching the conclusion that Mr. Liew poses a flight risk.  Mr. Liew's principal connections to China were centered around fulfilling USAPTI's contract with Pangang.  When Mr. Liew and Pangang were indicted, that contract and his contacts with Pangang were blown sky high, as was his need to travel to China.  That Mr. Liew had business contacts with Pangang in the past, or that he travelled there, says nothing (standing alone) about the likelihood or feasibility of his travelling there in the future, especially when on home detention, without a passport, and under electronic surveillance.

While Mr. Liew's wife does have family in China, that alone does little to suggest flight to China is a realistic possibility.  Mr. Liew is an American citizen of Malaysian descent who has never lived in China and does not have permission to reside there.  Mr. Liew would have to slip into China undetected (again without a passport and while under DOJ and private security surveillance).  Once there, he would have to live underground with his wife and a 12-year-old American son who speaks little or no Chinese, in an authoritarian state where a state-sponsored

17

710757.02

I.D. is needed to get a job, attend a school, or rent an apartment.  It is hard to imagine that he would be welcomed warmly by the Chinese government:  Chinese government officials have loudly denied involvement in "economic espionage" and hardly could be expected to undercut these public denials by harboring a fugitive American businessman whose alleged actions (if true) reflect badly on the Chinese government. Gasner Decl. Exh. Q.

Finally, the Government has made much of foreign financial transactions that it believes are suspicious.  Presumably those transactions are the subject of the Government's long-threatened superseding indictment, and will be addressed if and when such an indictment is returned.  Until then, the Government's innuendo should be given little weight in the bail equation, especially in light of the fact that persons accused of financial crimes are often admitted to bail.

In short, none of these "connections" with foreign countries, when considered realistically, suggest any meaningful risk of flight under the conditions of bail proposed here.

### 5.   Mr. Liew's "credibility" is not the issue in assessing the need for detention.

Yet another aspect of the Government's opposition to bail at prior hearings was a generalized attack on Mr. Liew's "credibility," which they can be expected to renew in response to this motion.  That challenge to Mr. Liew's integrity was based on Mr. Liew's disavowal of statements he had made in a letter to Chinese officials when he was trying to convince them to take his small company seriously, and may also have been influenced by the obstruction of justice charges that formed the backdrop of the prior bail hearings.  The defense will address those issues at trial, but they should not color excessively the Court's consideration of bail at this time, for several reasons.

*First*, the Government's assessment of a defendant's credibility cannot weigh heavily in the bail equation, since the Government presumably has a dim view of the defendant's credibility in every criminal case it brings.  Most white collar defendants get bail even in fraud cases where dishonesty is the crux of the crime; Bernie Madoff, perhaps the most notorious fraudster in recent memory, was able to prepare for his trial from home. *United States v. Madoff*, 586 F. Supp. 2d

18

710757.02

240, 246 (S.D.N.Y. 2009).

*Second*, the defense is not asking for the Court simply to take the defendant's word that he will appear at trial. Far from it: as discussed below, the defense is not seeking an unsecured appearance bond, but, rather, is willing to accept a highly restrictive set of conditions (home detention with a private security guard and electronic monitoring) and incentives (a substantial pledging of property or cash) designed to ensure his appearance at trial.

*Third*, any concerns that Mr. Liew might obstruct justice if released have been mitigated by the fact that he has now spent nearly sixteen months in jail. Whatever inferences the Court may have drawn from the charges in the Indictment about Mr. Liew's allegedly obstructive behavior in the time period after he was sued by DuPont or at the time of the search must be viewed in the light of Mr. Liew's long incarceration. Mr. Liew has felt the blows inflicted on him by the long arm of the law for well over a year; his behavior going forward should be viewed in the context of a man who will keenly appreciate the need to adhere to his conditions of bail.

The defense looks forward to proving Mr. Liew's credibility at trial, but should not be put to that task at this juncture; nor should the Court pre-judge it without reference to his current situation.

### D. The Court should order an appropriate amount of security, commensurate with other comparable cases, together with other restrictive conditions.

