MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

JOHN H. HEMANN (CABN 165823)
PETER B. AXELROD (CABN 190843)
Assistant United States Attorneys

  450 Golden Gate Ave., Box 36055
  San Francisco, California 94102
  Telephone: (415) 436-7200
  Fax: (415) 436-7234
  E-Mail:   john.hemann@usdoj.gov
            peter.axelrod@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 11-0573 JSW (NC) |
| Plaintiff, | OPPOSITION TO DEFENDANT WALTER LIEW'S THIRD MOTION FOR PRETRIAL RELEASE |
| v. | |
| WALTER LIEW, | Date: December 21, 2012<br>Time: 11:00 am |
| Defendant. | Courtroom A |

**INTRODUCTION**

The Court should deny Walter Liew bail for two reasons that bear directly on his risk of flight: (1) he is a fundamentally dishonest person who has proven, time and again, that he cannot be trusted; and (2) he has never accounted for the millions of dollars that he moved offshore. Those factors make him unsuitable for release under any set of conditions, and his most recent motion only reinforces that conclusion. Moreover, Liew's claim that his continued detention amounts to a due process violation is wholly without merit. The Court should also reject the conditions of release proposed by Liew – in addition to being inadequate, they serve to underscore the unanswered questions about his

finances and raise new ones. Finally, Liew's habitual dishonesty renders inapposite the cases he cites in support of his release.

At every turn in this prosecution, Liew has engaged in a pattern of dishonest conduct. When DuPont initiated a civil action, Liew responded by obstructing justice and tampering with witnesses, which culminated in an effort to prevent the FBI from collecting information relevant to its criminal investigation. In the last round of detention proceedings, he misled the Court – he stated in a declaration that he has not had regular contact with his in-laws but then failed to explain how it came to be that he controlled a bank account in his father-in-law's name in China that received hundreds of thousands of dollars from another account Liew himself controlled in Singapore. *See* Declaration of Walter Liew, Clerk's Record (CR) 48-7 at ¶ 37; United States' Opposition to Motion for Pretrial Release, CR 59 at 11-14.

In his most recent filing, Liew has called into question statements he previously made *under oath* in United States bankruptcy court. Liew argues that he is motivated to stay and fight the criminal charges because the discovery shows the "vast amount of development work" his companies have engaged in. Defendant's Renewed Motion for Pretrial Release (Def. Mot.), CR 198 at 6. Nonsense. That assertion is directly contradicted by statements he made to the bankruptcy court in 2009, including in a filing, in which he stated that his company owned no intellectual property, and at a hearing, in which he said his company, described as five people working on their own laptops, provided "engineering support services" and did not do much design work. Declaration of FBI Special Agent Cecily Rometo, Ex. 3 (Transcript of February 4, 2009 bankruptcy court proceeding) at 3-5. Regardless of whether he lied to the bankruptcy court then or this Court now, Liew has again proven himself to be inherently untrustworthy.

Second, although the Court previously identified his failure to account for the transfer of millions of dollars abroad in denying bail, Liew has never explained what happened to those funds and whether they are available to him now. Order Denying Motion for Pretrial Release, CR 74 at 4. As set forth below, Liew's companies received

almost $28,000,000 from Chinese TiO2 customers and subsequently moved approximately $22,500,000 from the United States to six shell companies in Singapore. Rometo Decl., Ex. 4, 5. From an account he controlled for one of those companies in Singapore, Liew sent $2,360,000 to the account in China in his father-in-law's name that he also controlled. Concern about the ultimate disposition and control of the funds that Liew sent abroad are particularly heightened here where his finances remain a mystery and he is now offering to shoulder the expense of 24/7 private security. It raises questions – where did the overseas money go? who currently controls it? why is he concealing the disposition of those funds? and, in light of his prior financial disclosures to Pretrial Services, where would the money now come from to pay for a security guard?

In its last order denying bail, the Court found that "the government has presented compelling evidence that Mr. Liew is a serious flight risk." Order Denying Release, CR 74 at 4. This pending motion only raises more questions about Liew and reinforces the flight risk concerns identified in the Court's prior order.[1] The Court should deny the motion.

