KEKER & VAN NEST LLP
STUART L. GASNER - #164675
sgasner@kvn.com
SIMONA A. AGNOLUCCI - #246943
sagnolucci@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Defendants WALTER LIEW and
USA PERFORMANCE TECHNOLOGY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>       v.<br><br>WALTER LIEW, CHRISTINA LIEW, USA PERFORMANCE TECHNOLOGY, INC., and ROBERT MAEGERLE,<br><br>             Defendants. | Case No. CR 11-0573-JSW (NC)<br><br>**REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW**<br><br>Date:      December 21, 2012<br>Time:     11:00 a.m.<br>Place:    Courtroom A, 15th Floor<br>Dept.:    Hon. Magistrate Judge<br>            Nathanael Cousins |

REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW
Case No. CR 11-0573-JSW (NC)

715999.02

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...............................................................................................................1

II. ARGUMENT .....................................................................................................................1

    A. The Government Does Not Meaningfully Contest That This Is Essentially A Residual Knowledge Civil Case Based On Old Technology In A Crowded Field. ........................................................................................................1

    B. The Government Cannot Blame Mr. Liew For Its Own Delays In Bringing This Case To Trial. ...........................................................................................2

    C. The Attacks On Mr. Liew's "Honesty" Are Unpersuasive And Irrelevant To Whether There Is A Serious Risk That He Will Flee. .........................................4

    D. The Government's Conclusory Assertion that Trial Preparation will be "Simple" Ignores the Nature of this Case. ..............................................................7

    E. The Conditions Proposed by Mr. Liew "Reasonably Assure" that he will not Flee. ....................................................................................................................8

        1. The Assertions that Mr. Liew Transferred Money Overseas Prove Nothing about his Actual Ability to Flee under the Proposed Conditions. ...................................................................................................9

        2. Mr. Liew Offers to Post Appropriate Security that will "Reasonably Assure" his Appearance at Trial. ..............................................................10

III. CONCLUSION................................................................................................................12

i
REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW
Case No. CR 11-0573-JSW (NC)

715999.02

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*United States v. Ailemen*
    165 F.R.D. 571 (N.D. Cal. 1996) ................................................................................................ 4

*United States v. Chen*
    820 F. Supp. 1205 (N.D. Cal. 1992) ........................................................................................... 2

*United States v. Gelfuso*
    838 F.2d 358 (9th Cir. 1988) ....................................................................................................... 4

*United States v. Gonzales Claudio*
    806 F.2d 334 (2d Cir. 1986) ........................................................................................................ 4

*United States v. Khashoggi*
    717 F. Supp. 1048, 1050 (S.D.N.Y. 1989) .................................................................................. 9

*United States v. Madoff*
    586 F. Supp. 2d 240 (S.D.N.Y. 2009) ............................................................................. 6, 7, 8, 10

*United States v. Motamedi*
    767 F.2d 1403 (9th Cir. 1985) .............................................................................................. 6, 10

**Federal Statutes**

18 U.S.C. §1831(a)(5) .................................................................................................................... 2

18 U.S.C. § 3142 ............................................................................................................................ 8

18 U.S.C. § 3142(f) ...................................................................................................................... 11

18 U.S.C. § 3142(g)(4) ................................................................................................................. 11

ii
REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW
Case No. CR 11-0573-JSW (NC)

715999.02

I. INTRODUCTION

Rather than address the gravamen of Mr. Liew's opening brief—that he has been detained without bail for 17 months in what is essentially a civil "residual knowledge" trade secret case, when conditions to assure his appearance at trial could plainly be crafted—the Government's Opposition engages in an unfair and misleading attack on Mr. Liew's "honesty," coupled with speculation as to the Liew family's finances. Neither approach has anything to do with risk of flight (the only basis for Mr. Liew's detention to date), nor does either argument persuasively establish that continued detention is the only way to assure Mr. Liew's presence at trial. The Government's further attempt to blame Mr. Liew for its lengthy delays in investigating and prosecuting this case is disingenuous, and underscores that his continued detention is a due process violation.

