MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

JOHN H. HEMANN (CSBN 165823)
PETER B. AXELROD (CSBN 190843)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    john.hemann@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. CR-11-0573-JSW |
| Plaintiff, | ) |
| | ) AMENDED UNITED STATES' NOTICE OF |
| v. | ) MOTION AND MOTION FOR REVOCATION OF |
| | ) MAGISTRATE JUDGE'S RELEASE ORDER |
| WALTER LIEW, | ) |
| | ) Date: March 18, 2013 |
| Defendant. | ) Time: 10:00 am |
| | ) |

# **TABLE OF CONTENTS**

AMENDED NOTICE OF MOTION ........................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

I.   INTRODUCTION ........................................................................................ 1

II.  FACTUAL BACKGROUND ........................................................................ 2

III. PROCEDURAL HISTORY ........................................................................ 7

IV.  ARGUMENT ................................................................................................ 9

  A.   Liew Is A Risk Of Flight And Should Be Detained............................... 9

    1.   Liew Is Facing a Substantial Custodial Term .................................. 9

    2.   Liew Has Significant Financial And Family Ties to Asia and Has Never Accounted for His Transfers of Over $22,000,000 to Singapore and the PRC ....................... 10

    3.   Liew Is Fundamentally Dishonest................................................... 12

  B.   The Conditions of Release Ordered By Magistrate Judge Cousins Are Insufficient To Ensure Liew's Appearance. ....................................... 15

    1.   The Home Cannot Be Used As Security Because It Is Subject To Forfeiture. ...................... 15

    2.   Liew Has Access To Significant Funds Beyond The Home He Has Offered To Sell To Post Bail. ................................................ 16

    3.   The Magistrate Judge Did Not Conduct An Appropriate Review Of The Source Of The Funds Liew Proposes To Post Or Liew's Financial Condition. ............................... 17

  C.   Continued Detention Does Not Violate Liew's Due Process Rights. .......................... 20

CONCLUSION.................................................................................................... 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*United States v. Bright*,
  596 F.3d 683 (9th Cir. 2010) --------------------------------------------------------- 19

*United States v. Gelfuso*,
  838 F.2d 358 (9th Cir. 1988) -------------------------------------------------------- 22

*United States v. Hubbell*,
  530 U.S. 27 (2000) ------------------------------------------------------------------ 19

*United States v. Koenig*,
  912 F.2d 1190 (9th Cir. 1990) -------------------------------------------------------- 1

*United States v. Motamedi*,
  767 F.2d 1403 (9th Cir. 1985) -------------------------------------------------------- 9

*United States v. Sharma*,
  2012 WL 1902919 (E.D. Mich. May 25, 2012) ------------------------------------------- 18

## STATUES, RULES, AND GUIDELINES

18 U.S.C. § 1835 ---------------------------------------------------------------------- 2

18 U.S.C. § 3142 ---------------------------------------------------------------------- 2

18 U.S.C. § 3142(e) ------------------------------------------------------------------- 9

18 U.S.C. § 3142(g)(4) ------------------------------------------------------------- 16, 18

18 U.S.C. § 3145(a)(1) ---------------------------------------------------------------- 1

USSG §2B1.1(a)(2) --------------------------------------------------------------------- 9

USSG §2B1.1(b)(1)(L) ------------------------------------------------------------------ 10

USSG §2B1.1(b)(5) --------------------------------------------------------------------- 10

USSG §3B1.1(a) ------------------------------------------------------------------------ 10

USSG §3C1.1---------------------------------------------------------------------------- 10

### AMENDED NOTICE OF MOTION[1]

PLEASE TAKE NOTICE that on March 18, 2013, at 10:00 am before the Honorable Jeffery S. White, United States District Judge, 450 Golden Gate Avenue, San Francisco, California, the United States of America will move pursuant to 18 U.S.C. § 3145(a)(1) to revoke the release order issued by Magistrate Judge Nathanael Cousins as to defendant Walter Liew. This motion is based on the following Memorandum of Points and Authorities, the record in the above-captioned action, and further evidence and proffers to be made by the parties.

### MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to 18 U.S.C. § 3145(a)(1), the United States moves for revocation of Magistrate Judge Nathanael Cousins' Order Granting Motion for Pretrial Release (Feb. 26, 2013). Under § 3145(a), the United States "may file with the court having original jurisdiction over the offense, a motion for revocation of" the release order issued by the magistrate judge. This Court's review is *de novo*: "[A] district court's review of a magistrate's detention order is to be conducted without deference to the magistrate's factual findings." *United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir. 1990).

### I.    INTRODUCTION

Walter Liew is a flight risk. (1) His incentive to flee is enormous. Liew is charged with serious felonies – multiple counts of economic espionage, trade secret theft, and obstruction of justice – for which he may be sentenced to many years in prison. (2) Liew is has significant financial and family ties to the People's Republic of China ("PRC"), Singapore, and Malaysia – but few strong ties to the United States. Since 2006, he moved over $22,000,000 in proceeds from his illegal conduct to Singapore and from there, at least some of it to the PRC. There still is no account for that money. (3) Liew cannot be trusted; he is a dishonest person. For years he ran a business based on the sale of stolen intellectual property. He has lied about his education

---

[1]   The United States files this amended notice to provide the Court and the parties with a copy of the brief that contains a table of contents and table of authorities, as required by Crim. L.R. 47-2(b). That is the only amendment to this filing.

and employment history.  He has lied under oath on his company's federal income tax returns.  He has lied under oath to the United States Bankruptcy Court.  He has lied to the Federal Bureau of Investigation.  He has lied to Magistrate Judge Cousins.

Magistrate Judge Cousins three times has held that Liew is a flight risk.  He concluded most recently, however, that Liew's continued detention offends due process and that there are a combination of conditions that will secure Liew's appearance at trial.  These conclusions are not correct:  (1) the length of Liew's pretrial detention is not the result of delay caused by the government and can be remedied by the setting of a trial date; (2) the $2,000,000 bond and electronic monitoring do not provide meaningful assurance that Liew will appear for trial.  The United States has had no opportunity to evaluate the source of the $2,000,000 or Liew's overall financial circumstances because Magistrate Judge Cousins allowed Liew to present evidence regarding the property and his finances *in camera*.  Liew's proffer that the money would come from the sale of home in Singapore, if true, reveals the insufficiency of the bond:  The property in Singapore was purchased with the proceeds of the crimes Liew is charged with committing.  If he is convicted, the property will be forfeited pursuant to 18 U.S.C. § 1835 – so he risks nothing by posting property that he may lose in any event.

