KEKER & VAN NEST LLP
STUART L. GASNER - #164675
sgasner@kvn.com
SIMONA A. AGNOLUCCI - #246943
sagnolucci@kvn.com
KATHERINE M. LOVETT – #276256
klovett@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Defendants WALTER LIEW and
USA PERFORMANCE TECHNOLOGY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>WALTER LIEW, CHRISTINA LIEW, USA PERFORMANCE TECHNOLOGY, INC., and ROBERT MAEGERLE,<br><br>        Defendants. | Case No. CR 11-0573-JSW (NC)<br><br>**OPPOSITION TO GOVERNMENT'S MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S RELEASE ORDER**<br><br>Date:     March 18, 2013<br>Time:    10:00 a.m.<br>Place:   Courtroom 11- 19th Floor<br>Dept.:   Hon. Jeffrey S. White |

733890.04

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................................1

II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY .....................................1

III. ARGUMENT ........................................................................................................5

    A.   Mr. Liew's continued and prolonged detention points strongly to a due
        process violation. ..........................................................................................5

        1.   Trial remains a long way off. ...................................................................6

        2.   The delay in this case is attributable entirely to the Government. ...............7

        3.   Mr. Liew cannot meaningfully participate in his defense while
            incarcerated. .........................................................................................8

    B.   The Government has failed to meet its burden of proving that Mr. Liew is a
        flight risk. ...................................................................................................12

        1.   The Government presumes Mr. Liew's guilt and ignores his strong
            defenses on the merits of this case. .........................................................12

        2.   Mr. Liew's past foreign travel and alleged foreign connections and
            transactions do not bear on his present ability to flee, or the
            likelihood that he would attempt to do so. .................................................15

        3.   The attacks on Mr. Liew's "honesty" are unpersuasive and
            irrelevant to whether there is a serious risk that he will flee. ....................18

    C.   The conditions ordered by Magistrate Judge Cousins are sufficient to
        ensure Mr. Liew's appearance. .....................................................................21

        1.   The Government has attempted to distract the Court from the
            applicable legal standard. .......................................................................21

        2.   Judge Cousins properly ordered an *ex parte in camera* review of the
            source of the funds Mr. Liew proposes to post. ........................................22

        3.   Judge Cousins' bail determination comports with bail orders in
            comparable cases. ..................................................................................24

IV.  CONCLUSION.....................................................................................................25

OPPOSITION TO MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S RELEASE ORDER
Case No. CR 11-0573-JSW (NC)

733890.04

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Chicago Lock Co. v. Fanberg*
676 F.2d 400 (9th Cir. 1982) ...................................................................................... 13

*Kewanee Oil Co. v. Bicron Corp.*
416 U.S. 470 (1974) ...................................................................................................... 13

*Stutz Motor Car of America, Inc. v. Reebok Int'l, Ltd.*
909 F. Supp. 1353 (C.D. Cal. 1995) ..................................................................... 13, 14

*United States v. Ailemen*
165 F.R.D. 571 (N.D. Cal. 1996) ............................................................... 5, 6, 7, 16

*United States v. Chen*
820 F. Supp. 1205 (N.D. Cal. 1992) ........................................................................... 12

*United States v. Ellis DeMarchena*
330 F. Supp. 1223 (S.D. Cal. 1971) ..................................................................... 23, 24

*United States v. Gelfuso*
838 F.2d 358 (9th Cir. 1988) ........................................................................................ 5

*United States v. Gonzales Claudio*
806 F.2d 334 (2d Cir. 1986) ......................................................................................... 6

*United States v. Kaila*
2008 WL 1767728 (E.D. Wash. April 15, 2008) ....................................................... 23

*United States v. Khashoggi*
717 F. Supp. 1048 (S.D.N.Y. 1989) ..................................................................... 24, 25

*United States v. Madoff*
586 F. Supp. 2d 240, 249 (S.D.N.Y. 2009) ................................................................ 18

*United States v. Mancuso*
726 F. Supp. 1210 (D. Nev. 1989) .............................................................................. 22

*United States v. Motamedi*
767 F.2d 1403 (9th Cir. 1985) ........................................................................ 18, 20, 25

*United States v. Sabhnani*
493 F.3d 63 (2d Cir. 2007) .......................................................................................... 16

*United States v. Sanchez*
2011 WL 744666 (C.D. Cal. Feb. 23, 2011) .............................................................. 16

*United States v. Sharma*
2012 WL 1902919 (E.D. Mich. May 25, 2012) ......................................................... 23

733890.04

**State Cases**

*Aetna Bldg. Maintenance Co. v. West*
     39 Cal. 2d 198 (1952) ............................................................................. 13

*E.I. Du Pont De Nemours and Company v. USA Performance Technology, Inc., et al.*
     Case No. 3:11-cv-1665-JSW (N.D.C.A.) ............................................... 3, 4

*Whyte v. Schlage Lock Co.*
     101 Cal. App. 4th 1443 (2002) ............................................................... 13

**Federal Statutes**

18 U.S.C. §1831(a)(5).................................................................................. 12

18 U.S.C. § 3142(g)(4) ........................................................... 4, 5, 21, 22, 23

18 U.S.C. § 3142(j).................................................................................... 17

Fed. R. Crim. Pro. 16(a)(1)(E)(ii) ........................................................... 7, 9

**Constitutional Provisions**

Fifth Amendment ...................................................................... 17, 22, 24

OPPOSITION TO MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S RELEASE ORDER
Case No. CR 11-0573-JSW (NC)

733890.04

## I.     INTRODUCTION

This Court should reject the Government's effort to reverse the decision of Magistrate Judge Cousins to grant bail to Walter Liew.  The Government's appeal attempts to downplay the central point of Judge Cousins' decision—that Mr. Liew's 20-month pretrial detention has been "directly attributable to the decisions of the prosecution," that trial remains a long way off, and that continued incarceration would likely violate the Due Process Clause—and instead continues a campaign of unfair character assassination, speculation and distortion of the record.

Rather than address the issues that actually are relevant to the Court's bail analysis, the Government's appeal engages in a misleading attack on Mr. Liew's "honesty," coupled with speculation as to Mr. Liew's foreign connections and family's finances.  Neither approach has anything to do with risk of flight (the only basis for Mr. Liew's detention to date), nor does either argument persuasively establish that continued detention is the only way to assure Mr. Liew's presence at trial.  Magistrate Judge Cousins took into account the Government's arguments, and rightly concluded, as required by the bail statute, that the conditions proposed by Mr. Liew—including a $2 million bond, home detention, and electronic monitoring—are sufficient to ensure Mr. Liew's appearance.  This Court should do the same.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Since the beginning of this case, the Government has strained to characterize Walter Liew as a "spy" who stole trade secrets and who has stronger connections abroad than in the United States.  The facts show otherwise.  Mr. Liew is a United States citizen who has lived in this country for over 30 years.  In 1980, when he was 23 years old, he arrived in Norman, Oklahoma to study at the University of Oklahoma,  obtaining his Master's Degree in electrical engineering in 1982.  He then moved to the Bay Area and worked for well-known high-tech companies Advanced Micro Devices and Hewlett Packard before starting his first small business—LH Performance—in 1989.  He married Christina Liew in 1991 and became a United States citizen in 1993.  In 2000, Walter and Christina had a son, Michael.  Michael is now twelve years old and a star 6th grader at the Bentley School in Oakland, California.  Dkts. 204-3, 205 (Gasner Decl. Exhs. N, O).

OPPOSITION TO MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S RELEASE ORDER
Case No. CR 11-0573-JSW (NC)

733890.04

After working on various engineering and other projects in the 1990s, Mr. Liew began to develop an expertise in the "chloride route" method for manufacturing titanium dioxide. The "chloride route" is a well-known process described in countless textbooks, conferences, websites, supplier catalogues and other sources of publicly available information,[1] and is practiced by DuPont and many of its competitors in titanium dioxide plants around the world.[2] It has been publicly described in thousands of patents owned by DuPont and others for over 50 years. *See, e.g.* U.S. Pat. No. 2,488,439 (DuPont patent filed Nov. 15, 1949);[3] U.S. Pat. No. 2,856,264 (dated October 14, 1958);[4] U.S. Pat. No. 5,201,949 (dated April 13, 1993);[5] Dkt. 199 at ¶ 6 (Gasner Decl.) (71,677 United States patents mentioning "titanium dioxide").

