KEKER & VAN NEST LLP
STUART L. GASNER - # 164675
sgasner@kvn.com
SIMONA A. AGNOLUCCI - # 246943
sagnolucci@kvn.com
KATHERINE M. LOVETT - # 276256
klovett@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Defendants WALTER LIEW and
USA PERFORMANCE TECHNOLOGY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>      v.<br><br>WALTER LIEW, CHRISTINA LIEW, USA PERFORMANCE TECHNOLOGY, INC., and ROBERT MAEGERLE,<br><br>           Defendants. | Case No. CR 11-0573-JSW (NC)<br><br>**DEFENDANTS' JOINT NOTICE OF MOTION AND MOTION FOR BILL OF PARTICULARS**<br><br>Date:       June 6, 2013<br>Time:      2:00 p.m.<br>Place:     Courtroom 11, 19th Floor<br>Dept.:     Hon. Jeffrey S. White |

### NOTICE OF MOTION

PLEASE TAKE NOTICE that on June 6, 2013 at 2:00 p.m., or as soon as the matter may be heard before the Honorable Jeffrey S. White, defendants Walter Liew, Christina Liew, USA Performance Technology Inc. and Robert Maegerle, will and hereby do move the Court for an order requiring the government to issue a bill of particulars providing the information set forth below or as the Court may direct in its discretion.  This motion is based upon the instant notice, the attached memorandum of points and authorities, the records in this case, and upon such arguments made at the hearing.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................................1

II. LEGAL STANDARD............................................................................................................2

III. FACTUAL BACKGROUND.................................................................................................3

    A. The Chloride Route Process for Manufacturing Titanium Dioxide is Complex .................................................................................................................3

    B. Use of the Chloride Route Process Worldwide .......................................................3

    C. Many Details of the Chloride Route Process Have Been Publicly Disclosed ........4

IV. ARGUMENT .........................................................................................................................5

    A. The Defense Cannot Adequately Prepare for Trial without a Bill of Particulars as to the Trade Secrets at Issue ..............................................................5

    B. A Bill of Particulars is Warranted for the Financial Charges in the Indictment ................................................................................................................10

V. CONCLUSION....................................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Stutz Motor Car of America, Inc. v. Reebok Int'l, Ltd.*
  909 F. Supp. 1353 (C.D. Cal. 1995) ............................................................................... 5

*United States v. Bin Laden*
  92 F. Supp. 2d 225 (S.D.N.Y. 2000) ....................................................................... 2, 9, 10

*United States v. Hsu*
  185 F.R.D. 192, *available at* 1999 WL 80952 (E.D. Pa. Feb. 16, 1999) ............................ 9, 10

*United States v. Smith*
  16 F.R.D. 372 (W.D. Mo. 1954) ................................................................................... 2, 9

*United States v. Thevis*
  474 F. Supp. 117 (D.C. Ga. 1979) .................................................................................. 2

**State Cases**

*Aetna Bldg. Maintenance Co. v. West*
  39 Cal. 2d 198 (1952) .................................................................................................. 5

*Whyte v. Schlage Lock Co.*
  101 Cal. App. 4th 1443 (2002) ..................................................................................... 6

**Federal Rules**

Federal Rule of Criminal Procedure 7(f) .................................................................... 1, 2

**Other Authorities**

142 Cong. Rec. S12201-03 (daily ed. Oct. 2, 1996) ........................................................ 9

Barksdale, Jelks, TITANIUM: ITS OCCURRENCE, CHEMISTRY, AND TECHNOLOGY AT 309-39
  (The Ronald Press Company 1949) ............................................................................. 4

*Megabytes, Gigabytes, Terabytes—What Are They?*, www.whatsabyte.com .................. 7

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

As argued in defendants' concurrently-filed motion to dismiss, the Second Superseding Indictment (the "Indictment") is defective because its descriptions of "Trade Secret 1" and "Trade Secret 5" incorporate the entirety of DuPont's chloride route process for the manufacture of titanium dioxide, as well as an infinite set of permutations of "proprietary" and "non-proprietary" information, rendering the Indictment unconstitutionally vague and overbroad.[1] The proper remedy for these defects is the striking of those particular trade secrets, or in the alternative, the dismissal of the Indictment. If the Court denies the motion to dismiss, or if it grants it by striking Trade Secrets 1 and 5 and allows the rest of the Indictment to stand, the Court should consider this motion for a bill of particulars under Federal Rule of Criminal Procedure 7(f).

