# EXHIBIT G

# UNITED STATES DISTRICT COURT DISTRICT OF MARYLAND
**(Northern Division)**

|  |  |  |
|---|---|---|
| HALEY PAINT COMPANY and ISAAC INDUSTRIES, INC., on behalf of themselves and all others similarly situated, | * | |
| | * | Case No.: 10-cv-00318-RDB |
| Plaintiff, | * | **CONSOLIDATED COMPLAINT** |
| v. | * | **JURY TRIAL DEMANDED** |
| E.I. DUPONT DE NEMOURS AND COMPANY, HUNTSMAN INTERNATIONAL LLC, KRONOS WORLDWIDE INC., MILLENNIUM INORGANIC CHEMICALS, INC. (a Delaware corporation with its principal place of business in Hunt Valley, Baltimore County, Maryland), and THE NATIONAL TITANIUM DIOXIDE COMPANY LIMITED (d/b/a CRISTAL), | * * * * * * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## INTRODUCTION

1.    Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities who purchased Titanium Dioxide in the United States directly from one or more named Defendants between March 1, 2002, and the present (the "Class Period"). Defendants and their co-conspirators are the leading suppliers of Titanium Dioxide in the United States and the world. They own and manage all U.S. and North American capacity, as

well as approximately 70% of global capacity, and supply a comparable percentage of the global market. During the Class Period, Defendants sold millions of tons of Titanium Dioxide in the United States, earning billions of dollars in revenues. For example, in 2007, Defendants and other producers sold approximately 4.9 million tons of Titanium Dioxide worldwide, earning more than $10 billion in revenues.

2.    Plaintiffs allege that Defendants conspired and combined to fix, raise, maintain, and stabilize the price at which Titanium Dioxide was sold in the United States. The alleged conspiracy was furthered and facilitated by a course of anticompetitive conduct, including agreements and understandings among Defendants to increase prices, and to maintain and effectively allocate customers and market shares, *e.g.*, by refusing to bid (or intentionally bidding high) for the business of certain customers being served by other Defendants, so as not to take business from a competitor and risk retaliation. The alleged conspiracy was also facilitated by the cartelized nature of the industry, by secret discussions and agreements among Defendants concerning capacity, costs and raw materials, and by exchanges of nonpublic, commercially sensitive information between and among Defendants and their agents and co-conspirators. Plaintiffs further allege that Defendants fraudulently concealed their anticompetitive conduct from Plaintiffs and the Class in furtherance of the conspiracy.

3.    As a result of Defendants' unlawful conduct, Titanium Dioxide prices in the United States were increased during the Class Period, and Plaintiffs and the other members of the Class paid artificially inflated prices for Titanium Dioxide. Such prices

exceeded the amount they would have paid if the price for Titanium Dioxide had been determined by a competitive market. Therefore, Plaintiffs and the other members of the Class have been injured and have suffered damages.

## JURISDICTION AND VENUE

4.     Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorney's fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

6.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), because at least one of the Defendants resides in this judicial district; is licensed to do business, or is doing business in this judicial district; and because a substantial portion of the affected interstate trade and commerce described below has been carried out in this judicial district.

## PARTIES

7.     Plaintiff Haley Paint Company (f/k/a Finneran and Haley Incorporated) is a Pennsylvania corporation with its principal place of business in West Chester, Pennsylvania. Plaintiff Haley Paint purchased Titanium Dioxide directly from one or more of the Defendants during the Class Period, and has suffered antitrust injury as a result of Defendants' conduct as alleged in this Complaint.

8.     Plaintiff Isaac Industries, Inc. is a Florida corporation with its principal place of business in Miami, Florida. Plaintiff Isaac Industries purchased Titanium

3

Dioxide directly from one or more of the Defendants during the Class Period, and has suffered antitrust injury as a result of Defendants' conduct as alleged in this Complaint.

9.     Defendant E.I. DuPont de Nemours and Company ("DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. During the Class Period, DuPont manufactured and sold Titanium Dioxide to purchasers in the United States and elsewhere, directly or through predecessors, affiliates and/or subsidiaries.  DuPont is the largest, and is believed to be the most low cost, producer of Titanium Dioxide in the world.  It is the Titanium Dioxide market leader.   DuPont owns and controls approximately half of the Titanium Dioxide production capacity in North America, and its global market share based on volume is approximately 23%.  In addition to plants in Taiwan, Mexico, and Brazil, DuPont has U.S. manufacturing plants in Delaware, Tennessee, Florida and Mississippi.  DuPont recognizes billions of dollars of sales revenue annually through its Coatings and Color Technologies segment, which includes the sales of its Titanium Dioxide business, DuPont Titanium Technologies.

10.    Defendant Huntsman International LLC ("Huntsman") is a Delaware corporation with its principal place of business in Salt Lake City, Utah.  During the Class Period, Huntsman manufactured and sold Titanium Dioxide to purchasers in the United States and elsewhere, directly or indirectly through predecessors, affiliates, and/or subsidiaries, including Tioxide Americas, Inc., an indirect subsidiary of Huntsman and a direct subsidiary of Tioxide Group (a UK Company), which is wholly-owned by Huntsman.  Huntsman is the fourth largest Titanium Dioxide producer in the

4

world.  Huntsman sells Titanium Dioxide to approximately 1500 customers worldwide. Huntsman had annual Titanium Dioxide sales of over $1 billion in 2005, 2006 and 2007. Huntsman (through a subsidiary, Huntsman Holding LLC) and defendant Kronos Worldwide jointly operate (50/50) a Titanium Dioxide manufacturing venture, Louisiana Pigment Company, L.P., in Lake Charles, Louisiana.  Huntsman also operates Titanium Dioxide plants in the United Kingdom, France, Spain, Italy, Malaysia and South Africa.

11.  Defendant Kronos Worldwide, Inc., ("Kronos," formerly known as Kronos, Inc.) is a Delaware corporation with its principal executive offices in Dallas, Texas, and its principal North American sales, marketing, and technical offices in Cranbury, New Jersey.  During the Class Period, Kronos manufactured and sold Titanium Dioxide to purchasers in the United States and elsewhere, directly or through predecessors, affiliates and/or subsidiaries.  Kronos is the fifth largest global producer of Titanium Dioxide, and had net sales of approximately $1.3 billion in 2007.  Kronos sells to over 4,000 customers in approximately 100 countries.  Kronos and defendant Huntsman jointly operate (50/50) a Titanium Dioxide manufacturing venture, Louisiana Pigment Company, L.P., in Lake Charles, Louisiana.  Kronos also has manufacturing sites in Canada, Norway, Germany, and Belgium.

12.  Defendant Millennium Inorganic Chemicals, Inc. ("Millennium"), is a Delaware corporation with its principal place of business in Hunt Valley, Maryland. Millennium is wholly-owned, directly or indirectly, by defendant The National Titanium Dioxide Company Limited (also known as "Cristal").  During the Class

Period, Millennium manufactured and sold Titanium Dioxide to purchasers in the United States and elsewhere, directly or through predecessors, affiliates and/or subsidiaries. Cristal and Millennium together form the world's second largest Titanium Dioxide producer and, in 2006, they had combined sales of approximately $1.6 billion. Prior to its acquisition by Cristal in 2007, Millennium comprised the Titanium Dioxide business of Lyondell Chemical Company. During the Class Period, Millennium operated plants in Ashtabula, Ohio, and Baltimore, Maryland, as well as in Australia, Britain, France, and Brazil.

13. Defendant The National Titanium Dioxide Company Limited (doing business as "Cristal") is a Saudi Arabian corporation with its principal place of business in Jeddah within the Kingdom of Saudi Arabia. During the Class Period, Cristal manufactured and sold Titanium Dioxide to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, and/or subsidiaries, including defendant Millennium.

