MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

JOHN H. HEMANN (CSBN 165823)
PETER B. AXELROD (CSBN 190843)
Assistant United States Attorneys

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-7200
     FAX: (415) 436-7234
     john.hemann@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 11-0573 JSW |
|      Plaintiff, | AMENDED UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (DKT. 312) AND MOTION FOR A BILL OF PARTICULARS (DKT. 314) |
|      v. | |
| WALTER LIEW, CHRISTINA LIEW, USA PERFORMANCE TECHNOLOGY, INC. AND ROBERT MAEGERLE, | Date: June 6, 2013<br>Time: 2:00 p.m. |
|      Defendants. | |

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ....................................................................................................1

II.  THE SECOND SUPERSEDING INDICTMENT ...................................................2

     A.   Trade Secret Allegations............................................................................3

     B.   Tax and Bankruptcy Allegations ...............................................................6

III. DISCOVERY .........................................................................................................6

IV.  ARGUMENT ..........................................................................................................8

     A.   The Motion To Dismiss Should Be Denied. ..............................................8

          1.   Legal Standards……………………………………………………...8

          2.   Attempted Economic Espionage - Count 4………………………….8

          3.   Attempted Economic Espionage and Trade Secret Theft Involving
               Trade Secret 1 - Counts 3 and 5…………………………………...9

          4.   Conveying Trade Secrets Charge Involving Trade Secret 5 - Count 8…………12

          5.   The Motion To Dismiss Entire Indictment Should Be Denied……………………13

          6.   The Motion To Strike Should Be Denied…………………………………………13

     B.   The Motion For A Bill Of Particulars Should Be Denied. ...............................13

          1.   Legal Standards……………………………………………………13

          2.   The Trade Secret Charges Have Been Alleged With Particularity And Full
               Discovery Has Been Provided To The Defense…………………………………14

          3.   Financial Charges…………………………………………………...18

               (a)   The Defendants' Fail To Establish The Need For A Bill Of Particulars
                     For The Tax Charges…………………………………………………18

               (b)   The Defendants' Also Fail To Establish The Need For A Bill Of
                     Particulars For The Bankruptcy Fraud Charges…………………………...19

V.   CONCLUSION......................................................................................................21

1

# **TABLE OF AUTHORITIES**

2

## **FEDERAL CASES**

3   228 F.3d at 13…………………………………………………………………………..10

4   281 F.3d at 202………………………………………………………………………….10

5   *Costello v. United States*, 350 U.S. 359, 363 (1956)……………………………………….8

6   *Hamling v. United States*, 418 U.S. 87, 117 (1974)………………………………………..8

7   *Ryland*, 806 F.2d at 942……………………………………………………………………17

8   *United States v. Ayers*, 924 F.2d 1468, 1483 (9th Cir. 1991)....................................14

9   *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir.1982)......................................8

10  *United States v. Buffington*, 815 F.2d 1292, 1304 (9th Cir. 1987)………………………8

11  *United States v. Case*, 2007 WL 1746399 (S.D. Miss. June 15, 2007)……………………...11, 12

12  United States v. Devine's Milk Labs., Inc., 179 F.Supp. 799, 801 (D. Mass. 1960)…………………..13

13  *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988)……………………………………17

14  *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979)…………………………………14, 17, 19

15  *United States v. Hsu*, 155 F.3d 189, 198 (3rd Cir. 1998)……………………………………...9, 11

16  *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir.1996)………………………………………8

17  *United States v. Latimore*, 2009 WL 3876171 (E.D. Mich. Nov. 17, 2009)…………………………15

18  *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983)………………………………………18

19  *United States v. Martin*, 228 F.3d 1, 13 (1st Cir. 2000)………………………………………...10

20  *United States v. Mitchell*, 744 F.2d 701, 705 (9th Cir. 1984)…………………………………………14

21  *United States v. Nosal*, CR-08-0237-EMC…………………………………………10

22  *United States v. Yang*, 281 F.3d 534, 543 (6th Cir. 2002)…………………………………………10

23  *Yeargain v. United States*, 314 F.2d 881, 882 (9th Cir. 1963)…………………………………………19

1

## **FEDERAL STATUTES**

2   18 U.S.C. § 152(3)…………………………………………………………………………6

3   18 U.S.C. § 1831(a)(5)……………………………………………………………………9

4   18 U.S.C. § 1832……………………………………………………………………..*passim*

5   18 U.S.C. § 1832(a)(2)……………………………………………………………………12

6   18 U.S.C. § 1832(a)(3)……………………………………………………………………1

7   18 U.S.C. § 1832(a)(4)……………………………………………………………………10

8   18 U.S.C. § 1839(3)…………………………………………………………………1, 13, 18

9   18 U.S.C. §§ 1831(a)(4) and 1832(a)(4)………………………………………………...1

10  18 U.S.C. §§ 1832(a)(1) and (2)………………………………………………………..11

11  18 U.S.C. §§ 1832(a)(4) and (5)…………………………………………………………9

12  26 U.S.C. § 7206(1)……………………………………………………………………6, 19

13  18 U.S.C. § 1832(a)(5)……………………………………………………………………9

14

## **FEDERAL RULES**

15  Fed. R. Crim. P. 16(a)(1)(E)(ii)…………………………………………………………7

16  Fed. R. Crim. P. 7(c)……………………………………………………………………8

17

18

19

20

21

22

23

24

25

26

27

28

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARTICULARS
CR 11-0573 JSW

# I.   INTRODUCTION[1]

The United States opposes defendants' Motion to Dismiss (Dkt. 312) ( "Def. MTD") and defendants' Motion for a Bill of Particulars (Dkt. 314) ( "Def. MBP").  Because the relevant charges, factual background, and authorities overlap considerably, the United States submits this single memorandum in opposition to both of defendants' motions.

