1  DORON WEINBERG (SBN 46131)
   LAW OFFICES OF DORON WEINBERG
2  523 Octavia Street
   San Francisco, CA 94102
3  Telephone: (415) 431-3472
   Facsimile:  (415) 552-2703
4  Email: doronweinberg@aol.com

5  Attorney for Defendant CHRISTINA LIEW

6  KEKER & VAN NEST LLP
   STUART L. GASNER (SBN 164675)
7  sgasner@kvn.com
   SIMONA A. AGNOLUCCI (SBN 246943)
8  sagnolucci@kvn.com
   KATHERINE M. LOVETT (SBN 276256)
9  klovett@kvn.com
   633 Battery Street
10 San Francisco, CA 94111-1809
   Telephone: (415) 391-5400
11 Facsimile:  (415) 397-7188

12 Attorneys for Defendant WALTER LIEW and
   USA PERFORMANCE TECHNOLOGY, INC.
13
                    UNITED STATES DISTRICT COURT
14
                  NORTHERN DISTRICT OF CALIFORNIA
15

16 UNITED STATES OF AMERICA,          )   CASE NO. CR-11-0573 JSW
                                      )
17              Plaintiff,            )
                                      )
18      vs.                           )   DEFENDANTS CHRISTINA LIEW
                                      )   AND WALTER LIEW'S *AMENDED*
19 WALTER LIEW,                       )   NOTICE OF MOTION AND MOTION
   CHRISTINA LIEW, et. al.,           )   TO SUPPRESS EVIDENCE
20                                    )
             Defendants.              )
21 _____  )   DATE:      July 25, 2013
                                         TIME:      2:00 pm
22                                       COURT:     11, 19th Floor
                                         JUDGE:     Hon. Jeffrey S. White
23

24       NOTICE IS HEREBY GIVEN that on July 25, 2013 at 2:00 p.m., or as soon thereafter as

25 the matter may be heard, defendants Christina Liew and Walter Liew will, and hereby do, move

26 the Court, the Honorable Jeffrey S. White presiding, for an Order suppressing all evidence

27
   Defendants Christina Liew and Walter Liew's
   *Amended* Notice of Motion and Motion to Suppress
28 Evidence  (CR-11-0573 JSW)                    1

tangible and intangible, including observations, obtained directly or indirectly as a result of the search of defendants' residence located at 2 Crown Court, Orinda, California, on or about July 19, 2011.

The motion will be made on the grounds that the search was conducted in violation of the Fourth Amendment to the United States Constitution in that the warrant authorizing the search was issued without probable cause and was impermissibly overbroad, and could not have been executed by the agents in good faith.

The motion is based on this Notice, the Memorandum of Points and Authorities and exhibits submitted herewith, the files and records in this cause, and such other and further argument and evidence as may be presented at the hearing on the motion.

Dated: June 27, 2013

Respectfully submitted,

LAW OFFICES OF DORON WEINBERG

/s/  Doron Weinberg
DORON WEINBERG
Attorney for Defendant CHRISTINA LIEW

Dated: June 27, 2013

KEKER & VAN NEST LLP

/s/ Stuart A. Gasner
STUART A. GASNER

/s/ Simona A. Agnolucci
SIMONA A. AGNOLUCCI

/s/ Katherine M. Lovett
KATHERINE M. LOVETT

Attorneys for Defendant WALTER LIEW and USA PERFORMANCE TECHNOLOGY, INC.

Defendants Christina Liew and Walter Liew's
*Amended* Notice of Motion and Motion to Suppress
Evidence (CR-11-0573 JSW)

2

1  DORON WEINBERG (SBN 46131)
   LAW OFFICES OF DORON WEINBERG
2  523 Octavia Street
   San Francisco, CA 94102
3  Telephone: (415) 431-3472
   Facsimile:  (415) 552-2703
4  Email: doronweinberg@aol.com

5  Attorney for Defendant CHRISTINA LIEW

6  KEKER & VAN NEST LLP
   STUART L. GASNER (SBN 164675)
7  sgasner@kvn.com
   SIMONA A. AGNOLUCCI (SBN 246943)
8  sagnolucci@kvn.com
   KATHERINE M. LOVETT (SBN 276256)
9  klovett@kvn.com
   633 Battery Street
10 San Francisco, CA 94111-1809
   Telephone: (415) 391-5400
11 Facsimile:  (415) 397-7188

12 Attorneys for Defendant WALTER LIEW and
   USA PERFORMANCE TECHNOLOGY, INC.

13
                    UNITED STATES DISTRICT COURT
14
                  NORTHERN DISTRICT OF CALIFORNIA
15

16 UNITED STATES OF AMERICA,          )   **CASE NO. CR-11-0573 JSW**
                                      )
17            Plaintiff,              )   **DEFENDANTS CHRISTINA LIEW**
                                      )   **AND WALTER LIEW'S** *AMENDED*
18       vs.                          )   **MEMORANDUM OF POINTS AND**
                                      )   **AUTHORITIES IN SUPPORT OF**
19 WALTER LIEW,                       )   **MOTION TO SUPPRESS EVIDENCE**
   CHRISTINA LIEW, et. al.,           )
20                                    )
              Defendants.             )
21 _____ )   **DATE:**     **July 25, 2013**
                                         **TIME:**     **2:00 pm**
22                                       **COURT:**    **11, 19th Floor**
                                         **JUDGE:**    **Hon. Jeffrey S. White**
23
   ///
24
   ///
25
   ///
26

   Defendants Christina Liew and Walter Liew's
27 *Amended* Memo of Points and Authorities in
   Support of Motion to Suppress Evidence
28 (CR-11-0573 JSW)

# TABLE OF CONTENTS

|  | PAGE |
|---|---|
| INTRODUCTION AND STATEMENT OF FACTS | 1 |
| ARGUMENT | 4 |
| I. THE WARRANT AUTHORIZING THE SEARCH OF DEFENDANTS' RESIDENCE WAS INVALID BECAUSE IT WAS BASED ON AN AFFIDAVIT THAT FAILED TO PROVIDE PROBABLE CAUSE. | 4 |
|     A. The Affidavit Fails to Establish Probable Cause. | 5 |
|     B. The Good Faith Exception is Not Available On These Facts. | 9 |
| II THE SEARCH WARRANT IS FATALLY OVERBROAD AND FAILS FOR LACK OF PARTICULARITY. | 11 |
|     A. The Warrant Is Impermissibly Overbroad. | 11 |
|     B. This Impermissibly Overbroad Warrant Cannot Be Made Valid By The Good Faith Exception. | 15 |
| CONCLUSION | 17 |

i

1

**TABLE OF AUTHORITIES**

2   <u>**CASES**</u>                                                                                <u>**PAGE**</u>

3   *Beck v. Ohio*, 375 U.S. 89 (1964)                                                      8

4   *Center Art Galleries - Hawaii, Inc., v. United States*, 875 F.2d 747 (9th Cir. 1989)   14, 15

5   *Chimel v. California*, 395 U.S. 752 (1969)                                             5

6   *Durham v. United States*, 403 F.2d 190 (9th Cir. 1968)                                 6

7   *In re Grand Jury Proceedings*, 716 F.2d 493 (8th Cir. 1983)                            15

8   *In re Grand Jury Subpoenas*, 926 F.2d 847 (9th Cir. 1991)                              15

9   *Henry v. United States*, 361 U.S. 98 (1959)                                            8

10  *Illinois v. Gates*, 462 U.S. 213 (1983)                                                6

11  *KRL v. Est*, 512 F.3d 1184 (9th Cir. 2008)                                             9

12  *Marron v. United States*, 275 U.S. 192 (1927)                                          11

13  *Millender v. County of Los Angeles*, 620 F.3d 1016 (9th Cir. 2010)                     9

14  *Ortiz v. Van Auken*, 887 F.2d 1366 (9th Cir. 1989)                                     16

15  *Payton v. New York*, 445 U.S. 573 (1980)                                               4

16  *Sgro v. United States*, 287 U.S. 206 (1932)                                            6

17  *United States v. Bridges*, 344 F.3d 1010 (9th Cir. 2003)                               11, 13, 14

18

19  *United States v. Cardwell*, 680 F.2d 75 (9th Cir. 1982)                                11

    *United States v. Crozier*, 777 F.2d 1376 (9th Cir. 1985)                               16
20
    *United States v. Grant*, 682 F.3d 827 (9th Cir. 2012)                                  9
21
    *United States v. Hill*, 459 F.3d 966 (9th Cir. 2006)                                   11
22
    *United States v. Hove*, 848 F.2d 137 (1988)                                            9
23
    *United States v. Kow*, 58 F.3d 423 (1995)                                              14, 16
24
    *United States v. Leon*, 462 U.S. 897 (1984)                                            9, 16
25
    *United States v. Loy*, 191 F.3d 360 (3d Cir. 1999)                                     8
26
    *United States v. Lucarz*, 430 F.2d 1051 (9th Cir. 1970)                                5
27

28                                          ii

| | |
|---|---|
| *United States v. Michaelian*, 803 F.2d 1042 (9th Cir. 1986) | 16 |
| *United States v. Needham*, __F.3d__ (2013) WL2665889 (CA 9, 6/14/13) | 10 |
| *United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996) | 9 |
| *United States v. SDI Future Health, Inc.*, 568 F.3d 684 (9th Cir. 2009) | 14 |
| *United States v. Savoca*, 739 F.2d 220 (6th Cir. 1984) | 5 |
| *United States v. Spilotro*, 800 F.2d 959 (9th Cir. 1986) | 15, 16 |
| *United States v. United States District Court*, 407 U.S. 297 (1972) | 4 |
| *United States v. Wagner*, 989 F.2d 69 (2d Cir. 1993) | 6 |
| *United States v. Weber*, 923 F.2d 1338 (9th Cir. 1991) | 8, 10, 11 |
| *United States v. Zimmerman*, 277 F.3d 426 (3d Cir. 2002) | Passim |
| *VonderAhe v. Howland*, 508 F.2d 364 (9th Cir. 1974) | 11 |
| *Voss v. Bergsgaard*, 774 F.2d 402 (10th Cir. 1985) | 15 |

**STATUTES AND OTHER AUTHORITIES**

| | |
|---|---|
| Comment, 28 U. Chi. L. Rev. 664, 687 (1961) | 5 |
| LaFave, et. al., *Criminal Procedure*, (3rd Ed. 2007) | 5 |
| Title 18 U.S.C. § 1831 | 1 |
| Title 18 U.S.C. § 1832 | 1 |
| United States Constitution Fourth Amendment | Passim |

iii

**INTRODUCTION AND STATEMENT OF FACTS**

On July 19, 2011 search warrants were executed at two locations in the Northern District of California: 1000 Broadway, Suite 480, Oakland, CA, the office of U.S.A. Performance Technology, Inc. ("USAPTI"), a business owned and operated by Walter and Christina Liew, and 2 Crown Court, Orinda, CA, the residence of Walter and Christina Liew.

The instant motion challenges only the search pursuant to warrant of the Liews' residence, on the grounds that it lacked probable cause and was impermissibly overbroad.

The warrant authorizing the search of the Liews' residence, as well as the offices of USAPTI, was based on a single application, supported by the affidavit of FBI Special Agent Cynthia Ho. The affidavit is attached as Exhibit A to the Declaration of Doron Weinberg submitted herewith.

At the outset Agent Ho states that "[t]he facts of this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses." (Exhibit A, ¶ 3). Strikingly, and significantly, Agent Ho never describes her training and experience, let alone her expertise. The entirety of the "AGENT BACKGROUND" that is set forth in ¶ 2 of the Affidavit is as follows:

> "I am a Special Agent with the Federal Bureau of Investigation, and have been since September 2001. I am currently assigned to the San Francisco division, Palo Alto Resident Agency, located in Palo Alto, California. My duties include the investigation of various violations of federal criminal law, including matters related to the theft of trade secrets, including economic espionage."

Not included in this description is any indication of how long Agent Ho has been involved in the investigation of trade secrets and economic espionage cases or how many investigations she has been involved in, and in what roles, nor of any special training or experience she has that would be relevant to the subject matter of the affidavit.

The affidavit asserts that there is probable cause to believe that Walter Liew, Christina Liew, USAPTI and Robert Maegerle have committed violations of 18 U.S.C. §§ 1831 and 1832

Defendants Christina Liew and Walter Liew's
*Amended* Memo of Points and Authorities in
Support of Motion to Suppress Evidence
(CR-11-0573 JSW)                                        1

1   by unlawfully obtaining DuPont trade secrets and providing them to companies owned by the

2   government of the Peoples Republic of China. In support of this assertion the affidavit sets out as

3   background the uniqueness of DuPont's chloride route process for production of titanium dioxide

4   (TiO2), the steps it has taken to safeguard its process, and the purported discovery that USAPTI

5   misappropriated DuPont's trade secrets. The affidavit recounts information obtained from

6   various sources, including John Liu, a former employee of both Chevron and USAPTI; Leonard

7   Tilton, a former USAPTI employee; and Abel-Baker Automation, an engineering consulting

8   service.  This information is offered in support of the suggestion that USAPTI had improperly

9   obtained DuPont's trade secrets. The affidavit then sets forth information provided by former

10   USAPTI employee Peter Wong, as well as various business and government records suggesting

11   that USAPTI has substantial business relations with representatives of certain Chinese

12   companies, apparently involving the design of TiO2 manufacturing facilities.  The affidavit

13   concludes with allegations intended to suggest that the Liews attempted to conceal information

14   that might prove their connection to former DuPont employees and to John Liu.

15        Nowhere in the affidavit is there any factual allegation that the activities under

16   investigation are connected in any way to Walter and Christina Liew's residence. No meetings

17   are alleged to have occurred there, and none of the relevant documents identified as evidence of

18   the theft of trade secrets were known or alleged to be at the residence. All documents identified

19   as suggesting the misappropriation of trade secrets by the defendants were observed at the offices

20   of USAPTI, not the Liew residence.  Indeed, John Liu is cited as reporting that two documents of

21   substantial evidentiary significance were kept by Walter Liew in a locked drawer in his office.

22   (Exhibit A, ¶ 28).

23        Nonetheless, the affiant asserts that there is probable cause to believe that evidence,

24   fruits, and/or instrumentalities of theft of trade secrets and economic espionage will be found at

25   the Liew residence.  (Exhibit A, ¶ 105a).  The basis for this assertion is as follows:

26

27   Defendants Christina Liew and Walter Liew's
     *Amended* Memo of Points and Authorities in

28   Support of Motion to Suppress Evidence
     (CR-11-0573 JSW)          2

"As set forth above, [PETER] WONG, an ex-USAPTI employee, noted that WALTER LIEW spent a lot of hours working on this project and that while WALTER LIEW predominately worked at the office, he would do related work from home after hours.  Also, due to the skeleton crew at the office, WONG noted that USAPTI employees would work remotely.  Additionally, CHRISTINA LIEW had paid LIU for services rendered for the USAPTI TiO2 project using her Citibank checking account opened with the home address of 2 Crown Court, Orinda, CA.  Moreover, based on my training and experience, I know that individuals who are self-employed and involved in theft of trade secrets and economic espionage typically keep records related to these crimes, in this instance, including documents related to the TiO2 project, DuPont, travel records, and financial records in their personal computers or lap tops in their homes.  I have participated as an FBI agent in numerous searches of residences in which these types of business and financial records are located." (*Ibid.*).

Based on this showing, the affiant requested and the magistrate[1] granted authorization to search Walter and Christina Liew's home for all the items described in ATTACHMENT B to the Warrant Application, without limitation.  This authorization included not only documents related specifically to TiO2 (¶ 1), DuPont (¶ 2), the Chinese companies named in the affidavit (¶ 3) and Pinewater Designs, Inc., an entity affiliated with Robert Maegerle (¶ 10), but also:

•Any and all travel records, and documents, without limitation to time frame, person, purpose or destination (¶ 6);

•Any and all address books and directories, and telephone records, without limitation as to time, subscriber or subject (¶ 7);

•All financial documents and records related to Walter and Christina Liew, from January 2007 to the date of issuance, without other limitation (¶ 8);

•All tax records of Walter and Christina Liew, without any limitation including time frame (¶ 9);

•All items, documents and effects tending to show residency and/or dominion and control of the premises (¶ 11); and

•All computer equipment used to create the items, data or records referenced above (¶ 12).

