Volume 10

Pages 1930 - 2140

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )      NO. CR 11-00573 JSW
                               )
WALTER LIEW; ROBERT MAEGERLE;  )
and USA PERFORMANCE TECHNOLOGY,)
INC.,                          )
                               )
          Defendants.          )
_____)
                          San Francisco, California
                          Monday, January 27, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    MELINDA HAAG
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
          BY:  **PETE AXELROD**
               **JOHN H. HEMANN**
               **ASSISTANT UNITED STATES ATTORNEYS**

                    U.S. DEPARTMENT OF JUSTICE
                    600 E Street NW
                    Washington, D.C.  20044
          BY:  **RICHARD S. SCOTT**
               **ASSISTANT U.S. ATTORNEY**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Official Reporters

**<u>APPEARANCES</u>:   (CONTINUED)**

For Defendant Walter Liew and USA Performance Technology, Inc.:
                          KEKER & VAN NEST LLP
                          633 Battery Street
                          San Francisco, California  94111
                   BY:   **STUART L. GASNER**
                          **SIMONA A. AGNOLUCCI**
                          **KATHERINE M. LOVETT**
                          **CHRISTINA BLAIS**
                          **ATTORNEYS AT LAW**

For Defendant Robert J. Maegerle:
                          MCKENNEY & FROELICH
                          1349 West Peachtree Street
                          Two Midtown Plaza - Suite 1250
                          Atlanta, Georgia  30309
                   BY:   **JEROME J. FROELICH, JR.**
                          **ATTORNEY AT LAW**

<u>**I N D E X**</u>

Monday, January 27, 2014

<u>**GOVERNMENT'S WITNESSES**</u>                                    <u>PAGE</u>  <u>VOL.</u>

<u>**PATTILLO, KATHERINE (RECALLED)**</u>
(PREVIOUSLY SWORN)                                        1951  10
Direct Examination resumed by Mr. Hemann                   1951  10
Cross-Examination by Mr. Froelich                         1996  10
Cross-Examination by Ms. Lovett                           2043  10
Cross-Examination resumed by Mr. Froelich                 2050  10
Redirect Examination by Mr. Hemann                        2051  10

<u>**ILAGAN, PHILIPP**</u>
(SWORN)                                                   2063  10
Direct Examination by Mr. Hemann                          2063  10
Cross-Examination by Ms. Agnolucci                        2072  10
Redirect Examination by Mr. Hemann                        2099  10
Recross-Examination by Ms. Agnolucci                      2109  10

<u>**GIBNEY, ROBERT**</u>
(SWORN)                                                   2111  10
Direct Examination by Mr. Hemann                          2112  10

<u>**E X H I B I T S**</u>

<u>**TRIAL EXHIBITS**</u>                                <u>IDEN</u>  <u>EVID</u>  <u>VOL.</u>

53                                                 1959  10

57                                                 1965  10

57                                                 1973  10

59                                                 1961  10

60                                                 1962  10

61                                                 1963  10

62                                                 1964  10

63                                                 1979  10

221                                                2044  10

333                                                1983  10

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 334 | | 1984 | 10 |
| 336 | | 1984 | 10 |
| 678 | | 1968 | 10 |
| 679 | | 1970 | 10 |
| 681 | | 2008 | 10 |
| 682 | | 1974 | 10 |
| 683 | | 1975 | 10 |
| 698 | | 1981 | 10 |
| 718 | | 2048 | 10 |
| 1076 | | 2047 | 10 |
| 1972 | | 2083 | 10 |
| 2614 | | 2094 | 10 |
| 2615 | | 2087 | 10 |
| 2616 | | 2096 | 10 |
| 2617 | | 2089 | 10 |
| 2618 | | 2091 | 10 |
| 3443 | | 2077 | 10 |
| 4008 | 1953 | 1954 | 10 |
| 4009 | 2029 | | 10 |

PROCEEDINGS

```
 1  Monday - January 27, 2014                         9:11 a.m.

 2                     P R O C E E D I N G S

 3                        ---000---

 4      (Proceedings were heard out of the presence of the jury:)

 5          THE COURT:  Good morning.  Everybody.  Please be

 6  seated.

 7          ALL:  Good morning, Your Honor.

 8          THE COURT:  Please call the case.

 9          THE CLERK:  Calling Case Number CR-11-573,

10  United States versus Walter Liew, United States versus Robert

11  Maegerle, and United States versus USAPTI.

12      Counsel, please state your appearances.

13          MR. HEMANN:  Good morning, Your Honor.  John Hemann,

14  Pete Axelrod, and Richard Scott for the United States.

15          THE COURT:  Good morning.

16          MR. GASNER:  Good morning, Your Honor.  Stuart Gasner,

17  Simona Agnolucci for Walter Liew and USAPTI.  Mr. Liew is

18  present.

19          THE COURT:  Good morning.  Good morning, Mr. Liew.

20          MS. AGNOLUCCI:  Good morning, Your Honor.

21          MR. FROELICH:  Good morning, Your Honor.  Jerry

22  Froelich for Mr. Maegerle, and Mr. Maegerle is present standing

23  next to me.

24          THE COURT:  Good morning.  Good morning, Mr. Maegerle.

25      All right.  So I understand you have an issue with respect
```

1    to Mr. Gibney?

2          **MR. GASNER:**  Yes, Your Honor.  He's an expert as to

3    whom we moved in limine on the grounds of -- that he would be

4    duplicative of Mr. Fisher.  So duplication is going to be less

5    an issue since Gibney is going first, but he is not an

6    engineer.  He's a businessperson.

7          And I do just want to alert the Court that I'm going to

8    want to voir dire on his qualifications before he expresses his

9    opinions.  And we haven't really had that come up yet, so I

10   want to make sure that we go about it in the proper way that

11   the Court is used to.

12         But I do think that the Government will ask him for

13   opinions that I don't think he has true expertise in, and I

14   think the Court needs to hear his qualifications in order to be

15   able to make rulings as his testimony proceeds.

16         **THE COURT:**  All right.  Yes, Mr. Froelich?

17         **MR. FROELICH:**  Yes, Your Honor, I agree.  I don't

18   think he's an expert.  He's a businessman and he's coming in

19   here, one, to try and repeat what we've heard now for two

20   weeks.  And, so, I think 403 keeps it out, and I also think

21   it's going to drag out the trial.

22         But, more importantly, I don't think he's an expert on

23   what the Government wants to put him up for.  He's a

24   businessman.  He's not an engineer; and as a businessman, he

25   doesn't know the inside workings of anything.

PROCEEDINGS

1      **THE COURT:**  Counsel?

2      **MR. HEMANN:**  Well, I think this -- number one, the

3   Court has addressed this issue already, in addition to arguing

4   that he is duplicative of Mr. Fisher.  (reading)

5          "The Defendants" -- I'm quoting from the Court's

6      order, which the Court may be reading right now --

7      "Defendants also move to exclude Mr. Gibney's testimony on

8      the basis that he is not qualified to opine on TiO2

9      technology, DuPont's internal practices," and a number of

10     other items.

11     The Court reviewed his qualifications, determined that he

12  was, in fact, qualified based on the proffer made by the

13  Government, which he will repeat today, and concluded that the

14  proper remedy is to challenge his opinions via vigorous

15  cross-examination rather than exclusion.

16     I don't think, under the circumstances and given this has

17  been raised by the defendants, that voir dire is appropriate.

18     **THE COURT:**  All right.  Well, I did review the Court's

19  ruling, and I did also indicate that, obviously, you know, I

20  was not ruling out any particular objection.  I was making a

21  ruling based upon the record presented to the Court.

22     And the defendants have a right to voir dire the witness.

23  The Government made certain representations.  Obviously that

24  has to be tested to the Court.

25     And with respect to any given question, although the Court

1  made certain categorical rulings, clearly a foundation has to

2  be set forth in front of the jury and the Court so the Court

3  can rule on each question.

4      So I guess what I'm saying is, I will entertain -- I will

5  not exclude the witness.  I've already made that decision

6  pursuant to, I will take it as a renewed motion by Mr. Maegerle

7  and that will be denied.

8      But with respect to Mr. Gasner's request to voir dire the

9  witness, that will be granted.  And then with respect to any

10  objections that Mr. Gasner has to the qualifications of the

11  witness and any particular question, then I'll certainly rule

12  on those as they present themselves.

13      So I think that's all I can do at this point.

14      **MR. HEMANN:**  Your Honor, and if I could ask a question

15  about the Court's preference.  Would the Court like the

16  Government to offer Mr. Gibney as a witness [sic]?

17      There's a divergence of practice amongst judges now.

18  Many, as the Court knows, like the proffering party to stand up

19  and say, "We offer him as an expert in such and so."

20      And I will tell the Court we would offer him as an expert

21  in the titanium dioxide business and industry; but I'm

22  certainly fine to end his qualifications and not do that.  And

23  I'm certainly happy to adhere to the Court's preference.

24      **THE COURT:**  Well, I do it sort of kind of a hybrid

25  way, which is, I ask the offering party to offer the witness as

**PROCEEDINGS**

1  an expert and in the area indicated for a couple of reasons.

2  Number one, so the jury knows why he or she is being offered;

3  number two, it's a signal to the Court that you believe you

4  have laid a proper foundation under Rule 703, and that triggers

5  Defendants' ability to voir dire the witness.

6       What I don't do is what is done in State Court practice; I

7  don't make a ruling or accept the witness.  I simply tell the

8  jury that his testimony is to be judged like any other witness,

9  and I will give a more fulsome instruction at the end of the

10 case.

11      So please do offer the witness because the jury has a

12 right to know why he's being offered, and that also gives the

13 defendant sort of a context in which to voir dire the witness

14 in an effort to, perhaps, present an alternative or contrary

15 view about his qualifications.

16          **MR. HEMANN:**  Thank you, Your Honor.

17          **THE COURT:**  So that's the way we'll do it, and I'll

18 allow you to voir dire the witness.

19          **MR. GASNER:**  Thank you, Your Honor.

20          **THE COURT:**  Anything further that needs to be brought

21 up this morning?

22          **MR. HEMANN:**  There are two other issues that I think

23 will be briefer.  Briefer now, perhaps more complicated later.

24      One of them has to do with a witness by the name of Jian

25 Liu, L-I-U, who will be testifying later this week, either

1    tomorrow or Wednesday.  Amongst the Defense exhibits are a

2    series of emails between Mr. Liu and his attorney, Mark

3    Bernstein.  Those emails were obtained by the Government in a

4    search warrant of Mr. Liu's Hotmail account.

5        We went through a lengthy process of privilege review.  We

6    had an agent designate them as privilege.  They were

7    inadvertently produced to the Defense by a -- in the technical

8    production process.

9        We reviewed those emails with Mr. Liu's attorney, Mary

10   McNamara, over the weekend.  She does take the position that

11   they are privileged and should not have been produced.

12       I did not look at them until I began looking at the

13   Defense exhibits over the weekend believing that they had been,

14   in fact, excluded from the production.  In fact, we're not able

15   to look at the originals now because they have been segregated

16   from the database that we're allowed to look at.

17       I raise this now because I anticipate that the Defense

18   will seek their admission.  I think that it's appropriate for

19   us to take steps to protect the privilege.

20       I'd also observe that the emails themselves are hearsay.

21   They're communications between Mr. Liu and his attorney; but I

22   think the primary issue is the inadvertent production during

23   discovery by the Government, no fault of Mr. Liu or his

24   attorney.

25            THE COURT:  Well, I think procedurally any privilege

1   belongs to the witness; and if he has a problem with it, then

2   his attorney needs to file some sort of a motion. I don't

3   think the Government really -- I appreciate the Government

4   taking appropriate steps that may be prudent in light of, you

5   know, the fact the way the Government obtained these; but to

6   the extent that Mr. Liu himself has an objection, putting aside

7   any hearsay issues or foundation, I think Mr. Liu needs to file

8   a timely motion, which I will consider, and then decide, you

9   know, how I'm going to deal with it.

10       **MR. HEMANN:** And, Your Honor, so thank you for that.

11   And I wanted to raise it and ask the Court how the Court would

12   like to deal with it.

13       We will advise Ms. McNamara of that this morning, and

14   allow her to respond accordingly.

15       **THE COURT:** Well, she needs to file an expedited

16   motion sooner rather than later. I don't want to get this at

17   the last minute. I mean, she needs to file it today.

18       **MR. HEMANN:** I was going to suggest that, Your Honor.

19       **THE COURT:** And then I will look at that and, at a

20   proper break point, give the defendants an opportunity to

21   respond if they wish to object or oppose the request to

22   preclude use of the documents.

23       And it's going to be a very quick turnaround time, because

24   it doesn't take -- this is not a very complicated issue.

25       **MR. HEMANN:** No, Your Honor.

PROCEEDINGS

1    **THE COURT:**  Although, I should ask Ms. Agnolucci.

2    Just to give the Court a preview, what's the Defendants'

3    position going to be with respect to these?

4    **MS. AGNOLUCCI:**  Your Honor, without getting into the

5    content of the email, I will say that they are highly

6    exculpatory of our client, and we will be seeking their

7    admission.

8    We will respond to any motion that's filed, but we think

9    that there are sort of two issues here.  One is the issue of

10   the privilege, and the other is the issue of how any such

11   privilege would interact with Mr. Liew's right to a fair trial.

12   So we do ask for the opportunity to respond to any briefing by

13   Mr. Jian Liu's attorney.

14   **THE COURT:**  All right.  Well, what I'm -- again, I am

15   kind of loath to set a deadline for a person who's not here,

16   but you can tell -- when do you anticipate Mr. Liu will

17   testify?

18   **MR. HEMANN:**  I think that we could probably arrange --

19   I was thinking that he would probably begin on direct tomorrow

20   based on some assumptions about how things will go, but

21   probably not get to cross tomorrow.

22   **THE COURT:**  All right.  Well, then, what I would like

23   to do is have Ms. McNamara file her -- again, I'll sort of have

24   you tell her, I'll put it in the minutes, that she needs to

25   respond -- she needs to file any motion by 4:00 o'clock today,

PROCEEDINGS

1    and I'll give the Defendants till 4:00 o'clock tomorrow to file

2    any response or earlier, 4:00 o'clock will be the latest, so

3    the Court will have a chance to look over it, you know, late

4    afternoon, early evening, and make a ruling tomorrow on

5    cross-examination.

6         But since I'm not going to allow a reply, I may allow oral

7    argument, but given that there will not be a reply, I think she

8    needs -- she's a very prominent member of the Defense bar, she

9    needs to address -- anticipate the issue that Ms. Agnolucci

10   raised, which is, how, if at all -- how does the Court deal

11   with the issue of proper cross-examination, right to

12   confrontation, et cetera, versus -- due process versus the

13   privilege.  And I don't have a position on that right now

14   because I haven't looked at it.

15        So you might want to tell her that Defense counsel did

16   raise that as an issue, and I'm sure she will anticipate that

17   those two are going to have to be reconciled by the Court.

18        **MR. HEMANN:**  Indeed, Your Honor.

19        **THE COURT:**  All right.  So the only thing I would say

20   is, again, there's a whole body of law that exists, that I'm

21   sure Defense counsel are aware of, about Defense counsel even

22   looking at these documents.

23        Defense Counsel run quite a substantial risk, and there's

24   been Bar opinions on this, there's been cases on this, and the

25   law is evolving on what counsel's obligation is who receives

1    what is obviously or could reasonably be determined to be

2    inadvertently produced.  And I think both sides have to

3    tread -- pending a ruling by the Court, need to tread pretty

4    lightly on how they have used or use these documents because

5    they may very well implicate other issues for the Court,

6    ethical issues.

7         And, again, this may not be the time to raise that -- to

8    adjudicate that, but I wanted to advise the parties that there

9    is a very, I would think, pretty in flux but developing body of

10   law on the right of a litigant, certainly in a civil case, I

11   don't know about a criminal case, to review such documents at

12   all if they believe they were inadvertently produced and they

13   may be privilege.

14        So that's all going to have to be worked out, and I

15   appreciate the parties bringing that up.  It's an interesting

16   issue, and I'll deal with it.

17             **MR. HEMANN:**  Thank you, Your Honor.

18             **THE COURT:**  All right.  But I would say to

19   Ms. McNamara, if you speak to her, that given the nature of the

20   trial and the schedule, that the Court cannot be much more

21   flexible with respect to briefing unless the Government -- she

22   persuades the Government, if she happens not to be available to

23   file and maybe even appear on the Court's schedule, that the

24   Government may consider delaying this witness to accommodate

25   Ms. McNamara's schedule.  Because I could order that certainly.

 1   I'd rather not.  I'd rather let the parties try the case the

 2   way they plan to do it.

 3       So I don't want to hear any argument on that now.  Let's

 4   just -- you said you had another issue?

 5       **MR. HEMANN:**  The final issue, Your Honor, we spoke

 6   last week prior to Special Agent Pattillo beginning to testify

 7   about this article that was located in Mr. Maegerle's drawer;

 8   and based on the information that the Court had last week, the

 9   Court indicated that we should go ahead and lay the foundation

10   but not discuss the contents of the article.

11       We've subsequently learned two things about the article.

12   Number one, that it was published in November of 2007, which is

13   before Mr. Maegerle began sending this number of emails

14   regarding Kuan Yin that have been suggested.  So we believe the

15   timing of that weighs in favor of admissibility.

16       Second of all, it was found in a folder, in a particular

17   folder, that is entitled "Correspondence To" with no to whom.

18   There's another article in the same folder, which is an article

19   that the Defense has not yet offered but is on their list and

20   they intend to offer, again going to state of mind.

21       We believe that, to the extent that that article goes to

22   his state of mind, this one would go to his state of mind as

23   well.

24       Our proposal, Your Honor, is to redact the text of the

25   article other than the first paragraph of the article, which is

1    all of the inflammatory, confusing, irrelevant matters that the

2    Court was scanning through last week.

3        I think the Court's question about the timing of the

4    article was apropos, and I feel badly for not knowing it

5    earlier; but I do think, if it's just the headline and the

6    first paragraph, it ought to be admitted.

7            THE COURT:  Can I see the article, please?

8            MR. HEMANN:  Yes, Your Honor.  Feel free to take it

9    out of the bag that it's in.  This is the actual cut-out of the

10   article from the desk drawer.

11           THE COURT:  All right.  Thank you.

12                   (Pause in proceedings.)

13           THE COURT:  All right.  So I guess my question is --

14   I'm not going to spend a lot of time on this at this point.

15       So if the article was redacted, the headline would say:

16   "Jail Time Imposed in DuPont Spy Case."  And then the

17   subheading is, "Scientist Admitted Stealing Trade Secrets."

18   And then the first paragraph is:  (reading)

19           "Wilmington.  On Tuesday the Government closed its

20       case against an ex-DuPont senior scientist who admitted to

21       stealing more than $400 million in trade secrets when he

22       left for another company," unquote.

23       So to what -- I understand you say it's relevant to

24   Mr. Maegerle's state of mind, but how so?

25           MR. HEMANN:  We believe it's consciousness of guilt

1    evidence, Your Honor.  He went to the trouble of cutting out an

2    article, and he wouldn't -- and it's an original article for

3    the record, as the Court can see, cut out of the newspaper and

4    placed in his file drawer with the rest of the work that he is

5    doing with Mr. Liew and his activities with the Chinese

6    companies.

7        I believe that it is particularly so, given the fact that

8    when interviewed, as the Court heard on Thursday,

9    Mr. Liew [sic] denied any involvement in Kuan Yin, both earlier

10   or professionally, which he had had; but also that he had had

11   any used -- or had any involvement with Kuan Yin as to

12   Mr. Liew, notwithstanding the vast amount of physical evidence

13   that we have that that is not the case.

14       **THE COURT:**  All right.  Mr. Froelich?

15       **MR. FROELICH:**  Well, Your Honor, first of all, that's

16   incorrect and that's misleading.

17       And this is highly prejudicial.  It doesn't go to state of

18   mind.  In fact, it talks about someone who's admitted things

19   and is going to jail.  It is so prejudicial, you'll never get

20   it out of the jury, and it's just not relevant to state of

21   mind.  It comes out of a local newspaper, and that's -- and,

22   so, Your Honor has ruled that way, and I think Your Honor

23   should say that.

24       They're saying we're putting in some other newspaper that

25   goes to state of mind.  Well, then that's an issue they can

PROCEEDINGS

1    deal with then, and it shouldn't be conditioned.  They can come

2    back with it then if that's what they're saying.

3            THE COURT:  What's the other article relate to?

4        MR. HEMANN:  The other article is an article with

5    regard to the licensing of the Ashtabula factory in 1968.  It's

6    another article that is in the same -- it's a copy, not a

7    cut-out, being from 1968, but it's in the same folder.

8        And how that goes -- I mean, if that goes to his innocent

9    state of mind, the Government would submit that this goes to

10   his guilty state of mind; and it's a fair point for us to make

11   given where the articles were located and given Mr. Maegerle's

12   obvious interest in this subject matter.

13           MR. FROELICH:  What the articles -- the other article

14   says is that DuPont says that it is selling its Ashtabula --

15   it's building for Sherwin-Williams the Ashtabula plant, and it

16   is licensing it for 10 years because it believes that its TiO2

17   technology is getting old and has been acquired -- you know,

18   been gotten by competitors, and this is a way at least ensuring

19   for the next 10 years that it makes money off its TiO2 process

20   because it's going to get a percentage from Sherwin-Williams of

21   the amount of product -- you know, a dollar amount for the

22   amount that's produced.  We haven't put it in yet.

23           THE COURT:  All right.  Well, the Court's ruling is

24   that I'm going to exclude this.  I think that it is probative,

25   but the prejudicial -- the probative value does not clearly

**PROCEEDINGS**

1    outweigh the prejudicial effect.  We're talking about -- you

2    know, even with the redactions, it's talking about jail time,

3    it's talking about a spy case; and I think that it cuts both

4    ways as far as perhaps Mr. Maegerle wanted to be careful about

5    making sure he didn't do the same thing.

6        And, so, I think that if Mr. Maegerle were to testify, and

7    I don't presume to know whether he is or not or care at this

8    point, but if he is, then this may very well be appropriate

9    cross-examination material, but I'm not ruling on that either.

10       I think that although this article, which is marked as

11   Trial Exhibit 691, is somewhat probative, but I think it's

12   ambiguous and it's prejudicial; and at this point -- now, there

13   may be other places in the trial that it may come up.  If

14   there's expert testimony, this may be proper to use on proper

15   cross-examination of an expert witness.  I can't judge every

16   single possibility; but coming in through Agent Pattillo just

17   as is, that it was found, is not appropriate.

18       You can properly authenticate it; and then if at the

19   appropriate time it comes up, it will have been properly

20   authenticated without having to call Agent Pattillo again.

21       So that's the Court's ruling on this article.

22            **MR. GASNER:**  Your Honor, if I might add on behalf of

23   Mr. Liew, first of all, I think Mr. Hemann inadvertently

24   misspoke when he described statements made in connection with

25   this document.  I think he said Mr. Liew.  I think he meant

**PROCEEDINGS**

 1    Mr. Maegerle in context.

 2          **THE COURT:**  Right.

 3          **MR. GASNER:**  My other concern about the foundation and

 4    then future reference, this whole idea that it's in a folder

 5    marked "Correspondence To" with no indication where it comes

 6    from I think leads to an unfair inference that this was going

 7    to be or intended to be correspondence to Mr. Liew, because --

 8          **THE COURT:**  Well, you may be right, but right now I'm

 9    not admitting it.  So if I reconsider, then you can make that

10    argument at this point.  But it's been brought to my attention

11    now, and I'm not going to -- under the current circumstances,

12    I'm not going to allow the substance to be revealed through

13    Agent Pattillo.

14          **MR. GASNER:**  And I would ask, Your Honor, that

15    Mr. Hemann not ask questions about the "Correspondence To"

16    location of it given that it may never be admitted.  We would

17    stipulate, if it's admissible later, as to where it was found;

18    but I think to bring it up now --

19          **THE COURT:**  Well, I think if it's merely that the

20    exhibit was found in a file that says "Correspondence To,"

21    that's hardly prejudicial, and I'm not going to -- I'll

22    overrule that objection.  They can certainly say, "We found

23    Exhibit 691 in a file named such and such," and leave it at

24    that at this point.  We'll all know what it is.

25          **MR. GASNER:**  We did stipulate to it, but I understand

1    the Court's ruling.

2            THE COURT:  All right.  Let's get the jury.

3            MR. HEMANN:  And, Your Honor, if I could just ask the

4    Court, when we -- so it will be a bit unusual, if the Court

5    could just advise the jury that it's the Court's direction that

6    we not reveal the context at this point and the jury

7    shouldn't --

8            MR. FROELICH:  We can just stipulate.  Your Honor, she

9    doesn't have to go into it.  If it gets admissible, we'll

10   stipulate.

11           THE COURT:  All right.  So defendants are willing to

12   stipulate it was found in this file named "Correspondence To"

13   without prejudice to objecting later should it be offered.

14           MR. FROELICH:  That's right.

15           THE COURT:  So now you don't have to go into it.  Now

16   you've won that.

17           MR. FROELICH:  We'll stipulate where it was found and

18   who found it if it becomes admissible.

19           MR. GASNER:  That's fine.

20           MR. FROELICH:  In other words, you don't have to

21   recall Agent Pattillo.

22           THE COURT:  All right.

23           MR. HEMANN:  We certainly accept that stipulation,

24   Your Honor.

25           THE COURT:  Okay.  Let's get the jury.

1     **MR. HEMANN:**  Thank you for your time.

2                    (Pause in proceedings.)

3        (Proceedings were heard in the presence of the jury:)

4        **THE COURT:**  Please be seated.

5        Good morning, ladies and gentlemen.  I hope you had a

6     pleasant weekend, and thank you for your punctuality again.

7     And just to remind you, we're going to be going until

8     2:00 o'clock today.

9        And we're still in the direct examination of Special Agent

10    Pattillo of the FBI.

11       You may continue.

12                   <u>**KATHERINE PATTILLO**</u>,

13    called as a witness for the Government, having been previously

14    duly sworn, testified further as follows:

15       **MR. HEMANN:**  Thank you very much, Your Honor.  May I

16    proceed?

17       **THE COURT:**  Yes, you may.

18                 <u>**DIRECT EXAMINATION**</u>  (resumed)

19    BY MR. HEMANN:

20    **Q.**   Good morning, Special Agent Pattillo.

21    **A.**   Good morning.

22    **Q.**   Last week when we left off, you had been describing an

23    interview that you conducted of Mr. Maegerle.  Do you recall

24    that?

25    **A.**   Yes, I do.

1   Q.   And then we proceeded to talk a little bit about the

2   beginning of the search process.  Do you remember that?

3   A.   Yes, I do.

4   Q.   Could you -- and you mentioned that Mr. Maegerle had asked

5   some questions about the search.  Do you remember that?

6   A.   Yes.

7   Q.   Could you describe the questions that Mr. Maegerle asked

8   and the responses that you gave him?

9   A.   Certainly.  At this point in time I was sharing with him

10  that we had a search warrant that we would be executing, and we

11  had a conversation about sort of what that entailed and the

12  logistics of that execution, especially given the fact that

13  there were two homes that we would be searching at the site.

14       And during the course of that explanation, Mr. Maegerle

15  asked a couple of logistical questions.  I can't remember

16  specifically what they were, but they were pertaining to how

17  things were going to happen.  And I answered those questions,

18  and we proceeded.

19  Q.   As part of the FBI's search procedure, are photographs

20  typically taken?

21  A.   Yes, they are.

22  Q.   And could you describe for the jury the reason and the

23  type of photographs -- the reason for taking photographs and

24  the type of photographs that are taken of the premises?

25  A.   Sure.  After we arrive at a location, one of the first

1  things we do when executing a search warrant is to designate

2  each room with a letter so that we understand, when we're

3  talking about locations, what room we're all talking about

4  because we'll refer to it by letter.

5      And then we subsequently go through the home or the site,

6  and we take photographs of the rooms in the site with the

7  letter so that we have a visual record as well as a written

8  record of each letter that was assigned to a particular area in

9  a location.

10  Q.   Did an FBI employee, an agent or somebody assisting in the

11  search, take photographs of the Maegerle residence at the time

12  of the search?

13  A.   Yes.

14          MR. HEMANN:   Your Honor, may I approach the witness

15  with what's been marked as Exhibit 4008.

16          THE COURT:   Yes, you may.

17      (Trial Exhibit 4008 marked for identification)

18  BY MR. HEMANN:

19  Q.   Special Agent Pattillo, I've handed you what's been marked

20  for identification as Exhibit 4008.  Do you recognize that?

21  A.   (Witness examines document.)  Yes, I do.

22  Q.   And what is it?

23  A.   These are copies of photographs taken during the course of

24  our search of Mr. Maegerle's home.

25  Q.   Were they taken on July 19th, 2011?

PATTILLO - DIRECT / HEMANN

1    **A.**    Yes, they were.

2    **Q.**    And do you recognize the photographs as accurate

3    representations of the way the residence -- certain parts of

4    the residence looked on that day?

5    **A.**    Yes, I do.

6         **MR. HEMANN:**  Your Honor, the United States moves

7    Exhibit 4008 into evidence.

8         **MR. FROELICH:**  No objection, Your Honor.

9         **THE COURT:**  Admitted.

10        (Trial Exhibit 4008 received in evidence)

11        **MR. HEMANN:**  Your Honor, may I retrieve it for the

12   purpose of putting it on the display?

13        **THE COURT:**  Yes, you may.

14        **MR. HEMANN:**  Thank you.

15   **Q.**    I'm just going to ask you, Special Agent Pattillo, about a

16   couple of these photographs.

17        You had mentioned that you had interviewed Mr. Maegerle in

18   a certain part of the house.  Do you remember that?

19   **A.**    Yes, I do.

20   **Q.**    What part of the house is that?

21   **A.**    At the beginning of the interview, we spoke with

22   Mr. Maegerle in his office.

23   **Q.**    Is this the office or a picture of the office?

24   **A.**    Yes, it is.

25   **Q.**    And if you could -- I don't know if we should give this a

1    try or not -- indicate to the jury where -- there's a way to

2    draw on the screen there.

3    **A.**    Oh, no.

4    **Q.**    If you could just mark --

5    **A.**    Okay.  I feel like this is an opportunity for disaster.

6    **Q.**    -- with your finger where you and Mr. Maegerle sat during

7    the course of the interview.

8    **A.**    I'm not clear on the technical way this works.

9              **THE COURT:**  Just use your finger.

10             **THE WITNESS:**  Oh, I'm sorry.  I thought there was -- I

11   see.

12             **THE COURT:**  It will make a red mark.

13             **THE WITNESS:**  Okay.  It might be better in this

14   particular instance if I just state that the other agent and I

15   sat on the couch.

16   **BY MR. HEMANN:**

17   **Q.**    Okay.  And where did Mr. Maegerle sit?

