**Volume 11**

**Pages 2141 - 2376**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
  VS.                           )        NO. CR 11-00573 JSW
                                )
WALTER LIEW; ROBERT MAEGERLE;   )
and USA PERFORMANCE TECHNOLOGY, )
INC.,                           )
                                )
          Defendants.           )
_____ )
                          San Francisco, California
                          Tuesday, January 28, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    MELINDA HAAG
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
               BY:  **PETE AXELROD**
                    **JOHN H. HEMANN**
                    **ASSISTANT UNITED STATES ATTORNEYS**

                    U.S. DEPARTMENT OF JUSTICE
                    600 E Street NW
                    Washington, D.C.  20044
               BY:  **RICHARD S. SCOTT**
                    **ASSISTANT U.S. ATTORNEY**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
              Official Reporters

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant Walter Liew and USA Performance Technology, Inc.:
                         KEKER & VAN NEST LLP
 3                       633 Battery Street
                         San Francisco, California  94111
 4              BY:   STUART L. GASNER
                      SIMONA A. AGNOLUCCI
 5                    KATHERINE M. LOVETT
                      CHRISTINA BLAIS
 6                    ATTORNEYS AT LAW

 7   For Defendant Robert J. Maegerle:
                         MCKENNEY & FROELICH
 8                       1349 West Peachtree Street
                         Two Midtown Plaza - Suite 1250
 9                       Atlanta, Georgia  30309
                BY:   JEROME J. FROELICH, JR.
10                    ATTORNEY AT LAW

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

Tuesday, January 28, 2014

**GOVERNMENT'S WITNESSES**                               **PAGE**  **VOL.**

**GIBNEY, ROBERT**
                                                         2157    11
Direct Examination resumed by Mr. Hemann                 2157    11
Voir Dire Examination by Mr. Gasner                      2172    11
Voir Dire Examination by Mr. Froelich                    2189    11
Direct Examination resumed by Mr. Hemann                 2190    11
Cross-Examination by Mr. Gasner                          2232    11
Cross-Examination by Mr. Froelich                        2258    11
Redirect Examination by Mr. Hemann                       2275    11
Recross-Examination by Mr. Froelich                      2283    11

**BHATNAGAR, BRIJESH**
(SWORN)                                                  2285    11
Direct Examination by Mr. Hemann                         2285    11
Cross-Examination by Ms. Lovett                          2298    11
Redirect Examination by Mr. Hemann                       2335    11

**DIEMER, JUNIOR, RUSSELL BERTRUM**
(SWORN)                                                  2342    11
Direct Examination by Mr. Axelrod                        2342    11

E X H I B I T S

**TRIAL EXHIBITS**                           **IDEN**  **EVID**  **VOL.**

 1090                                                 2328    11

 1093                                                 2329    11

1297                                                  2305    11

1683                                                  2307    11

1690                                                  2318    11

2631, page 31                                         2252    11

2631, page 30                                         2256    11

2959                                                  2319    11

2960                                                  2321    11

1

**I N D E X**

2

**E X H I B I T S**

3

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 2975 | | 2322 | 11 |
| 3010 | | 2324 | 11 |
| 3065 | | 2302 | 11 |
| 3075 | | 2326 | 11 |
| 3080 | | 2331 | 11 |
| 3100 | | 2333 | 11 |
| 4005 | | 2341 | 11 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

| | |
|---|---|
| 1 | **Tuesday - January 28, 2014**                                **7:44 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---000---** |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **THE COURT:**  Good morning, everybody.  Please be |
| 6 | seated. |
| 7 | **MR. FROELICH:**  Good morning, Your Honor. |
| 8 | **THE COURT:**  Call the case. |
| 9 | **THE CLERK:**  Calling case No. CR-11-573, United States |
| 10 | versus Walter Liew, United States versus Robert Maegerle, |
| 11 | United States versus USAPTI. |
| 12 | Counsel, please state your appearances. |
| 13 | **MR. HEMANN:**  Good morning, Your Honor.  John Hemann, |
| 14 | Pete Axelrod, and Richard Scott for the United States. |
| 15 | **THE COURT:**  Good morning. |
| 16 | **MR. GASNER:**  Good morning, Your Honor.  Stuart Gasner, |
| 17 | Simona Agnolucci, and Katie Lovett for Defendant Walter Liew |
| 18 | and Defendant USAPTI.  Mr. Liew is present. |
| 19 | **THE COURT:**  Welcome, everybody. |
| 20 | (Counsel greet the Court.) |
| 21 | **MR. FROELICH:**  Good morning, Your Honor. |
| 22 | Jerry Froelich for Mr. Maegerle.  And Mr. Maegerle is standing |
| 23 | next to me. |
| 24 | **THE COURT:**  Good morning. |
| 25 | I understand there's some issues that counsel wishes to |

PROCEEDINGS

 1 | bring up.

 2 |         **MR. GASNER:**  Yes, Your Honor.  The first is just a

 3 | general concern that if the government's case goes past next

 4 | Thursday, that it's going to compress the defense case.

 5 |     And Mr. Hemann had said, originally, next Thursday the

 6 | government would be done.  He said from time to time other

 7 | things suggesting it might bleed over slightly into the

 8 | following week.  And I'm just concerned that the pressure to

 9 | get done is going to fall on the defense side and we're going

10 | to be compressed.

11 |     We have four experts.  We have several witnesses.  We had

12 | originally said two to three weeks.  I think two weeks is

13 | realistic; that is, eight trial days.  But I'm just getting a

14 | little bit worried that the bleeding over will compress the

15 | defense unfairly.

16 |         **THE COURT:**  All right.  Mr. Hemann.

17 |         **MR. HEMANN:**  So, Your Honor, I think our estimate at

18 | the time of the joint pretrial statement for the government's

19 | case was five to six weeks.  I think we're at just over five

20 | weeks now, at the longest.

21 |     And the comments that I made to the Court when the Court

22 | first raised the scheduling issue on -- I guess a couple of

23 | weeks ago, when Mr. Zisko was testifying, or last week, was

24 | that we would be done in three weeks from then, which is a week

25 | from this Thursday.  And then I said maybe a day or two into

**PROCEEDINGS**

1  the next week, early the next week.  I think we're very easily

2  on that schedule.  We could possibly be done on next Thursday,

3  depending on some cross-examinations.

4      I would observe to the Court that this issue with

5  Mr. Gibney is going to lengthen his testimony.  I had believed,

6  based on the adjudication of the motion in limine -- or the

7  *Daubert* motions, that his qualifications were settled and that

8  there had not been a challenge.

9      So I went pretty quickly with him yesterday.  I feel now

10  I've got to go back and lay a much more painstaking foundation,

11  and then we're going to have voir dire.  And so things like

12  this will potentially lengthen it.

13      Again, he's certainly entitled to -- the defense is

14  entitled to make the objections it wishes to make, and the

15  Court shall rule on them.  But there are things about this that

16  they are now going to go a bit longer.

17      Again, I do feel even with a bit longer we're talking

18  about end of next week and, as I said, possibly early into the

19  week after that, meaning Monday.

20      **THE COURT:**  All right.  Well, let me say to you,

21  Mr. Gasner, there's not going to be any compression of the

22  defense case.  We're not all going to turn into pumpkins on

23  March 1.  And the Court is not going to unfairly prejudice the

24  defendants.

25      I think the bigger -- if there's a bigger issue, the

**PROCEEDINGS**

 1    bigger issue is more the jury because we promised the jury a

 2    certain period of time.

 3        But I think if we continue to get updates, especially,

 4    let's say, before we close of business tomorrow, which will be

 5    our last day of the week, if I kind of give them a little bit

 6    of a warning that we might spill over into March, then -- so

 7    give them plenty of notice and they can make arrangements for

 8    whatever they need, I don't think it's going to be an issue.

 9        So, you know, I certainly want the case to move along in

10    an expeditious fashion, but not at the risk of compressing the

11    defendants' case in any way.

12        I often find in civil cases that compressing cases usually

13    makes them more effective, and lawyers thank you at the end,

14    and say, Thank you for limiting my time in civil cases because

15    it made the case more efficient.  Now, they weren't under oath

16    when they said that --

17        (Laughter)

18        **THE COURT:**  -- or on a polygraph, but that's what they

19    say.

20        So we'll deal with it.  I would suggest the following:  My

21    practice in this court, and I think it's the practice of other

22    judges, if you are simply laying a foundation with respect to

23    qualifications, you are entitled to lead the witness because

24    there's not going to be a dispute about -- you know, the

25    defense has a view about his qualifications, the government has

**PROCEEDINGS**

1  a view, but they are what they are.  And I think you can move

2  it along.

3      And I think when you start asking open-ended questions

4  particularly, the witness may not understand that you're

5  dealing only with his qualifications rather than the substance,

6  and you get into issues such as concerning Mr. Froelich

7  yesterday, having to do with things he was saying that might be

8  part of his opinion.

9      So you can lead him on that issue and on the issue of --

10  you know the foundation of his qualifications.  And if it gets

11  into something really critical and the defendants want to

12  object, you know, I'll rule on those.

13      So let's just keep going expeditiously.

14      I understand you had another -- or Ms. Agnolucci had

15  another issue with respect to scheduling.

16          **MR. GASNER:**  Yes, Your Honor.

17          **MS. AGNOLUCCI:**  It has to do with the brief, Your

18  Honor.

19      We intend to file a brief in response to the brief that

20  was filed by Ms. McNamara, as promised, by 4:00 p.m. today.

21  One kind of administrative matter that I wanted to raise is

22  that we had planned to attach the emails at issue and file it

23  under seal.

24      Does Your Honor have any concerns about us attaching the

25  emails to a declaration in support of the brief?

**PROCEEDINGS**

1    **THE COURT:**  Well, first of all, I think it would be

2    helpful to the Court to -- you all have the exhibits that are

3    at issue.  Just give them to the Court.

4        **MS. AGNOLUCCI:**  We will do that today.

5        **THE COURT:**  I would like to get those sooner rather

6    than later.

7        And then if you're going to further -- if you need to

8    present them again in your brief, then you need to follow the

9    procedure for filing them putatively under seal.  Pending

10   further order of the Court, I would seal them.  So file them

11   under seal.  But I would like to get them earlier rather than

12   later so I can continue to work on this.

13       **MS. AGNOLUCCI:**  And we will file them under seal, Your

14   Honor.  We think that it's important for Your Honor to look at

15   the emails because one of the points that we hope to convey is

16   that many of them are not privileged at all.

17       One question, from a housekeeping perspective, would it be

18   acceptable to Your Honor if we submit the brief and all of the

19   attachments by 4:00 p.m., but the administrative motion to

20   come -- to file under seal may come a little bit later?

21       **THE COURT:**  That's fine.  As long as I have the actual

22   exhibits.

23       **MR. HEMANN:**  I mean, Your Honor, I would be amenable

24   to, since we're on the record, at some point today just lodging

25   them with Your Honor on the record, with the understanding that

**PROCEEDINGS**

1    the Court will use them in reviewing and will return them.

2        I mean, this is a process that's frequently used with

3    magistrates in terms of the -- you know, assessing these sort

4    of privileged issues, and the Court will look at them and

5    return them.  They are exhibits that have been designated in

6    the case.

7        I don't want to cause anybody undue strain in having to

8    file complicated administrative motions.

9            THE COURT:  All right.  Well, that's absolutely

10   acceptable.  I just want to get the exhibits.  I'll treat them

11   appropriately until the Court rules on the privileged nature of

12   them.

13           MR. HEMANN:  So we'll lodge the six, I believe, that

14   are at issue during a break --

15           THE COURT:  Yes.  That would be appreciated.

16           MR. HEMANN:  -- today.  And then the Court will have

17   them and then we can move along.

18           THE COURT:  Let me ask, without prejudice to the brief

19   that you'll be filing, Ms. Agnolucci, is there going to be a

20   contention that somehow -- that somehow, by virtue of actions

21   by Mr. Jian Liu and/or Mr. Bernstein that somehow the privilege

22   was waived?  Or are you simply going to argue -- not simply, or

23   argue that the documents are not privileged?  Because that's --

24   Mr. Bernstein filed a very conclusory --

25           MS. AGNOLUCCI:  Yes.

**PROCEEDINGS**

 1          **THE COURT:**  -- document.

 2          **MS. AGNOLUCCI:**  Your Honor, we have independent

 3    knowledge of the content of those emails because at the time

 4    Mr. Bernstein was in conversation with Mr. Walter Liew's civil

 5    attorney, who then subsequently informed us of the nature of

 6    those conversations.

 7          We believe that the privilege was waived, yes.

 8          **THE COURT:**  All right.

 9          **MS. AGNOLUCCI:**  And we will address that in our brief.

10          **THE COURT:**  Okay.  That's certainly an issue because

11    to the extent you're distinguishing existence of the privilege,

12    potential waiver of the privilege, then there is the issue of,

13    assuming a privilege, what does the Court -- this is the issue

14    that the Court raised yesterday:  To what extent does the

15    privilege have to yield to constitutional rights of

16    confrontation?

17          And the law on that issue, as Ms. McNamara correctly

18    observed, is unsettled in the Supreme Court and even in the

19    Circuit because in the *McClintock* case, which is 609 F.3d 893,

20    the -- 983, excuse me, 609 F.3d 983, in a habeas case the Ninth

21    Circuit *en banc* said that the issue is indeed unsettled in the

22    Supreme Court as to what -- how you balance the constitutional

23    right of confrontation, right to present a defense, et cetera,

24    versus the right of a party to confidentiality of

25    communications with the attorneys.

**PROCEEDINGS**

 1         So it seems like what will have to happen -- I'll look at

 2    the briefs, but I think the way to make the record on this is

 3    in addition to reviewing the briefs and the factual information

 4    that's presented, is to first allow Mr. Liu to testify fully on

 5    direct, and let's see what he says.  Because it may be -- I

 6    think the devil may be in the details.

 7         It may well be that the defense need not go into the

 8    substantive -- the physical communications and put them before

 9    the jury rather than the facts that support those.  And then

10    the defense would be, you know, entitled to make a record about

11    why, given the nature of the substance of Mr. Liu's direct

12    testimony, why it may be that a particular document, assuming

13    privilege and assuming no waiver, why it is -- a particular

14    document may be central to the defense.

15         And the Court will then need to do the balancing test that

16    is implicated in some of these decisions, such as the *Grace*

17    case in the District of Montana.  And that case, of course,

18    relied on the Ninth Circuit panel decision which was ultimately

19    withdrawn based upon the *en banc* decision in *McClintock*.

20         So I think it's a very complicated issue, but I think the

21    best way to do it is to make the full record so the parties, we

22    can kind of get real with what is the need and all that.

23         But, you know, it's an interesting issue because if you're

24    right, Ms. Agnolucci, the issue would have been, if the

25    government hadn't inadvertently produced these, then we might

 1   have had a *Brady* issue --

 2           **MS. AGNOLUCCI:**  Right.

 3           **THE COURT:**  -- if they came up later on in the

 4   proceedings.

 5       So now, by virtue of inadvertence, the government has

 6   actually satisfied its *Brady* obligation, and the issue is now

 7   to what extent may the defendant use such disclosed documents.

 8       It's sort of like a law school exam question here.  I

 9   don't like those, but they exist.

10           **MR. HEMANN:**  Precisely what I was looking for in the

11   middle of trial, Your Honor.

12           **THE COURT:**  That's right.

13       (Laughter)

14           **MR. HEMANN:**  I would, I guess -- I have a lot of

15   thoughts about the *Brady* issue that are not apropos right now,

16   I guess.  But this may not become the complex issue that we --

17   we -- that it might be, because I feel like, in just talking to

18   Mr. Liu prior to having looked at the emails, I knew all of

19   these things because -- and I certainly intend for him to

20   testify as to all of these things on direct.  I would guess

21   that -- without reference to his attorney or attorney-client

22   communications.

23       I believe that the defendants would be able to

24   cross-examine him effectively, without reference to his

25   confidential communications with his attorney.

**PROCEEDINGS**

1          **THE COURT:** Let me interrupt you.

2          Clearly, it is the case that if he says, you know, fact A

3    on direct, or if he doesn't say it on direct, and he says --

4    let's say he says the light was red on direct, and then on

5    cross the defendants say isn't it true the light was green, and

6    the defendant says, yeah, the light was green, then the -- any

7    statement that he would have made would then become hearsay, as

8    to which no exception would apply.

9          That's why I say the devil is really in the details, and

10   it really depends upon how much he gives up on direct and how

11   much he gives up on cross, without the documents.

12         And then when we get to the point where the defendant

13   needs to use the documents, then we'll get into the real crisp

14   issue of the balancing test.

15         So I think we need to just sort of take it a step at a

16   time.

17         **MR. HEMANN:** I think the good news is that we've been

18   able to make some scheduling adjustments so that we -- we

19   certainly won't get to Mr. Liu today. I think it is unlikely

20   that we will need to get to him tomorrow.

21         So it may be that that issue doesn't need to be addressed

22   by the Court until next Monday, and the Court has a little bit

23   of time to sort through the issues.

24         **THE COURT:** Very well. So nobody is prejudiced by

25   that.

**PROCEEDINGS**

1      Are we ready to bring in the jury?  Let's bring in the

2  jury.

3      Yes.

4          **MR. AXELROD:**  I just wanted to alert the Court to a

5  smaller witness issue, relating to a witness tomorrow, who is

6  Tony Duong.

7      The Court may recall, that's the witness the Court issued

8  an immunity order for his testimony.  And we filed a short

9  brief this morning, with a request that we treat him as a

10  hostile witness.  And so I just wanted to let the Court --

11         **THE COURT:**  I haven't seen that yet, but I'll look at

12  the brief.

13         **MR. AXELROD:**  Yes, just to let the Court know that's

14  coming.

15         **THE COURT:**  Very well.

16      All right.  Let's get Mr. Gibney in here, and let's get

17  the jury.

18         **THE CLERK:**  All rise for the jury.

19      (Jury enters at 8:00 a.m.)

20         **THE COURT:**  All right.  Please be seated.

21      Good morning, ladies and gentlemen.  Once again, thank you

22  for your punctuality.  It continues to keep the case flowing

23  smoothly and promptly.

24      Just to remind you, we are still in the government's case,

25  and we are in the midst of Mr. Gibney's direct examination by

1    the government.

2         And I want to remind the witness, as we do all witnesses,

3    that you're still under oath.

4              **THE WITNESS:**  Yes, Your Honor.

5              **THE COURT:**  All right.  Please proceed.

6                        **ROBERT GIBNEY**,

7    called as a witness for the Government, having been previously

8    sworn, testified as follows:

9                  **DIRECT EXAMINATION**  **(resumed)**

10   BY MR. HEMANN:

11   **Q.**   Good morning, Mr. Gibney.

12   **A.**   Good morning.

13   **Q.**   We had, sort of, summarily gone through your career at

14   Kerr-McGee slash Tronox quickly yesterday.  Do you remember

15   that?

16   **A.**   Yes, I do.

17   **Q.**   I want to talk a little bit more about that in a moment,

18   but, first, after you left Tronox in -- 2011?

19   **A.**   2012.

20   **Q.**   -- 2012, what did you do?

21   **A.**   So I took some much needed time off.

22        But towards the end of that year, December, I began doing

23   some consulting work, and established my own consulting

24   practice as of January last year, 2013.

25   **Q.**   Could you briefly describe the nature of the consulting

GIBNEY - DIRECT / HEMANN

1    work?

2    **A.**    Well, I do work for a variety of clients, some in the

3    mineral sands industry, helping them better understand the

4    needs and requirements of the titanium dioxide customers;

5    looking at strategy; worked on the due diligence effort for

6    them in terms of trying to -- I can't go into specifics of it,

7    but it was a due diligence look at a potential acquisition.

8         Also did some work for a private equity firm, doing due

9    diligence around the acquisition of the titanium dioxide

10   manufacturer.

11        Worked with investors to better understand the industry.

12   **Q.**    And in the course of your consulting work over two years,

13   2012 and 2013, have you studied the titanium dioxide industry

14   in detail?

15   **A.**    Yes.  Part of the work that I had to perform for a number

16   of the clients was put together reports with my opinion on

17   supply/demand, on competitive strengths and weaknesses,

18   basically a swat analysis on the various competitors within the

19   various industry as well as the mineral sand suppliers.

20        **THE COURT:**  Just a moment.  I need to consult with the

21   reporter.

22        Madam Reporter.

23        (Interruption in proceedings.)

24        **THE COURT:**  I'm sorry, Mr. Hemann.  You may continue.

25        **MR. HEMANN:**  Thank you, Your Honor.

GIBNEY - DIRECT / HEMANN

1  BY MR. HEMANN:

2  Q.   We were talking about your consulting, your consulting

3  work in the due diligence that you had done for certain clients

4  with regard to titanium dioxide manufacturers?

5  A.   That's correct.

6  Q.   And did that due diligence work -- can you just describe,

7  briefly, what due diligence means in the context of

8  acquisitions?

9  A.   So when a company decides that they want to grow through

10  an acquisition, they'll begin analysis in preparation to

11  understand, better understand the company that they're looking

12  to acquire.

13      So they'll do -- due diligence means they're assembling,

14  you know, a full understanding of their products, their

15  markets, their strengths, their weaknesses, everything about

16  the company, trying to find out if there's any areas of

17  concern, any opportunities that have been missed by the current

18  incumbent, the company that owns the assets.  That type of

19  work.

20  Q.   And does that work, in particular, require you to develop

21  an understanding of the potential acquired company's technology

22  and technological abilities?

23  A.   Yes.

24  Q.   Through that work -- now, I'm just focusing on consulting.

25  We'll go back to the Kerr-McGee/Tronox stuff in a moment.  But

1  through that work did you develop an understanding of what

2  sorts of information are available publicly about a company's

3  technological capabilities and technology?

4  **A.**  Yes.  Essentially, starting out fresh as a consulting firm

5  like I did, virtual scratch, you then have to rely upon

6  information you can gather in the public market.  So it's not

7  anything that I had with me coming into my own firm.

8      So I quickly discovered that it's -- and everyone has

9  known that within the TiO2 industry that it's very opaque.  The

10  information is not readily available.  That's why there are a

11  number of consulting firms active in the industry.

12  **Q.**  And I want to step back, now, to Kerr-McGee and Tronox for

13  a moment or two.

14      You described for the jury yesterday a number of positions

15  that you've held at Kerr-McGee and then Tronox, correct?

16  **A.**  Correct.

17  **Q.**  Would it be fair to say, Mr. Gibney, that you performed a

18  full range of executive management positions while at

19  Kerr-McGee and Tronox?

20  **A.**  Yes.  I wore virtually every hat that there is to wear

21  within the executive management team, so to speak.

22  **Q.**  And do you have a preference as to whether I refer to it

23  as Kerr-McGee or Tronox?  I could probably shorten up a little

24  bit here.

25  **A.**  Tronox is fine.  It's the eventual owner of the asset, so

 1   that's fine.

 2   **Q.**   If I refer to Tronox, I'm meaning the entire career with

 3   Kerr-McGee and Tronox, unless you explain otherwise.

 4   **A.**   That's fine.

 5   **Q.**   Is the range of experience that you had as an executive

 6   rare?

 7   **A.**   Yes.  I've been told by -- I was --

 8          **MS. AGNOLUCCI:**  I'm going to object, Your Honor.

 9          **THE COURT:**  Sustained.

10       Unless you're specifically asked a question, because of

11   hearsay problems please refrain from talking about what

12   somebody told you.

13       If counsel wants to ask you a question like that, and have

14   the Court determine whether it's appropriate for you to answer,

15   I'll do that.  But please don't volunteer something somebody

16   told you, because that's hearsay.  And without some rules the

17   Court has to apply, it's not admissible.

18          **THE WITNESS:**  Thank you, Your Honor.

19          **THE COURT:**  You wouldn't know that as witness, but

20   it's something that we have to deal with here.

21   **BY MR. HEMANN:**

22   **Q.**   And this may elicit the same answer, but how do you know

23   that your experience is rare?

24   **A.**   Well, being in charge of human resources at Tronox part of

25   my responsibility was to recruit new executives for our team or

1   for the company.  And we would review, on a regular basis,

2   resumes and backgrounds of potential employees that we were

3   trying to hire.  And it's rare to find someone with a wide

4   variety of positions within the company.

5   **Q.**   When was the last time at Tronox that you had a job in

6   sales?

7   **A.**   2000.

8   **Q.**   Have you ever testified before as a witness on behalf of

9   Tronox?

10  **A.**   Yes, I have.

11  **Q.**   And can you describe the capacity in which you testified

12  as a witness?

13  **A.**   Following the bankruptcy filing in early 2009, Tronox

14  filed a fraudulent conveyance case against Kerr-McGee, the

15  former parent company.

16      What Kerr-McGee did, during the spinoff they took all of

17  their environmental liabilities from 50 or --

18          **MR. FROELICH:**  I'm going to object, Your Honor.

19          **MR. HEMANN:**  I can shorten this just a bit, Your

20  Honor.

21          **THE COURT:**  Please do.

22  **BY MR. HEMANN:**

23  **Q.**   You don't need to describe the context of the suit, but

24  I'm looking more for what your role was as a witness?

25  **A.**   I was what's called a 30(b)(6) witness on behalf of

GIBNEY - DIRECT / HEMANN

1   Tronox.   I represented, essentially, Tronox in the court case.

2   **Q.**   Were you involved in discussions with regard to who should

3   be the 30(b)(6) witness?

4   **A.**   Yes.

5   **Q.**   Why were you selected as the 30(b)(6) witness?

6   **A.**   The chief legal counsel, as well as the CEO and our

7   outside counsel, thought that I had the widest -- the broadest

8   range of background, both throughout Kerr-McGee, my career with

9   Kerr-McGee, and then, subsequently, the spinoff with Tronox.

10  **Q.**   You talked a little bit about the technical reviews that

11  you participated in over your years at Tronox.

12      Could you describe in a bit more detail what -- what those

13  technical reviews were like and who attended in the company?

14  **A.**   We would bring in, basically, the leadership of the

15  company from both sales and marketing, R&D, plant technical

16  services, the plant management came in, oftentimes our CEO

17  would also sit in, because these were critical aspects of how

18  we were performing against benchmarks and goals and how we were

19  also performing against the industry.

20  **Q.**   During those technical review meetings, did you and the

21  other -- and your colleagues do some comparative analysis

22  between Tronox's technology and the technology that you were

23  able to understand as a competitor that some of your

24  competitors possessed?

25  **A.**   Well, we would benchmark ourselves off of how we were

**GIBNEY - DIRECT / HEMANN**

1    performing both financially as well as on a performance basis.

2         But to know exactly what the competitors were doing with

3    their technology was difficult.  But we had a general

4    understanding of their -- of their throughput, how much

5    material they were producing by facility so we could measure

6    ourselves against that.  But specific equipment we didn't know.

7    **Q.**   But as a Tronox executive were you involved in making

8    decisions with regard to something called capital expenditures

9    or cap X?

10   **A.**   Yes.  We would have annual capital expenditure reviews.

11   **Q.**   Could you describe, a little bit, what capital

12   expenditures means.

13   **A.**   So on an annual basis you have to set a budget for how

14   much money you're going to spend on equipment at your facility.

15        And oftentimes half of the capital that you're going to

16   spend is for maintenance, basically.  You're replacing pumps or

17   equipment that's failed.

18        The other part of the budget is how you're going to grow

19   your business by adding new equipment, new lines, new capacity,

20   or how you're going to save costs or improve efficiencies or

21   improve quality.

22   **Q.**   As part of that, did you have to develop some knowledge as

23   to manufacturing process and equipment in order to assist in

24   making those determinations?

25   **A.**   Yes.  You have to have a basic understanding of when the

**GIBNEY - DIRECT / HEMANN**

1    engineers are presenting a -- a request for expenditure.  As

2    part of the budget process, they have to detail out how that

3    piece of equipment is going to affect the company or affect

4    throughput or quality, and so on and so forth.

5    **Q.**   You mentioned yesterday that you had some particular

6    responsibilities with regard to a chloride plant in the

7    Netherlands called Botlek.  Do you remember that?

8    **A.**   Yes.

9    **Q.**   And let me just stop for a definitional point.

10        When I say "chloride plant" I'm referring to chloride TiO2

11   plants.

12   **A.**   Correct.

13   **Q.**   Is that typically how it's referred to in the industry?

14   **A.**   Yes.

15   **Q.**   So this chloride plant in Botlek, did you have

16   responsibilities to -- particular responsibilities with regard

17   to capital review?

18   **A.**   I had to sign off on the budget and any capital

19   expenditures so, yes, I did.

20   **Q.**   And did you become familiar with the idea -- with the

21   technology and the equipment that's used in the chloride

22   process through that responsibility?

23   **A.**   Yes.

24   **Q.**   And how is that?

25   **A.**   Well, I mean, it -- it layered on to my previous

1   knowledge, but I understood better the issues that Botlek had

2   in terms of trying to produce TiO2 at that facility: the

3   maintenance problems; the chlorinator life; other issues with

4   regards to oxidation and even finishing.

5   **Q.**   Now, you're familiar, Mr. Gibney, with the titanium

6   dioxide market and the major producers of titanium dioxide?

7   **A.**   Yes.

8   **Q.**   Can you, very briefly, describe how you gained that

9   familiarity over the years?

10  **A.**   Well, each -- I mean, starting off early in my career

11  you -- you gain a familiarity.  And then on an annual basis and

12  sometimes even more often you're -- you're studying the

13  industry to find out who's trying to build a new plant or a new

14  line, how are we going to compete against that.

15      It's just a -- years of experience built on by doing all

16  these studies.

17  **Q.**   And as a competitor of DuPont, have you become familiar or

18  did you as a Kerr-McGee executive become familiar with DuPont's

19  position in the market?

20  **A.**   Yes.

21  **Q.**   And have you continued to add to that familiarity as a

22  consultant?

23  **A.**   Yes.

24  **Q.**   Are you familiar with the kinds of information that's

25  available to participants in the chloride industry in terms

GIBNEY - DIRECT / HEMANN

1   of -- of technical equipment and technical matters?

2   A.   Yes.

3   Q.   And over the course of your career at Tronox, and then

4   later as a consultant, have you been involved in evaluating

5   expansion plans for TiO2 plants either through expansion or

6   addition of existing lines, or evaluating the possibility of

7   building a new greenfield facility?

8   A.   Yes.  We -- we ran through a number of those reviews over

9   the years.

10  Q.   And are you familiar, through your studies over the last

11  couple of years, with historical expansions across the industry

12  either by the addition of lines or by the construction of new

13  plants?

14  A.   Yes.

15  Q.   Are you familiar, from your work at Kerr-McGee and Tronox,

16  with how companies in the chloride industry take steps to

17  protect their confidential information?

18  A.   Yes.

19  Q.   How did you become familiar with that?

20  A.   Well, in terms of how Kerr-McGee and then Tronox, how we

21  went about protecting our information, we had procedures in

22  which people had to sign off on certain documents.

23       We kept our -- our most closely held documents in a

24  fireproof safe in the R&D center.  We had firewall systems in

25  our computer systems.

1          Everything was managed by our legal staff.  There was

2      stamps put on confidential information.

3          Anytime you wanted to put out a presentation, it had to go

4      through certain sign-offs with both legal as well as R&D and

5      technical, to make sure that we weren't divulging anything

6      through a public disclosure.

7      **Q.**   You're familiar, also, with the history of licensing

8      chloride technology through the chloride industry?

9      **A.**   Well, because Kerr-McGee was probably the largest licensee

10     of technology, yes.

11     **Q.**   And have you gone through and looked at the history of

12     chloride route licensing?

13     **A.**   The history?

14     **Q.**   Sort of what other companies have done in addition to

15     Kerr-McGee.

16     **A.**   Yes.

17     **Q.**   And, Mr. Gibney, have you had HR, human resources

18     responsibility over the course of your career?

19     **A.**   Yes.

20     **Q.**   And during the -- both during that and at other points in

21     time as an executive at Kerr-McGee and Tronox, have you become

22     familiar with industry norms with regard to the movement of

23     employees from chloride route company to chloride route

24     company?

25     **A.**   In terms of industry norms, in terms of observing and

**GIBNEY - DIRECT / HEMANN**

1  recruiting people within the industry, yes.

2  **Q.**   Let me ask, probably, a better question.

3      Over the course of your career at Tronox and Kerr-McGee

4  did the company hire employees from other companies?

5  **A.**   Yes.

6  **Q.**   And did employees of your company leave and go work for

7  other companies?

8  **A.**   Yes.

9  **Q.**   And did you, over the course of seeing that happen, become

10 familiar with the -- the circumstances surrounding their

11 ability to share technology either from their former employer

12 or share your technology with their new employer?

13 **A.**   Yes.

14 **Q.**   And are you familiar -- familiar with confidentiality and

15 noncompete kinds of restrictions based on your work in human

16 resources and as an executive?

17 **A.**   Yes.

18 **Q.**   You've been hired, Mr. Gibney, as an expert, or retained

19 as an expert by the United States, correct?

20 **A.**   Yes.

21 **Q.**   And did you sign an agreement with the United States as

22 part of that?

23 **A.**   Yes.

24 **Q.**   And did that agreement require you to maintain the

25 confidentiality of information that had been provided to you?

**GIBNEY - DIRECT / HEMANN**

1  **A.**    Yes.

2  **Q.**    Have you done so?

3  **A.**    Yes.

4  **Q.**    Could you describe for the jury your -- the payment

5  arrangements that you have with the United States pursuant to

6  that agreement.

7  **A.**    I've been paid, I think, to date approximately $25,000.

8  And under the contract it was for a maximum -- I think it was

9  36,000 with travel.

10  **Q.**    And was there an hourly component to that?

11  **A.**    Yeah, I believe it was 350 an hour.

12  **Q.**    And how does that compare with the other consulting work

13  that you do?

14  **A.**    It's substantially less.

15  **Q.**    Do you anticipate invoicing the United States for

16  additional work beyond the $25,000?  That sort of went up to

17  before you came out to testify at trial, correct?

18  **A.**    Correct.  So I will have an additional bill that I'll

19  submit.

20  **Q.**    You've met with -- with me and FBI agents in connection

21  with preparing your testimony?

22  **A.**    Yes.

23  **Q.**    Approximately how many times have you met with us?

24  **A.**    Once in New York City; and then Saturday evening; and then

25  Sunday; and then most of the day yesterday, when I was sitting

1    outside, I guess.

