**Volume 12**

**Pages 2377 - 2525**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

```
UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )        NO. CR 11-00573 JSW
                                 )
WALTER LIEW; ROBERT MAEGERLE;    )
and USA PERFORMANCE TECHNOLOGY,  )
INC.,                            )
                                 )
          Defendants.            )
_____  )
```

San Francisco, California
Wednesday, January 29, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

    MELINDA HAAG
    United States Attorney
    450 Golden Gate Avenue
    San Francisco, California  94102
    BY:  **PETE AXELROD**
        **JOHN H. HEMANN**
        **ASSISTANT UNITED STATES ATTORNEYS**

    U.S. DEPARTMENT OF JUSTICE
    600 E Street NW
    Washington, D.C.  20044
    BY:  **RICHARD S. SCOTT**
        **ASSISTANT U.S. ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
        Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
        Official Reporters

2378

1   **<u>APPEARANCES</u>:   (CONTINUED)**

2   For Defendant Walter Liew and USA Performance Technology, Inc.:
                         KEKER & VAN NEST LLP
3                        633 Battery Street
                         San Francisco, California  94111
4              BY:  **STUART L. GASNER**
                    **SIMONA A. AGNOLUCCI**
5                   **KATHERINE M. LOVETT**
                    **CHRISTINA BLAIS**
6                   **ATTORNEYS AT LAW**

7   For Defendant Robert J. Maegerle:
                         MCKENNEY & FROELICH
8                        1349 West Peachtree Street
                         Two Midtown Plaza - Suite 1250
9                        Atlanta, Georgia  30309
              BY:  **JEROME J. FROELICH, JR.**
10                  **ATTORNEY AT LAW**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2379

```
 1              I N D E X

 2   Wednesday, January 29, 2014

 3   GOVERNMENT'S WITNESSES                    PAGE   VOL.

 4   DIEMER, JUNIOR, RUSSELL BERTRUM (RECALLED)
     (PREVIOUSLY SWORN)                        2398   12
 5   Direct Examination resumed by Mr. Axelrod 2398   12
     Cross-Examination by Mr. Gasner           2428   12
 6   Redirect Examination by Mr. Axelrod       2449   12
     Recross-Examination by Mr. Gasner         2450   12
 7
     THONGTHAWEE, THONGCHAI
 8   By Video Deposition (not reported)        2455   12

 9   DUONG, CHUONG SI (OUTSIDE PRESENCE OF JURY
     (SWORN)                                   2457   12
10   Examination by Mr. Axelrod                2457   12

11   DUONG, CHUONG SI
     (SWORN)                                   2485   12
12   Direct Examination by Mr. Axelrod         2485   12
     Cross-Examination by Ms. Agnolucci        2503   12
13   Redirect Examination by Mr. Axelrod       2512   12

14              E X H I B I T S

15   TRIAL EXHIBITS                     IDEN  EVID  VOL.

16     856                                    2421   12

17     887                                    2427   12

18     892                                    2426   12

19     1914                                   2406   12

20     1935                                   2453   12

21     2351                                   2428   12

22     3438                                   2453   12

23     3439                                   2453   12

24     3440                                   2453   12

25
```

2380

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 3441 | | 2453 | 12 |
| 3442 | | 2453 | 12 |
| 3444 | | 2453 | 12 |
| 3445 | | 2453 | 12 |
| 3446 | | 2453 | 12 |
| 3447 | | 2453 | 12 |
| 3448 | | 2453 | 12 |
| 3449 | | 2453 | 12 |

PROCEEDINGS

```
 1   Wednesday - January 29, 2014                        7:55 a.m.

 2                      P R O C E E D I N G S

 3                          ---oOo---

 4        (Proceedings were heard out of the presence of the jury:)

 5        THE COURT:  Good morning, everybody.  Please be

 6   seated, and call the case.

 7        THE CLERK:  Calling Case Number CR-11-573,

 8   United States versus Walter Liew, United States versus Robert

 9   Maegerle, and United States versus USAPTI.

10        Counsel, please state your appearances.

11        MR. HEMANN:  Good morning, Your Honor.  John Hemann,

12   Pete Axelrod, and Richard Scott for the United States.

13        THE COURT:  Good morning.

14        MR. AXELROD:  Good morning, Your Honor.

15        MS. AGNOLUCCI:  Good morning, Your Honor.  Simona

16   Agnolucci, Stuart Gasner, and Katie Lovett for Walter Liew,

17   who's here, and USAPTI.

18        THE COURT:  Good morning.

19        MR. GASNER:  Good morning, Your Honor.

20        MR. FROELICH:  Good morning, Your Honor.  Jerry

21   Froelich representing Mr. Maegerle, who's standing right next

22   to me here.

23        THE COURT:  All right.  Good morning, everybody.

24        All right.  I understand there may be an issue that might

25   come up today?
```

**PROCEEDINGS**

 1          **MR. HEMANN:**  Yes.  There's one minor logistical issue.

 2   When Mr. Diemer is done testifying, we'll be playing the

 3   Thongchai Thongthawee deposition.  We would -- we're going to

 4   have to move the computer and hook it up up here, and I'm not

 5   quite sure whether that will require system reboot.

 6          But Mr. Axelrod will be about a half an hour more on

 7   Mr. Diemer, and then there will be cross; and I just wanted to

 8   advise the Court that there will be a little bit of technical

 9   kerfuffle going on after that.

10          **THE COURT:**  My understanding is that it's all hot

11   swappable, so just plugging in will not change anything.

12          The other thing is, typically I don't have the court

13   reporter transcribe what has already been transcribed so long

14   as what is actually played is captured on a disc or something

15   that becomes part of the transcript record.

16          Is that acceptable to the Government, rather than having

17   the reporter --

18          **MR. HEMANN:**  It is absolutely acceptable.  I would

19   propose, Your Honor, that we mark the disc to which the parties

20   have agreed as an exhibit and admit it into -- well, not admit

21   it into evidence, but mark it as an exhibit because we wouldn't

22   want the jury to have that.

23          **THE COURT:**  Yes, mark it for identification only as

24   part of the record to go up if there's an appeal, so that will

25   be part of the transcript actually.  So it will just be marked

**PROCEEDINGS**

 1   as an exhibit, and the record will reflect that that will be

 2   the testimony of the deponent.

 3        **MR. HEMANN:**  We'll probably have to do something like

 4   lodge it with the Court as a part of the record.  Some of the

 5   exhibits that get marked just for identification don't really

 6   end up with the court as part of the record, but we'll -- it's

 7   good with us to work that out.

 8        **THE COURT:**  All right.  So we'll work that out.

 9        And were there any other issues?

10        **MR. HEMANN:**  Yes, Your Honor.  There's a more

11   substantive issue with regard to the testimony of Tony Duong

12   who will be testifying today.  He'll be testifying pursuant to

13   an immunity order that the Court signed.

14        The first matter is probably relatively noncontroversial.

15   He needs to be brought in out of the presence of the jury.  He

16   needs to assert that he's going to -- he's been advised to take

17   the Fifth as to any questions he will be answering, and then

18   either the Court or the Government needs to advise him on the

19   record of the terms of the order that the Court issued.  That

20   should happen outside the presence of the jury at a break; and

21   we've asked Mr. Taback to bring him in so that he's here at the

22   time of the first break, and we were going to suggest that we

23   do that then.

24        **THE COURT:**  All right.

25        **MR. HEMANN:**  The second issue is more substantive, and

1    it concerns Ms. Agnolucci's objection to raising the issue of

2    his immunity before the jury.

3         We've done some research on that, and our proposal is that

4    we handle that essentially like we would handle a plea

5    agreement; wherein, on direct examination the fact of a plea

6    agreement and the fact that he has received immunity because of

7    the plea agreement is admissible on direct because it goes to

8    the witness' state of mind regarding the consequences of his

9    testimony.

10        If the Defense then on cross-examination attacks his

11   credibility, the Government would on redirect be able to elicit

12   from him the truth-telling requirements of the immunity order;

13   in other words, he is required to tell the truth, and there are

14   consequences like perjury, et cetera, if he does not tell the

15   truth.  So we propose to handle it just exactly that way.

16        We did some research last night about this and found one

17   case, and I made two copies, and I'd like to hand them up to

18   the Court.

19        **THE COURT:**  All right.  And have you made counsel

20   aware of this?

21        **MR. HEMANN:**  I've provided them with copies of this.

22   It is a First Circuit case from 1984, which it's older than

23   Kuan Yin, so it may not be relevant, Your Honor; but

24   Justice Breyer was on the panel, so maybe that balances it out.

25        **THE COURT:**  It might be older than some of the

1   attorneys in the room.

2        **MR. HEMANN:**  It certainly is older than some of the

3   attorneys in the room, Your Honor --

4        **THE COURT:**  Yes.

5        **MR. HEMANN:**  -- present company excluded.

6        This case deals with, we think, precisely the issue.  It

7   involves a case in which the Government offered witnesses who

8   were testifying pursuant to an immunity order.  The Defense

9   objected and said that they would not attack the witness'

10  credibility, so it was inadmissible.

11       The First Circuit held that the Government was permitted

12  to elicit the information, and the reasoning was that the fact

13  of immunity and compulsion orders aids the jury function

14  regardless of whether the defendant intended to attack the

15  credibility of the witnesses.  It's *United States versus*

16  *McNeill*, 728 F.2d 5.

17       **THE COURT:**  I'll read the case, but here's my question

18  to you:  Given the representation that the Defense made that

19  they don't intend to bring up the immunity grant, and given the

20  fact that any witness who's here, whether voluntarily or by

21  compulsion of a subpoena or otherwise, is required to tell the

22  truth under pain of possible perjury, so my question is, why do

23  you need or what makes relevant the additional factor at the

24  front end?  I understand the point about redirect potentially.

25  Why do you need -- what's the justification of that?

**PROCEEDINGS**

1      **MR. HEMANN:**  The justification for that, Your Honor,

2   is that Mr. Duong will be testifying that he broke the law.

3   The Government understands that and believes that.  Mr. Duong

4   understands that and believes that; hence, his assertion of his

5   Fifth Amendment rights.

6      He assisted Walter Liew in obstructing DuPont civil action

7   by assisting him in destroying documents.  That has been a --

8   that's the premise for which he's taking the Fifth.

9      If Mr. Duong takes the stand and says, "I destroyed

10  documents," the jury is going to think, "Well, why is he not

11  getting prosecuted?  Why is he sitting up there free of any

12  sort of consequence while Mr. Liew is sitting there being

13  accused of obstruction of justice?"

14      **THE COURT:**  My question is:  Is that relevant?

15      Let's assume -- I don't want to presume to tell or even,

16  much less, guess what the Defense might argue; but if they say

17  something like, on cross -- let's assume we just brought out

18  what we said yesterday, that he was compelled by a court order

19  to testify and, like any witness he has to tell the truth when

20  he takes the oath.

21      And if the Defense doesn't say on cross-examination, "Oh,

22  isn't it true that what you did constitutes a crime; and if

23  he's guilty, you're guilty," and, you know, with the

24  implication that somehow there's some kind of secret deal here,

25  that might open the door.  But if they don't do that, why would

1    it be relevant for the jury to know?

2        And I would not allow the -- if that were the agreement,

3    and we'll get -- I'll hear Ms. Agnolucci's response, I would

4    not allow the Defense to argue, "Well, you know, he's really

5    the guilty person, and he should have been prosecuted; and, you

6    know, the fact that he wasn't means that the Government doesn't

7    believe he's guilty of anything and, therefore, Mr. Liew must

8    not be guilty of something."

9        So I don't understand from that standpoint.  Because the

10   flip side is, when you're doing the 403 analysis, if he gets up

11   there and says -- and you bring out he's been given immunity,

12   which means he's asserted his Fifth Amendment, the Court has

13   basically ordered him to testify notwithstanding his

14   Fifth Amendment rights, the consequence of which is X, Y, Z,

15   then that raises the implication -- you're basically telling

16   the jury, even though it may not be a fair inference, that

17   because he took the Fifth, he must be guilty of something.

18       **MR. HEMANN:**  Well, I have two comments on that,

19   Your Honor.  Number one, the answer to your question is the

20   essential holding of the First Circuit case, which is

21   Mr. Duong's state of mind, the fact of the immunity and the

22   compulsion orders are critical to the jury's ability to assess

23   the credibility of his testimony.

24       Just because it doesn't come out, doesn't mean that it's

25   not in Mr. Duong's mind; and it perverts the truth-seeking

**PROCEEDINGS**

 1   function if there's this pregnant question as to what is

 2   motivating him, what is allowing him to stand before the Court

 3   and admit that he did things that subject him to prosecution.

 4        And it is more unfair, I would submit, to the Government

 5   to allow the jury to think that the Government is letting this

 6   conduct go as to this individual while it is prosecuting this

 7   other individual for the same conduct.  And I think that's the

 8   essential holding of the First Circuit case, and that does not

 9   go to the, "You promised to tell the truth, and there are

10   consequences if you don't."

11        **THE COURT:**  All right.  Let me hear -- I don't want to

12   keep the jury waiting.  Ms. Agnolucci, what's your response?

13        **MS. AGNOLUCCI:**  I mean, I would start by saying that

14   we disagree with the characterization of his testimony, and the

15   fact that Mr. Duong is going to be testifying, you know, about

16   a crime that he committed.

17        Having read the Grand Jury testimony, I believe, from what

18   I read in the testimony, that he's going to testify that

19   nothing was permanently destroyed, that documents were removed

20   from a server so that employees wouldn't have access to them,

21   and that a copy was kept of those documents.

22        So the characterization of his testimony, I think, is

23   inaccurate --

24        **THE COURT:**  Well, does it matter?

25        **MS. AGNOLUCCI:**  -- and it's irrelevant.

1      **THE COURT:**  Well, the question -- I think what you

2   just said may be true, but I don't know that it matters

3   because, as we all know, somebody doesn't have to actually be

4   guilty of anything.  They just need to have a reasonable fear

5   that they might be prosecuted and, therefore, they can take the

6   Fifth.  It's a very light standard.

7      So I don't know -- I understand your point that you don't

8   want, just like I posited, the jury to believe that just

9   because he took the Fifth, he must be guilty and, therefore,

10  Mr. Liew must be guilty of something, Mr. Walter Liew, must be

11  guilty of something.

12      **MS. AGNOLUCCI:**  Yeah, that's -- and, Your Honor, we

13  just got this case ten minutes ago.

14      **THE COURT:**  All right.  Well, let me suggest the

15  following, and, again, without -- let's put this in abeyance

16  for now because -- and let me just throw out -- let me just --

17  I'll let you -- I know you want to say one other thing.

18      **MS. AGNOLUCCI:**  More than one, Your Honor.

19      **THE COURT:**  It is possible -- I know, and I'm not

20  going to cut you off because I think this is too important --

21  but it's possible to fashion an instruction to the jury.  Let's

22  assume, hypothetically, that the Court were to allow this.  I

23  can imagine an instruction which basically tells the jury -- in

24  effect, it blunts the prejudicial effect of the

25  Fifth Amendment, that any -- in this country anybody has the

**PROCEEDINGS**

1  right to take the Fifth if they have some belief or fear that

2  they may be prosecuted.  It doesn't mean they're guilty of

3  anything at all.  It's a constitutional right that's deeply

4  rooted in Anglo-Saxon jurisprudence and the Constitution.  Not

5  in Anglo-Saxon jurisprudence because it's not a right in

6  England.

7       But, so, go ahead.  You can make one last point,

8  Ms. Agnolucci, because I want to sort of put this in abeyance

9  until we get to that point because I don't know how far we're

10  going to get.  But go ahead.

11       **MS. AGNOLUCCI:**  And, Your Honor, I don't want to dwell

12  on the point that I was just making, but I do want to say one

13  more thing.  We will object to this entire line of questioning.

14  Mr. Liew is not charged in the Indictment with obstruction of

15  justice arising out of these facts that Mr. Hemann is now

16  talking about.  There was no 404(b) disclosure as to these

17  acts, and, so, you know, just as an aside, this entire line of

18  questioning is objectionable to us.

19       Now, on to the issue that we're talking about.  It is --

20  there -- you know, we just got this case ten minutes ago, so

21  I've done what I can to read it; but my understanding of this

22  case is that this involved fraud allegations against the budget

23  director for the City of Boston arising out of money and --

24  mismanagement of money in the retirement system.  One of the

25  witnesses who was granted immunity was the executive secretary

**PROCEEDINGS**

1  of the Retirement Board and, you know, clearly involved, from

2  what I've read of the facts in five minutes, in the allegation.

3  So the case is distinguishable for that reason.

4      Here I don't think the Government has made a showing of a

5  need to tell the jury that Mr. Duong has immunity, and --

6      **THE COURT:**  Well, I'm going to interrupt you because I

7  want to read the case.  You need to read the case, or some of

8  your colleagues, and see if there's any other authority, number

9  one.

10      Number two, you've now raised a much more significant

11  point, and the Court's view is it sounds like you're objecting

12  to all this testimony as being irrelevant and/or overly

13  prejudicial.  So that's going to require a much longer

14  discussion, and it's going to require essentially an offer of

15  proof and, perhaps, even a pocket brief by the Government and

16  the Defense about the relevance.

17      If he's not charged -- if Mr. Walter Liew is not charged

18  with obstruction of justice arising out of these circumstances

19  and the Government is arguing that it's, you know -- I'm sure

20  they're not going to argue it's 404(b) because they'd be

21  essentially admitting that the testimony is not admissible if

22  they didn't comply.  So they're going to argue, presumably,

23  inextricably wound up, or whatever the phrase they use to get

24  around 404(b).  I'm not saying that in a negative way, but to

25  avoid the application of 404(b).  And I need to have -- I'm

 1  going to need an offer of proof.  I'm going to need an

 2  argument.  I'm going to need written argument on that and,

 3  again, we can't do it now.

 4      Ironically when I came on the bench, the only juror absent

 5  was Juror 7, and we received a voice mail from him, he's stuck

 6  in traffic.  Estimate about 30 minutes at 7:40 a.m.  There was

 7  an accident on the bridge.  So he may actually be here.

 8          **THE CLERK:**  I can check and see.

 9          **THE COURT:**  Yes.  But, anyway, so you don't need to

10  argue this now.

11      **MR. HEMANN:**  Certainly, Your Honor.

12          **THE COURT:**  And I'll give you ample time because

13  that's -- you know, the argument you just made, Ms. Agnolucci,

14  wasn't raised yesterday, and I'm not saying that precludes the

15  defendant from making the argument, but that's a whole other

16  issue that the Court needs to resolve.

17      **MR. HEMANN:**  And, Your Honor, I would -- I don't -- at

18  some point the Court is going to need to resolve this in

19  applying the law in the proper way that the Court does.

20      I do have to point out that Mr. Duong has been -- they've

21  had the Grand Jury transcripts for many moons.  Mr. Duong has

22  been on the witness list from the first day; and it is highly

23  inappropriate, in my view, to wait and raise this kind of issue

24  as to 404(b) the morning Mr. Duong is going to testify.  It

25  jams us.  It jams the Court in terms of actually coming up with

**PROCEEDINGS**

1  the right answer.  This is a weighty issue and weighty

2  objection.

3          **THE COURT:**  Well, I'll certainly hear argument, and

4  that certainly is something I will consider.

5      When is he expected to testify, realistically?  With a

6  half hour for Dr. Diemer, roughly -- are you cross-examining,

7  Mr. Gasner?

8          **MR. GASNER:**  Yes.

9          **THE COURT:**  Rough numbers, without --

10          **MR. GASNER:**  Half an hour.

11          **THE COURT:**  Half an hour for cross.  So that's an

12  hour.  And then we have about two hours with setup and

13  everything of the Mr. Thongthawee video.  So that gets us about

14  three hours.

15          **MR. HEMANN:**  That's when he would testify.

16          **THE COURT:**  Okay.  So we may take a longer break.

17      And I will say to the Defense that there is an issue.  The

18  Court has to give some weight to the procedural posture if this

19  is something that could have been raised in an in limine

20  motion.  The parties were very good about asking for permission

21  to go beyond the Court's presumptive five; and to bring this up

22  in the midst of trial, you know, when the issue of Mr. Duong's

23  testimony was raised yesterday on the issue of immunity, and

24  then this wasn't even raised until this morning, it is a bit of

25  a crunch for the Court, and I'm going to have to take that into

**PROCEEDINGS**

 1   account as I decide whether he should be able to testify.

 2       MS. AGNOLUCCI:  May I briefly respond to that,

 3   Your Honor?

 4       We, having read the Grand Jury testimony, were under the

 5   impression -- first of all, Mr. -- as I said, Mr. Liew was not

 6   charged with obstruction of justice arising out of these acts.

 7   We read the Grand Jury testimony and were under the impression

 8   that Mr. Duong gave testimony that this was not obstructive

 9   conduct; that, in fact, it was conduct to keep documents away

10   from employees, and that a backup of every document that was

11   removed from the server was kept.

12       THE COURT:  But he was on the witness list.  He was on

13   the Government's witness list; wasn't he?

14       MS. AGNOLUCCI:  Yes, and we -- Your Honor, we were

15   here yesterday with Mr. Axelrod.  Mr. Axelrod raised the issue

16   of immunity yesterday.  He did not raise any of these issues

17   about -- his reason, his stated reason yesterday, was that

18   Mr. Duong and Mr. Liew had a, quote, close relationship

19   presumably because Mr. Ilagan testified that they occasionally

20   had lunch and talked a lot.  That was the basis that was given

21   yesterday.  So this is raised --

22       THE COURT:  Excuse me.  We're spilling over into the

23   substance, and we'll have the luxury of being longer if Juror

24   Number 7 is still not here because of the accident on the Bay

25   Bridge; but it's something I want to hear about, and I think

1    we'll figure out a way.

2        If we have to take a longer break to hear about this

3    briefly, then we'll do that.  I'll get an offer of proof from

4    the Government in summary fashion about what he's likely to

5    testify to.

