**Volume 13**

**Pages 2526 - 2750**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
  VS.                            )        NO. CR 11-00573 JSW
                                 )
WALTER LIEW; ROBERT MAEGERLE;    )
and USA PERFORMANCE TECHNOLOGY,  )
INC.,                            )
                                 )
            Defendants.          )
_____)
                          San Francisco, California
                          Monday, February 3, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    MELINDA HAAG
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:  **PETE AXELROD**
                 **JOHN H. HEMANN**
                 **ASSISTANT UNITED STATES ATTORNEYS**

                    U.S. DEPARTMENT OF JUSTICE
                    600 E Street NW
                    Washington, D.C.  20044
            BY:  **RICHARD S. SCOTT**
                 **ASSISTANT U.S. ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant Walter Liew and USA Performance Technology, Inc.:
                          KEKER & VAN NEST LLP
 3                        633 Battery Street
                          San Francisco, California  94111
 4                  BY:  STUART L. GASNER
                        SIMONA A. AGNOLUCCI
 5                      KATHERINE M. LOVETT
                        CHRISTINA BLAIS
 6                      ATTORNEYS AT LAW

 7   For Defendant Robert J. Maegerle:
                          MCKENNEY & FROELICH
 8                        1349 West Peachtree Street
                          Two Midtown Plaza - Suite 1250
 9                        Atlanta, Georgia  30309
                    BY:  JEROME J. FROELICH, JR.
10                       ATTORNEY AT LAW

11   For the Witness Jian Liu:
                          SWANSON & MCNAMARA
12                        300 Montgomery Street - Suite 1100
                          San Francisco, California  94104
13                  BY:  MARY G. MCNAMARA, ATTORNEY AT LAW

14

15

16

17

18

19

20

21

22

23

24

25
```

1        **I N D E X**

2   Monday, February 3, 2014

3   <u>**GOVERNMENT'S WITNESSES**</u>                          <u>**PAGE**</u>  <u>**VOL.**</u>

4   <u>**LIU, JIAN**</u>
      <u>(SWORN)</u>                                        2546   13
5   Direct Examination by Mr. Hemann                    2546   13
      Cross-Examination by Ms. Agnolucci                 2623   13
6   Redirect Examination by Mr. Hemann                  2685   13

7   <u>**JUBB, JAMES**</u>
      <u>(SWORN)</u>                                        2693   13
8   Direct Examination by Mr. Scott                     2694   13
      Cross-Examination by Mr. Gasner                    2705   13
9   Redirect Examination by Mr. Scott                   2718   13
      Recross-Examination by Mr. Gasner                  2720   13
10
    <u>**CHANG, ALLEN**</u>
11    <u>(SWORN)</u>                                        2723   13
      Direct Examination by Mr. Axelrod                  2723   13

12        **E X H I B I T S**

13
    <u>**TRIAL EXHIBITS**</u>                        <u>**IDEN**</u>  <u>**EVID**</u>  <u>**VOL.**</u>
14
      163                                              2577   13
15
      294                                              2558   13
16
      326                                              2637   13
17
      326T                                             2637   13
18
      687                                              2607   13
19
      687T                                             2607   13
20
      777                                              2632   13
21
      778                                              2570   13
22
      788                                              2596   13
23
      790                                              2628   13
24
      804                                              2585   13
25

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 805 | | 2585 | 13 |
| 884 | | 2610 | 13 |
| 1256 | | 2649 | 13 |

```
 1   Monday - February 3, 2014                        7:48 a.m.

 2                     P R O C E E D I N G S

 3                         ---oOo---

 4       (Proceedings were heard out of the presence of the jury:)

 5           THE COURT:  Good morning.  Please be seated.

 6       Please call the case.

 7           THE CLERK:  Calling Case Number CR-11-573;

 8   United States versus Walter Liew, United States versus Robert

 9   Maegerle, and United States versus USAPTI.

10       Counsel, please state your appearances.

11           MR. AXELROD:  Good morning, Your Honor.  Pete Axelrod,

12   John Hemann, and Richard Scott for the United States.

13           THE COURT:  Good morning, everybody.

14           MR. HEMANN:  Good morning, Your Honor.

15           MR. GASNER:  Good morning, Your Honor.  Stuart Gasner

16   with Simona Agnolucci, Katie Lovett for USAPTI and Mr. Liew,

17   who is present.