One factor that may have played a role in the Court's prior analysis was the lack of any substantial property pledged as security. Instead, prior counsel relied upon small amounts of money pledged by a variety of sureties. While, as the Court noted, white collar defendants in this District with no criminal record are often released on bail, the amount of security previously offered in this case was far below the level needed to assuage the Court's concerns about flight risk. As the Court noted after the February 1, 2012 hearing, although it "considers this a close question," the "defendant's ***proposal is inadequate*** to address the substantial concerns posed by his release."[25]

Present counsel stand ready, willing and able to raise the ante considerably, in a form and

---

[25] Order (Dkt. 74) at 1 and 4 (emphasis added).

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

amount of security acceptable to the Court and Pretrial Services.  The Singapore property owned by Mrs. Liew was purchased for $3.65 million Singapore dollars, which is approximately $2.98 million U.S. dollars.  Gasner Decl. Exh. P.  Mrs. Liew is willing to post the house as security.  If the Court and/or Pretrial Services prefers (because posting a foreign property is cumbersome or due to other concerns), that property could be sold or borrowed against so as to post a $2 million cash bond.

Whatever amount of security is required by the Court, it should be similar to bail arrangements in comparable charges.  Mrs. Liew was released on an appearance bond of $1 million secured by a $100,000 cash deposit.  Minute Order (Dkt. 3).  In a recent case of alleged economic espionage in the Northern District of Illinois, a Motorola employee (Hanjuan Jin) was released on bail, even though she had been *arrested at the airport with a one-way ticket to China* and the prosecutors had characterized her as "better than James Bond" in stealing over 1,000 Motorola documents. Gasner Decl. Exh. R.

*United States v. Khashoggi*, 717 F. Supp. 1048 (S.D.N.Y. 1989)—deemed persuasive by the Court in the February 2012 hearing—makes clear that the bond offered by Mr. Liew is beyond sufficient.  As the Court will recall, Mr. Khashoggi was an "enormously wealthy" Saudi Arabian businessman who "possesse[d] the means to procure staggering amounts of cash in fewer than 24 hours." *Id.* at 1049-50.  He was charged with assisting former Philippine President Ferdinand Marcos and his wife Imelda Marcos "in concealing the true ownership of property and other assets." *Id.* at 1049.  The court ordered Khashoggi released despite: (1) his enormous wealth; (2) charges of financial dishonesty; (3) limited ties to the United States, including a wife who lived abroad and not having visited the country in three years; and (4) the fact that after the charges against him were filed, he did not voluntarily submit to the jurisdiction of the Court, but remained abroad as a fugitive for six months until he was arrested in Switzerland and extradited to the United States.  The court found it reasonable to require Mr. Khashoggi to post a bond of $10 million—only a fraction of the defendant's staggering wealth. *Id*. at 1052.

In *United States v. Motamedi*, a case where the Iranian-citizen defendant was charged with conspiracy to violate the Arms Export Control Act by acting as a *de facto* purchasing agent for

20

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

the Iranian government, bail was set at $750,000 (secured by the parents' residence). 767 F.2d 1403, 1404 (9th Cir. 1985). In seeking pretrial detention, the Government alleged that the defendant maintained a series of large bank accounts in foreign countries funded predominantly by the Iranian government, that he could return to Iran "with impunity," and that he disregarded federal agents' warnings that his export activities were illegal. *Id.* The magistrate ordered Motamedi's detention and the district court affirmed the order. *Id.* at 1404-05. The Ninth Circuit reversed the detention order, reasoning that the magistrate had placed too much weight on the severity of the allegations against the defendant. *Id.* at 1408. The magistrate's findings concerning Motamedi's foreign accounts, his role as agent for the Iranian government, and his ability to flee to Iran were "drawn primarily from allegations contained in the indictment," and thus an insufficient basis for detention. *Id.*

Here, Mr. Liew offers either the Singapore residence or a $2 million cash bond, which includes the proceeds of the sale of his wife's family home in Singapore. This $2 million constitutes a significant portion of the money the Government alleges Mr. Liew received to operate his business—none of which the Government has *actually prove*n is still in Mr. Liew's possession. As in *Motamedi*, the Government cannot rely on speculation regarding Mr. Liew's foreign assets as a basis for detention, and cannot argue that no amount of bail is reasonable. And, even if *none* of the $24 million allegedly received by Mr. Liew to execute his contracts was actually spent on rent, equipment purchases and employee salaries, the proffered bail *still* would be sufficient. The $2 million proffered by Mr. Liew is far more significant, relative to the $24 million alleged by the Government, than the $10 million dollars posted by Mr. Khashoggi, and it unquestionably is sufficient to secure his future appearance at trial.[26]

Moreover, the defense is proposing a variety of other conditions, including surveillance by a private security guard at defendant's expense, that are sufficient to mitigate any risk of flight. The case law is full of creative means for reducing the risk of flight, and the defense is open to

---

[26]Mr. Liew does not offer the relatively smaller amounts of money pledged by various sureties at the last bail hearing because the Court found that proposal to be inadequate. Order (Dkt. 74) at 1 and 4. However, should the Court consider those sureties significant, Mr. Liew will contact them and request that they re-pledge the previously-pledged amounts.