**WALTER LIEW'S CONDUCT ESTABLISHES THAT HE IS A FLIGHT RISK AND CANNOT BE RELEASED ON ANY SET OF CONDITIONS**

**I.     Liew Is Fundamentally Dishonest And Remains a Substantial Flight Risk**

Although Liew suggests that his pre- and post-arrest behavior support his release, nothing could be further from the truth. As soon as DuPont initiated civil litigation, Liew engaged in a pattern of conduct designed to obstruct justice – he conspired with co-defendant Robert Maegerle to file a materially false answer to DuPont's civil suit (*see* Superseding Indictment, Count Ten), he threatened a former USAPTI employee by telling him it would not be good for the employee or his family to disclose the work of two former DuPont employees on behalf of USAPTI (Count Eleven), and when the FBI came

---

[1] It is worth mentioning at the outset that current motion is predicated on an expanded set of charges contained in the superseding indictment filed on February 7, 2012. CR 64; *see also* Order Denying Release, CR 74, at 3 n.2.

U.S. OPP. TO THIRD BAIL MOT.
CR 11-573 JSW (NC)                              3

to execute a search warrant at his residence, he directed Christina Liew to deny knowing anything about the safe deposit box keys they had recovered (Counts Thirteen and Fourteen). Of course, Liew had good reason to try to stymie the investigation – in a closet in his house and in the safe deposit box, the FBI found DuPont drawings with the DuPont logo and confidentiality markings. *See* Superseding Indictment, CR 64, at ¶¶ 14(b) and (d), 48, 49. If, as he now claims, Liew just wanted to defend himself in a run-of-the-mill civil dispute, why would he engage in all of that obstructive conduct, and why would he have those DuPont documents in his possession.

Liew's lack of trustworthiness was on display in his last bail motion. There, he filed a declaration stating that he did not have "regular contact" with his father-in-law, Qiao Hua. Liew Decl., CR 48-7 at ¶ 37. Yet, he never explained the disconnect between that statement and the fact – laid out in great detail in the government's opposition to that motion (CR 59 at 11-14) – that he operated an HSBC bank account in Qiao Hua's name in China (Hong Kong) that received a $750,000 deposit on May 29, 2008 from an account he controlled in Singapore on behalf of Huadong Equipment Solutions, a Singaporean company he owned. *See* Rometo Decl. in Support of Opposition to Prior Bail Motion, CR 59-1, Ex. 16-17. As set forth below, Liew transferred another $1,610,000 from the Huadong account to the same Qiao Hua HSBC account in Hong Kong that he controlled. Rometo Decl., Ex. 6, 15.

In the last bail motion, Liew admitted that sometimes he lies. He claimed that two documents were "not accurate or reliable" and cataloged nine "erroneous statements" in them. *See* Liew Decl., CR 48-7 at ¶ 36. In other words, when it suits him, he is willing to change his story.

In this motion, Liew has crossed the rubicon. He has now staked out a position – that the trade secret violations are defensible based on his own independent design work – that is completely at odds with his representations to the bankruptcy court in 2009. When he sought bankruptcy protection, he filed a petition in which he affirmatively represented that he owned no intellectual property. *See* Rometo Decl., Ex. 1 (file-stamped petition

U.S. OPP. TO THIRD BAIL MOT.
CR 11-573 JSW (NC)                                              4

with electronic signatures), Ex. 2 (petition with Liew's signature recovered from his residence). Liew executed three separate affirmations in the petition, each one under penalty of perjury, that the information contained therein was true and correct. Rometo Decl., Ex. 1 at 3, 16, 22. Shortly after that filing, he appeared in bankruptcy court, was placed under oath, and again affirmed the accuracy of the petition. Rometo Decl., Ex. 3 at 2-3. Liew explained to the bankruptcy trustee what his company did – it was a company that at its peak consisted of 5 employees mostly working on their own laptops providing engineering support services, which he described as calculating equipment specifications based on information provided by design engineers. *Id*. at 4-5. According to Liew, the company "just [did] some calculation" and "not much" design work. *Id*.

At the time Liew made those statements, he had been working for years with his co-conspirators to pass DuPont TiO2 information on to his Chinese customers, he had already entered into a multimillion dollar contract with a Chinese customer for the design of a 30,000 MTPY plant, bid for another 100,000 MTPY plant, and received millions of dollars in payments from those companies. *See* Superseding Indictment, CR 64, at ¶¶ 20 (execution of $6,180,000 contract in 2005), 24 (providing proprietary DuPont photos to Chinese customer), 33 (1998 facsimile from Maegerle with DuPont trade secret information); 42 (Maegerle emailing Liew DuPont trade secret information); *see also* Rometo Decl., Ex. 4 (summary of transfers into Performance Group/USAPTI).