II. ARGUMENT

    A. **The Government Does Not Meaningfully Contest That This Is Essentially A Residual Knowledge Civil Case Based On Old Technology In A Crowded Field.**

Before addressing the two arguments that occupy most of the Government's Opposition, it is worth noting what the Opposition ignores. The Government fails to respond to Mr. Liew's argument that he has powerful defenses on the merits of this case, and that the weaknesses in the Government's allegations of trade secret theft weigh in favor of granting his release. Mr. Liew's opening brief pointed out, *inter alia*, that:

- While the indictment alleges that the *entirety* of the chloride route process for manufacturing titanium dioxide is a trade secret, the details of that process have been disclosed in thousands of public references, including patents issued to DuPont that expired decades ago. Opening Brief at 4:25-5:8;

- While the materials seized from Mr. Liew and his business total millions of pages of work, the Government has identified only a handful of confidential DuPont documents that are alleged to have been in Mr. Liew's possession. *Id*. at 3:6-8;

- Based on the (allegedly) highly confidential materials produced in discovery, the Government's accusations of trade secret misappropriation appear to have been spoon fed to them

1

REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW
Case No. CR 11-0573-JSW (NC)

715999.02

by biased DuPont engineers ignorant of trade secret law. *Id*. at 3:9-21;

- Based on the DuPont engineers' commentary, the core of the Government's "trade secret" case appears to be that consultants hired by Mr. Liew's company (some of whom were former DuPont engineers) drew sketches and did other work that contains features that resemble aspects of certain DuPont titanium dioxide plants, several of which long ago ceased operations. *Id*. at 7:1-9; and

- Any similarities between the work of Mr. Liew's consultants and features found in DuPont's old plants are non-actionable because based on previous public disclosures, independent development, proper reverse engineering, common knowledge in the field, Mr. Maegerle's or other consultants' residual knowledge, or are precluded by other defenses such as DuPont's failure to maintain confidentiality. *Id*. at 7:5-9.

It is troubling that in response to serious criticism of the merits of its trade secret case in the opening brief, the Government's Opposition says virtually nothing. Instead, it goes to the opposite extreme, taking Mr. Liew's guilt for granted (without citing any evidence and in contravention of the presumption of innocence), and even predicting a sentence in excess of the statutory maximum for economic espionage.[1] The weakness of the evidence against Mr. Liew is "an important factor favoring release." *United States v. Chen*, 820 F. Supp. 1205, 1207 (N.D. Cal. 1992), yet the Government's Opposition entirely fails to address it.

**B.     The Government Cannot Blame Mr. Liew For Its Own Delays In Bringing This Case To Trial.**

Equally evasive is the Government's response to the contention in Mr. Liew's opening brief that the length of time it has taken to prosecute this case to date, and the delays ahead in moving this case to trial, raise significant due process concerns. The Government's response—that Mr. Liew "has only himself to blame" for what likely will be *at least a two-and-a-half-year detention*, Opposition at 10:25—is, at best, based on faulty memory, and at worst, a disingenuous re-writing of history.

---

[1] 18 U.S.C. §1831(a)(5).

2
REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW
Case No. CR 11-0573-JSW (NC)

715999.02

Mr. Liew was arrested and detained in July 2011 based on limited charges of obstruction of justice arising out of circumstances around his civil lawsuit and the search of his home. *It took the Government over six months to bring its trade secret charges on February 7, 2012.* Plainly Mr. Liew had nothing to do with this period of delay. When Mr. Liew hired Keker & Van Nest in April 2012, the undersigned met promptly with the prosecution on May 1, 2012 to discuss obtaining discovery and filing a renewed motion for bail. The Government made a variety of commitments but then dragged its feet in fulfilling them, responding to defense requests for discovery or follow-up information with silence, further unkept promises, and even mockery. Declaration of Simona Agnolucci ("Agnolucci Decl.") at ¶¶6, 7, 10, 12-18 & Exhs. E, K-O, Q, T, V. The suggestion that Mr. Liew has somehow acquiesced to this state of affairs is untrue. So, too, is the suggestion that Mr. Liew's objections to the protective order were unfounded or a significant source of delay. Opposition at 10:6-10. Mr. Liew cannot be faulted for objecting to the over-reaching protective order proposed by DuPont and eventually rejected by the Court. Further, although the Government has been saying since at least April 2012 that it planned to bring a superseding indictment, it still has not done so and does not plan to seek such an indictment until after the first of the year … *another approximately 10 months of delay in bringing this case to trial that cannot fairly be attributed to Mr. Liew*. Finally, although service of the indictment on the Pangang defendants was quashed on July 23, 2012 (Dkt. 176), it has taken the Government until December 6, 2012 (Dkt. 210) even to claim that it has effected service, with more motions practice (and possibly an appeal) to follow. None of this is remotely Mr. Liew's fault.