No conditions or combination of conditions can ensure Walter Liew's appearance before this Court for trial.  The factors the Court must consider under 18 U.S.C. § 3142 reveal that Liew is likely to flee if the opportunity presents itself.  A person who so brazenly flouts the law, who so easily lies when required to account for himself, simply cannot be trusted when he promises to appear for trial.  Combined with his financial resources and ties abroad, Liew is the picture-perfect flight risk.

Magistrate Judge Cousins's release order should be revoked and defendant Liew ordered detained pending trial.

## II.    FACTUAL BACKGROUND

In the 1990s, Walter Liew learned that the government of the People's Republic of China (PRC) had prioritized the development of chloride-route TiO2 technology.  By the beginning of

1998, Liew had assembled a team of former DuPont employees to assist him in his efforts to

convey DuPont's TiO2 technology to entities in the PRC.  Superseding Indictment, Docket

Number (Dkt.) 64, at 19.

In a memorandum attached to his letter to Pangang Group's Chairman in October 2004,[2]

Liew described his motivation to locate and develop TiO2 technology for the PRC government:

> In December 1991, Mr. Luo Gan, who at the time was the Secretary General of the State
> Council, hosted me at the Diaoyutai State Guesthouse.  Also present were:  Tan Zhuzhou,
> Vice Minister of the former Ministry of Chemical Industry; Zhang Yujie, Vice Minister
> of the State Bureau of Foreign Experts; Qiao Schichang, head of the General Planning
> Department of the State Bureau of Foreign Experts; Kang Deyao, Director of the Talent
> Development Research Institute.  The purpose of the banquet is to thank me for being a
> patriotic overseas Chinese who has made contributions to China; and who has provided
> key technologies with national defense applications, in paint/coating and microwave
> communications.  At that time Secretary General Luo Gan gave directives, so that I
> would better understand China and continue to make contributions to her.  Two days later
> I was given a list of key task projects by the appropriate Chinese agency.  Titanium white
> by chlorination[3] was one of the more important projects.

Liew wrote that "[f]rom what I know, the titanium white by chlorination technology in

China is not yet mature, in particular there is a gap for facilities for the production of titanium

white by chlorination the DuPont way.  I have always hoped that China can soon successfully

build a production line for titanium white by chlorination, and I have always worked towards the

completion of that mission."  Rometo Decl., Dkt. 59-1, Ex. 2, at 3.  Liew boasted in the

memorandum that his company possessed the DuPont technology that China needed:  "Some

years ago China let me know that she urgently needed titanium white by chlorination technology.

After many years of follow-up research and application, my company has possession and

mastery of the complete DuPont way of titanium white by chlorination."  *Id*. at 6.

Liew understood that DuPont safeguarded its TiO2 technology and did not make it

available for sale in China.  As he stated in his 2004 letter and memorandum to Pangang Group's

---

[2]   These documents were located in a computer hard-drive found in a safe deposit box rented by
Christina Liew, which, as described more fully below, was the subject of criminal obstruction
and false statement charges.  *See* United States Opposition to (Second) Motion for Release, Dkt.
59, at 3-4; Declaration of FBI SA Cecily Rometo, Dkt. 59-1, Ex. 2 (English translation of letter
and memorandum) at 2.

[3]   "Titanium white by chlorination" is what the Chinese call chloride-route TiO2.

chairman, "DuPont's titanium white by chlorination technology is the most advanced, but DuPont has always monopolized that technology and has never transferred that technology to China."  Rometo Decl., Ex. 2, Dkt. 59-2, at 6.  In 2005, Liew repeated those claims in an email with a potential business partner:

> China wants this technology badly.  They have been trying to develop the technology for many years but they have realized that they have to buy the technology.  The technology is tightly controlled by a few manufacturers and they are not willing to sell it to China for the obvious reasons.

Rometo Decl., Dkt. 59-2, Ex. 6.

Liew's efforts to sell DuPont's TiO2 technology to entities in the PRC bore fruit.  Liew entered into a number of TiO2 contracts with Chinese state-owned entities worth millions of dollars, including a 2005 contract with Pangang Jinzhou for $6,180,000, a 2007 contract with Pangang Jinzhou for $7,000,000, and a 2009 contract with PIETC and Pangang Group Titanium for $17,800,000.  Superseding Indictment, Dkt. 64, at ¶ 20.

Between January 2006 and July 2011, Liew received over $27,000,000 through his companies (Performance Group and USAPTI) on these contracts.  Rometo Decl., Dkt. 214-2, Ex. 4 (wire transfer summary).

Liew personally directed the subsequent transfer of over $22,000,000 of those funds to shell companies in Singapore that he and his wife, Christina Liew controlled.  Rometo Decl., Dkt. 214-2, Ex. 5 (summary of wire transfers to Singapore).[4]  Liew himself was the registered owner of one of the companies, Huadong Equipment Solutions (Huadong), and controlled Huadong's bank account in Singapore, which received over $5,800,000 in transfers from Performance Group.[5]  Rometo Decl. (Third Mot.), Dkt. 214-3: Ex. 10 (Huadong corporate record), Dkt. 214-2: Ex. 5 (summary of transfers to Huadong); Rometo Decl. (Second Mot.), Dkt. 59-2, Ex. 16 (record of Huadong bank transfer executed by Walter Liew), Ex. 17 (Walter

---

[4]  Walter Liew provided written instructions to the U.S. banks to transmit all of those funds to the Singaporean entities identified in Exhibit 5 to SA Rometo's Declaration on the Third Motion for Release.  Dkt. 214-2.  An exemplar of Walter Liew's instructions may be found at Ex. 19 to SA Rometo's Declaration on the Second Motion for Release.  Dkt. 59-2.

[5]  For additional discussion of Liew's ownership of Huadong and control of its Singapore bank account, *see* Opp. to Second Mot. for Release, Dkt. 59, at 12-13; Opp. to Third Mot. for Release, Dkt. 214, at 6-8.