Mr. Liew assembled a team of engineers, including consultant Bob Maegerle, who had retired in the 1990s from a long and distinguished career at DuPont, and began pursuing opportunities in the field of titanium dioxide. In 2005, he formed Performance Group, and the following year, Pangang Group Jinzhou Titanium accepted Performance Group's bid to improve on the front-end design of the chlorination portion of an already-existing titanium dioxide production facility in Jinzhou, China (the "Jinzhou project"). In 2007, Mr. Liew formed USA Performance Technology, Inc. ("USAPTI"). Two years later, USAPTI was engaged by another Pangang entity to work on a larger titanium dioxide plant in Chongqing, China (the "Pangang project").

Mr. Liew and his team of engineers spent years working tirelessly on the Jinzhou and Pangang projects. Indeed, just a single hard-drive seized by the Government—the backup hard drive that Mr. Liew kept in his safety deposit box—contains *thousands* of files with the work-product of the many engineers employed by USAPTI. *See, e.g.,* Dkt. 203-8 (Gasner Decl. Exh. I) (first 100 pages of folder index). Each of the folders in that hard drive contains nested folders with scores of detailed engineering work at the bottom level, such as draft after draft of Process Flow Diagrams and Piping and Instrumentation Designs. *See, e.g.*, Dkt. 203-9 (Gasner Decl.

---

[1] *See* Dkts. 203-5-203-7 (Gasner Decl. Exhs. F-H).
[2] *See* Dkt. 199 at ¶ 3, 15 (Gasner Decl.).
[3] Dkt. 203-4 (Gasner Decl. Exh. E).
[4] *Id.*
[5] *Id.*

1  Exh. J) (example of detailed engineering work).

2          As is often the case in Silicon Valley when a small venture starts to succeed in the

3  marketplace, Mr. Liew soon faced the litigation wrath of a larger competitor.  In April 2011,

4  DuPont sued Mr. Liew and others, alleging that certain features of USAPTI's designs for the

5  Jinzhou and Pangang projects misappropriated DuPont's trade secrets.  *See* Compl. (Dkt. 1), *E.I.*

6  *Du Pont De Nemours and Company v. USA Performance Technology, Inc., et al.*, Case No. 3:11-

7  cv-1665-JSW (N.D.C.A.).  Mr. Liew did not flee or otherwise respond to the accusations of trade

8  secret misappropriation as would the "spy" of the Government's imagination; instead, he hired

9  counsel and *voluntarily* met with DuPont's investigator, lawyers, and engineers in order to

10  explain how he developed the plant designs at issue in the case. Dkt. 199 at ¶ 8 (Gasner Decl.).

11  When that effort to dissuade DuPont went nowhere—the DuPont representatives seemed

12  singularly uninterested in any substantive explanation of how a small engineering firm could have

13  designed a chloride route titanium dioxide plant—Mr. Liew and his civil counsel started to

14  defend himself vigorously, filing a detailed answer and counterclaim and preparing to

15  demonstrate that the Pangang and Jinzhou designs were based on concepts that were available

16  publicly.  *See* Substituted Answer and Countercls. to Pl.'s Compl. (Dkt. 35), *E.I. Du Pont De*

17  *Nemours and Company*, Case No. 3:11-cv-1665-JSW.

18          Unbeknownst to Mr. Liew, however, DuPont—with little interest in a fair fight in civil

19  litigation over its supposed "trade secrets"—was secretly conferring with the Government and

20  identifying similarities between DuPont's titanium  dioxide plants and the USAPTI designs, and

21  claiming (without basis) that virtually all of the similarities were evidence of trade secret

22  misappropriation.  On July 19, 2011, Mr. Liew's house and business were subject to massive

23  searches.  *See* Dkt. 48-4 (Search and Seizure Warrant).  Even though the searches put Mr. Liew

24  on notice of the seriousness of the coming criminal case, Mr. Liew and his wife did not flee the

25  United States, but, rather, stayed put in their house in Orinda, retained counsel, and tried to

26  negotiate their voluntary surrender.  On July 28, 2011, Mr. Liew was arrested and detained based

27  on limited charges of obstruction of justice arising out of circumstances related to his civil lawsuit

28  and the search of his home.  *See* Dkt. 15 (Arrest Warrant).  His wife and co-defendant Christina

Liew was released on a $1 million bond.

What followed has been 19 months of incarceration for Mr. Liew, much of it in the miserable conditions of the North Oakland County Jail, while the Government has proceeded at a snail's pace.  It took the Government over six months (until February 1, 2012) to bring trade secret charges, despite the fact that these charges were the focus of the search warrants and mirrored the allegations made by DuPont's civil complaint almost a year earlier.  Dkt. 64 (Superseding Indictment).  No discovery on the trade secret charges was produced until July 2012.  Since that date, the Government has repeatedly stated that it would be bringing additional financial accusations in a further Superseding Indictment, initially representing that the charges would be brought before the end of 2012,[6] then shortly after the New Year,[7] and most recently promising that the charges would be brought in March 2013.  It appears that the Second Superseding Indictment finally was returned today.  Dkt. No. 269.

On November 20, 2012, Mr. Liew filed the renewed motion for bail currently before the Court on appeal.  Dkt. 198.  Finally armed with discovery on the trade secret case, Mr. Liew was able to attack the Government's allegations as based largely on the conclusory, biased and inaccurate input of DuPont's engineers, and to note the practical difficulties of analyzing massive amounts of electronic evidence (much of it technical or in Chinese or both) while incarcerated.  The Government opposed the motion on essentially the same grounds it raises now on appeal.  Pretrial Services recommended that the Court release Mr. Liew on a $2 million secured bond, supported by special conditions.  *See* Dkt. 255 at 2 (Order).

The parties appeared before Judge Cousins on December 21, 2012.  Dkt. 223 (Minute Order).  At that hearing and in a written order that followed, Judge Cousins found that there did exist conditions that would reasonably assure Mr. Liew's appearance at trial.  However, because the Government had moved for an inquiry into the source of the security to be posted pursuant to 18 U.S.C. § 3142(g)(4), Judge Cousins ordered Mr. Liew to lodge with the Court an *in camera ex parte* declaration, with supporting documentation, regarding: (1) the total amount of assets presently available to or controlled by Mr. Liew and his wife; and (2) the source of the $2 million

---

[6] Dkt. 235 at ¶ 2 (Agnolucci Decl.).
[7] *Id.* at ¶ 8.

that Mr. Liew proposes to submit to assure his appearance. *Id.* The Government objected to the review being *in camera* and *ex parte*, but, on January 14, 2013, Judge Cousins rejected the Government's request to unseal any declaration to be submitted by Mr. Liew and reaffirmed his earlier order. Dkt. 232. On February 15, 2013, Mr. Liew complied with Judge Cousins' order and submitted the required information *in camera* and *ex parte*. Dkt. 255 at 2-3 (Order).

On February 26, 2013, after considering the briefing of the parties and Mr. Liew's *in camera* declaration, Judge Cousins granted pretrial release to Mr. Liew, concluding that a bond secured by $2 million in cash, with special conditions, including home detention with electronic monitoring, would reasonably secure his future appearances. *Id.* at 4, 7. Judge Cousins took note of Mr. Liew's then-nineteen-month pretrial detention and concluded that "further detention points strongly to a denial of Mr. Liew's due process rights." *Id.* at 4. He additionally determined that the pace of the case was "directly attributable to decisions of the prosecution." *Id.* The Government's current appeal of that order followed.

## III.   ARGUMENT

### A.   Mr. Liew's continued and prolonged detention points strongly to a due process violation.

Faced with Judge Cousins' determination that "further detention points strongly to a denial of Mr. Liew's due process rights," Dkt. 255 at 4, the Government tries several evasive maneuvers. The Government puts the due process argument last in its brief, apparently hoping it will receive less attention. Mot. at 20-24. It claims that the remedy is an early trial date. *Id*. at 2:7-8. And it claims the delay in this case is the defendant's fault. *Id.* at 21.