The Court should exercise its discretion to grant a bill of particulars, especially as to the trade secret allegations. The chloride route process for manufacturing titanium dioxide is complex, combining thousands of pieces of equipment with a myriad of operating parameters. Yet the Indictment claims (implausibly) that the entirety of the process is DuPont's trade secret. Further, discovery has revealed that DuPont engineers have advised the government of hundreds of perceived "similarities" between the USAPTI designs and features at various DuPont plants. This means that thousands of *potential* trade secrets fall within the allegations of the Indictment or are suggested by discovery. To prepare for trial is simply impossible in this posture. As detailed below, this is especially true given the volume of public disclosures in the titanium dioxide field, the volume of discovery materials produced in this case, the government's "derivative use" theory at the heart of its case, and Mr. Liew's inability to assist in his defense given his lengthy and continued incarceration.

For similar reasons, certain details of the government's recently added financial allegations should be provided in a bill of particulars, as well.

---

[1] *See* Defendants' Joint Motion to Dismiss the Second Superseding Indictment and/or Strike Trade Secrets Nos. 1 and 5 and Counts 3, 4, 5 and 8 ("MTD").

1
DEFENDANTS' JOINT NOTICE OF MOTION AND MOTION FOR BILL OF PARTICULARS
Case No. CR 11-0573-JSW (NC)

748925.04

II. **LEGAL STANDARD**

Under Rule 7(f) of the Federal Rules of Criminal Procedure, "The court may direct the government to file a bill of particulars." FED. R. CRIM. P. 7(f). A bill of particulars serves "to furnish to the defendant further information respecting the charge stated in the indictment when necessary to the preparation of his defense, and to avoid prejudicial surprise at trial …." (internal quotations omitted). *United States v. Smith*, 16 F.R.D. 372 (W.D. Mo. 1954). While obtaining a bill of particulars historically required a showing of good cause, the 1966 amendment to the Rules eliminated that requirement so as to "encourage a more liberal attitude by the courts toward bills of particulars without taking away the discretion which courts must have in dealing with such motions in individual cases." *See* FED. R. CRIM. P. 7(f), Advisory Committee Notes to 1966 Amendment. As the Advisory Committee explained in highlighting *Smith*, 16 F.R.D. 372, as an illustration of the proper use of discretion, "where charges of an indictment are so general that they do not sufficiently advise the defendant of the specific acts with which he is charged, a bill of particulars should be ordered." *Id*.

In determining whether to order a bill of particulars, "the court must examine the totality of the information available to the defendant – through the indictment, affirmations, and general pre-trial discovery – and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000). The government often raises a standard litany of objections to providing a bill of particulars, claiming that the indictment provides sufficient notice, that ample discovery has been provided, and that the government need not detail how it intends to prove elements of each offense. But in the end, the decision whether to order a bill of particulars rests "on the details of a particular case," which means that precedents and stock arguments "furnish little help in disposing of requests for bills of particulars in criminal cases." *Id.* at 234 (citation omitted). Moreover, the 1966 amendment "requires that the defendant be given the benefit of the doubt in gray areas." *United States v. Thevis*, 474 F. Supp. 117, 124 (N.D. Ga. 1979).

### III. FACTUAL BACKGROUND

#### A. The Chloride Route Process for Manufacturing Titanium Dioxide is Complex

The need for a bill of particulars can only be fully appreciated with some background knowledge of the chloride route process for manufacturing titanium dioxide. As the Court has no doubt gleaned at this stage of the proceedings, titanium dioxide ("TiO2") is a white powdery substance that is commonly used in paints and pigments. Various processes for manufacturing TiO2 have been employed since the middle of the last century, with the "sulfate route" and "chloride route" being the two principal process mechanisms. *See* Decl. of Simona A. Agnolucci in Supp. of Def. Mot. for Bill of Particulars ("Agnolucci Decl.") at Exhs. E, N at 2-3.