14. At all relevant times, Millennium has acted as the U.S. agent and alter ego for Cristal. Cristal has exerted considerable control over the activities and operations of Millennium such that the two entities are essentially one. Facts demonstrating the substantial control that Cristal has exercised over Millennium include, but are not limited to: (1) Cristal's direct and controlling ownership interest in Millennium, (2) Millennium's role as the primary U.S. importer and distributor of Cristal's products, (3) Cristal's exercise of control over Millennium's marketing, purchasing, pricing, management, and/or operating policies, (4) Cristal's role in approving Millennium's

significant business decisions, and (5) the overlapping functions and operations of Cristal and Millennium. Cristal knew, or should have known, that its conduct through Millennium in Maryland would have an impact in the United States. According to Cristal's website, Cristal and Millennium share the same Maryland operational headquarters, commercial offices, research center, and plant, as well as two shared plants in Ohio. *See* http://www.cristalglobal.com/AboutUs.aspx?page=SiteLocations (last visited Apr. 5, 2010). Based on this relationship, Cristal could not do business in the United States absent its wholly owned subsidiary Millennium.

## AGENTS AND CO-CONSPIRATORS

15.   Various entities not named as Defendants herein have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof. Plaintiffs reserve the right to name some or all of these entities as defendants at a later date.

16.   Alleged co-conspirator Lyondell Chemical Company ("Lyondell") is a Delaware corporation with its principal place of business in Houston, Texas. During the Class Period, Lyondell manufactured and sold Titanium Dioxide to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, and/or subsidiaries, including a wholly-owned subsidiary that is the predecessor of defendant Millennium. Lyondell acquired its Titanium Dioxide business as part of its acquisition of Millennium Chemicals, Inc., in 2004. In 2005, Lyondell was the second-largest global producer of Titanium Dioxide and earned approximately $1.4 billion in revenues from sales of Titanium Dioxide. Lyondell sold its Titanium Dioxide business (the

predecessor of Millennium) to defendant Cristal in 2007.  In January 2009, Lyondell and numerous affiliates filed voluntary petitions to restructure under Chapter 11 of the United States Bankruptcy Code.

17.    Alleged co-conspirator Tronox Inc. ("Tronox") is a Delaware corporation with its principal place of business in Oklahoma City, Oklahoma.  During the Class Period, Tronox manufactured and sold Titanium Dioxide to purchasers in the United States and elsewhere, directly or through predecessors, affiliates and/or subsidiaries. Tronox is the world's third largest producer of Titanium Dioxide.  In 2006, Tronox had approximately $700 million in net sales of Titanium Dioxide in the United States. Tronox has customers in more than 100 countries and owns and operates Titanium Dioxide plants in Hamilton, Mississippi, and Savannah, Georgia, as well as in Australia, Germany, and the Netherlands.  Prior to becoming a publicly traded company in November 2005, Tronox was a wholly owned subsidiary of Kerr-McGee Corporation, and was acquired by Anadarko Petroleum Corporation in 2006.  In January 2009, Tronox and certain of its subsidiaries filed voluntary petitions to restructure under Chapter 11 of the United States Bankruptcy Code.   Tronox's website stated that the "decision to file was made to address the legacy liabilities [it] incurred at the time of [its] spinoff from Kerr-McGee. These liabilities, including environmental remediation and litigation costs, have been an obstacle to our financial stability and success."

18.    Alleged co-conspirator International Business Management Associates, Inc. ("IBMA") is a Delaware corporation and its principal place of business is believed to be in Plainsboro, New Jersey.  Alleged co-conspirator James R. Fisher is the President

8

and Chief Executive Officer of IBMA and has held this role at all relevant times. IBMA is the alter ego of Fisher. Mr. Fisher has been a consultant to the Titanium Dioxide industry for many years, including before and during the Class Period. Prior to working as a consultant to the industry, he was employed by defendant Kronos. Plaintiffs allege that Mr. Fisher has been a conduit of nonpublic, commercially-sensitive information concerning Titanium Dioxide between and among Defendants and their co-conspirators, and also has been an agent and co-conspirator of one or more Defendants.

19.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly authorized officers, agents, employees, or representatives or each co-conspirator while actively engaged in the management, direction, or control of its affairs.

20.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## CLASS ACTION ALLEGATIONS

21.     Plaintiffs bring this action both on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), on behalf of the following class (the "Class"):

> All persons and entities who purchased Titanium Dioxide in the United States directly from one or more Defendants or co-conspirators, or from any predecessors, parents, subsidiaries, or affiliates thereof, between March 1, 2002, and the present. Excluded from the Class are Defendants, their co-conspirators, parent companies, predecessors, subsidiaries and affiliates, and all governmental entities.

9

22.    Plaintiffs do not know the exact number of class members, because such information is in the exclusive control of Defendants and their co-conspirators. Plaintiffs are informed and believe that, due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States and elsewhere, such that joinder of all class members is impracticable.

23.    Plaintiffs' claims are typical of the claims of the class in that Plaintiffs are direct purchasers of Titanium Dioxide, Plaintiffs and all Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the class.

24.    Numerous questions of law or fact arise from Defendants' and their co-conspirators' anticompetitive conduct that are common to the class, including but not limited to:

    a.    Whether Defendants and their co-conspirators combined or conspired to fix, raise, maintain, or stabilize prices of Titanium Dioxide sold in the United States;

    b.    Whether Defendants and their co-conspirators shared nonpublic information, allocated markets and customers, restricted output of Titanium Dioxide sold in the United States, and/or committed other conduct in furtherance of the alleged conspiracy;

    c.      Whether Defendants' and their co-conspirators' conduct caused the prices of Titanium Dioxide sold in the United States to be at artificially high and noncompetitive levels;

    d.      Whether Plaintiffs and the other members of the Class were injured by Defendants' and their co-conspirators' conduct and, if so, the appropriate class-wide measure of damages for Class members; and

    e.      Whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief.

25.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

26.    Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of Titanium Dioxide and have no conflicts with any other members of the Class.  Furthermore, Plaintiffs have retained competent counsel that is experienced in antitrust, class action, and other complex litigation.

27.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

28.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.

29.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## TRADE AND COMMERCE

30.   During the Class Period, each Defendant, directly or through its subsidiaries, sold Titanium Dioxide in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

31.   During the Class Period, Defendants and their co-conspirators collectively controlled the market for Titanium Dioxide, both globally and also in the United States and North America.

32.   Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## FACTUAL ALLEGATIONS

### Titanium Dioxide (TiO$_2$)

33.   Titanium Dioxide is a dry chemical powder that is primarily used as a white pigment.   It is by far the world's most widely used pigment for providing whiteness, brightness, and opacity (it hides or masks other colors) to many products, particularly paints and other coatings.   Consumed in more than 170 countries, it is one of the most important inorganic chemicals used in the production of goods.   Given its ubiquity in global industries, Titanium Dioxide has been called a "quality of life" or "life-style" product, in that consumption rates tend to correlate with standards of living.

12

Demand for Titanium Dioxide also tends to correlate with Gross Domestic Product and the general economic conditions of a given region.

34.   Titanium Dioxide traps and reflects light better than almost any known substance.  The vast majority (over 90%) of Titanium Dioxide is consumed by customers in the coatings, plastics, and paper industries.   Titanium Dioxide is also used in synthetic fiber production and to make inks, pharmaceuticals (*e.g.,* tablet coatings), toothpaste, sunscreen, cosmetics (*e.g.,* rouge, eyeshadow), food (*e.g.,* candies, icings, salad dressings, cheese, confections, pet food), rubber, ceramic, and other products.  It is also nonflammable and nontoxic—and has replaced lead compounds in residential paints.

35.   Although there are white pigments other than Titanium Dioxide (such as calcium carbonate and talc), they are generally not considered to be competitive substitutes for Titanium Dioxide.   In terms of its opacifying or masking ability, Titanium Dioxide has no technical substitute.  In addition to excellent opacity, Titanium Dioxide also features great resistance to other chemicals and to ultraviolet degradation, and even has good heat stability.  Although the high price of Titanium Dioxide has inspired attempts to create cost-effective substitute pigments (particularly for use in the paper industry), for the price per pound, Titanium Dioxide is generally considered to be the best white pigment that exists for most uses and applications and, accordingly, in terms of value, it is by far the most widely consumed pigment.  Given Titanium Dioxide's value and the lack of competitive substitutes for it, demand for Titanium Dioxide tends to be inelastic, in that the loss in volume arising from a price increase

tends to be small relative to the magnitude of the increase in price. This demand inelasticity also exists because the cost of Titanium Dioxide typically represents only a small share of the total cost of manufacturing the products which use it as an input. For example, Titanium Dioxide is typically less than 4% of the total cost of making paints and coatings and less than 1% of the total cost for making plastic and rubber products.