Defendants' motion to dismiss should be denied.  Defendants argue that the Second Superseding Indictment does not sufficiently identify Trade Secrets 1 and 5, and that the indictment, therefore, is unconstitutionally vague.  Defendants are incorrect.  Counts Three and Five,[2] the counts based on Trade Secret 1, charge attempt, not a substantive misappropriation offense.  The government is not required to allege or prove the existence of an actual trade secret to secure a conviction for attempted economic espionage or attempted trade secret theft, in violation of 18 U.S.C. §§ 1831(a)(4) and 1832(a)(4), respectively.  Nor should Count 8, which is based on Trade Secret 5, be dismissed.  Trade Secret 5 identifies very specifically a specific DuPont document, the Kuan Yin basic data document, a "trade secret" as defined by 18 U.S.C. § 1839(3), and alleges that it was illegally "copied, duplicated, sketched, drew, altered, photocopied, replicated, transmitted, delivered, sent, communicated, and conveyed," in violation of 18 U.S.C. § 1832(a)(3).   Counts Three, Five, and Eight are more than sufficiently detailed to put defendants on notice of the crimes with which they are charged.

Defendants' motion for a bill of particulars also should be denied.  Defendants' claim that they are unable to prepare for trial is not supported by the facts and is belied by their ability in both of their motions to articulate defense theories.  The Second Superseding Indictment is extremely specific as to the alleged trade secrets – each alleged trade secret is specifically identified in the first sentence of each sub-paragraph of paragraph 14 – and the discovery has been extensive and complete.  The Indictment cites specific examples of how defendants improperly used the alleged trade secrets.  Defendants have received full discovery, all FBI 302 interview memoranda, analysis by DuPont engineers, and a set of

---

[1] The United States files this amended opposition to provide the court and the parties with a copy of the brief that contains a Table of Contents and Table of Authorities, as required by Crim. L. R. 47-2(b).  This is the only amendment to this filing.

[2] Defendants erroneously include Count Four in their motion to dismiss, notwithstanding that none of them are named in Count Four.

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

1  "key documents" (including the alleged trade secrets); they will receive shortly an early designation of

2  the documents the government intends to offer in its case-in-chief and prior to trial will be provided with

3  expert reports regarding the trade secrets.  This combination of information is more extensive than is

4  typical and is more than sufficient to inform defendants of the government's theory of the case and

5  allow them to prepare for trial.

6  **II.      THE SECOND SUPERSEDING INDICTMENT**

7          Defendants Walter Liew, Christina Liew, Robert Maegerle, and their company, USA

8  Performance Technology, Inc., were charged in a Second Superseding Indictment ( "the Indictment"),

9  on March 12, 2013.

10          The Indictment alleges that the government of the People's Republic of China (the "PRC")

11  identified as a priority the development of chloride-route titanium dioxide ("TiO2") production

12  capabilities.  TiO2 is a commercially valuable white pigment with numerous uses, including coloring

13  paint, plastics, and paper.  To achieve that goal, companies controlled by the PRC government,

14  specifically the Pangang Group companies named in the Indictment, and employees of those companies

15  conspired and attempted to illegally obtain TiO2 technology that had been developed over many years

16  of research and development by E.I. du Pont de Nemours & Company ("DuPont").

17          DuPont invented the chloride-route process for manufacturing TiO2 in the late-1940s and since

18  then has invested heavily in research and development to improve that production process.  The global

19  titanium dioxide market has been valued at roughly $12 billion, and DuPont has the largest share of that

20  market.  The chloride-route process is more efficient and cleaner than the sulfate-route process prevalent

21  in the PRC.  The Indictment alleges that the object of the defendants' conspiracy was to convey

22  DuPont's secret chloride-route technology to the PRC companies for the purpose of building modern

23  TiO2 production facilities in the PRC without investing in time-consuming and expensive research and

24  development.

25          The Pangang Group companies were aided in their efforts by individuals in the United States

26  who had obtained TiO2 trade secrets and were willing to sell those secrets for significant sums of

27  money.  The Indictment charges that Walter Liew, Christina Liew, Maegerle, and Tze Chao obtained

28

2

and possessed TiO2 trade secrets belonging to DuPont.  Maegerle and Chao are former employees of

DuPont.  Each of these individuals allegedly sold information containing DuPont TiO2 trade secrets to

the Pangang Group companies for the purpose of helping those companies develop large-scale chloride

route TiO2 production capability in the PRC, including a planned 100,000 ton TiO2 factory at

Chongqing, PRC.

The Liews, USA Performance Technology, Inc. (USAPTI), and one of its predecessor

companies, Performance Group, entered into contracts worth almost $28 million to convey TiO2 trade

secret technology to Pangang Group companies.  The Liews received millions of dollars of proceeds

from these contracts.  The proceeds were wired through the United States, Singapore, and ultimately

back into several bank accounts in the PRC in the names of relatives of Christina Liew.

**A.      Trade Secret Allegations**

Paragraph 14 of the Indictment identifies in detail five discrete trade secrets, each of which is

later referenced in one or more of the charges.  In each case, the first sentence of the paragraph

containing the allegation identifies the trade secret, and the remainder of the paragraph describes the

trade secret in more detail:

> a.  **Trade Secret 1**: The DuPont chloride-route process to manufacture TiO2.  Trade Secret 1
> includes ways and means in which proprietary and non-proprietary components were compiled
> and combined by DuPont to form substantial portions of the TiO2 manufacturing process, and
> Trade Secrets 2 through 5 set forth below.
>
> b.  **Trade Secret 2**: DuPont Drawing No. W1245258, titled "Edge Moor Plant Oxidation W/RPS
> System Drawing."  This drawing, marked with the DuPont oval logo trademark, explicitly stated
> that the "information and know-how [on the drawing] may not be used nor the drawing
> reproduced without the written permission of DuPont."  The drawing provided information about
> TiO2 oxidation area process, including detailed process flow descriptions for each major stream
> within the process, including stream capacities, chemical compositions, temperatures, pressures,
> and physical states.  The drawing included details related to pipeline sizes, automatic and manual
> valve sizes and locations, detailed instrumentation requirements, and safety relief devices.
>
> c.  **Trade Secret 3**: DuPont Accession Report No. 18135, titled "Improved Mixing Correlation
> for the TiCl4 Oxidation Reaction Computer Model," dated September 7, 1994, which appended a
> mathematical equation, referred to as the "Diemer correlation," and related code in the Fortran
> language for a computer model.  The correlation, which enabled the calculation of the mixing
> time and distance required for the completion of the oxidation process for any DuPont reactor
> under any set of process conditions, incorporated historical operating data from DuPont's
> production lines and its oxidation science.  On its cover page, the report was marked "DuPont