•All passwords, password files, encryption codes and other information necessary to access the computer equipment and other devices (¶ 13).

---

[1]  Visiting Magistrate Timothy Bommer.

Defendants Christina Liew and Walter Liew's
*Amended* Memo of Points and Authorities in
Support of Motion to Suppress Evidence
(CR-11-0573 JSW)                                          3

The affidavit provides no specific information supporting the belief that any of the thirteen numbered items identified in ATTACHMENT B would be located at the Liews' residence and no explanation why the four broad categories identified in ¶¶ 6, 7, 8 and 9, let alone the three open-ended categories in ¶¶ 11,12 and 13, are proper objects of the search of the residence.

Defendants submit that the evidence obtained from the search of their residence must be suppressed because (1) the warrant authorizing the search was based on an affidavit so lacking in the indicia of probable cause as to render official belief in its existence entirely unreasonable; (2) the search warrant is fatally overbroad and fails for lack of particularity; and (3) the deficiencies of the warrant were such that no reasonable agent could have relied on it in good faith. Additionally, as will be seen, in conducting the search the agents exceeded the limits of the almost-limitless authorization given them.

**ARGUMENT**

**I.    THE WARRANT AUTHORIZING THE SEARCH OF DEFENDANTS' RESIDENCE WAS INVALID BECAUSE IT WAS BASED ON AN AFFIDAVIT THAT FAILED TO PROVIDE PROBABLE CAUSE.**

The Fourth Amendment to the Constitution provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

"One's home is sacrosanct, and unreasonable government intrusion into the home is the 'chief evil against which the wording of the Fourth Amendment is directed.'" *United States v. Zimmerman*, 277 F.3d 426, 431 (3d Cir. 2002), quoting *Payton v. New York*, 445 U.S. 573, 585 (1980) and *United States v. United States District Court*, 407 U.S. 297, 313 (1972).

In order to justify police intrusion into a personal residence, more must be shown than the

Defendants Christina Liew and Walter Liew's
*Amended* Memo of Points and Authorities in
Support of Motion to Suppress Evidence
(CR-11-0573 JSW)                                    4

1  fact that the person is reasonably suspected of having committed a crime. "We must also bear in

2  mind . . . that search warrants are directed against evidence of crime and not persons. The fact

3  that there is probable cause to arrest a person for a crime does not automatically give police

4  probable cause to search his residence or other areas in which he has been observed for evidence

5  of that crime. [Citations omitted.] If the rule were otherwise 'there would be no reason to

6  distinguish search warrants from arrest warrants and cases like *Chimel v. California*, 395 U.S.

7  752 (1969) would make little sense.' *United States v. Savoca*, 739 F.2d 220, 224-25 (6th Cir.

8  1984), quoting *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970)."

9       Accordingly, two conclusions necessary for the issuance of a search warrant must be

10  supported by substantial evidence: that the items sought are in fact seizable by virtue of being

11  connected with criminal activity, and that the items will be found in the place to be searched.[2]

12       The affidavit for the search of the residence of defendants Walter and Christina Liew

13  plainly fails to meet this dual requirement.

14       **A.       The Affidavit Fails to Establish Probable Cause.**

15       The purported probable cause showing presented in the affidavit has three prongs: (1) the

16  statement by ex-employee Peter Wong that Walter Liew would do work related to USAPTI from

17  home after hours; (2) a single check written by Christina Liew to John Liu on a checking account

18  opened with the Liews' home address; and (3) the opinion of affiant Cynthia Ho that "individuals

19  who are self-employed and involved in theft of trade secrets and economic espionage typically

20  keep relevant records in their homes."  Although this may initially appear to provide probable

21  cause, given any serious scrutiny the appearance quickly fades.

22       The information provided by Peter Wong contributes nothing to probable cause; it is

23  stale, unreliable and hopelessly vague.  According to the affidavit, Peter Wong was employed at

24

25       [2]   Comment, 28 U.Chi.L.Rev. 664, 687 (1961); LaFave, et. al., *Criminal Procedure*, (3rd

26  Ed. 2007), p.107.

27  Defendants Christina Liew and Walter Liew's
   *Amended* Memo of Points and Authorities in
   Support of Motion to Suppress Evidence
28  (CR-11-0573 JSW)                                         5

1   USAPTI from July 2009 until August 2010 (Exhibit A, ¶ 57). Not only was his employment

2   brief, but it ended 11 months prior to the issuance of the instant warrant. Yet the affidavit

3   provides no reason to believe that whatever Wong may have observed during his employment

4   was still relevant 11 months later. The affidavit accordingly fails to provide "facts so closely

5   related to the time of the issue of the warrant as to justify a finding of probable cause at the

6   time." *Sgro v. United States*, 287 U.S. 206, 210 (1932); *United States v. Zimmerman, supra*, 277

7   F.3d at 435, 436. The passage of 11 months since the time of Wong's purported observations is

8   significantly greater than delays that have been found excessive in other cases. See, e.g., *Durham*

9   *v. United States*, 403 F.2d 190 (9th Cir. 1968) (four months); *United States v. Wagner*, 989 F.2d

10   69 (2d Cir. 1993) (six weeks); *United States v. Zimmerman, supra*, (six months).

11       In this regard, it is noteworthy that no other employee or associate who worked with

12   Walter Liew in the 11 months preceding the issuance of the warrant, including John Liu whose

13   information is heavily relied upon in the affidavit, provided any evidence suggesting that Walter

14   Liew used his home to conduct any USAPTI business.

15       This raises the second, and greater concern about Wong's allegation: its reliability. The

16   affidavit is entirely silent about the basis for Wong's assertion, and the magistrate therefor could

17   not know whether Wong was passing on personal observations or mere hearsay, rumor or

18   conjecture.

19       Although the "totality of the circumstances" test announced in *Illinois v. Gates*, 462 U.S.

20   213 (1983) is generally seen as a relaxation of the previous standards for testing the sufficiency

21   of search warrant affidavits, the Supreme Court did not abandon the requirement that "[a]n

22   affidavit must provide the magistrate with a substantial basis for determining the existence of

23   probable cause." (*Id.* at 239). Accordingly, the "basis of knowledge" is a "highly relevant"

24   consideration under the *Gates* test (*Id.* at 230), yet, the affidavit is silent on this issue. And, here

25   again, it is significant that no other witness, including any of those cited in the affidavit, provide

26

27   Defendants Christina Liew and Walter Liew's
     *Amended* Memo of Points and Authorities in
     Support of Motion to Suppress Evidence
28   (CR-11-0573 JSW)           6

1   support for the assertion that Walter Liew conducted his USAPTI work at his residence.

2       Moreover, even beyond its staleness and apparent lack of foundation Wong's information

3   is irrelevant to probable cause because it is simply too vague. It says nothing about how often

4   Walter Liew reportedly worked at home, what kind of work he did, whether he brought home

5   documents and records or merely used his computer, and whether any computer he worked on

6   would normally be kept at home or at his office. What the affidavit does tell us, however

7   (Exhibit A, ¶ 28), is that apparently sensitive documents were kept by Walter Liew under lock

8   and key at his office.

9       Thus, the assertion attributed to Peter Wong provides no element of probable cause to

10  search defendants' home.

11      The significance of the second piece of information advanced by the affiant to justify the

12  search of the  residence – the check written by Christina Liew to John Liu –  is at least equally

13  opaque. Nowhere does the affidavit attempt to provide any context for the allegation that on a

14  single occasion Christina Liew wrote a check to John Liu from an account opened with her home

15  address.  Significantly, the affidavit reveals that other checks were written to John Liu,

16  apparently from accounts not connected to the Liew residence (Exhibit A,  ¶ 66) and that the

17  check in question, although bearing the Orinda residence address, was drawn on an account held

18  at a bank in downtown Oakland, very close to the office of USAPTI (Affidavit, ¶ 67). Given

19  these additional facts, it is difficult to draw any relevant meaning from the use of this check to

20  pay John Liu, and certainly not that any substantial business involving USAPTI was conducted

21  from the residence.

22      The third prong of the purported showing of probable cause is Cynthia Ho's opinion

23  about what people involved in theft of trade secrets and economic espionage "typically" do.

24      Assertions such as this have become inevitable in search warrant affidavits, and are

25  routinely used to fill whatever gaps in proof are left by the evidence.  Accordingly, they have

26

27  Defendants Christina Liew and Walter Liew's
    *Amended* Memo of Points and Authorities in
    Support of Motion to Suppress Evidence
28  (CR-11-0573 JSW)                                 7

1   been deservedly criticized for their facility and lack of persuasiveness. In *United States v. Weber*,

2   923 F.2d 1338, 1344 (9th Cir. 1991), the Court found the "expert" testimony in the affidavit to be

3   without foundation. "It consisted of rambling boilerplate recitations designed to meet all law

4   enforcement needs." In *United States v. Loy*, 191 F.3d 360, 366 (3d Cir. 1999) the Court stated

5   that "experience and expertise, without more, is insufficient to establish probable cause." The

6   Court found the expert's conclusory statement that people who collect child pornography

7   commonly keep it in their homes insufficient to establish the necessary nexus between the

8   contraband and the defendant's residence. See also, *United States v. Zimmerman, supra*, 277

9   F.3d at 433, n.4.

10       It should be noted that the expert opinions criticized in *Weber, Loy, Zimmerman* and other

11   cases were provided by persons who purported actually to be experts, with specifically identified

12   training and experience in matters relevant to the opinion they expressed.

13       In contrast, the affidavit in this case gives the magistrate no information whatever by

14   which he could measure whether Agent Ho had a substantial basis for her asserted opinions.

15   Although she claims to have "training and experience," (Exhibit A, ¶ 105a) she provides no

16   information about any relevant training and little if any about her experience. Unlike the usual

17   presentation, Agent Ho says nothing about how long she has been involved in this particular kind

18   of investigation, how many such cases she has been involved in and in what roles, or what the

19   objective facts are that she believes support her conclusions.

20       Given this lack of objective information, and the absence of any basis on which the

21   magistrate could conclude that Agent Ho is in fact an expert whose opinion is tailored to the

22   actual facts of this case, Ho's statement in ¶ 105a of the affidavit is in fact nothing more than her

23   subjective belief that evidence would be found at the Liew residence. This is plainly insufficient.

24   *Henry v. United States*, 361 U.S. 98 (1959); *Beck v. Ohio*, 375 U.S. 89 (1964).

25   ///

26

27   Defendants Christina Liew and Walter Liew's
     *Amended* Memo of Points and Authorities in
     Support of Motion to Suppress Evidence
28   (CR-11-0573 JSW)                               8

**B.     The Good Faith Exception is Not Available On These Facts.**

The absence of probable cause here is so clear that the affidavit cannot be rescued by the good faith exception adopted by the Supreme Court in *United States v. Leon*, 462 U.S. 897, 923 (1984).

As the Third Circuit observed in *United States v. Zimmerman, supra*, 277 F.3d at 437, 438, "when the Supreme Court announced the good faith exception in *Leon*, it weakened the exclusionary rule but it did not eviscerate it. 'Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble.'" Quoting *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996). "[P]articularly where the affiant is also one of the executing officers, it is somewhat disingenuous, after having gone to the magistrate with an inadequate showing, to suggest that at bottom it was the magistrate who made the error and the search and seizure are insulated because the officers reliance on that error was objectively reasonable." *Zimmerman, supra*, 277 F.3d at 438.

As the *Leon* court itself stated: "an officer does not 'manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." 462 U.S. at 923; *United States v. Weber, supra*, 923 F.2d at 1346. Similarly, the Ninth Circuit observed in *United States v. Hove*, 848 F.2d 137, 140 (1988) when a police officer has "not presented a colorable showing [of probable cause] and the warrant and affidavit on their face preclude reasonable reliance, the reasoning of *Leon* does not apply." See also, *Millender v. County of Los Angeles*, 620 F.3d 1016, 1033 (9th Cir. 2010) (where the lack of probable cause was so obvious that any reasonable officer reading the warrant would conclude that the warrant was facially invalid "we have held that '[a]pproval by an attorney and a magistrate did not justify reasonable reliance.'"); *KRL v. Estate of Moore*, 512 F.3d 1184 at 1192 (9th Cir. 2008); *United States v. Grant*, 682 F.3d 827, 839 (9th Cir. 2012) ("A reasonable officer would know that probable cause is not supplied by stating everything one

Defendants Christina Liew and Walter Liew's
*Amended* Memo of Points and Authorities in
Support of Motion to Suppress Evidence
(CR-11-0573 JSW)                                                    9

1  knows about a particular item one would like to find to solve a murder case, if the mass of facts

2  simply does not plausibly connect the place searched to the items sought.").

3      Here, Agent Ho had to be plainly aware of the inadequacy of the probable cause she was

4  asserting. She plainly knew:

5      •that she was not providing the magistrate with any information about her own training

6  and experience or the basis for her opinion;

7      •that she provided the magistrate with no information upon which to judge the basis and

8  reliability of Peter Wong's information, and knew as well that she had not received similar

9  information from any other witness including those who worked more closely and more recently

10  with Walter Liew;

11      •that she had provided no context or explanation for the single check written on Christina

12  Liew's account, or any way for the magistrate to determine the significance of that isolated fact,

13  or why inconsistent facts should be disregarded; and

14      •that she conducted no meaningful investigation designed to confirm the existence of

15  probable cause such, for example, as the trash search conducted at the residence of Robert

16  Maegerle.

17      Accordingly, the good faith exception is not available to rescue the warrant.[3]

18  ///

19  ///

20  ///

21

22      [3]  This conclusion is not altered by the Ninth Circuit's decision in *United States v.*
*Needham*, __F.3d __, (2013) WL2665889 (CA 9, June 14, 2013).  In that case, after finding that

23  probable cause plainly did not exist, despite the substantially greater expertise of the affiant there,
the Court based its decision on the ground that the good faith exception was available because of

24  the unsettled state of the law regarding probable cause in child pornography cases and, in
particular, the fact that the Court felt constrained to follow an earlier decision based on prior

25  standards that the searching officers were entitled to rely on.  No such reasonable reliance on
earlier formulations of the legal standard are relevant here.

26

27  Defendants Christina Liew and Walter Liew's
*Amended* Memo of Points and Authorities in
28  Support of Motion to Suppress Evidence
(CR-11-0573 JSW)                                          10

**II      THE SEARCH WARRANT IS FATALLY OVERBROAD AND FAILS
          FOR LACK OF PARTICULARITY.**

The Fourth Amendment specifically commands that no warrant shall issue except

warrants "particularly describing the . . . things to be seized." With reference to that requirement,

the United States Supreme Court has said "the requirement that warrants shall particularly

describe the things to be seized makes general searches under them impossible and prevents the

seizure of one thing under a warrant describing another." *Marron v. United States*, 275 U.S. 192

(1927).  See also *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir. 1982).

The command of the Fourth Amendment has two aspects: particularity and breadth.

"Breadth deals with the requirement that the scope of the warrant be limited by the probable

cause on which the warrant is based."  See *United States v. Hill*, 459 F.3d 966, 973 (9th Cir.

2006); *VonderAhe v. Howland*, 508 F.2d 364 (9th Cir. 1974).  Particularity requires that the

warrant should list the items to be seized with such specificity that "nothing is left to the

discretion of the officer executing the warrant." *United States v. Bridges*, 344 F.3d 1010, 1016

(9th Cir. 2003) (quoting *Cardwell* and *Marron, supra*).

The particularity and probable cause rules serve a common purpose: "to protect privacy

by prohibiting a general, 'exploratory rummaging in a person's belongings.' (Citing *VonderAhe,

supra*, at 369)." *United States v. Weber, supra*, 923 F.2d at 1342.

**A.      The Warrant Is Impermissibly Overbroad.**

The instant warrant violates both rules: the breadth of the search greatly exceeds the

limited probable cause (if any) provided in the affidavit, and the broad categories of items to be

seized establish virtually no limit on what the executing agents can take.  As has been noted

above, the items enumerated in ATTACHMENT B include five relatively narrowly defined

categories of items:

1.      Documents and records related to Titanium Dioxide (TiO2), TiO2 manufacturing

facilities, the components used in such facilities, or the process of manufacturing TiO2;

Defendants Christina Liew and Walter Liew's
*Amended* Memo of Points and Authorities in
Support of Motion to Suppress Evidence
(CR-11-0573 JSW)                                      11

2.      Documents and records related to E.I. du Pont de Nemours and Co. ("DuPont") and any TiO2 manufacturing facilities owned by or associated with DuPont.