18   **A.**    Mr. Maegerle sat in his desk chair, which is obscured by

19   the lampshade.

20   **Q.**    That's the little shadow or little object right sticking

21   up above the lampshade is the desk chair?

22   **A.**    Correct.

23   **Q.**    If you push clear -- there you go.  I can clear it.

24             And, Special Agent Pattillo, I'm showing you the second

25   page of the document.  What does this show?

1   **A.**   This is a picture of Mr. Maegerle's desk and accompanying

2   bookshelves.

3   **Q.**   Did the desk have file drawers?

4   **A.**   Yes.   There are files on the left side of the desk that

5   were cropped out of the photo.

6   **Q.**   Did the agents taking the photographs take pictures of the

7   file drawers?

8   **A.**   Yes, they did.

9   **Q.**   How many pictures in this packet, do you remember, are of

10   file drawers?

11   **A.**   At least one.

12   **Q.**   There's --

13   **A.**   Perhaps two, yes.

14   **Q.**   -- one here (indicating).   What is that?   I'm showing the

15   fourth page.

16   **A.**   Right.   This is a photograph of -- Mr. Maegerle had an

17   excellent filing system, and we had -- a majority of our

18   evidence was seized during the search from this drawer.

19   **Q.**   And is there a drawer above this?

20   **A.**   From the office.   Most of it from the drawer.

21        I'm sorry?

22   **Q.**   I'm sorry.   Is there a drawer above this?

23   **A.**   Yes.

24   **Q.**   And page 6, is this the drawer above it?

25   **A.**   Yes.

PATTILLO - DIRECT / HEMANN

1  Q.   You mentioned, Special Agent Pattillo, that over the

2  course of the search you moved to a different part -- when the

3  search began, you moved to a different part of the house?

4  A.   Yes, that's correct.

5  Q.   Where was it that you moved?

6  A.   We moved to a room on the back of the home.  I would

7  describe it as sort of a sunroom, and we stayed there for the

8  remainder of the search.

9  Q.   And is this a picture of the sunroom that you sat in for

10  the remainder of the search?

11  A.   Yes, it is.

12  Q.   And that's the final page of the exhibit.

13       Thank you, Special Agent Pattillo.

14       Now, you mentioned --

15       MR. HEMANN:  Ms. Ottolini, if you could switch it to

16  our computer, please.

17       THE CLERK:  Sure.

18  BY MR. HEMANN:

19  Q.   You mentioned last week that Mr. Maegerle had specifically

20  denied that he had information regarding the Kuan Yin, Taiwan,

21  plant.  Do you remember that?

22  A.   Yes, that's correct.

23  Q.   During the search of the Maegerle residence, did the FBI

24  find information, locate information, in the Maegerle residence

25  regarding DuPont's Taiwan Kuan Yin plant?

1   **A.**   Yes, we did.

2   **Q.**   There's been discussion in the trial of something called a

3   Kuan Yin Basic Data Document.  Are you familiar from your

4   participation in the case with the Kuan Yin Basic Data

5   Document?

6   **A.**   Yes, I am.

7   **Q.**   Was a copy of the Kuan Yin Basic Data Document located in

8   Mr. Maegerle's house?

9   **A.**   No, we did not locate that.

10          **MR. HEMANN:**  Your Honor, may I approach the witness

11   with a copy -- I'm sorry, with Exhibit Number 53?

12          **THE COURT:**  Yes.

13   **BY MR. HEMANN:**

14   **Q.**   Do you recognize Exhibit 53, Special Agent Pattillo?

15   **A.**   Yes, I do.

16   **Q.**   What is it?

17   **A.**   This is a binder full of process and instrumentation

18   drawings.

19   **Q.**   Where was it located?

20   **A.**   This was located in Mr. Maegerle's office.

21   **Q.**   And does it contain items in it that reference Kuan Yin?

22   **A.**   Yes, I believe it does.

23          **MR. HEMANN:**  Your Honor, the United States will move

24   into evidence Exhibit Number 53.

25          **MR. FROELICH:**  No objection.

1          **THE COURT:**  Admitted.

2          (Trial Exhibit 53 received in evidence)

3    **BY MR. HEMANN:**

4    **Q.**   Could you please turn to page 135 of the documents?

5          And, Ms. Mahoney, if you could be so kind as to put up

6    Exhibit 53, page 135.

7    **A.**   (Witness examines document.)

8    **Q.**   Do you have that on your screen yet?

9    **A.**   Yes, I do have it on my screen.

10   **Q.**   Okay.  Is there a reference on this page to the Kuan Yin

11   factory?

12   **A.**   Yes, there is.

13   **Q.**   And where is that reference?

14   **A.**   The top half of the document basically, that references

15   Kuan Yin as a "2 chlorinator plant," and then proceeds to list

16   some additional information.

17   **Q.**   If you could turn a couple pages along, Special Agent

18   Pattillo, to page 138 of this binder.  Is there another

19   reference to Kuan Yin?

20   **A.**   Yes, there is.

21   **Q.**   And where is that reference on page 138?

22   **A.**   It is, again, at the top of the page.  It references the

23   Kuan Yin chlorinator.

24          **MR. HEMANN:**  Your Honor, may I approach with

25   Exhibits 53 -- I'm sorry, 55, 56, and 58, which are already in

1    evidence?

2              THE COURT:  Yes, you may.

3    BY MR. HEMANN:

4    Q.    Special Agent Pattillo, you've got in front of you three

5    documents:  55, 56, and 58.  Do you see those?

6    A.    Yes.

7    Q.    And before your testimony today, have you had a chance to

8    look at these documents?

9    A.    Yes, I have.

10   Q.    And do each of these three documents contain references to

11   Kuan Yin?

12   A.    Yes, they do.

13   Q.    Where were they located?

14   A.    They were located in Mr. Maegerle's home in his office.

15   Q.    And you had a chance to look at them all again just now?

16   A.    Yes.

17             MR. HEMANN:  Your Honor, may I approach with Exhibit

18   Number 59?

19             THE COURT:  Yes, you may.

20   BY MR. HEMANN:

21   Q.    I've handed you what's been marked as Exhibit 59, Special

22   Agent Pattillo.  Do you recognize that document?

23   A.    Yes, I do.

24   Q.    What is it?

25   A.    This is a handwritten document that was found in

1    Mr. Maegerle's home.  It does reference Kuan Yin.

2              MR. HEMANN:  Your Honor, the United States moves

3    Exhibit 59 into evidence.

4              MR. FROELICH:  No objection.

5              THE COURT:  Admitted.

6         (Trial Exhibit 59 received in evidence)

7              MR. HEMANN:  And, Ms. Mahoney, could you please put up

8    Exhibit 59, page 1?

9    Q.   Where is the reference on this page?

10   A.   It references -- this page references Kuan Yin on the

11   second line of handwriting.

12   Q.   Up towards the top?

13   A.   Correct.

14   Q.   Thank you.

15             MR. HEMANN:  Your Honor, may I approach the witness

16   with Exhibit Numbers 61 -- 60, 61, and 62?

17             THE COURT:  Yes.

18                      (Pause in proceedings.)

19   BY MR. HEMANN:

20   Q.   Special Agent Pattillo, I'm going to go through each one

21   of these with you, but I'd like to do so fairly quickly.

22   A.   Okay.

23   Q.   Please look at Exhibit Number 60.  What is this?

24   A.   This is a handwritten document found in Mr. Maegerle's

25   home.

PATTILLO - DIRECT / HEMANN

1   **Q.**   And does this reference Taiwan?

2   **A.**   Yes, it does.

3   **Q.**   And where is that reference?

4   **A.**   It's on the second half of the page at the beginning of

5   the second paragraph of handwriting.

6         **MR. HEMANN:**   And, Your Honor, the United States offers

7   Exhibit 60 into evidence.

8         **MR. FROELICH:**   No objection.

9         **THE COURT:**   All right.   Admitted.

10        (Trial Exhibit 60 received in evidence)

11  **BY MR. HEMANN:**

12  **Q.**   And does it refer to something particular about Taiwan?

13  **A.**   It refers to the chlorination operation.

14  **Q.**   Thank you.

15        If you could please look at Exhibit 61.

16  **A.**   (Witness examines document.)

17  **Q.**   Can you tell me what Exhibit 61 is?

18  **A.**   This is a handwritten document entitled "Chlorinator," and

19  it subsequently references Taiwan.

20  **Q.**   Where was this document located?

21  **A.**   This was located in Mr. Maegerle's home.

22        **MR. HEMANN:**   Your Honor, the Government offers

23  Exhibit 61.

24        **MR. FROELICH:**   No objection.

25        **THE COURT:**   Admitted.

1          (Trial Exhibit 61 received in evidence)

2     **BY MR. HEMANN:**

3     **Q.**   And in the writing on this, does it refer to a particular

4     aspect of the Taiwan -- in handwriting does it refer to a

5     particular aspect of the Taiwan operation?

6     **A.**   Yes.  I presume it is written reference to the

7     chlorinator.

8     **Q.**   And, Ms. Mahoney, could you please put up Exhibit 61,

9     page 2?

10         And do you see -- can you direct the jury to the two

11    references to Taiwan that appear on this page?

12    **A.**   Certainly.  The first reference is outlined there; and

13    there is another reference halfway down, "Spirals/Taiwan."

14    **Q.**   Thank you.

15         And this particular reference to Taiwan refers to, what's

16    the word just to the left of "Taiwan"?

17    **A.**   In the first reference?

18    **Q.**   In the second reference.  I'm sorry.

19    **A.**   It's -- I'm not clear on your question.

20    **Q.**   What's the word just to the left?

21    **A.**   Oh, "spirals."

22    **Q.**   Thank you.

23         Could you please have a look at Exhibit Number 62?

24    **A.**   (Witness examines document.)  Yes.

25    **Q.**   What is that?

PATTILLO - DIRECT / HEMANN

1  **A.**   This is a handwritten document, "Cost Reductions from

2  Taiwan Base," found in Mr. Maegerle's home.

3  **Q.**   And does it refer to Taiwan?

4  **A.**   Yes, it does.

5          **MR. HEMANN:**  Your Honor, the United States moves

6  Exhibit 62 into evidence.

7          **MR. FROELICH:**  No objection.

8          **THE COURT:**  It's admitted.

9      (Trial Exhibit 62 received in evidence)

10         **MR. HEMANN:**  Thank you.

11     May I approach the witness with Exhibit Number 57?

12         **THE COURT:**  Yes.

13                  (Pause in proceedings.)

14  **BY MR. HEMANN:**

15  **Q.**   Do you recognize Exhibit 57, Special Agent Pattillo?

16  **A.**   Yes, I do.

17  **Q.**   What is it?

18  **A.**   It is a handwritten document found at Mr. Maegerle's home.

19  **Q.**   Does it reference the Kuan Yin facility?

20  **A.**   (Witness examines document.)  It references Taiwan, yes.

21  **Q.**   Oh, I'm sorry.

22     And that's on the second page?

23  **A.**   Correct.

24         **MR. HEMANN:**  Your Honor, the United States moves

25  Exhibit 57 into evidence.

1          **MR. FROELICH:**  No objection.

2          **THE COURT:**  Admitted.

3       (Trial Exhibit 57 received in evidence)

4          **MR. HEMANN:**  Ms. Mahoney, could you please put up

5    page 2?  And could you highlight the text at the bottom

6    starting with "General"?

7    **Q.**   For some reason, Special Agent Pattillo, the screen is

8    yellow, and we are trying to figure out why that is.

9    **A.**   Okay.

10   **Q.**   And if you would be so kind as to, either from the

11   original, which is maybe a little easier to read, or from the

12   screen, read the two paragraphs under "General."

13   **A.**   Certainly.  (reading)

14          "The most difficult equipment to identify will be the

15      spray machine for the spray condenser.  This has been" --

16   **Q.**   And can I ask you just, some of the words, read it exactly

17   as it appears?  And I should have said this before, read it

18   just exactly as it appears on the page rather than what --

19   **A.**   Filling --

20   **Q.**   -- filling in blank stuff.

21   **A.**   Okay.  Beginning again:  (reading)

22          "The most difficult equipment to identify will be the

23      spray machine for the spray COND.  This has been a

24      DuPont-designed item manufactured in," "partnered" is

25      crossed out, "selected" is written above, "machine shops.

1    If your Taiwan contact knows the source of the Kuan Yin

2    machine, we could contact," under that "possibly," "them

3    for a quote."

4  **Q.**  And then there's another bullet point, if you will,

5  directly underneath that.

6  **A.**  Sure.  (reading)

7    "Process flow sheets and equipment details for the

8    package we will need a process knowledgeable chem ENGR and

9    a pressure vessel knowledgeable equipment designer."

10 **Q.**  Thank you.

11   When you interviewed Mr. Maegerle on July the 19th, 2001,

12 did you discuss with him the civil suit that had been filed by

13 that time by DuPont against Mr. Liew and others?

14 **A.**  Yes, we did.

15 **Q.**  And did Mr. Maegerle offer any commentary to you during

16 your conversation with regard to that civil suit?

17 **A.**  Yes, he did.

18 **Q.**  And what was the substance of what he had to say to you?

19 **A.**  Mr. Maegerle did not find the contents of the civil suit

20 to be particularly compelling.  He thought that the technology

21 described in the civil suit by DuPont was publicly available.

22   I recall that he specifically mentioned being aware of

23 literature publicly available that discussed chlorine catch

24 tanks.

25   **MR. HEMANN:**  Your Honor, may I approach -- let me ask

1    a question first.

2    **Q.**   Special Agent Pattillo, did you locate during -- did the

3    FBI locate during its search of Mr. Maegerle's home documents

4    that referenced the DuPont civil suit?

5    **A.**   Yes, we did.

6         **MR. HEMANN:**  Your Honor, may I approach the witness

7    with Exhibit 678?

8         **THE COURT:**  Yes, you may.

9              (Pause in proceedings.)

10   **BY MR. HEMANN:**

11   **Q.**   And before you look at that, I actually asked you a bad

12   question there or a misleading question.

13        Did the FBI conduct, in addition to the search of

14   Mr. Maegerle's home, searches of his Yahoo! email account

15   pursuant to a search warrant?

16   **A.**   Yes, we do.

17   **Q.**   And are you familiar with the documents related to

18   Mr. Maegerle that were seized during the execution of that

19   Yahoo! search warrant?

20   **A.**   Yes.

21   **Q.**   Thank you.

22        Exhibit 678 in front of you, without going into the

23   substance of it, can you describe what it is?

24   **A.**   This is an email from Mr. Maegerle from his Yahoo! account

25   to Walter Liew at another Yahoo! account.

1   **Q.**   What is the date on that email?

2   **A.**   Friday, April 8th, 2011.

3   **Q.**   And what is the subject of that email?

4   **A.**   The subject of the email is "DuPont Civil Suit."

5             **MR. HEMANN:**   Your Honor, the United States moves

6   Exhibit 678 into evidence.

7             **MR. FROELICH:**   No objection.

8             **THE COURT:**   Admitted.

9         (Trial Exhibit 678 received in evidence)

10            **MR. HEMANN:**   Ms. Mahoney, would you be so kind as to

11  put page 1 of that up on the screen and highlight the text?

12  **Q.**   And, Special Agent Pattillo, will you please read the

13  text?

14  **A.**   Certainly.  (reading)

15            "Walter,

16            "I plan to use your Yahoo! email for comments on this

17        Summons.  Charges appear to assume technical information

18        from Kuan Yin were obtained.  The actual scope basis for

19        Jinzhou was the Ashtabula plant which DuPont built for

20        Sherwin-Williams in the late 1960s; and after two resales,

21        that plant is now owned by Cristal Global Millennium, the

22        world's number two TiO2 producer.  This 30K 'sold

23        technology,'" in quotations, "plant is also the scale-up

24        basis for our current 100K proposed plant.  No Kuan Yin

25        design information has ever been obtained for our current

PATTILLO - DIRECT / HEMANN

1  design; and the 40-year-old Ashtabula technology, made

2  available to the public, should not constitute an

3  infringement on DuPont's current operations.

4      "To follow-up, we should:

5      "Determine the author of the 8/2010 letter to DuPont.

6      "Determine the legality of hacking into John's

7  computer mail.

8      "Tabulate the many errors in the listed charges.

9      "Bob."

10  **Q.**  Thank you.

11      Did you find in your -- did the FBI find in its search of

12  the Yahoo! email accounts additional documents with regard to

13  the DuPont civil suit?

14  **A.**  Yes, we did.

15  **Q.**  I'm handing --

16      **MR. HEMANN:**  May I approach, Your Honor?

17      **THE COURT:**  Yes, you may.

18      **MR. HEMANN:**  Thank you.

19  **Q.**  I'm handing you what's been marked as Exhibit 679.  Is

20  that one of those emails?

21  **A.**  (Witness examines document.)  Yes, it is.

22  **Q.**  And without going into the content yet, can you generally

23  describe what the email is?

24  **A.**  This is an email from Robert Maegerle using his Yahoo!

25  account to Walter Liew using his Yahoo! account sent on the 9th

1  of April 2011.

2  **Q.**  And the subject matter?

3  **A.**  The subject is "Comments on Complaint."

4  **Q.**  Does this document, this email, have an attachment to it?

5  **A.**  Yes, it does.

6  　　　　**MR. HEMANN:**  Your Honor, the United States moves

7  Exhibit 679 into evidence.

8  　　　　**MR. FROELICH:**  No objection.

9  　　　　**THE COURT:**  It's admitted.

10  　　　(Trial Exhibit 679 received in evidence)

11  　　　　**MR. HEMANN:**  And, Ms. Mahoney, could you please first

12  put up page 1?

13  **Q.**  Is that the cover page of the email, Special Agent

14  Pattillo?

15  **A.**  Yes, it is.

16  **Q.**  And if you could go to, please, page 2, Ms. Mahoney, and

17  highlight the first four paragraphs that are numbered item 1,

18  2, 3, and 7 at the top.

19  　　　If you could please read that, Special Agent Pattillo.

20  **A.**  Yes.  (reading)

21  　　　　"1.  Trade secret materials have not been wrongfully

22  　　　obtained.  DuPont detailed specifications have not been

23  　　　obtained.

24  　　　　"2.  DuPont sold its," quotation, "'superior

25  　　　process,'" end quotation to Sherwin-Williams in the late

1    1960s, and that plant is now owned by Cristal Global

2    Millennium, DuPont's chief competitor.

3         "3.  Dr. Liew initiated independent development of

4    the chloride TiO2 process in 1997 using published data and

5    the expertise of various consultants.  Construction of a

6    30K T/Y plant based on USAPTI engineering is expected to

7    be complete in 2012.  Many engineering and design man

8    hours have gone into this effort.

9         "7.  Dr. Walter Liew has a Ph.D. in engineering, and

10   is a citizen of the U.S.A.  His past experience in China

11   include the design and installation of polymer facilities

12   and upgrading Sulfate plant operations."

13   **Q.**  Ms. Mahoney, could you go down to -- let me just ask you

14   to summarize a little bit.

15        Does the next -- do the subsequent paragraphs and the next

16   page refer to particular aspects of the DuPont Complaint?

17   **A.**  Yes, they do.

18   **Q.**  And does Mr. -- does the attachment make reference to both

19   Ashtabula and Kuan Yin in other parts of the next two pages?

20   **A.**  (Witness examines document.)  Yes, they do.

21   **Q.**  If you could please turn to page 4, Ms. Mahoney, and

22   highlight the text that appears.

23        And I'd ask you, Special Agent Pattillo, to please read

24   the text that appears on that page.

25   **A.**  All of it?

1  **Q.**  Yes, please.

2  **A.**  Okay.  (reading)

3  "58.  DuPont released its technology to the

4  competition in 1978 as previously documented.  Process

5  improvements made by DuPont since that date are unknown

6  and are not a part of USAPTI design.  DuPont's competitive

7  edge in TiO2 production is in the age of their plants and

8  the experience of their operators.  Plant investment has

9  escalated sharply in recent years giving older plants a

10  significant return on investment advantage.

11  "61.  The USAPTI TiO2 process, although similar to

12  DuPont's 1968 technology, does not incorporate

13  improvements claimed by DuPont since that time.  It is

14  expected that a USAPTI China plant will undergo many of

15  the developmental problems experienced by DuPont after

16  their initial 1948 installation.

17  "62.  Building a chloride TiO2 plant for another

18  company does not appear to be a," quotation mark,

19  "'reasonable effort,'" end quote, "to maintain the secrecy

20  of its chloride TiO2 process.

21  "Summary.

22  "DuPont compromised their own technology with the

23  building of a chloride TiO2 plant for Sherwin-Williams in

24  Ashtabula in 1968.  This plant had a 10-year payback to

25  DuPont and a 10-year protection of technology agreement.

1    After the expiration of this 10-year period, this plant

2    was sold twice with the facilities available for all

3    competitors to view.  USAPTI design contains no Kuan Yin

4    technology, but has similarities to the Ashtabula

5    facility.  The cementation process will be a part of a

6    future design in China, but at this time no USAPTI scope

7    exists, and design will probably be contracted to a China

8    cement company."

9    Q.   Thank you.

10        MR. HEMANN:  And, Your Honor, just as a housekeeping

11   matter, I think I did not formally move Exhibit 59 -- 57 into

12   evidence.

13        THE COURT:  All right.  Any objection?

14        MR. FROELICH:  No objection.

15        THE COURT:  It's admitted.

16      (Trial Exhibit 57 received in evidence)

17        MR. HEMANN:  Thank you, Your Honor.

18      May I approach with Exhibits 682 and 683?

19        THE COURT:  Yes.

20        MR. HEMANN:  Thank you, Your Honor.

21                    (Pause in proceedings.)

22   BY MR. HEMANN:

23   Q.   I'm showing you two more emails, Special Agent Pattillo.

24   Do you recognize those from the email search that the FBI

25   conducted of the Yahoo! email account of Mr. Maegerle?

1   **A.**   Yes, I do.

2   **Q.**   Could you please first briefly describe Exhibit 682?

3   **A.**   Yes.  This is an email from Robert Maegerle to Walter Liew

4   sent on the 24th of April 2011, and the subject is

5   "Technology."

6   **Q.**   Does it refer to Ashtabula?

7   **A.**   Yes, it does.

8        **MR. HEMANN:**  Your Honor, the United States moves

9   Exhibit 682 into evidence.

10        **MR. FROELICH:**  No objection.

11        **THE COURT:**  Admitted.

12      (Trial Exhibit 682 received in evidence)

13        **MR. HEMANN:**  If you could expand the text of this

14   email, Ms. Mahoney, Exhibit 682, page 1.

15   **Q.**   And I'd ask you, Special Agent Pattillo, to read the text

16   of the email.

17   **A.**   Certainly.  (reading)

18        "Walter,

19        "I did a little web surfing this morning and found a

20      1978 court case where DuPont was charged with monopolizing

21      TiO2 world production.  In a 1980 verdict, it was ruled

22      DuPont did not violate their antitrust status.  In stating

23      their position, DuPont stated that," quotation mark,

24      '"they were under no obligation to license their

25      technology to their competitors, there being no reason the

1     other companies couldn't develop their own technologies,'"

2     end quotation.

3          "I would like to be referred to as your," quotation

4     mark, "'consultant on Ashtabula TiO2 technology,'" end

5     quotation, "in discussions with DuPont lawyers, Chevron

6     personnel, or private investigators.  When the Court

7     requests my name, feel free to identify me at that time.

8     My experience with court cases at Gaylord Chemical is

9     never to give any more information than a question

10    requires.

11         "Bob."

12    **Q.**   If you can refer to Exhibit 683.

13    **A.**   (Witness examines document.)

14    **Q.**   What is that?

15    **A.**   This is another email from Robert Maegerle to Walter Liew

16    sent on May 10th, 2011, "Subject:  Comments on Response."

17         **MR. HEMANN:**  Your Honor, the United States moves

18    Exhibit 683 into evidence.

19         **MR. FROELICH:**  No objection.

20         **THE COURT:**  Admitted.

21    (Trial Exhibit 683 received in evidence)

22         **MR. HEMANN:**  If you could put 683, page 1, on the

23    screen, please, Ms. Mahoney.

24    **Q.**   And if you could please read the text of that email,

25    Special Agent Pattillo.

1  **A.**   (reading)

2           "Walter,

3           "My initial comments on the response are as follows:

4           "Par. 25.  We should not deny that the vast majority

5  of TiO2 manufactured in China comes from the sulfate-route

6  process.  We should deny any knowledge of China's

7  five-year plan.

8           "Par. 31.  It is probably best to list Kuan Yin as a

9  large capacity plant and Jinzhou as a small capacity," in

10  parentheses, "(30K T/Y)," end parentheses, "plant.

11          "I see no additional problems, but will continue to

12  review.

13          "Bob."

14  **Q.**   Thank you.

15     You said earlier Thursday when you were describing the

16  interview that you conducted with Mr. Maegerle, that

17  Mr. Maegerle had denied that he had been provided any DuPont

18  proprietary information by Mr. Liew.  Do you remember that?

19  **A.**   That is correct.

20          **MR. HEMANN:**  I'd like to approach the witness, please,

21  Your Honor, with Exhibit Number 5 and Number 10.

22          **THE COURT:**  All right.

23          **MR. HEMANN:**  I believe these are already in evidence,

24  although I can --

25          **THE CLERK:**  5 is and 10 is, yes.

1     **MR. HEMANN:**   5 and 10 are already in evidence,

2     Your Honor.   I would like to hand the witness copies of

3     Exhibit 5 and Exhibit 10, if that's okay.

4     **THE COURT:**  Very well.

5     **MR. HEMANN:**   Thank you.

6     And, Ms. Mahoney, could you please put up Exhibit 5?

7     **Q.**   What is Exhibit 5, Special Agent Pattillo?

8     **A.**   Exhibit 5 is a schematic from the Edgemoor plant.

9     **Q.**   And what is Exhibit 10?

10    **A.**   Exhibit 10 is a schematic as well marked "DuPont

11    Confidential Special Control" also from the Edgemoor plant.

12    **Q.**   Where were these documents located?

13    **A.**   These documents were found on a thumb drive, which was

14    located in Mr. Maegerle's left desk drawer in his office.

15    **Q.**   Do the files, Exhibit 5 and Exhibit 10, have names?

16    **A.**   Yes, they do.

17    **Q.**   And could you tell the jury the name of Exhibit -- the

18    file path name of Exhibit Number 5?

19    **A.**   Exhibit Number 5 is called "Oxidation PFD" but is found in

20    a folder called "Flow Sheets from Walter."

21    **Q.**   Could you please also look at Exhibit Number 10 and

22    describe to the jury the file name?

23    **A.**   Yes.   Exhibit 10 is called "Chlorination PFD" and is also

24    from the folder "Flow Sheets from Walter."

25    **Q.**   There's a -- if you could just rotate that.   Thank you.

```
 1          The file name as it's up on the screen right now sort of

 2   runs down the right-hand side; is that correct, Special Agent

 3   Pattillo?

 4   A.   Yes, that's correct.

 5   Q.   There is a -- there's a box down in the bottom right-hand

 6   corner.

 7   A.   Yes.

 8   Q.   Ms. Mahoney, could you blow up the box, the legend that's

 9   down in the right-hand corner, sort of as large as you can?

10          Do you see a name "Drawn By" in this box?

11   A.   Yes, I do.

12   Q.   And can you read it from the screen?

13   A.   It says -- I believe it says, "Sheehand."

14   Q.   In your search of the Maegerle residence, did you locate

15   any references to a Sheehand?

16   A.   Yes, we did.

17          MR. HEMANN:  Your Honor, may I approach the witness

18   with Exhibit Number 63?

19          THE COURT:  Yes, you may.

20                    (Pause in proceedings.)

21   BY MR. HEMANN:

22   Q.   What is that, Special Agent Pattillo?

23   A.   This is a handwritten letter found in Mr. Maegerle's home.

24   Q.   And is it dated?

25   A.   It's dated March 2nd, 2008.
```

1    **Q.**   And is it -- to whom is it directed, and from whom is it

2    from?

3    **A.**   It's written in a memo format, and it is to Jack Sheehand

4    from Bob Maegerle.

5           **MR. HEMANN:**   Your Honor, the United States moves

6    Exhibit 63 into evidence.

7           **MR. FROELICH:**   No objection.

8           **THE COURT:**   It's admitted.

9       (Trial Exhibit 63 received in evidence)

10          **MR. HEMANN:**   And 63, page 1, please, Ms. Mahoney.   And

11   if you could blow up the subject line and the first

12   paragraph -- actually, the subject line and the text, please.

13   **Q.**   What is the subject?

14   **A.**   The subject is "Oxidation Reactor for China TiO2."

15   **Q.**   And if you could please blow up the text of this letter,

16   please, Ms. Mahoney.

17       And I'd ask you, Special Agent Pattillo, to please go

18   ahead and read this?

19   **A.**   (reading)

20          "I have tried to design a China 30,000 T/Y oxidation

21       reactor from memory.   Enclosed is my first attempt.   I

22       would like you," crossed out, "to have your comments if

23       you feel so inclined.   If you would rather not, just throw

24       it away and I will understand.

25          "I've enclosed a return envelope for any comments.

1         If you comment, please let me know how much time you spent

2         so you can be compensated.

3              "Hope you and Melva are doing well.  We hope to see

4         you when we are in Newark.

5              "Take care.

6              "Bob."

7    **Q.**   Did you locate -- did the FBI locate in the search of

8    Mr. Maegerle's residence any other correspondence between

9    Mr. Maegerle and former DuPont employees?

10   **A.**   Yes, we did.

11            **MR. HEMANN:**  Your Honor, may I approach the witness

12   with Exhibit 698?

13            **THE COURT:**  Yes, you may.

14                      (Pause in proceedings.)

15   **BY MR. HEMANN:**

16   **Q.**   And, again, I asked you the same incorrect question.  And

17   this refers not to the search of the residence but the search

18   of Mr. Maegerle's Yahoo! email.

19        Did you locate correspondence between Mr. Maegerle and any

20   other former DuPont employees in your search of the Yahoo!

21   email account of Mr. Maegerle?

22   **A.**   Yes, we did.

23   **Q.**   Can you generally describe what Exhibit 698 is?

24   **A.**   This is an email from the account of Tony and Judi Pezone

25   to Robert Maegerle's Yahoo! account, "Subject RE:  Engineering

1    ASST on China TiO2."  And it was sent March 24th, 2006.

2              MR. HEMANN:  Your Honor, the United States moves

3    Exhibit 698 into evidence.

4              MR. FROELICH:  No objection, Your Honor.

5              MS. LOVETT:  I object on grounds of relevance and 403

6    and hearsay.

7              THE COURT:  All right.  May I see it, please?

8              MR. HEMANN:  I'm handing a copy to Your Honor.

9              THE COURT:  All right.

10                   (Pause in proceedings.)