2    **Q.**    Didn't have much of a chance to talk yesterday?

3    **A.**    No.

4    **Q.**    And then you've worked on your own reviewing documents,

5    and helped prepare a disclosure statement to the Court in

6    connection with your testimony; is that correct?

7    **A.**    Correct.

8            **MR. HEMANN:**  Your Honor, the United States would offer

9    Mr. Gibney as an expert in the titanium dioxide business and

10   industry.

11           **THE COURT:**  All right.  At this time, ladies and

12   gentlemen, as I told you at the beginning when I gave you a

13   little lesson about various legal concepts, one of them was

14   voir dire.

15       Voir dire is used in part to -- as a procedure for

16   selecting the jury, as we did with you.  It's also used as an

17   opportunity for lawyers to examine the credentials of proposed

18   expert witnesses before the Court decides whether to allow them

19   to proceed further with their testimony.

20       So with that background, I'll ask, Mr. Gasner, do you wish

21   to voir dire the witness?

22           **MR. GASNER:**  Yes, Your Honor.

23           **THE COURT:**  All right.  Please do so.

24           **MR. GASNER:**  May I proceed, Your Honor?

25           **THE COURT:**  Yes, you may.

1                    <u>**VOIR DIRE EXAMINATION**</u>

2    **BY MR. GASNER:**

3    **Q.**   Good morning, Mr. Gibney.

4    **A.**   Good morning.

5    **Q.**   My name is Stuart Gasner, and I represent Mr. Liew,

6    sitting over there, and the company USAPTI.

7          You did a disclosure of your expected testimony on

8    August 5, 2013; is that right?

9    **A.**   Correct.

10   **Q.**   You were hired in July of 2013?

11   **A.**   That sounds correct, yes.

12   **Q.**   So you had about a month to put together your opinions,

13   true?

14   **A.**   Roughly, yes, that's correct.

15   **Q.**   Do you recall that you also prepared a list of the

16   materials that you reviewed in connection with your opinions?

17   **A.**   Yes.

18   **Q.**   I take it that your opinions that you intend to offer

19   today are based, in part, on the materials that you reviewed,

20   true?

21   **A.**   True.

22   **Q.**   And it's true that the materials you reviewed consisted of

23   drawings from USAPTI, right?

24   **A.**   Correct.

25   **Q.**   And a large number of DuPont analysis reports; is that

1  right?

2  **A.**   Correct.

3  **Q.**   Do you recall that the documents you reviewed were listed

4  on a spreadsheet attached to your disclosure that was about 355

5  items?  Do you recall that?

6  **A.**   I do.

7  **Q.**   And would it be fair to say that the items from number 190

8  through 353 were all DuPont analysis reports?  Do you recall

9  that?

10  **A.**   That's probably correct.  I don't recall the exact

11  numbers.

12  **Q.**   Would it help refresh your recollection if I gave you a

13  copy of the attachment?

14  **A.**   Sure.

15        **MR. GASNER:**  May I approach, Your Honor?

16        **THE COURT:**  Yes, you may.

17        **THE WITNESS:**  I'm sorry, the numbers, again, beginning

18  at one -- did you say 190?

19  **BY MR. GASNER:**

20  **Q.**   I believe starting at -- first of all, is this the Exhibit

21  A information reviewed to the disclosure of your expert

22  opinions?

23  **A.**   Yes.

24  **Q.**   Okay.  So if you look at -- why don't we just go through

25  it briefly.

1      Number 1 on the list is a consultant's report on

2  technology review?

3  **A.**    Correct.

4  **Q.**    And then numbers 2 through 19 are drawings from Mr. Liew's

5  business, right?

6  **A.**    Correct.

7  **Q.**    And then 20, 21, and 22 are alleged trade secrets 3, 4,

8  and 5 that the jury has heard a lot about.  Do you see that?

9  **A.**    Yes.

10  **Q.**    And then 23 through 190 are emails and attachments.  Do

11  you see that?

12  **A.**    Yes.

13  **Q.**    And those were all emails about the USAPTI project, right?

14  **A.**    Yes.

15  **Q.**    Okay.  So now we're up to 190.  And then starting after

16  190, there's a thing that says "DuPont Analysis Report."  Do

17  you see that?

18  **A.**    Yes.

19  **Q.**    And from 190 through 353, those are all DuPont analysis

20  reports, true?

21  **A.**    Yes.

22  **Q.**    And then 354 and 355 are a couple of Pangang reports,

23  right?

24  **A.**    That's correct.

25  **Q.**    Okay.  So there's nothing in there about due diligence on

1    acquisitions, true?

2    **A.**    True.

3    **Q.**    Nothing about confidentiality procedures at any company,

4    right?

5    **A.**    True.

6    **Q.**    Nothing in there about the market for titanium dioxide,

7    true?

8    **A.**    True.

9    **Q.**    Okay.  So for those areas you're relying on your personal

10   experience; would that be fair to say?

11   **A.**    Yes.

12   **Q.**    Okay.  And in terms of the time you spent reviewing this

13   material, the government's provided us with your invoices.  And

14   it appears that you spent about 37 hours in July, getting ready

15   for your disclosure.  Does that ring a bell?

16   **A.**    That sounds about right.

17   **Q.**    Okay.  Would it help refresh your memory to look at your

18   invoice?

19   **A.**    Sure.

20          **MR. GASNER:**  May I approach, Your Honor?

21          **THE COURT:**  Yes, you may.

22          **MR. HEMANN:**  Objection, Your Honor.  Foundation.  I

23   don't think he expressed a lack of memory.

24          **THE COURT:**  All right.  Sustained.

25

1    BY MR. GASNER:

2    Q.    Do you remember the days and hours that you spent in the

3    month of July on particular tasks?

4    A.    No.

5    Q.    Would it help to refresh your memory to look at the actual

6    invoice?

7    A.    That's fine, yes.

8            MR. GASNER:  May I approach, Your Honor?

9            THE COURT:  Yes, you may.

10           THE WITNESS:  Thank you.

11   BY MR. GASNER:

12   Q.    So in the days leading up to your disclosure, on four days

13   in July you reviewed documents, true?

14   A.    Yes.

15   Q.    And those would have been the documents that we just went

16   through on the attachment?

17   A.    Uh-huh.

18           THE COURT:  You have to answer audibly.

19           THE WITNESS:  I'm sorry.  Yes.

20   BY MR. GASNER:

21   Q.    Okay.  So we're up to eight -- about 16 hours.  Then on

22   July 18 you traveled to New York to meet with Mr. Hemann,

23   right?

24   A.    Correct.

25   Q.    That was eight hours.  Do you see that on there?

1    **A.**    Yes.

2    **Q.**    And does that square with your recollection?

3    **A.**    Well, part of that session of eight hours was also

4    reviewing documents.

5    **Q.**    During your travel to New York?

6    **A.**    Correct.  During -- it's travel, but it's also the meeting

7    and it's the time at the offices.

8    **Q.**    How long was the actual meeting with Mr. Hemann; do you

9    recall?

10   **A.**    Oh, probably four hours.

11   **Q.**    Okay.  And then later in July you had some other review of

12   documents, and, I presume, reviewing the expert disclosure that

13   was eventually given to us, to give us advance notice of your

14   opinions, right?

15   **A.**    Yes.

16   **Q.**    Okay.  So at the time that you approved the disclosure of

17   your opinions, is that a fair summary in your invoice of the

18   work that you did at that time?

19   **A.**    Yes.

20   **Q.**    Okay.  Let's turn to the -- your experience, your long

21   experience in the titanium dioxide industry.

22         Starting -- I think you said you had a bachelor's of

23   science from the University of Arizona?

24   **A.**    Correct.

25   **Q.**    Is that -- was that in business administration?

1   **A.**   Yes, correct.

2   **Q.**   Not in a hard science like chemistry or physics or

3   something like that?

4   **A.**   No.

5   **Q.**   Is that unusual, in your experience, for universities to

6   give a bachelor's of science in business administration?

7   **A.**   I don't know that it's unusual.

8   **Q.**   But your major was in marketing, right?

9   **A.**   Correct.

10  **Q.**   And I think you mentioned, also, that you attended the

11  Wharton School of Business for a management program of some

12  type?

13  **A.**   Correct.

14  **Q.**   How long did that program last?

15  **A.**   Approximately three weeks.

16  **Q.**   And then I believe that you went into a variety of sales

17  jobs after that.  Is that accurate?

18  **A.**   Beginning my career, that's correct.

19  **Q.**   Your first job was, I think you said, starting in 1986,

20  when you got out of college you worked for a DuPont

21  distributor.  Is that right?

22  **A.**   That's right.

23  **Q.**   Selling titanium dioxide?

24  **A.**   Amongst other products, but yes.

25  **Q.**   So what other products did you sell in addition to the

1    titanium dioxide?

2    **A.**    We had a wide variety of chemicals that went into a wide

3    variety of industries.  A distributor that's essentially

4    their -- what they do is they take, you know, certain products

5    from certain producers and then provide a whole suite of

6    options for a customer to buy from.

7    **Q.**    So what percentage of your sales do you remember was

8    titanium dioxide in particular during that time frame?

9    **A.**    Oh, it was probably 10 to 15 percent.

10   **Q.**    Okay.  So you were a salesman for a chemical company, and

11   part of what you did was to sell TiO2.  And you sold it to,

12   mostly, paint companies or plastic companies?

13   **A.**    Mainly paint.

14   **Q.**    Mostly paint.  Okay.

15       Then in your sales career you moved to Kerr-McGee, and you

16   were a sales representative for the western region from '91 to

17   '95, correct?

18   **A.**    Right.

19   **Q.**    Then --

20         **MR. HEMANN:**  Your Honor, I object.  This is all

21   repetitive.

22         **THE COURT:**  Sustained.

23   **BY MR. GASNER:**

24   **Q.**    Your sales career lasted until -- pure sales was until

25   '97, right?

GIBNEY - VOIR DIRE / GASNER

1  A.   Correct.

2  Q.   And then you did some -- you added marketing to that at

3  Kerr-McGee, true?

4  A.   True.

5  Q.   And I think you mentioned that in connection with sales

6  and marketing that you had some tours of the Kerr-McGee

7  facilities?

8  A.   Yes.

9  Q.   Now, when you started at Kerr-McGee in 1991, how many

10  plants did they have in titanium dioxide?

11  A.   They had the Hamilton, Mississippi plant; they had a joint

12  venture in Western Australia; and they had, also, a smaller

13  joint venture, 25 percent interest in the Janbu, Saudi Arabia

14  facility.

15  Q.   Where were you located in terms of doing your sales and

16  marketing work?

17  A.   Dallas.

18  Q.   And which plants, if any, did you actually visit during

19  your time at Kerr-McGee?

20  A.   Oh, Hamilton; the Kwinana, Western Australia plant; the

21  Botlek, Netherlands plant; the Uerdingen, Germany plant.

22  Q.   I'm talking about when you were a salesman in marketing.

23  Up until 2002, did you visit any plants in that time period?

24  A.   Well, up until 2002 yes, I would have visited all of those

25  facilities.

**GIBNEY - VOIR DIRE / GASNER**

1   **Q.**   And that would have been in support of your sales and

2   marketing responsibilities?

3   **A.**   Yes.

4   **Q.**   And then from 2002 to 2005, you were completely out of

5   TiO2?

6   **A.**   Correct.

7   **Q.**   Working for a battery company?

8   **A.**   Yes.

9   **Q.**   Okay.  Then in 2005, you went back to Kerr-McGee.  And

10   your first big job was managing their IPO, or initial public

11   offering, and spinoff of the titanium dioxide business, right?

12   **A.**   Well, initially, it was general manager of the paper and

13   specialties business within Kerr-McGee, for approximately nine

14   months; and then as we were spun off, became vice president of

15   investor relations.

16   **Q.**   So you spent about nine months as general manager of paper

17   and specialties.  And then your big job was the IPO to spinoff

18   the whole business, right?

19   **A.**   Correct, correct.

20   **Q.**   And during that time period your functions were primarily

21   financial within Kerr-McGee; wouldn't that be fair to say?

22   **A.**   As investor relations, yes.

23   **Q.**   In fact, you successfully implemented a restructuring plan

24   which closed down two unprofitable operations in the

25   United States, fair?

1    **A.**   Correct.

2    **Q.**   And you cut overhead and headquarters and staff in half

3    during that time period; is that right?

4    **A.**   That's correct.

5    **Q.**   So you were focused, primarily, on cutting costs within

6    Kerr-McGee, true?

7    **A.**   We were trying to survive.  There's no doubt about that,

8    yes.

9    **Q.**   And it was during that time period where the company was

10   trying to survive that because this gentleman in the

11   Netherlands wasn't willing to take on personal liability under

12   European law you became the acting director for the Netherlands

13   facility?

14   **A.**   Correct.

15   **Q.**   Did you ever go there?

16   **A.**   Yes, I've been to Botlek a number of times.

17   **Q.**   During the time when you were managing director?

18   **A.**   During that time I think we had travel restrictions

19   because, once again, we were trying to cut costs, so no.

20   **Q.**   So the answer would be no?

21   **A.**   "No."

22   **Q.**   You were managing director, but never went to the plant?

23   **A.**   I think I was there right before taking over

24   responsibilities.  And that's when we handed it over.  But

25   during that period of time we were doing videoconferences and

1   conference calls.

2   **Q.**   Is it fair to say that on your -- have you had a chance to

3   look at your resume lately?

4   **A.**   It's been a while.

5   **Q.**   Okay.  Among the skills that you tout include profit and

6   loss management; is that one?

7   **A.**   Correct.

8   **Q.**   Global sales and marketing, is that one?

9   **A.**   Yes.

10  **Q.**   Initial public offerings, is that one?

11  **A.**   Correct.

12  **Q.**   Team building and development?

13  **A.**   Yes.

14  **Q.**   Human resources?

15  **A.**   Yes.

16  **Q.**   Government relations?

17  **A.**   Yes.

18  **Q.**   Operations?

19  **A.**   Yes.

20  **Q.**   Corporate restructuring?

21  **A.**   Yes.

22  **Q.**   Investor relations?

23  **A.**   Yes.

24  **Q.**   Mergers and acquisitions?

25  **A.**   Yes.

1   Q.   And board experience in global procurement, true?

2   A.   Yes, correct.

3   Q.   So you, in your resume, when you're telling the world your

4   skill set it has nothing to do with the technical side of TiO2,

5   does it?

6   A.   No.  I don't list technical skills on my resume, no.

7   Q.   Because, in fact, that has not been a focus of your 25

8   years in the titanium dioxide business, true?

9   A.   True.

10  Q.   And, in fact, you've never been involved in the building

11  of a new plant, true?

12  A.   Not in the actual building of the plant.  On the ground --

13  Q.   You've never designed anything for a TiO2 plant yourself,

14  true?

15  A.   No, that's correct.

16  Q.   As part of your work on this case, did you ever look at

17  patents or textbooks or publicly available sources of

18  information to see what is -- what technical details are

19  available through those sources?

20  A.   Beyond what was provided to me in the disclosures?

21  Q.   Yeah.  Well, we went through everything that you reviewed?

22  A.   Correct.

23  Q.   And none of that contained any patents or textbooks,

24  right?

25  A.   But I have seen patents as part of the disclosures in the

1  case.

2  **Q.**   Well, in your -- on your resume and in your discussion

3  with Mr. Hemann, I didn't hear anything having to do with

4  active responsibility for intellectual property management.

5  Did I miss that?

6  **A.**   No, that's correct.

7  **Q.**   That's not been part of your career?

8  **A.**   No.

9  **Q.**   Do you -- have you ever drafted a process flow diagram?

10  **A.**   No.

11  **Q.**   Have you ever had job responsibilities that required

12  understanding the details of a process flow diagram?

13  **A.**   We would review, during capital expenditure requests,

14  detailed engineering documents.  But in terms of day to day and

15  having -- having to do that as part of my job, no.

16  **Q.**   If somebody just put a process flow diagram in front of

17  you and asked you to explain the technical details of it, you

18  couldn't do it, could you?

19  **A.**   I could generally give you an impression of the flow.

20  Within the titanium dioxide manufacturing process, I know

21  pieces of equipment and how they all fit together in a process

22  flow.  But in terms of providing technical analysis, that's --

23  that would be more difficult.

24  **Q.**   Mr. Hemann elicited that you testified as a witness for

25  Tronox.  Do you remember him asking you about that?

1    A.    Yes.

2    Q.    And that was a dispute because shortly after the IPO

3    Tronox went bankrupt, right?

4    A.    Yeah, within roughly three years, that's correct.

5    Q.    So there were a lot of unhappy investors; would that be

6    fair to say?

7    A.    Correct.

8    Q.    And you were the spokesperson on those financial issues

9    for the company, true?

10   A.    That's correct.

11   Q.    Mr. Hemann asked you about your study of the history of

12   licensing in this industry.  Do you recall him asking you about

13   those questions?

14   A.    Yes.

15   Q.    Have you reviewed the Sherwin-Williams contract with

16   DuPont from 1967?

17   A.    I don't recall.

18   Q.    You don't recall looking at that?

19   A.    No.

20   Q.    Do you recall any specific agreements that you looked at

21   in terms of the history of licensing that Mr. Hemann said that

22   you were an expert in?

23   A.    In the past I have looked at the Kerr-McGee -- at the time

24   it was Tanz, which is now part of Cristal, the licensing

25   agreement we had with them.  But other than that, no.

1  **Q.**   You're currently employed by IBMA; is that right?

2  **A.**   No.  I was doing -- Jim Fisher and I were collaborating,

3  during the course of 2012, on a number of projects.  But I'm

4  not currently employed by IBMA.

5  **Q.**   Are you still listed as a consulting expert available for

6  hire through IBMA?

7  **A.**   I don't know that I'm listed.  I don't believe so, no.

8  **Q.**   Have you been listed in the past?

9  **A.**   Yes.  I believe I was in 2012.

10  **Q.**   Were you recently taken off the website?

11  **A.**   I don't -- I don't know.

12  **Q.**   You mentioned that you and Mr. Fisher had worked together.

13  Was that on the due diligence issues that Mr. Hemann asked you

14  about?

15  **A.**   One project was, yes.

16  **Q.**   What -- what projects did you do due diligence on that

17  involved titanium dioxide, after you left Tronox up until

18  your -- well, up until the present time?

19          **MR. HEMANN:**  Objection.  Relevance.

20          **THE COURT:**  Sustained.

21  **BY MR. GASNER:**

22  **Q.**   Did those due diligence projects involve titanium dioxide

23  plants?

24  **A.**   Yes.

25  **Q.**   How many of those projects were there?

**GIBNEY - VOIR DIRE / GASNER**

1  **A.**    There was two.

2  **Q.**    Those were both with Mr. Fisher, or just one of them?

3  **A.**    Uhm, actually, neither of them were directly related with

4  IBMA.

5       I was hired by a private equity firm to work on a due

6  diligence project for an acquisition; hired by a mineral sands

7  producer to do some work on potential of an acquisition.

8  **Q.**    Was it your role in those due diligence engagements,

9  primarily, to look at the financial aspects of the acquisition?

10  Would that be fair to say?

11  **A.**    Financial; market position; strengths and weaknesses of

12  their product portfolio; their efficiencies; so on and so

13  forth.

14  **Q.**    When private equity firms do due diligence projects, they

15  often hire a number of specialists to look at different aspects

16  of the deal, true?

17  **A.**    That's correct.

18  **Q.**    Were there other people that looked at the technical

19  aspects of the acquisition?

20  **A.**    There were a number of folks on the team.  And, yes, they

21  also had some technical experts.

22  **Q.**    Your role was primarily financial, and other people

23  handled the technical aspects, fair?

24  **A.**    That would be fair.

25       **MR. GASNER:**  Nothing further on voir dire, Your Honor.

1          THE COURT:  All right.  Mr. Froelich, do you have

2    anything?

3          MR. FROELICH:  I just have two, to make it clear.

4          THE COURT:  All right.

5                    **VOIR DIRE EXAMINATION**

6    BY MR. FROELICH:

7    **Q.**   You're not an engineer, correct?

8    **A.**   That's correct.

9          MR. FROELICH:  That's all I have.

10          THE COURT:  All right.

11    So you've offered the witness?

12          MR. HEMANN:  As an expert in the titanium dioxide

13    business and industry, Your Honor.

14          THE COURT:  And you object?

15          MR. GASNER:  We object, Your Honor.

16          THE COURT:  The objection is overruled.

17    Ladies and gentlemen, at the end of the case I will give

18    you an instruction about how you are to treat testimony of

19    people such as this witness.

20          Bottom line is, you treat their testimony like you would

21    any other witness.  And it's you, as the triers of fact, the

22    judges of the facts, who make the sole determinative of the

23    credibility of a witness.  And I'll give you all the rules that

24    you will apply.

25          But right now you may proceed, Mr. Hemann.

1          **MR. HEMANN:**  Thank you very much, Your Honor.

2                    **DIRECT EXAMINATION**  (resumed)

3    **BY MR. HEMANN:**

4    **Q.**   I would like to talk -- first of all, let me ask you one

5    question.  These financial jobs that Mr. Gasner asked you

6    about, in managing a company do you have to understand what the

7    company makes and how it is made?

8    **A.**   Yes.

9    **Q.**   Do you feel like you developed that knowledge over the

10   course of your career?

11   **A.**   Yes.

12   **Q.**   We've heard some descriptions, as this case has gone

13   along, about the sulfate-route and the chloride-route

14   processes.  Are you familiar with the distinction between the

15   two of those?

16   **A.**   Yes.

17   **Q.**   And could you describe, just for the jury, a little bit of

18   general information regarding the historical ways in which TiO2

19   has been produced during the sulfate and then as it moved into

20   chloride?

21   **A.**   Sulfate process has been around a long, long time.  It was

22   the first process developed to produce titanium dioxide.  It's,

23   essentially, a batch process.  You utilize sulphuric acid as a

24   way of leaching out the titanium dioxide from the titanium

25   barium ore, then calcine is then produced the titanium dioxide.

1    The chloride process was developed back in the 1940s and

2   '50s.  It was determined early on to be a much more efficient

3   process in terms of it uses chlorine as a way of reacting with

4   the titanium barium ore.

5    It's a closed-loop system so that the chlorine is recycled

6   through the process.  It can create a much tighter particle

7   size distribution.  It produces a particle of TiO2 that tends

8   to be a brighter white.  And it's preferred by the -- the more

9   stringent applications, where you're looking for a true blue

10  white or clean white.

11    So your iPods, any of the applications where you're

12  looking for something that's a brilliant white, you tend to use

13  chloride versus sulfate.

14    Sulfate still is a major component of global

15  manufacturing.  But chloride, during the '70s and '80s, was

16  probably the biggest growth in terms of production.  But since

17  1994, when the last chloride plant was built, most of the

18  growth has been through sulfate.  And that's because it's --

19  it's grown tremendously in China and other parts of

20  Asia-Pacific.

21  **Q.**  I was going to ask you, Mr. Gibney, sort of to that last

22  point, is there a geographical -- can you make geographical

23  generalities regarding the prominence of chloride versus

24  sulfate processes?

25  **A.**  Well, the United States is a hundred percent chloride

**GIBNEY - DIRECT / HEMANN**

1    production today.  All the largest TiO2 plants in the world for

2    chloride process are in the United States.

3        In terms of sulfate, Western Europe, there's a large

4    number of sulfate production facilities.  And then the biggest

5    growth has been in China.  They, roughly, produce 1.5 million

6    metric tons a year of TiO2, spread across roughly 50 different

7    production facilities.  Many of those are very small.

8        There's only a small number of small chloride process

9    facilities that are attempting to ramp up.

10   **Q.**   Why is that?  What -- why is China predominantly sulfate?

11   **A.**   Well, it was the technology that was readily available.

12   It's easier to run.  It's a batch process.  You can make

13   adjustments along the course of producing the material.

14   **Q.**   Can I stop you.  And if you could explain batch process

15   versus --

16   **A.**   Continuous process is the other.  So chloride is a

17   continuous process.  So you're going from chlorination through

18   oxidation and then into finishing in one continuous production

19   of material.

20       Where sulfate, they'll have, in layman's terms, bats of

21   sulphuric acid that are reacting with the titanium barium ore

22   to leach out the ore.  So it's more labor intensive.

23       And you also then have to deal with all the sulphuric acid

24   waste, which in our case at Tronox and Kerr-McGee, at our

25   Uerdingen, Germany facility, if you were to look at the

1  sulfuric acid regeneration or recycling facility, that plant

2  was as big or bigger than the titanium dioxide facility itself.

3  **Q.**   And that's costly, presumably?

4  **A.**   Very costly.

5  **Q.**   Has there been an effort in China to move from sulfate to

6  chloride?

7  **A.**   Yes.  My understanding is the Chinese government, as part

8  of their long-term planning, wants to transition the industry

9  from sulfate over to chloride over the next five years.

10  **Q.**   And how successful has China been to date in moving from a

11  sulfate process to a chloride process?

12  **A.**   They -- my understanding is they've -- they've had one or

13  two very small operations they've been trying to ramp up for a

14  number of years.

15       And it takes a long time to bring the chloride plant

16  online.  Our known experience in Kwinana, Western Australia, it

17  took us five to six years to get that plant up and running to

18  where it was producing quality material.

19       It's a long learning curve even for people that know how

20  to produce the material via chloride process.

21  **Q.**   Is there information available about the productivity or

22  the efficiency of plants in China, both the chloride and the

23  sulfate processes?

24  **A.**   It's -- there are various reports by consulting firms.

25  They've done projects over the years to be on the ground and

1  understand better the capacities and the production rates.

2      But it's not published by any -- any government entities

3  that you can get your hands on.

4  Q.   But you've reviewed some of these reports?

5  A.   Yes.

6  Q.   And what do they say with regard to the efficiencies of

7  the plants in China?

8  A.   The latest information that came out in the last year was

9  that the industry itself is running at roughly 50 percent of

10  design capacity.

11  Q.   And what does that mean?

12  A.   Well, you know, if you look at a chloride plant or a

13  western sulfate plant in Europe, most of these plants you want

14  to run them as efficiently as possible and as at high a

15  capacity utilization rate as possible.  So you would like to be

16  between 88 and 95 percent of design capacity.

17      You're getting more bang for your buck, so to speak,

18  through your equipment.  By running at 50 percent, you're

19  spreading high fixed costs across a smaller number of tons.  So

20  financially speaking, it's much less efficient.

21  Q.   I would like to talk a little bit about the numbers in the

22  TiO2 market.  And, first of all, talk a little bit about the

23  breakdown between sulfate and chloride in terms of worldwide

24  production.

25  A.   Okay.  Roughly 55 percent of global production -- and

**GIBNEY - DIRECT / HEMANN**

1   we're talking about a market of 6.3 to 6.5 million metric tons,

2   about 55 percent of that would be sulfate today, 45 percent

3   being chloride.

4   **Q.**   And if you can do the math, tell me, you said 6.5 million

5   metric tons annually?

6   **A.**   Correct.

7   **Q.**   And what is the value of that market then, roughly?

8   **A.**   Well, it's -- if you attach $3,000 per metric ton, it's

9   billions of dollars.

10  **Q.**   Whatever 3,000 times 6.5 million is?

11  **A.**   Correct.

12  **Q.**   The -- so you said what percentage is -- 55 is sulfate?

13  **A.**   Correct.

14  **Q.**   So 45 percent of the worldwide market is chloride?

15  **A.**   Correct.

16  **Q.**   How does that break down -- who are the major players in

17  the manufacturing industry, the chloride, now, manufacturing

18  industry?

19  **A.**   Well, the largest producer in the world is DuPont.  They

20  have roughly 18 to 19 percent global market share.  They

21  produce roughly 1.2 million metric tons.  I should say they

22  have a capacity of 1.2 million metric tons.

23       The second largest is going to be, here at the end of the

24  first quarter, Huntsman, because of their acquisition of the

25  Rockwood assets.  They'll be number two, at roughly 13 percent

1  global market share.

2      Number three would be Cristal, Saudi Arabian-based

3  producer; roughly 11 percent.

4      And then there's another three producers -- well,

5  actually, two, now, with Huntsman acquiring Rockwood.

6      Then you have Kronos and Tronox, both at around 7 to

7  8 percent.

8  **Q.**  And after those five, are there any smaller

9  manufacturer -- chloride manufacturers?

10 **A.**  There's Ishihara.  They're a Japanese-based producer.

11 There's a producer in India by the name of KMML.  And then a

12 number of smaller producers in Eastern Europe, as well as,

13 obviously, China.

14 **Q.**  Now, you mentioned a moment ago, I don't know exactly what

15 words you used, output, perhaps, annual output.  Is that a

16 concept that you're familiar with?

17 **A.**  Yes.  You're talking about capacity?

18 **Q.**  Capacity.

19 **A.**  Okay, yes.

20 **Q.**  And is there also data available with regard to daily

21 capacity, daily output?

22 **A.**  Well, so over time if you study the financials of the

23 companies that are publicly disclosing on a quarterly basis

24 their financials, you get -- you get a good understanding of

25 the size of the production facilities that they're running.

**GIBNEY - DIRECT / HEMANN**

1   And by that you can also determine, because of their past

2   utilization that they disclose, how they're running each one of

3   these facilities.

4   **Q.**   And have you engaged in those sort of studies yourself?

5   **A.**   Yes.

6   **Q.**   What is DuPont's -- is the -- what does the word

7   "throughput" mean?

8   **A.**   So it's how efficient you are with your equipment,

9   installed equipment.

10      So the way we in the industry look at throughput is,

11  basically, your line hour rate through your oxidizer is

12  oftentimes determined -- can determine how efficient you are at

13  producing and how -- how cost effective you are at producing

14  titanium dioxide.

15  **Q.**   And how does DuPont's throughput compare to other chloride

16  route manufacturers?

17  **A.**   Well, they're heads and tails above the rest of the

18  industry.  They have line rates close to 20 tons per line hour,

19  18 to 20.  Where Tronox, for instance, Kerr-McGee, the

20  technology that we had was four-and-a-half tons per line hour.

21  **Q.**   Are you familiar with a Cristal plant called Ashtabula?

22  **A.**   Yes.

23  **Q.**   What's the approximate throughput of Ashtabula as compared

24  to DuPont's?

25  **A.**   Well, they would be in the 7 to 8 tons per line hour.

GIBNEY - DIRECT / HEMANN

1  Q.   Now, what -- you mentioned that the throughput is a result

2  of -- maximizing throughput is a result of what?  How a company

3  does certain things internally?

4  A.   Well, it's the size of your oxidizer, it's the size of

5  your chlorinators, it's your ability to maintain high pressure

6  oxidation, all of these variables come into play to -- in order

7  to get your line rates up to those numbers.

8  Q.   As a -- as a long-time competitor of DuPont's at

9  Kerr-McGee, were you able to see the technology that allowed

10 DuPont to have a large oxidation process and chlorinator

11 process and maximize the throughput the way that you described?

12 A.   To see the technology?

13 Q.   Yes.

14 A.   No.

15 Q.   Why not?

16 A.   Well, they closely guarded it, obviously.  Probably the

17 only time we actually saw a piece of their technology, an

18 oxidizer.  So an oxidizer is basically -- it's -- you could

19 call it a jet engine.  But the material is injected at a very

20 high velocity into a chamber to produce the particle of

21 titanium dioxide in just a fraction of a second.

22      Our oxidizers in the Kerr-McGee technology are rather

23 small.  The diameter is small.  And the length is restricted to

24 a certain length that doesn't give Kerr-McGee the ability to

25 produce at high rates.

**GIBNEY - DIRECT / HEMANN**

1          An oxidizer from DuPont, it's roughly the size of that

2     table.  I mean, it's an enormous piece of equipment.  The

3     diameters are exponentially larger than what you would find

4     with Kerr-McGee.

5          One of these oxidizers actually showed up at our facility

6     by mistake in Hamilton, Mississippi one day.  We saw it, but no

7     one ran over to take the dimensions.  We sent it on its way.

8     But that's probably the only time that we've actually seen

9     their technology.

10    **Q.**   And whose mistake was that?

11    **A.**   It was the -- it was the manufacturer that was rebuilding

12    the lining of the -- of the -- of the reactor.

13    **Q.**   But, otherwise, other than that one erroneous occasion,

14    did you as a competitor of DuPont have access to, Mr. Gasner

15    mentioned, PFDs for DuPont?

16    **A.**   No.

17    **Q.**   Did you have access to internal research -- R&D reports

18    prepared by DuPont?

19    **A.**   No.

20    **Q.**   And did you have access to design data regarding DuPont's

21    factories?

22    **A.**   Not -- in terms of patents, we would obviously have access

23    to that.  But in terms of their internal designs, no.

24    **Q.**   I want to talk to you about the idea of development of new

25    capacity.  And we've discussed that a little bit already.

1        Do you understand, generally, what I'm talking about?

2    **A.**    Yes.

3    **Q.**    And I want to ask you about the distinction between a

4    brownfield and a greenfield facility.  Do you understand that

5    distinction?

6    **A.**    Yes.

7    **Q.**    Could you explain to the jury a little bit what the

8    difference between a brownfield and a greenfield is?

9    **A.**    Well, a greenfield is, essentially, a plant from the

10   ground up.  So you're essentially going in and creating a

11   brand-new facility from, you know, essentially a green field of

12   grass.

13        And those -- those facilities, the last one to be built

14   was 1994, in terms of a chloride plant.  They've expensive to

15   put into the ground.  It's upwards of $5,000 per metric ton of

16   capital to be able to build that plant.  So at a hundred

17   thousand tons per year of capacity you're talking about half a

18   billion dollars to build one of these facilities.

19        Since 1994, the chloride producers have tended to opt to

20   do a brownfield expansion, where you take your existing plant

21   and you just add on an additional line to -- to increase your

22   capacity.

23   **Q.**    Is it easier to build a brownfield or a greenfield plant?

24   **A.**    Well, it's less expensive in terms of -- I don't know that

25   it's easier, but you already have a lot of the infrastructure

**GIBNEY - DIRECT / HEMANN**

1    in place; the power, the waste treatment.  A lot of the

2    infrastructure is already in place.

3         So it is cheaper.  Tends to be 2500 to $3,500 per metric

4    ton to do a brownfield expansion.

5    **Q.**   You mentioned that the last one that was built was

6    finished in 1994.  What facility was that?