6        I will -- I have this case here.  I'll be reviewing it

7    while Dr. Diemer is testifying; and if you want, I know you

8    have other colleagues who may be working on the case, they

9    could Shepardize the case and see.

10       I always used to get this when I was in your situation,

11   "Oh, you must have hundreds of lawyers back at the office who

12   can do this," when the reality is there's only two working on

13   it.

14            **MS. AGNOLUCCI:**  We're all here, Your Honor.

15            **THE COURT:**  Okay.  But, anyway, I will -- my own

16   preliminary view is that if I were to allow some allusion to

17   the immunity issue, that we could work out an instruction that

18   would blunt any prejudice, even going so far as to say:

19       You know, the fact that, you know, somebody takes the

20   Fifth doesn't mean they're guilty.  They don't have to be

21   guilty to take it.  Anybody can essentially take it.  I mean,

22   it's almost like, you know, the fact that an Indictment is not

23   evidence against anybody; and, indeed, Mr. -- the defendants in

24   this case deny any wrongdoing with respect to the conduct of

25   Mr. Duong.

**PROCEEDINGS**

1    So I believe I could fashion an instruction which would

2    border on commenting on the evidence, if you will, that would

3    blunt any issue and perhaps satisfy, if it's true, the sort of

4    extrinsic policy of having the jury understand the context in

5    which somebody testifies and caution both sides that they're

6    not allowed to argue one way or the other, that the fact that

7    there's immunity means he's guilty or, you know, not guilty.

8        The Defense can certainly argue that if they wanted to.  I

9    mean, that's your prerogative to say, "You know, he'll say --

10   the more he says, the less they can prosecute him for."  But

11   that issue is so ambiguous and potentially prejudicial that I

12   have to decide whether I'm going to allow it at all; and if so,

13   whether an instruction might mitigate any possible prejudice to

14   the defendants.

15       **MS. AGNOLUCCI:**  And we do think that it's highly

16   prejudicial, Your Honor.

17       And, you know, we were just alerted of this case this

18   morning; but I do know that there are cases, for example,

19   saying that a codefendant can't take the stand and then have,

20   you know, the fact of privilege elicited from him, and then

21   that fact can't be used to draw an inference against the

22   defendant because it's just too prejudicial.

23       So we'll do what we can to --

24       **THE COURT:**  I understand.  In a trial you sort of do

25   things on the fly.

1        Yes, Mr. Froelich?

2        **MR. FROELICH:**  Your Honor, I just want to say very

3    quickly, I'm pretty familiar with the Fifth Amendment because

4    everybody in the U.S. Attorney's Office in Atlanta when you

5    send a subpoena to my client, you better have an immunity

6    letter or an immunity agreement.

7        *Reiner v. Ohio* is the latest of the United States Supreme

8    Court cases, and all of them say in the situation in which

9    you're in, it doesn't matter whether -- like if you go before a

10   Grand Jury, that's enough to take the Fifth Amendment.  You

11   don't have to make explanations of it or anything else, and

12   that's very technical stuff that a jury is not going to

13   understand.

14       **THE COURT:**  All right.  And let's not talk -- let's

15   see if the juror is here, Ms. Ottolini; because if he is, we're

16   going to start.  If he's not, we'll argue here all day until he

17   gets here; and I'm not inviting that, but let's just see

18   whether....

19                    (Pause in proceedings.)

20       **THE COURT:**  All right.  Let's get Dr. Diemer.  He's

21   here.

22       To be continued, as far as this argument goes, and let's

23   continue with the jury.

24       (Proceedings were heard in the presence of the jury:)

25       **THE COURT:**  Please be seated.

 1          Good morning, ladies and gentlemen.  Once again, thank you

 2     for your punctuality.  We had a little bit of an issue with the

 3     Bay Bridge that caused us to start a little later, but we're

 4     ready to go.

 5          And just to remind you, we're still in the Government's

 6     case.  Dr. Diemer is on direct examination, in the middle of

 7     his direct examination.

 8                    **RUSSELL BERTRUM DIEMER, JUNIOR,**

 9     called as a witness for the Government, having been previously

10     duly sworn, testified further as follows:

11               **THE COURT:**  And, Dr. Diemer, as we do with all

12     witnesses whose testimony is interrupted by adjournment, I just

13     want to remind you that you're still under oath.  Okay?

14               **THE WITNESS:**  Thank you.

15               **THE COURT:**  All right.  Please proceed.

16               **MR. AXELROD:**  Thank you, Your Honor.

17                    **DIRECT EXAMINATION**   (resumed)

18     BY MR. AXELROD:

19     **Q.**   Good morning, Dr. Diemer.

20     **A.**   Good morning.

21     **Q.**   I want to pick up where we left off yesterday.

22          And, Ms. Mahoney, if you could bring up Exhibit 162,

23     page 9.

24          And, Dr. Diemer, when we stopped yesterday, I believe we

25     were talking about this data on page 9 of the Accession Report.

1   Do you recall that?

2   **A.**   Yes.

3   **Q.**   And this is specific data relating to conditions at

4   Edgemoor; right?

5   **A.**   That is correct.

6   **Q.**   And it relates specifically to the flue pond, that's some

7   of the data?

8   **A.**   Yes.

9   **Q.**   And we talked -- the top it has information about the flue

10  geometry, the length and diameter of various piping; is that

11  right?

12  **A.**   Yes.

13  **Q.**   Okay.  And I wanted to ask you, in the course of preparing

14  to testify, did you also examine a large flow sheet from

15  Edgemoor, which is Exhibit 7?

16  **A.**   Yes.

17  **Q.**   Okay.  And that flow sheet, if we could bring that up, I

18  believe the electronic version is Exhibit 5.

19          **THE COURT:**  Yes.

20          **MR. AXELROD:**  Okay.  And, Ms. Mahoney, if you could

21  blow up the middle section where there's the flue pond there.

22  **Q.**   Okay.  And do you see on the screen in front of you,

23  Dr. Diemer, the blown-up section of the flue area?  Can you

24  describe what we're looking at?

25  **A.**   So we are looking at the section where the oxygen and

1  titanium tetrachloride are mixed together, are brought together

2  and mixed.  There are some nozzles that indicate the addition

3  of scrubs.  I think there's a section that's labeled, perhaps,

4  "Scrubs T."  I can't tell.  Maybe not.

5  **Q.**  And --

6  **A.**  And "Quench."  And then it goes into the flue pond.

7  **Q.**  Okay.  So on the left side of that drawing is the

8  oxidation reactor?

9  **A.**  That is correct.

10  **Q.**  And that's what we spent some time talking about

11  yesterday?

12  **A.**  Yes.

13  **Q.**  And then in the drawing on the right side there's the

14  series of lines going back and forth.  That's the flue pond;

15  right?

16  **A.**  Yes, it is.

17  **Q.**  And the information contained in that exhibit that's in

18  front of you, Exhibit 5, is that, with respect to the length

19  and diameter of piping in the flue pond, is that as detailed as

20  what's contained in the Accession Report?

21  **A.**  It's not.

22  **Q.**  Okay.  And would the information contained in the

23  Accession Report about the flue pond be of use to somebody

24  designing a flue system?

25  **A.**  I believe so.

**DIEMER - DIRECT / AXELROD**

1   **Q.**   And why is that?

2   **A.**   Because it gives the lengths of the various sections.

3   This indicates diameters, but it does not indicate for how long

4   each of the sections goes.  And, so, the information in the

5   report actually gives the length of the section leading up to

6   an expansion, and then the length of the pipe after that.

7   **Q.**   And that information is not reflected in this flow sheet?

8   **A.**   No.

9   **Q.**   Are you familiar with patents?

10  **A.**   Yes.

11  **Q.**   How so?

12  **A.**   I hold, I think, either 12 or 13 U.S. patents.

13  **Q.**   And the correlation that we talked about yesterday, the

14  Diemer Correlation if you will, has that been patented?

15  **A.**   No.

16  **Q.**   Why not?

17  **A.**   Because it gives specific information about our plant

18  geometries and how to relate that to, you know, essential

19  information that's useful for a design or operations.

20  **Q.**   I'd like to show you a patent or two.

21          **MR. AXELROD:**  Your Honor, may I approach with

22  Exhibit 1914?

23          **THE COURT:**  Yes, you may.

24          **MR. AXELROD:**  Thank you.

25  **Q.**   And, Dr. Diemer, I'm handing you what's been marked as

1  Exhibit 1914.  Do you recognize that document?

2  **A.**  I do.

3  **Q.**  Okay.  What is it?

4  **A.**  It is a United States patent that describes the use of

5  cesium chloride as an additive for controlling particle size

6  known as Q salt.

7  **Q.**  And what's the significance of that additive in the

8  oxidation process?

9  **A.**  It's used for controlling the particle size.

10  **Q.**  Okay.  Does that patent reveal information from the

11  Accession Report?

12  **A.**  Not specifically from the Accession Report.

13  **Q.**  Well, what does it -- does it identify residence time?

14  **A.**  It does identify a range of residence times in the mixing

15  area, and it gives examples that give material flow rates and

16  conditions and residence times in the mixing area.

17  **Q.**  So I want to ask you, if you could, to explain.  Because

18  yesterday we talked about mixing length; right?

19  **A.**  Yes.

20  **Q.**  That part of your correlation was to establish the actual

21  physical distance it took for the TiCl and the oxygen to mix;

22  right?

23  **A.**  Right.

24  **Q.**  And you just mentioned residence time; right?

25  **A.**  Right.

1   Q.   And we talked a little bit about residence time yesterday

2   when we looked at the specific data from the plants?

3   A.   Yes.

4   Q.   What's the difference between mixing length, a distance,

5   and residence time, a length of time?

6   A.   So the distance for mixing is a physical dimension.  It

7   tells you where in space something has happened.  The time

8   tells you when in time, and there are many different geometries

9   or sets of dimensions you could use to accomplish the same

10  residence time.

11  Q.   So could you explain what you mean by that?

12  A.   I can.  It would be helpful to draw it.

13       MR. AXELROD:  Okay.  May I ask Dr. Diemer to step down

14  and draw?

15       THE COURT:  Yes.

16       MR. AXELROD:  Thank you.

17       THE COURT:  And when you're down there, Doctor, please

18  keep your voice up because you won't be amplified and neither

19  the court reporter nor the jury -- they'll have trouble hearing

20  you, as will the Court.

21       THE WITNESS:  Thank you.

22       THE COURT:  Thank you.

23       MR. GASNER:  Your Honor, I assume that Professor

24  Diemer -- that Dr. Diemer is not going to erase his prior

25  drawing.

1          **THE COURT:**  Yes, that's correct.

2          **MR. AXELROD:**  And we have -- for the record we've

3   taken a picture of this, and we're getting it printed out, and

4   we'll mark it, but we can leave it for now.

5          **MR. GASNER:**  Thank you.

6          **MR. AXELROD:**  Sure.

7          **THE WITNESS:**  So not being able to erase will cramp

8   the drawing a bit.  We'll try to deal with that.

9          So let's imagine that -- I'll have to wing it myself here.

10         This is an example of a volume from a slot to the end of a

11  mixing zone.  So it's got a diameter and a length, and the

12  residence time in there is this volume divided by volumetric

13  flow rate of the materials through it.

14         But this is not the only volume that you could draw to

15  have that same residence time.  You could make the diameter a

16  bit larger and the pipe a bit shorter, and it would have the

17  same volume and, therefore, the same residence time; or you

18  could make the pipe a bit smaller, and it would have the same

19  residence time.

20         So having the residence time itself doesn't tell you which

21  of these designs to choose.  There is a whole range.  There are

22  intermediate designs between these (indicating), each of these

23  (indicating), and designs even smaller and even larger, a whole

24  family of designs that you could choose.

25

1    BY MR. AXELROD:

2    Q.    And the residence time would be the same for each one?

3    A.    Would be the same in each one, yes.

4    Q.    Okay.  But the mixing length would be different?

5    A.    It would.  May I elaborate?

6    Q.    Yes.

7    A.    So let's suppose that in this one (indicating) it would be

8    mixed by here (indicating).

9         So then we apply the same conditions to the smaller

10   diameter pipe.  Well, the residence time is the same, but the

11   distance that we have to travel is longer so the velocity is

12   higher, and higher velocity promotes mixing.

13        Furthermore, the distance over which you have to mix in

14   the radial dimension is shorter.  So the net result is this

15   (indicating) will mix faster than this (indicating).  In fact,

16   it will probably be mixed here (indicating) rather than all the

17   way at the end here (indicating), according to the mixing

18   correlation.

19        So, likewise, here (indicating) the velocity is slower and

20   the distance you have to travel is longer.  So it will take

21   longer to completely mix.  In fact, it will probably not be

22   mixed until all the way out here (indicating).

23        So the fact is that just having a residence time is not

24   enough to figure out which of these to choose.  You have to

25   know more.  In fact, what you have to know to choose one of

1  these is, you have to have a diameter and a velocity in order

2  to relate mixing time to length.

3  **Q.**  And those types of geometries are not contained in the

4  patent that we were just looking at?

5  **A.**  They're not.

6  **Q.**  But they are contained in the Accession Report?

7  **A.**  That is correct.

8  **Q.**  Okay.  If you don't mind, you can go back up there.

9         **MR. AXELROD:**  And, Your Honor, the United States would

10  offer Exhibit 1914 into evidence.

11         **MR. GASNER:**  No objection.

12         **THE COURT:**  It's admitted.

13      (Trial Exhibit 1914 received in evidence)

14         **MR. AXELROD:**  Dr. Diemer -- Your Honor, may I approach

15  with Exhibit 2351?

16         **THE COURT:**  Yes, you may.

17         **MR. AXELROD:**  Thank you.

18  **Q.**  Dr. Diemer, I'm handing you what's been marked as

19  Exhibit 2351.  Do you recognize that document?

20  **A.**  (Witness examines document.)  Yes.

21  **Q.**  What is it?

22  **A.**  It is a U.S. patent, and would you like me to describe

23  the --

24  **Q.**  If you would, thank you.

25  **A.**  It is a patent that describes the splitting of the

1   titanium tetrachloride feed into two separate streams and only

2   feeding a portion of it at the slot and feeding the rest of it

3   downstream from the slot as a liquid rather than as a vaporized

4   gas with the aim of saving energy by not having to put energy

5   into that feed to vaporize it, but instead using the heat of

6   reaction that occurred ahead of the point of liquid

7   introduction to do the vaporization for you.

8   **Q.**   Does that patent reveal information from the Accession

9   Report?

10  **A.**   No.

11  **Q.**   Okay.  And I want to go back briefly to 1914.

12          **MR. AXELROD:**  And, Ms. Ottolini, can I turn on the

13  ELMO?

14          **THE COURT:**  Sure.

15          **MR. AXELROD:**  Thank you.

16  **Q.**   And I'm going to take that back from you for a minute,

17  Exhibit 1914.  Thank you.

18      Okay.  And, so, this is the patent that we were just

19  talking about, Exhibit 1914.  Do you see that before you?

20  **A.**   Yes.

21  **Q.**   And I'm going to turn back a few pages into this patent

22  just to briefly talk about some of the examples that are

23  provided, and it -- let me see if I can --

24          **THE CLERK:**  The little button.

25

DIEMER - DIRECT / AXELROD

1    BY MR. AXELROD:

2    Q.    -- zoom this in a little bit.

3         So I'm going to talk about the first example, and I'm

4    going to zoom in a little bit because it does contain a number

5    of pieces of information where -- and I'll -- right there it

6    says "Residence Time"?

7    A.    Yes.

8    Q.    And identifies a specific residence time of

9    8.6 milliseconds; right?

10   A.    Right.

11   Q.    And earlier in the patent -- and that's for a specific set

12   of conditions; right?

13   A.    Yes.

14   Q.    Okay.  Does that specific residence time figure allow you

15   to design a geometry for an oxidation reactor?

16   A.    Not without extra information.

17   Q.    And that's for the reasons you identified when you were

18   sketching out the different possibilities for residence time?

19   A.    Exactly.

20   Q.    Now, the patent also indicates -- on the very first page,

21   it talks about a range of residence time from 1 to

22   16 milliseconds.  Do you see that?

23   A.    Yes.

24   Q.    So perhaps to the uninitiated, the distance between 1 and

25   16 milliseconds sounds very small.  Could you describe the

DIEMER - DIRECT / AXELROD

1  difference in that time range for the oxidation reaction?

2  **A.**   That's a factor of 16; and, so, if you were to keep the

3  diameter of the mix section the same, that's a difference of 16

4  in length.  One -- a 16-millisecond residence time reactor

5  would be 16 times as long as a 1-millisecond residence time

6  reactor.

7      If you were to keep the distance the same, the

8  1 millisecond -- the 16-second -- millisecond residence time

9  reactor would be four times the diameter of the 1 millisecond

10  residence time reactor.  So those are quite different

11  geometries, and....

12  **Q.**   No.  I want you to finish your answer.

13  **A.**   Well, when you're designing something, that's what --

14  you're interested in understanding where things are in space.

15  So 1 versus 16 is an important difference.

16  **Q.**   Are you familiar with a single-feed reactor?

17  **A.**   Yes.

18  **Q.**   Okay.  What's a single-feed reactor?

19  **A.**   A single-feed reactor is like the ones we were discussing

20  yesterday when we were discussing the Accession Report where

21  the titanium tetrachloride is all introduced at the slot.

22  **Q.**   And are you familiar with a multifeed reactor?

23  **A.**   I'm familiar with the concept.

24  **Q.**   Okay.

25  **A.**   And in the Accession Report, we report a study of

1    multifeed reactor designs.

2    **Q.**   Does the Accession Report address single-feed reactors,

3    though?

4    **A.**   It does.  All of the information used to generate the

5    mixing correlation was for single-feed reactors.

6    **Q.**   And, so, is the report more relevant to multifeed reactors

7    versus single-feed reactors?

8    **A.**   No.

9    **Q.**   Why not?

10   **A.**   For the reasons we discussed yesterday regarding the

11   placement of the scrubs T and the quench introduction,

12   understanding how long it takes to mix the reactants even if

13   the TiCl is fed at only one place is important for the reactor

14   design or operation.

15          **MR. AXELROD:**  And, Your Honor, may I approach

16   Dr. Diemer with Exhibit 162?

17          **THE COURT:**  Yes, you may.

18   **BY MR. AXELROD:**

19   **Q.**   I'm handing you, sir, what's Exhibit 162.  This is the

20   Accession Report.

21          And I want to talk about computer code.  Does the report

22   contain computer code?

23   **A.**   It does.

24   **Q.**   And is that found at Appendix B?

25   **A.**   It is.

1    **Q.**    And, Ms. Mahoney, if you could bring up page 162-0040.

2         Okay.  And, Dr. Diemer, can you describe what we're

3    looking at here?

4    **A.**    We're looking at the cover sheet to Appendix B, which

5    describes the different pieces of computer code that are

6    contained in it.

7    **Q.**    And is that code in a particular language?

8    **A.**    It is in, I believe, FORTRAN 77.

9    **Q.**    Okay.  And what's the -- and is that a language that

10   you're familiar with?

11   **A.**    Yes.

12   **Q.**    What's the purpose of this code that's in Appendix B?

13   **A.**    This is part of a larger computer program that describes

14   the oxidation reactor and flue with the aim of calculating how

15   the temperature changes in it, how the extent of reaction

16   changes versus distance, and how the particle size changes with

17   distance.

18   **Q.**    So is it a program to model the correlation that you

19   created and make -- is that part -- is that the purpose of this

20   code?

21   **A.**    The code was created long before the correlation was

22   developed.  The purpose of showing this code -- these code

23   components in the appendix is just to show what we changed in

24   order to implement the correlation into this bigger model.

25   **Q.**    So Appendix B, it's a partial set of code?

1  **A.** Yes. It's not a complete program.

2  **Q.** Okay. And what are the portions -- if you could walk

3  through what portions of the code are contained in Appendix B.

4  **A.** There are several -- if you look at the list, you will see

5  a file extension dot INC. There are several of those elements,

6  and those make data available to multiple routines in the

7  program, so -- and you would have -- I would have to open this

8  up and look carefully. I don't think you want that.

9  **Q.** We don't need to go through all the code, but perhaps one

10  of the codes there is TIO2.FOR. Do you see that?

11  **A.** I do.

12  **Q.** So what's that?

13  **A.** So that is the main program that calls in all of the

14  different elements at the appropriate time to do that part of

15  the computation. So it is the main program. And if you go

16  through that, you'll see, "Call this program. Call that

17  program," in a logical sequence in order to do this overall

18  calculation that we desire to do.

19  **Q.** But to be clear, you couldn't run the whole program just

20  based on the elements that are in Appendix B?

21  **A.** No.

22  **Q.** Okay. And this program or set of codes -- I'm sorry, it's

23  in the FORTRAN language; right?

24  **A.** Yes, it is.

25  **Q.** And is that a commonly used language today?

**DIEMER - DIRECT / AXELROD**

1    **A.**   No.

2    **Q.**   Okay.  Is this code useless because it's in FORTRAN?

3    **A.**   Not particularly.  If you had the entire code, for

4    example, you could figure out exactly what was going on, and

5    you could recreate the same calculations on any platform.

6    **Q.**   So you could translate what's in FORTRAN into a more

7    commonly used code today?

8    **A.**   Right.

9    **Q.**   Now, do you need the code to calculate mixing length?

10   **A.**   No.

11   **Q.**   Okay.  Could you just calculate mixing length based on the

12   correlation?

13   **A.**   Yes, you could --

14   **Q.**   Okay.

15   **A.**   -- provided you have all the inputs.

16   **Q.**   Right.  And I want to bring up -- you had mentioned -- I

17   think in discussing the correlation you had talked about

18   particle size as well earlier.

19   **A.**   Okay.

20   **Q.**   Does the model allow for assessing or evaluating particle

21   size in this process?

22   **A.**   Yes.

23   **Q.**   How?