18           THE COURT:  Good morning.

19           MS. AGNOLUCCI:  Good morning, Your Honor.

20           MS. LOVETT:  Good morning, Your Honor.

21           MR. FROELICH:  Jerry Froelich for Mr. Maegerle.

22   Mr. Maegerle is standing next to me.  Good morning, Your Honor.

23           THE COURT:  Welcome.

24           MR. FROELICH:  Good morning.

25           THE COURT:  I understand we have a few issues to deal
```

**PROCEEDINGS**

 1   with before the jury comes in.

 2        **MR. GASNER:**  Yes, Your Honor.  First of all, we have

 3   been trimming back our witness list over the weekend, so I

 4   think prior estimate stands and may well be shorter.

 5        **THE COURT:**  Okay.

 6        **MR. GASNER:**  The Court had asked earlier about video,

 7   and there's one witness that we had mentioned before the trial

 8   started briefly, Ruth Oduca, who's a USAPTI former employee in

 9   Oklahoma; and it's possible that her testimony would best be

10   viewed through a live feed to the court.  So I just wanted to

11   inquire of the Court who to talk to about setting that up if it

12   becomes a reality, which it might not.

13        **THE COURT:**  Okay.  The person that you need to talk to

14   is Stefan Curl, C-U-R-L.  He's on the Court's directory.  He's

15   the technology person who sets up the screen.

16        And when would you -- I assume that wouldn't be until next

17   week?

18        **MR. GASNER:**  Next week at the -- yeah, absolutely.

19        **THE COURT:**  Okay.  So I would communicate with him

20   earlier so we can test it out.

21        **MR. GASNER:**  Very well.

22        **THE COURT:**  All right.

23        **MR. GASNER:**  Thank you, Your Honor.

24        One issue that I thought was different than it turned out

25   to be.  There's a DuPont custodian of the Sherwin-Williams

 1  contract.  Your Honor had issued a 17(c) subpoena to DuPont.

 2  Among the documents we received was the Sherwin-Williams

 3  contract from 1967, and we had subpoenaed Mr. Conner who is the

 4  DuPont person who coordinated the collection for DuPont, but we

 5  had neglected to put him on our witness list.

 6      So I had talked to the Government about this over the

 7  weekend, and they initially said, "Well, you know, raise it

 8  with the Court, and we'll kind of evaluate our position."

 9      I talked to Mr. Hemann before court today, and it's kind

10  of morphed into a more substantive issue having to do with the

11  admissibility of the Sherwin-Williams contract, and it's an

12  important issue to the Defense.  I don't know if the Court

13  wants us to brief it.

14      I think where we stand now is that the Government is going

15  to talk to DuPont, get further information on the provenance of

16  the Sherwin-Williams contract, exactly where it was found, how

17  and by whom; and it may be that we can stipulate to those facts

18  and then somehow tee up the issue about whether the contract is

19  admissible.

20      **THE COURT:**  Before we get to any other issues you

21  might have, what's the Government's response with respect to

22  that?

23      **MR. HEMANN:**  We agree with the facts as they were laid

24  out by Mr. Gasner.  The name of the custodian is not on the

25  witness list.  I don't think it's something that it would be

1    appropriate for us to make a big deal over that.  We do know

2    where the contract came from generally.  I would like to look

3    into the specifics of where the contract was located just to

4    satisfy myself that it is authentic and the circumstances under

5    which it is authentic.

6        I think there is also a legal issue as to its

7    admissibility.  I think that the portion of it that is

8    interesting to the defendants is being offered for the truth.

9    I think that nobody who -- custodian or not, there's an issue

10   of the interpretation of the contract and the meaning of the

11   contract, that, without explanation, is going to mislead the

12   jury.

13       I think that's an issue as to the substance that won't

14   come up until the Defense case.  It might be productive to have

15   a few more discussions with the Defense about it, and make a

16   proposal to the Court as to how to resolve that.

17           **THE COURT:**  All right.  My druthers would be that,

18   narrow the issue as you have done so throughout.  To the extent

19   that you can't resolve the issues, I think a brief -- a brief

20   brief, an offer of proof by the Defense, as I required the

21   Government to do, and then I can have -- be able to sort of

22   deliberate on it and rule expeditiously on its admissibility or

23   at least as to those issues that are still not disputed.

24       So we'll do it that way, and the earlier the better.

25           **MR. GASNER:**  Thank you, Your Honor.

**PROCEEDINGS**

1       **THE COURT:**  Do you have any other issues you want to

2   bring up, Mr. Gasner?

3       **MR. GASNER:**  No.

4       **THE COURT:**  From the Government's side?

5       **MR. AXELROD:**  Yes, Your Honor.  Thank you.

6       First, we wanted to let the Court know that we anticipate

7   resting possibly at the end of the day on Wednesday, depending

8   on how the cross-examinations go early on Thursday.  So we

9   notified the Defense of that this morning.  We wanted to give

10  the Court notice that's our schedule.

11      And I think with that we also wanted to raise the issue of

12  reverse Jencks, the discovery by the Defense, you know, the

13  statements of the witnesses that they're going to be providing.

14  We have not received that kind of information yet; and to make

15  the trial move expeditiously, we just want to make sure that

16  that gets addressed.

17      I spoke about that this morning with Mr. Gasner.  He

18  indicated that he was going to work on that, but I wanted to

19  flag that because if we're going to get to Defense witnesses on

20  Thursday, obviously we need to start to know what's coming down

21  the pike.

22      **THE COURT:**  All right.  What's your position on that?

23      **MR. GASNER:**  Well, Your Honor, I think the Government

24  is pushing the limits of the three-day notice of their resting.

25  I don't want to encourage them to go any further.

**PROCEEDINGS**

1     I think our first witnesses are likely to be experts.

2 So -- and I've already given them notice of that.  We need to

3 make sure that they're going to be available on Thursday.  I'm

4 told that there's zero chance that we would need a witness on

5 Wednesday.

6     And, you know, we're going to work hard to line up our

7 people for Thursday.  I think the first witnesses will be

8 experts.  And I did tell Mr. Axelrod we were going to be

9 thinking about the reverse Jencks issues and, you know, giving

10 them a timely production.

11     **THE COURT:**  All right.  So you have that

12 representation.

13     All right.  Anything further?

14     **MR. AXELROD:**  Your Honor, just briefly I wanted to

15 raise an issue, a potential issue, regarding the inadvertent

16 disclosure of confidential information during the course of the

17 trial.  Just to alert the Court and the parties, obviously we

18 had some substantive testimony on the technology, and I'm

19 thinking of the testimony of Mr. Dayton and Mr. Diemer or

20 Dr. Diemer.  We're reviewing that to see if there were any

21 instances where either the Government or the witness or Defense

22 counsel, you know, might have inadvertently disclosed

23 something; and if they have, we'll raise it.  And I just wanted

24 to flag that.

25     **THE COURT:**  All right.

1      **MR. AXELROD:**  And then, finally, at the end of the day

2  on Thursday, the jury asked a question about the applicability

3  of Dr. Diemer's testimony, whether it applied to all the

4  defendants or just Walter Liew and USAPTI; and at that time we

5  indicated it applied to just Walter Liew and USAPTI.  And I

6  think that that was inaccurate in the following respect:

7      Certainly all the testimony about the Accession Report and

8  the Diemer Correlation only applied to Walter Liew and USAPTI.

9  There was a discussion at the end of Dr. Diemer's testimony

10  about the trade secret policies of DuPont and some documents.

11  That would apply to all the defendants.  And, so, we should

12  probably clarify that with the jury.

13      **THE COURT:**  All right.  Mr. Froelich, do you have

14  anything to say about that?

15      **MR. FROELICH:**  The only thing, Your Honor, is some of

16  the testimony went -- my client left in 1991, and Diemer was

17  talking about some things he did in 1995 and 1996 and above.

18  That's my only problem with it.

19      **THE COURT:**  How are we going to deal with that?

20      **MR. AXELROD:**  Well, I think that the issue is not

21  about when Mr. Maegerle left, which is in the record and known;

22  but it's about what is a trade secret and whether it was

23  protected and the reasonable measures, and that would encompass

24  a time period that predated his departure and continued

25  afterwards.  So that would apply --

**PROCEEDINGS**

1          **THE COURT:**  What would you propose that I tell the

2   jury to modify what the parties agreed I would tell them last

3   week?

4          **MR. AXELROD:**  Well, the modification that I would

5   suggest is that the Court -- that the jury be advised that with

6   respect to the testimony of Dr. Diemer, his testimony relating

7   to DuPont's trade secret policies and practices applies to all

8   defendants.

9          **THE COURT:**  Mr. Froelich?

10         **MR. FROELICH:**  I hate to look bad in front of the

11  jury, but --

12         **THE COURT:**  Well, how about this -- well, you won't

13  look bad.  I will say the Court made an error, and simply say,

14  of course, Mr. Maegerle denies that.  So at least it's put in

15  sort of a noncommentary, and I'll simply put it that way

16  because I think that is his position.

17         **MR. FROELICH:**  And it will be limited as to -- because

18  my client is not involved with the Diemer equation or anything.

19  That's way past him.

20         **THE COURT:**  It would relate as to --

21         **MR. HEMANN:**  Trade secret policies.

22         **MR. FROELICH:**  As to -- the only thing it would be as

23  to the policy of -- not as to the substance of Diemer equation

24  or anything like that.

25         **THE COURT:**  Okay.

**PROCEEDINGS**

1            **MR. FROELICH:**  It would be just as to trade secret

2     policies.

3            **THE COURT:**  All right.  Do you anticipate -- I had

4     directed Jian Liu's attorney, Ms. McNamara, who we are

5     privileged to have here with us today.

6         Good morning, Ms. McNamara.

7            **MS. McNAMARA:**  Good morning.

8            **THE COURT:**  Do you plan on calling him this morning?

9            **MR. AXELROD:**  We do plan on calling him as the first

10    witness.

11           **THE COURT:**  Okay, great.  So what I would propose in

12    that regard -- you can come forward, Ms. McNamara, please, if

13    you wish to join us.

14        So let me first ask -- let me first ask, Ms. Agnolucci,

15    are you going to be dealing with Mr. Liu?

16           **MS. AGNOLUCCI:**  I am, Your Honor.

17           **THE COURT:**  All right.  Are you -- are you planning

18    on, in light of the Court's order issued Friday, attempting to

19    use the emails?

20           **MS. AGNOLUCCI:**  Your Honor, that will depend on what

21    comes out on direct examination.  It's our position that if the

22    emails would be necessary to fully cross-examine Mr. Liu, then

23    we would want to use some of them.

24           **THE COURT:**  All right.  Well, I think the way -- and

25    I'll hear from counsel, and particularly Ms. McNamara, how to

1    handle it; but I would imagine -- I don't anticipate, clearly,

2    there would be any need for Ms. McNamara to object during the

3    direct examination.

4        Do you anticipate, let me ask, since Ms. McNamara doesn't

5    know what the direct is going to be, a need to have possible

6    representation of Mr. Liu for direct examination?

7        **MR. HEMANN:**  I don't, Your Honor, with the following

8    caveat:  I returned the copies that I had of the emails to

9    Ms. McNamara last week.  She went over them, as I understand,

10   with her client.  She then went over in some detail the facts

11   that underlie them, not the communications, with me and with

12   Mr. Liu.

13       It's our intention to go through the underlying facts in

14   some detail.  Mr. Liu's English is his second language; and as

15   with many lay witnesses, he struggles a little bit with wanting

16   to say, "Well, when I talked to my lawyer, dot, dot, dot; he

17   said, dot, dot, dot."  So I'm slightly concerned about it.  I,

18   obviously, will be listening for those sort of things.

19       It will be easy for me to control on direct because I will

20   say things like, "Don't tell us what you said to your lawyer,

21   or vice versa."  On cross it's going to be a little more

22   difficult.

23       My suggestion would be that to the extent it comes up, I

24   simply stand up and say, "This goes to the matter that we were

25   discussing outside the presence of the jury," and maybe the

 1   Court can say, "Don't talk about what your lawyer said to you."

 2         THE COURT:  All right.  Ms. McNamara, what's your

 3   position as to how we should proceed, either on direct and/or,

 4   more importantly, on cross?

 5         MS. McNAMARA:  I agree with what the Government just

 6   said, Your Honor.  Mr. Liu may indeed blurt out something like,

 7   "As I said to my lawyer."  I've tried to caution him on that,

 8   but I would appreciate some help from the Government, perhaps,

 9   to direct him around that obstacle.

10      And I agree with the Court's protocol on cross.  If there

11   is an issue that the Defense feels it ought to be able to get

12   into, then perhaps the matter could be taken up at sidebar.

13         THE COURT:  Yeah.  I think maybe the thing to do at

14   that point would be -- well, let me ask both sides if there's

15   any dispute -- any concern about bringing Ms. McNamara as

16   Mr. Liu's attorney to sidebar as opposed to excusing the jury.

17      First of all, what's the Government's position on that?

18         MR. HEMANN:  I think that the jury probably would not

19   notice if the Court called a sidebar and Ms. McNamara simply

20   stood up from the first aisle and walked up.  I think the jury

21   probably wouldn't know her to be Mr. McNamara's -- or Mr. Liu's

22   lawyer.

23         THE COURT:  Well, they'd wonder who she was,

24   obviously, being a cameo appearance.

25         MR. HEMANN:  It would be.

PROCEEDINGS

1        **THE COURT:**  So do you have any concern with my

2   saying -- I would prefer, if we're going to do that, to tell

3   the jury, you know, invite Ms. McNamara up and say, "This is

4   Mr. Liu's attorney."  Do you have any objection to that?

5        **MR. HEMANN:**  My preference would be to permit the

6   ambiguity, the mystery.  Because I don't think it will -- I

7   think that we do enough things that are mysterious to them that

8   they probably won't notice.

9        But I think that calling attention to the fact that

10  Mr. Liu needs a lawyer for some reason, unlike the other

11  witnesses, puts him -- casts him in a bit of a different light.

12  So I guess I would prefer to just have her wander up sans

13  identification.

14       **THE COURT:**  Ms. Agnolucci?

15       **MS. AGNOLUCCI:**  We would prefer the approach that the

16  Court suggested, and the fact of his retaining lawyers is going

17  to be the subject of examination, not what he said to them if

18  the Court so rules during sidebar, but we would prefer that she

19  be identified.

20       **THE COURT:**  All right.  Well, what's your -- do you

21  mind being ambiguous or mysterious?

22       **MS. McNAMARA:**  I don't.  I have no position on this,

23  Your Honor.

24       **THE COURT:**  All right.  I think what I'll do is, I

25  will invite Ms. McNamara up and I will mention who she is,

**PROCEEDINGS**

1  because I think it's -- I believe in transparency.  I don't

2  think there's any prejudice to anybody.  That somebody has a

3  lawyer I don't think is a negative fact in this day and age.

4      So that's what I'll do.  And at sidebar I will ask -- the

5  burden is on the defendant to make a showing that complies with

6  what the Court required in its order.

7      And the other thing is, implicit in the Court's order is

8  that although the emails that are the subject -- were the

9  subject of Mr. Liu, Jian Liu's motion, will be made part of the

10  record and sealed, so that for appellate purposes, if

11  necessary, the defendants would be -- I would require the

12  defendants to return all copies of the subject emails because I

13  have ruled that they are privileged.

14      Again, it's a very fascinating issue, which fortunately we

15  don't need to get into, about whether the Government would have

16  been required in some fashion to make known to the defendants,

17  after getting Court approval, that these were -- if they are,

18  I'm not saying they are -- Brady material, but it does raise a

19  fascinating issue of which trumps which.  Fortunately or

20  unfortunately, because of the inadvertent disclosure, the

21  Defense is aware of them, so that's not an issue.

22      But I would, just in terms of -- I don't give advisory

23  opinions; but if this ever came up in the future, just for sort

24  of salutary reasons, I would think that the Government, if they

25  believe this was potentially *Giglio* or Jencks material, would

**PROCEEDINGS**

1    go to the Court in camera and say, "We have these documents.

2    We have a dilemma.  We need the Court's input on this."  And

3    then the Court would decide, probably bring Defense in on it's,

4    sort of, high-level basis and determine whether they are

5    privileged or the privilege trumps Brady or Brady trumps the

6    privilege.

7         Fortunately, we don't have to make new law in this case.

8    We have a lot of new law, perhaps, to make, but not this; and

9    we may on the privilege issue, but that is what it is.

10        So, anyway, so the jury's here.

11        Anything further, Ms. Agnolucci?

12        **MS. AGNOLUCCI:**  No.  Simply, Your Honor, that we would

13   be fine with the emails being sealed and with returning them,

14   provided that we could have access to them, if needed, for

15   further proceedings in this case.

16        **THE COURT:**  With the Court's permission, yes.

17        **MS. AGNOLUCCI:**  With the Court's permission.

18        **THE COURT:**  With the sealed documents, yes.  Of

19   course, the same with the Government.

20        So that if there is an issue, if Jian Liu has an issue

21   with your access for any purpose, I would certainly give

22   Ms. McNamara the opportunity to weigh in on whether or not you

23   should have further access to those.

24        **MS. AGNOLUCCI:**  And just to be clear, this sidebar

25   will be at the conclusion of the direct testimony; right?

**PROCEEDINGS**

1      **THE COURT:**  No -- yes and no.  It's at the conclusion,

2   but only when, as, and if -- as I said in my order, you can --

3   I'm sure there's other areas on which you could cross-examine

4   Mr. Liu unrelated to the documents, the privilege documents.

5   When you feel that you are at the point where you believe you

6   can make a showing and you need them for constitutional

7   reasons, then at that point you would approach and say, "Okay.

8   We want to use exhibit, you know, X, Y, Z.  We think that it's

9   clearly necessary to present our defense, and here's why," and

10  then I'll hear argument from both sides on that.

11      **MS. AGNOLUCCI:**  Understood.

12      **THE COURT:**  All right.

13      **MR. HEMANN:**  Your Honor, may I raise just one real

14  quick issue with that?  We obviously don't have the emails in

15  front of me.  We do, based on my quick review of them when we

16  did have them and my conversations with Ms. McNamara, I do have

17  some significant hearsay and relevance objections.  I will make

18  them now to the Court as to the emails; and, obviously, I have

19  to trust in Your Honor's judgment as to what it is that I'm

20  exactly objecting to because I think that they are rife with

21  hearsay.  And I think that if he testifies to the underlying

22  facts, his privileged communications with his lawyer are not

23  relevant, and the prejudicial impact of them substantially

24  outweighs the limited probative value.

25      **THE COURT:**  Well, procedurally the Defense -- if the

**PROCEEDINGS**

1  Defense is going to offer them or use them in any way and lay a

2  foundation, they have the burden of going forward in persuasion

3  with respect to the admissibility at all levels.  So they have

4  to show it's relevant, you know, not hearsay, proper

5  foundation.

6       And I would think that in terms of the argument, that to

7  the extent there's an issue about privilege, that argument is

8  solely for Ms. McNamara to make.  I don't think the Government

9  has a dog in that race from the Court's perspective because

10  it's not -- you're not their attorney -- his attorney.

11       So -- all right.  So let's bring the jury in and see where

12  we go.

13            **MR. HEMANN:**  Thank you, Your Honor.

14            **MR. AXELROD:**  Thank you, Your Honor.

15            **MS. McNAMARA:**  Thank you, Your Honor.

16                 (Pause in proceedings.)

17       **THE COURT:**  Let's get the jury.

18  (Proceedings were heard in the presence of the jury:)

19       **THE COURT:**  All right.  Please be seated.

20       Good morning, ladies and gentlemen.  I hope you had an

21  enjoyable rest of the week and weekend, and you're ready to

22  start fresh.  We have a full trial week this week, and we're

23  looking forward to making some good progress.  We will keep

24  you, as the week goes on, advised of where we are in terms of

25  schedule and, so, you'll have a really good sense of the --

1    when this matter is going to get to you.

2        So with that, we're still in the Government's case in

3    chief.  You can call your next witness.

4        MR. HEMANN:  Thank you, Your Honor.  The United States

5    calls Jian Liu.

6        THE COURT:  All right, Mr. Liu, please step over

7    there.

8        THE CLERK:  Raise your right hand, please.

9                        **JIAN LIU**,

10   called as a witness for the Government, having been duly sworn,

11   testified as follows:

12       THE WITNESS:  I do.

13       THE CLERK:  Thank you.  Please be seated, and state

14   and spell your full name for the record.

15       THE WITNESS:  It's Jian Liu; J-I-A-N, L-I-U.

16       THE CLERK:  Thank you.

17                   **DIRECT EXAMINATION**

18   **BY MR. HEMANN:**

19   **Q.**   And, Mr. Liu, can you make sure when you speak, pull the

20   microphone up towards you a little bit closer and speak into

21   the microphone, please.

22   **A.**   Okay.

23   **Q.**   Pull it just a little closer to your mouth.

24   **A.**   Okay?

25   **Q.**   Perfect.  Thank you.

1    Mr. Liu, did you work at some point in time for a company

2  called USA Performance Technology?

3  **A.**  Yes, I did.

4  **Q.**  When did you work for USA Performance Technology?

5  **A.**  It's really a part-time job, so it started, like, 2010

6  February, late February, and also carried on through early

7  2011, March.

8  **Q.**  Mr. Liu, if you can take the microphone and actually pull

9  it closer to your mouth there a little higher.

10 **A.**  Okay.

11 **Q.**  If you sit up straight, it will extend.  There you go.

12 Great.

13    Before you started working -- and can I call it USAPTI?

14 **A.**  Yes.

15 **Q.**  Before you started working for USAPTI, what did you do for

16 a living?

17 **A.**  I working for Chevron as a chemical engineer.

18 **Q.**  What's your educational background?

19 **A.**  I got a Master's degree in Canada.

20 **Q.**  A Master's degree in Canada?

21 **A.**  Yeah, in chemical engineering.

22 **Q.**  When was that?

23 **A.**  1995.

24 **Q.**  Before you got your Master's degree in Canada, did you get

25 an undergraduate degree?

**LIU - DIRECT / HEMANN**

1   **A.**   Yeah.  It was in China, 1989.

2   **Q.**   After your Master's degree in 19 -- and what university

3   did you get your Master's degree from?

4   **A.**   University of Calgary.

5   **Q.**   Calgary?

6   **A.**   Yeah.

7   **Q.**   After you got your Master's degree in Calgary, what did

8   you do?

9   **A.**   I work in Canada for Fluor Daniel, it's an engineering

10  company.

11  **Q.**   It's an engineering company?

12  **A.**   Yeah.

13  **Q.**   How long did you do that?

14  **A.**   It's about two or three years.  Then work in U.S.

15  **Q.**   Did you go to work for Chevron right away, or did you have

16  another job?

17  **A.**   No.  I had another job working in Chicago UOP.  It's a

18  licensing engineering company.  Then I worked in Wyoming

19  Frontier.  Then in 2006 moved to the Bay Area for Chevron job.

20  **Q.**   So from 2006 until 2000 -- well, how long did you work

21  after 2006 for Chevron?

22  **A.**   2006?

23  **Q.**   Until when?

24  **A.**   Until March 2011.

25  **Q.**   Can you tell the jury a little bit about what your job at

**LIU - DIRECT / HEMANN**

1  Chevron was?

2  **A.**   My job is process engineer doing licensing business,

3  really working on hydroprocessing.  It's an oil refinery kind

4  of work.

5  **Q.**   Before going to work part-time for USAPTI, did you have

6  any experience with manufacturing titanium dioxide?

7  **A.**   No.

8  **Q.**   Had you ever studied that before?

9  **A.**   No.

10 **Q.**   Can you tell the jury how you first came to learn about

11 Mr. Liu's business at USAPTI?

12 **A.**   It was in, I think, middle of February 2010, I got a phone

13 call from Christina basically -- I don't know where she got my

14 number, but she called my phone trying to meet me.  And we met,

15 and they introduced to me about the company.

16 **Q.**   When you say "Christina," who do you mean?

17 **A.**   Christina Liew.

18 **Q.**   Who is Christina Liew?

19 **A.**   It's Walter Liew's wife, yeah.

20 **Q.**   So the initial communication to you, the initial inquiry,

21 came from Christina Liew?

22 **A.**   Yes, uh-huh.

23 **Q.**   And did you ever find out where Ms. Liew obtained your

24 contact information?

25 **A.**   Later, actually, I think, Walter Liew also went to my

**LIU - DIRECT / HEMANN**

1  house, the couple went to my house and introduced the company

2  to me, yeah.

3  Q.   Okay.  So after she spoke to you on the phone, they went

4  to your -- you had a meeting with them at your house?

5  A.   Yeah.

6  Q.   And both Mr. Liew and Mrs. Liew came to that meeting?

7  A.   Yeah.

8  Q.   What did they tell you about what they were interested in

9  from an employment perspective?

10 A.   Just, at the beginning just introduce themselves about,

11 you know, they own a business.

12 Q.   What did they tell you about their business?

13 A.   It's kind of an engineering business and talk a little bit

14 about titanium dioxide, but I don't think I really, at that

15 time, I have any idea.  Okay.

16 Q.   And did they tell you what they were looking for in terms

17 of your skills?

18 A.   Looking for engineer to help them in the company, looking

19 at chemical engineers.

20 Q.   So after that initial meeting at your house, was there a

21 follow-up?

22 A.   Yes.

23 Q.   How long afterwards?

24 A.   Later actually we had -- they ask, you know, more people

25 to help.  So I introduced my colleagues to them, too.  So we

LIU - DIRECT / HEMANN

1   had dinner at 99 Ranch in the Albany area.  Albany, yeah.  We

2   had a dinner together.  I introduced my colleague to them.

3   Q.   So there's a restaurant called Ranch 99?

4   A.   No, it's a shopping mall.  Restaurant, the exact

5   restaurant I forgot.

6   Q.   Okay.

7   A.   Okay.

8   Q.   And you introduced them to your colleagues.  Your

9   colleagues from where?

10  A.   Chevron.

11  Q.   Were you at this point in time still working for Chevron;

12  correct?

13  A.   Yes.

14  Q.   At the meeting at the shopping mall at the dinner, did you

15  learn more about what it was that Mr. Liew and Mrs. Liew were

16  looking to hire engineers for?

17  A.   It's not really know too much yet; but just know it's some

18  kind of engineer work, could use our background.

19  Q.   And did you make arrangements to actually begin looking at

20  some materials or doing some work for USAPTI?

21  A.   Yes, I did.

22  Q.   What was the next step in the process?

23  A.   Next is I went to USAPTI to work as an engineer on

24  material, so basically PFD and P&ID, an engineer term for

25  process review, and I distributed this work to my colleagues.

**LIU - DIRECT / HEMANN**

1  **Q.**   Okay.  Did you start doing work -- were you just to review

2  the PFDs and P&IDs, or was there something in particular you

3  were supposed to do with them at that time?

4  **A.**   Basically review process and including the data sheets.

5  **Q.**   Did you have a particular responsibility that was

6  different than that of your two colleagues?

7  **A.**   Basically we work together.  Work together, yeah.

8  **Q.**   Did you start working right away or was there some delay?

9  **A.**   It's kind of -- because I still have a full-time job, so

10 after that -- after I distributed the work, I went to Malaysia

11 for business trip.

12 **Q.**   For part of your Chevron work?

13 **A.**   Yes.

14 **Q.**   While you were gone, do you know what happened with the

15 work that your two colleagues were doing with USAPTI?

16 **A.**   They weren't working.  It was kind of slow, so I think it

17 was on and off.  And at one point I said probably need stop

18 that.  Later when I come back, then we continue to work on

19 that.

20 **Q.**   What sort of payment arrangements did you make at that

21 time with USAPTI in terms of, was it an hourly rate or a

22 salary, or what were those terms?

23 **A.**   It's an hourly rate.

24 **Q.**   And were the three of you, you and your two colleagues,

25 all paid the same amount?

LIU - DIRECT / HEMANN

1   A.   It's based on hour, yes.

2   Q.   And how much an hour were you paid?

3   A.   For me $90 per hour.

4   Q.   How long were you in Malaysia?

5   A.   Oh, I think more than 20 days.  I don't know exactly the

6   date, you know.  I think I leave, like, February 27th, 28th,

7   come back March, middle of March.

8   Q.   Before you left for Malaysia, did you and your colleagues

9   from Chevron do any research or anything to sort of learn

10  how -- what the TiO2 process was about?

11  A.   We're all curious, so we start to Google search what's

12  TiO2 about.

13  Q.   What did you find out?

14  A.   It's widely used material.

15  Q.   What did you find out about the manufacturing process?

16  A.   We didn't really go too far.  We mainly study just, like,

17  scratch information, what's that about.

18  Q.   Was there detailed information available from what you

19  found on Google about how to design one of these factories?

20  A.   We did already look for that, yeah.

21  Q.   When you got back from Malaysia, did you start doing more

22  work for Mr. Liew and USAPTI?

23  A.   Yes, I did.

24  Q.   What was the nature of your particular job responsibility?

25  A.   Still doing, we call it in engineer's terms, process work.

LIU - DIRECT / HEMANN

1    Q.    What does that mean?

2    A.    Means you understand PFD more, process diagram more, and

3    also know some P&ID.

4    Q.    And was that sort of a learning process still?

5    A.    Yes.

6    Q.    About how long did that go on?  How long did you engage in

7    sort of the learning process?

8    A.    It was on and off because I always travel.  I have a

9    full-time job, so I believe some work I did in May 2010 and

10   June for doing some simulation work.

11   Q.    Simulation work?

12   A.    Yeah.

13   Q.    What's simulation work?

14   A.    We use, we call it, process software, PRO/II is the exact

15   name, to simulate the process.

16   Q.    Were the P&IDs and PFDs you were working with already

17   completed?

18   A.    Yes.

19   Q.    So you didn't have anything to do with actually drafting

20   PFDs or P&IDs yourself?

21   A.    No.

22   Q.    So you worked over the summer of -- the early summer of

23   2010.  Who were the employees, the other employees, of USAPTI

24   during that time frame?

25   A.    Other employees in USAPTI you mean?

**LIU - DIRECT / HEMANN**

1  Q.   Yes.

2  A.   Yeah.  I think quite a few.  I cannot recall all their

3  names.  I think, like, Allen I know.  Ken in the process.

4  Q.   Ken?

5  A.   Ken and Ruth.

6  Q.   Ruth?

7  A.   Ruth, yeah.

8  Q.   When you say "quite a few," do you mean more than 10, less

9  than 10?

10  A.   About close to 10.  Probably around 7 or 10, yeah.

11  Q.   What was Mr. Liew's role at USAPTI?

12  A.   He's the president.

13  Q.   In addition to -- and I'm focusing right now on the summer

14  of 2010.  At that point in time, had you met any consultants

15  who were working for USAPTI?

16  A.   In July P&ID review meeting, I met Tim and Bob.

17  Q.   And that was in July?

18  A.   Yeah.

19  Q.   So let's talk a little bit about that.  Did you have some

20  additional travel for Chevron in July of 2010?

21  A.   Yeah.  July I went to Malaysia again, and I think I come

22  back around July 26 or '7.  Right after this, I attended a P&ID

23  review meeting.

24  Q.   And the P&ID review, what was that?

25  A.   It's an engineer's review of process -- process design,

LIU - DIRECT / HEMANN

1   basically.

2   Q.   Where did the P&ID review take place?

3   A.   In San Francisco -- downtown San Francisco at the Hilton

4   Hotel close to Chinatown.

5   Q.   Generally who attended that?  I don't need the names right

6   now of the people there, but who were the participants in that

7   meeting?

8   A.   Other than those two I just mentioned, the engineers, the

9   entire company USAPTI was there, yeah.

10  Q.   Was there another party at the meeting?

11  A.   There was a Chinese client.

12  Q.   Who was the Chinese client?

13  A.   It's Pangang Group.

14  Q.   And does the Pangang Group have another name that it goes

15  by sometimes?

16  A.   I think Panzhihua Pangang, yeah.

17  Q.   And would those two names, Panzhihua and Pangang, both be

18  used for the same entity?

19  A.   Yeah.

20  Q.   Before the meeting at the Hilton Hotel -- and when in July

21  was that?  Do you remember?

22  A.   Could you repeat?

23  Q.   When in July was the meeting at the Hilton Hotel?

24  A.   1/28 and it lasted for about a week.

25  Q.   So the end of the month?

1   **A.**    Yeah.

2   **Q.**    Before that meeting, had you ever met anybody from Pangang

3   or Panzhihua?

4   **A.**    No.

5   **Q.**    And did you understand before that meeting that they were

6   customers or what did you -- did you know anything about them

7   from talking to Mr. Liew?

8   **A.**    They're -- from P&ID they would say which company; and

9   also I had an email exchange with Walter, you know, when I knew

10  they were coming.

11  **Q.**    So you had an email exchange with Mr. Liew?

12  **A.**    Yeah.

13  **Q.**    Where were you when you had that email exchange?

14  **A.**    I think it's in early -- early July or something like

15  that, because I remember actually in early July, I also ask the

16  Liews to give me PFDs.

17  **Q.**    So were you in Malaysia when you had this email exchange

18  with Mr. Liew about the Pangang Group coming?

19  **A.**    Coming, yes.

20  **Q.**    And did Mr. Liew ask you some -- ask you to do something

21  in anticipation for the meeting with Pangang Group?

22  **A.**    Yeah, just coming back to host the meeting for them.

23  **Q.**    And then did you participate in that meeting with the

24  Pangang Group?

25  **A.**    Yes, I did.

LIU - DIRECT / HEMANN

1  Q.   I'm going to show you --

2         MR. HEMANN:  Your Honor, may I approach the witness --

3         THE COURT:  Yes, you may.

4         MR. HEMANN:  -- with Exhibit 294?

5  Q.   Mr. Liu, I've put before you what's been marked as

6  Exhibit 294.  Do you recognize the documents in this exhibit?

7  Do you recognize those?

8  A.   Yeah.  That's photos.  I met all those people.

9  Q.   And are these photographs from the P&ID review at the

10 Hilton Hotel meeting that you just described?

11 A.   Yes.

12 Q.   And do you recognize that these are the individuals who

13 participated in the meeting?

14 A.   Yes.

15        MR. HEMANN:  Your Honor, the United States moves

16 Exhibit 295 -- I'm sorry, 294 into evidence.

17        THE COURT:  Any objection?

18        MS. AGNOLUCCI:  No objection, Your Honor.

19        THE COURT:  It's admitted.

20     (Trial Exhibit 294 received in evidence)

21        MR. HEMANN:  Could you just blow up the front page,

22 the first page, Ms. Mahoney?

23 Q.   Do you recognize these three individuals?

24 A.   Yes.

25 Q.   Who are they from left to right?

1   **A.**   One is Walter, one is Pangang Group chairman Mr. Zhuang, I

2   think; and another guy I think was -- that's -- I think

3   Mr. Yang, I think.  I forgot his real name.

4   **Q.**   Mr. Yang?

5   **A.**   Might be Yang, yeah.

6   **Q.**   So let's go through these.  The gentleman in the picture

7   with the tie on, who's that?

8   **A.**   That's Walter Liew, yeah.

9   **Q.**   And the gentleman in the middle with the plaid shirt?

10  **A.**   That's Mr. Zhuang.

11  **Q.**   And what was his job as you understood it?

12  **A.**   He's the -- I think he's the president for the project.

13  **Q.**   And then Mr. Yang is on the left?

14  **A.**   The left, yeah.

15  **Q.**   What was your understanding of Mr. Yang's role?

16  **A.**   I think he's one of the top managers.  I don't know

17  exactly his title was.

18  **Q.**   You mentioned that pretty much everybody from the company

19  USAPTI was at the meeting; correct?

20  **A.**   Yes.

21  **Q.**   The employees?

22  **A.**   Yeah.

23  **Q.**   Could you please put up page 3, Ms. Mahoney?

24      And would you be able, for the jury, Mr. Liu, to identify

25  from starting on the left side, your left, who the employees

**LIU - DIRECT / HEMANN**

1   were, the USAPTI employees?

2   **A.**   USAPTI is in the third was myself.

3   **Q.**   So that's you with a jacket and a light shirt?

4   **A.**   Yeah, with a glass of wine.

5   **Q.**   Yes.

6   **A.**   Okay.  And on the right side was Allen Chang.

7   **Q.**   And is Mr. Chang wearing a tie?

8   **A.**   A tie, yeah.  And beside him is a lady, is a process

9   engineer, Ruth.

10  **Q.**   Ruth?

11  **A.**   Ruth, yeah.

12  **Q.**   Is Ken Chan in this picture?

13  **A.**   No.

14  **Q.**   And there's -- next to you there's two gentlemen on either

15  side of you.  Do you know who those two gentlemen are?

16  **A.**   I remember one is a Mr. Hou.  He's the process engineer.

17  **Q.**   And is he on your right or your left?

18  **A.**   On my -- which -- facing left side with ties.

19  **Q.**   Okay.  So he's the gentleman with the tie fourth in from

20  the left side?

21  **A.**   Yeah.

22  **Q.**   And that's Hou Shengdong?

23  **A.**   Yeah.

24  **Q.**   Did you talk to Mr. Liew about what kind of company

25  Pangang was?  You can put that down.

LIU - DIRECT / HEMANN

1   **A.**   Okay.

2   **Q.**   Did you talk to Mr. Liew about what sort of company

3   Pangang was?

4   **A.**   Pangang is very big company in China.  So I grew up there,

5   so I knew that company.

6   **Q.**   And what do you know about Pangang?

7   **A.**   It's --

8           **MS. AGNOLUCCI:**  Objection.

9           **THE WITNESS:**  -- a steel company.

10          **THE COURT:**  Just a second.  Sustained.

11  **BY MR. HEMANN:**

12  **Q.**   How do you know about Pangang?

13  **A.**   This is basically a big company like IBM in U.S., so most

14  the people in the engineering field know that.

15  **Q.**   And you studied engineering in China?

16  **A.**   Yeah.

17  **Q.**   And remind me, you graduated in 1989?

18  **A.**   Yeah.

19  **Q.**   And then did you stay familiar with Pangang Group as you

20  continued in your engineering career?

21  **A.**   It's not really because it's a different field, but it's a

22  popular company.

23  **Q.**   And did you talk to Mr. Liew about the Pangang Group over

24  the course of your employment at USAPTI?

25  **A.**   Actually the document that we received is pretty much tell

1  you what they're doing, you know.

2  **Q.**   And what do you understand from both your conversation

3  with Mr. Liew and your familiarity with the company from China

4  about what kind of company Pangang Group is?

5          **MS. AGNOLUCCI:**  Objection.

6          **THE COURT:**  Sustained.

7          **MR. HEMANN:**  I can move on to something different,

8  Your Honor.

9  **Q.**   Did you talk with Mr. Liew and Mrs. Liew about Mrs. Liew's

10  family in China?  Over the course of your time working for

11  USAPTI, did you talk to Mr. Liew and Mrs. Liew about her family

12  in China?

13  **A.**   I know they're -- especially for Christina has similar

14  background as me.  Family is all in China, yes.

15  **Q.**   And what did you learn from talking to the Liews about

16  Mrs. Liew's family in China?

17  **A.**   So later we're getting really close, so we, you know, ask

18  each other's background; so I knew that.

19  **Q.**   And what did you find out about Mrs. Liew's family's

20  background?

21          **MS. AGNOLUCCI:**  Objection.

22          **THE COURT:**  Sustained.

23  **BY MR. HEMANN:**

24  **Q.**   When you spoke with Mrs. Liew about her family's

25  background, was Mr. Liew present?

**LIU - DIRECT / HEMANN**

1    **A.**    Yeah, most of the time, yes.   Yeah.

2    **Q.**    And during those conversations where Mr. Liew was present,

3    what did you learn about Mrs. Liew's family's background?

4            **MS. AGNOLUCCI:**   Objection.

5            **THE COURT:**   Sustained.

6    **BY MR. HEMANN:**

7    **Q.**    Did you talk to Mr. Liew and Mrs. Liew about what sort of

8    connections Mrs. Liew's family had within China?

9            **MS. AGNOLUCCI:**   Objection.

10           **THE COURT:**   Well, the answer to that is yes or no.

11   Did you talk to her?

12           **THE WITNESS:**   Yes.

13           **THE COURT:**   All right.   Next question.

14   **BY MR. HEMANN:**

15   **Q.**    And what did you learn from Mrs. Liew about her family's

16   connections in China?

17           **MS. AGNOLUCCI:**   Objection.

18           **THE WITNESS:**   They --

19           **THE COURT:**   Just a moment.   Overruled.

20       You may answer.

21           **THE WITNESS:**   Yeah, the family I think basically is a

22   business, a really good business tie with China, yes.

23   **BY MR. HEMANN:**

24   **Q.**    And when you say very good business ties with China, what

25   do you mean?

**LIU - DIRECT / HEMANN**

1  **A.**   Well, see, in China when you do business, you need to have

2  connections.  So I say they know lots of people.

3  **Q.**   Did you have an opportunity to work with Mr. Chan and

4  Allen Chang, Ken Chan, and Ruth Oduca, at USAPTI?

5  **A.**   Yes, I did.

6  **Q.**   And did you, over that time that you worked with them,

7  come to any familiarity with their experience?

8  **A.**   Yes.

9  **Q.**   And could you describe what their experience was?

10  **A.**   They're quite young.  The people you mentioned, I think,

11  Allen is fresh from school, I think might be first job, similar

12  to Ken.  And I think Ruth was -- she had the same background,

13  probably three to five years process engineer.

14  **Q.**   And did any of them have a background in titanium dioxide?

15  **A.**   Probably not.  I would say no.

16  **Q.**   You mentioned at the Hilton meeting -- if you can look at

17  the third page of the exhibit that we were just looking at,

18  294.  Were there any people at that meeting who are not

19  pictured in that photograph?

20  **A.**   Let's see, Allen -- Ken was not there.  And I think also

21  control engineer, Peter, Peter Wong probably.  Another person

22  is I know Phillipp, but I don't know his last name.

23  **Q.**   At this meeting were there any consultants who attended

24  the meeting?

25  **A.**   It was just mentioned Tim and Bob.

LIU - DIRECT / HEMANN

1  **Q.**  And they're not pictured in this photograph?

2  **A.**  I think that when that picture tooken, they already left.

3  **Q.**  You said Tim and Bob; correct?

4  **A.**  Yeah.

5  **Q.**  And who were Tim and Bob?

6  **A.**  Tim and Bob is both consultant for this P&ID review

7  meeting, and that was the first time I met them.

8  **Q.**  And did you talk to Mr. Liew about who Tim and Bob were?

9  **A.**  Yeah, I think I asked them -- asked them, yeah.

10  **Q.**  What did he tell you?

11  **A.**  They are ex-DuPont engineers.

12  **Q.**  And do you remember either of their last names?

13  **A.**  I don't know.  I still probably don't.

14  **Q.**  Okay.  Did they participate in the meeting?

15  **A.**  Yes.

16  **Q.**  And Bob, do you see Bob, the person you refer to as Bob,

17  in the courtroom here?

18  **A.**  Yeah, I know him.

19      **MR. FROELICH:**  We'll stipulate, Your Honor, that he

20  can recognize Mr. Maegerle.

21      **THE COURT:**  All right.  So stipulated.  The jury is so

22  instructed.

23  **BY MR. HEMANN:**

24  **Q.**  Did Tim and Mr. Maegerle participate in the meeting with

25  the Pangang Group?

LIU - DIRECT / HEMANN

1  A.   Yes.

2  Q.   And what was their participation?

3  A.   They mainly as kind of like a consultant to help answer

4  their questions.

5  Q.   The Pangang Group, was there a particular project that

6  they were working on?  What was the project?

7  A.   It's the Panzhihua -- it's the -- it's the Panzhihua

8  titanium dioxide project.

9  Q.   And was that the hundred-thousand-ton project?

10  A.   Yes.

11  Q.   And I see you looking, Mr. Liu, at the first page of

12  Exhibit 294.

13       If you would put that up, Ms. Mahoney.

14       And on the -- are you looking at the screen behind

15  Mr. Zhuang's head?

16  A.   Yeah.  I can't read it.  Basically it's talking about

17  Pangang Group 100K titanium dioxide project.

18  Q.   Is that the project that you worked on when you were

19  acting as a part-time employee for USAPTI?

20  A.   Yes.

21  Q.   Did you also work on another project?

22  A.   Yes.

23  Q.   What was the other project?

24  A.   It's Jinzhou project.

25  Q.   Did you have a different job with respect to those two

**LIU - DIRECT / HEMANN**

1    projects?

2    **A.**   They are really similar actually, really.

3    **Q.**   Okay.  And how would you describe your job?  After you

4    sort of went through the original learning process and the P&ID

5    review, what was your job with regard to those two projects?

6    **A.**   I -- at the beginning actually before -- before this

7    review meeting was like an engineer to help them to do some

8    simulation work, control process work.  Later it was like a

9    project, interim manager kind of work.

10   **Q.**   Did you during the time of your relationship with USAPTI

11   take any trips to visit Pangang, Panzhihua, Jinzhou?

12   **A.**   There was two approvals -- two trips is arranged.  One is

13   in 2000 -- end of 2010 during the Christmastime, and another is

14   in March 2011.

15   **Q.**   And what was the trip at Christmastime 2010?

16   **A.**   2010 was in Beijing.

17   **Q.**   And was Beijing -- did you meet with both companies during

18   that trip?

19   **A.**   That was the company, the people in the photos we met.

20   **Q.**   So the 2000 trip -- the 2010 trip to Beijing was just with

21   Pangang individuals?

22   **A.**   Yeah.

23   **Q.**   And the 2011 trip, what was that for?

24   **A.**   That's called equipment design.  We went to Jinzhou.

25   **Q.**   So in 2011 was the Jinzhou project finished or was it

**LIU - DIRECT / HEMANN**

1   still in progress?

2   **A.**   Project-wise the project has different phase.   Jinzhou was

3   very close to finish.   Engineering-wise it was almost done.

4   **Q.**   And you went to -- did you go to actually the factory site

5   for Jinzhou?

6   **A.**   Yes.

7   **Q.**   And had they begun building the factory yet?

8   **A.**   They just open the ground.

9   **Q.**   During your trips, and in particular your Christmas 2010

10  trip with Mr. Liew, did Mr. Liew tell you anything about

11  Panzhihua's or Pangang Group's ownership?

12  **A.**   Pangang is always owned the project.   Pangang is the

13  owner.

14  **Q.**   Did he tell you -- my question is:   Did he tell you

15  anything about who owned the Panzhihua company, the nature of

16  the Panzhihua ownership?

17  **A.**   Not -- we didn't really discuss that.

18  **Q.**   After -- you mentioned at some point in time you became an

19  engineering manager.   Do you remember that?

20  **A.**   Yes.

21  **Q.**   And when was that?

22  **A.**   After October.   I think middle October.

23  **Q.**   And how did you come to be asked to be the engineering

24  manager?

25  **A.**   I think based on my performance, my P&ID review and my

1   background, I think Walter asked me, you know, do you want to

2   be an engineer manager.

3          **MR. FROELICH:**  Excuse me, Your Honor.  May we

4   approach?  It's not about the witness.  I need to --

5          **THE COURT:**  All right.

6       (The following proceedings were heard at the sidebar:)

7          **THE COURT:**  Yes, Mr. Froelich?

8          **MR. FROELICH:**  Your Honor, my client has diarrhea.

9   He's taking some pills for different problems that he has, and

10  he has severe diarrhea, and he has to go to the bathroom.  I

11  didn't want to just say it in front of you.

12         **THE COURT:**  Oh, he can get up and go.

13         **MR. FROELICH:**  Okay.  We'll waive his presence.

14         **THE COURT:**  You waive his presence?

15         **MR. FROELICH:**  Yes, Your Honor.

16         **THE COURT:**  We just won't say anything.

17         **MR. FROELICH:**  That's fine.

18         **THE COURT:**  Thank you very much.

19      (The following proceedings were heard in open court:)

20         **THE COURT:**  All right.  You may continue.

21         **MR. HEMANN:**  Thank you, Your Honor.

22  **Q.**   So who asked you to become an engineering manager?

23  **A.**   I think Walter Liew.

24  **Q.**   Your Honor, may I approach the witness with Exhibit 778?

25         **THE COURT:**  Yes, you may.

**BY MR. HEMANN:**

**Q.**   Handing you, Mr. Liu, what's been marked as Exhibit 778, do you recognize that?

**A.**   Yes.

**Q.**   What is it?

**A.**   That's like an agreement to be a manager, engineer manager.

**Q.**   And who are the parties to the agreement?

**A.**   Me and USAPTI.

**Q.**   Did you sign this agreement?

**A.**   Yes, I did.

**Q.**   Is there another signature on the agreement?

**A.**   Yes.

**Q.**   Do you recognize that signature?

**A.**   It's Walter Liew.

            **MR. HEMANN:**  Your Honor, the United States moves Exhibit 778 into evidence.

            **THE COURT:**  Any objection?

            **MS. AGNOLUCCI:**  No objection, Your Honor.

            **THE COURT:**  It's admitted.

       (Trial Exhibit 778 received in evidence)

**BY MR. HEMANN:**

**Q.**   I'd like to direct your attention to the first page of the agreement, Mr. Liu.  Do you see that?

**A.**   Yeah.

1    Q.    And at the bottom of the first page there's a paragraph

2    that's entitled "Employment Confidentiality."  Do you see that?

3    A.    Yes.

4    Q.    And could you -- I'm not going to have you read that.

5    It's pretty long.

6          Did you have an understanding of what this paragraph

7    meant?

8    A.    In general, yes.  It's for me to keep confidential

9    knowledge.

10   Q.    To keep confidential knowledge?

11   A.    Yeah.  Mainly the knowledge I gain should keep

12   confidential for this, yeah.

13   Q.    Knowledge you learn as an employee of USAPTI?

14   A.    Yeah.  Yes.  Yeah.

15   Q.    And then on the next page there's a paragraph called

16   "Covenant Not to Compete."  Do you see that?

17   A.    Yeah.

18   Q.    And did you have an understanding of what that meant?

19   A.    I haven't seen that in a long time, but allow me to read

20   that?

21   Q.    Sure.  Please.  Go ahead.

22   A.    (Witness examines document.)  Mainly it's if I quit the

23   job first three years, I cannot work for competitor.

24   Q.    And that was a different requirement than the employment

25   confidentiality; correct?

**LIU - DIRECT / HEMANN**

1   **A.**   Yeah.

2   **Q.**   When you became engineering manager, how would you

3   describe your knowledge of the titanium dioxide process?

4   **A.**   Still limited.

5   **Q.**   And was part of your job to increase your knowledge about

6   titanium dioxide?

7   **A.**   Yeah.  I was trying.

8   **Q.**   Did there come a time where you obtained some information

9   from Mr. Liew regarding aspects of the titanium dioxide

10  process?

11  **A.**   I always try to gain more knowledge and asking.

12          **MR. HEMANN:**  Your Honor, I'd like to approach the

13  witness with what's been marked as Government Exhibit -- or

14  what's in evidence, I'm sorry, as Government -- or as

15  Exhibit 162.

16          **THE COURT:**  All right.

17  **BY MR. HEMANN:**

18  **Q.**   Mr. Liu, you have in front of you Exhibit 162.  Have you

19  seen that before?

20  **A.**   Yeah.  It's not exact the same, but, yes.  It's kind of a

21  copy like that, yeah.

22  **Q.**   So you've seen a photocopied copy of this in meeting with

23  the Government?

24  **A.**   Yeah.

25  **Q.**   The document has a title on it, and you can put up the

1  front page, Ms. Mahoney.  And could you highlight or expand

2  just the title that starts "Improved Mixing Correlation"?

3       Do you remember seeing this document at USAPTI?

4  **A.**   Yes.

5  **Q.**   Where did you first see it?

6  **A.**   I got it from Walter's office.

7  **Q.**   And when you say you got it from Walter's office, how did

8  you come to get it from Walter's office?

9  **A.**   I went to Walter's office.  I saw the document, so I flip

10  the lab book at the beginning, yeah.

11  **Q.**   Where was the document when you saw it in Mr. Liew's

12  office?

13  **A.**   I think on one of the desks.  I forgot really where it is

14  exactly which one.

15  **Q.**   And you saw it and you picked it up and looked at it?

16  **A.**   Yeah.

17  **Q.**   Why did you do that?

18  **A.**   From this title I found it a very valuable document I can

19  learn knowledge from.

20  **Q.**   Did you ask Mr. Liew about the document?

21  **A.**   Yeah, later.  Yes, I did.  I, in fact, asked him for a

22  copy, so I made a copy.

23  **Q.**   Did Mr. Liew tell you anything about the document when you

24  picked it up?

25  **A.**   I think he also agreed that's good information, good

LIU - DIRECT / HEMANN

1    document to study, yeah.

2    Q.   Did you ask him -- you said you asked him for a copy?

3    A.   Yes, I did.

4    Q.   Why did you ask him for a copy of the document?

5    A.   Because I like to study on that.

6    Q.   Why?

7    A.   It's a good document, good material there, you know.

8    Q.   Can you explain to the jury why it's good material?

9          MS. AGNOLUCCI:   Objection.

10         THE COURT:   Overruled.   You may answer.

11         THE WITNESS:   Okay.   Some engineer information is very

12   useful for process design on this one.

13   BY MR. HEMANN:

14   Q.   And what information is useful?

15   A.   Like some equations in how to size the reactor and some

16   data from this document.

17   Q.   And why was the data in the document useful?

18   A.   Those are real data, real plant data, so I can use it and

19   gauge the design.

20   Q.   The document contains, you said there was an equation; is

21   that correct?

22   A.   Yeah.

23   Q.   What was the equation that you're referring to?

24   A.   I have to --

25   Q.   Go ahead.   You can look.

1  **A.**  (Witness examines document.)  Yeah, like, page 3, you

2  know, that's a correlation equation.  So I studied that.

3  **Q.**  And there's -- you don't have the same copy that we have.

4  I'm sorry.

5      Ms. Mahoney, if you could put up page 6.

6      Is that the page?  Look on the screen, Mr. Liu.  Is that

7  the page that you were referring to?

8  **A.**  Yeah, that's the page, yeah.

9  **Q.**  And you found this particular formula to be useful to you?

10 **A.**  Yeah.  That's a good correlation equation.  So for later I

11 can use that to gauge the processing to specialize the

12 analytical design information.

13 **Q.**  Now, you said "later."

14 **A.**  Uh-huh.

15 **Q.**  Were you, at the point in time that you saw this document,

16 were you personally engaged in designing an oxidation reactor?

17 **A.**  No.

18 **Q.**  And, so, what was it about this that you found to be

19 helpful or useful?

20 **A.**  Because I decide to be an engineer manager, so I like to

21 know more knowledge about the process.

22 **Q.**  And at the time that you looked at this in -- well, again,

23 can you give a rough time that you looked at this?

24 **A.**  I don't really recall the exact time.  Probably around

25 February or March.

LIU - DIRECT / HEMANN

1   Q.   Of 2011?

2   A.   Yeah.

3   Q.   In February-March of 2011, was the Pangang Panzhihua

4   project completely finished?

5   A.   I don't think finished yet, yeah.

6   Q.   Did you -- you said you got -- did you get a copy from

7   Mr. Liew?

8   A.   Yeah.

9   Q.   Did he make a copy himself or did he give it to you to

10  make a copy?

11  A.   I made a copy.

12  Q.   What did you do with the original when you were done with

13  it?

14  A.   I return it to him.

15  Q.   Did you take any notes or anything on -- when you were

16  studying this document?

17  A.   Yes.

18          MR. HEMANN:  Your Honor, may I approach the witness

19  with what has been marked as Exhibit 163?

20          THE COURT:  Yes.

21  BY MR. HEMANN:

22  Q.   Mr. Liu, I've handed you what's been marked as

23  Exhibit 163.  Do you recognize that?

24  A.   Yeah.  That was my handwriting.

25  Q.   And it's your handwriting of what?

**LIU - DIRECT / HEMANN**

1   **A.**   The equation you just showed on the screen.

2   **Q.**   And did you take that handwritten note at or around the

3   time that you obtained Exhibit 162 from Mr. Liew?

4   **A.**   I think I took it back -- copied the book and then studied

5   the book, then I wrote out the equation.

6          **MR. HEMANN:**  Your Honor, the United States moves

7   Exhibit 163 into evidence.

8          **THE COURT:**  Any objection?

9          **MS. AGNOLUCCI:**  No objection, Your Honor.

10          **THE COURT:**  It's admitted.

11      (Trial Exhibit 163 received in evidence)

12          **MR. HEMANN:**  And, Your Honor, may I retrieve it from

13   the witness to show the original on the ELMO?

14          **THE COURT:**  Yes, you may.

15          **MR. HEMANN:**  Thank you.  I'll put the original up on

16   the screen.

17                    (Pause in proceedings.)

18          **MR. HEMANN:**  I think I will.  There you go.

19   **Q.**   Are these your handwritten notes, Mr. Liu?

20   **A.**   Yes, it was.

21   **Q.**   And do these handwritten notes correspond to the

22   correlation that was in the book that Mr. Liew let you copy?

23   **A.**   Yeah, that's like that equation I jot down from that book.

24   **Q.**   When you wrote it down, what did you do with the paper,

25   the notebook that you wrote this in?

1    **A.**    That book was still with me.  I kept it with me till later

2    I threw it out.

3    **Q.**    Okay.  Thank you.

4         Can we switch back to our...  Thank you.

5         Now, you mentioned that there is, you said real data, in

6    the research report that you obtained from Mr. Liew; is that

7    correct?

8    **A.**    Yeah, that's the correlation.  So you need real data to

9    back up your equation.

10   **Q.**    And could you please put page 36 up?

11        **MS. MAHONEY:**  162?

12        **MR. HEMANN:**  162-36, please.

13   **Q.**    And is this -- if you could look at the screen, Mr. Liu,

14   is this an example of the real data that you -- that you're

15   referring to?

16   **A.**    Those are just real critical designs.  This I have work

17   here, some is data on the different page.  This is real plant

18   design data, yeah.

19   **Q.**    And the data that you're referring to is what?

20   **A.**    I think....

21        (Witness examines document.)  This page, this data points,

22   those are real data (indicating).

23   **Q.**    Gotcha.  Thank you.

24        There's a --

25        **THE COURT:**  Can we have the record specify which page?

1          **MR. HEMANN:**  Yes.  If I may approach, Your Honor.

2          **THE COURT:**  You may approach.

3  **BY MR. HEMANN:**

4  **Q.**   The record is -- the witness was indicating figure RBD-3,

5  mixing length correlation, and it's on the page before

6  Appendix B.

7          **THE COURT:**  All right.  Thank you very much.

8          **MR. HEMANN:**  Thank you.

9  **Q.**   Now, there's -- speaking of Appendix B, Mr. Liu, there's

10  some FORTRAN code on -- you can take that down, Ms. Mahoney,

11  thank you -- there's some FORTRAN code in that document;

12  correct?

13  **A.**   Yes.

14  **Q.**   And what -- did you understand that somebody in the

15  company was doing something with that FORTRAN code?

16  **A.**   Yeah.  I think that Thongchai was working on that.

17  **Q.**   And what did you understand that Mr. Thongchai was doing?

18  **A.**   I think he tried to reproduce those codes.

19  **Q.**   And do you know why he was doing that?

20  **A.**   In that case you don't need to do a calculation by

21  yourself.  You just plug in the data, and it spit out the

22  results.  That's all this -- I think based on my background,

23  engineering background, this is all this code about.

24  **Q.**   It relates to the correlation?

25  **A.**   Yeah.

**LIU - DIRECT / HEMANN**

1  Q.  During the time that you were working for USAPTI, did you

2  see other documents that contained DuPont markings?

3  A.  One is --

4  Q.  That's sort of a yes or no.

5  A.  Yes.

6  Q.  Okay.  How many?

7  A.  Only I think with DuPont.  I think it's one or two.

8  Q.  Okay.  Could you describe the first of those documents?

9  A.  The first one was Edgemoor drawing in the office, office

10  like on the -- like in one office wall basically is PFD, yeah.

11  Q.  It was a PFD.  And why did you call it an Edgemoor

12  drawing?

13  A.  It says, "Edgemoor plant."

14  Q.  At the time that you worked for USAPTI, did you know what

15  Edgemoor was?

16  A.  Not really.

17  Q.  Not really or not at all?

18  A.  No, I don't know where it is.

19  Q.  Did you know at the time that it had something to do with

20  DuPont?

21  A.  I don't see any DuPont.  I cannot recall any DuPont logo

22  there, so I think it's like another PFD.

23  Q.  Could you describe for the jury what the drawing looked

24  like?  Was it a large drawing or small drawing?

25  A.  I recall it's a large drawing almost, like, half size of

```
1    this board, whiteboard, half size.

2              MR. HEMANN:  The witness is indicating the whiteboard

3    in the courtroom, Your Honor.

4              THE COURT:  All right.

5    BY MR. HEMANN:

6    Q.   And what did the drawing look like?

7    A.   It's a typical PFD, process flow diagram, means strings

8    with major equipment for the process.

9    Q.   Did the word "Edgemoor" appear somewhere on the drawing

10   itself?

11   A.   Yes.

12   Q.   Do you remember where it was?

13   A.   I think in the right lower corner.

14   Q.   And you only came later to find out that Edgemoor is a

15   DuPont facility?

16   A.   Yeah.

17   Q.   Did you see any other documents that bore a DuPont logo?

18              MS. AGNOLUCCI:  Objection.

19              THE COURT:  Sustained.

20   BY MR. HEMANN:

21   Q.   You mentioned earlier, Mr. Liu, that you saw one or two

22   documents that said something about DuPont.  Do you remember

23   that?