1   any and all that would allow the Court and Pretrial Services to reach an appropriate level of

2   comfort.

3           **E.**      **The law requires bail with the highly restrictive conditions suggested above.**

4          Justice Frankfurter put it well: "The practice of admission to bail, as it has evolved in

5   Anglo-American law, is not a device for keeping persons in jail upon mere accusation until it is

6   found convenient to give them a trial.  On the contrary, the spirit of the procedure is to enable

7   them to stay out of jail until a trial has found them guilty." *Stack v. Boyle*, 342 U.S. 1, 7-8 (1951)

8   (separate opinion of Frankfurter, J.).  To that end, the Bail Reform Act makes clear that bail must

9   be ordered under the circumstances present here.

10         *First*, as the Court is well aware, federal law has traditionally "provided that a person

11   arrested for a noncapital offense *shall be admitted to bail*." *Motamedi,* 767 F.2d at 1405 (citing

12   *Stack*, 342 U.S. at 4) (emphasis added). Bail should only be denied "in rare circumstances,"

13   *Sellers v. United States*, 89 S.Ct. 36, 38 (1968), and doubts regarding the propriety of release

14   should be resolved in favor of the defendant.  *See Herzog v. United States*, 75 S.Ct. 349, 351.

15         *Second*, and as the Court is also plainly aware, it is the Government's burden to show

16   facts indicative of flight risk by a "clear preponderance" of the evidence.  The Government

17   should not be permitted to rely on speculation, innuendo, or the presentation of just enough facts

18   to raise suspicion, but not present the full picture.

19         *Third*, and most importantly here, the Government must demonstrate that no condition or

20   combination of conditions will reasonably assure the defendant's appearance at future court dates.

21   18 U.S.C. § 3142(e); *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008).  "The Act does

22   not require that the risk [of flight or danger] be zero." *Madoff,* 586 F. Supp. 2d at 249.  Indeed,

23   "[a]dmission to bail always involves a risk that the accused will take flight.  That is a calculated

24   risk which the law takes as the price of our system of justice." *Stack*, 342 U.S. at 8.  Accordingly,

25   even if the Government succeeds in meeting § 3142(f)(2)'s standards for demonstrating danger to

26   the community or risk of flight, the court should grant bail if any condition or combination of

27   conditions will "reasonably assure" the mitigation of such risks.  18 U.S.C. § 3142(e); *see also*

28   *Chen*, 820 F. Supp. at 1208 ("Section 3142 does not seek ironclad guarantees, and the

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

1    requirement that the conditions of release 'reasonably assure' a defendant's appearance cannot be

2    read to require guarantees against flight.").

3           Under the conditions proposed herein, the risk of flight can and should be reduced to

4    bounds acceptable to the Court and Pretrial Services.  The Government cannot demonstrate that

5    there is no combination of conditions that would be sufficient to "reasonably assure" the

6    defendant's presence at trial, especially where continued detention would, as here, violate the

7    defendant's constitutional rights.  *See* Part II-B, *supra*.

8    **III.    CONCLUSION**

9           For the foregoing reasons, the Court should GRANT Mr. Liew's renewed motion, should

10   REVOKE the detention order, and should GRANT Mr. Liew's pretrial release, subject to the

11   conditions outlined herein or such other conditions as deemed suitable by the Court or Pretrial

12   Services.

13   Dated:  November 20, 2012                     KEKER & VAN NEST LLP

14

15                                        By:   */s/ Stuart L. Gasner*
                                               STUART L. GASNER
16                                             SIMONA A. AGNOLUCCI

17                                             Attorneys for Defendants WALTER LIEW and
                                               USA PERFORMANCE TECHNOLOGY, INC.