Under the best case scenario for his defense of *this* prosecution, Liew lied under oath to the bankruptcy court when he stated that he owned no intellectual property and did no design work. If, however, he was telling the truth then, he is in great jeopardy now, which would give him a powerful incentive to flee. Either way, he cannot be trusted.

In addition, Liew made other affirmatively false statements regarding his finances to the bankruptcy court. For example, he failed to disclose Performance Group's receipt of $772,540 in 2007 and $4,619,906 in 2008, despite an obligation to disclose "the gross amounts received" in those years. *Compare* Rometo Decl., Ex.1 (bankruptcy petition) at 17, no. 1 ("Income from employment or operation of business") *with* Ex. 4. Curiously, on

February 4, 2009, Liew told the bankruptcy trustee that Performance Group stopped operating in early November 2008 because, among other things, it had "lost business," "didn't have any new contract and ran out of cash." Rometo Decl., Ex. 3 at 3, 5. Yet, on October 22, 2008, just a few days before Performance Group stopped operating because, according to Liew, it was out of money, Performance Group had received $1,359,980 from Jinzhou. Similarly, on February 26, 2009, a few weeks after Liew made those statements to the bankruptcy court, Performance Group received $499,975 from Jinzhou. Liew also concealed from the bankruptcy court that he had a on-going $6,180,000 contract with Jinzhou despite an obligation to do so. *Compare* Rometo Decl., Ex. 1 at 7 (listing no accounts receivable), 14 (identifying no executory contracts) with Rometo Decl., Ex. 4 (summary of transfers to Performance Group/USAPTI). Liew's actions demonstrate that he is not constrained by the truth and will lie when it suits his interests. Right now, that interest is to obtain his release.

**II.     Liew's Unwillingness to Explain His Transfers of Millions to Singapore and China Demonstrates that he Remains a Flight Risk**

Liew's failure to explain what happened to the millions of dollars that he transferred overseas raises another red flag about his requested release.

According to records reviewed by the FBI, between January 1, 2006 and July 7, 2011, two companies controlled by Walter Liew and Christina Liew – Performance Group and USAPTI – received $27,985,402 from Chinese TiO2 customers. Rometo Decl., Ex. 4. Between July 31, 2006 and July 14, 2011, Liew directed the transfer of $22,537,452 from Performance Group/USAPTI to six companies in Singapore: Lawrence Process Engineers (Lawrence), Huadong Equipment Solutions (Huadong), ESI Equipment (ESI), Huan Qu Process Equipment (Huan Qu); Dongbei Process (Dongbei); and LHV Equipment. Rometo Decl., Ex. 5. Three of the Singapore companies (Huadong, Dongbei, and ESI) subsequently transferred $3,854,000 to bank accounts in China in the names of Christina Liew's father (Qiao Hua) and one of her brothers (Qiao Ning). Rometo Decl., Ex. 6 (summary of transfers to China), 15 (records for Qiao Hua

transfers), 16 (records for Qiao Ning transfers).

According to information obtained in the course of this investigation, including publically available information obtained from the Accounting and Corporate Regulatory Authority (ACRA) in Singapore, each of those six companies is directly linked to Walter Liew and Christina Liew. For example, each of the companies is owned by Walter Liew (Huadong), Christina Liew (Lawrence), or a family member. Christina Liew's brother Qiao Mu (a Chinese national) owns ESI, and Christina Liew's sister-in-law Li Rue (a Chinese national) is the owner of Huan Qu, Dongbei, and LHV. Walter Liew's nieces – Shirley Chin and Elaine Chin – reside in Singapore and serve as directors of five of the companies. Those relationships are summarized below and in a summary chart. Rometo Decl., Ex. 8. ACRA reports for those companies are also included as exhibits. Rometo Decl., Ex. 9-14.

**1.    Lawrence Process Engineers**. Christina Liew is listed as the sole shareholder and Elaine Chin is listed as a director. Lawrence received $1,608,888 in wire transfers from Performance Group.