Moreover, trial remains a distant prospect. After the filing of Mr. Liew's bail motion, the parties appeared for a status conference before Judge White, who advised that he intended to set a motions schedule and other pretrial deadlines at the next status conference on March 21, 2013. Dkt. 215. The feasibility of that plan depends, of course, on whether the Government will have sought and returned its planned Second Superseding Indictment, as well as completed discovery on all charges, by at least mid-February so that defendants have sufficient time to review the newly-produced materials and assess what motions need to be brought. Moreover, if the

3
REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW
Case No. CR 11-0573-JSW (NC)

715999.02

Government continues to insist that all defendants be tried together, a pretrial schedule cannot realistically be set until it is finally determined whether the Pangang defendants have been properly served and are subject to the Court's jurisdiction…posing novel questions that may require appellate review. Even in the best case scenario, this case is unlikely to go to trial earlier than late fall or early winter of 2013. By then, Mr. Liew will have been incarcerated for almost two and a half years—a length of time that "points strongly to a denial of due process." *United States v. Gonzales Claudio*, 806 F.2d 334, 341 (2d Cir. 1986); *see also United States v. Ailemen*, 165 F.R.D. 571, 577 (N.D. Cal. 1996) ("It is clear that long pretrial detentions, at least in some circumstances, can violate the Due Process Clause of the Fifth Amendment of the Constitution of the United States.").

The primary cause of the delays in getting this case to trial have been the Government's protracted investigation and its *seriatim* approach to charging. *See United States v. Gelfuso*, 838 F.2d 358, 359 (9th Cir. 1988) (in determining whether excessive detention rises to the level of a due process violation, courts must "consider the length of confinement in conjunction with the extent to which the prosecution bears responsibility for the delay that has ensued"); *see also Ailemen,* 165 F.R.D. at 591. The Government's attempt to pin the delay on Mr. Liew is so patently untrue as to call their good faith into question in even making this argument. *See* Agnolucci Decl. at ¶¶6, 7, 10, 12-18 & Exhs. E, K-O, Q, T, V. Under these circumstances, allowing Mr. Liew to remain incarcerated any longer rises to the level of a Constitutional violation.

    **C.**    **The Attacks On Mr. Liew's "Honesty" Are Unpersuasive And Irrelevant To Whether There Is A Serious Risk That He Will Flee.**

Unable or unwilling to address the reality that Mr. Liew—a United States citizen with no criminal record facing white collar charges to which he has strong defenses—has been incarcerated for a lengthy period of time with no end in sight, the Government resorts to name-calling, asserting (with remarkably thin evidence) that Mr. Liew is habitually dishonest. Opposition at 2:1. Examination of these supposed "lies" reveals no basis for denying bail to Mr. Liew.

One supposed "lie" is that Mr. Liew checked a column on a January 2009 bankruptcy petition stating that the bankrupt entity owned no "patents, copyrights, and other intellectual property." Rometo Decl. Exh. 1 at 8. In the Government's skewed logic, that representation is "completely at odds" with the position taken in the current bail motion "that the trade secret violations are defensible based on [Mr. Liew's] own independent design work." Opposition at 4:25-26. But that logic is utterly flawed. For starters, the Government misstates Mr. Liew's position. His defenses certainly include independent development, but also include many others, such as prior public disclosure (i.e., that DuPont's supposed secrets are not secrets at all but have been published or are otherwise common knowledge in the field); that certain design features were part of Mr. Maegerle's or other consultants' residual knowledge that they were entitled to use in practicing their professions in competition with DuPont; and that DuPont's failure to maintain a sufficient degree of confidentiality in practice precludes trade secret protection. Moreover, "independent development" merely means that Mr. Liew and his employees worked hard to create their own product rather than misappropriating DuPont's as the Government contends. It does not necessarily mean that the work generated patents or copyrights or any other intellectual property of value that would require disclosure in bankruptcy proceedings. In sum, the two statements—the January 2009 checkmark suggesting that a particular entity owned no patents, copyrights or other intellectual property at that time, and the more recent statement of Mr. Liew as to his defenses—are entirely consistent.