Liew Huadong account closing instruction).  In 2008, Liew directed the transfer of $2,360,000 from Huadong's bank account in Singapore to an account in Hong Kong in the name of his father-in-law (Qiao Hua) that he also controlled.[6]  Rometo Decl. (Third Mot.), Dkt. 214-3, Ex. 6 (summary of transfers from Singapore to Liew relatives in the PRC); Rometo Decl. (Second Mot.), Dkt. 59-2, Ex. 20-23 (records documenting Liew control over father-in-law's account). Two of the other Singapore shell companies – Dongbei Process Engineering and ESI Equipment and Engineering – transferred $1,494,000 to one of Christina Liew's brothers, Qiao Ning, at the Bank of China in 2010.  Opp. to Third Mot., Dkt. 214, at 8.

At the same time Performance Group was receiving millions of dollars on its Chinese TiO2 contracts, Liew entered the company into bankruptcy and repeatedly lied to the bankruptcy court about its status.

For example, in the petition he filed under penalty of perjury on January 14, 2009, Liew failed to disclose the existence of at least two on-going contracts with Pangang Jinzhou totaling $13,500,000 despite an obligation to do so in "Schedule G – Executory Contracts and Unexpired Leases."  Rometo Decl., Dkt. 214-2, Ex. 1, at 15 of 67 on ECF.  He also failed to report over $5,000,000 that Performance Group received in 2007 and 2008 despite a requirement to disclose the "gross amounts received" during that period in response to Question 1 of the "Statement of Financial Affairs."  *Id*. at 18 of 67 on ECF.

At a hearing on February 4, 2009, Liew lied under oath to the bankruptcy trustee – he told the trustee that Performance Group had been closed down "since the beginning of November [2008]" and it had "lost the business."  Rometo Decl., Dkt. 214-2, Ex. 3 at 3, 5.  Of course, Liew knew those statements were false – he had received over $4,600,000 on behalf of Performance Group in 2008, including $1,359,980 on October 22, 2008, and he received another $500,000 (less fees) on behalf of Performance Group just a few weeks after the hearing on February 26, 2009.  Rometo Decl., Dkt. 214-2, Ex. 4.

During this time, Liew routinely traveled -- up to five or six times a year – to points in

---

[6]  For additional discussion of Liew's control of his father-in-law's account, *see* citations in footnote 4 above.

1   Asia including the PRC, Taiwan, Singapore, and Malaysia.  Opp. to Second Mot., Dkt. 59, at 8-

2   9.  Liew's co-defendant wife owned property in both the PRC and Singapore,[7] and both have

3   extended family in Asia, not the United States.

4       Throughout this time, Liew also filed tax returns on behalf of his companies,

5   Performance Group and USAPTI, in which he substantially understated the gross receipts those

6   companies received.

7       On April 6, 2011, DuPont filed a civil complaint in United States District Court in San

8   Francisco.  Superseding Indictment, Dkt. 64, at ¶ 70.  The complaint alleged that Liew, USAPTI

9   and J.L., a USAPTI employee, misappropriated DuPont trade secrets related to its chloride-route

10  TiO2 manufacturing process.  *Id*.  After the lawsuit was filed, Liew conspired to obstruct it by

11  causing an answer to be filed that contained materially false information.  *Id*. at ¶¶ 73-74.  Liew

12  also tampered with J.L. by telling him not to say anything about the two former DuPont

13  employees who worked on USAPTI's TiO2 projects because it would not be good for J.L. or his

14  family.  *Id*. at ¶¶ 77-78.

15      A few months later, on July 19, 2011, the FBI executed a search warrant at the Liew's

16  residence.  *Id*. at ¶ 83.  After FBI agents located safe deposit box keys, an FBI agent asked

17  Christina Liew in English about the keys. Speaking in Mandarin, Walter Liew directed Christina

18  Liew to deny knowing anything about the keys, even though both Walter Liew and Christina

19  Liew knew that one of the keys corresponded to a safe deposit box they had at the Bank of East

20  Asia.  *Id*. at ¶¶ 87, 89.  Christina Liew followed the direction by telling the agents in English

21  that she did not remember the safe deposit boxes.  The FBI later obtained a search warrant for

22  the safe deposit box and found a number of items related to the Liew's efforts to sell DuPont

23  trade secrets to entities in the PRC, including the October 2004 letter to Pangang's Chairman

24  cited earlier, information about Pangang management (Rometo Decl., Dkt. 59-2, Ex. 5),

25

26  ─────────────
    [7]  According to the phone list located in the search of the Liews' rented home in Orinda, the
    Liews maintain a "residence" in Shenyang, Liaoning Province, PRC.  Rometo Decl., Dkt. 59-2,
27  Ex. 4, at 3 (40 of 180 on ECF).  According to documents located in a search of the Liews'
    Orinda residence, Christina Liew purchased a property at 18 Shelford Road, Singapore in June
28  2011 for 3,650,000 Singapore dollars (which works out to be approximately $2.8 million U.S.
    dollars).  Rometo Decl., Dkt. 59-2, Ex. 7.

information about the Huadaong bank account in Singapore (Rometo Decl., Dkt. 59-2, Ex. 17), executed copies of the $6,180,000 contract for Pangang Jinzhou and the $17,800,000 contracts for Pangang Group Titanium, and a document drafted by co-defendant Maegerle that referenced specific, confidential proprietary data contained in the Basic Data Document (Trade Secret 5) (Superseding Indictment, Dkt. 64, at ¶ 43).

## III.   PROCEDURAL HISTORY

The FBI arrested Liew on July 28, 2011, and he had his initial appearance in magistrate court the same day.  Dkt. 5.  The government moved for detention at the initial appearance based on Liew's risk of flight.  Liew was indicted on August 23, 2011.  Dkt. 16.

After several continuances at Liew's request, a detention hearing was held on August 24, 2011.  Dkt. 17.  Magistrate Judge Cousins found that Liew was a flight risk and ordered him detained.  He found the following factors relevant:  (1) Liew engages in significant overseas travel; (2) Liew has significant business ties with the PRC and has no customers in the United States; (3) Liew's "finances raise additional concerns," including the number of bank accounts he and his wife used and the millions of dollars that transited through these accounts; (4) Liew owns no property in the United States, but he and his wife own property in the PRC and were buying property in Singapore;[8] and (5) Liew has family ties in Malaysia and in the PRC through his wife.  Dkt. 19.