All of these arguments deserve to fail. It is clear that long pretrial detentions can violate the Due Process Clause of the Fifth Amendment. *See United States v. Ailemen*, 165 F.R.D. 571, 577 (N.D. Cal. 1996). In determining whether excessive detention rises to the level of a due process violation, courts "consider the length of confinement in conjunction with the extent to which the prosecution bears responsibility for the delay that has ensued." *United States v. Gelfuso*, 838 F.2d 358, 359 (9th Cir. 1988). Judge Cousins carefully considered these factors, and reached the unremarkable conclusion that keeping a presumably innocent man locked up without trial for what is likely to be at least 30 months "points strongly to a denial of due process." Nothing in the

5

1    Government's appeal papers should persuade this Court otherwise.

2         **1.     Trial remains a long way off.**

3         Unable to shorten the twenty month period of time Mr. Liew has already been

4    incarcerated, the Government's first line of defense is to claim that the time to trial can be

5    shortened so as to avoid due process concerns.  Mot. at 2:7-8.  Accordingly, the Government has

6    now rushed to return the Second Superseding Indictment on financial issues that it emptily

7    promised for nearly a year, and further promises expedited progress in the year ahead.

8         But even with the filing of the Second Superseding Indictment today,  there is much to do

9    to get this case ready for trial.  The status of the Pangang Defendants has not yet been determined,

10   making it unclear how many defendants are before the Court.  A motions schedule has not been

11   set.  Discovery is not yet complete, either on the trade secret charges[8] or on the new financial

12   charges.[9]

13        Even with all of the Government's promised diligence and unrealistic assumptions – for

14   example,  that "[g]*iven the defendant's familiarity with the subject matter*, the superseding

15   indictment will not materially extend the time necessary to get this case to trial,"  Government's

16   Motion ("Mot.") at 24 (emphasis added)—it is hard to imagine this case being ready for trial any

17   time before 2014.  By then, Mr. Liew will have been incarcerated for two and a half years—a

18   length of time that "points strongly to a denial of due process."  *United States v. Gonzales*

19   *Claudio*, 806 F.2d 334, 341 (2d Cir. 1986); *see also Ailemen*, 165 F.R.D. at 577.

20        Accelerating the trial date as the Government suggests would add to the due process

21   concerns, not alleviate them. The quantity of discovery to date has been staggering: the

22   Government has produced 5 terabytes of Encase and other image files from some 171 seized

23   computers and other devices.  Decl. of Joshua D. Maremont in Supp. of Opp'n to Mot. to Revoke

24   Detention Order ("Maremont Decl.") at ¶ 6.  It also has produced 24GB of email messages which,

25   _____

26   [8] Although discovery on the current indictment has progressed since Mr. Liew's renewed bail
     motion, the parties have yet to work out some remaining issues, including the production of
27   additional documents received from co-defendant Tze Chao and other digital materials that the
     Government has indicated it has not yet analyzed.
     [9] While the Government somewhat surprisingly contends that most of the financial discovery has
28   been provided – even though the discovery has contained virtually no information from foreign
     bank accounts – it concedes that more financial discovery is to come.  Mot. at 23-24.

733890.04

when de-duplicated, equal 139,789 individual documents.  *Id.* at ¶ 7.  Although these emails

would fill approximately 125 banker's boxes, they represent less than 1%, by file size, of the data

produced to date by the Government as EnCase images.  *Id.*  In other words, the EnCase images

produced to date, if processed and converted to TIFF images, could easily yield an additional 250

million pages, enough to fill another 90,909 banker's boxes.  *Id.*  In addition, the Government has

produced 14 discs of material scanned from paper files in multiple locations.  *Id.* at ¶ 8.  Although

the Government promised on May 1, 2012 to provide a list of key documents that might simplify

the discovery process, it has never produced that list; when the defense moved to compel it, Judge

Cousins ordered the Government to identify its Rule 16(a)(1)(E)(ii) case-in-chief documents by

April 30, 2013.  Dkt. 257 at 1.  Forcing the defendant to digest this vast amount of material before

an expedited trial date is no solution to the problem.

### 2.  The delay in this case is attributable entirely to the Government.

The Government's second line of defense with respect to the delay in this case is to blame

it on the defendant.  Magistrate Judge Cousins, who is intimately familiar with the Government's

course of conduct with respect to discovery, rejected that argument, finding that "the pace of this

case is directly attributable to decisions of the prosecution."  Dkt. 255 at 4 (Order); *Ailemen*,

165 F.R.D. at 582 ("the extent to which the prosecution bears responsibility for the delay that has

ensued" is the second factor in the two-prong due process analysis).  The Government's assertion

that Mr. Liew is the one to blame, Mot. at 21, for what likely will be *at least a two-and-a-half-*

*year detention* is, at best, based on faulty memory and, at worst, a disingenuous rewriting of

history.

This has been a trade secret case from the outset, starting no later than June 2011, when

the FBI interviewed Jian Liu, an engineer who worked with USAPTI.  Dkt. 199 at ¶ 5 (Gasner

Decl.).  The search warrants executed in July 2011 were directed at a trade secret case.  Dkt. 48-4

(search and seizure warrant).  Yet the Government did not obtain a trade secret indictment against

Mr. Liew *for over six months*, keeping him detained during that time on the basis of peripheral

obstruction of justice charges.  The Government then did not produce discovery on the trade

secret case until July 2012, the vast majority of it in the form of an electronic "dump truck" of

EnCase images.  Maremont Decl. at ¶ 4.  The Government then repeatedly refused to provide requested materials to defendants, refused to engage in a meaningful dialogue over discovery issues, and did little or nothing to expedite the case so as to allow trial in a reasonable amount of time.  Dkt. 218 at ¶¶ 6, 7, 10, 12-18 & Exhs. E, K-O, Q, T, V (Agnolucci Decl.); *see also* Dkt. 199 at ¶ 10-14 (Gasner Decl.).  Finally, while the Government seized documents relevant to potential financial charges *twenty months ago*, in July 2011, it only sought the return of the Second Superseding Indictment today.  The suggestion that Mr. Liew somehow acquiesced to this state of affairs is preposterous.

The primary cause of the delays in getting this case to trial has been the Government's protracted investigation and its *seriatim* approach to charging.  The Government's attempt to pin the delay on Mr. Liew is so patently untrue as to call its good faith into question in even making this argument.  *See* Dkt. 218 at ¶¶ 6, 7, 10, 12-18 & Exhs. E, K-O, Q, T, V (Agnolucci Decl.).[10]

### 3.    Mr. Liew cannot meaningfully participate in his defense while incarcerated.

The Government argues that Magistrate Judge Cousins "erroneously focused on the amount of discovery" in this case, asserting that "it should be a fairly simple matter" for Mr. Liew to assist his counsel, while incarcerated, with the review of the *five terabytes* of discovery produced to date—the equivalent of half the Library of Congress.[11]  Mot. at 22-23.  This statement entirely ignores the nature of the trade secret charges, the nature of the underlying evidence, and the kind of defense required in this case.

Eager to make a complicated case seem simple for the purpose of minimizing the burdens of incarceration, the Government claims that "the superseding indictment identifies, with a great deal of particularity, the specific trade secrets alleged to have been misappropriated."  Mot. at 23.  Nothing could be further from the truth.  In fact, the First Superseding Indictment charged that the *entirety of the DuPont chloride route process* for manufacturing titanium dioxide is at issue.  Dkt. 64 at ¶ 14(a) (Superseding Indictment).  The Second Superseding Indictment makes that vague

---

[10] For example, the Government's suggestion that Mr. Liew's objections to the protective order were unfounded, or a significant source of delay, is a non-starter.  Mot. at 22.  Mr. Liew cannot be faulted for objecting to the over-reaching protective order proposed by DuPont and eventually rejected by the Court.