The general outlines of the "chloride route" process can be quickly described. Titanium-containing ore is heated to a high temperature and reacted with chlorine gas to form TiCl4 (often referred to as "tickle"); the TiCl4 gas is then cooled until it condenses into liquid form, and impurities removed; the liquid TiCl4 is then oxidized to form titanium dioxide, which is then finished and packaged. See Agnolucci Decl. Exh. A.

While the process is quite simple at a high level, there are increasing layers of complexity as one gets into the details of manufacture. A typical titanium dioxide plant will have large areas of the plant devoted to each stage of processing, starting with handling of the raw materials (typically titanium ore, coke for heating, and chlorine), then on to chlorination, several stages of condensation, oxidation, and finishing of the final product. See Agnolucci Decl. Exh. N at 4, 13-14. As the Court can see from publicly-available photographs,[2] titanium dioxide plants contain a vast number of physical components, connected by an extensive array of piping and other transport mechanisms. The operation and maintenance of a titanium dioxide plant similarly requires innumerable procedures and techniques. *See generally* Agnolucci Decl. Exh. N.

#### B. Use of the Chloride Route Process Worldwide

In the middle of the 20th century, while many companies manufacturing titanium dioxide did so using the sulfate route, DuPont became an early developer of the chloride route. See Agnolucci Decl. Exhs. E, O at 158. DuPont built at least 7 titanium dioxide plants over the years,

---

[2] Agnolucci Decl. Exhs. B, C.

starting with Edgemoor, Delaware in 1949; followed by New Johnsonville, Tennessee; Antioch, California; Ashtabula, Ohio; DeLisle, Mississippi; Altamira, Mexico; and, most recently, Kuan Yin, Taiwan in 1994. Agnolucci Decl. Exhs. D, E. Some started as sulfate route plants and added chloride route "lines," others were designed to operate exclusively as chloride route plants. *Id*. at ¶ 7. Currently, all of DuPont's titanium dioxide plants operate using the chloride route. *Id.* at Exh. F. DuPont, however, is not the *only* manufacturer of titanium dioxide that uses a chloride route process. Currently, there are five major manufacturers of TiO2 (DuPont, Huntsman, Kronos, Millennium, and Cristal) who produce most of the world's output[3]—and all of them use the chloride route process, as did many of the predecessor companies they acquired.[4]

### C. Many Details of the Chloride Route Process Have Been Publicly Disclosed

The details involved in designing, building and running TiO2 plants has long been the subject of a considerable body of publicly available literature and information. Several of DuPont's original patents on production of TiO2 pigments were issued *in 1949, over 50 years ago. See, e.g.,* U.S. Pat. No. 2,488,439 (filed Nov. 15, 1949).[5] Many other DuPont patents on titanium dioxide technology have issued over the years, publicly disclosing increasing levels of detail as to DuPont's titanium dioxide plants and processes. *See, e.g.,* U.S. Pat. Nos. 2,856,264 (dated October 14, 1958) and 5,201,949 (dated April 13, 1993).[6] Indeed, there are roughly 71,680 other United States patents mentioning "titanium dioxide,"[7] to say nothing of other sources of process and equipment details such as foreign patents, textbooks, websites, and supplier catalogues.[8] There are a wealth of national and international meetings, conferences and

---

[3] Agnolucci Decl. Exh. G at ¶¶ 9-14, 42.

[4] Agnolucci Decl. Exh. F.

[5] Agnolucci Decl. Exh. H.

[6] *Id.*

[7] Agnolucci Decl. at ¶ 10.