36. The vast majority of titanium production is used to make Titanium Dioxide. The ninth most abundant element in the Earth's crust, titanium is typically found along with iron in a mineral oxide called ilmenite and also in a less common ore called rutile. The manufacture of Titanium Dioxide for commercial use is derived from the mining of ilmenite and rutile.

37. Titanium Dioxide is manufactured via two different processes, sulphate and chloride, which create two crystal forms, rutile and anatase. Most Titanium Dioxide plants utilize the chloride process, which generates considerably less waste than the sulphate process. Defendants and their co-conspirators operate most of the chloride process plants in the world. Although both the sulphate and chloride processes create the rutile crystal form of Titanium Dioxide, only the sulphate process produces the anatase form, which is less durable than rutile and tends to be preferred for use in food, drug, and cosmetic products. The rutile form of Titanium Dioxide fulfills more than 80% of the world's requirements for Titanium Dioxide. After Tronox's predecessor Kerr-McGee closed its sulphate process plant in 2004, only the chloride process has been used to produce Titanium Dioxide in the United States.

38.   Titanium Dioxide is a homogeneous commodity chemical that is sold in rutile and anatase grades worldwide.   Titanium Dioxide grades feature degrees of brightness and whiteness, and most are made by adjusting the size of the Titanium Dioxide particles.  Most grades are sold in fine powder form, but a few are sold in other forms, including ultrafine powder, water slurry (aqueous solutions), and coarse, nonpigmentary form (such as for use in glass and ceramic manufacturing).

39.   Grades of Titanium Dioxide supplied by one producer are readily substituted for grades of Titanium Dioxide supplied by other producers.   Accordingly, buyers make purchase decisions based largely, if not entirely, on price.

40.   All Defendants make and sell rutile grades of Titanium Dioxide, which comprise more than 80% of Titanium Dioxide sales, and which are sold primarily to customers in the paint, coatings and plastic industries.   All Defendants except for DuPont make and sell anatase grades.  The rutile crystalline form of Titanium Dioxide has a higher refractive index and is more durable than anatase.  Generally speaking, rutile grades are preferred for outdoor uses by customers in the coatings and plastics industries (the largest end-use applications for Titanium Dioxide), whereas anatase grades are preferred by customers in the food, drug, and cosmetic industries.   Both rutile and anatase grades are sold to fine paper and paperboard customers in the paper industry for use as a filler and in coatings.  Approximately 90-95% of Titanium Dioxide annual sales are made to customers in the coatings, plastics, and paper industries, and all Defendants sell grades of Titanium Dioxide to customers in these industries.

41.    Well-aware that Titanium Dioxide is a commodity chemical and that price is typically more important to customers than service or other non-price factors, manufacturers have tried to differentiate their Titanium Dioxide from that sold by other producers through branding.  For example, DuPont sells almost all of its Titanium Dioxide grades under the brand name Ti-Pure®, Millennium sells under the brand name Tiona®, and Huntsman sells under the TIOXIDE® brand.

**Defendants' Dominion Over the Titanium Dioxide Industry**

42.    During the Class Period, the Titanium Dioxide industry has been dominated by the Defendants and their co-conspirators, who account for most sales of Titanium Dioxide in the United States and throughout the world.  Defendants and co-conspirator Tronox control approximately 70% of the world's Titanium Dioxide capacity, including all U.S. and North American capacity and almost all Western European capacity.  Defendants' and their co-conspirators' high concentration of market share in the world's largest Titanium Dioxide markets facilitated their ability to implement the alleged conspiracy.

43.    The Titanium Dioxide industry has high barriers to entry.  For example, a new "greenfield" one-hundred kilotons-per-year plant has been estimated to cost approximately $450-500 million and require a three to five year lead time to build.  The Defendants also have cost advantages and proprietary technologies that effectively deter new entrants.  Such barriers are conducive to a conspiracy because they protect existing suppliers from competition and maintain the high concentration of the Titanium Dioxide industry.

44. Titanium Dioxide producers, including Defendants, face similar costs. When an industry's sellers face similar costs, their pricing preferences tend to be aligned. This makes it easier for them to reach and defend a consensus on price increases, as well as industry capacity utilization and expansion.

45. In and about 2005, allegedly to reduce the costs of importing Titanium Dioxide manufactured abroad into North America, Huntsman purportedly reduced its sales (and, presumably, its market share) in North America. Nevertheless, the domestic and global market shares of Defendants remained relatively stable during the Class Period. For example, even though DuPont's titanium dioxide plant in DeLisle, Mississippi, was shut down by Hurricane Katrina in August 2005 and did not even begin a phased-in production until January 2006, DuPont's resulting market share decline in 2005 was recovered in 2006, even in the midst of price increases and decreasing demand for Titanium Dioxide in the U.S. Indeed, sales volumes in DuPont's Coatings and Color Technologies segment (of which Titanium Dioxide sales are a part) declined only 3% from 2004 to 2005, while sales revenues were up 3%, reflecting 6% higher USD selling prices.

46. If a highly concentrated industry involving sales of a homogeneous commodity product for which there is inelastic demand is also characterized by high barriers to entry and similar costs among sellers, the industry bears characteristics that are conducive to cartelization. In other words, these characteristics facilitate collusion and the coordination of prices and output, and industries bearing such characteristics

are more likely to be cartelized than those that lack such characteristics.  The Titanium Dioxide industry bears these characteristics.

47.   Other market characteristics that facilitate collusive behavior include coordinated price increase announcements; the existence of numerous customers in a variety of industries (each of which forms a relatively small share of the total market, so there is less incentive for cartel members to cheat on a collusive pricing agreement because each potential sale is small compared to the risk of retaliation from the other cartel members for disrupting the agreement); the existence of joint venture agreements among cartel members; and static or declining demand over time, which increases the incentive to collude to avoid price competition, and also makes it easier to monitor compliance with a price-fixing agreement.

48.   Given that the mature Titanium Dioxide industry bears all of these characteristics of cartelization, and given the relatively stable market shares of Defendants, their contacts with each other, and their pricing behavior during the proposed Class Period, Plaintiffs are is informed and believe, and thereon allege, that Defendants and their co-conspirators have formed a cartel.  While the specific date of this alleged cartel's formation is unknown, Plaintiffs believe, consistent with their allegations of Defendants' alleged price-fixing conspiracy, that it began -- or at least began to impact industry pricing -- on or shortly before March 1, 2002.

**Defendants' Contacts Foster Cooperation and Collusion**

49.   The Titanium Dioxide industry is global, with over 60% of sales made in international trade.   Defendants and co-conspirator Tronox, all global players,

cooperated with each other worldwide. Defendants' joint ventures, transactions, and other deals and agreements have afforded them opportunities to discuss pricing, capacity, cost, customer and other nonpublic, commercially sensitive issues, and Plaintiffs allege that Defendants engaged in such discussions before and during the Class Period. In the absence of an agreement or understanding among Defendants, it would have been contrary to the independent economic self-interest of each Defendant to allow its competitors access to such information.

50.   For example, certain Defendants and their affiliates produce and sell raw materials to each other worldwide. Defendants Kronos and Cristal and their affiliates sell raw materials, such as ilmenite ore, to other Titanium Dioxide producers. Defendants also engage in other business transactions, *e.g.*, Huntsman and Kronos have a 50/50 Titanium Dioxide manufacturing joint venture, and Kronos and DuPont cross-license patents used to make certain Titanium Dioxide grades. The mutually beneficial nature of the business relations between Defendants provided not only the opportunity to conspire, but also a financial incentive to do so. The more that Defendants came to deal with and rely on each other, the more incentivized they were to maintain market stability, to agree on and support price increases, and to avoid competing on price for the business of each other's customers. Defendants' meetings and communications worldwide, before and during the Class Period, fostered cooperation, not competition, and facilitated the conspiracy as alleged herein.