3

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

Confidential – use and dispose per DISO [DuPont Information Security Organization] policy," and "[t]his report contains confidential information and each holder is responsible for its safekeeping.  When no longer needed, please destroy or dispose of in conformance with PIP [Proprietary Information Protection] Guidelines."

d.  **Trade Secret 4**: DuPont Flow Sheet No. EK2411, titled "Edge Moor Pigments Plant Flow Sheet – Reaction Area," with handwritten notations.  This flow sheet, bearing the DuPont oval logo trademark, was marked "DuPont Confidential – Special Control," and provided that the "employee receiving this registered print will sign and print the attached acknowledging card, will properly safeguard this print and will be held personally accountable for this print."  The flow sheet contained information about the TiO2 reaction area process, *e.g.*, the process of treating ores with chlorine gas, including the inter-connectivity of all major streams between the reaction area equipment, which illustrates where and how DuPont injects chemical additives, fuel, feedstocks, purge gases and coolants to the process.  This flow sheet also included roughly 30 alphanumeric handwritten references to a proprietary, internally-commissioned computer simulation model on the ASPEN-PLUS® platform, known as the Reaction Aspen-Plus (RAP) model, which was described in a separate confidential DuPont technical report.  The handwritten references matched the specific nomenclature used for the RAP model, which was created for plant optimization projects and capacity expansions.

e. **Trade Secret 5**: DuPont Document EM-C-8510-0148, titled "60,000 Metric Tons Per Year Scope/Basic Data," dated October 31, 1985, addressed to R.J. MAEGERLE (the "Basic Data Document").  This 407-page document, which was designated "Confidential – Special Control," and issued in numbered copies, provided the scope and basic data for DuPont's then-planned chloride-route plant in Taiwan, which later opened in Kuan Yin, Taiwan.  It contained the process and equipment information necessary to design a greenfield (*e.g.*, a plant built from scratch at an undeveloped site), world-class production scale, integrated chloride-route TiO2 production line.  The Basic Data Document's security statement provided that the report is "highly confidential" and "[m]uch of the report data are considered in the 'trade secret' category and should not be released to vendor representatives and non-Company personnel."  The Basic Data document was itself a trade secret and it contained numerous discrete trade secrets within in it.

Indictment, ¶¶ 14(a)-(e).

The Indictment carefully distinguishes between these trade secrets and reveals the government's different theories as to each of them.  Trade Secret 1, as discussed in more detail below, forms part of the basis for the conspiracy charge alleged in Count One and Two, and the basis for the attempt charges alleged in Counts Three, Four, and Five.  Though defendants complain that the term "DuPont chloride-route process" is too vague for them to understand, Walter Liew's use of the term is responsible for its inclusion in the Indictment, as it was he who boasted to the Pangang Group in 2004 that that his company possessed the DuPont technology that China needed:  "Some years ago China let me know that

1  she urgently needed titanium white by chlorination technology.  After many years of follow-up research

2  and application, my company has possession and mastery of *the complete DuPont way of titanium white*

3  *by chlorination*."  Dkt. 59, Ex. 2 (emphasis added).[3]

4      Trade Secrets 2 and 4 are alleged in Counts Six and Nine to have been misappropriated by

5  Walter Liew, Christina Liew, and USAPTI.  The Indictment narrowly and specifically alleges that

6  defendants possessed Trade Secrets 2 and 4, respectively, knowing them to have been "stolen and

7  appropriated, obtained, and converted without authorization."  In Count Seven, the Indictment alleges

8  that Trade Secret 3 was "received and possessed" by Walter Liew and USAPTI, knowing it to have been

9  "stolen and appropriated, obtained, and converted without authorization."

10     Count Eight concerns Trade Secret 5, the Kuan Yin basic data document.  As set forth above, the

11 basic data document was essentially the instruction manual for building a DuPont chloride-route factory.

12 The Indictment alleges in Count Eight that Walter Liew, Maegerle, and USAPTI "knowingly and

13

14 [3]Walter Liew described his motivation to locate and develop TiO2 technology for the PRC government
   in an October 2004 memorandum located by the FBI in a search of a computer hard-drive found in a
15 safe deposit box owned by Mrs. Liew.  Dkt. 59, Ex. 2.  The memorandum is attached to a letter, the
   purpose of which is to provide the PANGANG GROUP with an "introduction" to Liew's company and
16 an overview of "titanium white by chlorination technology."  "Titanium white" is what the Chinese call
   titanium dioxide, or TiO2.  The letter is addressed to the Chairman[1] and General Manager of the
17 Pangang Group.

18 The attached memorandum began with the following paragraph:

19     In December 1991, Mr. Luo Gan, who at the time was the Secretary General of the State
       Council, hosted me at the Diaoyutai State Guesthouse.  Also present were: Tan Zhuzhou,
20     Vice Minister of the former Ministry of Chemical Industry; Zhang Yujie, Vice Minister
       of the State Bureau of Foreign Experts; Qiao Schichang, head of the General Planning
21     Department of the State Bureau of Foreign Experts; Kang Deyao, Director of the Talent
       Development Research Institute.  The purpose of the banquet is to thank me for being a
22     patriotic overseas Chinese who has made contributions to China; and who has provided
       key technologies with national defense applications, in paint/coating and microwave
23     communications.  At that time Secretary General Luo Gan gave directives, so that I
       would better understand China and continue to make contributions to her.  Two days later
24     I was given a list of key task projects by the appropriate Chinese agency.  Titanium white
       by chlorination was one of the more important projects.
25

26     Liew wrote that "[f]rom what I know, the titanium white by chlorination technology in China is
   not yet mature, in particular there is a gap for facilities for the production of titanium white by
27 chlorination the DuPont way.  I have always hoped that China can soon successfully build a production
   line for titanium white by chlorination, and I have always worked towards the completion of that
28 mission."

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

without authorization copied, duplicated, sketched, drew, altered, photocopied, replicated, transmitted, delivered, sent, communicated, and conveyed a trade secret belonging to DuPont, specifically Trade Secret 5."

### B.   Tax and Bankruptcy Allegations

The Indictment charges Walter Liew with five counts of filing false tax returns (Counts Fifteen through Nineteen) and three counts of bankruptcy fraud (Counts Twenty through Twenty-Two).   Each of the false tax return charges (26 U.S.C. § 7206(1)) concerns a different annual corporate tax return filed by Liew for the years 2006 through 2010 for Performance Group (2006-2008) and USAPTI (2009-2010).  Each tax count charges that Liew under-reported the corporation's gross receipts for the specified tax years.  Each count alleges the amount actually reported; the discovery provided to defendants in the form of bank records contains the amounts received by Liew's corporations from the Pangang Group companies from 2006 through 2010.