3.      Documents and records related to Jinzhou Titanium Industry Co., Ltd.; Pangang Group Research Institute Co., Ltd.; Pangang Group Co., Ltd; Pangang Group Titanium Industry Co.; Pangang Group International Economic and Trading Co., Ltd.; Liaoning Province Petroleum Chemical Industry Planning Design Institute, and other customers of USAPTI.

5.      Documents and records related to the arrival of foreign nationals into the United States to conduct business with USAPTI, WALTER LIEW, or CHRISTINA LIEW;

10.      Documents and records related to Pinewater Designs, Inc.

Except for the unexplained and baseless authorization in ¶ 3 to seize documents and records relating to "other customers of USAPTI," these categories appear to be crafted to find evidence related to the subject matter of the investigation. The problem with respect to these categories is that there is, as argued above, insufficient probable cause to justify the search of the Liew residence for any of these specific items.

But the relatively focused and limited search that might have been authorized if only those five categories had been identified is completely overwhelmed and made irrelevant by the limitless general search authorized in the remaining categories:

6.      Employment and payment records for individuals (employees, contractors, consultants) engaged in work on TiO2 technology and manufacturing;

7.      Travel records, including but not limited to passports, visas, airline tickets, boarding passes and airline ticket receipts;

8.      Address books, telephone lists and directories, and telephone records;

9.      Financial documents, records related to USAPTI, ROBERT MAEGERLE, WALTER LIEW, and CHRISTINA LIEW, for the time period of January 1, 2007, to the present, including but not limited to tax records, investment account records, bank account records,

Defendants Christina Liew and Walter Liew's
*Amended* Memo of Points and Authorities in
Support of Motion to Suppress Evidence
(CR-11-0573 JSW)                                    12

1   account applications, account statements, signature cards, withdrawal slips, debit and credit

2   memos, checkbooks deposit slips, cancelled checks, client checks, cashier's checks, financial

3   statements, wire transfer records, wiring instructions, loan records, and credit reports;

4       10.    Tax records for USAPTI, ROBERT MAEGERLE, WALTER LIEW, and

5   CHRISTINA LIEW, including copies of federal or state tax returns and related tax preparation

6   files, such as forms W-2 and 1099.

7       These categories are capped off by three additional catch-alls:

8       11.    Items, documents and effects which show residency and/or dominion and control

9   of the place to be searched, including but not limited to keys, receipts, bills, cancelled checks,

10  mail envelopes, rental agreements, telephone records and bills, utility bills, and internet/cable

11  provider statements;

12      12.    Computer equipment, including thumb drives and/or storage devices used to

13  create or store items, data, or records referenced in the paragraphs of this Attachment, pursuant to

14  the protocol set forth in ATTACHMENT C.

15      13.    Passwords, password files, test keys, encryption codes, operating manuals, and

16  other information necessary to access the computer equipment, storage devices or data, as limited

17  by ATTACHMENT C.

18      Whatever may have been the intended limitation of categories 1, 2, 3, 5 and 10, the

19  remaining categories render those limitations meaningless. Under ¶¶ 4, 6, 7, 8, 9, 11, 12 and 13

20  there is virtually no piece of paper or device that could not be seized.  Given these paragraphs the

21  agents had two choices: either take everything in violation of the prohibition against general

22  warrants, or exercise their discretion to determine what was seizable, in usurpation of the

23  magistrate's role and in violation of the particularity requirement of the Fourth Amendment.

24  Warrants that place the executing agents in this position do not pass constitutional muster.  In

25  *United States v. Bridges*, the Ninth Circuit struck down a similar warrant containing terms

26

27   Defendants Christina Liew and Walter Liew's
     *Amended* Memo of Points and Authorities in
28   Support of Motion to Suppress Evidence
     (CR-11-0573 JSW)                              13

expanded by the phrase "including but not limited to" specifically enumerated items, reasoning that "[i]f, however, the scope of the warrant is 'not limited to' the specific records listed on the warrant, it is unclear what is its precise scope or what exactly it is that the agents are expected to be looking for during the search." 344 F.3d 1010, 1017-18 (9th Cir. 2003). The warrant to search the Liew residence contains the phrase "including but not limited to" in paragraphs 6, 8 and 11, impermissibly over-expanding the types of travel records (¶ 6), financial records (¶8), and items and documents showing residency of the place to be searched (¶11). The Ninth Circuit has also determined that warrant terms authorizing the general seizure of "[r]olodexes, address books and calendars" are overbroad and consist of "the laziest of gestures in the direction of specificity." *United States v. SDI Future Health, Inc.*, 568 .3d 684, 704-05 (9th Cir. 2009). Paragraph 7 of the warrant to search the Liew residence contains precisely the same language.

Even assuming some argument might be advanced to support probable cause to believe that documents related to TiO2 production would be found at the Liew residence, there is simply no argument to be made that the affidavit establishes probable cause to authorize the agents to rummage through Walter and Christina Liew's personal, social and financial records. But that is exactly what the warrant permits, with virtually no limitation.[4]

The affidavit provides no explanation why travel records and documents not directly related to China travel (¶ 6) should be searched and seized, or why address books, telephone lists and directories and telephone records in general should be seized, without limitation. And, nowhere in the affidavit is it suggested that there is a financial component of the investigation, yet ¶¶ 8 and 9 allow wholesale intrusion into the Liews' financial records not limited in any way to USAPTI, TiO2 production or any other subject matter of the investigation.

As the Ninth Circuit made clear in *United States v. Kow*, 58 F.3d 423, 427 (1995),

---

[4] The only limitation is in ¶ 8, authorizing the search of financial records going back to January 1, 2007.

Defendants Christina Liew and Walter Liew's
*Amended* Memo of Points and Authorities in
Support of Motion to Suppress Evidence
(CR-11-0573 JSW)                                    14

warrants authorizing seizure of all business records, without establishing how those records relate to specific criminal activities, are not sufficiently particular to satisfy the requirements of the Fourth Amendment.  See also, *In re Grand Jury Proceedings*, 716 F.2d 493 (8th Cir. 1983) (search warrant authorizing agents to seize all records pertaining to defendant's business was an invalid general warrant, where the warrant did not indicate that documents sought pertain to any specific transactions, did not identify offenses on which evidence was sought, and did not confine search to any particular files or categories of documents); *Center Art Galleries - Hawaii, Inc., v. United States*, 875 F.2d 747, 753-54 (9th Cir. 1989) (search warrant that provided almost unrestricted seizure from business establishment of items that were "evidence in violation of federal criminal law," without describing specific crimes suspected, was constitutionally invalid); *Voss v. Bergsgaard*, 774 F.2d 402, 406 (10th Cir. 1985) (in action by plaintiff seeking return of evidence seized by IRS in connection with tax fraud investigation, trial court properly ruled that warrants for search were invalid on particularity grounds since the bulk of the provisions simply allowed for seizure of evidence, whether or not related to tax fraud).

**B.**     **This Impermissibly Overbroad Warrant Cannot Be Made Valid By The Good Faith Exception.**

Given its overbreadth in both respects – the authorization to search vastly exceeded the probable cause asserted and the warrant descriptions were so broad as to leave undue discretion to the officers – the warrant is so plainly improper that it cannot be rescued by the good faith exception.

Although, as noted, a few of the categories of items to be seized are specific and apparently limited, "severance is not available when the valid portion of the warrant is 'relatively insignificant part' of an otherwise invalid search." *In re Grand Jury Subpoenas*, 926 F.2d 847, 858 (9th Cir. 1991); *United States v. Spilotro*, 800 F.2d 959, 967 (9th Cir. 1986); *United States v. Kow, supra*, at 428.

Here, the remaining categories were so broad and vague as to permit the seizure of every

Defendants Christina Liew and Walter Liew's
*Amended* Memo of Points and Authorities in
Support of Motion to Suppress Evidence
(CR-11-0573 JSW)                                                    15

1    record, document and device in the Liews' residence, and it can therefor not be determined what

2    would or would not have been properly seized under an appropriately limited warrant. It is

3    therefor not possible to sever the arguably adequate categories from those that are impermissibly

4    overbroad.[5]

5          Further, the overbreadth of these categories is so clear that the officers conducting the

6    search could not have acted in good faith and reasonable reliance on the warrant. Cf., *Leon,*

7    *supra,* at 926. Accordingly, the government cannot sustain its burden of proving that reliance

8    upon the warrant was objectively reasonable. *United States v. Michaelian*, 803 F.2d 1042, 1048

9    (9th Cir. 1986).

10         Here, as in *United States v. Kow* "the warrant . . . listed entire categories of documents to

11   be seized, encompassing essentially all documents on the premises." 58 F.3d at 428. In this

12   circumstance, the Ninth Circuit has been "vigilant in scrutinizing officers' good faith reliance on

13   such illegally overbroad warrants." (*Ibid.*), quoting *Ortiz v. Van Auken*, 887 F.2d 1366, 1370 (9th

14   Cir. 1989).

15         Because it was facially invalid, no reasonable agent could have relied on it. *Kow,* at 428-

16   29, *Center Art Galleries - Hawaii, supra*, 875 F.2d at 753. This is true notwithstanding the fact

17   that the warrant may have been reviewed by government prosecutors and was signed by a

18   magistrate. "[W]hen a warrant is facially overbroad, absent *specific assurances* from an impartial

19   judge and magistrate that the defective warrant is valid despite its overbreadth, a reasonable

20   reliance argument fails." *Kow,* at 429; *United States v. Crozier*, 777 F.2d 1376, 1381-82 (9th Cir.

21   1985); *Spilotro, supra,* 800 F.2d at 968.

22         The absence of good faith and reasonable reliance by these searching officers is further

23

24         [5]  Should the Court determine that severability is available here, defendants respectfully

25   suggest that the Court uphold the seizure of only those items specifically identified and described

     in categories 1, 2, 3, 5 and 10, and order suppression of all other items seized pursuant to this

26   warrant.

27   Defendants Christina Liew and Walter Liew's
     *Amended* Memo of Points and Authorities in

28   Support of Motion to Suppress Evidence
     (CR-11-0573 JSW)                                        16

1  demonstrated by their conduct of the search, which exceeded the scope of even the broadest

2  categories of the warrant.  For example, although the warrant does not authorize the search for or

3  seizure of safe deposit box keys, and the underlying affidavit provides no information upon

4  which officers might reasonably rely in searching for such items, the searching officers seized

5  keys which they believed were for bank safe deposit boxes, and questioned defendants about

6  them. (See, Declaration of Doron Weinberg submitted herewith).

7  **CONCLUSION**

8       For all the foregoing reasons, it is respectfully submitted that the warrant for the search of

9  defendants Walter and Christina Liew's residence is invalid, and any evidence derived from the

10  execution of that warrant must be suppressed.

11  Dated: June 27, 2013                    Respectfully submitted,

12                                          LAW OFFICES OF DORON WEINBERG

13                                          /s/  Doron Weinberg
                                            DORON WEINBERG
14                                          Attorney for Defendant CHRISTINA LIEW

15  Dated: June 27, 2013                    KEKER & VAN NEST LLP

16
17                                          /s/ Stuart A. Gasner
                                            STUART A. GASNER

18
19                                          /s/ Simona A. Agnolucci
                                            SIMONA A. AGNOLUCCI

20
21                                          /s/ Katherine M. Lovett
                                            KATHERINE M. LOVETT

22                                          Attorneys for Defendant WALTER LIEW and
                                            USA PERFORMANCE TECHNOLOGY, INC.
23
24
25
26
27  Defendants Christina Liew and Walter Liew's
    *Amended* Memo of Points and Authorities in
    Support of Motion to Suppress Evidence
28  (CR-11-0573 JSW)                              17

1   DORON WEINBERG (SBN 46131)
    LAW OFFICES OF DORON WEINBERG
2   523 Octavia Street
    San Francisco, CA 94102
3   Telephone: (415) 431-3472
    Facsimile:  (415) 552-2703
4   Email: doronweinberg@aol.com

5   Attorney for Defendant CHRISTINA LIEW

6   KEKER & VAN NEST LLP
    STUART L. GASNER (SBN 164675)
7   sgasner@kvn.com
    SIMONA A. AGNOLUCCI (SBN 246943)
8   sagnolucci@kvn.com
    KATHERINE M. LOVETT (SBN 276256)
9   klovett@kvn.com
    633 Battery Street
10  San Francisco, CA 94111-1809
    Telephone: (415) 391-5400
11  Facsimile:  (415) 397-7188

12  Attorneys for Defendant WALTER LIEW and
    USA PERFORMANCE TECHNOLOGY, INC.

13

14                  UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA
15

16  UNITED STATES OF AMERICA,          )    **CASE NO. CR-11-0573 JSW**
                                       )
17              Plaintiff,             )    **ERRATA TO DEFENDANT**
                                       )    **CHRISTINA AND WALTER LIEW'S**
18       vs.                           )    **NOTICE OF MOTION AND MOTION**
                                       )    **TO SUPPRESS EVIDENCE;**
19  WALTER LIEW,                       )    **MEMORANDUM OF POINTS AND**
    CHRISTINA LIEW, et. al.,           )    **AUTHORITIES IN SUPPORT**
20                                     )    **THEREOF; DECLARATION OF**
                Defendants.            )    **DORON WEINBERG AND EXHIBIT A**
21  _____)

22                                          **DATE:      July 25, 2013**
                                            **TIME:      2:00 pm**
                                            **COURT:     11, 19th Floor**
23                                          **JUDGE:     Hon. Jeffrey S. White**

24  ///

25  ///

26

27  Errata to Defendant Christina Liew and Walter Liew's Notice of
    Motion  and Motion to Suppress Evidence; Memorandum of
    Points and Authorities in Support Thereof; Declaration of Doron
28  Weinberg and Exhibit A (CR-11-0573 JSW)

Defendant Christina Liew, by and through her attorney, Doron Weinberg, files the instant errata amending Defendants Christina Liew and Walter Liew's Notice of Motion and Motion to Suppress Evidence (Dkt. 347) Declaration of Doron Weinberg in Support of Defendants Christina Liew and Walter Liew's Motion to Suppress Evidence (Dkt. 347-1, Dkt. 347-2) and Memorandum of Points and Authorities in Support of Defendants Christina Liew and Walter Liew's Motion to Suppress Evidence (Dkt. 348), because the signatures of co-defendant Walter Liew's attorneys were inadvertently left off of the above-referenced documents which were electronically filed with this Court on June 26, 2013. Counsel has corrected and will re-file the documents.

Counsel Doron Weinberg apologizes for any inconvenience to the Court and counsel.

Dated: June 27, 2013                    Respectfully submitted,

                                        LAW OFFICES OF DORON WEINBERG


                                         /s/   Doron Weinberg
                                        DORON WEINBERG
                                        Attorney for Defendant Christina Liew

Dated: June 27, 2013                    KEKER & VAN NEST LLP


                                         /s/ Stuart A. Gasner
                                        STUART A. GASNER


                                         /s/ Simona A. Agnolucci
                                        SIMONA A. AGNOLUCCI


                                         /s/ Katherine M. Lovett
                                        KATHERINE M. LOVETT

                                        Attorneys for Defendant WALTER LIEW and
                                        USA PERFORMANCE TECHNOLOGY, INC.