11             THE COURT:  The objection is overruled.

12             MR. HEMANN:  May the document be admitted, Your Honor?

13             THE COURT:  Yes, it may.

14             MR. HEMANN:  Thank you.

15             THE COURT:  It's admitted.

16        (Trial Exhibit 698 received in evidence)

17             MR. HEMANN:  Ms. Mahoney, could you please put up

18   Exhibit 698, page 1, and blow up just the text, please?

19   Q.   And I'd ask if you'd be so kind as to read that, Special

20   Agent Pattillo?

21   A.   Yes.  (reading)

22             "Bob,

23             "Ethically I would rather not work on this project

24        because of the work that I did with the White Pigment

25        Group just after I retired and their new process.  In

1    addition, I don't know enough about the competing

2    reactions for chlorine and the extent of reactions, as

3    well as the reaction products, and Cl loss through the

4    steps.  The person who should be doing this is the one who

5    will be doing the flow sheets.  As you know, if the flow

6    sheets and the eventual plant don't agree with what you

7    tell the Chinese now about chlorine consumption, there

8    will be problems.

9         "Sorry.

10        "Tony."

11   **Q.**   Thank you.

12        I'd like to just change gears a little bit, Special Agent

13   Pattillo, and ask you whether the FBI seized financial

14   information regarding Mr. Maegerle's search -- Mr. Maegerle's

15   work with Walter Liew?

16   **A.**   Yes, we did.

17        **MR. HEMANN:**  Your Honor, may I approach with

18   Exhibit 333.

19        **THE COURT:**  Yes, you may.

20   **BY MR. HEMANN:**

21   **Q.**   Special Agent Pattillo, do you recognize Exhibit 333 from

22   the search of the Maegerle residence?

23   **A.**   Yes, I do.

24   **Q.**   What is it?

25   **A.**   It is a series of invoices covering a range of time from

1    1997 to, I think, the end of 2010.

2    **Q.**   And do the invoices relate to particular work that

3    Mr. Maegerle performed?

4    **A.**   Yes.   These are invoices related to Mr. Maegerle's

5    consulting work for Walter Liew and USAPTI.

6             **MR. HEMANN:**   Your Honor, the United States moves

7    Exhibit 333 into evidence.

8             **MR. FROELICH:**   Excuse me, Your Honor.   No objection.

9             **THE COURT:**   They're admitted -- it's admitted.   Sorry.

10        (Trial Exhibit 333 received in evidence)

11            **MR. HEMANN:**   And, Your Honor, before I ask any

12   questions about this document, I'd also like to approach with

13   Exhibits 334 and 336.

14            **THE COURT:**   Very well.

15                    (Pause in proceedings.)

16   **BY MR. HEMANN:**

17   **Q.**   Special Agent Pattillo, do you recognize Exhibit 334?

18   **A.**   Yes, I do.

19   **Q.**   And what is it?

20   **A.**   This is an invoice from Pinewater Designs, Inc., which was

21   the name that Robert Maegerle used for his consulting practice,

22   to USAPTI.

23   **Q.**   And the date?

24   **A.**   The date is October 20th, 2009.

25   **Q.**   And what does this invoice pertain to?

1    **A.**   This is an invoice for the transfer of technical drawings

2    and text to USA Performance Technology.

3        **MR. HEMANN:**  Your Honor, the United States moves

4    Exhibit 334 into evidence.

5        **MR. FROELICH:**  No objection.

6        **THE COURT:**  Admitted.

7        (Trial Exhibit 334 received in evidence)

8    **BY MR. HEMANN:**

9    **Q.**   And if you could please look at Exhibit 336 as well,

10   Special Agent Pattillo.

11   **A.**   (Witness examines document.)  Uh-huh.

12   **Q.**   Do you have it in front of you?

13   **A.**   Yes, I do.

14   **Q.**   What is that document?

15   **A.**   It is an invoice dated November 15th, 2010, and it is from

16   Mr. Maegerle to USA Performance Technology for the transfer of

17   technical drawings and text.

18       **MR. HEMANN:**  Your Honor, the United States moves

19   Exhibit 336 into evidence.

20       **MR. FROELICH:**  No objection.

21       **THE COURT:**  It's admitted.

22       (Trial Exhibit 336 received in evidence)

23   **BY MR. HEMANN:**

24   **Q.**   Special Agent Pattillo, have you had a chance to study

25   Exhibit 333, 334, and 336?

1  **A.**   Yes, I have.

2  **Q.**   And could you tell the jury what those exhibits show with

3  regard to the way in which Mr. Maegerle invoiced Mr. Liew?

4  **A.**   Mr. Maegerle generally charged Mr. Liew $125 an hour for

5  his consulting services, and then Mr. Liew generally reimbursed

6  him for travel expenses and things of that nature as well.

7  **Q.**   In addition to the invoices, the hourly invoices, was

8  there another form of invoice contained in these three

9  exhibits?

10  **A.**   Yes.  There were three, what I would term, lump-sum

11  payment invoices, which were for the transfer of technical

12  drawings and text to USA Performance Technology from

13  Mr. Maegerle.

14  **Q.**   What exhibit is the first one of those in?

15  **A.**   The first of the payments is in Exhibit 333.

16  **Q.**   Ms. Mahoney, could you please put up Exhibit 333, page 28?

17      Is that one of the three lump-sum payments?

18  **A.**   Yes, it is.

19  **Q.**   If you could highlight the "To" line and the text all the

20  way through the second paragraph.

21      Could you please read that, Special Agent Pattillo?

22  **A.**   (reading)

23          "To USA Performance Technology, Inc., 1300 Clay

24      Street, Suite 600, Oakland, CA 94612-1425.

25          "For:  Transfer of technical drawings and text to

1      USA Performance Technology for construction of

2      manufacturing plants to produce titanium dioxide pigment

3      by the chloride process route.  Upon payment of this

4      invoice, all drawings and text produced by Robert J.

5      Maegerle prior to February 5, 2008, will be the permanent

6      property of USA Performance Technology, Inc.

7           "Invoice amount:  $50,000 payable to

8      Pinewater Designs, Inc."

9  **Q.**   What was the date of that invoice?

10 **A.**   February 6th, 2008.

11 **Q.**   If you could go to Exhibit 334, page 1, please,

12 Ms. Mahoney.

13      Is this the next of the lump-sum invoices?

14 **A.**   Yes, it is.

15 **Q.**   And is the text of it -- the date of this is what?

16 **A.**   The text is the same.  The date covers the time period

17 between February 7, 2008, and October 20, 2009.

18 **Q.**   And the amount of this invoice?  Is it the same?

19 **A.**   It's $50,000, yes.

20 **Q.**   Please go to Exhibit 336, page 1.

21      Is this the third of three lump-sum invoices?

22 **A.**   Yes, it is.

23 **Q.**   What's the date on this one?

24 **A.**   The date is November 15, 2010.

25 **Q.**   Is the text roughly the same?

**PATTILLO - DIRECT / HEMANN**

1   **A.**    It is.  Yes, it is roughly the same with a different time

2   period.

3   **Q.**    And the amount of this invoice?

4   **A.**    Is $25,000.

5   **Q.**    So the total amount of the lump-sum payments was $125,000?

6   **A.**    Correct.

7   **Q.**    Did you have a chance in reviewing Exhibit 333 to

8   determine the rough amount of the additional hourly invoices?

9   **A.**    Yes.

10  **Q.**    And what was the approximate amount of the additional

11  hourly and expense invoices?

12  **A.**    It was just under -- in total for the time period from --

13  **Q.**    1997 to 2010.

14  **A.**    It was just under $400,000.  It was approximately

15  $370,000.

16  **Q.**    Did you have an opportunity to go through and break that

17  down at all by year?

18  **A.**    Yes, I did.

19  **Q.**    And, more particularly, did you break it down into

20  periods --

21  **A.**    Yes, I did.

22  **Q.**    -- during that time frame?  Yes?

23  **A.**    Yes.

24  **Q.**    Focusing on the period of 1997 to 1998, what was the

25  amount that was billed by Mr. Maegerle to Mr. Liew?

1   **A.**   The amount was less than $2,000.

2     And just as a point of clarification, this is amount paid

3   for his time. This does not include reimbursement of expenses.

4   **Q.**   So the approximately $370,000 does not include expense

5   reimbursement?

6   **A.**   That is correct.

7   **Q.**   For the period 1999 through 2003, how much did

8   Mr. Maegerle invoice Mr. Liew for Mr. Maegerle's time?

9   **A.**   No money. He received no money contained in his invoice

10   inventory that we found during that time period.

11   **Q.**   And for the period 2004 through 2010, what did you find

12   with regard to the amounts that Mr. Maegerle invoiced to

13   Mr. Liew?

14   **A.**   Excluding the lump-sum payments, he received approximately

15   $40,000 a year during that time period. There were some --

16   there was one year where I think he received 28,000, and then

17   the top of the range was about 58,000.

18   **Q.**   But your review suggested that it was about -- worked out

19   to about $40,000 a year?

20   **A.**   Correct.

21     **MR. HEMANN:** Thank you, Your Honor.

22   If I may have one moment.

23     **THE COURT:** Yes.

24       (Pause in proceedings.)

25     **MR. HEMANN:** Your Honor, the United States has no

1   further questions at this time for Special Agent Pattillo.

2      **THE COURT:**  All right.  While Mr. Froelich is getting

3   in position, let's take a stretch break.

4      **MR. FROELICH:**  Your Honor, may we approach the bench,

5   please?

6      **THE COURT:**  All right.  You may stretch, ladies and

7   gentlemen.

8     (The following proceedings were heard at the sidebar:)

9      **THE COURT:**  Okay.

10      **MR. FROELICH:**  Your Honor, I was trying to avoid

11   getting in trouble with the Court, so I wanted to bring the

12   issue up.

13      **THE COURT:**  All right.

14      **MR. FROELICH:**  I had said early on, if the Government

15   puts in my client's statement, I had a right to go into the

16   circumstances behind it.

17     The agent has testified she came there -- that when she

18   came in, that the wife was there and that the wife had a health

19   aide.  I intend to go -- and I also know that they did an

20   investigation and that she has testified previously that they

21   did an investigation.  They knew she was sick.

22     I also know from other -- from both -- from what she has

23   said earlier, that my client kept the door open because he had

24   to watch his wife and everything.  And I intend to go into the

25   circumstances of her health and everything else because it

1    reflects on -- they're saying my client omitted things and

2    things like that.

3        And they walk into a house where my client's got a

4    hospice -- his wife is in a chair with a hospice aide, and he's

5    got a door open trying to watch her and they're interviewing

6    him; and I think that's critical as to the state of mind and

7    the circumstances of which they're talking to him.

8        They've opened the door by a health aide, and plus they've

9    opened the door into my client saying he forgot things and

10   things like that, and I need the circumstances surrounding it.

11       And I had said that earlier, but I didn't want to do

12   something that --

13       **THE COURT:**  All right.  Mr. Hemann?

14       **MR. HEMANN:**  Your Honor, the only purpose of this is

15   to engender sympathy.  It is not relevant to this case.  If he

16   were able to lay a foundation that Mr. Maegerle appeared to be

17   distressed, Mr. Maegerle appeared to be -- Mr. Maegerle was

18   free to come and go as he pleased, which is what Special Agent

19   Pattillo testified to.  They had a very calm conversation over

20   a long period of time.  He did not -- and there was a health

21   aide in the house at the time.  There's no purpose for this

22   other than to evoke sympathy.

23       Obviously, if Mr. Maegerle were to get up and say -- and

24   testify and say, "I was so stressed out that I had -- about my

25   wife," that would be fair for him to say about his own state of

1    mind; but nothing in the foundation that has been laid or that

2    could be laid would suggest that Mr. Maegerle was in any

3    distress or concern whatsoever, and there's no reason to

4    believe that he was.

5              THE COURT:  Well --

6         MR. HEMANN:  And let me just add one point to this.

7         Mrs. Maegerle is ambulatory, I think is the right word,

8    and sat in the chair and had a conversation with two FBI agents

9    during the interview.  I mean, it's not like she's, you know,

10   going to -- on the verge of death in the house.

11        And, so, I think that this is unfair, and it only is meant

12   to influence the jury and cause sympathy.

13        MR. FROELICH:  Well, it's not.  It's the circumstances

14   surrounding.

15        I've never gotten a copy of the interview.  He was

16   concerned because they were interviewing his wife, and he had

17   the door open.  They know that.  They knew going in that.  They

18   went in, and they said that they did a background on it.

19        And I have -- I don't have to put a client on the stand to

20   show the circumstances surrounding what's going on when there's

21   a hospice nurse there that they interviewed.  I've never gotten

22   a report of the interview.

23        MR. HEMANN:  I didn't say interview.  I said they had

24   a conversation with her.

25        MR. FROELICH:  Well --

1          **MR. HEMANN:**  They didn't talk to her about anything.

2          **MR. FROELICH:**  But she had a hospice nurse there.

3          **THE COURT:**  Well, here's the point:  The agent did

4   testify that there was a helper there, the wife was there.  I

5   think Mr. Froelich is entitled to go into that to reinforce

6   that, that there was a helper and his wife was present, and

7   those circumstances; and I'll take it question by question.

8          If, Mr. Froelich, if you start getting into she did an

9   investigation to show that the wife had, you know, some

10  terminal disease, or something like that, I'm not going to

11  allow that in.  Certainly if she had a helper and she needed a

12  helper, that's fine.

13         Of course, if you do that, then the Government's going to

14  be entitled on redirect to talk about the wife's demeanor, what

15  she looked like, you know.

16         But the point is, I'm not going to let you go beyond what

17  the agent has volunteered:  The wife -- Mrs. Maegerle was

18  present; she did appear to be, you know, under the care of a

19  helper; the door was open; and Mr. Maegerle appeared to be

20  looking at her, because I think that does go to the

21  circumstances.

22         But I have to balance this issue of undue prejudice,

23  sympathy, and the like, which this is going to definitely

24  engender at trial.  So I'm going to take it question by

25  question, but I'm not going to allow a full explication of

1    Mrs. Maegerle's condition because I think it injects a real

2    prejudicial element to this.

3        **MR. FROELICH:**  I understand, Your Honor; but they

4    brought it in, and I told them from the beginning that if you

5    go -- my client has a right -- I have a right to explain.  They

6    knew what it was.  She knew.  They did a background check, and

7    I think I have a right, because she said that they did a

8    background.  They knew my client's wife was ill.  And, so --

9        **THE COURT:**  Well, here's the point --

10        **MR. FROELICH:**  -- if they knew it and my client --

11        **THE COURT:**  Well --

12        **MR. FROELICH:**  -- and they have a hospice nurse

13    there --

14        **THE COURT:**  We're going to do this incrementally

15    because, you know, how the agent approached the interview, if

16    the agent knew going in that Mr. Maegerle had, you know, a wife

17    who was ill, I think you can go into that; but I'm not going to

18    get into what her disease was or that it's terminal.  Because I

19    think it's a fair point.

20        I think any defendant in a case has a right to have the

21    jury reflect upon, you know, the quality of the Government's

22    investigation that led to an Indictment in this case.  And, so,

23    I'm going to give Mr. Froelich leeway, but I will -- I'm not

24    going to give you an open season to get into a lot of detail

25    about her condition.

1    If they -- I think all that's relevant is that she was

2  ill, that she was under care, and the agents knew this going

3  in.  I think that's certainly relevant in terms of how they

4  approach the interview.  It's part of the -- it's part of the

5  whole, if you will, the res gestae.

6         MR. FROELICH:  I want to at least get out that this

7  isn't a cold.  This is a serious illness.  They knew it was a

8  serious illness.

9         THE COURT:  Well, you can say "serious illness."  I

10  don't want to get into the substance of it.  I don't want to

11  get into the fact that it's terminal, hospice; but I think the

12  fact if they knew going in -- and maybe it's an excellent

13  technique by the Government; but I think to the extent the

14  Government's going to argue that Mr. Maegerle wasn't fully

15  forthcoming, even if he doesn't testify -- if he testifies,

16  it's all fair game -- but if he doesn't testify, I think he's

17  still entitled to make the argument without testifying that --

18  the inference that if he was not as forthcoming as he should

19  have been, it's because he had something else on his mind.

20    That's what the circumstances are.  That's what she

21  brought up, this agent brought up.  So I will allow it, but I

22  will tell you if there's a particular -- I would go -- proceed

23  cautiously.  I have given you an indication I'm not going to

24  open up the entire condition of Mrs. Maegerle.

25         MR. HEMANN:  Again, Your Honor, we would ask that the

1   Court direct Mr. Froelich to do this by nonleading questions

2   because what I'm concerned about is, "Isn't it true that you

3   knew, blah, blah, blah."  That is inflammatory, and he's --

4        **THE COURT:**  No.  Mr. Froelich is a very experienced

5   lawyer.  He understands the parameters of the Court's ruling.

6   I am instructing both lawyers, all the lawyers, that I don't

7   want the specific nature of Mrs. Maegerle's illness to come

8   out.  The fact that she was seriously ill is a relevant factor;

9   and the fact that the Government, through the FBI, knew it also

10  may be relevant.  And, so, I'll take it question by question.

11       And this is a pretty smart jury.  They're pretty

12  attentive.  I'm very good at instructing, and I think the

13  lawyer who asked the question that gets stricken is the one I

14  think who takes the lump, and it's not a question of unringing

15  the bell here.

16       **MR. FROELICH:**  Judge, I wasn't trying -- that's why I

17  approached the bench.  I wasn't --

18       **THE COURT:**  No, I understand that.  I think it's a

19  fair point; and I think if the interview is relevant, what was

20  said is relevant.  I think the context is relevant as well.

21  All right.

22       **MR. HEMANN:**  Thank you, Your Honor.

23       (The following proceedings were heard in open court:)

24       **THE COURT:**  You may cross-examine, Mr. Froelich,

25  whenever you are ready.

1          **MR. FROELICH:**  Your Honor, we have no objection to the

2     agent having a list of the exhibits and where they were

3     located.

4          **THE COURT:**  Very well.

5          **MR. HEMANN:**  For some of the Defense exhibits,

6     Your Honor.

7          **THE COURT:**  Very well.

8          **MR. HEMANN:**  Thank you.

9       (Counsel handing documents to the witness.)

10         **THE WITNESS:**  Thank you.

11                    <u>**CROSS-EXAMINATION**</u>

12    BY MR. FROELICH:

13    Q.   Agent Pattillo, my name is Jerry Froelich, and I represent

14    Mr. Maegerle.

15         And we haven't met or talked before, have we?

16    A.   I believe I did meet you once in your initial visit to

17    San Francisco.

18    Q.   To the office or something, okay.

19    A.   Yes.

20    Q.   Now, there are no agents in the FBI; isn't that right?

21    Everybody is a special agent?

22    A.   That is correct.

23    Q.   So let's talk about, first of all, some of the -- your

24    background.

25         How many times have you testified in court?

1   **A.**   This is my first time testifying in court.

2   **Q.**   Have you testified -- how many searches have you

3   conducted?

4   **A.**   Uhm, I've conducted at least -- or participated in at

5   least 20 searches.

6   **Q.**   And at those searches, how many people have you conducted

7   interviews with?

8   **A.**   Have I personally conducted interviews?

9   **Q.**   Yeah, or been present.

10  **A.**   Have been present while interviews have been conducted?

11  **Q.**   Yes.

12  **A.**   Uhm, probably half.

13  **Q.**   And what did you do -- what did you review to prepare for

14  your testimony today?

15  **A.**   Uhm, I reviewed the documentation that was created as a

16  result of the search.

17  **Q.**   In other words, the exhibits that you -- that you

18  testified to about today?

19  **A.**   Yes.

20  **Q.**   And what else did you review?

21  **A.**   Uhm, we create a record, when we conduct a search, of

22  things like the, uhm, photo log and the photographs that I've

23  already discussed, things of that nature.

24  **Q.**   Okay.  What else did you review?  We've talked about you

25  looked at the exhibits, you looked at the photo log.  What else

1   did you review?

2   **A.**   We write up -- anytime we do an interview, we write up a

3   documentation of the content covered during the course of that

4   interview.  Internally, we call that a 302.  So I reviewed

5   those.

6   **Q.**   So the 302s that you reviewed, those are basically

7   memorandums of an interview; is that correct?

8   **A.**   That's correct.

9   **Q.**   And what 302s did you review?

10   **A.**   I reviewed the 302 that was written by my counterpart

11   during the course of the interview, the special agent from the

12   Palo Alto squad.  And I reviewed a series of 302s written by

13   people who participated in the search in various ways.

14   **Q.**   Those 302s, what did they -- what did they reflect, those

15   302s, that you -- first of all, the one that was written by

16   your counterpart, is that Koblitzki, is that how you pronounce

17   it?

18   **A.**   It's Koblitz.

19   **Q.**   Koblitz?

20   **A.**   Yes.

21   **Q.**   I'm sorry.  That's Agent Koblitz, and he's here in

22   California?

23   **A.**   That's correct.

24   **Q.**   All right.  And what 302 did you review that he wrote?

25   **A.**   Uhm, I reviewed a 302 that he wrote describing the

1    interview.

2    **Q.**    The interview of Mr. Maegerle?

3    **A.**    That's correct.

4    **Q.**    And the 302s of the other agents that you reviewed, what

5    did they reflect?

6    **A.**    They reflected more logistical documentation associated

7    with the execution of the search.

8    **Q.**    Like what type of logistics?

9    **A.**    Like who -- we have somebody called a search team lead.

10   And that's the person who's in charge of documenting when you

11   arrive on the scene; what items are seized; when you depart a

12   scene; things of that nature.

13   **Q.**    Now, I want to talk, first of all, about -- I want -- I'll

14   get to the search and to the interview of my client but, first

15   of all, I'd like to talk about Exhibits 5 and 10, okay.

16        Now, where were they located?

17   **A.**    Uhm, the exhibits were the -- may I -- were the Edgemoor

18   schematics, correct?

19   **Q.**    That's correct, the ones, Exhibits 5 and 10, that you

20   talked about --

21   **A.**    Right.

22   **Q.**    -- and you discussed with Mr. Hemann, where were they

23   located?

24   **A.**    They were located on a thumb drive.

25   **Q.**    And, in fact, they were located in a drawer with a thumb

1    drive with about six or seven other thumb drives; isn't that

2    correct?

3    A.   Yes, that's correct.

4    Q.   And then there was other discs there; isn't that correct?

5    A.   There were other discs seized during the search.  I'm not

6    sure, specifically, they were in that drawer.

7    Q.   Do you remember how many discs that were seized?

8    A.   I don't.

9    Q.   About five, six; do you remember?

10   A.   I don't remember.

11   Q.   Let's talk, first of all, about a thumb drive.  You know

12   what a thumb drive is; isn't that right?

13   A.   Yes, I do.

14   Q.   And a thumb drive they call it because it almost looks

15   likes a thumb, and you stick it in a computer; isn't that

16   right?

17   A.   Yes.

18   Q.   And a thumb drive is you can either unload from the

19   computer onto the thumb drive or you can unload from the thumb

20   drive onto the computer; isn't that correct?

21   A.   Yes.  It's a way to portably transfer documents.

22   Q.   All right.  Now, a thumb drive does not have an internal

23   clock; is that correct?

24   A.   I don't know if a thumb drive has an internal clock.

25   Q.   Well, it doesn't have any operating systems at all, does

PATTILLO - CROSS / FROELICH

1    it --

2    **A.**    I think --

3    **Q.**    -- such as Windows?

4    **A.**    It does not have a Windows software package.

5    **Q.**    And it doesn't have the ability, by itself, to either

6    create, open, or delete files; isn't that right?

7    **A.**    I believe that is correct.

8    **Q.**    All right.  A thumb drive has to work with a computer to

9    either get its material or to give away its material; isn't

10   that correct?

11   **A.**    I'm not really clear on your question.

12   **Q.**    Well, what I'm saying to you is, what's on a thumb drive

13   either comes from a computer; isn't that correct?

14   **A.**    It can, yes.

15   **Q.**    And you can release it from a computer -- onto a computer;

16   isn't that right?

17   **A.**    Yes, that's also correct.

18   **Q.**    And if you unload the thumb drive on the computer, the

19   computer has what was on the thumb drive; isn't that correct?

20   **A.**    I think you can view files saved on the thumb drive on the

21   computer.  But that doesn't mean the files are transferred to

22   the computer.

23   **Q.**    Doesn't a computer reflect -- the hard drive of the

24   computer reflect what is gotten off the -- when it's

25   transferred -- when the thumb drive is opened up, doesn't the

1  computer reflect a time and a date and what was opened up on

2  the computer?

3  **A.**  I think the data from the thumb drive displays on the

4  computer, but it does not save to the computer.

5  **Q.**  Do you know whether the hard drive of the computer, when

6  you view it on the computer, whether it saves what's on the

7  thumb drive?

8  **A.**  I don't believe it does.

9       **MR. HEMANN:**  Objection, Your Honor.

10      **THE COURT:**  Sustained.

11  **BY MR. FROELICH:**

12  **Q.**  Well, let's talk about the -- let's pull up Exhibit 5.

13     (Document displayed.)

14      **MR. FROELICH:**  And can we pull up the second page.

15     (Document displayed.)

16  **BY MR. FROELICH:**

17  **Q.**  Now, this is what is the footprint that was found on

18  the -- on the thumb drive; is that correct?

19  **A.**  I think this is information associated with the file from

20  the thumb drive.

21  **Q.**  Okay.  So this is what is on the file from the thumb

22  drive.  Do you know what the "Created Date" means?

23  **A.**  Uhm, I believe that is date associated with the creation

24  of the file on the thumb drive.

25  **Q.**  Okay.  What's the modified date?

**PATTILLO - CROSS / FROELICH**

1  **A.**   I believe it's referring to a date at which point the

2  document was re-saved.

3  **Q.**   Okay.  So the date is create -- you have here 1/23/08,

4  which is the created date, and yet you have an earlier date for

5  the modified date?

6  **A.**   Yes, that's correct.

7  **Q.**   Can you explain that?

8  **A.**   I can't explain that.

9  **Q.**   How about an access date, do you know what the access date

10  is?

11  **A.**   Uhm, my understanding is that can refer to the last time

12  the file was accessed.

13  **Q.**   It can refer to what?

14  **A.**   The last time a file was accessed.

15  **Q.**   Okay.  Do you know -- do you know that, or someone told

16  you that?

17  **A.**   Uhm, this is my understanding from previous experience

18  with thumb drives, but I'm not an expert.  Also, my

19  understanding is that sometimes this is not correct.

20  **Q.**   Okay.  So you know that that may not be correct, and it

21  may not even be the date the file was opened.  That may be

22  dates that actually come off the computer that transfer the

23  information to the thumb drive; isn't that correct?

24  **A.**   I don't know --

25        **MR. HEMANN:**  Objection, Your Honor.

1          **THE WITNESS:**  -- if that's correct.

2          **THE COURT:**  Sustained.

3    **BY MR. FROELICH:**

4    **Q.**   Do you know what that date means?

5    **A.**   I don't.

6    **Q.**   Okay.  Let's go to the other one, to 10.

7          Now, on -- this is -- this is Exhibit 10.  If you'll look

8    at that, what's the created day on that?

9    **A.**   The created date is January 23rd, 2008.

10   **Q.**   Okay.  And that would be the same created date that was on

11   Exhibit 5; isn't that correct?

12   **A.**   Yes, that's correct.

13   **Q.**   And what is the modified date?

14   **A.**   The modified date is 12/14/2007.

15   **Q.**   Okay.  And so that's the same date, is that correct --

16   **A.**   Correct.

17   **Q.**   -- that is on Exhibit 5?

18   **A.**   Yes.

19   **Q.**   And then we have an access date.  What's the access date?

20   **A.**   The access date is 6/11/2009.

21   **Q.**   Okay.  And that access date is different from 8 -- from

22   the access date on Exhibit 5; is that correct?

23   **A.**   Yes, that's correct.

24   **Q.**   But they were both found on the same thumb drive; isn't

25   that correct?

1  **A.**    Yes, that's correct.

2  **Q.**    Now, there were other -- you talked about some of the

3  things that you -- that were seized at my client's house.

4        **MR. FROELICH:**  May I have the original of 1623,

5  please.

6        (Defense and government counsel confer off the record, out

7  of hearing of the jury and the court reporter.)

8        **THE CLERK:**  1623?

9        **MR. FROELICH:**  Not sure.

10       (Counsel continue to confer off the record.)

11       **MR. FROELICH:**  Exhibit 1561.  I'm sorry.

12  **BY MR. FROELICH:**

13  **Q.**    I would like to show you what is marked Exhibit 1561, and

14  ask you to identify that.

15       **THE COURT:**  Please remember to ask for permission to

16  approach.

17       **MR. FROELICH:**  I'm sorry, Your Honor, I meant to.

18       **THE COURT:**  All right.

19       **THE WITNESS:**  Yes, this is a binder that we located at

20  Mr. Maegerle's home.

21       **MR. FROELICH:**  Your Honor, I would move 1561.

22       **MR. HEMANN:**  Your Honor, we object on relevance

23  grounds and hearsay grounds, based on what's contained in the

24  binder.

25       **THE COURT:**  Madam Clerk, would you please get the

**PATTILLO - CROSS / FROELICH**

1    binder from the witness.

2         (Pause)

3         **THE COURT:**  Objection sustained.

4    **BY MR. FROELICH:**

5    **Q.**   I'd like you to look at what's been admitted Exhibit 683.

6         **MR. FROELICH:**  Can we pull up 683.

7         (Document displayed.)

8    **BY MR. FROELICH:**

9    **Q.**   The -- one of the things you were asked about on 683 is

10   the bottom, where it says page 31 -- paragraph 31.  It says:

11        "It's best to list Kuan Yin as a large capacity plant

12        and Jinzhou as a small capacity plant."

13        Now, Kuan Yin was a large capacity plant; was it not?

14   **A.**   It was my understanding it was designed as a 60,000

15   capacity plant.

16   **Q.**   Are you familiar with the complaint that's been admitted,

17   the civil complaint involving USAPTI, USAPTI and DuPont?

18        **MR. HEMANN:**  Your Honor, as a matter of clarification,

19   the civil complaint has not yet been admitted in evidence.

20        **THE COURT:**  He's just asking whether she's aware of

21   it.

22        **MR. HEMANN:**  Yes.

23        **THE COURT:**  All right.

24   **BY MR. FROELICH:**

25   **Q.**   Are you aware of the complaint?

1    **A.**    I'm aware of the complaint.

2    **Q.**    That complaint involved -- the basics of that complaint

3    involved Jinzhou; did it not?

4    **A.**    I believe so.  It's been quite some time since I

5    reviewed --

6    **Q.**    It did not involve Pangang?

7    **A.**    I don't recall.  I haven't reviewed the complaint since

8    2011.

9    **Q.**    So that's one -- you did not -- you did not review that

10   when -- before you came to court today?

11   **A.**    Correct.

12         **MR. FROELICH:**  Now, if we could pull up Exhibit 682.