7    **A.**   That was DuPont's Kuan Yin plant.

8    **Q.**   And is there data available publicly as to exactly how

9    DuPont built that plant internally?

10   **A.**   No.

11   **Q.**   Prior to the DuPont greenfield facility in Kuan Yin, what

12   was the -- what were the greenfield facilities prior to that?

13   **A.**   Well, there were ten plants built between 1986 and 1994.

14   There was a big push amongst producers to both gain market

15   share, as well as the late '80s was probably one of the

16   all-time peaks in the industry in terms of pricing and

17   profitability.

18        Kerr-McGee built the Western Australian facility; helped

19   Cristal build the Janbu facility.  Ishihara built the plant in

20   Singapore.

21        (Reporter interrupts.)

22   **A.**   The Kwinana, K-w-i-n-a-n-a, facility in Western Australia.

23   And Janbu is J-a-n-b-u, Saudi Arabia.  Ishihara in Singapore.

24        And there's the Lake Charles facility, between Kronos and

25   Huntsman, a joint venture in Louisiana.  And a few other plants

GIBNEY - DIRECT / HEMANN

1   I can't recall now.

2   **Q.**   And those are '80s and -- mostly '80s, correct --

3   **A.**   Correct.

4   **Q.**   -- early '90s?

5   **A.**   Correct.

6   **Q.**   Did any of those plants use DuPont technology?

7   **A.**   No.

8   **Q.**   Why not?

9   **A.**   They were not licensing at that time.

10  **Q.**   "They" meaning DuPont?

11  **A.**   DuPont, correct.

12  **Q.**   The growth that you mentioned in the industry, in terms of

13  the growth in throughput, has that primarily been achieved over

14  the last couple of decades in -- in greenfield facilities or in

15  add-ons or improvements?

16  **A.**   You mean since the early '90s?

17  **Q.**   Since the early '90s.

18  **A.**   It's been through brownfield mainly.  Although, China has

19  grown -- in 1990 they had less than 2 percent of global

20  capacity.  Today they're around 25 percent of global capacity.

21  So that large increase has all been via sulfate; and much of

22  that has been greenfield production facilities.

23  **Q.**   So I'm focused now on chloride.

24  **A.**   Okay.

25  **Q.**   But I'll let you know if I have a sulfate question.

**GIBNEY - DIRECT / HEMANN**

1   **A.**   Okay.

2   **Q.**   Thanks.

3        We talked a few minutes ago about whether chloride route

4   manufacturers take steps to protect their -- their proprietary

5   know-how.  Do you remember talking, generally, about that?

6   **A.**   Yes.

7   **Q.**   Could you -- I think we'll talk a little bit more about

8   that in a minute.

9        But is chloride -- is TiO2 a commodity?

10  **A.**   No.  It's not a commodity in the true sense of the word.

11  In terms --

12  **Q.**   Why don't you stop and explain what a commodity -- when

13  you say "in the true sense of the word," what do you mean?

14  **A.**   So if you look at true commodities out in the market,

15  chlorine is a commodity; caustic soda; ethylene; gasoline that

16  you put in your car.  There's no distinction between

17  manufacturer of the properties of the product.  Every

18  manufacturer produces the same type of material, so you can

19  commingle.

20       When you put, for instance, gas in your car, you're not

21  worrying that, well, I filled up at a Mobil gas station last

22  week.

23       So it's different.  You can commingle products.

24  Manufacturers differentiate via price or service, not through

25  performance of the grades.

1          **THE COURT:**  Before we go on, let's take a stretch

2     break.

3          **MR. HEMANN:**  Sure, Your Honor.  Thank you.

4        (Pause)

5          **THE COURT:**  Everybody has returned.  You may continue.

6          **MR. HEMANN:**   Thank you, Your Honor.

7     **BY MR. HEMANN:**

8     **Q.**   So we were talking about TiO2 as a noncommodity.  I don't

9     know, there's probably a better word for that.

10         But you said that TiO2 is not a commodity like gasoline?

11    **A.**   Yeah, or like ethylene or chlorine or a caustic soda,

12    that's correct.

13    **Q.**   And why isn't it?

14    **A.**   Each producer has grades that vary in terms of their

15    performance.

16         So a Kerr-McGee/Tronox, for instance, would have a grade

17    by the name of 828CR, or chloride rutile 828.  Or CR826 is

18    their newer version of the grade.  It would compete head to

19    head with, let's say, a DuPont R706.

20         So these are all the brand names or the designations of

21    the grade.  But you can't commingle those two grades in the

22    same vat to mix up paint, for instance, for a Sherwin-Williams.

23         Sherwin-Williams, as a customer, they'll specify a Tronox

24    in a certain formulation.  And DuPont may be in the same

25    formulation but at a different facility because they have to

1    mix it with other ingredients at a different level, and put

2    other ingredients in to maximize their performance.  So each

3    grade is tailored separately.

4         So in that respect, we used to call it a differentiated

5    product rather than a commodity.

6    **Q.**   And do TiO2 manufacturers like the fact, from a

7    profitability standpoint, that it is a differentiated product

8    rather than a commodity?

9    **A.**   Yes.  If it was a true commodity, then pricing would be,

10   probably, lower in terms of where it is today.  You wouldn't

11   have technical sales and service representatives working hand

12   in hand with customers.  So there's a value associated with

13   producing or tailoring grades for certain applications so the

14   customers are then willing to pay for that, that added

15   performance.

16   **Q.**   Does -- does protection of proprietary information or

17   know-how by each of the manufacturers help keep TiO2 from

18   becoming a commodity?

19   **A.**   Yes.

20   **Q.**   How so?

21   **A.**   Well, if we -- if we were all producing TiO2 using exactly

22   the same equipment, the same throughputs, there would be a very

23   little cost differential between the producers.  The grades

24   would be the same; and, therefore, no designation or

25   distinction between the producers.  And you wouldn't see large

**GIBNEY - DIRECT / HEMANN**

1    variances in terms of profitability by producer either.

2         And, typically, it would then strictly be a matter of your

3    scale rather than your performance or your ability to produce

4    the product efficiently.

5    **Q.**   And do you see large variances in profitability between

6    producers?

7    **A.**   Yes.

8    **Q.**   Describe for the jury what those variances are.

9    **A.**   Well, you'll have -- there's a whole parade of -- every

10   plant around the world, if you rank it by profitability,

11   there's -- there's wide-ranging divergences.

12        DuPont -- for instance, DuPont and, I believe, Sichuan

13   Lomon, who is a sulfate manufacturer in China, have the most

14   efficient plants.  They would be considered top tier.

15        So the New Johnsonville facility for DuPont, DeLisle,

16   Mississippi, their Altamira plant, the Sichuan Lomon plant,

17   those would be, probably, the top four or five lowest-cost

18   production facilities.

19        And then if you looked at the bottom end of the scale, or

20   the top end in terms of costs per ton to produce, your smaller

21   sulfate plants would be the more inefficient.  And some of your

22   small chloride facilities, depending on the ore feedstock that

23   they're using, will, you know, have costs sometimes double what

24   you would find in the most efficient plants.

25   **Q.**   So if you were looking to build a new -- a greenfield TiO2

1   plant, you would look for the most efficient technology rather

2   than the least efficient technology?

3   **A.**   Yes.

4   **Q.**   And, as you mentioned, part of that has to do with -- part

5   of that explains why people try to get their secrets, correct?

6   **A.**   Correct.

7   **Q.**   How do chloride companies -- what sort of steps do they

8   take to protect their trade secrets or proprietary information?

9   **A.**   Well, each year we would have all of our employees sign a

10   code of conduct.  So when you're hired as a new employee, you

11   have to sign a confidentiality agreement as part of the code of

12   conduct.  And then each year we require employees to sign that

13   again, just to reiterate the fact that information that is

14   obtained while they work at the company is to be kept

15   confidential.

16       We also would stamp documents with "confidential" on the

17   document itself.  There would be internal controls, which

18   departments had access to which information.  You know, on

19   that.

20   **Q.**   Would there be physical security around the plants and the

21   plant equipment?

22   **A.**   Yes.  We would not allow cell phones or cameras into the

23   facilities.  We would -- there's security at the entrance.

24   Materials can't be taken out.

25   **Q.**   Are certain documents within the company, within a

GIBNEY - DIRECT / HEMANN

1  chloride manufacturer, held more closely than other documents?

2  **A.**   Yes.   I mean, your proprietary technology you're going to

3  hold that in a secure facility and limit access to it, yes.

4  **Q.**   You've looked at a number of documents that are involved

5  in this case, and in particular PFDs, Basic Data documents, and

6  an R&D report; correct?

7  **A.**   Yes.

8  **Q.**   Did Kerr-McGee Tronox have those same kinds of

9  information?

10  **A.**   Yes.

11  **Q.**   And did Kerr-McGee hold those closely and --

12       **MR. FROELICH:**   I'm going to object to what Kerr-McGee

13  did, Your Honor.

14       **THE COURT:**   Overruled.

15  **BY MR. HEMANN:**

16  **Q.**   -- and take steps to protect that kind of information?

17  **A.**   Yes.

18  **Q.**   And as a competitor of DuPont's and other major

19  manufacturers, did those manufacturers take steps to protect

20  that kind of information?

21  **A.**   I didn't work for, you know, a company outside of

22  Kerr-McGee; but I would assume they did, yes.

23  **Q.**   Well, let me ask you this:   At Kerr-McGee do you recall

24  ever getting access to one of those internal documents from

25  another company?

**GIBNEY - DIRECT / HEMANN**

1   **A.**   No.

2   **Q.**   Do you ever remember any R&D folks or engineers within

3   Kerr-McGee sharing with you, or with the other executives, that

4   they had obtained that kind of information?

5   **A.**   No.

6   **Q.**   In the technical reviews where you talked about

7   Kerr-McGee's technology and other companies' technology, did

8   you ever talk about that kind of information being available?

9   **A.**   No.

10  **Q.**   I want to switch gears a little bit and talk about

11  licensing.  Are you familiar with the practice of licensing

12  technology?

13  **A.**   Yes.

14  **Q.**   And how did you become familiar with technology licensing?

15  **A.**   Kerr-McGee was the largest licenser of technology in the

16  industry.  We licensed the KMML facility in India.  We licensed

17  Ishihara to build chloride facilities in our technology.  We

18  licensed Cristal to build their facility in Janbu,

19  Saudi Arabia.  So we've licensed -- we licensed Kimera to build

20  the facility in Botlek, Netherlands, and Savannah, Georgia,

21  that we eventually bought back.  So we licensed a number of

22  facilities in the 1980s, early '90s.

23  **Q.**   In the 1980s and early '90s?

24  **A.**   Correct.

25  **Q.**   And I want to ask you about a couple other examples of

**GIBNEY - DIRECT / HEMANN**

1   licensing.  Did DuPont ever license any of its technology?

2   **A.**   I believe they did.

3   **Q.**   And what was that?

4   **A.**   A chloride facility for Sherwin-Williams.

5   **Q.**   And do you remember, roughly, when that was?

6   **A.**   I think this was back in the '70s.

7   **Q.**   And at that point in time Sherwin-Williams -- or at this

8   point -- but Sherwin-Williams is a paint manufacturer?

9   **A.**   Yes.

10  **Q.**   And, so, why would a company license chloride technology

11  to a paint manufacturer?

12  **A.**   Back in the -- back in the '60s and '70s, a number of the

13  paint companies were vertically integrated with a -- they were

14  manufacturing their own titanium dioxide as well as paint.

15  **Q.**   So you said "vertically integrated," which I'm not sure I

16  completely understand.  So could you explain that a little bit?

17  **A.**   Sure.  If you vertically integrate, so you obtain your raw

18  material through your own company.  So you produce your own

19  titanium barium ore, for instance, is now a trend at Tronox.

20  We bought the Exarro Mineral Sands operation in South Africa to

21  actually go out and mine and beneficiate the ore that we use to

22  make titanium dioxide.

23       Another option would be to then go beyond titanium dioxide

24  and vertically integrate up the value chain and go into

25  producing the paint and coating itself.

1              And, like I said, at one time Glidden and Sherwin-Williams

2     and others, not only did they produce the paint, but they

3     obtained their raw material titanium dioxide through their own

4     operations.

5     **Q.**   Sherwin-Williams was one.  Was PPG one?

6     **A.**   Yes.  Yeah, they developed technology as well.

7     **Q.**   And we'll get to this in a moment.  Did PPG ever actually

8     produce its own titanium dioxide?

9     **A.**   I don't know that they actually were successful in

10    building plants and operating them, but they do have chloride

11    technology.

12    **Q.**   So you mentioned, as part of this vertical integration

13    effort, Sherwin-Williams acquired a DuPont plant in Ashtabula?

14    **A.**   Uh-huh, correct.

15    **Q.**   And that's the 7 tons per hour throughput plant that you

16    discussed earlier?

17    **A.**   There's two plants there.  There's Ashtabula 1 and

18    Ashtabula 2.  Ashtabula 1 is the smaller of the two.  It's just

19    over a hundred thousand tons of capacity.  Ashtabula 2, I

20    believe, is around 120,000 tons.  One has two lines in

21    operation and the other one, I believe, has one line; but,

22    roughly, 7 -- 7 tons per line item.

23    **Q.**   Ashtabula 1 was the Sherwin-Williams plant?

24    **A.**   I believe that's correct, yes.

25    **Q.**   Now, there was some sales and then consolidation within

2212
GIBNEY - DIRECT / HEMANN

1   the TiO2 industry that eventually related to that plant;

2   correct?

3   A.   Yes.

4   Q.   What happened in terms of the ownership of that plant from

5   Sherwin-Williams?

6   A.   Well, it went through a number of changes over the years.

7   SCM purchased the facility at some point.  It became

8   Millennium.  Later on Lyondell bought Millennium, and then

9   Lyondell eventually sold the Millennium TiO2 business to

10  Cristal.

11  Q.   So you have SCM, Lyondell, Millennium, and then Cristal?

12  A.   Yes.

13  Q.   Have any of those companies been engaged in the licensing

14  of their TiO2 technology?

15  A.   Not that I'm aware of, no.

16  Q.   And currently Cristal, does it license its technology?

17  A.   No.

18  Q.   Is, to the best of your knowledge, the design of the

19  Ashtabula oxidation reactor -- the oxidation -- sorry, the

20  Ashtabula process available publicly?

21  A.   No.

22  Q.   You mentioned that Kerr-McGee was active in licensing its

23  technology up to the early '90s; correct?

24  A.   Correct.

25  Q.   And why was Kerr-McGee engaged so late in the game in

1   licensing its technology?

2   **A.**   Well, Kerr-McGee being primarily an oil and gas company,

3   when they would go out to explore for oil and gas in the Gulf

4   of Mexico, for instance, it's common practice for oil and gas

5   companies to spread the risk and, so, they will partner with

6   firms in drilling for oil, for instance.

7        So they felt that that type of strategy would also work in

8   the chemical business.  So they partnered with Cristal in

9   Saudi Arabia, they partnered with a company in western

10  Australia to develop a mine, and then they helped by

11  contributing the chloride technology to the joint venture.

12       So the joint ventures were part of the corporate strategy.

13  They then entered into licensing agreements with Ishihara and

14  KMML in India.

15  **Q.**   So Cristal licensed technology from Kerr-McGee?

16  **A.**   Yes.

17  **Q.**   And when was that?

18  **A.**   The plant was built -- I think it came online in 1991.  So

19  this was middle '80s, '86-'87.

20  **Q.**   So in the middle '80s, was Kerr-McGee technology on par

21  with DuPont's technology?

22  **A.**   No.

23  **Q.**   So why did Cristal license DuPont -- Kerr-McGee's

24  technology rather than DuPont's technology?

25  **A.**   I believe Kerr-McGee was really the only license --

**GIBNEY - DIRECT / HEMANN**

1   company willing to license the technology at that time.

2   **Q.**   Are there any chloride projects, chloride-route projects,

3   under way in China right now?

4   **A.**   I believe there are, yes.

5   **Q.**   And are you familiar with a company called Henan Billions?

6   **A.**   Yes.

7   **Q.**   Is Henan Billions, to your knowledge, involved in a

8   chloride-route project right now?

9   **A.**   Yes.  They are building a plant currently with the help

10   of -- PPG is licensing their technology, and I believe a

11   company by the name of TiCons is also assisting in the project.

12   **Q.**   And you mentioned PPG earlier.  Are you aware of any other

13   plant in the world that is using PPG technology for chloride?

14   **A.**   No, I'm not.

15   **Q.**   Why is Henan Billions using PPG technology instead of

16   Cristal technology?

17   **A.**   Well, I think they had a relationship with PPG, and PPG

18   was willing to try and help them.  And PPG's goal is to try and

19   create further competition in the TiO2 industry.  It will help

20   them in procuring their titanium dioxide.

21   **Q.**   Is DuPont technology available to Henan Billions?

22   **A.**   No.

23   **Q.**   You reviewed some correspondence written by Walter Liew

24   regarding his efforts to sell technology to companies in China;

25   correct?

**GIBNEY - DIRECT / HEMANN**

1    **A.**    Yes.

2    **Q.**    And you've reviewed some PowerPoint presentations prepared

3    by Mr. Liew?

4    **A.**    Yes.

5    **Q.**    Do you recall an assertion by Mr. Liew that he had the

6    entire DuPont chloride-route technology?

7    **A.**    Yes.

8    **Q.**    Do you have an opinion, as an expert in the business,

9    Mr. Gibney, as to whether Mr. Liew could have the entire

10   chloride-route technology?

11   **A.**    I think it would be highly unlikely that a small firm

12   could obtain all of that through public-available information.

13   **Q.**    The technology that you've been describing is, relative to

14   things like iPhones and electronic devices, old; wouldn't you

15   say?

16   **A.**    Sorry.  Old?

17   **Q.**    Old.  I mean, the chloride-route technology is, relative

18   to some modern conveniences, an older technology; correct?

19   **A.**    Yes, that's correct.

20   **Q.**    Okay.  And has the technology changed much over the last

21   sort of 20 or 25 years?

22   **A.**    No.  I mean, it's essentially -- chloride technology is

23   still essentially what it was.  You know, incremental changes

24   have been made over the years.

25          Each manufacturer -- at Tronox, for instance, every year

GIBNEY - DIRECT / HEMANN

1   we would try and improve our micronization, for instance.  We

2   would, perhaps, change the ceramic lining; the lining, for

3   instance, of chlorinators.  You know, every year you get more

4   knowledge, more information about how you can extend the life

5   of your chlorinator.  Your oxidation, you try and increase your

6   line rate per hour by making changes to it.

7        So over time, since early '90s, yes, we've made

8   improvements, but they've been incremental steps.  No major

9   change to the technology has occurred.

10  Q.   And, so, these incremental steps, do they fall into the

11  category of know-how?

12  A.   Yes.

13  Q.   And is that know-how valuable?

14  A.   Yes, tremendously.

15  Q.   How so?

16  A.   Well, at Tronox by having three facilities that were

17  relatively the same in terms of construction, if one plant

18  changed, as I said before -- let's take, for instance, the

19  micronizer.  So a micronizer is essentially a high-velocity

20  steam -- I'm trying to put it in terms that makes it easy to

21  understand.  But the pigment is injected into a circular tube

22  that essentially grinds -- or grinds the material back up into

23  individual particles instead of it all being agglomerated.

24       So the micronizer is critical because it tends to clog.

25  It can reduce your throughput.  So the more efficient you are

1    at grinding the pigment and getting the pigment through the

2    micronizer, the better your performance in terms of production.

3        Each plant would make improvements over the course of time

4    to the micronizer design.  We would then translate that or take

5    that knowledge across the other plants, and they would

6    incorporate the small incremental changes.

7        But, you know, you're always looking.  It's not, "Can we

8    get 10 percent more?"  These are small incremental steps; but

9    over the course of 365 days, if you can get 1 or 2 percent out

10   of a, you know, hundred-thousand-ton-per-year plant, that's a

11   big step change and it's a lot of money to the bottom line.

12   **Q.**   And are things like, that sound sort of routine, like

13   maintenance and material selection and, you know, pipe

14   specifications important to making those incremental changes

15   and improve efficiency?

16   **A.**   Yes.

17   **Q.**   How so?

18   **A.**   Well, it's just -- like, for instance, if you take the

19   chlorinator, now, the chlorinator you're reacting chlorine with

20   the titanium barium ore to produce titanium tetrachloride or

21   TiCl.  The life of the chlorinator is critical because it costs

22   you a half a million dollars to rebuild it, and there's

23   downtime associated with that chlorinator failing.

24       So you try and stretch out the time between rebuilds as

25   far as you can, and a lot of that is determined by how the

**GIBNEY - DIRECT / HEMANN**

1  bricks are laid on the inside of the chlorinator, the type of

2  brick that you procure, how the -- how the bricks are put in

3  place around the exits from the chlorinator; and this type of

4  information is tightly held within the producers.

5  **Q.**  And just to step back on that, the chlorinator, why don't

6  you describe, without going into any specific details, the

7  bricks and the chlorinator and how they sort of -- where the

8  bricks are and where the -- how the chlorinator works with the

9  bricks?

10 **A.**  So the chlorinator essentially is a vertical, large tank.

11 It has a lining on the inside of, basically, firebricks.

12 Because you're running the chlorinator at a very high

13 temperature in order to react the chlorine with the titanium

14 barium ore, so these bricks have to maintain their stability

15 over a long period of time.

16     Titanium barium ore is essentially a sand.  It's very

17 aggressive on the inside of the chlorinator.  The fluidized bed

18 at the bottom of the chlorinator, there's a lot of turbulence

19 created by injecting the chlorine gas up through the ore.  That

20 turbulence then causes issues against the brick.

21     So it's a highly corrosive environment.  There's pressure.

22 There's high heat.  So your ability to have the bricks

23 installed in a certain way, a certain type of materials that

24 are used to adhere the brick to the inside of the lining, all

25 of these things come into play; and they're all -- each year,

1    Tronox for instance, we would try out various designs at each

2    plant.  And if we found that it helped get one or two or three

3    more months out of a chlorinator's life, we would then

4    translate that across the other facilities.  So that knowledge

5    would be shared.

6    **Q.**   And that falls into the category of maintenance

7    expenditures?

8    **A.**   Yes.

9    **Q.**   You've looked at, as part of your job, some, pursuant to

10   your confidentiality agreement, some DuPont internal documents;

11   correct?

12   **A.**   Correct.

13          **MR. HEMANN:**  And I'm referring to the R&D report

14   that's Exhibit 162, which I'm showing to the witness,

15   Your Honor --

16          **THE COURT:**  All right.

17          **MR. HEMANN:**  -- the Basic Data Document, which is 161,

18   which I'm showing to the witness; and a couple of process flow

19   diagrams, which are Exhibits 1 and 7.

20   **Q.**   Do you remember looking at these documents?

21   **A.**   I do.

22   **Q.**   Did you see information contained in this document that

23   would give DuPont an advantage in terms of maintaining a low

24   maintenance spend?

25   **A.**   Yes.  It's -- their throughput -- and if you just look at

**GIBNEY - DIRECT / HEMANN**

1   their facilities, at DeLisle, Mississippi, they're producing

2   over 300,000 tons per year via two production lines or

3   oxidation lines.  Tronox, with 225,000 tons a year production,

4   I believe they have six production lines.

5        So you're just more efficient.  You have less steel

6   installed in the ground, less equipment to maintain.  So you're

7   just inherently more efficient, especially on maintenance

8   costs.

9   **Q.**   Now, do you recall seeing some unique, and I very well

10  understand that you're not an engineer, do you remember seeing

11  anything in here -- anything in these documents that you found

12  to be unusual or unique?

13  **A.**   Yeah.  It was, you know, a fascinating exercise for me to

14  be able to see how DuPont does go about producing their

15  material.

16  **Q.**   And had you actually, in conversations with R&D people and

17  engineers at Tronox and Kerr-McGee, studied or attempted to

18  study how DuPont was doing things?

19  **A.**   Well, we -- we -- so Kerr-McGee's technology, and it's

20  common knowledge, it's a low-pressure oxidation.  So it's an

21  ambient pressure or atmospheric pressure.

22  **Q.**   And you're going to have to describe what "ambient" means,

23  "ambient pressure."

24  **A.**   It's the pressure we're all feeling right now in terms of

25  the atmosphere at -- you know, right now.  I don't know what

**GIBNEY - DIRECT / HEMANN**

1  the -- but it's just the ambient pressure that's in the room

2  right now.

3     So if you were to put pressure into a vessel, for instance

4  when you get into an aircraft, they pressurize the cabin, it's

5  the same type of principle.  So for DuPont, as well as some

6  other producers, they oxidize at high pressure, so it produces

7  higher velocity and higher line rates.

8     At Tronox we were not able to achieve high-pressure

9  oxidation; and we attempted for a five-year period of time, I

10  believe it was between 2002 and 2007, to achieve high-pressure

11  oxidation, we called it Hipol, and failed at that.  And we

12  eventually had to write down the investment, I believe, in 2007

13  or 2008.

14  **Q.**  Of how much?

15  **A.**  Roughly $25 million.

16  **Q.**  And did you see information in these documents regarding

17  high-pressure oxidation?

18  **A.**  Yes.  They -- yes.

19  **Q.**  Did you also study with folks at Tronox DuPont's flue pond

20  arrangement?

21  **A.**   Well, we would -- we would look at it via Google Earth;

22  and our plant manager at Hamilton showed me one day, he said,

23  "You know, do you want to see DuPont's DeLisle flue pond?"  And

24  I said, "Sure."  So he pulled up Google Earth, and we took a

25  look at it.

1          Kerr-McGee didn't utilize a flue pond.  We utilized a

2     cooling tube.  Essentially it would run roughly, you know, from

3     here (indicating) to that wall, and it would be water-jacketed;

4     and we would cool down the titanium dioxide as it went through

5     the reactor and down the cooling tube before it went into a

6     sand separator.

7          DuPont, on the other hand, they immediately go into a pond

8     and serpentine the pipe, so to speak, and get more resonance

9     time or time within the cooling pond.  So their throughput,

10    that's one of the ways in which they can get such high

11    velocities and high throughput through oxidation.

12    Q.   And did you see things in some of this information that

13    wasn't ascertainable through Google Earth?

14    A.   Yeah.  If you've got all the dimensions, you know, the

15    diameters, I mean, you can look at it from Google Earth and

16    say, "Okay.  It is a serpentine."  And you can -- in the new

17    Google Earth that has come out in the last year or two, you can

18    actually, you know, draw the line and get the length of each

19    tube; but you don't know the diameter, you don't know the

20    pressure, all the variables that would go into that line.

21    Q.   Now, beyond specifics with regard to these documents, do

22    they have value as conglomerations or compilations?

23    A.   Yes.

24    Q.   And what is the value as a compilation of information?

25    A.   Well, I mean, you can go out and get certain pieces of

**GIBNEY - DIRECT / HEMANN**

1  technology via patents, for instance, but that's just one piece

2  of the puzzle.  It's essentially, you know, the world's largest

3  jigsaw puzzle you're trying to put together, and that's all in

4  one place and one compilation of all their -- of all their

5  equipment and all their data.

6  Q.  As a businessperson managing a group of employees to build

7  or design either a line or a new product or a new project,

8  would it be helpful to give them something like this rather

9  than asking them to go out and figure out each component part?

10  A.  Yes.

11  Q.  Why so?

12  A.  Obviously it saves time and provides one document to go to

13  to make sure everyone's on the, quote/unquote, the same page

14  when going out to construct a facility.

15  Q.  And would it take some level of expertise to create these

16  kind of compilations?

17  A.  Yes.

18  Q.  And is that -- could you describe for the jury how readily

19  available that kind of expertise, particular to the DuPont

20  project, is available in the market?

21  A.  I think it's very -- it would be very difficult to pull

22  that type of data from the public market.

23  Q.  And why is that?

24  A.  DuPont, as well as Tronox and the other producers, we try

25  and control access to our technology and not divulge it.

**GIBNEY - DIRECT / HEMANN**

1   Q.   What about people capable of putting together information

2   like this, is it -- are those people readily available in the

3   market?

4   A.   No.  I would believe no.  The answer would be no.

5   Q.   Why not?

6   A.   Well, to have that type of knowledge in one person would

7   be incredibly difficult to find.  I mean, typically a document

8   like that would be compiled by a large team of process

9   engineers and people with extensive experience in the process.

10  Q.   And sort of to that point -- do you need some water,

11  Mr. Gibney?  I don't know if there's....

12          **THE CLERK:**  There is.

13          **MR. HEMANN:**  Okay.  Thank you.

14  Q.   To that point, when a chloride manufacturer goes about

15  putting together either a new line or a new product, can you

16  describe a little bit about how that would be done?

17  A.   I'm sorry.  Can you repeat the question?

18  Q.   When a chloride manufacturer decides to add a new line or

19  to build a greenfield project, how would that process be done?

20  A.   Well, you'd start with your initial feasibility study.

21  You would, you know, look at the potential cost, the equipment

22  necessary to build that plant.  You'd have to submit a detailed

23  study, get capital expenditure approval.

24          Once that's approved, then you would go into the

25  engineering procurement and construction and predesign phases

1  where you would provide -- or go out and put a bid out for an

2  engineering firm to help you with pre-engineering design, EPC

3  or engineering procurement construction, and then you would go

4  into the construction phase.

5  **Q.**   In terms of numbers of people that would need to be

6  involved, can you generally describe that?

7  **A.**   In the past we would put together a team of engineers.

8  Typically, you know, at Hamilton, Mississippi, for instance,

9  we'd have a team of eight to ten plant engineers that we would

10  basically secund or pull away from their day-to-day jobs, and

11  they would have the responsibility for putting all of that

12  information together.

13  **Q.**   And what sort of people by profession would be on this

14  team?

15  **A.**   These would be your, you know, your most well-respected

16  plant engineers.  You'd have someone representing from the

17  technology group, at least one or two people from the research

18  and development.  You'd have someone from your business

19  development or your finance group to run all the numbers in

20  terms of getting the capital expenditures approved.  Someone

21  from the sales and marketing in terms of looking out at how

22  you're going to place those additional tons into the market.

23  So it's a combination of a lot of different skill sets.

24  **Q.**   Within the engineering group, what sort of disciplines

25  would be required?

1  A.  Well, you'd need a wide variety.  You'd need electrical

2  engineers, chemical engineers.  If you're going to be doing

3  some -- some vertical integration like we did, you need someone

4  with some experience on the metallurgical side also.  So

5  there's a whole host of different disciplines you would need.

6      MR. HEMANN:  Your Honor, I'm about to go into a

7  different area.  I wonder if the Court wants to use this

8  opportunity.

9      THE COURT:  Yes, we'll use this opportunity to take a

10  break.

11      We're going to take our first 15-minute break.  Remember

12  the Court's usual admonitions to keep an open mind and don't

13  discuss the case and don't obtain outside information.

14  Fifteen-minute break.

15      (Proceedings were heard out of the presence of the jury:)

16      THE COURT:  All right.  15 minutes.

17      MR. HEMANN:  Thank you, Your Honor.

18          (Recess taken at 9:41 a.m.)

19          (Proceedings resumed at 9:59 a.m.)

20      (Proceedings were heard out of the presence of the jury:)

21      THE COURT:  Please bring in the jury.

22      (Proceedings were heard in the presence of the jury:)

23      THE COURT:  Please be seated.

24  You may continue.

25      MR. HEMANN:  Thank you, Your Honor.  I just have a

**GIBNEY - DIRECT / HEMANN**

1    little bit left to go.

2    **Q.**   You mentioned about the early stages of a design process

3    as we were breaking off.  Do you remember that?

4    **A.**   Yes.

5    **Q.**   And approximately, you said, about eight to ten people

6    would be involved in that design process?

7    **A.**   It depends on the size of the project but typically, yes,

8    we would pull together a small team like that.

9    **Q.**   And would the people on the team be people who had TiO2

10   experience?

11   **A.**   Yes.

12   **Q.**   Why is that?

13   **A.**   For a greenfield, if you're going to spend a half a

14   billion dollars, you're going to want to have your best people

15   secunded to the team in order to get the most knowledge and the

16   best chance of success in terms of the design.

17   **Q.**   And could you give the jury some idea of the relative

18   complexity of a TiO2 design?

19   **A.**   Producing TiO2 is regarded as one of the more difficult

20   processes to maintain, especially the chloride process.  You

21   have, you know, high-pressure chlorine gas in your process.

22   It's lethal.  You know, the chances of serious injury or death

23   at these facilities is quite high, so you have to maintain a

24   high level of safety and safety practices within the facility.

25        On a scale of 1 to 10, 10 being the most difficult,

1   cyanide is regarded as being probably the most difficult to

2   maintain.  TiO2 is probably a 9 right below it.

3   **Q.**   And are these, these complexity factors and safety

4   factors, things that need to be taken into account in the

5   design phase?

6   **A.**   Yes.

7   **Q.**   Would you need -- and, by the way, how long a process, a

8   turnaround process, are we talking about in terms of from the

9   beginning of a design to the actual operation of the facility

10  with this group of experienced people?

11  **A.**   Well, for a greenfield, you're talking about five to six

12  years.  For a brownfield, it's about three.

13  **Q.**   Would you need chemical engineers involved in that

14  process?

15  **A.**   Yes.

16  **Q.**   Why is that?

17  **A.**   Well, it's a highly complex chemical reaction throughout

18  the process.  At Tronox all of our plant management -- highest

19  level engineers in the plant were all chemis.

20  **Q.**   The documents that we talked about earlier -- just for the

21  record Exhibits 1, 7, 161, 162 -- do these contain documents

22  that relate to the expertise of -- or do these contain

23  information that relate to the expertise of a chemical

24  engineer?

25  **A.**   Yes.

**GIBNEY - DIRECT / HEMANN**

1  **Q.**   And how so?

2  **A.**   Well, there's, you know, flow and -- there's flow

3  dynamics.  There's pressure.  There's temperature.  There were,

4  you know, reaction time, resonance time in the reaction zone.

5  All of those issues would be related to chemical engineering.

6  **Q.**   We talked a little while ago at the beginning of today

7  about your human resources and operations management experience

8  at Tronox.  Do you recall that?

9  **A.**   Yes.

10 **Q.**   And were there occasions during the times you had those

11 responsibilities, and at other times at Tronox, that the

12 company hired employees from other chloride manufacturers,

13 including DuPont?