24   **A.**   This overall model has the equations of particle growth in

25   it; and, so, the appropriate equations are in there for

1  calculating how particles that form in this reaction and mixing

2  zone then grow as they go through the flue.

3  **Q.**  And I'm going to ask you -- Ms. Mahoney, could you bring

4  up Exhibit 209, page 37?

5       And to remind -- this is an admitted exhibit, and this is

6  in Mr. Liew's handwriting.

7       Dr. Diemer, if you could -- I want to blow up the bottom

8  third there where it says "FORTRAN Program."

9       Could you please read that, sir?

10  **A.**  (reading)

11       "FORTRAN Program - modeling slot versus," an

12       abbreviation for particle size," slot operation width to

13       predict particle size, fit for experience."

14  **Q.**  Is that statement a fair description of some of the

15  modeling capabilities of the FORTRAN code we've been talking

16  about?

17  **A.**  Yes.

18  **Q.**  Now, if you could back out of that for a moment.  Oh,

19  okay.

20       Are you familiar with a gentleman named Tim Spitler?

21  **A.**  Yes.

22  **Q.**  And how are you familiar with Mr. Spitler?

23  **A.**  Tim was an employee of the titanium dioxide business with

24  whom I worked.  He engaged me to do evaluations and analyses

25  regarding programs he was working on for the business,

DIEMER - DIRECT / AXELROD

1    including programs in oxidation.

2    **Q.**   And was he one of the recipients of this Accession Report?

3    **A.**   Yes.

4    **Q.**   And I want to -- if we could go page 162-108, Ms. Mahoney.

5         And, Dr. Diemer, is that the distribution list for this

6    report?

7    **A.**   Yes.

8    **Q.**   And we'll blow that up for you.

9         Okay.  And who determined the distribution list for this

10   report?

11   **A.**   I did.

12   **Q.**   And what was that based on?

13   **A.**   It was based on essentially need-to-know.  The top portion

14   are employees of the titanium dioxide business who all did work

15   in oxidation.

16        The second --

17   **Q.**   Sorry.  Let me stop you there.

18        And I see -- is that Mr. Spitler there, the third one from

19   the end of that section, T.M. Spitler?

20   **A.**   T.M. Spitler, yes.

21   **Q.**   Okay.  So you selected him specifically to receive this

22   report because he was working in the area of oxidation?

23   **A.**   Yes.

24   **Q.**   And what other components are described in the

25   distribution list?

**DIEMER - DIRECT / AXELROD**

1   **A.**   There's a section of people in Central Science and

2   Engineering who were attempting to build a pilot scale

3   oxidation reactor.  So they got copies of this report.

4   **Q.**   And then, finally?

5   **A.**   Finally there are people in Engineering, my colleagues and

6   managers who had connections to the titanium dioxide business

7   and did work for them.

8   **Q.**   Now, I wanted to ask you -- if we could, Ms. Mahoney, go

9   to the very first page of the report.

10          And I want to talk to you a little bit more about the

11  security designation and treatment of this particular document.

12  And the bottom of the first page you had -- it indicates that

13  it contains confidential information.  Do you see that?

14  **A.**   I do.

15  **Q.**   Okay.  And that it's to be destroyed or disposed of in

16  conformance with PIP guidelines; right?

17  **A.**   Yes.

18  **Q.**   So was there a procedure for the handling of this

19  document?

20  **A.**   A confidential document should be kept in a locked file

21  cabinet when not in use.

22  **Q.**   And was there a procedure for the disposition of the

23  document?

24  **A.**   When you were finished with it?  One could send it back to

25  a central file system, or one could deposit it in a shred bin

**DIEMER - DIRECT / AXELROD**

1   that collected confidential items that were no longer needed

2   and were to be disposed of.

3   **Q.**   Now, the document you have in front of you is a hard-copy

4   document; right?

5   **A.**   Yes.

6   **Q.**   Does this document now exist in electronic version?

7   **A.**   It does.

8   **Q.**   And how does one gain access to it electronically?

9   **A.**   One has to obtain a high-level approval.  In my case, if I

10  want a copy of this from our electronic document library, I

11  have to ask my director's approval; and --

12  **Q.**   And if you ask the approval and it's obtained, then what's

13  the next step to getting it?

14  **A.**   The electronic document library will send it to me.  It

15  will be password protected.  They'll send me the password

16  under, I believe, a separate communication, and the password

17  expires.  So I only have this document for a limited amount of

18  time.

19  **Q.**   Okay.  I want to ask you -- I want to switch gears a

20  little bit and ask you, stepping away from the Accession Report

21  for a moment, did you execute an employment agreement with

22  DuPont?

23  **A.**   Yes, I did.

24  **Q.**   And does it -- if we could bring up Exhibit 775, page 1.

25  And if we could just blow up the text from "Employment

**DIEMER - DIRECT / AXELROD**

1    Agreement" down through paragraph 1.  Down through, I'm sorry,

2    Ms. Mahoney, the first numbered paragraph, the one that's

3    numbered 1 there about halfway down.

4        Okay.  Does your employment agreement contain this type of

5    language?

6    **A.**   I believe so.

7    **Q.**   And in particular do you see paragraph 1 there?

8    **A.**   I do.

9    **Q.**   Okay.

10        **MR. FROELICH:**  I'm going to object, Your Honor.

11        **THE COURT:**  Is this in evidence?

12        **MR. AXELROD:**  Yes.

13        **MR. FROELICH:**  It's in evidence, but he just said he

14    believes so.

15        **THE COURT:**  All right.

16        **MR. FROELICH:**  I don't think he's in a position to

17    interpret anything.  It's not his document.

18        **THE COURT:**  Well, I'll overrule the objection, but I'm

19    not going to allow extensive testimony about this unless a

20    foundation is set forth, more of a foundation.  So I'll

21    overrule the objection to that question, but I think you should

22    ask a different question.

23        **MR. AXELROD:**  Sure.

24    **Q.**   Does your employment agreement generally describe how to

25    handle confidential information?

**DIEMER - DIRECT / AXELROD**

1  A.   Yes.

2  Q.   And, in general terms, what does it say?

3  A.   It says I am to treat it by corporate guidelines and not

4  disclose it to people outside the company.

5  Q.   Okay.  And do you receive training -- is that something

6  you executed the first day you arrived at DuPont?

7  A.   Yes.

8  Q.   And do you periodically receive training about the

9  handling of confidential information during --

10 A.   Yes.

11 Q.   -- the time that you've been at DuPont?

12      Can you describe that training?

13 A.   There are almost a continual set of contacts about this

14 topic.  There are discussions of it at the beginning of

15 meetings, for example; not every meeting, but with regular

16 frequency.

17      We take a training module called Legal Eagle every year.

18 Those module topics change from year to year, but some of them

19 pertain to protecting corporate information.

20      Recent group meeting entirely focused on classifying

21 electronic documents properly and protecting them.

22 Q.   Are you familiar -- I gather that in the course of your

23 time at DuPont, you've actually visited various TiO2 plants?

24 A.   Yes.

25 Q.   Which ones?

**DIEMER - DIRECT / AXELROD**

1  A.   Edgemoor, New Johnsonville, and Antioch, which no longer

2  exists.

3  Q.   When you visited -- are you familiar in general terms with

4  the physical security measures that were in place for those

5  visits?

6  A.   Yes.

7  Q.   Could you describe them?

8  A.   There's a guardhouse.  You have to access -- gain access

9  to the plant through the guardhouse.  You have to show

10  credentials showing that you're an employee.

11      If it's your first visit and the guards don't know who you

12  are, they will want to know who you are visiting and call them

13  to come escort you.

14      If you're a visitor from outside the company, you will be

15  escorted all the time everywhere you go.

16  Q.   Are you familiar with DuPont's proprietary information

17  protection policies?

18  A.   Generally.

19  Q.   And are those -- is that referred to as PIP?

20  A.   Yes.

21  Q.   Okay.  Could you just describe in general terms what that

22  is?

23  A.   The PIP program indicates several levels of classification

24  and gives guidelines for how to handle documents within those

25  levels of classification.

1          **MR. AXELROD:**  Your Honor, may I approach with

2   Exhibit 856?

3          **THE COURT:**  Yes, you may.

4          **MR. AXELROD:**  Thank you.

5   **Q.**   Dr. Diemer, I'm handing you what's been marked as

6   Exhibit 856, and ask if you recognize that document.

7   **A.**   (Witness examines document.)  Yes.

8   **Q.**   What is it?

9   **A.**   It is a guide for safeguarding DuPont Company documents

10  and information.

11  **Q.**   Okay.  So is that a PIP guideline?

12  **A.**   It says "Proprietary Information Protection" on the cover.

13         **MR. AXELROD:**  Okay.  The parties have stipulated that

14  that document is from DuPont and it's authentic.

15         **THE COURT:**  All right.  Is that correct, Counsel?

16         **MR. GASNER:**  Yes, Your Honor.

17         **MR. AXELROD:**  And at this point the Government offers

18  it into evidence.

19         **MR. GASNER:**  No objection.

20         **THE COURT:**  It's admitted.

21     (Trial Exhibit 856 received in evidence)

22  **BY MR. AXELROD:**

23  **Q.**   And, Dr. Diemer, that version is from October 1975?

24  **A.**   Yes.

25  **Q.**   Okay.  And, Ms. Mahoney, if we could bring up the first

1    page for a moment.

2         Okay.  So this is the cover of the document.  And is this

3    a document that gets disseminated to employees?

4    **A.**  Yes.

5    **Q.**  And if we could go to page 3, Ms. Mahoney, and if you

6    could blow up the first paragraph underneath "Introduction."

7         And, Dr. Diemer, can you please read that paragraph?

8    **A.**  (reading)

9              "DuPont know-how represents a tremendous investment

10             in time, money, and effort.  Safeguarding this information

11             is a more important matter than many employees realize.

12             Technology and timing are among the most important

13             elements of corporate success today; and both are easily

14             wasted by breakdowns in safeguarding information, whether

15             deliberate or inadvertent."

16   **Q.**  And if we could go back from there, and in the next column

17   it says under Roman Numeral II, "Policies and Rules," and if

18   you could highlight the first paragraph -- blow up the first

19   paragraph, Ms. Mahoney.

20        And, Dr. Diemer, could you please read that?

21   **A.**  (reading)

22             "All information relative to company affairs and all

23             documents containing such information should be considered

24             as restricted to use within the Company, unless released

25             for disclosure outside the Company as defined by

1          departmental guidelines."

2     Q.   And you'll see, Dr. Diemer, there the term "documents" has

3     an asterisk with it; and if we go to the bottom, that's where

4     the asterisk explanation is provided.

5          And, Ms. Mahoney, could you please go down to that

6     asterisk and blow that section up?

7          And, Dr. Diemer, could you please read that?

8     A.   (reading)

9               "The term 'document' in this guide is intended to

10              include all forms in which Company information is

11              recorded; e.g., notebooks, letters, memoranda,

12              photographs, computer tapes, cards, printouts, dictation

13              disks and tapes, proofs, reproduction masters, engineering

14              drawings, videotapes, slides, reports, typewriter ribbons,

15              magnetic tapes and cards, microfilms, and

16              telecommunications."

17    Q.   Now, the document -- and you can -- let's go to page 5 of

18    this document.

19         And the document sets forth different classifications,

20    internal classifications, of DuPont documents.  Do you see

21    that?

22    A.   I do.

23    Q.   And is the highest category special control?

24    A.   Yes.

25    Q.   Okay.  And, Ms. Mahoney, if you could highlight in that

**DIEMER - DIRECT / AXELROD**

1  second column, there's a section "DuPont Confidential Special

2  Control" in the middle and then a definition.

3      And, so, right above that it says "DuPont Confidential

4  Special Control."  Do you see that on the document, Dr. Diemer?

5  **A.**  (Witness examines document.)  Yes.

6  **Q.**  Okay.  Could you please read that definition?

7  **A.**  (reading)

8          "This designation should be used only for those few

9          documents which contain highly sensitive DuPont

10         proprietary business or technical information and to which

11         access is to be restricted only to those individuals with

12         a need to know.  Examples may be earnings reports,

13         departmental sales forecasts, selected research and

14         process information, as determined by departmental

15         guidelines."

16 **Q.**  And then further on in this document it goes on to

17 identify the specific handling procedures for the documents

18 based on their security classification; is that right?

19 **A.**  Yes.

20 **Q.**  Okay.  And I'm not going to ask you to read all of that;

21 but I did want to go back to page 8, and there's a discussion

22 called "Orientation Training" in the second column.

23      Ms. Mahoney, if you could blow up from above -- right,

24 from "Orientation Training" down through bullet 6.

25      And, Dr. Diemer, could you please read this paragraph?

**DIEMER - DIRECT / AXELROD**

1   **A.**   (reading)

2           "Programs for all employees, especially new

3       employees, should cover the following:

4           "The importance of safeguarding Company information.

5           "The meaning of the Employee Agreement.

6           "The meaning of 'confidential information.'

7           "The need to designate certain documents and

8       information.

9           "The explanation of the three DuPont designations and

10      their proper use, as described on pages 3, 4, and 5 of

11      this Guide.

12          "The fact that special designations are of no

13      significance if documents are not properly handled and

14      stored."

15  **Q.**   And is that information consistent with the kind of

16  training that you've received over your time at DuPont?

17  **A.**   Yes.

18  **Q.**   And this policy was in effect, either this or different

19  iterations, throughout the time that you've been at DuPont?

20  **A.**   Yes.

21          **MR. AXELROD:**  Your Honor, may I approach with

22  Exhibit 892?

23          **THE COURT:**  Yes.

24  **BY MR. AXELROD:**

25  **Q.**   Dr. Diemer, I'm handing you what's been marked as

1   Exhibit 892.  Do you recognize that document?

2   **A.**   (Witness examines document.)  It looks just like the other

3   one.

4   **Q.**   Okay.  Does that have a different revision date?  If you

5   look on page 17, the last page, at 3/84.

6   **A.**   (Witness examines document.)  Ah, yes.

7   **Q.**   So is that an update of the guide we just looked at?

8   **A.**   Yes.

9           **MR. AXELROD:**  Okay.  And the parties have stipulated

10  that this document is from DuPont and authentic.

11          **MR. GASNER:**  We have.

12          **MR. AXELROD:**  The Government offers 892 in evidence.

13          **THE COURT:**  Any objection?

14          **MR. GASNER:**  None.

15          **THE COURT:**  Admitted.

16      (Trial Exhibit 892 received in evidence)

17  **BY MR. AXELROD:**

18  **Q.**   And I'm not going to ask you to go through that, but

19  suffice it to say that, in general terms, does that contain the

20  same type of information and address the same kinds of policies

21  that we talked about with the earlier exhibit?

22  **A.**   It does.

23          **MR. AXELROD:**  Your Honor, may I approach with

24  Exhibit 887?

25          **THE COURT:**  Yes.

DIEMER - DIRECT / AXELROD

1   **BY MR. AXELROD:**

2   **Q.**   Dr. Diemer, I'm handing you what's been marked as

3   Exhibit 887, and ask if you recognize that document, or the

4   contents of the documents.

5   **A.**   (Witness examines document.)  Yes.

6   **Q.**   Okay.  And is this another proprietary information

7   protection policy document?

8   **A.**   Yes.

9   **Q.**   And this one is from 1994, I believe.  If you look at the

10  last page, page 15, it says "12/94."  Do you see that?

11  **A.**   Yes.

12  **Q.**   Okay.  So, again, this is another example of the type of

13  policy that's been in place during your time at DuPont?

14  **A.**   Yes.

15          **MR. AXELROD:**  Your Honor, the parties have stipulated

16  that this document is from DuPont and authentic.

17          **MR. GASNER:**  We have.

18          **MR. AXELROD:**  And the United States offers it.

19          **MR. GASNER:**  No objection.

20          **THE COURT:**  Admitted.

21      (Trial Exhibit 887 received in evidence)

22          **MR. AXELROD:**  And one housekeeping matter.  I had

23  spoken with Dr. Diemer about Exhibit 2351, which was a patent.

24  I'd move that into evidence as well.

25          **THE COURT:**  All right.  Any objection?

1          **MR. GASNER:**  No objection.

2          **THE COURT:**  Admitted.

3      (Trial Exhibit 2351 received in evidence)

4          **MR. AXELROD:**  I have no further questions.

5          **THE COURT:**  Thank you.

6      Let's take a stretch break while Mr. Gasner is getting

7  ready.

8          You can take a stretch break, too, if you like, Doctor.

9                  (Pause in proceedings.)

10         **THE COURT:**  All right.  Please be seated.

11     You may proceed with your cross-examination.

12         **MR. GASNER:**  Thank you, Your Honor.

13                  **CROSS-EXAMINATION**

14  BY MR. GASNER:

15  **Q.**  Good morning, Dr. Diemer.

16  **A.**  Good morning.

17  **Q.**  I want to ask you a few questions about the drawing that

18  you did yesterday with Mr. Axelrod.  Can you see your first

19  drawing from there?

20  **A.**  I can.

21  **Q.**  And this is a sketch of a typical reactor; is that true?

22  **A.**  Yes.

23  **Q.**  So it is standard to have in a reactor kind of a tubular

24  shape for the reaction area; true?

25  **A.**  Yes.

1    Q.    It's typical to have heated oxygen that enters the reactor

2    at one end?

3    A.    Yes.

4    Q.    Those heaters typically are sold by vendors to DuPont and

5    others?

6    A.    I'm not sure how we procure the equipment.  Some of these

7    are constructed to our design rather than -- they're not

8    standard items, if that's what you mean.  We have designs, I

9    believe, that we give to vendors.

10   Q.    And everybody that has an oxidation reactor heats up the

11   oxygen one way or another; true?

12   A.    When you say "everybody," do you mean all the DuPont

13   plants?

14   Q.    Well, my question was intended more broadly.  Are you

15   familiar with oxidation reactors at other plants?

16   A.    You mean other companies?

17   Q.    Yes.  I'm sorry.  Other companies.

18   A.    Not generally.

19   Q.    Have you studied their patents or other disclosures that

20   talk about the kinds of oxidation reactors that other companies

21   use?

22   A.    Not in my role at DuPont, no.

23   Q.    In some other role have you become familiar?

24   A.    No.

25   Q.    Okay.  So, really, how long have you been at DuPont?

**DIEMER - CROSS / GASNER**

1   **A.**   I've been at DuPont for 40 years.

2   **Q.**   40 years?

3   **A.**   Uh-huh.

4   **Q.**   So you've been kind of focused on what DuPont does; fair?

5   **A.**   That is correct.

6   **Q.**   Okay.  But you have some sense that all oxidation

7   reactors, whether made at DuPont or elsewhere, introduce oxygen

8   at one end; true?

9   **A.**   I believe that, yes.

10  **Q.**   And all of them introduce TiCl to react with the oxygen;

11  right?

12  **A.**   In some way.

13  **Q.**   And many of them use slots for introduction of the TiCl;

14  true?

15  **A.**   Again, since I don't know what all of these other

16  companies really do, that would be a guess on my part.

17  **Q.**   Okay.  But you did look at some sketches relating to the

18  oxidation reactor that Mr. Maegerle sketched out for USAPTI;

19  true?

20  **A.**   I did.

21  **Q.**   And do you recall that in their design, there was an

22  adjustable slot?  Do you recall that?

23  **A.**   I could not tell that from the drawing, that it was

24  adjustable.

25  **Q.**   But you know that to be true; do you not?

DIEMER - CROSS / GASNER

1   **A.**   Actually, I don't.  If you say that it's adjustable, then

2   it is.

3   **Q.**   All right.  So you studied the drawings, but couldn't

4   determine that the slot was adjustable or not; is that a fair

5   statement?

6   **A.**   Yes, that's a fair statement.

7   **Q.**   You've met with the FBI, though; true?

8   **A.**   I have.

9   **Q.**   And they showed you some exhibits in this case, including

10  81, 89, 90, 92, 100, 108, 109, and 119.  Do you recall that?

11  **A.**   I've seen exhibits.  I have no clue what those numbers

12  mean.

13  **Q.**   Okay.  But you did see a variety of sketches that

14  Mr. Maegerle had done for USAPTI; true?

15  **A.**   I saw some sketches, yes.

16  **Q.**   But you were unable to determine from those sketches

17  whether or not the USAPTI design had an adjustable slot for the

18  TiCl entry into the oxidation reactor; is that fair?

19  **A.**   That's a fair statement.

20  **Q.**   Okay.  And then you mentioned, in talking about your first

21  sketch, that there's a point along the oxidation tube where

22  scrubs are introduced; is that true?

23  **A.**   Yes.

24  **Q.**   And that, too, is commonplace in the industry to have some

25  kind of material used to scrub the inside of the oxidation tube

DIEMER - CROSS / GASNER

1  as the process goes along; true?

2  A.   I think -- I've seen that in other patents, so I have seen

3  that aspect, yes.

4  Q.   Okay.  And in your drawing that you did today, and sorry

5  to cramp your style, but you drew several cylinders or tubes in

6  varying diameters; right?

7  A.   Yes.

8  Q.   And your point was that velocity increases if you make the

9  tube smaller?

10  A.   That's not the entire point, but that's one of the points.

11  Q.   That was one of your points?

12       And that's a basic principle --

13       THE COURT:  Mr. Gasner, please don't talk over him.

14       And, Doctor, you need to let him finish his question.

15       THE WITNESS:  I'm sorry.

16       THE COURT:  Wait a beat.  It's different than normal

17  dialogue.  Otherwise there will be dashes in the transcript.

18       THE WITNESS:  Thank you.

19       THE COURT:  Thank you very much.

20       MR. GASNER:  My apologies, Your Honor.  I will try to

21  do better.

22       THE COURT:  Thank you very much.

23  BY MR. GASNER:

24  Q.   It's true that that's a commonplace engineering principle

25  that smaller diameter creates greater velocity; right?

DIEMER - CROSS / GASNER

1   A.   Yes, it is.

2   Q.   In our everyday experience, we have a garden hose and you

3   squeeze the end, that makes a smaller diameter and increases

4   the flow of the water; right?