24   A.   Yeah.

25   Q.   What was the other document you were referring to?
```

1    **A.**    Another one, like, called press filter.

2    **Q.**    Press filter?

3    **A.**    Yeah.

4    **Q.**    Can you describe that document?

5    **A.**    It's like -- it's a research document talking about, you

6    know, how to size press filter.

7    **Q.**    When you say "a research document," what do you mean?

8    **A.**    It's people study equipment and put their study results,

9    put as a memo.

10   **Q.**    And is it a research --

11   **A.**    It's like a research memo.

12   **Q.**    A research manual?

13   **A.**    Memo.  It's kind of a person's opinion on that.

14   **Q.**    A research memo?

15   **A.**    Yeah.

16   **Q.**    And what made you believe that it had something to do with

17   DuPont?

18   **A.**    I cannot recall exactly.  It might have had a DuPont name

19   on that but, you know, because I didn't really study on that.

20   **Q.**    Where did you get that document from?

21   **A.**    It was in the office, in the USAPTI office with a white

22   binder.  So I kept it, read it a little bit.

23   **Q.**    And where in the USAPTI office was it?

24   **A.**    I cannot recall exactly.  Either in Walter's office or on

25   an office desk.  I forgot.

1    Q.   Did you obtain any documents during the time that you were

2    at USAPTI from Mr. Maegerle?

3    A.   A document called a chlorinator is in one P&ID review

4    meeting in USAPTI in November.  I got a copy from him.

5    Q.   And what did that document concern?

6    A.   That document had like the history.  It's kind of like

7    brief history about chlorinator, some -- I cannot recall

8    detail, but it is talking about operation problems about it.

9    Q.   And did that document contain any references to DuPont

10   facilities?

11   A.   I don't recall detail, but it's talking about all the

12   plant mishappenings, the troubles, and describe how messy it

13   will be, you know.

14   Q.   And when you say "plants," what plants?

15   A.   I cannot recall mentioning specific plant name.

16   Q.   Did it refer to DuPont plants or other plants?

17          MS. AGNOLUCCI:  Objection.

18          THE COURT:  Sustained.

19   BY MR. HEMANN:

20   Q.   When you saw these documents, did you know where

21   Mr. Maegerle or Mr. Liew got them from?

22   A.   I did not put too much think at that time because I knew

23   Bob was from DuPont, so I assume based on engineering

24   background --

25          MR. FROELICH:  I'm going to object to what he assumes,

1  Your Honor.

2  　　　　　**THE COURT:**  Sustained.  The jury will disregard any

3  reference to what the witness assumed.

4  **BY MR. HEMANN:**

5  **Q.**  Did you ask Mr. Liew or Mr. Maegerle where they got the

6  documents?

7  **A.**  No, I didn't.

8  **Q.**  And why was that?

9  **A.**  Basically, at that time I did not put any thought on that

10  to ask.

11  **Q.**  How were you paid for your work at USAPTI?

12  **A.**  I'm paid hourly, and I record my working hour and gave to

13  USAPTI my working hour.

14  **Q.**  And did you work for USAPTI or for the Liews directly?

15  **A.**  I work --

16  **Q.**  Who was your employer, USAPTI the company, or Mr. and

17  Mrs. Liew?

18  **A.**  I think it's very confused to describe.  I think it would

19  be USAPTI, I would say that.

20  **Q.**  And how did you receive the money that you earned at

21  USAPTI?

22  **A.**  It was a check, and for myself I received a check.  I

23  think it was a personal check.

24  　　　　　**MR. HEMANN:**  Your Honor, may I approach the witness

25  with Exhibits 804 --

LIU - DIRECT / HEMANN

1    THE COURT:  Yes.

2    MR. HEMANN:  -- and 805?

3    Handing the witness, Your Honor, Exhibits 804 and 805.

4    THE COURT:  Okay.

5  BY MR. HEMANN:

6  Q.  Do you recognize those documents?

7  A.  Yes.

8  Q.  And, generally, what are they?

9  A.  Those are the checks to my mom.  So will you allow me to

10  explain?

11  Q.  I'll ask you to explain it.  They're checks?

12  A.  Yeah.

13  Q.  And are those the checks that you received in payment for

14  your work at USAPTI?

15  A.  Yeah, I work for USAPTI; but I look at these like a

16  personal check.

17  Q.  But these are -- are these checks that you received as a

18  result of your work for USAPTI?

19  A.  Yes.

20    MR. HEMANN:  Your Honor, the United States moves

21  Exhibit 804 and 805 into evidence.

22    THE COURT:  Any objection?

23    MS. AGNOLUCCI:  No objection, Your Honor.

24    THE COURT:  They're admitted.

25    (Trial Exhibits 804 and 805 received in evidence)

1      **MR. HEMANN:**  If you could put up Exhibit 804, please.

2    And if you just blow up the check at the top.

3    **Q.**  This is one of your paychecks?

4    **A.**  Yes.

5    **Q.**  And what's the date on it?

6    **A.**  March 13th, 2010.

7    **Q.**  May 13th maybe?

8    **A.**  Oh, May.  Sorry.

9    **Q.**  The check is from the account of Christina Hong Qiao Liew;

10   do you see that?

11   **A.**  Yes.

12   **Q.**  But this was for the work you did at the company?

13   **A.**  Yes.

14   **Q.**  Was it for the work you did at the beginning of your time

15   at the company?

16   **A.**  Yeah.

17   **Q.**  It is made out to a woman by the name of Gu Ya Zhen.  Do

18   you see that?

19   **A.**  That's my mom.

20   **Q.**  Why was it made out to your mom?

21   **A.**  Christina and I had -- she called, and we discussed how to

22   pay that.  Mainly I tried to avoid my tax.  So I said, yes, a

23   family member, so I suggested my mom to her, to pay direct to

24   my mom.

25   **Q.**  If you could put up exhibit -- the first page of 805,

**LIU - DIRECT / HEMANN**

1    please.

2         And is this the second one of the checks?

3    **A.**   Yeah.

4    **Q.**   And also to your mother?

5    **A.**   Yes.

6    **Q.**   And then there's a third one on the next page; correct?

7    **A.**   Yeah.

8    **Q.**   Whose idea was it to pay the money to your mother rather

9    than directly to you?

10   **A.**   I think Christina and I both discussed that.  I think it

11   would be -- it's a new to discuss for that.

12   **Q.**   The checks that were written, where are they now?

13   **A.**   Still in Canada.

14   **Q.**   And your mother is in Canada?

15   **A.**   Yeah.

16   **Q.**   Have you ever cashed these checks or had your mother send

17   the money to you?

18   **A.**   I never did.  I haven't done it yet.

19   **Q.**   Why not?

20   **A.**   Because of this case.

21   **Q.**   At some point in time, Mr. Liu, did you stop working for

22   Chevron, or did you keep working for Chevron during the time

23   that we've been talking about?

24   **A.**   I kept working until -- because there was a Chevron

25   interview, and I also planned to quit the job and later work

**LIU - DIRECT / HEMANN**

1  for USAPTI.

2  **Q.**   So let's just do that one sort of step at a time.  You

3  said most recently you -- or you just said that you had planned

4  to quit your job at Chevron and go to work for USAPTI?

5  **A.**   Yes.

6  **Q.**   When did you make that plan?

7  **A.**   Late March 2011.

8  **Q.**   And when was your -- when did you anticipate that you

9  would stop working at Chevron?

10  **A.**   April 15th.

11  **Q.**   Now, did something happen during that time at Chevron that

12  sort of changed things up?

13  **A.**   Yes.

14  **Q.**   And what happened?

15  **A.**   March 30 Chevron interviewed me and my colleagues

16  regarding the material.

17  **Q.**   March 30?

18  **A.**   March 30.

19  **Q.**   When you say they interviewed you about the material, what

20  do you mean?  What happened?

21  **A.**   They confiscated my computer and my colleagues' computer.

22  They think I have some material not related to the company,

23  Chevron business.

24  **Q.**   So you had material on your computer that was not related

25  to the Chevron business; is that correct?

LIU - DIRECT / HEMANN

1   A.   Yeah.

2   Q.   And you said something about an interview at Chevron?

3   A.   Yes.

4   Q.   What was the interview about?

5   A.   Interview about do I know any DuPont information.

6   Q.   Was your wife also interviewed?

7   A.   Yes.

8   Q.   Why was your wife interviewed?

9   A.   Because they think my wife also involved in things.

10  Q.   Was your wife also a Chevron employee?

11  A.   Yes.

12  Q.   Were you both interviewed on the same day?

13  A.   Yes.

14  Q.   Were you interviewed separately by Chevron?

15  A.   Separately, yeah.

16  Q.   How long did -- was your wife's interview longer or

17  shorter than yours?

18  A.   Shorter.

19  Q.   About how long was your interview?

20  A.   Mine was about almost five, six hours.

21  Q.   And without going into who said what during the interview,

22  what was the general subject of the interview?

23  A.   Mainly the way we know DuPont.  The way containing DuPont

24  material.

25  Q.   And did you find out why they were asking you those

1    questions?

2    **A.**   During the time, it was not until later.

3    **Q.**   Who was at the interview?

4    **A.**   I don't remember.

5    **Q.**   Was --

6    **A.**   The company.

7    **Q.**   Representatives of Chevron?

8    **A.**   Yeah.

9    **Q.**   And you?

10   **A.**   Yeah.

11   **Q.**   Nobody from the -- from DuPont?

12   **A.**   I don't believe anyone from DuPont.

13   **Q.**   After the interview, what did you do, immediately after

14   the interview?

15   **A.**   I went back home.

16   **Q.**   When you arrived home, who was there?

17   **A.**   My wife and Walter's family.

18   **Q.**   Why was Walter's family there?

19   **A.**   My wife called them.

20   **Q.**   When you say "Walter's family," who do you mean?

21   **A.**   Walter Liew and Christina Liew, and their boy Michael.

22   **Q.**   And your wife called them, and they were there when you

23   arrived at home?

24   **A.**   Uh-huh.

25   **Q.**   Did you speak with them about what had happened when you

2591

**LIU - DIRECT / HEMANN**

1  arrived at home?

2  **A.**   Yeah.

3  **Q.**   What did they tell -- what did you tell them?

4  **A.**   We're talking about -- I think my wife already went home,

5  so they already knew what's happened about the interview.  So

6  basically when I got back home, it was almost dinnertime.  If I

7  think I remember correctly, it's already dinner started.

8  **Q.**   And while you were there with Mr. and Mrs. Liew eating

9  dinner, did anybody else come to your house?

10  **A.**   Yeah, later, middle of dinner I think, DuPont

11  investigator.

12  **Q.**   Do you remember his name?

13  **A.**   Jim -- I always forget his last name.  It was a very short

14  time.

15  **Q.**   So a DuPont investigator named Jim came to your house;

16  correct?

17  **A.**   Yeah.

18  **Q.**   And about what time did he get to your house?

19  **A.**   8:00, 8:30, around that time.

20  **Q.**   And how did you know he was there?  Did he come to your

21  door?

22  **A.**   Yeah, he knocked at my door and I let him in.

23  **Q.**   And where were Mr. Liew and Mrs. Liew and your wife at the

24  time you let the DuPont investigator into your house?

25  **A.**   My wife and -- my wife was still hosting dinner.

**LIU - DIRECT / HEMANN**

1  **Q.**   Where was that in the house?

2  **A.**   In the dining room.

3  **Q.**   And where did you -- did you bring the DuPont investigator

4  into your house?

5  **A.**   Yes, I did.

6  **Q.**   Where did you bring him in your house?

7  **A.**   In my living room.

8  **Q.**   Where did Mr. Liew and Mrs. Liew go after the DuPont

9  investigator came into your house?

10  **A.**   Christine was present -- was there all the time.  And

11  Walter Liew, he hide in my basement, I think.

12  **Q.**   So Mrs. Liew went into your living room where the

13  investigator was?

14  **A.**   Yeah.

15  **Q.**   And Mr. Liew went down to the basement?

16  **A.**   Yeah.  Basement or one of my bedrooms, yeah.

17  **Q.**   Did Mrs. Liew identify herself to the DuPont investigator?

18  **A.**   I don't think anybody -- I don't think we did, no.

19  **Q.**   What did the DuPont investigator ask you about?

20  **A.**   Similar question like daytime.  They ask, "Do you know

21  DuPont?  And do you have DuPont material," you know, like that.

22  **Q.**   Did Mrs. Liew, while you were in the living room with the

23  DuPont investigator, speak to you in Mandarin Chinese?

24  **A.**   I -- you mean speak to me?

25  **Q.**   Yes.

**LIU - DIRECT / HEMANN**

1   **A.**   Yeah, Chinese, mainly speak to me in Chinese.

2   **Q.**   She did speak to you in Chinese in front of the DuPont

3   investigator?

4   **A.**   Yeah.

5   **Q.**   What did she tell you?

6          **MS. AGNOLUCCI:**  Objection.

7          **THE COURT:**  Overruled.

8       You may answer it.

9          **THE WITNESS:**  Okay.  Basically, I shouldn't let people

10  come into my house.

11  **BY MR. HEMANN:**

12  **Q.**   Did you identify, during the conversation with the DuPont

13  investigator, any individuals from Jinzhou or Pangang?

14  **A.**   He ask how many trips I took to China and who you met.  I

15  reviewed -- revealed Jinzhou's president's name to them.

16  **Q.**   And did Mrs. Liew have anything to say to you in Mandarin

17  Chinese about what you said?

18  **A.**   During that time, I don't think she mentioned anything,

19  no.

20  **Q.**   During that interview, did the DuPont investigator ask you

21  whether you had seen any DuPont materials?

22  **A.**   Yes, he did.

23  **Q.**   What did you say?

24  **A.**   I said no.

25  **Q.**   Why did you say that?

1   **A.**   I just -- I consistently said no, basically.  Basically,

2   at that time because I was thinking, I said no.

3   **Q.**   And why did you say no?

4   **A.**   Mainly I don't want to get anything, you know, because I

5   had a whole day was asking me, you know, you have DuPont

6   material, all those, I said no.  So I continuously say no,

7   yeah.

8   **Q.**   And you didn't tell him that you had seen this document

9   about the oxidizer or the press filter document?

10  **A.**   No.

11  **Q.**   How long did the DuPont investigator stay at your house?

12  **A.**   I think more than half hour, or an hour, yeah.

13  **Q.**   And when he left, what did he say?

14  **A.**   DuPont guy say?

15  **Q.**   Uh-huh.

16  **A.**   Yeah, he generally told me, you know, if you have anything

17  later you want to report to me, he left a business card to me,

18  if we forget anything, you can call him any time.

19  **Q.**   After the DuPont investigator left, did Mr. Liew come talk

20  to you?

21  **A.**   I think we continued dinner talking about.

22  **Q.**   So he came back?

23  **A.**   Yeah.

24  **Q.**   And did he and Mrs. Liew talk to you at the same time?

25  **A.**   Yeah, we all discuss, yeah.

**LIU - DIRECT / HEMANN**

1  **Q.**  What did they have to say to you about the things that you

2  said to the DuPont investigator?

3  **A.**  They mainly I should not really tell other people's name

4  to, you know, DuPont investigator.

5  **Q.**  And what was their mood towards you during the dinner?

6  **A.**  I don't think -- first they was comfortable, actually; but

7  later regarding the people interviewing, especially reveal the

8  name, they were not really happy, I think.

9  **Q.**  And then the next day, the day after the interview with

10  the DuPont investigator, did you have further interactions with

11  Mr. Liew?

12  **A.**  Yes, I did.

13  **Q.**  And what happened?

14  **A.**  Next day I think is around noontime they came to my house

15  again and drafted a letter to report to -- to ask me to report

16  to Chevron, DuPont people come to my house, you know.

17          **MR. HEMANN:**  Your Honor, may I approach the witness

18  with Exhibit 788?

19          **THE COURT:**  Yes.

20  **BY MR. HEMANN:**

21  **Q.**  I've put before you, Mr. Liu, Exhibit 788.  Do you

22  recognize that document?

23  **A.**  Yes.

24  **Q.**  What is it?

25  **A.**  This is a document drafted to report to Chevron.

**LIU - DIRECT / HEMANN**

1   Q.   The document that you just described?

2   A.   Uh-huh.

3   Q.   Yes?

4   A.   Yes.

5          MR. HEMANN:  Your Honor, the United States moves

6   Exhibit 788 into evidence.

7          THE COURT:  Objection?

8          MS. AGNOLUCCI:  No objection, Your Honor.

9          THE COURT:  All right.  It's admitted.

10       (Trial Exhibit 788 received in evidence)

11         MR. HEMANN:  If you could put up the first page.

12  Q.   The date on the document is April 1st, 2011.  Do you see

13  that?

14  A.   Yeah.

15  Q.   And down at the bottom in the right corner it looks like

16  there's a photocopy of a business card; is that correct?

17  A.   Yeah.  That's Jim's -- the DuPont investigator's.

18  Q.   That was the DuPont investigator who came to your house?

19  A.   Yeah.

20  Q.   This document, who wrote this document?

21  A.   Walter wrote this document.

22  Q.   You did not write this document?

23  A.   I did not.

24  Q.   Did Mr. Liew tell you why he wrote this document?

25  A.   Mainly because they were just complaining Chevron breached

**LIU - DIRECT / HEMANN**

1   ethical -- revealed my home address to investigator.

2   **Q.**   And your signature is on the bottom of this document.  Did

3   you sign it at Mr. Liew's request?

4   **A.**   Yes, I signed it.

5   **Q.**   Did you deliver this document to Chevron?

6   **A.**   I didn't.

7   **Q.**   Why not?

8   **A.**   First, I was really don't know who I deliver, and I don't

9   know but my instinct told me I should not -- at that stage I

10  should not do anything.

11  **Q.**   In addition to giving you this letter for Chevron, did

12  Mr. Liew talk about what you should do if people came and tried

13  to interview again?

14  **A.**   Mainly, don't let strange people come into your house and,

15  you know, you talk to people surely through your -- consulting

16  your lawyer first.

17  **Q.**   Did you have a lawyer at this point in time?

18  **A.**   No.

19  **Q.**   Were you concerned at this point in time, Mr. Liu, about

20  what was going on?

21  **A.**   I was not that concerned, actually, because I think during

22  the interview with Chevron, I thought it had nothing to do with

23  me.  So I didn't really consider too much.

24  **Q.**   After Mr. Liew brought this document to your house on the

25  1st of April, did he and Mrs. Liew continue to visit you to

**LIU - DIRECT / HEMANN**

1  talk about this matter?

2  **A.**  Yes.

3  **Q.**  About on how many occasions over the next week?

4  **A.**  Almost, probably not every day but quite frequently, you

5  know, we had a few dinners together, one or two after that at

6  my house, yeah.

7  **Q.**  And what did Mr. and Mrs. Liew say to you about this

8  matter during those subsequent meetings?

9  **A.**  I cannot recall really detail, but mainly asking some

10  questions during the interview of what we told because and --

11  we asked -- both my wife and I suspended at job, so comforting

12  us, don't worry.

13      And, also, I think when talking about the job situation,

14  mainly is the job and if you're not working, because I get

15  worried too, you know, regarding USAPTI.  So I think in a way

16  talking about job security mostly, yeah.

17  **Q.**  You mentioned that both you and your wife had been

18  suspended.  Is that suspended from Chevron?

19  **A.**  Yeah.

20  **Q.**  Were you suspended with or without pay?

21  **A.**  With pay.

22  **Q.**  Both you and your wife?

23  **A.**  Yeah.

24  **Q.**  Did you meet with Mrs. Liew at some point in time and talk

25  about the possibility of opening another company?

**LIU - DIRECT / HEMANN**

1  **A.**   Yes.

2  **Q.**   And if you could tell the jury how that first came up?

3  **A.**   I think one -- either on the 3rd or 4th of April

4  Christina's family came to my house, discussed that, forming a

5  company, a new company, to work for that new company instead of

6  USAPTI for me.

7  **Q.**   So it would be a company that would replace USAPTI?

8  **A.**   I don't know if it would replace.  I don't know the

9  detail, but it's another company.

10  **Q.**   And would that company continue to do the same work with

11  Pangang and Jinzhou that USAPTI was doing?

12  **A.**   I assume, yes.

13  **Q.**   What -- did Mrs. Liew or Mr. Liew explain why you would

14  want to start a new company?

15  **A.**   I don't recall because too many things those days in my

16  mind.  I cannot recall.

17  **Q.**   Did you with Mrs. Liew take steps to actually open the new

18  company?  Did you start doing some things to try to start a new

19  company?

20  **A.**   They asked my Social Security number and supposed -- I

21  think that they already paid money for registration company to

22  open that.

23  **Q.**   Did you learn from the Liews who the formal owner of the

24  new company would be or who would run the company?

25  **A.**   I only know is that Christina's sister-in-law will be

LIU - DIRECT / HEMANN

1   the -- one of the owners.

2   **Q.**   And do you know who Christina's sister-in-law is?

3   **A.**   No.

4   **Q.**   Do you know where she lives?

5   **A.**   I don't know.

6   **Q.**   Does she live in the United States?

7   **A.**   I don't know.

8   **Q.**   Do you know her name?

9   **A.**   I still don't know.

10  **Q.**   And what kind of work?  Would you be doing the same kind

11  of work at the new company?

12  **A.**   Yes.

13  **Q.**   And before this whole thing happened with the DuPont

14  investigator, had either of the Liews ever mentioned starting a

15  new company with you?

16  **A.**   No.

17  **Q.**   Did you at some point in time learn that a lawsuit had

18  been filed by DuPont?

19  **A.**   Yeah.  We were supposed to go -- we were supposed to go

20  with Christine -- Christina to sign the document open that

21  company, and I think they -- I think April 6th and we learned

22  USAPTI -- first I learned that USAPTI was sued by DuPont.

23  **Q.**   How did you learn this?

24  **A.**   Because we met with Walter actually, and Walter got a

25  phone call says he got sued.  So he told us.

**LIU - DIRECT / HEMANN**

1  Q.   So he telephoned you and said that --

2  A.   No, right in front of us.  We were in the office there.

3  Q.   And who were the people who were sued?  Who got sued?

4  A.   I think Walter and Christina.  Later afterward when I come

5  back, I found out I got sued, too, yeah, the three of us.

6  Q.   When you say when you came back, when you went back home?

7  A.   Yeah.

8  Q.   And at that time did you get a copy of the Complaint?

9  A.   Yes.

10  Q.   Did -- after you received the lawsuit, was that -- do you

11  remember what date that was?

12  A.   On the 6th, April 6.

13  Q.   2011?

14  A.   Yeah.

15  Q.   After that, did Walter Liew take a trip?

16  A.   Yeah.

17  Q.   When did he leave?

18  A.   I cannot recall the date.  It's probably around two -- one

19  or two days later, I think.

20  Q.   Very short -- within a day or two after you got sued?

21  A.   Yeah.

22  Q.   Do you know where he went?

23  A.   At the beginning I don't know.  Later I realized it was in

24  Singapore, yeah.

25  Q.   And who told you that he went to Singapore?

**LIU - DIRECT / HEMANN**

1   **A.**   Christina told me.

2   **Q.**   Before the DuPont investigator meeting and the lawsuit,

3   had you been told by Mr. Liew or Mrs. Liew that Mr. Liew was

4   going to Singapore?

5   **A.**   I don't recall.

6   **Q.**   Did you and Mrs. Liew take steps to, while Mr. Liew was

7   gone, to deal with the lawsuit?

8   **A.**   Yeah, we both stayed, yeah.

9   **Q.**   What was the first -- did you go about looking for a

10   lawyer?

11   **A.**   Yeah, I did.

12   **Q.**   Did you and Mrs. Liew talk about going to get a lawyer?

13   **A.**   Yes.

14   **Q.**   And what was the first thing that happened with respect to

15   that?

16   **A.**   She drove me to -- I think on the 8th, I think, April 8th,

17   she drove me to Fremont to meet a lawyer.

18   **Q.**   And was this a lawyer you had selected or a lawyer the

19   Liews had selected?

20   **A.**   I think not me.  I selected -- I was looking for a

21   different lawyer.

22   **Q.**   But did you go to a meeting with Mrs. Liew and a lawyer?

23   **A.**   Yeah, I did.

24   **Q.**   And then after that, you said you selected your own

25   lawyer?

**LIU - DIRECT / HEMANN**

1    **A.**    Yeah.

2    **Q.**    At some point in time did you hire a lawyer?

3    **A.**    Yes, I did.

4    **Q.**    When was that?

5    **A.**    It was a long story because first I select a lawyer.  I

6    don't know the law.  So he was not in this field.  So I went to

7    Oakland to meet Fidel (phonetic), and he said you ask the wrong

8    lawyer.  So he referred me to another lawyer.

9    **Q.**    And did you eventually get a lawyer with experience in

10    this field?

11    **A.**    Yes.

12    **Q.**    When did Mr. Liew -- did you meet with Mr. Liew again

13    shortly after this?

14    **A.**    Later when he came back, yeah.

15    **Q.**    When he came back from Singapore?

16    **A.**    Yeah.

17    **Q.**    When was that?

18    **A.**    I think 11th or 12th.  11th, I think, most likely 11th.

19    **Q.**    11th of April?

20    **A.**    April, yeah.

21    **Q.**    So just a couple days later?  Let me ask again.  You said

22    you met with Mrs. Liew and the lawyer on April 8th and then you

23    met with Mr. Liew when he got back from Singapore on

24    April 11th.

25    **A.**    Yeah.  It's, I think, April 11th afternoon, like that, you

**LIU - DIRECT / HEMANN**

1   know.

2   **Q.**   Where did you meet with him?

3   **A.**   Same place I mentioned, Ranch 99, one restaurant, it's

4   called the 168 Restaurant.

5   **Q.**   And did you talk with Mr. Liew about the lawsuit?

6   **A.**   Yes.

7   **Q.**   And what did Mr. Liew tell you with regard to your

8   communications with your lawyer?

9   **A.**   Mainly, it's an update to what's going on and are you

10  going to hire a lawyer, and also talking about the two

11  colleagues, the two colleagues involved in that because they

12  also suspended.  So he was talking about those situations.

13  **Q.**   Your Chevron --

14  **A.**   Chevron, yeah.

15  **Q.**   Did the two DuPont consultants that you mentioned were at

16  the Hilton meeting, Mr. Maegerle and Tim, did they come up

17  during this conversation?

18  **A.**   Yeah.

19  **Q.**   How did they come up?

20  **A.**   He basically tells me don't reveal those names.

21  **Q.**   And did he mention, when he told you not to reveal those

22  names, did he mention anything about your family in that

23  respect?

24  **A.**   He said it's not good for anybody, not even good for your

25  family.  And I think if I remember correctly is that those

1   two -- two consultants very old, already retired, don't get

2   into problem.

3   **Q.**   And how did you take the comment about your family?

4   **A.**   I wasn't really too happy about that.

5   **Q.**   Why is that?

6   **A.**   I was thinking, you know, he's already involved too much

7   in my family because this case, you know.

8   **Q.**   Did he talk to you at all about your communications with

9   your lawyer and what you should or should not tell your lawyer?

10  **A.**   I don't think he directly say anything.  Just hinted at me

11  some stuff; or if you can't keep with you, then don't tell

12  anybody.

13        **MR. HEMANN:**  I'd like to approach the witness,

14  Your Honor, with Exhibit 687.

15        **THE COURT:**  All right.

16        **MR. HEMANN:**  And, Your Honor, the parties have

17  stipulated that -- I seem to have the wrong document,

18  Your Honor.

19        **THE COURT:**  Okay.

20        **MR. HEMANN:**  Sorry.  If I could just have one moment.

21        **THE COURT:**  Sure.

22                     (Pause in proceedings.)

23        **THE COURT:**  We're going to break in about five

24  minutes, ladies and gentlemen.

25        **MR. HEMANN:**  I have the right one.

1      Yes, 687.  I'm sorry, Your Honor.  I'm handing the witness

2  Exhibit 687, which is a one-page, two-sided document.

3      And, Your Honor, the parties have stipulated to the

4  translation of this document, which is 687T.

5           **THE COURT:**  Is that correct?

6                     (Pause in proceedings.)

7           **MS. AGNOLUCCI:**  That's correct, Your Honor.

8           **THE COURT:**  All right.  So it's so stipulated and the

9  translation is agreed to by the parties.

10 **BY MR. HEMANN:**

11 **Q.**   Do you recognize the handwriting on Exhibit 687T, the back

12 of the page?

13 **A.**   Yes.  That's -- there are two handwritings and one is

14 Walter Liew, yeah.

15 **Q.**   And generally that would be the handwriting towards the

16 top of the document; correct?

17 **A.**   Yes.

18           **MR. HEMANN:**  Your Honor, may I consult with counsel

19 for just one moment?

20           **THE COURT:**  Yes.

21                     (Pause in proceedings.)

22           **MR. HEMANN:**  And, Your Honor, the parties have

23 stipulated that the handwriting towards the bottom is Christina

24 Liew's.

25           **THE COURT:**  All right.

**LIU - DIRECT / HEMANN**

1   BY MR. HEMANN:

2   Q.   And do the contents of this document reflect some of the

3   conversations you had around this period of time with Mr. Liew?

4   A.   Yeah.

5            MR. HEMANN:   Don't put it up yet, Pat.

6   Q.   Do these reflect some of the things that you discussed

7   with Mr. Liew at the time?

8   A.   Yes.

9            MR. HEMANN:   Your Honor, the United States would move

10   687 and 687T into evidence.

11           THE COURT:   Any objection?

12           MS. AGNOLUCCI:   No objection, Your Honor.

13           THE COURT:   It's admitted.

14      (Trial Exhibits 687 and 687T received in evidence)

15           MR. HEMANN:   If you could put 687-002 up, please.   And

16   if you could highlight the top of the document first, the top a

17   little further down, the handwriting through number three

18   there.   Thank you.

19   Q.   And is this the handwriting, Mr. Liu, that you recognize

20   as Walter Liew's handwriting?

21   A.   Yes.

22   Q.   And I think the best way to go, and you read Chinese;

23   correct?

24   A.   Yeah.

25           MR. HEMANN:   I think, Your Honor, what I'll do is just

1  put the stipulated translation up instead, if that's okay.

2      **THE COURT:**  All right.  Is this a good time for a

3  break?

4      **MR. HEMANN:**  This would be a good time for a break,

5  yes.

6      **THE COURT:**  All right, ladies and gentlemen, we'll

7  take our first break of the morning.  Remember the Court's

8  usual admonitions:  Don't discuss the case or allow anyone to

9  discuss it with you.  Don't do any research.  And I will see

10  you in 15 minutes.

11      **MR. HEMANN:**  Thank you, Your Honor.

12      (Proceedings were heard out of the presence of the jury:)

13      **THE COURT:**  15 minutes, everybody.

14      **MR. HEMANN:**  Thank you, Your Honor.

15                  (Recess taken at 9:42 a.m.)

16              (Proceedings resumed at 10:01 a.m.)

17      (Proceedings were heard out of the presence of the jury:)

18      **THE COURT:**  Please bring in the jury.

19      (Proceedings were heard in the presence of the jury:)

20      **THE COURT:**  All right.  Please be seated.

21      You may continue, Mr. Hemann.

22      **MR. HEMANN:**  Thank you, Your Honor.

23  **Q.**  Mr. Liu, I forgot to ask you when I was asking about

24  questions about -- I'm going to just change gears just for a

25  moment, and we'll go back to the document in front of you; but

**LIU - DIRECT / HEMANN**

1    when you went to visit the Pangang company in 2010, did

2    Mr. Maegerle go with you?

3    **A.**    No.

4    **Q.**    Did he go with you in 2011?

5    **A.**    No.

6    **Q.**    Are you aware of -- when you went, did you receive a

7    souvenir, some commemoration of your trip to the Pangang Group?

8    **A.**    Not either trip actually.  Souvenir is from July P&ID

9    review meeting.

10   **Q.**    Oh, when the Pangang people came to the United States?

11   **A.**    Yeah.

12   **Q.**    And did you receive something from the Pangang Group?

13   **A.**    Yeah.  It's a photo album, yeah.

14         **MR. HEMANN:**  Your Honor, can I approach the witness

15   with Exhibit 884?

16         **THE COURT:**  Yes.

17   **BY MR. HEMANN:**

18   **Q.**    And is this the photo album that you received?

19   **A.**    Yeah.

20   **Q.**    And if you could open it up, is there a page on that that

21   was signed by one of the Pangang officials?

22   **A.**    Yeah.  Mr. Zhuang.  That's the previous photo.  He's also

23   in this photo.

24   **Q.**    And there's a photograph there?

25   **A.**    Yeah.

1  **Q.**   And Mr. Zhuang signed that for you?

2  **A.**   I assume it's his handwriting but not sign in front of me.

3  **Q.**   Did Mr. Zhuang present that to you?

4  **A.**   Yeah, to everybody at USAPTI.

5  **Q.**   And does that page that you're referring to contain a

6  photograph of a meeting that involved the Pangang Group and

7  Mr. Liew's company?

8  **A.**   That says -- actually, the photo is the meeting --

9  basically is previous meeting's photo.

10 **Q.**   And do you see a photograph in there that has both

11 Mr. Liew and representatives of the Pangang company?

12 **A.**   Yeah, not in front of me.  They're both in the photo.

13       **MR. HEMANN:**  Your Honor, the United States moves

14 Exhibit 884 into evidence.

15       **MS. AGNOLUCCI:**  No objection, Your Honor.

16       **THE COURT:**  It's admitted.

17    (Trial Exhibit 884 received in evidence)

18       **MR. HEMANN:**  And if you, Ms. Ottolini, could put the

19 ELMO on just for on moment, please.

20 **A.**   It's here.

21       **THE COURT:**  Please ask for permission to approach.

22       **MR. HEMANN:**  Oh, I'm sorry, Your Honor.  I apologize.

23 **Q.**   And I'm going to put the page that you had opened this to

24 on the screen, Mr. Liu.  Is this the photograph that you were

25 referring to?

**LIU - DIRECT / HEMANN**

1   **A.**   Yeah.

2   **Q.**   And do you see in the photograph on the screen any

3   individuals from USA Performance Technology?

4   **A.**   That's -- one is Walter and one is Bob.

5   **Q.**   One is Walter and one is Bob?

6   **A.**   Yeah.

7   **Q.**   And where's, in this picture, Mr. -- Mr. Maegerle?

8   **A.**   Just sit beside him, yeah, beside Walter.

9   **Q.**   Can you describe what Mr. Liew is wearing in the picture?

10  **A.**   Yeah.  It's kind of a light blue shirt.

11  **Q.**   Thank you.

12       **MR. HEMANN:**  Your Honor, may I approach and grab just

13  the cover for this?

14       **THE COURT:**  Yes.

15       **MR. HEMANN:**  Thank you.

16  **Q.**   So going back, Mr. Liu, to the meeting that you had --

17  that you were describing with -- with -- the meetings that you

18  were describing with Walter Liew and Christina Liew.  First of

19  all, do you see Christina Liew here in the courtroom?

20  **A.**   Yeah.

21  **Q.**   Where is she sitting?

22  **A.**   Behind -- in the -- in there.

23  **Q.**   In the gallery?

24  **A.**   Yeah.

25  **Q.**   And can you just describe what she's wearing?

1  **A.**   A black -- a black clothing.

2  **Q.**   You said that you were looking at a document, and it's a

3  handwritten document.

4      If you could put that up on the screen again, Ms. Mahoney.

5  That's 687, page 1.  I'm sorry.  Page 2.

6      And you were saying that the handwriting on the top

7  portion of that document is Walter Liew's handwriting; is that

8  correct?

9  **A.**   Yes.

10 **Q.**   I'd like you to put the translation of the document up on

11 the screen.  That's 687T, page 2.  If you could just rotate

12 that around, please.

13     This has several references on it in English, Mr. Liu.  Do

14 you see those?

15 **A.**   Yes.

16 **Q.**   And the one at Number 1 says, "Ask Liu Jian what he had

17 told his lawyer."  Do you see that?

18 **A.**   Yes.

19 **Q.**   Did you discuss with Mr. Liew the information that you had

20 provided to your lawyer?

21 **A.**   Yeah.  Basically, this is the items below is talking

22 about.

23 **Q.**   And you're indicating on the page the items below where it

24 says "Ask Liu Jian what he had told his lawyer," those are the

25 items that you discussed with --

**LIU - DIRECT / HEMANN**

1  **A.**    Yeah.

2  **Q.**    -- with Mr. Liew?

3  **A.**    Yes.

4  **Q.**    There's a reference there, Number 1, says "old man."  Do

5  you see that?

6  **A.**    Yes.

7  **Q.**    To whom does that refer?

8  **A.**    I think it means, as far as I know, is Tim and Bob.

9  **Q.**    Why do you think that?

10  **A.**    Because those are two I met.

11  **Q.**    And then below that it says, "With us now."  Do you see

12  that?  Number 2.

13  **A.**    Yeah, Number 2, I don't know if the translation is right

14  or not.

15  **Q.**    Okay.

16  **A.**    Yeah, because seems to me it's different.

17  **Q.**    What does it mean to you?

18  **A.**    Means -- it means contractor and us.

19  **Q.**    Contract and us?

20  **A.**    Yeah.  (Speaking Chinese.)  Is two separate items.  I

21  don't know -- I don't know the translator right or not.

22  **Q.**    To what -- what does that mean to you?

23         If you could put up the 687, page 2, the Chinese version.

24  **A.**    Yeah, I think second is talking about -- I think partially

25  probably right is about us -- I mean, with us.  Also I think

1   it's (speaking Chinese) means contract.

2   **Q.**   And what did that have to do with the conversation that

3   you had with Mr. Liew?

4   **A.**   I don't recall really every detail.  I think I mention --

5   I can't recall.  It's mainly for first item is the older man.

6   I think he mentioned a few times directly.  But as a

7   contractor, I don't know if you discuss a lot.  The translation

8   was not there.

9         And about us, I think we discussed that too, and we also

10  discussed about other two employees in Chevron, what kind of

11  status they are.

12  **Q.**   There's a box on the left side of the page.  Do you see

13  that, like a square box?

14  **A.**   Yes.

15  **Q.**   And that refers to Hotmail --

16  **A.**   Yeah.

17  **Q.**   -- and Chevron UOP.  Do you see that?

18  **A.**   Yes.

19  **Q.**   Was UOP your prior employer?

20  **A.**   Yes.

21  **Q.**   And then at the bottom it says, "Liu Jian is afraid of

22  this."

23  **A.**   Yes.

24  **Q.**   What does that refer to?

25  **A.**   Yeah.  It means some Hotmail informations, yeah.  Hotmail

1  informations and -- mainly, I think it's Hotmail I use, yeah,

2  because Hotmail was accessed by Chevron.

3  **Q.**   Now, down at the bottom there's some handwriting that the

4  parties have stipulated belongs to Christina Liew.  Do you see

5  that?

6  **A.**   Okay.

7  **Q.**   To two points.  Do you see those?

8  **A.**   Yeah.

9  **Q.**   Can you tell the jury what the first of those says?

10  **A.**   That one, I don't know whose handwriting it is.  So --

11  **Q.**   The parties have agreed, as the Court instructed, that

12  that was Christina Liew's handwriting.  I'm just asking you

13  what it says.

14  **A.**   Okay.

15      (Witness examines document.)  "Your lawyer tell don't

16  contact us and discuss things," like first on the top.  Second

17  one, "If you again ask the lawyer, you probably will be got a

18  search warrant."

19  **Q.**   Does that have to do with the conversations that you had

20  with Mr. and Mrs. Liew about not providing information to your

21  lawyer?

22  **A.**   I cannot recall, actually.  Was too many things, items,

23  yeah.

24  **Q.**   Earlier, Mr. Liew, you said that you had received a copy

25  of a research report from Walter Liew.  Do you remember that?

LIU - DIRECT / HEMANN

1   **A.**   Yeah.

2   **Q.**   About the oxidation reactor?

3   **A.**   Yeah, okay.

4   **Q.**   When -- after Mr. Jubb came to your house, did you still

5   have that report in your possession?

6   **A.**   Yes, I did.

7   **Q.**   And what did you do with it?

8   **A.**   I throw it away, I think, the third day or the fourth day.

9   I forgot.  Actually, after that I start to look at my own --

10  anything related to UOP -- USAPTI document.  I found that

11  document, and I threw it to the garbage.

12  **Q.**   Why did you throw your copy of that document in the

13  garbage?

14  **A.**   I was panicked.  Anything that was related to -- because I

15  was interviewed and asked about DuPont.  So anything related to

16  DuPont, I was panicked and I just threw it out.

17  **Q.**   Why were you panicked?

18  **A.**   Because actually, at that time -- first, we are suspended

19  by company; second, there was DuPont people asking me, do you

20  have that?  Now I realize I have some material.  I try to hide

21  the evidence.

22  **Q.**   After -- you said that you looked for a lawyer, and you

23  eventually found one; correct?

24  **A.**   Yes.

25  **Q.**   How did you respond to the DuPont lawsuit?  What did you

**LIU - DIRECT / HEMANN**

1  do?

2  **A.**   I just -- mainly, for my side, I respond is, I am

3  innocent.  I did not steal any technology from DuPont.  And

4  that's my response, mainly, and that they do have an interview

5  with me later, yeah.

6  **Q.**   How did -- you said you had an interview with DuPont?

7  **A.**   Yes.

8  **Q.**   How did that come about?

9  **A.**   Was scheduled, you know, in May 25th, and we had an

10  interview.

11  **Q.**   And who scheduled that meeting for you?

12  **A.**   My lawyer.

13  **Q.**   Going into that meeting, did you believe that you had some

14  sort of understanding or agreement with DuPont?

15  **A.**   Yes.

16  **Q.**   What was the nature, the general nature, of your

17  understanding with DuPont that led to the interview?

18  **A.**   Cooperate with DuPont and tell the truth.

19  **Q.**   And if you cooperated with DuPont and told the truth, what

20  would happen to the lawsuit?

21  **A.**   They would dismiss me.

22  **Q.**   And going into that meeting, you mentioned a minute ago

23  that you didn't feel like you had done anything wrong as an

24  employee of USAPTI; correct?

25  **A.**   That's true.

LIU - DIRECT / HEMANN

1  Q.   And why is that?

2  A.   Because I did not steal anything like the charge in the

3  civil lawsuit.  I feel I don't even know what a trade secret

4  is, you know.

5  Q.   And did you know -- at the time that the meeting with

6  DuPont was scheduled, did you know where the document that we

7  looked at with the correlation, where that had come from, where

8  Mr. Liew had gotten it?

9  A.   The piece of paper and handwriting?

10  Q.   No.  The document that you copied it out of.  Do you know

11  where that came from?

12  A.   Yeah, I knew.

13  Q.   Where did it come from?

14  A.   From Walter.

15  Q.   And where had Mr. Liew gotten it from?

16  A.   I don't know.

17  Q.   Did you go interview, have an interview, with the

18  DuPont --

19  A.   Yes, I did.

20  Q.   -- investigator?

21  A.   Yes.

22  Q.   Was it the same guy who had come to your house?

23  A.   Yes.

24  Q.   And that was on April 25th?

25  A.   Yeah.

**LIU - DIRECT / HEMANN**

1   **Q.**   Where was that interview?

2   **A.**   It was in my lawyer's office.

3   **Q.**   And did the -- did the DuPont investigator ask you again

4   whether you had seen any DuPont materials?

5   **A.**   Yes, they did.

6   **Q.**   What did you tell them?

7   **A.**   I said, no, I did not see it.

8   **Q.**   Why didn't you tell them the truth?