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ...................................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................................1

I.      INTRODUCTION ...............................................................................................................1

II.     ARGUMENT .......................................................................................................................2

     A.      Newly provided discovery underscores Mr. Liew's incentive to stay and
        defend what is essentially a *civil* trade secret case based on old technology
        in a crowded field....................................................................................................2

     B.      It is now apparent that trial remains a long way off, and preparing for trial
        will be nearly impossible while Mr. Liew remains incarcerated. ............................7

     C.      Traditional bail considerations favor Mr. Liew's release under the proposed
        conditions. ...............................................................................................................13

         1.      Mr. Liew's behavior prior to his arrest confirms his intention not to
            flee...............................................................................................................13

         2.      Mr. Liew's behavior while detained augurs in favor of release. ...............15

         3.      Mr. Liew has strong local ties, especially his relationship to his
            American-born eleven-year-old son Michael. ..........................................15

         4.      Mr. Liew's past foreign travel, connections and transactions do not
            bear on his present ability to flee, or the likelihood that he would
            attempt to do so. .........................................................................................16

         5.      Mr. Liew's "credibility" is not the issue in assessing the need for
            detention....................................................................................................18

     D.      The Court should order an appropriate amount of security, commensurate
        with other comparable cases, together with other restrictive conditions. ..............19

     E.      The law requires bail with the highly restrictive conditions suggested
        above........................................................................................................................22

III.    CONCLUSION...................................................................................................................23

i

NOTICE OF MOTION AND RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE
Case No. CR 11-0573-JSW (NC)

710757.02

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Chicago Lock Co. v. Fanberg*
    676 F.2d 400 (9th Cir. 1982) ................................................... 4

*Herzog v. United States*
    75 S.Ct. 349 ................................................................ 22

*Kewanee Oil Co. v. Bicron Corp.*
    416 U.S. 470 (1974) ........................................................ 4

*Sellers v. United States*
    89 S.Ct. 36 (1968) ......................................................... 22

*Stack v. Boyle*
    342 U.S. 1 (1951)(separate opinion of Frankfurter, J.) ................... 22

*Stutz Motor Car of America, Inc. v. Reebok Int'l, Ltd.*
    909 F. Supp. 1353 (C.D. Cal. 1995) .................................... 4, 5

*United States v. Ailemen*
    165 F.R.D. 571 (N.D. Cal. 1996) ............................... 8, 9, 13, 14

*United States v. Chen*
    820 F. Supp. 1205 (N.D. Cal. 1992) .................................. 7, 22

*United States v. Gelfuso*
    838 F.2d 358 (9th Cir. 1988) ............................................. 8

*United States v. Gonzales Claudio*
    806 F.2d 334 (2d Cir. 1986) ............................................. 9

*United States v. Hir*
    517 F.3d 1081 (9th Cir. 2008) .......................................... 22

*United States v. Khashoggi*
    717 F. Supp. 1048 (S.D.N.Y. 1989) ..................................... 20

*United States v. Madoff*
    586 F. Supp. 2d 240 (S.D.N.Y. 2009) ............................... 18, 22

*United States v. Motamedi*
    767 F.2d 1403 (9th Cir. 1985) ....................................... 20, 21

*United States v. Sabhnani*
    493 F.3d 63 (2d Cir. 2007) ............................................. 14

*United States v. Sanchez*
    2011 WL 744666 (C.D. Cal. Feb. 23, 2011) .............................. 14

ii

710757.02

**State Cases**

*Aetna Bldg. Maintenance Co. v. West*
   39 Cal. 2d 198 (1952) ................................................................................. 4

*E.I. Du Pont De Nemours and Company v. USA Performance Technology, Inc., et al.*
   CV Case No. 3:11- cv-01665-JSW (N.D.C.A.) ..................................... 14

*Whyte v. Schlage Lock Co.*
   101 Cal. App. 4th 1443 (2002) ................................................................ 4

**Federal Statutes**

18 U.S.C. § 3142(e) ....................................................................................... 22

**Other Authorities**

Barksdale, Jelks, TITANIUM: ITS OCCURRENCE, CHEMISTRY, AND TECHNOLOGY AT 309-40
   (The Ronald Press Company 1949) ........................................................ 5

European Commission, *Integrated Pollution Prevention and Control Reference Document
   on Best Available Techniques for the Manufacture of Large Volume Inorganic
   Chemicals - Solids and Others* (August 2007) ...................................... 5

iii

710757.02