**2.    Huadong Equipment Solutions.** Walter Liew is listed as the sole shareholder and Shirley Chin is listed as a director. Huadong received $5,814,464 from Performance Group. As set forth above, Liew controlled Huadong's bank account at DBS Bank in Singapore and directed the transfer $2,360,000 from that account to Qiao Hua's HSBC account in Hong Kong.

**3.    Huan Qu Process Equipment.** Chinese national Li Rue is listed as the sole shareholder and Elaine Chin is listed as a director. Huan Qu received $3,530,000 from USAPTI.

**4.    Dongbei Process.** Chinese national Li Rue is listed as the sole shareholder and Elaine Chin is listed as a director. Dongbei received $3,645,138 from Performance Group and USAPTI. $702,000 was transferred from a Dongbei account in Singapore to an account at the Bank of China (Hong Kong) in the name of Christina Liew's brother, Qiao Ning.

**5.    ESI Equipment.** Chinese national Qiao Mu is listed as the sole shareholder. ESI received $6,160,184 from Performance Group and USAPTI. $792,000 was transferred from an ESI account in Singapore to an account at the Bank of China (Hong Kong) in the name of Christina Liew's brother, Qiao Ning.

**6.    LHV Equipment.** Chinese national Li Rue is listed as the sole shareholder and Elaine Chin is listed as a director. LHV was registered roughly a month after DuPont filed its civil action and it received $1,778,777 from USAPTI just days before the FBI executed search warrants on the Liew's residence and office.

Moreover, as set forth in the United States' opposition to the prior bail motion, there is evidence that the Liews brought money back from the PRC as needed, including transactions involving Qiao Ning's account at the Bank of China in Hong Kong. In January 2010, Qiao Ning's Bank Of China account received $1,494,000 in two separate transfers – one from Dongbei for $702,000 and one from ESI for $792,000. Rometo Decl., Ex. 6, 16. Then, on April 1, 2011, there was a $373,980 transfer from Qiao Ning's account at the Bank of China to an account at East West Bank in Oakland in name of a Pangang Jinzhou engineer for which Christina Liew signed documents as the "attorney-in-fact." Prior Opp., CR 59 at 13. Over the next four months, Christina Liew signed checks withdrawing approximately $242,000 from the Jinzhou employee's account, payable to Walter Liew and bearing the notation "personal loan." *Id*. Additionally, FBI agents located in Christina Liew's safe deposit box a Bank of China deposit slip, dated November 29, 2010, for a transfer deposit of SGD$3,956,036.26 into Christina Liew's Bank of China account from Qiao Ning's Bank of China account.

The lack of transparency regarding these transactions underscores the danger that Liew has tens of millions of dollars offshore that would be available to him to facilitate his flight and provide for his family's future needs. At least until Liew is able to provide sufficient information for the Court to be able to understand his financial circumstances, he should be detained. *United States v. Khashoggi*, 717 F.Supp. 1048, 1050 (S.D.N.Y. 1989) (detention required until the court had "adequate information about the defendant's

resources" to consider appropriateness of bail).

### III. Liew's Continued Detention Does Not Violate Due Process

Liew makes the argument that his continued detention would amount to a due process violation and relies on one case, *United States v. Aileman*, in which the court found such a violation. This case differs from *Aileman* in numerous material respects and, considering the relevant factors, does not present a circumstance in which Liew's due process rights are in jeopardy.

"[T]he due process limit on the length of pretrial detention requires assessment on a case-by-case basis." *United States v. Gelfuso*, 838 F.2d 358, 359 (9th Cir. 1988). The court is to consider in making that assessment "the length of confinement in conjunction with the extent to which the prosecution bears responsibility for the delay that has ensued." *Id*.

#### A. Delay

The length of Liew's detention is the result of one thing and one thing only: his dishonesty. A brief review of the history of this case demonstrates that Liew is responsible for not only his detention, but for the delay in getting to the point we are at now.

Liew was charged, arrested, and detained in August 2011 because he had attempted to obstruct the government's investigation (after similarly attempting to obstruct the civil proceeding). The charged obstruction was not "peripheral" in any way; it related directly to his effort to conceal his trade secret theft from DuPont and the FBI.