Another of the Government's alleged "lies" from the 2009 bankruptcy—Mr. Liew's statements in the bankruptcy hearing about what work his business entity Performance Group performed—falls equally flat. Contrary to the Government's innuendo, what Mr. Liew said is consistent with his positions in this case. Mr. Liew explained to the Court "we offer consulting. We offer engineering support services." Rometo Decl. Exh. 3 at 3:19-20. He said Performance Group did not do "much" design work, explaining that his employees instead *collaborated with outside consultants*. *Id*. at 4:4-14. When asked, for the purposes of assessing the value of office equipment such as computers, how many employees he had, Mr. Liew said he had about five people working *in the office*. *Id.* at 5:5-6. Moreover, these statements were made in February

5

REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW
Case No. CR 11-0573-JSW (NC)

715999.02

2009, at a time when Performance Group had been working on the 30,000 ton per year titanium dioxide project in Jinzhou, a project that is not charged in the indictment and that involved an *already-designed* plant. On that project, Mr. Liew worked with a small team of in-house engineers aided by outside consultants to improve upon Jinzhou's existing engineering design. On the Pangang project, in contrast, Mr. Liew had a larger team employed by a different entity (USA Performance Technology, Inc., the defendant in this case), and that team did more design work on a larger project to be built from scratch, also with the assistance of outside consultants. The Government's attempts to characterize Mr. Liew's statements in bankruptcy court as inconsistent with those in the bail motion ignore the fact that the two discuss different projects performed at different times by different companies.

Nor has the Government shown any falsity in Mr. Liew's statement in January 2012 that he did not have "regular contact" with his father-in-law. Opposition at 4:9-10. The fact that Mr. Liew allegedly was a signatory on a bank account in the name of his father-in-law, and that he allegedly made transfers to that account in 2008—*over three years earlier*—hardly demonstrates that Mr. Liew and his father-in-law had "regular contact" so as to render his statement false.

The remaining allegations that Mr. Liew "lied" are based on either (1) unproven obstruction of justice charges of which he currently is presumed innocent (Opposition at 3-4); (2) alleged financial misrepresentations to the bankruptcy court that have not been charged (Opposition at 5); or (3) statements taken out of context. The unproven financial allegations rest on a very thin reed: they are supported by either (1) a "summary of transfers" prepared by the Government with no evidentiary support or (2) no citation to evidence whatsoever. Those charges (if and when brought) will be addressed at trial but should not be the basis for denying bail. *Cf. United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (magistrate's findings concerning Motamedi's foreign accounts were "drawn primarily from allegations contained in the indictment" and therefore an insufficient basis for detention).

The Government's characterization of Bernie Madoff as an exemplar of truthful conduct who should be treated differently than Mr. Liew is preposterous. Opposition at 14-15. One week after the court enjoined Madoff from transferring his assets, he was caught mailing packages to

6
REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW
Case No. CR 11-0573-JSW (NC)

715999.02

various relatives, which the Government contended contained more than $1 million in Madoff's personal property. *United States v. Madoff,* 586 F. Supp. 2d 240, 245 (S.D.N.Y. 2009). The Government argued that Madoff should not get bail because he attempted to conceal his assets, asserting that the setting of bail conditions is "based, fundamentally, on the trustworthiness of the defendant." *Id*. at 255. The Court rejected this argument, noting that "implicit in the bail condition analysis is the assumption that the defendant *cannot be trusted on his own*." *Id*. (emphasis added). Accordingly, even if there were support for the Government's threadbare allegations that Mr. Liew is "dishonest," the *Madoff* decision makes clear that "dishonest" conduct does not establish actual flight risk when, as here, the defendant has proposed a host of measures to assure his appearance at trial.

### D. The Government's Conclusory Assertion that Trial Preparation will be "Simple" Ignores the Nature of this Case.

Mr. Liew's opening brief explains at length the many difficulties of preparing for trial with an incarcerated defendant in a case involving voluminous discovery in EnCase form, Chinese documents, and complex technical issues. Opening Brief at 10-13. The Government's conclusory response—that "it should be a fairly simple matter [for Mr. Liew] to point his counsel to the places in his business records that show independent development"—ignores each specific hurdle identified in Mr. Liew's opening brief, including:

- The fact that counsel must guess which of the 5 terabytes of documents (many in Chinese) to bring to the Dublin detention center for each visit;
- The attorney time and administrative delays required for each visit to Dublin;
- The impossible financial burdens of "processing" the staggering discovery produced into easily readable form;
- The fact that Mr. Liew cannot retain copies of the C-1 memos prepared by DuPont that lay out the allegations against him;
- The fact that Mr. Liew can only receive other materials through a slow and unreliable prison mail system; and
- The fact that Mr. Liew has no computer or Internet access in Dublin.