Almost five months later, on January 18, 2012, Liew filed a motion to be released from detention.  Dkt. 48.  Liew principally argued that he had defenses to the charges that had been filed and was intent on fighting them, that his various international contacts did not make him a flight risk, and that the sureties he offered were adequate to secure his future appearance.  With regard to the sureties, Liew offered thirteen sureties, some of whom were related to each other and to Liew, who together were willing to post approximately $200,000.

In support of his motion, Liew filed a lengthy declaration.  Dkt. 48-7.  In his declaration, Liew provided details regarding his family, education, and work history.  Liew claimed that

---

[8]  It appears that Christina Liew already owned the Singapore property as of the date of first detention hearing, although defendants did not make this clear to the Magistrate Judge at that time.

"before [his] arrest, [he] had a monthly income of approximately $10,000." *Id.*, ¶ 21.  Liew

identified seven bank accounts belonging to him and his company, each of which contained

relatively small sums of money (the largest was a personal account in Singapore containing just

over $34,000).  *Id.*, ¶¶ 24-27.  Liew did not, in his declaration, disclose that his company had

received over $5,000,000 from the Pangang Group between January and July 2011, and that he

had directed almost all of this money to companies in Singapore that he controlled.[9]

Liew also attempted to explain away the evidence regarding his contacts with China and

Chinese government officials – evidence that he had written and was seized from his computers

– by saying that the documents "are not accurate or reliable and include" various "erroneous

statements."  *Id.*, ¶ 36.  In other words, he explained that documents he had written should not be

relied upon because they are false.

On February 28, 2012, the Magistrate Judge denied Liew's motion for bail.  Dkt. 74.  The

court concluded that "Liew is charged with deceptive conduct and the government has presented

compelling evidence that Mr. Liew is a serious flight risk."  *Id.* at 4:11-12.  With regard to the

proffered sureties, the court found that they were inadequate because they "have little or no

knowledge about Mr. Liew's business activities, financial condition, and ability and motivation

to flee."  *Id.* at 4:3-8.  The court also noted the "credible evidence that Mr. Liew moved

significant sums of money to accounts in China and has not accounted for that money or offered

to post it as security for his own release."  *Id.* at 4:8-10.


Nine months later, on November 20, 2012, Liew filed another motion for bail.  Dkt. 198.

In this motion, Liew offered to post bail in the amount of $2,000,000, which consisted of

anticipated proceeds from the sale of a home in Singapore owned by Christina Liew.

This time, the Magistrate Judge granted the motion and ordered Liew released on a

$2,000,000 cash bond.  Dkt. 255.  The court held that two things had changed between February

2012 and December 2012:  (1) that Liew increased his proposed bond from $200,000 to

---

[9] The Magistrate Judge declined the government's request to cross-examine Liew on the contents
of his declaration.  Dkt. 74 at 2.

1    $2,000,000; and (2) that he was still in custody, additional charges were contemplated, and no

2    trial date had been set.  The Magistrate Judge found that the cash bond, along with home

3    detention and electronic monitoring, would reasonably assure his future appearances.  The court

4    also found that further detention threatened Liew's due process rights.

5          The Magistrate Judge allowed Liew to submit information to the court by declaration

6    under seal and in camera describing the source of the $2,000,000 and Liew's and his wife's

7    financial condition generally.  Dkt. 232.  A month after receiving this order from the Magistrate

8    Judge, Liew filed his evidence with the Magistrate Judge.  Counsel for the government has not

9    seen this evidence.

10   **IV.    ARGUMENT**

11        A.  <u>Liew Is A Risk Of Flight And Should Be Detained.</u>

12         Liew presents a substantial risk of flight and therefore should be detained.  The Bail

13   Reform Act of 1984 requires pretrial detention of a defendant without bail where "no condition

14   or combination of conditions will reasonably assure the appearance of the person as required and

15   the safety of any other person and the community."  18 U.S.C. § 3142(e).  Detention is

16   appropriate where a defendant is either a danger to the community or a flight risk; it is not

17   necessary to prove both.  *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).  A

18   finding that a defendant is a flight risk need only be supported by a preponderance of the

19   evidence.  *Id.* at 1406.

20             1.  <u>Liew Is Facing a Substantial Custodial Term</u>

21         Liew has an enormous incentive to flee.  He has been charged with multiple serious

22   felonies, including economic espionage, theft of trade secrets, and witness tampering.  If

23   convicted after trial, the United States conservatively estimates Liew's offense level would be 36

24   and the corresponding guideline range would be 188-235 months.  This calculation assumes a

25   base offense level of six (USSG §2B1.1(a)(2)), an adjustment for amount of gain of 22 levels

26   (USSG §2B1.1(b)(1)(L)), a two level adjustment for theft of trade secret for a foreign

27   government (USSG §2B1.1(b)(5)), a four level enhancement for role in the offense (USSG

28   §3B1.1(a)), and a two level enhancement for obstruction (USSG §3C1.1).  Other adjustments

and enhancements could be appropriate, including a larger adjustment for loss if the harm to

DuPont is calculable.

    2.   Liew Has Significant Financial And Family Ties to Asia and Has Never
         Accounted for His Transfers of Over $22,000,000 to Singapore and the PRC

    The most that confidently can be said about Walter Liew's ties to the United States is that

he has owned businesses located here.  Beyond this, Liew has maintained contacts with Asia that

are considerably stronger and deeper than those with the United States.[10]

    Despite living in the Bay Area for many years and earning enormous sums of money

through their sale of stolen trade secrets, the only residences owned by the Liews are overseas –

in the PRC and Singapore.  Moreover, Liew's own description of his efforts to purchase a

residence in the Bay Area in 2011 only underscores fundamental questions about his finances.

    Liew claimed in a declaration he submitted in support of his second bail motion that

"[p]rior to our arrest, my wife and I were actively looking to buy a new home in Orinda.  My

wife bid on five (5) homed in the area."  Liew Decl., Dkt. 48-7, at ¶ 19.  Liew's story was

misleading, at best.  The real story was that Christina Liew had attempted to purchase a house for

her brother, Qiao Ning, using cash from three separate accounts.  According to the real estate

agent who worked with her, Christina Liew made offers (and one counter-offer) on three

different houses – in each case proposing an all-cash purchase.  In attempting to make these

purchases, Christina Liew purported to be acting as the legal representative of Qiao Ning, her

brother who resides in the PRC, who had executed a power of attorney appointing Christina

Liew at the U.S. Consulate in Shenyang, Liaoning, PRC.  Rometo Decl., Ex. 59-2, Ex. 8.