[11] *See Megabytes, Gigabytes, Terabytes—What Are They?*, www.whatsabyte.com, last visited March 13, 2013.

733890.04

and sweeping allegation even vaguer, modifying the alleged "trade secret" to include "ways and means in which proprietary and non-proprietary components were compiled and combined by DuPont to form substantial portions of the TiO2 manufacturing process." Dkt. 269 at ¶14(a) (Second Superseding Indictment). Further, the memos from the DuPont engineers produced as part of the Government's "C-1" discovery (the "highly confidential" materials containing alleged DuPont trade secrets) claim wrongful similarities between DuPont processes and USAPTI's in everything from plant layout to ore handling, chlorination, gas pre-cooling, condensation, oxidation, solids removal, finishing, and various aspects of budgeting for, equipping, staffing, and running a titanium dioxide plant.[12] The Government has refused, despite multiple requests by defense counsel, to identify with any additional particularity the documents alleged to contain DuPont's trade secrets.[13] What Mr. Liew needs to do to defend himself against the Government's sweeping and unspecified allegations is to review the "highly confidential" materials in detail and decipher the aspects of the titanium dioxide process that the Government alleges to be trade secrets. He must then find in the terabytes of discovery the work-product demonstrating how USAPTI developed the feature in question; find communications with Pangang and others (many in Chinese) relating to that aspect of the project; search the Internet, technical libraries and otherwise research relevant disclosures; communicate by telephone with experts, vendors and others in the field with relevant knowledge; and otherwise engage in a collaborative process with counsel that requires both breadth of research and depth of investigation to rebut the Government's technical allegations. Dkt. 199 at ¶ 35 (Gasner Decl.).

Since Keker & Van Nest entered its appearance in April 2012, counsel have tried mightily to accomplish the same within the constraints of his incarceration. *Id.* at ¶¶ 36-40. Counsel have tried to solo climb the Mt. Everest of electronic materials, but their sheer volume makes the going inordinately slow if not impassable. There is no feasible way to load all of the documents onto a litigation support platform: just the cost of "processing" a single terabyte of the EnCase images

---

[12] Dkt. 199 at ¶ 19 (Gasner Decl.); *see also* Dkt. 203-3 at C1-000275 (oxidation); C1-000306 (chlorination); C1-000307 (gas pre-cooling and solids removal); C1-000331-35 (equipment); C1-000339 (oxidation); C1-000340 (filtration, drying, grinding and packer feed) (Gasner Decl. Exh. D).
[13] *See, e.g.*, Dkt. 234 at 3-5 (Defs.' Mot. for Rule 16(a)(1)(E)(ii) Order); Dkt. 235 at ¶¶ 5-7 (Agnolucci Decl.).

733890.04

that the Government has provided into a viewable and easily printable format (such as TIFF) would be $450,000 at current rates of $450 per gigabyte, or over $2.2 million for 5 terabytes. Maremont Decl. at ¶ 5. It is possible to "restore" drives from EnCase into native format at a cost of several hundred dollars per drive, but that yields a complex folder structure (many of the headings in Chinese) that must be viewed on a computer in native format and that cannot easily be searched. Counsel have crept a small ways up the electronic Everest by processing and printing selected batches of documents, and by bringing a restored drive to the prison, and sitting side by side with Mr. Liew while he assists in finding relevant documents. But that process is simply too slow and cumbersome to make substantial progress, let alone reach the summit. *See* Dkt. 199 at ¶ 36 (Gasner Decl.).

The Federal Detention Center in Dublin is approximately a 45-minute drive from the Keker & Van Nest offices in San Francisco. After extensive paperwork and other delays, counsel is escorted into a small interview room where a face-to-face meeting can be conducted, albeit under video surveillance. A laptop usually can be brought into the interview room if counsel executes additional paperwork and/or if the computer undergoes an inspection by prison IT staff. Dkt. 199 at ¶ 37 (Gasner Decl.); Dkt. 249-1 at ¶ 4 (Lovett Decl.). Given the detention center's needs for "counts" and other administrative matters, it is difficult to conduct a meeting of more than three hours in duration without lengthy interruption or skipping meals. As a practical matter, each three hour session requires roughly six hours of attorney time (due to travel time and administrative delays), which, based on the realities of scheduling, makes it difficult to visit Mr. Liew more than once a week and effectively doubles the cost of consulting with counsel. *See* Dkt. 199 at ¶ 37 (Gasner Decl.).

Mr. Liew is not permitted to possess a computer while in detention, nor is he permitted under the Protective Order to possess "highly confidential" or C-1 materials. Materials left for or mailed to the Detention Center often take inordinately lengthy periods of time to be delivered (sometimes weeks), and there are practical limits on the quantities of materials that can be printed out and mailed. As a result of these restrictions, the collaboration between counsel and client is exactly the opposite of what it should be. Rather than having Mr. Liew—who is highly motivated

733890.04

and uniquely qualified—wade through the terabytes of documents produced by the Government (substantial portions of them in Chinese) and select documents of significance to discuss with counsel, counsel must attempt to identify the important documents, print them, and bring them to Dublin to review with Mr. Liew—or sit idly by while Mr. Liew tries to find them on a restored drive under video surveillance.  If, upon meeting with Mr. Liew, it turns out that the attorneys have missed the mark in what they chose, counsel cannot simply pull up those documents on the spot.  The entire conversation must be delayed until the next visit to Dublin.  Intensive document review and collaboration is, in practical effect, impossible.  *See* Dkt. 199 at ¶ 38 (Gasner Decl.).[14]

The Government's characterization of this case—which involves complex charges of trade secret theft, multiple terabytes of discovery, numerous Chinese documents, and many documents that can only be meaningfully reviewed electronically—as "simple" (Mot. at 23) is laughable.  The fact that a significant portion of the documents produced by the Government were seized from Mr. Liew and/or the USAPTI offices is precisely *why* it is critical for Mr. Liew to be an active participant in the defense team.  He is uniquely suited to filter through the terabytes of discovery and locate the significant items, and there is no meaningful way to accomplish this task in any reasonable amount of time while he remains incarcerated.  Moreover, the "small amount" of discovery the Government claims was seized from and/or provided by the Pangang defendants (Mot. at 23) is actually *one terabyte*, and is primarily in Chinese, making it extremely difficult to review without Mr. Liew's assistance.

It would be unjust, unfair and a violation of Mr. Liew's constitutional rights for him to remain locked up indefinitely under conditions where he is disabled from assisting effectively in his own defense, especially where the Government's concerns about flight can be reduced by the types of conditions on release that Judge Cousins ordered.

---

[14] Moreover, many of the critical documents in this case are computer-aided design ("CAD") or other types of files that must be analyzed on a computer in their native form, because printing them out loses significant data, including many of the numbers and calculations underlying the designs.  Accordingly, it is difficult if not impossible for Mr. Liew to do meaningful work on his defense in between attorney visits.  And some of the work that Mr. Liew would ordinarily be expected to do so as to participate in his defense—such as helping to review the more than 100,000 emails produced by the Government in electronic form—he cannot do at all, because those emails can only be reviewed on Concordance on the Keker & Van Nest litigation support network, which cannot be accessed from the detention center.  Dkt. 199 at ¶ 39 (Gasner Decl.).

11

733890.04

**B.     The Government has failed to meet its burden of proving that Mr. Liew is a flight risk.**

     **1.     The Government presumes Mr. Liew's guilt and ignores his strong defenses on the merits of this case.**

The weakness of the evidence against Mr. Liew is "an important factor favoring release." *United States v. Chen*, 820 F. Supp. 1205, 1207 (N.D. Cal. 1992).  It is troubling that in response to serious criticism of the merits of its trade secret case in briefing before Magistrate Judge Cousins, the Government's Opposition said virtually nothing.  *See generally* Dkt. 213.  As it did before Judge Cousins, the Government now goes to the opposite extreme, taking Mr. Liew's guilt for granted and even predicting a sentence in excess of the statutory maximum for economic espionage.  Mot. at 9-10; 18 U.S.C. §1831(a)(5).  The Government's proposed adjustment for amount of gain of 22 levels seems to presume that *every penny* of the money allegedly earned by Mr. Liew was the fruit of illegal activity.  Mot. at 9:25.  The assumption that Mr. Liew is guilty, and that he earned no money legitimately over the years of operating his businesses, contradicts the presumption of innocence required by the bail statute and ignores the overwhelming weight of the evidence in this case—evidence that has been brought to the Government's attention numerous times and that the Government has never been able to meaningfully address.