[8] *See, e.g.,* Agnolucci Decl. at Exh. I (portions of Barksdale, Jelks, TITANIUM: ITS OCCURRENCE, CHEMISTRY, AND TECHNOLOGY AT 309-39 (The Ronald Press Company 1949)); Agnolucci Decl. at Exh. J (European Commission, chapter on titanium dioxide from *Integrated Pollution Prevention and Control Reference Document on Best Available Techniques for the Manufacture of Large Volume Inorganic Chemicals - Solids and Others* (August 2007)); Agnolucci Decl. at Exh. K (excerpt from the website of Thermal Ceramics).

publications devoted exclusively to titanium dioxide.[9] Moreover, many aspects of titanium dioxide manufacture—such as techniques for handling ore, handling chlorine, disposing of waste, and scrubbing of exhaust—are shared in common with many other industries.[10]

## IV. ARGUMENT

### A. The Defense Cannot Adequately Prepare for Trial without a Bill of Particulars as to the Trade Secrets at Issue

Several features of this case stand out with respect to the trade secret accusations at the heart of the Indictment. Together, these factors warrant the Court exercising its discretion to order a bill of particulars specifying the trade secrets at issue.

*First*, the subject matter of the Indictment's trade secret allegations -- the chloride route process for manufacturing titanium dioxide -- involves a staggering array of equipment and methods of operation. *See* sections III(A) and III(B) *supra*. Limiting discussion to the "DuPont Process" does nothing to narrow the field, especially because DuPont has built at least 7 different titanium dioxide plants around the world, each presumably with varying types of equipment and operating procedures.

*Second*, there is a considerable body of published or otherwise previously disclosed knowledge about the chloride route process, so that many aspects of it cannot be trade secrets. *See* section III-C *supra; see also Stutz Motor Car of Amer., Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995) ("It is well established that disclosure of a trade secret in a patent places the information comprising the secret into the public domain."); *Aetna Bldg. Maint. Co. v. West*, 39 Cal. 2d 198, 205 (1952) (information that is "commonly known to the trade or may easily be discovered" is not entitled to trade secret protection).

*Third*, this is not the typical trade secret criminal case in which the defendant is apprehended with a cache of secret documents. Only two DuPont documents bearing confidentiality legends were found among millions of pages seized from defendants USAPTI,

---

[9] *See* Agnolucci Decl. Exh. G at ¶¶ 52-61.

[10] *See, e.g.*, Agnolucci Decl. Exh. L (pamphlets from the Chlorine Institute, one on "Bulk Storage of Liquid Chlorine" dated October 2005, and one on "Chlorine Vaporizing Systems" dated October 2002); Exh. M at 1311 (excerpt from Industrial Mineral and Rocks).

Walter and Christina Liew, or Robert Maegerle.[11] Rather, both the Indictment and discovery produced by the government reveals that much of its case is premised on the theory that work done in 2006 and later for USAPTI by DuPont's former employee Robert Maegerle was *derived from* allegedly confidential DuPont information to which Maegerle had access when he worked for DuPont between 1957 and 1991. For example, the C-1 materials initially produced by the Government principally consist of: (1) internal DuPont technical materials *obtained by the Government from DuPont in the investigation*, such as the "Basic Data" manual mentioned in Trade Secret 5;[12] (2) sketches and notes apparently prepared by Bob Maegerle;[13] (3) design materials or specifications from Mr. Liew's companies (Performance Group and USAPTI);[14] and (4) extensive commentary from DuPont engineers opining as to how the information in Mr. Maegerle's notes and sketches "must have" come from the Basic Data document or other DuPont sources.[15] In other words, it appears that most of the C-1 material initially produced *was provided to the Government by DuPont to support their allegations*—initially raised in a civil case and now exported to the criminal case—that information in USAPTI's drawings and specifications *was derived from* the 1985 Basic Data document or DuPont facilities or other materials. This theory is similar to that pursued in many civil trade secret cases in Silicon Valley, in which established companies accuse their prior employees of doing work for a new start-up allegedly based upon trade secrets learned at their old job.[16]

***Fourth***, the workpapers at issue on the defense side are voluminous. Discovery in this case has included over 5 terabytes of electronic materials that, if printed, would fill half the

---

[11] Agnolucci Decl. Exh. P.
[12] Agnolucci Decl. at ¶ 19; Exh. W.
[13] Agnolucci Decl. at ¶ 19; Exh. Q.
[14] Agnolucci Decl. at ¶ 19; Exh. R.
[15] Agnolucci Decl. at ¶ 19; Exh. S.
[16] In these cases, of course, California law strongly favors employee mobility, and often permits the employee to rely on his residual knowledge even if that leads to similar results that he would have reached for his former employer. *See, e.g., Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1462 (2002). The new employer/competitor often has strong defenses based on prior public disclosures of the alleged trade secrets including in patents, publications, conferences, and the like.