51.   Plaintiffs allege that Defendants' conspiracy was monitored and policed by conversations not only among Defendants themselves, but also between Defendants

and industry consultants, customers, and others.  For example, beginning in May 2004, Defendants were able to monitor each other's conduct both in the United States and worldwide through TZ Minerals International's *TiO2 Review*, a publication that provided Defendants during the Class Period with detailed production, pricing, capacity, raw material, and other information and statistics.  The July 2004 issue of this publication included on article on industry price dynamics written by Robert Louw, Senior Vice President of Huntsman.  (Upon leaving Huntsman, Mr. Louw joined TZ Minerals International as its senior global pigment advisor in or about April 2005.) Defendants were also able to monitor whether price increases would be followed, or were followed, through conversations with consultants, customers, and others, as well as through public sources like *Chemical Week*, the *Chemical Market Reporter* (now *ICIS*), and Defendants' websites.   For example, in advance of the effective date of a price increase, Defendants routinely sent price increase announcement letters to customers being served by other producers, conditioning the market to accept a price increase by the effective date.   This conduct maximized the transparency in the market of Defendants' collective willingness to increase prices, and discouraged price competition or "cheating" on the price increase.  After having reached an unlawful agreement or understanding as alleged herein, Defendants used consultants, customers, and others as conduits to signal or confirm intended pricing and other actions to each other.

52.   Plaintiffs allege that Defendants' collusive activities were also furthered during meetings and discussions that took place during (or around the time of) trade association functions.   Defendants are all members of the American Chemistry

Council's Titanium Dioxide Panel.  Although the timing and frequency of the meetings of the Panel are unknown, annual American Chemistry Council meetings are held in June at the Greenbrier in White Sulphur Springs, West Virginia, and these were attended by certain Defendants.  Defendants are also members of the Titanium Dioxide Manufacturers Association, which conducts annual and other meetings and is associated with the European Chemical Industry Council (aka "Cefic").  Defendants are also members of the Titanium Dioxide Stewardship Council, which was formed as a U.S.-industry trade group focusing on safety, health and environmental issues. Defendants also met and spoke with each other at bi-annual (odd year) IntertechPira Titanium Dioxide Conferences, and at bi-annual (even year) meetings and exhibitions of the Industrial Minerals International Congress, annual meetings of the U.S.-based National Paint and Coatings Association, and other associations related to their industry and customers.

53.   During the Class Period, when Defendants met and spoke with each other, they were always in the process of trying to increase Titanium Dioxide prices to their customers.   Like their other business meetings, trade association functions provided Defendants with the opportunity to discuss prices and support for price increases, as well as capacity and cost issues.  Plaintiffs allege that Defendants engaged in such private discussions with each other at dinner meetings before -- and during -- trade association and other business meetings.  Defendants' contacts also fostered industry discipline in maintaining -- and effectively allocating -- customer positions and market shares.

54.   For example, a meeting of the Titanium Dioxide Manufacturers Association took place in Finland on or about January 24, 2002.  Immediately following this meeting, in spite of flat demand, decreasing raw material costs, and excess capacity in the industry, Defendants and their co-conspirators announced price increases worldwide, including in the U.S., to be effective March 1, 2002.   Also, the annual Industrial Minerals International Congress Exhibition was held in Paris, France, on April 21-24, 2002.  At the time this exhibition was held in Paris, Defendants were still in the process of increasing prices to their customers globally, in part because the largest customers typically buy Titanium Dioxide under contracts that contain price protection clauses, which defer the effective date of an increase until several months after the increase's announcement.  The March 2002 price increases also occurred right before the seasonal demand peak period of April to June.  The increases were successful, and the Defendants increased prices again in and about July 2002.  The Industrial Minerals International Congress Exhibition, and other functions and trade shows like it during the Class Period that also took place when Defendants were increasing prices, provided Defendants with the opportunity to affirm to each other their resolve to increase industry prices and, in fact, industry prices did increase during the Class Period.

55.   From February 3-5, 2003, a Titanium Dioxide Conference was held in Miami, Florida.  It was attended by Defendants, including DuPont's Global Business Director (Ian Edwards, who gave the keynote address), as well as a former Vice President of defendant Millennium (Bruce Zwicker), who told conference attendees to expect further price increases.  Around the time of this conference, Defendants and their

co-conspirators announced a $0.06 per pound price increase for all grades except paper grades sold in North America.

56.    A few months later, while Defendants were still trying to increase prices to some customers, and shortly after DuPont and other Defendants announced a North American price increase for paper grades (effective April 1, 2003), an Industrial Minerals International Congress Exhibition was held in Montreal, Canada, from April 6-9, 2003.

57.    At an Industrial Minerals International Congress conference in Barcelona, Spain, held in the last few days of March 2004, a Senior Vice President of Huntsman gave a presentation about Titanium Dioxide industry prices and price dynamics.  It was a timely speech, because Defendants were in the process of increasing prices to customers at this time.   As described in greater detail below, Defendants had announced Titanium Dioxide price increases in North America that became effective March 15, 2004.

58.    From March 2-4, 2005, a Titanium Dioxide Conference was held in Cannes, France.   It was attended by Defendants, including Vice Presidents from Lyondell and DuPont (Sam Severance), who gave keynote presentations.  As described below, Defendants had previously increased prices effective in January 2005, and also announced worldwide price increases within weeks of this conference in March 2005 that became effective April 1, 2005.   Indeed, around this time, Defendants were announcing price increases every quarter.

59.   An Industrial Minerals International Congress Exhibition was held in San Francisco, California, from March 26-29, 2006.   Defendants, who likely attended the Exhibition, were in the process of trying to increase prices at this time.

60.   An Intertech Titanium Dioxide Conference took place in Fort Lauderdale, Florida, from February 12-14, 2007.   It was attended by Defendants, including Vice Presidents from Lyondell and DuPont.   Defendants were in the process of increasing prices at this time.

61.   An Industrial Minerals International Congress Exhibition was held in Athens, Greece, from March 30 - April 2, 2008.   Defendants, who were in the process of increasing prices at this time, were registered to attend and are believed and alleged to have attended.

62.   Plaintiffs allege that in addition to prices, costs, and customers, Defendants also discussed capacity issues with each other.   Their discussions helped them reach an understanding of the need to restrain Titanium Dioxide capacity expansion, which they knew would help stabilize prices and support price increases despite industry overcapacity.   For example, the July 2004 issue of TZ Minerals International's *TiO2 Review* stated that the "decision to reduce capacity by both Huntsman Tioxide and Millennium will possibly impact on future price levels." Indeed, it did, as the industry announced price increases shortly thereafter to be effective in October 2004.   Defendants monitored each other's capacity plans, including plant closures, "debottleneckings," and "brownfield" capacity expansion, such as through the improvement of production efficiencies at existing facilities.   Defendants

were generally aware of each other's inventory levels and operating rates.   Plaintiffs allege that Defendants understood that industry expansion needed to occur in a "disciplined" way, *i.e.*, in a manner that sought to eliminate -- or at least minimize -- the potentially negative pricing impact of capacity expansion.   At times during the Class Period, Defendants wanted the industry to appear to be "tight" on product (regardless of whether demand was weak or strong), so that industry overcapacity never caused prices to decline like it did in the mid-1990s.

63.   At an investor conference in September 2005, Lyondell -- which owned Millennium and had an estimated 19% of North American capacity at that time -- made a presentation noting that there were minimal announced Titanium Dioxide industry capacity additions.   The same presentation included a chart that showed annual industry operating rates and overcapacity.   According to the chart, the industry operating rate averaged approximately 87% in the 2002-2005 period, a time when Defendants were announcing price increases nearly every quarter.

64.   Even when industry leader DuPont announced in November 2005 that it had an agreement with Chinese officials to build a massive 200,000 metric-ton-per-year Titanium Dioxide plant in China, Defendants were still able to increase prices both in 2005 and in subsequent years, and even at times when demand and consumption were declining in the face of poor economic conditions (*e.g.*, as in 2007-2008).   An industry analyst was quoted as saying in November 2005 that DuPont's new capacity would have no problem being absorbed by the market when it eventually came online, because pigments would remain "tight" in the future.