Walter Liew put Performance Group, the company that initially entered into contracts with the Pangang Group, into bankruptcy in 2009.  Counts Twenty through Twenty-Two allege that Liew made various false statements during the bankruptcy proceedings regarding Performance Group's financial circumstances and business.  Counts Twenty and Twenty-One allege false statements in a bankruptcy proceeding, in violation of 18 U.S.C. § 152(3), and identify specific false statements made by Liew in bankruptcy petition and statement of financial affairs.  Count Twenty-Two alleges that Liew made specific false statements under oath to the bankruptcy trustee, in violation of 18 U.S.C. § 152(3).

## III.   DISCOVERY

The government has produced extensive discovery, including the paper and electronic documents that were obtained from various sources through the course of the investigation.  In addition to enormous quantities of documents belonging to the defendants that are required to be returned as part of discovery, the government has provided the following key discovery that is both discrete and gives defendants specific information regarding important aspects of the government's case.  Those items include:

- On May 24, 2012, the government produced the relevant search warrants and related

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

records, certain FBI 302s, and bank records.

- On June 19, 2012, the government produced an index of seized electronic devices and a corresponding list of computer files for each device, including name, path, file size, and create, access, and modification dates for the computer files.

- On March 8, 2013, the government produced DuPont confidential documents seized from co-defendant Tze Chao.

- On April 10 and 11, 2013, the government produced FBI 302s memorializing witness interviews conducted by FBI agents through the course of their investigation.

- On April 17, 2013, the government produced the documents government counsel considers to be significant or "key" to the prosecution, and specifically identified trade secret documents that had previously been produced.

- On May 16, 2013, the government produced a complete set of tax records related to the false tax return charges.

Far from inundating defendants with "5 terabytes" of potential trade secrets, as they suggest in their motions, the government has produced only 8000 pages of documents it considers to be DuPont proprietary information (other than the information seized from Tze Chao). On July 3, 2012, the government produced nearly 1800 pages of hard copy documents considered to be DuPont proprietary information, including trade secrets. These documents were obtained by the government during the execution of search warrants. On December 5, 2012, the government produced approximately 6000 additional hard copy documents considered to be DuPont propriety information, including trade secrets. This production included detailed analysis by DuPont TiO2 experts.

In addition, the government has responded to each of defendants' requests for better or more legible copies of certain documents, including on December 5 and 12, 2012, by providing new copies of documents defendants and their attorneys had a difficult time reading. The government also has made the original documents and evidence available for defense counsel to review at the FBI.

Finally, the government will shortly be providing early identification for defendants of all documents it intends to offer in its case-in-chief at trial. Defendants filed a motion seeking early

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

identification of trial documents pursuant to Fed. R. Crim. P. 16(a)(1)(E)(ii), based in part on their

argument that early disclosure would assist the defense in preparing for trial.  Dkt. 234 at 7-8.

Magistrate Judge Cousins granted the motion and this Court upheld the order, directing the government

to "identify the documents it intends to use in its case in chief" by May 30, 2013.  Dkt. 294.

## IV.    ARGUMENT

### A.    The Motion To Dismiss Should Be Denied.

#### 1.    Legal Standards

"[A]n indictment regular on its face and returned by a legally constituted and unbiased grand

jury is presumed to be valid; the party challenging this presumption faces a heavy burden." *United

States v. Buffington*, 815 F.2d 1292, 1304 (9th Cir. 1987), *quoting Costello v. United States*, 350 U.S.

359, 363 (1956).  "A motion to dismiss the indictment cannot be used as a device for a summary trial of

the evidence."  *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir.1996) (internal quotations omitted).  In

the indictment, the government need only allege the essential information necessary to apprise the

defendant of the crime charged. *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir.1982).

A criminal defendant is entitled to an indictment that is "a plain, concise, and definite written

statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  An indictment

count is sufficient when it:  (1) contains each element of the charged offense; (2)  fairly informs the

defendant of the charge against which he must defend; and (3) contains sufficient information for the

defendant to plead acquittal or double jeopardy for the same offense.  *Hamling v. United States*, 418

U.S. 87, 117 (1974).  "The Constitution does not require impossible standards; all that is required is that

the language conveys sufficiently definite warning as to the proscribed conduct when measured by

common understanding and practices."  *Id.*

#### 2.    Attempted Economic Espionage – Count 4

Defendants move to dismiss Count Four.  None of the moving defendants, however, are named

in Count Four.  Only the four Pangang Defendants and the individual employee of Pangang Titanium,

Hou Shendong – none of whom have appeared before the Court – are named as defendants in Count

Four.  Accordingly, the motion to dismiss should be denied as to Count Four.

8

3.      **Attempted Economic Espionage and Trade Secret Theft Involving Trade Secret 1 – Counts 3 and 5**

Counts Three and Five charge attempted economic espionage and attempted theft of trade secrets, in violation of specific provisions of the Economic Espionage Act that criminalize attempts.  In Count Three, Walter Liew, Christina Liew, and USAPTI are charged with attempted economic espionage, in violation of 18 U.S.C. § 1831(a)(5).  In Count Five, these same three defendants and Robert Maegerle are charged with attempted trade secret theft, in violation of 18 U.S.C. § 1832(a)(5).

In their motion to dismiss, defendants contend that Counts Three and Five should be dismissed because the description of Trade Secret 1 is unconstitutionally vague.  Def. MTD at 1.  They contend that because the chloride-route process encompasses "thousands of component steps, sub-processes, pieces of equipment, connections, and protocols," some of which have been publicly disclosed, the description of Trade Secret 1 in the Indictment does not put the defendants on notice of the government's theory as to what portions of the process are actual trade secrets.  *Id.*  Defendants argue that the definition allows the government to prove "an almost infinite number of combinations of proprietary or non-proprietary components that might constitute the proposed trade secrets," or, alternatively, to "narrow its proof and claim that it met the allegations of the Indictment with little proof."  Def. MTD at 5.