Errata to Defendant Christina Liew and Walter Liew's Notice of
Motion and Motion to Suppress Evidence; Memorandum of
Points and Authorities in Support Thereof; Declaration of Doron
Weinberg and Exhibit A (CR-11-0573 JSW)

1  DORON WEINBERG (SBN 46131)
   LAW OFFICES OF DORON WEINBERG
2  523 Octavia Street
   San Francisco, CA 94102
3  Telephone: (415) 431-3472
   Facsimile:  (415) 552-2703
4  Email: doronweinberg@aol.com

5  Attorney for Defendant CHRISTINA LIEW

6  KEKER & VAN NEST LLP
   STUART L. GASNER (SBN 164675)
7  sgasner@kvn.com
   SIMONA A. AGNOLUCCI (SBN 246943)
8  sagnolucci@kvn.com
   KATHERINE M. LOVETT (SBN 276256)
9  klovett@kvn.com
   633 Battery Street
10 San Francisco, CA 94111-1809
   Telephone: (415) 391-5400
11 Facsimile:  (415) 397-7188

12 Attorneys for Defendant WALTER LIEW and
   USA PERFORMANCE TECHNOLOGY, INC.

13

14                 UNITED STATES DISTRICT COURT

15                NORTHERN DISTRICT OF CALIFORNIA

16
   UNITED STATES OF AMERICA,          )   **CASE NO. CR-11-0573 JSW**
17                                     )
              Plaintiff,               )   ***AMENDED* DECLARATION OF
18                                     )   DORON WEINBERG IN SUPPORT OF
          vs.                          )   DEFENDANTS CHRISTINA LIEW
19                                     )   AND WALTER LIEW'S MOTION TO
   WALTER LIEW,                        )   SUPPRESS EVIDENCE**
20 CHRISTINA LIEW, et. al.,            )
                                       )
21            Defendants.              )
                                       )   **DATE:       July 25, 2013**
22 _____    )   **TIME:       2:00 pm**
                                           **COURT:      11, 19th Floor**
23                                         **JUDGE:      Hon. Jeffrey S. White**

24        DORON WEINBERG declares under penalty of perjury that the following is true and

25 correct:

26        I am an attorney licensed to practice law in the State and Northern District of California,

27
   Amended Declaration of Doron Weinberg in Support of
   Defendants Christina Liew and Walter Liew's
28 Motion to Suppress Evidence (CR-11-0573 JSW)              1

1 | and am the attorney for defendant Christina Liew in the above-captioned matter and I make this

2 | declaration in support of defendants' joint motion to suppress evidence seized from their

3 | residence located at 2 Crown Court, Orinda, CA.

4 |      Attached hereto as Exhibit A is a true and correct copy of the Affidavit and Attachments

5 | submitted by FBI Special Agent Cynthia Ho in support of the Application for Warrants to Search

6 | the Residence of Walter and Christina Liew at 2 Crown Court, Orinda, CA, as well as the Offices

7 | of USA Performance Technology, Inc. at 1000 Broadway, Suite 480, Oakland, CA.

8 |      Additionally, I have reviewed the discovery provided by the government, including a

9 | report dated July 21, 2011, by Special Agents Bozman, White and Ho (PTI-00006). That report

10 | describes, in part, an interaction between the agents and the defendants, in which the agents

11 | inquired whether defendants had a safe deposit box. This interaction arose because the officers

12 | observed safe deposit keys, which they seized.

13 |      Executed this 27th day of June, 2013, in the City and County of San Francisco, State and

14 | Northern District of California.

15 |

16 |                       /s/   Doron Weinberg
 |                       DORON WEINBERG
 |                       Attorney for Defendant

17 |                       CHRISTINA LIEW

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 | Amended Declaration of Doron Weinberg in Support of

28 | Defendants Christina Liew and Walter Liew's
Motion to Suppress Evidence (CR-11-0573 JSW)        2

# Exhibit A

**AFFIDAVIT IN SUPPORT OF**

**AN APPLICATION FOR SEARCH WARRANTS**

I, Cynthia Ho, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this affidavit in support of an application for a warrant to search the below-listed places, hereinafter the **"SUBJECT PREMISES."**

    **PREMISES 1: 2 Crown Court, Orinda, California**, a single family residence which is the residence of WALTER LIANHEEN LIEW, hereinafter "WALTER LIEW" and CHRISTINA HONG QIAO LIEW, hereinafter "CHRISTINA LIEW" (see **Attachment A-1**); and

    **PREMISES 2: 1000 Broadway, Suite 480, Oakland, California**, a business, USA Performance Technology, Inc., owned and operated by WALTER LIEW and CHRISTINA LIEW (see **Attachment A-2**).

2.  I am a Special Agent with the Federal Bureau of Investigation, and have been since September 2001. I am currently assigned to the San Francisco Division, Palo Alto Resident Agency, located in Palo Alto, California. My duties include the investigation of various violations of federal criminal law, including matters related to the theft of trade secrets, including economic espionage.

3.  The facts of this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

PTI-000336

## SUMMARY

4.      Based on the facts as set forth in this affidavit, there is probable cause to believe that

violations of 18 U.S.C. § 1831, economic espionage, and 18 § 1832(a) theft of trade

secrets, have been committed by ROBERT J. MAEGERLE, WALTER LIEW,

CHRISTINA LIEW and USA PERFORMANCE TECHNOLOGY, INC., herein after

referred to as "USAPTI."

a.      In order to establish a violation of 18 U.S.C. § 1831, the government must prove:

(1) the defendant stole or, without authorization of the owner, obtained, destroyed

or conveyed information; (2) the defendant knew this information was proprietary;

(3) the information was in fact a trade secret; and (4) the defendant knew the

offense would benefit or was intended to benefit a foreign government, foreign

instrumentality, or foreign agent.

b.      In order to establish a violation of 18 U.S.C. § 1832, the government must prove:

(1) the defendant stole, or without authorization of the owner, obtained, destroyed

or conveyed information; (2) the defendant knew this information was proprietary;

(3) the information was in fact a trade secret; (4) the defendant intended to convert

the trade secret to the economic benefit of anyone other than the owner; (5) the

defendant knew or intended that the owner of the trade secret would be injured;

and (6) the trade secret was related to or was included in a product that was

produced or placed in interstate or foreign commerce.

5.      In summary, there is probable cause to believe that ROBERT J. MAEGERLE, WALTER

LIEW, CHRISTINA LIEW, and their company, USAPTI, knowingly misappropriated

PTI-000337

trade secrets from E.I. du Pont de Nemours and Company (hereafter "DuPont") regarding

the process and equipment used to manufacture titanium dioxide ("TiO2"), a valuable

pigment used in a wide variety of industrial and consumer products. There is probable

cause to believe that WALTER LIEW, CHRISTINA LIEW and USAPTI obtained this

information from DuPont through at least two former DuPont employees, one of whom

was ROBERT J. MAEGRLE, who had access to DuPont trade secrets through their

employment with DuPont. Finally, there is probable cause to believe that WALTER

LIEW, CHRISTINA LIEW, MAEGERLE, and USAPTI obtained and used the DuPont

information for the benefit of DuPont competitors, including instrumentalities of a

foreign government, and to the strategic and competitive disadvantage of DuPont.

6.     WALTER LIEW, CHRISTINA LIEW, MAEGERLE, USAPTI, and their agents and

employees, conducted their business at the premises set forth below, where they

communicated and worked with each other regarding the business of USAPTI, which was

focused on the design of TiO2 manufacturing processes and equipment for industrial

concerns in the People's Republic of China (hereafter "PRC"), using at least in part,

confidential information misappropriated from DuPont.

## PROBABLE CAUSE

### Background Regarding DuPont and Titanium Dioxide

7.     On or about March 17, 2011, representatives of DuPont met with Federal Bureau of

Investigation ("FBI") investigators and provided information that WALTER LIEW and

his company USAPTI, formerly known as Performance Group USA, Inc., had wrongfully

obtained and possessed trade secret material surrounding DuPont's chloride route titanium

dioxide (TiO2) pigment manufacturing process. Based on their own investigation into the matter, DuPont believes that USAPTI is actively marketing this process to clients in the People's Republic of China (PRC).

8.  DuPont is headquartered in Wilmington, Delaware. According to information provided by DuPont in June 2011, DuPont is the leading manufacturer, world-wide, of TiO2, a white pigment used in a large number of materials ranging from paints to plastics to paper. Sales of TiO2 pigment annually exceed an estimated 5 million tonnes. DuPont is currently the world's largest producer of TiO2 pigment.

9.  TiO2 pigment is produced through either a sulfate route process or a chloride route process. DuPont invented the chloride route process in 1948 and has modified this process over time. In general terms, the process begins with feedstock ores containing titanium going through chlorination to produce titanium tetrachloride, which can be sold as a separate product or that can be purified and oxidized to create a pigment base. This pigment base then goes through a finishing process consisting of wet treatment, filtration, washing, drying, and grinding to produce the TiO2 pigment product.

10. DuPont's chloride route process is a continuous process that produces substantially less waste than the conventional sulfate route batch process. The chloride route process also yields TiO2 in the preferred rutile crystalline form where as the sulfate route process produces TiO2 in the anatase crystalline form which requires additional processing to convert to the rutile form. DuPont's technology also permits lower-grade ore to be used in the manufacturing process and produces more TiO2 more quickly than other industrial processes known to DuPont.

PTI-000339

11.    DuPont has taken steps to carefully safeguard their process. DuPont transmits, receives and destroys confidential information in a secure manner. DuPont employees are required to sign agreements to protect the secrecy of DuPont's confidential information. Regarding the TiO2 process specifically, DuPont's Titanium Technology ("DTT") division compartmentalizes information surrounding the process and access to it so that individual employees generally do not have access to any more than one part of the overall process. According to DuPont, only a few people have access to the entire TiO2 process. Furthermore, all data systems that contain DTT documentation – including drawings, equipment specs, instrument specs, logic diagrams, standard operation procedures, maintenance work practices, technology reports, etc. – require specific permission for access.

12.    DuPont manufactures TiO2 at plants in the United States and in Taiwan, the Kuan Yin Plant, using its proprietary technology, and sells the finished product throughout the world in interstate and foreign commerce. TiO2 manufactured by DuPont accounts for approximately one-fifth of all world-wide TiO2 sales.

**Information Regarding USAPTI**

13.    USAPTI is an engineering company located in Oakland, California. According to their website, www.usapti.com, USAPTI is a U.S. corporation that specializes in the business of high technology and fine chemicals and offers its industrial experiences and engineering services to clients in a global market. USAPTI lists "TIO2 pigments" as one of their expertise areas.

14.    The FBI interviewed BRIJESH BHATNAGAR, a former USAPTI employee.

PTI-000340

BHATNAGAR stated that WALTER LIEW formerly operated a company called PERFORMANCE GROUP USA, INC. (hereinafter referred to as "PERFORMANCE GROUP"). Between 2007 and 2009, PERFORMANCE GROUP was actively designing a TiO2 plant for the PANGANG GROUP JINZHOU TITANIUM INDUSTRY CO., LTD. In early 2009, WALTER LIEW closed PERFORMANCE GROUP, filed for bankruptcy, and vacated its office space without paying his employees and contractors for their services rendered.

15.   A query of public database records from LexisNexis revealed that USAPTI was incorporated on April 23, 2007. The company was registered by WALTER LIEW using the same business address as PERFORMANCE GROUP as mentioned above, 1300 Clay Street, Oakland, California. CHRISTINA LIEW is listed as the owner and WALTER LIEW is listed as the president. USAPTI's website lists their office location as 1300 Clay Street, Suite 600, Oakland California, telephone (510)268-3288, fax (510)268-3289, info@usapti.com. However, a physical surveillance conducted by FBI agents on May 20, 2011 determined that USAPTI is currently located at 1000 Broadway, Suite 480, Oakland, California. JOHN LIU, also known as "JIAN LIU (hereafter "LIU"), a former USAPTI employee, confirmed that USAPTI's office is located at 1000 Broadway, Suite 480, Oakland, California.

**Information Regarding DuPont's Initial Discovery of Misappropriation of Trade Secrets**

16.   DuPont first became aware of USAPTI in November of 2009 while conducting routine internet browsing. At that time, USAPTI's website was advertising that their "experts have many years of working experiences from . . . DuPont" (and other large companies)

PTI-000341

and listed the "TiO2 by Chloride Process" as one of their technologies in fine chemicals. DuPont's legal department sent a letter to USAPTI objecting to the mention of DuPont technology. USAPTI subsequently made significant revisions to its website, including removing any mention of DuPont and the chloride process.

17.    In June 2010, a representative of DuPont's titanium processing division was contacted by a private consultant while attending a trade show in the PRC. The consultant had been shown plans for a prospective titanium processing plant in Pangang, PRC, which the consultant recognized as including DuPont technology based on the components and configurations depicted. The plans were marked with the USAPTI logo with certain redacted areas which the consultant believed may have concealed the DuPont logo. Based on the plans that the consultant had been asked to review while in China, the consultant believed that DuPont technology may have been misappropriated for use in the PRC.

18.    In August 2010, DuPont received an anonymous letter, postmarked San Francisco, California, which alleged that WALTER LIEW of USAPTI, and John LIU of Chevron Corporation, were stealing DuPont technology. The note stated that they had "embezzled Titanium Technology from US company sold to Panzhihua China."

**Information Obtained From Chevron and Former Chevron/USAPTI Employee John Liu**

19.    In or about December 2010, DuPont contacted Chevron Corporation (hereafter as "Chevron") to inquire about LIU, a chemical engineer employed with Chevron. Based upon DuPont's discussion with Chevron, Chevron conduct an internal review of LIU's work e-mail and determined that LIU had been in contact with WALTER LIEW.

PTI-000342

Chevron further identified two other Chevron employees, STEVEN SONG (hereafter "SONG") and HUPING LUO (hereafter "LUO"), who were in e-mail contact with each other, LIU, and WALTER LIEW. According to Chevron, all three of their employees were chemical engineers by training and none of their assigned duties at Chevron included work or research on titanium processing technologies.

20.  Based on Chevron's review of the company computers used by LIU, SONG, and LUO, Chevron's internal investigation revealed that all three of the employees had downloaded specific software used to run chemical and chloride process equations. Chevron also discovered an e-mail, from SONG to LIU and LUO, that contained a link to a Chinese website discussing chloride and sulfide titanium dioxide processing.

21.  In March 2011, LIU submitted his resignation to Chevron Corporation and informed them of his plans to accept a position at USAPTI. However, LIU ultimately decided not to accept the position after a civil suit was filed by DuPont against USAPTI.

22.  On or about May 27, 2011, the FBI received information from Chevron pursuant to a Federal Grand Jury subpoena, including:

   a.  A 37 page document marked Performance Group (USA) Inc, titled "Operation Description, Project: 30000 MTPY TiO2 Production by Chloride Process Project of Pangang Group Jinzhou Titanium Industry Co. Ltd, Contract No.: PJTY-(XIN)-08-01, Revision: B, Date: April, 2008."

   b.  Partial cellular telephone invoice records for AT&T account number 876627160, telephone number 510-292-5360, which is known to be used by LIU but is subscribed to by Chevron-R-GSM CCDA MAC CRU. The invoices spanned

PTI-000343

multiple billing cycles throughout 2010 and showed routine communications with WALTER LIEW's telephone, 510-268-3288.

c.     Cached website information from the inbox of Hotmail account johnjianLIU@hotmail.com.  The cached website only showed the sender's name, subject line, and date.  The following e-mails of interest were included: An e-mail from "Walter LIEW" with the subject "Re: Instrument Data Sheets" dated 05/27/10; and an e-mail from "Walter LIEW" with the subject "Re: PFD review comments" dated 2/23/10.Three hand drawn engineering schematics, similar to those described below.  The schematics are dated 6/18/2010 and are titled "100K T/Y TiO2 SR Hx Review."