13   And if we could go to the last paragraph, please.

14         (Document displayed.)

15   **BY MR. FROELICH:**

16   **Q.**    This is a discussion between my client and Walter Liew

17   about the lawsuit, is that correct, between them?

18   **A.**    That's my understanding from reading the email, yes.

19   **Q.**    And what my client says, what Mr. Maegerle says is that

20   feel free to identify him if the Court asks or if they're asked

21   about it; isn't that correct?

22   **A.**    That's my understanding, yes.

23   **Q.**    On 681 -- turn to 681.

24         (Document displayed.)

25         **MR. HEMANN:**  Objection, Your Honor.  This is not in

**PATTILLO - CROSS / FROELICH**

1  evidence.

2          **THE COURT:**  Oh.

3          **MR. FROELICH:**  Let me -- Your Honor, I would move --

4  let me show you -- may I approach?

5          **THE COURT:**  Yes.

6          **THE CLERK:**  What exhibit are you showing, Counsel?

7          **MR. FROELICH:**  I'm going to show her 681.

8          **THE CLERK:**  Thank you.

9  **BY MR. FROELICH:**

10  **Q.**   I show you what has been marked Exhibit 681.  Can you

11  identify that for me?

12  **A.**   This is an email from Robert Maegerle to Walter Liew,

13  dated 21 April 2011.

14  **Q.**   And are you familiar with that email?

15  **A.**   Yes, I've read this email.

16  **Q.**   And where did that email come from?

17  **A.**   This email was -- came about through the email search

18  warrant of Mr. Maegerle's Yahoo! account.

19          **MR. FROELICH:**  Your Honor, I would move 681.

20          **MR. HEMANN:**  No objection, Your Honor.

21          **THE COURT:**  Admitted.

22       (Trial Exhibit 681 received in evidence.)

23       (Document displayed.)

24          **MR. FROELICH:**  Can we blow that up, please?

25          **THE COURT:**  Yes.

BY MR. FROELICH:

Q.   Again, this is my client talking to Mr. Liew about the complaint; isn't that true?

A.   That's my understanding from reading the email, yes.

Q.   And he -- he's talked -- my client is telling them, again, about the Ashtabula plant; is that correct?

A.   Yes, this email references the Ashtabula plant.

Q.   And the bottom line, he also says there's no patent infringement; isn't that correct?

A.   He says, "No patent infringement is specified."

Q.   And he also says that specific trade secrets have not been enumerated; isn't that correct?

A.   Yes, that's correct.

Q.   Now, I'd like to talk to you about the search of my client's residence.

On July -- first of all, I'd like to talk to you -- I'd like to ask you about some things that were found and not found.

First of all, the Asian Basic Data Book was not found; is that correct?

A.   You mean the Kuan Yin Basic Data?

Q.   Well, it's not a Kuan Yin Basic Data, is it?  It says -- it doesn't have the words "Kuan Yin" on it, does it?

A.   I don't know.  We did not find a Basic Data Document.

Q.   So you didn't find a Basic Data Document.

1        Did you find -- you found a lot of background about my

2   client.  You found his file concerning his employment at

3   DuPont; isn't that correct?

4   **A.**   We did find information pertaining to Mr. Maegerle's

5   employment at DuPont, yes.

6   **Q.**   And I'd like to show you what has been marked Exhibit 722.

7        **THE COURT:**  Please ask permission to approach.

8        **MR. FROELICH:**  I'm sorry, Your Honor.  I'm not used to

9   it.

10        **THE COURT:**  Yes.

11        **MR. FROELICH:**  Your Honor, may I approach the witness?

12        **THE COURT:**  Yes.  Yes, you may.

13        **MR. FROELICH:**  Okay.

14        **THE CLERK:**  It's been admitted.

15        **MR. FROELICH:**  It has been admitted.  I just want

16   to --

17        **THE COURT:**  Yes, go ahead and show it to her.

18        (Document displayed.)

19   **BY MR. FROELICH:**

20   **Q.**   I want to show you Exhibit 722.  Are you familiar with

21   that?

22   **A.**   Yes, I am.

23   **Q.**   Okay.  And can you explain to the ladies and gentlemen

24   what that is?

25   **A.**   Uhm, it appears to be a collection of documents related to

1   Mr. Maegerle's employment at DuPont.  Specifically, they appear

2   to be performance evaluations and things of that nature.

3   Q.   I'd like to show you --

4           MR. FROELICH:  Or could you pull up the first page of

5   that exhibit, please.

6         (Document displayed.)

7   BY MR. FROELICH:

8   Q.   Now, this is the -- you recognize that as the first -- the

9   first page of the exhibit; is that correct?

10  A.   Yes, I do recognize that is in the exhibit.

11  Q.   And can you tell us what -- can you read what his

12  responsibilities were for the past year.

13  A.   Well, it's unclear, based on what I can see, which year

14  this refers to but --

15  Q.   We'll get to that.

16  A.   For the past year --

17          MR. HEMANN:  Objection, Your Honor.  Vague as to year.

18          THE COURT:  Sustained.  He can have her read directly

19  from the document, but once you start asking the witness to

20  characterize then I think we have problems.

21          MR. FROELICH:  I was asking, Your Honor.

22  BY MR. FROELICH:

23  Q.   What does it say in the past year your responsibilities

24  were?

25  A.   (reading)

1            "Responsibilities include lead project engineer for

2        DeLisle line II," in parentheses, "(Project 5901) 100M

3        ton/per year TiO2 manufacturing facilities," in

4        parentheses, "(156MM)."

5   **Q.**   Okay.  And what is the second?

6   **A.**   (reading)

7            "Lead project engineer for Korea," in parenthesis,

8        "(Project 6554) 60M ton per year TiO2 manufacturing

9        facilities," in parentheses, "(195MM)."

10  **Q.**   All right.  And what is the third?

11  **A.**   (reading)

12           "Key member of the Front-End Loading Resource Team

13       Supporting the C&P Engineering Section."

14       **MR. FROELICH:**  Now, if we can turn to the second page,

15  please.

16       (Document displayed.)

17  **BY MR. FROELICH:**

18  **Q.**   And can you read the date on that?

19  **A.**   Yes.  The signatures are dated September 1990.

20  **Q.**   And you know Mr. Maegerle retired the next year; is that

21  correct?

22  **A.**   Yes --

23  **Q.**   1991?

24  **A.**   -- that's correct.  That's my understanding.

25  **Q.**   On July -- in July 2011, you -- you had obtained your

1  search warrant and you were going to go to Mr. Maegerle's

2  house; is that correct?

3  **A.**   Yes.

4  **Q.**   And you were going to search his house and you were going

5  to search -- he had a small home, also, across the street; is

6  that correct?

7  **A.**   That's correct.

8  **Q.**   Now, you had done research on Mr. Maegerle, had you not,

9  before going there?

10 **A.**   Yes.

11 **Q.**   And you knew, did you not, that his wife had a serious

12 illness?

13         **MR. HEMANN:**   Objection, Your Honor.

14         **THE COURT:**   Overruled.

15         **THE WITNESS:**   We knew at the time that his wife might

16 have -- we could see a ramp when we drove past the house.  So

17 it was our suspicion that she had a mobility issue or

18 something, a health ailment of that kind.

19 **BY MR. FROELICH:**

20 **Q.**   Okay.  Now, when you -- how big was your team that was

21 going there?

22 **A.**   We had a search team of approximately eight to ten people

23 for each house.

24 **Q.**   So approximately 20 people?

25 **A.**   That's correct.

1  Q.   Were they both local law enforcement and FBI agents?

2  A.   It was primarily FBI agents, but we did have a local state

3  police representative.

4  Q.   Okay.  Everybody was armed?

5  A.   Yes, that's correct.

6  Q.   And a lot of people had FBI blazers on -- not blazers, but

7  windbreakers?

8  A.   I believe so, yes.

9  Q.   And they say FBI on them?

10  A.   Yes.

11  Q.   Now, you went to the door and -- you and the other agent.

12  Who was the other agent went to the door with you?

13  A.   I went to the -- Agent Koblitz and I went to --

14  Q.   Pardon?

15  A.   Agent Koblitz.

16  Q.   Agent Koblitz and you go to the door.  And it's just the

17  two of you; is that correct?

18  A.   Correct.  The search team was a couple of miles away at

19  that point.

20  Q.   Because you didn't want Mr. Maegerle to see the search

21  team?

22  A.   No, that's not correct.  We wanted to have some time to

23  meet with Mr. Maegerle, and we didn't need the search team at

24  that time.

25  Q.   Well, you didn't want Mr. Maegerle to see the search team,

1   did you?

2   **A.**   That was not how I would characterize the --

3   **Q.**   Well, why wouldn't you just park it out front, park -- why

4   wouldn't you just park the vehicles out front and walk in and

5   knock on his door, if you didn't mind if Mr. Maegerle saw a

6   search team of 20 agents armed, in FBI jackets, sitting out in

7   front of his house?

8   **A.**   Given that we thought we might be with Mr. Maegerle for

9   some time it was easier and more convenient for our search team

10  to have access to bathrooms and refreshments.

11  **Q.**   Uh-huh.  And so you go and you ring the doorbell?

12  **A.**   Yes.

13  **Q.**   And you -- Mr. Maegerle answers the door; isn't that

14  right?

15  **A.**   Yes.

16  **Q.**   And when you ring the doorbell and he answers the door,

17  you tell him you're FBI agents; isn't that right?

18  **A.**   Yes, we did identify ourselves.

19  **Q.**   And you tell him that you've got an active investigation

20  and you'd like to talk to him; isn't that correct?

21  **A.**   We said we were investigating a potential DuPont and

22  USAPTI matter.

23  **Q.**   Okay.  What exactly did you tell them?

24  **A.**   I recall having said that we were investigating a matter

25  involving DuPont and USAPTI, and we asked him if he might have

1   some time to speak with us.

2   **Q.**   Did you write down anywhere what you said to him?

3   **A.**   Verbatim, no.

4   **Q.**   So Mr. Maegerle invites you into the house, isn't that

5   correct, says, I'll speak to you?

6   **A.**   Correct.

7   **Q.**   And you get -- you get into the house.  And who's in the

8   house?

9   **A.**   When Agent Koblitz and I arrived at the house,

10  Mr. Maegerle invited us in.  When we walked in his wife was

11  there with her home health nurse, and he introduced us to both

12  of them.

13  **Q.**   And she had a nurse there, didn't she?

14  **A.**   Yes, that's correct.

15  **Q.**   And she was in -- what kind of chair was she in?

16  **A.**   Uhm, she was in -- it looked like a cushion chair,

17  watching television.

18  **Q.**   And her nurse was sitting right next to her?

19  **A.**   I believe the nurse stood up, so I'm -- when we arrived.

20  I'm not sure where she was seated.

21  **Q.**   You never tell Mr. Maegerle that he's a suspect, do you?

22  **A.**   No, we did not.

23  **Q.**   All right.  And you deliberately didn't do that; isn't

24  that right?

25  **A.**   No, that's not correct.

**PATTILLO - CROSS / FROELICH**

1    **Q.**    You just happened to forget?

2    **A.**    We didn't forget he was a suspect.  We were there

3    investigating claims that Walter Liew had misappropriated

4    technology from DuPont, and we weren't clear what

5    Mr. Maegerle's role may have been.

6    **Q.**    Well, you were there -- did you tell him you were there to

7    search his house?

8    **A.**    We did.

9    **Q.**    Pardon me?

10   **A.**    At a certain point we did, yes.

11   **Q.**    Well, when you came to the door and you came into the

12   house, did you tell him you were there to search his house?

13   **A.**    No, we did not.

14   **Q.**    Why not?

15   **A.**    Because we wanted to have a conversation first.

16   **Q.**    All right.  And why would telling him that eventually

17   you're going to search his house interfere with the

18   conversation you were going to have with him?

19   **A.**    It's a very distracting thing.

20   **Q.**    He may be distracted enough that he may say, I want to

21   talk to a lawyer.  Isn't that why you don't tell him?

22   **A.**    It's always Mr. Maegerle's right to speak to a lawyer.

23   **Q.**    But you didn't tell him he was a suspect?

24   **A.**    We did not tell him he was a suspect.

25   **Q.**    And you didn't tell him you were going to search his

1   house?

2   **A.**   Immediately upon entrance we did not tell him we were

3   going to search his house.

4   **Q.**   How long was it before you told Mr. Maegerle you were

5   going to search his house?

6   **A.**   We spoke to Mr. Maegerle for about an hour before we

7   informed him of the search warrant.

8   **Q.**   And up to that time, you were just telling him that you

9   had an investigation concerning DuPont trade secrets; isn't

10  that right?

11  **A.**   Yes, that's correct.

12  **Q.**   All right.  Now, Mr. Maegerle takes you out of the living

13  room into an office; isn't that correct?

14  **A.**   When we arrived, yes.

15  **Q.**   Because, he tells you, he doesn't want to upset his wife;

16  isn't that right?

17  **A.**   Yes, that's correct.

18  **Q.**   Okay.  And when he takes you into the office, he leaves

19  the door open so he can watch his wife; isn't that correct?

20      He leaves his door partially open and he gets in a chair

21  where he can watch his wife; isn't that right?

22  **A.**   He left the door open, yes.

23  **Q.**   Okay.  And then you start talking to him; isn't that

24  right?

25  **A.**   Yes.

1   **Q.**   You ask him questions?

2   **A.**   Yes.

3   **Q.**   Do you write down the questions that you're asking him?

4   **A.**   Uhm, no, we don't.

5   **Q.**   Do you have a memorandum of the questions that you asked

6   him?

7   **A.**   No.

8   **Q.**   Okay.  And he's cooperating with you?

9   **A.**   Yes.

10  **Q.**   He's going to get documents for you, isn't he?

11  **A.**   He showed us some drawings from his binder that has been

12  previously entered into evidence, yes.

13  **Q.**   The binder that you were reporting -- the exhibit that you

14  were showed, that you were showing these things about Kuan Yin

15  and all those others, that's 95 pages long, isn't it?

16  **A.**   I don't know.

17  **Q.**   And there's only two references in there of Kuan Yin;

18  isn't that right?

19  **A.**   I'm aware of the two references we read today, yes.

20  **Q.**   Right.  And they refer to the Pangang plant, not the

21  Jinzhou plant; isn't that correct?

22  **A.**   I don't recall.

23  **Q.**   But he gets that binder for you; isn't that right?

24  **A.**   Yes.

25  **Q.**   And he starts showing you the things within the binder;

1  isn't that right?

2  **A.**   He really only showed us one drawing in the binder.

3  **Q.**   At some point, too, he even point -- well, we'll talk

4  about that in a minute.

5       So you start talking to him, and it goes for about an hour

6  or so.  Is he cooperating with you?

7  **A.**   Yes, he was very cooperative.

8  **Q.**   Is he bringing you other things than the binder with all

9  the documents in it?

10  **A.**   I can't immediately recall any other items.

11       **MR. FROELICH:**  Can I have the -- what exhibit are the

12  pictures?

13       **MR. HEMANN:**  7008.

14       **THE CLERK:**  4008.

15       **MR. FROELICH:**  4008.

16  Your Honor, may I approach the witness?

17       **THE COURT:**  Yes, you may.

18  (Photographs displayed.)

19  **BY MR. FROELICH:**

20  **Q.**   I want to show you what has been marked Exhibit 4008.

21  Now, we talked about --

22       **MR. FROELICH:**  If we can bring them up.

23       (Photograph displayed.)

24  **BY MR. FROELICH:**

25  **Q.**   You talked about the office; isn't that correct?

PATTILLO - CROSS / FROELICH

1   A.   Yes.

2   Q.   And you said that on the left there you were sitting on

3   the couch.  Mr. Maegerle asked you to sit on the couch; isn't

4   that right?

5   A.   Yes, that's correct.

6   Q.   And then he was sitting not behind the desk, but he was

7   sitting on a chair over on this -- over behind the lamp; isn't

8   that correct?

9   A.   Yes, that's correct.

10  Q.   And that's so he could see out the door to his wife; isn't

11  that correct?

12  A.   I don't know.

13  Q.   The -- did you look at the books -- there's a bookcase

14  there.  Did you look at those books?

15  A.   With Mr. Maegerle?

16  Q.   Well, at any time.

17  A.   Uhm, I probably observed the books, yes.

18  Q.   All right.  Did you see that those were books about flows,

19  and they were mechanical books and chemical engineering books

20  and things like that?

21  A.   I would have been able to observe that.  I don't recall

22  noting it.

23  Q.   Well, did you take them?

24  A.   I don't know.

25  Q.   Okay.

1          **MR. FROELICH:**  Can I have the picture of the porch,

2    please.  The porch.

3          (Photograph displayed.)

4    **BY MR. FROELICH:**

5    **Q.**   Eventually, you -- you talked to Mr. Maegerle for about an

6    hour; isn't that right?

7    **A.**   Yes.

8    **Q.**   And then you tell him that you have a search warrant?

9    **A.**   Correct.

10   **Q.**   And what do you tell him then?  What do you say to him?

11   **A.**   We tell him that we have a search warrant.  I explain

12   logistically how it's going to work, and that's the

13   conversation.

14   **Q.**   And then you go out.  And how many agents do you bring in

15   the house?

16   **A.**   Approximately eight to ten.

17   **Q.**   They are all armed?

18   **A.**   Yes.

19   **Q.**   And they all have FBI blazers or -- I mean windbreakers

20   on?

21   **A.**   I don't know that they all do but, certainly, some do.

22   **Q.**   Okay.  And then you move Mr. Maegerle out to the porch;

23   isn't that correct?

24   **A.**   Yes, that's correct.

25   **Q.**   Both of you, both you and the other agent; isn't that

1  correct?

2  **A.**   We all moved to the porch, yes.

3  **Q.**   And you move him out to the porch and you continue talking

4  to him; isn't that correct?

5  **A.**   Yes, we continued to speak.

6  **Q.**   Don't tell him he's a suspect, do you?

7  **A.**   No, we don't use those words.

8  **Q.**   Okay.  And you said that -- excuse me.  We'll go back in a

9  second.

10       Do you remember that when you testified yesterday that you

11  told him -- basically, first of all, when you came to the

12  house, that you were just going to speak to him about an

13  ongoing investigation?

14  **A.**   That's correct.

15  **Q.**   Okay.  So at the time, when you initially talked to him,

16  you didn't tell him what the investigation was about, did you?

17  **A.**   I think we almost immediately told him what the

18  investigation was about.

19  **Q.**   And one of the things you said is that you thought, in

20  your experience, it's easier to go in and have a conversation

21  with somebody without the distraction of a search warrant.

22  Remember saying that?

23  **A.**   Yes.

24  **Q.**   And that you thought the best way to have a really good

25  conversation with Mr. Maegerle was not to tell him that you had

1    a search warrant or that he was a suspect, right?

2        Wasn't that the point of it, that you wanted to get him to

3    talk, and you weren't going to tell him that he was a suspect

4    or you had a search warrant until you got him talking?

5    **A.**   The point of having an interview prior to executing the

6    search warrant was to have an opportunity to speak with

7    Mr. Maegerle without all the commotion of a search.

8    **Q.**   Now, you get him out.  And from the time you come into the

9    house, Mr. Maegerle is never alone; is that correct?

10   **A.**   Yes, that's correct.

11   **Q.**   And when you take him out to the porch, the other agent,

12   Koblitz --

13   **A.**   Koblitz, yes.

14   **Q.**   -- he continues to talk to Mr. Maegerle; isn't that

15   correct?

16   **A.**   Uhm, we both spoke with Mr. Maegerle while we were on the

17   porch.

18   **Q.**   Well, even -- he would talk -- did you stay with him the

19   whole time?

20   **A.**   Generally, we were generally with him for the -- most of

21   the time.  There were times where I would go speak with another

22   agent and Mr. Koblitz would be there, and vice versa.

23   **Q.**   And were you taking notes?

24   **A.**   No, I was not taking notes.

25   **Q.**   Okay.  So then -- and how long do you talk to Mr. Maegerle

**PATTILLO - CROSS / FROELICH**

1 for?

2 **A.** Overall?

3 **Q.** Overall.

4 **A.** We arrived at approximately 10:50, at his house.

5 Agent Koblitz and I spoke with him about an hour.  The search

6 team then arrived.  And I think we concluded our search at

7 approximately 2:50 p.m.

8 **Q.** Well, you continued to talk to him until 2:51 p.m., didn't

9 you, one or the other of you?  You spoke to him for four hours?

10 **A.** That's correct.

11 **Q.** And he cooperates during the whole four hours?

12 **A.** Yes, Mr. Maegerle was very cooperative.

13 **Q.** In fact, at one point during his search he tells you that

14 you've missed a computer and a cell phone; isn't that right?

15 **A.** Yes, that's correct.

16 **Q.** And he points that out to you?

17 **A.** Yes.

18 **Q.** And so it's going on and then it concludes, and you pack

19 up and you take everything and you leave.  And Mr. Maegerle's

20 concerned though, isn't he?

21 **A.** I don't know.

22 **Q.** Well, one, he was concerned about what you -- he was

23 concerned that some of the private -- didn't he ask you to have

24 available some of the documents because he had -- it had his

25 wife's medical conditions on it?

1   **A.**   We made sure that he had an opportunity to write down some

2   of the times for his wife's medical appointments prior to

3   seizing some -- I think a computer and something else that had

4   that information on it.

5   **Q.**   Okay.

6         **THE COURT:**  Mr. Froelich, can we break now?

7         **MR. FROELICH:**  Yes.

8         **THE COURT:**  All right.  Ladies and gentlemen, we're

9   going to take our first break of the morning.  Little different

10  schedule.

11       Please remember the Court's usual admonitions; keep an

12  open mind; don't obtain outside information.  And we will see

13  you in 15 minutes.

14       (Jury out at 11:12 a.m.)

15       **THE COURT:**  You may step down, Agent.

16       **THE WITNESS:**  Thank you.

17       (Recess taken from 11:13 a.m. to 11:32 p.m.)

18       **THE COURT:**  Please bring in the jury.

19       **THE CLERK:**  All rise for the jury.

20       (Jury enters at 11:33 p.m.)

21       **THE COURT:**  All right.  Please be seated.

22       You can continue.

23  **BY MR. FROELICH:**

24  **Q.**   Agent Pattillo, I'd like to go over with you what my

25  client told you during those four hours while you were -- you

1    and the other agent were interviewing him at his house.

2        He told you that he had been employed at DuPont for

3    30-some-odd years; is that correct?

4    **A.**    Yes, that's correct.

5    **Q.**    And he told you that during his time his main work at

6    DuPont involved the TiO2 process; isn't that right?

7    **A.**    Yes, that's correct.

8    **Q.**    And then you started -- those were the initial things you

9    talked to him about, wasn't it?

10   **A.**    We did go over his -- sort of the narrative of his DuPont

11   employment at the beginning of the interview, yes.

12   **Q.**    Okay.  Do you remember exactly what you -- what you asked

13   him about and what order you asked him?

14   **A.**    I think we asked him to describe his employment at DuPont.

15   **Q.**    Do you remember what details he gave you?

16   **A.**    Yes.  He said that he worked, primarily, on titanium

17   dioxide; and the most significant projects that he was involved

18   with at the end of his career at DuPont were a plant in the

19   1980s, in Mississippi, and a project in South Korea, which

20   never came to fruition.

21   **Q.**    Now, was that in the beginning of the interview or was

22   that towards the end of the interview?

23   **A.**    That was in the beginning of the interview.

24   **Q.**    That was in the beginning of the interview?

25   **A.**    Yes.

**PATTILLO - CROSS / FROELICH**

1  **Q.**    Now, we -- you talked about an FBI 302.  That's the

2  document that reflects the -- it's a memo reflecting yours and

3  the other agent's interview of my client; isn't that correct?

4  **A.**    Yes, that's correct.

5  **Q.**    I think we talked about this, but you didn't -- you didn't

6  tape-record the interview, did you?

7  **A.**    No, we did not.

8  **Q.**    You didn't have him write out a statement, did you?

9  **A.**    No, we did not.

10  **Q.**    You didn't write up a statement and have him come and sign

11  the statement, did you?

12  **A.**    No, we did not.

13  **Q.**    He did not get to review your 302, did he?

14  **A.**    That is correct.

15  **Q.**    How you do a 302 is somebody, one of you -- you weren't

16  taking notes, right?

17  **A.**    That's correct.  Agent Koblitz was taking notes.

18  **Q.**    But there were times when you were in the room with my

19  client and he was not; isn't that correct?

20  **A.**    Yes, that's correct.

21  **Q.**    And you were talking to him at that time?

22  **A.**    Well, whoever was in the room with him would be talking

23  with him, yes.

24  **Q.**    Okay.  And then several days later you get together with

25  the agent; is that correct?

**PATTILLO - CROSS / FROELICH**

1   **A.**   Uhm --

2   **Q.**   With the other agent?

3   **A.**   We were in communication.  The agent had returned to

4   San Francisco.

5   **Q.**   So he returned to San Francisco.  And then one of you

6   drafts up a 302; is that correct?

7   **A.**   Yes, that's correct.

8   **Q.**   Who drafted up the 302?

9   **A.**   Agent Koblitz.

10   **Q.**   So you have -- you're working off your recollection.  You

11   don't have any notes of the conversation of your own; is that

12   correct?

13   **A.**   I have a copy of Agent Koblitz's notes.

14   **Q.**   Well, you -- you have a copy of his 302?

15   **A.**   Correct.

16   **Q.**   Uhm, let me mark -- I want to talk about that 302.  Can I

17   tell you, what's the last exhibit?

18         **THE CLERK:**  4008, I believe.

19         **MR. FROELICH:**  This would be 4000?

20         **THE CLERK:**  And 9.

21         **MR. FROELICH:**  4009.  Thank you very much.

22      (Trial Exhibit 4009 marked for identification)

23         **MR. FROELICH:**  Your Honor, may I approach?

24         **THE COURT:**  Yes.

25

**BY MR. FROELICH:**

**Q.**   I show you what is marked -- not in evidence, but just marked for identification purposes as 4009.  Exhibit 4009.  Do you recognize that?

    **MR. HEMANN:**  Objection, Your Honor, relevance.

    **THE COURT:**  Sustained.

**BY MR. FROELICH:**

**Q.**   Are you -- on 4009, is that what you're relying on for your testimony?  Didn't you review that for your testimony?

    **MR. HEMANN:**  Objection, Your Honor.

    **THE COURT:**  Sustained.

    **MR. FROELICH:**  Your Honor, may I be heard?

    **THE COURT:**  No.

    **MR. FROELICH:**  Okay.

**BY MR. FROELICH:**

**Q.**   I'd like you to look at that.  I would like to see if this refreshes your recollection.

    **MR. HEMANN:**  Objection, Your Honor.

    **THE COURT:**  Sustained.

**BY MR. FROELICH:**

**Q.**   Do you remember -- do you remember the -- that he talked to you about Condux; isn't that correct?

**A.**   Yes, that's correct.

**Q.**   And he told you at the time that that's how he had met Walter Liew; isn't that correct?

1  **A.**   Yes, that's correct.

2        **MR. HEMANN:**  Your Honor, may I interject and ask that

3  the record should reflect that although the 302 is in front of

4  Special Agent Pattillo, she is not reading it or looking at it?

5        **THE COURT:**  All right.

6        **MR. HEMANN:**  I actually ask that it be taken away

7  right now.

8        **THE COURT:**  Yes, please do.

9        **THE CLERK:**  Can I get the date of that 302, please?

10       **THE COURT:**  No.  We'll do that at another time.

11       **THE CLERK:**  Thank you.

12  **BY MR. FROELICH:**

13  **Q.**   And he told you that Liew was with the Performance Group,

14  is that correct, at the time?

15  **A.**   I don't know that he used -- Walter Liew went through

16  several iterations of company names, so I think he just

17  referred to Mr. Liew as Mr. Liew.

18  **Q.**   And he was looking for conceptual assistance; isn't that

19  correct?

20  **A.**   Mr. Maegerle characterized the assistance he provided as

21  conceptual.

22  **Q.**   And that was in 1997, that's what you were talking about,

23  correct?

24  **A.**   Correct.

25  **Q.**   And then you talked to him about, and he told you about

PATTILLO - CROSS / FROELICH

1   how DuPont had built a TiO2 plant at Ashtabula for

2   Sherwin-Williams; isn't that correct?

3   **A.**   We did discuss the Ashtabula plant, yes.

4   **Q.**   And he told you that DuPont had sold the plant; isn't that

5   correct?

6   **A.**   Yes, yes, he did.

7   **Q.**   And that, in addition, he told you, as you've testified,

8   that he had made up drawings of TiO2 -- of two TiO2 plants;

9   isn't that correct?

10  **A.**   I'm sorry, I'm not clear on the question.

11  **Q.**   Didn't he go and get -- didn't he tell you that he had

12  drawings of the TiO2 plants that he had worked on for Mr. Liew?

13  **A.**   Yes, he did.

14  **Q.**   Okay.  And the -- and then he got the book; isn't that

15  correct?

16  **A.**   He showed us the book, yes.

17  **Q.**   Now, he also told you that Jinzhou, who he was originally

18  working -- which was the first client that he started working

19  for for Mr. Liew; isn't that correct?

20  **A.**   He did mention Jinzhou.

21  **Q.**   All right.  And that the -- they already were operating a

22  chloride plant, chloride line plant in China; isn't that right?

23  **A.**   That's correct.

24  **Q.**   And he also told you that -- he talked about that he was

25  working on a TiO2 plant for the -- in -- for the Pangang Group,

PATTILLO - CROSS / FROELICH

1   didn't he?

2   **A.**   Yes, he did.

3   **Q.**   All right.  And that the plant was going to be a

4   chloride -- chloride line TiO2 hundred-ton plant; isn't that

5   what he told you?

6   **A.**   Yes, it is.

7   **Q.**   He told you he wasn't aware of the ownership structure.

8   He didn't know whether it was government owned or anything

9   about it, did he?

10  **A.**   That's correct.

11  **Q.**   He told you that the last two major projects he worked on

12  for DuPont were the Mississippi, the DeLisle, Mississippi?

13  **A.**   I don't believe he used the term DeLisle, but he did say

14  Mississippi, yes.

15  **Q.**   A plant in Mississippi.  And then a Korean plant which

16  never got built; isn't that correct?

17  **A.**   Yes, it is.

18  **Q.**   And you've looked at his personnel documents, and you know

19  that's the last two -- two that -- two projects that he did for

20  DuPont; isn't that correct?

21  **A.**   Yes.

22  **Q.**   Okay.  Now, he also told you that he was certain that

23  since he retired from DuPont that the TiO2 technology had --

24  had continued to grow; isn't that correct?

25  **A.**   Yes, it is.

1    **Q.**    And he also told you that -- and he told you about the

2    ten-year contract that Sherwin-Williams had with -- about the

3    Ashtabula plant; isn't that correct?

4    **A.**    He discussed that the -- or he mentioned that the

5    Ashtabula plant had been sold to Sherwin-Williams.  I don't

6    believe that we discussed a ten year length of period.