14 **A.**   Yes.

15 **Q.**   And were there times that your employees would go leave

16 and work for other chloride manufacturers?

17 **A.**   Yes.

18 **Q.**   Did you become familiar with the restrictions on that sort

19 of movement?

20 **A.**   In terms of restrictions, you're talking about like a

21 confidentiality restriction or a --

22 **Q.**   Both confidentiality, and are you familiar with the term

23 "noncompete clauses"?

24 **A.**   Yes.

25 **Q.**   So restrictions on the ability of somebody to actually

**GIBNEY - DIRECT / HEMANN**

1  make that move and, in addition, restrictions on their ability

2  to use information gleaned from one place and another.

3  **A.**   Correct.

4  **Q.**   And did you become familiar with those practices while you

5  were at Kerr-McGee?

6  **A.**   Yes.  Well, and at Tronox, especially in the human

7  resources side, I was responsible for executing and reviewing

8  employment agreements and contracts with key employees.

9  **Q.**   And were there sort of, in terms of the noncompete aspect

10  of it, the ability to go work for another employer, were there

11  differences between groups of employees at the company as to

12  their ability to go work for somebody else, a competitor?

13  **A.**   Yes.  And oftentimes a noncompete has, you know, a

14  definite period of time.  I -- for instance, when I left

15  Tronox, I had a one-year noncompete agreement.

16  **Q.**   And was that as a result of a contract that you had with

17  Tronox?

18  **A.**   Yes.

19  **Q.**   For employees who are not under contract, did they have

20  the same sort of noncompete restrictions?

21  **A.**   No.

22  **Q.**   Would employees be able to freely leave a DuPont and go

23  work for a Tronox in terms of getting a paycheck?

24  **A.**   Yes.

25  **Q.**   Did you ever recall hearing about any sort of five-year or

1   definitive time restrictions on such employees before they

2   could go work for a potential competitor or a competitor?

3   **A.**   Five-year, no.

4   **Q.**   Any time frames for noncontract employees?

5   **A.**   No.

6   **Q.**   Now, is the idea of a noncompete different than the idea

7   of restrictions on the kinds of information that you're able to

8   use when you leave one employer and go to another?

9   **A.**   Yes.  I mean, confidentiality agreement, you're bound to

10  not divulge confidential information for the remainder of your

11  career no matter where you go.

12  **Q.**   And does that include information that's in a physical

13  form, information actually obtained, paperwork, reports,

14  blueprints, things like that?

15  **A.**   Yes.

16  **Q.**   Does it also include things that you have in your head?

17  **A.**   Yes.

18  **Q.**   How so?

19  **A.**   Well, you know, if you, over the course of your work at a

20  company, have developed knowledge of confidential information,

21  whether or not it's on paper or not, you can't divulge that.

22  **Q.**   And without going into the specifics of it, did you have

23  direct experience with that as an executive at Tronox?

24  **A.**   Yes.

25          **MR. HEMANN:**  Can I have one moment, Your Honor?

1                THE COURT:  Sure.

2                        (Pause in proceedings.)

3                MR. HEMANN:  Your Honor, we have no further questions

4    for Mr. Gibney at this time.

5                THE COURT:  All right.  Very well.

6         Mr. Gasner.

7                MR. GASNER:  Thank you, Your Honor.

8                        (Pause in proceedings.)

9                        **CROSS-EXAMINATION**

10   BY MR. GASNER:

11   Q.   Good morning again, Mr. Gibney.

12   A.   Good morning.

13   Q.   The chloride-route technology has been around for

14   sometime; true?

15   A.   True.

16   Q.   DuPont pioneered it in the 1940s and 1950s; is that right?

17   A.   That's correct.

18   Q.   There are many aspects of that technology that are common

19   among all chloride-route manufacturers; true?

20   A.   Yeah.  I mean, there's chlorination, oxidation, finishing,

21   yes.

22   Q.   Everybody's got to have a way of moving the ore into the

23   facility; right?

24   A.   Correct.

25   Q.   Everybody's got to have a chlorinator?

1   A.   Correct.

2   Q.   The chlorinator often has bricks on the inside; true?

3   A.   Yes.   True.

4   Q.   Exclusively?

5   A.   Exclusively, I believe that's true.   I'm not aware of any

6   other way to insulate the inside of a chlorinator.

7   Q.   Those bricks are often made out of ceramic materials that

8   withstand corrosion?

9   A.   Yes.

10  Q.   There are companies, like Thermal Ceramics is a consulting

11  company that gives advice on exactly how to line a chlorinator;

12  true?

13  A.   I believe that's correct.

14  Q.   DuPont uses them?

15  A.   That, I don't know.

16  Q.   They are open, though, to Tronox and others to use as

17  well; right?

18  A.   True.

19  Q.   So in this enormous jigsaw puzzle, as you described it, of

20  a titanium dioxide facility, there are many, many highly

21  specialized areas of expertise in which outside consultants and

22  vendors are often used; right?

23  A.   True.

24  Q.   You mentioned micronizers as being important.   Sturtevant

25  is a company that makes great micronizers; true?

**GIBNEY - CROSS / GASNER**

1   **A.**   True.

2   **Q.**   And there's no point in Tronox or Kronos, or any of these

3   companies, in reinventing the wheel by designing their own

4   micronizer when they can just get the state of the art from

5   Sturtevant; true?

6   **A.**   Well, when you say "state of the art," we would buy our

7   micronizers from the same company; however, we would have

8   certain specifications even by plant, as I said earlier.  For

9   instance, Kwinana developed a better ceramic lining that they

10  then contracted to have installed in that micronizer.  So there

11  are variations to it.

12  **Q.**   Fair enough.  There are commonalities and there are

13  variations; right?

14  **A.**   Correct.

15  **Q.**   And everybody in the industry can go to a company like

16  Sturtevant and give them their specifications and get slightly

17  different micronizers; true?

18  **A.**   True.

19  **Q.**   So the devil's in the details as to what's common and what

20  is unique?

21  **A.**   True.

22  **Q.**   Oxidizers, for example, everybody -- you have to have an

23  oxidizer to have titanium dioxide; right?

24  **A.**   Chloride titanium dioxide.

25  **Q.**   Chloride route.

**GIBNEY - CROSS / GASNER**

1   A.   Yes.

2   Q.   Okay.  And you mentioned that Tronox uses a low-pressure

3   oxidizer; right?

4   A.   Correct.

5   Q.   There are a number of manufacturers that use high-pressure

6   oxidizers; true?

7   A.   That's true.

8   Q.   In fact, in addition to DuPont, Kronos uses high pressure;

9   right?

10  A.   They do.

11  Q.   What other companies use the high-pressure oxidizer?

12  A.   I believe that -- well, Kronos -- so there's a joint

13  venture between Kronos and Huntsman, but it's essentially the

14  Kronos technology.  Cristal uses high-pressure oxidation at

15  their facilities, other than Janbu, which is the current new

16  technology.

17  Q.   So even within oxidizers, you've got to get increasingly

18  specific to identify unique qualities between the

19  manufacturers; right?

20  A.   Correct.

21  Q.   Do you know of a manufacturer in China called Jinzhou?

22  A.   Yes.

23  Q.   Do you know that they have a high-pressure oxidizer?

24  A.   I didn't know it was high pressure.

25  Q.   And in terms of other aspects of the chloride-route

1  technology, there are certain things that everybody knows about

2  DuPont; right?

3  **A.**    I'm sorry.  Repeat the question.

4  **Q.**    Well, let me give you an example.  You mentioned that you

5  and a colleague looked at Google Earth and saw that there was a

6  flue pond at one of the DuPont plants; right?

7  **A.**    Right.

8  **Q.**    So the concept of having a flue pond with a serpentine

9  structure in it is readily knowable by anybody with access to

10  Google Earth; true?

11  **A.**    True.

12  **Q.**    The devil's in the details exactly how to do the bends and

13  all of that; right?

14  **A.**    That's exactly right.  Because just to have a bend, in

15  Tronox technology you couldn't have a bend in your flue pipe

16  because they didn't know how to keep the scouring in that pipe,

17  otherwise they would have done the same thing and done some

18  serpentines to increase the cooling length of the tube.

19  **Q.**    Okay.  So there's a particular aspect of a flue pond with

20  a serpentine bend that Tronox had trouble executing --

21  **A.**    Correct.

22  **Q.**    -- fair?

23  **A.**    Fair.

24  **Q.**    But the idea of having a flue pond with a serpentine thing

25  in it for the hot particles to go through, nothing secret about

**GIBNEY - CROSS / GASNER**

1    that; right?

2    **A.**   Well, in terms of knowing that it's serpentine, that's not

3    a secret.  You can see that, that's true.

4    **Q.**   Okay.  Now, you mentioned several times during your

5    testimony what you called "DuPont technology."  Do you remember

6    using that phrase with Mr. Hemann?

7    **A.**   I don't recall using that exact phrase, but I'm sure I

8    probably used it.

9    **Q.**   And before you undertook this engagement for the

10   Government as an expert, you had some sense, in the course of

11   your career, of what DuPont did in titanium dioxide in terms of

12   its technology; right?

13   **A.**   Yeah.  We knew generally they were able to use low-grade

14   ores where we couldn't.  We knew that they were using

15   high-pressure oxidation.  We tried and failed to do it.

16       So there were aspects that, you know, we knew they were

17   more efficient in how they produced titanium dioxide, and we

18   would have loved to have figured out exactly how they did it.

19   **Q.**   Okay.  But at Tronox, while you were there, you had a

20   pretty good idea of how DuPont generally went about doing

21   things.  It was the details you didn't know; right?

22   **A.**   Correct.

23   **Q.**   And there would be nothing wrong with trying to replicate

24   what you knew was DuPont's way of doing things if you could do

25   it yourself?

GIBNEY - CROSS / GASNER

1   **A.**    Nothing wrong?  Well, if it was publicly available through

2   means, then, yes.  I mean, our -- that's what you expect your

3   research and development group to do, is come up with new and

4   more efficient ways to do it.

5   **Q.**    Before you undertook this engagement and you had some

6   sense, Mr. Gibney, of what the DuPont technology was from your

7   study of the industry, what, in addition to high-pressure

8   oxidation, low-grade ore, use of a flue pond, what were the

9   other general things that you knew that you would put under the

10  umbrella of the DuPont way of doing things?

11  **A.**    Well, we knew that their ability to finish the TiO2 was

12  better than ours.  The quality of DuPont's pigment -- if you go

13  to a paint company and you watch Tronox's titanium dioxide

14  being dispersed in a resin base versus a DuPont, it takes

15  longer for the Tronox material to wet-in than DuPont's.  So

16  DuPont's material disperses better.  It's more efficient.  It

17  tends to have better ten strength, better gloss.  So we were

18  always trying to make up that difference, but we didn't know

19  exactly how they were able to do that.

20  **Q.**    So it sounds like, as a salesman, you lost some deals to

21  DuPont?

22  **A.**    Yes.

23  **Q.**    Okay.  But exactly the relationship between dispersion in

24  the resin and what they did in the plant, there's a big gap

25  between those two; fair to say?

1   A.    A big gap?  Actually they're related to each other.

2   Q.    Okay.  And did you ever figure out what the relationship

3   was, why their paint -- their TiO2 dispersed better than yours?

4   A.    We have theories but we didn't know exactly, no.

5   Q.    Now, you talked about differentiated -- before I get to

6   that, let me ask you another thing.

7         In the materials you looked at, you saw some emails

8   between Mr. Liew and Mr. Maegerle and others as part of your

9   preparation; true?

10  A.    Yes.

11  Q.    You never, though, studied the final plans that USAPTI

12  delivered to the Jinzhou project, though; did you?

13  A.    I don't believe I did.

14  Q.    And you never studied the actual plans that were finally

15  done for the 100K project for Pangang; did you?

16  A.    No.

17  Q.    So in terms of this devil-in-the-details point, you can't

18  say whether the USAPTI designs, either the 100K or the 30K, are

19  different than what DuPont does; true?

20  A.    True.

21  Q.    In fact, you don't even know sitting here today what

22  DuPont does today; right?

23  A.    Not specifically, no.

24  Q.    You looked at these -- the same poster the Government has

25  shown a lot, which is from 1993; right?

GIBNEY - CROSS / GASNER

1   **A.**   Correct.

2   **Q.**   And you never even compared this to what USAPTI finally

3   did for its Chinese customers; true?

4   **A.**   True.

5   **Q.**   Okay.  You also talked a lot with Mr. Hemann about the

6   differentiated product that the titanium dioxide manufacturers

7   come up with.  Do you recall that?

8   **A.**   Yes.

9   **Q.**   And if I understood you correctly, and I'm not sure I got

10  this entirely, there's something about price efficiency that

11  you thought gave them a technology advantage?  Can you explain

12  that again?

13  **A.**   In terms of giving who a technology advantage?

14  **Q.**   DuPont.

15  **A.**   DuPont?  DuPont typically, if -- on the sales side of the

16  business over time, we've noticed they typically are able to

17  get a higher price for their material than the competition

18  because of the performance of their products.

19  **Q.**   That was your experience?

20  **A.**   Yes.

21  **Q.**   And you attributed that to a technology advantage?

22  **A.**   Well, it's the performance of their product and, hence,

23  it's their technology or their know-how about how to produce

24  titanium dioxide that provides that performance differential

25  versus the competition.

1    Q.   But your analysis assumes that there's an efficient market

2    for titanium dioxide, doesn't it, that it's -- there's no undue

3    influence over the system?

4    A.   I don't understand.

5    Q.   Well, you're assuming a market in which all of the

6    competitors compete head to head on things like quality of

7    their product; true?

8    A.   True.

9         MR. GASNER:   Your Honor, may I approach?  I don't want

10   to get into my next question without consulting with the Court.

11        THE COURT:   All right.  You may stand, ladies and

12   gentlemen, if you wish.

13        (The following proceedings were heard at the sidebar:)

14        THE COURT:   All right, Mr. Gasner?

15        MR. GASNER:   Thank you, Your Honor.

16   We heard on direct examination about five or ten minutes

17   of economic theory about this not being a commodity, and that

18   basically DuPont does better in the market because of the

19   quality of their manufacturing and their product.

20        And, as the Court knows from the motion in limine ruling,

21   there is an antitrust case that both Tronox and DuPont settled;

22   and all I want to ask him is:  You know, isn't it true that

23   there has been a settlement of a price fixing case that would

24   undercut your theory?

25        MR. HEMANN:   Absolutely we object, Your Honor.  The

**SIDEBAR**

1   settlement, as the Court knows probably better than all of us

2   put together, the settlement of an antitrust case is so

3   complicated and is driven by so many factors, including what

4   the settlement amount is.  I don't know whether it was a

5   high-value settlement or a low-value settlement.

6       It doesn't have anything to do with the merits of -- it

7   doesn't necessarily have anything to do with the merits of the

8   claims, the monopolization claims.

9       We also have in evidence, from Mr. -- an email from

10  Mr. Maegerle to Mr. Liew in 2011, you know, saying DuPont is

11  not a monopoly.  And, so, you know, asking this witness to

12  opine on the validity of a plaintiff's lawyer's claims of

13  monopoly --

14          **THE COURT:**  You don't have to go on.  I'm not allowing

15  this in because it's going to require -- if I allow you to do

16  that, I would have to allow the Government to put in the

17  settlement.  We would be litigating what the settlement meant;

18  and I think, generally speaking, there's an extrinsic policy

19  against admitting settlements.

20      And, of course, that's only to prove liability, but I

21  think the policy is there; and I think it opens up too much of

22  a complexity that even if it had some probative value to

23  undercut this witness' credibility, it's far outweighed by the

24  prejudicial effect.  It's confusing and it injects an issue

25  that may require a minitrial.

1          So I appreciate your approaching the bench, but I won't

2     allow any evidence with respect to any settlements.

3          **MR. GASNER:**  My proffer, for the record, would be I

4     would ask the witness about his knowledge of the litigation,

5     the fact that summary judgment was denied because the Court

6     found that there was sufficient evidence of a price fixing

7     conspiracy, that the case settled thereafter.

8          And he's here as an all-purpose industry expert.  He's

9     injected economics in.  And I understand the Court's ruling,

10    but that would be my proffer.

11         **THE COURT:**  All right.  And the objection -- the

12    ruling remains.  In fact, by interlineating another level of

13    complexity as a summary judgment motion, what are the grounds,

14    it's just overly complex, and I'm just not going to allow it.

15         **MR. GASNER:**  Thank you, Your Honor.

16         **MR. HEMANN:**  Your Honor, for the record, I'd like to

17    thank Mr. Gasner for approaching as well.  I appreciate it.

18         **THE COURT:**  Thank you.

19         (The following proceedings were heard in open court:)

20         **MR. GASNER:**  May I proceed, Your Honor?

21         **THE COURT:**  Yes, you may proceed.

22    **BY MR. GASNER:**

23    **Q.**   Mr. Gibney, you talked a bit on direct about throughput.

24    Do you remember talking to Mr. Hemann about that?

25    **A.**   Yes, sir.

1   Q.   And that's basically the amount of titanium dioxide that

2   the plant is able to crank out; true?

3   A.   True.

4   Q.   Isn't it true that one of the big problems with titanium

5   dioxide plants is having good personnel to actually run the

6   plant?

7   A.   Well, yeah.  You absolutely have to have technical

8   know-how on the ground to be able to efficiently run these

9   plants on a continuous basis.

10  Q.   So you could have all of the same parts and pipe sizes and

11  all of that, and the plant could achieve terrible throughput if

12  you didn't have good people on the ground; true?

13  A.   True.

14  Q.   You talked about the ways the different companies protect

15  their trade secrets, and I want to ask you a few questions

16  about that.

17       I take it that during your time after the IPO when the

18  company -- the new Tronox spinoff was downsizing, that you had

19  to lay off a lot of engineers?

20  A.   Yes.

21  Q.   And part of that was an assessment by you, from a business

22  perspective, that the company had too many engineers doing jobs

23  that fewer people could do; fair?

24  A.   Well, I mean, during that downsizing, and if you looked

25  at -- we pretty much left the operations alone.  Because when

1   you develop good engineering talent internally, you want to

2   protect that and hold onto those people.  So if you look at the

3   reductions in staff, they were primarily at the headquarters

4   facility.

5   **Q.**   But I take it that some engineers were let go as part of

6   the restructuring?

7   **A.**   Yes.

8   **Q.**   And one of the things in your résumé that you touted was

9   that you were able to reduce head count and refocus employees

10  on doing more with fewer resources; true?

11  **A.**   True.

12  **Q.**   So it's a judgment call about what you keep in the company

13  and what you outsource to consulting firms and the like; right?

14  **A.**   Yes.

15  **Q.**   And in terms of the engineers that Tronox had to let go as

16  part of these restructurings, many of them go on to consulting

17  jobs; true?

18  **A.**   True.

19  **Q.**   And then they have to use judgment about what they're

20  allowed to remember and use from their prior employment; true?

21  **A.**   Judgment, essentially true.  I mean, you're bound by a

22  confidentiality agreement and, yes, you pretty much know what's

23  confidential and what's not.

24  **Q.**   You know it when you see it?

25  **A.**   Yeah.

GIBNEY - CROSS / GASNER

1  Q.   And people that have more experience are better,

2  typically, at knowing what's truly confidential and what isn't;

3  right?

4  A.   Well, if it's stamped "Confidential," you pretty much know

5  it's confidential; but I would assume that's correct, more

6  experience would help.

7  Q.   Let's pause on that if it's stamped "Confidential," you

8  pretty much know it's confidential comment.

9       In fact, there's a lot of overstamping of things as

10  confidential in companies in your experience; true?

11  A.   I would not agree, no.  What do you mean "overstamping"?

12  Q.   Well, not everything that gets stamped as confidential has

13  been thoroughly vetted in terms of it's unique to that company

14  and hasn't been publicly disclosed elsewhere; right?

15  A.   I don't know that I'd go along with that.

16  Q.   People use judgment, though, on what they stamp

17  confidential; true?

18  A.   True.

19  Q.   And sometimes things get stamped confidential that were in

20  a patent issued the week before; right?

21  A.   Perhaps.

22  Q.   That happens?

23  A.   It could happen.

24  Q.   And in terms of engineers that leave companies to go

25  consult, what are they supposed to do if they remember

 1   something from their prior employment, but believe that it's

 2   been publicly disclosed?  In your view, are they okay to use

 3   that information?

 4            MR. HEMANN:  Objection.

 5            THE COURT:  Sustained.

 6   BY MR. GASNER:

 7   Q.   Well, you testified, for example, to your practices when

 8   an engineer comes over to Kerr-McGee or Tronox from DuPont.  Do

 9   you remember talking about that?

10   A.   Yes.

11   Q.   And you testified that there you expect those incoming

12   employees not to divulge DuPont confidential information;

13   right?

14   A.   Right.

15   Q.   So let me ask you a little bit about that.

16        What if at DuPont that engineer worked on a project, then

17   realized that a certain technique didn't work.  Okay?  Are you

18   with me so far?

19   A.   Yes.

20   Q.   And then at Tronox they're going to -- other engineers are

21   saying, "Hey, let's do it that same way."  Is the engineer

22   allowed to say, "I don't think that's a good idea"?

23   A.   He's allowed to say, "I don't think it's a good idea."

24   For instance, Marty Rowland, who came over from DuPont, I was

25   in meetings with him over and over, and he would be asked,

1  "Well, you know, how does DuPont do it?"  Or -- and he would

2  say, "Listen, I can't tell you, but I can encourage you to

3  continue working on this route or this path."

4  **Q.**  Okay.

5  **A.**  And continue to ask questions to try and get them to think

6  in the right direction, but he couldn't come right out and tell

7  them, "This is how we do it."

8  **Q.**  So he had to use judgment about how to respond to those

9  situations?

10  **A.**  True.

11  **Q.**  If he knew, based on his experience, that a certain route

12  of technology was going to be a dead-end and was going to cost

13  Tronox shareholders money, he could say, "Hey, let's not do

14  that"; right?

15  **A.**  I don't know.  That's -- I don't know -- I don't know how

16  to answer that.  As long as he doesn't come out and say why it

17  would be a bad idea.

18  **Q.**  If he doesn't utter the words, "At DuPont we used to do it

19  X way," that in your view is the wrong way to handle it?

20  **A.**  He wouldn't even have to use "DuPont."  He can just say,

21  "This is just the wrong way to do it because others" -- he's

22  divulging a confidential information.

23  **Q.**  But he could say, "Stay on this track" --

24  **A.**  Sure.

25  **Q.**  -- right?  Kind of like, "You're getting warmer or

1   colder."  He could kind of nudge people in one way or another

2   based on his judgment and experience?

3   **A.**   That's my understanding.

4   **Q.**   He just couldn't say, "At DuPont we used to do it this

5   way," or, "The DuPont oxidizer does this, that, and the other

6   thing."  He couldn't put it expressly; right?

7   **A.**   Yeah, otherwise we would have achieved high-pressure

8   oxidation when we tried.

9   **Q.**   Well, this was a pretty -- I mean, the COO of Tronox is a

10  pretty high-level person; right?

11  **A.**   Yes.

12  **Q.**   And he had spent many years at DuPont; right?

13  **A.**   Correct.

14  **Q.**   So there's nothing wrong with hiring people that know a

15  lot about DuPont; true?

16  **A.**   No, there's nothing wrong.

17  **Q.**   And you have to count on their judgment and discretion to,

18  you know, not use things improperly?

19  **A.**   That's correct.

20  **Q.**   Now, you said a lot about, you know, that DuPont was so

21  great, but Tronox claims that it's pretty good at making

22  chloride-route technology; isn't it?

23  **A.**   Yes.

24  **Q.**   And did you guys develop slide shows over time bragging

25  about Tronox?

GIBNEY - CROSS / GASNER

1    **A.**   You know, well, we were proud about our technology; but if

2    you compare it to others in the industry, it's not as

3    efficient.  But, yeah, part of -- part of a company's marketing

4    itself to investors or to customers is you're trying to

5    differentiate yourself from competitors.

6         **MR. GASNER:**  Your Honor, may I approach with

7    Exhibit 2631?

8         **THE COURT:**  Yes, you may.

9                   (Pause in proceedings.)

10   **BY MR. GASNER:**

11   **Q.**   Mr. Gibney, do you recognize Exhibit 2631?

12   **A.**   I was shown this on Sunday, and I have not seen this exact

13   presentation.  I'm not sure when it was put together.  I assume

14   it may have been after I left the company.

15   **Q.**   Do you know Robin de Bondt?

16   **A.**   No, I do not.

17   **Q.**   Did you, while you were in your various jobs at Tronox,

18   see presentations like this?

19   **A.**   Like this, yes.

20   **Q.**   Were these presentations prepared in the regular course of

21   Tronox business?

22   **A.**   I don't know I would call it regular course; and I don't

23   know the audience, quite frankly, for this presentation.

24   **Q.**   Were there -- do you recognize certain slides in here as

25   ones that you've used before?

1    A.    Yes.

2    Q.    Which ones do you recognize?

3    A.    Towards the back, for instance, the comparison of

4    Tronox -- are these numbered?

5    Q.    To other industry members; is that it?

6    A.    It's the third page, I think, the third page from the end.

7    Q.    Third page from the end?

8    A.    Yeah.

9          And then the following page is a chart we put together a

10   number of times.  The second-to-the-last page.  Yeah, there are

11   a number of these pages were common in presentations we had

12   given internally, as well as externally.

13   Q.    How about the page that says, "Highly Concentrated

14   Industry," and it has a pie chart?  This is about five pages

15   from the back.

16   A.    (Witness examines document.)  Okay.

17   Q.    Have you used that slide before?

18   A.    Not this exact slide, but we used some of the same

19   terminology and some of that information in other

20   presentations, yes.

21   Q.    How about the next slide that has "Tronox" and "Cristal"

22   and "Huntsman" and others in a chart?

23   A.    Yeah.  This was actually -- this slide was put together

24   by, I think, Goldman Sachs during our emergence from bankruptcy

25   and when we were going out for additional funding or loans.

**GIBNEY - CROSS / GASNER**

1    So, yes.

2    **Q.**    Did you have a chance to review this slide at the time?

3    **A.**    Yes.

4    **Q.**    Do you think it's accurate?

5    **A.**    Yes.

6    **Q.**    Prepared in the ordinary course of Tronox business?

7    **A.**    Correct.

8         **MR. GASNER:**  Your Honor, I'd move the admission of

9    2631.

10        **MR. HEMANN:**  Your Honor, we object on hearsay grounds.

11        **THE COURT:**  May I see it?  Are you offering the whole

12   exhibit or just the slide you were showing him?

13        **MR. GASNER:**  I'd prefer to introduce the whole

14   exhibit, but I'm happy to just introduce that one page if it

15   meets the Government's objection.

16        **THE COURT:**  Well, I will sustain the objection except

17   with respect to the particular page or pages that the witness

18   identified that he's familiar with and he's used it before.

19        **MR. GASNER:**  Okay.

20        **THE COURT:**  So the objection to that extent is

21   overruled.

22        (Trial Exhibit 2631, page 31, received in evidence)

23        **MR. GASNER:**  So let's go to the page, Mr. Guevara, if

24   you might -- I believe it's on the screen now.

25        **THE CLERK:**  Counsel, can you tell me which page is

1   going to actually be admitted?

2           MR. GASNER:  I will mark it, and we'll have to number

3   the page.

4           MR. GUEVARA:  The 31st page.

5           MR. GASNER:  The 31st page, Ms. Ottolini.  Thank you.

6           MR. HEMANN:  Your Honor, if I might make a suggestion,

7   perhaps before we publish this to the jury, Mr. Gibney can go

8   through the slides on the screen in front of him and identify

9   those that he -- it might take a while.  I'm just trying to

10  come up with an efficient way to do it.

11          THE COURT:  Well, I'll leave it up to Mr. Gasner, but

12  I'll admit the pages that he's already alluded to; but we're

13  going to need either a Bates stamp number or some other way of

14  identifying those exhibits which the Court is allowing to be

15  admitted.

16  BY MR. GASNER:

17  Q.   So let's take a look at the 31st page that's on the screen

18  right now, which I believe has been admitted.

19          THE CLERK:  For the jury?  You're talking for the

20  jury?

21          MR. GASNER:  And I'd like to publish it to the jury,

22  if I might.

23          THE COURT:  All right.  It's admitted and you may

24  publish it to the jury.  And if you could give it a little bit

25  more description so the record is clear what we're talking

**GIBNEY - CROSS / GASNER**

1   about here.

2              MR. GASNER:  Very well, Your Honor.

3        This is a page that shows a chart of different competitors

4   in the titanium dioxide area, and it has "Tronox" on the left

5   and "DuPont" on the right, and "Cristal," "Huntsman," and then

6   there's a middle column.

7   Q.   Perhaps you can identify, Mr. Gibney, what company is

8   that.

9   A.   The middle column, you're talking about Cristal?

10  Q.   Yes.  Is that all Cristal?

11  A.   Yes.

12  Q.   And does this accurately depict the location of different

13  facilities that are owned by these different competitors in the

14  market?

15  A.   (Witness examines document.)  I believe it does.

16  Q.   And on the preceding page, which I believe you also

17  identified -- let's go to that one if we could, Mr. Guevara.

18              MR. GASNER:  And, Your Honor, I'd request permission

19  to publish this to the jury as well.

20              THE COURT:  Yes.

21  BY MR. GASNER:

22  Q.   Could you tell the members of the jury what this --

23              THE COURT:  So this is numerically listed as 2631-30,

24  correct?  That's according to what's on the screen now, and

25  Mr. Guevara is affirming that.

1          **MR. GASNER:**  Very well.  I think I ended up with a

2    copy that doesn't have the Bates numbers on it somehow, so I'm

3    floundering.

4          **THE COURT:**  All right.

5          **THE WITNESS:**  Mine don't as well, but I see it on the

6    screen.

7    **BY MR. GASNER:**

8    **Q.**   Okay.  Do you see it on the screen?

9    **A.**   Yeah.

10   **Q.**   And can you tell the members of the jury, what is this

11   slide intended to depict?

12   **A.**   This is essentially the market shares on the right on the

13   pie chart.  DuPont, as I said earlier in the day, roughly

14   19 percent market share in terms of capacity.

15        Huntsman -- Huntsman's actually in the midst of acquiring

16   the Rockwood assets.  That would be over in the other category.

17   So they'll eventually become roughly 13 percent of market

18   share, slightly larger than Cristal at 12 percent.

19   **Q.**   And when you refer to efficiency among the different

20   competitors, what are you referring to?

21   **A.**   I'm sorry?

22   **Q.**   When you were referring to efficiency when you were

23   talking to Mr. Hemann about different competitors, what exactly

24   do you mean by that?

25   **A.**   Well, efficiency typically is how much throughput are they

1  getting through their lines, production lines.

2  **Q.**   That has to do with the quantity of the output?

3  **A.**   Correct, and their cost efficiency.  So it can be pretty

4  broad; but typically we're looking at production efficiency,

5  that then translates into financial performance.

6  **Q.**   Is there a metric that you typically follow to compare?

7  Is it cost per thousand tons or something along those lines?

8  **A.**   Yes.

9          **THE COURT:**  Mr. Gasner, the record should also reflect

10  that exhibit -- page 30 is also admitted --

11          **MR. GASNER:**  Thank you, Your Honor.

12          **THE COURT:**  -- since I allowed you to show that to the

13  jury.

14          **MR. GASNER:**  Thank you very much.

15          **THE COURT:**  All right.

16      (Trial Exhibit 2631, page 30, received in evidence)

17  **BY MR. GASNER:**

18  **Q.**   It's true, though, Mr. Gibney, is it not, that there are a

19  variety of factors that contribute to this kind of cost

20  efficiency; right?

21  **A.**   Correct.

22  **Q.**   And, in fact, you mentioned that Huntsman recently

23  acquired a company that has led it to become a much larger

24  company?

25  **A.**   Yes.

1   **Q.**   Did they acquire a mine of some type or a mining company?

2   **A.**   Huntsman?

3   **Q.**   Yes.

4   **A.**   No.

5   **Q.**   Has that been a trend in the industry of kind of vertical

6   integration, having access to titanium ore by the manufacturer

7   acquiring mining operations?

8   **A.**   Yes.

9   **Q.**   That's a way of increasing cost per output; true?

10  **A.**   Increasing or decreasing?

11  **Q.**   I'm sorry.  Decreasing.

12  **A.**   Decreasing.

13  **Q.**   Getting better at that; right?

14  **A.**   Correct.

15  **Q.**   Is it fair to say that there are many factors that

16  contribute to the cost of manufacturing in addition to the

17  precise mechanics of the chloride process used?

18  **A.**   Yeah.  It's a highly complex process, so there are a wide

19  variety of inputs, and there's, you know, the maintenance

20  spend.  Everything that goes into running the plant efficiently

21  is going to translate into your cost on a per ton basis.  So,

22  yes, there's definitely correlations.

23  **Q.**   Do you know if the Pangang plant is operational right now?

24  **A.**   I'm sorry?

25  **Q.**   The Pangang 100K plant that is one of the topics of this

GIBNEY - CROSS / FROELICH

1   case, do you know if that's operational?

2   **A.**   No, I don't believe it is.

3   **Q.**   So until it's operational, you couldn't tell how efficient

4   it is; right?

5   **A.**   That's true.

6         **MR. GASNER:**  Nothing further, Your Honor.

7         **THE COURT:**  All right.  Mr. Froelich, you may

8   cross-examine.

9         **MR. FROELICH:**  Thank you, Your Honor.

10                (Pause in proceedings.)

11                **CROSS-EXAMINATION**

12  BY MR. FROELICH:

13  **Q.**   Mr. Gibney, I'm Jerry Froelich.  I represent Mr. Maegerle.

14  You don't know Mr. Maegerle; is that correct?

15  **A.**   That's correct.

16  **Q.**   And we've never met; is that correct?

17  **A.**   That's correct.

18  **Q.**   Now, you talked about an individual that you hired from

19  DuPont.  What was his name?

20  **A.**   Marty Rowland.

21  **Q.**   And what job were you hiring him to be?

22  **A.**   As our plant manager of Hamilton, Mississippi, our largest

23  facility.

24  **Q.**   And what had he done for DuPont?

25  **A.**   I believe he was the head of maintenance for a number of

1    their facilities.  He had worked at virtually every one of

2    their plants at one point in his career.