5   A.   Yes.

6   Q.   And in designing an oxidation reactor, there are lots of

7   applications of basic engineering principles; true?

8   A.   That is true.

9   Q.   I wanted to talk to you about your mixing length project

10  that you talked about at length with Mr. Axelrod.

11       Do you have Exhibit 162 in front of you?

12  A.   Yes.

13  Q.   That's the original document; true?

14  A.   Yes.

15  Q.   It's got a beige cover on it?

16  A.   Yes.

17  Q.   It's got a black kind of old-fashioned piece of tape along

18  the side; true?

19  A.   Yes.

20  Q.   And you missed I was waving that around in front of the

21  jury in opening statement.  That comes from DuPont; right?

22  A.   I expect so.

23  Q.   It's been stipulated that that particular document was

24  produced by DuPont.  So I want to go through the structure of

25  that particular document, if I might.

**DIEMER - CROSS / GASNER**

1        So the front page, let's just start there, if we could.

2        And, Mr. Guevara, if you could put up the front page of

3   162, which has been admitted.

4        I'll get this out of the way.

5        This particular report was written by Scott Sills.  Do you

6   see that?

7   **A.**   Yes.

8   **Q.**   Who is or was Scott Sills?

9   **A.**   Scott was a summer intern and then a limited service

10  employee when he wrote this document.  He was a student at the

11  University of Delaware.

12  **Q.**   So this particular report was written by a student; true?

13  **A.**   Right.

14  **Q.**   And it says that it's an improved mixing correlation for

15  the TiCl4 oxidation reaction computer model.  Do you see that?

16  **A.**   Yes.

17  **Q.**   And below that it says "Progress Report"?

18  **A.**   Yes.

19  **Q.**   So this particular document was a summer intern's work,

20  and it relates to an improvement on work that you had done

21  before; true?

22  **A.**   It actually incorporates work that I had done into the

23  computer program.

24  **Q.**   Okay.  Now, a correlation is a mathematical concept;

25  right?

**DIEMER - CROSS / GASNER**

1   **A.**   Yes.

2   **Q.**   That has to do with looking at the relationships between

3   sets of data; is that fair?

4   **A.**   Yes.

5   **Q.**   And then if we go on to the rest of the title, it talks

6   about an oxidation reaction computer model.  Do you see that?

7   **A.**   Yes.

8   **Q.**   A model is also a mathematical construct that takes data

9   in and tries to generate results; true?

10   **A.**   Correct.

11   **Q.**   We have econometric models where people try to predict

12   where the economy is going; right?  Have you heard of those?

13   **A.**   Yes, I have.

14   **Q.**   And there are models that try to predict all kinds of

15   things in science generally; right?  Is that true?

16   **A.**   (Nods head.)

17   **Q.**   You need to say "yes" or "no" just for the record.

18   **A.**   Yes.

19   **Q.**   I see that you're nodding.

20        So let's continue with our guided tour of the structure of

21   your report.

22        This is an improved correlation, that is, improved

23   mathematical formula, relating to relationships between data

24   that is going to go into a model, which is another kind of

25   mathematical construct; true?

**DIEMER - CROSS / GASNER**

1  **A.**    Yes.

2  **Q.**    Okay.  So the first part of Mr. Sills' paper goes from

3  page 1 through page 30; true?

4  **A.**    (Witness examines document.)  Can you mention the sections

5  you're referring to?

6  **Q.**    So if you look in the lower right -- actually, you may --

7  are there no page numbers on that one?

8  **A.**    Did you say page 30 or page 3?

9  **Q.**    Page 30.  The one that -- I don't think you have page

10  numbers, so let me see if I can guide you.

11      Up until --

12  **A.**    I do have.  I have page numbers up to Appendix A.

13  **Q.**    Okay.  So let's just go to Appendix A, which, in the copy

14  that we have on the screen, has page numbers on it.

15      So up through Appendix A, that's the part that Mr. Sills

16  wrote; right?

17  **A.**    Yes.

18  **Q.**    And many of the questions that Mr. Axelrod asked you about

19  yesterday related to that part of the report; right?

20  **A.**    Some of them, yes.

21  **Q.**    So certainly the parts that dealt with the tables,

22  there's -- there are tables that he asked you about.  Let's

23  take this and we'll take it one step at a time.

24      So Mr. Sills' section is pages 1 through 30 up to

25  Appendix A.  Then Appendix A is a letter that you wrote to

**DIEMER - CROSS / GASNER**

1  Mr. Kremer in 1993; right?

2  **A.**   Yes.

3  **Q.**   And that goes on for a few pages.

4        And attached to Appendix A are the tables that you went

5  through with Mr. Axelrod yesterday; right?

6  **A.**   Some of the tables.

7  **Q.**   All right.  RBD-1 is there.  It's page 36.

8  **A.**   I'm looking at it.  Thank you.

9  **Q.**   Okay.  And if you go two more pages, there's Table RBD-2;

10  right?  Do you see that?

11  **A.**   Yes.

12  **Q.**   And then you get to Appendix B; right?

13  **A.**   Yes.

14  **Q.**   Okay.  So those two tables, RBD-1 and 2, are part of

15  Appendix A as attachments to a letter that you wrote to

16  Mr. Kremer?

17  **A.**   Yes.

18  **Q.**   Continuing our guided tour, Appendix B are the model

19  revisions that Mr. Axelrod just asked you about today?

20  **A.**   Yes.

21  **Q.**   That goes on for a long time until we get to Appendix C,

22  which is page 80.  I don't know if -- you have little blue slip

23  sheets, so you get to use the color to orient yourself; right?

24  **A.**   Yes.

25  **Q.**   Okay.  So you're with me at Appendix C?

1   **A.**    I am.

2   **Q.**    And that's called, "A Variable Map for Input File.  Only

3   Applies to Edgemoor Reactor."  Do you have that in front of

4   you?

5   **A.**    Yes.

6   **Q.**    Then a couple pages back, your next blue slip sheet,

7   Appendix D is an example output; right?

8   **A.**    Yes.

9   **Q.**    Okay.  And Appendix E, your next blue slip sheet, page 95

10  in the exhibit, is called, "Molar Flow TI versus Axial Distance

11  for Example Output."  Do you see that?

12  **A.**    Yes.

13  **Q.**    Next page is Appendix F, "Diemer Letter Confirming New

14  Model Results," right?

15  **A.**    Yes.

16  **Q.**    Next slip sheet, page 102, Appendix G, "TK Solver Routine

17  to Generate Triple Feed Reactor Data"?

18  **A.**    Yes.

19  **Q.**    And that's page 102.

20       And then -- almost done with our guided tour -- Appendix H

21  is Triple Feed Reactor Data, page 105?

22  **A.**    Yes.

23  **Q.**    And then there's a distribution list at the end of the

24  document, page 108.  And that has Mr. Spitler's name on it,

25  right?

DIEMER - CROSS / GASNER

1    **A.**    Yes.

2    **Q.**    Can you tell from the distribution list whether this whole

3    document went to Mr. Spitler, or just attachment H or Appendix

4    H?  Can you tell just looking at it?

5    **A.**    Yes.

6    **Q.**    What's your take?

7    **A.**    The entire document is bound, and the intention was that

8    every recipient got the entire document.

9    **Q.**    Okay.  That's the significance of the distribution list on

10   page 108, in your view looking back on this?

11   **A.**    Yes.

12   **Q.**    Okay.  Did the government tell you that the only thing

13   that they found at USAPTI's office was Appendix B?

14        **MR. AXELROD:**  Objection.

15        **THE COURT:**  Sustained.

16   **BY MR. GASNER:**

17   **Q.**    Are you aware -- I understand your testimony about this

18   document, but do you have any awareness of what parts of this

19   were found as part of the government's investigation in this

20   case?

21        **MR. AXELROD:**  Objection.

22        **THE COURT:**  Sustained.

23   **BY MR. GASNER:**

24   **Q.**    Let's talk about your work, if I might, Dr. Diemer.

25        The modeling that -- DuPont has done modeling for a long

1    time of its titanium dioxide plants, true?

2    **A.**   Yes.

3    **Q.**   So there -- if you take a look at page 2 of -- it's page 5

4    of the report.  It's page 2 of Mr. Sill's section.  In the,

5    kind, of original pagination it's page 2.  And in the last full

6    paragraph it talks about computer modeling that DuPont did in

7    1973, right?

8    **A.**   Uh-huh.

9    **Q.**   And --

10             **THE COURT:**  Is that a yes?

11             **THE WITNESS:**  "Yes."

12   **BY MR. GASNER:**

13   **Q.**   And your particular work in 1993 related to the computer

14   model that DuPont was using at that time, right?

15   **A.**   Actually, no.

16   **Q.**   Did it relate to an earlier version of the model, or what?

17   **A.**   The computer-generated results I was using in that work

18   were generated by a contract research agreement using a

19   completely different kind of code, a much more detailed code

20   for calculating computational fluid dynamics.

21   **Q.**   What was the name of that outside contractor?

22   **A.**   Cham of North America.

23   **Q.**   So Cham -- did they have access to bigger and better

24   computers?

25   **A.**   They had this code which at the time was relatively

DIEMER - CROSS / GASNER

1  unique.

2  **Q.**  So the Fortran code belonged to Cham?

3  **A.**  I have no idea what language they used to code their

4  computational fluid dynamic routine.  They did not have this

5  code.

6  **Q.**  When you talk about computational fluid dynamics, that's a

7  whole area of engineering, true?

8  **A.**  It is.

9  **Q.**  And it's true, is it not, that a lot of the modeling that

10  is currently done in the titanium dioxide industry uses very

11  advanced computational fluid dynamic techniques, true?

12  **A.**  That's correct.

13  **Q.**  There's been tremendous advances in computational fluid

14  dynamics, fair?

15  **A.**  Yes.

16  **Q.**  And with computers getting more and more powerful, it's --

17  the modeling has become much more sophisticated, true?

18  **A.**  That's correct.

19  **Q.**  Back in 1993, computers had a big ole monitor on top, and

20  looked like an IBM PC pretty much, right?

21  **A.**  Yes.

22  **Q.**  Not nearly the processing power that is now available to

23  engineers, right?

24  **A.**  Yes.

25  **Q.**  Okay.  So your work was based on the technology that was

1  available to Cham at the time, in actually doing the modeling,

2  right?

3  **A.**   Yes.

4  **Q.**   Mr. Axelrod showed you a few patents.  And I'd like to

5  talk to you about those.

6       **MR. GASNER:**  Mr. Guevara, if we could look at 914.

7       (Document displayed.)

8       **MR. GASNER:**  I'm sorry, 1914.  My bad.

9       (Document displayed.)

10  **BY MR. GASNER:**

11  **Q.**   This was a patent assigned to DuPont; is that right?

12  **A.**   Yes.

13  **Q.**   And patents, generally there's a section called

14  "Background of the Invention."  Are you familiar with that?

15  **A.**   Yes.

16       **MR. GASNER:**  Mr. Guevara, if we could look at Column

17  1, Lines 14 through 18, and blow that up.

18  **BY MR. GASNER:**

19  **Q.**   So in the section called "Background of the Invention,"

20  this is where the person applying for a patent tells both the

21  examiner and the world, kind of, the state of the art as of

22  that time, right?

23  **A.**   Yes.

24  **Q.**   And the point of that is to tell the examiner what novel

25  contribution the inventor believes he or she is making to the

**DIEMER - CROSS / GASNER**

1   world, right?

2   **A.**   Yes.

3   **Q.**   Okay.  And in this particular patent that you and

4   Mr. Axelrod talked about, it says:

5          "The preparation of pigmentary titanium dioxide by

6          oxidizing titanium tetrachloride in the vapor state with

7          an oxygen-containing gas is well-known."

8          Right?

9   **A.**   Yes.

10  **Q.**   So that's -- and it then talks about various patents

11  because the examiner who's skilled in this art is going to know

12  you're not getting a patent on oxidizing titanium

13  tetrachloride, right, because that's well-known?

14  **A.**   Right.

15  **Q.**   All right.  Then it goes on.

16         **MR. GASNER:**   Let's go to the next full paragraph and

17  blow that up, if we could, Mr. Guevara.

18  **BY MR. GASNER:**

19  **Q.**   The inventors here then talk about some of the patents.

20  And they talk about, for example, that these patents disclose

21  that adding small, controlled amounts of water, et cetera,

22  promotes nucleation and production of a high-quality pigment

23  having a high carbon black undertone or CBU, right?

24  **A.**   Yes.

25  **Q.**   Part of the work that you were doing in your correlation

1  and the modeling that you were doing was to try to figure out

2  the relationship between the mixing length and the carbon black

3  undertone, right?

4  **A.**   That was one of the objectives, yes.

5  **Q.**   Carbon black undertone was what DuPont used back in 1993,

6  to characterize its products to paint manufacturers and others,

7  right?

8  **A.**   It was one measure.

9  **Q.**   DuPont doesn't use CBU anymore, do they?

10  **A.**   I think we do.

11  **Q.**   It's one of the metrics that's still used today?

12  **A.**   Yes.

13  **Q.**   Okay.  But, again, what the inventor is doing here is

14  saying that -- that there are techniques for creating high CBU

15  that are known in the art and already disclosed in patents,

16  right?  That's what the inventor is saying here, true?

17  **A.**   Yes.

18       **MR. GASNER:**  All right.  Let's go to the next

19  paragraph, if we could, Mr. Guevara.  Just one more.

20  **BY MR. GASNER:**

21  **Q.**   And, again, here's another statement to the examiner of

22  what some other patent discloses generally.

23       And this is an improvement in the production of TiO2

24  pigment by the oxidation which, and then it goes on to describe

25  some other improvement that's already out in the art, right?

1    **A.**    Right.

2    **Q.**    Okay.  Now, when we get to the claims, those are all the

3    way at the end.

4            **MR. GASNER:**  And if we could go to column -- Column 8,

5    at the very bottom, Mr. Guevara.

6    **BY MR. GASNER:**

7    **Q.**    You're familiar with the part of the patent that is called

8    the claim section, true?

9    **A.**    I'm familiar with the claim section in patents.  I have

10   not studied this one carefully.

11   **Q.**    Fair enough.  We'll keep it at a high level.

12           You've got 16 patents, yourself?

13   **A.**    I'll take the extra three that you have awarded me.

14   **Q.**    Okay.

15   **A.**    Thank you.

16           (Laughter)

17   **Q.**    You're welcome.

18           (Laughter)

19   **Q.**    So you know that the process is you do these disclosures

20   to the Patent Office to tell them what's already in the art,

21   right?

22           You need to say yes or no.

23   **A.**    Yes.

24   **Q.**    And the exam- -- then there's a back and forth with the

25   examiner, where you tinker with the claim language until the

1   patent examiner either rejects the invention entirely or gives

2   you certain claims based on the back and forth, right?

3   **A.**   Correct.

4   **Q.**   Okay.  And when you look at the claim section, a lot of

5   the elements of those claims are themselves well-known in the

6   art, right?

7   **A.**   Yes.

8   **Q.**   So, for example, the first element in A, "... reacting

9   titanium tetrachloride and an oxygen-containing gas in the

10  vapor phase, at a reaction zone temperature of at least about

11  800 degrees," that's well-known in the art, true, that

12  particular element?

13  **A.**   I guess so.

14  **Q.**   Okay.  I could show you a bunch of textbooks that have it.

15  **A.**   Thank you.

16  **Q.**   The key to getting a patent claim, it's the combination of

17  all the elements that eventually either convinces or doesn't

18  convince the examiner that those -- that combination of

19  elements is unique, true?

20  **A.**   Yes.

21  **Q.**   Okay.  So same -- let's look, just briefly, at the other

22  patent that Mr. Axelrod showed you, Exhibit 2351.

23       (Document displayed.)

24  **Q.**   This is a more recent patent, January 13, 2009.  But,

25  again, let's go to the first column, Field of the Disclosure,

**DIEMER - CROSS / GASNER**

 1  or Background of the Disclosure.

 2      This is another way of describing background of the

 3  invention.  It's what's already known in the art, right?

 4  **A.**   Yes.

 5          MR. GASNER:  And then, Mr. Guevara, if we go to

 6  Detailed Description of the Invention of the Disclosure, Column

 7  3, Line 8.

 8  **BY MR. GASNER:**

 9  **Q.**   There then comes a point where the patentee will talk

10  about what's known in the art and what they think is new about

11  the invention, true?

12  **A.**   Yes.

13  **Q.**   And then there's a claim section where whoever the

14  inventor is gets a -- a patent on a combination of elements,

15  true?

16  **A.**   Yes.

17  **Q.**   Mr. Axelrod asked you about some confidentiality paperwork

18  that DuPont had.

19      Take a look, if you would, at the first page of Exhibit

20  856, which you have in front of you.  Either on the screen or

21  hard copy, your pick.

22      (Document displayed.)

23          MR. GASNER:  And, Mr. Guevara, if you could go up to

24  the upper right-hand corner, if you could blow up the

25  handwriting.

DIEMER - CROSS / GASNER

BY MR. GASNER:

Q.   So this is a piece of paper from 1975, true?

A.   Yes.

Q.   Do you think that in your 40 years at DuPont you still have a copy of this in your possession?

A.   I am unsure.

Q.   Okay.  Do you think in your 40 years at DuPont, if you had one of these, you'd looked at it in 40 years at DuPont?

A.   I've looked at the most recent ones I've received.

Q.   Was that in connection with your testimony here, or for some other reason?

A.   Oh, no, the most recent ones were part of the group training we had on the DISO program, which superseded the PIP program.  And we got an update on all of this.  Every time we get an update, we look at the new document.

Q.   Now, would it be fair to say that in thinking about confidentiality in your day-to-day work, you wouldn't necessarily go back to your 1975 revision of the PIP policy, would you?

A.   That's fair.

          MR. GASNER:  Nothing further, Your Honor.

          THE COURT:  All right.  Any redirect?

          MR. AXELROD:  Briefly.

          THE COURT:  All right.

     I'm, sorry, Mr. Froelich.  I keep doing that and I

1  apologize.

2          **MR. FROELICH:**  It doesn't have anything to do with me.

3          **THE COURT:**  Okay.  Thank you.

4                      <u>**REDIRECT EXAMINATION**</u>

5  **BY MR. AXELROD:**

6  **Q.**   Dr. Diemer, Mr. Gasner asked you about Mr. Sills and the

7  fact that he authored a part of this document.  What was -- can

8  you just describe for the jury what your role was in -- in the

9  creation of this document and the supervision of Mr. Sills?

10 **A.**   He worked directly under me and in close supervision with

11 me, as well as with one of the recipients of the document,

12 David Zimmerman, from the titanium dioxide business.  The three

13 of -- the two of us supervised the program.  I was his

14 supervisor in engineering.  He was an engineering employee

15 during his internship, and later limited service employee term

16 of employment.

17 **Q.**   Mr. Gasner also asked you about the two patents that we

18 discussed earlier.  Do either one of those patents speak to the

19 correlation that we've been talking about?

20 **A.**   No.

21 **Q.**   And he mentioned that, you know, some information is

22 well-known in the field of titanium dioxide.  Do you recall

23 that?

24 **A.**   Yes, I do.

25 **Q.**   Is your correlation well-known?

DIEMER - RECROSS / GASNER

1   **A.**   No.

2   **Q.**   Is it known outside of DuPont, to your knowledge?

3   **A.**   Not to my knowledge.

4       **MR. AXELROD:**  No further questions.

5       **THE COURT:**  All right.  Anything further?

6       **MR. GASNER:**  Just very briefly, Your Honor.

7                    **RECROSS-EXAMINATION**

8   BY MR. GASNER:

9   **Q.**   So I understand, your correlation from 1993 is not

10  well-known, true --

11  **A.**   Yes.

12  **Q.**   -- in your opinion?

13      But there are many, many computational fluid dynamic

14  techniques available to engineers today to accomplish the same

15  objectives in different ways, true?

16  **A.**   The database upon which this was based and the specifics

17  of our operations and dimensions are not available.

18  **Q.**   So the data as to the dimensions, you believe, is not

19  available.  I understand that.

20      But the equations and modeling techniques that are

21  available today would allow a different way of accomplishing

22  the same computational objectives as what you were doing in

23  1993, true?

24  **A.**   Someone could reproduce the computational fluid dynamics

25  computations for a range of conditions of their choice.

1          MR. GASNER:  Thank you.

2          THE COURT:  All right.  Anything further?

3          MR. AXELROD:  No, Your Honor.

4          THE COURT:  All right.  You're excused.  Thank you,

5    Doctor.  You can leave the exhibits.

6        (Witness excused.)

7          THE COURT:  Is the next order of business the video?

8          MR. AXELROD:  That's correct, Your Honor.

9          THE COURT:  So we can set this up we're going to have

10   a video deposition.  I'll explain that to all of you.  We're

11   ending at 2:00 today, so we're going to have to reconfigure the

12   schedule.  But we have to set up this video and make sure it's

13   going to run okay.  We'll take our first 15-minute break.

14       Please remember the Court's usual admonitions.  Keep an

15   open mind.  And I'll see you in 15 minutes.

16   (Proceedings were heard out of presence of the jury:)

17          THE COURT:  All right.  Fifteen minutes, Counsel.

18               (Recess taken at 9:35 a.m.)

19              (Proceedings resumed at 9:56 a.m.)

20   (Proceedings were heard out of presence of the jury:)

21          THE COURT:  All right.  Before we get started --

22   everybody here?  Yes.

23       We're ready to go with the video?

24          MR. HEMANN:  We are, Your Honor.

25          THE COURT:  Any objection to the instruction that I

**PROCEEDINGS**

1    gave out?

2          **MR. HEMANN:**  No, Your Honor.

3       We have one, perhaps, additional matter.  There are a

4    number of -- all the government's exhibits that were used with

5    Mr. Thongthawee are already in evidence.  There are a number of

6    defense exhibits that are not already in evidence.  We've

7    stipulated to their admissibility.  And Ms. Lovett has them.