9   **A.**   I think in my mind I tried to honor my own words, because

10  I promised I would not tell, you know.  I promised Walter's

11  family I would not tell them.

12  **Q.**   Did Mr. Jubb, during the interview, ask you if there were

13  any DuPont consultants working for USAPTI?

14  **A.**   Yes, they did.

15  **Q.**   And what did you tell him?

16  **A.**   I did not say anything.

17  **Q.**   You said you didn't say anything?

18  **A.**   Yeah.  I told him I did not say anything.  He put white

19  people.  I said no, no white people there.

20  **Q.**   He asked you if there were any white people working for --

21  **A.**   White people, yeah.

22  **Q.**   And you said no?

23  **A.**   Yeah.

24  **Q.**   Why didn't you tell him about Tim or Mr. Maegerle?

25  **A.**   Yeah, it's the same thing.  I tried to -- I was really

1  trying to honor my promise to Walter, with Walter Liew.

2  **Q.**   After the interview, for a period of time, were you still

3  getting paid by Chevron?

4  **A.**   Yeah, I was.  My payment was supposed to stop, and is

5  already stopped, because my last payment day is April 15th.  I

6  was supposed to work for USAPTI.  So I rendered my resignation

7  letter, and my last date was April 15th.

8  **Q.**   So your payment had stopped by the time you spoke to

9  Mr. Jubb again.  Yes?

10  **A.**   Yes.

11  **Q.**   And at some point after that, did your wife's pay stop

12  from Chevron?

13  **A.**   Yes.

14  **Q.**   When was that?

15  **A.**   May 19th.

16  **Q.**   Why did her pay stop?

17  **A.**   Because they basically fired her.

18  **Q.**   Did that have an effect on your family finances?

19  **A.**   Yes.

20  **Q.**   What was the effect?

21  **A.**   Because we now have entire family without pay, without any

22  income.

23  **Q.**   Do you have children, Mr. Liu?

24  **A.**   Yeah, I have two kids.

25  **Q.**   And did that cause you some concern?

1    **A.**    Yes.  Yes.  I was really financially desperate.

2    **Q.**    Did you do something to address that financial

3    desperation?

4    **A.**    I did.

5    **Q.**    What did you do?

6    **A.**    Basically after my wife's termination, I called Walter's

7    family.  I think I called Christina, reported that.  And she

8    was quite nice and said, "Don't worry, you know, because you

9    guys always have a job."

10   **Q.**    Did you talk about going back to work for USAPTI?

11   **A.**    Yes, I did.

12   **Q.**    Did you talk about the possibility of your wife going to

13   work for USAPTI?

14   **A.**    Yes.

15   **Q.**    Why did you do that?

16   **A.**    Because I think now I was already quite desperate, and

17   because of this lawsuit, it was very hard to find a job.  And

18   if somebody promise me I will have a job, I think I will take

19   that chance.

20   **Q.**    Ultimately, did you decide whether or not to go back and

21   work for USAPTI?

22   **A.**    Yeah.

23   **Q.**    What did you decide?

24   **A.**    I decide not to.  Because of this lawsuit, I don't want to

25   get things too complicated.

**LIU - CROSS / AGNOLUCCI**

1   Q.   At some point in time, did DuPont actually dismiss you

2   from the lawsuit?

3   A.   Yes.

4   Q.   When was that?

5   A.   In September 2011.

6   Q.   And you also -- at some point in time, did you learn about

7   an FBI investigation?

8   A.   Yes.

9   Q.   How did you learn about that?

10  A.   I got a lot of information from my lawyer.

11  Q.   After the -- with regard to the FBI investigation, did you

12  have some meetings with the FBI and people from the

13  U.S. Attorney's Office?

14  A.   Yes.

15  Q.   And about how many times did you meet with people from the

16  FBI and U.S. Attorney's Office?

17  A.   Several times.

18         MR. HEMANN:  Your Honor, I have no further questions.

19         THE COURT:  All right.  Thank you.

20      Any questions?

21                     (Pause in proceedings.)

22         MS. AGNOLUCCI:  May I proceed, Your Honor?

23         THE COURT:  Yes, you may.

24

25

1                          <u>**CROSS-EXAMINATION**</u>

2     **BY MS. AGNOLUCCI:**

3     **Q.**   Good morning, Mr. Liu.

4     **A.**   Hi.

5     **Q.**   You first got involved with USAPTI through Christina Liew;

6     correct?

7     **A.**   Yes.

8     **Q.**   She called you around February of 2010?

9     **A.**   Yes.

10    **Q.**   And she told you that her husband's company was looking

11    for engineers, and she set up a meeting with you and her

12    husband; correct?

13    **A.**   Yeah.

14    **Q.**   At that time you were working as a chemical engineer at

15    Chevron?

16    **A.**   Yes.

17    **Q.**   How many years of chemical engineering experience did you

18    have?

19    **A.**   Around 14 years at that time, 14, 15 years.

20    **Q.**   Did you say 14 or 15 years?

21    **A.**   Yes.

22    **Q.**   And your wife, Lucy, was also an engineer at Chevron;

23    correct?

24    **A.**   That's true.

25    **Q.**   After the phone call, the Liews came to your house and

1  gave you some background information on USAPTI; right?

2  A.   Yes.

3  Q.   They also asked you for referrals to other engineers?

4  A.   That's true.

5  Q.   And you referred them to your Chevron colleagues, Huping

6  Luo and Steve Song; correct?

7  A.   Huping, last name.  Just Huping and Steve, yes.

8  Q.   One of them was Huping?

9  A.   Yeah.

10  Q.   And one of them was named Steve Song?

11  A.   Steve Song, yes.

12  Q.   A few days later, you met with Walter Liew again about

13  working for USAPTI; right?

14  A.   Yeah.

15  Q.   And your colleagues Huping and Steve Song came along to

16  that meeting?

17  A.   Yes.  Actually, they're not together.

18  Q.   Mr. Liew gave you some USAPTI documents to get you

19  familiarized with the type of work that he did; right?

20  A.   Yes.

21  Q.   And you got an overview of his company and of titanium

22  dioxide?

23  A.   Yes.

24  Q.   The next day Mr. Liew dropped off some additional

25  documents, including an equipment list and a process flow

LIU - CROSS / AGNOLUCCI

1  diagram; right?

2  **A.**   I think so.  A bunch of material, yes.

3  **Q.**   And was the general nature of those materials process flow

4  diagrams and equipment lists?

5  **A.**   Yes.

6  **Q.**   You reviewed those materials?

7  **A.**   I reviewed, yes.  We divided the job.  So, yeah.

8  **Q.**   By "we" you mean you and Huping and Steve Song?

9  **A.**   The three of us, yeah.

10  **Q.**   After reviewing the materials, you decided that you wanted

11  to work for USAPTI?

12  **A.**   Not at that time yet.  It would be later, yes.

13  **Q.**   Did you, in fact, begin working for USAPTI sometime in

14  March of 2010?

15  **A.**   I think so, yes, I did, yeah.

16  **Q.**   You were still employed by Chevron at the time?

17  **A.**   Yes.

18  **Q.**   So you decided to start out by working at USAPTI in the

19  evenings after you got off work at Chevron?

20  **A.**   Yes, like part-time.  Like help, yeah.

21  **Q.**   And your colleagues Huping and Steve did the same?

22  **A.**   Yeah, they both.

23  **Q.**   You were putting in a full day at Chevron and meeting all

24  of your responsibilities there; right?

25  **A.**   That's true.

**LIU - CROSS / AGNOLUCCI**

1  **Q.**   So you didn't feel discomfort with your decision to work

2  nights for Mr. Liew?

3  **A.**   No.  I was -- at the beginning it was very limited, you

4  know, work actually.  You can look at the hours I put.  It's

5  only about for a few months, only 23 hours.

6  **Q.**   And you were comfortable with those hours that you were

7  putting in in the evenings; right?

8  **A.**   That's true.

9  **Q.**   You used your engineering skills to review USAPTI's

10  detailed designs for consistency and errors; right?

11  **A.**   That's true.

12  **Q.**   They were existing designs, and you were helping Mr. Liew

13  double-check and --

14  **A.**   Correct.

15  **Q.**   -- double-check them and suggest improvements?

16  **A.**   Yes.

17          **THE COURT:**  Mr. Liu, wait until she finishes her

18  question before you answer.  Okay?

19          **THE WITNESS:**  Yes.

20          **THE COURT:**  All right.  Thank you.

21  **BY MS. AGNOLUCCI:**

22  **Q.**   Do you remember finding some mistakes with the material

23  balance process?

24  **A.**   Yes.

25  **Q.**   Can you please explain what the material balance process

**LIU - CROSS / AGNOLUCCI**

1   is?

2   **A.**   Material balance is supposed -- the element goes in and

3   out, so it will be balanced.  One gauge material coming in;

4   going out is one gauge.  That's the definition for that.

5   **Q.**   And you had never worked in titanium dioxide before?

6   **A.**   No, I never did.

7   **Q.**   But you had been a chemical engineer for 15 years, and you

8   felt that that experience was transferable to titanium dioxide?

9   **A.**   That's true.

10  **Q.**   In fact, so transferable that you were able to find

11  mistakes in USAPTI's work?

12  **A.**   That's true.

13  **Q.**   Is it common in engineering to work on a variety of

14  products and processes?

15  **A.**   That's what we do actually, yeah.

16  **Q.**   That's what engineers do.  They don't necessarily work on

17  the same thing their whole lives; right?

18  **A.**   That's true.

19  **Q.**   Sometime after you started working for Mr. Liew, he gave

20  you a USAPTI laptop; correct?

21  **A.**   That's true.

22  **Q.**   And by the time March of 2010 rolled around, you had

23  worked about 32 hours for Mr. Liew; is that accurate?

24  **A.**   I think, yeah, it's about 20, 30 hours, yes.

25          **MS. AGNOLUCCI:**  Your Honor, may I publish to the

**LIU - CROSS / AGNOLUCCI**

1   witness only -- or may I approach the witness with Exhibit 790,

2   which has not been admitted?

3          **THE COURT:**  Yes, you may.

4          **MS. AGNOLUCCI:**  Thank you.

5   **Q.**   Do you recognize this document?

6   **A.**   Yes.  That's the document I generated.

7   **Q.**   And is this a time sheet reflecting the hours that you and

8   Huping Luo and Steve Song worked during that first month at

9   USAPTI?

10  **A.**   That's true.

11  **Q.**   And is this something that you were keeping in the

12  ordinary course of your work at USAPTI?

13  **A.**   That's true.

14         **MS. AGNOLUCCI:**  Your Honor, I move to admit

15  Exhibit 790.

16         **THE COURT:**  Any objection?

17         **MR. HEMANN:**  No objection, Your Honor.

18         **THE COURT:**  It's admitted.

19     (Trial Exhibit 790 received in evidence)

20         **MS. AGNOLUCCI:**  Mr. Guevara, if you could please

21  publish the first page of the exhibit.

22                      (Pause in proceedings.)

23  **BY MS. AGNOLUCCI:**

24  **Q.**   Is this an email from you to Christina Liew sending her

25  your time sheets?

**LIU - CROSS / AGNOLUCCI**

1    **A.**    Yes.

2    **Q.**    Christina Liew was the one who handled all the time sheets

3    and payments; right?

4    **A.**    That's true.

5    **Q.**    She handled all of the business and financial affairs of

6    the company; right?

7    **A.**    I don't know.

8    **Q.**    Was she generally the financial person at the company?

9    **A.**    For the time sheet which I submit to her.  But I don't

10   know really is the financial person.  I really don't know,

11   yeah.

12   **Q.**    Let's look at the page ending in 004.  Mr. Liu, can you

13   please read the entries under the column with your name?

14   **A.**    Okay.

15   **Q.**    If you could highlight those, Mr. Guevara.

16   **A.**    Shall I read or --

17   **Q.**    Yes, please.

18   **A.**    (reading)

19          "Equipment and PFD comments, equipment review in

20       Huping's home, pump and vessel review, equipment review in

21       Huping's home."

22   **Q.**    And if we could go farther down the page to the items at

23   the bottom of the page in that same column, please.

24   **A.**    Yeah.  That's called, next page, work plan, Walter's

25   office, PFD review at John's home, Steven and John, PFD review

1    at John's home, Steven and John.  The three of us at my home

2    continuously review these documents.

3    **Q.**   These are time entries describing the work that you did?

4    **A.**   Yes.

5    **Q.**   You reviewed PFDs, which are process flow diagrams?

6    **A.**   Yes.  Yeah.

7    **Q.**   Let's go to page 5, please.

8         If you could please read all of that page, Mr. Liu.

9    **A.**   (reading)

10        "General.  Review the process.  Review process

11        data/mass status and stream properties.  Equipment

12        characterization.  Chloride section equipment review.

13        Check equipment with equipment list table and having

14        comments.  P&ID review.  Equipment and line spec notes.

15        Sump pump capacity.  Report.  Chloride reactor startup

16        options."

17   **Q.**   Mr. Liu, does this also describe the substance of the work

18   that you were doing for USAPTI?

19   **A.**   That's all what I involved in at that time.

20   **Q.**   You testified that around July of 2010, you attended your

21   first meeting with Pangang, which was USAPTI's Chinese

22   customer; right?

23   **A.**   That's true.

24   **Q.**   And Mr. Maegerle was there?

25   **A.**   Yes.

LIU - CROSS / AGNOLUCCI

1   Q.   And Mr. Spitler was there, too?

2   A.   Yes.  You mean Tim; right?

3   Q.   Yes.

4   A.   Okay.

5   Q.   A couple of months after that, you officially signed an

6   employment agreement with USAPTI; right?

7   A.   Yes.

8        MS. AGNOLUCCI:  Your Honor, may I approach the witness

9   with Exhibit 777, which has not been admitted?

10       THE COURT:  Yes, you may.

11       MS. AGNOLUCCI:  Thank you.

12  Q.   Mr. Liu, can you take a look at those first two pages,

13  please?

14  A.   Uh-huh.

15  Q.   That is an employment agreement between you and USAPTI;

16  correct?

17  A.   That's true.

18  Q.   And you signed that document --

19  A.   Yes.

20  Q.   -- the second page?  And it's dated August 2010?

21  A.   (Witness examines document.)  August 3rd, yeah, 2010, yes.

22  Q.   And do you also recognize Mr. Liew's signature on that

23  second page?

24  A.   That's true.

25       MS. AGNOLUCCI:  Your Honor, I move to admit

LIU - CROSS / AGNOLUCCI

1    Exhibit 777.

2              **THE COURT:** Any objection?

3              **MR. HEMANN:** No objection.

4              **THE COURT:** It's admitted.

5         (Trial Exhibit 777 received in evidence)

6    BY MS. AGNOLUCCI:

7    Q.  Mr. Liu, is this similar to the employment agreement that

8    we just looked at with Mr. Hemann?

9    A.  Yes.

10   Q.  Except this one is dated a little bit earlier?

11   A.  (Witness examines document.)  I did not look at the

12   detail.  Yeah, there are two.  One is earlier; one is later.

13   Yeah.

14   Q.  There are two agreements.  One is from August and one is

15   from October?

16   A.  One is from October, yes.

17   Q.  We're looking now at the August 1; right?

18   A.  Yes.  Okay.

19   Q.  Mr. Guevara, if you could please go to the second page or

20   the first page, rather -- sorry -- where it says "Covenant Not

21   to Compete."  And if you could blow that up.

22        Mr. Liu, there was a three-year limit on your ability to

23   work for a competitor of USAPTI; correct?

24   A.  Uh-huh.

25   Q.  And after that --

1        **THE COURT:**  Just a moment.  Is that a yes?

2        **THE WITNESS:**  Yes.

3        **THE COURT:**  Say yes or no.

4        **THE WITNESS:**  Okay.

5        **THE COURT:**  Don't give uh-huhs, because we don't know

6    what that means.  Thank you.

7    **BY MS. AGNOLUCCI:**

8    **Q.**   After that, you could go work for another company that did

9    similar business; right?

10   **A.**   Yes.

11   **Q.**   Based on your experience working at Chevron and for many

12   years as a chemical engineer, was that kind of noncompete

13   clause with a time limit in it standard practice in the

14   industry?

15       **MR. HEMANN:**  Objection.

16       **THE COURT:**  Sustained.

17   **BY MS. AGNOLUCCI:**

18   **Q.**   Do you know whether that type of noncompete clause was

19   standard practice in the industry?

20       **MR. HEMANN:**  Objection.

21       **THE COURT:**  Do you know?  Yes or no.

22       **THE WITNESS:**  Could you repeat that again?

23       **THE COURT:**  Do you know whether that type of

24   noncompete clause was standard practice in the industry?  Do

25   you know?

**LIU - CROSS / AGNOLUCCI**

1          **THE WITNESS:**  Yes.

2          **THE COURT:**  How do you know?

3          **THE WITNESS:**  From -- it's not really -- I cannot say

4   standard, because I don't know the company.  Sometimes some

5   companies do.

6          **THE COURT:**  All right.  The objection is sustained.

7   **BY MS. AGNOLUCCI:**

8   **Q.**    Right before you signed this agreement, Chevron had gone

9   through a reorganization; right?

10  **A.**    That's true.

11  **Q.**    And they had made you reapply for another job so that you

12  could stay employed with Chevron?

13  **A.**    Yes.

14  **Q.**    You were excited at the prospect of a new opportunity with

15  USAPTI; right?

16  **A.**    By that time, actually, I already confirmed with Chevron

17  to maintain my position there.  Basically, Chevron would not

18  lay off me at that time when I signed this document.

19  **Q.**    But you were excited to start a new venture, try something

20  new, take this new job?

21  **A.**    Yes.  That's why I decided to quit the job.

22         **THE COURT:**  Just a moment.  Please wait until she

23  finishes the question.  All right?  So just delay until you

24  think she's done and then answer.  All right?  Do you

25  understand the Court?

1          THE WITNESS:  Okay.

2          THE COURT:  Say yes or no.

3          THE WITNESS:  Yes.

4          THE COURT:  All right.

5    BY MS. AGNOLUCCI:

6    Q.   Mr. Liu, did you just say that's why you took the job,

7    because you were excited about it?

8    A.   Yes.

9    Q.   You stayed officially working for Chevron after you signed

10   this agreement; correct?

11   A.   That's true.

12   Q.   Your work at USAPTI was still after hours?

13   A.   Yes.

14   Q.   And sometimes on the weekends?

15   A.   Yes.

16   Q.   And on one occasion did you take vacation from Chevron and

17   then spend those vacation days working at USAPTI?

18   A.   Yes.

19   Q.   You didn't see anything wrong with working for USAPTI in

20   your spare time, did you?

21   A.   I did not see that's wrong during that time, yeah.

22   Q.   Can you please repeat your answer?

23   A.   Yes.

24   Q.   You did or did not think it was wrong?

25   A.   Did not think it was wrong.

1  Q.   Did not think it was wrong.  Thank you.

2       A few months after you signed the employment agreement

3  that we just looked at, you attended a second meeting with the

4  Chinese customers; correct?

5  A.   You refer which one?  The October 1?

6  Q.   Do you recall attending a second meeting with Chinese

7  customers in December 2010?

8  A.   Yes.

9          MS. AGNOLUCCI:  Your Honor, may I approach the witness

10 with Exhibit 326T?

11         THE COURT:  Yes, you may.

12         MS. AGNOLUCCI:  Thank you.

13         THE CLERK:  326T as in Tom?

14         MS. AGNOLUCCI:  Yes, 326T and 326, which is the

15 Chinese language document.

16         THE COURT:  Yes.

17 BY MS. AGNOLUCCI:

18 Q.   Does this document relate to the December 2010 meeting

19 that you attended with the Chinese customers?

20 A.   (Witness examines document.)  You mean this one?

21 Q.   Yes.  There should be an English translation and a Chinese

22 document.

23 A.   Oh, okay.

24 Q.   The English is a translation of the Chinese.

25 A.   Is a translation.  It's not two documents.

**LIU - CROSS / AGNOLUCCI**

1    **Q.**   Yes.  They're the same document in two languages.

2    **A.**   Okay.  Yeah.  That's the meeting at the end, yeah.

3    **Q.**   This was a meeting regarding the detailed design, or the

4    DD?

5    **A.**   Yes.

6    **Q.**   And do you have in your mind that meeting?  Do you

7    remember attending it?

8    **A.**   Yes.

9         **MS. AGNOLUCCI:**  Your Honor, I move to admit

10   Exhibits 326 and 326T.

11        **MR. HEMANN:**  Objection, Your Honor.

12        **THE COURT:**  Let me see the document.  Ms. Ottolini,

13   would you please retrieve it from the witness?

14                   (Pause in proceedings.)

15        **THE COURT:**  I'm going to need to see the English

16   translation.  This one is in Chinese.

17                   (Pause in proceedings.)

18        **THE COURT:**  Thank you.

19                   (Pause in proceedings.)

20        **THE COURT:**  The objection is overruled.

21        **MS. AGNOLUCCI:**  Your Honor, may the document be

22   admitted?

23        **THE COURT:**  Yes.  It's admitted.

24      (Trial Exhibits 326 and 326T received in evidence)

25        **THE CLERK:**  Your Honor, these are not marked with any

1   exhibit tags.

2       THE COURT:  All right.  Give them back to counsel,

3   please, and they need to be marked appropriately.

4       MS. AGNOLUCCI:  These are the -- they're Government

5   exhibits, so we can retrieve the Government's copies.

6       THE COURT:  Yes.  I'd like to use the actual exhibits,

7   then, rather than copies.

8       MS. AGNOLUCCI:  Sure.  Would you like us to retrieve

9   those now, Your Honor?

10      THE COURT:  Please.

11      If you want to stand up, ladies and gentlemen, you can

12  take a stretch break while we're shoring all this up.

13                  (Pause in proceedings.)

14      MS. AGNOLUCCI:  Your Honor, these are the Government's

15  exhibits.  They don't have the ones with the stamp.

16      THE COURT:  If they don't have the ones with the stamp

17  immediately available, why don't you write on them, and we'll

18  get the originals.

19      MS. AGNOLUCCI:  The exhibit number is on the right.

20      THE COURT:  We'll have to substitute the original when

21  we get it.  Where is it, by the way?

22      MS. AGNOLUCCI:  It's Mr. Hemann's exhibit.  I don't

23  know.

24      MR. HEMANN:  Yeah, we don't know that this particular

25  exhibit was going to come in, and we didn't bring all of them

1    up every day.

2              THE COURT:  Okay.

3              MR. HEMANN:  So we can substitute it at the break.

4              THE COURT:  Very well.  Thank you.

5              MS. AGNOLUCCI:  May I approach the witness to --

6              THE COURT:  Yes, you may.

7              MS. AGNOLUCCI:  -- redeliver the exhibits.

8         May I proceed, Your Honor?

9              THE COURT:  Yes, you may.

10        You may sit down, Mr. Liu.  Thank you.

11             MS. AGNOLUCCI:  Mr. Guevara, can you please publish

12   the page ending in 005 of 326T and blow up paragraph 1?

13   Q.   Mr. Liu, can you please read paragraph 1?

14   A.   (reading)

15             "The partial DD material that the Seller has

16        completed on Pangang (Group) Company's 100K t/a titanium

17        white powder by chlorination project has reasonable design

18        and complete content for the major design.  The depth of

19        the DD design material is in compliance with that which is

20        required by contract.  This portion of DD design passes

21        review."

22   Q.   Pangang determined at that meeting that the portion of the

23   detailed design that USAPTI submitted had passed the review

24   phase; correct?

25             MR. HEMANN:  Objection, Your Honor.

1              **THE COURT:**  Sustained.

2    **BY MS. AGNOLUCCI:**

3    **Q.**   At the meeting was there a discussion about whether

4    USAPTI's material passed the DD review phase?

5    **A.**   This document says already passed.

6    **Q.**   Do you remember from attending the meeting whether it was

7    discussed?

8    **A.**   Was discussed, yes.

9    **Q.**   And do you remember that Pangang determined at the meeting

10   that USAPTI had passed the DD review phase?

11   **A.**   I think I did.  I think it did pass that.

12   **Q.**   You think they did pass?

13   **A.**   Yeah.

14   **Q.**   Did that passing require Pangang to look at the designs

15   you submitted, ask questions, and vet USAPTI's work product?

16   **A.**   I think that meeting was all the review meeting, review

17   all those design components.

18   **Q.**   At the review meeting, Pangang reviewed USAPTI's designs?

19   **A.**   Yeah.

20   **Q.**   And then determined that the designs passed?

21   **A.**   Passed, yeah.

22   **Q.**   Please look now at paragraphs 2 and 3.  I won't have you

23   read all of them, but do you see where it says that "The DD

24   technical drawings need additional information on the

25   stipulations for ordering items to be purchased overseas..."

1    And then in the third paragraph it says, "Prior to placing

2  the orders, the technical drawings for equipment to be

3  purchased have to be reviewed with the manufacturers and

4  optimized before they can be confirmed and used in the placing

5  of orders."

6    Do you see that?

7  A.  Yeah.  Yes.

8  Q.  One component of the work USAPTI did was to assist Pangang

9  in ordering the right equipment for its plants; correct?

10  A.  Yes.

11  Q.  And before placing those orders, the equipment had to be

12  reviewed with manufacturers and optimized before the orders

13  could be placed; right?

14  A.  Right.

15  Q.  From your experience, is that typical in the industry?

16        MR. HEMANN:  Objection, Your Honor.

17        THE COURT:  Sustained.

18  BY MS. AGNOLUCCI:

19  Q.  Was there a lot of very specific equipment involved in the

20  USAPTI designs?

21  A.  I cannot recall how many, but I think quite a few

22  equipment.

23  Q.  You think quite a few different types of equipment?

24  A.  Yes.

25  Q.  About a month later, in January 2011, do you recall

1  attending another set of meetings with Mr. Liew's Chinese

2  customers?

3  **A.**   Which -- January, no.  I think March.

4  **Q.**   You don't recall any January meetings?

5  **A.**   No, I don't recall any January meetings with that group.

6  **Q.**   Might it help refresh your memory to look at a document?

7  **A.**   Okay.

8       **MS. AGNOLUCCI:**  Your Honor, may I approach the witness

9  with a document?

10      **THE COURT:**  Yes.

11      **THE WITNESS:**  (Witness examines document.)

12      **THE COURT:**  Mr. Liu.  Mr. Liu, what she's asking you

13  to do is to tell us whether looking at that document refreshes

14  your memory.  We don't want you to read what's in the document

15  or simply say it -- say something because it's in the document.

16      The question is whether it stimulates your memory so that

17  you have an independent recollection of whether there was a

18  meeting in January of 2011.

19      **THE WITNESS:**  I don't recall this.

20      **THE COURT:**  All right.

21      **THE WITNESS:**  This is my first time seeing this memo.

22      **THE COURT:**  All right.  You've answered the question.

23  **BY MS. AGNOLUCCI:**

24  **Q.**   You don't recall a meeting in January 2011?

25  **A.**   Yeah, I don't really recall, yeah.

**LIU - CROSS / AGNOLUCCI**

1   Q.   Okay.  But you said you do recall a meeting in March 2011?

2   A.   Yeah.

3   Q.   That was a meeting again with the Chinese --

4   A.   No.  2011.

5   Q.   March 2011?

6   A.   March, I think after 2011, yes, I went to China with

7   Walter.  Okay.  Yeah.

8   Q.   That was in March of 2011; correct?

9   A.   Yeah, I think 2011.  I forgot, yeah.

10  Q.   And you and Mr. Liew met with the Chinese customers?

11  A.   Yes.

12  Q.   That was an equipment review and project update?

13  A.   Yes.

14  Q.   And one of the things you discussed during that meeting

15  was the purchasing of equipment?

16  A.   That's true.

17  Q.   USAPTI made recommendations for third-party vendors who

18  would supply equipment to the Chinese customers?

19  A.   Right.

20  Q.   That was the third meeting that you recall attending with

21  USAPTI's Chinese customers; right?

22  A.   Yes.

23  Q.   We're now in March 2011, and at this point you saw nothing

24  wrong with your working for USAPTI, did you?

25  A.   Right.

**LIU - CROSS / AGNOLUCCI**

1  **Q.**   You were happy there?

2  **A.**   Yeah.

3  **Q.**   This was an opportunity for you to do something new and

4  exciting?

5  **A.**   Yeah.

6  **Q.**   And, in fact, right around this time you officially

7  resigned from your job at Chevron; correct?

8  **A.**   Correct.

9  **Q.**   You were planning on joining USAPTI permanently; correct?

10  **A.**   Correct.

11  **Q.**   Now, that all changed on March 30th, didn't it?

12  **A.**   Yes.

13  **Q.**   You, Huping Luo, and Steve Song, were taken aside at

14  Chevron and told that you were being investigated; right?

15  **A.**   Right.

16  **Q.**   And Chevron took away your phone?

17  **A.**   Right.

18  **Q.**   They took away your computer?

19  **A.**   Right.

20  **Q.**   They separated all of you?

21  **A.**   Right.

22  **Q.**   They questioned you about your work for USAPTI for five to

23  six hours?

24  **A.**   Right.

25  **Q.**   They also questioned your wife, Lucy?

**LIU - CROSS / AGNOLUCCI**

1   **A.**   Right.

2   **Q.**   And they questioned Huping?

3   **A.**   Right.

4   **Q.**   And they questioned Steve Song?

5   **A.**   Right.

6   **Q.**   And they suspended all of you from work?

7   **A.**   Right.

8   **Q.**   It's fair to say that this was an extremely stressful turn

9   of events; right?

10   **A.**   That's true.

11   **Q.**   Did you come to learn that Chevron went through your

12   computer and found documents that showed you had been working

13   for Mr. Liew and USAPTI?

14   **A.**   Yes.

15   **Q.**   And did you come to learn that Chevron handed all those

16   documents to DuPont?

17   **A.**   Don't know.

18   **Q.**   You still have that bad day, March 30th, in your mind;

19   right?

20   **A.**   True.

21   **Q.**   That night, around 8:00 o'clock, a DuPont investigator

22   came knocking on your door?

23   **A.**   Right.

24   **Q.**   Do you remember if his name was James Jubb?

25   **A.**   Yes.

LIU - CROSS / AGNOLUCCI

1  **Q.**  Is it fair to describe him as a large, intimidating man?

2  **A.**  I don't know.

3  **Q.**  You were intimidated by him; right?

4  **A.**  Actually, we had a good conversation.  I would say he was

5  okay, yeah.

6  **Q.**  He started questioning you about your work for USAPTI?

7  **A.**  Yes.

8  **Q.**  And your wife asked him to leave at some point?

9  **A.**  No.

10  **Q.**  What happened?  Why did he leave?

11  **A.**  He finished the investigation, then left.

12  **Q.**  You don't recall your wife asking him to leave?

13  **A.**  No.

14  **Q.**  It's safe to say that March 30th was a bad day for you;

15  right?

16  **A.**  That's true.

17  **Q.**  Suddenly you had both DuPont and Chevron after you?

18  **A.**  Yeah.

19  **Q.**  And your world was turned upside down; right?

20  **A.**  Yes.

21  **Q.**  Your wife was very upset that day, wasn't she?

22  **A.**  That's true.

23  **Q.**  She was crying?

24  **A.**  Yes.

25  **Q.**  And she called Mr. and Mrs. Liew and asked them to come

**LIU - CROSS / AGNOLUCCI**

1  over?

2  **A.**   Later I found out that's the case, yes.

3  **Q.**   And they came over to comfort her with their son, who was

4  friends with your son; right?

5  **A.**   Yes.

6  **Q.**   And your kids regularly played together; right?

7  **A.**   Yeah, we often see each other, yes.

8  **Q.**   And that night did they go downstairs to play together

9  while Mr. Jubb was interrogating you?

10  **A.**   I don't recall that detail because I was with James.

11  **Q.**   You testified that the next day Mr. and Mrs. Liew came to

12  your house; correct?

13  **A.**   Yes.

14  **Q.**   And Mr. Liew helped you write a document to Chevron?

15  **A.**   Uh-huh.  Yes.  Yeah.

16  **Q.**   Yes.  And that was a letter saying, "I want to let you

17  know that this man, James Jubb, came knocking on my door and

18  started asking me questions"; right?

19  **A.**   That's true.

20  **Q.**   There's nothing wrong with complaining about DuPont

21  showing up on your doorstep at night, is there?

22  **A.**   I really don't know yes or no that one.  I did not really

23  judge that at that time.  I was very confused in those days,

24  yeah.

25  **Q.**   Well, you had the right not to let Mr. Jubb into your

LIU - CROSS / AGNOLUCCI

1    house; right?

2    **A.**    Yes.

3              **MR. HEMANN:**  Objection.

4    **BY MS. AGNOLUCCI:**

5    **Q.**    And you had the right to consult a lawyer, didn't you?

6    **A.**    Yes, I think I should have.

7    **Q.**    You told me just now that you didn't feel too concerned

8    with what was going on that night when Mr. Jubb showed up;

9    right?

10   **A.**    That's true.

11   **Q.**    And you also said that to Mr. Hemann; right?

12   **A.**    Yeah.

13   **Q.**    You didn't tell Mr. Jubb that you had seen any documents

14   that gave you concern; right?

15   **A.**    That's true.

16   **Q.**    Is that because you didn't think there was anything wrong

17   with the documents you had seen?

18   **A.**    That's also true.

19   **Q.**    Now, at some point things got even worse for you; is that

20   fair to say?

21   **A.**    That's true.

22   **Q.**    About a week later, on April 6, DuPont sued you and

23   Mr. Liew and USAPTI; correct?

24   **A.**    Correct.

25             **MS. AGNOLUCCI:**  Your Honor, may I approach the witness

LIU - CROSS / AGNOLUCCI

1    with Exhibit 1256, which has not been admitted?

2                **THE COURT:**  Yes, you may.

3                **MS. AGNOLUCCI:**  Thank you.

4    **Q.**   Do you recognize this document, Mr. Liu?

5    **A.**   Yes.

6    **Q.**   What is it?

7    **A.**   That's the document -- it, basically, is a document suing

8    against me and the other people you're talking about.

9    **Q.**   It's a civil complaint that DuPont filed against you and

10   Mr. Liew; correct?

11   **A.**   Yes.

12               **MS. AGNOLUCCI:**  Your Honor, may I confer with counsel

13   for one moment?

14               **THE COURT:**  Sure.

15                         (Pause in proceedings.)

16               **MS. AGNOLUCCI:**  Your Honor, the parties have

17   stipulated that this document is admissible and relevant.

18               **THE COURT:**  All right.  Is that correct, Mr. Hemann?

19               **MR. HEMANN:**  Yes, it is, Your Honor.

20               **THE COURT:**  All right.  So the exhibit number again?

21               **MS. AGNOLUCCI:**  1256.

22               **THE COURT:**  Exhibit 1256 is admitted by stipulation.

23            (Trial Exhibit 1256 received in evidence)

24               **MS. AGNOLUCCI:**  Thank you, Your Honor.

25   **Q.**   Mr. Liu, this was a civil complaint; right?

**LIU - CROSS / AGNOLUCCI**

1  **A.**    Yes.

2  **Q.**    That's different than a criminal complaint; right?

3  **A.**    Yes.

4  **Q.**    This was a dispute between DuPont on the one hand and you

5  and Mr. Liew and USAPTI on the other hand about money; right?

6  **A.**    Yes.

7  **Q.**    Whereas a criminal case, like the one against Mr. Liew

8  now, involves an individual's freedom; right?

9           **MR. HEMANN:**  Objection, Your Honor.

10          **THE COURT:**  Sustained.

11 **BY MS. AGNOLUCCI:**

12 **Q.**    You understood this document to be an account of the

13 things DuPont was alleging that you and Walter Liew did wrong;

14 right?

15 **A.**    That's true.

16 **Q.**    It was extremely stressful for you to have been sued by

17 DuPont; right?

18 **A.**    That's true.

19 **Q.**    Especially when you didn't think you had done anything

20 wrong; right?

21 **A.**    That's true.

22 **Q.**    And it was stressful for you to be sued by DuPont and have

23 you and your wife suspended from work all within the span of a

24 week; right?

25 **A.**    True.

LIU - CROSS / AGNOLUCCI

1  Q.   Let's look at page 7 of the document, please.

2       Mr. Guevara, if you could go to paragraph 33 and blow it

3  up.

4       Do you see, Mr. Liu, where it says, "In August 2010,

5  DuPont received an anonymous letter indicating that Walter Liew

6  of USAPTI and John Liu had embezzled TiO2 pigment technologies

7  from DuPont"?  Do you see that?

8  A.   Yes.

9  Q.   This refers to an anonymous letter sent to DuPont about

10 you and Walter Liew; right?

11 A.   Yes.

12 Q.   This letter is what started the whole investigation into

13 you and Mr. Liew; correct?

14          MR. HEMANN:  Objection.

15          THE COURT:  Sustained.

16 BY MS. AGNOLUCCI:

17 Q.   Do you know whether this letter is what caused Chevron to

18 look through your computers?

19 A.   No, I don't know.

20 Q.   According to the Complaint, DuPont received this letter in

21 August of 2010; right?

22 A.   Yeah.  That says here, yes.

23 Q.   Okay.  Now, that was one month after an employee by the

24 name of Peter Wong was fired; right?

25 A.   Yes.

**LIU - CROSS / AGNOLUCCI**

1  **Q.**  You remember Peter Wong; right?

2  **A.**  Yes.

3  **Q.**  He had worked with you at USAPTI?

4  **A.**  Yes.

5  **Q.**  You thought he was really bad at his job, didn't you?

6  **A.**  Yes.

7  **Q.**  Do you recall that during one of the meetings with the

8  Chinese customers, Pangang was upset because there were a lot

9  of mistakes in USAPTI's designs?

10     That's not going to be in this document you're looking at.

11  **A.**  Yeah.  I don't remember that detail, no.

12  **Q.**  Do you remember Peter Wong making a lot of errors?

13  **A.**  I only know his job -- work quality was not good.

14  **Q.**  His work quality was not good.

15  **A.**  Yeah.

16  **Q.**  Is it safe to say that you thought he was a bad engineer?

17  **A.**  I not say bad, but -- no, not good.  Put it that way.

18  Okay.

19  **Q.**  He was not a good engineer?

20  **A.**  Yeah.

21  **Q.**  And do you remember letting him know that?

22  **A.**  I think all people in USAPTI probably work with him

23  probably knew that.

24  **Q.**  You specifically told him that there were errors in his

25  designs; right?

LIU - CROSS / AGNOLUCCI

1   A.   I cannot remember which -- that event, but I probably said

2   lots of words.  I cannot really remember that.

3   Q.   Are you saying that you don't remember ever telling Peter

4   Wong that there were errors in his designs?

5   A.   Let me put it that way:  I probably talked to quite a few

6   people in USAPTI that design is not right.  If I see anything

7   not right, I will tell them directly.

8   Q.   So you remember telling quite a few people at USAPTI that

9   Peter Wong had made errors?

10  A.   Not this one -- I think I will put it this way:  If Peter

11  Wong or other people -- and other people, if I see those

12  people, you know, anyone make a mistake, I will tell them

13  directly.

14  Q.   Okay.  Well, right now we're talking only about Peter

15  Wong.  So let's forget about other people.

16       Do you remember saying that Peter Wong had made errors in

17  his designs?

18  A.   I think I -- I would say I did.

19  Q.   You did?

20  A.   Yeah, I did.

21  Q.   And shortly thereafter, Peter Wong was fired, wasn't he?

22  A.   Yes.

23  Q.   And you were in favor of him being fired; right?

24  A.   I would say not in favor or not, but I think -- I don't

25  think I was against that because I --

**LIU - CROSS / AGNOLUCCI**

1    Q.   You weren't against him being fired --

2         THE COURT:  Just a second.  Let him finish.

3         Finish your answer, sir.

4         THE WITNESS:  Because I'm not really the employer

5    there.  So I probably stay neutral.  Yeah, what I say.

6    BY MS. AGNOLUCCI:

7    Q.   Do you remember recommending to Walter Liew that Peter

8    Wong get fired?

9    A.   I would say -- I would say that I would say he's probably

10   not -- is not good engineer, and that's what I would say.

11   Q.   You told --

12   A.   I mentioned that a few times probably.

13   Q.   You mentioned a few times that he was not a good engineer?

14   A.   Yeah.

15   Q.   And do you specifically remember mentioning that it would

16   probably be best if he was let go?

17   A.   I don't recall it.  I don't recall.

18   Q.   Is it safe to say that Peter Wong left USAPTI on bad

19   terms?

20   A.   I don't know.  Actually, he probably quite upset.  I

21   hardly worked with him.  So, I mean, I did not see him left,

22   so....

23   Q.   He was quite upset, you said?

24   A.   Yeah.  Anybody probably would be if let go, would not be

25   happy.

1  **Q.**   And about one month after he was fired, the anonymous

2  letter appeared in DuPont's mailbox; right?

3  **A.**   That one I don't know because I really don't know what

4  happened after that.  I only know April 6 I got sued, and I

5  read this sentence too.

6  **Q.**   April 6 is 2011.

7  **A.**   Yeah.

8  **Q.**   So we're going back to 2010.

9  **A.**   Uh-huh.

10 **Q.**   Is it fair to say that in August 2010 the anonymous letter

11 was sent to DuPont, according to the Complaint?

12           **MR. HEMANN:**  Objection.

13           **THE COURT:**  Sustained.

14 **BY MS. AGNOLUCCI:**

15 **Q.**   Do you recall that Peter Wong was fired shortly after the

16 meeting that you attended with Pangang in the summer of 2010?

17           **MR. HEMANN:**  Objection.  Asked and answered.

18           **THE COURT:**  Sustained.

19     Move on to something else, please.

20 **BY MS. AGNOLUCCI:**

21 **Q.**   It's now April 6 and you've been sued by DuPont.  You

22 decide to retain a lawyer; right?

23 **A.**   Yes.

24 **Q.**   A civil attorney named Marc Bernstein?

25 **A.**   Yes.

LIU - CROSS / AGNOLUCCI

1   Q.   And you and Mr. Bernstein go to a meeting with DuPont;

2   correct?

3   A.   Yes.

4   Q.   That meeting was about three weeks after the civil

5   Complaint was filed?

6   A.   It's -- yeah, it's about then.

7   Q.   Unlike the first meeting when Mr. Jubb came knocking on

8   your door unannounced, this was a meeting that you and your

9   lawyer set up in advance?

10  A.   Yes.

11  Q.   Were there a lot of DuPont folks at the meeting?

12  A.   No.

13  Q.   Do you remember a man named Dan Dayton being at the

14  meeting?

15  A.   I don't remember names.

16  Q.   How many people do you remember being at the meeting?

17  A.   Two.  Two people.

18  Q.   Only two?

19  A.   Yeah.

20  Q.   Well, there were at least three; right?  You, Mr. Jubb,

21  and your lawyer?

22  A.   For DuPont, I think only two.  I can remember two at this,

23  yeah.

24  Q.   Do you recall telling those people that, in your view,

25  Walter Liew knew quite a lot?

1        **MR. HEMANN:**  Objection, Your Honor.  Hearsay.

2        **THE COURT:**  Sustained.

3    **BY MS. AGNOLUCCI:**

4    **Q.**   At the time you didn't think there was anything improper

5    about USAPTI's work; did you?

6    **A.**   That's true.

7    **Q.**   And you didn't think that there had been any warning signs

8    at all about USAPTI's work; right?

9        **MR. HEMANN:**  Objection, Your Honor.

10        **THE COURT:**  Sustained.

11        **MS. AGNOLUCCI:**  Your Honor, may we have a sidebar?

12        **THE COURT:**  No.  Does this have to do with the matter

13    we discussed earlier?

14        **MS. AGNOLUCCI:**  Yes, it does.

15        **THE COURT:**  All right.  Let's come to sidebar.  This

16    relates to the exhibits we discussed?

17        **MS. AGNOLUCCI:**  Yes.  I have them here.

18      All right.  Ms. McNamara, would you please come forward?

19      You may stand, ladies and gentlemen.

20      (The following proceedings were heard at the sidebar:)