When Liew first sought release in August 2011, he claimed that he had no financial resources for bail and could not offer any sureties. This claim was fundamentally false, as revealed by his financial records, his current offer to post his Singapore apartment, and his suggestion that he pay for a round-the-clock security guard.

After several months, in early 2012, Liew moved to be released from custody. This time, he offered sureties who would pledge approximately $150,000 to secure his release. He offered no money or property himself, including the Singapore property or

any of the other assets to which he obviously has access.  He filed a declaration in support of his motion in which he attempted to mislead the Court regarding his financial circumstances.

Liew then terminated his legal counsel (for the second time since he was originally charged) and spent approximately two months selecting new counsel.

After being charged in the superseding indictment and hiring new counsel, counsel objected to the protective order proposed by the government and litigation ensued, causing further delay.  The court ultimately issued the protective order that had been originally proposed by the Government with minor modifications.

In July 2012, immediately after the protective order was issued, the United States began producing discovery.  The discovery relevant to the trade secret case consists largely of documents seized from Liew's home and office.  For five months, defendant did not complain to the court about the pace of discovery.  At this time, discovery is effectively complete and Liew's primary complaint is that the United States has produced too much.

Now, Liew comes to court again seeking release.  He claims his constant presence in counsel's office to review the discovery is necessary so that he can identify the evidence of "hard work and independent development" and "reverse engineering" to which he refers in his brief. Def's Mot. at 4.  However, Liew has again failed to inform the Court of a key relevant fact: He swore under penalty of perjury to the bankruptcy court that he did not have any intellectual property and that his small firm did not do design work, but only performed mathematical calculations.  Witness Liew's extraordinary dishonesty, at work again.

Liew's claim that the United States is responsible for the delay and detention is without merit.  He has only himself to blame.

**B.     Length of Confinement**

The length of confinement is the other prong of the due process analysis.  Liew takes the position that there is "no end in sight" and he cannot be detained indefinitely.

U.S. OPP. TO THIRD BAIL MOT.
CR 11-573 JSW (NC)                                10

1  This contention, too, is without merit.

2  Discovery is essentially complete, as the Court learned during the hearing on
3  December 12, 2012.

4  Review of the discovery is not the herculean task Liew makes it out to be.  A
5  majority of the information that has been produced to the defendants is information seized
6  from their residences and offices – not new information seized from third parties.  A
7  significant amount of the remaining discovery consists of records seized from Pan
8  America, Inc., which have nothing to do with the trade secret charges.  The emails, which
9  are in electronic form, can be searched.  A small amount of the discovery originated with
10 the Pangang Group employees whose motel rooms were searched while they were in the
11 United States in July 2011.  The relevant information from the bank records has been
12 summarized in the exhibits attached to the Rometo Declaration.

13 The superseding indictment identifies, with a great deal of particularity, the
14 specific trade secrets alleged to have been misappropriated.  If, in fact, Liew developed
15 this technology on his own, it should be a fairly simple matter to point his counsel to the
16 places in his business records that show this development.  He should have no need to
17 search voluminous records for evidence of independent development, hard work, or
18 reverse engineering.  He should be able to identify the USAPTI and Performance Group
19 employees who developed and engineered this technology; the USAPTI files and
20 documents belonging to those employees, if they exist, should show the development
21 work defendant claims he needs to look for.

22 Of course, as he admitted to the bankruptcy court, Liew possessed no intellectual
23 property of his own and his employees were not developing technology – they were
24 copying it and performing mathematical equations to size stolen technology to the
25 Chinese factories they were helping build.  The Court should not simply accept without
26 question Liew's representations regarding the amount of work he must do before a trial
27 date is set.  The allegations in the superseding indictment are clear and Liew either has or
28 does not have evidence that he and his company developed the trade secrets identified in

the indictment. No amount of work is going to uncover evidence that is not there. A trial date could be set within the next few months.

The United States does intend to seek a superseding indictment. Government counsel has identified the nature of the anticipated charges to the defense and already has provided to the defense bank records that relate to those types of charges. Notably, the financial charges the Government continues to investigate and will seek to charge involve precisely the shenanigans that are implicated by defendant's repeated requests for bail – specifically, his laundering of profits from sales of trade secrets to the Pangang Group in Singapore shell companies and the subsequent repatriation of that money to bank accounts in China. A minimal amount of additional discovery will be required. Given defense counsel's familiarity with the subject matter, the superseding indictment will not materially extend the time necessary to get this case to trial.