7
REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW
Case No. CR 11-0573-JSW (NC)

715999.02

To characterize the process of defending this case as "simple" is laughable. The fact that a significant portion of the documents produced by the Government were seized from Mr. Liew and/or the USAPTI offices is precisely why it is critical for Mr. Liew to be an active participant in the defense team. He is uniquely suited to filter through the terabytes of discovery and locate the significant items, and there is no meaningful way to accomplish this task in any reasonable amount of time while he remains incarcerated.

### E. The Conditions Proposed by Mr. Liew "Reasonably Assure" that he will not Flee.

As explained in Mr. Liew's bail motion, the burden is on the Government to demonstrate that no condition or combination of conditions will *reasonably assure* Mr. Liew's appearance at future court dates. 18 U.S.C. § 3142. The Bail Reform Act does not require that the risk of flight be zero. *Madoff,* 586 F. Supp. 2d at 249. Mr. Liew proposes a set of conditions that more than adequately mitigate any serious risk of flight, including home detention (except for trial preparation at the offices of Keker & Van Nest) under the constant watch of a private security guard chosen by the Government, electronic monitoring, and the pledging of substantial security in a form satisfactory to the Court (including the sale of Christina Liew's Singapore home and/or the posting of an amount of up to $2 million in cash).

The Government does not explain how the proposed conditions are insufficient to mitigate any serious risk that Mr. Liew will flee. Instead, its Opposition launches unpersuasive attacks on Mr. Liew's credibility based on statements made years ago in a bankruptcy proceeding, and relies on innuendo and speculation regarding Mr. Liew's finances, to demonstrate that there is a "red flag about his requested release." Opposition at 6:16. As discussed in more detail below, when the Court looks at the actual facts behind the Government's rhetoric, it becomes clear that the rhetoric is largely unsubstantiated. Most importantly, the Government's attempts at character assassination say nothing about Mr. Liew's *actual risk of flight*. They simply reveal how far the Government is willing to stretch, and the extent to which it will ignore the applicable legal standard, in order to detain Mr. Liew.

8
REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW
Case No. CR 11-0573-JSW (NC)

715999.02

1. **The Assertions that Mr. Liew Transferred Money Overseas Prove Nothing about his Actual Ability to Flee under the Proposed Conditions.**

The Government states that Mr. Liew's "finances remain a mystery," conceding that it does not know who currently controls money that Mr. Liew allegedly transferred overseas. Opposition at 3:6. The superseding indictment alleging financial crimes—originally promised for last September, and now delayed until sometime in the New Year—has been a long time coming. Apparently unable to put its financial case together, the Government asks Mr. Liew to do its work for it, arguing that he is not entitled to bail unless and until he makes full disclosure of all of his and his extended family's finances to the Government. Even assuming that Mr. Liew possesses this information, it would be foolish for Mr. Liew to take positions regarding his finances and put a "full confessional" on the table prior to learning the specifics of the upcoming financial charges against him. No lawyer would advise his client to do so under these circumstances.

Nor does the law require such a confessional. In *United States v. Khashoggi*, the defendant was "an enormously wealthy man" with "the means to procure staggering amounts of cash in fewer than 24 hours." 717 F. Supp. 1048, 1050 (S.D.N.Y. 1989). The court only required "adequate information" about the extent of his resources to render a "meaningful recommendation" regarding bail. *Id.* Here, the Government has provided that information: in its view, Mr. Liew allegedly transferred $22,537,452 to six companies in Singapore, and the Government has traced roughly $3.8 million of it to Mr. Liew's family members. Opposition at 6; Rometo Decl. at Exhibit 8. Even if the Court were to accept the Government's speculative characterization of this money—that Mr. Liew still somehow controls all of it, even though there has been no showing that any of it even remains in the possession of those Singapore companies—the proffered security of approximately $2 million dollars is more than adequate to assure his appearance at trial. *See id.* at 1052 (ordering Mr. Khashoggi released upon posting of $10 million bond, a tiny fraction of his net worth at the time); http://en.wikipedia.org/wiki/Adnan_Khashoggi.

In any event, the hypothesis that Mr. Liew has stashed money abroad for his escape is nothing more than a bald assertion. The Government provides no back-up for the charts

9

REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW
Case No. CR 11-0573-JSW (NC)

715999.02

purporting to describe various transfers of money allegedly effectuated by Mr. Liew—not even a description of how they were made or by whom.[2] As the Ninth Circuit explained in *Motamedi*— a case the Government does not even attempt to distinguish—speculation that Mr. Liew is guilty of the forthcoming financial charges cannot serve as the basis for detention. Evidence that the defendant is guilty "may be considered *only in terms of the likelihood that the person will fail to appear* or will pose a danger to any person or to the community. Otherwise, if the court impermissibly makes a preliminary determination of guilt, the refusal to grant release could become in substance a matter of punishment." *United States v. Motamedi,* 767 F.2d 1403, 1408 (9th Cir. 1985) (emphasis added).