Christina Liew proposed to pay for the residences in cash, using money from three bank

accounts: (1) an account in the name of Allen Chiang, containing $499,980; (2) an account in the

name of Shu Hua Zuo, Mrs. Liew's mother, containing $541,073.40; and (3) an account in the

name of Christina Liew, containing $283,929.37.  She provided account statements for these

---

[10]  The FBI located in a search of the Liews' residence a telephone list on which the names and
telephone numbers of numerous PRC officials and business leaders appear, including those
identified in Liew's 2004 letter to Pangang Group's chairman.  Rometo Decl., Dkt. 59-2, Ex. 4.

three accounts to the real estate agent.  Rometo Decl., Dkt. 59-2, Ex. 9.

What the evidence, therefore, shows is: (1) the Liews have overseas residences which are worth millions of dollars; (2) they do not own property in the United States; (3) in the first half of 2011 they attempted to purchase property for Christina Liew's brother using cash, the vast majority of which comes from accounts belonging to an Allen Chiang and Christina Liew's mother.

Liew's failure to explain what happened to the more than $22,000,000 that he transferred overseas raises a giant red flag about his requested release.

Between January 2006 and July 2011, two companies controlled by Walter Liew and Christina Liew – Performance Group and USAPTI – received over $27,000,000 from Chinese TiO2 customers.  Rometo Decl., Dkt. 214-2, Ex. 4.  Between July 2006 and July 2011, Liew directed the transfer of over $22,000,000 from Performance Group/USAPTI to six companies in Singapore: Lawrence Process Engineers (Lawrence), Huadong Equipment Solutions (Huadong), ESI Equipment (ESI), Huan Qu Process Equipment (Huan Qu); Dongbei Process (Dongbei); and LHV Equipment.  Rometo Decl., Dkt. 214-2, Ex. 5.  Three of the Singapore companies (Huadong, Dongbei, and ESI) subsequently transferred $3,854,000 to bank accounts in China in the names of Christina Liew's father (Qiao Hua) and one of her brothers (Qiao Ning).  Rometo Decl., Dkt. 214-2, Ex. 6 (summary of transfers to China), 15 (records for Qiao Hua transfers), 16 (records for Qiao Ning transfers).

According to information obtained in the course of this investigation, including publically available information obtained from the Accounting and Corporate Regulatory Authority (ACRA) in Singapore, each of those six companies is directly linked to Walter Liew and Christina Liew.  For example, each of the companies was owned by Walter Liew (Huadong), Christina Liew (Lawrence), or a family member.  Christina Liew's brother Qiao Mu (a Chinese national) owned ESI, and Christina Liew's sister-in-law Li Rue (a Chinese national) owned Huan Qu, Dongbei, and LHV.  Walter Liew's nieces – Shirley Chin and Elaine Chin – reside in Singapore and served as directors of five of the companies.  Those relationships are summarized in a chart.  Rometo Decl., Dkt. 214-3, Ex. 8.  ACRA reports for those companies are also

included as exhibits.  Rometo Decl., Dkt. 214-3, Ex. 9-14.

Moreover, there is substantial evidence that, after moving money through Singapore to the PRC, the Liews brought money back into the United States as needed, including transactions involving Qiao Ning's account at the Bank of China in Hong Kong.  In January 2010, Qiao Ning's Bank of China account received $1,494,000 in two separate transfers – one from Dongbei for $702,000 and one from ESI for $792,000.  Rometo Decl., Ex. 6 (Dkt. 214-3), 16 (Dkt. 214-4).  Then, on April 1, 2011, there was a $373,980 transfer from Qiao Ning's account at the Bank of China to an account at East West Bank in Oakland in name of a Pangang Jinzhou engineer for which Christina Liew signed documents as the "attorney-in-fact."  Opp. to Second Mot., Dkt. 59, at 13.  Over the next four months, Christina Liew signed checks withdrawing approximately $242,000 from the Jinzhou employee's account, payable to Walter Liew and bearing the notation "personal loan."  *Id*.  Additionally, FBI agents located in Christina Liew's safe deposit box a Bank of China deposit slip, dated November 29, 2010, for a transfer deposit of SGD$3,956,036.26 into Christina Liew's Bank of China account from Qiao Ning's Bank of China account.

The lack of transparency regarding these transactions underscores the danger that Liew has tens of millions of dollars offshore that would be available to him to facilitate his flight and provide for his family's future needs.

### 3.   Liew Is Fundamentally Dishonest

Liew has a proven track record of dishonesty.

As soon as DuPont initiated civil litigation in 2011, Liew engaged in a pattern of conduct designed to obstruct justice – he conspired with co-defendant Robert Maegerle to file a materially false answer to DuPont's civil suit (*see* Superseding Indictment, Count Ten), he threatened a former USAPTI employee by telling him it would not be good for the employee or his family to disclose the work of two former DuPont employees on behalf of USAPTI (Count Eleven), and when the FBI came to execute a search warrant at his residence, he directed Christina Liew to deny knowing anything about the safe deposit box keys they had recovered

(Counts Thirteen and Fourteen).  Of course, Liew had good reason to try to stymie the investigation – in a closet in his house and in the safe deposit box, the FBI found DuPont drawings with the DuPont logo and confidentiality markings.  *See* Superseding Indictment, Dkt. 64, at ¶¶ 14(b) and (d), 48, 49.  If, as he now claims, Liew just wanted to defend himself in a run-of-the-mill civil dispute, why would he engage in all of that obstructive conduct, and why would he have those DuPont documents in his possession.

Liew has displayed that same lack of trustworthiness in the bail proceedings before Magistrate Judge Cousins.  As part of his second bail motion, Liew filed a declaration that is misleading at best.