The "highly confidential" materials produced by the Government in this case are surprisingly devoid of the type of evidence one would expect in a criminal trade secret case.  Instead, they principally consist of (1) internal DuPont technical materials *obtained by the Government from DuPont in the investigation*, such as a lengthy  technical manual *from 1985* relating to DuPont titanium dioxide plants (the "Basic Data document"); (2) sketches and notes apparently prepared by Bob Maegerle; (3) design materials or specifications from Performance Group and USAPTI;  and (4) extensive commentary from DuPont engineers opining as to how the information in Mr. Maegerle's apparent notes and sketches "must have" come from the Basic Data document or other DuPont sources.  Dkt. 199 at ¶ 3 (Gasner Decl.); Dkts. 203-1-203-3 (Gasner Decl. Exhs. B-D).  In other words, it appears that most of the "highly confidential" material *was provided to the Government by DuPont to support their allegations*—initially raised in a civil case and now exported to the criminal case—that information in USAPTI's drawings

733890.04

1    and specifications *was derived from* the 1985 Basic Data document or DuPont facilities or other

2    materials.

3            This is the stuff of a typical *civil* trade secret case, where a former employee (Maegerle)

4    leaves his employer (DuPont), works as a consultant for an upstart competitor (USAPTI), and the

5    former employer contends that the consultant's work for the competitor is based on

6    misappropriated trade secrets.  In this kind of civil trade secret case (a run-of-the-mill event in

7    Silicon Valley), the competitor often defends based on California law that strongly favors

8    employee mobility, and permits the employee to rely on his residual knowledge even if that leads

9    to similar results.  *See, e.g., Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1462 (2002).

10   The new employer/competitor often has strong defenses based on prior public disclosures of the

11   alleged trade secrets including in patents, publications, conferences, and the like.  *See, e.g., Stutz*

12   *Motor Car of America, Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995) ("It is

13   well established that disclosure of a trade secret in a patent places the information comprising the

14   secret into the public domain."); *Aetna Bldg. Maintenance Co. v. West*, 39 Cal. 2d 198, 205

15   (1952) (information that is "commonly known to the trade or may easily be discovered" is not

16   entitled to trade secret protection).  Often persuasive, too, is evidence of hard work and

17   independent development by the new employer.  *See Kewanee Oil Co. v. Bicron Corp*., 416 U.S.

18   470, 490 (1974) (noting that "trade secret law does not forbid the discovery of the trade secret by

19   fair and honest means, *e.g.* independent creation or reverse engineering").  A major factor in cases

20   of this type is the law that makes clear that "reverse engineering" is a permissible, and indeed a

21   desirable feature of a competitive economy.  *Id*.; *see also Chicago Lock Co. v. Fanberg*, 676 F.2d

22   400, 403-05 (9th Cir. 1982) (defendant's own independent reverse engineering was proper means

23   of discovering plaintiff's trade secret).

24           In civil cases with this fact pattern, the plaintiff's extravagant claims of theft of the former

25   employer's "crown jewel" technology often turn out to be far more modest that the initial rhetoric

26   promised.  There is ample reason to believe that this pattern will be repeated here.  The

27   Government will have an uphill battle proving beyond a reasonable doubt that features in a *27-*

28   *year old* technical manual have remained trade secrets in a longstanding and crowded field.

OPPOSITION TO MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S RELEASE ORDER
Case No. CR 11-0573-JSW (NC)

733890.04

1  Everything disclosed in the countless patents and publications relating to titanium dioxide and the

2  chloride route process (*see supra* p. 2) lost any trade secret protection it ever had at the time of

3  publication. *See Stutz Motor Car*, 909 F. Supp. at 1359.  Moreover, Bob Maegerle is a talented

4  engineer who was entitled to practice his trade as a consultant after his career at DuPont, and

5  Walter Liew and USAPTI were entitled to hire and rely upon him in designing titanium dioxide

6  plants to compete with many others throughout the world.[15]  While this case has the twist that

7  USAPTI's customer is an entity allegedly owned by the Chinese government (as are many

8  Chinese companies), not a single "highly confidential" document shows the direct transmission of

9  any confidential DuPont document to China.  Dkt. 199 at ¶ 2 (Gasner Decl.).

10  Significantly, the DuPont engineers relied on by the Government to annotate USAPTI's

11  work product characterize as wrongful certain design similarities between the USAPTI work-

12  product and alleged DuPont "proprietary" information that is, in fact, publicly disclosed or

13  commonplace in the industry.  One annotation, for example, claims that usage of a certain term is

14  "unique" to a certain DuPont plant (Dkt. 203-3 at C1-000307 (Gasner Decl. Exh. D)); the same

15  term, however, is used in a European Commission monograph on best practices for titanium

16  dioxide production.  Dkt. 203-6 at 175 (Gasner Decl. Exh. G).  Another annotation notes that a

17  certain size "blend tank" is the same in the USAPTI document and in a DuPont plant, as well as

18  being the size specified in the Basic Data document; both the USAPTI document and the

19  annotation, however, refer to that size as "standard."  *See* Dkt. 203-3 at C1-000339 (Gasner Decl.

20  Exh. D). Whether ignorant of trade secret law or choosing to ignore it, the DuPont engineers

21  apparently focused on what "looks like DuPont" rather than what would truly qualify as a trade

22  secret.

23  Although the Government has made it sound as though the contents of a safety deposit

24  box belonging to Mr. Liew that was searched in July 2011 was a "treasure trove" of electronic

25  trade secrets,[16] the folder indices show them to be nothing of the sort.  They are, rather, the kind

26  of generic computer back-ups that any small business owner might keep, with a hodgepodge of

27  company materials, research from public sources, family pictures and videos and back-ups of

28

---

[15] See Dkt. 199 at ¶¶ 3, 15 (Gasner Decl.).
[16] Dkt. 59 at 1, 3 (Opp. to Defs.' Mot. for Pretrial Release).

14

733890.04

favorite music (including "oldies," "rock" and "songs of the 70's"). *See, e.g.*, Dkt. 203-8 at 61, 82 (Gasner Decl. Exh. I); *see also* Dkt. 199 at ¶¶ 26-27 (Gasner Decl.); Dkt. 204-204-1 (Gasner Decl. Exhs. K, L).  And over a year and a half after seizing the hard drive, the Government still has not identified *any* documents on that hard drive that it contends deserve "highly confidential" treatment.  Dkt. 199 at ¶ 4 (Gasner Decl.).

The discovery materials produced by the Government to date demonstrate that at the heart of the Government's case is the issue more typically found in civil trade secret cases: whether any similarities between the USAPTI plans for the Pangang TiO2 plant and DuPont's plants or technology are the result of misappropriation of true trade secrets (the Government's and DuPont's view) or whether (as the defense contends), any similarities are non-actionable because based on previous public disclosure, independent development, proper reverse engineering, common knowledge in the field,  Mr. Maegerle's or other consultants' residual knowledge, or are precluded by other defenses such as DuPont's failure to maintain confidentiality.  The Court cannot decide on this motion who is right and who is wrong on the merits of the Government's trade secret case.  But it is clear that Mr. Liew will have powerful defenses to the Government's claims, and thus a strong incentive to appear at trial and to defend his conduct—a factor that weighs heavily in favor of bail and that the Government would like to gloss over.

> **2.      Mr. Liew's past foreign travel and alleged foreign connections and transactions do not bear on his present ability to flee, or the likelihood that he would attempt to do so.**

Even though Mr. Liew is a United States citizen with long-standing ties to the community, an American-born son, and no criminal record, the Government asserts that he is a "flight risk" due to foreign "financial and family ties" and alleged overseas transactions.  Mot. at 10.  A careful look at the facts, however, shows that there is little realistic risk of flight, and what risk the Court may perceive can easily be addressed by conditions less drastic than detention.