1  Library of Congress.[17]  The electronic discovery contains a significant amount of work product
2  produced by USAPTI, its predecessor companies, and their various employees and consultants.
3  Agnolucci Decl. at ¶ 24.  For example, just a single hard-drive seized by the Government—the
4  backup hard drive that Mr. Liew kept in his safety deposit box—contains thousands of files with
5  the work-product of the many engineers employed by USAPTI over many years.[18]  Each of the
6  folders contains nested folders containing detailed engineering work at the bottom level.[19]

   *Fifth*, the alleged trade secrets identified in the Indictment are described in extraordinarily
broad language.  Trade Secret 1 claims the entirety of the "DuPont" process as a secret, as well as
a seemingly infinite number of "ways and means" by which both "proprietary and non-
proprietary components" can be "compiled and combined" to form a "substantial portion" of the
process.  Indictment at ¶ 14(a).  Similarly, Trade Secret 5 asserts that a 407-page "basic data"
manual is both a trade secret in its entirety, and that it contains "numerous" (but unspecified)
trade secrets.  Indictment at ¶ 14(e); *see also* Agnolucci Decl. Exh. W.

   Although Trade Secrets 2, 3 and 4 are described in more definite language and each is
associated with a relatively short document, the Indictment's allegations suggest, but do not
specify, a number of supposed secrets embodied in them. Trade Secret 2, for example, is
premised on an "Oxidation W/RPS System Drawing" from a plant that DuPont built in 1951.  For
starters, the document is largely illegible.[20]  Moreover, the Indictment's description of the
supposedly secret information that the drawing conveys is generic.[21]  The same is true of Trade
Secret 3 and Trade Secret 4: both reference specific documents (the one in Trade Secret 4 is also

---

[17] Agnolucci Decl. Exh. T (declaration describing the volume of discovery in this case).  A terabyte is approximately one trillion bytes and could store 1,000 copies of the Encyclopedia Britannica.  *See Megabytes, Gigabytes, Terabytes—What Are They?*, www.whatsabyte.com, last visited January 27, 2013.  Ten terabytes could store the entire printed collection of the Library of Congress.  *See id.*

[18] *See, e.g.,* Agnolucci Decl. Exh. U.

[19] *Id.*

[20] Agnolucci Decl. Exh. P at C1-015485.

[21] The Indictment alleges that the drawing "provided information about TiO2 oxidation area process, including detailed process flow descriptions for each major stream within the process, including stream capacities, chemical compositions, temperatures, pressures and physical states. The drawing included details related to pipeline sizes, automatic and manual valve sizes and locations, detailed instrumentation requirements, and safety relief devices." Indictment at ¶ 14(b).

7
DEFENDANTS' JOINT NOTICE OF MOTION AND MOTION FOR BILL OF PARTICULARS
Case No. CR 11-0573-JSW (NC)

748925.04

1 largely illegible),[22] but the descriptions of the documents seemingly incorporate broad swaths of generic information.[23]

*Sixth*, as mentioned above, discovery has revealed that DuPont engineers have pored over defendants' work and have identified scores of "similarities" with DuPont's plants or methods by annotations on USAPTI's or Mr. Maegerle's work, largely by placing hundreds of annotations on copies of the documents.[24] Some of the annotations suggest that DuPont considers the similarity to be a trade secret; others do not.[25] Moreover, the Government has recently produced two boxes of C-1 materials seized from Tze Chao (a defendant named in the Superseding Indictment who has since pleaded guilty). Interestingly, his materials *do* contain a large number of documents that appear to be from DuPont, and that DuPont appears to contend are trade secrets based upon their C-1 designation.[26] DuPont engineers also did detailed analyses of the Tze Chao materials, this time in elaborate spreadsheets claiming that hundreds of pages of documents contained "high IP risk" information.[27] Mr. Chao was effectively a competitor of Mr. Liew's and USAPTI's and had every reason not to share his DuPont-derived information with Mr. Liew.[28] Yet under the impossibly vague definitions of Trade Secrets 1 and 5, the DuPont materials in Mr. Chao's possession may or may not be deemed part of the allegations against the Liews and Mr. Maegerle, at the government's whim.