25

65.   Defendants' alleged discussions about capacity issues had their intended effect.   None of the capacity increase announcements made during the Class Period, including increases planned by DuPont to cover the industry's annual growth, decreased prices.   For example, within weeks after DuPont's announcement of its intent to build an enormous plant in China, Defendants announced price increases in North America and worldwide that were successful.

**Titanium Dioxide Pricing**

66.   During the Class Period, price increase announcements for sales in the United States or North America were typically in cents per pound for all grades of Titanium Dioxide sold to all customers for all end-use applications, effective on a particular date.   Prices in the United States tended to set a benchmark for prices in other regions worldwide.   Price increases in one region were used by Defendants to justify price increases in other regions.   Indeed, industry price increases often occurred worldwide, in that regional price increases were announced simultaneously or within a month or two of each other.   For example, North American price increases typically occurred within a month or two of announcements of price increases in Europe, Asia and other regions.

67.   Defendant DuPont, the world's largest supplier of Titanium Dioxide, which had the largest U.S. and world Titanium Dioxide market share, typically led industry price increases during the Class Period.   Defendants routinely matched the amount and typically the effective date of each other's price increase announcements

during the Class Period.  Defendants also usually justified price increases on the same grounds, whether in written announcements or in discussions with customers.

68.   During the 1990s, on account of factors including global overcapacity and customer consolidation, Titanium Dioxide prices trended downward.  The profitability of Titanium Dioxide manufacturers even reached an all-time low in 1996.  Bayer and Rhone-Poulenc left the industry, selling their Titanium Dioxide businesses to Kerr-McGee (Tronox's predecessor) and Millennium, respectively.  The Titanium Dioxide business of Imperial Chemical Industries also went up for sale, and it was eventually sold to Huntsman.  Although industry consolidation and other factors helped industry prices and margins improve by 2000 from their 1996 lows, poor economic conditions (*e.g.,* following the events of September 11, 2001), declining demand, and increased global customer purchasing power severely eroded prices in 2001.  Demand in 2001 had even decreased to the point that defendant Millennium idled one of its U.S. plants effective September 1, 2001, informing customers that they would not be impacted because other plants could still supply them.  By the end of 2001, average U.S. prices of Titanium Dioxide purportedly had reached their lowest level, in current dollars, since 1991.

69.   Plaintiffs allege that as a result of abysmal industry conditions in 2001, Defendants were motivated to reach, and did reach, an agreement or understanding in or about early 2002 to increase prices and improve margins in the industry.  These increases were announced and implemented despite flat demand, decreasing raw material costs, and excess capacity in the industry.  Plaintiffs further allege that

Defendants' agreement or understanding caused customers to pay higher prices for Titanium Dioxide during the Class Period than they would have paid in a competitive market.

70.   Immediately following a meeting of the Titanium Dioxide Manufacturers Association in Finland on or about January 24, 2002, Defendants announced Titanium Dioxide price increases for all grades worldwide, including a five cent per pound increase in the U.S. to be effective March 1, 2002.   Plaintiffs allege that prior to these price increases, Defendants communicated with each other directly (bi-laterally and/or multi-laterally) and indirectly (such as through industry analysts, consultants or others) and reached an understanding or agreement to increase industry prices.   Defendants' price-fixing agreement or understanding was reached in secret, so Plaintiffs do not know the precise circumstances surrounding its formation.   Plaintiffs further allege that this understanding or agreement was maintained and fostered throughout the Class Period by means of other communications, which led to numerous additional price increases, and relatively stable customer positions and market shares.   Defendants' communications were conducted in secrecy.

71.   After Defendants' announcements of the early 2002 price increases, but several weeks before their effective date of March 1, 2002, a chemical and oil industry news service published an article on February 11, 2002, entitled "TiO2 Producers Seek Large Price Increases As Profitability Hovers Near Break-Even Point." The article noted that support for the worldwide increases "appears unanimous" and it predicted further increases if demand recovered in the next few months.   The article quoted an industry

analyst, James Fisher of IBMA, as stating that "Every producer is hurting. They all need to get prices up." The article stated that "Producers concede that buyers may question the increases because of last year's falloff in demand, but they stress that the increases are necessary to rebuild margins." The article also quoted high-level executives from defendants DuPont (Ian Edwards, Global Marketing Director for Titanium Dioxide), Millennium (Bruce Zwicker, Vice President of the Global Coatings Business) and Huntsman (Stuart Heyes, Vice President of NAFTA Sales), commenting on industry prices, margins, consumption, and demand.

72. In the Summer 2002, Defendants announced price increases worldwide again. In the U.S., prices of Titanium Dioxide grades sold to the coatings and plastics industries increased $0.06 per pound, and prices of laminate grades sold to the paper industry increased by $0.08 per pound. A few months later, in and about September 2002, a U.S. price increase of $0.04 per pound for other grades sold to the paper industry was announced.

73. Defendants also increased prices in 2003. For example, Defendants and their co-conspirators announced price increases in North America in January 2003 (for all grades except paper grades, effective February 1, 2003), March 2003 (for paper grades, effective April 1, 2003), and September 2003 (for all grades, effective October 1, 2003).

74. Even though global demand declined in 2003 and industry capacity utilization was approximately 85% that year, Titanium Dioxide prices still increased. For example, the North American annual average price per ton of Titanium Dioxide

(including cost of goods, insurance and freight) increased from $1753 to $1830 from 2002 to 2003, an increase of 4%.

75.  Defendants increased prices several times in 2004.  There was a U.S. price increase of $0.05 per pound for all grades effective March 15, 2004.  There were also U.S. increases for all grades of $0.04 per pound effective June 15, 2004 (Millennium, DuPont, Tronox, Huntsman), or July 1, 2004 (Kronos); $0.03 - $0.07 per pound, depending on grade, effective October 1, 2004; and $0.06 per pound for all grades effective January 1, 2005.

76.  The North American annual average price per ton of Titanium Dioxide increased from $1830 to $1921 from 2003 to 2004, an increase of 5%.

77.  In an article dated February 28, 2005, after the 2004 Fourth Quarter price increases, an industry analyst was reported to say that he "expects 75-85 percent of the increase to get implemented by the end of [the first quarter of 2005]" and that he "expects benchmark pricing in the U.S. to be around $1 per pound once the increase goes through."

78.  Defendants increased prices in 2005.  For example, DuPont announced a $0.05 per pound increase for all grades effective April 1, 2005, which was in addition to the $0.06 increase that it had announced in December 2004 that had become effective January 1, 2005.  There were also U.S. price increases for all grades of $0.04 per pound effective July 1, 2005, and for $0.06 per pound effective October 1, 2005.

79.  The North American annual average price per ton of Titanium Dioxide increased from $1921 to $2169 from 2004 to 2005, an increase of 13%.

80.  Defendants increased prices in 2006.  For example, Defendants and their co-conspirators announced a $0.05 per pound increase for all grades in North America effective January 1, 2006.  This increase was in addition to the October 1, 2005 increase.  There was also a U.S. price increase of $0.04 per pound for all grades effective June 15, 2006 (DuPont) and July 1, 2006 (Millennium, Tronox, and Kronos).

81.  Even though global industry capacity increased from approximately 4 million tons to 5.3 million tons from 2005 to 2006, and industry operating rates were approximately 87% in 2006, the North American annual average price per ton of Titanium Dioxide increased from approximately $2169 to $2273 from 2005 to 2006, an increase of 5%.

82.  Defendants sought price increases for all grades worldwide in 2007, despite weak demand for Titanium Dioxide in some regions due to declining economic conditions and overcapacity in the market.  In the U.S., Defendants and their co-conspirators announced a $0.05 per pound increase effective July 1, 2007, and a $0.06 per pound increase effective October 15, 2007 (or October 17, 2007, in the case of Huntsman).  The increases were for all grades.