The flaw in defendants' argument is that Counts Three and Five allege attempt, and the attempt charge under the Economic Espionage Act does "not require proof of the existence of an actual trade secret, but, rather, proof only of one's attempt . . . to steal a trade secret."  *United States v. Hsu*, 155 F.3d 189, 198 (3rd Cir. 1998).  In other words, "the government need not prove that an actual trade secret was used . . . , because a defendant's culpability for a charge of attempt depends only on 'the circumstances as he believes them to be,' not as they really are."  *Id.* at 203, *quoting* Model Penal Code § 5.01(1)(c) (1985).

In *Hsu*, the defendants were charged with attempted theft of trade secrets and conspiracy to steal trade secrets under 18 U.S.C. §§ 1832(a)(4) and (5).  That which the defendants were accused of attempting and conspiring to steal was not, in fact, an actual trade secret.  Defendants  moved to compel

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

the government to produce in discovery the victim company's trade secrets in order to establish their defense of legal impossibility.  Defendant Hsu argued that if the information he had sought to steal was not actually a trade secret, it was legally impossible for him to be guilty of the offense of attempted theft of a trade secret.

The Third Circuit rejected the defense and reversed the district court's order that directed the production of the discovery Hsu intended to use to prove the defense.  The court held that "[a] defendant is guilty of attempting to misappropriate trade secrets if, 'acting with the kind of culpability otherwise required for commission of the crime, he . . . purposely does or omits to do anything that, under the circumstances as he believe them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."  281 F.3d at 202, *quoting* Model Penal Code § 5.01(1)(c) (1985).  For this reason, the court held, the government is not required to prove that what the defendant sought to steal was in fact a trade secret, but only that the defendant believed it to be one.  *Id.* at 203.

Two other courts of appeal have considered this issue and both followed *Hsu*'s approach.  *See United States v. Yang*, 281 F.3d 534, 543 (6th Cir. 2002) ("We find persuasive the logic and reasoning of the Third Circuit."); *United States v. Martin*, 228 F.3d 1, 13 (1st Cir. 2000).  In *Martin*, the court firmly rejected (in the context of a conspiracy charge) a variation of the argument advanced by defendants by their motions:

> Martin's final argument – that he actually received no trade secrets – even if true, is irrelevant.  Martin has only been found guilty of a conspiracy to steal trade secrets, rather than the underlying offense.  The relevant question to determine is whether a conspiracy existed was whether Martin *intended* to violate the statute.

228 F.3d at 13 (citation and footnote omitted).

In a case recently tried in the Northern District of California, the indictment in *United States v. Nosal*, CR-08-0237-EMC, charged the defendant with *attempting* to download, copy, and duplicate trade secrets without authorization and to receive and possess stolen trade secrets without authorization, in violation of 18 U.S.C. § 1832(a)(4).  Judge Chen instructed the jury on the first element of the attempt charge as follows:  "First, the defendant intended to commit the crimes charged.  However, for the

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

1  charges related to downloading, copying, duplicating, receiving, or possessing trade secrets, *the*

2  *government need not prove the existence of an actual trade secret* and that Defendant knew that the

3  information in question was a trade secret so long as it can prove that Defendant firmly believed that the

4  information in question was a trade secret . . . ."   *United States v. Nosal*, CR-08-0237-EMC, Dkt. 401 at

5  45 (April 19, 2013).

6       The gravamen of defendants' motion to dismiss Counts Three and Five is that the Indictment

7  fails to specify in detail what particular components of the DuPont chloride-route process are actual

8  trade secrets.  But these *attempt* charges do not require such an allegation or corresponding proof.  The

9  charges alleged in Counts Three and Five require the government to prove that defendants believed that

10  the DuPont chloride-route process was a trade secret and *attempted* to misappropriate it by taking

11  substantial steps to convey it to the Pangang Group entities.  As in *Hsu*, *Yang*, *Martin*, and *Nosal*, the

12  relevant question is not whether defendants copied, duplicated, sketched, drew, altered, photocopied,

13  replicated, transmitted, delivered, sent, communicated, or conveyed an *actual* trade secret, it is whether

14  they attempted to do those things with something they *believed* to be a trade secret.

15       With regard to Counts Three and Five, the sole case relied upon by defendants to advance their

16  dismissal argument, *United States v. Case*, 2007 WL 1746399 (S.D. Miss. June 15, 2007), is easily

17  distinguishable because that case did not charge attempted trade secret theft, it charged substantive

18  violations of 18 U.S.C. §§ 1832(a)(1) and (2).[4]  The district court held that the government was required

19  to allege the trade secrets with greater specificity than it had because "the allegation of the existence of a

20  'trade secret' goes to the 'core criminality' of the statute."  *Id.* at *3.  While this is true with regard to the

21  substantive violations of the EEA, it is not the case with an attempt because it is not the "existence of a

22  trade secret" that defines the core criminality; instead, "a defendant's culpability for a charge of attempt

23  depends only on 'the circumstances as he believes them to be,' not as they really are."  *Hsu*, 155 F.3d at

24  203.

25       The motion to dismiss Counts Three and Five should be denied.

26

27      [4] The district court in *Case* did not dismiss the conspiracy charge, 18 U.S.C. § 1832(a)(5),
because it found that two overt acts alleged in the Indictment provided sufficient identification of the

28  "trade secrets or categories of trade secrets."  2007 WL 1746399, at *5.

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

4.      **Conveying Trade Secrets Charge Involving Trade Secret 5 – Count 8**

Defendants also move to dismiss Count 8.  Count 8 alleges that defendants Walter Liew, Maegerle, and USAPTI illegally copied, duplicated, sketched, drew, altered, photocopied, replicated, transmitted, delivered, sent, communicated, and conveyed Trade Secret 5, in violation of one of the substantive provisions of the EEA, 18 U.S.C. § 1832(a)(2).  Trade Secret 5 is the "Basic Data Document" for DuPont's Kuan Yin TiO2 factory.

Defendants contend that Trade Secret 5, and therefore Count 8, is impermissibly vague because, in the last sentence of paragraph 14(e), the Indictment alleges that not only is the Basic Data Document a trade secret, "it contained numerous discrete trade secrets within it."  Def. Mem. at 5.