23.    In March 2011, Chevron provided some of the DuPont material and computer models found on their computer system to DuPont for further analysis.  Employees of DuPont's Titanium Technology Division ("DTT") reviewed the documents and found several matches between the models provided by Chevron Corporation and DuPont's Kuan Yin TiO2 processing plant in Taiwan, which was based on DuPont's Antioch plant.  I have been informed by the DuPont employees who reviewed the materials obtained from Chevron that the materials contain information that DuPont considers propriety and treats as confidential.  The following, in particular, was noted:

a.     Only DuPont's plant can produce 20 tons/hr of finished TiO2, which is achieved through the use of four micronizers (grinding systems).  This is unique to DuPont and the Kuan Yin plant.

b.     The documents from Chevron Corporation referenced fatty acid as a purification

PTI-000344

treating agent, which is only used by DuPont.

c.  The documents included a pressure transmitter specification for conveying cement, which suggests a solid cementation process similar to that used at the Kuan Yin plant and the Antioch plant.

d.  The sizing of the pipe connecting the chlorine vaporizer header and the chlorinator, as specified in the PRO/II source code, matches that of the Kuan Yin plant.

e.  The sizing of the pipe to the oxidation area, as specified in the PRO/II source code, matches that of the Kuan Yin plant.

f.  The PRO/II model appears to use electrically heat-traced piping just as the Kuan Yin plant does.

g.  The PRO/II model calls for three vaporizers just as the Kuan Yin plant.

h.  Based on the flow meter specified, the sizing of the fuel header feeding the oxidation building appears to match that of the Kuan Yin plant.

i.  Two chlorine vapor flow meters specified in the instrument specifications obtained from Chevron were consistent with those of the Kuan Yin plant.

j.  The pipe sizing for the oxygen flow meter, in the specification sheet obtained from Chevron, matches that of the Kuan Yin plant.

k.  Based on the specified components and sizings used, the design documents obtained from Chevron appear to reflect a production rate of 20 tons/hr of finished product, which matches the capacity of the Kuan Yin plant and is a greater throughput than is available from any competitive technology for a single

PTI-000345

operating line.

24.     On June 16, 2011, LIU's attorney provided a proffer to the FBI and U.S. Attorney's office, in anticipation of LIU voluntarily providing additional information to the Government. LIU's attorney stated that LIU knew that MAGEARLE and a man named TIM (last name unknown) were former DuPont employees and had provided information regarding DuPont's TiO2 process to WALTER LIEW and LIU. She stated that LIU attended meetings between WALTER LIEW and PANGANG GROUP executives in which MAGEARLE and "TIM" participated. She stated that LIU had seen documents that were labeled DuPont confidential that WALTER LIEW and USAPTI had obtained from MAGEARLE and "TIM."

25.     LIU, through his attorney, produced documents pursuant to a subpoena. The documents include: several printed photographs of a TiO2 plant; a telephone contact list with USAPTI employee names, telephone numbers and email addresses; a "composition" notebook with handwritten notes to include, but not limited to, subject matters of "Standard PFD," "Equipment Numbering systems," and "Detail Design," etc; a folder labeled "Bob's Drawings" containing copies of handwritten technical notes and drawings; a signed employment agreement between USAPTI and LIU dated 10/1/2010; a folder labeled with Chinese characters containing copies of typed and handwritten technical drawings and notes to include, but not limited to, some marked as prepared by Performance Group (USA), Inc. for project, "Fluid-Bed Chlorination and Purification of a 30,000 MPTY TiO2 By Chloride Route Project of Pangang Jinzhou Titanium Industry Co., Ltd." and "Conceptual Operation and Control Jinghou 75,000 MT/YR TiCl4

PTI-000346

Facility;" a book by the Pangang Group Titanium Industry Corporation, Ltd. featuring various photographs that included one showing WALTER LIEW seated next to MAEGERLE among other individuals, and a handwritten page of computer code.

26.   On June 21, 2011, I interviewed LIU in the presence of his attorney, Mary McNamara. LIU confirmed the information that had previously been provided by McNamara and provided significant additional details not recorded in this Affidavit. He stated that as an employee of USAPTI he had been given access to information that he believed was confidential to DuPont and that he and other USAPTI employees were instructed by WALTER LIEW to use the DuPont information in connection with the design of TiO2 manufacturing facilities for Chinese customers.

27.   LIU reviewed drawings that he had produced pursuant to subpoena and stated that MAEGERLE had written the comments on the drawings. LIU recognized MAEGERLE's handwriting. The documents were dated 2008. The Process and Instrument Diagrams (hereafter "P&ID") was derived from these documents. LIU received these documents around June or October 2010 via an email from WALTER LIEW, who had received it via email from MAEGERLE. WALTER LIEW had informed LIU that the drawings were from MAEGERLE.

28.   LIU reviewed a handwritten document he had produced and described it as a portion of an oxidation reactor source code. The source of the document was Fortran code contained in a pamphlet kept by WALTER LIEW. The code contained parameters for the oxidation reactor. WALTER LIEW kept the pamphlet in a locked drawer in his office. Also in the drawer was a blueprint for a TiO2 plant layout in English. WALTER LIEW

PTI-000347

locked his office when he was out and only he had the key. WALTER LIEW had given

LIU permission to copy the pamphlet, and LIU kept the copy at his desk. The pamphlet

had DuPont's logo on it. Around March 2011, Tongchai LNU, a USAPTI employee, was

seen using the source code pamphlet in the office.

29.    DuPont employees reviewed the computer code LIU obtained from WALTER LIEW and

said that it had been copied verbatim from some internal DuPont documents concerning

computer modeling of their oxidation reactor, which is one of the most closely held and

proprietary aspects of DuPont's TiO2 processing.

30.    LIU stated that WALTER LIEW had also given him photocopied information on a press

filter in a 3-ringed binder. The document had a "DuPont Proprietary" marking in the

corner. LIU believed that PANGANG TITANIUM GROUP planned to purchase a

similar press filter from a U.S. company for around $2 million USD.

31.    WALTER LIEW had also given LIU a 15-page document on a chlorinator reactor. The

document discussed the process and the equipment, including operating issues.

MAEGERLE had given LIU the same document in person because MAEGERLE worked

on the process and operating manual.

**Information Obtained From Former USAPTI Employee Leonard Tilton**

32.    On June 7, 2011, I interviewed Leonard TILTON (hereafter "TILTON"). TILTON was

hired by USAPTI in July 2009 and worked until about February 2010. TILTON was

hired by WALTER LIEW as a process engineer. WALTER LIEW had explained to

TILTON that USAPTI was designing a chloride method TiO2 manufacturing plant for

customers in China. WALTER LIEW told TILTON that the process was based on a

PTI-000348

method used by DuPont and that an ex-DuPont employee was assisting USAPTI. TILTON identified the DuPont employee as BOB MAEGERLE who used cellular telephone number (302) 359-3444 and home number (302) 947-1051.

33.     TILTON thought that there might be issues with USAPTI using DuPont technology. TILTON asked WALTER LIEW about it, but WALTER LIEW stated that the technology was old and that the patents had expired. WALTER LIEW added that it did not matter because the clients were in China. FBI agents have discussed the age of the technology and the status of patents with employees of DuPont, who have informed the agents that the DuPont TiO2 manufacturing processes detailed elsewhere in this Affidavit remain propriety and protected trade secret information today. DuPont's competitors have not been able to duplicate the DuPont techniques and processes that permit DuPont to manufacture large quantities of TiO2 using low-grade ore, including the techniques and processes detailed elsewhere in this Affidavit. In addition, in order to strengthen trade secret protection, DuPont will sometimes choose not to seek patent protection for its proprietary information to avoid public disclosure.

34.     While TILTON was employed at USAPTI, there were approximately eight employees and everybody was working on the chloride method TiO2 production plant design. USAPTI only had two clients, both of whom are located in China. TILTON stated that one client was PANGANG. TILTON could not recall the name of the second client, but upon hearing the name JINZHOU confirmed that they were the second client. TILTON stated that the only difference between the plants was that one had a 30,000 mtpy capacity and the other had a 100,000 mtpy capacity. TILTON believed that the 30,000 mtpy

PTI-000349

capacity was for PANGANG. He also noted that the PANGANG project had been going on for a few years longer that the JINZHOU project.

35. TILTON stated that on one occasion WALTER LIEW showed him a half- inch thick stack of DuPont process flow diagrams that were on 11" by 17" paper but he could not recall looking at the title block or how it was marked.

36. Although TILTON had never traveled to China, he met individuals from JINZHOU when they attended a design review that was held at the Hilton Hotel in San Francisco Chinatown, from 11/30/2009 to 12/04/2009. There were approximately 18 to 20 people present, with approximately half being from JINZHOU. WALTER LIEW ran the meeting but frequently deferred to MAEGERLE for answers to technical questions posed by the engineers from JINZHOU.

37. TILTON stated that CHRISTINA LIEW was involved in the operation of USAPTI and frequently attended meetings with the clients from China. TILTON stated that she would help translate and "monitor" the side discussions that her husband was not involved in.

**Information Obtained from Able-Baker Automation**

38. When the FBI interviewed former USAPTI employee BHATNAGAR, he identified Able-Baker Automation as an engineering consulting service that had been contracted by USAPTI to design the process control system for the chloride route process TiO2 plant. In April 2011, an employee of Able-Baker Automation confirmed that Able-Baker was contracted by USAPTI to design the controls for the TiO2 plant being designed for the Pangang Group Jinzhou Titanium Industry Co. Ltd. Able-Baker Automation also identified MAEGERLE as the technical expert for the design and noted that any technical

PTI-000350

questions that Able-Baker Automation had about the plant process were directed to MAEGERLE.

39. Upon receipt of a Federal Grand Jury Subpoena for documentation related to their work for USAPTI, Able-Baker Automation provided a thumb drive with approximately 1.6 gigabytes of data related to the project.

40. A review of the thumb drive was conducted by the FBI, during which a folder titled "from BobR 22Aug08" was found. An Able-Baker employee stated that all of the documents in the folder were from either MAEGERLE or WALTER LIEW and had been provided to support Able-Baker's controls design objectives. Within the folder, two engineering schematics that bore DuPont's name and logo in the title block were found.

   a. The first schematic was labeled "EDGE MOOR PLANT OXIDATION W/RPS SYSTEM DRAWINGS" and was dated 03/10/94. Adjacent to the title block the drawing was marked with the following caveat "THIS DRAWING HAS BEEN FURNISHED BY E.I. DU PONT DE NEMOURS & CO. THE INFORMATION AND KNOW-HOW THEREON MAY NOT BE USED NOR THE DRAWING REPRODUCED WITHOUT THE WRITTEN PERMISSION OF DUPONT. ALL REPRODUCTIONS IN WHOLE OR IN PART, INCLUDING VENDOR'S SHOP DRAWINGS SHALL BEAR OR REFER TO THIS STAMP."

   b. The second schematic was labeled "EDGE MOOR PIGMENTS PLANT FLOW SHEET-REACTION AREA" and was dated 10/20/88. The drawing was marked "DUPONT CONFIDENTIAL - SPECIAL CONTROL." Within the title block was the following caveat "THIS PRINT CONTAINS DUPONT CONFIDENTIAL

PTI-000351

- SPECIAL CONTROL INFORMATION," and listed the following handling
instructions "EMPLOYEE RECEIVING THIS REGISTERED PRINT WILL
SIGN AND MAIL IMMEDIATELY THE ATTACHED ACKNOWLEDGING
CARD. WILL PROPERLY SAFEGUARD THE INFORMATION HEREON
AND WILL BE HELD PERSONALLY ACCOUNTABLE FOR THIS PRINT.
REGISTERED PRINTS CHARGED TO AN ENGINEERING DEPARTMENT
EMPLOYEE SHALL BE RETURNED BY TRANSMITTAL MEMORANDUM
IN PERSON OR UNDER SEALED COVER TO THE DRAWING FILE
SECTION TO BE DESTROYED WHEN THEY HAVE SERVED THEIR
PURPOSE. PERMISSION OF THE DESIGN PROJECT MANAGER IS
REQUIRED IN CASE A REGISTERED PRINT CHARGED TO AN
ENGINEERING DEPARTMENT EMPLOYEE IS TO BE RETAINED FOR A
PERIOD IN EXCESS OF ONE YEAR."

41.     The folder "from BobR 22Aug08" was also found to contain approximately 61 jpeg files
of images that Able-Baker Automation identified as possibly photographs of a DuPont
TiO2 plant in Antioch, California.

42.     Numerous technical documents, authored by MAEGERLE, that pertained to the chloride
route TiO2 process were found in the folder "from BobR 22Aug08." Based on the files'
attributes MAEGERLE was listed as the author of approximately 16 text documents
describing various parts of the process in detail, and approximately three spreadsheets of
what appear to be related calculations.

43.     Approximately 26 jpg / pdf files were also found in the folder "from BobR 22Aug08,"

PTI-000352

which Able-Baker Automation attributed to MAEGERLE. The files contained scans of handwritten engineering notes, calculations, and key component diagrams. Some of the drawings are marked with MAEGERLE's initials.

44. In or about May 2011, the FBI reviewed the documents obtained from Able-Baker with technical experts from DuPont. DuPont employees identified the two schematics bearing DuPont's name and logo, as described above, as fundamental process diagrams, or pink sheets, for their TiO2 production methodology. DuPont considers this information to be trade secrets and takes steps to protect it from dissemination publicly or to competitors. DuPont employees identified these documents attributed to MAEGERLE, as described above, as containing multiple trade secrets and, based on the level of detail, believed that they may have been derived directly from other pink sheets or DuPont operating manuals.

**Information Regarding ROBERT MAEGERLE**

45. Information obtained from interviews of several former USAPTI employees identified ROBERT J. MAEGERLE as a former DuPont employee who was contracted by WALTER LIEW to work on USAPTI's TiO2 projects for their Chinese clients. MAEGERLE was positively identified by LIU and WONG, former USAPTI employees, from a photograph provided by DuPont and shown to them by FBI agents.

46. DuPont confirmed that MAEGERLE was employed by DuPont as, among other things, a process engineer from 1956 to 1991. MAEGERLE had access to TiO2 design schematics and process flow diagrams as part of his duties. MAEGERLE worked on design data for DuPont's Kuan Yin plant in Taiwan from approximately 1985 to 1988 and was included on the distribution of "special control" information, one of DuPont's highest level of

PTI-000353

security control markings.

47.    FBI agents have spoken to DuPont employees regarding the information to which

MAEGERLE had access.  The DuPont employees stated that even though MAEGERLE's

direct access to DuPont information ended sometime in the 1990s, the DuPont TiO2

manufacturing processes to which he had access remains propriety and protected trade

secret information today.  DuPont's competitors have not been able to duplicate the

DuPont techniques and processes that permit DuPont to manufacture large quantities of

TiO2 using low-grade ore, including the techniques and processes detailed elsewhere in

this Affidavit.

48.    According to DuPont employees, even though it makes efforts to compartmentalize

knowledge of the entire TiO2 manufacturing process, as a process engineer, MAEGERLE

would have had access to more information regarding the entire manufacturing process

than other employees.

49.    MAEGERLE reported on his 2010 Federal Income Tax Form 1040-Schedule C, Profit or

Loss From Business statement that he operates a consulting business.  MAEGERLE also

applied for a State of Delaware business license for Pinewater Designs, Inc. in 2008.

This application describes his business activity as "Professional Services – Engineer."

This business is currently in good standing with Delaware's Department of Revenue and

its annual tax franchise returns from 2008 - 2010 list MAEGERLE as the company

president.

50.    When I interviewed former USAPTI employee LIU on June 21 and July 7, 2011, LIU said

WALTER LIEW had previously told him that MAEGERLE is a close family friend of

PTI-000354

both WALTER LIEW and CHRISTINA LIEW and that they have known each other for over 10 years.

51.    LIU had met MAEGERLE in person on three separate occasions during the time he worked on the TiO2 project with WALTER LIEW. LIU met MAEGERLE for the first time in July 2010 during a meeting that WALTER LIEW had hosted for about 10-15 visitors from the PANGANG TITANIUM GROUP from the PRC at the Hilton Hotel on Kearney Street in San Francisco, California. In attendance for this meeting were the USAPTI team, MAEGERLE, and TIM SPITLER. WALTER LIEW introduced MAEGERLE and SPITLER to LIU as his friends and consultants. The PANGANG group subsequently left California and traveled to the east coast, either in New York or New Jersey to visit two companies. The PANGANG group purchased a "fired heater" for about $3 million USD from one of the companies. LIU recalled that MAEGERLE had assisted the PANGANG group with this transaction because MAEGERLE knew the sellers.

52.    LIU met MAEGERLE for the second time around late-November or early December 2010 when MAEGERLE visited USAPTI to work on mechanical equipment issues. Around January 2011, LIU met MAEGERLE for the third time when approximately six representatives from JINZHOU visited USAPTI for about a month. JINZHOU had purchased some instruments, such as a control valve or logic, from Rockwell and the representatives had received training from the company. During this visit, the JINZHOU representatives also conducted the final P&ID review and MAEGERLE was present for this purpose.