7    **Q.**    You don't remember him telling you that there was a

8    ten-year restriction on Sherwin-Williams' ownership rights to

9    the plant had long since -- that DuPont's ownership rights --

10   excuse me, Sherwin-Williams ownership plans had long expired,

11   and the process had been made available to other competitors?

12   **A.**    He characterized the process from Ashtabula as publicly

13   available to competitors.

14   **Q.**    Now, he also talked about the civil case; isn't that

15   right?

16   **A.**    Yes, it is.

17   **Q.**    That involved the Jinzhou plant, right?

18   **A.**    Yes.

19   **Q.**    Okay.  And he said that he didn't find DuPont's case very

20   compelling; isn't that right?

21   **A.**    That's correct.

22   **Q.**    And that, for example, he said the chlorine catch tank was

23   in the public information; didn't he tell you that?

24   **A.**    Yes, he did.

25   **Q.**    He told you that he had incorporated Pinewater Design?

PATTILLO - CROSS / FROELICH

1    **A.**    Yes, he did.

2    **Q.**    He told you that he was charging $125 an hour; isn't that

3    right?

4    **A.**    That is correct.

5    **Q.**    He also went back and told you about Gaylord Chemical, and

6    that he had done some work for Gaylord Chemical; isn't that

7    right?

8    **A.**    Yes, it is.

9    **Q.**    And he told you what his understanding was about his

10   limitation with DuPont, didn't he?

11   **A.**    In terms of what?

12   **Q.**    Well, he believed that he only had a five-year restriction

13   with DuPont.  Didn't he tell you that?

14   **A.**    Mr. Maegerle said that he believed that he was subject to

15   the same rules as DuPont contractors, and specifically that he

16   couldn't consult for a competitor within a five year time

17   period after having left DuPont.

18   **Q.**    And that he could use the Ashtabula work, the Ashtabula

19   plant which had been sold, whatever information he learned

20   about that, he told you he could use that, right?

21   **A.**    Mr. Maegerle said he believed that the Ashtabula

22   information was in the public domain, yes.

23   **Q.**    Okay.  He also told you that he had kept some DuPont

24   memorandum and documents; isn't this right?

25   **A.**    Yes, he said he had retained some DuPont paperwork.

**PATTILLO - CROSS / FROELICH**

1  Q.   And that he had destroyed them, he just didn't remember

2  when?

3  A.   Yes, that's correct.

4  Q.   And he also told you that he still might have some DuPont

5  stuff around the house; isn't that right?

6  A.   Yes, but he said it wouldn't contain proprietary

7  information.

8  Q.   He also said that -- he talked about proprietary

9  information; isn't that right?

10 A.   Yes.

11 Q.   And he said that he had not -- he had not provided

12 proprietary information.  He used that word, didn't he?

13 A.   Yes, he did.

14 Q.   So he was -- and he distinguished the information he was

15 providing, the type of information he was providing, but not --

16 he was not providing proprietary information; isn't that right?

17 A.   Yes, that's correct.

18 Q.   Said he didn't provide any pink sheets; isn't that right?

19 A.   That's correct.

20 Q.   And he also told you that he didn't have -- he didn't have

21 the -- well, let me go back.

22      He also told you his initials may be on a lot of USAPTI

23 schematics; isn't that right?

24 A.   Yes, that's correct.

25 Q.   And he said some he had reviewed and some he hadn't; isn't

**PATTILLO - CROSS / FROELICH**

1  that right?

2  **A.**   Yes.

3  **Q.**   And he said that his initials basically got put on

4  everything; isn't that right?

5  **A.**   Of USAPTI's, that's correct.

6  **Q.**   That's right.

7       He also told you -- and, by the way, this is over this

8  four-hour period, right?

9  **A.**   Yes.

10 **Q.**   You don't have a note, not one note of what he said to

11 you?

12 **A.**   I personally was not taking notes.

13 **Q.**   And you don't have one recording of it?

14 **A.**   Correct.

15 **Q.**   And you don't have one signed statement of it?

16 **A.**   That is correct.

17 **Q.**   And he was cooperating with you?

18 **A.**   Mr. Maegerle was very cooperative.

19 **Q.**   Do you have any reason why -- to believe --

20       **THE COURT:**  Counsel, let her finish the answer,

21 please.

22       **MR. FROELICH:**  I'm sorry.

23       **THE COURT:**  Thank you very much.

24       **MR. FROELICH:**  I get into a rhythm.

25       **THE COURT:**  All right.  All right.

**PATTILLO - CROSS / FROELICH**

1  BY MR. FROELICH:

2  Q.   You don't have any reason to believe that since he was

3  cooperating with you and talking to you that you could have

4  taken out a recorder and recorded what he said?

5       MR. HEMANN:  Objection, Your Honor.

6       THE COURT:  Overruled.

7       THE WITNESS:  It's not FBI's policy to record

8  interviews.

9  BY MR. FROELICH:

10  Q.   Right.  That's exactly right.  It is not FBI policy to

11  record anything; isn't that right?

12  A.   Yes.

13  Q.   And because they want the word of the agent rather than

14  the recorded of whoever they're interviewing; isn't that right?

15       MR. HEMANN:  Objection.

16       THE COURT:  Sustained.

17  BY MR. FROELICH:

18  Q.   Are you taught that -- you're taught that in school,

19  aren't you?

20       MR. HEMANN:  Objection, Your Honor.

21       THE COURT:  Overruled.

22  BY MR. FROELICH:

23  Q.   You're taught -- you went to the FBI Academy; isn't that

24  correct?

25  A.   Yes.

**PATTILLO - CROSS / FROELICH**

1  Q.   And they teach you not to record when you take statements;

2  isn't that right?

3  A.   No, they told us that it's not FBI policy to record

4  interviews.

5  Q.   Okay.  So that's what they told you, not to record

6  interviews.

7       He also went through and he told you that -- what his

8  email address was; isn't that correct?

9  A.   I believe so.

10 Q.   And he told you the number of people that -- he gave you

11 the names of a lot of people that worked for USAPTI, didn't he?

12 A.   I believe -- I believe he gave us the name of about eight

13 employees.

14 Q.   Okay.  And he -- he also told you that he had been at a

15 meeting in California with some executives from -- was it

16 Pangang or Jinzhou?

17 A.   In November 2010, I think it was Pangang.

18 Q.   Pangang.

19      And he gave you the name of one of those people, didn't

20 he?

21 A.   Of one of the Pangang executives, yes.

22 Q.   He also -- you asked him to identify if there was any

23 DuPont, ex-DuPont people who were working as consultants; isn't

24 that correct?

25 A.   For Walter Liew, yes.

PATTILLO - CROSS / FROELICH

1   Q.   For Walter Liew.  He said he didn't want to do that; isn't

2   that right?

3   A.   Yes, that's correct.

4   Q.   But -- and then he said that he would at least -- he'd

5   give one name; isn't that right?

6   A.   He ended up giving us the name of Daniel McIntosh.  He did

7   that at the beginning of the interview when --

8   Q.   What?

9   A.   He gave us Daniel McIntosh's name when we were in the

10  office.

11  Q.   You weren't there, were you?

12  A.   Not initially, no.

13  Q.   You weren't there when he gave the name Daniel McIntosh,

14  were you?

15  A.   Initially, no.

16  Q.   In fact, you're relying on what you were told?

17  A.   We subsequently talked about Daniel McIntosh when I was

18  present.

19  Q.   And did he -- he gave you some background on McIntosh,

20  didn't he?

21  A.   A little bit.

22  Q.   And what did he tell you about McIntosh?

23  A.   That McIntosh was another former DuPont employee, and that

24  he and Mr. Maegerle had worked briefly with Walter Liew on a

25  project through Condux.

1   Q.   He also told you about other meetings that Mr. Liew had,

2   both in China and in California; isn't that right?

3   A.   Yes, that's correct.

4   Q.   He also told you that DuPont, at one time, had attempted

5   to build -- were in negotiations to build a plant in China;

6   isn't that right?

7   A.   Yes, that's correct.

8   Q.   And he told you that he had no animosity against DuPont,

9   and didn't know anybody that had animosity against DuPont?

10   A.   Yes, that's correct.

11   Q.   Did you learn that Mr. Maegerle's father had worked for

12   DuPont?

13   A.   I believe he may have mentioned that.

14   Q.   And, again, we talked about, earlier, that Mr. Maegerle

15   pointed out to you that -- a computer and a cell phone that you

16   had missed in the search; is that right?

17   A.   I believe our search team had identified the computer, but

18   he did raise the cell phone and bring it to our attention.

19   Q.   And he also told you that it had been 20 years since he

20   had -- over 20 years since he had retired from DuPont, right?

21   A.   Yes.

22   Q.   And that he had no information concerning what had been

23   done at DuPont for the 20 -- since the 20 years that he had

24   left; isn't that right?

25   A.   Yes, that's correct.

PATTILLO - CROSS / FROELICH

1  Q.   And he also knew -- you knew and you've talked about that

2  the Basic Data Book was in 1985; was it not?

3  A.   I don't believe we ascribed a date to that during the

4  course of the interview.

5  Q.   Well, you know that, don't you?

6  A.   Yes, I do.

7  Q.   Now, you never asked Mr. Maegerle about Kuan Yin, did you?

8  A.   I asked Mr. Maegerle on several occasions about Kuan Yin.

9  Q.   You -- but you didn't make any notes of that, or you

10 didn't write it down, right?

11 A.   Agent Koblitz wrote it down.

12 Q.   Okay.  And you didn't record that?

13 A.   No, we did not record that.

14 Q.   And you didn't record his response?

15 A.   No, we did not.

16 Q.   You didn't have him sign anything?

17 A.   That is correct.

18 Q.   And this was in July of 2011; is that right?

19 A.   That's correct.

20      **MR. FROELICH:**  That's all I have.

21      **THE COURT:**  Thank you, Counsel.

22      Ms. Lovett.

23      **MS. LOVETT:**  Yes, Your Honor.

24      Your Honor, may I proceed?

25      **THE COURT:**  Yes, you may.

<u>**CROSS-EXAMINATION**</u>

**BY MS. LOVETT:**

**Q.**   Good morning, Agent Pattillo.

**A.**   Good morning.

**Q.**   Barely.

You testified last week that you were the lead agent on

the search of the Maegerle residence, correct?

**A.**   That's correct.

**Q.**   And you went through a number of documents seized in that

search, with Mr. Hemann, right?

**A.**   Yes, that's correct.

**Q.**   And you're generally familiar with the documents that were

collected during that search, correct?

**A.**   Generally, yes.

**MS. LOVETT:**   Your Honor, may I approach with Exhibit

221?

**THE COURT:**   Yes, you may.

**MS. LOVETT:**   And, Your Honor, one further point of

clarification, the original of Exhibit 221 is quite difficult

to read, so may I also approach with a copy?

**THE COURT:**   Yes.   And, all counsel, where possible I'd

like to use the actual exhibits rather than copies.   But if

there's a problem with its legibility you may.

**MS. LOVETT:**   Thank you, Your Honor.

**MR. HEMANN:**   We agree to use, in this particular case,

1  copies of data -- I mean the originals can use a copy.

2          **THE COURT:**  Okay.  Very well.

3  **BY MS. LOVETT:**

4  **Q.**   Agent Pattillo, are you familiar with this document?

5  **A.**   Yes, I am.

6  **Q.**   What is it?

7  **A.**   It's correspondence from Condux Consulting Company to

8  Robert Maegerle.

9  **Q.**   And what is the date on this document?

10 **A.**   August 5th, 1997.

11         **MS. LOVETT:**  And, Your Honor, the parties have

12 stipulated that this document was seized at the Maegerle

13 residence and may be offered by any witness into evidence.

14         **THE COURT:**  Is that correct, Mr. Hemann?

15         **MR. HEMANN:**  Yes, it is, Your Honor.

16         **THE COURT:**  Are you offering it?

17         **MS. LOVETT:**  Yes, Your Honor.

18         **THE COURT:**  All right it's admitted.

19     (Trial Exhibit 221 received in evidence.)

20     (Document displayed.)

21 **BY MS. LOVETT:**

22 **Q.**   The copy on the screen may be a bit more legible, as well,

23 than the one you have.

24         **MS. LOVETT:**  Mr. Guevara, if you could display the

25 first three paragraphs of this letter.

1          (Document displayed.)

2     BY MS. LOVETT:

3     Q.    Agent Pattillo, would you mind reading just the first

4     three paragraphs of this letter for the jury?

5     A.    Certainly.

6              "Dear Bob:

7              "Mike Marinak, private consultant in Petaluma,

8          California, and his partner, Walter Liew of LH Performance

9          Inc. in Alameda, CA would like to visit with you at the

10         Condux office in the near future.  Their purpose is to

11         evaluate whether to engage you as a consultant relative to

12         the chloride route TiO2.

13             "As I have mentioned earlier, they are planning to

14         bid on and then prepare a technology package that will

15         form the production design basis for a 25,000 metric tons

16         per year TiO2 plant to be built in China.  A Chinese

17         design firm will provide final facilities design and

18         installation.  The fee will be a 88 percent rutile slag

19         and we understand that some site work has already begun.

20             "Marinak indicates that he and Liew have done other

21         similar work in China.  Their method of operation, as

22         unbelievable as it sounds, is to gather technical and

23         process information from available public sources and

24         patent literature, and then put a package together.

25         However, Mike does recognize that his proposal must be

1    more than just a, quote, paper study, end quote, and that

2    is where you come in.  Your role will be as an advisor and

3    reviewer of the work to be done by others.

4        "Because your expertise was obtained while working

5    for DuPont, Marinak would expect that you not divulge any

6    process, product, scientific or engineering information

7    that you feel is still proprietary.  However, for those

8    areas that are currently in the public domain I'm sure

9    that you can improve on literature-generated information,

10   and that is what Marinak is looking for."

11   **Q.**   Thank you so much, Agent Pattillo.

12       **MS. LOVETT:**  Your Honor, may I approach with

13   Exhibit 1076?

14       **THE COURT:**  Yes, you may.

15   **BY MS. LOVETT:**

16   **Q.**   Agent Pattillo, are you familiar with this document?

17   **A.**   Yes, I am.

18   **Q.**   What is it?

19   **A.**   This is an invoice from Condux, Inc., to Mr. Maegerle.

20       **MS. LOVETT:**  And, Your Honor, the parties have

21   stipulated that this document was seized at the Maegerle

22   residence.

23       **THE COURT:**  All right.  Is that correct, Mr. Hemann?

24       **MR. HEMANN:**  It is, Your Honor.

25       **THE COURT:**  All right.  Are you offering it?

1              MS. LOVETT:  Defendants move to admit this exhibit.

2              THE COURT:  It's admitted.

3              MR. HEMANN:  And we have no objection, Your Honor.

4              THE COURT:  It's admitted then.

5          (Trial Exhibit 1076 received in evidence)

6    BY MS. LOVETT:

7    Q.    Agent Pattillo, can you please read the header of this

8    document?

9    A.    (reading)

10             "Condux, Inc., a Consulting Association of Former

11       DuPont Professionals, 201 Possum Park Road, Suite 9,

12       Newark, Delaware 19711, 302-738-9200."

13   Q.    Thank you very much.

14             MS. LOVETT:  Your Honor, may I approach with

15   Exhibit 718?

16             THE COURT:  Yes, you may.

17                      (Pause in proceedings.)

18             MS. LOVETT:  Just one moment, Your Honor.

19                      (Pause in proceedings.)

20   BY MS. LOVETT:

21   Q.    Agent Pattillo, are you familiar with this document?

22   A.    Yes, I am.

23   Q.    What is it?

24   A.    This is a letter to Walter Liew from Dan McIntosh.

25             MS. LOVETT:  Your Honor, the parties have stipulated

1    that this document was also seized at the Maegerle residence.

2              **THE COURT:**  Is that correct, Mr. Hemann?

3              **MR. HEMANN:**  Yes, Your Honor.

4              **THE COURT:**  All right.  So stipulated.

5              **MS. LOVETT:**  And defendants move to admit Exhibit 718

6    into evidence.

7              **MR. HEMANN:**  No objection, Your Honor.

8              **THE COURT:**  Admitted.

9         (Trial Exhibit 718 received in evidence)

10   **BY MS. LOVETT:**

11   **Q.**   Agent Pattillo, do you recognize the handwriting on this

12   document near the second half?

13   **A.**   Yes, I do.

14   **Q.**   Whose handwriting is that?

15   **A.**   It appears to be Mr. Maegerle's handwriting.

16   **Q.**   And can you read the statement in his handwriting to the

17   jury?

18   **A.**   Yes.  It says, "DuPont clearance for TiO2 work," question

19   mark.

20   **Q.**   And I believe you already mentioned this, but this letter

21   is signed by Daniel McIntosh; correct?

22   **A.**   Yes, that's correct.

23   **Q.**   Thank you.

24        Agent Pattillo, you interviewed an individual named Paul

25   Reis or Rice (phonetic) on January 30th, 2012; correct?

1  A.   Yeah, I believe that date is correct, but I definitely

2  interviewed Mr. Reis.

3  Q.   And are you aware that his attorney provided a number of

4  documents to the FBI after that interview?

5         MR. HEMANN:  Objection, Your Honor.

6         THE COURT:  Well, the question is are you aware.

7         THE WITNESS:  Yes, I do believe he did.

8  BY MS. LOVETT:

9  Q.   Your office took possession of those documents; correct?

10        THE COURT:  The objection is overruled.

11        MR. HEMANN:  All right.  Thank you.

12        THE WITNESS:  It was another agent from my office,

13  yes.

14  BY MS. LOVETT:

15  Q.   Are you familiar with those documents?

16  A.   I did not see the documents, no.

17        MS. LOVETT:  No further questions, Your Honor.

18        THE COURT:  Thank you.

19        MR. FROELICH:  Your Honor, I forgot two questions, if

20  I might.

21        THE COURT:  Really, two?  I never met a lawyer --

22                        (Laughter)

23        THE COURT:  -- who could restrain him or herself with

24  two.

25        MS. LOVETT:  Your Honor, may I approach to retrieve

PATTILLO - CROSS / FROELICH

1    the exhibits?

2           THE COURT:  Yes, you may.

3       Certainly you can proceed.  You can ask more than two if

4    you wish.

5           MR. FROELICH:  I understand, Your Honor.

6                  CROSS-EXAMINATION    (resumed)

7    BY MR. FROELICH:

8    Q.   I forgot one area.

9        Mr. Maegerle told you that he had gotten permission from

10   DuPont to be a consultant; isn't that correct?

11   A.   Mr. Maegerle said that in the mid-'90s he had been

12   approached by a consulting firm, I think in Atlanta, who was

13   interested in using his services for a Kimera contract.  So he

14   said he contacted DuPont and requested permission, yes.

15   Q.   Okay.  He gave you two names when he was talking about

16   permission from DuPont; didn't he?

17   A.   Yes, he did.

18   Q.   Tell the ladies and gentlemen of the jury the two names he

19   gave you?

20   A.   Dennis Dakin and I cannot recall the other name.

21   Q.   Would you remember if it was Drew McCullin?

22   A.   Yes.

23   Q.   And you didn't remember the other name because it's been a

24   while, isn't that correct, since that interview with

25   Mr. Maegerle?

PATTILLO - REDIRECT / HEMANN

1   **A.**    Yes.

2   **Q.**    And you have reviewed the notes of it just recently?

3   **A.**    I did review the notes recently, yes.

4          **MR. FROELICH:**  Thank you.

5          **THE COURT:**  Mr. Hemann, any redirect?

6          **MR. HEMANN:**  Yes, Your Honor.  Thank you.

7                    <u>**REDIRECT EXAMINATION**</u>

8   BY MR. HEMANN:

9   **Q.**    A few questions, Special Agent Pattillo.

10         First of all, do you recall discussion with Mr. Froelich

11  about metadata attached to Exhibits 5 and 10?

12  **A.**    Yes, I do.

13  **Q.**    Ms. Mahoney, when the computer comes on, can we put up

14  Exhibit 5, page 2?

15         But do you have a general recollection --

16  **A.**    Yes, I do.

17  **Q.**    -- of the metadata?

18         The metadata associated with that document, was that added

19  somehow by the FBI or did it come with the document itself?

20  **A.**    No.  I believe that was some electronic information that

21  was provided by some of our experts in this area.

22  **Q.**    And does that electronic information correspond to the

23  document as it was found on the thumb drive?

24  **A.**    I don't understand the question.

25  **Q.**    Let me put the document up.

PATTILLO - REDIRECT / HEMANN

1     And if you could blow up the top of that.

2     There are three dates:  Accessed date, created date, and

3  modified date.  Do you see those?

4  **A.**   Yes.

5  **Q.**   Do all of those dates precede the FBI's first involvement

6  in the case?

7  **A.**   Yes, they do.

8  **Q.**   And do those dates correspond to activities that occurred

9  with the document on or about those particular dates?

10         **MR. FROELICH:**  Objection, Your Honor.  She's --

11         **THE COURT:**  Sustained.

12  **BY MR. HEMANN:**

13  **Q.**   Do you know what those dates generally correspond to?

14  **A.**   I believe so.

15  **Q.**   And what do you know?

16         **MR. FROELICH:**  Again, I'm going to object to

17  "generally correspond to."

18         **THE COURT:**  Pardon me?

19         **MR. FROELICH:**  I object to the question.

20         **THE COURT:**  Sustained.  Lack of foundation.

21  **BY MR. HEMANN:**

22  **Q.**   Mr. Froelich asked you some questions about these

23  particular dates.  Do you remember that?

24  **A.**   Yes, I do.

25  **Q.**   And he asked you what you knew about what you believed

**PATTILLO - REDIRECT / HEMANN**

1  created, modified, and accessed.  Do you remember that?

2  **A.**   Yes.

3  **Q.**   And do you remember testifying as to what you believed

4  those meant?

5  **A.**   Yes.

6  **Q.**   Do you believe that -- further, do you believe that those

7  dates correspond to activities with the underlying document?

8  **A.**   Yes.

9  **Q.**   Why is that?

10  **A.**   My understanding is that --

11          **MR. FROELICH:**  I'm going to object to what her

12  understanding is, Your Honor.

13          **THE COURT:**  Sustained.  Lack of foundation for this

14  witness.

15  **BY MR. HEMANN:**

16  **Q.**   Did the FBI -- let me ask a different question.

17  **A.**   Okay.

18  **Q.**   Did the FBI have possession of this document on any of

19  those three dates?

20  **A.**   No, we did not.

21  **Q.**   Do you know who accessed this document on August 21st,

22  2008?

23  **A.**   No, I do not.

24  **Q.**   Have you ever seen any FBI report that suggests that the

25  FBI knows who accessed this document on August 21st, 2008?

1              MR. FROELICH:  I'm going to object, Your Honor.

2              THE WITNESS:  No, I don't.

3              THE COURT:  All right.  Sustained.

4    BY MR. HEMANN:

5    Q.    Do you know who created this document on the thumb drive

6    on January 23rd, 2008 -- January -- yes.  Do you know who

7    created this document on the thumb drive on that date?

8    A.    No, I don't.

9    Q.    And do you know who modified this document on the computer

10   that Mr. Froelich referred to on December the 14th, 2007?

11   A.    No, I don't.

12   Q.    And if I were to ask you the same set of questions with

13   regard to Exhibit 10 and the metadata associated with

14   Exhibit 10, would your answers be the same?

15   A.    Yes.

16   Q.    Thank you.

17         Mr. Froelich asked you some questions about the Basic Data

18   Document; correct?

19   A.    Yes.

20   Q.    And he asked you if the Basic Data Document itself

21   referred to the -- Exhibit 161 referred to the location of the

22   project.  Do you remember that, Taiwan versus another project?

23   A.    Correct.

24   Q.    You do remember that?

25   A.    Yes, I do.

1          **MR. HEMANN:**  Your Honor, may I approach the witness

2    with what's been entered into evidence as Exhibit 161?

3          **THE COURT:**  Yes, you may.

4                    (Pause in proceedings.)

5    **BY MR. HEMANN:**

6    **Q.**   And if you could look at the second page of that document.

7    **A.**   (Witness examines document.)

8    **Q.**   If you could put up 161, page 2.  Blow up the text,

9    please.

10         Is this document addressed to Mr. Maegerle, Special Agent

11   Pattillo?

12   **A.**   Yes, it is.

13   **Q.**   And does the first paragraph of this refer to the situs,

14   the location, of the project?

15   **A.**   Yes, it does.

16   **Q.**   And what is the location?

17   **A.**   The plant presently planned for Taiwan.

18   **Q.**   Mr. Froelich also asked you some questions about the Asia

19   project.  Do you remember that?

20   **A.**   Yes.

21   **Q.**   And he asked you some questions about the Korea project on

22   which Mr. Maegerle worked.  Do you remember that?

23   **A.**   Yes.

24   **Q.**   And do you remember that Mr. Froelich asked you some

25   questions about Government Exhibit 722?

1   A.   Yes.

2          MR. HEMANN:   And, Your Honor, this is in evidence.

3       And, Ms. Mahoney, would you be so kind as to put up

4   page 14 of Exhibit 722?  And could you blow up the

5   second-to-last paragraph?  No.  Second-to-last one.  Sorry.

6   One more down from that, please.

7   Q.   Could you please read that text, Special Agent Pattillo?

8   A.   Yes.  (reading)

9          "In mid-1985 I began front-end-loading activities for

10         the proposed Asian TiO2 ventures and guided these

11         activities to completion of a Taiwan technology package

12         and scope of work for a similar Korea plant."

13  Q.   Could you please put up the next page, Ms. Mahoney?  And

14  page 15.  And blow up the top several lines.

15         Ms. Lovett asked you a question about whether you

16  recognized Mr. Maegerle's handwriting.  Do you remember that?

17  A.   Yes, I do.

18  Q.   And you answered the question "yes"?

19  A.   Correct.

20  Q.   Do you recognize the handwriting on this page?

21  A.   Yes, I do.

22  Q.   Whose is it?

23  A.   It appears to be Mr. Maegerle's handwriting.

24  Q.   Can you please read the first entry on this page?

25  A.   (reading)

1            "6-85 to 9-87, Asia TiO2 ventures Taiwan/Korea."

2  **Q.**   Thank you, Special Agent Pattillo.  Just a couple more

3  questions.

4            Mr. Froelich asked you a series of questions about the

5  conduct of the search warrant and the meeting that you had with

6  Mr. Maegerle prior to the execution of the search warrant;

7  correct?

8  **A.**   Correct.

9  **Q.**   Could you describe -- when you and Special Agent Koblitz

10  first approached the door and knocked on it, can you describe

11  how you were dressed?

12  **A.**   I was wearing a business suit as was Mr. Koblitz.

13  **Q.**   You agreed with Mr. Froelich's question about being

14  questioned that you were armed.  Do you remember that?

15  **A.**   Yes.

16  **Q.**   Can you describe where your firearm was when you

17  approached the front door?

18  **A.**   Yes.  I was wearing my firearm in a holster on my right

19  hip.  It was covered by my suit jacket.

20  **Q.**   And Special Agent Koblitz?

21  **A.**   The same.

22  **Q.**   When the eight to ten other agents arrived an hour later

23  to conduct the search, you stated that they were armed as well.

24  Do you remember that?

25  **A.**   Yes.

1  **Q.**   And were their firearms visible outside their clothing?

2  **A.**   They may have been.  They were wearing firearms on their

3  hips as well, and they may not all have had concealing

4  garments.

5  **Q.**   Does the wearing of firearms relate to certain FBI

6  policies?

7  **A.**   We're obligated to wear our firearms at a search site.

8  **Q.**   And when you say "obligated," what do you mean?

9  **A.**   Well, it's our general practice to be armed at search

10  sites.

11  **Q.**   And that is a general practice that's mandated by FBI

12  regulations; correct?

13  **A.**   It's our general practice.  I'm unclear if there's an FBI

14  regulation which stipulates specifically that we have to do

15  that.

16  **Q.**   You were asked a question about whether you informed

17  Mr. Froelich [sic] that he was a suspect in the case.  Do you

18  remember that?

19  **A.**   Yes, I do.

20  **Q.**   And you said that you did not.  Do you remember that?

21  **A.**   Correct.

22  **Q.**   Is "suspect" a term that is used by the FBI to describe

23  individuals who are involved in any way in FBI investigations?

24  **A.**   No, it is not a term we use.

25  **Q.**   Have you in your career ever informed anyone that they are

PATTILLO - REDIRECT / HEMANN

1   a suspect?

2   **A.**   No, I have not.

3   **Q.**   Have you ever been in the presence of an FBI agent who has

4   informed anyone that they are a suspect?

5   **A.**   No, I have not.

6   **Q.**   Mr. Maegerle also asked -- Mr. Froelich also asked you a

7   series of questions regarding your note taking and the

8   preparation of the 302.  Do you remember those?

9   **A.**   Yes, I do.

10  **Q.**   And also questions related to the tape recording of -- or

11  the not tape recording of the interview and the sworn

12  statement.  Do you remember those?

13  **A.**   Yes, I do.

14  **Q.**   Is there anything that you or Special Agent Koblitz did

15  with regard to those matters that was different than standard

16  FBI policy?

17  **A.**   No.

18  **Q.**   When you spoke to Mr. Maegerle, did he say at any time

19  that he was distressed?

20  **A.**   No, he did not.

21  **Q.**   Did he say at any time that he was worried?

22  **A.**   No, he did not.

23  **Q.**   Did you have an opportunity over the course of the time

24  that you were there to observe Mr. Maegerle's demeanor?

25  **A.**   Yes, I did.

PATTILLO - REDIRECT / HEMANN

1   **Q.**   Did he appear to you that he was distressed at any time?

2   **A.**   Mr. Maegerle seemed very composed.

3   **Q.**   Did he appear to you at any time in answering your

4   questions to be confused?

5   **A.**   No.

6   **Q.**   Mr. Froelich asked you a series of questions with regard

7   to the drawings, the binder that is in evidence as Exhibit

8   Number 53.  Do you remember that?

9   **A.**   Yes, I do.

10  **Q.**   And one of the questions he asked you was whether this

11  only referred to the Pangang project.  Do you remember that?

12  **A.**   Yes.

13  **Q.**   And you responded that you did not know?

14  **A.**   Correct.

15           **MR. HEMANN:**  Your Honor, may I approach with

16  Exhibit 53?

17           **THE COURT:**  Yes.

18  **BY MR. HEMANN:**

19  **Q.**   Special Agent Pattillo, is this the binder that we looked

20  at previously?

21  **A.**   Yes, it is.

22  **Q.**   If you could, please, turn to page 14 of the binder.  You

23  have to page through, I guess.

24           Actually, it's in evidence.  Ms. Mahoney, could you put up

25  page 14?