3    **Q.**    And how soon had he been out of DuPont when you hired him,

4    or did you hire him from DuPont?

5    **A.**    I believe we hired him from DuPont.

6    **Q.**    So you were -- the purpose of hiring him was his

7    experience at DuPont; isn't that correct?

8    **A.**    Correct.

9    **Q.**    You've talked about a couple different things that I'd

10    also like to talk about.

11        You talked about tons per hour; is that correct?

12    **A.**    Yes.

13    **Q.**    How do you know what the tons per hour is on each DuPont

14    plant?

15    **A.**    Well, you don't know specifically, but you make

16    assumptions.  You know that they have a certain capacity across

17    their facilities.  You get information from consulting firms.

18    There's published data that says that, you know, DeLisle, for

19    instance, is around 225 -- or, sorry, 320,000 tons per year

20    capacity.

21        You can look on Google Earth and see that they have two

22    oxidizer production lines, and you can run the math and see

23    what their line rates on an hourly -- per hour basis are.

24    **Q.**    What kind of information do you get from consulting firms?

25    **A.**    Well, there's a number of firms out there that will

1    publish on a regular basis detailed analysis reports on the

2    industry:  TZMI, IBMA, Artical (phonetic), and others.

3    **Q.**  Well, what kind of information, I mean, do they have?

4    **A.**  Well, they'll provide -- it depends on what you want, but

5    you can get a detailed study on their -- their analysis of, you

6    know, plant economics per ton cost -- per ton basis by plant

7    capacity, utilization by plant.  I mean, the whole gamut of

8    supply and demand, pricing.

9    **Q.**  How would they get the information?  Does DuPont publish,

10   for example, how much they're selling to each client?

11   **A.**  No.

12   **Q.**  Okay.  But you get that information.  How about, do they

13   publish what their -- how much each plant is producing?

14   **A.**  I don't believe DuPont gives a capacity utilization

15   figure.  A number of the other competitors do.

16   **Q.**  But you get consultants that get that for you?

17   **A.**  They write reports and provide that information, yes,

18   that's correct.

19   **Q.**  Do you know -- and they provide ton per hour.  You have to

20   know -- one of the things you were saying was DuPont's own --

21   DuPont's oxidizers are only down, I thought you said, for a

22   certain amount of time; is that correct?

23   **A.**  What do you mean "down for a certain amount of time"?

24   **Q.**  Didn't you say that parts of your plants needed more

25   maintenance than DuPont's did?

**GIBNEY - CROSS / FROELICH**

1   **A.**   Well, in terms of having more installed equipment.  I

2   think my reference was to Tronox, for instance, at Hamilton has

3   six lines where at DeLisle has two.  So that translates, then,

4   into higher maintenance costs.

5   **Q.**   Okay.  Do you know what the -- do you get from your people

6   who provide you information, do you get the maintenance cost

7   that DuPont has for each plant?

8   **A.**   They will provide their estimates of what they think it

9   is, yes.

10  **Q.**   And will they provide to you also information about the

11  amount of time that they're down, that a plant is down for

12  maintenance?

13  **A.**   I'm not -- I'm not sure I've seen a report with that type

14  of data.

15  **Q.**   How about do they tell you -- I thought you talked about

16  something about the pressure, there's difference -- that your

17  plants have different type of pressure --

18  **A.**   Right.

19  **Q.**   -- than DuPont; is that correct?

20  **A.**   Correct.

21  **Q.**   Where do you learn the pressure that DuPont uses?

22  **A.**   That I don't know.  I don't know.

23  **Q.**   But you get that information?

24  **A.**   No.  We don't know -- we don't know the pressure within

25  the oxidation phase.  But you -- but we know it's high

GIBNEY - CROSS / FROELICH

1   pressure.  But I, quite frankly, don't know if that's

2   published.  I don't know.

3   **Q.**   You know that they have serpentine flue ponds?

4   **A.**   You can see that, yes.

5   **Q.**   You can see it.  But that's also common knowledge, isn't

6   it?

7   **A.**   I believe so.

8   **Q.**   And square elbows is common knowledge; isn't that correct?

9   **A.**   That I don't know.

10  **Q.**   How about do you know that -- you talked about one time

11  your plant manager called you -- first of all, let me go back

12  one question.

13       Kerr-McGee, I think you said, doesn't use flue ponds; is

14  that correct?

15  **A.**   That's correct.

16  **Q.**   And, yet, your manager called you over one time and showed

17  you the flue pond of DuPont; isn't that correct?

18  **A.**   Correct.

19  **Q.**   And he was just showing you what it was?

20  **A.**   Correct.

21  **Q.**   And you didn't take any measurements or anything, did you?

22  **A.**   No.

23  **Q.**   You don't know whether you could take measurements.  You

24  haven't tried to do that, have you?

25  **A.**   Actually, I have.  Part of the consulting work I did last

**GIBNEY - CROSS / FROELICH**

1   year, we were looking at different flue ponds.  And the new

2   Google Earth that's out you can actually measure the length of

3   lines.

4   Q.   Right.  So now, as I said, you -- you actually can measure

5   the length of all those lines, isn't that correct, through --

6   A.   You can get an approximate.  You can't get the exact

7   length, but yes.

8   Q.   And you actually did that, you said?

9   A.   Yes.

10  Q.   Now, we talked about -- one of the things you've said is

11  that DuPont one is bigger; isn't that correct?

12  A.   One?

13  Q.   It produces more titanium dioxide through chloride method

14  than anyone else in the world; is that correct?

15  A.   That's correct.

16  Q.   And do you know the profitability of each plant?

17  A.   We -- we have assumptions.  And, like I said earlier,

18  consulting companies will provide their estimates.

19  Q.   And do you know what they base their estimates on?

20  A.   Well, it's a wide variety of inputs.  There's

21  stoichiometric chemistry models that help determine the cost on

22  a per-ton basis, depending on the type of ore that's being

23  consumed, how much chlorine, how much caustic soda, all the

24  various components.  And then it spits out, through a model,

25  your cost on a per-ton basis.

**GIBNEY - CROSS / FROELICH**

1  **Q.**  So it knows what is being -- amount of ore that's going

2  into the plant, the amount of chlorine that's going into the

3  plant, those type of things your -- excuse me, your consultants

4  know?

5  **A.**  Correct.

6  **Q.**  Now, after -- and they then estimate what each plant

7  produces; is that correct?

8  **A.**  Correct.

9  **Q.**  Now, do you know that the Kuan Yin plant is not

10  profitable?

11  **A.**  Is not profitable?

12  **Q.**  Yes.

13  **A.**  Well, it is their highest-cost plant.  Whether or not it's

14  profitable, I think it probably is profitable.

15  **Q.**  What do you base that on, if you don't know?

16  **A.**  Well, on a per-ton basis compared to other plants, at

17  least the studies that I've seen would say that it's -- today's

18  pricing would be profitable.

19  **Q.**  Okay.  But that depends, also, there's a lot of -- do you

20  know what they -- for example, what kind of ore they're using?

21  **A.**  Yes.

22  **Q.**  Okay.

23  **A.**  You can track that.

24  **Q.**  They use what?

25  **A.**  You can track the ore coming into a country.

**GIBNEY - CROSS / FROELICH**

1  Q.  Okay.  And you know what the price of the ore is?

2  A.  Yes.

3  Q.  And --

4  A.  Well, not the exact price that they've negotiated, but you

5  have assumptions.

6  Q.  Okay.  And do you know what it costs them to run a plant?

7  A.  You make assumptions around that.

8  Q.  And what do you make those assumptions based on?

9  A.  Well, like I said earlier, it's -- you can model out the

10  inputs to a production facility.  It's not easy, but you can.

11       And there are various consulting companies out there that

12  have the stoichiometric models that are integrated with the

13  other information that they have that can spit that out.

14  Q.  And you should be able to size out the plant, too, based

15  on production; isn't that correct?

16  A.  Size it out in terms of?

17  Q.  How big the -- the chlorinator is, and the oxidator [sic],

18  you know --

19  A.  Yeah.

20  Q.  Correct?

21  A.  That's correct.

22  Q.  Fine.  Now, DuPont has some advantages, and has had

23  advantages for a long time, isn't that correct --

24  A.  Yes.

25  Q.  -- in that -- pardon?

**GIBNEY - CROSS / FROELICH**

1    A.    Yes.

2    Q.    And one of them is that their main advantage that they've

3    always told everybody, at least it was at one time, was their

4    ability to use low-grade ore; isn't that correct?

5    A.    That's correct.

6    Q.    And that was one -- that's the primary advantage because

7    that's the most expensive thing that goes into the plant.

8    Besides building the plant, that's the most expensive thing

9    that goes into figuring out what you're going to charge for the

10   product; isn't that correct?

11   A.    That's correct.

12   Q.    And the other thing that they've always triumphed or raved

13   about is they have experienced personnel that run the plant;

14   isn't that correct?

15   A.    Correct.

16   Q.    And they have experienced personnel that maintain the

17   plant, right?

18   A.    Correct.

19   Q.    And that's one of the things we talked about, was

20   performance.  You've mentioned that four or five times; isn't

21   that right?

22   A.    Uh-huh, correct.

23   Q.    And it's performance -- you can have identical plants.

24   It's the people who are running the plant, performance; isn't

25   that correct?

**GIBNEY - CROSS / FROELICH**

1   **A.**    That's correct.

2   **Q.**    Now, let's talk about a few other things.  First of all,

3   about Kerr-McGee.

4        Did there come a time -- Kerr-McGee was trying to sell

5   some of its facilities; isn't that right?

6   **A.**    Uhm --

7   **Q.**    Some of its plants, its TiO2 plants?

8   **A.**    When would this have been?

9   **Q.**    Well, was there a time while you were there that they were

10  trying to sell a plant?

11  **A.**    Well, we were -- during the bankruptcy we were in a 363

12  asset sale process.  So we were certainly trying to sell all of

13  our assets at that point.  But I don't recall us trying to

14  sell, outside of that period of time, our facilities.

15  **Q.**    Did there come a time when someone who had looked at the

16  plant, potentially to buy it, disclosed in public documents how

17  the plant worked, its oxidation and chlorination system and

18  everything?  Do you remember that?

19  **A.**    No.

20  **Q.**    You don't remember that?

21  **A.**    No.  Disclosed in public documents?

22  **Q.**    Yes.

23  **A.**    No.

24  **Q.**    How about were you aware that -- how about NL Industries,

25  were you aware that -- does NL Industries have the TiO2

GIBNEY - CROSS / FROELICH

1    chloride-route process?

2    **A.**    Yes.   NL is a separate entity, but Kronos is the name of

3    the company that controls those assets.

4    **Q.**    Were you aware that they disclosed their processes in

5    Canada, in the Canadian newspapers?

6    **A.**    No.

7    **Q.**    Okay.   You talked about Ashtabula.   One of the things you

8    were talking about, you talked about, you said you were aware

9    of Ashtabula was originally built by DuPont; is that correct?

10   **A.**    One of the facilities, I believe that's true, yes.

11   **Q.**    Now, when did you really get -- when were you actively in

12   the TiO2 business as far as learning how it operated and

13   things?   Would that be in the 2000s?

14   **A.**    Well, I think I said earlier, or maybe it was yesterday,

15   in 1991, when I started, I spent quite a bit of time at our

16   Hamilton facility.   So I learned about the process back in the

17   early '90s.

18   **Q.**    But you were a salesperson then.   You were just trying to

19   get a general overview.   You didn't really -- your customers

20   didn't care how it was produced.   They wanted to know what the

21   product was and how much it was going to cost; isn't that

22   right?

23   **A.**    Well, they wanted to know about the performance and how it

24   would perform in their formulations.

25   **Q.**    Did they want to know how big the oxidizer was, or the

**GIBNEY - CROSS / FROELICH**

1   chlorinator?

2   **A.**   Well, we wouldn't let them see that.

3   **Q.**   Pardon me?

4   **A.**   We wouldn't let them see that.

5   **Q.**   Okay.  But you didn't -- that wasn't of any necessity to

6   you; you weren't interested in those type of things, were you?

7   **A.**   Well, customers, quite frankly, are very concerned about

8   the viability of their major suppliers; the efficiencies; the

9   financial performance.  So we would give customer tours on a

10  regular basis, of our facilities.  But we wouldn't show them

11  specific equipment.

12  **Q.**   But my question to you was:  You weren't interested in

13  knowing, you didn't have to know or you weren't interested in

14  knowing the size of the chlorinator and the size of the

15  oxidator [sic]; is that right?  Oxidation unit.

16  **A.**   It wasn't necessary at that point.

17  **Q.**   Now, as to Ashtabula, is it your understanding that DuPont

18  built the whole plant?

19  **A.**   That I don't know.

20  **Q.**   Didn't you -- do you remember what you told the government

21  in your report?

22  **A.**   You'd have to refresh --

23          **MR. HEMANN:**  Objection.

24          **THE COURT:**  Sustained.  On what issue?  I'm sorry.

25          **MR. FROELICH:**  Excuse me.

**BY MR. FROELICH:**

Q.   Do you remember that you told the government that Sherwin-Williams built the oxidation portion of the plant?

A.   I believe that's correct.

Q.   And so how did you -- how did you come to that belief?

A.   How did I come to that belief?

Q.   Yes.

A.   That's the information that I've been aware of for a long time.

Q.   And where did you get that information?

A.   I don't recall.  That would have been over the course of my career.

Q.   Okay.  And so you understood that Sherwin -- the oxidation, you indicate, is that very important part of the plant, right?

A.   That's the heart of the technology.

Q.   It's the heart of the technology.

     And Sherwin-Williams is buying a -- it was a paint company; is that correct?

A.   Yes, a vertically-integrated paint company.

Q.   Right.  It didn't have a TiO2 plant?

A.   I'm sorry?

Q.   It didn't have a TiO2 plant before Ashtabula?

A.   I don't believe they did.

Q.   All right.  And then it's your understanding that it -- it

**GIBNEY - CROSS / FROELICH**

1   gets together with DuPont to build a plant, and it -- and

2   Sherwin-Williams builds the most important part of the plant?

3   **A.**   I guess that's true, yes.

4   **Q.**   Okay.  Then you know that eventually that plant is sold;

5   is that correct?

6   **A.**   Yes.

7   **Q.**   And who's it sold to?

8   **A.**   I believe SCM.

9   **Q.**   And then -- SCM?

10  **A.**   Right.

11  **Q.**   And SCM, do you know, it takes that technology, it keeps

12  running that plant, but then it takes the technology and builds

13  a plant in Baltimore?  Did you know that?

14  **A.**   Yes.

15  **Q.**   Right.  And then it takes that technology and it builds

16  other plants, doesn't it?

17  **A.**   Yes.

18  **Q.**   And then SCM is either taken over, or is it bought?

19  **A.**   I can't remember the exact transaction, but taken over

20  probably would be the correct --

21  **Q.**   And who takes it over?

22  **A.**   I believe it was Millennium.

23  **Q.**   Well, was there a step before Millennium?  Was there a

24  company in there that also bought it and built a plant?

25  **A.**   I can't recall.

**GIBNEY - CROSS / FROELICH**

1  Q.  But then Millennium takes it over; is that correct?

2  A.  Uh-huh.

3  Q.  It gets that technology.  It's gone.  It's gone DuPont,

4  Sherwin-Williams.  It's gone to SCM and then Millennium.  And

5  Millennium builds plants, doesn't it?

6  A.  Yes.

7  Q.  How many plants does millennium build with it?

8  A.  I -- I don't recall.

9  Q.  How about -- and then Cristal takes it over; isn't that

10  correct?

11  A.  Correct.

12  Q.  And then Cristal builds plants with it?

13  A.  No, they haven't built a plant with it.

14  Q.  Aren't they bidding a huge plant in Saudi Arabia, with

15  that?

16  A.  No.

17  Q.  Were they adding lines to plants?

18  A.  They actually added a line at Janbu, using Tronox's

19  technology.

20  Q.  When was that?

21  A.  I believe they added a line back in 2007 or '8.  Or maybe

22  it was '6.

23       **THE COURT:**  Mr. Froelich, we're going to take a

24  stretch break.

25       **MR. FROELICH:**  Sure.

1          THE COURT:  Let's stand up, ladies and gentlemen.  You

2    may stand.

3          (Pause)

4          THE COURT:  All right.  You may be seated whenever you

5    are ready, ladies and gentlemen.

6          And you may continue, Mr. Froelich.

7          MR. FROELICH:  Thank you, Your Honor.  I don't have

8    much.

9    BY MR. FROELICH:

10   Q.   Have you heard of a company called Condux?

11   A.   Condux?

12   Q.   Yes.

13   A.   I believe I have, yes.

14   Q.   Can you tell me what that company is?

15   A.   I believe it's a consulting firm.

16   Q.   All right.  And do you know that it's made up of DuPont

17   employees?

18   A.   I think they have other employees, as well, but they have

19   a number of DuPont employees.

20   Q.   And do they advertise that they have expertise in the TiO2

21   business and that they have ex-DuPont employees?

22   A.   I believe that's -- yeah, it's listed amongst the other

23   products that they'll consult on.

24   Q.   Have you gone to Condux to hire employees?

25   A.   I don't -- I don't recall.

**GIBNEY - CROSS / FROELICH**

1  Q.  Where did you get the employee that came to you to be the

2  manager of a plant?

3  A.  I don't recall how we recruited him.

4  Q.  By the way, how did the government find you?

5  A.  I, quite frankly, don't know.

6  Q.  The -- there's a difference between confidential

7  information and proprietary information, isn't there?

8  A.  I'm sorry?

9  Q.  Is there a difference between confidential information and

10  proprietary information?  Isn't that correct?

11  A.  I'm not an expert on legal definitions.

12  Q.  Well, you looked at the -- the Basic Data Document, didn't

13  you?

14  A.  Yes.

15  Q.  All right.  And would you -- for example, did you see

16  things in there like it referred to the Chloride Institute

17  pamphlets?

18  A.  I don't recall seeing that described.

19  Q.  Okay.  But if that's in there, that's not confidential, is

20  it?

21  A.  If it's publicly -- if it's public information, that

22  wouldn't be confidential.

23  Q.  No matter what you stamp it, if it's public information or

24  known, it's not confidential; isn't that right?

25  A.  I don't know.  I'm not an expert in law so I don't know

1    how to answer that.

2            MR. FROELICH:  Your Honor, if I may have just one

3    second.

4            THE COURT:  Sure.

5            MR. FROELICH:  I do have one other area.

6    BY MR. FROELICH:

7    **Q.**   You were talking about the difference between the chloride

8    and sulfate routes.

9            Isn't the back end in both the chloride and the --

10   chlorine -- I'm sorry, chloride route and the sulfate route

11   aren't they both -- the back end both the same; aren't they

12   both batches, the finishing part?

13   **A.**   Finishing part?

14   **Q.**   Yeah.

15   **A.**   Yes, that's correct.

16   **Q.**   So they're the same?

17   **A.**   Essentially, yes, that's correct.

18           MR. FROELICH:  That's all I have.  Thank you.

19           THE COURT:  Thank you.

20           MR. HEMANN:  Very shortly, Your Honor.

21           THE COURT:  All right.

22                      <u>**REDIRECT EXAMINATION**</u>

23   BY MR. HEMANN:

24   **Q.**   Mr. Gibney, Mr. Froelich asked you a few questions about

25   some -- a couple of consulting firms and consulting information

GIBNEY - REDIRECT / HEMANN

1   available in the industry.  Do you remember those?

2   **A.**    Yes.

3   **Q.**    And he referred to TZMI and IBMA.  Do you recall them?

4   **A.**    Yes.

5   **Q.**    Can you, just generally, describe for the jury what they

6   are?

7   **A.**    So these are consulting firms that provide data to

8   industry producers.  Customers will contract to get

9   information; investors, analysts.  And they will provide a

10  whole host of information.

11      As I said, I think earlier in the day, the titanium

12  dioxide industry is rather opaque.  It doesn't provide a lot of

13  detailed information through their public disclosures.

14      So the industry investors have to rely, then, upon experts

15  similar to a TZMI or an IBMA, or other firms to provide

16  their -- their look at supply/demand, financial performance by

17  plant, all the metrics that are of interest by investors and

18  producers and customers.

19  **Q.**    Would you describe those two firms as well-respected?

20  **A.**    Yes.

21  **Q.**    And what's the basis of that?

22  **A.**    Over time, they've built up a reputation of providing good

23  insight, reputable data and information in a -- in a large

24  suite of -- of knowledge on the industry.

25  **Q.**    In your experience in reviewing data in reports by those

**GIBNEY - REDIRECT / HEMANN**

1  two firms, do they provide confidential proprietary information

2  from TiO2 producers?

3  **A.**   No.

4  **Q.**   Why do you say that?  How do you know that?

5  **A.**   Well, A, the -- the people that would contract to buy the

6  information are also expecting that they -- they're not going

7  to buy confidential information because if you have TZMI come

8  into your facility to do a project or help you do an

9  acquisition, they have to sign a confidentiality agreement not

10  to divulge that information through their reports.

11      So if you saw them providing confidential information,

12  there would be a red flag that you can't trust them with your

13  own information then.

14  **Q.**   And you said that they provide estimates with regard to

15  the performance of certain -- of TiO2 facilities; is that

16  correct?

17  **A.**   That's correct.

18  **Q.**   And you mentioned that that's based on complex set of

19  publicly available variables and some mathematical modeling?

20  **A.**   Yes.

21  **Q.**   Is there a difference between those kind of estimates and

22  validated -- actual validated data from a company?

23  **A.**   Yes.

24  **Q.**   And how would you describe those differences?

25  **A.**   Well, a TZMI or -- I mean, each -- each producer of ore,

1   for instance, they'll have the same type of models internally.

2   And they'll look at a TZMI's model to verify whether or not

3   they're correct.  But both companies will go about the same

4   analysis.

5       There's publicly available trade data that's published on

6   a monthly basis, that shows imports and exports of ore, for

7   instance.  So you can track -- you know the ore that's going

8   into Kuan Yin, for instance, because it's the only producer of

9   titanium dioxide in the country.  So you can track what type of

10  ore is showing up at the port.  It also shows a value of that

11  shipment.

12      So you then use that as the basis of your input because

13  that's 35 to 40 percent of the cost input for that plant.  You

14  then calculate out how much ore is being used.  Then that would

15  translate into how much chlorine, how much caustic soda, with

16  the other inputs.

17      You would then run that through your stoichiometric model.

18  It would spit out a value.  And then you make other assumptions

19  based off of maintenance, employee spend, headcount, all of

20  those things.  And it comes up with a cost per ton.

21  Q.  And if you're a business attempting to build a DuPont

22  factory, a factory modeled after DuPont, would you prefer to

23  have that kind of databased on this mathematical modeling that

24  IBMA and TZMI might do, or would you prefer to have actual data

25  from DuPont?

**GIBNEY - REDIRECT / HEMANN**

1   **A.**   The actual data would be more accurate, that's certain.

2   **Q.**   And you -- when you reviewed some of this information --

3   I'm referring now to Exhibit 162 -- did some of the information

4   that you saw in this document (indicating) was it different

5   than the industry estimates that you had assumed previously

6   were correct?

7   **A.**   Yeah, because it's specific to that facility.  And the

8   assumptions that TZMI and others are making, that's what they

9   are, they're assumptions.  It's not the real data.

10  **Q.**   You talked with Mr. Froelich about personnel making a

11  difference in running a plant.  Do you remember that?

12  **A.**   Yes.

13  **Q.**   In addition to the personnel and cost of the raw

14  materials, does the know-how make a difference as well?

15  **A.**   Yes.

16  **Q.**   Why's that?

17  **A.**   Well, the high complexity level of running the TiO2 plant,

18  you're going to have seasoned individuals that understand what

19  to do during maintenance shutdowns, to quickly turn a plant

20  back around and get it back up and running; or if an emergency

21  occurs, certainly, to keep people safe within the plant.

22      We had to fire one of our plant engineers at Hamilton,

23  Mississippi because they had a chlorine release at the facility

24  and almost killed an employee.  And you just can't tolerate

25  people that aren't performing well.

1    So to find someone that has the background around not only

2    running a plant but running it safely is -- it's not easy to

3    come by.  And when you find those individuals, you hold on to

4    them.

5  **Q.**  You mentioned -- Mr. Froelich asked you some questions

6    about the Sherwin-Williams chlorination section and oxidation

7    section, who designed them.  Do you remember that?

8  **A.**  Yes.

9  **Q.**  And do you have a specific memory, as you sit here today,

10   whether it was Sherwin-Williams who designed the oxidation part

11   or the chlorination part of Ashtabula?

12 **A.**  I don't remember specifically.

13 **Q.**  Would it refresh your recollection to take a look at the

14   disclosure statement that you assisted in writing?

15 **A.**  Sure.

16        **MR. HEMANN:**  Your Honor, may I approach?

17        **THE COURT:**  Yes, you may.

18 **BY MR. HEMANN:**

19 **Q.**  If you would look at paragraph 7A, please.  Just read it

20   to yourself.

21 **A.**  They designed the chlorination section.

22 **Q.**  Let me just ask you a question, though.  Let me take it

23   back.

24        Does that refresh your recollection, Mr. Gibney, as to

25   which part of Ashtabula Sherwin-Williams designed and which

**GIBNEY - REDIRECT / HEMANN**

1   part DuPont designed?

2   **A.**   Yes.

3   **Q.**   And what's your recollection?

4   **A.**   Chlorination.

5   **Q.**   Sherwin-Williams designed which part?

6   **A.**   Chlorination.

7   **Q.**   Thank you.

8         When you were talking with Mr. Froelich about some of the

9   information from consultants, he asked you whether that -- the

10  information from consultants would help you size out parts of

11  the plant.  Do you remember that?

12  **A.**   Yes.

13  **Q.**   What do you understand the term "size out" to mean?

14  **A.**   Well, you're trying to estimate the throughput and how big

15  the chlorination and oxidation sections would be.

16  **Q.**   How big in terms of what?

17  **A.**   Probably it would be your diameters, the volume of

18  material that would have to be going through those vessels.

19  **Q.**   Now, are you able, based on the publicly available

20  information from these consultants, able to determine the

21  interior diameter of the DuPont chlorinators?

22  **A.**   I don't believe you can, no.

23  **Q.**   What about the surface area of the pipes in the flue pond?

24  **A.**   I don't believe so, no.

25  **Q.**   When you looked at the flue pond last year on Google

1    Earth, were you able to determine the surface area of the pipes

2    in the flue pond?

3    **A.**    Surface area --

4    **Q.**    Yeah.

5    **A.**    -- no.

6    **Q.**    And, finally, you talked about the series of management

7    changes or ownership changes on Ashtabula, going back from the

8    time that Sherwin-Williams was involved in the '70s.  Do you

9    remember that?

10    **A.**    Yes.

11    **Q.**    And Cristal now owns Ashtabula, correct?

12    **A.**    Correct.

13    **Q.**    How much would it cost to license the Ashtabula technology

14    from Cristal right now?

15    **A.**    I have no idea what they would -- what they would value

16    that at.  I, quite frankly, don't know.

17    **Q.**    And does Cristal -- like if I had $500 million, would I be

18    able to license it from Cristal?

19            **MR. FROELICH:**  I'm going to object, Your Honor.

20            **THE COURT:**  Sustained.

21            **MR. GASNER:**  Objection, Your Honor.

22            **THE COURT:**  Sustained.

23    BY MR. HEMANN:

24    **Q.**    Does Cristal currently license that technology?

25    **A.**    I don't believe they do.

1    Q.    And you mentioned that Cristal is involved in a project in

2    Saudi Arabia, building out one of its plants right now?

3    A.    They're building a slag plant.  So, to get titanium barium

4    ore ilmenite upgraded or beneficiated up to 85 or 86 percent

5    TiO2 content, one of the ways to do that is to put it into a

6    slag furnace.

7          And they're building that exact plant south of Janbu, in

8    Jazan Economic City, a new city in Saudi Arabia, with a design

9    capacity of a half million metric tons of slag.  And that will

10   feed their TiO2 plants around the world with slag.

11             THE COURT:  I think we need to wrap it up now.

12             MR. HEMANN:  We're done, Your Honor.  I'm done, Your

13   Honor.

14             THE COURT:  Thank you.

15             MR. HEMANN:  Thank you very much.

16             THE COURT:  You don't have anything further, do you?

17             MR. FROELICH:  A couple of quick ones, Your Honor.

18             THE COURT:  All right.

19                        <u>**RECROSS-EXAMINATION**</u>

20   BY MR. FROELICH:

21   Q.    The -- did you know -- you said that the only -- I thought

22   you said the only plant -- how many plants did you say were in

23   China?

24   A.    Approximately 50, is the estimate.

25   Q.    TiO --

GIBNEY - RECROSS / FROELICH

1    **A.**    TiO2 plants.

2    **Q.**    And the consulting firms that you talked about, did they

3    have ex-DuPont employees in them; do you know?

4    **A.**    Uhm, I don't know if TZMI does or not.  They probably do.

5    They have 40 people on staff, so they may.

6    **Q.**    Okay.  And one of the two -- we talked about you said that

7    you now believe it's the chlorinator that Sherwin-Williams

8    built; is that correct?

9    **A.**    Correct.

10   **Q.**    The two main -- the two main parts of a TiO2 process,

11   we're talking about the chloride route, are the chlorinator and

12   the oxidation part, right?

13   **A.**    Yeah, chlorination and oxidation are the two most

14   important.

15   **Q.**    And it's your information and belief that Sherwin-Williams

16   built the chlorinator?

17   **A.**    Yes.

18           **MR. FROELICH:**  Thank you.

19           **THE COURT:**  You're excused.  Thank you very much.  You

20   can leave the exhibits there.  We'll take care of it.

21       (Witness excused.)

22           **THE COURT:**  Next witness, please.

23           **THE CLERK:**  Mr. Gasner, do you want to get your

24   exhibits?

25           **THE COURT:**  Thank you.

1          **MR. HEMANN:**  Your Honor, the United States calls

2     Brijesh Bhatnagar.

3          **THE COURT:**  All right.  Please step forward, sir.

4          **THE CLERK:**  Raise your right hand, please.

5                    **BRIJESH BHATNAGAR,**

6     called as a witness for the Government, having been duly sworn,

7     testified as follows:

8          **THE WITNESS:**  I do.

9          **THE CLERK:**  Thank you.  Please be seated, and state

10    and spell your full name for the record.

11         **THE WITNESS:**  Brijesh Bhatnagar.

12         **THE CLERK:**  Spell it, please.

13         **THE WITNESS:**  B-r-i-j-e-s-h B-h-a-t-n-a-g-a-r.

14         **THE CLERK:**  Thank you.

15                    **DIRECT EXAMINATION**

16    BY MR. HEMANN:

17    **Q.**   Could you -- maybe a couple of hints here.  It would be

18    easiest if you pull the microphone pretty close to your mouth

19    there, and speak as loudly -- loudly so that the court reporter

20    can hear you, okay?

21    **A.**   Okay.

22    **Q.**   Mr. Bhatnagar, did you work for a period of time at a

23    company called Performance Group?

24    **A.**   Yes.

25    **Q.**   When did you first start working at Performance Group?

BHATNAGAR - DIRECT / HEMANN

1  **A.**   In May of 2007.

2  **Q.**   How did you come to start working at Performance Group?

3  **A.**   Through an agency, employment agency.

4  **Q.**   What was the name of that agency?

5  **A.**   I don't remember.

6  **Q.**   What did you do before you worked at Performance Group?

7  **A.**   I was working at Chevron for a while.  And then before

8  that I was working Stanford Linear Accelerator Center.

9  **Q.**   What's your educational background?

10 **A.**   I have a diploma in mechanical engineering.

11 **Q.**   In what year?

12 **A.**   In 1965.

13 **Q.**   How long did you work for Performance Group?

14 **A.**   Until December of 2008.

15 **Q.**   Were you paid during that period of time?

16 **A.**   Not the last paycheck.

17 **Q.**   So leading up to prior to the last paycheck, did you

18 receive a wage for working at Performance Group?

19 **A.**   Yes.

20 **Q.**   And how were you paid?

21 **A.**   By check.

22 **Q.**   And was it an hourly or a yearly sum?

23 **A.**   Hourly.

24 **Q.**   How much were you paid by the hour?

25 **A.**   Seventy-five dollars.

BHATNAGAR - DIRECT / HEMANN

1   **Q.**   And what was -- did you work a typical 40-hour workweek,

2   or more or less?

3   **A.**   Uhm, as required.

4   **Q.**   And how would you -- how would you characterize that?  Was

5   it pretty steady, at a certain amount over the two years you

6   were there, or would it go up and down, fluctuate?

7   **A.**   Fluctuate up and down.  Initially, it was fluctuating, but

8   afterwards it was 40 hours, more than 40 hours sometimes.

9   **Q.**   When you say more than 40 hours, would it be a lot more

10  than 40 hours or --

11  **A.**   Not -- not too much, but more than 40 hours.

12  **Q.**   You worked until -- when did you leave the company?

13  **A.**   Uhm, in December of 2008, for the last --

14  **Q.**   2000 what year?

15  **A.**   2008.

16  **Q.**   2008?

17  **A.**   Yes.

18  **Q.**   How long were you there?

19  **A.**   From -- from May 2007 to, I think, July 2007.  And then

20  afterwards, after one month, again then started working

21  directly with him.

22  **Q.**   Until December 2008?

23  **A.**   Yes.

24  **Q.**   We'll talk about that in a bit.

25       When you started at Performance Group in 2007, what was

BHATNAGAR - DIRECT / HEMANN

1   your job?

2   **A.**    Designing the equipment, what was required in the process

3   of manufacturing.

4   **Q.**    What sort of equipment?

5   **A.**    Pressure vessels, mostly.

6   **Q.**    Pressure vessels?

7   **A.**    Yes.

8   **Q.**    Anything else?

9   **A.**    Most of them are pressure vessels, and some other parts,

10  other containers and all that.

11  **Q.**    Say again.

12  **A.**    Containers, pressure vessels, storage tanks.

13  **Q.**    What is a pressure vessel?

14  **A.**    It's a -- it's a processor with a -- which -- where you

15  can process under certain conditions.

16  **Q.**    Process what?

17  **A.**    Any -- anything.  You know, it can be any chemical or any

18  food processing --

19       (Reporter interrupts.)