8          And we'd like to have those admitted, and then ask the

9    Court to instruct the jury that the exhibits that will be

10   referred to during Mr. Thongthawee's deposition are all in

11   evidence.

12         **THE COURT:**  All right.  And then at some point they

13   will be marked -- will there be a way the jury will know which

14   exhibits are which?

15         **MR. HEMANN:**  Yes.  They will be referred to in

16   Mr. Thongthawee's deposition, and they are marked and will be

17   provided to the Court.

18         **THE COURT:**  All right.  I'll just tell the jury that

19   all the exhibits referred to are admitted in evidence.

20         **MS. LOVETT:**  Do you want me to list the numbers on the

21   record here?

22         **THE COURT:**  Yes, please, I do.

23         **MS. LOVETT:**  Thank you, Your Honor.

24         **THE COURT:**  By the way, do you have any objection to

25   the instruction with that additional piece?

PROCEEDINGS

1          MR. GASNER:  No, Your Honor.

2          THE COURT:  It's from the Ninth Circuit.

3          MR. GASNER:  That's fine.

4          THE COURT:  All right.  Go ahead.

5          MS. LOVETT:  The first exhibit is Exhibit 1935.

6     3438.

7     3439.

8     3440.

9     3441.

10    3442.

11    3444.

12    3445.

13    3446.

14    3447.

15    3448.

16    And 3449.

17    And all other exhibits admitted or admissible through the

18    Thongthawee deposition are already in evidence.

19         THE COURT:  Very well.  Do you agree with that?

20         MR. HEMANN:  Agreed.  And we stipulate to the

21    admission of the listed exhibits.

22         THE COURT:  All right.  They are all admitted.

23    (Trial Exhibits 1935, 3438, 3439, 3440, 3441, 3442, 3444,

24    3445, 3446, 3447, 3448, and 3449 received in evidence.)

25         MR. HEMANN:  And, then, just as to the Court's

PROCEEDINGS

```
 1    preference, Mr. Duong is here.  I would assume that the Court
 2    would want to do the off-the-record portion of him at the next
 3    break, rather than at this break.
 4              THE COURT:  Yes, after we're done with this.
 5              MR. HEMANN:  Great.  Thank you, Your Honor.
 6              THE COURT:  Thank you.
 7              THE CLERK:  All rise for the jury.
 8         (Proceedings were heard in the presence of the jury:)
 9              THE COURT:  All right.  Please be seated.
10         Ladies and gentlemen, the next portion of the government's
11    case in the trial will be the playing for you of a deposition.
12    And I want to give you -- it will be by videotape, and I want
13    to give you -- not tape.  There's no such thing as videotape
14    anymore.
15         (Laughter)
16              THE COURT:  A video.  Shows the Court's age.
17         (Laughter)
18              THE COURT:  I want to give you an instruction about
19    that.
20         When a person is unavailable to testify at trial, the
21    deposition of that person may be used at the trial.  A
22    deposition is the sworn testimony of a witness taken before
23    trial.  The witness is placed under oath to tell the truth, and
24    lawyers for each party may ask questions.  The questions are
25    recorded.
```

**THONGTHAWEE - VIDEOTAPED TESTIMONY**

1      The deposition of Thongchai Thongthawee, which was taken

2   on December 9, 2013, is about to be presented to you.  You

3   should consider deposition testimony in the same way that you

4   consider the testimony of witnesses who have appeared before

5   you.

6      I will also tell you that you will see referred to during

7   the deposition video certain exhibits.  All the exhibits have

8   now been admitted into evidence in this trial and will be

9   available to you during your deliberations.

10      So with that, let's, as they say, go to the video.

11          MR. HEMANN:  Yes.  And, for the record, the

12   United States calls Thongchai Thongthawee --

13          THE COURT:  All right.

14          MR. HEMANN:  -- through the deposition.

15          THE COURT:  All right.

16    (Video was played but not reported starting at 10:01 a.m.)

17          THE COURT:  Excuse me, can you pause.

18              (Video deposition paused at 11:37 a.m.)

19          THE COURT:  Let's take a stretch break.  We've been

20   going quite a while here.

21      How much longer on the video, Counsel?  Anybody?

22          MR. HEMANN:  Well, maybe 15 minutes.

23          THE COURT:  Okay.  Thank you.

24       (Pause)

25          THE COURT:  We'll just wait for counsel to return

**PROCEEDINGS**

1    momentarily.

2         (Pause)

3              **MR. GASNER:**  Apologies, Your Honor.

4              **THE COURT:**  That's all right.  Can we resume?

5              **MR. GASNER:**  Yes, Your Honor.

6              **MR. AXELROD:**  Yes.

7              **THE COURT:**  Resume.

8    **(Video was played but not reported** resumed at 11:41 a.m.)

9              **(Video** deposition concluded at 11:56 a.m.)

10             **THE COURT:**  All right.  Ladies and gentlemen, we're

11   going to give you a break.  We have some legal matters to

12   discuss, so it might be somewhat longer, probably not more than

13   25 minutes at the outside.

14        So I'll remind you of the usual admonitions: keep an open

15   mind; don't make up your mind; don't get any outside

16   information; and don't discuss the case with anybody or let

17   anyone discuss it with you.  And we will see you -- we'll call

18   you when we're ready for you.

19        **(Proceedings were heard out of presence of the jury:)**

20             **THE COURT:**  So let's bring in the witness and have him

21   advised, and then we'll move on from there.

22                       **(Pause in proceedings.)**

23             **THE COURT:**  Please come forward, sir, over here.

24             **THE CLERK:**  Raise your right hand, please.

25

1              **CHUONG SI DUONG**,

2   called as a witness for the Government, having been duly sworn,

3   testified outside the presence of the jury as follows:

4              **THE WITNESS:**  Yes, I do.

5              **THE CLERK:**  Thank you.

6          Please be seated, and state and spell your full name for

7   the record.

8              **THE WITNESS:**  Morning.  My name is Duong Chuong Si.

9   I'm known as Tony also.

10             **THE CLERK:**  Spell it, please.  Spell your name,

11  please.

12             **THE WITNESS:**  D-u-o-n-g, last name, C-h-u-o-n-g, S-i.

13             **THE CLERK:**  Thank you.

14             **THE COURT:**  All right.  So what I would prefer to do,

15  at this point, is have the government conduct this part of the

16  examination to -- with respect to just advising the witness and

17  laying a foundation for the immunity.

18             **MR. AXELROD:**  Very well, thank you, Your Honor.

19                          **EXAMINATION**

20  **BY MR. AXELROD:**

21  **Q.**   Mr. Duong, good afternoon.

22  **A.**   Good afternoon to you.

23  **Q.**   You understand you've been called to testify in this

24  matter relating to your work at USAPTI?

25  **A.**   Yes, I do.

1  Q.   And I understand, from speaking with your counsel, that if

2  you're asked about that work you intend to invoke your right

3  against self-incrimination?

4  A.   Yes, I do.

5  Q.   And based on that, the United States has asked the Court

6  for an order immunizing your testimony; and that order has been

7  granted.  Are you aware of that fact?

8  A.   Yes, I am.

9  Q.   And have you been provided with a copy of the order?

10 A.   Yes, I have.

11        MR. AXELROD:  Okay.  And, then, may I approach and

12 provide that to him?

13        THE COURT:  Yes.

14    Has the defense seen this?

15        MR. AXELROD:  Yes, yes.

16        THE COURT:  All right.  Very well.

17 BY MR. AXELROD:

18 Q.   Mr. Duong, is, that's a copy of the Order of the Court

19 relating to your testimony in these proceedings.

20    Are you familiar with that document?

21 A.   Yes, I do.

22 Q.   And do you understand that under the terms of this court

23 order, you are required to testify and answer the questions

24 including those about your work at USAPTI?

25 A.   Yes, I do.

PROCEEDINGS

1   **Q.**   And do you understand that based on the Court Order, the

2   information that you provide in your testimony may not be used

3   against you in a criminal case unless you -- except for

4   prosecution for perjury or false statement.  Do you understand

5   that?

6   **A.**   Yes, I do.

7          **THE COURT:**  All right.  You may step down, sir, for

8   the moment.

9          You may join your attorney there in the back or outside

10  the courtroom.  Probably better outside the courtroom.

11         **MR. AXELROD:**  Outside the courtroom.

12         **THE COURT:**  Yes.  And welcome, Mr. Taback.

13         **MR. TABACK:**  Thank you.  Nice to see you again, Your

14  Honor.

15         **THE COURT:**  Thank you.

16         Is there any more brief discussion?  I've actually read

17  some authorities in this area with respect to the issue of

18  allowing the government to bring out on direct examination the

19  fact of the grant of immunity.

20         **MS. AGNOLUCCI:**  Yes, Your Honor, we have some points

21  to make, if we may.

22         **THE COURT:**  All right.

23         **MS. AGNOLUCCI:**  I first want to address what came up

24  this morning about the timing of our objection to Mr. Duong's

25  testimony, because I do think it's kind of related to the issue

**PROCEEDINGS**

1    of the immunity.

2         The witness disclosure that we received from Mr. Duong was

3    very long, and it included a number of items that were very

4    standard items relating to work at USAPTI and Walter Liew, Bob

5    Maegerle and Tim Spitler, and the type of sort of standard

6    disclosure that we saw relating to other USAPTI witnesses.  It

7    also said -- it also stated, kind of in this long paragraph of

8    topics, that the removal of computer files would be addressed.

9         At the time we didn't object because this was -- seemed

10   like a very insignificant part of Mr. Duong's testimony, and we

11   had no notice that the government would be using this to argue

12   that Mr. Liew was committing a crime.  And that's really the

13   main focus here.  And we think that should be the centerpiece

14   of the Court's inquiry.

15        Mr. Liew was not charged with obstruction relating to

16   these incidents.  And the government has had these documents

17   that -- that were -- that, you know, Mr. Duong presumably will

18   say were removed from the server because they were preserved.

19        And the government hasn't argued up to this point that

20   there were any trade secrets there.  And, presumably, there was

21   nothing of interest to the government in those documents.

22        For that reason, you know-- and Your Honor also knows,

23   we've explained to the Court our view of Mr. Duong's Grand Jury

24   testimony.

25        For all of those reasons, we had no reason to think that

1   the government was going to try to use the fact of Mr. Duong's

2   immunity to create an inference of wrongdoing.  And it became

3   clear this morning that that's what they would be trying to do.

4        And, you know, I also would remind the Court about our

5   discussion yesterday on the issue of immunity.  It was not

6   raised that the immunity was supposedly probative of criminal

7   activity.  So that's -- that's why we didn't object until now.

8        And I think it ties in to this issue of immunity because

9   the case that the government cited involved charged criminal

10  activity.  This is about uncharged conduct.

11       It would be extremely prejudicial to the jury to infer

12  that Mr. Liew committed wrongdoing here.  And the government --

13  you know, the government's stated reason for wanting to tell

14  the jury about the immunity is:  How can we let Mr. Duong stand

15  up here and testify and make it look like we got away with

16  letting him testify, while we're charging Mr. Liew with crimes?

17       Well, they're not charging Mr. Liew with any crimes

18  arising out of this set of events.  And so their so-called

19  desire to cure the problem is actually creating the problem.

20            **THE COURT:**  Do you intend, on cross-examination, to

21  attack Mr. Duong's credibility?

22            **MS. AGNOLUCCI:**  Not based on what we know now, Your

23  Honor, no.

24            **THE COURT:**  All right.  Mr. Froelich, you want to add

25  anything to this?

PROCEEDINGS

1          **MR. FROELICH:**  Yes, Your Honor.  As I said, as Your

2  Honor well knows, Fifth Amendment can be asserted particularly

3  by innocent people, and that's actually one of the main things

4  it's supposed to protect.

5          They've thrown up a lot of witnesses that have talked

6  about working there, and no one has said anything about

7  immunity.

8          Now they're going to put a witness up who they granted

9  immunity because he had counsel that's probably very

10  conservative, like I am, and --

11          **THE COURT:**  Actually, I think his counsel is very

12  liberal.

13          (Laughter)

14          **THE COURT:**  That's a very different issue, yes.

15          (Laughter)

16          **THE COURT:**  He's sitting in court and he's smiling.

17          **MR. FROELICH:**  I know he's here.

18          What I'm saying is, then, he's going to talk about -- and

19  I assume they're going to bring out about my client worked at

20  the -- was a consultant.  And so now, all of a sudden, all

21  these employees have come forward, no one has -- no one has

22  said anything about immunity, and they're going to put someone

23  on the stand who's going to have immunity, and he's going to

24  mention my client's name, which has nothing to do with the

25  immunity.  It's a very limited -- very limited objective that

PROCEEDINGS

1  he's being protected from and the government is going to use

2  him for.

3      So I'm really suffering now.  And that's one of the

4  reasons I --

5          THE COURT:  I understand the argument.

6          MS. AGNOLUCCI:  May I make one more very quick point,

7  Your Honor?

8          THE COURT:  Yes.

9          MS. AGNOLUCCI:  Because I think this is important.

10     We filed a motion in limine about uncharged conduct.  And

11 we said in that motion that we were guessing as to what we

12 thought the government would argue was uncharged conduct.

13     Now, one of the bases for that guesswork was the

14 government's Rule 16 disclosure.  There were no documents in

15 the Rule 16 disclosure that related to this deletion.

16     Now, we just learned a few minutes ago that the government

17 is going to attempt to introduce through Mr. Duong a couple of

18 documents related to this deletion that, A, were not in the

19 Rule 16 disclosure and, B, were not disclosed to us as part of

20 the government's disclosure of direct documents under this

21 Court's standing order.

22         THE COURT:  All right.

23         MS. AGNOLUCCI:  We didn't know about them until five

24 minutes ago.

25         THE COURT:  All right.

**PROCEEDINGS**

1          **MS. AGNOLUCCI:** That's just an example of how they are

2    trying to, kind of, create this inference around Mr. Duong, and

3    totally surprising us with it.

4          **THE COURT:** All right.

5          **MR. HEMANN:** There's a lot there, Your Honor.

6          First of all, we turned over the Grand Jury transcripts

7    with regard to Mr. Duong in October.

8          The lion's share of the testimony Mr. Duong gave in the

9    Grand Jury had to do with this issue and his role as an IT

10   consultant. And this could not possibly have come as the

11   remotest of surprises.

12         Mr. Duong is very close to the Liew family. He described

13   that at length in his Grand Jury testimony. And there's

14   nothing at all sneaky or underhanded about how this was

15   disclosed to the defense back in October. So I think that's a

16   red herring.

17         There are a couple of issues as to how this is -- how

18   Mr. Duong's testimony is directly relevant.

19         **THE COURT:** Before we get to that --

20         **MR. HEMANN:** Sure.

21         **THE COURT:** -- an assertion was just made by the

22   defense that there are documents that you intend to use, or

23   exhibits that were not disclosed either as Rule 16 -- as

24   Rule 16 and/or as exhibits pursuant to the Court's standing

25   order.

**PROCEEDINGS**

1          **MR. HEMANN:**  All of the documents that we are showing

2     to him were disclosed as exhibits.  All of the documents were

3     produced by the government many, many moons ago.  I don't I

4     have a specific date on which each of the documents at issue

5     were produced, but they have been produced.  They were on the

6     exhibit list, and this is the first time we're hearing about

7     there being an issue with regard to that.

8          **THE COURT:**  Let me hear about the relevance part.

9          **MR. HEMANN:**  The relevance part is the United States

10    is required to show that Mr. Liew acted knowingly under five of

11    the counts relevant to this testimony.

12         Number one, Count Ten charges a conspiracy to obstruct

13    justice during the time that this activity with Mr. Duong took

14    place.

15         The United States is not required, in the indictment, to

16    allege every single piece of evidence that it will show to

17    prove that conspiracy.

18         Ms. Agnolucci is right to the extent that the indictment

19    does not identify this activity as part of the conspiracy.

20    But, the United States is not required to allege this activity

21    as part of a conspiracy during the time frame that it took

22    place.  Moreover, with regard to that count, the United States

23    is required to prove that Mr. Liew acted knowingly.

24         The United States is also required to prove that Mr. Liew

25    acted knowingly with regard to the conspiracy and attempt

**PROCEEDINGS**

1   counts that are Counts One, Two, Three, and Five, that relate

2   directly to DuPont materials.

3       The testimony that we'll eliciting from Mr. Duong is that

4   upon being -- upon finding out that DuPont was on to him,

5   Mr. Liew directed Mr. Duong to go through the computer and

6   delete references to DuPont.  That shows his knowing behavior.

7   So that's our -- that's our argument.

8       There's also a consciousness of guilt argument that is

9   different than but related to.  Mr. Liew had -- Mr. Liew's

10   consciousness of guilt as a result of this conduct is manifest.

11       I'd like to explain to the Court that our intentions with

12   regard to this, the immunity thing, which is -- can't figure

13   out whether it's the tail or the dog now, but the immunity

14   request is simple.  We propose to handle this precisely the way

15   the Court would handle a plea agreement.

16       Number 1, are you testifying pursuant to a court order?

17       Yes, I am.

18       As a result of that order can you be prosecuted in the

19   future for any of the past conduct you testify about today?

20       No, I cannot; and I understand that.

21       Done.  Unless --

22       **THE COURT:**  So you're not going to ask about perjury?

23       **MR. HEMANN:**  No, Your Honor, because we understand

24   that is precisely what the Ninth Circuit has said you can't ask

25   about because then you lead impermissibly into the vouching

PROCEEDINGS

```
 1   problem.
 2        I think we're taking a step back from what the McNeil
 3   Court allowed, because as I understand the McNeil Court allowed
 4   both the -- you have immunity, which I don't think we need to
 5   use that word if it's confusing, but, we're not going so far as
 6   to say, You understand that if you lie here you're going to be
 7   prosecuted for perjury?
 8        THE COURT:  So you don't intend to use the word
 9   "immunity"?
10        MR. HEMANN:  We can -- I think that we're going to do
11   what I just read, which is:
12        As a result of the order, you cannot be prosecuted in the
13   future for any of the past conduct that you testify about
14   today.  Do you understand that?
15        THE COURT:  All right.
16        I want to hear about this -- there seems to be a
17   difference of opinion or difference of position with respect --
18   before we get to that, Mr. Froelich has made some points here.
19        Is this one of those witnesses as to whom you're going to
20   say his testimony does not relate to Mr. Maegerle?
21        MR. HEMANN:  We can say this testimony does not relate
22   to Mr. Maegerle.
23        As we -- I'm sorry, Your Honor.  When we made our
24   disclosure, we contemplated the possibility that Mr. Duong
25   would testify as some of the other employees have testified.
```

**PROCEEDINGS**

1      We think that we have that evidence in.  We think the jury

2  understands the point.  We do not need to mention Mr. Maegerle

3  in the course of this testimony, so I think that

4  Mr. Froelich's --

5           **THE COURT:**  Mr. Froelich is now receding.

6      (Laughter)

7           **THE COURT:**  I won't take that as a concession.

8           **MR. FROELICH:**  Absolutely, Your Honor.

9           **MR. HEMANN:**  His role as amicus to the Court is noted,

10  though.

11          **THE COURT:**  All right.  Is there anything further you

12  want to say?

13          **MS. AGNOLUCCI:**  Yes, Your Honor.

14          **THE COURT:**  What I'm going to do procedurally is --

15  give the staff a little bit of a break, as well -- is to hear

16  this last point and then take a break myself, and the court

17  staff, and then come back and announce my ruling, and then

18  we'll move on.

19          **MS. AGNOLUCCI:**  Yes, Your Honor.  I want to address

20  four points.  The first is this disclosure of documents.

21  Mr. Hemann is correct that the documents were produced.  They

22  were produced in September.  But -- of 2012 or 2013.  I believe

23  it was 2013.

24      If Your Honor recalls, we had a hearing before Judge

25  Cousins regarding a -- what we call a Rule 16 case-in-chief

1  documents disclosure.

2      The deadline for that disclosure was May of 2013.  And

3  Your Honor upheld Judge Cousins' ruling that the government had

4  to disclose all of its case-in-chief documents by that deadline

5  or show good cause why it didn't.

6      The documents that the government has now told us that it

7  intends to use were not in that disclosure, nor has the

8  government ever asked that they be included in that disclosure,

9  or shown good cause, point one.

10     Point two, Your Honor has a standing order that requires

11 the government to tell us which documents it intends to use on

12 direct 48 hours before a witness testifies.  We learned about

13 these documents probably 15 minutes ago.  So there are two

14 violations here: one, of the Rule 16 order and, two, of Your

15 Honor's standing order.

16     Now, that's just about these two documents.  I believe

17 they are Exhibits 792 and 795.

18         **THE COURT:**  All right.

19     **MS. AGNOLUCCI:**  Now, on to the points --

20         **THE COURT:**  I don't want to hear any more argument

21 about the immunity.  I have all I need on that.  You've made

22 your point and they've made their point.  I don't need any more

23 argument on that.  If that's your other two points, I don't

24 want to hear any more about that.

25         **MS. AGNOLUCCI:**  Understood, Your Honor.

**PROCEEDINGS**

1        **THE COURT:**  All right.  Let's get to the nuts and

2    bolts of this.

3        What about, Judge Cousins did issue an order.  It was kind

4    of a creative order, and I upheld it.

5        What are these documents we're talking about?  Not so much

6    by number but just --

7        **MR. HEMANN:**  We're trying to figure that out right

8    now, Your Honor.

9        **MR. AXELROD:**  I believe these actually were disclosed

10   previously, and certainly not in the last 15 minutes.

11       What I will say happened in the last period of time is I

12   had a chance to speak to Mr. Taback about those exhibits.  What

13   they are is it's an email exchange between Mr. Duong and

14   Mr. Liew about a program to shred -- electronically shred

15   documents.