21        **THE COURT:**  All right.  Ms. Agnolucci?

22        **MS. AGNOLUCCI:**  Well, Your Honor, if we're not going

23    to be able to get into what he said to DuPont, I mean, that's

24    what's in these documents.  So that's why I'm trying to elicit

25    it from him, is to obviate the need for these emails.

**SIDEBAR**

1      **THE COURT:**  Well, that doesn't solve the problem

2   whether the emails are privileged.  The fact that it's --

3   you're asking him about a hearsay discussion.  The fact that

4   there's some emails about it which purport to memorialize the

5   same hearsay doesn't make it any better.  It doesn't cure it.

6   In fact, it's worse.

7      **MS. AGNOLUCCI:**  Well, I would ask to be able to ask

8   him about what he said to DuPont because it's relevant to his

9   state of mind.

10      **THE COURT:**  All right.  What's your response?

11      **MR. HEMANN:**  As to the hearsay and relevance

12   objections, his state of mind isn't relevant to anything in

13   this trial.  It doesn't go to his bias.  The underlying facts

14   are all out, and it remains hearsay without an exception.

15      **THE COURT:**  All right.  And I'll ask Ms. McNamara.  Do

16   you want to say anything about the privilege aspect since

17   counsel is now dealing with an email that purports to relate to

18   the subject matter of the witness' testimony?

19      **MS. McNAMARA:**  Thank you, Your Honor.  The document is

20   privileged and I assert it.

21      **THE COURT:**  All right.  The document is privileged.

22   The privilege hasn't been overcome, and I don't believe the

23   information, substantively, is even relevant -- is not

24   admissible because it's hearsay.

25      The witness' state of mind is not relevant.  He's not on

1   trial here.  He's testified that he didn't think anything was

2   wrong.  And the fact that he repeated it to others means

3   nothing.  What DuPont knew or didn't know doesn't really

4   matter.

5       So I think it's irrelevant, there's no foundation for it,

6   and it's privileged.  So to the extent that you want to go into

7   this area, I've already sustained the objection.  To the extent

8   that you have an email that purports to repeat that in a

9   conversation with his lawyer that's both privileged and it's

10  still hearsay, now it's double hearsay.  So it's not

11  admissible.

12      **MS. AGNOLUCCI:**  Your Honor, you say that he's

13  testified that he didn't think anything was wrong, but on

14  direct with Mr. Hemann, he also gave kind of a hedgy account of

15  whether he thought it was right or wrong.

16      **THE COURT:**  Excuse me for interrupting.  He was

17  equivocal, and I think now on cross you've got him to say many

18  times that, and he did it in a much more, I would say,

19  incremental way, that he didn't think he was doing anything

20  wrong; he didn't think Walter Liew was doing anything wrong.

21  And even if that were true, the material you seek to bring out

22  from him doesn't really -- is not a prior inconsistent

23  statement.  So I don't think it's admissible.

24      **MR. HEMANN:**  And I'd like to just make one

25  clarification, Your Honor, as to what the "it" is because the

1   "it" that he said he didn't think there was anything wrong with

2   was the activities during his employment at USAPTI and the

3   review of DuPont documents.  The "it" that I'm concerned about

4   is he also testified that he threw a document away because he

5   possessed it.

6       So at some point in time he did become concerned.  These

7   emails, as I understand it, don't go to that, because the

8   questions that were being asked by Mr. Jubb at these meetings

9   had to do with his conduct as an employee of USAPTI.

10      So I do think it's fair to explore the reason why he threw

11  away a document.  And, again, it doesn't have anything to do

12  with the hearsay or the privilege.

13          THE COURT:  Well, the important thing for this

14  inquiry, one of the important things, is that I have previously

15  ruled the documents -- the emails that were the subject of

16  Ms. McNamara's motion were privileged.  The only remaining

17  issue was with respect to the privilege, whether the Court --

18  whether the defendant demonstrated that his right to

19  confrontation, Sixth Amendment right, would overcome the

20  privilege based upon both the direct and the cross.

21      I don't believe the defendant has made such a showing.

22  Therefore, the emails remain privileged and they're not going

23  to be admitted based upon this showing.

24          MS. AGNOLUCCI:  All right.  Well, Your Honor, we'll

25  ask a few more questions.

LIU - CROSS / AGNOLUCCI

1        **THE COURT:** Yes, as many as you want.  I'm not cutting

2    any lines off.

3        **MS. AGNOLUCCI:** Right.

4        **THE COURT:** I'm just telling you that the last

5    question was hearsay.  I will tell you that the basis of my

6    ruling was that in addition to it being hearsay, as no

7    exception applies, it's also irrelevant to the inquiry that

8    we're after because this gentleman is not on trial.  He doesn't

9    have a deal with the Government.  And his state of mind is

10   irrelevant.  And, quite frankly, what DuPont believed is really

11   irrelevant.  And that's been creeping into this trial, and I

12   think it's completely irrelevant what DuPont believed.  It's

13   what the jury believes and what the Court believes, not what

14   DuPont believes.

15       So I'll let you go on and ask as many questions as you

16   want.

17       **MS. AGNOLUCCI:** Okay.  Thank you, Your Honor.

18       **THE COURT:** The objection is sustained.

19       (The following proceedings were heard in open court:)

20       **THE COURT:** You may proceed now.

21       **MS. AGNOLUCCI:** Thank you, Your Honor.

22   **Q.** We were just discussing the April 25th meeting that you

23   attended with DuPont.  Do you have that in your mind again?

24   **A.** Yeah.

25   **Q.** Thank you.

1          Mr. Liu, at the time you didn't think there had been any

2    warning signs at all; correct?

3    **A.**   Correct.

4    **Q.**   In fact, at the time you repeatedly and vehemently

5    insisted that there were absolutely no warning signs suggesting

6    that Mr. Liew had done anything wrong; right?

7    **A.**   Yeah.

8    **Q.**   Do you recall saying that?

9    **A.**   I did not really -- I don't think that they involved

10   talking about detail like what is wrong.  They were talking

11   about material, things like that.

12   **Q.**   By then, you had looked at --

13          **THE COURT:**  Just a second.  Would you just repeat your

14   last answer?

15          **THE WITNESS:**  I don't think that they specifically

16   talking about the names like you said.  They did not state

17   Walter was not right or is right, I don't think.

18   **BY MS. AGNOLUCCI:**

19   **Q.**   But at the time there were absolutely no warning signs

20   that anything you had done --

21   **A.**   That's true.

22   **Q.**   -- in working for USAPTI was wrong?

23          **MR. HEMANN:**  Objection.

24          **THE COURT:**  Sustained.

25          We've been over this, Counsel.  Please move on to another

LIU - CROSS / AGNOLUCCI

1   subject.

2   **BY MS. AGNOLUCCI:**

3   Q.   By then you had looked at many USAPTI designs, right, over

4   the course of your work there?

5   A.   Yes.

6   Q.   And you didn't see anything wrong with them; right?

7   A.   That's true.

8   Q.   And you also had attended several meetings with USAPTI's

9   Chinese customers; right?

10  A.   That's true.

11  Q.   You went to at least three meetings that you can remember;

12  right?

13  A.   That's true.

14  Q.   And as you -- nothing that happened at those meetings

15  raised any red flags; right?

16  A.   That's true.

17  Q.   And you had met Mr. Maegerle; right?

18  A.   Yes.

19  Q.   And you knew he was a former DuPont employee?

20  A.   That's true.

21  Q.   And nothing about that made you think that Mr. Liew was

22  doing anything wrong; right?

23  A.   That's true.

24  Q.   So it's safe to say that you defended yourself and

25  Mr. Liew in that April 25th meeting?

1          **MR. HEMANN:**  Objection, Your Honor.

2          **THE COURT:**  Sustained.

3  **BY MS. AGNOLUCCI:**

4  **Q.**  Let's focus now on the time frame after that meeting.

5  We're now in late April and Chevron is continuing to

6  investigate you; right?

7  **A.**  Yes.

8  **Q.**  DuPont has a pending lawsuit against you?

9  **A.**  Yes.

10  **Q.**  And soon after that, the FBI gets involved and starts

11  asking to meet with you; right?

12  **A.**  I think it would be later, yes.

13  **Q.**  When did the FBI first start asking you for meetings?

14  **A.**  I think after June.  I think, yes, after June.

15  **Q.**  Do you recall that it was by June of 2011?

16  **A.**  Yeah, I think -- I don't recall exact date.  It's around

17  June, mid-June, I think.

18  **Q.**  Mid-June 2011?

19  **A.**  Yeah.

20  **Q.**  Okay.  And that was before Mr. Liew was -- before

21  Mr. Liew's house was searched?

22  **A.**  I still don't know which date was search, actually.

23  **Q.**  Did you at some point learn that Mr. Liew's house had been

24  searched and that he had been arrested?

25  **A.**  Yes.

**LIU - CROSS / AGNOLUCCI**

1  Q.   And when you learned that, you had already been meeting

2  with the FBI; right?

3  A.   I have to think the sequence.  I think yes.  I think yes.

4  Q.   There were some meetings before and some meetings after;

5  right?

6  A.   Yes.

7  Q.   At that point when the FBI first asked you for a meeting

8  in mid-June of 2011, you retained a second lawyer; right?

9  A.   Yes.

10  Q.   You retained a criminal defense attorney named Mary

11  McNamara?

12  A.   Yes.

13  Q.   And you started cooperating with the FBI; right?

14  A.   Yes.

15  Q.   You met with them several times starting then?

16  A.   Yes.

17  Q.   How many times would you say you met with the FBI or with

18  the prosecutors between June 2011 and today?

19  A.   Four or five.  Five I can see -- five -- around five

20  times.

21  Q.   Around five times?

22  A.   Yeah.

23  Q.   Did you sign something called a proffer letter with the

24  prosecutors?

25  A.   Yes.

**LIU - CROSS / AGNOLUCCI**

1   Q.   That was in June 2011 when you first started meeting with

2   them?

3   A.   Yes.

4   Q.   It said that as long as you met with the FBI and told them

5   what you knew, they wouldn't use anything you said against you;

6   right?

7   A.   That's true.

8   Q.   This was a way for you to get out of the criminal case;

9   right?

10   A.   I don't know I get out or not still, because nothing

11   promised me anything.

12   Q.   Well, this letter promised that you would avoid certain

13   things being used against you in a criminal case; is that fair?

14   A.   I just recall it's two things.  First asking me to tell

15   the truth, and also interview -- interview, anything I say not

16   against me for future.  But I don't got any words they were not

17   charging me.

18   Q.   So in exchange for telling the truth, anything you said

19   would not be used against you in the future; right?

20   A.   I think that's the agreement, yeah.

21   Q.   And at the same time, you were cooperating with DuPont to

22   get out of the civil case; right?

23   A.   Yes.

24   Q.   And you persuaded them to drop the civil case against you,

25   too?

**LIU - CROSS / AGNOLUCCI**

1    **A.**    I think my lawyer did.

2    **Q.**    You were doing what you needed to to get your family out

3    of a stressful situation; weren't you?

4    **A.**    That's true.

5    **Q.**    And you decided it was in your interest to cooperate with

6    Chevron, with DuPont, and with the FBI; right?

7    **A.**    That's true.

8    **Q.**    You testified today that after DuPont sued you, Walter

9    Liew told you not to say anything else because it was not good

10   for you or your family.  Do you remember that?

11   **A.**    Yeah.

12   **Q.**    That was a conversation that happened after the civil suit

13   was filed?

14   **A.**    Yes.

15   **Q.**    You testified today that it was April 11th or 12th; right?

16   **A.**    Yeah.

17   **Q.**    Now, we were just discussing that you met with FBI agents

18   and prosecutors in this case on various occasions; right?

19   **A.**    Yeah.

20   **Q.**    There were some meetings before Mr. Liew's home was

21   searched and there were some meetings after; correct?

22   **A.**    Could you tell me which date was the search?

23   **Q.**    Sure.

24   **A.**    Yeah.

25   **Q.**    Would it refresh your memory to look at a document?

1    **A.**    Sure.

2            **THE COURT:**  Yes, you may approach.

3            **MS. AGNOLUCCI:**  I'm sorry, Your Honor.

4            **THE COURT:**  All right.  Would you remind the witness

5    exactly what he is trying to refresh his memory on?

6            **MS. AGNOLUCCI:**  Yes, Your Honor.

7    **Q.**    Does that document refresh your memory about the date of

8    your first meeting with FBI agents and prosecutors?

9    **A.**    Yes, that's the first meeting.  Yeah, that's true.  That's

10   late -- June 22nd, yeah.

11   **Q.**    And that was in June 2011?  That was before Mr. Liew's

12   arrest in July 2011; right?

13   **A.**    July.  Okay.

14   **Q.**    Do you recall during that meeting talking to the FBI and

15   the prosecutors about this April 11th conversation with

16   Mr. Liew?

17   **A.**    Yes.

18   **Q.**    And do you recall telling the FBI that the conversation

19   was about Huping Luo, Steve Song, and Charlie Chee?

20           **MR. HEMANN:**  Objection, Your Honor.

21           **THE COURT:**  Sustained.

22   **BY MS. AGNOLUCCI:**

23   **Q.**    Do you recall telling the FBI that Mr. Liew had told

24   you --

25           **MR. HEMANN:**  Your Honor, objection as to the form of

LIU - CROSS / AGNOLUCCI

1    the question.

2          **THE COURT:**  Sustained.

3    **BY MS. AGNOLUCCI:**

4    **Q.**   You recall talking to the FBI about the April 11th

5    conversation with Mr. Liew; right?

6    **A.**   Yes.

7    **Q.**   During that first meeting with the FBI, you didn't mention

8    that Mr. Liew was talking to you about Mr. Maegerle and

9    Mr. Spitler, did you?

10   **A.**   I don't remember that detail.

11   **Q.**   Would it refresh your memory to look at a document?  Just

12   answer "yes" or "no" if it might help, before you look at the

13   document.

14   **A.**   I think I -- could you repeat that question again, please?

15   **Q.**   Yes.  What I'm asking is whether it might help you

16   remember if you looked at a document.

17   **A.**   Remember the question itself again.  Sorry.

18   **Q.**   Would it help you remember whether you told the FBI that

19   the April 11th conversation was about Mr. Maegerle and

20   Mr. Spitler?

21   **A.**   I think during the conversation, mentioned those two names

22   too, yeah.

23   **Q.**   In June of 2011 you did not mention Mr. Spitler or

24   Mr. Maegerle to the FBI, did you?

25          **MR. HEMANN:**  Objection, Your Honor.

1          **THE COURT:**  Sustained.

2     **BY MS. AGNOLUCCI:**

3     **Q.**  Do you remember a second meeting that you had with the

4     FBI, Mr. Liu?

5     **A.**  Yes.

6     **Q.**  And do you remember in that second meeting also discussing

7     the April 11th conversation with Mr. Liew?

8     **A.**  Yes.

9     **Q.**  And do you recall that the FBI questioned you again about

10    that April 2011 conversation?

11    **A.**  I cannot recall detail.  Might be, yes.  Yeah, but I

12    cannot really remember.

13    **Q.**  Would it help you to remember to look at a document?

14    **A.**  Yeah, sure.

15          **MS. AGNOLUCCI:**  Your Honor, may I approach the

16    witness, please?

17          **THE COURT:**  Yes.

18    **BY MS. AGNOLUCCI:**

19    **Q.**  Do you now remember whether you specifically mentioned

20    Mr. Maegerle and Mr. Spitler during that second conversation

21    with the FBI?

22    **A.**  Might be similar to this.  Probably all repeated the

23    questions from the FBI, so I answered them like the previous

24    one, yes.

25    **Q.**  You told the FBI that you had a conversation with Mr. Liew

**LIU - CROSS / AGNOLUCCI**

1   in April of 2011; right?

2   **A.**   Yes.

3   **Q.**   You did not tell the FBI that that conversation was about

4   Mr. Maegerle or Mr. Spitler; right?

5           **MR. HEMANN:**  Objection, Your Honor.

6           **THE COURT:**  Sustained.

7   **BY MS. AGNOLUCCI:**

8   **Q.**   Do you remember a third meeting with the FBI in August

9   after Mr. Liew had been arrested?

10  **A.**   Yes.

11  **Q.**   And in that third meeting did you again talk about this

12  April 11th conversation?

13  **A.**   I think similar.  I don't know if it's a document -- if

14  you can show me document, it might be the same question I ask

15  again and told again.

16          **MS. AGNOLUCCI:**  Your Honor, may I approach the witness

17  with a document?

18          **THE COURT:**  Yes, you may.

19          **MS. AGNOLUCCI:**  Thank you.

20          **THE COURT:**  Does it have a number?

21          **MS. AGNOLUCCI:**  I'm looking for the number.

22          **THE COURT:**  All right.

23                    (Pause in proceedings.)

24  **BY MS. AGNOLUCCI:**

25  **Q.**   So you do remember this August 2011 meeting; right?

LIU - CROSS / AGNOLUCCI

1    **A.**    Yeah.  That was a short meeting, actually.

2    **Q.**    You were shopping?

3    **A.**    Short meeting.

4          **THE COURT:**  He said "short meeting."

5          **MS. AGNOLUCCI:**  It was a short meeting.  Okay.

6    **Q.**    And you recall that the April 11th conversation with

7    Mr. Liew came up during that meeting?

8    **A.**    I think I cannot really recall that because they asked me

9    a few times, yes.

10   **Q.**    They asked you about it a few times?

11   **A.**    Yeah, because that question was asked.

12   **Q.**    And by the time they asked you about it in August of 2011,

13   isn't it true that you then, for the first time, mentioned

14   Mr. Maegerle and Mr. Spitler?

15   **A.**    I could be wrong, but I think first meeting I already

16   mentioned, you know, because --

17   **Q.**    You just said you could be wrong?

18   **A.**    I could be wrong.

19   **Q.**    You could be wrong.  So you're not sure --

20   **A.**    There's so many things --

21   **Q.**    You're not sure --

22          **MR. HEMANN:**  Your Honor --

23          **THE COURT:**  Whoa.  Whoa.  Whoa.  Finish your answer.

24   You could be wrong but what?

25          **THE WITNESS:**  Which meeting I reported, you know.  I

1   probably, at the first meeting, already reported -- reported

2   Tim and Bob, I think.

3   BY MS. AGNOLUCCI:

4   Q.   You could be wrong.  You're not sure when you first told

5   the FBI --

6   A.   Either first or second.  I think probably I -- I think it

7   was first meeting.  I don't know exactly recall or not.  First

8   meeting because we're talking about, you know, again, you see

9   white people, and I said no, you know.  So I think I pointed at

10  Tim and Bob, yes.

11  Q.   Right.  What I'm asking you is something different.  I'm

12  asking you about the April 11th conversation with Mr. Liew, and

13  you said you're not sure when you first told the FBI that that

14  April 11th conversation was about Mr. Maegerle and Mr. Spitler;

15  right?  You don't know if that came up in the first meeting or

16  the second meeting or the third meeting?

17          MR. HEMANN:  Objection.  Compound.

18          THE COURT:  Sustained.

19  BY MS. AGNOLUCCI:

20  Q.   Is it correct that you don't recall when you first told

21  the FBI about Mr. Maegerle and Mr. Spitler?

22  A.   I cannot remember.  Between those three meetings, I think

23  I probably asked at almost probably every meeting.

24  Q.   But you say you can't remember now when you first told the

25  FBI?

LIU - CROSS / AGNOLUCCI

 1   **A.**   Yes, I -- the impression is only third time I met the FBI

 2   that I pointed out Bob and Tim.  But my recollection was not.

 3   Probably first time I already did.

 4   **Q.**   By that last meeting with the FBI in August, Mr. Liew had

 5   been arrested; right?

 6   **A.**   Yes.

 7   **Q.**   And his home and his office had been torn apart; right?

 8          **MR. HEMANN:**  Objection, Your Honor.

 9          **THE COURT:**  Sustained.

10   **BY MS. AGNOLUCCI:**

11   **Q.**   His home had been searched; correct?

12   **A.**   I was been told, yes.

13   **Q.**   And you understood that his office also had been searched?

14   **A.**   I was been told, yes.

15   **Q.**   Were you concerned that the same thing could happen to you

16   and your family?

17   **A.**   No.

18   **Q.**   You had no concern that you or your family might get in

19   trouble?

20   **A.**   I put -- because I reviewed all my work I did, I pretty

21   much open to whatever, you know, things happen, because they

22   could go to my house, do the same thing, but I not really

23   afraid because I know what I did.

24   **Q.**   Did you have any concern about being deported?

25   **A.**   Yes.

1  Q.   And that was because you were a noncitizen who had lived

2  in the U.S. for less than five years; right?

3  A.   That's true.

4  Q.   So certain criminal convictions would have resulted in

5  your deportation; right?

6  A.   That's true.

7  Q.   That was a concern; fair?

8  A.   Yes.

9  Q.   Let's go back to that April 11th conversation where

10  Mr. Liew told you that you didn't need to talk to DuPont

11  investigators.

12       Isn't it true that you weren't required to talk to

13  Mr. Jubb or to anyone from DuPont if you didn't want to?

14  A.   That's true.

15  Q.   You had a right to not let them into your house?

16  A.   That's true.

17  Q.   And you had the right to refuse to meet with them?

18  A.   That's true.

19  Q.   Mr. Liew was informing you of that right; isn't that true?

20  A.   That's true.

21  Q.   And at that time a civil suit had been filed against you,

22  and you had retained a lawyer; right?

23  A.   Yes.

24  Q.   And it was good advice, wasn't it, to let the lawyers

25  handle the conversations with DuPont; right?

1    **A.**    That's true.

2    **Q.**    That's what depositions and discovery are for; right?

3    **A.**    That's true.

4    **Q.**    Isn't it true that Mr. Liew told you, "This is America,

5    and you are not required to talk to anyone if you don't want

6    to"?

7              **MR. HEMANN:**  Objection.

8              **THE COURT:**  Sustained.

9    **BY MS. AGNOLUCCI:**

10   **Q.**    Do you recall Mr. Liew telling you, "This is America and

11   you don't have to talk to anyone"?

12             **MR. HEMANN:**  Objection.

13             **THE COURT:**  Overruled.

14             **THE WITNESS:**  Yes.  Yes.

15   **BY MS. AGNOLUCCI:**

16   **Q.**    You do recall him saying that to you?

17   **A.**    Yes.

18   **Q.**    And he was right, wasn't he, that this is America and that

19   you don't have to talk to anyone you don't want to?

20             **MR. HEMANN:**  Objection, Your Honor.

21             **THE COURT:**  Sustained.

22   **BY MS. AGNOLUCCI:**

23   **Q.**    Isn't it also true that Mr. Liew was concerned that the

24   civil lawsuit would cause problems for you and your family?

25   **A.**    That's true.

LIU - CROSS / AGNOLUCCI

1   **Q.**   He was worried for your well-being; right?

2   **A.**   That's true.

3   **Q.**   He was a friend?

4   **A.**   Yes.

5   **Q.**   And you were worried, too; right?

6   **A.**   Yes.

7   **Q.**   As a result of the anonymous letter and the Chevron

8   investigation and the DuPont lawsuit, you and your wife

9   eventually lost your jobs; right?

10  **A.**   That's true.

11  **Q.**   And you had to sell your house to pay your legal fees?

12  **A.**   Yes.

13  **Q.**   DuPont's investigation brought financial ruin to your

14  family; is that fair?

15          **MR. HEMANN:**  Objection.

16          **THE COURT:**  Sustained.

17          **MR. HEMANN:**  Thank you.

18          **THE COURT:**  Sustained.

19  **BY MS. AGNOLUCCI:**

20  **Q.**   How did DuPont's investigation impact your family

21  financially?

22  **A.**   It was very devastating, yes.

23  **Q.**   It was devastating?

24  **A.**   Devastating, yeah.

25  **Q.**   Mr. Liew was right, wasn't he, when he said that the

 1  lawsuit would be bad for your family?

 2          **MR. HEMANN:**  Objection.

 3          **THE COURT:**  Sustained.

 4  **BY MS. AGNOLUCCI:**

 5  **Q.**   Now, for some time after this conversation with Mr. Liew,

 6  you wanted to take a job for USAPTI, didn't you?

 7  **A.**   Yes.

 8  **Q.**   And you also wanted your wife to work for USAPTI?

 9  **A.**   Yes.

10  **Q.**   Both of you were considering going to work for Mr. Liew

11  almost two months after the civil lawsuit and well after this

12  conversation; right?

13  **A.**   Uh-huh.  Yes.

14  **Q.**   Isn't it true that well after this conversation, you

15  continued to maintain that you knew of nothing implicating

16  Mr. Liew in any wrongdoing?

17  **A.**   That's true.

18  **Q.**   Including this conversation?

19  **A.**   That's true.

20  **Q.**   In fact, do you remember being very happy that Mr. Liew

21  understood your family situation?

22  **A.**   I kind of am neutral on that, yeah.

23  **Q.**   You don't recall?

24  **A.**   I don't think I either happy or not happy, I would say.

25          **MS. AGNOLUCCI:**  Your Honor, may we have a sidebar

1    about the matter that we were discussing earlier?

2           THE COURT:  Sure.

3           MS. AGNOLUCCI:  Thank you.

4        (The following proceedings were heard at the sidebar:)

5           MS. AGNOLUCCI:  Your Honor, there's really only one

6    email at issue now.  It says here, "I'm glad that Walter" --

7           THE COURT:  For the record you're showing me

8    Exhibit 349.

9           MS. AGNOLUCCI:  Yes, I'm sorry.  Exhibit 349 and

10   particularly the top portion where it says, "I'm glad that

11   Walter understood my family situation."

12          THE COURT:  "And his lawyer is going to cooperate with

13   us.  I hope DuPont also understands that I have nothing to do

14   with them as regards Jian."

15          MS. AGNOLUCCI:  And the piece that says, "I'm glad

16   Walter understood my family situation" is needed to

17   cross-examine him on what he just said, which was he didn't

18   know whether he was glad or not.

19          THE COURT:  Why is it relevant whether he was glad or

20   sad or shocked or what?

21          MS. AGNOLUCCI:  It's directly relevant to the

22   Government's obstruction charges.  The Government is saying

23   that Walter, Mr. Liew, was trying to obstruct justice by

24   intimidating this man into saying or not saying things with

25   this, you know, sort of New Jersey style threat of, you know,

 1   it's not going to be good for you and your family.  And he says

 2   here, "I'm glad Walter understood my family situation."

 3          THE COURT:  All right.  Mr. Hemann?

 4          MR. HEMANN:  I don't think his happiness or lack of

 5   happiness is relevant.  I think he's testified as to the

 6   subject matter of this, and specifically he said that he went

 7   back and looked for a job that he felt comfortable, both on

 8   direct and cross, going back to Walter Liew and particularly

 9   Christina Liew and asking for a job because he was having

10   financial trouble.

11          MS. AGNOLUCCI:  Well, but the obstructive -- the

12   obstructive comment is it wouldn't be good for you or your

13   family, and this is directly relevant to whether he thought

14   that that was --

15          MR. HEMANN:  What's the date of this, Your Honor?

16          THE COURT:  The date of this is April 14th.

17          MS. AGNOLUCCI:  After the conversation.  So --

18          THE COURT:  Let me ask Ms. McNamara.

19          MS. McNAMARA:  It's still privileged, Your Honor, and

20   we don't waive it.

21          THE COURT:  Okay.  All right.

22      Well, I think there are other ways to establish the

23   issue -- the point that you're trying to make about whether

24   this witness felt intimidated, what the impact of the alleged

25   statement by Mr. Liew was.

**LIU - CROSS / AGNOLUCCI**

1        But the fact that he's glad that Walter understood his

2  family situation cuts both ways.  Maybe he understands the

3  family situation, that the family is vulnerable.  So I think

4  this cuts both ways.

5        I don't think this is -- not allowing this in is going to

6  interfere with your ability to test whether this witness was

7  actually intimidated or took actions or refrained from taking

8  actions, official action, in this investigation based upon the

9  comments that were allegedly made by Mr. Liew.

10       So I'm going to sustain the objection.

11         **MS. AGNOLUCCI:**  Thank you, Your Honor.

12       (The following proceedings were heard in open court:)

13         **THE COURT:**  You may continue.

14         **MS. AGNOLUCCI:**  May I proceed, Your Honor?

15         **THE COURT:**  Yes, you may.

16  **BY MS. AGNOLUCCI:**

17  **Q.**   You testified earlier regarding a July 2010 meeting you

18  attended with USAPTI and Pangang, the Chinese customers.

19  **A.**   Yes.

20  **Q.**   At that meeting do you recall that the customers were not

21  satisfied with USAPTI's work product?

22  **A.**   That's true.

23  **Q.**   And do you recall that at one point Pangang was

24  withholding payments from Mr. Liew?

25  **A.**   Yes.  I later was told, yes.

LIU - CROSS / AGNOLUCCI

1    Q.   Were you told that Mr. Liew was stressed about being able

2    to collect payments from his Chinese customers?

3              MR. HEMANN:  Objection.

4              THE COURT:  Sustained.

5    BY MS. AGNOLUCCI:

6    Q.   Did you observe Mr. Liew's response to not being able to

7    collect payments from his Chinese customers?

8    A.   Yeah.  I think that he -- he or Walter's wife, Christina,

9    told me that.  It was after that meeting, I left; then later I

10   was being told by either -- I forgot -- that they tried to

11   withhold the payment, yes.

12   Q.   Christina told you that Pangang was trying to withhold

13   payments?

14   A.   Yeah.  Might be Christina, yeah.

15   Q.   You testified that you recalled telling DuPont that you

16   thought Mr. Liew knew quite a lot; right?

17   A.   Yes.

18   Q.   Do you recall telling the FBI and the prosecutors in this

19   case that you thought he was a good engineer?

20   A.   That's true.

21   Q.   And that he was a smart man?

22   A.   That's true.

23   Q.   Do you recall saying that his wife, Christina, was the one

24   who handled the financial aspects of the business?

25   A.   I believe so, yes.

**LIU - CROSS / AGNOLUCCI**

1    **Q.**    She handled all of the paychecks?

2    **A.**    To my side, yes.

3    **Q.**    And do you recall that at some point after you first met

4    with Chevron but before the civil suit, you and Christina Liew

5    discussed forming a new venture?

6    **A.**    I think, yes, coming to my house, yes.

7    **Q.**    She came to your house?

8    **A.**    Yeah, to discuss that.

9    **Q.**    She came by herself; right?

10   **A.**    Might be both, but I think she was there, yeah.  I think

11   both at my house.  I cannot recall.

12   **Q.**    Do you recall that this conversation was with Christina

13   Liew?

14   **A.**    Yes, that's true.

15   **Q.**    And it was sometime in early April?

16   **A.**    Yes.

17   **Q.**    Do you recall that she suggested starting a new company

18   called Advanced Engineering?

19   **A.**    Yes.

20   **Q.**    And do you recall that the company would be co-owned by

21   her sister-in-law?

22   **A.**    Yes.

23   **Q.**    The wife of her brother?

24   **A.**    Yes.

25   **Q.**    And do you remember if that person was named Li Rue?

1   **A.**   I don't remember the name.

2   **Q.**   And do you remember if Walter Liew said anything to you

3   about this new venture?

4   **A.**   It's really simple description as engineer work, basically

5   similar work for engineering.

6   **Q.**   And did Christina mention to you that her sister-in-law

7   and her brother had previously loaned money to USAPTI to help

8   start it up?

9           **MR. HEMANN:**  Objection.

10          **THE COURT:**  Sustained.

11          **MS. AGNOLUCCI:**  I have no further questions,

12  Your Honor.

13          **THE COURT:**  Thank you.

14          **MS. AGNOLUCCI:**  Thank you.

15      Thank you, Mr. Liu.

16          **THE COURT:**  Mr. Froelich?

17      **MR. FROELICH:**  I have nothing, Your Honor.

18          **THE COURT:**  Thank you, Mr. Froelich.

19      **MR. HEMANN:**  I can go pretty quickly, Your Honor.

20          **THE COURT:**  Okay.

21      **MR. HEMANN:**  I don't know when the Court wants to --

22          **THE COURT:**  Well, yeah, it's quarter to 12:00, so --

23          **MR. HEMANN:**  I probably can go ten minutes, but if you

24  want to take --

25          **THE COURT:**  Let's take a break because I don't want to

1  go past the break time.

2     All right.  We're going to take our second and last

3  15-minute break.  Remember the Court's usual admonitions, and

4  I'll see you in 15 minutes.

5     (Proceedings were heard out of the presence of the jury:)

6         **THE COURT:**  All right.  15 minutes.

7         **MR. HEMANN:**  Thank you, Your Honor.

8                 (Recess taken at 11:42 a.m.)

9     (Proceedings were heard out of the presence of the jury:)

10        **THE COURT:**  Please bring in the jury.

11    (Proceedings were heard in the presence of the jury:)

12        **THE COURT:**  Please be seated, everybody.

13    And you may conduct your redirect examination, Mr. Hemann.

14        **MR. HEMANN:**  Yes.  Thank you, Your Honor.

15                  <u>**REDIRECT EXAMINATION**</u>

16  **BY MR. HEMANN:**

17  **Q.**  I'm going to ask you some questions, Mr. Liu, about some

18  things that you testified to on cross-examination.  Okay?

19  **A.**  Okay.

20  **Q.**  Ms. Agnolucci asked you some questions about finding

21  mistakes in the material balance process.  Do you remember

22  that?

23  **A.**  Yes.

24  **Q.**  And you testified that you were able to identify those

25  mistakes as a result of your engineering experience; correct?

**LIU - REDIRECT / HEMANN**

1    **A.**   Yes.

2    **Q.**   Can you just tell the jury, very briefly, what the

3    material balance process is?

4    **A.**   Material balance is also called a mass balance.  It's mass

5    cannot be created or destroyed if a mass is already there.   So

6    PFD contents called material balance means all those should add

7    up to plus and minus ends at the zero balance.  At the same

8    time engineer would often -- often engineer is sometimes doing

9    some calculations; they cannot balance that because of mistake.

10   Those mistake should be checked.

11   **Q.**   How did you -- did you learn about how to balance -- do

12   material balancing?  Are those general chemical engineering

13   principles or are they specialized to titanium dioxide?

14   **A.**   It is general.  I think all engineers shall do -- process

15   engineer, specifically should always watch out the material

16   balance.

17   **Q.**   Move that microphone just --

18   **A.**   Oh, yeah.

19   **Q.**   Thank you.

20        And in identifying those mistakes, did you draw upon

21   general engineering principles or something specific to TiO2?

22   **A.**   General.

23   **Q.**   Were there things about the TiO2 process that you did not

24   know?

25   **A.**   No.

**LIU - REDIRECT / HEMANN**

1  **Q.**   Were there things that you -- when you start -- did you

2  know everything about TiO2 or were --

3  **A.**   No.

4  **Q.**   -- there things that you didn't know?

5  **A.**   I don't know.  Basically, it's apply engineer rules to

6  check material balance, yes.

7  **Q.**   So you were applying general engineering rules to --

8  **A.**   Yes.

9  **Q.**   -- things specific to TiO2?

10  **A.**   Right.

11  **Q.**   Were there things about the TiO2 process that you did not

12  know?

13  **A.**   I think by that time, you don't need to know process

14  because as long as they can find there's mistakes, especially

15  material balance applied to any process.

16  **Q.**   Is there something earlier in the design process that you

17  do need to know something about TiO2?

18  **A.**   Yes.

19  **Q.**   What is that?  Give us some examples, please.

20  **A.**   Well, when you design a brand new plant, you should at

21  least have a deep knowledge that you can design a new process.

22  **Q.**   And did you have that kind of deep knowledge?

23  **A.**   No.

24  **Q.**   Ms. Agnolucci asked you some questions about looking at

25  the designs, the USAPTI designs.  Do you remember that?

**LIU - REDIRECT / HEMANN**

1   A.   Yeah.

2   Q.   And you said that you looked at many of them?

3   A.   Yes.

4   Q.   And that you didn't see anything wrong with them; correct?

5   A.   Correct.

6   Q.   Other than USAPTI designs for titanium dioxide factories,

7   have you ever seen any other designs?

8   A.   No.

9   Q.   Had you ever seen any -- had you seen DuPont designs?

10  A.   No.

11  Q.   Had you seen Tronox designs?

12  A.   No.  That's first time I heard that name.

13  Q.   Did you have anything to compare the USAPTI designs to?

14  A.   No.

15  Q.   Do you remember Ms. Agnolucci asked you some questions

16  about Mr. Jubb from DuPont?

17  A.   Yes.

18  Q.   When Mr. Jubb was at your house, did your wife talk to him

19  at all?

20  A.   No.

21  Q.   Were you -- was Mr. Jubb there with anybody else or was he

22  by himself?

23  A.   By himself.

24  Q.   Did he yell at you during the interview?

25  A.   No.

**LIU - REDIRECT / HEMANN**

1  **Q.**   Did he threaten you during the interview?

2  **A.**   No.

3  **Q.**   Ms. Agnolucci asked you about a document that Mr. Liew

4  brought to your house the next day, the letter to Chevron.  Do

5  you remember that?

6  **A.**   Yes.

7  **Q.**   And she asked you whether Mr. Liew helped you write that

8  document.  Do you remember that?

9  **A.**   Yes.

10  **Q.**   Did Mr. Liew help you write it or did he write it himself?

11  **A.**   I think -- I cannot recall because that night too many

12  things happened.  I don't think I ask him for -- for that.  I

13  don't think I asked for write anything; otherwise, I will

14  submit it to Chevron, otherwise.

15  **Q.**   So you don't believe that you asked Mr. Liew for the

16  letter?

17  **A.**   I don't believe I did, no.  Otherwise, I would definitely

18  have submitted that, yeah.

19  **Q.**   Ms. Agnolucci asked you several questions about the

20  anonymous letter that's mentioned in the Complaint.  Do you

21  remember that?

22  **A.**   Yes.

23  **Q.**   Have you ever seen the anonymous letter?

24  **A.**   As far as what, I don't know that detail accused for what.

25  No, I haven't.

LIU - REDIRECT / HEMANN

1   **Q.**   Do you know who wrote the anonymous letter?

2   **A.**   I don't know.

3   **Q.**   You testified on cross-examination quite a bit about

4   meetings in April of 2011 with Mr. Liew and Mrs. Liew.

5   Remember that?

6   **A.**   Yeah.  For the letter, you mean the purpose of the letter.

7   By that time, I haven't seen.

8   **Q.**   Let me -- all right.  Let me -- I'll go back and clarify.

9   **A.**   Okay.

10  **Q.**   So I'm going to ask you a couple of different questions.

11  Okay?

12  **A.**   Okay.

13  **Q.**   At the time of the Complaint and the lawsuit in April of

14  2011 --

15  **A.**   2011.

16  **Q.**   -- had you seen the anonymous letter at that time?

17  **A.**   No.  No.

18  **Q.**   And at that time, did you know who wrote it?

19  **A.**   No.

20  **Q.**   Today, do you know who wrote it?

21  **A.**   I don't know.

22  **Q.**   Now I'm going to ask you different questions.  Okay?

23  **A.**   Okay.

24  **Q.**   Different subject.

25       You testified about your memory about some meetings that

1   you had with Mr. Liew and Mrs. Liew in April of 2011.  Do you

2   remember that?

3   **A.**   Uh-huh.

4          **THE COURT:**  Is that a yes?

5   **BY MR. HEMANN:**

6   **Q.**   Yes?

7   **A.**   Yes.  Yes.

8   **Q.**   Sorry.  It's going fast.  So I'll just stop you and ask

9   you to say yes or no, please.  Okay?

10  **A.**   Uh-huh.

11  **Q.**   We looked at --

12         Ms. Mahoney, can you put up 687, page 2?  And expand the

13  top half of this, please.

14         And this is the note in Mr. Liew's handwriting.  Remember?

15  **A.**   Yes.

16  **Q.**   And do the notes here concern the subject of your meetings

17  in April of 2011?

18         **MS. AGNOLUCCI:**  Objection.

19         **THE COURT:**  Overruled.

20         **THE WITNESS:**  Yes.

21  **BY MR. HEMANN:**

22  **Q.**   And if you can look at Number 1 on the right side -- do

23  you see on the right side Number 1?

24  **A.**   Yes.

25  **Q.**   And what does that say?

1    **A.**    (Chinese spoken)  Means "old men."

2    **Q.**    And old men refers to whom?

3    **A.**    I think it refers to Tim and Bob.

4    **Q.**    Thank you.

5         Mr. Liu, you testified on cross-examination that you did

6    not have any concerns.  Do you remember that?

7    **A.**    Yes.

8    **Q.**    Mr. Liu, you threw away a document that you had received

9    from Walter Liew after the DuPont investigator came to your

10   house.  Do you remember that?

11   **A.**    That's true.

12   **Q.**    Why did you throw the document away if you weren't

13   concerned?

14   **A.**    Because at that time in my mind, first time I told

15   interviewer of both DuPont and Chevron I have no document and

16   nothing -- no document, you know, contains DuPont information.

17   So later I found that document at home, and first it's

18   inconsistent, and I tried to destroy that information.

19   **Q.**    And you -- go ahead.  I'm sorry.

20   **A.**    Yeah.  And also because I think the first thing is destroy

21   that; and secondly, I think I will say anything related to

22   DuPont, I don't really want to have at my house.  That's almost

23   a similar situation.

24   **Q.**    And you mentioned, Mr. Liu, in answer just now to my

25   question that you had lied to both Chevron and DuPont; correct?

LIU - REDIRECT / HEMANN

1   **A.**    That's true.

2   **Q.**    And did you have some concerns about telling them the

3   truth?

4   **A.**    At that time, yes.

5           **MR. HEMANN:**  Thank you, Your Honor.  No further

6   questions.

7           **THE COURT:**  Ms. Agnolucci, anything further?

8           **MS. AGNOLUCCI:**  Nothing, Your Honor.

9           **THE COURT:**  All right.  Very well.  You're -- and,

10  Mr. Froelich, I assume you don't have anything further?

11          **MR. FROELICH:**  Pardon me, Your Honor?  No.  I don't

12  have any recross.

13          **THE COURT:**  All right.  Thank you very much.  You're

14  excused, sir.  Thank you very much.

15                          (Witness excused.)

16          **THE COURT:**  Next witness.

17          **MR. SCOTT:**  Your Honor, the United States calls James

18  Jubb.

19                          (Pause in proceedings.)

20          **THE COURT:**  Please come forward to the witness stand,

21  sir.

22          **THE CLERK:**  Raise your right hand, please.

23                          **JAMES JUBB**,

24  called as a witness for the Government, having been duly sworn,

25  testified as follows:

JUBB - DIRECT / SCOTT