### C. Other Factors

The cases suggest two other factors which might be relevant to the due process analysis. The first is the strength of the evidence regarding risk of flight, which is addressed elsewhere in this brief and in the United States' prior filings regarding detention. The second is the anticipated sentence Liew would receive if convicted.

The United States conservatively estimates that, if convicted after trial, defendant's offense level would be 36 and the corresponding guideline range would be 188-235 months. This calculation assumes a base offense level of six (USSG §2B1.1(a)(2)), an adjustment for amount of gain of 22 levels (USSG §2B1.1(b)(1)(L)), a two level adjustment for theft of trade secret for a foreign government (USSG §2B1.1(b)(5)), a four level enhancement for role in the offense (USSG §3B1.1(a)), and a two level enhancement for obstruction (USSG §3C1.1). Other adjustments and enhancements could be appropriate, including a larger adjustment for loss if the harm to DuPont is calculable. This is not, accordingly, a situation in which Liew's pretrial detention will exceed his prison term if convicted.

\\

**D.     Liew's Legal Authority**

Liew does not cite much in the way of legal authority for the proposition that he should be released on due process grounds. He appears to rely primarily on *Aileman*, which is distinguishable. In *Aileman*, the defendant had already been detained for twenty-six months "with no trial date in sight." 165 F.R.D. at 589. At the time of the detention hearing, the case was on appeal, and the district court did not even have jurisdiction. *Id*. Awaiting the parties after resolution of the appeals were evidentiary hearings on the defendant's challenge to two (and perhaps six) wiretap applications, which involved recorded telephone calls in obscure Nigerian dialects. *Id*. at 590. The court found that the non-speculative duration of the defendant's pretrial detention was "between thirty-five and thirty-eight months." *Id*. at 591. In this case, there is no reason that the trial could not take place in the middle of 2013, which would result in a total pretrial detention time of approximately 24 months.

*Aileman* also found that the government – the prosecution and the court – was responsible for the delay in three respects: "(1) the prosecution's failure to promptly turn over discovery that the defendants sought; (2) the time consumed by the judicial system in connection with securing reliable translations of the wiretapped conversations; and (3) the time consumed by the judicial system responding to the appeals of the trial court's double jeopardy rulings." *Id*. at 591-92. Even assuming that the latter two respects are properly considered, the delay and detention in this case are entirely Liew's fault. Liew has obfuscated his finances and attempted to mislead the Court regarding his ability to post security. He has replaced his attorney twice since the beginning of the proceeding. He objected to the entry of the protective order that ultimately was adopted by the Court. The United States began producing discovery as soon as the protective order was issued in July 2012 and has effectively completed discovery at this time. The remaining discovery consists of the sort of clean-up items that exist in all large cases and typically are resolved in the weeks and months just prior to the submission of trial papers. The 16 months Liew has spent in pretrial detention are the result of his dishonesty, not any dilatory conduct on

1    the part of the United States.

2    **IV.     The Release Conditions Proposed by Liew are Unworkable and Inadequate**

Liew offers to post a home owned in his wife's name in Singapore or the proceeds from the sale of that home, which defendant estimates to be $2,000,000. The Court cannot accept this because the source of the funds used to pay for the home were the proceeds of the trade secret theft alleged in the superseding indictment. *See* 18 U.S.C. § 3142(g)(4).

Section 3142(g)(4) provides that the Court "shall" upon the Government's motion,

> conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and *shall decline to accept* the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g)(4) (emphasis added).

The evidence strongly suggests that the Singapore home was funded with proceeds from the Pangang Group that had been laundered through shell companies in Singapore. The United States intends to seek forfeiture of the home and, accordingly, it cannot be used to assure Liew's appearance.

If Liew wishes to attempt to establish the bona fides of the ownership of the home, independent of proceeds from the alleged sale of trade secrets, the United States moves the Court to conduct an inquiry, as required by § 3142(g)(4), to establish the source of the funds used to purchase the home.

Liew also offers to pay for a private security guard to monitor his activity 24/7. This proposal raises new questions about Liew's finances. If he has the resources to fund round-the-clock security coverage, then why didn't he suggest this at the time of his very first court appearance? Instead, at that time, he failed to identify any assets that could support that kind of expense.