Here, the Government's unproven financial assertions have no bearing on the likelihood that Mr. Liew *actually will flee*. The Government expresses "concern about the ultimate disposition and control of the funds," stating that it does not know who currently controls the money Mr. Liew allegedly sent abroad. Opposition at 3:5-7. In other words, the Government does not know whether Mr. Liew could even access the funds and use them for his escape. And, even if Mr. Liew could access the funds, the Government does not explain how any amount of money would enable him to flee the country undetected with no passport, while wearing an ankle bracelet, with a family in tow, and with a private security guard camped outside his house 24 hours a day. As in *Madoff*, "the conditions imposed for release are unique in their own right" and are "reasonably calculated to assure [Mr. Liew's] appearance when required." *Madoff*, 586 F. Supp. 2d at 249.

### 2. Mr. Liew Offers to Post Appropriate Security that will "Reasonably Assure" his Appearance at Trial.

At Mr. Liew's prior bail hearing, the Court expressed concern about the amount of security pledged.[3] Mr. Liew has responded in this renewed motion by offering to pledge a Singapore house owned by Christina Liew, or by selling or borrowing against the home and

---

[2] The accompanying declaration of Special Agent Rometo simply states that "the attached exhibits were collected by the FBI during its investigation and are maintained in evidence by the FBI." Rometo Decl. at ¶3.

[3] Order (Dkt. 74) at 4:3-8.

10
REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION
ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW
Case No. CR 11-0573-JSW (NC)

715999.02

posting up to $2 million in cash, which represents what is believed to be all (or a substantial portion) of the equity in the home. The Government argues that the Court cannot accept Mr. Liew's offer because "the evidence strongly suggests" that the Singapore home was paid for with the proceeds of trade secret theft. That argument fails for several reasons.

*First*, the relevant question under the statute is whether the posting of the property for bail "because of its source, will not reasonably assure the appearance of the person as required."[4] That is assuredly not the case here. For one, even if one assumes for the purposes of this motion that the Government's hypothesis is correct—that the Singapore house was purchased using proceeds derived in part from the Pangang titanium dioxide work—that theory *supports* Mr. Liew's incentive to appear and protect an asset that he believes he earned based on years of legitimate engineering work. This is the very opposite of the paradigmatic § 3142(g)(4) case, in which an accused drug trafficker typically posts a bond secured by cash put up by criminal associates. In passing this section of the Bail Reform Act, Congress noted that legislation was needed for these situations, in which an individual "engaged in highly lucrative criminal activities such as drug trafficking, who [is] able to make extraordinarily high money bonds" posts bail and then flees the country. S. Rep. No. 98-225, at 23 (1983). "Among such defendants, forfeiture of bond is simply a cost of doing business[.]" *Id*. at 23-24. That paradigm bears little resemblance to the situation here, in which a defendant with no criminal record faces white collar charges armed with a myriad of defenses, and has offered to put up a home owned by his family.

*Second*, whether or not posting the Singapore home or cash derived from it, standing alone, would be sufficient to assure Mr. Liew's presence at trial—which it plainly would be—it is

---

[4] The statute provides, in part:

> In considering the conditions of release . . . the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g)(4); *see also* 18 U.S.C. § 3142(f) (providing for a "hearing to determine whether any condition or combination of conditions . . . will reasonably assure the appearance" of the defendant).

more than adequate when coupled with the other proposed conditions of release proposed here, including electronic monitoring and a private security guard.

### III.     CONCLUSION

For the foregoing reasons, the Court should GRANT Mr. Liew's motion.

Dated:  December 19, 2012                             KEKER & VAN NEST LLP

By:  */s/ Stuart L. Gasner*
STUART L. GASNER
SIMONA A. AGNOLUCCI

Attorneys for Defendants WALTER LIEW and USA PERFORMANCE TECHNOLOGY, INC.

12
REPLY BRIEF IN SUPPORT OF RENEWED MOTION FOR AN ORDER REVOKING THE DETENTION ORDER AND GRANTING PRETRIAL RELEASE OF WALTER LIEW
Case No. CR 11-0573-JSW (NC)

715999.02