First, Liew stated that he did not have "regular contact" with his father-in-law, Qiao Hua.  Liew Decl., Dkt. 48-7 at ¶ 37.  Yet, he never explained the disconnect between that statement and the fact – laid out in great detail in the government's opposition to the second motion (Dkt. 59 at 11-14) – that he operated an HSBC bank account in Qiao Hua's name in China (Hong Kong) that received a $750,000 deposit from an account he controlled in Singapore on behalf of Huadong, a Singaporean company he owned.  *See* Rometo Decl., Dkt. 59-1, Ex. 16-17.  Liew transferred another $1,610,000 from the Huadong account to the same Qiao Hua HSBC account in Hong Kong that he controlled.  Rometo Decl., Dkt. 59-1, Ex. 6, 15.

Second, Liew identified two letters of credit related to his contracts with Pangang Jinzhou and Pangang Group Titanium, but he never explained that there were other letters of credit and letters of guarantee at Mega Bank that resulted in the receipt of millions of dollars by Performance Group and USAPTI.  Liew Decl., Dkt. 48-7, at ¶¶ 29-32.  In essence, Liew treated Magistrate Judge Cousins much like he has the bankruptcy court and the IRS – he has failed to make full and complete financial disclosures.

Third, he never addressed the funds he transferred to Singapore, including those sent to the Huadong account at DBS that he controlled.

In his declaration, Liew admitted that sometimes he lies.  He claimed that two documents were "not accurate or reliable" and cataloged nine "erroneous statements" in them.  *See* Liew Decl., Dkt. 48-7 at ¶ 36.  In other words, when it suits him, he is willing to change his story.

In 2009, Liew lied to the bankruptcy court.  He concealed Performance Group's receipt of $772,540 in 2007 and $4,619,906 in 2008, despite an obligation to disclose "the gross amounts received" in those years.  *Compare* Rometo Decl., Dkt. 214-2, Ex. 1 at 17, No. 1 ("Income from employment or operation of business") *with* Ex. 4.  Curiously, Liew told the bankruptcy trustee that Performance Group stopped operating in early November 2008 because, among other things, it had "lost business," "didn't have any new contract and ran out of cash." Rometo Decl., Dkt. 214-2, Ex. 3 at 3, 5.  Yet, on October 22, 2008, just a few days before Performance Group stopped operating because, according to Liew, it was out of money, Performance Group had received $1,359,980 from Pangang Jinzhou.  Similarly, on February 26, 2009, a few weeks after Liew made those statements to the bankruptcy court, Performance Group received $499,975 from Jinzhou.  Liew also concealed from the bankruptcy court that he had on-going multi-million dollar contracts with Pangang Jinzhou despite an obligation to do so. *Compare* Rometo Decl., Dkt. 214-2, Ex. 1 at 14 (identifying no executory contracts) *with* Ex. 4.

Liew also lied on the tax returns he filed under penalty of perjury on behalf of Performance Group and USAPTI for 2006-2010 by substantially understating the gross receipts for these respective entities.  Given Liew's track record, the Court cannot trust him and therefore has no adequate basis to release him.

Finally, the circumstances surrounding the $2,000,000 cash bond offered by Liew show not only deception, but evidence an intent to flee.  When Liew initially sought release in August 2011, he did not reveal that his wife owned a $2,000,000 property in Singapore.  He led the Magistrate Judge to believe that his wife was merely seeking to purchase property in Singapore. In truth, the property had already been purchased and was very valuable.  In January 2012, when

he again sought bail, he offered $200,000 in various small pieces from a group of acquaintances. He did not offer the $2,000,000 Singapore property. Only after being denied twice, did Liew put the Singapore property on the table. This incremental approach reveals his desire to offer only what is minimally necessary get released – and a great hesitance to offer anything of his own. Why? Because he will flee if he is able and does not want to lose anything when he does.

B. **The Conditions of Release Ordered By Magistrate Judge Cousins Are Insufficient To Ensure Liew's Appearance.**

Magistrate Judge Cousins found that "[m]any of the bail factors for Mr. Liew are unchanged" since the February 2012 order detaining Liew as a flight risk. Release Order at 3:18-19, Dkt. 255. In deciding that Liew should now be released, Magistrate Judge Cousins determined that Liew's offer to post a $2,000,000 cash bond is a new factor that weighs in favor of release. He found that this bond, in combination with a number of other conditions, would secure Liew's appearance at future proceedings. *Id.* at 3-4 & 7.

Although the Magistrate Judge's ultimate order was not specific as to the source of the funds that would be used for the $2 million cash bond, defense counsel previously proffered that the funds would come from the sale of a home in Singapore owned by Christina Liew. Counsel has also proffered that the Magistrate Judge could assume that the Singapore home was purchased using proceeds from Liew's "TiO2 business" – *i.e.,* the money Liew received from the sale of DuPont trade secrets to the Pangang Group defendants.

1. **The Home Cannot Be Used As Security Because It Is Subject To Forfeiture.**

The Magistrate Judge erred in ordering a cash bond that would be funded by proceeds from the criminal conduct alleged in the Superseding Indictment. Section 3142(g)(4) of the bail statute provides that the Court "shall" upon the Government's motion,

conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and *shall decline to accept* the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g)(4) (emphasis added).

If defendants are convicted of any one of the Economic Espionage Act charges alleged in the Superseding Indictment, the proceeds of their crimes, including the home in Singapore, will be forfeited. Faced with the prospect of losing this property in the event of a conviction, Liew risks nothing by offering to sell it and use the proceeds to secure his release. This is particularly so because there is no evidence as to Liew's current financial circumstances and no answer to the question of what became of the almost $30,000,000 Liew was paid by the Pangang Group defendants between 2006 and 2011.

> 2.   Liew Has Access To Significant Funds Beyond The Home He Has Offered To Sell To Post Bail.

Posting proceeds from the sale of a home that Liew will lose if he is convicted is meaningless. It is even more meaningless if Liew has significant financial resources in the PRC that are out of the Court's reach and can be used to support himself and his family if he flees. The government has proven in great detail that Liew obtained and controlled many millions of dollars as a result of his business ventures with the Pangang Group companies. That money was moved by Liew out of the United States, though he appears to have access to it when necessary.