*First*, Mr. Liew has shown no inclination or ability to flee regardless of whatever foreign connections he may have.  He had plenty of opportunities to see trouble brewing, not the least of which was on July 19, 2011 when scores of federal agents executed a surprise search warrant raid on his home and business. But Mr. Liew and his wife did <u>not</u> flee. They stayed put, ready to fight

733890.04

the charges—just as Mr. Liew had been fighting the civil allegations that morphed into this criminal case for the prior four months. These facts weigh strongly in favor of bail. *See, e.g., Ailemen*, 165 F.R.D. at 599 (ordering release of defendant who had made "no effort" to avoid arrest despite his expectation that he would be arrested); *United States v. Sabhnani*, 493 F.3d 63, 68 (2d Cir. 2007) (holding that defendants' "failure to flee in the twelve hours between the search of their home and their arrest" militates against detention); *United States v. Sanchez,* 2011 WL 744666, at *2 (C.D. Cal. Feb. 23, 2011) (affirming magistrate's bail order where the defendant, who faced a potential lengthy sentence and was "aware of the threat of prosecution" for several years, did not attempt to flee). Even if Mr. Liew wanted to flee the country—which he does not—there is no realistic way for him to do so. His passport has been seized. Under the conditions imposed by Judge Cousins—home detention and electronic monitoring[17]—it would be virtually impossible for Mr. Liew to escape undetected.

*Second*, the Government makes much of the fact that Mrs. Liew owns family property abroad, and that the Liews own no property in the United States, but those facts bear no actual connection to flight risk. Mrs. Liew had been arranging to buy a Singapore residence for her mother before the criminal charges came to light. Dkt. 205-1 (Gasner Decl. Exh. P). Now that her mother is deceased, that property has become available to use as security for Mr. Liew's release, and the timing demonstrates that it was never intended as a means to evade the charges at issue.[18]

While Mr. Liew's wife does have family in China, and owns the house in China in which her father resides, that alone does little to suggest flight to China is a realistic possibility. Mr. Liew is an American citizen of Malaysian descent who has never lived in China and does not have permission to reside there. Mr. Liew would have to slip into China undetected and live underground with his wife and a 12-year-old American son, who speaks little or no Chinese, in an

---

[17] In his renewed bail motion, Mr. Liew offered to hire and pay for an around the clock private security guard at his residence, which both Judge Cousins and Pretrial Services concluded was not necessary to ensure Mr. Liew's future appearances. Mr. Liew stands prepared to renew his offer to hire a private guard if the Court deems it necessary.

[18] The Government's Motion states that Mrs. Liew has agreed to sell her home and post $2 million of the proceeds as security, but she in fact offered to sell *or borrow against* it. Dkt. 198 at 1:23, 20:5 (Defs.' Renewed Mot. for Order Revoking Detention).

16

authoritarian state where a state-sponsored I.D. is needed to get a job, attend a school, or rent an apartment.  It is hard to imagine that he would be welcomed warmly by the Chinese government.  Chinese government officials have loudly denied involvement in "economic espionage" and hardly could be expected to undercut these public denials by harboring a fugitive American businessman whose alleged actions (if true) reflect badly on the Chinese government.  Dkt. 205-2 (Gasner Decl. Exh. Q); *see also* Qi Han, *Victims of Unfair Espionage Laws*, China Daily, Nov. 27, 2012, *available at* http://usa.chinadaily.com.cn/cndy/2012-11/27/content_15961099.htm.

The Government focuses on the fact that the home the Liews were attempting to purchase in Orinda at the time of their arrest allegedly would have been titled in the name of Mrs. Liew's brother and purchased in part with family money (Mot. at 10), but does not explain why those facts make Mr. Liew a flight risk.  There is nothing unusual about individuals holding real estate in the names of family members, especially when the family contributes to the purchase of that real estate.  If anything, the fact that the Liews were laying down additional roots in the United States contradicts the Government's theory that Mr. Liew is a flight risk.

*Third*, the Government asserts that Mr. Liew's "failure to explain" how the alleged proceeds of his businesses were spent over the years, even though his finances are the subject of the Second Superseding Indictment returned today, is a reason to deny bail.  This flouts the Bail Reform Act's insistence that nothing in the bail procedures outlined in Section 3142 "shall be construed as modifying or limiting the presumption of innocence."  18 U.S.C. Section 3142(j).  The suggestion that Mr. Liew waive his Fifth Amendment rights and provide the Government with a full disclosure of his and his extended family's finances is a transparent fishing expedition for discovery on the Government's newly-charged financial case.  No lawyer would advise his client to do so under these circumstances, and Mr. Liew's "failure" to do more than required by the Magistrate Judge cannot be deemed a reason to deny him bail.

Finally, there is no logical connection between *past* money transfers abroad and flight risk on the facts of this case.  The Government's hypothesis appears to be that Mr. Liew has stashed money abroad that remains available to him for an escape and/or support of himself and family

1   while a fugitive.  But this is bald speculation, unsupported by any evidence adduced by the

2   Government.  Indeed, the Government primarily relies on summary charts that purport to show

3   wire transfers from the United States to various Chinese and Singaporean entities and individuals;

4   but these transfers are over a five year period, with nothing to show the subsequent disposition of

5   those funds.  There are countless ways that money could have been spent in the process of

6   operating a legitimate business with customers in China.  Although the Government warns of "the

7   *danger* that Liew has tens of millions of dollars offshore" (Mot. at 13 (emphasis added)), it does

8   not *actually assert* (presumably because it has no evidence) that Mr. Liew currently controls a

9   single penny of overseas money.

10          As the Ninth Circuit explained in *United States v. Motamedi,* speculation that Mr. Liew is

11   guilty of the newly-minted financial charges cannot serve as the basis for detention.  Evidence

12   that the defendant is guilty "may be considered *only in terms of the likelihood that the person will*

13   *fail to appear* or will pose a danger to any person or to the community. Otherwise, if the court

14   impermissibly makes a preliminary determination of guilt, the refusal to grant release could

15   become in substance a matter of punishment."  *United States v. Motamedi,* 767 F.2d 1403, 1408

16   (9th Cir. 1985) (emphasis added).  Here, the Government's unproven assertions of financial

17   wrongdoing have no bearing on the likelihood that Mr. Liew *actually will flee*.  The Government

18   does not assert that Mr. Liew could even access the funds he allegedly sent abroad and use them

19   for his escape.  And, even if Mr. Liew could access the funds, the Government does not explain

20   how any amount of money would enable him to flee the country undetected with no passport,

21   while wearing an ankle bracelet, and with a family in tow.  As in *United States v. Madoff*, "the

22   conditions imposed for release are unique in their own right" and are "reasonably calculated to

23   assure [Mr. Liew's] appearance when required."  586 F. Supp. 2d 240, 249 (S.D.N.Y. 2009).

         **3.      The attacks on Mr. Liew's "honesty" are unpersuasive and irrelevant to**
24              **whether there is a serious risk that he will flee.**

25          Unable or unwilling to address the reality that Mr. Liew—a United States citizen with no

26   criminal record facing white collar charges to which he has strong defenses—has been

27   incarcerated for a lengthy period of time with no end in sight, the Government resorts to name-

28   calling, asserting (with remarkably thin evidence) that Mr. Liew is "fundamentally dishonest."

733890.04

Mot. at 12-15.  Examination of the Government's weak attempts at pseudo-impeachment reveals no basis for denying bail to Mr. Liew.

One supposed "lie" is that Mr. Liew stated in January 2012 that he did not have "regular contact" with his father-in-law.  Mot. at 14.  The fact that Mr. Liew allegedly was a signatory on a bank account in the name of his father-in-law, and that he allegedly made transfers to that account in 2008—*over three years earlier*—hardly demonstrates that Mr. Liew and his father-in-law had "regular contact" so as to render his statement false.