*Finally*, defendant Walter Liew has been incarcerated for almost two years, under conditions that make it difficult to review technical materials. *See* Notice of Mot. and Renewed Mot. for an Order Revoking the Detention Order and Granting Pretrial Release of Walter Liew

---

[22] Agnolucci Decl. Exh. P at C1-015484.

[23] Indictment at ¶ 14(c) (stating that the Diemer correlation "enabled the calculation of the mixing time and distance required for the completion of the oxidation process for any DuPont reactor under any set of process conditions, [and] incorporated historical operating data from DuPont's production lines and its oxidation science"); ¶ 14(d) (stating that the flowsheet "contained information about the TiO2 reaction area process").

[24] *See, e.g.,* Agnolucci Decl. Exh. S.

[25] Agnolucci Decl. at ¶ 23.

[26] Agnolucci Decl. at ¶ 28.

[27] Agnolucci Decl. Exh. X.

[28] Agnolucci Decl. Exh. Y at 3:12-26, 4:14-18.

8
DEFENDANTS' JOINT NOTICE OF MOTION AND MOTION FOR BILL OF PARTICULARS
Case No. CR 11-0573-JSW (NC)

748925.04

(Dkt. No. 198) at 10-13.

Taken together, these factors create a "perfect storm" of difficulties in preparing for trial. Without a bill of particulars identifying and defining the trade secrets that the government actually intends to assert at trial, the defense will face the impossible task of preparing to defend against hundreds or even thousands of potential ones. Each trade secret at issue brings with it the associated burdens of understanding the technology, the state of the art and public disclosures in the relevant time period, and the defendants' work and communications about it—each of which, as discussed above, is a morass of information. It is accordingly vital that the government do better than pointing vaguely at the entire process. This is precisely the kind of situation in which a bill of particulars is essential to allow meaningful trial preparation.

There are other strong reasons for the Court to exercise its discretion. A bill of particulars is needed to ensure that prosecutions under the Economic Espionage Act are premised on *specific information*, as Congress intended. 142 Cong. Rec. S12201-03, S12213 (daily ed. Oct. 2, 1996) ("a prosecution under the EEA *must establish a particular piece of information* that a person has stolen or misappropriated"). It is also needed is to avoid unfair surprise at trial, a further purpose of the bill of particulars. *Smith*, 16 F.R.D. 372, 375. Under the current state of affairs, however, the government could change the trade secrets it is alleging at its whim, between now and trial, or during the trial itself, posing a grave danger of unfair surprise. *See id*.

While the government has indeed produced a vast amount of discovery in this case, and may rely on that fact in opposing this motion, the quantity of discovery here is no substitute for what a bill of particulars would provide. Indeed, the "the large volume of material disclosed is precisely what necessitates a bill of particulars." *Bin Laden* at 234. Nor is it enough for the government to claim that expert reports will sort things out. *United States v. Hsu*, which involved allegations of trade secret theft under the Economic Espionage Act, highlights the danger of failing to specify the trade secrets the defendants allegedly misappropriated and instead relying on experts. 40 F. Supp. 2d 623 (E.D. Pa. 1999). The defendant in *Hsu* was charged with misappropriating "second generation taxol technology," which Hsu alleged was generally known to the public and was not a trade secret. *Id.* at 628. The government hired two scientists from

Bristol-Meyers Squibb, the alleged victim, to identify any confidential trade secret information contained in documents seized from the defendant. *Id.* at 629. The court noted that the two scientists "could not agree about what information in [those] documents was 'confidential' and what information was public," finding twenty-one inconsistencies in these two experts' conclusions. *Id*. (*citing United States v. Hsu*, 185 F.R.D. 192, *available at* 1999 WL 80952, at *1-4 (E.D. Pa. Feb. 16, 1999)). After an interlocutory appeal, a third expert undertook a complete re-evaluation of the work of the first two experts, and concluded that over 100 pages previously designated as confidential were in fact publicly available information. *Id.* The court then appointed an independent technical advisor to make sense of the competing expert opinions; that advisor determined that yet another ten pages of material previously designated as confidential was in fact publicly available. *Id*.