83.  Defendants announced price increases worldwide for all grades in 2008 on several occasions and also implemented "energy surcharges" for the first time.  Defendants and their co-conspirators announced a $0.06 per pound price increase for all grades sold in North America effective January 15, 2008 (or January 18, 2008, in the case of Huntsman), stating that the increase was in addition to the $0.06 per pound increase previously announced that was effective October 15, 2007.

84.   On January 7, 2008, the same day of DuPont's first price increase announcement in 2008, an article published in an industry publication quoted a Titanium Dioxide industry analyst and consultant as stating that Titanium Dioxide prices and margins were expected to increase in 2008.  Tronox's CEO was also quoted in the same article as stating: "Although supply and demand fundamentals support increased prices, since 2004 the TiO2 industry has been largely unsuccessful in its efforts to offset rising costs of various inputs, from energy to process chemicals, through increased prices."  This statement was false and misleading, because industry "supply and demand fundamentals" did not always explain and support increased prices during the 2004-2007 time period, and because Defendants were at times able to offset increased costs during this period and improve their margins.   There was also overcapacity in the industry and flat or weak demand at times during this period, yet prices still increased.  This statement by Tronox's CEO was also false and misleading to the extent that it justified increased prices based solely on "supply and demand fundamentals," in light of Defendants' unlawfully coordinated and sustained campaign to increase industry prices worldwide, as alleged herein.

85.   On May 23, 2008 (the Friday before Memorial Day weekend), defendant Kronos announced a $0.05 per pound increase for all grades sold in North America to be effective June 15, 2008, as well as a $0.03 per pound "energy related surcharge" effective June 9 that would be added to all North American invoices for the sale of all Titanium Dioxide products.   Kronos stated that the surcharge "represents further

implementation of previously announced North American price increases."  This was the first time that an "energy surcharge" was announced in the industry.

86.   On Monday, June 2, 2008, DuPont announced that it would increase prices for all grades in all regions, telling customers that they "can expect the rapid implementation of previously announced price increases, additional increases and, in some geographies, energy-related surcharges."  That same day, DuPont announced a North American price increase of $0.05 per pound effective June 15, 2008, for all grades, stating that this increase was in addition to the two $0.06 per pound increases in late 2007 and early 2008 which were still "in the process of being implemented."  On June 3, 2008, DuPont announced an "energy cost related surcharge" of $0.04 per pound effective July 1, 2008, for grades of Titanium Dioxide sold in North America to the paper and board industry.  DuPont cited the dramatically increased cost of crude oil as an example of an energy cost increase that necessitated the surcharge.

87.   On June 3, 2008, Tronox announced global price increases, stating in its press release that "prices for all TRONOX® titanium dioxide (TiO2) grades sold worldwide will increase by up to 8 percent by July 1."  On the same day, June 3, 2008, the Vice President and General Manager of DuPont Titanium Technologies was quoted in a PRNewswire article as saying "We expect to increase the global pricing structure by as much as 8 percent in coming weeks."

88.   On June 4, 2008, Millennium and Tronox announced a $0.05 per pound price increase in North America for all grades.  Tronox's increase was effective June 15, 2008, and Millennium's increase was effective July 1, 2008.

89.   Also on June 4, 2008, Huntsman announced "energy related surcharges," including a surcharge of $75 per metric ton for "all sales of imported product into North America."   On June 6, 2008, Huntsman announced price increases throughout the world, and on June 9, 2008, Huntsman matched the other Defendants in announcing a North American price increase of $0.05 per pound effective July 1, 2008.

90.   On June 12, 2008, Millennium announced that it would apply "raw material surcharges" to Titanium Dioxide grades sold into the North American paper market of either $0.04 per pound (for Tiona RCS-P grades) or $0.09 per pound (for sulfate anatase grades).

91.   On June 23, 2008, only three weeks after its June 2, 2008, price increase, DuPont announced another price increase, this time for $0.06 per pound for all grades sold in North America effective July 1, 2008.   This increase was in addition to all previous increases and the paper surcharge announced earlier in June.

92.   On June 25, 2008, both Kronos and Tronox matched DuPont's $0.06 per pound increase for all grades sold in North America effective July 1, 2008.   The Tronox announcement stated that the "increase is in addition to the price increases announced in October 2007, January 2008 and on June 4, 2008, and is the next step toward partially offsetting the extraordinary increases in freight, energy, and other input costs that the TiO2 industry has absorbed over the last two years."   Kronos also announced another $0.03 per pound energy surcharge to be added to all North American invoices effective July 15, 2008, which would be in addition to the surcharge that became effective on June 9, 2008.

93.   On June 27, 2008, defendant Huntsman matched DuPont's second increase ($0.06 per pound for all grades in North America effective July 1) and also announced another energy surcharge ($0.03 per pound in North America effective August 1). These increases were in addition to all previously announced price increases as well as the June 4, 2008 surcharge.

94.   On June 30, 2008, defendant Millennium joined DuPont and the other Defendants and their co-conspirators, announcing a $0.06 per pound price increase for all grades sold in North America effective July 1, 2008, which was in addition to its previously announced price increases in North America.

95.   On August 1, 2008, defendant DuPont announced another energy surcharge, this time for $0.06 per pound on all sales of the Titanium Dioxide grades that it sold to the North American paper and board industry, specifically its Ti-Pure® RPS Vantage® grades.   At least Millennium and Tronox matched DuPont's surcharge increase.

96.   On August 19, 2008, Huntsman announced a $0.05 per pound increase on ten Titanium Dioxide grades sold in North America effective September 1, 2008 or as contracts allowed.

97.   On September 2, 2008, DuPont announced a North American price increase effective that same day of $0.08 per pound for all Ti-Pure® Titanium Dioxide grades. Kronos and Tronox matched this increase the next day, on September 3, 2008. Millennium joined it on September 4, 2008, and Huntsman joined it on September 5, 2008.   The Huntsman increase announcement did not clarify whether this increase

(which was for all grades) was in addition to the $0.05 per pound price increase for ten grades that it had announced several weeks earlier on August 19, 2008.

98.    The September 2008 price increases were justified by DuPont, Millennium, and Huntsman because of cost increases, even though oil prices had fallen far below the record highs that they had reached earlier in the year. Defendants' 2007-2008 price increases and energy surcharges also occurred in spite of declining demand in the United States for Titanium Dioxide due to recessionary economic conditions, including declining demand in the paint and construction industries. Titanium Dioxide demand generally had decreased almost 20% from 2000 - 2008, and more than 25% from 2004 - 2008.

99.    In short, over the course of approximately 14 weeks, from late May 2008 to early September 2008, Defendants and their co-conspirators announced three separate Titanium Dioxide price increases and at least two energy surcharges -- in spite of declining demand. The prices of ilmenite and rutile titanium ore, key raw materials for making Titanium Dioxide, also decreased from 2007-2008, further showing a disconnect between the 2008 price increases and their purported justification. These price increases prompted an investigation into whether a cartel had formed in the Titanium Dioxide industry and, ultimately, led to the filing of this Complaint.