The description of the Basic Data Document is extremely detailed and defendants do not cite a single case in which an EEA charge containing a similarly detailed description of the alleged trade secret was dismissed.  The case upon which defendants rely, *United States v. Case*, illustrates the sort of allegation that is subject to challenge for vagueness.  In *Case*, the defendants moved to dismiss the trade secret charges filed against them.  The district court dismissed two substantive trade secrets counts – an 1832(a)(1) count and an 1832(a)(2) count – because the indictment merely tracked the language of the statues and "did not identify with any greater specificity the trade secret which was allegedly stolen or copied."  *Id.* at *1.  These two counts simply identified the alleged trade secret as a "technology related to the design, specifications, manufacture and sale of military and commercial aviation hydraulic products that are related to or included in a product that is produced for or placed in interstate or foreign commerce."  *Id.*

Trade Secret 5, as alleged in the instant Indictment, goes well beyond the sort of "generic" description of a trade secret that troubled the district court in *Case*.  Indeed, the district court in *Case* allowed the government to proceed with the conspiracy charge alleged in the indictment because it alleged overt acts that included "an Eaton design drawing of a spline shaft and piston" and "Eaton CADs," with no further description of the specific trade secrets contained in these drawings or CADs, or even an allegation that the drawing or CADs were trade secrets themselves.  *Id.* at *5.  The very identification of the Basic Data Document in the Indictment is infinitely more specific than the

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

1   references to drawings and CADs found sufficient by the court in *Case*.

2         Defendants focus on the allegation at the end of paragraph 14(e) that the Kuan Yin Basic Data

3   Document contains numerous trade secrets.  But the fact is that it does, as the document itself on the

4   security page, and Congress clearly contemplated that compilations like the basic data document can be

5   trade secrets.  The broad statutory definition of "trade secret" includes "all forms and types of . . .

6   scientific, technical, . . . or engineering information, including patterns, plans, compilations, . . . designs,

7   [and] procedures . . . ."  18 U.S.C. § 1839(3).  The Kuan Yin basic data document, as described in Trade

8   Secret 5, is all of these things and fits easily into the definition enacted by Congress.

9         Trade Secret 5 identifies a very specific compilation of information that was identified as

10  containing trade secrets and was provided by DuPont to defendant Maegerle while he was still employed

11  by DuPont.  The motion to dismiss Count 8 should be denied.

12        **5.**      **The Motion To Dismiss Entire Indictment Should Be Denied.**

13        Defendants assert that the entire Indictment should be dismissed because it is unconstitutionally

14  vague.  In support of this contention, defendants cite a 1960 district court decision dismissing an

15  indictment "because it merely parroted the statute and did not 'indicate what specific false statements or

16  claims were to be made or presented' by the defendants."  Def. MTD at 6, *citing United States v.*

17  *Devine's Milk Labs., Inc.*, 179 F.Supp. 799, 801 (D. Mass. 1960).

18        The instant Indictment does far more than "parrot" any statute.  Defendant's argument that the

19  Indictment should be dismissed is frivolous and should be denied.

20        **6.**      **The Motion To Strike Should Be Denied.**

21        Defendants also request that the Court "strike" Trade Secrets 1 and 5, though they cite no rule or

22  other authority to support this request.  The cases cited by defendants – only one, *Case*, concerning trade

23  secret charges – involve the dismissal of charges; none provide for the "striking" of factual allegations.

24  Defendants' motion to strike should be denied.

25      **B.**      **The Motion For A Bill Of Particulars Should Be Denied.**

26        **1.**      **Legal Standards**

27  Defendants refrain from citing Ninth Circuit cases addressing motions for a bill of particulars

28

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

1    and dismissively predict that the government will raise "a standard litany of objections to providing a

2    bill of particulars."  Def. MBP at 2.  If by "standard litany of objections," defendants mean the actual

3    legal standards that apply under Fed. R. Crim. P. 7(f) in the Ninth Circuit, their prediction was correct.

4           A defendant "is not entitled to know all the *evidence* the government intends to produce but only

5    the *theory* of the government's case."  *United States v. Ryland*, 806 F.2d 941, 942 (9th Cir. 1986).  "The

6    purposes of a bill of particulars are to minimize the danger of surprise at trial and to provide sufficient

7    information on the nature of the charges to allow preparation of a defense."  *United States v. Mitchell*,

8    744 F.2d 701, 705 (9th Cir. 1984).  "To the extent that the indictment or information itself provides

9    details of the alleged offense, a bill of particulars is, of course, unnecessary."  *United States v. Giese*,

10   597 F.2d 1170, 1180 (9th Cir. 1979).  Full discovery also obviates the need for a bill of particulars.  *Id.*

11   (denying bill of particulars because government produced a large volume of discovery, including

12   physical evidence and memoranda which revealed theory of case); *United States v. Ayers*, 924 F.2d

13   1468, 1483 (9th Cir. 1991) (same).

14                  **2.      The Trade Secret Charges Have Been Alleged With Particularity And Full
                            Discovery Has Been Provided To The Defense.**

16          Defendants request an exposition of all the evidence the government will introduce to prove the

17   charges alleged in the Indictment.  This is not the purpose of a bill of particulars.

18          The Indictment returned by the grand jury is extremely detailed.  As set forth above, the

19   Indictment identifies, in the first sentence of each sub-paragraph of paragraph 14, each specific trade

20   secret, and then describes that trade secret in detail.  The conspiracy, attempt, and substantive trade

21   secret charges – Counts One through Nine – identify with specificity the trade secrets to which the

22   charges relate, the government's theory of misappropriation with regard to each secret, and the statutory

23   basis for each charge.