PTI-000355

53.     On approximately July 27, 2010, LIU participated in a full day of meetings. MAEGERLE and SPITLER were present and actively participated and answered questions. Their answers revealed a deep knowledge about the TiO2 process, including technical knowledge such as separation temperatures, pumps, and other aspects. SPITLER left on July 28, 2010. MAEGERLE left on July 29, 2010. After SPITLER and MAEGERLE left, the remaining participants discussed topics around instruments and not processes.

54.     On Approximately July 26, 2010, LIU returned to the U.S. from his business trip for Chevron and met the PANGANG group the same day. During subsequent meetings, SPITLER gave a presentation about a special nitrogen pump. SPITLER may have mentioned how the pump was utilized at DuPont. This special pump was new to the PANGANG visitors. The pump cost around $250,000.00 U.S. Dollars (USD) and was only built in the U.S. and Germany.

55.     When DuPont interviewed former USAPTI employee BHATNAGAR in 2011, he identified MAEGERLE as a former DuPont employee who was contracted by WALTER LIEW to help with the design of a chloride route process TiO2 for USAPTI clients in the PRC. MAEGERLE's work with USAPTI began on or prior to 2007. MAEGERLE had also traveled to the PRC on at least two occasions with WALTER LIEW to meet clients and attend design reviews for the TiO2 plant.

56.     MAEGERLE continues to have what appears to be a close relationship with the LIEW family. On July 12, 2011, FBI agents conducted a trash cover at MAEGERLE's residence at 33 Pinewater Drive and discovered items and documents including, but not

PTI-000356

limited, to a piece of paper with "CHINA TRIP" written on top, a small piece of paper containing written notes, including, but not limited to a "password CHLL39," and flight information for US Air written on a stationary bearing the logo "Hilton" and "750 Kearny Street, San Francisco, California 94108." The flight information were written as "7/12 USAIR 657 7:45AM PHL-SFO ARR. 10:50A," "7/15 USAIR 658 11:00AM SFO-PHL ARR 7:21 PM," and "510-452-1776." On the same day, on July 12, 2011, FBI agents in San Francisco International Airport observed MAEGERLE exiting the secure area of Terminal 1 and greeting CHRISTINA LIEW and a young boy. MAEGERLE, CHRISTINA LIEW, and the young boy then entered a burgundy Mercedes sedan bearing California License Plate Number 5SQN189, a vehicle registered to CHRISTINA LIEW, 2 Crown Court, Orinda, California. CHRISTINA LIEW was observed as the driver of the vehicle.

**Information Regarding USAPTI's Customers In the People's Republic of China**

57. On June 28, 2011, I interviewed PETER WONG (hereafter as "WONG"), a former employee of USAPTI, who worked for WALTER LIEW at USAPTI from approximately July 2009 until August 2010. WONG was hired as a senior engineer to assist with the design of a 100,000 mtpy titanium dioxide (TiO2) process plant for Panzhihua, an industrial company in China. Prior to this project, USAPTI designed a 30,000 mtpy plant for Jinzhou Titanium company. Jinzhou is a city in China. WONG said that the project was done under the name of Performance Group Inc., but in reality it was the same company as USAPTI. The TiO2 production process is composed of a chlorination phase and an oxygen activation phase, which WONG described as very complex because it

PTI-000357

involves volatile chemicals at very high temperatures and pressures. WONG believed that USAPTI's process was based on DuPont's process. WONG observed that WALTER LIEW's background is in electrical engineering, not chemical or process engineering, and the TiO2 production process is so complex that WONG believes that WALTER LIEW does not have the training or expertise to design TiO2 plants himself.

58.   Travel records and United States Department of State Visa information obtained by the FBI indicate that in 2010 WALTER LIEW sponsored a delegation of engineers from the PANGANG GROUP, two of whom were traveling on PRC diplomatic passports. In my training and experience, I know that individuals who travel on diplomatic passports are traveling for the purpose of representing the interests of the government who provided the diplomatic passports. Additionally, diplomatic passports are typically issued to individuals who traveled on work-related matter and employed by or acting on behalf of that government.

59.   On 06/15/2011, FBI agents obtained hotel guest records from the Hilton San Francisco Financial District, 750 Kearny Street, San Francisco, California, which showed that MAEGERLE, TIM SPITLER, and VIRGINIA SPITLER, were among the many hotel guests who were registered under the hotel group code for "USAPT USA PERFORMANCE TECH/JULY 2010" for the period 07/24/2010 to 08/09/2010. Additionally, MAEGERLE and TIM SPITLER listed "USA PERFORMANCE TECHNOLOGY, 1000 Broadway, Oakland, CA 94607, US," as their addresses on their hotel registration. In addition to MAEGERLE and the two SPITLER guests, approximately nineteen other guests with Chinese names were also registered under the

PTI-000358

relevant hotel group code. The same guest records showed that two other groups, all with Chinese names, had also stayed at the hotel under the "USAPT USA PERFORMANCE TECH" group code on two other occasions, 11/29/2009 to 12/8/2009 and 1/15/2010 to 1/16/2010.

60. In early 2011, WALTER LIEW also sponsored another delegation of engineers from the PANGANG GROUP. Based on this information, I believe that despite operating under a new business name, WALTER LIEW continued to work on the same TiO2 projects as he had under his previous business, PERFORMANCE GROUP, and maintained the same clients, the PANGANG GROUP and JINZHOU.

61. Several former USAPTI employees that have been interviewed by the FBI have given slightly varying versions of the names of the Chinese companies who are clients of USAPTI and who have attended meetings with WALTER LIEW, MAEGERLE, and others regarding the design of TiO2 manufacturing facilities. The employees generally have referred to the companies as "Pangang" or "Jinzhou."

62. FBI agents have reviewed the visa applications submitted by individuals who have been sponsored by WALTER LIEW for visits to the United States and have identified the following Chinese employers or affiliated organizations: Jinzhou Titanium Industry Co., Ltd.; Pangang Group Research Institute Co., Ltd (one visitor traveling with a diplomatic passport listed this group); Pangang Group Company, Ltd. (a second visitor traveling with a diplomatic passport listed this group); Pangang Group Titanium Industry Co.; Pangang Group International Economic and Trading Company, Ltd.; Liaoning Province Petroleum Chemical Industry Planning Design Institute; Pangang Information Engineering

PTI-000359

Technology, Co. Ltd.; Panzhihua Iron and Steel Group (a large delegation in 2006); Jinzhou Ferrolloy Group Co. (a large delegation in 2006).

63. Regarding the two diplomatic passport visitors in July 2010, visa documentation obtained from the State Department states that they were "traveling to meet with vendors at USA Performance Technology in Oakland, CA to purchase heater for 100,000 MPTY TIO2 production by chloride process project." They also stated on the visa application that their "company to pay expenses." Information obtained from LIU reveals that this statement is incomplete and misleading in the following respects: (1) the individuals met with USAPTI (including former DuPont employees MAEGERLE and SPITLER) at the Hilton in San Francisco to engage in a design review for the on-going development of a new TiO2 facility in China; (2) after this meeting, the Pangang group went to the east coast, either New York or New Jersey, to buy a fired heater from a third party (not USAPTI) which cost around $3 million USD.

**The LIEWs Instructed JOHN LIU to Conceal Relationship To DuPont**

64. After DuPont contacted Chevron to seek information regarding LIU and other employees who were performing work for USAPTI, Chevron began an internal investigation. On or about March 30, 2011, Chevron interviewed LIU, SONG, LUO, and LIU's wife.

65. When interviewed by the FBI, LIU provided the following information regarding the Chevron interview and its aftermath:

   a.      LIU's wife was released from questioning by Chevron first because she was not involved with USAPTI at all. She tried to call LIU, but because he was still being questioned, he did not answer his phone. As a result, she contacted WALTER

PTI-000360

LIEW.

b.     WALTER LIEW, CHRISTINA LIEW, and their child went to LIU's house to comfort LIU's wife.  LIU returned home around 8:00 p.m.  Around 8:30 p.m., James Jubb, a DuPont investigator, knocked on LIU's door.  WALTER LIEW retreated down to LIU's basement as soon as Jubb identified himself. CHRISTINA LIEW and LIU's wife stayed in the dining room.

c.     Jubb asked LIU questions, and CHRISTINA LIEW confronted Jubb.  LIU told Jubb that he had met the Jinzhou CEO and took 2 trips to China with WALTER LIEW.  After Jubb left, WALTER reappeared, shaking his head.  Both WALTER LIEW and CHRISTINA LIEW stated that they were unhappy with LIU's responses to Jubb's questions.  WALTER LIEW and CHRISTINA LIEW stated that LIU should not have given the name of the Jinzhou CEO, Mr. QI (phonetic), and that LIU did not have to talk to anyone because they are in America.  They also told LIU not to open the door if anyone knocks and if asked any questions, to say he did not remember.

d.     WALTER LIEW and CHRISTINA LIEW asked LIU about what happened at Chevron earlier that day and comforted him.  After WALTER LIEW and CHRISTINA LIEW left, LIU realized that CHRISTINA LIEW stole a red 256 MB USB thumbdrive from his dining table.  That thumbdrive contained Chevron material.

e.     Around April 3 or 4, 2011, CHRISTINA LIEW arrived at LIU's house before 6:00 a.m., almost in tears, and stated that they had treated LIU so well and that LIU

PTI-000361

should not abandon them. She proposed another way for LIU to work with them. The proposal was to create another company, called something like ADVANCED ENGINEER, which would be co-owned by CHRISTINA LIEW's sister-in-law and LIU. USAPTI would subcontract work to ADVANCED ENGINEER. Later that day, CHRISTINA LIEW called and asked for LIU's Social Security number. LIU later found out that CHRISTINA LIEW's sister-in-law lived in China.

f.     Around April 6, 2011, LIU went to the USAPTI office to sign documents to start ADVANCED ENGINEER. LIU noticed that ALAN CHANG's name was also on the documents. CHANG is one of the principal investors in USAPTI. CHRISTINA LIEW received a call from WALTER LIEW, informing her that WALTER LIEW was being sued. After LIU returned home, he found out that he was also being sued by DuPont.

g.     Around April 8, 2011, CHRISTINA LIEW picked up LIU and they visited a lawyer in Fremont, California. CHRISTINA LIEW stated that they were facing the same issues in their lawsuits and would be helpful if they had the same lawyer. WALTER LIEW had left for Singapore around this time. LIU decided to go with a different lawyer.

h.     After WALTER LIEW returned from Singapore, he asked LIU about LUO, and SONG. WALTER LIEW instructed LIU not to say anything else because it is not good for LIU or his family. WALTER LIEW stated that LIU's case was easy because everything LIU received was from WALTER LIEW.

i.     Later in April 2011, CHRISTINA LIEW met with LIU for lunch at Pacific East

PTI-000362

Mall and specifically told him not to mention MAEGERLE or SPITLER. As a result, when LIU was interviewed by DuPont around April 25, 2011, DuPont investigators asked LIU if any white people were involved with USAPTI, LIU stated there were none.

j.      WALTER LIEW and CHRISTINA LIEW also instructed LIU that he should not tell his lawyer things the lawyer did not need to know.

**The LIEWs and USAPTI Paid LIU Surreptitiously For Work on TiO2 Projects**

66.     LIU told FBI agents that he and the two Chevron employees, LUO and SONG, were paid hourly for their USAPTI work and that their timesheets were given to CHRISTINA LIEW. CHRISTINA LIEW suggested that to avoid paying taxes, LIU be paid by check through his mother's account in Canada. LIU was paid in three separate checks for a total of around $43,000.00.

67.     On July 11, 2011, the FBI obtained from LIU's attorney a copy of a check that LIU's attorney explained was one of her client's paychecks from the LIEWs and USAPTI. The check was from CHRISTINA H. LIEW, 2 Crown Ct., Orinda, CA 94563-4206, dated 1/7/2011, for $25,000 payable to GU YA ZHEN. LIU has previously told FBI agents that CHRISTINA LIEW made payments to him via checks that were payable to his Mother who resided in Canada. The memo line stated "9/26/10 - 12/31/2010." The check, number 148, was from Citibank N.A. BR#956, 801 - A Franklin St, Oakland, CA 94607, and bore the following routing and account numbers respectively: 321171184 and 40054775370.

68.     LIU's attorney informed the FBI that GU YA ZHEN is JOHN LIU's mother and that LIU

obtained two other similar paychecks from CHRISTINA LIEW that were addressed to his mother.

## Information Regarding the Residence of WALTER and CHRISTINA LIEW

69.    Former USAPTI employee WONG was interviewed by FBI agents on June 28, 2011. WONG stated that WALTER LIEW spent a lot of hours working on the TiO2 projects and that while WALTER LIEW predominately worked at the office, he would perform related work from home after hours. Due to the skeleton crew at USAPTI, WONG noted that a number of USAPTI employees would work remotely.

70.    On June 28, 2011, at approximately 6:50 a.m., FBI agents conducted a surveillance at 2 Crown Court, Orinda, California and observed two maroon-color vehicles, a Mercedes bearing California License Plate Number ("CLPN") 4ANX207, and a second Mercedes sedan bearing CLPN 5SQN189, registered to WALTER LIEW and CHRISTINA HONGQIAO LIEW, 2 Crown Court, Orinda, California, respectively, according to California DMV records. WALTER LIEW exited the house and entered vehicle with CLPN 4ANX207. WALTER LIEW was observed driving away from 2 Crown Court and, later, entering the office building that houses USAPTI at 1000 Broadway, Oakland, California.

## Information Regarding the Properties of ROBERT MAEGERLE

71.    Two residences are associated with MAEGERLE and there is probable cause to believe that he uses both addresses. As more fully described in Attachments A-3 and A-4, 30 Pinewater Drive, Harbeson, Delaware and 33 Pinewater Drive, Harbeson, Delaware, are

PTI-000364

residential properties. They are located directly across the street from each other.

72. On July 12, 2011, FBI agents in Delaware conducted a physical surveillance in the vicinity of 30 Pinewater Drive, Harbeson, Delaware and observed that the properties of 30 and 33 Pinewater share a mailbox.

73. County property ownership records reviewed by the FBI show that 30 Pinewater Drive is owned by Mary Ann Maegerle, Revocable Living Trust. Mary Ann Maegerle is ROBERT MAEGERLE's wife.

74. County property ownership records reviewed by the FBI show that 33 Pinewater Drive is owned by ROBERT J. MAEGERLE and Mary Ann Maegerle.

75. Currently, MAEGERLE is believed to operate an engineering consulting business as reported in his Combined Registration Application for a State of Delaware Business License and/or Withholding Agent; this application was submitted in 2008 and the company is currently in good standing with Delaware's Department of Revenue. According to MAEGERLE's 2010 Federal Income Tax Form 1040-Schedule C, Profit or Loss from Business statement, his business address is 30 Pinewater Drive, Harbeson, Delaware.

76. Two form 1099-MISC statements that MAEGERLE received from USAPTI and filed in connection with his 2008 tax returns, in amounts of $28,675.34 and $40,490.80 from USAPTI, listed his address as 33 Pinewater Drive, Harbeson, DE 19951.

77. FBI agents have reviewed telephone records associated with the number (302) 947-1051, which a former USAPTI employee, TILTON, stated is MAEGERLE's telephone number. According to information obtained from Verizon, (302) 947-1051 is a land line (not a

PTI-000365

cellular phone) that is subscribed to ROBERT J. MAEGERLE and services 33 Pinewater

Drive, Pinewater Farm, Delaware. Pinewater Farm is the housing development within

Harbeson in which the residences of 30 and 33 Pinewater Drive are located. Verizon

telephone records show that someone using this land line contacted (510) 268-3288, a

telephone number used by WALTER LIEW, seventeen times from November 2009

through March 2011.

78. A query of Delaware driver's license records conducted by the FBI revealed that

MAEGERLE lists his residence as 30 Pinewater Drive, Harbeson, Delaware 19951.

79. In public databases, MAEGERLE's address comes back as both 30 and 33 Pinewater

Drive, depending on the information source. Two vehicles registered to MAEGERLE, an

Acura and a Jeep, have been observed at 33 Pinewater Drive. The Acura has been

observed in the driveway at 33 Pinewater Drive on several occasions. An FBI agent saw

an individual resembling MAEGERLE's DMV photo outside 33 Pinewater.