**PATTILLO - REDIRECT / HEMANN**

1      Do you see the page on the screen, Special Agent Pattillo?

2  **A.**    Yes.

3  **Q.**    And does that page of the binder contain a reference to

4  30,000 tons per year TiO2?

5  **A.**    Yes, it does.

6  **Q.**    And do you know that to be the Pangang project or the

7  Jinzhou project?

8  **A.**    That is a reference to the Jinzhou project.

9  **Q.**    Mr. Froelich asked you about the length of the interview,

10  and you referred him to the full amount of time that you were

11  there, which is approximately four hours.  Do you remember

12  that?

13  **A.**    Correct.

14  **Q.**    Was there any distinction in the interview between the

15  first hour and the subsequent three?

16  **A.**    We covered the majority of the topics actually in the

17  first hour, and then sort of revisited a couple of things, in

18  particular the Kuan Yin topic, and asked for some additional

19  clarification for the rest.

20  **Q.**    Mr. Froelich asked you some questions about Mr. Maegerle

21  saying that he had kept some DuPont material after he left the

22  company; correct?

23  **A.**    Correct.

24  **Q.**    How did Mr. Maegerle characterize the DuPont material that

25  he had kept?

1   **A.**   He said it was -- he had not retained any proprietary

2   information.

3   **Q.**   And did he tell you whether it was information that he had

4   authored and was proud of?

5   **A.**   He said that he had retained some information that he had

6   authored and was proud of, but that he'd gotten rid of most of

7   it over time.

8   **Q.**   I think at one point I misspoke and said did you inform

9   Mr. Froelich that he was a suspect and not Mr. Maegerle.  Did

10   you recall me misspeaking that way?

11   **A.**   I do not.

12   **Q.**   Okay.

13   **A.**   I informed nobody that they were a suspect.

14   **Q.**   Okay.  Thank you, Special Agent Pattillo.

15           **MR. HEMANN:**  Your Honor, I have no further questions.

16           **THE COURT:**  Anything further, Mr. Froelich?

17           **MR. FROELICH:**  No, Your Honor.

18           **THE COURT:**  All right.

19           **MS. LOVETT:**  No, Your Honor.

20           **THE COURT:**  All right.  You may be excused.  Thank

21   you, Agent.  You can leave everything there.

22                       (Witness excused.)

23           **THE COURT:**  Let's take a stretch break while we're

24   calling the next witness.

25                       (Pause in proceedings.)

1          THE COURT:  All right.  Please call your next witness.

2          MR. HEMANN:  Your Honor, the United States calls

3   Philipp Ilagan.

4          THE COURT:  Come forward, sir.

5      You may be seated when you're ready, ladies and gentlemen.

6          THE CLERK:  Raise your right hand, please.

7                        PHILIPP ILAGAN,

8   called as a witness for the Government, having been duly sworn,

9   testified as follows:

10          THE WITNESS:  Yes.

11          THE CLERK:  Thank you.

12      Please be seated and state and spell your full name for

13   the record.

14          THE WITNESS:  Philipp Ilagan.

15          THE CLERK:  Spell it, please.

16          THE WITNESS:  P-H-I-L-I-P-P.  Last name Ilagan,

17   I-L-A-G-A-N.

18          THE CLERK:  Thank you.

19                      DIRECT EXAMINATION

20   BY MR. HEMANN:

21   Q.   Good morning, Mr. Ilagan.

22      Was there a time that you were employed by a company

23   called Performance Group?

24   A.   Yes.

25   Q.   When was that?

ILAGAN - DIRECT / HEMANN

1   **A.**   Summer between July 2008.

2   **Q.**   And what was the length of your employment with

3   Performance Group?

4   **A.**   Like three years.

5   **Q.**   What was your start date and what was your end date?

6   **A.**   Start date between June or July 2008 to somewhere between

7   April or May 2011.

8   **Q.**   Can you move the microphone just slightly closer so that

9   we can hear?

10      So you worked for Performance Group from summer 2008 till

11  early 2011; correct?

12  **A.**   Yes.

13  **Q.**   And just a couple of notes.  You have to keep the

14  microphone close; and when you answer, please sort of say your

15  answer audibly rather than nodding.  Okay?  Yes?

16  **A.**   Yes.

17  **Q.**   Okay.  How did you come to be employed by Performance

18  Group?

19  **A.**   I saw an ad on Craigslist regarding a piping designing

20  job.

21  **Q.**   Did you have a background in piping and designing?

22  **A.**   I have a little background in piping designing.  I was

23  working in Chevron doing piping designing for a year -- a year

24  and a half or a year at that time.

25  **Q.**   Did you answer the Craigslist ad?

**ILAGAN - DIRECT / HEMANN**

1    **A.**   Yes, I did.

2    **Q.**   And what did you do?  Did you go have an interview or send

3    a résumé?

4    **A.**   I sent a résumé, and I got respond back from him.

5    **Q.**   When you say "him," who do you mean?

6    **A.**   Walter.

7    **Q.**   Mr. Liew?

8    **A.**   Yes.

9    **Q.**   And what was Mr. Liew's response?

10   **A.**   I forgot already as far as that.  I mean, basically he

11   wants to get -- he wants me -- he wants to interview me as far

12   as that job.

13   **Q.**   Did you go in and have an interview?

14   **A.**   Yes, I did.

15   **Q.**   Were you hired?

16   **A.**   What do you mean?  Yeah, of course.

17   **Q.**   Okay.  What were you hired to do?

18   **A.**   At that time it's a piping designing job, to finish the

19   piping designing.

20   **Q.**   Piping designing for what?

21   **A.**   For the plant, 30,000K.  At that time I didn't know what

22   job, but I was hired for a piping designing job.

23   **Q.**   Did, over the next several years that you were employed,

24   did your piping and designing duties evolve at all?  Did they

25   change?

1   **A.**    Yes.

2   **Q.**    How did they change?

3   **A.**    I was doing some P&IDs, doing some autoCAD drafting as far

4   as different disciplines.

5   **Q.**    When you started at Performance Group in 2008, who were

6   the employees --

7   **A.**    BJ --

8   **Q.**    -- the other employees?

9   **A.**    I remember BJ, Sudha, Dinesh, and I think Wendell at that

10  time doing consulting.  He doesn't work there, but he's doing

11  consulting.  And I think Bob something over there.

12  **Q.**    When you say "Bob," you referenced your hand.  Are you

13  referring to Mr. Maegerle?

14  **A.**    Yeah, but at that time -- I already know Bob at that time

15  as far as he's actually working for Walter.

16  **Q.**    Of the -- did you have an opportunity to work with the

17  individuals, and let's set Mr. Maegerle aside for one moment,

18  the other individuals that you listed, BJ, Dinesh, Sudha, and

19  Mr. Wendell Baker is a consultant; correct?

20  **A.**    I think there's another guy.  I forgot his name.  I think

21  JC or some guy doing the same job as me, but I couldn't

22  remember his name no more.

23  **Q.**    What did the job entail?  Did you find -- after you

24  started, what did you find out the job involved?

25  **A.**    It's a piping -- basically it's a piping job that I have

1    to route the piping, estimate routing as far as what's in the

2    P&ID to oxidation plant.

3    **Q.**    Did you have an understanding as to what the project was

4    that you were working on?

5    **A.**    Understanding at that time, no.  I just -- they just want

6    me to pipe it.

7    **Q.**    And at some point in time did you gain an understanding as

8    to what the project was that you were working on?

9    **A.**    Oh, yes.

10   **Q.**    And what was the project that you were working on?

11   **A.**    TiO2 chemical plant.

12   **Q.**    Prior to starting work with Mr. Liew at Performance Group,

13   did you have any experience with TiO2?

14   **A.**    No.

15   **Q.**    What other -- what chemicals had you had experience with

16   prior to working at Performance Group?

17   **A.**    Just the refinery, but it's not chemical.

18   **Q.**    Did you have an opportunity to interact with or work with

19   the other individuals that you listed?

20   **A.**    Mostly with Sudha and once in a while with BJ at that

21   time.

22   **Q.**    Did you come to know whether they had experience with

23   TiO2?

24   **A.**    At that time, no.  I'm not sure if they have experience in

25   TiO2.

**ILAGAN - DIRECT / HEMANN**

1  Q.   At what point in time did you become familiar with

2  Mr. Maegerle?

3  A.   That's probably a year or something after I worked there

4  because I don't really deal with Bob.

5  Q.   What occasion did you begin to deal with Mr. Maegerle?

6  A.   Oh, can you repeat that question?  I'm sorry.

7  Q.   On what occasion did you begin to deal with Mr. Maegerle?

8  A.   I did basically, like, a couple of times or three times

9  dealing with some piping suggestion; and there's another one

10  trying to get some, like, showing the Madera -- I sent him some

11  drawings from Madera involving something.

12  Q.   Why did you do that?

13  A.   Because I had to get some approvals if this is -- the

14  writing is okay or not.

15  Q.   At some point in time did Mr. Liew hire additional

16  employees to work at Performance Group?

17  A.   Can you repeat that?

18  Q.   At some point in time did Mr. Liew hire additional

19  employees to work at Performance Group?

20  A.   Yes.

21  Q.   When was that?

22  A.   There's a lot of people.  With the three years that I was

23  working with them, there's a lot of people that had been

24  working in different discipline.

25  Q.   Say again.  I'm sorry.

ILAGAN - DIRECT / HEMANN

1  A.   There's a lot of people that work there on and off thing.

2  Basically they work there and then they're out.

3  Q.   I'm sorry.  Let me -- I think we're talking over each

4  other a little bit.

5       Say your answer again, please.

6  A.   Okay.  Basically when they -- what they -- the three years

7  period that I worked for Walter, there's basically a lot of

8  people that I've seen work there for, like, you know, certain

9  period of time and then let go after that.

10  Q.   At some point in time did Mr. Liew hire somebody by the

11  name of Tony Duong?

12  A.   Yes.

13  Q.   And who's Tony Duong?

14  A.   I think he's our IT guy or -- I'm not really sure what's

15  his title, but he's dealing with IT stuff.

16  Q.   And did you have an opportunity to observe Mr. Liew's

17  interactions with Tony Duong?

18  A.   I mean, they go out, take lunch together, you know.

19  Q.   Was Mr. Liew closer to Mr. Duong than he was to the other

20  employees?

21       MS. AGNOLUCCI:  Objection.

22       THE COURT:  Sustained.

23  BY MR. HEMANN:

24  Q.   Did you have an opportunity to observe Mr. Liew's

25  relationship with Mr. Duong as compared to other employees?

1  A.    I just notice they talk a lot, I mean, as far as that.

2  Q.    How would you characterize Mr. Liew's relationship with

3  Mr. Duong?

4  A.    What is that supposed to mean, sir?

5  Q.    How would you describe his relationship with Mr. Duong?

6  A.    Probably closer or something.  Close or something because

7  they interact a lot, they talk a lot, so....

8  Q.    You said that you worked on the 30,000 -- 30K plant.  Do

9  you remember that?

10  A.    Yes.

11  Q.    The 30K design I think you said.  Do you remember whether

12  that -- whether the project had a name other than 30K?

13  A.    Pretty much I call it 30K.  They call it the Jinzhou or

14  something, but I typically call it 30K.  It's easier for me.

15  Q.    You said you left in April?

16  A.    Yeah, somewhere between there, April or -- from March to

17  May, probably, 2011.

18  Q.    Did you work on the 30K project the entire time you were

19  at Performance Group?

20  A.    Yes, I was working on it.

21  Q.    Was the 30K project done when you left Performance Group?

22  A.    No.

23  Q.    Did you also work on another project?

24  A.    Yes.

25  Q.    What was that project?

**ILAGAN - DIRECT / HEMANN**

1  **A.**    100K.

2  **Q.**    When did you start working on the 100K project?

3  **A.**    I don't have the specific date for that, but probably a

4  year or year and a half, two years after 30K.  After I've been

5  there, but it's been awhile.

6  **Q.**    Were you paid by Mr. Liew for your work at Performance

7  Group?

8  **A.**    Yes.

9  **Q.**    What was your payment arrangement with him?

10  **A.**    I think I was 1099 contract employee.

11  **Q.**    Okay.  And what do you mean by "1099"?

12  **A.**    It's a contract employee.  Basically it's not directly --

13  what's a 1099?  It's a type of payment that you're not actually

14  working for -- I mean, you're working for a company, but it's

15  not under that company.

16  **Q.**    And to whom did you report at Performance Group?

17  **A.**    Walter.

18  **Q.**    Did you bring your own equipment to work?

19  **A.**    No.  They have their own equipment.

20  **Q.**    How much were you paid?

21  **A.**    I was making 40, at that time, an hour.

22  **Q.**    $40 an hour?

23  **A.**    Yes.

24  **Q.**    And was that a consistent amount for the whole time you

25  were there?

1   A.   Yes.

2   Q.   How often were you paid?

3   A.   Every two weeks.

4   Q.   And were you paid consistently throughout the time you

5   were there 2008 through 2011?

6   A.   There's a time that he didn't give me, but mostly it's

7   consistent, yes.

8   Q.   And how long was that time that he didn't give you the

9   money?

10  A.   Probably not even a month or something, or -- but the

11  1099, I mean, there's rules that they cannot pay me, like, 45

12  days until you have finished something.

13          MR. HEMANN:  Thank you, Your Honor.  No further

14  questions.

15          THE COURT:  All right.  Ms. Agnolucci?

16          MS. AGNOLUCCI:  Yes, Your Honor.

17                  (Pause in proceedings.)

18          MS. AGNOLUCCI:  May I proceed?

19          THE COURT:  Yes.

20                  **CROSS-EXAMINATION**

21  BY MS. AGNOLUCCI:

22  Q.   Good afternoon, Mr. Ilagan.

23  A.   Good afternoon.

24  Q.   You testified that you worked for USAPTI for roughly three

25  years?

**ILAGAN - CROSS / AGNOLUCCI**

1   **A.**   Yes.

2   **Q.**   Did you consider Mr. Liew to be a mentor to you?

3   **A.**   Yes.

4   **Q.**   Would you say he was a good boss to you?

5   **A.**   Yes.

6   **Q.**   And would you say he was a smart guy?

7   **A.**   Yes.

8   **Q.**   Would you say he was a good engineer?

9   **A.**   Yes.

10          **THE COURT:**  You have to answer audibly, sir, "yes" or

11  "no" or say something verbally.

12          **THE WITNESS:**  I say yes.

13          **THE COURT:**  All right.  Thank you.

14  **BY MS. AGNOLUCCI:**

15  **Q.**   Your work at USAPTI related to designs for two TiO2

16  plants; correct?

17  **A.**   Yes.

18  **Q.**   The 30K and the 100K project?

19  **A.**   Yes.

20  **Q.**   And your specific job at USAPTI was to work on piping

21  design; correct?

22  **A.**   Yes.

23  **Q.**   You testified earlier about something called a P&ID.

24  **A.**   That's after -- after I'm done with the piping, the one

25  I'm doing, I start doing different things.  One of them is

1    P&ID.

2    **Q.**    Can you please tell the jury what a P&ID is?

3    **A.**    It's a process and instrument diagram, which the piping

4    and instrumentations that is listed to that drawings.

5    **Q.**    So it's a diagram that shows piping and instrumentation

6    design?

7    **A.**    Yes.

8    **Q.**    And it relates to your work in piping design; correct?

9    **A.**    Yes.

10   **Q.**    And you also testified that you worked on autoCAD

11   drawings; is that right?

12   **A.**    Yes.

13   **Q.**    Were those 3D autoCAD drawings?

14   **A.**    2D and partial 3D at that time.

15   **Q.**    And can you please explain to the jury what autoCAD is?

16   **A.**    It's a special software that we use in drawing something

17   like a line or objects.

18   **Q.**    So is it fair to say that it makes a computer drawing of

19   things like a piping design?

20   **A.**    Yes.

21   **Q.**    Now, when you made these autoCAD drawings, did you use

22   information provided by the engineers who worked at USAPTI?

23   **A.**    Yes.

24   **Q.**    Was a fellow you testified about whose name was BJ

25   Bhatnagar one of those engineers who did the drawings?

ILAGAN - CROSS / AGNOLUCCI

1    **A.**    Yes.

2    **Q.**    And was Sudha Sanghi another engineer who did the

3    drawings?

4    **A.**    Yes.

5    **Q.**    These engineers were doing a lot of drawings over the

6    course of your time at USAPTI; right?

7    **A.**    Yes.

8    **Q.**    How many drawings would you say you worked on?

9    **A.**    I'm sorry?

10   **Q.**    How many drawings would you say you worked on during your

11   three years at USAPTI?

12   **A.**    A lot.  Like a lot of drawings.

13   **Q.**    Too many to count?

14   **A.**    Yes.

15   **Q.**    Okay.  Would you say that a lot of hard work went into

16   USAPTI's designs?

17   **A.**    Yes.

18   **Q.**    Would you say that Mr. Liew was constantly working hard to

19   improve his work product?

20   **A.**    I think so.  There's a lot of changes, yes.

21   **Q.**    By "a lot of changes," you mean that there were multiple

22   drafts and iterations of the designs?

23   **A.**    Yes.

24   **Q.**    And multiple improvements to the designs over time?

25   **A.**    Yes.

1  Q.   And everyone in the office was, as far as you knew,

2  working hard on these improvements?

3  A.   I think so, yes.

4  Q.   And Mr. Liew had very high standards; didn't he?

5  A.   Yes, he has.

6  Q.   And he was always working hard to improve the quality of

7  his work?

8  A.   I can say yes.

9  Q.   Did he ever say to you that he wanted to work hard to

10  impress his customers?

11  A.   He mentioned that one, yes.

12       MS. AGNOLUCCI:  Your Honor, may I please approach the

13  witness with Exhibit 3443?

14       THE COURT:  Yes, you may.  Is that in evidence,

15  Counsel?

16       MS. AGNOLUCCI:  No, it isn't.

17       THE COURT:  All right.

18  BY MS. AGNOLUCCI:

19  Q.   Mr. Ilagan, please take a look at this document.

20  A.   (Witness examines document.)

21  Q.   Do you recognize this as an email?

22  A.   From Walter, yes.

23  Q.   And is it an email to you and other USAPTI employees?

24  A.   Pretty much for everyone working at that time, yes.

25  Q.   Does it relate generally to your work at USAPTI on the

1    design of the TiO2 plant?

2    **A.**    This kind of relates mostly on the process area, which

3    also relates on me.

4    **Q.**    And was it sent during the ordinary course of your work at

5    USAPTI?

6    **A.**    I'm sorry?

7    **Q.**    Was this email an ordinary part of your work --

8    **A.**    Yes.

9    **Q.**    -- at USAPTI?

10   **A.**    Yes.

11           **MS. AGNOLUCCI:**  Your Honor, I move to admit

12   Exhibit 3443.

13           **MR. HEMANN:**  Objection.  Hearsay.

14           **THE COURT:**  All right.  May I see the exhibit?

15   Ms. Ottolini, would you please retrieve it from counsel?

16                  (Pause in proceedings.)

17           **THE COURT:**  The objection is overruled.  It's

18   admitted.

19       (Trial Exhibit 3443 received in evidence)

20           **MS. AGNOLUCCI:**  Thank you, Your Honor.

21       Mr. Guevara, can you please put that email up on the

22   screen?

23           **MR. GUEVARA:**  I'm sorry.  We seem to be having some

24   difficulty.

25           **THE COURT:**  We have to reset the system.

 1         **MS. AGNOLUCCI:**  Okay.

 2         **THE COURT:**  How long is it going to take to reset?

 3         **THE CLERK:**  I think I actually need to shut the whole

 4    system down and restart it.  I tried to do it --

 5         **THE COURT:**  All right.  Well, why don't we take our

 6    break then.  We're going to end at 2:00, but we'll take a

 7    15-minute break.

 8      And please remember the usual admonitions not to discuss

 9    the case and keep an open mind.  I'll see you in 15 minutes.

10      You may step down for the break as well, sir.

11      (Proceedings were heard out of the presence of the jury:)

12         **THE COURT:**  15 minutes.

13                    (Recess taken at 12:38 p.m.)

14              (Proceedings resumed at 12:55 p.m.)

15      (Proceedings were heard out of presence of the jury:)

16         **THE COURT:**  Please bring in the jury.

17         **THE CLERK:**  All rise for the jury.

18      (Proceedings were heard in the presence of the jury:)

19         **THE COURT:**  Please be seated.

20      Ms. Agnolucci, you may continue your cross-examination.

21         **MS. AGNOLUCCI:**  Thank you, Your Honor.

22       (Document displayed.)

23   **BY MS. AGNOLUCCI:**

24   **Q.**  Mr. Ilagan, before we get into the email that's in front

25   of you, I want to ask you about your experience in piping

1    design before going to USAPTI.

2        Did you testify that you worked on piping design at

3    Chevron as well?

4    **A.**    Yes.

5    **Q.**    Is Chevron where you learned how to do piping design?

6    **A.**    Yes.

7    **Q.**    For how long, approximately, did you work on piping design

8    at Chevron?

9    **A.**    Like a year and a half, a year.

10   **Q.**    And were you mentored and taught about piping design by

11   people above you at Chevron?

12   **A.**    Yes.

13   **Q.**    So by the time you went to USAPTI you had significant

14   experience in piping design under your belt?

15   **A.**    Yes, but not that much though.

16   **Q.**    You had been doing it for about a year and a half --

17   **A.**    Yes.

18   **Q.**    -- is that accurate?

19   **A.**    Yes.

20   **Q.**    Let's look at the document in front of you, Exhibit 3443.

21          **MS. AGNOLUCCI:**  Mr. Guevara, could you please

22   highlight the first paragraph and then the second one-line

23   paragraph below it.

24          (Document displayed.)

25

BY MS. AGNOLUCCI:

Q.   And, Mr. Ilagan, can you please read the highlighted
portion that's on the screen in front of you.

A.   (reading)

     "Philip and I have just completed the 100K BD
submittal meeting in Chengdu.  We will leave Chengdu and
travel to meet 30K people tomorrow."

Q.   And the next line please.

A.   (reading)

     "There are a few major changes they have made as
follows."

Q.   Thank you.

     Does this email refer to a trip you took with Mr. Liew to
China?

A.   Yes.

Q.   Did he bring you along to meet the Chinese clients?

A.   Yes.

Q.   During that trip, did you assist in giving any AutoCAD or
3D design presentations to the clients?

A.   Uhm, I think I did a couple, or once, or couple.

Q.   So your answer is yes, you did give presentations?

A.   Oh, presentations, no.

Q.   Or you showed AutoCAD and 3D designs?

A.   I gave it to Walter at times to probably give it to
somebody else.

1  **Q.**    Were you assisting Mr. Liew in operating the AutoCAD --

2  **A.**    Yes.

3  **Q.**    -- and 3D designs?

4  **A.**    Yes.

5  **Q.**    This email -- the remainder of this email discusses a

6  number of changes to USAPTI designs that resulted from the

7  meetings with the Chinese clients; is that correct?

8  **A.**    Uhm, according to this one, yes.

9  **Q.**    For example, in item 1, on the last line it says:

10         "We'll have to update the PFD, P&ID, equipment list,

11         instrument list, line list, etc., accordingly," correct?

12 **A.**    Yes.

13 **Q.**    These were changes that came out of those meetings with

14 the Chinese clients?

15 **A.**    I guess so, yes.

16 **Q.**    The clients had suggested making some changes to the

17 designs, and Mr. Liew was emailing a number of people on the

18 design team about implementing those changes, right?

19 **A.**    Yes, I guess, yes.

20 **Q.**    Is it fair to say that after your trip to China there was

21 a lot of work to be done to customize these designs to meet the

22 Chinese customer's needs?

23 **A.**    Yes.

24 **Q.**    Thank you.

25         Under item 2 on that same email --

1          **MS. AGNOLUCCI:**  I'll give Mr. Guevara a minute to pull

2    it up.

3          (Document displayed.)

4    **BY MS. AGNOLUCCI:**

5    **Q.**   The last line reads:

6          "The customer always wants to cross the pump so that

7          any one of the 2 pumps can feed to any one of the 6 press

8          filters."

9          Do you see that?

10   **A.**   Yeah.

11   **Q.**   And is that another example of a request from the Chinese

12   clients?

13   **A.**   Yes.

14         **THE COURT:**  Wait for her to finish her question before

15   you respond.

16         **THE WITNESS:**  Sorry, sir.

17   **BY MS. AGNOLUCCI:**

18   **Q.**   It's another example of a request to customize the design,

19   correct?

20   **A.**   Yes.

21   **Q.**   Thank you.

22         **MS. AGNOLUCCI:**  Your Honor, may I approach the witness

23   with Exhibit 1972, which has not been admitted yet?

24         **THE COURT:**  Yes.

25         **MS. AGNOLUCCI:**  Thank you.

1    BY MS. AGNOLUCCI:

2    Q.    Do you recognize this document, Mr. Ilagan?

3    A.    Yes.

4    Q.    Is it an email chain between Walter Liew, you, and other

5    USAPTI employees?

6    A.    Yes.

7    Q.    Does it relate, generally, to your work on the designs of

8    the TiO2 plant?

9    A.    Yes.

10   Q.    And was this email also a regular email sent in the course

11   of your business at USAPTI?

12   A.    Yes.

13        MS. AGNOLUCCI:  Your Honor, I move to admit Exhibit

14   1972.

15        MR. HEMANN:  No objection.

16        THE COURT:  Admitted.

17   (Trial Exhibit 1972 received in evidence.)

18   (Document displayed.)

19        MS. AGNOLUCCI:  Mr. Guevara, if you could please go to

20   page 2 of the document, at the bottom of the email chain.

21   BY MS. AGNOLUCCI:

22   Q.    Mr. Ilagan, can you read that highlighted part, starting

23   with "Hi, Walter."

24   A.    Uhm, sorry, did what -- okay.

25        "Hi, Walter.  Mayer Valve.  Draw off elevation was

1    modified per client's request.  Draw off inlet (K1-k2)

2    elevation is same as chlorination K1-K."

3         **THE COURT:**  Please slow down, sir.

4         **THE WITNESS:**  (reading)

5         "Location of draw off was move 200 on both side

6    closer to each other due to pipe location.

7         "Caldera.  I cannot get a final angle orientation

8    without the actual size of the valve.

9         "My suggestion is to let them know not to drill the

10   hole for Chlorinator (K1-K2) and draw off inlet without

11   getting the final valve drawing dimension.

12        "Thanks, Philipp."

13   **BY MS. AGNOLUCCI:**

14   **Q.**   It says that the draw off elevation was modified per the

15   client's request, correct?

16   **A.**   Yes.

17   **Q.**   The client was asking that you, again, modify an aspect of

18   the design, correct?

19   **A.**   Yes.

20   **Q.**   And in the email you're saying perhaps we should wait to

21   drill the hole until we have the final dimensions, right?

22   **A.**   Yes.

23        **MS. AGNOLUCCI:**  Mr. Guevara, if you could blow up the

24   rest of the chain above that email, on the first page.  The

25   entire first page, actually, would be fine.

1          (Document displayed.)

2    BY MS. AGNOLUCCI:

3    Q.    And without reading it aloud, Mr. Ilagan, is it fair to

4    say that in response to your email the rest of the team is

5    discussing your question and weighing in?

6    A.    Yes.

7    Q.    Mr. Liew is asking questions, and then one of the team

8    members is proposing solutions, correct?

9    A.    Yes.

10   Q.    This type of back-and-forth discussion was typical in your

11   office, wasn't it?

12   A.    Yes.

13   Q.    Drawings were revised many times?

14   A.    Yes.

15   Q.    And details changed over the course of your projects,

16   right?

17   A.    Yes.

18   Q.    And sometimes, like here, it was USAPTI's Chinese

19   customers who suggested the design changes, correct?

20   A.    Yes.

21   Q.    Thank you.

22          MS. AGNOLUCCI:    Your Honor, I'd like to publish the

23   next exhibit, and a couple more after that, to the witness and

24   court only.  They are 3D AutoCAD designs that we have on CD.

25          THE COURT:    All right.

1          MS. AGNOLUCCI:  I don't think he'll -- I can't give it

2     to him on paper.

3          THE COURT:  All right.

4          MS. AGNOLUCCI:  May I please publish Exhibit 2615 to

5     the witness and the Court only?

6          THE COURT:  Yes, you may.

7          MS. AGNOLUCCI:  Thank you.

8     BY MS. AGNOLUCCI:

9     Q.   Is that coming up on your screen, Mr. Ilagan?

10    A.   Yes.

11    Q.   Do you recognize this image?

12    A.   Yes.

13    Q.   What is it?

14    A.   It's a layout of a chlorination --

15    Q.   And --

16    A.   -- and piping.

17    Q.   Is this something that you worked on?

18    A.   Yes.

19    Q.   And was this in the ordinary course of your job at USAPTI?

20    A.   Yes.

21         MS. AGNOLUCCI:  Your Honor, I move to admit Exhibit

22    2615.

23         MR. HEMANN:  We don't have an objection, Your Honor.

24    We haven't discussed the logistics of its admission, but we

25    don't have an objection to this image as it appears.  Keeps

1    moving on the screen, but we don't have an objection to an

2    image like this being admitted to the -- into evidence.

3          THE COURT:  Well, to the extent that the image is

4    contained on the CD -- is it a CD?

5          MS. AGNOLUCCI:  I believe it's a CD, Your Honor.

6          THE COURT:  Yeah, then we'll admit that and worry at a

7    later time how it will be dealt with later on.  But, certainly,

8    I'll admit the -- the physical media, and then counsel, if she

9    wishes to display it to the jury and ask questions, she may do

10   so.  So it's admitted.

11         (Trial Exhibit 2615 received in evidence.)

12         MR. HEMANN:  Thank you, Your Honor.

13         MS. AGNOLUCCI:  Thank you, Your Honor.

14         THE CLERK:  I'm sorry, twenty-six-one-five, not

15   one-six?

16         MS. AGNOLUCCI:  One-five, yes.

17         THE CLERK:  Thank you.

18         (Document displayed.)

19         MS. AGNOLUCCI:  Mr. Guevara, could you please zoom in

20   on the image, so a little more.

21         THE CLERK:  Can I display this to the jury?

22         THE COURT:  Are you asking to publish this to the

23   jury?

24         MS. AGNOLUCCI:  May I publish it to the jury, please?

25         THE COURT:  Yes, you may.

1              **MS. AGNOLUCCI:**  Thank you, Your Honor.

2         (Document displayed.)

3    **BY MS. AGNOLUCCI:**

4    **Q.**   Mr. Ilagan, is this a 3D AutoCAD drawing?

5    **A.**   This is -- came from a 3D AutoCAD software.  But this is

6    not a 3D AutoCAD.

7    **Q.**   Can you explain what it is?

8    **A.**   It's a conversion from one software to another software.

9    But it came from AutoCAD 3D drawings, yes.

10   **Q.**   And is this a drawing that you worked on?

11   **A.**   Yes, I did.