20  **Q.**    You said chemical or food processing?

21  **A.**    Any processing can be done under conditions.

22  **Q.**    And what experience had you had in designing pressure

23  vessels?

24  **A.**    I worked for a long time at another company making

25  pressure vessels and heat exchangers.

1    Q.   Could you describe for the jury a little bit about how at

2    Performance Group you would go about designing a pressure

3    vessel.

4    A.   Uhm, I would be given a criteria.

5    Q.   Criteria?

6    A.   Yes.  And size, outside dimensions and everything, all the

7    dimensions and temperature and pressure, and the material of

8    construction.  Then I would design it.

9    Q.   So you would be given criteria that included temperature

10   and pressure and dimensions?

11   A.   Dimensions and the material of construction.

12   Q.   And where did you get that criteria?

13   A.   Either from -- most of the time from Walter.

14   Q.   And also from --

15   A.   And also from Bob.

16   Q.   And how would it be communicated to you?

17   A.   They will give me a -- a sketch with those -- those

18   criteria written on it.

19   Q.   And how would you get the sketch?

20   A.   Uhm, either through email or through Walter.

21   Q.   Who was drawing the sketches?

22   A.   Mostly Bob.

23   Q.   And the sketches contained these various criteria,

24   correct?

25   A.   Yes.

BHATNAGAR - DIRECT / HEMANN

1  Q.   Do you know where Mr. -- and when you say "Bob," you mean

2  Bob Maegerle?

3  A.   Bob Maegerle.

4  Q.   Yes?

5  A.   Yes.

6  Q.   Do you know where Mr. Maegerle got the criteria that was

7  included in the sketches?

8  A.   Uhm, he must have been knowing it.  I don't know.

9  Q.   Did you ever ask him where he got the criteria that were

10 included in the sketches?

11 A.   No.

12 Q.   Did you ever ask Mr. Liew where the criteria came from?

13 A.   No.

14 Q.   Prior to coming to work at Performance Group, did you have

15 any experience with titanium dioxide?

16 A.   No.

17 Q.   And the -- the criteria, did you have any way of knowing

18 that information yourself?

19 A.   Uhm, no.

20 Q.   Was that information available, as far as you know, the

21 criteria that you were using in publicly available information?

22 A.   For certain, like oxygen or chlorine or those kind of

23 things you can get on the Internet, but not -- not titanium

24 tetrachloride or titanium dioxide.

25 Q.   Not for titanium chloride or titanium dioxide?

1    **A.**    No.

2    **Q.**    What was Mr. Liew's position at Performance Group?

3    **A.**    He was the president of the company.

4    **Q.**    And did you report directly to him?

5    **A.**    Yes.

6    **Q.**    Did anybody else participate in the management of the

7    company?

8    **A.**    Not to my knowledge.

9    **Q.**    What was Mr. Maegerle's position at the company?

10   **A.**    He was consultant.

11   **Q.**    And explain how he acted in his role as consultant?

12   **A.**    Whatever we have questions, he will answer those

13   questions.

14   **Q.**    Did you get -- you mentioned earlier you -- you received

15   information from Mr. Maegerle through Mr. Liew.  Is that

16   correct?

17   **A.**    Yes.

18   **Q.**    And in addition to the information that you listed

19   earlier, would you obtain pressure readings from Mr. Maegerle

20   and Mr. Liew?

21   **A.**    Yes.

22   **Q.**    And would you obtain information about nozzles and the

23   location of nozzles?

24   **A.**    Yes.

25   **Q.**    Did you have any sources of information that you used at

1  Performance Group, other than Mr. Maegerle through Mr. Liew?

2  **A.**    Uhm, sometime, yes, I used Internet.

3  **Q.**    And what would you use the Internet for?

4  **A.**    To look some of the -- some of the things, you know, which

5  are general.

6  **Q.**    Which are general?

7  **A.**    Yes.

8  **Q.**    And by "general" what do you mean?

9  **A.**    Like when we are writing the specifications, so we'll look

10 for the specifications and use that format as a template,

11 putting the -- all the criteria into that.

12 **Q.**    And what are some examples of things that are not general,

13 that are more specific?

14 **A.**    Not -- specific is not available on the Internet,

15 specific.

16 **Q.**    I'm sorry?

17 **A.**    Specifics are not available on the Internet, not to my

18 knowledge.

19 **Q.**    And would that include materials of construction?

20 **A.**    Yes.

21 **Q.**    And would that include pressure?

22 **A.**    Yes.

23 **Q.**    Would that include temperature?

24         **MS. LOVETT:**  Objection, Your Honor.  Foundation.

25         **THE COURT:**  Overruled.

BHATNAGAR - DIRECT / HEMANN

1   **BY MR. HEMANN:**

2   **Q.**   Would that include temperature?

3   **A.**   Yes.

4   **Q.**   And would that include size?

5   **A.**   Yes.

6   **Q.**   While you were working at Performance Group, did you ever

7   hear the name DuPont used by either Mr. Liew or Mr. Maegerle?

8   **A.**   Uhm, sometime.

9   **Q.**   And would Mr. Liew or Mr. Maegerle ever refer to any other

10  TiO2 manufacturer?

11  **A.**   Not to my knowledge, no.

12  **Q.**   Did you ever hear Mr. Liew make a statement that his

13  company has completely mastered the know-how of DuPont?

14  **A.**   Yes.

15  **Q.**   And tell the jury the context in which you heard him make

16  this statement.

17  **A.**   When meeting some vendors or, you know, then -- then he

18  will mention sometime.

19  **Q.**   Do you know how Mr. -- Mr. Liew's company mastered the

20  know-how of DuPont?

21  **A.**   I don't know.

22  **Q.**   Have you ever been in a titanium dioxide plant?

23  **A.**   Yes.

24  **Q.**   What titanium dioxide plant have you been in?

25  **A.**   In China.

BHATNAGAR - DIRECT / HEMANN

1    **Q.**   What plant was that?

2    **A.**   Jinzhou.

3    **Q.**   And when was that?

4    **A.**   That was in, I believe, in August 2007.

5    **Q.**   Did you go there with Mr. Liew?

6    **A.**   Yes.

7    **Q.**   Was there -- at the time you went, was there a chloride

8    route line that was running?

9    **A.**   No.

10   **Q.**   Compared to other engineering endeavors in which you've

11   been engaged at your prior employers, how complicated was the

12   TiO2 process?

13   **A.**   I never work in any chemical company for a long time.  I

14   work just for Chevron, so I don't have any -- any idea about

15   it.

16   **Q.**   You said that Mr. -- Mr. Liew referred to DuPont know-how.

17   Did you ever hear Mr. Maegerle refer to DuPont?

18   **A.**   Sometime.

19   **Q.**   And how would Mr. Maegerle refer to DuPont?  In what

20   context?

21   **A.**   Like this 100,000-ton is like this.  And so 30,000-ton --

22   I worked on 30,000-ton project.  So it will be like that, you

23   know.

24   **Q.**   You mentioned that over time at -- well, you were there

25   for about a year and a half total; is that correct?

BHATNAGAR - DIRECT / HEMANN

1   **A.**   Yes.

2   **Q.**   Do you feel like you worked -- did a lot of work during

3   that period of time?

4   **A.**   Yes.

5   **Q.**   Did you produce lots of -- of drawings based on the

6   criteria that was supplied by Mr. Maegerle?

7   **A.**   Yes.

8   **Q.**   Did you ever design, on your own, the criteria for a

9   particular piece of equipment?

10  **A.**   Uhm, no.

11  **Q.**   What led to your leaving the company?

12  **A.**   He -- he went to China for the final submission.  And

13  after that he was supposed to call me.  He didn't call me.

14  **Q.**   And when you say "he" do you mean Mr. Liew?

15  **A.**   Mr. Liew.

16  **Q.**   When did he go to China?

17  **A.**   In -- in late December or first week of January of 2009.

18  **Q.**   So late December 2008 or first week of January 2009?

19  **A.**   Yes.

20  **Q.**   And when he left, what did he tell you about his return?

21  **A.**   Uhm, when we went there to the office, the office was

22  empty.

23  **Q.**   Well, before he left to go to China what did he tell you?

24  **A.**   That when he will come back he will give us a call.

25  **Q.**   And did he tell you what he was going to China to do?

BHATNAGAR - DIRECT / HEMANN

1   **A.**   It was a final submission of 30-ton (sic) project.

2   **Q.**   To Jinzhou?

3   **A.**   To Jinzhou.

4   **Q.**   When January came, did you go back to work?

5   **A.**   Yes, we went to work there.  And there was a -- there was

6   a note in the office that you -- that we will be moving from

7   here and we will give you a call, and return the key at the

8   front desk.

9   **Q.**   At that time, at that point in time, had you been fully

10  paid by Performance Group?

11  **A.**   No, not the last check.  Last check he didn't pay us.

12  **Q.**   And how much was that for?

13  **A.**   It was about $7,500.

14  **Q.**   Did you have any warning before -- before you went to the

15  office that day and found it empty, that the -- the -- that you

16  were not going to be working for the company anymore?

17  **A.**   No.

18  **Q.**   Did you attempt to obtain the $7,500 payment from

19  Mr. Liew?

20  **A.**   Yes.

21  **Q.**   How did you do that?

22  **A.**   I went to see him.  And he was in the same office.  And he

23  didn't say that he will not pay me, but he didn't pay me

24  either.

25  **Q.**   You said he's not in the same office.  I thought you said

BHATNAGAR - DIRECT / HEMANN

1   you went to the office and it was empty?

2   **A.**   At that time it was empty, but then he then stayed in the

3   same building, same floor.

4   **Q.**   Different office in the same building?

5   **A.**   Same building, same floor.

6   **Q.**   At some point in time -- so Mr. Liew said he would pay

7   you.  Did he pay you?

8   **A.**   No.

9   **Q.**   At some point in time did you learn that Performance Group

10  had been placed into bankruptcy?

11  **A.**   Yes.  I went to Labor court, and when I file it I got a

12  letter.

13          **THE COURT:**  You went to Labor Board and what, sir?

14          **THE WITNESS:**  I went to Labor court for the wages.

15  And I came to know, when I got a letter from Labor court, that

16  they had filed bankruptcy.

17  **BY MR. HEMANN:**

18  **Q.**   You got a letter from the Labor court saying that USA --

19  Performance Group --

20  **A.**   (Inaudible response.)

21      (Reporter interrupts.)

22          **THE COURT:**  You have to wait until he finishes the

23  question before you answer.

24      Ask it again.

25

1  BY MR. HEMANN:

2  **Q.**   You got a letter from the Labor court saying that

3  Performance Group had been placed in bankruptcy?

4  **A.**   Yes.

5  **Q.**   And did you ever get your $7,500 payment?

6  **A.**   No.

7          **MR. HEMANN:**  Thank you, Your Honor.  No further

8  questions.

9          **THE COURT:**  Ms. Lovett, you may cross-examine.

10          **MS. LOVETT:**  Thank you, Your Honor.

11          **THE COURT:**  It's a mighty big box.

12          **MS. LOVETT:**  I'm not going to use all of it.

13          **MR. HEMANN:**  Let me just --

14          **THE COURT:**  All right.  You may if you wish.

15      (Laughter)

16          **THE COURT:**  I was just noting.  It's the battle of the

17  boxes.

18          **MR. HEMANN:**  Yes.

19          **THE COURT:**  Okay.  All right.  You may proceed,

20  Counsel.

21          **MS. LOVETT:**  Thank you, Your Honor.

22                          **CROSS-EXAMINATION**

23  BY MS. LOVETT:

24  **Q.**   Good morning, Mr. Bhatnagar.  You testified just a moment

25  ago that you were originally hired to work for Mr. Liew through

1  a consulting agency, correct?

2  **A.**    Yes.

3  **Q.**    Was that agency called Adecco?

4  **A.**    Yes.

5  **Q.**    And they're a general staffing agency for engineers,

6  correct?

7  **A.**    Yes.

8  **Q.**    You mentioned that you have a degree in mechanical

9  engineering, right?

10  **A.**    Yes.

11  **Q.**    And you also mentioned that you began work for Performance

12  Group in the summer of 2007; is that right?

13  **A.**    Yes.

14  **Q.**    And, eventually, you became a full-time employee, not just

15  a contractor for the company; is that right?

16  **A.**    Yes.

17  **Q.**    And you worked for them until December 2008, correct?

18  **A.**    Yes.

19  **Q.**    One of your main job responsibilities was making computer

20  models of different pressure vessels, as you mentioned, right?

21  **A.**    Yes.

22  **Q.**    And you used a computer program called COMPRESS to do

23  that; is that right?

24  **A.**    COMPRESS is to do the stress analysis of that.  Otherwise,

25  for the models I used Pro E.

BHATNAGAR - CROSS / LOVETT

1  **Q.**  So you used two computer programs, Pro E and COMPRESS?

2  **A.**  Yes, ma'am.

3  **Q.**  Can you please explain for the jury what Pro E does?

4  **A.**  Pro E is a program to make the models.

5  **Q.**  How does it make the models?

6  **A.**  It's a design program, and you can make models on it.

7  **Q.**  And how does COMPRESS work?

8  **A.**  COMPRESS, it's a -- you have to -- there's a -- it has all

9  the fields there.  You have to fill out all the fields.  And

10  then it starts -- it gives you -- it does the stress analysis.

11  If some of the things are failing, then they let you know that

12  these things are failing.  Then you have to change the

13  thicknesses, or whatever.  Like thickness, you have to change.

14  **Q.**  It helps you figure out the stress analysis of the

15  pressure vessel?

16  **A.**  Yes.

17  **Q.**  And you were also involved in getting quotes from vendors

18  for different pieces of equipment; is that right?

19  **A.**  Yes.

20  **Q.**  And sometimes in your work you would reference machine

21  design books that you owned from your previous work; is that

22  right?

23  **A.**  Yes.

24  **Q.**  You -- one reference material you used was the ASME Code;

25  is that right?

BHATNAGAR - CROSS / LOVETT

1   **A.**    Yes.

2   **Q.**    What is the ASME Code?

3   **A.**    The American Society of Mechanical Engineers.

4   **Q.**    And how would you use that code?

5   **A.**    It gives all the -- all the tensile strength of different

6   materials.

7   **Q.**    So you could learn more about the different materials?

8   **A.**    Materials.  It gives all the formulas, if you want to use

9   it manually.  But with COMPRESS we don't need to do that.  It

10  does everything for you.

11          **MS. LOVETT:**  Your Honor, may I approach the witness

12  with Exhibit 3065?

13          **THE COURT:**  Yes.  Is that already in evidence,

14  Counsel?

15          **MS. LOVETT:**  No, it is not.

16          **THE COURT:**  All right.  You may.

17  BY MS. LOVETT:

18  **Q.**    Mr. Bhatnagar, do you recognize this document in front of

19  you there?

20  **A.**    Yes.

21  **Q.**    What is it?

22  **A.**    It says B -- this is a ASME code.

23  **Q.**    So this is part of the ASME book that you referenced?

24  **A.**    This is one, yes.

25  **Q.**    And can you describe the first page, just right there, for

1   the jury please.  What is that?

2   **A.**   I'm attaching ASME 3013 process piping specifications.

3   **Q.**   So is that an email from you?

4   **A.**   Yes.

5   **Q.**   And who did you address this email to?

6   **A.**   To Bob Maegerle, and copy to Walter Liew.

7   **Q.**   And did you write this email in the normal course of your

8   business as part of Performance Group?

9   **A.**   Yes.

10       **MS. LOVETT:**  Your Honor, I move to admit Exhibit 3065

11   into evidence.

12       **THE COURT:**  Any objection?

13       **MR. HEMANN:**  No, Your Honor.

14       **THE COURT:**  Admitted.

15       (Trial Exhibit 3065 received in evidence.)

16       **MS. LOVETT:**  Mr. Guevara, can you please display it to

17   the jury.  The second page, please.

18       (Document displayed.)

19   **BY MS. LOVETT:**

20   **Q.**   Mr. Bhatnagar, you mentioned that this is part of the ASME

21   materials that you referenced, correct?

22   **A.**   Yeah, this is for the pressure piping.

23   **Q.**   Do you recall why you sent this to Mr. Maegerle and

24   Mr. Liew?

25   **A.**   It's for the piping specifications I had with me.

1    Q.    So this is information you wanted to share with them about

2    the piping specifications?

3    A.    Yes.

4    Q.    Thank you.

5          You spoke with Mr. Hemann about your use of the Internet

6    to look up general information on this project, right?

7    A.    Yes.

8    Q.    And you mentioned that, to your knowledge, you can't find

9    specifics like temperature and pressure for the TiO2 system on

10   the Internet, right?

11   A.    Yes.

12   Q.    Did you ever go look for those things on the Internet?

13   A.    I didn't have to.

14   Q.    So you just never looked for those on the Internet?

15   A.    I never looked for it because it was available for me.

16          THE COURT:  Because what?

17          THE WITNESS:  It was available for me.

18          THE COURT:  Okay.  Thank you.

19          THE WITNESS:  So I didn't have to look for it.

20   BY MS. LOVETT:

21   Q.    And you also mentioned that one time you traveled with

22   Mr. Liew to China, correct?

23   A.    Yes.

24   Q.    And at that time you went to the Jinzhou plant?

25   A.    Yes.

BHATNAGAR - CROSS / LOVETT

1   Q.   And there you met with engineers from Jinzhou, correct?

2   A.   Yes.

3   Q.   You also mentioned that you got a lot of the information

4   you used in your models from Mr. Liew, right?

5   A.   Yes.

6   Q.   And some of the information from Mr. Maegerle, correct?

7   A.   Yes.

8   Q.   You thought that Mr. Liew knew a lot about the titanium

9   dioxide process, right?

10  A.   Yes.  When I met him, he knew a lot -- a lot of

11  information.

12  Q.   And you felt like he knew what he was doing, correct?

13  A.   Yes.

14  Q.   You also thought that Mr. Maegerle was a smart person,

15  right?

16  A.   Yes.

17  Q.   And there were also old patents that were kept in the

18  Performance Group office; isn't that correct?

19  A.   Yes.

20          MS. LOVETT:  Your Honor, may I approach with Exhibit

21  1297?

22          THE COURT:  Yes, you may.

23  BY MS. LOVETT:

24  Q.   Mr. Bhatnagar, do you recognize this document?

25  A.   Yes.

1    Q.    What is it?

2    A.    This is pressure vessel design calculations for oxidation

3    reactor.

4    Q.    You drafted this document, correct?

5    A.    Uhm, yes.

6    Q.    You drafted it in the course of your job responsibilities

7    at Performance Group, correct?

8    A.    Yes.

9    Q.    Where -- where did you send this document once it was

10   complete?

11   A.    Uhm, gave it to Walter for submission.

12         MS. LOVETT:  Your Honor, I move to admit Exhibit 1297

13   into evidence.

14         THE COURT:  Any objection?

15         MR. HEMANN:  None, Your Honor.

16         THE COURT:  It's admitted.

17      (Trial Exhibit 1297 received in evidence.)

18      (Document displayed.)

19   BY MS. LOVETT:

20   Q.    You mentioned that this is the pressure vessel design for

21   the oxidation reactor, correct?

22         THE COURT:  Counsel, can you say for the record

23   exactly what's on the screen now.  There's something on the

24   screen.

25         MS. LOVETT:  The first page.

1            **THE COURT:**  The first page.  Thank you.  Okay.

2    BY MS. LOVETT:

3    **Q.**   So, yes, you mentioned this is a pressure vessel design

4    for the oxidation reactor, right?

5    **A.**   Uh-huh.

6    **Q.**   And this is for the 30K Jinzhou project?

7    **A.**   Yes.

8    **Q.**   And this document is quite lengthy, correct?

9    **A.**   Yes.

10   **Q.**   And it includes a lot of detailed information and

11   calculations related to the oxidation reactor --

12   **A.**   Yes.

13   **Q.**   -- right?

14           **MS. LOVETT:**  Mr. Guevara, can you turn to the second

15   page of this document, please.

16        (Document displayed.)

17   BY MS. LOVETT:

18   **Q.**   Is this an example of the type of drawings and

19   calculations that you created as part of this oxidation reactor

20   design?

21   **A.**   This one is created by -- by the COMPRESS program.

22   **Q.**   So this is the output of the COMPRESS software?

23   **A.**   Yes.

24   **Q.**   Thank you.

25           **MS. LOVETT:**  Your Honor, may I approach with Exhibit

1    1683?

2           THE COURT:  Yes, you, you may.  And after you're done

3    with this we're going to take our break.

4           MS. LOVETT:  Thank you, Your Honor.

5    BY MS. LOVETT:

6    Q.   Mr. Bhatnagar, do you recognize this document?

7    A.   Yes, ma'am.

8    Q.   What is it?

9    A.   This is a condenser tank.

10   Q.   Is this another pressure vessel design calculation?

11   A.   Yes, ma'am.

12   Q.   You drafted this document, correct?

13   A.   Yes.

14   Q.   And you drafted it in the course of your job

15   responsibilities at Performance Group?

16   A.   Yes.

17          MS. LOVETT:  Your Honor, I move to admit Exhibit 1683

18   into evidence.

19          MR. HEMANN:  No objection, Your Honor.

20          THE COURT:  It's admitted.

21       (Trial Exhibit 1683 received in evidence.)

22   BY MS. LOVETT:

23   Q.   What is this pressure vessel design calculation for, what

24   vessel?

25   A.   This is SR condenser tank.

1  **Q.**  And it was your understanding that this was another one of

2  the vessels to be used in the 30K Jinzhou plant, correct?

3  **A.**  Yes.

4      **MS. LOVETT:**  Your Honor, this would be a good time for

5  a break.

6      **THE COURT:**  Okay.  Thank you.

7      Ladies and gentlemen, we are going to take our usual

8  break.  We may go a couple of more minutes, I have something to

9  take up with counsel.

10      Remember the Court's usual admonitions: keep an open mind;

11  don't discuss the case; don't get any outside information.

12      We'll see you in 15 minutes, perhaps a few minutes more.

13      And you can step down, sir, for the moment.

14      (Jury out at 11:44 a.m.)

15      **THE COURT:**  You can step outside, if you like, sir.

16      All right.  The jury has retired.  I wanted to raise with

17  counsel the question of the most recent note that we received

18  from Juror Number 7, Mr. Xavier.  It was received today, at

19  8:00 a.m., and distributed to both sides.  And it says the

20  following:

21          "Your Honor, my wife sister-in-law's chemo schedule

22      has been tentatively set on Mondays, except holidays, late

23      in the morning till end of February unless something comes

24      up," exclamation point, I think that is, but maybe not.

25      "Think my jury duty will be back to normal.  Sincerely,

1    Antonio Xavier."

2         Now, this now is the second note we received from this

3    juror indicating his personal situation.  And as counsel will

4    recall, the last time this came up it necessitated, with

5    counsel's input, my inquiring, bringing Mr. Xavier, Juror

6    Number 7, out, asking him about the circumstances surrounding

7    his -- this medical situation and his family, how he was

8    feeling, et cetera, and then giving us the schedule at least

9    for this past Monday; followed by inquiring of the jury about

10   their ability to come in at different hours; resulting in notes

11   from the jury with respect to their likes, their wants and,

12   shall we say, aversions to certain schedules being imposed that

13   were different than what the Court had established originally.

14        This note would necessitate my bringing Mr. Xavier out and

15   asking him about what he means by the word "tentatively," what

16   he means by the word "later in the morning," what he means by

17   "unless something comes up," and that -- and what he means by

18   "think my jury duty will be back to normal."

19        There are too many uncertainties in this, and I think that

20   this continuous questioning of Mr. Xavier and -- Juror Number

21   7, and the concomitant questioning of the jury panel about

22   scheduling, and then the Court having to impose additional

23   scheduling on the jury that was different than what I told them

24   at the beginning, coupled with counsel's concern about how long

25   this case may run vis-a-vis the original schedule that we set

1   forth, so I'm proposing and I'll ask counsel's input and then

2   I'll tell you what I'm going to do after I do that, to excuse

3   this juror because I think it's getting too complicated.

4        I have noticed, I have been watching him very carefully.

5   He seems to be staring out into space.  For the last witness's

6   testimony he was reading from his jury instructions and not

7   looking at the witness.

8        And I want to know what counsel's position is.  I would

9   propose to excuse him.

10       What's the government's position?

11           **MR. AXELROD:**  The government would concur, Your Honor.

12   I think that, you know, what this note reflects is that there's

13   going to be, at a minimum, a Monday scheduling issue.  And

14   given Mr. Gasner's concerns about the trial and the timing and

15   moving this thing along, I think it would be prudent.

16       We'll still have three alternates.  And we move forward.

17   Otherwise, we're going to be revisiting an issue and having

18   scheduling concerns on top of whatever scheduling issues may

19   otherwise arise.

20       So we would concur.

21           **THE COURT:**  Ms. Agnolucci.

22           **MS. AGNOLUCCI:**  I read the note otherwise.  I see that

23   it says here that the chemo would be later in the morning,

24   which I understand to mean later than it was before; i.e., the

25   wife will be able to take care of the day-care responsibilities

1   that otherwise were preventing this juror from being here.

2       If this is going to cause any scheduling changes we

3   certainly defer to Your Honor's decision not to involve the

4   entire jury.  But we read this note as a statement by

5   Mr. Xavier that the chemo schedule has been changed to later,

6   so that there will be no problems with him adhering to the

7   current schedule.

8           **THE COURT:**  All right.  Mr. Froelich, what's your --

9           **MR. FROELICH:**  I read it the same way, Your Honor.

10          **THE COURT:**  As which, as whom?

11      (Laughter)

12          **MR. FROELICH:**  I read it as I thought I remembered him

13  saying that his wife didn't get home in time.

14          **MS. AGNOLUCCI:**  Correct.

15          **MR. FROELICH:**  And that because it was in the morning

16  he had to take -- his wife's sister, I believe, who was having

17  a problem.  So that's the way I interpreted it.

18          **THE COURT:**  Well, I think there are too many variables

19  here because in order to confirm what Ms. Agnolucci just

20  hypothesized we would need to bring him out again, separately,

21  question him again, and depending on his answer determine

22  whether we need to speak to the rest of the jury.

23      So I am -- pursuant to Rule 24(c) of the Federal Rules of

24  Criminal Procedure, I have the discretion to deal with this

25  issue.  And, more particularly, the Ninth Circuit has taught in

1    *United States vs. Alexander*, 48 F.3d 1477, that whether a

2    juror's absence is sufficiently disruptive to warrant removal

3    is a function of the managerial complexity of the case, the

4    flexibility of the Court's and the parties' schedules, and the

5    availability of witnesses and other evidence.

6        The Court goes on to discuss the factors that the District

7    Court should consider when exercising its discretion.  And the

8    Court refers to a previous decision, *United States vs. Gay*, a

9    Ninth Circuit decision, in which the Ninth Circuit says that it

10   held that the complexity of the case, which involved numerous

11   parties, voluminous evidence, and lengthy trial proceedings, as

12   well as various rescheduling conflicts justified the Court's

13   decision to replace the juror.

14       So for that reason, at the end of today I intend to excuse

15   this juror from this case.  We have three alternates available.

16   I think that the pendency of this is too uncertain.  Given the

17   number of moving parts in this case with respect to exhibits,

18   complexities, scheduling, and that we're on a pretty tight

19   schedule, although I said I would not compress anybody's

20   ability to present their case or defense, it's just something

21   that we need not deal with.

22       And I worry about, in light of having to solicit those

23   notes from the juror before, alienating the rest of the jury.

24       I understand Mr. Gasner's, I think, position, or

25   Ms. Agnolucci, well, that the word might get out and everybody

1    else would want out.  I have the ability to control that as

2    well.

3        So my proposal would be -- not my proposal, my ruling is

4    and I have ruled and I will excuse this juror at the end of the

5    day.  I will ask him to remain, and then I will instruct him

6    not to discuss the matter with any other juror, and just to

7    leave with the Court's thanks.

8        So that's on this Court.  And if I'm wrong, the Ninth

9    Circuit can make new law.  They are known to do that.  But

10   that's going to be the ruling of the Court.

11       And I find further support in Rule 24(c) of the Federal

12   Rules of Criminal Procedure.

13       Yes, Mr. --

14       **MR. FROELICH:**  Your Honor, I agree with the procedure.

15   I would just like to make sure we hold him a little bit

16   afterwards, so the jury clears the buildings, so that they

17   don't run into him.

18       **THE COURT:**  Well, I'll leave him for a few minutes.

19   We'll make sure the jury has left.

20       I have another matter right after, but I will hold him,

21   not for too long, but I will -- I think that's a good point.

22       All right.  Let's take our 15-minute break.

23       **MR. AXELROD:**  Thank you, Your Honor.

24       **MS. AGNOLUCCI:**  Thank you, Your Honor.

25                (Recess taken at 11:53 a.m.)

1       (Proceedings resumed at 12:09 p.m.)

2       (Proceedings were heard out of the presence of the jury:)

3       **THE COURT:**  Everybody is here.  Okay.

4       I wanted to -- what I've decided to do is, I think that

5   what Defense counsel said has merit with respect to this juror.

6   So I'm going to bring him out at the very end today, and I'm

7   going to ask Juror Number 7 what he meant by this note.  If he

8   meant what Ms. Agnolucci and Mr. Froelich believe, i.e., that

9   as a result of the change in the schedule for the chemotherapy

10  that he can now sit on a normal schedule, then we'll just keep

11  him unless and until something happens and we have to revisit

12  that.

13      If it's the way I read it, and I guess maybe I'm in the

14  minority here, but that he needs some sort of accommodation,

15  further accommodation, to his schedule on Mondays, then I'm

16  going to go ahead -- and I want to ask the Defense position on

17  that.

18      Let's assume he says, "I need an accommodation every

19  Monday except holidays for the rest of February," what would be

20  your position?

21      **MS. AGNOLUCCI:**  Our position would be that it would be

22  fine to excuse him in the interest of not creating a disruption

23  for the rest of the jury; but only if he said, "You know, I'm

24  certain that I would need it."

25      **THE COURT:**  Right.  And he may need it later on; but

**PROCEEDINGS**

 1   if he, for the foreseeable future, can be on our schedule, then

 2   the other issues that I have observed, I think, don't -- that

 3   is to say, he seemed a little distant, that was just my

 4   observation, and I don't think that -- and I've disclosed it to

 5   the parties and the parties have the same position.

 6       So let's see what he says at the end of the day, and we'll

 7   be guided accordingly.

 8       **MR. GASNER:**  Your Honor, I had one brief matter before

 9   the jury comes back.

10       **THE COURT:**  Yes.

11       **MR. GASNER:**  I read the Government's brief on

12   Mr. Duong's testimony.

13       **THE COURT:**  Which I haven't, by the way.  So you're

14   ahead of me.

15       **MR. GASNER:**  It basically says they want to treat him

16   as a hostile witness.  The thing that caught my eye is an

17   assertion that he's going to assert his Fifth Amendment

18   privilege.  But what I confirmed with Mr. Axelrod is, number

19   one, he's not going to do that in front of the jury; number

20   two, he does have an immunity order.

21       But, number three, Mr. Axelrod was planning to elicit the

22   fact of the immunity order in front of the jury, and I would

23   not cross-examine him on that basis.  He's got a very good

24   lawyer who got him the immunity, insisted upon that; but I

25   think it creates an atmosphere of wrongdoing that I would

1    object to.

2        **THE COURT:** All right. Well, I need to think about it

3    further, and I don't want to keep the jury waiting; but I say

4    off the top of my head, I would think that what Mr. Gasner says

5    has some traction with the Court. It's a different issue about

6    whether or not the Court allows the Government to examine him

7    as a hostile witness.

8        But I think to the extent that the witness -- his

9    Fifth Amendment right is no longer at issue because he's been

10   given immunity, I agree -- and he's not a cooperator or someone

11   who's pled guilty wherein the Government would have a right to

12   go into a plea agreement, et cetera, even if that meant the

13   defendant [sic] saying, "Oh, and I pled guilty to the same

14   crime that these defendants are charged with."

15       So I'll hear more from the Government on this, but my

16   initial reaction is I don't know that that would be relevant.

17       **MR. AXELROD:** Well, I'm happy to think some more about

18   it, Your Honor; but I think that whether it's through my

19   eliciting it or the Court's instructing it, it does seem that

20   the fact of his testimony pursuant to a court order is relevant

21   to evaluating --

22       **THE COURT:** That's a different issue, though. We can

23   certainly bring out that he's here pursuant to a court order

24   and testifying pursuant, but not that he asserted his

25   Fifth Amendment and the Court --

1          **MR. AXELROD:**  I agree.

2          **THE COURT:**  All right.  So, I mean, I assume you don't

3    have any objection.  Because witnesses are subpoenaed all the

4    time and, you know, and it's implicit.  Some of them are

5    subpoenaed, some come voluntarily.

6          **MR. GASNER:**  If the word "immunity" is taken out and

7    it's just "court order," I'm fine with it.

8          **THE COURT:**  All right.  Well, let's get the jury, and

9    we can worry about -- we have plenty to worry about now.  We'll

10   worry about more later.

11        (Proceedings were heard in the presence of the jury:)

12        **THE COURT:**  Please be seated.

13   You may come forward, sir, and resume the witness stand.

14   And you may continue your cross-examination, Ms. Lovett.

15        **MS. LOVETT:**  Thank you, Your Honor.

16   **Q.**   Good afternoon, Mr. Bhatnagar.

17   **A.**   Good afternoon.

18        **MS. LOVETT:**  Your Honor, may I approach with

19   Exhibit 1690?

20        **THE COURT:**  Yes, you may.

21                    (Pause in proceedings.)

22   **BY MS. LOVETT:**

23   **Q.**   Mr. Bhatnagar, do you recognize this document?

24   **A.**   Yes.

25   **Q.**   What is it?

1    A.    This is another pressure vessel calculations for aluminum

2    chloride generator.

3    Q.    This is for the aluminum chloride generator; correct?

4    A.    Yes, ma'am.

5    Q.    And you drafted this document; right?

6    A.    Yes.

7    Q.    You drafted it in the course of your job responsibilities

8    at Performance Group; right?

9    A.    Yes, ma'am.

10          MS. LOVETT:  Your Honor, I move to admit Exhibit 1690

11    into evidence.