16       And what I understand from speaking with Mr. Taback and

17   with Mr. Duong is that what he would say is:  In May 2011

18   Mr. Liew was in China; told him he wanted to get this program

19   because he was in China and he was worried about documents

20   being provided to other people inadvertently, or not; you know,

21   that he didn't want certain people to get documents.  And

22   that's what those two exhibits --

23       **THE COURT:**  Wait a minute.  Either these documents

24   were disclosed in accordance with Judge Cousins' order or they

25   weren't.  If they weren't, they're not admitted.  There's no

1   motion before me, nor will I entertain one, to show good cause

2   as to why these can be used.

3       So I need some categorical showing by the government

4   because an objection has been made on this basis.  The

5   government is the offering party.  So either they were

6   disclosed in accordance with Judge Cousins, which was heavily

7   litigated -- it was litigated before this Court.  I upheld

8   Judge Cousins.  So if they were disclosed, that's one thing.

9   If they weren't, it's game over as far as those exhibits, as

10  far as I'm concerned.

11          MR. HEMANN:  Let me make --

12          THE COURT:  I only want an answer to that question.  I

13  don't want a Fourth of July speech.  I want the answer to that

14  question.

15          MR. HEMANN:  As I stand here today, Your Honor, I do

16  not have it.  This didn't come up until --

17          THE COURT:  Well, still, I mean, it's been raised now.

18  And so it's an appropriate -- either it was complied with or it

19  wasn't.  Whether it was raised or not is a different issue.

20  There's no waiver of a court order of that nature.

21      So there must be a way, and if you can't come up with it

22  I'm not going to allow these documents to be admitted.  That

23  said, we're not dealing with a suppression motion here.

24          MR. HEMANN:  Understand.

25          THE COURT:  We're not dealing with the fruit of the --

**PROCEEDINGS**

1   Mr. Gasner, would you mind?  I'll let you speak to

2   Ms. Agnolucci, but it's kind of hard to, as much -- I don't

3   have enough RAM to multitask listening to you guys --

4        **MR. GASNER:**  Apologies, Your Honor.

5        **THE COURT:**  -- or trying to filter you out.

6        Certainly, the testimony about the program, if there was

7   such a program, would be -- would be, you know, potentially

8   admissible because we're not talking about a taint issue or a

9   Fourth Amendment or fruit of the poisonous tree.

10       But I think it's incumbent upon the government, and I want

11  to take a break to give you a chance to come up with proof that

12  you produced them.  If you didn't, I'm not criticizing you, but

13  it's strict liability.  You did or you didn't.  If you didn't,

14  they're not coming in.

15       **MR. HEMANN:**  Your Honor, I don't have any reason to

16  doubt the assertion that is made by Ms. Agnolucci on that

17  point.

18       What I would say to Your Honor is that we would ask you to

19  reconsider your statement that it's strict liability for the

20  following reason:

21       We put these on the exhibit list in, I think, November,

22  when the exhibit list was due.  These have been known to the

23  defense for many, many moons.  They are significant points that

24  go directly to the heart of the case.

25       I would make a motion, Your Honor, given the enormous

**PROCEEDINGS**

1    number of documents in this case, to allow the United States to

2    put in two that may have inadvertently not gone in when --

3    pursuant to Judge Cousins.

4         THE COURT:  Were they disclosed pursuant to the

5    48-hour rule?

6         MR. HEMANN:  I don't know the answer to that, Your

7    Honor.

8         MS. AGNOLUCCI:  I have the email in front of me, Your

9    Honor.  And Mr. Hemann is free to look at it on my screen.

10        THE COURT:  All right.

11        MR. HEMANN:  Your Honor, I would say, without getting

12   into it, I think we have gotten along nicely as the trial has

13   gone on.  The 48-hour and the 24-hour rules that the Court has

14   imposed have been honored in the breach over the last four

15   weeks, by both sides, more often than they've been honored in

16   the -- or as often, perhaps.  And both sides are sending emails

17   the night before, late, saying, We're going to use these.

18        This has not been an issue until we've come up with

19   something that the defense really cares about.

20        I understand the Court's order.  I understand --

21        THE COURT:  Well, the test is not what they care

22   about.

23        MS. AGNOLUCCI:  May I respond?

24        THE COURT:  No.  No, you can't, because I'm not going

25   to get into -- I just need the facts.

PROCEEDINGS

1        So what I'm going to assume for these purposes is that on

2    the positive -- on the negative side, the government didn't

3    produce these pursuant to Judge Cousins' order; the government

4    didn't disclose them pursuant to this Court's standing order;

5    the government is requesting an exception based upon

6    inadvertence or maybe, shall we say -- I wouldn't call it --

7    maybe, a clean hands doctrine.

8            **MR. HEMANN:**  Perhaps, Your Honor.

9            **THE COURT:**  Even though this court is not sitting in

10   equity here, and I understand that.

11       But the other side of that coin is you were certainly free

12   to object to any exhibits that the defense came forward with,

13   and you are in the future if they -- in other words, if that's

14   the Court's holding and the defense hasn't made a request for

15   an exception, showing good cause, you know, what's good for the

16   goose is good for the gander, and I'm going to exclude those

17   documents as well.

18       So I understand what the facts are.

19       Do you have copies of the exhibits available so as I take

20   a break --

21           **MR. HEMANN:**  I do, Your Honor.  If I can hand them up.

22       And for the record, they are Exhibit 792 -- 792 and 795.

23   They're each one page, Your Honor.

24           **THE COURT:**  All right.  Thank you.

25       And I'm going to take another look at Judge Cousins' order

1    and my standing order.

2        So I'm going to take a break and I'll come out.

3        **MR. HEMANN:**  Thank you, Your Honor.

4        **THE COURT:**  By the way, two things.  One thing.  I am

5    going to grant the government's request to treat Mr. Duong as

6    an adverse witness solely for the purpose of cross-examination.

7    I'm not going to instruct the jury on that.  I don't think it's

8    necessary because it wouldn't be obvious to them.  And if I

9    start talking about he's adverse or hostile, I think of -- you

10   know, makes me think of *My Cousin Vinny*, "You think I'm hostile

11   now?"  They won't understand that.

12       **MR. HEMANN:**  We agree with that.

13       **THE COURT:**  All right.

14       **MR. HEMANN:**  Thank you.

15            (Recess taken at 12:21 p.m.)

16           (Proceedings resumed at 12:48 p.m.)

17     (Proceedings were heard out of presence of the jury:)

18       **THE COURT:**  All right.  We're back in session.

19     We have two notes.  One has to do with -- well, one says,

20   by Juror Number 1:

21           "If we watch movies/screen presentations in excess of

22       45 minutes please arrange for an eye-level screen for the

23       jury.  I'm under the care of a chiropractor and this

24       situation is very bad for my neck and spine.  Moving the

25       screen from floor to a desk would suit me, or moving the

**PROCEEDINGS**

1          large screen."

2          Are there going to be any more videos?

3               **MR. AXELROD:**  Not that the government is aware of.

4               **MS. AGNOLUCCI:**  We don't know of any either, Your

5     Honor.

6               **THE COURT:**  All right.  I'll apologize and say if

7     anything like that happens that's analogous just let us know

8     while it's happening and we'll mitigate that.  And we can raise

9     and lower the screen.

10         The second one is more substantive.  And it says, from

11    Juror Number 11:

12              "Your Honor, this question is in reference to

13         Dr. Russell M. Diemer."

14              **MR. HEMANN:**  B. Diemer, I think.

15              **THE COURT:**  Oh.

16              "B. Diemer, Jr.'s testimony.  When you almost forgot

17         to ask defense lawyer Jerry Froelich if he wanted to

18         cross-examine for Robert M., his client, Mr. Froelich said

19         it did not pertain to him.  I do not remember being

20         instructed that Dr. Diemer's testimony was to pertain to

21         Walter Liew and USAPTI only.  It is not in my notes.  I am

22         not sure if this is a question I am allowed to ask, who

23         the testimony pertained to.  If not allowed, I will

24         understand."

25              **MR. AXELROD:**  Your Honor, I have a suggestion for how

PROCEEDINGS

```
1   to handle this because it's a fair point, and one that's going

2   to come up when Mr. Duong hits the stand.

3       And I suggest that when I explain the testimony of

4   Mr. Duong only relates to Walter and USAPTI, I also notify the

5   jury that Dr. Diemer's testimony was only in relation to Walter

6   Liew and USAPTI.

7           THE COURT:  All right.

8           MR. AXELROD:  It's fair to give them that and, you

9   know, we did not provide that notice in advance.  And so --

10          THE COURT:  With respect to --

11          MR. AXELROD:  To Dr. Diemer.

12          THE COURT:  Oh, you didn't do it with respect to

13  Diemer.

14          MR. AXELROD:  Correct.

15          THE COURT:  Okay.  But you agree that that's

16  appropriate?

17          MR. AXELROD:  Correct.

18          THE COURT:  All right.  You agree with that,

19  Mr. Froelich?

20          MR. FROELICH:  Yes, Your Honor.  It slipped by me.  I

21  thought they had, and --

22          THE COURT:  This juror is obviously very attentive to

23  the instructions.

24      With respect to the pending issue, I have one questions

25  for which I would like a brief answer from Ms. Agnolucci, which
```

1    is:

2         By virtue of what the defense claims is the violation of

3    the Court's standing order and the -- Judge Cousins' and this

4    Court's -- Judge Cousins' order and this Court's affirmance of

5    his and its own order with respect to Rule 16, what precisely

6    is the prejudice to the defendants?  Defendant, I'm sorry.

7         **MS. AGNOLUCCI:**  Your Honor -- and as I said, I want to

8    be clear, we didn't learn about this document last night.  We

9    learned about the document five to ten to 15 minutes before our

10   conversation.

11        Had we known about it we probably would have gone and

12   looked and seen what other related documents there were.  We

13   may have raised the issue with the Court in the morning

14   regarding the admissibility of the document.

15        It's a highly prejudicial document, and we only learned

16   about it at the last minute.

17        **THE COURT:**  All right.

18        **MS. AGNOLUCCI:**  And, Your Honor, the government hasn't

19   shown any good cause for why --

20        **THE COURT:**  That was going to be my next question.

21   What precisely is the reason that -- the Court's order that

22   we're alluding to, the Rule 16 order that this Court signed

23   said the following:

24         "The Court will not automatically preclude the

25         government from using in its case-in-chief any documents

1        identified after the deadline set forth in this order.

2        However, the government must be prepared to show that in

3        the exercise of due diligence it could not have identified

4        those documents sooner; there is good cause for the

5        belated identification; and the defendants would not be

6        unduly prejudiced by the belated identification."

7        So, first, how is the government able to show that in the

8   exercise of due diligence it could not have identified these

9   documents sooner?

10        **MR. HEMANN:**  Your Honor, in all candor, I don't think

11   that we can make that showing.

12        We have made a real effort, as witnesses have come about,

13   to -- to make sure that even as the schedule for witnesses has

14   changed that we've made timely notifications.  These are

15   documents that we were aware of with regard to Mr. Duong.  And

16   what we had done when we were going through the exhibits was to

17   designate them many, many weeks ago to go to different

18   defendants.

19        I think there was a slipup when we were doing this in

20   November or December, by putting Mr. Duong's name next to these

21   exhibits on our spreadsheet, that was -- and that's -- and

22   that's the thing we've been working off of.

23        It was simply an error on our part that I think is a

24   result of just simply the large number of exhibits that we're

25   dealing with in this case.

PROCEEDINGS

```
 1          THE COURT:  And what's the good cause for the belated

 2   identification?

 3          MR. HEMANN:  Well, the good cause for the belated

 4   identification is that as we were preparing for Mr. Duong's

 5   testimony today -- or, I'm sorry, yesterday, realizing that he

 6   would, in fact, come up this week, we went through and did a

 7   more detailed scrub.  We identified them.  And we -- we -- and

 8   that was sort of the reason why.

 9      Again, it is entirely a function, Your Honor, of the press

10   of the schedule and the number of documents.  I don't have a

11   particularly compelling excuse as to why these two, amongst the

12   many, have slipped through the cracks, but I think that that's

13   why.

14          THE COURT:  All right.  I'm excluding these documents.

15          MS. AGNOLUCCI:  Thank you, Your Honor.

16          THE COURT:  The Court has specific orders for a

17   purpose.  Yes, I understand in the press of business these

18   things get missed.  But we have a double whammy here.  We have

19   both the noncompliance -- and I'll accept that it's inadvertent

20   by the government.  There's been no allegation to the contrary.

21   But together with not complying with the Court's, you know,

22   standing order, then the Court's standing order itself has no

23   teeth in it.  It just simply is more hortatory than, shall we

24   say, mandatory, but beyond precatory.  If you understand any of

25   that you can write an essay for that.
```

**PROCEEDINGS**

1      But, more seriously, I don't think it's fair -- but I will

2   say, again, and I'm not trying to in any way mitigate the

3   Court's order.  I don't think that the subject matter of these

4   documents is off limits to at least saying you can lay a proper

5   foundation.

6      **MR. HEMANN:**  Certainly.  And, by the way, I took on

7   this issue a little bit last night, in terms of the legal

8   research.  Mr. Axelrod is going to do the examination.

9      **THE COURT:**  Okay.

10     **MR. HEMANN:**  We were splitting up duties.

11     But I would say in sum, Your Honor, it would be our

12   intention to inquire as to the subject matter.  If he says he

13   doesn't remember -- which is unlikely since he looked at them

14   in the hallway a little while ago -- obviously, we would want

15   to refresh.  If he denies them, then they would, I think,

16   become rebuttal or impeachment evidence which is not covered by

17   these --

18     **THE COURT:**  Let's take it a step at a time.

19     **MR. HEMANN:**  Correct.

20     **THE COURT:**  I'm not going to rule in advance.

21     With respect to the question of bringing out the immunity,

22   I have looked at the authorities, and I've decided to permit

23   the government to approach the colloquy with the witness as he

24   outlined.

25     And I'll say, briefly, that the holding or the statement

1  made by the Seventh Circuit has been echoed many times by the

2  Ninth Circuit.  In fact, in a case of *U.S. vs. Williams*, 997

3  F.2d 594, which is a Ninth Circuit case decided in 1992, page

4  596, the Court -- and in response to the same argument made as

5  in the -- *McNeil*, is that the case, the First Circuit case?

6          **MR. HEMANN:**  Yes, Your Honor.

7          **THE COURT:**  -- about vouching, that the prosecutor was

8  vouching, Judge Tallman said for the Ninth Circuit:

9          "Contrary to Williams's arguments, the prosecutor did

10      not vouch for Layton," the witness, "by telling the jury

11      that she had been granted immunity.  Juries are routinely

12      advised that immunity has been granted before a witness's

13      testimony."

14      And there's many other cases where the Ninth Circuit said

15  this is routine and appropriate.

16      If the defense wants the Court to give an instruction, in

17  the final instructions, from the Ninth Circuit's proposed Model

18  Instruction 4.9, which has to do with testimony of witnesses

19  who receive immunity, for which the jury is entitled to examine

20  the testimony of that witness with greater caution than any

21  other witnesses, I will give that instruction.

22      So I'm not going to do the instruction now.  I'm not even

23  going to ask the defense to decide now.  But in the final

24  instructions the Court will, if asked, provide such an

25  instruction.

1          **MS. AGNOLUCCI:**  And just so I'm clear on the Court's

2   ruling, Your Honor, Your Honor is permitting Mr. Axelrod to ask

3   the one question that he previously stated he would be asking?

4          **THE COURT:**  It may have been more than one.

5          **MR. HEMANN:**  Two.

6          **THE COURT:**  Why don't you put it on the record again.

7          **MR. AXELROD:**  What I would intend to ask Mr. Duong,

8   after he's seated and sworn in, is that -- to confirm that

9   he's -- that he's aware that he's testifying pursuant to a

10  court order, and then ask him that as a result of that order

11  does he understand that he cannot be prosecuted in the future

12  for any of the conduct that he testifies about today.

13         **THE COURT:**  That's my understanding.  And that's

14  appropriate.

15      All right.

16         **MR. HEMANN:**  Last matter, Your Honor.  We have an

17  exhibit.  This is the CD of Mr. Thongthawee's testimony.  Would

18  the Court like us to enter this as an exhibit entered in trial,

19  or would you like us to file it separately?

20         **THE COURT:**  I would file it separately so it gets the

21  same status as the transcript because it's actually part of the

22  court record as a transcript.  It's not something that would go

23  to the jury.

24         **MR. HEMANN:**  Yes, Your Honor.

25         **THE COURT:**  All right.  Let's get the jury in and

PROCEEDINGS

```
 1    let's get the witness ready, please.

 2         (Proceedings were heard in the presence of the jury:)

 3         THE COURT:  Please be seated.  So you had a little bit

 4    longer break than normal.  We were discussing legal matters, as

 5    I told you.

 6         You can be seated, sir, but I have something to say to the

 7    jury first.

 8         Two things I want to say.  One, with respect to the issue

 9    of the physical, the display of the transcript of

10    Mr. Thongthawee that we just saw, there will be no further

11    videos in this trial, I am told.  If there were, or if anything

12    like that occurs again with respect to any aspect of the trial

13    that causes a juror discomfort, raise your hand, please, while

14    it's going on.

15         For example, with respect to the monitor, if you were

16    watching the monitor, they can be adjusted upward or downward

17    and moved around.  That's one of the nice things.

18         So it's not likely to happen again for a video.  But if

19    there's some exhibit that is displayed, or a chart, and you

20    say, gee, that's really hurting some part of me to be displayed

21    that way, raise your hand and we'll deal with it.

22         The other question is with respect to Dr. Diemer's

23    testimony and the issue of whether or not -- as to which

24    defendants the government contends that testimony is relevant.

25    And the government agrees -- or has stated that that testimony
```

1   of Dr. Diemer relates only to Mr. Liew and USAPTI, and not

2   Mr. Maegerle.

3       Is that correct?

4           **MR. AXELROD:**  That is correct, Your Honor.

5           **THE COURT:**  Is that acceptable, Mr. Froelich?

6           **MR. FROELICH:**  Yes, Your Honor.

7           **THE COURT:**  All right.  Thank you very much.

8       You may proceed.

9           **MR. AXELROD:**  Thank you, Your Honor.

10          **THE COURT:**  Would the witness --

11          **THE CLERK:**  Please stand and raise your right hand.

12                          **CHUONG SI DUONG**,

13  called as a witness for the Government, having been duly sworn,

14  testified as follows:

15          **THE WITNESS:**  Yes, I do.

16          **THE CLERK:**  Thank you.  Please be seated, and state

17  and spell your full name for the record.

18          **THE WITNESS:**  Okay.  My name again is Duong Chuong Si.

19  Spelled D-u-o-n-g, C-h-u-o-n-g, S-i.

20          **THE CLERK:**  Thank you.

21                          **DIRECT EXAMINATION**

22  BY MR. AXELROD:

23  **Q.**  Good afternoon, Mr. Duong.

24  **A.**  Good afternoon to you.

25  **Q.**  Mr. Duong, I understand that you are testifying today

**DUONG - DIRECT / AXELROD**

1  pursuant to a court order?

2  **A.**   Yes.

3  **Q.**   And that as a result of that order you cannot be

4  prosecuted in the future for -- for the past conduct that you

5  will testify about today?

6  **A.**   Yes.

7  **Q.**   You understand that?

8  **A.**   Yes, I do.

9        **MR. FROELICH:**   Excuse me, Your Honor.  I think the

10  government has an announcement.

11        **MR. AXELROD:**   I also have an announcement to make,

12  Your Honor -- thank you, Mr. Froelich -- which is, the

13  testimony of Mr. Duong relates only to Mr. Liew and USAPTI, and

14  not to Mr. Maegerle.

15        **THE COURT:**   All right.  The jury is so instructed.

16    Thank you Mr. Froelich.

17  **BY MR. AXELROD:**

18  **Q.**   Did you work at USAPTI?

19  **A.**   Yes, I did.

20  **Q.**   And when did you work there?

21  **A.**   Between the period of June 2010 and October 2011.

22  **Q.**   And how did you come to be employed at USAPTI?

23  **A.**   Through my cousin, who's a friend of Mr. Liew.

24  **Q.**   And prior to working at USAPTI, how were you employed?

25  **A.**   I migrated to the U.S. in April 2010, so I wasn't employed

**DUONG - DIRECT / AXELROD**

1  in the U.S. prior to that.

2  **Q.**  I see.

3     And could you describe your job at USAPTI?  What was your

4  job function?

5  **A.**  Basically, I'm just a system engineer, the IT engineer.

6  So I take care of the server and the computers that we use in

7  the company.

8  **Q.**  Mr. Duong, would it be fair to say that you're friends

9  with Walter Liew and Christina Liew?

10  **A.**  That's correct.

11  **Q.**  Okay.  And at times you take care of their son?

12  **A.**  Yes, that's correct too.

13  **Q.**  And you socialize with them?

14  **A.**  Not on a regular basis, but I do.

15  **Q.**  But from time to time?

16  **A.**  From time to time, yes.

17  **Q.**  And I want to ask you, in April of 2011, you were working

18  at USAPTI?

19  **A.**  That's correct, sir.

20  **Q.**  And as -- in this IT function?

21  **A.**  That's correct, sir.

22  **Q.**  Responsible for the server?

23  **A.**  That's correct, sir.

24  **Q.**  And in April of 2011, Mr. Liew and USAPTI were sued by

25  DuPont, right?

**DUONG - DIRECT / AXELROD**

1   **A.**   That's correct, sir.

2   **Q.**   And you were aware of that fact?

3   **A.**   Yes, I'm aware of that, sir.

4   **Q.**   And at some point after that Mr. Liew asked you to do

5   something that might be inappropriate; is that right?

6   **A.**   Yes, sir.

7   **Q.**   And what did he ask you to do?

8   **A.**   We look for files that are in the server that may have

9   something to do with DuPont.

10   **Q.**   Okay.  And what did you do with those files?

11   **A.**   They were erased.

12   **Q.**   They were, I'm sorry?

13   **A.**   Erased.