```
 1              THE WITNESS:  I do.

 2              THE CLERK:  Thank you.  Please be seated and state and

 3   spell your full name for the record.

 4              THE WITNESS:  James Thomas Jubb.  Last name spelling

 5   is J-U-B as in boy, B as in boy.

 6              THE CLERK:  Thank you.

 7              MR. SCOTT:  May I begin, Your Honor?

 8              THE COURT:  Yes.

 9                        DIRECT EXAMINATION

10   BY MR. SCOTT:

11   Q.   Good afternoon, Mr. Jubb.

12   A.   Good afternoon.

13   Q.   How are you currently employed?

14   A.   I'm employed by the DuPont Company as a corporate

15   investigator.

16   Q.   How long have you worked for DuPont?

17   A.   Since January of 2010.

18   Q.   And what's your title at DuPont?

19   A.   Corporate investigator/executive security officer.

20   Q.   And what are your responsibilities in that role?

21   A.   Under the corporate investigator, I investigate trade

22   secret theft, economic espionage cases, some of the heavier

23   felony theft cases from our sites; and I also provide

24   protection for our CEO.

25   Q.   Can you describe your work experience prior to starting
```

**JUBB - DIRECT / SCOTT**

1    with DuPont?

2    **A.**   I was 30 years law enforcement.  I worked for the

3    Wilmington Department of Police for 30 years.

4    **Q.**   Mr. Jubb, have you heard of a company called USAPTI?

5    **A.**   Yes, sir.  Yes, I have.

6    **Q.**   And when did you first hear about that company?

7    **A.**   In June of 2010.

8    **Q.**   And could you generally describe the circumstances in

9    which you heard the name of the company?

10   **A.**   I had been -- I went to a meeting with our DTD, which is

11   our DuPont titanium dioxide folks, and they were concerned

12   about someone possibly having our technology, and the name of

13   USAPTI came up in that meeting.

14   **Q.**   And did you subsequently begin an investigation related to

15   that information?

16   **A.**   Yes, I did.

17   **Q.**   And are you also aware of an anonymous letter received by

18   DuPont related to USAPTI?

19   **A.**   Yeah.  We received a letter in August of 2010 basically

20   telling us that USAPTI performance technology was brokering our

21   TiO2 technology in China and that it was involving a Walter

22   Liew and a Jian Liu.

23   **Q.**   And during the course of your investigation, did you speak

24   with the FBI?

25   **A.**   Yes, I did.

JUBB - DIRECT / SCOTT

1   Q.   And how often did you -- how many times did you speak with

2   the FBI?

3   A.   I'd have to say probably three or four times.

4   Q.   And you mentioned that the anonymous letter contained the

5   name Jian Liu?

6   A.   Yes.

7   Q.   Did you ever have an opportunity to speak with Jian Liu?

8   A.   Yes, I did.

9   Q.   When was that?

10  A.   It was March 30th of 2011.

11  Q.   And where did you speak with him?

12  A.   It was in his home in California.

13  Q.   And what time of day was it?

14  A.   It was 8:30 in the evening.

15  Q.   Did you knock on the door?

16  A.   Yes.

17  Q.   Who answered the door?

18  A.   It was a woman and a gentleman, who identified himself as

19  Jian Liu.

20  Q.   Were you invited in?

21  A.   Yes.

22  Q.   And where did you go when you went in the house?

23  A.   They invited me in, and they had me take a seat on the

24  couch in the living room.

25  Q.   And were there -- was there anyone else in the house

**JUBB - DIRECT / SCOTT**

1  besides the two people who greeted you at the door?

2  **A.**   There was obviously other individuals in the home at the

3  time.  It was clear to me they were probably in the kitchen

4  area and went to another room or something along those lines

5  when I entered the living room area.

6  **Q.**   Did you just -- did you have a discussion with Jian Liu in

7  the living room?

8  **A.**   Yes, I did.

9  **Q.**   And did you discuss the work Mr. Liu had done with USAPTI?

10  **A.**   Yes, I did.

11  **Q.**   And did you discuss any relationship to DuPont with that

12  work?

13  **A.**   Yes.  I basically -- I asked him what type of work he was

14  doing, were there any markings on the documents that he was

15  working on, or anything along those lines, that would indicate

16  that it was DuPont technology.

17  **Q.**   And what did you learn?

18       **MR. GASNER:**  Objection.  Hearsay.

19       **THE COURT:**  Sustained.

20  **BY MR. SCOTT:**

21  **Q.**   Did you discuss USAPTI projects related to China?

22  **A.**   Yes.

23  **Q.**   Did you ask questions about specific companies in China?

24  **A.**   Yes.

25  **Q.**   Did you ask about a company called Jinzhou?

JUBB - DIRECT / SCOTT

1   A.   Yes.

2   Q.   And do you recall -- did you learn any information about

3   Jinzhou?

4           MR. GASNER:  Same objection.

5           THE COURT:  Sustained.

6   BY MR. SCOTT:

7   Q.   How long did you speak with Mr. Liu?

8   A.   It was probably maybe 15, 20 minutes at the most.

9   Q.   And at some point the conversation came to an end?

10  A.   Yes, it came to a very abrupt end.

11  Q.   How did the conversation come to an end?

12  A.   I was talking to Jian, and I was asking him some pretty

13  specific detail questions, and the female that had come to the

14  door when I arrived originally and basically identified

15  themselves as Jian Liu's wife, came in and basically

16  interrupted and started having a conversation with Jian Liu in

17  what I believe to be Mandarin Chinese.

18  Q.   Do you speak Mandarin Chinese?

19  A.   No, I do not.

20  Q.   And did you -- after that conversation, did you speak with

21  the female?

22  A.   I never got the opportunity to speak to her, no.

23  Q.   Did you subsequently speak to Jian Liu?

24  A.   Yes.  I was just trying to understand -- you know, tell

25  him that, you know, I really needed to talk to him.  You know,

**JUBB - DIRECT / SCOTT**

1    I'm coming back to California.  I provided him with my business

2    card, and told him that if he would like to talk to me, to

3    please give me a call and I would make arrangements to have a

4    further conversation with him.

5    **Q.**    And did you subsequently leave the residence?

6    **A.**    Yes.

7    **Q.**    And I'm sorry.  You said you provided a business card?

8    **A.**    Yes.

9    **Q.**    Did you ever have another opportunity to speak with Jian

10   Liu?

11   **A.**    Yes.

12   **Q.**    When was that?

13   **A.**    That was on the 25th of April.

14   **Q.**    And where was that meeting?

15   **A.**    That was at his -- it was here in California, and it was

16   at an attorney's office.

17   **Q.**    And was that meeting set up by Mr. Jian Liu's attorney?

18   **A.**    Yes, that is correct.

19   **Q.**    In the course of your investigation, did you also have an

20   opportunity to speak with Walter Liew?

21   **A.**    Yes, I did.

22   **Q.**    And when was that?

23   **A.**    It was on the 26th of April.

24   **Q.**    And where did that meeting take place?

25   **A.**    It occurred at an attorney's office here in California.

JUBB - DIRECT / SCOTT

1   Q.   And was that Walter Liew's attorney?

2   A.   That was at the request of his attorney's office, yes.

3   Q.   Do you know who set up the meeting?

4   A.   It was his attorney that made the request.

5   Q.   And who was present at that meeting?

6   A.   It was myself; Steve Taylor from DuPont; Clark Collins,

7   who was an attorney representing DuPont; and Walter's two

8   attorneys.

9            MR. SCOTT:  Your Honor, may I have one moment?

10           THE COURT:  Sure.

11                (Pause in proceedings.)

12  BY MR. SCOTT:

13  Q.   I'll take a quick step back to where we were.

14       In Mr. Liu's house, you said there was a female who spoke

15  to him in Mandarin Chinese?

16  A.   Yes.

17  Q.   And she opened the door with him when you knocked on the

18  door?

19  A.   Yes.

20  Q.   And you understood that to be his wife?

21  A.   Yes.

22  Q.   And have you seen that person since that day?

23  A.   Yes.

24  Q.   And do you see that person right now?

25  A.   Yes.

JUBB - DIRECT / SCOTT

1  Q.   Could you --

2  A.   It's the individual, second row, with the looks like a

3  black-and-gray tweed jacket with her hair pulled up into a bun.

4  Q.   In the gallery?

5  A.   Yes.

6  Q.   Thank you.

7       Back to where we were, which was a meeting with Walter

8  Liew and his attorneys -- and his attorney.  Excuse me.

9  A.   Yes.

10 Q.   And you were present as well as two other individuals; one

11 an employee of DuPont, another an attorney for DuPont?

12 A.   That is correct.

13 Q.   To your understanding, was there an issue with your being

14 present at the meeting?

15 A.   Yes.

16 Q.   And what was that?

17 A.   The attorneys for Walter basically said that they objected

18 to me being present for the interview of Walter.

19 Q.   And did you subsequently work through that issue?

20 A.   They worked through and decided that I would be there for

21 the interview.

22 Q.   And did Walter Liew subsequently appear for the meeting?

23 A.   Yes.

24 Q.   And can you describe the meeting?  Was it a

25 question-and-answer session?  How did it work?

**JUBB - DIRECT / SCOTT**

1  **A.**   Well, the way it kind of started out was Walter came in

2  and took a seat and just, basically, proceeded to start telling

3  us about himself and his work with the TiO2 business.

4       Eventually we were able to start asking some questions,

5  but it just seemed that once the questioning started to get to

6  specifics and particulars, the interview was ended and they

7  said that Walter had to leave.

8  **Q.**   During -- when Mr. Liew began talking, did he discuss his

9  educational background?

10  **A.**   Yes, he did.

11  **Q.**   What did he tell you?

12  **A.**   He said that he had a Ph.D. in electrical engineering from

13  Stanford University.

14  **Q.**   Did he make any statements as to his engineering

15  capabilities?

16  **A.**   He basically talked about his experience with TiO2 and how

17  he could, if he wanted to, pretty much create a TiO2 from front

18  to back.

19  **Q.**   Did he tell you how long he'd been working with TiO2?

20  **A.**   He indicated that he was working on that from the late

21  1990s.

22  **Q.**   Did he make any statements regarding USAPTI's use of

23  DuPont technology?

24  **A.**   He came right out and said, "You know, if I was going to

25  use DuPont technology, I wouldn't have hired Chevron employees.

**JUBB - DIRECT / SCOTT**

1    I would have hired former DuPont employees or DuPont

2    employees."

3    **Q.**   At some point in the meeting, were questions posed by the

4    representatives from DuPont to Mr. Liew?

5    **A.**   Yes.

6    **Q.**   And who posed those questions?

7    **A.**   Steven Taylor was the engineer for DuPont.  He posed some

8    of the questions.

9    **Q.**   And what was the subject matter of his inquiry?

10   **A.**   It was based on some schematics that we came across, and

11   it was basically based on the chlorinator.  And he basically

12   said that the schematics he had for the chlorinator, he got

13   from a website.

14   **Q.**   And were there follow-up questions asked?

15   **A.**   After that question, that kind of ended the interview, and

16   that's when Walter supposedly had to leave.

17   **Q.**   So how long do you think the entire discussion took?

18   **A.**   We were there for a while, but it was more along the lines

19   of whether or not I was going to be there for the interview or

20   anything along those lines.  The interview itself was maybe 15,

21   20 minutes at the most.

22   **Q.**   Did Walter Liew mention the name Bob Maegerle during the

23   interview?

24   **A.**   No, he did not.

25   **Q.**   Did he mention the name Tim Spitler?

**JUBB - DIRECT / SCOTT**

1   **A.**   No, he did not.

2   **Q.**   Did he tell you he was in possession of DuPont flow

3   sheets?

4   **A.**   No, he did not.

5   **Q.**   Did he tell you he was in possession of DuPont Basic Data

6   information?

7   **A.**   No, he did not.

8   **Q.**   Did he mention that he was in possession of any DuPont

9   proprietary information?

10   **A.**   No, he did not.

11   **Q.**   Mr. Jubb, during your investigation did you also interview

12   former USAPTI employees?

13   **A.**   Yes, I did.

14   **Q.**   And where did you meet with them?

15   **A.**   Some asked to meet me at certain locations that they felt

16   comfortable to talk to me at.  Some of them I met at their new

17   work positions.  Some I met at their homes.

18   **Q.**   Were any of the interviews we've discussed conducted at

19   the behest of the FBI?

20   **A.**   No.

21   **Q.**   Did you subsequently meet with the FBI in California?

22   **A.**   Yes.

23   **Q.**   When was that, approximately?

24   **A.**   It was the middle of April 2011.

25   **Q.**   And to your understanding, did the FBI open a case related

1  to USAPTI and Walter Liew?

2  **A.**   Yes.  At that date they informed me that they would be

3  adopting a case.

4  **Q.**   Did you continue to conduct an internal investigation at

5  DuPont related to these matters?

6  **A.**   Within DuPont I did, yes.

7  **Q.**   And do you continue to work on matters related to USAPTI

8  and Walter Liew?

9  **A.**   Not at this moment, no.

10        **MR. SCOTT:**  One moment.

11                    (Pause in proceedings.)

12        **MR. SCOTT:**  Your Honor, that's all I have.

13        **THE COURT:**  Thank you.

14     Mr. Gasner?

15        **MR. GASNER:**  Thank you, Your Honor.

16                   <u>CROSS-EXAMINATION</u>

17  BY MR. GASNER:

18  **Q.**   Good afternoon, Mr. Jubb.

19  **A.**   Good afternoon, sir.

20  **Q.**   I'm Stuart Gasner.  I represent Walter Liew and USAPTI.

21     You mentioned that you spent about 30 years with the

22  Wilmington police force; is that right?

23  **A.**   Yes, sir.

24  **Q.**   Before you went to DuPont, what was the highest rank you

25  achieved?

JUBB - CROSS / GASNER

1    **A.**    Captain.

2    **Q.**    Is captain the highest rank in the --

3    **A.**    No, sir.

4    **Q.**    There's the police chief above you?

5    **A.**    There's the police chief and an inspector's position.

6    **Q.**    And those are individuals, one inspector and one police

7    chief?

8    **A.**    Two inspectors and a chief.

9    **Q.**    But other than those top officers, captain is the highest

10   ranking police officer; true?

11   **A.**    Yes, sir.

12   **Q.**    And when you --

13           **THE COURT:**  All right, sir.  Wait until he finishes

14   the question until you answer.  You're kind of jumping on his.

15           **THE WITNESS:**  Yes, Your Honor.

16           **THE COURT:**  Thank you very much.

17   **BY MR. GASNER:**

18   **Q.**    In fact, you were a commanding officer in the criminal

19   investigations division for many years; true?

20   **A.**    That is correct.

21   **Q.**    So you conducted many, many interviews in that capacity;

22   right?

23   **A.**    Yes.

24   **Q.**    And supervised others in doing interviews; right?

25   **A.**    Yes, sir.

**JUBB - CROSS / GASNER**

1   **Q.**   Before that, you were a commanding officer in the Office

2   of Professional Standards for the Wilmington police force; is

3   that true?

4   **A.**   Yes, sir.

5   **Q.**   Is that like the internal investigator?  You investigate

6   police officers that are suspected of misconduct; is that true?

7   **A.**   Yes, sir.

8   **Q.**   You did that for about seven years; right?

9   **A.**   About four years, sir.

10  **Q.**   Okay.  And you graduated high school in 1975?

11  **A.**   Yes, sir.

12  **Q.**   Did you go straight into the police force?

13  **A.**   No.  I actually worked for a bank as a computer operator

14  prior to that.

15  **Q.**   During your rise to captain in the Wilmington police

16  force, what kinds of police work did you do?

17  **A.**   Obviously, I was hired as a patrolman.  I was in patrol

18  for probably about nine and a half years before I got into

19  investigative operations.  I was promoted to the rank of

20  sergeant, I believe, in 1992, promoted to lieutenant in 1994,

21  and promoted to captain in 1997.

22      As a sergeant, I was a patrol sergeant.  I was the

23  operational sergeant for the Drug, Organized Crime, and Vice

24  Division.  When I became a lieutenant, I took over as the

25  acting commanding officer of the Drug, Organized Crime, and

**JUBB - CROSS / GASNER**

1    Vice Division.

2        When I was promoted to captain, I took over the Office of

3    Professional Standards.  A lot of people pretty much know it as

4    the internal affairs.  And then after that, I was moved to the

5    commanding officer of the Criminal Investigations Division.

6    **Q.**   Is it fair to say you have a lot of experience in

7    investigating crimes and in police work?  True?

8    **A.**   Yes, sir.

9    **Q.**   You have also studied at the FBI Academy, have you not?

10   **A.**   Yes, sir.

11   **Q.**   And also the Secret Service Dignitary Security School is

12   another part of the training that you received?

13   **A.**   Well, as the commanding officer of the Criminal

14   Investigations Division, I was in charge of executive security

15   and more along the lines of dignitaries.  And obviously, when

16   Obama became president and Joe Biden was his vice president,

17   Joe Biden is from Delaware, so there was a lot of visits to

18   Delaware as a result of that.  So they sent me to the Secret

19   Service school.

20   **Q.**   In the course of your long police career, you learned

21   about what interrogation techniques are most effective, have

22   you not?

23   **A.**   Yes, sir.

24   **Q.**   Is it fair to say that you visited Jian Liu's, L-I-U,

25   house at 9:00 p.m. because you thought that would be an

1  advantageous time to surprise him with an interview?

2  **A.**   No, that would not be fair to say.  It was more along the

3  lines of a time line that I had to get some interviews done

4  before I had to fly back to Delaware.

5  **Q.**   Just a matter of scheduling, in your view?

6  **A.**   Yes, sir.

7  **Q.**   The fact that it would be late in the evening and he would

8  be home and more likely to be vulnerable was no part of your

9  thought process?

10  **A.**   No.  It was just more along the lines of him being there,

11  as well as -- I would not categorize it as an interrogation.

12  It was more of a desire to have an interview.

13  **Q.**   You mentioned, speaking of interviews, that you talked

14  with Mr. Liew on April 26 of 2011; is that right?

15  **A.**   Yes, sir.  April 25th, Mr. Liu.  March 30th the first time

16  and then April 25th the second time.

17        **THE COURT:**  Perhaps we can specify which since the

18  names are pronounced the same way.

19        **MR. GASNER:**  Yes.  Absolutely.

20        **THE WITNESS:**  I'm sorry.

21        **THE COURT:**  No, it's not your fault.

22        **MR. GASNER:**  Bad question.  My apologies, Your Honor.

23  **Q.**   I want to focus, well, first, on Jian Liu, L-I-U.  That's

24  who you're referring to.  You interviewed him on March 30.

25  That was the nighttime interview?

**JUBB - CROSS / GASNER**

1 **A.** Yes.

2 **Q.** And then there was another interview on April 26th, 2011,

3 at the offices of his attorney; right?

4 **A.** I believe it was April 25th.

5 **Q.** And the interview with Walter Liew, L-I-E-W, that was the

6 one that was the day after, on April 26th, 2011; true?

7 **A.** Yes, sir.

8 **Q.** All right.  Let's focus on the Walter Liew interview, if

9 we might.  That was kind of a contentious interview, wasn't it?

10 **A.** I wouldn't call it contentious.  I would -- because it was

11 clear to me that he didn't want me there, either his attorneys

12 or he didn't want me there for the interview.  So, really, I

13 didn't ask any questions.  I kind of decided that I would kind

14 of take a step back and just see how things unfolded.

15 **Q.** The context was this was an off -- an interview at the

16 offices of Mr. Liew's civil attorney who was representing him

17 in the civil case that DuPont had brought; right?

18 **A.** Yes, sir.

19 **Q.** That case had been brought on April 6, 2011, just a few

20 weeks before; true?

21 **A.** I believe it was around that date, yes.

22 **Q.** It was your understanding, was it not, that Mr. Liew's

23 civil attorney was hoping to have a meeting with attorneys from

24 DuPont that he might convince to drop the suit.  Is that a fair

25 sense of the context?

**JUBB - CROSS / GASNER**

1  **A.**   I couldn't speak to the state of mind of his attorneys and

2  what they wanted to accomplish from that meeting.  I think it

3  was just kind of to get a feel for what was going on type of

4  thing.

5  **Q.**   But the fact is that a large part of the meeting was spent

6  in a contentious discussion about your presence as a DuPont

7  security/former police officer being at what was supposed to be

8  just a settlement meeting; true?

9  **A.**   You used the word "contentious," and I'm not comfortable

10  with that.  And I understand where you're coming from.  I would

11  say it was just more along the lines of a concern, but not

12  contentious.

13  **Q.**   Isn't it true that the meeting had to be broken up so that

14  DuPont counsel could call the general counsel of DuPont?  Do

15  you remember that?

16  **A.**   That is correct.  Yes, sir.

17  **Q.**   And the total meeting was only about 15 or 20 minutes of

18  actual dialogue with Walter Liew; true?

19  **A.**   Pretty much, yes.

20  **Q.**   Okay.  The rest of the time you were meeting was kind of

21  arguing about who would be at the meeting; true?

22  **A.**   It was a discussion, yes.

23  **Q.**   Okay.  And it was a discussion.  And it got heated at

24  times; true?

25  **A.**   I wouldn't -- I thought it was very professional.  I don't

1  think it was heated at all, on both sides.

2  Q.   But it was -- you weren't agreeing to the point where you

3  had to take a break and call the general counsel of DuPont back

4  in Wilmington; right?

5  A.   I think it was more for guidance rather than not agreeing.

6  Q.   When Mr. Liew started just talking, you got the

7  impression, did you not, that he felt strongly that the civil

8  suit was not justified; true?

9  A.   He felt more strongly about the fact that we referred to

10  him not as a U.S. citizen.  And I thought it was kind of

11  strange he was addressing those issues more than the issue at

12  hand, but, yes.

13  Q.   He was offended by the references in the Complaint to

14  China and the way it was characterized in the Complaint.  Is

15  that fair to say?

16  A.   You'd have to ask him that.  I think it was just that one

17  specific detail that he wanted to make sure he got across.

18  Q.   He wanted to make sure you knew he was a United States

19  citizen; true?

20  A.   Yes.

21  Q.   And in the course of that meeting, you took notes, did you

22  not?

23  A.   Yes, I did.

24  Q.   In your long police career, Mr. Jubb, you understand that

25  it's important for notes to be accurate and complete?

1   A.   Yes, I do.

2   Q.   In your 30 years as a police officer, you strive to make

3   your notes accurate and complete?

4   A.   Yes, sir.

5   Q.   Did you have a chance to review the notes you took in

6   handwriting of the interview with Mr. Walter Liew on April 26,

7   2011?

8   A.   Yes, I did, sir.

9   Q.   And it's true, is it not, that the comment, that you

10  quoted Mr. Liew as supposedly saying to the effect of, "If I

11  had wanted to get something from DuPont, I would have hired

12  somebody from DuPont rather than Chevron," that's nowhere in

13  your notes, is it?

14  A.   No, sir, it is not.

15  Q.   Thank you.

16       Let me back up in the chronology a little bit.  The

17  interview with Walter Liew was not the first activity that you

18  had engaged in in this investigation; true?

19  A.   That's correct.

20  Q.   You mentioned that back in August of 2010, you were

21  working with a group about the anonymous letter that you

22  received back then?

23  A.   Yes, sir.

24  Q.   That included a variety of lawyers at DuPont, did it not?

25  A.   Yes, sir.

1  Q.   In between August 10 and your interview with Jian Liu,

2  L-I-U, on March 30, 2011, what did you do in your

3  investigation?

4  A.   We were trying to develop some things on the Internet,

5  some of the search engines that we had, to find out what we

6  could find out about USAPTI.  And we also hired a private

7  investigator firm to look into some things for us here in

8  California.

9  Q.   Did you conduct any interviews of employees in that time

10  period before you visited Jian Liu's house at 9:00 p.m. on

11  March 30th?

12  A.   When you say "employees," employees of USAPTI?

13  Q.   Correct.

14  A.   Yes.  I interviewed two other individuals prior to

15  interviewing Jian.

16  Q.   And that would include Peter Wong?

17  A.   No.

18  Q.   Which two did you interview before you got to Jian Liu?

19  A.   Huping Luo and Steven Song.

20  Q.   Those were the two Chevron employees that were working

21  with Jian Liu?

22  A.   Yes.

23  Q.   Then you talked to Jian Liu; true?

24  A.   Yes.

25  Q.   And after that you talked to -- did you talk to anybody

1  else before Chevron -- or DuPont brought the civil lawsuit

2  against Walter Liew and Jian Liu on April 6 of 2011?

3  **A.**   I don't -- I don't believe so, no.

4  **Q.**   But you've been in touch with the FBI before DuPont filed

5  its civil lawsuit; true?

6  **A.**   Yes, sir.

7  **Q.**   Were you there at the February 2011 meeting back in

8  Wilmington with the FBI?

9  **A.**   Yes, sir.

10  **Q.**   Were you involved in sending a variety of search terms to

11  the FBI in case they had an opportunity to search any

12  electronic media?

13  **A.**   Yes, sir.

14  **Q.**   Were you involved in any other meetings prior to the time

15  that DuPont filed its civil lawsuit on April 6th?

16  **A.**   I believe there was a short meeting in March.

17  **Q.**   And during this time period, that March meeting, did that

18  include the technical people, Mr. Taylor and others, from the

19  titanium division?

20  **A.**   Yes, sir.

21  **Q.**   You were involved in that meeting as well?

22  **A.**   Yes, sir.

23  **Q.**   And the FBI brought you a thumb drive that they had gotten

24  from Mr. Able-Baker.  Do you recall that?

25  **A.**   The March 1 was information that we had gleaned from

**JUBB - CROSS / GASNER**

1   Chevron.

2   **Q.**   When did you reach out to Chevron to coordinate your

3   investigative activities?

4   **A.**   That was early on in 2010.

5   **Q.**   Chevron --

6   **A.**   When I say "early on," probably October-November.

7   **Q.**   Shortly after getting the anonymous letter; true?

8   **A.**   Yes, sir.

9   **Q.**   Who was the contact at Chevron?  Another police officer or

10  a lawyer or someone else?

11  **A.**   The first individual was the head of corporate security

12  for Chevron, and then I was referred to a corporate

13  investigator for Chevron.

14  **Q.**   Chevron had searched Mr. Jian Liu's email account at

15  Chevron, had they not?

16  **A.**   Yes, sir.

17  **Q.**   And they shared the results of that investigation with

18  DuPont, did they not?

19  **A.**   They shared some of the things, yes.

20  **Q.**   What else did Chevron do that they shared with DuPont at

21  this stage of your investigation?

22  **A.**   Well, in January they ended up turning over some TiO2

23  information that they came across on Jian Liu's computer.

24  **Q.**   Do you know whether Chevron separately shared items with

25  the FBI or did that all go through you?

JUBB - CROSS / GASNER

1   **A.**   You'd have to ask the FBI that.

2   **Q.**   But to your knowledge was --

3   **A.**   No.

4   **Q.**   -- Chevron involved in any joint meetings with you and the

5   FBI?

6   **A.**   Not to my knowledge.

7   **Q.**   Did you coordinate the filing -- and by "you," I mean you

8   or others at DuPont to your knowledge -- coordinate the filing

9   of the civil lawsuit with the overall investigation?

10  **A.**   I don't understand the question.

11  **Q.**   Let's break it down a little bit.

12       Did you or others, to your knowledge, at DuPont tell

13  anybody at the FBI that DuPont was going to file a lawsuit on

14  April 6 against Walter Liew and Jian Liu?

15  **A.**   I know I didn't have that conversation with them.  I can't

16  say that that didn't happen.  I know I didn't.

17  **Q.**   Was it your understanding that that lawsuit came as a

18  surprise to the FBI?

19  **A.**   I couldn't tell you.

20  **Q.**   You just don't know one way or the other?

21  **A.**   No, I couldn't answer that.

22  **Q.**   Were you involved in the preparation of the civil lawsuit

23  at all?

24  **A.**   In trying to put some of the details to it, yes.

25  **Q.**   What details from the civil complaint?

JUBB - REDIRECT / SCOTT

1   **A.**    Just kind of a time line kind of thing.

2   **Q.**    Time line of the investigation that you conducted?

3   **A.**    Yes.  Yes, sir.

4   **Q.**    Was there any discussion that you recall to the effect

5   that filing the lawsuit against Jian Liu would put pressure on

6   him so that he would cooperate?

7   **A.**    I never had that conversation, no.

8   **Q.**    There were others, though, at DuPont that were

9   coordinating with the FBI besides yourself; true?

10  **A.**    As I've stated before, I was the one usually meeting with

11  the FBI.  I'm not going to definitively say that somebody

12  outside did that -- did or did not do that.  I know I did not.

13          **MR. GASNER:**  Thank you.  No further questions.

14          **THE COURT:**  Thank you, Mr. Gasner.

15      Mr. Froelich, do you have any questions?

16          **MR. FROELICH:**  No, Your Honor.

17          **THE COURT:**  All right.  Any redirect, Mr. Scott?

18          **MR. SCOTT:**  Very briefly, Your Honor.

19                    <u>**REDIRECT EXAMINATION**</u>

20  BY MR. SCOTT:

21  **Q.**    Mr. Jubb, in answering Mr. Gasner's questions, you

22  referred to notes you took at the meeting at Walter Liew's

23  attorney's office on April 26.  Do you remember that?

24  **A.**    Yes, sir.

25  **Q.**    Do you recall taking notes at that meeting?

1   **A.**   Yes.

2   **Q.**   You testified on direct that Mr. Liew said, "If I wanted

3   DuPont technology, I would have hired someone from DuPont."

4        Do you recall saying that?

5   **A.**   Yes.

6   **Q.**   Do you remember taking notes about that point?

7   **A.**   Yes.

8   **Q.**   And let me rephrase that.

9        You testified with Mr. Gasner that you didn't -- there

10  were no notes related to that point; correct?

11  **A.**   That is correct.

12  **Q.**   And do you specifically recall Mr. Liew saying that?

13  **A.**   Absolutely.

14  **Q.**   And can you say why there are no notes on that point?

15  **A.**   Sometimes in interviews and interrogations, they'll make a

16  point that you find to be very, very intriguing.  That was one

17  of the points, based on some interviews I had done, for him to

18  say that, and it was kind of a -- almost like a poker face I

19  wanted to have so that he didn't know that I knew about a

20  former DuPont employee he was utilizing.  So that's why I

21  didn't write the note down.

22        **MR. SCOTT:**  Nothing further, Your Honor.

23        **MR. GASNER:**  Very briefly, Your Honor.

24        **THE COURT:**  Yes.

25

<u>**RECROSS-EXAMINATION**</u>

1

2    **BY MR. GASNER:**

3    **Q.**   Now, Mr. Jubb, when you find something particularly

4    interesting that a person says in an interview, do you

5    sometimes put a star next to it?

6    **A.**   It depends on -- yeah, I could put a star, depending on --

7    it may be something they said intriguing or I find it just

8    interesting.

9    **Q.**   Do you recall Mr. Liew saying something that led you to

10    put a star in your handwritten notes?

11    **A.**   Yes, I do.

12    **Q.**   And what it said, true, is, quote, "We don't know what is

13    best or what is right, but we know what is wrong"?  Do you

14    remember him saying that?

15    **A.**   Yes.

16    **Q.**   And you put a star next to that?

17    **A.**   Yes.

18    **Q.**   You also put a star in your notes next to a statement, "He

19    does not expect to operate at 20,000 metric tons."

20         Do you recall Mr. Liew saying that?

21    **A.**   Yes.

22    **Q.**   You put a star next to that; true?

23    **A.**   Yes.

24    **Q.**   And your testimony is that you didn't write it down

25    because you didn't want to, like, lose your poker face or

1    something?

2    **A.**    I didn't want to show my hand.

3    **Q.**    But you were writing the whole time; right?

4    **A.**    That is correct.

5    **Q.**    Wouldn't it be more obvious to the person being

6    interviewed if you suddenly stopped writing?

7    **A.**    When he talked -- he's not talking about the facts of the

8    case.  He's basically making an outside statement that he

9    wouldn't hire a Chevron employee; he would hire a DuPont

10   employee.  So, no, I didn't think it would raise any red flags.

11   **Q.**    Wouldn't it --

12   **A.**    I was more concerned that Steven Taylor might say

13   something, because he also knew what I knew.  Now, I know he

14   didn't have the experience as far as an interview when it came

15   to those type of things.

16   **Q.**    So from your point of view, you already knew a lot about

17   this investigation that you'd been doing; right?

18   **A.**    Yes.

19   **Q.**    And your concern was not to tell Walter Liew what you

20   knew; right?

21   **A.**    Correct.

22   **Q.**    In the hopes that he would say things inconsistent with

23   what you knew from other parts of the investigation; right?

24   **A.**    No, it wasn't in the hopes that he'd be inconsistent.  It

25   was just to determine -- I was kind of trying to be a barometer

**JUBB - RECROSS / GASNER**

1    to his veracity.

2    **Q.**   Okay.  So you -- this was a test that you were giving

3    Mr. Liew, although he didn't know that; right?

4    **A.**   I was trying to see how honest and forthright he was going

5    to be with me, yes.

6    **Q.**   And there are tactics that the police employ to do that

7    kind of thing that you learned over your long career; right?

8    **A.**   Yes, sir.