**V.     Liew's Dishonesty Renders Inapposite the Cases He Cites in Support of Release**

Liew cites several cases of well-heeled defendants, accused of non-violent offenses, who were released on bail with the sort of restrictive conditions he suggests. He

U.S. OPP. TO THIRD BAIL MOT.
CR 11-573 JSW (NC)                           14

argues that if those defendants were appropriately released, given their greater wealth and stronger foreign connections, he certainly should be released.

Liew's pesky dishonesty again returns to haunt him. In none of the cases Liew cites is there any evidence that, once charged and arrested, the defendants obfuscated their financial condition. Indeed, it appears that the courts were fully apprised of the defendants' financial circumstances and were able to make an educated judgment regarding appropriate bail. In *United States v. Madoff*, 586 F. Supp. 2d 240, 244 (S.D.N.Y. 2009), defendant was interviewed by pretrial services, pretrial services recommend release, the government initially agreed, and defendant was released; there was no evidence that Madoff deceived the court regarding his financial condition.

In *United States v. Khashoggi*, 717 F.Supp. 1048 (S.D.N.Y. 1989), the defendant was an "enormously wealthy" individual with strong connections outside the United States. In determining that a $10 million bond was sufficient to guarantee his appearance, the district court considered his financial circumstances and made the following pertinent observation: "[t]he breadth of his wealth and its sources necessitated the defendant's incarceration until Pretrial Services could gather adequate information about the defendant's resources to render a meaningful recommendation on the appropriateness of bail." *Id*. at 1050. Here, the moment at which "adequate information regarding the defendant's resources" is available has not yet been reached. Not only have defendant's resources been a moving target – from none at the time of his arrest to enough at this time to post a $2,000,000 home in Singapore and pay for round-the-clock security – his true resources have been hidden from the Court. The Government has shown that defendant directed over $22,000,000 to Singapore shell companies between 2006 and 2011. Liew and his wife transferred at least some of that money to his wife's relatives, who have periodically sent money back to the Liews in the United States. The true picture of Liew's financial resources has not been provided to the Court and until they are, like Mr. Khashoggi, his detention is necessary.

argues that if those defendants were appropriately released, given their greater wealth and stronger foreign connections, he certainly should be released.

Liew's pesky dishonesty again returns to haunt him. In none of the cases Liew cites is there any evidence that, once charged and arrested, the defendants obfuscated their financial condition. Indeed, it appears that the courts were fully apprised of the defendants' financial circumstances and were able to make an educated judgment regarding appropriate bail. In *United States v. Madoff*, 586 F. Supp. 2d 240, 244 (S.D.N.Y. 2009), defendant was interviewed by pretrial services, pretrial services recommend release, the government initially agreed, and defendant was released; there was no evidence that Madoff deceived the court regarding his financial condition.

In *United States v. Khashoggi*, 717 F.Supp. 1048 (S.D.N.Y. 1989), the defendant was an "enormously wealthy" individual with strong connections outside the United States. In determining that a $10 million bond was sufficient to guarantee his appearance, the district court considered his financial circumstances and made the following pertinent observation: "[t]he breadth of his wealth and its sources necessitated the defendant's incarceration until Pretrial Services could gather adequate information about the defendant's resources to render a meaningful recommendation on the appropriateness of bail." *Id*. at 1050. Here, the moment at which "adequate information regarding the defendant's resources" is available has not yet been reached. Not only have defendant's resources been a moving target – from none at the time of his arrest to enough at this time to post a $2,000,000 home in Singapore and pay for round-the-clock security – his true resources have been hidden from the Court. The Government has shown that defendant directed over $22,000,000 to Singapore shell companies between 2006 and 2011. Liew and his wife transferred at least some of that money to his wife's relatives, who have periodically sent money back to the Liews in the United States. The true picture of Liew's financial resources has not been provided to the Court and until they are, like Mr. Khashoggi, his detention is necessary.

## CONCLUSION

Liew's motion for release from pre-trial detention should be denied.

DATED: December 12, 2012          Respectfully submitted,

MELINDA HAAG
United States Attorney


          /S/
_____
JOHN H. HEMANN
PETER B. AXELROD
Assistant United States Attorneys

U.S. OPP. TO THIRD BAIL MOT.
CR 11-573 JSW (NC)                     16