Meaningful discussion of this money, however, is missing from both Liew's briefs and Magistrate Judge Cousins's release order. Neither Liew in seeking release nor Magistrate Judge Cousins in granting Liew's motion have addressed the almost $28,000,000 Liew received from Chinese TiO2 manufacturers between 2006 and July 2011. There has been no explanation as to why over $22,000,000 of that money was transferred to Singapore shell corporations formed and controlled by the Liews, including over $5,000,000 in early 2011. There has been no explanation as to why money from the Singapore shell companies went to Christina Liew's

relatives in China or where that money is now.  There has been no explanation as to why the Liews received wire transfers from China, why a Pangang Jinzhou engineer set up a bank account with Christina Liew, or why Christina Liew was writing checks to Walter Liew bearing the notation "personal loan."

These and many other unusual financial transactions reveal the danger that Liew has millions of dollars offshore that would be available to him to facilitate his flight and to provide for his family's future needs, even if he were to walk away from a $2,000,000 home in Singapore.  This danger is heightened by Liew's obfuscation and dishonesty throughout the bail process, as shown most clearly by his unwillingness to forthrightly account for his assets and unwillingness to offer to post the Singapore property when he was first detained.

> 3.   The Magistrate Judge Did Not Conduct An Appropriate Review Of The Source Of The Funds Liew Proposes To Post Or Liew's Financial Condition.

The Magistrate Judge recognized that, in order to properly assess Liew's offer to post a $2,000,000 bond, he needed to have some basic understanding of Liew's financial circumstances.  An impediment to this was Liew's unwillingness to provide any information regarding his financial circumstances that could be reviewed, assessed, or challenged by the government.  Liew objected, on Fifth Amendment grounds, to providing any meaningful information regarding his available finances.

The Magistrate Judge erred by permitting Liew to present evidence regarding the Singapore property and his financial circumstances *in camera*.  The government has not been permitted to review whatever evidence Liew provided to the magistrate court *in camera* on February 15, 2013, and the Magistrate Judge was not in any position to investigate or meaningfully challenge the truthfulness of Liew's information, which is particularly important given Liew's general character for dishonesty and his false declaration to the magistrate court in connection with the second bail motion.  The Magistrate Judge's February 27 order does not

contain any analysis of or findings regarding Liew's financial condition.  The adversarial process has been suspended, apparently based entirely on Liew's overbroad assertion of his Fifth Amendment rights.

The Court must conduct a *Nebbia* hearing at the request of the Government.  The Bail Reform Act mandates an "inquiry into the source of the property to be . . . offered as collateral to secure a bond" upon motion of the Government.  18 U.S.C. § 3142(g)(4); *United States v. Sharma*, 2012 WL 1902919 *2 (E.D. Mich. May 25, 2012).   The Court "must determine the hearing procedure, which is not addressed either in the statute or in its legislative history." *Sharma* at *3.

To satisfy the requirements of the Bail Reform Act and protect the defendant's Fifth Amendment rights, there is district court authority for the proposition that Court may conduct an *in camera* proceeding, on the record, without the presence of counsel for the United States.  *Id.* (citing authorities).  There is no support, however, for Liew's blanket request that *any* evidence he submits should be *in camera*.

The extent to which the proceeding is closed should be carefully limited to only that evidence which implicates defendant's Fifth Amendment rights.  Information offered by defendant, in the form of his statements or documents the production of which would be incriminating, *could* be protected by the Fifth Amendment.  Information obtained by the defense team from third parties, including bank and other financial records and information from family members, is not protected by the Fifth Amendment and defendant has no arguable right to offer such evidence under the cloak of an *in camera* proceeding.

Without knowing what evidence – statements or documents – Liew offered the Court, the Government cannot say whether the Fifth Amendment applies or not.  As a general matter, the Fifth Amendment applies only to statements or acts that are (1) compelled, (2) testimonial, and (3) incriminating.  *United States v. Hubbell*, 530 U.S. 27, 34-37 (2000).  Whether these elements

are met is not a question that can be answered in the abstract, but requires particularized analysis of the statements or acts of production at issue. *See, e.g., United States v. Bright*, 596 F.3d 683, 691-94 (9th Cir. 2010) (analyzing specific categories of documents for applicability of act of production privilege). A blanket claim of privilege over documents is not appropriate. *Id.* at 692.

As a general matter, it is difficult to understand how records showing the source of money used to fund a home purchase by defendant's wife could be protected by defendant's Fifth Amendment privilege. Bank and real estate records are not testimonial. The records obviously exist, or the home could not have been purchased. The home was not purchased in defendant's name, so it is difficult to see how he could be incriminated from the production of relevant records. Similarly, bank records showing where $22,000,000 he sent to Singapore ended up exist and presumably defendant's attorneys can get them.

The Magistrate Judge created a Fifth Amendment straw horse by requiring Liew to submit a declaration. Liew cannot, of course, be compelled to make any statement and the Magistrate Judge did just that – compelled him to make a statement that now will be argued must be shielded from the government. But a declaration by the defendant is not the only way – particularly under the Bail Reform Act – to present evidence to the Court. The financial records that provide the information are not protected by the Fifth Amendment. Nor are real estate records. Nor are counsel's proffer regarding financial conditions. Bail proceedings routinely – and complex ones almost always – involve extensive discussions and analysis of the defendant's financial condition. There was no reason for the Magistrate Judge to order Liew to file a declaration and his decision to do so should not shield this entire inquiry from the normal adversarial process.

Notably, Liew *did* file a declaration in support of his January 2012 bail motion. In it, he purported to describe his and his company's assets. He claimed that he had just under $50,000

and USAPTI had less than $10,000.  Dkt. 48-7, ¶¶ 24-28.  Notably, Liew failed to reveal the $5,000,000 he and his companies had received from the Pangang Group in the first six months of 2011 or explain what had happened to that money.  The Magistrate Judge refused to allow the government to cross-examine Liew regarding the information included in – and omitted from – his January 2012 declaration.

All the government is now able to do is point out that (1) proceeds from the sale of the Singapore home should not be sufficient under the Bail Reform Act because the home is subject to forfeiture; (2) Liew ran $22,000,000 over five years through his companies' bank accounts to phony Singapore companies, and there is no account for where that money is now; and (3) the evidence submitted in camera by the defendant has not been subject to any meaningful investigation or challenge and, thus, cannot be trusted, particular in light of Liew's tenuous relationship with the truth.

The Court should either disregard the evidence submitted by Liew or direct him to go back and submit it to the Court in a way that can be meaningfully reviewed by the government and subject to the normal adversarial process.