The Government also alleges that Mr. Liew is dishonest because he did not tell Judge Cousins about (1) funds he allegedly had transferred overseas years prior to his previous bail motion and (2) letters of credit and letters of guarantee that allegedly made funds available to Mr. Liew through the Jinzhou and Pangang projects.  Mot. at 13.  But the Government makes no assertion that any of that money was still available to Mr. Liew at the time he made the statements to the Magistrate Judge.  If the allegedly undisclosed money had been spent by Mr. Liew in the course of operating his businesses or otherwise had become unavailable, there would have been no reason to disclose it to the Court.

The Government acts as though it was incumbent on Mr. Liew as matter of "honesty" to offer more bail than he thought necessary in prior bail proceedings.  Prior counsel offered small amounts of money pledged by a variety of sureties, perhaps relying on the fact that, as the Magistrate Judge noted, white collar defendants in this District with no criminal record are often released on bail.  Dkt. 74 at 4 (Order).  After it became apparent that the amount of security previously offered in this case was below the level needed to assuage the Court's concerns about flight risk, current counsel offered to raise the ante considerably, in a form and amount of security acceptable to the Magistrate Judge and Pretrial Services.  Mr. Liew should not be punished for his counsel's strategic decisions, and certainly cannot be called "dishonest"—let alone a flight risk— because of them.

The Government asserts (without citation) that Mr. Liew intentionally misled the Magistrate Judge when he sought bail in August 2011 by stating that he and his wife "were merely seeking to purchase property in Singapore" when they actually owned that property.  Mot.

733890.04

1    at 14.  This is a mischaracterization of the record.  In fact, Mr. Liew's counsel stated at the

2    August bail hearing that "[i]t's true that he has property in Singapore."  Declaration of Simona A

3    Agnolucci in Supp. of Opp'n to Mot. to Revoke Detention Order Exh. A.[19]

4            The remaining allegations that Mr. Liew "lied" are based on either (1) unproven

5    obstruction of justice charges of which he currently is presumed innocent (Mot. at 13); and

6    (2) alleged financial misrepresentations to the bankruptcy court or on tax returns that were

7    charged today (Mot. at 14-15).  The financial allegations rest on a very thin reed: they are

8    supported by either (1) a "summary of transfers" prepared by the Government with no evidentiary

9    support or (2) no citation to evidence whatsoever.  Those charges will be addressed at trial but

10   should not be the basis for denying bail.  *See Motamedi*, 767 F.2d  at 1408 (magistrate's findings

11   concerning Motamedi's foreign accounts were "drawn primarily from allegations contained in the

12   indictment" and therefore an insufficient basis for detention).[20]

13           Most importantly, even if the Government's characterization of Mr. Liew as "dishonest"

14   were accurate, most white collar defendants get bail even in fraud cases where dishonesty is the

15   crux of the crime; Bernie Madoff, perhaps the most notorious fraudster in recent memory, was

16   able to prepare for his trial from home.  *Madoff*, 586 F. Supp. 2d at 246.  The Government argued

17   that Madoff should not get bail after he attempted to conceal his assets by mailing packages to

18   various relatives, asserting that the setting of bail conditions is "based, fundamentally, on the

19   trustworthiness of the defendant."  *Id*. at 255.  The Court rejected this argument, noting that

20   "implicit in the bail condition analysis is the assumption that the defendant *cannot be trusted on*

21   *his own*."  *Id*. (emphasis added).  Accordingly, even if there were support for the Government's

22   [19] Mrs. Liew had been seeking to purchase property in Singapore since May 2011, well before
     Mr. Liew's arrest.  Dkt. 205-1 at 2 (Gasner Decl. Exh. P).  At the time of the colloquy at issue,
23   she had entered into a contract to purchase the Singapore property, and her purchase of the
     property was about to close.  *Id.* at 4-10 (showing Mrs. Liew's final payment on the property due
24   in September 2011).
     [20] The Government also asserts, in another section of its Motion, that Mr. Liew "admitted" to the
25   bankruptcy court that he possessed no intellectual property of his own and that "his employees
     were not developing technology."  Mot. at 23.  This is a gross mischaracterization of the record.
26   Mr. Liew checked a column on a January 2009 bankruptcy petition stating that his bankrupt entity
     owned no "patents, copyrights, and other intellectual property."  Dkt. 214-2 (Rometo Decl. Exh. 1
27   at 8).  The fact that Mr. Liew did not own any patents or other intellectual property that required
     disclosure to a bankruptcy court does not equate to an "admission" that Mr. Liew and his
28   employees did not independently develop their own technology.  Independent development may
     or may not result in patents, copyrights, or other intellectual property.

threadbare allegations that Mr. Liew is "dishonest," the *Madoff* decision makes clear that "dishonest" conduct does not establish actual flight risk where, as here, the defendant has proposed a host of measures to assure his appearance at trial.

**C.   The conditions ordered by Magistrate Judge Cousins are sufficient to ensure Mr. Liew's appearance.**

Unable to undercut Judge Cousins' findings on flight risk and the existence of conditions sufficient to assure Mr. Liew's appearance at trial, the Government's appeal papers attack the collateral itself, as well as the procedures that Judge Cousins followed in ordering Mr. Liew's release.  All of these arguments are without merit.

**1.   The Government has attempted to distract the Court from the applicable legal standard.**

At the outset, the Government's appeal brief subtly shades the legal standard to be applied, emphasizing the portion of Section 3142(g)(4) of the bail statute stating that the Court "*shall decline to accept*" the use of certain property as bail collateral under certain circumstances. Mot. at 16 citing 18 U.S.C. § 3142(g)(4) (emphasis in original).  But the Government fails to emphasize the rest of the statutory language that follows, which makes clear that the Court need only decline to accept property as collateral for bail if "*because of its source*, [it] will not *reasonably assure* the appearance of the person as required."  *Id.* (emphasis added).

The relevant question under Section 3142(g)(4), in other words, is *not* a single-minded inquiry into whether property is allegedly forfeitable or otherwise associated with the underlying charges, but whether the property, "because of its source, will not reasonably assure the appearance of the person as required."  That is plainly not the case here.  Even if one assumes for the purposes of bail that the Government's hypothesis is correct—that the Singapore house was purchased using proceeds derived in part from Mr. Liew's titanium dioxide work—that theory *supports* Mr. Liew's incentive to appear and protect an asset that he believes he and his family members earned based on years of legitimate engineering work.  This is the very opposite of the paradigmatic Section 3142(g)(4) case, in which an accused drug trafficker typically posts a bond secured by cash put up by criminal associates.  The legislative history of Section 3142(g)(4) explains that the section was designed to address situations in which an individual "engaged in highly lucrative criminal activities such as drug trafficking, who [is] able to make extraordinarily

21

733890.04

1   high money bonds" posts bail and then flees the country.  S. Rep. No. 98-225, at 23 (1983).

2   "Among such defendants, forfeiture of bond is simply a cost of doing business[.]"  *Id*. at 23-24.

3          That paradigm bears little resemblance to the situation here, in which a defendant with no

4   criminal record faces white collar charges armed with a myriad of defenses, and has offered to put

5   up a home owned by his family.  As set forth in this briefing and the materials submitted to Judge

6   Cousins, the evidence shows that a vast amount of legitimate work went into the titanium dioxide

7   projects performed by Mr. Liew's companies.  Posting the proceeds of a loan borrowed against

8   the Singapore house plainly adds incentive for Mr. Liew to show up and defend his life's work.

9   Mr. Liew has offered to be subject to additional conditions, including full-time electronic

10  monitoring, house arrest, and continued seizure of his passport, all of which, in concert with the

11  funds pledged from the Singapore home, will "reasonably assure" his appearance.

12         Contrary to the Government's suggestion, whether or not the Singapore house or proceeds

13  from a loan against it might be  forfeitable at the conclusion of the case does *not* preclude using

14  those assets for bail collateral.  As the district court observed in *United States v. Mancuso*, 726 F.