The Court should accordingly order the government to produce a bill of particulars as to the trade secret allegations in the Indictment. At a minimum, the order should require the government to define each Trade Secret in Paragraph 14 of the Indictment with reference to particular equipment specifications or process parameters, and identify the portions of defendants' work-product that it alleges was derived from each alleged secret.

### B.  A Bill of Particulars is Warranted for the Financial Charges in the Indictment

A bill of particulars is also warranted with respect to the financial charges added in the Second Superseding Indictment. Counts Fifteen through Nineteen of the Indictment allege false entries on Performance Group's or USAPTI's tax returns for calendar years 2007-10; Counts Twenty through Twenty-Two allege certain false statements made in connection with the bankruptcy of Performance Group.

With respect to the tax charges, all the Indictment alleges is that in each tax year, Performance Group or USAPTI filed tax returns claiming a certain amount in "gross receipts," and that Mr. Liew knew the company's gross receipts "substantially exceeded that amount." Indictment at ¶¶ 91, 93, 95, 97, 99. The Indictment is silent, however, on the critical point needed to defend these charges, namely, the amount the Government contends the companies received that should have been reported. Likewise with respect to the bankruptcy charges. Count Twenty

alleges that Mr. Liew checked a box on a bankruptcy form stating that "debtor has no executory contracts," but is silent on what executory contracts the government contends Performance Group had at the time. Indictment at ¶ 102. Count Twenty-One is similarly opaque on what the government contends is the undisclosed truth, stating that on another bankruptcy form Mr. Liew (a) failed to identify "gross amounts received during the two years preceding," (b) checked "none" in response to a long question about property transfers, and (c) failed to disclose the existence of certain "letters of guarantee that closed in 2008" in response to a long question about financial accounts and instruments. Indictment at ¶ 104. Count Twenty-Two is also baffling, presenting four quotes from a hearing in Performance Group's bankruptcy that are alleged to be false, without stating what the accurate facts should have been. Indictment at ¶ 107.

The defense cannot adequately prepare for trial without knowing what the government contends should have been disclosed or stated. Virtually all of the business records of USAPTI and Performance Group were seized pursuant to search warrants in July 2011, almost two years ago. Agnolucci Decl. at ¶ 30. While the seized materials have been produced in discovery, they are largely in an electronic format that is not readily searchable, and it is no easy task to isolate comprehensive collections of contracts, receipts, payments, financial instruments, or records of transfers. *Id*. Counsel has inspected the originals, and it is no easier to find relevant documents in that fashion. *Id*. Mr. Liew has been incarcerated since July 2011, and can be of little assistance in reconstructing his financial affairs at the level of detail needed. *Id*.

Under these circumstances, the Court should exercise its discretion to require a bill of particulars stating the amount of gross receipts that should have been reported as to each tax count, and a short description of the undisclosed truth as to each of the bankruptcy allegations.

## V. CONCLUSION

The Court should order a bill of particulars directing the government to provide the information requested above, or such other and further relief as may be appropriate in the Court's discretion.

Respectfully submitted,

Dated: May 2, 2013                                         KEKER & VAN NEST LLP

By:  */s/ Stuart L. Gasner*
STUART L. GASNER
SIMONA A. AGNOLUCCI
KATHERINE M. LOVETT

Attorneys for Defendants WALTER LIEW and USA PERFORMANCE TECHNOLOGY, INC.

Dated:  May 2, 2013                          By:  */s/ Doron Weinberg*
DORON WEINBERG

Attorney for Defendant
CHRISTINA LIEW

Dated:  May 2, 2013                          By:  */s/ Jerome J. Froelich, Jr.*
JEROME J. FROELICH, JR.

Attorney for Defendant
ROBERT J. MAEGERLE