100.  Some of the coordinated price increase announcements of the Defendants and their co-conspirators during each year of the Class Period are listed by effective date in the following table:

| Examples of Certain U.S. $TiO_2$ Industry Price Increase Announcements by Effective Date in Cents Per Pound | | | | | |
| --- | --- | --- | --- | --- | --- |
| EFFECTIVE DATE | DUPONT | MILLENNIUM | KRONOS | TRONOX | HUNTSMAN |
| 03/01/2002 | $0.05 | $0.05 | | $0.05 | $0.05 |
| 07/01/2002 | $0.06 | $0.06 | $0.06 | $0.06[1] | |
| 10/01/2003 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 06/15/2004 | $0.04 | $0.04 | $0.04[2] | $0.04 | $0.04 |
| 10/01/2004 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 07/01/2005 | $0.04 | $0.04 | $0.04 | $0.04 | |
| 10/01/2005 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06 |
| 01/01/2006 | $0.05 | $0.06 | $0.05 | $0.05 | $0.05 |
| 07/01/2007 | $0.05 | $0.05 | $0.05 | $0.05 | $0.05 |
| 10/15/2007 | $0.06 | $0.06 | $0.06 | $0.06 | |
| 01/15/2008 | $0.06 | $0.06 | $0.06 | $0.06 | $0.06[3] |
| 06/15/2008 | $0.05 | $0.05[4] | $0.05 | $0.05 | $0.05[5] |
| 07/01/2008 | $0.06 | $0.06[6] | $0.06 | $0.06 | $0.06[7] |
| Sept. 2008[8] | $0.08 | $0.08 | $0.08 | $0.08 | $0.08 |

Sources:  Defendants' press releases; 2002-2008 *Chemical Market Reporter*, *Chemical Week*, and other industry news articles

[1]   Effective 08/01/2002.
[2]   Effective 07/01/2004.
[3]   Effective 01/18/2008, the same date it was announced.
[4]   Effective 07/01/2008, announced 06/04/2008.
[5]   Effective 07/01/2008, announced 06/09/2008.
[6]   In addition to the 06/04/2008 announced increase.
[7]   Effective 08/01/2008.
[8]   DuPont announced Sept. 2, Kronos and Tronox Sept. 3, Millennium Sept. 4, and Huntsman Sept. 5, and all increases were effective immediately.

101. Plaintiffs allege that Defendants reached an unlawful agreement or understanding to fix, raise, maintain, and stabilize Titanium Dioxide prices during the Class Period.  Pursuant to the alleged conspiracy, Defendants and their co-conspirators

engaged in secret discussions about industry pricing, capacity, costs, and customers, and conspired and agreed to support industry price increase announcements.  Plaintiffs further allege that Defendants knew that if they attempted to take significant business or market share from another producer on the basis of price (e.g., by "attacking" or trying to "steal" another Defendant's customer with a low-price offer), they risked retaliation from that producer at their own customer accounts, not only in the United States, but also around the world.  For example, defendant Huntsman was careful not to appear to compete aggressively for the business of a DuPont customer, lest its own customer accounts then be subject to retaliation from DuPont.  Plaintiffs allege that such conduct was not limited to Huntsman but was also practiced by the other Defendants, pursuant to and consistent with an understanding or agreement among DuPont, Millennium, Kronos, Huntsman and their co-conspirators to keep customer positions and industry prices stable.  Price increase announcements were routinely supported in the industry during the Class Period, and this consistent conduct in light of Defendants' considerable contacts with each other also gives further support to the allegation that an anticompetitive understanding or agreement existed among Defendants during the Class Period.

102.  The conspiracy among Defendants was successful in increasing prices during the Class Period, even when industry overcapacity and weak demand existed. For example, in November 2007, defendant Millennium announced that it was closing a Titanium Dioxide plant in France in part due to industry overcapacity.  As discussed above, Defendants announced worldwide price increases in 2007 and in 2008.  Unlike in

the 1990s, when industry overcapacity contributed to lower prices and poor industry margins, Defendants' conspiracy managed to prevent overcapacity from severely impacting prices during the Class Period.

103. Defendants' price increases during the Class Period had their intended effect, and the alleged conspiracy has been profitable for Defendants. For example, the average annual price per ton of Titanium Dioxide in North America increased from approximately $1753 in 2002 to $2273 in 2006, an increase of 30%. Defendants Huntsman and Kronos dramatically increased their operating income and margins between 2002 and 2003. Even after discounting the $142 million in insurance proceeds that defendant DuPont received for damages to its Mississippi plant from Hurricane Katrina in 2005, DuPont's operating income for its Coatings & Color Technologies segment (which includes its Titanium Dioxide business) increased approximately 45% from 2002 to 2007. In addition, in 2008, and in spite of declining demand for Titanium Dioxide and recessionary economic conditions in the United States and elsewhere, the global Titanium Dioxide industry earned over $1 billion in pre-tax operating income. Industry leader and defendant DuPont achieved approximately half of that amount.

### EFFECTS

104. Defendants' combination and conspiracy has had the following effects, among others:

    a.    Price competition in the sale of Titanium Dioxide by Defendants and their co-conspirators has been restrained, suppressed, and eliminated throughout the United States;

    b.      Prices for Titanium Dioxide sold by Defendants and their co-conspirators have been raised, fixed, maintained, and stabilized at artificially high and noncompetitive levels throughout the United States; and,

    c.      Direct purchasers of Titanium Dioxide from Defendants and their co-conspirators have been deprived of the benefit of free and open competition in the purchase of Titanium Dioxide.

105. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other members of the Class have been injured in their business and property in that they paid more for Titanium Dioxide than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## FRAUDULENT CONCEALMENT

106. Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

107. By its very nature, Defendants' and their co-conspirators' alleged price-fixing conspiracy was inherently self-concealing. Plaintiffs thus had neither actual nor constructive knowledge of the facts constituting their claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws, at least until Defendants' and their co-conspirators' unprecedented pricing behavior in mid-2008

(during a time of weak demand) prompted an investigation of the industry. Nor could Plaintiffs or the class members have discovered the alleged violations earlier than that time, because Defendants and their co-conspirators are alleged to have affirmatively concealed their conspiracy by meeting secretly to discuss Titanium Dioxide prices, customers and markets; by agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme; by giving false and pretextual reasons for price increases, and by describing Titanium Dioxide pricing falsely as being the result of competitive factors rather than collusion; and by wrongfully and fraudulently concealing their collusive activities through various other means and methods designed to avoid detection.

108. Without the benefit of discovery, it is impossible to determine the scope and extent of Defendants' and their co-conspirators' (non-public) meetings and communications with each other. Defendants are alleged to have engaged in a secret conspiracy that necessarily did not give rise to facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for Titanium Dioxide. As explained above, it was not until after Defendants and their co-conspirators had announced three separate Titanium Dioxide price increases and at least two energy surcharges over the course of approximately 14 weeks, from late May 2008 to early September 2008, during a period of declining demand and recessionary economic conditions, that an investigation began of the Titanium Dioxide industry and led to the filing of this Complaint.

109.  Because Defendants' agreement, understanding and conspiracy was kept secret, Plaintiffs and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for Titanium Dioxide.

110.  The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

111.  Plaintiffs and members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their conspiracy.   The conspiracy as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, communications and agreements.   If they were memorialized in records at all, Defendants' contacts and meetings with each other were memorialized in a false and/or misleading manner, in order to conceal the anticompetitive topics of discussion.   Defendants' contacts and meetings with each other were also concealed from Defendants' customers and other nonconspirators.

112.  As alleged above, in 2002, after years of declining prices, the price of Titanium Dioxide began to increase.   The price increases and "surcharges" implemented by Defendants and their co-conspirators during the Class Period tended to be based on a need to improve margins, justify future investment, offset increased

costs, and/or meet allegedly increased demand at a time of tight supply.   The
justifications offered by Defendants and their co-conspirators for their price increases
were false, pretextual, and/or misleading and operated to conceal the conspiracy.   In
fact, price increases were the result of collusive conduct among the Defendants and
their co-conspirators, which was undisclosed at the time of the increases.   To the extent
there was any truth in the explanations offered by Defendants for their numerous price
increases during the Class Period, the explanations were nevertheless misleading
because of Defendants' conspiracy, which was kept secret from customers.

113. For example, in early 2002, when industry prices had hit bottom and
Titanium Dioxide producers were desperate to increase prices, they offered a variety of
justifications for price increases.   Huntsman's Vice President of NAFTA sales was
quoted in an article as saying that "recent pricing has been insufficient to justify
investments in major new capacity, which will be needed by 2003 to 2004, leading to a
tight market at that time."   But this was false and misleading, because new capacity was
in fact not needed: Huntsman and other producers, who successfully increased prices in
2002-2005, actually shut down some capacity during the 2003-2004 period.

114. Indeed, a lack of new capacity was used at times to justify price increases
during the Class Period, even though Defendants and their co-conspirators often had
more than enough capacity (and inventory) on hand to supply global markets.   For
example, Huntsman and Millennium decreased capacity at certain plants in 2004, and
shortly after the October 2007 price increase, Defendant Millennium closed a plant in

France citing "the over capacity of titanium dioxide in the world market" among other reasons.