24          Moreover, the Indictment provides numerous examples of how the alleged trade secrets were

25   improperly used by defendants.  For example, the Indictment alleges:

26          • On or amount March 15, 1998, MAEGERLE sent a facsimile to WALTER LIEW that

27            contained proprietary and confidential information about DuPont's TiO2 plant costs and

28

                                                        14
     GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
     CR 11-0573 JSW

personnel data, including information from Trade Secret 5.  (Indictment, ¶ 33)

- On or about August 22, 2008, MAEGERLE provided a USAPTI consultant with electronic copies of confidential, proprietary DuPont documents during a business trip to the PRC, including Trade Secret 2, Trade Secret 4, and a set of the photographs described in Paragraph 34.  (Indictment, ¶ 41)

- On or about October 25, 2008, MAEGERLE emailed WALTER LIEW specific information from Trade Secret 5 and stated that "[t]he Jinzhou specifications were scaled down" from information from Trade Secret 5.  (Indictment, ¶ 42)

- In or about July 2009, MAEGERLE drafted a three-page document entitled, "100K T/Y TiO2 CHLORINATOR DESIGN," which referenced specific confidential, proprietary data contained in the Basic Data Document (Trade Secret 5), which he used to scale up for the 100,000 MTPY project.  (Indictment, ¶ 43)

- On or about September 3, 2009, MAEGERLE sent WALTER LIEW an email containing a specific and confidential figure from Trade Secret 5.  (Indictment, ¶ 44)

In addition to the detail provided by the Indictment itself, the government has provided full discovery (including all the documents referenced in the Indictment).  The government also has produced each of the documents specifically referred to in Trade Secrets 2, 3, 4, and 5, as alleged in Paragraph 14 of the Indictment, some of which have been identified in defense counsel's declaration. The United States has produced to the defense all FBI Form 302 interview memoranda.  The government also has produced to defendants all of the analysis provided by DuPont engineers evaluating the alleged trade secrets.  On April 17, 2013, the government produced significant, "key" documents to the defense.  The government also has been ordered to and will by May 30 provide to the defense a list of the documents it will offer in evidence at trial.  Finally, expert reports have not yet been written and produced; those reports will provide defendants with additional detail regarding the government's planned proof at trial.

Defendants are not entitled to identification of *every* document containing trade secrets that were misappropriated.  In *United States v. Latimore*, 2009 WL 3876171 (E.D. Mich. Nov. 17, 2009), the

1    defendant was charged with various violations of 18 U.S.C. § 1832.  The indictment described the

2    alleged trade secrets as "a set of confidential documents containing costs and supplier strategies."  *Id.* at

3    *1.  The court held that the defendant was not entitled a bill of particulars identifying the specific

4    documents containing trade secrets.  The court explained that the defendant had "been provided with

5    access to all information in the Government's file, including the actual documents that were sold during

6    the investigation . . . ."  *Id.* at *3.  The court concluded that the defendant had been provided with

7    "adequate notice of the evidence the Government will use against him at trial" and that he was able to

8    "discern the essential nature of the charges against him."  *Id.*

9          The combination of the detail provided by the Indictment, the full discovery provided by the

10   government (including the witness interview memoranda), the voluntary identification of key

11   documents, and the early identification of trial documents obviates the need for a bill of particulars.

12   Defendants identify seven "factors" explaining why they cannot adequately prepare for trial without a

13   bill of particulars.  Def. MBP at 5-9.   Four of defendants' factors are duplicative – focusing repeatedly

14   on defendants' central theme that Trade Secrets 1 and 5 are impossibly vague.  The *first* factor focuses

15   on the allegation in Trade Secret 1 regarding the "DuPont process" and contends that it is impermissibly

16   broad and "involves a staggering array of equipment and methods of operation"; the *second* factor

17   contends that many aspects of the DuPont chloride-route process are the subject of patents; the *fifth*

18   factor repeats the concern that Trade Secrets 1 and 5 "are described in extraordinarily broad language";

19   and the *sixth* factor takes on DuPont's analysis of the Kuan Yin Basic Data Document (Trade Secret 5)

20   and refers again to the "impossibly vague definitions of Trade Secrets 1 and 5."

21          Defendants' attempt to cast the same argument four different ways does not make it stronger or

22   more persuasive. Nor does it justify a bill of particulars because both the charges and the theories that

23   relate to Trade Secrets 1 and 5 are plainly alleged in the Indictment.  As discussed above, defendants are

24   charged with attempting to convey the Trade Secret 1, the DuPont chloride-route process, to the

25   Pangang entities; the government is not required to prove that the DuPont process is an actual trade

26   secret, only that defendants believed that it was.  Trade Secret 5 is alleged very specifically and

27   defendants are charged in Count 8 with providing information from Trade Secret 5 to the Pangang

28

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

1  entities.  Defendants are not entitled under Rule 7(f) to obtain a bill of particulars explaining precisely

2  how the government plans to prove its case at trial.  A bill of particulars is not intended to serve as a

3  discovery device or to compel the government's disclosure of the factual proof planned for trial.  *United*

4  *States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988); *Ryland*, 806 F.2d at 942; *Giese*, 597 F.2d at 1181

5  ("Appellant's request for the 'when, where, and how' of every act in furtherance of the conspiracy was

6  equivalent to a request for complete discovery of the government's evidence, which is not a purpose of

7  the bill of particulars.").

8       The other factors identified by defendants do not warrant a bill of particulars, alone or in

9  combination. The point of the *third* factor appears to be that this case should really be a civil case

10  between DuPont and its former employee Maegerle. The argument begins with the unsupported

11  contention that "this is not the typical trade secret criminal case in which the defendant is apprehended

12  with a cache of secret documents" and continues with the incorrect claim that "much of [the

13  government's] case is premised on the theory that work done in 2006 and later for USAPTI by DuPont's

14  former employee Robert Maegerle was *derived from* allegedly confidential DuPont information to which

15  Maegerle had access when he worked for DuPont between 1957 and 1991."  Def. MBP at 5-6.  Neither

16  point supports a request for a bill of particulars and, in fact, defendants' argument proves that one is not

17  necessary.

18       The government's theory is *not* that defendants' work for the Pangang entities was "derived

19  from" or "based upon" things Maegerle had learned while at DuPont – that is defendants' theory, which

20  they were able to develop and articulate based on the Indictment and discovery.  The government's

21  theory, which is alleged plainly in paragraph 66 of the Indictment, is that defendants "copied,

22  duplicated, sketched, drew, altered, photocopied, replicated, transmitted, delivered, sent, communicated,

23  and conveyed" the Basic Data Document, a compilation of trade secrets, for their own benefit and the

24  benefit of the Pangang entities.  Defendants identify some of the evidence the government will use to

25  prove its case, including certain evidence obtained from DuPont. Def. MBP at 6.  Defendants' ability to

26  identify this evidence, far from demonstrating any need for a bill of particulars, shows that defendants

27  understand both the charge and the government's theory and are able to formulate a defense.