80. A trash cover at 33 Pinewater Drive was conducted by the FBI on July 12, 2011. The FBI

recovered a notepad from the same San Francisco Hilton Hotel which hosted the

aforementioned USA PTI / PANGANG conferences that contained flight information

about a trip from Philadelphia to San Francisco from 7/12 – 7/15/2011. The handwriting

on this notepad resembled examples of MAEGERLE's distinctive handwriting from

instrumentation documents identified by JOHN LIU. Documents in the same

handwriting were found, to include a "to do" list which included the entry "CHINA

TRIP" and "Develop a equip spread sheet of critical dates." There were also some

instructions referencing a "a parallel type phone system" which may be referring to the

PTI-000366

installation of a fax machine.

81.   Information received on July 15, 2011 in response to a Grand Jury subpoena issued to

Chase Bank USA, NA indicate that MAEGERLE has listed 30 Pinewater Drive,

Harbeson, Delaware as his address for his business credit card account (account number

4246 3151 3799 8280). This account was opened prior to January 2007 and remains

active as of May 2011. MAEGERLE also applied for a second business account credit

card with Chase Bank on September 9, 2010. This application lists his address as 30

Pinewater Drive, Harbeson, Delaware and his occupation as a self-employed professional

engineer / consultant. This second account (5466 2640 0509 1291) appears to be for a

credit card with an affiliation with Continental Airlines.

## ELECTRONIC EVIDENCE

### Background Information

82.   I have consulted with experienced agents who have had training in the investigation of

computer-related crimes. Based on my own training and experience, as well as the

training and experience of other agents with whom I have consulted, I know the

following:

83.   Computer hardware, software, documentation, passwords, and data security devices may

be important to a criminal investigation in two distinct respects: (1) the items themselves

may be instrumentalities, fruits, and/or evidence of crime; and/or (2) items may have been

used to collect and store information about crimes (in the form of electronic data).

84.   Individuals who use computers or the Internet in furtherance of criminal activity often

store, intentionally or unintentionally, evidence of the criminal activity on their computers

PTI-000367

and on digital storage media for an indefinite period of time. Computers often store data relating to a computer user's activity automatically and without the computer user's knowledge. It is often possible for a trained forensic examiner to recover evidence from computers and digital storage media even after an attempt has been made by the computer user to delete the evidence.

85.   Electronic evidence can be stored and found on many forms of digital storage media. Traditional forms of digital storage media include, but are not limited to, floppy disk drives, hard disk drives, tape drives, "thumb" drives, CDs, or DVDs. In addition, there are now commonplace consumer electronic devices that can be connected to computers and used as digital storage media, including portable hard drives, mobile phones, handheld games or gaming consoles, organizers or personal digital assistants (PDAs), and cameras or video cameras, as well as memory cards that can be used in both computers and consumer electronic devices. Individuals engaging in criminal activity often attempt to hide information relating to the criminal activity by storing it in unusual or unexpected places. Therefore, as used herein, the term "digital storage media" includes traditional forms of digital storage media, as well as any other electronic device or storage medium which is capable of storing information in digital form and being connected to a computer.

86.   During the execution of a search warrant involving computers and other electronic evidence, it is often necessary to seize hardware, software, and documentation for subsequent examination. In particular, a proper forensic examination of computers or digital storage media can often be conducted only in the controlled setting of a computer

Page 33 of 50

forensic lab, both to ensure, and to be able to prove, that the evidence has not been modified or deleted from the time of seizure. This is true for a number of reasons, including the following:

a.      Computer storage devices can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal evidence; he or she might also store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and often it would be impractical to attempt this kind of search on site.

b.      Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. For example, on site and laboratory analysis by a qualified computer specialist is often required in order to properly retrieve and analyze electronically-stored (computer) data, document and authenticate the data, and prevent the loss of the data either from accidental or deliberate programmed destruction.

c.      Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device is necessary to decrypt the data into readable form. In

PTI-000369

addition, computer users can conceal data within another seemingly unrelated and innocuous file, for example to conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

        d.     In many cases, the evidentiary data can be backed up to government-owned computer data storage devices at the site of the search. However, there are circumstances that may necessitate the seizure and removal of the entire computer system and peripheral devices to a secure laboratory setting in order to analyze and extract the evidence. To effect accurate and complete analysis may require seizure of all computer equipment and peripherals which may be interdependent, the software to operate the computer system, data security devices (including passwords) and related instruction manuals which contain directions concerning the operation of the computer system and software programs. This is true because the peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the computer expert be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence. In addition, the computer expert needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data

PTI-000370

security devices.

   e.  Furthermore, seizure of computer hardware, software, and documentation is not only necessary at times, but is often the more practical alternative and less intrusive than requiring federal agents to remain at the search site for the lengthy amount of time that would be required to review, analyze, and copy pertinent data.

87. Based on the above facts and circumstances and information, permission is requested to seize all computer systems and peripherals if necessary even though there may be unrelated information stored on the computer system(s). This unrelated data will not be used and will be separated (to the extent possible) from the evidentiary data and preserved. The search will be performed in compliance with the Northern District of California Protocol for Searching Devices or Media that Store Data Electronically, as set forth in Attachment C to this affidavit, and as discussed in greater detail below.

**Definitions**

88. The terms "records," "documents," and "materials" include all of the items described in Attachment B in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

89. Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing

PTI-000371

units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, compact flash cards, smart media cards and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

90.    Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way it works. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs, utilities, compilers, interpreters, and communications programs).

91.    Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

92.    Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric

PTI-000372

characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

93.     System peripherals are pieces of equipment that send data to, or receive data from, a computer. Keyboards, mouses, printers, scanners, plotters, video display monitors, and certain types of facsimile machines are examples of peripherals.

94.     Storage media comprises any material capable of storing information in a manner that can be used by computer hardware to save and/or retrieve information. Examples of storage media include diskettes, CD-ROMs, DVDs, magnetic tapes, ZIP disks, JAZ disks, and EPROMS.

**Electronic Search and Seizure Procedures**

95.     In executing the warrant, law enforcement agents will comply with the Northern District of California Protocol for Searching Devices or Media that Store Data Electronically, as set forth in Attachment C to this affidavit. Law-enforcement officers will begin by ascertaining whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time. If the search reasonably can be completed on site, the officers will remove the device from the site only if removal is necessary to

PTI-000373

preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

96.     If the law enforcement officers determine that a search reasonably cannot be completed on site within a reasonable time period, they must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site. The law enforcement officers will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

97.     In a circumstance where the law enforcement officers determine that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

98.     When the government removes a device from the searched premises it may also remove any equipment or documents ("related equipment or documents") that reasonably appear to be necessary to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

99.     When the government removes a device or related equipment or documents from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic review of the device, the government will file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents within 14 calendar days of the execution of the search warrant.

PTI-000374

100. Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government will use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the government is otherwise permitted by law to retain such data.

101. The time periods set forth in this protocol may be extended by court order for good cause.

102. In the forensic review of any device or image under this warrant the government will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically-stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files. to the extent reasonably practicable.

103. For the purposes of this search protocol, the phrase "to preserve evidence" is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.

## REQUEST FOR SEALING

104. Because this investigation is continuing, disclosure of the contents of this affidavit will jeopardize the progress of the investigation. Accordingly, I request that the Court issue an order pursuant to which the Applications for Search Warrant and the Affidavit be filed under seal under further order of this Court.

## CONCLUSION

105. Based upon all of the foregoing, there is probable cause to believe that WALTER LIEW, CHRISTINA LIEW, ROBERT MAEGERLE, and USAPTI committed economic espionage, in violation of 18 U.S.C. § 1831, and theft of trade secrets, in violation of 18

PTI-000375

U.S.C. § 1832, and aided and abetted these crimes. Based upon all of the foregoing, I

further believe, and there is probable cause to believe, that evidence, fruits, and/or

instrumentalities of these violations, including those items listed in Attachment B, will be

found at the SUBJECT PREMISES. Specifically:

a.       There is probable cause to believed that evidence, fruits, and/or

instrumentalities of theft of trade secrets and economic espionage will be found at the residence

of WALTER LIEW and CHRISTINE LIEW, located at **2 Crown Court, in Orinda, California**

(Attachment A-1). As set forth above, WONG, an ex-USAPTI employee, noted that WALTER

LIEW spent a lot of hours working on this project and that while WALTER LIEW predominately

worked at the office, he would do related work from home after hours. Also, due to the skeleton

crew at the office, WONG noted that USAPTI employees would work remotely. Additionally,

CHRISTINA LIEW had paid LIU for services rendered for the USAPTI TiO2 project using her

Citibank checking account opened with the home address of 2 Crown Court, Orinda, California.

Moreover, based on my training and experience, I know that individuals who are self-employed

and involved in theft of trade secrets and economic espionage typically keep records related to

these crimes, in this instance, including documents related to the TiO2 project, DuPont, travel

records, and financial records in their personal computers or laptops in their homes. I have

participated as an FBI agent in numerous searches of residences in which these types of business

and financial records are located. Accordingly, there is probable cause to believe that the items

set forth in Attachment B will be found in the residence of WALTER LIEW and CHRISTINA

LIEW located at **2 Crown Court, in Orinda, California**.

b.       There is  probable cause to believe that evidence, fruits, and/or

PTI-000376

instrumentalities of of theft of trade secrets and economic espionage will be found at the office

of USAPTI, a business owned by WALTER LIEW and CHRISTINA LIEW, located at **1000**

**Broadway, Suite 480 in Oakland, California**.  As set forth above, during his employment with

USAPTI, LIU has observed WALTER LIEW keep documents with the DuPont logo and related

to the TiO2 project, specifically a pamphlet consisting of a Fortran source code for parameters

for the oxidation reactor, in a locked drawer in his office.  The pamphlet had DuPont's logo on it.

Around March 2011, Tongchai LNU, a USAPTI employee, was seen using the source code

pamphlet in the office. LIU stated that WALTER LIEW would lock his office and only he had

the key.  Furthermore, during an interview conducted on July 7, 2011, LIU told FBI agents that in

the USAPTI office, there was a copy of an old Process Flow Diagram, hereafter as "PFD," posted

on the wall in the USAPTI office.  The writing on the PFD indicated that it was a DuPont Edge

Moor plant.  All the employees working in the office have seen this PFD.  On June 28, 2011, FBI

agents observed WALTER LIEW driving to and entering the building at 1000 Broadway,

Oakland, California.  Accordingly, there is probable cause to believe that the above-described

evidence, fruits, and/or instrumentalities will be found at **1000 Broadway, Suite 480, Oakland,**

**California**,

     I declare under penalty of perjury under the laws of the United States the foregoing is true

and correct.

                                    Cyntha ~~CHRISTINA~~ Ho, Special Agent
                                    Federal Bureau of Investigation

Sworn and subscribed to before me this _18_ day of July 2011.

PTI-000377

HON.  TIMOTHY BOMMER
United States Magistrate Judge

Page 43 of  50

PTI-000378

## ATTACHMENT A-1

### PREMISES 1:  2 Crown Court, Orinda, California

2 Crown Court, Orinda, California, is a single story residential dwelling located on the corner of Ivy Drive and Crown Court.  The dwelling is olive-grey with an attached garage located on the left hand side, when facing the structure from Crown Court.  The number "2" is painted on the curb below the mailbox, which is located at the end of the driveway.



PTI-000379

## ATTACHMENT A-2

### PREMISES 2:  1000 Broadway, Suite 480, Oakland, California

1000 Broadway, Oakland, California is the address for the Trans Pacific Centre, a six-story office

building located on the corner of Broadway and 11th Street.  A building security employee was

observing sitting in the lobby area behind a desk.


An office directory located on the fourth floor of 1000 Broadway listed "USA Performance

Technology Inc 480."  Suite 480 is located to the right of the main elevator bank upon exiting on

the fourth floor.  A sign with the name, "480" above "USA Performance Technology, Inc." was

posted outside Suite 480.  The entry door was made of solid material which restricted an interior

view.



PTI-000380

## ATTACHMENT B

### ITEMS TO BE SEIZED

All items and records which constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1831 (economic espionage), 18 U.S.C. § 1832 (theft of trade secrets), and 18 U.S.C. § 2 (aiding and abetting), including the items listed below. As used in this Attachment, the terms "records," "documents," and "materials" include all of the items described in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, paper, digital, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, e-mail, and/or data security devices. The items and records to be seized from the SUBJECT PREMISES (described in Attachment A-1 & A-2) are:

1. Documents and records related to titanium dioxide (TiO2), TiO2 manufacturing facilities, the components used in such facilities, or the process of manufacturing TiO2;

2. Documents and records related to E.I. du Pont de Nemours and Company ("DuPont") and any TiO2 manufacturing facilities owned by or associated with DuPont;

3. Documents and records related to Jinzhou Titanium Industry Co., Ltd; Pangang Group Research Institute Co., Ltd.; Pangang Group Company, Ltd.; Pangang Group Titanium Industry Co.; Pangang Group International Economic and Trading Company, Ltd.; Liaoning Province Petroleum Chemical Industry Planning Design Institute; and other customers of USAPTI;

4. Employment and payment records for individuals (employees, contractors, consultants, and similar) engaged in work on TiO2 technology and manufacturing;

PTI-000381

5.      Documents and records related to the arrival of foreign nationals into the United

States to conduct business with USAPTI, WALTER LIEW, or CHRISTINA LIEW;

6.      Travel records, including but not limited to passports, visas, airline tickets,

boarding passes, and airline ticket receipts;

7.      Address books, telephone lists and directories, and telephone records;

8.      Financial documents records related to USAPTI, ROBERT MAEGERLE,

WALTER LIEW, and CHRISTINA LIEW, for the time period of January 1, 2007, to the present,

including but not limited to tax records, investment account records, bank account records,

account applications, account statements, signature cards, withdrawal slips, debit and credit

memos, checkbooks, deposit slips, canceled checks, client checks, cashier's checks, financial

statements, wire transfer records, wiring instructions, loan records, and credit reports;

9.      Tax records for USAPTI, ROBERT MAEGERLE, WALTER LIEW, and

CHRISTINA LIEW, including copies of federal or state tax returns and related tax preparation

files, such as Forms W-2, and Forms 1099.

10.      Documents and records related to Pinewater Designs, Inc.;

11.      Items, documents and effects which show residency and/or dominion and control

of the place to be searched, including but not limited to keys, receipts, bills, canceled checks,

mail envelopes, rental agreements, telephone records and bills, utility bills, and internet/cable

provider statements;

12.      Computer equipment, including thumbdrives and/or storage devices used to create

or store the items, data, or records referenced in the paragraphs of this Attachment, pursuant to

the protocol set forth in Attachment C; and

PTI-000382

13.     Passwords, password files, test keys, encryption codes, operating manuals, and other information necessary to access the computer equipment, storage devices or data, as limited by Attachment C.

PTI-000383

## ATTACHMENT C

### *PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY*

THIS PROTOCOL WILL BE ATTACHED TO EACH SEARCH WARRANT THAT AUTHORIZES A SEARCH OF ANY DEVICE OR MEDIA THAT STORES DATA ELECTRONICALLY

It Also Will Be Incorporated, At Least As An Attachment,
in the Affidavit Supporting the Warrant

    1.   In executing this warrant, the government will begin by ascertaining whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time. If the search reasonably can be completed on site, the government will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

    2.   If the government determines that a search reasonably cannot be completed on site within a reasonable time period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site. The government will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

    3.   In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

    4.   When the government removes a device from the searched premises it may also remove any equipment or documents ("related equipment or documents") that reasonably appear to be necessary to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

    5.   When the government removes a device or related equipment or documents from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic review of the device, the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents within 14 calendar days of the execution of the search warrant.

    6.   Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the

PTI-000384

government is otherwise permitted by law to retain such data.

7.    The time periods set forth in this protocol may be extended by court order for good cause.

8.    In the forensic review of any device or image under this warrant the government must make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically-stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files. to the extent reasonably practicable.

9.    For the purposes of this search protocol, the phrase "to preserve evidence" is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.