12   **Q.**   Does it depict the chlorination phase of the TiO2 plant?

13   **A.**   This is chlorination, yes.

14   **Q.**   Did you create this drawing using drawings and equipment

15   arrangements that you got from USAPTI engineers?

16   **A.**   Yes.

17   **Q.**   In this case, were the engineers who worked with you on

18   this file Sudha Sanghi and BJ Bhatnagar?

19   **A.**   Yes.

20   **Q.**   Thank you.

21              **MS. AGNOLUCCI:**  Your Honor, may I please publish

22   Exhibit 2617, which is a similar file, to the witness and the

23   Court only?

24              **THE COURT:**  Yes, you may.

25              **THE CLERK:**  I'm sorry, the number?

1              MS. AGNOLUCCI:  2617.

2     BY MS. AGNOLUCCI:

3     Q.    Mr. Ilagan, do you recognize this drawing?

4     A.    Yes.

5     Q.    Is this something that you worked on at USAPTI?

6     A.    Yes.

7     Q.    And does it relate to the designs for a TiO2 plant?

8     A.    Yes.

9     Q.    And was this prepared in the ordinary course of your work

10    at USAPTI?

11    A.    Yes.

12              MS. AGNOLUCCI:  Your Honor, I move to admit Exhibit

13    2617.

14              THE COURT:  Any objection?

15              MR. HEMANN:  No objection.

16              THE COURT:  It's admitted.

17         (Trial Exhibit 2617 received in evidence.)

18              MS. AGNOLUCCI:  And may we please publish it to the

19    jury?

20              THE COURT:  Yes, you may.

21         (Document displayed.)

22    BY MS. AGNOLUCCI:

23    Q.    This drawing shows the oxidation phase of a TiO2 plant,

24    correct?

25    A.    Yes.

1          **MS. AGNOLUCCI:**  And, Mr. Guevara --

2    **BY MS. AGNOLUCCI:**

3    **Q.**   Let me ask, Mr. Ilagan, is it possible to rotate these

4    drawings?

5          **MS. AGNOLUCCI:**  Mr. Guevara, I don't know if it's

6    asking too much --

7          **THE WITNESS:**  There you go.

8          **MS. AGNOLUCCI:**  Can you rotate it a little bit so we

9    can get kind of a view from above of that purple area, and then

10   zoom in.

11         Thank you.

12   **BY MS. AGNOLUCCI:**

13   **Q.**   Mr. Ilagan, what's this purple area that we're looking at

14   here?

15   **A.**   It's a flue pond pipe, flue pond area.

16   **Q.**   And the flue pond, so we all understand, is a system of

17   winding pipes that cools liquid during the oxidation phase,

18   correct?

19   **A.**   Yes.

20   **Q.**   And is this another example of the work that you did at

21   USAPTI?

22   **A.**   Yes.

23   **Q.**   Who did you work with on this particular file?

24   **A.**   Mostly with BJ, Sudha, and Walter.

25   **Q.**   BG Bhatnagar, Sudha Sanghi, and Mr. Liew?

1  **A.**    Yes.

2  **Q.**    Thank you.

3        **MS. AGNOLUCCI:**  Your Honor, may I publish Exhibit 2618

4  to the witness and court only?  And after that one I only have

5  one or two others.

6        **THE COURT:**  Okay.

7  **BY MS. AGNOLUCCI:**

8  **Q.**    Do you recognize this document, Mr. Ilagan?

9  **A.**    Yes.

10  **Q.**    What is it?

11  **A.**    It's updated version of the last drawing that you showed.

12  **Q.**    And by "updated version" you mean a revision of the

13  previous one?

14  **A.**    Yes.

15  **Q.**    And did you work on this?

16  **A.**    Yes.

17  **Q.**    And was this prepared in the ordinary course of your work

18  at USAPTI?

19  **A.**    Yes.

20        **MS. AGNOLUCCI:**  Your Honor, I move to admit Exhibit

21  2618.

22        **MR. HEMANN:**  No objection, Your Honor.

23        **THE COURT:**  Admitted.

24      (Trial Exhibit 2618 received in evidence.)

25        **MS. AGNOLUCCI:**  Thank you, Your Honor.  And can we

1   please publish it for the jury?

2          **THE COURT:**  Yes.

3       (Document displayed.)

4   **BY MS. AGNOLUCCI:**

5   **Q.**   Mr. Ilagan, you say that this is an updated version of the

6   previous drawing that we looked at.  What about it, if you

7   recall, was updated?

8   **A.**   There's more pipes in there.  The structure is covered

9   by -- it's covered now, compared to the other ones.

10  **Q.**   And by "the structure" do you mean the portion that

11  Mr. Guevara is zooming in on right now?

12  **A.**   Yeah, pretty much the whole thing, yes.

13  **Q.**   And you updated the design by adding a cover to the

14  structure?

15  **A.**   Copper, more pipes, more -- you know, structural stuff in

16  there, yes.

17  **Q.**   And can you identify the tall column in the middle of the

18  screen that we're looking at right now?

19  **A.**   If I recall, that's a heater.  It's been a while already.

20  Sorry.

21  **Q.**   Understood.

22          **MS. AGNOLUCCI:**  And, Mr. Guevara, if you could rotate

23  it, and we could see that purple area again, from above.

24  **BY MS. AGNOLUCCI:**

25  **Q.**   Is one of the changes that you made, Mr. Ilagan, the pipe

1  that goes down to the purple area from the covered structure?

2  **A.**    Yes.

3  **Q.**    And what is that?

4  **A.**    Those are pipe that's coming from one equipment going to a

5  flue pond.

6  **Q.**    Going down into the flue pond, correct?

7  **A.**    Yes.

8  **Q.**    And did you also work with the engineers Sudha Sanghi and

9  BJ Bhatnagar on this drawing?

10  **A.**    Yes.  And this time I did -- did, uhm, talk to -- not talk

11  to but emailed Bob as far as the changes and the pipe that's

12  the radius that he wants it to be accomplished in this pipe.

13  **Q.**    Can you repeat the last part of what you said.  There's a

14  radius?

15  **A.**    The radius that he wants to use on the -- that pipe that's

16  going from top -- from the top to bottom of the flue pond.

17  **Q.**    You and Mr. Maegerle corresponded about the specifications

18  for that pipe that goes down?

19  **A.**    Yeah.  He suggested it, yes.

20        **THE COURT:**  Let her finish her question, please,

21  before you answer.

22        **MS. AGNOLUCCI:**  Thank you.

23  Your Honor, may I publish Exhibit 2614?

24        **THE COURT:**  Yes.

25        **THE CLERK:**  To just the witness?

1          **MS. AGNOLUCCI:**  To only the witness and the Court.

2  Thank you.

3          **THE COURT:**  All right.

4  **BY MS. AGNOLUCCI:**

5  **Q.**  Mr. Ilagan, do you see it up on your screen?

6  **A.**  No.  Oh, yeah.

7  **Q.**  Is it up on your screen now?

8  **A.**  Yes.

9  **Q.**  Do you recognize this drawing?

10  **A.**  Yes.

11  **Q.**  Is this a -- another 3D AutoCAD file that you worked on?

12  **A.**  Yes.

13  **Q.**  And was this also created in the ordinary course of your

14  work at USAPTI?

15  **A.**  Yes.

16          **MS. AGNOLUCCI:**  Your Honor, I move to admit Exhibit

17  2614.

18          **MR. HEMANN:**  No objection.

19          **THE COURT:**  It's admitted.

20      (Trial Exhibit 2614 received in evidence.)

21          **MS. AGNOLUCCI:**  Thank you.

22      And may we publish it to the jury, please?

23          **THE COURT:**  Yes, you may.

24          **MS. AGNOLUCCI:**  Mr. Guevara, if you could zoom in on

25  the image.  Thank you.

1          (Document displayed.)

2    **BY MS. AGNOLUCCI:**

3    Q.   Do you see towards the upper left, Mr. Ilagan, where it

4    says "30K piping"?

5    A.   Oh, yes, yes.

6    Q.   Does this drawing depict piping for the 30K project?

7    A.   Yes.

8    Q.   And the 30K project, that's the smaller plant in Jinzhou,

9    that Mr. Liew first worked on, correct?

10   A.   Yes.

11   Q.   That's the first contract he got?

12   A.   Yes.

13   Q.   And is this another example of work you did at USAPTI?

14   A.   Yes.

15   Q.   And what does this drawing depict?

16   A.   It's mostly piping -- piping routing.

17   Q.   Piping routing.  And the piping are the little purple,

18   sort of thinner lines --

19   A.   Yes.

20   Q.   -- is that right?

21   A.   Yes.

22   Q.   And those were the pipes that you were tasked specifically

23   with working on?

24   A.   Yes.

25   Q.   And who did you work with in preparing this file?

1    **A.**    Uhm, mostly with Sudha and BJ on this.

2    **Q.**    Again, the engineers Sudha Sanghi and Brijesh Bhatnagar?

3    **A.**    Yes.

4         **MS. AGNOLUCCI:**  Thank you.

5         I have one more, Your Honor.  May I publish 2616 to the

6    Court and witness only?

7         **THE COURT:**  Yes, you may.

8         **MS. AGNOLUCCI:**  Thank you.

9    **BY MS. AGNOLUCCI:**

10   **Q.**    Mr. Ilagan, do you recognize this file?

11   **A.**    Yes.

12   **Q.**    Is this another example of a 3D AutoCAD file that you

13   worked on at USAPTI?

14   **A.**    Yes.

15   **Q.**    And does it relate to the TiO2 -- TiO2 plant designs that

16   you worked on?

17   **A.**    Yes.

18   **Q.**    And this was prepared in the ordinary course of your work

19   at USAPTI?

20   **A.**    Yes.

21        **MS. AGNOLUCCI:**  Your Honor, I move to admit Exhibit

22   2616.

23        **MR. HEMANN:**  No objection.

24        **THE COURT:**  It's admitted.

25        (Trial Exhibit 2616 received in evidence.)

1          MS. AGNOLUCCI:  Thank you.

2       May we please publish it for the jury?

3          THE COURT:  Yes.

4        (Document displayed.)

5          MS. AGNOLUCCI:  And, Mr. Guevara, can you zoom in just

6   a little bit.

7          THE COURT:  Wait until the big monitor comes up.

8        (Document displayed.)

9          THE COURT:  There it goes.  Okay.

10          MS. AGNOLUCCI:  Thank you.

11  BY MS. AGNOLUCCI:

12  Q.   Mr. Ilagan, is this another example of the work you did at

13  USAPTI?

14  A.   Yes.

15  Q.   Can you tell us what this file depicts?

16  A.   This is a finishing area of the TiO2.

17  Q.   And what exactly about the finishing area is shown here in

18  this drawing?

19  A.   Uhm, that bottom part are mostly tank preparation area.

20  And there's -- those six boxes are, I think, reflects this

21  filter press, if I recall, from that email that you showed

22  earlier.

23  Q.   The filter press that the Chinese customers asked for

24  modifications on?

25  A.   Yes, I think, yes.  If I still remember, yes.

1  **Q.**    Which project did this drawing relate to?

2  **A.**    I think this is 30K, as far as --

3  **Q.**    Who did you work with on this file?

4  **A.**    Uhm, same person, BJ and Sudha.

5  **Q.**    That's BJ Bhatnagar and Sudha Sanghi?

6  **A.**    Yes.

7  **Q.**    We've now looked at five AutoCAD drawings you worked on at

8  USAPTI, Mr. Ilagan.  Is it fair to say that there were many

9  more?

10 **A.**    Yes.

11 **Q.**    And are there too many to count, or do you have an idea of

12 how many you did?

13 **A.**    It's too many to count.

14 **Q.**    These are examples of the designs that you and the

15 engineers and Mr. Liew worked hard on over the years, correct?

16 **A.**    Yes.

17 **Q.**    And you revised them over the years, correct?

18 **A.**    Yes.

19         **MS. AGNOLUCCI:**  Thank you, Mr. Ilagan.  I don't have

20 any other questions.

21         **THE COURT:**  Mr. Froelich, do you have any questions?

22         **MR. FROELICH:**  No, Your Honor.

23         **MR. HEMANN:**  I have a few, Your Honor.

24         **THE COURT:**  All right.

25         **MR. HEMANN:**  And I would ask that Mr. Guevara indulge

1    us with these 3D drawings just for a moment.

2              **THE COURT:**  All right.

3              **MR. HEMANN:**  Thank you.

4              **THE CLERK:**  Let me go back.

5              **MR. HEMANN:**  Would you be so kind to put up 2616 when

6    it clicks on.

7              (Document displayed.)

8                      <u>**REDIRECT EXAMINATION**</u>

9    **BY MR. HEMANN:**

10   **Q.**   We just looked at this one, Mr. Ilagan?

11   **A.**   Yes.

12   **Q.**   And you testified that this was for the 30,000-ton

13   facility?

14   **A.**   Yeah, I think so, yes.

15   **Q.**   And you testified that these were the press filters from

16   the 30,000-ton facility, correct?

17   **A.**   Zoom -- hold on.  I'm not sure -- sorry.  This is, I

18   think -- I think this is a 100K project.  I'm sorry.  A 100K

19   project.  Can you zoom in more on the top area.

20        I'm sorry, this is either 30K or 100K.  I'm not a hundred

21   percent sure.  But it looks like it's a 100K also.

22   **Q.**   Also?

23   **A.**   Yeah.  I'm trying to remember how many lines are on 30K

24   and 100K.  It's been a while.  I haven't seen these drawings.

25   **Q.**   So you don't know whether this is the 30K or the 100K?

1   **A.**   The first three parts, the drawings, it's 30K.  But this

2   one here, now, it kind of looks like a 100K, but I cannot a

3   hundred percent guarantee now.  It's been a while.  I haven't

4   seen this drawing.

5   **Q.**   When was the last time you saw this drawing?

6   **A.**   When she -- when I talked to -- I forget her name.

7   **Q.**   Ms. Agnolucci?

8   **A.**   Yes.

9   **Q.**   When was that?

10  **A.**   Four days ago, five days -- Monday -- Wednesday.

11  **Q.**   And you reviewed each of these drawings?

12  **A.**   Yes, but I haven't really focused on the drawings.

13  **Q.**   And you testified a moment ago that this was from the 30K,

14  but now you're not sure?

15  **A.**   By zooming in on some area, it looks kind of different.

16  But I did work on this one also.

17  **Q.**   All the other ones you worked on --

18  **A.**   Yes.

19  **Q.**   -- were for which project?

20  **A.**   It's 30K.

21  **Q.**   There are some tanks and other vessels.  If I use the term

22  "vessel" do you know what that means?

23  **A.**   Yeah.

24  **Q.**   In the -- in the portion of this that are under the -- the

25  square structure, do you see that?

1  **A.**   I'm sorry?

2  **Q.**   Do you see the vessels that are under the -- sort of in

3  that square structure that's closest to us on the screen?

4  **A.**   Yes.

5          **MR. HEMANN:**   Mr. Guevara, could you just scan in on

6  that first set of four that are there.

7  **BY MR. HEMANN:**

8  **Q.**   What are those vessels?

9  **A.**   I think those are filter, if I recall.  Some of them

10 are -- it's been a while.  Pumps.  Site micronizer.  Yeah.

11 It's been a while.

12 **Q.**   Did you review those the other night, these parts?

13 **A.**   Not in detail.  I just check with the drawings, and I

14 remember those drawings come from -- you know, came from me.

15 **Q.**   But you don't remember precisely what any of these items

16 are, correct?

17 **A.**   Yes.  It's about three years.  Four -- three years, two

18 years.

19          **MR. HEMANN:**   If you could please go to 2618,

20 Mr. Guevara.  Thank you.

21     (Document displayed.)

22          **MR. HEMANN:**   And back on the back side of the

23 structure, if you would, the other side on the flue pond side

24 there.

25

**BY MR. HEMANN:**

Q.    What part of it did you consult with Mr. Maegerle on?

A.    The pipe from the green part on top going down.

Q.    Okay.  And what is that pipe?

A.    It's a pipe that connecting from one equipment to a flue

pond.

Q.    From one -- a piece of equipment to the flue pond?

A.    Yes.

Q.    What piece of equipment?

A.    Uhm, I forget which one is that.

Q.    Did you review that the other night, or no?

A.    I'm sorry?

Q.    Did you review that the other night?

A.    Yes, I did.

Q.    And what piece of equipment was it?

A.    Can't remember no more.

Q.    You had to consult with Mr. Maegerle on the radius of

the -- of the vertical section of that pipe?

A.    I think he was suggesting to use five times diameter of

the -- five times diameter radius so the flow will be smoother

than the -- than using a regular 90-degree.

Q.    When was this, roughly?

A.    Can't remember.

Q.    And this is the 30-ton project?

A.    30K, yes.

ILAGAN - REDIRECT / HEMANN

1    Q.    Okay.  So for Jinzhou?

2    A.    Yes.

3    Q.    And why didn't you ask Sudha or BJ about this particular

4    measurement?

5    A.    Because I was doing the piping that time, and I think it

6    was brought up that that pipe needs to be in a certain diameter

7    so the flow will be -- will be better flowing for this area.

8    Q.    How is it that BJ and Sudha were not able to answer that

9    question?

10              **MS. AGNOLUCCI:**  Objection.

11              **THE COURT:**  Sustained.

12   **BY MR. HEMANN:**

13   Q.    Did you -- did the answering that question require some

14   particular expertise?

15   A.    I think so, yes.

16   Q.    And what sort of expertise was needed?

17   A.    Probably piping experience.

18   Q.    Did BJ or Sudha have the necessary piping experience?

19   A.    No.

20   Q.    The -- the materials you used to create these CAD

21   drawings -- well, let me ask a better question.  Were these

22   based on something?

23   A.    Based on AutoCAD.

24   Q.    How did you know what to draw on AutoCAD, if that's the

25   right terminology?

1   **A.**   As far as -- I'm sorry, can you be more specific on that?

2   **Q.**   Sure.

3        When you created these drawings, you were essentially

4   electronically drawing on the computer, correct?

5   **A.**   Yes.

6   **Q.**   And how did you know what to draw?

7   **A.**   Uhm, basically, I get instruction from either BJ, or some

8   of them already been drawn before, before I start working

9   there.

10  **Q.**   So are you looking at flow sheets and equipment designs?

11  **A.**   No.  Basically, dimensions from -- from engineering.

12  **Q.**   And who in particular was providing you with those

13  dimensions?

14  **A.**   BJ, Walter, pretty much.

15  **Q.**   Anybody else?

16  **A.**   Once in a while Sudha.

17        **MR. HEMANN:**  And if we could look at the side, the

18  back -- I'm sorry, the far side of this, Mr. Guevara.  Back in

19  here, in the middle there.

20  **BY MR. HEMANN:**

21  **Q.**   There's a small tank there, do you see that, small vessel?

22  **A.**   Behind that --

23  **Q.**   The small one.

24  **A.**   Yes.

25  **Q.**   What is that?

ILAGAN - REDIRECT / HEMANN

1  A.    Can't remember.

2  Q.    And above that, just to the right, there are several other

3  vessels.  What are those?

4  A.    I can't remember what's the -- the name of the vessel.

5  Q.    You took a trip to China, you testified about on

6  cross-examination, with -- with Mr. Liew.  Do you remember

7  that?

8  A.    Yes.

9  Q.    And what was your role in that trip?

10 A.    Supposed to be for piping, to understand the way that the

11 pipe in China.

12 Q.    And did you -- did you go to meetings with Mr. Liew?

13 A.    Yes, I did.

14 Q.    How did you participate in those meetings?

15 A.    Mostly in Chinese.

16 Q.    Do you speak Chinese?

17 A.    No.

18 Q.    So what did you do on the trip?

19 A.    Uhm, basically sit there and -- and once in a while the --

20 they kind of translated.  But I don't -- I don't speak any

21 Chinese.

22 Q.    Did everything get translated for you?

23 A.    I'm sorry?

24 Q.    Did everything get translated for you?

25 A.    Oh, no, no.

**ILAGAN - REDIRECT / HEMANN**

1  **Q.**   What percentage of the meetings got translated for you?

2  **A.**   Five percent or -- about that much.

3  **Q.**   What sort of presentations did you make during the

4  meetings?

5  **A.**   I didn't do any presentation.  I just probably gave a

6  couple of drawings to Walter when he needs something.

7  **Q.**   Ms. Agnolucci asked you about your experience with piping

8  at Chevron.  Do you remember that?

9  **A.**   Yes.

10 **Q.**   And you said little bits and not that much?

11 **A.**   Yes.

12 **Q.**   Is that accurate?

13 **A.**   Yes.

14 **Q.**   It was not significant experience, was it?

15 **A.**   Yeah.  Learning piping, you have to have tons of

16 experience understanding as far as pipes.  It's not like

17 regular stuff like you can just learn it quick.  There's

18 different discipline or different area that you have to have

19 special, you know, experience on it.

20 **Q.**   When I asked you on direct examination the company that

21 you went to work for, you said it was Performance Group,

22 correct?

23 **A.**   Yes.

24 **Q.**   When Ms. Agnolucci was asking you questions on

25 cross-examination, you referred -- she referred to the company

**ILAGAN - REDIRECT / HEMANN**

1    as USAPTI.  Do you remember that?

2    **A.**    Yes.

3    **Q.**    And you agreed with that, correct?

4    **A.**    Yes.

5    **Q.**    What was the name of the company?

6    **A.**    Before or after?  After?

7    **Q.**    Before or after what?

8    **A.**    Uhm, PGI when I start working there.  And at the end it

9    got changed to PTI or Performance -- I think PTI.

10   **Q.**    When did that change take place?

11   **A.**    I'm not really sure.  I didn't actually pay attention at

12   that.

13   **Q.**    How did the company change over time?

14   **A.**    I'm not really sure as far as that.

15   **Q.**    Did you notice any changes in the way the company was

16   structured or organized when the name went from Performance

17   Group --

18   **A.**    No.

19   **Q.**    -- to USAPTI?

20        **MS. AGNOLUCCI:**  Objection.

21        **THE COURT:**  Sustained.

22   BY MR. HEMANN:

23   **Q.**    What did you do for Performance Group?

24   **A.**    Mostly all the drawings involved as far as AutoCAD.

25   **Q.**    And did you do the same for USAPTI?

1    **A.**    Yes.

2    **Q.**    On cross-examination, Ms. Agnolucci asked you whether

3    Mr. Liew was smart.  Do you remember that?

4    **A.**    Yes.

5    **Q.**    And you said yes?

6    **A.**    He's smart.

7    **Q.**    How was he smart?

8    **A.**    He's very smart.  He's the type of person he learn quick.

9    **Q.**    And can you give me an example?

10          **MS. AGNOLUCCI:**  Objection.

11          **THE COURT:**  Overruled.

12          **THE WITNESS:**  It's kind of hard to say.

13   **BY MR. HEMANN:**

14   **Q.**    You testified on cross-examination he was a good engineer.

15   Do you remember that?

16   **A.**    Yes.

17   **Q.**    Can you give me an example of that?

18   **A.**    He's pretty smart as far as learning some stuff and

19   understanding it quick than people that I know.  If I compare

20   him to other people, Walter is smart, smart guy.

21   **Q.**    Can you give me an example?

22          **MS. AGNOLUCCI:**  Objection.

23          **THE COURT:**  I'll let him answer one more time.  Can

24   you give an answer of how he was smart?

25          **THE WITNESS:**  It's a lot of things to -- what exactly

**ILAGAN - RECROSS / AGNOLUCCI**

1  do you want as far as -- I mean, there's a lot of things, you

2  know, I could tell he's smart.

3  **BY MR. HEMANN:**

4  **Q.**   You met the other day with Ms. Agnolucci, correct?

5  **A.**   Yes.

6  **Q.**   You met four days ago with Ms. Agnolucci?

7  **A.**   Yes.

8  **Q.**   And did you go through these questions and answers with

9  her?

10 **A.**   As far as -- yes, as far as being smart, yes.

11        **MR. HEMANN:**  Thank you very much, Your Honor.  No

12 further questions.

13        **THE COURT:**  Anything further?

14        **MS. AGNOLUCCI:**  Yes, just briefly, Your Honor, if I

15 may.

16        **THE COURT:**  Yes.

17                    <u>**RECROSS-EXAMINATION**</u>

18 **BY MS. AGNOLUCCI:**

19 **Q.**   Mr. Ilagan, you testified that you met with me the other

20 night, right?

21 **A.**   Yeah, Wednesday, yes, if I still remember, yes.

22 **Q.**   Wednesday night.  And you also met with the government

23 that same night, correct?

24 **A.**   Yes.

25 **Q.**   How much time did you spend meeting with the government?

1    **A.**    I didn't actually pay attention on that.  So after I'm

2    done with them I went straight with you.

3    **Q.**    Do you have any idea how long you met with them?

4    **A.**    Honestly, I didn't pay attention at that.  I can probably

5    see my text or something, but I didn't actually time it.

6    **Q.**    You and I only met for about half an hour, right?

7    **A.**    Something like that, yes.

8    **Q.**    And we didn't rehearse your questions, did we?

9    **A.**    No.  Mostly showing the drawings and pretty much whatever

10    this paper.

11    **Q.**    How long would you say we looked at each of the 3D

12    drawings that we've been discussing today?

13    **A.**    Not that long.  I just know that it's my drawing because,

14    you know, it's my work.

15    **Q.**    Long enough for you to identify the drawing and recognize

16    that you had worked on it, right?

17    **A.**    Yes.

18    **Q.**    Less than one minute per drawing, would you say?

19    **A.**    Probably like that.

20    **Q.**    Thank you.

21         You also testified with Mr. Hemann just now about a trip

22    that you took with Mr. Liew to China, correct?

23    **A.**    Yes.

24    **Q.**    You told me earlier today that you considered Mr. Liew to

25    be a mentor; is that right?

```
 1   A.    Yes.

 2   Q.    And is one of the reasons that you went on the trip an

 3   opportunity for him to mentor you?

 4   A.    Yeah, to see the plant, yes, also.

 5          MS. AGNOLUCCI:  Thank you.  No further questions.

 6          THE COURT:  All right.  You're excused.  Thank you

 7   very much.

 8       (Witness excused.)

 9          THE WITNESS:  Thank you.

10          THE COURT:  Next witness.

11          MR. HEMANN:  Thank you, Your Honor.  The United States

12   calls Robert Gibney.

13          MS. AGNOLUCCI:  Your Honor, may I retrieve the

14   documents?

15          THE COURT:  Yes, please do.

16          MS. AGNOLUCCI:  Thank you.

17          THE CLERK:  Raise your right hand, please.

18                      ROBERT GIBNEY,

19   called as a witness for the Government, having been duly sworn,

20   testified as follows:

21          THE WITNESS:  I do.

22          THE CLERK:  Thank you.  Please be seated.

23       State and spell your full name for the record.

24          THE WITNESS:  Robert Gibney.  R-o-b-e-r-t.  Gibney,

25   G-i-b-n-e-y.
```

1          **THE CLERK:**  Thank you very much.

2                    **DIRECT EXAMINATION**

3  BY MR. HEMANN:

4  **Q.**   Good afternoon, Mr. Gibney.  And let me just ask you, when

5  you speak, try to speak relatively close to the microphone.

6  And I'll be asking questions.  If you'll wait until I'm done

7  and then go ahead and answer, okay?

8  **A.**   Okay.

9  **Q.**   Thank you.

10        Mr. Gibney, have you been retained by the United States as

11  an expert witness?

12  **A.**   Yes, I have.

13  **Q.**   Do you have experience in the titanium dioxide industry?

14  **A.**   Yes.  I've spent my entire adult career in the TiO2

15  industry, roughly since 1986.

16  **Q.**   So I'd like to begin your testimony today by reviewing

17  with you your -- your educational background and your career in

18  the titanium dioxide industry, okay.

19  **A.**   Okay.

20  **Q.**   And I may interrupt with questions as we go, but if you

21  could begin with describing for the jury your educational

22  background.

23  **A.**   Well, I have a bachelor of science degree at University of

24  Arizona.  Graduated in 1985.  Beyond that, executive

25  development course at Wharton, but no advanced degree.

**GIBNEY - DIRECT / HEMANN**

Q.   After you graduated from the University of Arizona, did
you get a job in the titanium dioxide industry?

A.   Yes, I did.

Q.   What was your first -- your first job in the TiO2
industry?

A.   I was a sales representative for a company by the name of
Van Waters and Rogers.  They're now known as Univar National
Distributor.  It was DuPont's main distributor of titanium
dioxide.  So I represented, on top of DuPont, other raw
materials that went into the paint and coatings industry, and
held that job for roughly five years.

Q.   During that job did you become familiar with -- with
titanium dioxide products, both DuPont's and other companies'?

A.   Yes.

Q.   Could you describe, sort of, how you developed that
familiarity during that job.

A.   Well, a lot of it's on-the-job training.  You're out
working with customers, trying to get them to specify your
brand of TiO2 over another.

     You -- you work hand in hand with -- at different
representatives from the various companies that we worked with.
So a technical sales and service representative, for instance,
from DuPont would go with me to visit with accounts.  And you'd
be able to learn about their grades and their properties.  And
then also attended seminars.  And they would come in and

**GIBNEY - DIRECT / HEMANN**

1    provide us with training.

2    **Q.**   And did you do the same with other companies in the

3    titanium dioxide industry?

4    **A.**   Just DuPont for that five year period of time.

5    **Q.**   After that five year period of time, did you -- what was

6    your next job?

7    **A.**   The next job -- I decided that I enjoyed the TiO2

8    industry.  Kerr-McGee approached me.  And this is in 1991.

9    They wanted to establish a direct representation in the Texas

10   region where I was based.  I was out of Dallas, Texas.

11        So I hired on with Kerr-McGee to be their regional sales

12   manager, essentially a sales representative, at the beginning

13   in 1991.

14   **Q.**   Could you tell the jury just a little bit about

15   Kerr-McGee.

16   **A.**   So Kerr-McGee is an old or was an old oil and gas company

17   that was based out of Oklahoma City; hence the reason it was

18   Oklahoma.  They had discovered oil in the region early on, I

19   guess in the 1930s.  They then invested in a wide variety of

20   products.  They wanted to be basic in a whole host of different

21   industries.  It was back during the conglomerates.

22        They invested in coal as well as a chemical company.  Back

23   in 1967, they bought American Potash, their titanium dioxide

24   business that had a plant in Hamilton, Mississippi.

25   **Q.**   And did the -- did the Kerr-McGee TiO2 line have a

1  particular brand name?

2  **A.**   Yes.  Tronox.  T-r-o-n-o-x.

3  **Q.**   You were initially a sales representative for Kerr-McGee;

4  is that correct?

5  **A.**   That's correct.

6  **Q.**   How long did you keep that position or hold that position

7  as a sales representative?

8  **A.**   Just a few years.  And then I was promoted to regional

9  manager, and set up a western regional office out of Dallas,

10  Texas, and then held that position, I believe, for another two

11  years.