12          THE COURT:  Any objection?

13          MR. HEMANN:  No, Your Honor.

14          THE COURT:  Admitted.

15       (Trial Exhibit 1690 received in evidence)

16          MS. LOVETT:  Mr. Guevara, please display it for the

17    jury.

18    Q.    You mentioned that this is a design for the aluminum

19    chloride generator; right?

20    A.    Yes, ma'am.

21    Q.    And it was your understanding that this was a design for

22    the 30K Jinzhou aluminum chloride generator; right?

23    A.    Yes, ma'am.

24    Q.    Thank you.

25          MS. LOVETT:  Your Honor, may I approach with

1    Exhibit 2959?

2                    **THE COURT:**  Yes, you may.

3                              (Pause in proceedings.)

4    BY MS. LOVETT:

5    **Q.**   Mr. Bhatnagar, do you recognize this document?

6    **A.**   Yes, ma'am.

7    **Q.**   Is this another pressure vessel design calculation?

8    **A.**   Yes, ma'am.

9    **Q.**   Which vessel is this for?

10   **A.**   This is a cyclone.

11   **Q.**   The NR cyclone?

12   **A.**   NR cyclone.

13   **Q.**   And you drafted this document; correct?

14   **A.**   Yes, ma'am.

15   **Q.**   You drafted it in the course of your job responsibilities

16   at Performance Group like the others; correct?

17   **A.**   Yes, ma'am.

18              **MS. LOVETT:**  Your Honor, I move to admit Exhibit 2959

19   into evidence.

20              **THE COURT:**  Any objection?

21              **MR. HEMANN:**  No, Your Honor.

22              **THE COURT:**  It's admitted.

23          (Trial Exhibit 2959 received in evidence)

24   BY MS. LOVETT:

25   **Q.**   You mentioned that this is the design for the NR cyclone;

1   right?

2   **A.**   Yes, ma'am.

3   **Q.**   And was it your understanding that this was the NR cyclone

4   designed to be used in the 30K Jinzhou plant?

5   **A.**   Yes, ma'am.

6            **MS. LOVETT:**  Your Honor, may I approach with one more,

7   Exhibit 2960?

8            **THE COURT:**  Yes, you may.

9                         (Pause in proceedings.)

10  **BY MS. LOVETT:**

11  **Q.**   Mr. Bhatnagar, do you recognize this document?

12  **A.**   Yes, ma'am.

13  **Q.**   What is this?

14  **A.**   This is a quench tank.

15  **Q.**   Is this another pressure vessel design calculation?

16  **A.**   Yes.

17  **Q.**   And you drafted this; right?

18  **A.**   Yes, ma'am.

19  **Q.**   And you drafted it in the course of your job

20  responsibilities at Performance Group; correct?

21  **A.**   Yes, ma'am.

22           **MS. LOVETT:**  Your Honor, I move to admit Exhibit 2960

23  into evidence.

24           **MR. HEMANN:**  No objection.

25           **THE COURT:**  It's admitted.

1              (Trial Exhibit 2960 received in evidence)

2    BY MS. LOVETT:

3    Q.   You testified just a moment ago that this is for the

4    quench tank; correct?

5    A.   Yes, ma'am.

6    Q.   And, again, this was for the 30K Jinzhou project; correct?

7    A.   Yes, ma'am.

8              MS. LOVETT:  Apologies, Your Honor.  There's one last

9    one.

10             THE COURT:  All right.

11             MS. LOVETT:  May I approach with Exhibit 2975?

12             THE COURT:  Yes, you may.

13                      (Pause in proceedings.)

14   BY MS. LOVETT:

15   Q.   Mr. Bhatnagar, do you recognize this document?

16   A.   Yes, ma'am.

17   Q.   What is this?

18   A.   This is a head tank.

19   Q.   This is the head tank you said?

20   A.   Yes, ma'am.

21   Q.   And is this another pressure vessel design calculation

22   that you drafted?

23   A.   Yes, ma'am.

24   Q.   And you drafted this in the course of your

25   responsibilities at Performance Group; correct?

1  A.   Yes, ma'am.

2       MS. LOVETT:   Your Honor, I move to admit Exhibit 2975

3  into evidence.

4       MR. HEMANN:   No objection.

5       THE COURT:   It's admitted.

6       (Trial Exhibit 2975 received in evidence)

7  BY MS. LOVETT:

8  Q.   So this image at the top is of the head tank design; is

9  that correct?

10  A.   Yes, ma'am.

11  Q.   And this, again, was designed for the 30K Jinzhou project;

12  right?

13  A.   Yes, ma'am.

14  Q.   So, Mr. Bhatnagar, we've gone through a number of

15  different designs that you did for the 30K Jinzhou plant;

16  correct?

17  A.   Yes, ma'am.

18  Q.   And Mr. Hemann asked you during direct whether you had any

19  titanium dioxide experience; right?

20  A.   Yes.

21  Q.   You answered that you didn't; correct?

22  A.   Yes.

23  Q.   And now that we've looked at this work product, there was

24  much more work product that you created at Performance Group

25  than what we've seen today here; right?

BHATNAGAR - CROSS / LOVETT

1    A.    Yes.

2    Q.    And you didn't feel that you needed titanium dioxide

3    experience to do this mechanical design work; did you?

4    A.    No.

5              MS. LOVETT:  Your Honor, may I approach the witness

6    with Exhibit 3010?

7              THE COURT:  Yes.

8                       (Pause in proceedings.)

9    BY MS. LOVETT:

10   Q.    Mr. Bhatnagar, do you recognize this document?

11   A.    Yes, ma'am.

12   Q.    What is it?

13   A.    This is a microgrinder assembly.

14   Q.    A microgrinder assembly?

15   A.    Yes, ma'am.

16   Q.    And did you draft this document?

17   A.    Yes.

18   Q.    You drafted it in the course of your job responsibilities

19   at Performance Group; correct?

20   A.    Yes, ma'am.

21   Q.    And do you know what project this drawing was done for?

22   A.    This for Jinzhou 30K.

23             MS. LOVETT:  Your Honor, I move to admit Exhibit 3010

24   into evidence.

25             MR. HEMANN:  No objection.

1              **THE COURT:**  Admitted.

2         (Trial Exhibit 3010 received in evidence)

3    **BY MS. LOVETT:**

4    **Q.**   Mr. Bhatnagar, you mentioned that this is the microgrinder

5    assembly.  Is that part of a micronizer?

6    **A.**   Micronizer.

7    **Q.**   And Mr. Liew provided you with patents and public

8    information related to micronizers; correct?

9    **A.**   Yes.

10   **Q.**   And he also provided you with a Sturtevant drawing of a

11   micronizer; right?

12   **A.**   Yes.

13   **Q.**   And you worked from that information to create this

14   package of drawings; right?

15   **A.**   Yes.

16   **Q.**   And it's many pages long with different parts of the

17   micronizer; correct?

18   **A.**   Yes.

19   **Q.**   You learned that the micronizer design here was

20   successfully built at Zhenjiang; correct?

21   **A.**   I don't know about that.

22   **Q.**   Moving to a different topic, Performance Group used a

23   company called Stantec for work on piping; correct?

24   **A.**   Yes.

25   **Q.**   You also worked with a man named Wendell Baker; right?

1    A.    I don't work for him, but he worked for Performance Group.

2    Q.    You did work with him as part of your responsibilities at

3    Performance Group?

4    A.    Yes.

5    Q.    What was Mr. Baker's role at the company?

6    A.    He was doing controls and instrumentation.

7    Q.    Controls and instrumentation?

8    A.    Yes.

9          MS. LOVETT:  Your Honor, may I approach with

10   Exhibit 3075.

11         THE COURT:  Yes, you may.

12              (Pause in proceedings.)

13   BY MS. LOVETT:

14   Q.    Mr. Bhatnagar, do you recognize this document?

15   A.    (Witness examines document.)  Yes, ma'am.

16   Q.    What is it?

17   A.    This is a P&ID diagram.

18   Q.    A P&ID diagram?

19   A.    Yes, piping and instrumentation diagram.

20   Q.    And the first page, is that an email?

21   A.    Yes, ma'am.

22   Q.    And who is that email from?

23   A.    From me.

24   Q.    Who is it addressed to?

25   A.    Wendell.

BHATNAGAR - CROSS / LOVETT

1   Q.   And anyone else?

2   A.   Copy to Walter Liew and Bob Maegerle.

3   Q.   So it's addressed to Wendell Baker, Walter Liew, and Bob

4   Maegerle; correct?

5   A.   Yes, ma'am.

6   Q.   And did you draft this email in the course of your job

7   responsibilities at Performance Group?

8   A.   Yes.

9        MS. LOVETT:  Your Honor, I move to admit Exhibit 3075

10  into evidence.

11       MR. HEMANN:  No objection, Your Honor.

12       THE COURT:  It's admitted.

13     (Trial Exhibit 3075 received in evidence)

14  BY MS. LOVETT:

15  Q.   Looking at the first page, the email --

16  A.   Yes, ma'am.

17  Q.   -- you were sending Mr. Baker, Mr. Liew, and Mr. Maegerle

18  a revised chlorination P&ID; correct?

19  A.   Yes.

20  Q.   Mr. Guevara, could you turn to page 2, please?

21       This is an example of a chlorination P&ID; correct?

22  A.   Yes.

23  Q.   Thank you.

24       MS. LOVETT:  Your Honor, may I approach with

25  Exhibit 1090?

```
 1                THE COURT:  Yes, you may.

 2                         (Pause in proceedings.)

 3   BY MS. LOVETT:

 4   Q.   Mr. Bhatnagar, do you recognize this document?

 5   A.   (Witness examines document.)  Yes.

 6   Q.   What is it?

 7   A.   (Witness examines document.)  These are some equipment we

 8   bought, some instrumentation we bought.

 9   Q.   I'm sorry.  Can you say that again?

10   A.   This is some instrumentation we bought and sent the

11   brochure to Wendell.

12   Q.   It's a vendor brochure?

13   A.   Yes.

14   Q.   And the first page, is that an email?

15   A.   Uh-huh.

16           THE COURT:  Is that a "yes," sir?

17           THE WITNESS:  Yes.

18   BY MS. LOVETT:

19   Q.   Who is that email from?

20   A.   From me.

21   Q.   And who is it addressed to?

22   A.   To Wendell.

23   Q.   Is there anyone else addressed on this email?

24   A.   Copy to Walter and Bob Maegerle.

25   Q.   And what's the date on this email?
```

BHATNAGAR - CROSS / LOVETT

1    **A.**    July 14th, 2008.

2    **Q.**    You drafted this email in the course of your job

3    responsibilities at Performance Group; correct?

4    **A.**    Yes.

5        **MS. LOVETT:**  Your Honor, I move to admit Exhibit 1090

6    into evidence.

7        **THE COURT:**  Any objection?

8        **MR. HEMANN:**  No objection.

9        **THE COURT:**  It's admitted.

10        (Trial Exhibit 1090 received in evidence)

11   **BY MS. LOVETT:**

12   **Q.**    So, Mr. Bhatnagar, looking at that first page, the email,

13   you mentioned that you were sending this to Wendell Baker;

14   correct?

15   **A.**    Yes.

16   **Q.**    And the brochure that you mentioned that's attached, and

17   feel free to look at the other pages if you need to, was

18   related to the Vanadium Analyzer; is that right?

19   **A.**    Yes.

20   **Q.**    Mr. Guevara, can you turn to the second page, please?

21        This page here is an example of a quote that you received

22   from a vendor; is that correct?

23   **A.**    Yes.

24   **Q.**    Thank you.

25        **MS. LOVETT:**  Your Honor, may I approach with

1    Exhibit 1093?

2              THE COURT:  Yes, you may.

3                        (Pause in proceedings.)

4    BY MS. LOVETT:

5    Q.   Mr. Bhatnagar, do you recognize this document?

6    A.   (Witness examines document.)  Yes.

7    Q.   What is it?

8    A.   This is an email from me to Wendell Baker, Walter, and Bob

9    Maegerle.

10   Q.   Wendell Baker, Walter Liew, and Bob Maegerle?

11   A.   Yes, ma'am.

12   Q.   And what's the date on this email?

13   A.   July 18th, 2008.

14   Q.   And did you draft this email in the course of your job

15   responsibilities at Performance Group?

16   A.   Yes.

17            MS. LOVETT:  Your Honor, I move to admit Exhibit 1093

18   into evidence.

19            THE COURT:  Objection?

20            MR. HEMANN:  No objection.

21            THE COURT:  It's admitted.

22        (Trial Exhibit 1093 received in evidence)

23   BY MS. LOVETT:

24   Q.   Mr. Bhatnagar, you mentioned that in this email -- you

25   addressed this email to Wendell Baker, Walter Liew, and Bob

1  Maegerle; correct?

2  **A.**   Yes, ma'am.

3  **Q.**   And you were sending along a revised oxidation P&ID in

4  this email; correct?

5  **A.**   Yes.

6  **Q.**   Mr. Guevara, can you turn to page 2, please?

7       This is an example of an oxidation P&ID created by

8  Performance Group; correct?

9  **A.**   Yes.

10  **Q.**   Thank you.

11          **MS. LOVETT:**  Your Honor, may I approach with

12  Exhibit 3080?

13          **THE COURT:**  All right.

14                  (Pause in proceedings.)

15  **BY MS. LOVETT:**

16  **Q.**   Mr. Bhatnagar, do you recognize this document?

17  **A.**   (Witness examines document.)  Yes.

18  **Q.**   What is it?

19  **A.**   This is an email which I sent to Wendell Baker and Bill

20  Hensiek.

21  **Q.**   Who was Bill Hensiek?

22  **A.**   He was working for Wendell Baker.

23  **Q.**   He worked for Wendell Baker?

24  **A.**   Yes, ma'am.

25  **Q.**   And who is copied on this email?

1    A.    To Walter Liew and Bob Maegerle and Steve Amerine.

2    Q.    And Steve Amerine worked with you; is that correct?

3    A.    Yes.

4    Q.    And what's the date on this email?

5    A.    September 17th, 2008.

6    Q.    And was this email sent in the normal course of your job

7    responsibilities at Performance Group?

8    A.    Yes, ma'am.

9          MS. LOVETT:  Your Honor, I move to admit Exhibit 3080

10   into evidence.

11         THE COURT:  Any objection?

12         MR. HEMANN:  No objection, Your Honor.

13         THE COURT:  It's admitted.

14    (Trial Exhibit 3080 received in evidence)

15   BY MS. LOVETT:

16   Q.    Mr. Bhatnagar, looking at this first page here, this

17   email, you were sending Mr. Baker and a number of other people

18   updated drawings of the oxidation area equipment; is that

19   right?

20   A.    Yes, ma'am.

21   Q.    Mr. Guevara, can you turn to the second page, please?

22         This page is an example of an equipment specification; is

23   that correct?

24   A.    (Witness examines document.)  It's equipment drawing.

25   Q.    An equipment drawing?

BHATNAGAR - CROSS / LOVETT

1   A.   Yes, ma'am.

2   Q.   And do you see in the lower right-hand corner it mentions

3   that it's an equipment specification?

4   A.   (Witness examines document.)  Yes.

5   Q.   And this was one of the equipment specifications for the

6   oxidation step; correct?

7   A.   Yes.

8   Q.   Thank you.

9            MS. LOVETT:  Your Honor, may I approach the witness

10  with Exhibit 3100?  And this is my last one.

11           THE COURT:  Yes, you may.

12                    (Pause in proceedings.)

13  BY MS. LOVETT:

14  Q.   Mr. Bhatnagar, do you recognize this document?

15  A.   (Witness examines document.)  Yes, ma'am.

16  Q.   What is it?

17  A.   This is an email from Steve.

18  Q.   From Steve Amerine?

19  A.   From Steve Amerine.

20  Q.   And who is it addressed to?

21  A.   To Walter Liew, me, and Bob Maegerle.

22  Q.   And what is the date on this email?

23  A.   September 17th, 2008.

24  Q.   And did you receive this email from Steve Amerine as part

25  of the ordinary course of your responsibilities at Performance

1    Group?

2    **A.**   Yes, ma'am.

3           **MS. LOVETT:**  Your Honor, I move to admit Exhibit 3100

4    into evidence.

5           **MR. HEMANN:**  No objection.

6           **THE COURT:**  Admitted.

7        (Trial Exhibit 3100 received in evidence)

8    **BY MS. LOVETT:**

9    **Q.**   Looking at this first email, Mr. Bhatnagar, Mr. Amerine is

10   forwarding you an email from a vendor; correct?

11   **A.**   Yes, ma'am.

12   **Q.**   And this email involved technical information about the

13   rotary drum vacuum filter; is that right?

14   **A.**   Yes.

15   **Q.**   Thank you.

16       When Mr. Hemann was questioning you, you mentioned that

17   many of the numbers you worked with came from Mr. Maegerle;

18   correct?

19   **A.**   Yes.

20   **Q.**   But you weren't sure where Mr. Maegerle got those

21   emails -- those numbers; correct?

22   **A.**   No.

23   **Q.**   You don't know where he learned those numbers; right?

24   **A.**   No.

25   **Q.**   You don't know what sources he was relying on; do you?

BHATNAGAR - CROSS / LOVETT

1    **A.**   No.

2    **Q.**   You also mentioned that sometimes Mr. Maegerle made

3    reference to his employment -- his former employment at DuPont;

4    correct?

5    **A.**   Sometimes, yes.

6    **Q.**   And he would sometimes mention a plant in Korea; isn't

7    that right?

8    **A.**   Yes.

9    **Q.**   But he didn't mention a plant in Taiwan; did he?

10    **A.**   No, not to the best of my knowledge.

11    **Q.**   You also mentioned that sometimes with vendors you heard

12    Mr. Liew mention that he had a mastery of DuPont know-how;

13    correct?

14    **A.**   Yes.

15    **Q.**   But you understood him to be making a sales pitch when he

16    said that; right?

17    **A.**   Yes.

18    **Q.**   You finally mentioned that after you stopped working for

19    Mr. Liew, you came and found that his office was empty; right?

20    **A.**   Yes.

21    **Q.**   And later on you found that he was again working in the

22    same building; correct?

23    **A.**   Yes.

24    **Q.**   He was in a smaller office than before, though; right?

25    **A.**   Yes.

```
 1              MS. LOVETT:  Thank you.  No further questions,

 2   Your Honor.

 3              THE COURT:  Mr. Froelich, do you have any questions?

 4              MR. FROELICH:  No, Your Honor.

 5              THE COURT:  Anything further?

 6              MR. HEMANN:  I do, Your Honor.  It's going to take me

 7   a moment here.

 8              MS. LOVETT:  It will take me a moment, too.

 9              MR. HEMANN:  Okay.  Go slow.

10       And I won't be asking about all of them, Your Honor, so

11   don't fear.

12                        (Pause in proceedings.)

13              THE COURT:  I don't think I've ever seen four binders

14   stacked up like that.

15              MR. HEMANN:  It seems very precarious, Your Honor.

16              MS. LOVETT:  Do you want him to hold on to the

17   exhibits?

18              MR. HEMANN:  Sure.

19              MS. LOVETT:  All right.

20                       REDIRECT EXAMINATION

21   BY MR. HEMANN:

22   Q.   Ms. Lovett just asked you a question about statements

23   Mr. Liew made to vendors about possessing DuPont know-how.  Do

24   you remember that?

25   A.   Yes.
```

1  **Q.**   And she described it as a sales pitch.  Do you remember

2  that?

3  **A.**   Yes.

4  **Q.**   Did you feel when you heard Mr. Liew say what he said to

5  the vendors, that there was anything dishonest about it?

6  **A.**   No.

7  **Q.**   Ms. Lovett showed you a series of equipment

8  specifications.  I'm just going to use one.

9          **THE COURT:**  Is this a photocopy or a copy of an

10  exhibit?

11          **MR. HEMANN:**  This is an exhibit that's in evidence,

12  Your Honor.

13          **THE COURT:**  Is this one of the ones that Ms. Lovett --

14          **MR. HEMANN:**  Yes.

15          **THE COURT:**  Because I prefer using the actual exhibit.

16  Take it from the witness and use the actual one rather than a

17  copy.

18          **MR. HEMANN:**  I think he has it in front of him,

19  Your Honor.

20          **THE COURT:**  But I meant to show to the jury.

21          **MR. HEMANN:**  Oh.  Certainly, Your Honor.  I can take

22  that from him.

23          **THE COURT:**  All right.

24          **MR. HEMANN:**  It might be a little bit easier.

25      May I approach?

```
 1              THE COURT:  Yes.  Sure.
 2              MR. HEMANN:  I can start with -- I think it's the --
 3   the same one.
 4   Q.    This document, do you remember this, Mr. Bhatnagar?
 5   A.    Yes, sir.
 6   Q.    What is it?
 7   A.    This is an SR condenser tank.
 8   Q.    What does an SR condenser tank do?
 9   A.    I don't remember right now.
10   Q.    In the TiO2 process, what function does it perform?
11   A.    It's the condenser -- it's a -- it condenses the fumes
12   which is coming out.
13   Q.    From?
14   A.    From the -- I don't remember actually.  Exactly I can't
15   tell you.
16   Q.    Well, then how did you design it?
17   A.    At that time -- see, it's almost five years now, so I
18   don't remember; but at that time all the information was given
19   to me, and I designed it.
20   Q.    Given to you by whom?
21   A.    Not -- I can't tell you exactly, but must be either from
22   Mr. Liew or Mr. Maegerle.
23   Q.    Ms. Lovett showed you an ASME booklet.  Do you remember
24   that?
25   A.    Yes.
```

BHATNAGAR - REDIRECT / HEMANN

1    Q.    I think we may have had that returned.

2          THE CLERK:  If it's the one that had the clip, they

3    have it.

4                     (Pause in proceedings.)

5          THE COURT:  In the future, if that's an admitted

6    exhibit, it should always be up here, not in counsel's

7    possession, please.  Thank you.

8    BY MR. HEMANN:

9    Q.    Do you remember that Ms. Lovett showed you the ASME

10   process piping document?

11   A.    Yes.

12   Q.    Now, there are many ASME publications regarding different

13   aspects of mechanical engineering; correct?

14   A.    Yes, sir.

15   Q.    And this is just one of them?

16   A.    Yes, sir.

17   Q.    But as an employee of Performance Group, you had access

18   either in hard copy or electronically to all of them; correct?

19   A.    He had Section 8, which is required for the pressure

20   vessels.

21   Q.    Okay.  So he had the portions of it that were pertinent to

22   the job you were doing?

23   A.    Yes.

24   Q.    And is this one of those portions?

25   A.    This is different from the pressure vessel.  This is for

**BHATNAGAR - REDIRECT / HEMANN**

1  the process piping.

2  **Q.**   Did you have a pressure vessel ASME publication at the

3  Performance Group office?

4  **A.**   Yes, part of it was there.

5  **Q.**   And that's public information just like this is; right?

6  **A.**   Yes.

7  **Q.**   Okay.  Based on the pressure vessel document, that's the

8  information that you would use to design something like the

9  document in Exhibit 1683; correct?

10  **A.**   Yes.

11  **Q.**   You wouldn't use the piping.  You would use the pressure

12  vessel; correct?

13  **A.**   Yes.

14  **Q.**   Okay.  Would you have been able or were you able to design

15  this item only using the ASME publication, or did you require

16  information from Mr. Maegerle and Mr. Liew?

17  **A.**   All the criterias I need from them.

18  **Q.**   So you need both criterias and specifications?

19  **A.**   Specifications.

20  **Q.**   Correct.  And the criteria, are they TiO2 specific?

21  **A.**   Yes.

22  **Q.**   And the specifications are general knowledge?

23  **A.**   Yes.

24        **MR. HEMANN:**  I'm looking for Exhibit 3075, please.  It

25  will take me a moment.

BHATNAGAR - REDIRECT / HEMANN

1                        (Pause in proceedings.)

2   BY MR. HEMANN:

3   Q.   Okay.  Do you remember, Mr. Bhatnagar, Ms. Lovett showing

4   you this document?

5   A.   Yes, sir.

6            THE COURT:  Does it have an exhibit number, Counsel?

7            MR. HEMANN:  Thank you, Your Honor.  3075.

8            THE COURT:  Thank you.

9   BY MR. HEMANN:

10  Q.   And this has to do with a P&ID; correct?

11  A.   Yes, sir.

12  Q.   And also this document, which is 3093 [sic], and that has

13  to do with a P&ID; correct?

14  A.   Yes, sir.

15           THE CLERK:  30?

16           MR. HEMANN:  1093.  I apologize.

17  Q.   You were making changes to a P&ID that were directed by

18  somebody else; correct?

19  A.   Yes, sir.

20  Q.   Did you draft the original P&ID for the oxidation phase or

21  for any other part of this?

22  A.   I didn't draft it.

23                       (Pause in proceedings.)

24           MR. HEMANN:  No further questions, Your Honor.  Thank

25  you.

1    **THE COURT:**  Ms. Lovett, anything further?

2    **MS. LOVETT:**  Nothing further.

3    **THE COURT:**  All right.  You're excused, sir.  Thank

4    you very much.

5    **THE WITNESS:**  Thank you.

6                    (Witness excused.)

7    **THE COURT:**  Next witness, please.

8    **MR. AXELROD:**  Thank you, Your Honor.  The

9    United States calls Bert Diemer.

10   **THE COURT:**  All right.  Ladies and gentlemen, if you

11   want to stand while we're waiting for the witness, now would be

12   a good time to stretch.

13   **MR. AXELROD:**  And I have one housekeeping matter,

14   Your Honor.  Last week during the testimony of Mr. Dayton, he

15   created that image on the board.  We took a picture of it.

16   I've provided it to counsel.  I wanted to offer that as

17   Exhibit 4005.

18   **THE COURT:**  All right.  Any objection, Mr. -- I think

19   it was -- I don't know if you were defending that one,

20   Mr. Gasner.  Counsel has offered a picture of what's on the

21   board that says, "Do Not Erase Board," as an exhibit.

22   **MR. GASNER:**  That's fine.

23   **THE COURT:**  All right.  It's admitted.

24        (Trial Exhibit 4005 received in evidence)

25   **MR. AXELROD:**  All right.  And I may then erase and use

1    this board again?

2              THE COURT:  Yes, you may.

3              MR. AXELROD:  All right.  Thank you, Your Honor.  And

4    I'll put this in.

5              THE CLERK:  Raise your right hand, please.

6                    **RUSSELL BERTRUM DIEMER, JUNIOR**,

7    called as a witness for the Government, having been duly sworn,

8    testified as follows:

9              THE WITNESS:  I do.

10             THE CLERK:  Thank you.  Please be seated.

11        And state and spell your full name for the record.

12             THE WITNESS:  Russell Bertrum Diemer, Junior.

13             THE CLERK:  Please spell it.

14             THE WITNESS:  R-U-S-S-E-L-L, B-E-R-T-R-U-M,

15   D-I-E-M-E-R, Junior.

16             THE CLERK:  Thank you.

17             MR. AXELROD:  May I proceed, Your Honor?

18             THE COURT:  Yes, please.

19             MR. AXELROD:  Thank you.

20                    **DIRECT EXAMINATION**

21   BY MR. AXELROD:

22   Q.   Good afternoon, Dr. Diemer.

23   A.   Good afternoon.

24   Q.   Where do you work?

25   A.   I work in Wilmington, Delaware, for the DuPont Company.

**DIEMER - DIRECT / AXELROD**

1  Q.   For the DuPont Company.  What is your current position at

2  DuPont?

3  A.   My title is engineering fellow in our Corporate

4  Engineering Department.

5  Q.   When you say "engineering fellow," could you describe for

6  the jury what that position is?

7  A.   It's a professional position, not a management position,

8  and it is the second-highest level a professional can achieve

9  in a career at DuPont.

10  Q.   Okay.  And when you say "the second-highest level," can

11  you give us some context for kind of relative to the number of

12  engineers in the Engineering Department, how many are fellows?

13  A.   So I'm estimating there might be a thousand engineers in

14  the Engineering Department, and there's somewhere 10 -- between

15  10 and 20 fellows.

16  Q.   Okay.  And can you briefly describe your educational

17  background?

18  A.   I received a Bachelor of Science in chemical engineering

19  from Lehigh University 1973.  I did a Master's in chemical

20  engineering finishing in 1980 from the University of Delaware,

21  and a Ph.D. in chemical engineering finishing in 1999 from the

22  University of Delaware.

23  Q.   When did you join DuPont?

24  A.   I joined DuPont in 1973 just after graduating from Lehigh.

25  Q.   So you've been there for a considerable period of time

**DIEMER - DIRECT / AXELROD**

1   now?

2   **A.**   I celebrated 40 years.

3   **Q.**   Okay.  Could you describe for the jury the work you've

4   done at DuPont relating to the titanium dioxide business?

5   **A.**   In my first assignment, I worked on the design of several

6   of our lines, Edgemoor Line II and DeLisle Line I from the

7   point of view of the fume disposal areas.

8       And then I didn't touch the process for quite a while; but

9   after the Master's degree, I entered into my current position

10  and began working on titanium dioxide projects in the middle

11  '80s.  I worked on oxidation and modeling the oxidation reactor

12  starting at that time, and I've also worked on other projects

13  in oxidation and projects primarily directed toward treatment

14  of ores prior to feeding them to the process.

15  **Q.**   And could you describe -- you said you started working on

16  the oxidation in the mid-'80s; right?

17  **A.**   Yes.

18  **Q.**   What kind of work -- and you were in your current position

19  at that time?

20  **A.**   Not current title, but current functional role, yes.

21  **Q.**   Right.  So could you describe what that function is and

22  what kind of work you would be doing in general terms in that

23  position?

24  **A.**   Our Engineering Department has two different divisions.

25  I'm in the Technology Division and, so, I act as an internal

1  specialist or consultant to all of our businesses, one of which

2  was the titanium dioxide business.

3     My area is reaction engineering, and I would then work on

4  projects for all of our businesses related to chemical

5  reactions and chemical reactors.

6  **Q.**  And when you say "reaction engineering," could you kind of

7  explain what that means in general terms?

8  **A.**  So to engineer a reaction means to be able to conduct that

9  reaction in a way that is practical at a full scale compared to

10  what you might do in a laboratory.  So it means being able to

11  not just have the chemistry occur but to be able to supply the

12  reactants, mix them, remove or supply heat, all the other

13  pieces that have to go into conducting a reaction in

14  large-scale equipment.

15     **MR. AXELROD:**  Your Honor, may I approach with

16  Exhibit 162?

17     **THE COURT:**  Yes.

18     **MR. AXELROD:**  And this is an admitted exhibit.

19  **Q.**  Dr. Diemer, I'm handing you what's been marked as

20  Exhibit 162 and ask, do you recognize that document?

21  **A.**  I do.

22  **Q.**  And what is it?

23     And, Ms. Mahoney, if you could just bring up the first

24  page of that document.  Great.  Thank you.

25     **THE COURT:**  Let's wait until it comes up on the big

1    monitor.

2        There we go.

3    **BY MR. AXELROD:**

4    **Q.**   So, Dr. Diemer, what is this that we're looking at?  What

5    is Exhibit 162?

6    **A.**   This is a report, a formal Accession Report, written in

7    the Engineering Department on the topic of mixing in the

8    titanium tetrachloride oxidation reactor and embedding that

9    into a computer model.

10   **Q.**   Okay.  And what type of report is an Accession Report?

11   **A.**   It's a formal report like an R&D Technical Report, as

12   opposed to a memorandum or some less formal means of

13   communication.  So this goes in a library that then people in

14   the company can search and....

15   **Q.**   And is this a confidential document?

16   **A.**   It is.

17   **Q.**   Okay.  And is that indicated on the cover of the document?

18   **A.**   It is.  At the bottom it says, "This report contains

19   confidential information, and each holder is responsible for

20   its safekeeping," and so on.

21   **Q.**   Okay.  What was your role in this particular report?

22   **A.**   I was supervising the author of this report in doing the

23   work, and I reviewed the report prior to its issue and approved

24   it.

25   **Q.**   And the report itself, could you -- what does it relate to

**DIEMER - DIRECT / AXELROD**

1  exactly in the oxidation -- in the process?

2  **A.**   It relates to mixing oxygen and titanium tetrachloride

3  together in the reactor, in the oxidation reactor, and in

4  particular how long it takes -- over what distance the mixing

5  occurs.

6  **Q.**   Okay.  And does -- can you kind of -- can you describe in

7  general terms the contents of this document, this report?

8  **A.**   Contained in the report are an equation that describes the

9  mixing length and how it depends upon process conditions and

10  equipment dimensions.

11      There are tables of data that give design and operating

12  conditions for, I think, five of our commercial lines.  There

13  are -- there's some routines, some code that we change to put

14  this equation for mixing into a preexisting computer model so

15  that we could better describe the mixing and explore how -- how

16  mixing impacted the performance of the reactor.

17      And there's at least another table that's even more

18  detailed on the design and conditions for one of our lines.

19  **Q.**   So does the report contain historical information about

20  DuPont's efforts to model the reaction in oxidation?

21  **A.**   Yes.

22  **Q.**   And it contains DuPont know-how in that regard?

23  **A.**   Yes.

24  **Q.**   And you mentioned that there's a mathematical equation

25  that relates to this process.

**DIEMER - DIRECT / AXELROD**

1  **A.**   Yes.

2  **Q.**   Is that an equation that, in fact, you created?

3  **A.**   Yes.

4  **Q.**   Okay.  And for shorthand, what's that called?

5  **A.**   It has come to be called the Diemer Mixing Correlation.

6  **Q.**   Okay.  So when we talk about it, I may refer to it as the

7  Diemer Correlation.

8  **A.**   Yes.

9  **Q.**   Could you describe in general terms what that is?

10 **A.**   So it's an equation that takes information on how much

11 material the material flows into the reactor and its dimensions

12 and says over what distance from the point that the reactants

13 are contacted with each other do they mix -- till they're fully

14 mixed.

15 **Q.**   And would it assist in explaining this to the jury to

16 actually diagram out a little bit of this oxidation process?

17 **A.**   I think it would.

18       **MR. AXELROD:**  Okay.  Your Honor, with the Court's

19 permission, may I ask Dr. Diemer to step down and do that?

20       **THE COURT:**  Sure.

21       **MR. AXELROD:**  Thank you.

22                 (Pause in proceedings.)

23       **THE COURT:**  Could you use a black or dark pen?

24 Because the red, I couldn't see it.

25       **MR. AXELROD:**  Very well, Your Honor.