14   **Q.**   Erased.

15   Did you understand that project at the direction of

16   Mr. Liew?

17   **A.**   Yes, I did.

18   **Q.**   Okay.  Did -- how did you go about it?  How did you go

19   about deleting the files?

20   **A.**   Uhm, I do not understand the question.

21   **Q.**   Well, so you said that you deleted these files from the

22   server?

23   **A.**   Yes.

24   **Q.**   Okay.  So I'm asking you to explain the process that you

25   went through to delete these files from the server.

**DUONG - DIRECT / AXELROD**

1  **A.**  Uhm, we just find the files and then erase them.

2  **Q.**  Okay.  And when you say "we," who are you talking about?

3  **A.**  Basically it's I, myself.

4  **Q.**  Was Mr. Liew with you when you did this?

5  **A.**  I don't believe so.

6  **Q.**  But he's the one who asked you to do it?

7  **A.**  Yes.

8  **Q.**  Okay.  And did he instruct you to delete a certain kind of

9  file?

10  **A.**  Can you elaborate on that question?

11  **Q.**  Sure.  Did he -- well, in directing you to delete files,

12  did he tell you which specific files to delete from the server?

13  **A.**  No, no.  Not specifically like this file or that file, are

14  you trying to say?

15  **Q.**  Well, I'm not talking about the file format.  I'm talking

16  about did the files that you were asked to delete contain a

17  particular reference?

18  **A.**  They do contain reference to the word "DuPont," if that's

19  what you're referring to.

20  **Q.**  Okay.  So the files that contained a reference to DuPont

21  were the files that you were directed to delete?

22  **A.**  Yes, sir.

23  **Q.**  Was that a specific instruction that you received from

24  Mr. Liew?

25  **A.**  Can you refresh that question?

1    Q.    Sure.  How did he direct you to do this particular task?

2    A.    Well, we just -- I was just told to find files that has --

3    has DuPont in it, and remove them.

4    Q.    And how many such files did you find on the server?

5    A.    Not many.  Something like around 40, probably.

6    Q.    Only 40 files?

7    A.    I don't remember exactly the number so --

8    Q.    Okay.  Do you recall testifying in the Grand Jury on this

9    matter?

10   A.    Yes, I did.

11   Q.    Okay.  And do you recall being asked how many files there

12   were?

13   A.    Yes, I did.

14   Q.    Okay.  Would it refresh your recollection to see that

15   testimony?

16   A.    Yes, it would help.

17          MR. AXELROD:  Your Honor, may I approach?

18          THE COURT:  Yes, you may.

19          MR. AXELROD:  I have a binder of his testimony for the

20   Court's convenience as well, and for defense counsel.

21   BY MR. AXELROD:

22   Q.    Mr. Duong, I'm handing you a binder that contains the --

23   your prior Grand Jury testimony.  And I want to ask you if you

24   could look at page -- in the bottom right corner of the pages

25   they all have a number, a Bates number that begins with PTI.

1    And if you go to the page PTI 2480.  And that was during --

2    that was on October 16th.  It's page 9 of the transcript, that

3    first transcript.

4    **A.**   Yes, I can see that.

5    **Q.**   Okay.  So does that refresh your recollection about how

6    many files you were -- you removed?

7    **A.**   I guess I would -- I did say that it was between a hundred

8    and 150, but my -- my memory now kind of tell me it's less than

9    a hundred.

10   **Q.**   Okay.  So when you testified -- and when you testified in

11   the Grand Jury you were under oath, right?

12   **A.**   Yes.

13   **Q.**   And that was back in October 2012, right?

14   **A.**   That's correct.

15   **Q.**   And October 2012 was -- you were asked to delete the files

16   in April 2011, right?

17   **A.**   That's correct.

18   **Q.**   Okay.  So October 2012 is a little bit more than a year

19   later, right?

20   **A.**   Yes.

21   **Q.**   And at that time you remembered it was about a hundred,

22   and 150 files, right?

23   **A.**   That's what I remember then, yes.

24   **Q.**   Okay.  But as we stand here today, you believe now it was

25   actually less than that?

**DUONG - DIRECT / AXELROD**

1   **A.**   Might not be that many.

2   **Q.**   Okay.  But you think your memory has improved since then?

3   **A.**   I hope so.

4        (Laughter)

5   **Q.**   Okay.  How many today do you think it is?  How many files

6   do you believe that you removed, that contained references to

7   DuPont, at Walter Liew's direction in April 2011?

8   **A.**   Could not been more than a hundred, that's what I'm sure

9   of.

10  **Q.**   Could not be more than a hundred?

11  **A.**   Yes.

12  **Q.**   Okay.  Was it around a hundred?

13  **A.**   When you say "around a hundred" you mean like 90, 80,

14  something like that?  Could be.

15  **Q.**   Okay.  Did -- after you -- so after you identified those

16  files, you deleted them from the USAPTI server, right?

17  **A.**   That's correct, sir.

18  **Q.**   Okay.  But you believe that those files continue to exist

19  on some backup server?

20  **A.**   That's correct, sir.

21  **Q.**   Okay.  But that backup server was not accessible to the

22  employees of the company?

23  **A.**   Not -- not accessible to everyone, yes.

24  **Q.**   Did -- after the lawsuit was filed by DuPont, did Mr. Liew

25  ask you to help him print out patents from the Internet?

1    **A.**   No, sir.

2    **Q.**   He did not?

3    **A.**   No, sir.

4    **Q.**   Okay.  If you -- do you recall testifying about that

5    subject matter in front of the Grand Jury?

6    **A.**   I do not remember that, sir.

7    **Q.**   Okay.  Would it refresh your recollection --

8    **A.**   Yes, please.

9    **Q.**   -- to look at your Grand Jury testimony?

10       If you could go to page 2489 and 2490.  So just a few more

11   pages along from where we were.  And if you look at 2489, if

12   you could just read that to yourself.  And you might start at

13   2488.  The last question on that page might help refresh your

14   recollection there.

15   **A.**   (Reading)  Okay.  Now I remember.

16   **Q.**   Okay.  So back in April of 2011 -- at some point after the

17   lawsuit was filed by DuPont, did Mr. Liew ask you to help him

18   by printing out patents from the Internet?

19   **A.**   That's correct.

20   **Q.**   And you did that?

21   **A.**   Yes, I did.

22   **Q.**   How many patents did you print out?

23   **A.**   I do not remember how many, but the number should be like

24   between 30 to 40, sir.

25   **Q.**   About 30 to 40?

**DUONG - DIRECT / AXELROD**

1   **A.**   Yes, but I remember I did not print out all of them.

2   That's my recollection.

3   **Q.**   Did you identify other patents that you did not print out?

4   **A.**   What do you mean by "identify"?

5   **Q.**   Well, you said you printed out 30 or 40 patents.  How did

6   you locate those patents?

7   **A.**   Mr. Liew handed them to me.

8   **Q.**   He gave you a list of patents?

9   **A.**   He gave me a list of files.

10   **Q.**   A list of files?

11   **A.**   Yes.

12   **Q.**   And then you identified those and --

13   **A.**   Just print them out.

14   **Q.**   Okay.  Did -- at some point in that spring of 2011, did

15   you also provide Mr. Liew with a file-shredding software?

16   **A.**   Yes, I believe so.

17   **Q.**   Well, isn't it true that in -- in May of that year you

18   sent him an email with a file-shredding software?

19   **A.**   Yes, there was.

20   **Q.**   And he had asked you for that?

21   **A.**   Yes.

22   **Q.**   And he -- what were the circumstances surrounding that

23   request?

24   **A.**   Uhm, as far as I can remember, Mr. Liew was then in China.

25   He was meeting with the -- some people in China, and they were

**DUONG - DIRECT / AXELROD**

1    passing files left and right.  So he was concerned that there

2    might be -- they were sharing files on USB sticks.  So he was

3    concerned that we might have deleted files on that stick, but

4    that it could be recoverable by people who are not intended to

5    see those files.

6    **Q.**   Okay.  And that was the basis of the request for you to

7    provide him with this --

8    **A.**   With a utility, yes.  A utility, a software.

9    **Q.**   And it's a software that allows someone to erase

10   electronically the files from whatever device it's stored on?

11   **A.**   That's correct, sir.

12   **Q.**   Okay.  I want to ask you about another project that you

13   were involved in at the time that you were at USAPTI, relating

14   to Fortran computer code.  Do you have that in mind?

15   **A.**   Yes, I remember testifying to that.

16   **Q.**   Okay.  And so in -- sometime at the end of 2010, in

17   November or December of 2010, you were given this assignment to

18   scan in a piece of Fortran code, right?

19   **A.**   I believe that was in December.

20   **Q.**   That was in December?

21   **A.**   Yes.

22   **Q.**   So in December 2010, you were given an assignment to scan

23   in a piece of code, right?

24   **A.**   That's correct, sir.

25   **Q.**   And who gave you that assignment?

**DUONG - DIRECT / AXELROD**

1  **A.**   I do not remember exactly.

2  **Q.**   Okay.  Do you know, who are the people that could have

3  given you that assignment?

4  **A.**   It could be either Thongchai, one of my colleagues, or

5  Mr. Liew.

6  **Q.**   So either Walter Liew or Thongchai Thongthawee asked you

7  to scan in some Fortran code into the system?

8  **A.**   That's correct, sir.

9  **Q.**   And that was in December 2010?

10  **A.**   That's correct, sir.

11  **Q.**   And Mr. Liew told you that he knew Fortran code, right?

12  **A.**   He say he's familiar with, yes.

13  **Q.**   And your role was to take a piece of code that -- and who

14  gave you the code?

15  **A.**   I told you I am not sure who did.

16  **Q.**   Okay.  So either Mr. Thongthawee or Mr. Liew gave you the

17  code, right?

18  **A.**   That's correct, sir.

19  **Q.**   And it was a hard-copy document?

20  **A.**   It's a hard-copy document, sir.

21  **Q.**   Okay.  And then what did you do with it?

22  **A.**   We scan it.

23  **Q.**   And after you scanned it, what -- did you save it

24  somewhere?

25  **A.**   Yeah.  We do save it on the server.

**DUONG - DIRECT / AXELROD**

1  Q.   Okay.

2       MR. AXELROD:  Your Honor, may I approach with exhibit

3  12?

4       THE COURT:  Yes.

5  BY MR. AXELROD:

6  Q.   Mr. Duong, I'm approaching with Exhibit 12.  And this is

7  an admitted exhibit.

8       Do you recognize that document?

9  A.   I think you show me this document in -- during the Grand

10 Jury testimony.  And I already told you so that I do -- this

11 document look familiar, but it may or may not be the very, very

12 same document that you were referring to.

13      MR. AXELROD:  Okay.  And I'm going to ask Ms. Mahoney

14 to pull up page 3 of that document.  So this is Exhibit 12,

15 page 3.

16      (Document displayed.)

17 BY MR. AXELROD:

18 Q.   And do you see that?  It's also, Mr. Duong, on the

19 computer screen right in front of you as well.

20 A.   Page 3?

21 Q.   Yeah.  There's a monitor to your left.  Do you see that?

22      MR. AXELROD:  And if you could actually remove that

23 highlight.  Thank you.

24      THE WITNESS:  Okay.

25

**DUONG - DIRECT / AXELROD**

1   BY MR. AXELROD:

2   **Q.**   Okay.  Does that appear to be the document that you

3   scanned in?

4   **A.**   It sure look like, but I'm not certain it is.

5   **Q.**   Okay.  And if we could go to the last page, which is

6   Exhibit 12, page 23.

7        (Document displayed.)

8   **Q.**   And do you see on the screen -- and take your time.

9        Does that appear to be the last page of the document that

10  you scanned in?

11  **A.**   I believe.  I can't tell for sure.

12  **Q.**   Okay.  So I just want to make sure I understand your

13  testimony.  You can't say for sure, but this looks like it?

14  **A.**   It may look similar, but I'm not certain this is the exact

15  document.

16  **Q.**   Okay.  When you were done -- but you got this document,

17  you scanned it in, you saved -- did you save it onto the

18  server?

19  **A.**   Yes, we did.

20  **Q.**   And then what did you do with the hard-copy document?

21  **A.**   I either return that to Thongchai or Mr. Liew, wherever it

22  come from.  It could be Thongchai, most likely.

23  **Q.**   And was Mr. -- was Thongchai Thongthawee's goal to get

24  this program to run?

25          **MS. AGNOLUCCI:**  Objection.

1          **THE COURT:**  Sustained.

2  **BY MR. AXELROD:**

3  **Q.**   Well, what was Mr. Thongthawee's goal?

4          **MS. AGNOLUCCI:**  Objection.

5          **THE COURT:**  Sustained.

6  **BY MR. AXELROD:**

7  **Q.**   Are you aware of what Mr. Thongthawee's goal was in

8  scanning this and having access to this particular document?

9  **A.**   I believe for him to go over it.

10 **Q.**   Okay.  Well, was it more than to go over it, but to do

11 something with the program?

12         **MS. AGNOLUCCI:**  Objection.

13         **THE COURT:**  Sustained.

14 **BY MR. AXELROD:**

15 **Q.**   Do you -- do you recall being asked about what his goal

16 was in your prior Grand Jury testimony?

17 **A.**   Can you refresh my memory on that?

18 **Q.**   Sure.  If you could look at page 2592, which is the next

19 tab, which is the next -- it was November 13th, 2012, your

20 appearance.  And if you go to page 2592.

21 **A.**   Yes, I got 2592.

22 **Q.**   Okay.  Does that refresh your recollection -- and take a

23 moment there in that bottom half of the page.

24 **A.**   Yes.

25 **Q.**   So isn't it true you knew he was trying to get the code to

**DUONG - DIRECT / AXELROD**

1  run?

2  **A.**    That's correct, sir.

3  **Q.**    And isn't it also true that in early 2011, you -- he --

4  you were asked to get a compiler for that Fortran code?

5  **A.**    I was asked to get a compiler?  I wasn't asked to get a

6  compiler.  That's for sure.

7  **Q.**    Would it refresh your recollection to look at your Grand

8  Jury testimony?

9  **A.**    To get a compiler to run, yes.

10  **Q.**    First of all, what's a compiler?

11  **A.**    It's like a program that runs some programming codes and

12  compile it into executables.

13  **Q.**    Okay.  So it's a program that allows you to run code?

14  **A.**    That's correct.

15  **Q.**    And isn't it true that you were asked in early 2011 to --

16  to get a code -- a compiler for the Fortran code?

17  **A.**    Again, can you refresh my memory on that?

18  **Q.**    Sure.  If you go to page 2620, which is your March 12,

19  2013 testimony, do you see that?  It's in the middle of the

20  page there.

21  **A.**    (Witness examines document.)  As far as I can read from

22  that transcript, there is nothing here that says I was asked to

23  find a compiler.

24  **Q.**    Okay.  So --

25  **A.**    I'm sorry.

**DUONG - DIRECT / AXELROD**

1  Q.   No.  My question is:  You were aware of the fact that he

2  was looking for a compiler to run that code in early 2011;

3  weren't you?

4  A.   Yes, I was aware of that.

5  Q.   Now, I want to ask you about the events that occurred a

6  little bit later on in 2011.  Do you recall that the FBI

7  executed a search warrant at USAPTI on July 19th, 2011?

8  A.   Yes, I do.

9  Q.   And you went to the office that day?

10  A.   Yes, I was there.

11  Q.   And you left shortly after you arrived?

12  A.   Yes.

13  Q.   And you went to go look for the Liews?

14  A.   Yes, sir.

15  Q.   And you went to the Courtyard Marriott to look for

16  Mr. Liew; is that right?

17  A.   That's correct, sir.

18  Q.   And that was because that was where USAPTI and Mr. Liew

19  were holding meetings with the clients from Pangang?

20  A.   That's correct, sir.

21  Q.   And eventually Mr. Liew showed up that afternoon or later

22  that day at the Marriott Courtyard; is that right?

23  A.   That's correct, sir.

24  Q.   And he asked you to watch his son at that point in time?

25  A.   That is correct, sir.

**DUONG - DIRECT / AXELROD**

1  **Q.**   And you did so?

2  **A.**   Yes, I did.

3  **Q.**   I want to ask you about your contacts with Mr. Liew since

4  that time, since July 19th, 2011.  Have you had any personal

5  contact with Mr. Liew?

6  **A.**   What do you mean?

7  **Q.**   Have you seen him?

8       **MS. AGNOLUCCI:**  Objection.  Your Honor, may we have a

9  sidebar?

10      **THE COURT:**  No.

11      I think you need to be more focused in your question.

12  Sustained.

13  **BY MR. AXELROD:**

14  **Q.**   Have you had -- since July of 2011, have you had contacts

15  with Christina Liew?  Have you had visits with her, talked to

16  her, over that time period?

17  **A.**   You mean since July?

18  **Q.**   2011.

19  **A.**   The month of July?

20  **Q.**   Yes.

21  **A.**   You mean talking all three of us?

22  **Q.**   Right.  Since that time.

23  **A.**   Yes, we do see each other, yes.

24  **Q.**   How often?

25  **A.**   When we were at the office almost daily.

DUONG - CROSS / AGNOLUCCI

1   Q.   But at some point in time the office closed; right?

2   A.   Yes.

3   Q.   And that was in the month or two -- in August or

4   September 2011?

5   A.   October or November, sir.

6   Q.   Okay.  And since that time, how many times have you seen

7   Christina Liew?

8   A.   Quite often because she will be asking me to babysit his

9   son -- her son.  Sorry.

10         MR. AXELROD:  Thank you.  I have no further questions,

11   Your Honor.

12         THE COURT:  All right.  Ms. Agnolucci,

13   cross-examination?

14         MS. AGNOLUCCI:  Thank you, Your Honor.

15                   (Pause in proceedings.)

16         MS. AGNOLUCCI:  May I proceed, Your Honor?

17         THE COURT:  Yes, you may.

18                   <u>CROSS-EXAMINATION</u>

19   BY MS. AGNOLUCCI:

20   Q.   Good afternoon, Mr. Duong.

21   A.   Good afternoon, ma'am.

22   Q.   You testified that Mr. Liew hired you in June 2010 to

23   perform IT work for USAPTI?

24   A.   That's correct, ma'am.

25   Q.   You also stated that you came to the U.S. in April of

**DUONG - CROSS / AGNOLUCCI**

1   2010?

2   **A.**   That's correct, ma'am.

3   **Q.**   Before that, you worked as a freelance computer

4   technician; correct?

5   **A.**   That's correct, ma'am.

6   **Q.**   Did you also operate a computer rental shop at one point?

7   **A.**   Yes, ma'am.

8   **Q.**   Mr. Liew hired you to maintain the computers at the

9   company?

10  **A.**   That's correct, ma'am.

11  **Q.**   Was one of your job responsibilities to create backups?

12  **A.**   That's correct, ma'am.

13  **Q.**   In your experience, is creating backups a normal part of

14  IT practice?

15  **A.**   It's pretty standard.

16  **Q.**   Is it recommended to create a backup?

17  **A.**   It's always recommended, ma'am.

18  **Q.**   Why is it recommended?

19  **A.**   Because if something happen to the originals, you have a

20  backup to work with.

21  **Q.**   Mr. Liew told you that he had been backing up the USAPTI

22  server before you started working for him; right?

23  **A.**   That's correct, ma'am.

24  **Q.**   He had a backup procedure already in place?

25  **A.**   That's correct, ma'am.

DUONG - CROSS / AGNOLUCCI

1  Q.   And he felt strongly about backing up material; correct?

2       MR. AXELROD:  Objection.

3       THE WITNESS:  That's correct, ma'am.

4       THE COURT:  Sustained.

5       MR. AXELROD:  And move to strike.

6       THE COURT:  Motion granted.  The jury will disregard

7  the last answer.

8  BY MS. AGNOLUCCI:

9  Q.   After you joined USAPTI, you helped perform a weekly

10 backup of the server; correct?

11 A.   That's correct, ma'am.

12 Q.   Can you explain how the backup was carried out?

13 A.   We have a backup software that start backing up the server

14 every Friday evening, I believe, when everybody is gone from

15 the office.

16 Q.   Would you say that there were a number of files on the

17 USAPTI server?

18 A.   I beg your pardon?

19 Q.   Would you say there were a lot of files on the USAPTI

20 server?

21 A.   There were a lot, ma'am.

22 Q.   Do you have any idea how many?

23 A.   No, ma'am.

24 Q.   Is it safe to say that it's too many to count?

25 A.   Yeah.  I believe it will run in the tens of thousands.

DUONG - CROSS / AGNOLUCCI

1    Q.   You were asked on direct about removing various documents

2    with the word "DuPont" in them from the USAPTI server.  Do you

3    remember that?

4    A.   That's correct, ma'am.

5    Q.   And you testified that you removed less than 150 files;

6    correct?

7    A.   That's correct, ma'am.

8    Q.   You didn't open up any of the files to look at them; did

9    you?

10   A.   No, ma'am.

11   Q.   So you can't describe their content?

12   A.   No, ma'am.

13   Q.   Did anyone ever say to you that the files contained trade

14   secrets?

15   A.   No, ma'am.

16   Q.   And isn't it true that some 30 to 40 of those files that

17   you removed were also publicly available on the Internet?

18   A.   It could be, ma'am.

19   Q.   It could be?

20   A.   But since I did not open them, I cannot tell for sure.

21   Q.   Do you recall testifying before the Grand Jury regarding

22   whether the files that you removed were available on the

23   Internet?

24   A.   Yes, I do.

25   Q.   And do you recall saying in that testimony that 30 to 40

**DUONG - CROSS / AGNOLUCCI**

1   of the files you removed were available on the Internet?

2   **A.**   Now I remember I did.

3   **Q.**   And is that still your testimony today?

4   **A.**   Yes, ma'am.

5   **Q.**   At the time that this removal happened, Mr. Liew told you

6   that he wanted to restrict access within USAPTI to files

7   mentioning the word "DuPont"; correct?