9    **Q.**   Is one of them stop writing when the person says something

10   particularly interesting?

11   **A.**   Not necessarily.  It's kind of a thing that you pick up as

12   you go along in your career.  Some people may just write -- put

13   a little red mark or they may not write it or they may write it

14   or they may put it in shorthand type things.  It all depends on

15   the investigator, I would imagine.

16          **MR. GASNER:**  Nothing further.

17          **THE COURT:**  Thank you.

18      You're excused.  Thank you, sir.

19                          (Witness excused.)

20          **THE COURT:**  Next witness.

21          **MR. AXELROD:**  Thank you, Your Honor.  The

22   United States calls Allen Chang.

23          **THE COURT:**  All right.  If you want to take a stretch

24   break, ladies and gentlemen, while we're waiting, please do so.

25                      (Pause in proceedings.)

1          THE COURT:  All right.

2          THE CLERK:  Please rise and raise your right hand.

3                           ALLEN CHANG,

4    called as a witness for the Government, having been duly sworn,

5    testified as follows:

6          THE WITNESS:  Yes.

7          THE CLERK:  Thank you.  Please be seated and state and

8    spell your full name for the record.

9          THE WITNESS:  My name is Allen Chang, A-L-L-E-N,

10   C-H-A-N-G.

11         THE CLERK:  Thank you.

12         MR. AXELROD:  May I proceed, Your Honor?

13         THE COURT:  Yes, you may.

14                      DIRECT EXAMINATION

15   BY MR. AXELROD:

16   Q.  Good afternoon, Mr. Chang.

17       Did you previously work at USAPTI?

18   A.  Yes.

19   Q.  When?

20   A.  From March 2010 to December 2011.

21   Q.  What was the position that you were hired into at USAPTI

22   in March of 2010?

23   A.  I started off as an instrumentation and then transitioned

24   into more of a mechanical engineer role.

25   Q.  Prior to joining USAPTI, what was your employment?

**CHANG - DIRECT / AXELROD**

1   A.    HVAC engineering.

2   Q.    And could you describe for the jury what HVAC engineering

3   is?

4   A.    Sure.  HVAC stands for heating, ventilation, and air

5   conditioning.  It's essentially how to ensure that there's

6   proper ventilation and heating and cooling within an enclosed

7   space.

8   Q.    Could you describe your educational background prior to

9   that position?

10  A.    Yes.  I graduated -- I graduated from U.C. Berkeley with a

11  B.S. in mechanical engineering.

12  Q.    When was that?

13  A.    2008.

14  Q.    How did you come to work at USAPTI?

15  A.    I had posted my résumé on Craigslist, and was contacted

16  for an interview.

17  Q.    Who contacted you?

18  A.    Walter Liew.

19  Q.    And did you come in and have a meeting with him about the

20  position?

21  A.    Yes.

22  Q.    Did he describe what the position would involve?

23  A.    Yes.

24  Q.    What did he tell you?

25  A.    He said that I would be starting off with -- you know,

1   starting off as a position doing instrumentation inputs, and he

2   also described generally, like, what their company did.

3   **Q.**   What did he tell you the company did?

4   **A.**   That it was chemical plants.

5   **Q.**   Was it a particular type of chemical plant?

6   **A.**   I believe -- I believe he mentioned that it was TiO2, I

7   think.

8   **Q.**   During that -- and did you -- prior to that interview, had

9   you ever heard of TiO2 previously?

10  **A.**   No.

11  **Q.**   Did Mr. Liew describe for you his own background during

12  your interview?

13  **A.**   I wasn't sure if he described the background during the

14  interview, but at some point he did.

15  **Q.**   And at whatever point in time that was, what did he tell

16  you about his background?

17  **A.**   That he was a Ph.D. in double E.

18  **Q.**   I'm sorry.  What's double E?

19  **A.**   Oh, electrical engineering.  Sorry.

20  **Q.**   Did he at some point describe for you his background in

21  TiO2?

22  **A.**   He -- he explained that he had -- after -- after doing

23  electrical engineering, he transitioned over to TiO2.

24  **Q.**   Did he tell you how long he'd been working in TiO2?

25  **A.**   I don't think it was specifically, but it did seem -- I do

**CHANG - DIRECT / AXELROD**

1  remember that he mentioned that it was for a good amount of

2  time.

3  Q.   When you were at USAPTI, could you -- you said you started

4  in March of 2010.  Could you describe kind of the progression

5  of projects that you worked on?

6  A.   Sure.  My involvement was primarily on the 100K -- K

7  stands for kilotons-per-year production -- project.  That one

8  was not as further along as the parallel project that USAPTI

9  was working on, which was the 30K project.  I primarily worked

10  on the 100K project, but I also did a little bit of work on the

11  30K too.

12  Q.   The 100K and the 30K projects, do those relate to the

13  design of TiO2 factories for clients in China?

14  A.   Yes.

15  Q.   Who was the client on the 30K project?

16  A.   I believe -- I believe it was the Jinzhou Group.

17  Q.   And on the 100K?

18  A.   Pangang.

19  Q.   During the time that you worked at USAPTI, did any of the

20  employees of the business have prior TiO2 experience, to your

21  knowledge?

22  A.   To my knowledge, I didn't -- I don't know precisely, but

23  not -- aside from Walter and Mr. Maegerle, I -- and -- yeah,

24  the employees that I worked with I don't think had direct TiO2

25  knowledge.

1    **Q.**   You identified Mr. Maegerle.  What was his role at USAPTI

2    during the time that you were there?

3    **A.**   Sure.  He was one of the -- he was a consultant.

4    **Q.**   And as a consultant, what did he do?

5    **A.**   He -- he provided guidance and direction for -- for, like,

6    a lot of the designs, mostly -- mostly on the equipment side.

7    **Q.**   Did you work with him on that -- on equipment design?

8    **A.**   Yes.

9    **Q.**   And did he provide you guidance?

10   **A.**   Yes.

11   **Q.**   Did you understand what his background was?

12   **A.**   Yes.  He had previously worked for DuPont when he was --

13   but he retired from there.  He had a mechanical engineering

14   background.

15   **Q.**   Did he describe for you his experience at DuPont?

16   **A.**   Brief -- yeah, like, briefly, you know, that he previously

17   worked with DuPont for some time, and that he was -- then,

18   yeah, he had been working there for a while and then retired.

19   **Q.**   Now, was he physically present at the USAPTI office on a

20   regular basis?

21   **A.**   No.

22   **Q.**   So in the course of time that you worked there, how many

23   times did you see him in the office?

24   **A.**   Not -- only -- only a handful of times.  Like, usually,

25   like, when there was, like, a client meeting and he would come

**CHANG - DIRECT / AXELROD**

1    over to -- to participate with the client meetings in

2    California, he would stop by the office.

3    **Q.**   And for the times that he wasn't present for the handful

4    of times for the client meetings, did you communicate with him

5    on a -- regularly?

6    **A.**   Yes.

7    **Q.**   How did you do that?

8    **A.**   Primarily through email and occasionally through calls.

9    **Q.**   Okay.  How often were you in contact with him?

10   **A.**   Pretty regularly.  I'd say, like, at least once a week or

11   so.

12   **Q.**   Okay.  And what was the purpose of those contacts?

13   **A.**   Sure.  If I had specific questions about the equipment

14   that I was designing or if I needed to have my work reviewed.

15   **Q.**   Was there any other -- were there any other consultants

16   for USAPTI who had a background at DuPont?

17   **A.**   I believe there was a gentleman, first name Tim.

18   **Q.**   And what was -- did you ever meet Tim?

19   **A.**   I did, yeah.

20   **Q.**   Where did you meet Tim?

21   **A.**   This was also when there was a client meeting and, like,

22   during -- like, around the client meeting.

23   **Q.**   What was Tim's role at USAPTI?

24   **A.**   I believe he had a better understanding of the chemical

25   process -- processes.

**CHANG - DIRECT / AXELROD**

1  Q.  So you indicated that he came for a client meeting.  Would

2  he provide guidance or talk at the client meetings?

3  A.  I believe that he would help field questions, yes.

4  Q.  How many times do you think you saw him in conjunction

5  with USAPTI work?

6  A.  I think just -- just once.

7  Q.  Now, I think you indicated that when you got there, you

8  were doing instrumentation specifications?

9  A.  Uh-huh.

10         THE COURT:  Is that a yes?

11         THE WITNESS:  Yes.  Yeah, it is.

12  BY MR. AXELROD:

13  Q.  And from that, what -- did you progress to other work?

14  A.  Yes.  Yes.  I started off with instrumentation.  And then

15  as I continued to work, like, I transitioned into doing more so

16  equipment specifications and design.

17  Q.  And when you did equipment design, could you describe the

18  types of pieces of equipment that you worked on?

19  A.  Sure.  Specifying the size and specifications of a lot of

20  the tanks, in addition to, like, computer-aided drafting of the

21  more sophisticated equipment.

22  Q.  Okay.  When you say "more sophisticated equipment," what

23  kind of equipment are you talking about?

24  A.  Reactors, specialty valves, that sort.

25  Q.  And would the reactors, would that be like the oxidation

**CHANG - DIRECT / AXELROD**

1   reactor?

2   **A.**   Yes.

3   **Q.**   Chlorinator?

4   **A.**   Yeah.

5   **Q.**   Okay.  Would you -- would flue pond fall into that

6   category?

7   **A.**   Yes.

8   **Q.**   Did you obtain specifications for those pieces of

9   equipment?

10  **A.**   My CAD work was based off of previous -- of a previous

11  version of the design.  Like, whenever I created for the 100K,

12  I had the 30K version as a reference to go off of.

13  **Q.**   I see.  And do you know where the information came that

14  was used to create those 30K designs that you used as your

15  starting point?

16  **A.**   Not -- not precisely.

17  **Q.**   In doing equipment design, did you ever look at patents?

18  **A.**   No.

19  **Q.**   Why not?

20  **A.**   It just never came up.

21  **Q.**   Did you -- at any point in time that you were at USAPTI,

22  did you perform any patent research or look at patents?

23  **A.**   No.

24  **Q.**   When you were designing equipment, did you have to perform

25  calculations to size the equipment?

**CHANG - DIRECT / AXELROD**

1  **A.**   Yes.  Mostly -- mostly, like, basic calculations on vessel

2  thicknesses.

3  **Q.**   Okay.

4  **A.**   Certain -- certain vessels had a -- have like -- are

5  pressurized.  And in order to ensure that -- in order to ensure

6  that the vessel is thick enough in order to take the pressure,

7  you know, I would perform some calculations using -- using a

8  program.

9  **Q.**   Okay.  And to do that, would you need inputs to -- to do

10  the calculation, you'd need certain criteria to calculate from?

11  **A.**   Yes.

12  **Q.**   Where did you get those inputs?

13  **A.**   From the chemical team.

14  **Q.**   Okay.  And who was the chemical team?

15  **A.**   In-house they were Ruth and Ken.

16  **Q.**   And at some point in time, was there a gentleman named

17  Jian Liu?

18  **A.**   Yes.

19  **Q.**   What was his role?

20  **A.**   I think he was brought in to take on a more managerial

21  role.

22  **Q.**   When it came to designing the various pieces of equipment,

23  could you describe the process by which you would create the

24  designs?

25  **A.**   Sure.  For the simpler tanks, I would get input values

1   from the chemical teams and, like, size the tanks just using,

2   like, flow rate and time to determine, like, you know, the

3   required size and basic inputs for how to generally size the

4   tanks.

5       For the more sophisticated equipment, like with the

6   reactors, I would start with a 30K version of the drawing, and

7   I would scale it up to -- I would scale it up with direction

8   and also fill out the rest of the details for the design with

9   direction.

10  Q.  When you said you would scale it up with direction, to

11  whom did you go for direction?

12  A.  Walter and Bob.

13  Q.  Why did you go to them?

14  A.  Because I alone could not be able to -- I would not be

15  able to, you know, know how to fill out the rest of the details

16  for specifying the equipment.

17  Q.  And could you explain why not?  I mean, what is it about

18  that process that would require some direction?

19  A.  Just -- you know, just, like, with specifying reactors is

20  something outside of my experience, you know.  I was still

21  learning, like, on the job.  So they would -- they would need

22  to provide me with a lot of input and guidance on how to --

23  what to do and how to specify certain things.

24  Q.  On those kind of, like, technical consultations or

25  directions, what were the respective roles of Mr. Liew and

**CHANG - DIRECT / AXELROD**

1   Mr. Maegerle?

2   **A.**   Right.  For the equipment specifically, Mr. Maegerle

3   was -- was the -- was the primary person of reference for

4   fielding questions.  Mr. Liew would be able to provide good

5   input, but at least on the equipment side, Mr. Maegerle was the

6   primary reference.

7   **Q.**   Why was -- why was Mr. Maegerle the primary reference?

8   **A.**   He had a better sense of the equipment.

9   **Q.**   What was that based on?

10  **A.**   I guess it was just because that was what his background

11  on -- was on, and Mr. Liew's background on equipment was not as

12  strong.

13  **Q.**   Now, you said that the work involved scaling up.  There

14  was some preexisting designs from the 30K project, and then you

15  would use those to create the 100K equipment; is that right?

16  **A.**   Yes.

17  **Q.**   Could you describe that scaling-up process?  Is that,

18  like, a simple kind of you apply a ratio and you get the

19  result?

20  **A.**   No.  It's -- like, the 30K equipment was -- in general,

21  they're smaller because the production is smaller.  But it

22  wasn't just simply just scaling -- scaling up, you know, the

23  size.  It would -- it might provide, like, you know, a

24  benchmark to start from, you know, but there would still need

25  to be a lot of work to figure out the details of, like, how to

**CHANG - DIRECT / AXELROD**

1    specify the equipment.

2    **Q.**   And let's take the oxidation reactor as an example.  From

3    a complexity standpoint, can you describe the technology

4    involved in that piece of equipment?

5    **A.**   Sure.  There's a complex high-temperature reaction that

6    happens in the inside of a metal enclosure.  There's also -- in

7    order to help take the reaction, there's also ceramics in the

8    middle.  It's made of various sections that come together.

9    **Q.**   Did you have any training in that type of complex reactor

10   technology?

11   **A.**   Prior to USAPTI, no.

12   **Q.**   Did anyone at USAPTI have training to design that type of

13   technology?

14   **A.**   I believe -- I believe that would have -- that person

15   would have been Bob -- or, sorry, Mr. Maegerle.

16   **Q.**   And how about the chlorinator?  Is that -- from a

17   complexity standpoint, could you describe that technology?

18   **A.**   Sure.  Similarly to the oxidation reactor, it was also

19   ceramic-lined because it was a high-temperature reactor.

20   **Q.**   And did you have any training in that area?

21   **A.**   No.

22   **Q.**   Okay.  And to your knowledge did anyone at USAPTI other

23   than Mr. Maegerle?

24   **A.**   I guess -- I guess also other than Mr. Liew.

25   **Q.**   Now, you --

1          **THE COURT:**  Which Mr. Liew?  Jian Liu or Walter Liew?

2          **THE WITNESS:**  Walter.  Sorry.

3          **MR. AXELROD:**  Thank you, Your Honor.

4    **Q.**   You indicated earlier that for some things that you worked

5    on for some calculations, you would get input from the

6    chemical -- I think you said Ruth and Ken, and you identified

7    them as the chemical team?

8    **A.**   Yes.

9    **Q.**   Okay.  And do you know their full names?

10   **A.**   Ken Chan and Ruth Oduca.

11   **Q.**   And could you describe what their backgrounds were?

12   **A.**   I believe they had chemical engineering backgrounds.

13   **Q.**   And were they recent -- what was their work history?  Were

14   they recent college graduates?

15   **A.**   I don't believe that they were -- they probably weren't,

16   like, super recent.  Ken, I remember, was around my age, and

17   Ruth probably wasn't too far away from how old I was either.

18   **Q.**   Did either one of them have TiO2 experience, to your

19   knowledge?

20   **A.**   I can't -- I don't think that they had any knowledge prior

21   to USAPTI, but I don't know -- I don't know for sure.

22   **Q.**   Do you know what the source of the information was that

23   they would provide to you?

24   **A.**   I believe that they would run, you know, calculations,

25   like, chemical engineering calculations to help determine,

1    like, what the inputs and outputs that they would give to me.

2    **Q.**   But they had to start from some set of numbers; right?

3    **A.**   Perhaps.  I'm not as familiar with how -- like, the exact

4    chemical engineering portion of the job.

5              **MR. AXELROD:**  Your Honor, may I -- actually, may I

6    call up Exhibit 126 --

7              **THE COURT:**  Yes, you may.

8              **MR. AXELROD:**  -- which is an admitted exhibit?

9         Ms. Mahoney, if you could bring up 126.

10        And, Ms. Mahoney, if you could blow up the top portion of

11   that.

12   **Q.**   And, Mr. Chang, if you could look -- is that appearing on

13   a computer screen in front of you?

14   **A.**   Not on this one.

15   **Q.**   It's not appearing on that one?

16   **A.**   No.  It says -- oh, it just switched over.

17   **Q.**   Okay.  And can you see that?

18   **A.**   Uh-huh.

19   **Q.**   Do you recognize this document?

20   **A.**   Yes.

21   **Q.**   Okay.  And what is it?

22   **A.**   It seems to be an email from Mr. Maegerle addressed to me

23   and Ruth.

24   **Q.**   Okay.  And the subject is "Nitrogen Flow to Chlorinator";

25   right?

**CHANG - DIRECT / AXELROD**

1  **A.**   Yes.

2  **Q.**   And it's from August 26, 2010?

3  **A.**   Uh-huh.

4  **Q.**   And --

5       **THE COURT:**  Is that a yes?

6       **THE WITNESS:**  Oh, sorry.  Yes.  Sorry.

7  BY MR. AXELROD:

8  **Q.**   And it says (reading):

9       "Allen/Ruth -

10       "The Kuan Yin nitrogen flow to inject ore and coke

11      solids into the chlorinator is [number] of pounds per

12      hour.  This is through a [number] inch line.  Since the

13      Kuan Yin plant is a 60,000 T/H, a [number] inch line

14      should be adequate for the 100 T/H, although we show

15      [number] inches on our P&ID.  I would assume [number] of

16      pph would be the correct flow for Pangang."

17      Do you recall that email?

18  **A.**   Yes.

19  **Q.**   You're hesitating.

20  **A.**   Oh, sorry.  Yeah.

21  **Q.**   Let me ask you a question.  Is this the kind of

22  communication that you would have from time to time with

23  Mr. Maegerle about the work that you were performing at USAPTI?

24  **A.**   Sometimes, because this email seems to be a little bit

25  more chemical-process related.  But I imagine I was copied

**CHANG - DIRECT / AXELROD**

1  because part of it related to me.

2  **Q.**  Okay.  And what part related to your work?

3  **A.**  I imagine it would be the number -- one of the numbers

4  for -- for -- that's on the email that could relate to the size

5  of an equipment nozzle that I might have to use.

6  **Q.**  I see.  So it referenced some specific line sizes in

7  inches.  Is that what you're talking about?

8  **A.**  Yes.

9  **Q.**  So could you explain how that would be relevant to the

10  work that you were doing?

11  **A.**  For example, one of the numbers in there, if the -- if the

12  equipment required a size of a line to connect to the

13  equipment, I'd have to ensure that the equipment has an

14  adequately sized nozzle to accompany the incoming line.

15  **Q.**  And the piece of equipment that's the subject of this

16  email is the chlorinator; right?

17  **A.**  Yes.

18  **Q.**  And is this -- based on the description you're giving, is

19  that sort of the scaling up or scaling down that we were

20  talking about earlier?

21  **A.**  I believe so, yes.

22  **Q.**  Do you know the source of the information that's being

23  provided in this email?

24  **A.**  Not -- not personally, no.

25  **Q.**  When you -- did you use this information in your work?

**CHANG - DIRECT / AXELROD**

1    **A.**   Yes.

2    **Q.**   Okay.  How so?

3    **A.**   Like, in this example, I would have to ensure that the

4    number that everyone came up with for a particular nozzle was

5    incorporated into my design.

6    **Q.**   Okay.  Now, did you also work on the flue pond design for

7    the 100K project?

8    **A.**   Yes.

9    **Q.**   Could you describe what your responsibility was with

10    respect to the flue pond?

11    **A.**   I would -- I would -- I was also given a 30K version of

12    the flue pond as a starting point, and I would have to

13    create -- draft a design of the flue pond for the 100K.

14    **Q.**   And who provided you -- for that project, who provided you

15    the requirements, the process requirements, if you will?

16    **A.**   Right.  The process requirements came from the process

17    team, and also I received direction from Walter and Bob.

18    **Q.**   Okay.  What kinds of requirements were there?  What kind

19    of data did you need to do that job?

20    **A.**   Well, to ensure that the flue pond would work properly,

21    there had to be, like, a minimum run of pipe.  That would

22    help -- that would also -- that would help determine the length

23    of the flue pond.

24    **Q.**   And did you need to know for the pipe the diameter?

25    **A.**   Yes.

**CHANG - DIRECT / AXELROD**

1    Q.   And who provided you with that specific guidance?

2    A.   A combination of the chemical process team and Bob.

3    Q.   At some point in time, were you provided with photographs

4    of a flue pond?

5    A.   Yes.

6    Q.   And did you use those photographs in your design work?

7    A.   Mostly as a reference, but in one instance I did try to

8    use more of the photos to try to scale an estimate thickness of

9    a wall.

10           **MR. AXELROD:**  And, Ms. Mahoney, if you could bring up

11   Exhibit 38-18.  And, Ms. Mahoney, could you blow that up a

12   little bit?  Thank you.

13   Q.   Mr. Chang, do you recognize that photograph?

14   A.   Yes.

15   Q.   And could you describe what it is?

16   A.   This is the -- this is the pond portion of the flue pond.

17   Q.   And who -- was this a photograph that was provided to you

18   as part of your work on the 100K flue pond?

19   A.   Yes.

20   Q.   Who provided it to you?

21   A.   I believe it was Walter Liew.

22   Q.   How did you -- and could you sort of just describe for the

23   jury what it is that we're looking at?

24   A.   So the flue pond is essentially a large heat exchanger.

25   It's literally a pond that's filled with water, and there's a

**CHANG - DIRECT / AXELROD**

1  pipe running through the water that is carrying chemicals that

2  needs to be cooled down; and as it runs through the pool, it

3  cools down because the water is cooling down.  And this is --

4  the concrete that you see there is the pond.

5  **Q.**  How did you use -- well, let me ask you first, were there

6  other photographs that Mr. Liew gave to you related to the flue

7  pond?

8  **A.**  I did -- yeah, there was one other photo that I -- that I

9  saw.

10      **MR. AXELROD:**  Okay.  And if we go to -- Ms. Mahoney,

11  can you briefly -- can you go to 38 I think it's page 2, 0002?

12  And blow that up.

13  **Q.**  Is that the other photograph that was provided to you?

14  **A.**  Yes.

15  **Q.**  And can you describe for the jury what we're looking at in

16  that photo?

17  **A.**  These are -- these are elbows for when the pipe needs to

18  turn.

19  **Q.**  Okay.  So, like, there's legs of pipe; they turn --

20  **A.**  Yes.

21  **Q.**  -- go a different direction; they turn back?

22  **A.**  Yes.

23  **Q.**  All right.  What did -- did Mr. Liew say anything to you

24  when he provided you with these photographs?

25  **A.**  Just that they were there for reference.

**CHANG - DIRECT / AXELROD**

1  Q.   And going back to 38-18, if we can bring that back up.

2       Could you describe for the jury how you used that

3  particular photograph to develop your design?

4  A.   This one in particular, part of the 100K design that I

5  wasn't sure of was the thickness of the wall.  So I -- I

6  essentially scaled or approximated the thickness of the wall by

7  measuring out lines on the .pdf drawing.  Approximating, for

8  example, that the barrel would be, like, 3 feet.  If I can

9  measure how tall the barrel was in the photograph with respect

10  to the thickness of the wall, I can estimate how thick the wall

11  was.

12  Q.   And did you kind of put the photograph in a computer

13  program to help you with that?

14  A.   Yeah, it was just Adobe .pdf because it allows you to

15  measure, you know, distances on a page.

16  Q.   Did -- at some point in time did you attend meetings with

17  the Chinese clients of USAPTI?

18  A.   Yes.

19  Q.   And what was the first meeting you went to?

20  A.   The first meeting was in San Francisco.

21  Q.   When was it?

22  A.   I don't remember precisely when, but it was -- it was for

23  early deliverable that we owed to the clients.

24  Q.   And where did the meeting take place?

25  A.   The San Francisco Hilton.

**CHANG - DIRECT / AXELROD**

1  **Q.**   Who was -- and which client was it for?

2  **A.**   I believe it was for the Pangang Group.

3  **Q.**   Who was present for USAPTI?

4  **A.**   Most -- pretty much the whole team:  Mr. Walter Liew, Bob

5  Maegerle, myself, Ruth, Ken.

6  **Q.**   And was the former DuPont individual named Tim present as

7  well?

8  **A.**   I believe so.

9  **Q.**   And what did -- what did Mr. Maegerle and Tim do at the

10  meeting?  What did they do?

11  **A.**   They were there to help field questions.

12  **Q.**   So can you kind of describe what -- how that -- how it

13  happened?  Would the client ask questions, and they would

14  provide answers?

15  **A.**   Yes.  Like, for instance, if the client had a question

16  about, you know, a certain process or a piece of equipment, you

17  know, they had a question that Walter couldn't answer directly,

18  Bob -- either Bob or Tim would chime in and help answer them.

19         **THE COURT:**  Mr. Axelrod, at a convenient time, would

20  you break?

21         **MR. AXELROD:**  This would be a convenient time,

22  Your Honor.

23         **THE COURT:**  All right.  You may step down, sir, for

24  the moment.  You'll be back tomorrow morning at 8:00 o'clock.

25         **THE WITNESS:**  Okay.

**PROCEEDINGS**

1          **THE COURT:** All right.

2       If anybody wants to leave, now would be the time, before I

3   instruct the jury.

4       All right. So, ladies and gentlemen, I'm going to remind

5   you of your conduct as jurors. I will -- then I'll give you a

6   little bit more of an update on -- just a moment -- a little

7   bit more of an update on the -- and lock the door, please -- on

8   scheduling in a moment.

9       Just to remind you again of a very important instruction

10  on your conduct as jurors. First, keep an open mind throughout

11  the trial. Do not decide what the verdict should be until you

12  and your fellow jurors have completed your deliberations at the

13  end of the case.

14      Second, because you must decide this case based only on

15  the evidence received in the case and on my instructions as to

16  the law that applies, you must not be exposed to any other

17  information about the case or to the issues it involves during

18  the course of your jury duty.

19      Thus until the end of the case or unless I tell you

20  otherwise, do not communicate with anyone in any way and do not

21  let anyone else communicate with you in any way about the

22  merits of the case or anything to do with it. This includes

23  discussing the case in person, in writing, by phone,

24  Smartphone, or electronic means, via email, text messaging, or

25  in or on any Internet chat room, blog, website, including such

1    social networking media like Facebook, Myspace, LinkedIn,

2    YouTube, or Twitter, or other feature.

3         This applies to communicating with your fellow jurors

4    until I give you the case for deliberation.  And it applies to

5    communicating with everyone else, including your family

6    members, your employer, the media or press, and the people

7    involved in the trial, although you may notify your family and

8    your employer that you've been seated as a juror in the case.

9         But if you are asked or approached in any way about your

10   jury service or anything about the case, you must respond that

11   you have been ordered not to discuss the matter and to report

12   the contact to the Court.

13        Because you will receive all the evidence and legal

14   instruction you properly may consider to return a verdict, do

15   not read, watch, or listen to any news or media accounts or

16   commentary about the case or anything to do with it.

17        Do not do any research, such as consulting dictionaries,

18   searching the Internet, or using other reference materials; and

19   do not make any investigation or in any other way try to learn

20   about the case on your own.

21        The law requires these restrictions to ensure the parties

22   have a fair trial based on the same evidence that each party

23   has had an opportunity to address.  A juror who violates these

24   restrictions jeopardizes the fairness of these proceedings, and

25   a mistrial could result that would require the entire trial

**PROCEEDINGS**

1  process to start over.

2      If any juror is exposed to any outside information, please

3  notify the Court immediately.

4      Counsel has advised me that we are pretty much on

5  schedule.  That can change, obviously, either way, but right

6  now we're pretty much on schedule.  Barring any unforeseen

7  circumstances, we should get this case to you on the original

8  schedule.

9      We're going to start tomorrow again at 8:00.  We'll

10  probably end about 1:15 or so as the Court has another matter

11  scheduled in court in the afternoon.  But we're going to go

12  Monday, Tuesday, Wednesday, Thursday as scheduled on our

13  basically regular schedule, and cover a lot of ground.

14      Thank you for your attention.  We'll see you tomorrow

15  morning.

16      (Proceedings were heard out of the presence of the jury:)

17      **THE COURT:**  The jury has retired.

18      A couple of things.  You can sit down if you wish.

19      I'm thinking that based upon the estimates that I received

20  this morning from counsel, once the Government rests, depending

21  upon the time, the Court will immediately entertain any motions

22  that the Defense wishes to make with respect to the

23  Government's case.

24      So, for example, if the Government finishes on Wednesday,

25  then we'll begin the argument on Wednesday afternoon.  If the

**PROCEEDINGS**

1  Government finishes late on Wednesday, you know, and I decide

2  otherwise, we'll start Thursday morning at 7:00 a.m.  But I'm

3  not going to have the argument go on when the jury is here.

4      If we get to a situation where we have time, we haven't

5  finished the arguments, my practice is to allow -- or require

6  the defendants to begin their case without prejudice to

7  whatever their rights may be with respect to the

8  Government's -- their position with respect to the Government's

9  case.

10     In other words, by offering a witness or evidence in their

11 own cases at the direction of the Court, they will not be

12 waiving their right to contest the Government's evidence as a

13 matter of law.  That way we continue to utilize the jury's

14 time.  If the Court decides to grant the motion, then, you

15 know, the time will not necessarily have been well spent, but I

16 prefer to just keep the case moving as far as the time that the

17 jury is here.

18     The other possibility that I wanted to mention was in

19 terms of how the arguments go or when you all -- when the

20 Government rests in particular would be Friday morning.  The

21 Court has one matter on the law and motion calendar starting at

22 9:00, and right after that we would continue -- begin,

23 continue, and complete the argument with respect to any motions

24 that the defendant may make -- defendants may make.

25     As I said, I gave everybody warning about this because I

**PROCEEDINGS**

 1  prefer or require that the arguments be pretty laserlike.  I

 2  don't need, you know, a general speech about how, you know,

 3  weak this or that is.  I need, if the defendants feel that a

 4  particular element or elements have not been met, that they

 5  should be prepared to point to specific evidence that they feel

 6  supports their point or the absence of any evidence on a

 7  particular point, and that would then put it to the Government

 8  to fill in what they believe is the response.  But since we

 9  have transcripts and the evidence is quite specific, I expect

10  the argument to be specific.

11      The Court has been here and reviewing the transcripts and

12  the evidence every evening, so I'm pretty familiar with the

13  evidence.  And I would appreciate the parties marshaling the

14  evidence from their respective positions and then citing the

15  Court, and then the Court will have the parties' positions with

16  respect to the evidence, and I can make a decision based upon

17  the record accordingly.

18      So, again, it's going to be a little bit of a moving

19  target depending upon when the Government rests, but that's my

20  current plan.

21      Do you have any comment, Mr. Axelrod?

22          **MR. AXELROD:**  No, Your Honor.

23          **THE COURT:**  Ms. Agnolucci, do you have any comment

24  since you'll be doing most of the work here?

25                      (Laughter)

PROCEEDINGS