C.  <u>Continued Detention Does Not Violate Liew's Due Process Rights.</u>

The Magistrate Judge found that continued detention of Liew "strongly points to a denial of due process."  Order at 4.  The Magistrate Judge pointed to two factors in support of this conclusion.  He found that there has been a large amount of discovery, with "more . . . yet to come," *id.* at 4:16-19, and "[o]f greatest concern, the government has stated that it will be seeking additional, unspecified charges against Mr. Liew."  *Id.* at 4:20-22.  Finally, the Magistrate Judge concluded that "the pace of this case is directly attributable to the decisions of the prosecution."  *Id.* at 4:23.

The Magistrate Judge's conclusion that continued detention violates Liew's due process rights is not correct.  The issue of new charges will be resolved this week, consistent with the

government's proffer to the Magistrate Judge that charging would be complete in March. Discovery is virtually complete, including as to new charges contemplated by the government. And attributing "the pace of this case" to the "decisions of the prosecution," ignores the reality that both the scope of criminal conduct and the amount of discovery are the direct responsibility of the defendant – the government is playing the hand that it has been dealt by the defendant, including having to trace and attempt to account for the millions of dollars in proceeds defendant laundered through phony companies in Singapore on its way to banks in the PRC.

"[T]he due process limit on the length of pretrial detention requires assessment on a case-by-case basis." *United States v. Gelfuso*, 838 F.2d 358, 359 (9th Cir. 1988). The court is to consider in making that assessment "the length of confinement in conjunction with the extent to which the prosecution bears responsibility for the delay that has ensued." *Id*.

The length of Liew's detention is the result of one thing and one thing only: his dishonesty. A brief review of the history of this case demonstrates that Liew is responsible for not only his detention, but the delay in getting to the point we are at now.

Liew was charged, arrested, and detained in August 2011 because he had attempted to obstruct the government's investigation (after similarly attempting to obstruct the civil proceeding). These charges related directly to Liew's effort to conceal his trade secret theft from DuPont and the FBI.

When Liew first sought release in August 2011, he claimed that he had no financial resources for bail and did not offer any sureties. This claim was fundamentally false, as revealed by his financial records, his current offer to post his Singapore apartment, and his suggestion that he pay for a round-the-clock security guard. Liew then terminated his first counsel.

Several months later, Liew moved to be released from custody. This time, he offered sureties who would pledge $200,000 to secure his release. He offered no money or property himself, including the Singapore property or any of the other assets to which he obviously has

access.  He filed a declaration in support of his motion in which he attempted to mislead the Magistrate Judge regarding his financial circumstances.

After his motion for bail was denied, Liew terminated his legal counsel for the second time and spent approximately two months selecting new counsel.

After being charged in the superseding indictment and hiring new counsel, counsel objected to the protective order proposed by the government and litigation ensued.  The court ultimately issued the protective order that had been originally proposed by the Government with minor modifications.  In July 2012, immediately after the protective order was issued, the United States began producing discovery.  The discovery relevant to the trade secret case consists largely of documents seized from Liew's home and office.  For five months thereafter, defendant did not complain to the court about the pace of discovery.  By December 2012, discovery was effectively complete and Liew's primary complaint is that the United States has produced too much.

The Magistrate Judge erroneously focused on the amount of discovery and the likelihood of new charges.  Liew makes much of the volume of discovery and the need to evaluate it for evidence of his "hard work and independent development" and "reverse engineering."  Liew Motion for Bail at 4 (Dkt. 198).  This claim is absurd.  Liew swore under penalty of perjury to the bankruptcy court in 2009 that he did not have any intellectual property and that his small firm did not do design work, but only performed mathematical calculations.  Rometo Decl., Dkt. 214-2, Ex. 1 (at 8 of 67 on ECF), Ex. 3.  This may be the only true thing defendant has ever said; defendant could take 300 years to review the discovery, but he's not going to find in it evidence that he was coming up with original designs for titanium dioxide factories.

Discovery is essentially complete, as the Court learned during the hearing on December 12, 2012.  Review of the discovery is not the herculean task Liew makes it out to be.  A majority of the information that has been produced to the defendants is information seized from their

residences and offices – not new information seized from third parties.  A significant amount of the remaining discovery consists of bank records and records seized from Pan America, Inc., which have nothing to do with the trade secret charges.  The emails, which are in electronic form, can be searched.  A small amount of the total discovery originated with the Pangang Group employees whose motel rooms were searched while they were in the United States in July 2011.

The superseding indictment identifies, with a great deal of particularity, the specific trade secrets alleged to have been misappropriated.  If, in fact, Liew developed this technology on his own, it should be a fairly simple matter to point counsel to the places in his business records that show this development.  He should have no need to search voluminous records for evidence of independent development, hard work, or reverse engineering.  He should be able to identify the USAPTI and Performance Group employees who developed and engineered this technology; the USAPTI files and documents belonging to those employees, if they exist, should show the development work defendant claims he needs to look for.  Of course, Liew, as he admitted to the bankruptcy court, possessed no intellectual property of his own and his employees were not developing technology – they were copying it and performing mathematical equations to size stolen technology to the Chinese plants they were helping build.  Although it would indeed be time-consuming for Liew to locate in the discovery evidence that does not exist, that should not justify a delay in the trial.

The United States does intend to seek a superseding indictment.  Government counsel has identified the nature of the anticipated charges to the defense and already has provided to the defense bank records that relate to those types of charges.  Notably, the financial charges the government seeks to file involve precisely the financial shenanigans that are implicated by defendant's repeated requests for bail – specifically, his laundering of profits from sales of trade secrets to the Pangang Group in Singapore shell companies and the subsequent repatriation of that money to bank accounts in China.  A minimal amount of additional discovery will be

1   required.   Given defendant's familiarity with the subject matter, the superseding indictment will

2   not materially extend the time necessary to get this case to trial.

3                                                    **CONCLUSION**

4                The Court should revoke Magistrate Judge Cousin's February 26, 2013, order releasing

5   defendant Liew and order that Liew be detained pending trial.

6

7   Dated: March 10, 2013                            MELINDA HAAG

8                                                    United States Attorney

9                                                            /S/
                                                     _____
10                                                   JOHN H. HEMANN

11                                                   PETER B. AXELROD
                                                     Assistant U.S. Attorneys
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28