15  Supp. 1210, 1214-15 (D. Nev. 1989), even property that *already* has been seized by the

16  Government may be used for bail, because it is "merely tied up[,]" not wholly lost to a defendant.

17  In fact, even if a particular defendant is found guilty, the jury might still find the specific property

18  at issue should not be forfeited.  *Id*. at 1215.  The Government is again putting the cart before the

19  horse by assuming Mr. Liew's guilt in order to argue that he is not entitled to bail.

20         **2.**     **Judge Cousins properly ordered an *ex parte in camera* review of the source of
              the funds Mr. Liew proposes to post.**

21         Magistrate Cousins did not err by ordering Mr. Liew to present information about the

22  source of the money used to purchase the Singapore house and information about Mr. Liew's

23  current resources in an *ex parte in camera* declaration.  As Judge Cousins observed in his order,

24  "the [Section 3142(g)(4)] hearing procedure must be determined by the Court as the process is not

25  addressed either in the statute or the legislative history."  Dkt. 232 (citing *United States v.

26  Sharma*, 2012 WL 1902919, at *2 (E.D. Mich. May 25, 2012)).

27         In recognition of the need to protect a criminal defendant's Fifth Amendment right against

28  self-incrimination, many district courts have conducted *ex parte* inquiries regarding the source of

property offered as bail collateral.  *See*, *e.g.*, *Sharma*, 2012 WL 1902919, at *2 (district court ordered *ex parte in camera* hearing to determine source of collateral); *United States v. Kaila*, 2008 WL 1767728, at *1 (E.D. Wash. April 15, 2008) (district court held hearing in closed courtroom and outside of the presence of the Government to discuss source of money posted as collateral); *United States v. Ellis DeMarchena*, 330 F. Supp. 1223, 1227 (S.D. Cal. 1971) (district court offered to conduct closed *in camera* examination regarding source of collateral).

The Government objects to the use of an *ex parte* declaration instead of an *ex parte* hearing, but cites no legal support for drawing such a distinction.  Nowhere in the language of Section 3142(g)(4) is the word "hearing" used; the statute merely calls for the Court to "conduct an inquiry."  Even at an *in camera* hearing (which the Government apparently would have no objection to), Mr. Liew could present documentary evidence that the Government would not be entitled to review.  Nothing in the language of Section 3142(g)(4) indicates that the Government is entitled to play a role in the Section 3142(g)(4) inquiry.  In addition, the Government has cited not a single case in which the Government was privy to the information adduced in a district court's Section 3142(g)(4) inquiry. Moreover, the Government seems to have no problem with *ex parte* submissions when they serve the Government's ends.  As Magistrate Judge Cousins observed, "the Government earlier submitted materials ex parte in support of Liew's detention" and "may not have it both ways."  Dkt. 232 at 2 (Order).

The Government rehashes the same arguments against an *ex parte in camera* determination that it unsuccessfully presented before Judge Cousins.  The Government's insistence that the Magistrate Judge's determination was in error is in fact a transparent and improper attempt to force Mr. Liew to make the Government's newly-charged financial case for it.  Unable to obtain the documents and testimony it needs in order to support its unknown financial allegations through traditional channels, the Government plainly hopes to use the inquiry required by Section 3142(g)(4) to force the defendant to provide evidence that it will use against him.  The Government's suggested procedure, parsing out protected and unprotected statements and documents on an *ad hoc* basis, would create an impossible Catch-22 for Mr. Liew, forcing him to choose between his right to bail and his privilege against self-incrimination.

733890.04

Against this background, Judge Cousins correctly perceived that the Government's arguments must be rejected in favor of robust protection of Mr. Liew's Fifth Amendment rights. *See Ellis DeMarchena*, 330 F. Supp. at 1227 ("The exercise of the right to examine sureties must not be to the substantial prejudice of important rights of the defendant, such as the right to bail and the privilege against self-incrimination."). Judge Cousins was therefore correct in determining that an *in camera ex parte* declaration, supported by sealed documentary evidence, was an appropriate way to determine the source and sufficiency of the funds used to purchase the Singapore house.

### 3. Judge Cousins' bail determination comports with bail orders in comparable cases.

Judge Cousins' determination that a $2 million bond, supported by electronic monitoring, house arrest, and other special conditions, would reasonably assure Mr. Liew's appearance at trial was well within the mainstream of bail decisions in comparable cases. Mrs. Liew was released on an appearance bond of $1 million secured by a $100,000 cash deposit. Dkt. 3. In a recent case of alleged economic espionage in the Northern District of Illinois, a Motorola employee (Hanjuan Jin) was released on bail, even though she had been *arrested at the airport with a one-way ticket to China* and the prosecutors had characterized her as "better than James Bond" in stealing over 1,000 Motorola documents. Dkt. 205-3 (Gasner Decl. Exh. R).

*United States v. Khashoggi*, 717 F. Supp. 1048 (S.D.N.Y. 1989) makes clear that the bond offered by Mr. Liew is beyond sufficient to assure the Court of Mr. Liew's reappearance. Mr. Khashoggi was an "enormously wealthy" Saudi Arabian businessman who "possesse[d] the means to procure staggering amounts of cash in fewer than 24 hours." *Id.* at 1049-50. He was charged with assisting former Philippine President Ferdinand Marcos and his wife Imelda Marcos "in concealing the true ownership of property and other assets." *Id.* at 1049. The court ordered Khashoggi released despite: (1) his enormous wealth; (2) charges of financial dishonesty; (3) limited ties to the United States, including a wife who lived abroad and not having visited the country in three years; and (4) the fact that after the charges against him were filed, he did not voluntarily submit to the jurisdiction of the Court, but remained abroad as a fugitive for six months until he was arrested in Switzerland and extradited to the United States. The court found

24

1   it reasonable to require Mr. Khashoggi to post a bond of $10 million—only a fraction of the

2   defendant's staggering wealth.  *Id*. at 1052.

3       In *United States v. Motamedi*, a case where the Iranian-citizen defendant was charged with

4   conspiracy to violate the Arms Export Control Act by acting as a *de facto* purchasing agent for

5   the Iranian government, bail was set at $750,000 (secured by the parents' residence). 767 F.2d at

6   1404.  In seeking pretrial detention, the Government alleged that the defendant maintained a

7   series of large bank accounts in foreign countries funded predominantly by the Iranian

8   government, that he could return to Iran "with impunity," and that he disregarded federal agents'

9   warnings that his export activities were illegal.  *Id.*  The magistrate ordered Motamedi's detention

10  and the district court affirmed the order.  *Id.* at 1404-05.  The Ninth Circuit reversed the detention

11  order, reasoning that the magistrate had placed too much weight on the severity of the allegations

12  against the defendant.  *Id.* at 1408.  The magistrate's findings concerning Motamedi's foreign

13  accounts, his role as agent for the Iranian government, and his ability to flee to Iran were "drawn

14  primarily from allegations contained in the indictment," and thus an insufficient basis for

15  detention.  *Id.*

16      Here, Mr. Liew offers a $2 million cash bond, which constitutes a significant portion of

17  the money the Government alleges Mr. Liew received to operate his business—none of which the

18  Government has *actually prove*n is still in Mr. Liew's possession.  As in *Motamedi*, the

19  Government cannot rely on speculation regarding Mr. Liew's foreign assets as a basis for

20  detention, and cannot argue that no amount of bail is reasonable.  The $2 million proffered by

21  Mr. Liew is far more significant, relative to the $24 million alleged by the Government, than the

22  $10 million dollars posted by Mr. Khashoggi, and it unquestionably is sufficient to secure his

23  future appearance at trial.

24  **IV.    CONCLUSION**

25      For the foregoing reasons, the Court should DENY the Government's motion to revoke

26  Mr. Liew's release and should GRANT Mr. Liew's pretrial release, subject to the conditions

27  ordered by Magistrate Judge Cousins or such other conditions as deemed suitable by the Court or

28  Pretrial Services.

733890.04

1    Dated:  March 13, 2013                    KEKER & VAN NEST LLP

2                                        By:    /s/ Stuart L. Gasner

3                                               Attorneys for Defendants WALTER LIEW and
4                                               USA PERFORMANCE TECHNOLOGY, INC.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S RELEASE ORDER
Case No. CR 11-0573-JSW (NC)

733890.04