115. Often during the Class Period, Defendants justified the need for price increases due to poor or otherwise "unacceptable" industry margins, even though the Titanium Dioxide business of DuPont and other Defendants earned hundreds of millions of dollars in profits annually. For example, in August 2007, DuPont informed customers (even customers who were being supplied by other Defendants) that price increases were justified in part because industry profitability had declined, even though DuPont's operating income for its Coatings & Color Technologies segment (which includes its Titanium Dioxide business) increased approximately 45% from 2002 to 2007. Also, in 2008, a year in which the paint and plastics industries (which account for approximately 80% of Titanium Dioxide consumption) were beleaguered by recession, DuPont -- the industry leader -- earned over $500 million in pre-tax operating income from global Titanium Dioxide sales.

116. In addition, when DuPont led an industry price increase in September 2008, its price increase announcement contained various justifications for the increase from its Global Business Director, Ian Edwards. The justifications included not only the existence of higher raw material, energy and transportation costs (which plagued a vast number of industries in 2008), but also the purported fact that "Demand for TiO2 remains strong." This was false and misleading, as demand for Titanium Dioxide was declining in 2008, particularly given recessionary economic conditions in the paint, construction, paper and plastic industries. In fact, demand for Titanium Dioxide had

been declining for years.  For example, the market volume of Titanium Dioxide sold in the U.S. declined over 25% between 2004-2007.

117. Although Defendants' price increase announcements during the Class Period often did not contain justifications for price increases (such justifications were typically given to customers orally), the announcements nevertheless constituted implicit statements that the price increases in question were legitimate and were the result of competitive market forces.  Customers also were often told that price increases were needed because raw material costs were increasing and industry margins were being adversely impacted.  For example, after Defendants announced price increases to be effective on October 1, 2004, an article published in Paint and Coatings Industry magazine on October 1, 2004 stated: "Dupont said the price increases are the result of rising raw-material costs, economic expansions that are driving 'very strong global TiO2 demand,' high capacity rates, and 'reinvestment economics for capital funding to support industry growth.' Similar statements were issued by other suppliers . . . Huntsman Tioxide said the price hikes 'reflect both strong global market demand and the significant impact of raw material, energy and freight cost increases.'"  These statements were false and misleading, because (1) capacity was not "high" -- the industry operating rate averaged approximately 87% in the 2002-2004 period; and, (2) ore costs, which are a substantial part of the raw material costs of manufacturing Titanium Dioxide, were either decreasing (ilmenite ore) or stable (rutile ore) during the 2002-2004 period.

118. Defendants' customers, including Plaintiffs and members of the Class, were thus conditioned by experience in dealing with Defendants in what they believed to be a competitive industry to expect price increases from time to time. Plaintiffs and members of the Class were lulled into believing that price increases were the normal result of competitive market forces rather than the product of collusive, unlawful efforts. Indeed, as alleged herein, Defendants and their co-conspirators made statements in the media in support of price increases that were presumed to be true and were designed to convince members of the Class to pay purportedly legitimate price increases.

119. Plaintiffs are informed and believe, and thereon allege, that Defendants' reasons for the price increases of Titanium Dioxide during the Class Period were materially false and/or misleading and were made, at least in part, in order to conceal Defendants' anticompetitive scheme as alleged herein.

120. As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims that Plaintiffs and the Class members have as a result of the anticompetitive conduct alleged in this complaint.

## CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1

121. Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

122. Beginning at least as early as March 1, 2002, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their

co-conspirators entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

123. In particular, Defendants and their co-conspirators have combined and conspired to raise, fix, maintain or stabilize the prices of Titanium Dioxide sold in the United States.

124. As a result of Defendants' and their co-conspirators' unlawful conduct, prices for Titanium Dioxide were raised, fixed, maintained and stabilized in the United States.

125. The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

126. For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

    a.    Participating in meetings and conversations to discuss the prices and supply of Titanium Dioxide;

    b.    Communicating in writing and orally to fix prices;

    c.    Agreeing to manipulate the prices and supply of Titanium Dioxide sold in the United States, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

d.   Issuing price announcements and price quotations in accordance with the agreements reached;

e.   Selling Titanium Dioxide to customers in the United States at noncompetitive prices; and

f.   Providing false and/or misleading statements to the public to explain price increases for Titanium Dioxide.

127. As a result of Defendants' and their co-conspirators' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses and property in that they have paid more for Titanium Dioxide than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## DAMAGES

128. During the Class Period, Plaintiffs and the other members of the Class purchased Titanium Dioxide directly from Defendants or their co-conspirators, or their subsidiaries, agents, and/or affiliates and, by reason of the antitrust violations herein alleged, paid more for Titanium Dioxide than they would have paid in the absence of such antitrust violations. As a result, Plaintiffs and the other members of the Class have sustained damages to their business and property in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

48

A.      This action may proceed as a class action, with Plaintiffs as the designated class representatives and their counsel, Gold Bennett Cera & Sidener LLP and Lieff Cabraser Heimann and Bernstein LLP, as Co-Lead Class Counsel;

B.      Defendants have combined and conspired in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and that Plaintiffs and the members of the Class have been injured in their business and property as a result of Defendants' violations;

C.      Plaintiffs and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

D.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the conspiracy or agreement alleged herein;

E.      Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.      Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.      Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Date:  April 12, 2010                                   Respectfully submitted,

SHAPIRO SHER GUINOT & SANDLER

_____/s/_____
Paul Mark Sandler – Bar No. 00145
pms@shapirosher.com
Robert B. Levin – Bar No. 00695
rbl@shapirosher.com
John J. Lovejoy – Bar No. 28905
jjlovejoy@shapirosher.com
36 South Charles Street
Charles Center South, Suite 2000
Baltimore, Maryland  21201
Telephone:  (410) 385-0202
Facsimile:  (410) 539-7611


GOLD BENNETT CERA & SIDENER LLP

_____/s/_____
Solomon B. Cera
*(signed by Robert B. Levin with Permission*
*  of Solomon B. Cera)*
scera@gbcslaw.com
*Admitted Pro Hac Vice*
C. Andrew Dirksen
cdirksen@gbcslaw.com
*Admitted Pro Hac Vice*
595 Market Street, Suite 2300
San Francisco, California  94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189

LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

_____/s/_____

Joseph R. Saveri
*(signed by Robert B. Levin with Permission*
  *of Joseph R. Saveri)*
jsaveri@lchb.com
*Admitted Pro Hac Vice*
Eric B. Fastiff
efastiff@lchb.com
*Admitted Pro Hac Vice*
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, California  94111
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008


LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

_____/s/_____

Steven E. Fineman
*(signed by Robert B. Levin with Permission*
  *of Steven E. Fineman)*
sfineman@lchb.com
*Admitted Pro Hac Vice*
Daniel E. Seltz
dseltz@lchb.com
*Admitted Pro Hac Vice*
250 Hudson Street, 8th Floor
New York, New York  10013
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

BERGER & MONTAGUE, P.C.


_____/s/_____

Eric L. Cramer
*(signed by Robert B. Levin with Permission
of Eric L. Cramer)*
ecramer@bm.net
*Admitted Pro Hac Vice*
Matthew P. McCahill
mmccahill@bm.net
*Admitted Pro Hac Vice*
1622 Locust Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604


CRIDEN & LOVE, P.A.


_____/s/_____

Kevin B. Love
*(signed by Robert B. Levin with Permission
of Kevin B. Love)*
klove@cridenlove.com
*Pro Hac Vice Admission Pending*
7301 Southwest 57th Court, Suite 515
South Miami, Florida 33143
Telephone: (305) 357-9000
Facsimile: (305) 357-9050
*Attorneys for Plaintiffs and Proposed Direct
Purchaser Class Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on the 12th day if April, 2010, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system.  The Court or the CM/ECF system will send notification of such filings to all CM/ECF participants. I further certify that a true and correct copy of this document was sent via U.S. first-class mail, postage paid, to all non-CM/ECF participants.

       /s/   Robert B. Levin
Robert B. Levin