28

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

1    Defendants' *fourth* factor is that there is a large amount of discovery.  Def. MBP at 6-7.  This

2    concern was raised by defendants in their motion for early disclosure of the documents the government

3    will offer in its case-in-chief, and addressed by the Court's order granting the motion.  The "5 terabytes"

4    of information will be significantly reduced to an amount that will be more manageable for defendants.

5    Providing full discovery weighs against, not in favor of, a bill of particulars.  *United States v. Long*, 706

6    F.2d 1044, 1054 (9th Cir. 1983).[5]

7    Defendants' request for an order directing the government to "define each Trade Secret in

8    Paragraph 14 of the Indictment with reference to particular equipment specifications or process

9    parameters, and identify the portions of defendants' work-product that it alleges was derived from each

10   alleged secret" is without precedent.  Neither the violations of the EEA alleged in the Indictment nor the

11   definition of trade secret in 18 U.S.C. § 1839(3) require that trade secrets be defined by "equipment

12   specifications or process parameters."  The definition of "trade secret" is extremely broad and

13   encompasses the specific trade secrets alleged in the Indictment.  Defendants' demand that the

14   government identify the specific evidence it intends to use to prove the violations alleged in the

15   Indictment is well beyond the purpose of a bill of particulars.

16   The Indictment in this case is unusually detailed and the discovery – including the overall

17   production, the production of FBI 302s, information provided by DuPont, and the Court's order

18   requiring the government to make early identification of trial exhibits – has been full and complete.

19   The reality is that defendants understand the charges against them and, as their briefs reveal, have

20   developed and can articulate specific and detailed defenses.  They are not entitled to a bill of particulars

21   regarding the alleged trade secrets and their motion should be denied.

22   **3.      Financial Charges**

23   **(a)      The Defendants' Fail To Establish The Need For A Bill Of
            Particulars For The Tax Charges.**

24

25   In what appears to be an afterthought, defendants ask the Court for a bill of particulars for the tax

26   charges alleged in the Indictment against Walter Liew.  Def. Mot. at 10-11.  The claim fails for at least

27   _____

28   [5] The final factor identified by defendants is that Walter Liew is in custody.  Defendants do not
     explain how this factor supports the need for a bill of particulars.

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

two reasons.

First, the Indictment identifies with great particularity the materially false information, *e.g.*, the gross receipts, for each specific false tax return charged in the Indictment. *See* Indictment, Counts 15 through 19, at ¶¶ 91, 93, 95, 97, 99. That specificity alone defeats the purpose of the bill of particulars, which is "to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to enable him to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment itself is too vague, and indefinite for such purposes," and this motion. *Geise*, 597 F.2d at 1181.

Second, without any authority the defendants argue that a bill of particulars is necessary to identify the "amount the Government contends . . . that should have been reported." Def. Mot. at 10. This is a red herring. The amount underreported is not an element of the offense of filing a false tax return under 26 U.S.C. § 7206(1). Moreover, the defense has been provided in discovery with the specific tax returns in question, the files provided to the Liews' return preparer, relevant contracts and contract-related documents, and the company bank records that reflect unreported gross receipts. In other words, the discovery provided obviates the need for any bill of particulars. *See Geise*, 597 F.2d at 1181 ("[a] defendant is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case") (quoting *Yeargain v. United States*, 314 F.2d 881, 882 (9th Cir. 1963)).

>           **(b)     The Defendants' Also Fail To Establish The Need For A Bill Of Particulars For The Bankruptcy Fraud Charges.**

In a similar vein, the defense attacks the sufficiency of the bankruptcy fraud charges in the Indictment against Walter Liew and asks for a bill of particulars. Here again, the motion fails for the very same reasons.

First, the bankruptcy fraud charges are very specific – they identify a series of particular statements as false as to material matters in two distinct aspects of the bankruptcy proceedings – the written petition and accompanying schedules submitted by Walter Liew and his *under oath* statements at

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

1    a bankruptcy proceeding.  *See* Indictment, Counts 20 through 22, at ¶¶ 102, 104(a)-(c), 107(a)-(d).

2    Thus, the concerns that normally animate a bill of particulars are not present.

3           Second, the defense has had extensive discovery on these charges – the government has

4    produced the relevant bankruptcy petition and accompanying schedules filed in bankruptcy court by

5    Walter Liew together with the transcript from the bankruptcy hearing at which he testified. The bank

6    records, contracts, and other items that may be introduced at trial to establish these violations have also

7    been provided to the defense in discovery.

8           Third, the defense claims the records related to these charges are hard to find and they do not

9    know how the particular statements are false.  Yet, the defense conveniently ignores the roadmap the

10   government has already provided in the bail proceedings.  A brief review the United States' Motion for

11   Revocation of the Magistrate Judge's Release Order (Revocation Mot.) eviscerates the defense

12   argument.  *See* Revocation Mot. (Docket No. 267) at 4-6 and 14-16.  For example, the defense

13   complains that they do not know what executory contracts Liew should have disclosed in response to a

14   specific question in the bankruptcy proceedings (Def. MBP at 11), but in the Revocation Motion, the

15   United States noted that "Liew failed to disclose the existence of at least two on-going contracts with

16   Pangang Jinzhou totaling $13,500,000" in response to that specific question.  Revocation Mot. at 5.

17   Likewise, the defense seeks additional information about the gross amounts that Liew failed to identify

18   in response to Question 1 of the Statement of Financial Affairs (*see* Def. MBP at 11, Indictment at

19   ¶ 104(a)), but the Revocation Motion explicitly states that Liew "failed to report over $5,000,000 that

20   Performance Group received in 2007 and 2008."  Revocation Mot. at 5.  While the United States has no

21   duty to provide information in this format to the defense nor is it limited to those statements in proving

22   up these charges, the fact that it has already made such fulsome disclosures to the defense makes a bill

23   of particulars unwarranted here.

24

25

26

27

28

GOVT. OPP. TO MOT. TO DISMISS AND FOR BILL OF PARICULARS
CR 11-0573 JSW

V.      **CONCLUSION**

Defendants' motion to dismiss and motion for a bill of particulars should be denied.

                                        Respectfully submitted,

                                        MELINDA HAAG
                                        United States Attorney

                                                /s/

Dated: May 16, 2013             _____
                                        JOHN H. HEMANN
                                        PETER B. AXELROD
                                        Assistant United States Attorneys

21