PTI-000385

AO 93  (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

UNDERSEAL

<table>
<tr><td>In the Matter of the Search of<br><i>(Briefly describe the property to be searched<br>or identify the person by name and address)</i><br><br>1000 Broadway, Suite 480, Oakland, California</td><td>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No. 4 11-7079 3 MEJ</td></tr>
</table>

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Northern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:
  see Attachment A-2

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
  see Attachments B & C

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ August 1, 2011 _____
                                                                          *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.          ☐ at any time in the day or night as I find reasonable cause has been
                                                                      established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Timothy Bommer _____ .
                        *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for _____ days *(not to exceed 30)*.
                                                      ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   7/18/11 @ 2:35 p.m.         _____
                                                                                      *Judge's signature*

City and state:   San Francisco, California              Hon. Timothy Bommer, U.S. Magistrate Judge
                                                                              *Printed name and title*

PTI-000386

FILED
AUG 0? 2011

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| | | |
|---|---|---|
| **Return** | | |
| Case No.: 4H 70793 | Date and time warrant executed: 07/19/2011, 7:20 Am | Copy of warrant and inventory left with: 1000 Broadway Ste. 480, Oakland, CA (Kevin Tafguinelli, @ttorney @ location 10:50 Am) |
| Inventory made in the presence of : N/A | | |
| Inventory of the property taken and name of any person(s) seized: | | |

See attached FBI Receipt for Property.

| |
|---|
| **Certification** |

*I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.*

Date: 08/05/2011

_____
Executing officer's signature

CYNTHIA HO   SPECIAL AGENT   FBI
Printed name and title

PTI-000387



UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # _2846-SF-147682_

On (date) _7/19/11_

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☑ Seized

(Name) _USA Performance Technology Inc._

(Street Address) _1000 Broadway, Suite 480_

(City) _Oakland_

Description of Item(s): _6 binders re: 30K TiO2 Project oxidation drawings & process description; 4 binders re: TiO2 by chloride route schematics & plans · Diagram for Panzhihua Iron & Steel Group c.; multiple schematics for Panzhihua Iron & Steel (Group) Co. - TiO2 by chloride route; handwritten notes & schematics - 30 TiO2 Arch; email - Robert Maegerle dated 5/3/10; 3 binders - Bob Maegerle, Oxidation & Finishing Design; US patents re: Dupont and miscellaneous documents re: chloride process &/or Pangang Group; 2 binders containing documents re: Jinzhou Titanium Industry Co.; CD re: Oxidation & post - treatment basic design engineering diagrams & documents; 2 binders · equipment specifications, 36k folders containing diagrams, layouts, import list & diagrams; Binder w/ documents, sketches, binder · 30,000 MTPY TiO2, diagrams, instrumentation books; diagrams, documents in Chinese, sticky notes w/ "comment by USAPTI", Jinzou TiO2 project, instrument & control, and detail design submittal package, April 2011 marked confidential; 12 in total 11x17 binders w/ sketches / diagrams / lists; documents and diagrams - 3 ring binder labeled 30K MTPY TiO2 (chlorine route), handwritten notes; 2 binders re: 30K project & 2 66 folders containing diagrams, w sketches re: 100k project; 2 11x17 66 folders re: 100K project containing diagrams, sketches, list; 3 binders re: 100K project; Dupont Titanium tech document, Dupont Ilmenid TiO2, Dupont Chloride Route to titanium dioxide, instruction letter, binded labeled "phoe 3D", binder and documents re: project owner Pangang Group; binder re: Pangang Group Jinzhou Titanium Industry, binder - 30K TiO2 project, 2c folder re: Pangang Group Jinzhou; Diagrams & sketches - copier generated & handwritten; 3 compact disks,_

PTI-000388



FD-597 (Rev 8-11-94)

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # _2846-SF-1476852_

On (date) _7/19/11_                    item(s) listed below were:
                                        ☐ Received From
                                        ☐ Returned To
                                        ☐ Released To
                                        ☑ Seized

(Name) _USA Performance Technology Inc._

(Street Address) _1000 Broadway, Suite 480_

(City) _Oakland_

Description of Item(s): _1 thumbdrive, miscellaneous engineering documents + diagrams; documents re chloride process 4/or Pangang Group and schematics re pangang group 4/or chloride process; 3 BINDERS RE ENGINEERING NOTES, SCHEMATIC RE TiO2 PROJECT, NOTE PAD w/ HANDWRITTEN NOTES AND VARIOUS SCHEMATIC; 8 BINDERS - CHLORINATOR DESIGN CALCULATION, MODELING OF VACUUM ARC, ERNIE NELSON, SCHEMATICS/DESIGN DOCUMENT; SCHEMATIC/DESIGN DOCUMENTS; FINANCIAL DOCUMENTS, TAX RECORDS, AND EMPLOYMENT AGREEMENTS, VARIOUS BILLS, CONTRACT; SCHEMATIC/ DESIGN DOCUMENT; EMAIL CORRESPONDENCE, DESIGN DOCS, TRAVEL DOCUMENT EMPLOYEE INFO, TAX INFO; TAX DOCS, FINANCIAL DOCUMENT, VARIOUS DESIGN DRAWINGS HOTEL RECEIPTS NOTEBOOKS; BINDER RE: 30K TiO2 PROJECT, NOTEBOOK REGARDING HANDWRITTEN NOTES; NOTES IN ENGLISH + CHINESE; DIAGRAMS + DRAWINGS; ALLEN CHANG BUSINESS CARD; VARIOUS BUSINESS CARDS; DIAGRAMS + SKETCHES; USAPTI DOCS, 100,000 PROJECT; BINDERS RE: MEET-E HANDBOOK; BUSINESS CARD w/ MAEGERK EMAIL; MISCELLANEOUS BINDER + DOCS; PANGANG PERFORMAN GROUP USE, DOCS, SPECS, BLUEPRINTS + VARIOUS COMPANY DOCUMENTS, DUPONT BINDER CONTAINING DOCUMENTS, SPECS, BLUEPRINT EXXON MOBILE PROPRIETARY DOCUMENTS; PANGANG PERFORMANCE GROUP USA DOCUMENTS, SPECS, BLUEPRINTS + VARIOUS COMPANY DOCUMEN PLANS FOR 100,000 MTPY, INVITATION LETTER TO WINNER TECH_



FD-597 (Rev. 8-11-94)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

File #  284G-SF - 147682

On (date)  7/19/11

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☑ Seized

(Name)  USA PERFORMANCE TECHNOLOGY INC.

(Street Address)  1000 BROADWAY, SUITE 480

(City)  OAKLAND

Description of Item(s): CHURCH DIAGRAM, ENGINEERING DOCS, EMAR-
CHINESE PASSPORT; CORPORATE DOCS; DESIGN DOCS; CHINESE
WRITTEN DOCS, EMPLOYEE DOCS, BUSINESS CARDS, BANK DOCS; 30K
EQUIPMENT QUOTES AND CRAIGSLIST RESUMES MECHANICAL
ENGINEERS; DOCUMENTS + SCHEMATICS RELATING TO TiO2
AND CORRESPONDENCE; DOCUMENTS FROM BINDER RE 30K TiO2
PROJECT CHLORINATION; DOCS RE TITANIUM DIOXIDE BY CHLORIDE
ROUTE PROJECT, INVIR LIST; MISC DOCS RE PANGANG +
PANZHIHUA "CHLORIDE ROUTE"; BINDERS RE PANGANG +
PANZIHUA "CHLORIDE ROUTE"; schematics re: Pangang + Panzhi
"chloride route"; Binders + diagrams (sketches; Binders containing
data sheets + file folders containing diagrams; Diagrams, schematic
+ docs for Panzhihua + Pangang; Docs re: Panzhihua "chloride
Route"; Diagrams + schematics for Panzhihua + Pangang;
Docs re: Pangang group + Panzhihua, plant schematic for T.O.
in a binders; Docs marked w/ Dupont; Titanium Dioxide
specs for Dupont; Fujitsu laptop S/n R5708364; 18 hard-drives
  1) WCATR4570688; 2) WKG58732; 3) HYQ3EETC; 4) 6GF5YTFC; 5) 6GF5IKGH
  6) 6GF4XRR4; 7) 4ND159DE; 8) STH6G7MS2mBLCS; 9) 6GF5IK64;
  10) 5VP3NAMS; 11) 6GE4XSGX; 12) 5VP3SGKE; 13) 6GF9QVGE,

FD-597 (Rev 8-11-94)                                                    Page _4_ of _7_

### UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION
Receipt for Property Received/Returned/Released/Seized

File # _284G - SF - 147682_

On (date) _7/19/11_

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☑ Seized

(Name) _USA Performance Technology Inc._

(Street Address) _1000 Broadway, Suite 480_

(City) _Oakland_

Description of Item(s): _14) 9VP3X05M, 15) WCAV55280G26; 16) 9VPY3R79,_
_17) NESY2L54 ; 18) WMAR WD183589A; 19) WMARW D184343; WD external_
_drive ext attch WMAVU100167 f+ Power Edge T300 - S/N 51PF6J1._

PTI-000391

**ATTACHMENT A-2**

**PREMISES 2:  1000 Broadway, Suite 480, Oakland, California**

1000 Broadway, Oakland, California is the address for the Trans Pacific Centre, a six-story office building located on the corner of Broadway and 11th Street.  A building security employee was observing sitting in the lobby area behind a desk.

An office directory located on the fourth floor of 1000 Broadway listed "USA Performance Technology Inc 480."  Suite 480 is located to the right of the main elevator bank upon exiting on the fourth floor.  A sign with the name, "480" above "USA Performance Technology, Inc." was posted outside Suite 480.  The entry door was made of solid material which restricted an interior view.



1

PTI-000392

## ATTACHMENT B

## ITEMS TO BE SEIZED

All items and records which constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1831 (economic espionage), 18 U.S.C. § 1832 (theft of trade secrets), and 18 U.S.C. § 2 (aiding and abetting), including the items listed below. As used in this Attachment, the terms "records," "documents," and "materials" include all of the items described in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, paper, digital, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, e-mail, and/or data security devices. The items and records to be seized from the SUBJECT PREMISES (described in Attachment A-1 & A-2) are:

1.      Documents and records related to titanium dioxide (TiO2), TiO2 manufacturing facilities, the components used in such facilities, or the process of manufacturing TiO2;

2.      Documents and records related to E.I. du Pont de Nemours and Company ("DuPont") and any TiO2 manufacturing facilities owned by or associated with DuPont;

3.      Documents and records related to Jinzhou Titanium Industry Co., Ltd; Pangang Group Research Institute Co., Ltd.; Pangang Group Company, Ltd.; Pangang Group Titanium Industry Co.; Pangang Group International Economic and Trading Company, Ltd.; Liaoning Province Petroleum Chemical Industry Planning Design Institute; and other customers of USAPTI;

4.      Employment and payment records for individuals (employees, contractors, consultants, and similar) engaged in work on TiO2 technology and manufacturing;

1

PTI-000393

5.      Documents and records related to the arrival of foreign nationals into the United States to conduct business with USAPTI, WALTER LIEW, or CHRISTINA LIEW;

6.      Travel records, including but not limited to passports, visas, airline tickets, boarding passes, and airline ticket receipts;

7.      Address books, telephone lists and directories, and telephone records;

8.      Financial documents records related to USAPTI, ROBERT MAEGERLE, WALTER LIEW, and CHRISTINA LIEW, for the time period of January 1, 2007, to the present, including but not limited to tax records, investment account records, bank account records, account applications, account statements, signature cards, withdrawal slips, debit and credit memos, checkbooks, deposit slips, canceled checks, client checks, cashier's checks, financial statements, wire transfer records, wiring instructions, loan records, and credit reports;

9.      Tax records for USAPTI, ROBERT MAEGERLE, WALTER LIEW, and CHRISTINA LIEW, including copies of federal or state tax returns and related tax preparation files, such as Forms W-2, and Forms 1099.

10.     Documents and records related to Pinewater Designs, Inc.;

11.     Items, documents and effects which show residency and/or dominion and control of the place to be searched, including but not limited to keys, receipts, bills, canceled checks, mail envelopes, rental agreements, telephone records and bills, utility bills, and internet/cable provider statements;

12.     Computer equipment, including thumbdrives and/or storage devices used to create or store the items, data, or records referenced in the paragraphs of this Attachment, pursuant to the protocol set forth in Attachment C; and

PTI-000394

13.     Passwords, password files, test keys, encryption codes, operating manuals, and other information necessary to access the computer equipment, storage devices or data, as limited by Attachment C.

PTI-000395

## ATTACHMENT C

### *PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY*

THIS PROTOCOL WILL BE ATTACHED TO EACH SEARCH WARRANT THAT AUTHORIZES A SEARCH OF ANY DEVICE OR MEDIA THAT STORES DATA ELECTRONICALLY

It Also Will Be Incorporated, At Least As An Attachment,
in the Affidavit Supporting the Warrant

1.    In executing this warrant, the government will begin by ascertaining  whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time.  If the search reasonably can be completed on site, the government will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

2.    If the government determines that a search reasonably cannot be completed on site within a reasonable time period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site. The government will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

3.    In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

4.    When the government removes a device from the searched premises  it may also remove any equipment or documents ("related equipment or documents") that reasonably appear to be necessary to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

5.    When the government removes a device or related equipment or documents from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic review of the device,  the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents within 14 calendar days of the execution of the search warrant.

6.    Within a reasonable period of time, but not to exceed 60 calendar days after completing the forensic review of the device or image, the government must use reasonable efforts to return, delete, or destroy any data outside the scope of the warrant unless the

1

PTI-000396

government is otherwise permitted by law to retain such data.

7.     The time periods set forth in this protocol may be extended by court order for good cause.

8.     In the forensic review of any device or image under this warrant the government must make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, or other electronically-stored information that are identified with particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged, or confidential files. to the extent reasonably practicable.

9.     For the purposes of this search protocol, the phrase "to preserve evidence" is meant to encompass reasonable measures to ensure the integrity of information responsive to the warrant and the methods used to locate same.

PTI-000397

1   MELINDA HAAG (CABN 132612)
    United States Attorney
2
    MIRANDA KANE (CABN 150630)
3   Chief, Criminal Division

4   JOHN H. HEMANN (CABN 165823)
    Assistant United States Attorney
5       450 Golden Gate Ave., Box 36055
        San Francisco, California 94102
6       Telephone: (415) 436-7200
        Fax: (415) 436-7234
7       E-Mail: john.hemann@usdoj.gov

8   Attorneys for Plaintiff

9

**ORIGINAL FILED**

**JUL 1 8 2011**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNDERSEAL

                UNITED STATES DISTRICT COURT

10              NORTHERN DISTRICT OF CALIFORNIA

11                SAN FRANCISCO DIVISION

12

13                                  )   No. 4  11-70793
    IN RE SEARCH AND SEIZURE        )
14  WARRANT FOR 1000 BROADWAY,      )                                MEJ
    SUITE 480, OAKLAND, CALIFORNIA  )
15  _____     )   APPLICATION AND [PROPOSED]
                                    )   ORDER TO FILE UNDER SEAL
16  _____     )

17

18       The United States by and through its counsel, Assistant United States Attorney John Hemann,

19  hereby moves this Court for an order sealing the government's application for a sealing order, the

20  sealing order, the application and affidavit for a search warrant, the search warrant, and all

21  attachments in the above-referenced investigation.  As set forth more fully in the affidavit in

22  support of the search warrant, this is an ongoing investigation that is neither public nor known to

23  all of the targets of the investigation.  Accordingly, premature disclosure of these documents may

24  seriously jeopardize the investigation.

25

26

27

28

APPLICATION/ORDER RE: SEALING

PTI-000398

DATED: 7/18/2011

Respectfully Submitted,

MELINDA HAAG
United States Attorney

JOHN H. HEMANN
Assistant United States Attorney

## ORDER

Upon motion of the United States and for good cause shown, it is hereby ORDERED that the application for a sealing order, the sealing order, the application and affidavit for a search warrant, the search warrant, and all attachments in the matter of the search warrant of 1000 BROADWAY, SUITE 480, OAKLAND, CALIFORNIA, shall be filed under seal by the Clerk until further order of the Court.

IT IS SO ORDERED.

DATED: 7/18/11

TIMOTHY BROMMER
United States Magistrate Judge

APPLICATION/ORDER RE: SEALING

PTI-000399