12  **Q.**   And that was also in sales?

13  **A.**   Yes.

14  **Q.**   And because we're going to use these terms a little bit,

15  sales of a product like titanium dioxide involves what kind of

16  activities?

17  **A.**   Well, it's both negotiating annual and semiannual

18  contracts or even on a quarterly basis.

19       But a lot of what's done you're -- at the time we were a

20  very small regional player.  We only had one plant in the U.S.

21  and a joint venture in western Australia.  So we were trying to

22  gain a foothold at some of the major accounts in the U.S.  And

23  to do that you have to go through an approval process to get

24  TiO2 approved in the various formulations, for instance,

25  Sherwin-Williams or PPG would use.

1          **THE COURT:**  Would you pull that microphone a little

2     closer to you, sir.

3          **THE WITNESS:**  Yes.  Sorry.

4          **THE COURT:**  Thank you very much.

5     **BY MR. HEMANN:**

6     **Q.**   And so did you begin to educate yourself during that

7     process on titanium dioxide as a product?

8     **A.**   Yes.  Part of the -- it does work better.  Sorry.

9          Part of the process is when you first hire on, or at least

10    we used to do this, you would spend a great deal of time at the

11    production facility.

12         So I spent, you know, a week at a time going down to our

13    Hamilton, Mississippi plant and working side by side with the

14    various operators, and getting a much better understanding of

15    the -- of the process itself.

16    **Q.**   When you say "working side by side," what do you mean by

17    that?

18    **A.**   So they would assign me -- a TiO2 plant is typically set

19    up in sections.  You've got your chlorination, oxidation, and

20    finishing.

21         So they would set me up with an operator and, you know,

22    person actually in the plant that would operate, whether it be

23    the control equipment or the bagging equipment.  And so I would

24    walk around with them, basically, by their side all day long,

25    to understand the process better.

**GIBNEY - DIRECT / HEMANN**

1   Q.   How long did you hold sales positions with Kerr-McGee?

2   A.   It was a variety of -- so once I became regional sales

3   manager in Dallas, that was for just about a year and a half,

4   was then promoted to the largest region, the eastern region

5   based out of Atlanta.  Was only there for seven months.  Then

6   became director of sales for the Americas.  I had

7   responsibility for north and South America.

8        And then in -- I think it was '99 or 2000, became vice

9   president of global marketing; had global responsibility for

10  not only the marketing of the TiO2 but also the technical sales

11  and service.

12       We had, you know, a relatively large group of technical

13  sales and service representatives, including Ph.D.s that worked

14  closely with the accounts to try and get our material specified

15  into formulations.

16  Q.   How is marketing different than sales?

17  A.   Sales -- you know, if you look at it, you're blocking and

18  tackling on a day-to-day basis.  You're in the trenches, trying

19  to make sure product is getting shipped out to the customers;

20  you're negotiating much more shorter term or shorter duration

21  contracts or pricing agreements.

22       Marketing is more of trying to get your products

23  specified, get a position with an account, and then negotiate

24  longer-term contracts.

25       So my responsibility was laid out in 2000, as part of this

**GIBNEY - DIRECT / HEMANN**

1  job, to gain a market share position at Sherwin-Williams, PPG,

2  and AkzoNobel.  So I spent a great deal of time both on the

3  technical service side, getting our sales approved, but also in

4  negotiating contracts.

5  **Q.**  Does the marketing responsibility include learning about

6  the titanium dioxide markets around the world?

7  **A.**  Yes.

8  **Q.**  And did you begin that process when you became involved in

9  marketing in '99 or 2000?

10  **A.**  Well, we -- we were already monitoring on a regular basis,

11  even when I was director of sales for the Americas.  We were

12  competing on a global basis then.  And we would have regular

13  reviews of how we were doing versus the competition.  So I had

14  been keeping track of that even before taking on that role.

15  **Q.**  Did you, at some point, take a hiatus from titanium

16  dioxide as an employee of Kerr-McGee?

17  **A.**  As part of the development program, they -- they wanted me

18  to get some international experience, so they -- they offered

19  me the position of getting outside of TiO2 for a period of time

20  in a developmental role.

21      I moved up to Montreal, Canada, and was a chief marketing

22  officer of a small startup.  We had a joint venture with

23  Hydro-Québec to develop a lithium metal polymer battery for

24  automobiles and other applications.

25  **Q.**  How long did you do that job?

**GIBNEY - DIRECT / HEMANN**

1  **A.**    I was there for three-and-a-half or four years.  Was there

2  2001, and came back in early 2005.

3  **Q.**    When you came back, what did you come back to?

4  **A.**    So we -- in 2005, a number of things occurred.  Number

5  one, they restructured the company so that I was then made

6  general manager of a product group.  It was the paper and

7  specialties business.

8       So the material that we were then manufacturing out of

9  Germany, which was a sulfate plant, was targeted towards both

10  paper as well as specialty applications.

11       You know, if you look at cosmetics or food-grade

12  applications, we were competing with Cristal and others to sell

13  our product into those specialty applications, which tend to

14  get a much higher -- higher price.

15       So I did that, roughly, for seven months, because in the

16  midst of taking over that job, Carl Icon got involved in

17  Kerr-McGee's stock, bought a substantial stake, and forced the

18  board of directors of Kerr-McGee to spin us off or sell us.

19       And so we went through a -- about a six-month process of

20  both negotiating -- or they were negotiating, but we were in

21  the rooms, as part of the due diligence, with some of the

22  private equity firms.  But the eventual decision was made to

23  spin us off.

24  **Q.**    And the business was spun off and a new TiO2 only company

25  was created?

**GIBNEY - DIRECT / HEMANN**

1   **A.**   That's correct.

2   **Q.**   And what was the naming of that company?

3   **A.**   Tronox.

4   **Q.**   Did you take a position at Tronox?

5   **A.**   Yes.  They asked me to take on a new role, that I really

6   had no experience in.  But it was because I knew the company so

7   well and I knew the industry, they asked me to take on the role

8   of vice president of industrial relations.

9        So I had the responsibility for dealing with the

10  day-to-day calls from investors and analysts about the company,

11  and then the various trade shows that we would go to, or

12  investor conferences.

13  **Q.**   As the -- in the position of investor relations, did that

14  evolve into other responsibilities at Tronox?

15  **A.**   Yes.  They then started giving me more responsibilities.

16       I took on communications.  Government relations eventually

17  reported to me.

18       As we started entering the global financial crisis, the

19  company was going through a bit of difficulty with our

20  financial position, so we started downsizing.  Went from 11

21  officers of the company, of which I was one, one of the

22  officers, down to four, leading up to our bankruptcy.

23       So I took on additional responsibilities for human

24  resources, global procurement.  I was, essentially, the chief

25  administrative officer of the company at that point.

1    Q.   And throughout that time did you continue to be involved

2    in operating and managing the titanium dioxide business and

3    understanding what the market was with regard to TiO2?

4    A.   Yes.  There was -- you know, there was only four of us,

5    essentially, at the upper level of the management structure, so

6    we were -- we didn't have a business development group.  We

7    didn't have a strategic planning group.  The vice president of

8    operations was let go.  So we all shared responsibility across,

9    across the company to look at both markets as well as

10   technology.

11   Q.   Did you, at some point in time, add human resources and

12   supply chain management to your portfolio of jobs?

13   A.   Yes.

14   Q.   And what does supply chain management involve?

15   A.   So our main inputs into making titanium dioxide, the

16   largest input, of course, is your titanium barium ore.  You

17   can't make TiO2 without the ore itself.  And so at the time I

18   took over responsibility, it was roughly a third of our cost

19   structure.  Today it's -- it can be upwards of 40 to

20   50 percent.

21        But the other major components are chlorine, caustic soda,

22   some of the process chemicals that you would use to manufacture

23   TiO2.  So I had responsibility across all of those inputs, as

24   well as energy, freight, any of the cost inputs.

25   Q.   In 2009, did you add a responsibility with regard to the

**GIBNEY - DIRECT / HEMANN**

1   company's factory in Germany?

2   **A.**   Yes.   During -- as we filed for Chapter 11 bankruptcy

3   protection, the plant manager at our Botlek, Netherlands

4   facility.

5   **Q.**   Netherlands, I'm sorry.

6   **A.**   Yeah.   He did not feel comfortable continuing to have

7   responsibility for the plant because of liability reasons.

8   When a company is in bankruptcy in Europe, there's personal

9   liability that's associated with that.   So we put him in a

10   lesser role, and I took over responsibility as the acting

11   general manager for the facility.

12   **Q.**   And what sort of facility is that?

13   **A.**   It was a chloride plant, roughly 90,000 tons per year

14   production.

15   **Q.**   Over your tenure -- let me ask you, how long did you hold

16   that position?

17   **A.**   We were in bankruptcy from early 2009 until January of

18   2011.   So a few years.

19   **Q.**   Over your years at Kerr-McGee, how would you describe

20   your -- your learning and knowledge with regard to both the

21   technology at Kerr-McGee and the technology and -- of other

22   companies?

23   **A.**   It's -- it's like learning a new language, but you get to

24   understand pretty quickly not only your own technology but

25   your -- we were constantly benchmarking ourselves versus the

**GIBNEY - DIRECT / HEMANN**

1   competition because you're always trying to either reduce your

2   costs or improve your quality of your product so that you can

3   gain a bigger market share position on a global basis.

4        So we had constant reviews, both on a technical basis as

5   well as on a business basis, to find out where we stood.

6   Q.   And the technical reviews on a -- or the technical reviews

7   on a technical basis, can you describe those over the course of

8   your career at Kerr-McGee and Tronox?

9   A.   We would have on a regular basis, at least once a quarter,

10  technical reviews at our research and development facility in

11  Oklahoma City.  And plant managers from our various plants

12  would fly in, along with their technical staff.  We would

13  review their performance versus benchmarks.  Essentially, their

14  goals for the year.

15       If changes had to be made or new equipment be purchased to

16  improve their quality or their technical performance or reduce

17  their costs, those reviews helped us evaluate whether or not we

18  were going to spend that capital or not.  So it was -- we did

19  that every quarter.  And then we had an annual capital review

20  that we would also sit in on.

21  Q.   The capital review, would that involve decisions about

22  expanding factories and potentially building new factories and

23  that sort of thing?

24  A.   Yes, that's correct.

25  Q.   You also mentioned that there were business reviews.

**GIBNEY - DIRECT / HEMANN**

1  Could you describe those.

2  **A.**   So business reviews, we would bring in not only the

3  production staff but also folks from R&D, pretty much people

4  across the company.  Sales and marketing.  And we would review

5  the performance of the business on an annual basis, sometimes

6  even more often if the need arose.  Especially as we were

7  approaching 2008 and 2009, we started having more meetings

8  because we were trying to figure out how we were going to turn

9  the ship around and get it moving in the right direction.

10  **Q.**   In the course of those meetings and your other management

11  responsibilities, did you become familiar with how -- how

12  companies in the TiO2 industry would protect their proprietary

13  information?

14  **A.**   Well, yes.  We -- we -- during the course of my career we

15  hired a number of individuals from competitors because it's a

16  small industry.  There's not a lot of -- you can't run out and

17  grab someone from a Dow Chemical that understands TiO2.

18  It's -- you tend to look for people that have been in the

19  trenches and understand the business.

20       So we would hire -- for instance, there was a gentleman by

21  the name of Marty Roland, high-ranking engineer at DuPont.  And

22  we made him, eventually, our plant manager of Hamilton,

23  Mississippi, our largest plant, and eventually chief operating

24  officer.  So we got to know him.

25       But they -- it was interesting.  Marty, in technical

**PROCEEDINGS**

1    reviews people would look to Marty and say, Marty, how does

2    DuPont do this?  And he would say, listen, I --

3            **MR. GASNER:**  Objection, Your Honor, hearsay.

4            **MR. HEMANN:**  It's offered for experience.

5            **THE COURT:**  Sustained.  Overruled.

6        You may answer.

7            **THE WITNESS:**  So he would say, listen, I can't divulge

8    that.  And he'd just say, you've got to just keep working on

9    what you're doing.

10       So we saw firsthand that people were -- were not willing

11   to divulge confidential information.

12           **THE COURT:**  Mr. Froelich.

13           **MR. FROELICH:**  Objection.  Move to strike.

14           **THE COURT:**  Objection is overruled.  Motion is denied.

15       Would you please, at a convenient breaking point I would

16   like to adjourn.

17           **MR. HEMANN:**  This would be a convenient breaking

18   point.

19           **THE COURT:**  Okay.  You may step down, sir, until

20   tomorrow.

21       (Witness steps down.)

22           **THE COURT:**  Ladies and gentlemen, I'm going to give

23   you your proper conduct instruction, as I'm required to do

24   every day.  Then we'll break until tomorrow morning, and I'll

25   give you some more information about that.

**PROCEEDINGS**

1       Again, to remind you again of your conduct as jurors,

2  first, keep an open mind throughout the trial.  Do not decide

3  what the verdict should be until you and your fellow jurors

4  have completed your deliberations at the end of the case.

5       Secondly, because you must decide this case based only on

6  the evidence received in the case and on my instructions as to

7  the law that applies, you must not be exposed to any other

8  information about the case or to the issues it involves during

9  the course of your jury duty.

10       Thus, until the end of the case or unless I tell you

11  otherwise, do not communicate with anyone in any way and do not

12  let anyone else communicate with you in any way about the

13  merits of the case or anything to do with it.

14       This includes discussing the case in person, in writing,

15  by phone, Smartphone or electronic means, via email, text

16  messaging, or in or on any Internet chat room, blog, website,

17  including such social networking media like Facebook, MySpace,

18  LinkedIn, YouTube, and Twitter or other feature.  This applies

19  to communicating with your fellow jurors until I give you the

20  case for deliberation, and it applies to communicating with

21  everyone else, including your family members, your employer,

22  the media or press, and the people involved in the trial.

23  Although, you may notify your family and your employer that you

24  are continuing to sit as a juror in this case.

25       But, if you are asked or approached in any way about your

**PROCEEDINGS**

1  jury service or anything about this case, you must respond that

2  you have been ordered not to discuss the matter and to report

3  the contact to the Court.

4      Because you will receive all the evidence and legal

5  instruction you may properly consider to return a verdict, do

6  not read, watch, or listen to any news or media accounts or

7  commentary about the case, or anything to do with it.

8      Do not do any research such as consulting dictionaries,

9  searching the Internet, or using other reference materials.

10  And do not make any investigation or in any other way try to

11  learn about the case on your own.

12      The law requires these restrictions to ensure the parties

13  have a fair trial based on the same evidence that each party

14  has had an opportunity to address.  A juror who violates these

15  restrictions jeopardizes the fairness of these proceedings, and

16  a mistrial could result that would require the entire trial

17  process to start over.

18      If any juror is exposed to any outside information, please

19  notify the Court immediately.

20      So tomorrow we're going to have our regular day from 8:00

21  to 1:30, the same drill as before.  And then you've already got

22  the printed schedule for the rest of the week.

23      We're going to be dark on Thursday and Friday of this

24  week, not sitting.  And we'll talk more about that tomorrow.

25      So thank you for your attention.  We'll see you tomorrow

PROCEEDINGS

1    morning at 8 o'clock, to start.

2        (Proceedings were heard out of presence of the jury:)

3        THE COURT:  All right.  So the door is closed.  The

4    jury is gone.

5        Two things I wanted to raise.  One, we got a

6    nonsubstantive note from the jury.

7        THE CLERK:  Do you want it?

8        THE COURT:  Yes.  And in the interest of complete

9    disclosure and transparency, I'll read the note.  I mean the

10   jury is doing literally what we asked them to do in

11   communicating only by note.  So it says the following, and it

12   was received at 11:35 a.m.:

13           "Hallway bathroom (ladies) is almost out of toilet

14       paper."

15       This could be an issue on appeal so we've got to be

16   careful.

17           "Also our water tank is also empty.  Also, I need

18       another pad of paper (and a Skill Craft pen if

19       available)."

20       And it was signed by, of all people, Lindsay DuPont, Juror

21   No. 1.  So we'll handle that administratively, but I thought I

22   would raise that important matter with you.

23       The other issue is I wanted to ask government counsel if

24   you've been able to communicate with Ms. McNamara.

25       MR. HEMANN:  I have, Your Honor.  She was,

**PROCEEDINGS**

1  coincidentally, here today for another meeting.  I spoke with

2  her at the first break, and I passed along to her a little

3  status report about what had occurred in our conversation.

4      She indicated that she would endeavor to have something

5  filed to the Court by 4 o'clock today, in the nature of an

6  expedited motion, hopefully, with the support of a declaration

7  of Mark Bernstein, who is the civil attorney who was

8  representing Mr. Jian Liu at the time of the communications in

9  question.

10      THE COURT:  Well, I think one thing that -- one thing

11  that the Court would like to get, because I think it might be

12  relevant, has to do with the circumstances under which these

13  communications were disclosed to the defense, and what, if

14  anything was done -- how the disclosure was -- what the

15  government calls an inadvertent disclosure was discovered, and

16  what the government did, and when it did it, to deal with the

17  inadvertent disclosure.

18      MR. HEMANN:  I can make a proffer to the Court now.

19      THE COURT:  No.  I need -- we're going to do this in

20  writing.  So I think you need to file a declaration, as well,

21  by 4 o'clock.

22      MR. HEMANN:  And the declaration that I would file by

23  4 o'clock would be, at least to some degree, of course, hearsay

24  because there are parts of this that I am not -- that I have

25  been made aware of, but there would be several people involved

1   in the process.

2        My intention would be to submit a declaration from

3   Mr. Scott and Mr. Axelrod or myself, just laying out what we

4   know and what we've been advised of by the relevant employees

5   of the FBI.  And then, certainly, all of them would be

6   available for further inquiry if necessary.

7        **THE COURT:**  All right.  The more information the

8   better.

9        Yes, Ms. Agnolucci, do you want to say anything?

10       **MS. AGNOLUCCI:**  No, Your Honor.  I simply wanted to

11  ask that if this brief that's coming from Ms. McNamara comes

12  after 4:00 p.m., may we have 24 hours to respond?

13       **THE COURT:**  Yes.  You can have -- probably not an

14  enforceable order because I've done it indirectly and haven't

15  issued anything in writing, but knowing Ms. McNamara, if she

16  was going to file whatever she was going to file later than

17  4:00, she would ask for permission.

18       But your request to file 24 hours after Ms. McNamara and

19  the government E-file their materials is granted.

20       **MS. AGNOLUCCI:**  Thank you, Your Honor.

21       **THE COURT:**  Yes, Mr. Froelich.

22       **MR. FROELICH:**  Your Honor, I have a motion for a

23  mistrial.

24       Your Honor, Mr. Gibney is so far afield, it's so

25  prejudicial.  There's no date -- he talks about some

**PROCEEDINGS**

1  ex-employee of DuPont.  You don't know what kind of agreement

2  he had with DuPont and when he left DuPont, what questions were

3  asked of him and what year it was.  And my client left DuPont

4  in 1991.

5      This is very, very prejudicial.  It's hearsay.  And

6  there's just no way to combat it.

7          **THE COURT:**  Mr. Hemann.

8      **MR. HEMANN:**  My intention is to provide all of those

9  details that Mr. Froelich just asked for through Mr. Gibney's

10 testimony as we go forward.

11     It is -- it could literally not be more relevant to the

12 issues in this case.  This is an expert who has dealt with,

13 personally, how to -- how to handle confidential information

14 sharing.  He'll testify that this is an employee who left

15 DuPont with no restriction other than the restriction that he

16 not use DuPont information.

17     That is what this trial is about, Your Honor.

18         **THE COURT:**  All right.  Well, I'm going to take

19 Mr. Froelich's -- in light of the representation of the

20 government -- motion under advisement.  Because in fairness to

21 them, we had to adjourn and the government hasn't finished.

22     If you are correct, we'll see what remedy is appropriate.

23         **MR. FROELICH:**  The problem is it's all hearsay.  I

24 don't get to cross-examine the employee.

25         **THE COURT:**  First of all, if you want to get technical

**PROCEEDINGS**

1   about it, it's not hearsay because it's not offered for the

2   truth of the matter, just that this one employee made this

3   statement.  And it's not -- there's no substantive truth that's

4   ascribed to that, number one.

5       Number two, as you well know, in qualifying an expert and

6   in the reliance by an expert, an expert is entitled to rely on

7   information that is otherwise inadmissible, if it's the kind of

8   information that's usually and regularly relied upon by an

9   expert in the field.

10      **MR. FROELICH:**  I know that.  It's all hearsay.  I

11  don't believe -- he's a salesman and because he talks -- and

12  because he talks to one DuPont employee that doesn't make him

13  an expert on DuPont's protection.

14      I mean -- and he's going to say that this employee told

15  him he had this agreement, this agreement.  That's all hearsay.

16      **THE COURT:**  All right.  Well, I will certainly -- I

17  think it's premature, your request is premature.

18      I would like to hear the full foundation, and then I'll

19  decide, if there's a specific objection -- I ruled on the one

20  objection, and now I've given you my reasons, and I'll rule on

21  all the other objections.

22      But I think that this all -- I will say to the government,

23  this all needs to be linked up because the concern that the

24  Court has -- and, again, because I haven't heard his testimony,

25  I've read the in limines and the responses and all that, and I

**PROCEEDINGS**

1   adjudicated that motion in limine with respect to Mr. Gibney's

2   qualifications and opinion, but I certainly would expect -- the

3   Court would be very concerned if all Mr. Gibney was going to be

4   relying on is anecdotal information about what various people

5   viewed various things, because those people aren't before us to

6   cross-examine.

7       And unless the government can show that this is somehow --

8   you know, a practice of DuPont, that, you know, is a practice

9   that is followed by DuPont, then this testimony may not come

10  in.  Because what I want to avoid is -- you may get ten people

11  in here, some of them qualifying as experts, some not, who

12  might say, well, I was at DuPont and I thought that my

13  obligations for confidentiality expired after five years.  Some

14  might say ten years.  Some might say well, I think, you know, a

15  good ethical practice would be never to reveal it.

16      But that's not really going to be probative.  So, again,

17  I'll have to await the testimony, but I want to warn the

18  government that that's not -- if it's going to be only

19  anecdotal evidence, then I'm not going to allow it.  So I think

20  you need to be properly guided by that.

21      And I don't want to argue hypotheticals of what he might

22  say.  But I understand Mr. Froelich's point.  And to the extent

23  that some random person or two or three had this view of the

24  DuPont world, that to the extent you can link that up as being

25  probative with the issues the jury must find, and in

**PROCEEDINGS**

1   particular, more to the point, and the point that the

2   government argued in response to the in limine motion with

3   respect to Mr. Gibney's testimony, the statutory elements that

4   the government offered as a support to show an attempt to keep

5   confidential information confidential.

6      And that was what was laid out in the Court's order with

7   respect to Mr. Gibney.  And it's particularly with respect

8   to -- the government has, according to the Court's order, page

9   7, lines 24, quote:

10       "The government contends this testimony is relevant

11      to elements of the alleged offenses, namely, quote, the

12      reasonable measures element, unquote, of 18 U.S.C. Section

13      1839(3)(A), and the element that the information has value

14      because it is not generally known to the public, 18 U.S.C.

15      Section 1839(3)(B)."

16      And on that basis, the Court ruled that the government had

17   made a sufficient showing that he is qualified to testify.

18      And I invited the defense to challenge the opinions in

19   vigorous cross-examination rather than exclusion.

20      So, again, I don't want to get into hypotheticals about

21   what this witness might say or not say, but --

22      **MR. HEMANN:**  And, Your Honor, I understand that.  And

23   I guess I have two things I would very much like to say about

24   this.

25      Number one, this specific information was included in the

PROCEEDINGS

1   expert disclosure.  And neither defendant objected to this

2   specific information.  And that is, of course, the purpose of

3   going through the whole *Daubert* motion process.  That's number

4   one.

5        And so waiting until the morning that he's going to

6   testify and then, you know, making argument seems to be

7   contrary to the Court's intention of setting these *Daubert*

8   motions.

9            THE COURT:  Just a minute, I'll let you speak.

10           MR. HEMANN:  And not really fair as we've gone ahead

11   and prepared.

12           THE COURT:  All right.  When we get to the point,

13   then, as to that specific point you should have prepared the

14   disclosure.  And I will look at -- and I'm going to look at it

15   again because I think that's a fair point.  That's why we have

16   *Daubert* procedures.  And the Court took a lot of time with --

17   you know, in adjudicating these motions.

18           MR. HEMANN:  And then the other observation I'd like

19   to make, Your Honor, is that that particular piece of testimony

20   doesn't go to the elements of -- the reasonable measures

21   elements or the -- the use of technology elements of what the

22   government is attempting to prove.

23        What it does go to is this idea that has been articulated

24   consistently throughout the case that there is a restriction on

25   DuPont's employees that expires after five years.  That notion

**PROCEEDINGS**

1   is fallacious.  It comes from nowhere.  It is not standard.

2   And Mr. Gibney will testify it is not standard in the industry.

3       Unless a high-level executive has a contractual

4   noncompete, any of DuPont can leave and go work at any

5   competitor the day after.  And there is no restriction.  Except

6   another restriction that is common throughout the industry

7   which is that that employee may thereafter not spout off either

8   from memory or by using DuPont documents about information that

9   that employee used in -- obtained from DuPont.

10      That is consistent with the DuPont agreements both at the

11  beginning and end of the employee's tenure.  It is consistent

12  with the testimony of every witness who has testified so far in

13  this case.

14      And Mr. Gibney, as an expert, is going to say in the

15  industry that is standard.  And that is what it --

16          **THE COURT:**  All right.  Mr. Froelich.

17          **MR. FROELICH:**  Your Honor, that's -- now we're really

18  far afield.  That's a standard in the industry.  That's not

19  what this is about.  And we should -- and that's not what --

20  the way he was put up.

21      And my understanding is what we're doing is doing a

22  *Daubert* -- you know, we objected to this man being an expert

23  from the get-go.  And I thought there would be a *Daubert*

24  hearing where he had to get on the stand.  And we're doing a

25  *Daubert* hearing before the jury, where we can't unring the

PROCEEDINGS

1    bell.

2        And for him to say -- this is a salesman.  This isn't --

3    his background is sales.  And he's -- he's in a position in a

4    bankrupt company for a while and he says -- I mean, it's in the

5    industry.  No one is talking about -- we've talked about and

6    there's been plenty of evidence showing a five year, that my

7    client had a belief.  It wasn't something he made up.  And

8    that's what this is about.  Not an industry practice.

9        There's never been an allegation here that this is an

10   industry practice or at DuPont it's an industry practice.  In

11   fact, we've been blocked a little bit, but DuPont has all kinds

12   of contracts, and they know it, from a year to five years.

13   And, actually, McIntosh says he didn't even have a contract,

14   and he even told them that.

15           THE COURT:  Mr. Gasner, it seems like you want to --

16           MR. GASNER:  Yes, Your Honor.  I believe the Court is

17   on the right path in trying to distinguish --

18           THE COURT:  That's all good.

19           MR. GASNER:  -- proper expert testimony.

20           THE COURT:  Getting to the end.

21           MR. GASNER:  I do think that after the voir dire the

22   Court is going to have a sense of what this man is an expert in

23   or not.

24           THE COURT:  I agree.  The parties had an opportunity

25   to fully flesh out the *Daubert* issues.

**PROCEEDINGS**

1    I said that I would certainly entertain, which I would be

2  required to do any way, a voir dire, and, of course, allow

3  cross-examination -- assuming I allow him to testify as an

4  expert on whatever area he's offered, a full and thorough

5  cross-examination.

6    So I think all of these issues that Mr. Froelich is

7  concerned about really are the stuff that voir dire and

8  cross-examination are made of.  And the voir dire may knock him

9  out.  The cross-examination may cause me to strike his

10  testimony, or portions of it.  You'll have that full

11  opportunity to do that.

12    And the government, in fairness to the government, they

13  haven't finished even starting to make their foundation.  Once

14  they've made their foundation, I'll turn it over to counsel to

15  voir dire, and we'll see where we go from there.

16    But I will say, as I said in the order -- and counsel

17  should certainly reread the order because I cited cases -- that

18  the expert does not have to have personal experience in every

19  area in which he or she will testify.  And, you know, I went

20  through and summarized his experience and said the government

21  had made, at least on that record, a sufficient showing.

22    So let's see where it goes, is all I'm saying.  I

23  understand this is a very important issue to counsel and,

24  Mr. Froelich, you're concerned about it, which you should be.

25    But to the extent that you've made a motion for a

**PROCEEDINGS**

1  mistrial, based upon what he said so far, the motion is denied

2  without prejudice.

3      To the extent that you are objecting to his testimony at

4  this point, the request is overruled without prejudice.  That's

5  all I'm going to do right now.

6          **MR. FROELICH:**  Can I just say --

7          **THE COURT:**  Yeah.

8          **MR. FROELICH:**  The problem is they didn't even lay a

9  foundation.  They gave him a general -- a general outline, but

10  didn't really lay anything.

11          **THE COURT:**  They haven't gotten to it.  They haven't

12  finished yet.

13          **MR. FROELICH:**  He has already given the opinion.

14          **THE COURT:**  Well, he's talking about his basis.

15      Anyway, let's deal with this tomorrow.  We're adjourned

16  until tomorrow.  And to the extent that the Court wishes oral

17  argument on the motion, the anticipated motion by -- what's the

18  witness's name, Mr. Liu?

19          **MR. HEMANN:**  Jian.  It's J-i-a-n L-i-u.

20          **THE COURT:**  Yes, Mr. Liu, L-i-u, perhaps we'll deal

21  with it after court tomorrow.  We'll see how -- actually, we

22  can't deal with it after court tomorrow because we don't have

23  the defense response.

24      So I'll let you know.  It may be the following morning

25  that we'll deal with it.  I'll let you know, give you plenty of

PROCEEDINGS

1   notice.

2          **MR. HEMANN:**  Thank you, Your Honor.

3      I anticipate, based on our timing, that it's possible

4   Mr. Liu would begin testifying tomorrow.  It may be unlikely,

5   at this point.  But he certainly would not get to cross, and we

6   would not be bringing those documents up in direct.

7          **THE COURT:**  Sounds good.  All right.  Thank you very

8   much.

9          **MS. AGNOLUCCI:**  Thank you, Your Honor.

10         **THE COURT:**  Have a good evening.

11         **MR. HEMANN:**  Thank you, Your Honor.

12             (Proceedings adjourned at 2:13 p.m.)

13                     ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        <u>**CERTIFICATE OF REPORTERS**</u>

4            I certify that the foregoing is a correct transcript

5      from the record of proceedings in the above-entitled matter.

6

7      DATE:   Monday, January 27, 2014

8

9

10

11      _____

12            Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                       U.S. Court Reporter

13

14

15      _____

16         Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
                       U.S. Court Reporter

17

18

19

20

21

22

23

24

25