**DIEMER - DIRECT / AXELROD**

1           **THE COURT:**  Thank you.

2           **THE WITNESS:**  Use black?

3           **MR. AXELROD:**  Yes, use black, please.

4           **THE COURT:**  And if counsel wants to reposition

5    themselves, you may do so, of course, to be able to see because

6    there's no perfect space in this courtroom for that kind of a

7    demonstration.

8    **BY MR. AXELROD:**

9    **Q.**   So, Dr. Diemer, if you could begin by sort of orienting

10   us, we're talking about -- what part of the process we're

11   talking about, and then perhaps you could sketch that out.

12   **A.**   So we're talking about the part of the process where we

13   take the purified titanium tetrachloride that has been produced

14   in the front part of the process and mix it with oxygen and

15   react it to make the titanium dioxide product that we intend to

16   sell.

17          And --

18   **Q.**   Where does that occur?  Does that occur in a particular

19   vessel?

20   **A.**   It occurs in the reactor.

21   **Q.**   Okay.  Is that called an oxidation reactor?

22   **A.**   Yes, it is.

23   **Q.**   Okay.

24   **A.**   So the oxygen is first preheated.  And this is -- this is

25   part of the vessel (indicating).  So the oxygen is coming here

**DIEMER - DIRECT / AXELROD**

1    (indicating).  I don't know if you can see that.

2         And the titanium tetrachloride is vaporized and comes into

3    what is called the slot.  So there's a little gap here

4    (indicating).  And picture a slot going all the way around a

5    round pipe, and the titanium tetrachloride comes in all around

6    the circumference of the pipe.

7         So this is the titanium tetrachloride.  And, so, the

8    reactor really begins here (indicating).  Now we've got the two

9    reactants in contact.

10   **Q.**   The two reactants being the oxygen and the --

11   **A.**   The oxygen and the titanium tetrachloride.

12   **Q.**   And that's often referred to as TiCl?

13   **A.**   It is.

14   **Q.**   Okay.

15   **A.**   So two of the things you need for the correlation are the

16   mass flow of oxygen and the mass flow of TiCl.

17        Then you need this dimension (indicating), which is a

18   diameter we call the run diameter.  It's running up to the

19   slot.  We need this width (indicating), the slot width; and you

20   need this diameter (indicating), which we call the diameter

21   after the slot or D slot.  And these inputs plus some physical

22   properties allow you to calculate how far down this pipe it

23   takes to mix the reactants.

24        So what happens here is that the titanium tetrachloride

25   comes in, but it is pushed to the wall by this flow

 1   (indicating).  Okay?  And, so, you've got titanium

 2   tetrachloride that tends to be pushed to the wall, and it has

 3   to mix from there into the oxygen, and the oxygen has to mix

 4   from the center out to the wall.

 5       As long as they're in distinct zones in the center and on

 6   the wall, they can't react with each other.  They've got to mix

 7   together to react.

 8       And, so, at some point what we calculate as correlation is

 9   this length (indicating), the mixing length; and that's what

10   this correlation is about.

11   Q.  And when you say you calculate the mixing length, what

12   does that mean?  What happens at the end, whatever you

13   calculate to be the end of that length, what has occurred?

14   A.  So the mixing process has to occur before the chemical

15   process can occur.  So mixing is a physical process, and then

16   what follows is a chemical process.

17       So in this case the chemical process is considerably

18   faster than the mixing process; and, so, as soon as these

19   things mix, the mixed part reacts.  And by the time you finish

20   mixing, you essentially have complete or near complete

21   reaction.

22       So when you get to here (indicating), you have made most

23   of the titanium dioxide particles or converted the titanium

24   tetrachloride into titanium dioxide particles.

25       The particles are changed by things that happen after

DIEMER - DIRECT / AXELROD

 1  that, but there is not much chemistry happening after this.

 2  This is where the chemistry's happening, and it's controlled by

 3  how fast they mix.

 4  Q.   Now, in your correlation you identified some specific

 5  diameters, the diameter of the run, the pipe before the slot;

 6  right?

 7  A.   Right.

 8  Q.   Then the width of the slot?

 9  A.   Right.

10  Q.   And then the diameter of the pipe afterwards, the slot

11  diameter?

12  A.   Yes.

13  Q.   Where this mixing occurs; right?

14  A.   That is correct.

15  Q.   Are all of those variables factored into the correlation?

16  A.   Yes, they are.

17  Q.   And from sort of a practical standpoint, a manufacturing

18  standpoint, what's the significance in the process of when this

19  mixing occurs?

20  A.   I should add one other thing that I left out, if I may.

21  Q.   Please.

22  A.   We also -- so you're making particles in here, solvents.

23  They want to end up on these walls and plug things up; and, so,

24  to keep that from happening, we also add chlorine here

25  (indicating), which we call the purge flow, and all around the

DIEMER - DIRECT / AXELROD

1    pipe.  And, so, that sort of provides a curtain at the wall to

2    keep plugging from happening.

3        And that, too, is in the correlation, the amount of purge

4    relative to the amount of these flows.  So that's another piece

5    that goes into the correlation.  And, so, the concern is that

6    you would plug this up as you make the particles, and we

7    prevent that with the purge.

8        But what happens here, then, when we can be pretty sure

9    that we have complete reaction, is then we add much coarser

10   solids, salt particles or other kinds of particles, that sort

11   of act like sandblasting as they go down the rest of this.

12   There's a considerable amount of pipe after this where we take

13   all the heat out.  And, so, we effectively sandblast the walls

14   of that with what we add here.

15       But you can't add that until you finish the reaction.  So

16   you want to know when that's finished so you can add those.

17   They're solids, which are a much more effective way of keeping

18   this clean than to try to put chlorine in all along the wall of

19   this for a considerable distance.

20       In some of our plants we also add at this point a large

21   quantity of chlorine, not along the wall like this but through

22   a nozzle; and the idea there is to cool the reaction mass, now

23   that the reaction is complete, to help control particle size.

24   So we add some things here (indicating), and that's why we want

25   to know when we're finished.

**DIEMER - DIRECT / AXELROD**

1   **Q.**   And, so, you mentioned adding the solids; right?

2   **A.**   Yes.

3   **Q.**   So is knowing where the reaction -- the mixing is complete

4   important for knowing where to start to add the solids?

5   **A.**   Yes, it is.

6   **Q.**   And then also for this additional chlorine that you

7   mentioned?

8   **A.**   Yes.

9   **Q.**   Okay.

10   **A.**   Which is called quench flow.

11   **Q.**   It's called a quench flow?

12   **A.**   Yes.

13   **Q.**   This pipe that you've diagrammed, where does it go from

14   the oxidation reactor?  Does it go --

15   **A.**   It goes into something called the flue --

16   **Q.**   Okay.

17   **A.**   -- which is a long section that's in a water bath to take

18   heat out through the walls.

19   **Q.**   And I think that that's a helpful diagram.  We may come

20   back and refer to it; but if you want to come back up to the

21   stand, I can continue to ask you some questions about this.

22   Thank you.

23   **A.**   (Witness returns to the witness stand.)

24   **Q.**   To your knowledge has the correlation that you developed

25   been used to size equipment?

**DIEMER - DIRECT / AXELROD**

1  **A.**  Not to my knowledge.  I'm not aware of such a case.

2  **Q.**  And that wasn't, perhaps, the right question.  Has it been

3  used to determine where to place the various quenches?

4  **A.**  It has been used to take an existing process where we're

5  having issues related to the mismatch between mixing length and

6  the position of those quenches and alter the slot dimensions in

7  order to bring the mixing length back in front of the addition

8  of scrubs and quench --

9  **Q.**  Now --

10  **A.**  -- which is an equivalent kind of application to a design

11  application, but this is troubleshooting an existing operation.

12  **Q.**  I want to ask you about the process by which you actually

13  developed this particular correlation.

14  **A.**  Yes.

15  **Q.**  And my question is:  In developing the correlation, did

16  you use actual operating data from existing DuPont plants?

17  **A.**  Yes.

18  **Q.**  How did you use that information?

19  **A.**  I took information or the DuPont Company took information,

20  I was not personally involved in the simulations I'm about to

21  describe, but the DuPont Company took this information and used

22  it to perform computational fluid dynamic simulations of this

23  reactor, which are much higher level of computer computation

24  than what we do in this model that's in the report.

25      And with those calculations, you could actually see the

**DIEMER - DIRECT / AXELROD**

1   interaction between mixing and reaction, and understand what

2   the mixing lengths were in each of five different commercial

3   reactors.

4       So the information we took, the DuPont information, were

5   dimensions and operating conditions, put them into a

6   simulation, obtained mixing lengths from the simulation.

7   **Q.**   Why did you use actual operating data?

8   **A.**   Because we were interested in simulating and learning

9   about the plants we were running.

10  **Q.**   And what I'd -- does the report, the exhibit that you have

11  in front of you, Exhibit 162, does it contain actual plant

12  operating data?

13  **A.**   Yes.

14  **Q.**   Okay.  And what I'd like to do is, Ms. Mahoney, if you

15  could pull up page 162-36, 0036.  And if you could highlight

16  that.  Great.

17      And, Dr. Diemer, can you explain to the jury what it is

18  that we're looking at?  This is a table in the report?

19  **A.**   It is.

20  **Q.**   And what's this data?

21  **A.**   So this is data for five of our plants, which gives the

22  dimensions required to use this correlation the run diameter,

23  the slot diameter, the slot width.  Those are the top three

24  lines below the heading line.

25      Then there's the operating condition data in terms of the

**DIEMER - DIRECT / AXELROD**

1  rate of titanium production, the excess oxygen, the other feeds

2  that come in with these two streams, the amount of purge that I

3  described in drawing the diagram, and temperatures and

4  pressures.  So there are operating conditions and there are

5  dimensions.

6  **Q.**  And let me make sure that I understand this.  On the top

7  row there it says "Plant"; right?

8  **A.**  Yes.

9  **Q.**  And then it identifies five different plants, right --

10  **A.**  Yes.

11  **Q.**  -- by initials?

12      Could you identify what those initials refer to?

13  **A.**  DL-I is DeLisle Line I in Mississippi; JV-II is New

14  Johnsonville Line II in Tennessee; Edgemoor-II is -- EM-II is

15  Edgemoor Line II in Wilmington, Delaware; JV-I is New

16  Johnsonville Line I, also in Tennessee; and Antioch is the

17  plant we had in Antioch, California.

18  **Q.**  Okay.  So if you look at -- then if you go down each

19  column underneath each one of those plants, there's a series of

20  pieces of information that you just identified?

21  **A.**  Yes.

22  **Q.**  And the first three where it's got the diameter of the

23  run, the diameter of the slot, the width of the slot, that's

24  the geometry that you just drew up on the board; right?

25  **A.**  That is correct.

**DIEMER - DIRECT / AXELROD**

1  **Q.**   Okay.  And that is actual specific geometry from the

2  oxidation reactors at each of those identified DuPont plants?

3  **A.**   Yes, it is.

4  **Q.**   Is that information publicly available?

5  **A.**   No.

6  **Q.**   Why not?

7  **A.**   Because if we made this information available, people

8  could duplicate it.

9  **Q.**   Then beneath it it says -- there's a line "Rate," and it

10 says T -- it's got T TiO2 per hour.  Do you see that?

11 **A.**   Yes, I do.

12 **Q.**   What is that?

13 **A.**   Tons of titanium dioxide per hour.

14 **Q.**   Okay.  And I'm not going to ask you to identify the

15 specific numbers in there, but is then what's identified there,

16 basically, the line rate per hour of TiO2 manufactured at the

17 various plants?

18 **A.**   Yes, it is.

19 **Q.**   And those are actual operating data?

20 **A.**   Yes.

21 **Q.**   And then underneath it there is some other information,

22 and could you just generally describe what we see underneath

23 that rate?

24 **A.**   Well, the other information that, for example, the lines

25 "Excess Oxygen," "Other Feeds," and "Purge," describe all the

**DIEMER - DIRECT / AXELROD**

1   streams that are coming into this reactor.

2       If you know the rate of TiO2 you're producing, you know

3   how much -- you can turn that into how much titanium

4   tetrachloride you're feeding, and you always feed a little more

5   oxygen than you need to convert that to titanium dioxide.  So

6   by knowing how much titanium tetrachloride and this excess, you

7   can work out how much oxygen you're using.

8       So those two lines give you enough to know what these mass

9   flows are that are required to use the correlation.  And the

10  purge flow tells you how -- that's the actual quantity that's

11  used in the correlation of this ratio on a molar basis of a

12  purge through all the other feeds.

13      With the titanium tetrachloride, there are some other

14  chemical species that come with it, and that's what this "Other

15  Feeds" represents.

16  **Q.**   From the perspective of somebody designing a TiO2 plant

17  with limited experience, would the information contained in

18  this chart be helpful to designing an effective oxidation

19  reactor?

20          **MR. GASNER:**  Objection.  Lack of foundation.

21          **THE COURT:**  Overruled.

22          **THE WITNESS:**  I believe it would.

23  **BY MR. AXELROD:**

24  **Q.**   It would.  Why?

25  **A.**   Because this is actual operating data; and if you know

1   that this represents something that is in existence and

2   operating and functioning, you would be well on your way to be

3   able to duplicate that particular aspect of a plant and have

4   some confidence that it would run as you hope.

5   **Q.**   And how would you use this information?

6   **A.**   Well, there's a line here that says what the rates are

7   associated with each of these plants.  And, so, if you had a

8   target rate in mind, you could look at this table and say, "Oh,

9   let's take the first column.  I'd like to run at that rate, or

10  something close to that.  Here's a reactor geometry that works

11  for that.  So why don't I specify that for my reactor."

12  **Q.**   And I gather from looking at that rate, you could multiply

13  out and figure out, well, this would be, you know, X number of

14  tons per year?

15  **A.**   Indeed.

16  **Q.**   Okay.  Does the report contain additional operating data

17  from DuPont facilities?

18  **A.**   It does.

19  **Q.**   And if we could go to page 38.

20       Thank you, Ms. Mahoney.  And if you could blow that up.

21       And the top part got cut off there, but what's the title?

22  **A.**   It says "Mixing Lengths and Other Calculated Results."  So

23  this is a table of calculated results and physical properties.

24  The top two lines are the mixing length in feet that you would

25  calculate from the information in the previous table.  And then

**DIEMER - DIRECT / AXELROD**

1   there is a line that translates for the top set for those

2   mixing lengths and the conditions of Table RBD-1 what the

3   residence time in this mixing length or mixing zone would be.

4   **Q.**   Okay.  So that first line, that first row that's got the

5   Z, right, that's the length -- the actual physical distance for

6   the mixing length?

7   **A.**   Yes.

8   **Q.**   And that relates -- it's the same five plants; right?

9   **A.**   It is.

10  **Q.**   Okay.  So that tells you, you know, to pick the first one

11  for that particular DeLisle oxidation reactor, that tells you

12  that it's going to go this distance to complete mixing?

13  **A.**   Yes.

14  **Q.**   And then underneath it there is the letter T, and then it

15  says "ms"?

16  **A.**   Milliseconds.

17  **Q.**   Milliseconds, okay.  And that's the residence time?

18  **A.**   Yes.

19  **Q.**   So is that the time it takes for that mixing to occur?

20  **A.**   Yeah.  It's the time that it takes for the material

21  flowing through this zone of length Z, as it says in the table,

22  to transit that zone.

23  **Q.**   Okay.  Is the information in this particular table

24  publicly available?

25  **A.**   No.

DIEMER - DIRECT / AXELROD

1   Q.   Why not?

2   A.   Again, if you couple the mixing length with the dimensions

3   on the previous table, that then completes the picture of what

4   this mixing correlation provides for design or adjusting

5   existing operations.

6   Q.   Okay.  So would this information also be useful to someone

7   who's designing an oxidation reactor?

8   A.   Yes.

9   Q.   For the same reasons?

10  A.   Yes.

11  Q.   Does the report contain other additional -- additional

12  specific pieces of operating data?

13  A.   It does.

14  Q.   And if we could go to page 9, and if you could blow up,

15  Ms. Mahoney, that table.

16       Okay.  Dr. Diemer, can you explain for the jury what we're

17  looking at in this table on page 9?

18  A.   So what's in this table is a complete description other

19  than the slot run -- slot and run diameters and slot widths,

20  but it does give the slot diameter.  It doesn't give the run

21  diameter and the slot width because they were varied in a

22  study.  Actually we used this as a base case for a computer

23  study.  But it gives a configuration for what happens after

24  this reactor, the flue.  It tells how many feet of pipe that

25  has an outside diameter of about .9 feet --

**DIEMER - DIRECT / AXELROD**

1  **Q.**  Let's not mention the specific --

2  **A.**  Okay.

3  **Q.**  -- figures --

4  **A.**  Sure.

5  **Q.**  -- but just sort of describe in general terms.

6  **A.**  Right.  It gives a diameter and a distance, and then it

7  shows a change in diameter over a given transition zone; and

8  then, you know, another section that completes the -- the flue

9  and, you know, what the dimensions of that are.

10      It gives an expanded view of what this titanium

11  tetrachloride input stream is in terms of actual compositions.

12  These are some of the other things that got lumped together in

13  that line in Table 1 that we looked at, and it gives the oxygen

14  flows.

15      It gives then some specifics on how the purge is

16  introduced and at what position, several different places.

17      It gives a quench flow, and it gives a flow of the scrub

18  solids I talked about, and so on.

19      So this is a more in-depth description of Edgemoor Line

20  II.

21  **Q.**  Okay.  So this is based on the actual operations of

22  Edgemoor Line II?

23  **A.**  Yes.

24  **Q.**  And the information that you started out talking about,

25  about how it identifies lengths of pipe and a transition point

**PROCEEDINGS**

1    where there's changes in some of that, of the diameters of the

2    pipe, that's all indicated in this document?

3    **A.**    It is.

4    **Q.**    Is that information publicly available?

5    **A.**    For this exact configuration, I don't believe so.

6    **Q.**    Okay.  And why not?

7    **A.**    Again, for the reasons that this is an existing plant.  If

8    you want to design and build something that you have confidence

9    will work, you can copy this.

10   **Q.**    So this information would also be useful to someone who is

11   designing the oxidation process for a TiO2 plant?

12   **A.**    Yes.

13   **Q.**    And we looked -- I want to show you --

14        **THE COURT:**  Well, before we do that, I think this is a

15   good time to break.

16        **MR. AXELROD:**  Absolutely, Your Honor.

17        **THE COURT:**  All right.  Dr. Diemer, you may step down.

18   We're going to adjourn for today.

19        So, ladies and gentlemen -- you may step down.  You're

20   excused for the day -- I'm going to give you your usual final

21   instruction, which I'm required by law to give, and then I'll

22   remind you about schedule and the like.

23        So I will now remind you of your conduct -- lock the door.

24        **MR. HEMANN:**  I'll take care of it, Your Honor.

25        **THE COURT:**  All right.  The instruction is so

**PROCEEDINGS**

1    important that it's rude and disrespectful for people to be

2    entering and leaving the courtroom when the Court is speaking

3    such important words to you.

4         So I'm now going to remind you about your conduct as

5    jurors.  First, keep an open mind throughout the trial, and do

6    not decide what the verdict should be until you and your fellow

7    jurors have completed your deliberations at the end of the

8    case.

9         Second, because you must decide this case solely based on

10   the evidence received in the case and on my instructions as to

11   the law that applies, you must not be exposed to any other

12   information about the case or to the issues it involves during

13   the course of your jury duty.

14        Thus, until the end of the case, or unless I tell you

15   otherwise, do not communicate with anyone in any way and do not

16   let anyone else communicate with you in any way about the

17   merits of the case or anything to do with it.  This includes

18   discussing the case in person, in writing, by phone,

19   Smartphone, or electronic means, by email, text messaging, or

20   in or on any Internet chat room, blog, website, including such

21   social networking media like Facebook, MySpace, LinkedIn,

22   YouTube, and Twitter, or other feature.

23        This applies to communicating with your fellow jurors

24   until I give you the case for deliberation; and it applies to

25   communicating with everyone else, including your family

1    members, your employer, the media or press, and the people

2    involved in the trial, although you may notify your family and

3    your employer that you have been seated as a juror in this

4    case.

5         But if you are asked or approached in any way about your

6    jury service or anything about this case, you must respond that

7    you've been ordered not to discuss the matter and to report the

8    contact to the Court.

9         Because you will receive all the evidence and legal

10   instruction you properly may consider to return a verdict, do

11   not read, watch, or listen to any news or media accounts or

12   commentary about the case or anything to do with it.

13        Do not do any research, such as consulting dictionaries,

14   searching the Internet, or using other reference materials; and

15   do not make any investigation or in any other way try to learn

16   about this case on your own.

17        The law requires these restrictions to ensure the parties

18   have a fair trial based on the same evidence that each party

19   has had an opportunity to address.  A juror who violates these

20   restrictions jeopardizes the fairness of these proceedings, and

21   a mistrial could result that would require the entire trial

22   process to start over.

23        If any juror is exposed to any outside information, please

24   notify the Court immediately.

25        So tomorrow we are sitting from 8:00 to 2:00.  We'll have

1    our properly-spaced breaks and stretch breaks.  Remember, we

2    are not sitting Thursday and Friday.  We will resume next

3    Monday on what is anticipated to be our regular schedule; and

4    we'll just keep going, and we're moving along at the

5    appropriate pace.  So have a good evening, and I will see you

6    tomorrow.

7         Juror Number 7, would you mind remaining for a moment,

8    please?

9         (Proceedings were heard out of the presence of the jury:)

10        **THE COURT:**  You can be seated.

11   Good afternoon.

12        **JUROR NO. 7:**  Yes, Your Honor.

13        **THE COURT:**  So we received your note, and we wanted to

14   check in with you and see kind of what's going on with you and

15   how that might impact your service.

16        So you mentioned in your note that -- you say:  (reading)

17             "My wife's sister-in-law's chemo schedule has been

18        tentatively set on Mondays, except holidays, later in the

19        morning, till end of February."

20        So could you explain a little bit more what you mean by

21   that?

22        **JUROR NO. 7:**  So I talked to my wife last night, and

23   her schedule is receiving the chemotherapy like 9:00 o'clock,

24   10:00 o'clock so she can be in the hospital with her later of

25   the morning so she can bring the baby to the daycare, and I

1  could be here on time.

2       **THE COURT:**  Okay.  So, I'm sorry to interrupt, but are

3  you saying essentially that you could be here to start at

4  8:00 o'clock every morning?

5       **JUROR NO. 7:**  Yes, Your Honor.

6       **THE COURT:**  And your letter said that's from -- your

7  memo -- sorry, your note said is that:  (reading)

8          "Unless something else comes up, I think my jury duty

9       will be back to normal."

10     So are you saying that it's back to normal now, and that

11  for the foreseeable future, you'll be able to be here starting

12  at 8:00 o'clock every morning Monday through Thursday except

13  the days that we take off?

14      **JUROR NO. 7:**  Yes, or maybe something really comes up

15  we don't -- that we don't know.

16      **THE COURT:**  Of course.  That's true of anybody.  But,

17  so, for the foreseeable future, we can go back to our regular

18  schedule of essentially 8:00 to 1:30, and you'll be able to be

19  here starting at 8:00 o'clock?

20      **JUROR NO. 7:**  Yes, Your Honor.

21      **THE COURT:**  Okay.  And if something changes, of

22  course, as you've very properly done, you just let us know with

23  a note, and we'll see what we need to do.

24     But everybody appreciates your candor and keeping us

25  up-to-date; and as things change, if they do, just let us know

**PROCEEDINGS**

 1 | and we'll certainly act accordingly, you know, and make sure,

 2 | you know, that you're okay with whatever you do.

 3 |     So bottom line is, you're okay to continue with this case

 4 | as a juror on our agreed-upon schedule; correct?

 5 |     **JUROR NO. 7:**  Yes, Your Honor.

 6 |     **THE COURT:**  Great.  Well, you're excused and, by the

 7 | way, very importantly, do not discuss, I would say now, as

 8 | before, do not discuss anything we discussed or anything else

 9 | about this case with the jury per my instruction that I give

10 | you, you know, every night; and you should probably refrain --

11 | not probably, you should refrain and you will refrain from

12 | discussing this matter at all with your family or anybody else

13 | just like I said, unless it relates to your ability to be here

14 | on time.  Do you understand that?

15 |     **JUROR NO. 7:**  Yes, Your Honor.

16 |     **THE COURT:**  And that's doable for you?

17 |     **JUROR NO. 7:**  Yes.

18 |     **THE COURT:**  Great.  Thank you so much and have a

19 | wonderful evening.

20 |     **JUROR NO. 7:**  Thank you.

21 |     (Juror Number 7 exiting courtroom.)

22 |     **THE COURT:**  The juror has left.

23 |     So I don't hate to say that Ms. Agnolucci was right and

24 | Mr. Froelich was right, but I appreciate that; and it kind of

25 | prevented the Court from, perhaps, making a rash judgment based

**PROCEEDINGS**

 1  upon not having accurate facts.

 2      So we'll just go along with this juror, and we'll keep him

 3  on; and if things change, we'll react as appropriately.  And I

 4  appreciate counsel's giving me their interpretation of the

 5  note.

 6      Let me just ask to get a sense of where we're going

 7  vis-a-vis, well, a couple things.

 8      Number one, I can't keep this very long because I've got a

 9  bunch of patent lawyers waiting and we can't keep them waiting,

10  is, number one, what do you anticipate happening, from the

11  Government's perspective, tomorrow, because it's our last day

12  of the week, in terms of witnesses?

13          **MR. HEMANN:**  We have a full day of witnesses.  One of

14  the witnesses that we'll hear from is the Rule 15 deposition,

15  which is about an hour and 51 minutes.

16          **THE COURT:**  Okay.

17          **MR. HEMANN:**  The parties have stipulated to or agreed

18  to the transcript and the video, and I think we're just ready

19  to go ahead and play it with Your Honor's permission.  I think

20  we'll probably do that immediately upon the conclusion of

21  Mr. Diemer's testimony.  Then we will have Mr. Duong.

22          **THE COURT:**  Will Mr. Duong be after the video?

23          **MR. HEMANN:**  Correct, Your Honor.

24          **THE COURT:**  Okay.  So I'm guessing that as between

25  Dr. Diemer and Duong, we're going to be taking up substantial

PROCEEDINGS

1   part of the day.

2         **MR. HEMANN:**  I believe so.  It is -- and then we've

3   got a DuPont security officer, Mr. Jubb, to follow --

4         **THE COURT:**  All right.  So it --

5         **MR. HEMANN:**  -- if necessary.

6         **THE COURT:**  I'm sorry.  So it sounds like Mr. Liu,

7   L-I-U, will not be called tomorrow; correct?

8         **MR. HEMANN:**  Correct.

9         **THE COURT:**  All right.  So what I would urge, in light

10  of what Ms. Agnolucci said earlier about that, is perhaps the

11  Defense team can talk to Ms. McNamara and the other lawyer

12  involved, Mr. Bernstein, to maybe work out some kind of an

13  arrangement.

14        Because the way I see it, the Government doesn't have a

15  dog in this race as far as privilege.  It's Mr. Liu's

16  privilege.  So it may well be that you can fashion some sort of

17  an operating protocol that would at least take us to the point

18  where the Court has to decide whether you can actually use the

19  documents when you get to that point.

20        But I'm hoping that -- certainly we know the direct will

21  not be an issue.  Presumably some of the cross-examination will

22  not be an issue implicating these allegedly privileged

23  documents.  So I'm hoping that you all -- you should file your

24  brief, Ms. Agnolucci, or whoever is filing it for your side;

25  but I would think you should -- Ms. McNamara, as we all know,

**PROCEEDINGS**

1    is eminently reasonable, and I'm sure we can find -- we might

2    be able to find some sort of ground that accommodates

3    everybody's interests.  And if not, you know, then I'll rule

4    and we'll go forward with the record that we have.  Okay?

5            **MS. AGNOLUCCI:**  Yes, Your Honor.

6        And may we address a couple of logistical issues about

7    filing the brief?

8            **THE COURT:**  Yes.  Quickly.

9            **MS. AGNOLUCCI:**  The first thing I wanted to do was

10   lodge these exhibits as we discussed earlier.

11           **THE COURT:**  Please do.

12           **MS. AGNOLUCCI:**  So would you like me to hand them to

13   Ms. Ottolini?

14           **THE COURT:**  Yes.  Why don't you identify the numbers

15   that you're giving her, the premarked numbers.

16           **MS. AGNOLUCCI:**  I will.

17       And there's one exhibit that we did not produce to the

18   Government because we've since learned that they believe that

19   the production to us of that exhibit was inadvertent, so the

20   Government has not seen it.

21           **THE COURT:**  Okay.

22           **MS. AGNOLUCCI:**  How does Your Honor want us to proceed

23   with respect to that one?

24           **THE COURT:**  Why don't you lodge that as well and tell

25   the Government what the number is of it so they can retrieve

**PROCEEDINGS**

1   it; and when we discuss them all, we'll discuss that one as

2   well.

3        **MR. HEMANN:**  I'm sorry.  There's one more that's not

4   been provided?

5        **MS. AGNOLUCCI:**  One more email that we didn't provide

6   after we learned that the production to us was inadvertent.

7   We, in an abundance of caution, didn't provide it.  We have it

8   here.  We're happy to do as the Court --

9        **THE COURT:**  You'll preserve whatever objections you

10  have to it, but I just want to look at it.

11       **MR. HEMANN:**  Certainly, Your Honor.  Oh, yeah.  We

12  don't need to see it.

13       **THE COURT:**  All right.

14       **MS. AGNOLUCCI:**  So the exhibits that I'm now lodging

15  with Ms. Ottolini are Exhibit 3397, Exhibit 3404, Exhibit 3493,

16  Exhibit 3494, Exhibit 3495, Exhibit 3496.

17      There's one more.  If I may have just one moment,

18  Your Honor.  I don't know where it went.

19                     (Pause in proceedings.)

20       **MS. AGNOLUCCI:**  And Exhibit 3498.

21       **THE COURT:**  Okay.

22       **MS. AGNOLUCCI:**  So that's a total of seven documents.

23       **THE COURT:**  All right.  I will order that, subject to

24  further Order of the Court, those documents are to be filed

25  under seal until we resolve the issue of any potential

**PROCEEDINGS**

1    privilege.

2         **MS. AGNOLUCCI:**  And one other issue, Your Honor.  In

3    our brief, we at a very high level of generality describe these

4    documents.  I don't believe that's a problem because

5    Ms. McNamara has represented in her brief that Mr. Liu's

6    testimony will be entirely consistent with what's in these

7    documents.  We don't quote from the emails, but there are some

8    general characterizations.

9         **THE COURT:**  That's fine.  That's fine.

10        **MS. AGNOLUCCI:**  And then one last point, which I just

11   raised with Mr. Axelrod.  We would like to attach two 302s of

12   Mr. Liu, one from June of 2011 and one from August of 2011, and

13   would like permission to publicly file those.

14        **MR. HEMANN:**  Our preference would be, Your Honor, to

15   lodge them with the remaining -- with the emails.  I don't know

16   what information they contain because part of what Mr. Liu will

17   testify about is that he was given the Accession memorandum

18   that Mr. Diemer -- Dr. Diemer just testified about and wrote

19   down information from that.  So --

20        **THE COURT:**  All right.  Why don't you simply lodge

21   those.  I'll seal those as well.  And, so, you should file

22   sealed copies of those.  And, again, that's without -- I

23   haven't seen them, so I'm kind of shooting blind here; but I

24   will promptly rule on their -- and I'll ask the Government to

25   give me further input after they've considered the matter,

**PROCEEDINGS**

1  because I'd rather not keep anything sealed that's not

2  permitted to be under seal because of the public's right to

3  know.

4          **MS. AGNOLUCCI:**  Understood, Your Honor.

5          **THE CLERK:**  How many 302s are there?

6          **MS. AGNOLUCCI:**  I'm, therefore, now submitting the

7  first document is an August 15th, 2011, 302 of Mr. Jian Liu

8  marked C2-000502 through 506.

9          **THE COURT:**  All right.  And the Government's not

10 contending that these were inadvertently produced?

11         **MR. HEMANN:**  Oh, no, Your Honor.

12         **MR. AXELROD:**  No.

13         **THE COURT:**  All right.  Okay.  Anything else,

14 Ms. Agnolucci?

15         **MS. AGNOLUCCI:**  Yes.  One more, which is -- if I may

16 just have one moment, Your Honor.

17         **THE COURT:**  Yes.  Sure.

18         **MR. HEMANN:**  Your Honor, I just might notice the door

19 is still locked.

20         **THE COURT:**  Oh, yes.

21         **MR. HEMANN:**  We should probably unlock it.

22         **THE COURT:**  Would somebody unlock the door?  Yes.

23 Thank you.

24    If anybody has any people that they can control, they

25 should tell them that it's highly improper when the Court's

**PROCEEDINGS**

1   instructing a jury for them to be running in and out of the

2   courtroom.  It happened during the preliminary instruction; and

3   what I plan on doing is, as a prophylactic matter, I'm going to

4   lock the door, I think I have discretion to do that, for that

5   brief period because people just were running -- I don't know

6   whether they were press or, we certainly can't control them,

7   but I will tell people that if they want to leave, they have to

8   leave before -- finish leaving before I instruct the jury.

9           **MR. AXELROD:**  Understood, Your Honor.

10          **MR. HEMANN:**  Yeah, I don't think it was anybody with

11  either party.

12          **THE COURT:**  I'm not saying it was, and I don't care at

13  this point.

14      Yes?

15          **MS. AGNOLUCCI:**  The second document is a 302 dated

16  June 22nd, 2011, Bates number C2-000293 through 300.

17          **THE COURT:**  Sounds good.  All right.

18          **MS. AGNOLUCCI:**  Thank you, Your Honor.

19          **THE COURT:**  All right.  We're adjourned until tomorrow

20  morning unless something comes up before then, and I'll see you

21  all tomorrow.  Thank you.

22          **MR. HEMANN:**  Thank you, Your Honor.

23          **THE COURT:**  Have a good evening.

24              (Proceedings adjourned at 1:34 p.m.)

25                      ---oOo---

**<u>CERTIFICATE OF REPORTERS</u>**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, January 28, 2014

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter

_____

Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
U.S. Court Reporter