8           **MR. AXELROD:**   Objection.

9           **THE COURT:**   Overruled.

10          **THE WITNESS:**   Am I supposed to answer that?

11          **THE COURT:**   Yes, you may answer.

12          **THE WITNESS:**   Can you repeat that question, please?

13  **BY MS. AGNOLUCCI:**

14  **Q.**   Yes.   Mr. Liew told you that he wanted to restrict access

15  within USAPTI to files mentioning the word "DuPont"?

16  **A.**   That's correct, sir -- ma'am.

17  **Q.**   And he told you -- Mr. Liew told you that he was concerned

18  about USAPTI employees gaining access to the files; correct?

19          **MR. AXELROD:**   Objection.

20          **THE COURT:**   Overruled.

21          **THE WITNESS:**   Yes, ma'am.

22  **BY MS. AGNOLUCCI:**

23  **Q.**   All of USAPTI employees had access to the server before

24  that point; right?

25  **A.**   That's correct, ma'am.

1    Q.   So any employee could go to the server and look up any

2    document whenever they wanted?

3    A.   That's correct, ma'am.

4    Q.   And this was -- when this removal request came, it was at

5    the time of the civil suit; right?

6    A.   That's correct, ma'am.

7    Q.   Removing a document from the server would have restricted

8    USAPTI employees from accessing those documents; right?

9    A.   That's correct, ma'am.

10   Q.   At the time that you performed this removal from the

11   server, you and Mr. Liew kept a backup of all the files that

12   you removed; didn't you?

13   A.   That's correct, ma'am.

14   Q.   Mr. Liew, in fact, instructed you to keep that backup;

15   didn't he?

16   A.   That's correct, ma'am.

17   Q.   So these files were never permanently destroyed; were

18   they?

19   A.   Not in that sense, because they still exist in the backup.

20   Q.   And that backup had a more limited access; right?

21   A.   That's correct, ma'am.

22   Q.   Mr. Liew could supervise and control who was viewing the

23   backup; right?

24   A.   That's correct, ma'am.

25   Q.   And the backup did not permanently remove any documents;

DUONG - CROSS / AGNOLUCCI

1    correct?

2    **A.**    No, ma'am.

3              **THE COURT:**  No, is what counsel just said correct?

4              **THE WITNESS:**  Yes, what she said was correct, ma'am --

5              **THE COURT:**  All right.

6              **THE WITNESS:**  -- Your Honor.

7              **THE COURT:**  Thank you.

8    **BY MS. AGNOLUCCI:**

9    **Q.**    Mr. Duong, you testified regarding some code that you were

10   asked to scan.  I believe it was your testimony that

11   Mr. Thongthawee most likely was the one who asked you to scan

12   it; is that correct?

13   **A.**    That's correct, ma'am.

14   **Q.**    And you also testified that Mr. Thongthawee wanted to see

15   if that code could run; is that correct?

16   **A.**    That's correct, ma'am.

17   **Q.**    No one was sure whether that code could run or not;

18   correct?

19   **A.**    No one, ma'am.

20   **Q.**    And isn't it true that Mr. Thongthawee never got the code

21   to run?

22   **A.**    That's correct, ma'am.

23   **Q.**    You also testified that when Mr. Liew was in China, he was

24   concerned about the security of some of his documents.  Do you

25   remember that?

**DUONG - CROSS / AGNOLUCCI**

1    **A.**    That's correct, ma'am.

2    **Q.**    Did you recommend to Mr. Liew that USAPTI use a hosting

3    method for transmitting electronic files to Pangang?

4    **A.**    Can you refresh that question?

5    **Q.**    Yes.  I'll repeat the question.

6        Do you remember recommending to Mr. Liew that USAPTI use a

7    cloud-based hosting method to transmit electronic files to

8    Pangang?

9    **A.**    Not a cloud base.  Not in that sense.  What I remember

10   recommending is for us to upload the file and limit the file to

11   a certain time and reasonable access to be removed.

12   **Q.**    So is it fair to characterize what you recommended as a

13   hosting method?

14   **A.**    It could be a hosting method, but not a cloud base in that

15   sense, no.

16   **Q.**    I apologize.  I may not have used the right technical

17   terminology.

18   **A.**    That's okay, ma'am.

19   **Q.**    This was a method of transmitting the packages of work

20   that USAPTI engineers completed to the Chinese customers;

21   correct?

22   **A.**    That's correct, ma'am.

23   **Q.**    And these were very large packages of work; right?

24   **A.**    They were quite big, ma'am.

25   **Q.**    And one reason that you recommended that hosting method is

1  that the files were bulky, and they would have had to have been

2  chopped up in many parts and sent over many emails; right?

3  **A.**  That's correct, ma'am.

4  **Q.**  And another reason was for security purposes?

5  **A.**  Yes.

6  **Q.**  Did that hosting method that you recommended require a

7  password?

8  **A.**  Yes, it did.

9  **Q.**  And did it limit access to a period of three days?

10  **A.**  That's correct, ma'am.

11  **Q.**  Without this protection, Pangang could have forwarded

12  along those files to other people; right?

13  **A.**  Yes, correct.  You are correct, ma'am.

14  **Q.**  The Pangang management changed pretty often; didn't it?

15          **MR. AXELROD:**  Objection.

16          **THE COURT:**  Sustained.

17  **BY MS. AGNOLUCCI:**

18  **Q.**  Do you know whether the management of Pangang changed over

19  time?

20  **A.**  That's what I heard, yes, ma'am.

21  **Q.**  Was one of the reasons for setting up this hosting method

22  to ensure that employees at Pangang wouldn't pass USAPTI's work

23  product on to other companies?

24  **A.**  One of the reasons, yes.

25  **Q.**  You wanted to make sure the files only went to their

1    intended recipients; right?

2    **A.**    That's correct, ma'am.

3         **MS. AGNOLUCCI:**  Thank you, Mr. Duong.  I have no

4    further questions.

5         **THE WITNESS:**  Thank you.

6         **THE COURT:**  Anything further?

7         **MR. AXELROD:**  Yes.

8         **THE COURT:**  All right.

9                    **REDIRECT EXAMINATION**

10   BY MR. AXELROD:

11   **Q.**    Mr. Duong, on cross-examination you indicated that you

12   actually hadn't looked at the files that you deleted that

13   contained DuPont; right?  That's what you just testified to?

14   **A.**    Yes.  I believe I did, yes.

15   **Q.**    So how did you know how many were available on the

16   Internet?

17   **A.**    Some of them by names.  Some of the documents actually

18   were accessed prior -- I mean, we kind of see those files

19   before.  There are certain names documents that we have

20   access -- I have access to the file before.  Not -- what I'm

21   saying is, I do not go into each document, but some of the

22   documents names are familiar because I have seen them before.

23   **Q.**    I see.

24   **A.**    In other words, those files were taken from the Internet.

25   **Q.**    I see.  So Mr. Liew, he could supervise and control access

1  to the server; right?

2  **A.**   That's correct, sir.

3  **Q.**   Okay.  And up until the time that DuPont filed the

4  lawsuit, the files were accessible to all the employees of

5  USAPTI?

6  **A.**   That's correct, sir.

7  **Q.**   But after that, Mr. Liew made a decision to change the

8  practice; right?

9  **A.**   That's correct, sir.

10  **Q.**   And he decided that only certain people would have access

11  to the backup or to the -- he decided to eliminate documents

12  from the server accessible to everybody?  He took the DuPont --

13  he directed you to take DuPont documents off the server.

14         **MS. AGNOLUCCI:**  Objection.

15         **THE COURT:**  Overruled.

16         **THE WITNESS:**  You could say that, sir.

17         **THE COURT:**  Well, the question is what you could say,

18  not what he could say.  Is that correct or not?

19         **THE WITNESS:**  That's correct, sir.

20  **BY MR. AXELROD:**

21  **Q.**   And the backup server had limited access; right?  Mr. Liew

22  could have access to it; right?

23  **A.**   Yes, he do.

24  **Q.**   And who else?

25  **A.**   And myself.

DUONG - REDIRECT / AXELROD

1   **Q.**   And you.  Anyone else?

2   **A.**   No, sir.

3   **Q.**   And, by the way, could you describe what that backup

4   server looked like?

5   **A.**   It's actually an external hard drive.

6   **Q.**   Okay.  Could you describe that external hard drive?

7   **A.**   I believe it's a Western Digital.  It's a black box.

8   **Q.**   Black box?

9   **A.**   Yeah.

10   **Q.**   Okay.  And how big of a hard drive?

11   **A.**   I don't remember the size.  It's about 1 or 2 terabyte.

12   **Q.**   You testified that the deleted DuPont files would still be

13   on the backup server; right?

14   **A.**   Yes, they are.

15          **MS. AGNOLUCCI:**  Objection.

16          **THE COURT:**  Overruled.

17   **BY MR. AXELROD:**

18   **Q.**   Did you ever go back and look at that backup server?

19   **A.**   I don't have to.  I'm sure they're there.

20   **Q.**   Did you ever go -- that's not my question.  My question

21   is:  Did you ever go back and see if those deleted DuPont files

22   were on the backup server?

23   **A.**   I did monitor them afterward, and I believe they are still

24   there.

25   **Q.**   So you went back and verified that those DuPont files were

**DUONG - REDIRECT / AXELROD**

1  on the backup server?

2  **A.**   I did not go back there just to verify whether those files

3  are there.  I went back to verify that the backup was still

4  intact.

5  **Q.**   Well, that's a different question.  My question is:  Did

6  you go back and look at the backup and determine that the

7  files -- that DuPont files that had been deleted from the

8  business' server were still present on the backup?

9  **A.**   Let me clarify that.  I went back and make sure that the

10  backup is still intact and backed -- and the backup prior to

11  the date of -- I mean, the backup -- the whole backup is still

12  good.  I did not go back to validate and find out if those

13  files are still there, but I believe those files are still

14  there --

15  **Q.**   Okay.

16  **A.**   -- because the backup is good.

17  **Q.**   Okay.  So you believe that they're there, but you don't

18  know that for a fact?

19  **A.**   They should be there.

20  **Q.**   Okay.

21  **A.**   Because the reason I went back once to look at them

22  because we were trying to find some files that were prior to I

23  think it's February or March 5, and we were still able to

24  retrieve those files.  So I believe that those files would

25  still be there.

1   **Q.**   Now, you indicated that the management at Pangang changed

2   frequently?

3   **A.**   From what I heard say, sir.

4   **Q.**   Do you have any -- can you give an example of a change in

5   management?

6   **A.**   I was told that the Pangang team, they changed the

7   composition every time we meet.  So it's an implication that

8   management itself has changed.

9         **MR. AXELROD:**  I have no further questions, Your Honor.

10  Thank you.

11        **THE COURT:**  Ms. Agnolucci, do you have anything else?

12        **MS. AGNOLUCCI:**  No, Your Honor.  I have no further

13  questions.

14        **THE COURT:**  All right.  You're excused.

15     Mr. Froelich?

16        **MR. FROELICH:**  Your Honor, this witness doesn't apply

17  to me.

18        **THE COURT:**  True.  Okay.  I just wanted to give you

19  the opportunity.

20     Thank you, sir.  You're excused.

21        **THE WITNESS:**  Thank you.

22                    (Witness excused.)

23        **THE COURT:**  All right, ladies and gentlemen, we're

24  going to break for the weekend or for the rest of the week.  I

25  will remind you of your conduct as jurors again, and then we'll

**DUONG - REDIRECT / AXELROD**

1   go over the schedule for next week again.

2        So I'm going to remind you of your conduct as jurors.

3   We'll wait until we let the people leave.

4                    (Pause in proceedings.)

5        **THE COURT:**  All right.  Nobody is to leave now until I

6   finish this instruction under pain of contempt.

7        I will now remind you of your conduct as jurors.  First,

8   keep an open mind throughout the trial and do not decide what

9   the verdict should be until you and your fellow jurors have

10  completed your deliberations at the end of the case.

11       Second, because you must decide this case based only on

12  the evidence received in the case and on my instructions as to

13  the law that applies, you must not be exposed to any other

14  information about the case or the issues it involves during the

15  course of your jury duty.

16       Thus, until the end of the case, or unless I tell you

17  otherwise, do not communicate with anyone in any way and do not

18  let anyone else communicate with you in any way about the

19  merits of the case or anything to do with it.  This includes

20  discussing the case in person, in writing, by phone,

21  Smartphone, or electronic means, by email, text messaging, or

22  in or on any Internet chat room, blog, website, including such

23  social networking media like Facebook, MySpace, LinkedIn,

24  YouTube, and Twitter, or other feature.  This applies to

25  communicating with your fellow jurors until I give you the case

1    for deliberation; and it applies to communicating with everyone

2    else, including your family members, your employer, the media

3    or press, and the people involved in the trial, although you

4    may notify your family and your employer that you remain as a

5    juror in this case.

6         But if you're asked or approached in any way about your

7    jury service or anything about this case, you must respond that

8    you have been ordered not to discuss the matter and to report

9    the contact to the Court.

10        Because you will receive all the evidence and legal

11   instruction you properly may consider to return a verdict, do

12   not read, watch, or listen to any news or media accounts or

13   commentary about the case or anything to do with it.

14        Do not do any research, such as consulting dictionaries,

15   searching the Internet, or using other reference materials; and

16   do not make any investigation or in any other way try to learn

17   about the case on your own.

18        The law requires these restrictions to ensure the parties

19   have a fair trial based on the same evidence that each party

20   has had an opportunity to address.

21        A juror who violates these restrictions jeopardizes the

22   fairness of these proceedings, and a mistrial could result that

23   would require the entire trial process to start over.

24        If any juror is exposed to any outside information, please

25   notify the Court immediately.

**PROCEEDINGS**

1          Next week we're going to sit on a regular schedule, as the

2    printed schedule we gave you indicates, February 3rd to

3    February 6th, Monday through Thursday.  We're going to sit from

4    our regular 8:00 to 1:30 schedule.

5          I'm going to check in with counsel before then to talk

6    about -- get their best estimates of the remaining trial time

7    so we can keep you up-to-date on how we're going vis-a-vis our

8    schedule.

9          So the Court thanks you for your attention, and we will

10   see you next Monday at 8:00 o'clock.  Please enjoy the rest of

11   your week and your weekend.

12         (Proceedings were heard out of the presence of the jury:)

13             **THE COURT:**  All right.  So the jury has retired.

14         Where is the Government now in terms of its case, so I can

15   kind of get a little better update on the estimate?

16             **MR. HEMANN:**  Your Honor, may we unlock the door?

17             **THE COURT:**  Oh, yes.  Sure.  Please do.  Thank you.

18             **MR. HEMANN:**  So we believe that we're on schedule to

19   finish at the end of the day next Thursday.  I'll offer the

20   caveat that I've been offering for sometime, which is that we

21   may go into the very early part of the following week, by which

22   I mean Monday of the following week; but I would feel -- I feel

23   about 80 percent comfortable with saying that we'll be done by

24   the end of the day, or slightly earlier perhaps, this next

25   Thursday, a week from tomorrow.

1        **THE COURT:**  All right.  Mr. Gasner, obviously to some

2   extent, you know, the Defense is a moving target based upon

3   cross-examination and the like, but what's your rough

4   guesstimate in terms of any case that Mr. Liew and USAPTI might

5   put on?

6        **MR. GASNER:**  Our team is going to be assembling

7   between now and Monday, Your Honor.  We'll have a better sense.

8   My guess at this point would be two full trial weeks, eight

9   days.  I think Mr. Froelich has talked about having one day

10  beyond that.  So I think nine days would be our best estimate

11  at this point.

12       **THE COURT:**  So if we started on, let's say, the 11th

13  of February, just to be conservative, so we'd have three days

14  that week, and then three days the following week, and then

15  four days -- no.  We're dark.  We have holidays coming up.

16       So it sounds like we're probably going to go into March is

17  my guess.  And, again, I'm not criticizing anybody, but just --

18  and I won't tell the jury anything because it's not really

19  relevant until we get closer to the end of the Government's

20  case; and then, as you said, you'll probably have a slightly

21  better sense of how long your case is going to take and

22  Mr. Froelich will as well, and I'll be able to give the jury

23  plenty of notice.

24       Because we have to build in other aspects, motions, a

25  charging conference, closing argument, deliberations, so I'm

1    guessing that the case is going to go into probably at least

2    the first week in March.

3        What I'd like to get from the Government on Monday is I

4    want to get sort of a three-day warning as to the end of the

5    Government's case as best as possible.  Because what I want the

6    parties to do is -- you've been getting transcripts of the

7    proceedings, I hope you are, as time goes on, the trial goes

8    on, and you're receiving the transcripts, marshaling the

9    evidence.

10        Because to the extent that there are motions with respect

11   to, for example, a motion for judgments of acquittal and the

12   like, I'm going to want some meaty arguments.  I don't want

13   generalities or summaries.  I want specific marshaling of the

14   evidence and not -- I mean, obviously motions will be made, but

15   I want the motions to drill down into the evidence itself.

16        If there's a particular point, for example, from the

17   Defense perspective, where the Defense believes that the

18   Government has failed to satisfy an element of any of the

19   offenses or the Indictment as it's pled, I want a marshaling of

20   the evidence as opposed to just saying, "Well, they didn't

21   produce any evidence," or characterizing it because you have

22   more than that.

23        And rather than put the burden on the parties at this

24   stage or at that stage of filing, you know, long briefs, I

25   mean, you're free to do it if you want, I think we can have a

 1   more robust argument if we do it -- if you start working on,

 2   particularly whatever the Defense is going to do and also the

 3   Government's response, from the evidence that's been adduced

 4   rather than just characterizations or summaries.  It will help.

 5   And the Court has been doing the same thing.

 6        But having that three-day notice will give the Court a

 7   chance to really do its own work as far as marshaling the

 8   evidence and prepare for the arguments that will be made, and

 9   then I will allow time for the arguments to be made and

10   responded to.

11        And, again, I'm not at this point ordering briefs to be

12   filed.  If you want to file them, you can.  Feel free to do so.

13        The other thing that we have, sort of housekeeping thing

14   that we have to keep in mind, is that with respect to the

15   privilege documents, or the allegedly privilege documents, with

16   respect to John Liu's, L-I-U, testimony, the Court has ordered,

17   as you know, Mr. Liu to respond by Friday morning -- I think

18   it's Friday -- Friday morning, yes -- to respond to the filings

19   that have taken place; and then at some point the Court will

20   hear argument.

21        I think the best time to do that in terms of -- just sort

22   of in terms of the event is after the direct testimony because

23   I think the cases teach that we have to evaluate what it is the

24   Defense would like to use, how central is it to cross-examining

25   the witness or to the Defense, and we won't know that until we

**PROCEEDINGS**

 1 | hear the direct and the Defense makes an offer as to what it

 2 | needs to put in and why.  And then the Court will rule

 3 | ultimately on those issues after giving Ms. McNamara a chance

 4 | to file her papers.

 5 |     All right.  So anything further before we break for the

 6 | day?

 7 |         **MR. HEMANN:**  No.

 8 |     Just on that last note, Your Honor, we anticipate calling

 9 | Mr. Jubb, who's a DuPont security officer, first on Monday; and

10 | then we will move to Mr. Liu.  I don't anticipate Mr. Jubb will

11 | be more than an hour total.  I would guess sort of half an

12 | hour-ish.

13 |         **THE COURT:**  All right.  We'll see where that takes us.

14 |     Are you planning on calling Mr. Fisher?

15 |         **MR. HEMANN:**  We are not planning on calling

16 | Mr. Fisher, Your Honor.

17 |         **THE COURT:**  All right.  What about the gentleman from

18 | Georgetown Law?

19 |         **MR. HEMANN:**  We're going to make final decisions on

20 | that over the next few days.

21 |         **THE COURT:**  All right.  And, you know, then the

22 | Defense can call whoever they want.

23 |     But, all right, so I'll see you all on Monday.  I think --

24 | I don't see the need, nor do I think it's prudentially a good

25 | idea, to expand the hours.  I don't think we could negate going

**PROCEEDINGS**

1  into March the way the case is configured now, and I'd hate to

2  get into a situation where we start stretching the jury further

3  than we told them just so that we could save an hour here or an

4  hour there.  So my plan is just to go -- roar ahead with the

5  schedule, and see where things take us.

6        **MR. HEMANN:**  And, Your Honor, let me just correct

7  briefly.  We could call Mr. Fisher as a rebuttal witness.  I

8  don't want to preclude.  I meant we are not planning on calling

9  him in our case in chief.

10       **THE COURT:**  All right.  Very well.  You reserve

11 whatever -- the Defense reserves whatever they reserve with

12 respect to objecting to rebuttal.

13     I'm very -- those of you who have tried cases in front of

14 me know that I'm extremely tight when it comes to -- I don't

15 want to use the word "conservative."  I don't want to be

16 compared to Mr. Taback.  But I don't generally like rebuttal;

17 and I have a view that if anything could have been presented in

18 the case in chief, I don't allow it; and it's not, therefore,

19 appropriate rebuttal.  I don't allow it.  So everybody's on

20 notice.  I've done that in criminal cases, as well as civil

21 cases.  So please be advised of that.

22       **MR. HEMANN:**  We understand, Your Honor.

23       **THE COURT:**  Tactics are one thing, but my philosophy

24 of rebuttal is another thing.  So just take that into account.

25     Thanks, everybody.  See you next week.

PROCEEDINGS

1         **MR. HEMANN:**  Thanks, Your Honor.

2         **MR. GASNER:**  Have a good weekend.

3         **MS. AGNOLUCCI:**  Thank you, Your Honor.

4              (Proceedings adjourned at 1:57 p.m.)

5                       ---oOo---

6

7              **CERTIFICATE OF REPORTERS**

8         I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   DATE:   Wednesday, January 29, 2014

12

13

14

15   _____

16        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

17

18

19   _____

20     Katherine Powell Sullivan, CSR No. 5812, RMR, CRR
                U.S. Court Reporter

21

22

23

24

25