```
 1           MS. AGNOLUCCI:  I'm going to defer to Mr. Gasner on

 2    this one, Your Honor.

 3           THE COURT:  Okay.

 4           MR. GASNER:  That's fine, Your Honor, although

 5    Ms. Lovett is doing all the work.

 6           THE COURT:  I should ask her then.  I see a smile, so

 7    I'll take that as a yes.

 8           MS. LOVETT:  Yes, Your Honor.

 9           THE COURT:  All right.  Thank you very much.  You were

10    trained well.

11        But, seriously, I do want to move it along, and I think,

12    because the Court's been on top of the evidence and you all

13    have as well, without, again, having begun to think about the

14    issues from that perspective, but it will help us focus

15    directly on the specifics.  And then the Court can go back and

16    say, you know, yes, so-and-so is right or, no, so-and-so is

17    wrong, and I may have additional evidence that goes one way or

18    the other.

19        So that's what I really want.  I don't want a

20    generalized -- I don't want a closing argument because that

21    won't help the Court at all.

22        All right.  If I want any follow-up writings in terms of

23    specific legal issues or the like, I can request it at the

24    appropriate time, but I won't rule until I feel like I've

25    gotten everything that I need both factually and legally to
```

**PROCEEDINGS**

1   make the right decision.

2       So we'll keep moving.  I'll ask the Government, as the day

3   goes on tomorrow, how we're doing vis-a-vis the schedule so we

4   can all plan on afternoon activities or morning activities.

5           **MR. AXELROD:**  Understood.  Thank you, Your Honor.

6       **THE COURT:**  All right.  Thank you very much.  See you

7   tomorrow.

8           **MS. AGNOLUCCI:**  Thank you, Your Honor.

9       **THE COURT:**  Thank you.

10          (Proceedings adjourned at 1:29 p.m.)

11                  ---oOo---

12

13

14              **CERTIFICATE OF REPORTER**

15      I certify that the foregoing is a correct transcript

16  from the record of proceedings in the above-entitled matter.

17

18  DATE:  Monday, February 3, 2014

19

20

21

22  _____

23      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

24

25