**Volume 14**

**Pages 2751 - 2970**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | NO. CR 11-00573 JSW |
| ) | |
| WALTER LIEW; ROBERT MAEGERLE; ) | |
| and USA PERFORMANCE TECHNOLOGY,) | |
| INC., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

San Francisco, California
Tuesday, February 4, 2014

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES:</u>**
For Plaintiff:

MELINDA HAAG
United States Attorney
450 Golden Gate Avenue
San Francisco, California  94102
BY:  **PETE AXELROD**
**JOHN H. HEMANN**
**ASSISTANT UNITED STATES ATTORNEYS**

U.S. DEPARTMENT OF JUSTICE
600 E Street NW
Washington, D.C.  20044
BY:  **RICHARD S. SCOTT**
**ASSISTANT U.S. ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
Official Reporter

1 | **APPEARANCES**:   (CONTINUED)

2 | For Defendant Walter Liew and USA Performance Technology, Inc.:
                            KEKER & VAN NEST LLP
3 |                         633 Battery Street
                            San Francisco, California  94111
4 |               BY:  **STUART L. GASNER**
                       **SIMONA A. AGNOLUCCI**
5 |                    **KATHERINE M. LOVETT**
                       **CHRISTINA BLAIS**
6 |                    **ATTORNEYS AT LAW**

7 | For Defendant Robert J. Maegerle:
                            MCKENNEY & FROELICH
8 |                         1349 West Peachtree Street
                            Two Midtown Plaza - Suite 1250
9 |                         Atlanta, Georgia  30309
               BY:  **JEROME J. FROELICH, JR.**
10 |                   **ATTORNEY AT LAW**

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

2753

| | | |
|---|---|---|
| 1 | **I N D E X** | |
| 2 | Tuesday, February 4, 2014 | |
| 3 | **GOVERNMENT'S WITNESSES** | **PAGE** **VOL.** |

**CHANG, ALLEN (RECALLED)**
(PREVIOUSLY SWORN)                                              2760   14
Direct Examination resumed by Mr. Axelrod                      2760   14
Cross-Examination by Ms. Lovett                                2769   14
Cross-Examination by Mr. Froelich                              2812   14
Redirect Examination by Mr. Axelrod                            2818   14

**GUAN, PHILLIP**
(SWORN)                                                        2827   14
Direct Examination by Mr. Hemann                               2828   14
Cross-Examination by Mr. Gasner                                2886   14
Voir Dire Examination by Mr. Hemann                            2897   14
Cross-Examination resumed by Mr. Gasner                        2898   14
Voir Dire Examination by Mr. Hemann                            2923   14
Cross-Examination resumed by Mr. Gasner                        2924   14
Redirect Examination by Mr. Hemann                             2929   14
Recross-Examination by Mr. Gasner                              2931   14

**ROMETO, CECILY**
(SWORN)                                                        2932   14
Direct Examination by Mr. Scott                                2932   14

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 420, pages 1 and 11 | | 2915 | 14 |
| 421A, pages 75 through 80 | 2893 | | 14 |
| 421A | | 2895 | 14 |
| 446 | | 2953 | 14 |
| 494, page 1 | | 2949 | 14 |
| 496 | | 2955 | 14 |
| 505 | | 2951 | 14 |
| 637 | | 2843 | 14 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 638 | | 2852 | 14 |
| 639 | | 2858 | 14 |
| 640 | | 2883 | 14 |
| 641 | | 2861 | 14 |
| 642 | | 2871 | 14 |
| 643 | | 2876 | 14 |
| 656 | | 2840 | 14 |
| 658 | | 2852 | 14 |
| 659 | | 2924 | 14 |
| 664 | | 2858 | 14 |
| 668 | | 2863 | 14 |
| 670 | | 2872 | 14 |
| 672 | | 2879 | 14 |
| 673 | | 2877 | 14 |
| 904 | | 2935 | 14 |
| 905 | | 2942 | 14 |
| 909 | | 2958 | 14 |
| 929 | | 2946 | 14 |
| 939 | | 2940 | 14 |
| 941 | | 2956 | 14 |
| 1283 | | 2790 | 14 |

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1681 | | 2787 | 14 |
| 1728 | | 2793 | 14 |
| 1766 | | 2801 | 14 |
| 1776 | | 2805 | 14 |
| 1802 | | 2803 | 14 |
| 1813 | | 2797 | 14 |
| 1819 | | 2799 | 14 |
| 1826 | | 2806 | 14 |
| 1926 | | 2808 | 14 |
| 1927 | | 2780 | 14 |
| 1934 | | 2778 | 14 |
| 1946 | | 2810 | 14 |
| 1948 | | 2795 | 14 |
| 2036 | | 2904 | 14 |
| 2602 | | 2773 | 14 |
| 2927 | | 2782 | 14 |
| 2979 | | 2784 | 14 |
| 2980 | | 2785 | 14 |

<u>**PROCEEDINGS**</u>

1   <u>**Tuesday - February 4, 2014**</u>                    <u>**7:56 a.m.**</u>

2                        <u>**P R O C E E D I N G S**</u>

3                            **---oOo---**

4        (Proceedings were heard out of the presence of the jury:)

5        **THE COURT:**  Good morning.  Please be seated.

6        Call the case, please.

7        **THE CLERK:**  Calling Case Number CR-11-573,

8   United States versus Walter Liew, United States versus Robert

9   Maegerle, and United States versus USAPTI.

10       Counsel, please state your appearances.

11       **MR. AXELROD:**  Good morning, Your Honor.  Pete Axelrod,

12  John Hemann, and Richard Scott for the United States.

13       **THE COURT:**  Good morning.

14       **MS. AGNOLUCCI:**  Good morning, Your Honor.  Simona

15  Agnolucci, Stuart Gasner, and Katie Lovett for Mr. Walter Liew

16  and USAPTI, and Mr. Liew is here with us today in court.

17       **THE COURT:**  Good morning, everybody.

18       **MR. FROELICH:**  Good morning, Your Honor.  Jerry

19  Froelich for Mr. Maegerle, standing next to me in court.

20       **THE COURT:**  Good morning, everybody.

21       Any issues before the jury is brought in?

22       **MR. AXELROD:**  Not from the Government.

23       **THE COURT:**  All right.  Ms. Agnolucci?

24       **MS. AGNOLUCCI:**  We do have one brief issue that

25  doesn't need to be discussed right now, but that I wanted to

**PROCEEDINGS**

1    alert the Court to.  Depending on the way that the testimony

2    goes, we may want to raise with Your Honor during one of the

3    breaks the issue of the partnership agreement between Mr. Liew

4    and his business partners, which Your Honor ruled on in

5    connection with the *Daubert* motion.

6        We've since obtained a certified copy of the agreement,

7    which was signed in the presence of a Chinese lawyer, and we'd

8    like to discuss both the use of the document as an exhibit and

9    the expert's ability to rely on it.

10       And I want to raise that now because I do think it could

11   affect cross-examination later today.

12       **THE COURT:**  All right.  Well, when we get to that

13   issue, let's discuss it maybe during a break.

14       Yes?

15       **MR. AXELROD:**  Yeah, I think that would be an important

16   issue to discuss because that exhibit was not part of what was

17   disclosed for the cross-examination of the witnesses today, and

18   I think there are serious questions about the reliability of

19   that document and its meaning that would be -- that really

20   probably merit the Court's attention before anything resembling

21   that agreement or argument about that agreement can be

22   presented to the jury.

23       **MS. AGNOLUCCI:**  And just to be clear, we're not asking

24   to use the actual document during cross-examination.  We just

25   want to, you know, alert the Court and be very clear about the

**PROCEEDINGS**

```
 1   Court's expectations about what we can and can't ask.

 2            THE COURT:  Okay.  Well, let's let events unfold, and

 3   we'll see what happens.

 4            MR. AXELROD:  And one reminder for the Court.

 5   Yesterday we'd spoken about the Diemer testimony and advising

 6   the jury about the portion that would apply to Mr. Maegerle.  I

 7   just wanted to put that on the Court's radar screen to let them

 8   know, or if the Court would like me to do it.

 9            THE COURT:  Oh, that's right.  That's right.  Well,

10   why don't you do it, because I think if the Court does it --

11   it's the Government's case, and why don't we do that just

12   before we continue with the examination of the current witness.

13            MR. AXELROD:  Very well.  Thank you, Your Honor.

14            THE COURT:  All right.  Let's get the jury in,

15   Ms. Ottolini.

16            MR. HEMANN:  Your Honor, we'll keep Mr. Chang outside

17   just until he makes that announcement.

18            THE COURT:  Yeah, that's fine.  Actually, I don't

19   think that affects him.

20            MR. HEMANN:  I'll bring him in.  Thank you.

21       (Proceedings were heard in the presence of the jury:)

22            THE COURT:  Please be seated.

23       Good morning, ladies and gentlemen.  Once again, thank you

24   for your punctuality that enables us to start on time.

25            There's one housekeeping matter that I wanted to bring to
```

**PROCEEDINGS**

1  your attention.  The Court's been trying to be diligent with

2  respect to telling you when witnesses' testimony or evidence

3  might relate to less than all of the defendants, and the Court

4  neglected to do that with respect to Dr. Diemer, who is the

5  DuPont person that the Government called.

6      So, Mr. Axelrod, why don't you tell us the situation

7  vis-a-vis which defendants the Government contends Dr. Diemer's

8  testimony applied to.

9          **MR. AXELROD:**  Very well.  Thank you, Your Honor.

10     At the end of Dr. -- at the end of last week after

11  Dr. Diemer testified, the jury was advised that the testimony

12  of Dr. Diemer related only to USAPTI and Walter Liew.  And we

13  wanted to clarify that, while that's true in the main and with

14  respect to Dr. Diemer's testimony about his correlation and the

15  Accession Report, that Dr. Diemer's testimony also included a

16  discussion related to DuPont's trade secret policies and

17  protections and measures in that regard; and that testimony

18  would apply to Mr. Maegerle as well.

19         **THE COURT:**  All right.  And, of course, ladies and

20  gentlemen, this is simply the Government's contention.  They're

21  in their case, and we've asked them, as a courtesy, to specify

22  that; but it's for you to determine against who, if anybody,

23  the evidence should be considered, all evidence.

24     So let's continue with the direct examination, please.

25         **MR. AXELROD:**  Very well.  Thank you, Your Honor.

CHANG - DIRECT / AXELROD

1     **THE COURT:**  And I just want to remind you, sir, you're

2     still under oath.  Thank you.

3                        <u>**ALLEN CHANG**</u>,

4     called as a witness for the Government, having been previously

5     duly sworn, testified further as follows:

6                   <u>**DIRECT EXAMINATION**</u>  (resumed)

7     BY MR. AXELROD:

8     **Q.**   Good morning, Mr. Chang.

9     **A.**   Good morning.

10    **Q.**   When we stopped yesterday, we were talking about meetings

11    that occurred in -- with the clients -- with USAPTI's clients,

12    the Chinese clients.  Do you recall that?

13    **A.**   Yes.

14    **Q.**   And we -- I wanted to ask you about confidentiality, the

15    confidentiality of the information that you received and that

16    you worked on during your time at USAPTI.

17         Did Mr. Liew discuss with you the confidentiality of your

18    work?

19    **A.**   Yes.

20    **Q.**   What did he tell you?

21    **A.**   I'm sorry.  With relation to the client?

22    **Q.**   Well, in general.

23    **A.**   Oh, in general.

24         Well, I guess with the client, that we were to deliver

25    the -- whatever information that was required of us per our

1  agreements, like, with the clients during each deliverable, and

2  with the potential vendors, that there would be a nondisclosure

3  agreement whenever we sent out equipment bids.

4  **Q.**    What was the purpose of those?  Did he explain to you the

5  purpose of having nondisclosure agreements?

6  **A.**    Yes.  And I also had some background information just

7  understanding, like, the reason why they were there:

8  Essentially to prevent vendors from utilizing or distributing

9  any sort of design or specifications that our company came up

10  with.

11  **Q.**    And I'd like to show you an admitted exhibit, Exhibit 784.

12         Ms. Mahoney, if you could bring up 784, page 1.

13         And can you see that, Mr. Chang?

14  **A.**    Yes.

15  **Q.**    Do you recognize that document?

16  **A.**    I do.

17  **Q.**    And what is it?

18  **A.**    It's a note from Mr. Liew.

19  **Q.**    And what was the -- is this a note that you signed?

20  **A.**    Yes.

21  **Q.**    Can you describe where your signature is there?

22  **A.**    It's -- it's the -- I guess the third column, just the

23  second one to the left, down at the top.

24  **Q.**    Okay.  Do you see the cursor?  Is that right there?

25  **A.**    Yes.

1    Q.    Okay.  What was -- could you just briefly read that note,

2    the first -- down to the first second bullet point?

3    A.    Sure.  (Reading):

4              "To All USAPTI.

5              "Point 1.  Please guard our data, especially 3D

6         files.  Do not give any to Pangang.

7              "2.  Call me if any do not" --

8    Q.    Is that "doubt"?

9    A.    Oh, yeah.  (Reading):

10        -- "if any doubt or major decision," yes.

11   Q.    So what was the context in which this note was provided?

12   A.    We were at -- we were at the meetings with the client, and

13   I believe at some point Mr. Liew was unable to attend, and this

14   note, I think, was just given to us as a direction for -- to be

15   cautious about our files.

16   Q.    I want to switch gears with you for a moment and talk

17   about the DuPont lawsuit.

18        At some point in time, did you become aware of the fact

19   that DuPont had sued USAPTI and Walter Liew?

20   A.    Yes.

21   Q.    And when was that?

22   A.    It was -- it was around the summer of 2011.

23   Q.    Okay.  Was -- was it in the spring?

24   A.    Yeah.  It's -- I don't remember exactly when.

25   Q.    Okay.

**CHANG - DIRECT / AXELROD**

1   **A.**   But it was getting close to our latter deliverable date,

2   which I remember was around the summertime.

3   **Q.**   At some point did an investigator go to your parents'

4   house?

5   **A.**   Yes.

6   **Q.**   And how did you learn about that?

7   **A.**   I learned about it through my parents.

8   **Q.**   Did the investigator -- and was that -- did the

9   investigator identify him or herself?

10         **MS. LOVETT:**  Objection.

11         **THE COURT:**  Well, that's just -- overruled.  The

12   answer is yes or no.

13         **THE WITNESS:**  I'm sorry.  What was the question again?

14         **THE COURT:**  Did the investigator identify him or

15   herself?

16         **THE WITNESS:**  I believe so.  I think.

17   **BY MR. AXELROD:**

18   **Q.**   Did you have an understanding on who the investigator --

19   where the investigator was from, who he or she was working for?

20   **A.**   Not specifically.

21   **Q.**   Okay.  And when did that visit by the investigator to your

22   parents' house occur in relation to the filing of the lawsuit

23   by DuPont?

24   **A.**   It happened a little bit after we found out.

25   **Q.**   Okay.  So after the lawsuit, an investigator went to your

1  parents' house?

2  **A.**   Yes.

3  **Q.**   Did you discuss the fact the investigator went to your

4  parents' house, with Walter Liew?

5  **A.**   Yes.

6  **Q.**   And what did Mr. -- what did you tell Mr. Liew?

7  **A.**   I told Mr. Liew that there was an investigator who came to

8  my parents' house looking for me, and he dropped off a card for

9  my parents.

10  **Q.**   Did -- what did Mr. -- what did Mr. Liew say in response?

11  **A.**   He said that I was not obligated to give up any

12  information to any sort of private investigator.

13  **Q.**   And did he give you, at that point in time -- prior to

14  that point in time, had you heard of Kuan Yin?

15  **A.**   Yes, I had.

16  **Q.**   And how did Kuan Yin come up?

17  **A.**   Mostly not as, like, a main topic, but it had come up

18  through, like, you know, emails that were pertaining to just,

19  like, our project as a basis of comparison.

20  **Q.**   Did you know what Kuan Yin was?

21  **A.**   Not exactly.  I inferred that it was maybe a previous

22  plant.

23  **Q.**   Okay.  But at the time that you were working, did you know

24  who owned -- did you know that Kuan Yin was a TiO2 plant?

25  **A.**   I mostly inferred it, yes.

**CHANG - DIRECT / AXELROD**

1   Q.   Okay.  Did anyone tell you that?

2   A.   I can't -- I can't say that I recall anyone told me

3   directly that Kuan Yin specifically was a TiO2 plant.

4   Q.   Did you have any discussion with Mr. Liew about Kuan Yin

5   in relation to the visit by the investigator to your parents'

6   house?

7   A.   Yes.

8   Q.   And what was that?

9   A.   It was mostly, you know, when I brought up that the

10  investigators were at my house, I guess, you know, when we were

11  discussing it, he might have -- he said that, oh, perhaps the

12  investigators were interested in me because my parents were

13  from Taiwan.

14  Q.   So how did that relate to Kuan Yin?

15  A.   Supposedly Kuan Yin was in Taiwan.

16  Q.   So that's what Mr. Liew told you?

17  A.   Yes.

18  Q.   Okay.  I just -- I want to make sure I've got that.

19       So he told you that maybe your parents -- maybe the

20  investigator was interested in your parents because --

21            MS. LOVETT:  Objection.

22  BY MR. AXELROD:

23  Q.   -- because they're from Taiwan?

24            THE COURT:  Sustained.

25

CHANG - DIRECT / AXELROD

 1    BY MR. AXELROD:

 2    Q.   When did you stop working at USAPTI?

 3    A.   September 2011.

 4    Q.   Were you paid in full at the time you stopped working?

 5    A.   No.

 6    Q.   How much money were you owed?

 7    A.   About two months' worth of salary.

 8    Q.   And how much did that work out to?

 9    A.   Roughly $6,000.

10    Q.   During the time -- I want to ask you about some companies

11    in Singapore.  Okay?

12    A.   Okay.

13    Q.   In the course of your work, you worked with various

14    vendors; right?

15    A.   Yes.

16    Q.   And suppliers of equipment and things like that?

17    A.   Yes.

18    Q.   Okay.  Were you familiar with any companies in Singapore

19    working on the projects?

20    A.   No.

21    Q.   Did -- I want to run down some names with you.  A company

22    called Lawrence Process Engineers in Singapore.

23    A.   No.

24    Q.   Did Walter Liew ever mention that company to you?

25    A.   No.

**CHANG - DIRECT / AXELROD**

1   **Q.**   Did anybody at USAPTI ever mention that company to you?

2   **A.**   No.

3   **Q.**   Anyone ever discuss that company doing any work on the

4   project?

5   **A.**   No.

6   **Q.**   Do you know anything about who owns that company?

7   **A.**   No.

8   **Q.**   Huadong Equipment Solutions.

9   **A.**   No.

10  **Q.**   You never heard of that company?

11  **A.**   No.

12  **Q.**   Walter Liew never mentioned it?

13  **A.**   No.

14  **Q.**   Nobody at USAPTI ever mentioned it?

15  **A.**   No.

16  **Q.**   Didn't do any work on the TiO2 projects, to your

17  knowledge?

18  **A.**   No.

19  **Q.**   ESI Equipment & Engineering?

20  **A.**   Only -- only because it was brought up in the

21  correspondence.

22  **Q.**   Okay.

23  **A.**   But prior to that, no.

24  **Q.**   Okay.  And was a company called ESI Equipment in Singapore

25  raised in any correspondence?

**CHANG - DIRECT / AXELROD**

1   **A.**   Just I think there was at least one correspondence that

2   was brought up.

3   **Q.**   Okay.  Did you -- did Walter Liew ever mention that

4   company to you as doing any work on these TiO2 projects?

5   **A.**   I don't think prior to getting that correspondence.

6   **Q.**   And do you know who owned ESI Equipment in Singapore?

7   **A.**   No.

8   **Q.**   Huan Qu Process Equipment?

9   **A.**   I never --

10  **Q.**   You never heard of it?

11  **A.**   No.

12  **Q.**   Didn't do any work on the TiO2 project?

13  **A.**   Not to my understanding.

14  **Q.**   Walter Liew never mentioned it to you?

15  **A.**   No.

16  **Q.**   Dongbei Process Engineering?

17  **A.**   No.

18  **Q.**   Walter Liew never mentioned that company?

19  **A.**   No.

20  **Q.**   Nobody at USAPTI ever mentioned that company as working on

21  the TiO2 projects?

22  **A.**   No.

23  **Q.**   LHV Equipment and Service?

24  **A.**   No.

25          **MR. AXELROD:**  If I may have a moment.

CHANG - CROSS / LOVETT

1              (Pause in proceedings.)

2         **MR. AXELROD:**  I have no further questions, Your Honor.

3         **THE COURT:**  Thank you, Counsel.

4         **MR. AXELROD:**  Thank you.

5         **THE COURT:**  Ms. Lovett?

6         **MS. LOVETT:**  Yes, Your Honor.

7    May I proceed, Your Honor?

8         **THE COURT:**  Yes, you may.

9                   **<u>CROSS-EXAMINATION</u>**

10   BY MS. LOVETT:

11   **Q.**   Good morning, Mr. Chang.

12   **A.**   Good morning.

13   **Q.**   You testified yesterday that you have a degree in

14   mechanical engineering from Berkeley; correct?

15   **A.**   Yes.

16   **Q.**   And you began your work at USAPTI in March 2010; is that

17   correct?

18   **A.**   Yes.

19   **Q.**   You worked with the company for about a year and a half;

20   right?

21   **A.**   Yes.

22   **Q.**   And at first you were an instrumentation engineer;

23   correct?

24   **A.**   Yes, at USAPTI.

25   **Q.**   At USAPTI?

**CHANG - CROSS / LOVETT**

1    **A.**    Yes.

2    **Q.**    You were part of a team of four engineers that were

3    working on instrumentation; right?

4    **A.**    I believe that's correct.

5    **Q.**    And what tasks did you perform in that role?

6    **A.**    It was mostly filling out specifications for a long list

7    of instrumentation that was given to us, like -- like, for

8    example, at any point in a chemical process, there's something

9    that needs to be measured, and there are inputs that helps --

10   help us determine what we need to specify the equipment for.

11   And I would look at the information and specify the equipment.

12   **Q.**    Okay.  And later you became an equipment engineer at

13   USAPTI; correct?

14   **A.**    Correct.

15   **Q.**    And what kind of tasks did you perform in that role?

16   **A.**    A lot of computer-automated drafting of tanks, and also

17   some calculations to help size and specify tanks, and also

18   reach out to equipment vendors to bid out for the equipment.

19   **Q.**    And doing that computer-aided drafting, you used the

20   program autoCAD; right?

21   **A.**    AutoCAD and Illustrator -- not Illustrator, Inventor.

22   **Q.**    And what part of the process did you use autoCAD for?

23   **A.**    Mostly whenever there was 2D drafting as opposed to 3D

24   drafting.

25   **Q.**    What did you use Inventor for?

**CHANG - CROSS / LOVETT**

1   A.    3D drafting.

2   Q.    And you also used a program called Compress; right?

3   A.    Yes.

4   Q.    What did you use Compress for?

5   A.    To do pressure vessel tank calculations.

6   Q.    And you also used some open-source material for the

7   generic engineering tasks you did at USAPTI; right?

8   A.    Yes.  Yeah, reference materials.

9   Q.    And you yourself kept a binder with reference materials

10  that you had collected on materials and their compatibility;

11  right?

12  A.    I believe so, yes.

13  Q.    And some of that information you had collected from the

14  Internet yourself; right?

15  A.    Yes.

16  Q.    You mentioned yesterday that Mr. Maegerle often provided

17  you with input or guidance; correct?

18  A.    Yes.

19  Q.    And you had only been a mechanical engineer working in the

20  field for a few years; right?

21  A.    Correct.

22  Q.    Mr. Maegerle, to your understanding, had been a mechanical

23  engineer for many years; right?

24  A.    Yes.

25  Q.    So his general experience as a mechanical engineer was

1    pretty valuable to you; right?

2    **A.**   Yes.

3    **Q.**   And engineering is an iterative field; right?

4    **A.**   Sorry.  Could you clarify that?

5    **Q.**   Of course.

6    **A.**   Okay.

7    **Q.**   As you work on a project, you learn more about the context

8    in which that project is placed; right?

9    **A.**   Yes.

10   **Q.**   So even though you came in with very little titanium

11   dioxide knowledge, you learned more about the process as you

12   worked; correct?

13   **A.**   Correct.

14   **Q.**   You also had access to the shared USAPTI server; correct?

15   **A.**   Correct.

16       **MS. LOVETT:**  Your Honor, may I approach with

17   Exhibit 2602?

18       **THE COURT:**  Yes.

19       **MS. LOVETT:**  Your Honor, the parties have stipulated

20   that this exhibit is an accurate reflection of part of the

21   USAPTI server.

22       **THE COURT:**  All right.  Is that correct?

23       **MR. AXELROD:**  Yes, sir.  Yes, Your Honor.

24       **THE COURT:**  All right.  So stipulated.

25

CHANG - CROSS / LOVETT

1  BY MS. LOVETT:

2  **Q.**   Mr. Chang, do you recognize what is depicted in this

3  exhibit I just handed to you?

4  **A.**   I believe so.

5  **Q.**   What is it?

6  **A.**   It seems to be a library of reference materials.

7  **Q.**   And where was this library of reference materials?

8  **A.**   I think it was just on the company server.

9        **MS. LOVETT:**   Your Honor, I move to admit this

10  screenshot of Exhibit 2602.

11        **MR. AXELROD:**   No objection.

12        **THE COURT:**   It's admitted.

13      (Trial Exhibit 2602 received in evidence)

14        **MS. LOVETT:**   Mr. Guevara, can you please display it?

15  Thank you.

16  **Q.**   So you mentioned that this was a folder called "Reference

17  Materials"; correct?

18  **A.**   Yes, that's what it looks like it is.

19  **Q.**   And if you look over in the sort of upper right-hand

20  corner -- and Mr. Guevara can help you out a little bit --

21  you'll see that there's a folder called "Books on Mechanical

22  Engineering"; correct?

23  **A.**   Yes.

24  **Q.**   And, so, there were many different reference materials

25  kept in this folder; correct?

CHANG - CROSS / LOVETT

1    **A.**    I believe so, yes.

2    **Q.**    And to your understanding, these sort of folders on the

3    server were available to all USAPTI employees; correct?

4    **A.**    Yes.

5    **Q.**    Thank you.

6            **MS. LOVETT:**   Your Honor, may I approach with

7    Exhibit 1934?

8            **THE COURT:**   Yes.

9    **BY MS. LOVETT:**

10   **Q.**    Mr. Chang, are you familiar with this document?

11   **A.**    (Witness examines document.)   To an extent, yeah.

12   **Q.**    Whose handwriting is it on this document?

13   **A.**    I believe it's mine.

14   **Q.**    And when was this prepared?

15   **A.**    It looks like it's -- it looks like it was written on

16   February 24th, 2011.

17   **Q.**    And if you could just take a look, flip through all the

18   pages of the exhibit quickly.   Is the handwriting on every page

19   of the exhibit your handwriting?

20   **A.**    (Witness examines document.)   Yes.

21   **Q.**    And did you prepare these notes in the ordinary course of

22   your responsibilities at USAPTI?

23   **A.**    Pretty regularly.   I wrote notes whenever I thought that

24   there was something that I felt needed to be written down.

25           **MS. LOVETT:**   Your Honor, I move to admit Exhibit 1934

1    into evidence.

2             **MR. AXELROD:** Objection.

3             **THE COURT:** May I see it, please?

4             **THE CLERK:** May I have it?

5             **THE WITNESS:** Oh, sorry.

6             **THE CLERK:** That's okay.

7             **THE COURT:** Thank you.

8                      (Pause in proceedings.)

9             **THE COURT:** Why don't you come to the sidebar.

10      You may stand if you want, ladies and gentlemen.

11      (The following proceedings were heard at the sidebar:)

12             **THE COURT:** All right. So why don't you tell us,

13      first, what's the relevance of Exhibit 1934?

14          **MS. LOVETT:** Well, these are notes that he kept in the

15      course of meetings with various vendors, and I want to talk to

16      him a little bit about how he kept information about vendors on

17      the USAPTI system. So on page 4 he's drawn out a drawing of

18      how he stored information that was supplied by vendors.

19             **THE COURT:** And to what issue is that relevant?

20          **MS. LOVETT:** It's -- we're -- the rest of my

21      cross-examination is going to cover some of the information,

22      the public information that vendors provided him about

23      different types of equipment throughout the 100K process; and I

24      just sort of want to establish that he was the person

25      responsible for maintaining all of this information and that he

```
 1   specialized in the vendor information.
 2            THE COURT:  All right.  What's your objection?
 3            MR. AXELROD:  The objection is these are hearsay.
 4   They're not business records.  She can elicit all that
 5   testimony without having his notes.  They don't add anything,
 6   and they're --
 7            THE COURT:  Well, "add anything" is a relevance issue
 8   or cumulative issue, so let's keep it -- let's get the
 9   relevance piece because I think there's probably sufficient
10   foundation in the sense that it is kept -- he did say it was
11   kept in the ordinary course of business he was involved in, and
12   it does have an indicia of reliability.  He's on the stand and
13   he can defend or, you know, explain.
14        So I guess my biggest issue, really, at this point is
15   relevance.  And I guess Ms. Lovett's point is that to the
16   extent that some of these pieces of equipment which the
17   Government contends are or DuPont contends are trade secrets
18   were actually available on the market.
19            MR. AXELROD:  Well, that, I think, is an excellent
20   observation the Court's making.  In fact, none of this is
21   relevant to the actual issues in the case about the specific
22   pieces of trade secrets that we've alleged.  This is just
23   general information about vendors and vendor information.
24   There's no linking up to the specific trade secrets alleged in
25   this particular case.  So I would, you know, suggest that this
```

1    is not relevant at all.

2         **MS. LOVETT:**  Your Honor, this is very important for us

3    in laying the foundation for our expert.  In the Bill of

4    Particulars, they laid out a number of different parts of the

5    process that they were going to argue our client reasonably

6    believed were a trade secret, and we want to show that he was

7    receiving information about those things from vendors.

8         **THE COURT:**  All right.  I'm going to admit it.  I

9    think it's marginally relevant, and I don't think there's a

10   huge amount of prejudice to the Government.  And certainly he

11   can explain on redirect, or you can bring out through the cross

12   or your argument, that, you know, this is not what the

13   Government is talking about.  But I think it's -- you're

14   talking about lots and lots of generic equipment and its

15   availability, and I think that's part of, you know, the

16   defense.

17        So it's got some relevance, and it's not -- the relevance

18   is not clearly outweighed by the prejudicial effect.  So I

19   think I should admit it.

20        Anything you want to say on this point?

21        **MR. AXELROD:**  No.  I understand the Court's ruling.  I

22   will say, just to clarify, I do not believe that the witness

23   indicated that it was his regular course of business to keep

24   this.  I think he said he would take notes, you know, at times,

25   but I understand the Court's ruling.

 1              **THE COURT:**  I'm sure if Ms. Lovett wanted to spend

 2   more time, she could probably get this in as past recollection

 3   recorded.  There's probably a myriad of exceptions to the

 4   hearsay rule, but I'll overrule the objection and admit the

 5   document.

 6              **MS. LOVETT:**  Thank you, Your Honor.

 7              **THE COURT:**  And give it back to the witness.

 8              **MR. AXELROD:**  Thank you, Your Honor.

 9              **THE COURT:**  Thank you.

10      (The following proceedings were heard in open court:)

11              **THE COURT:**  The objection is overruled.  You may

12   continue.  The document is admitted.

13         (Trial Exhibit 1934 received in evidence)

14              **MS. LOVETT:**  Mr. Guevara, can you display page 4 of

15   the exhibit, please.

16   **Q.**   Mr. Chang, did you draw this diagram on page 4?

17   **A.**   Yes.

18   **Q.**   And does it depict the way that the RFQ and quotes for the

19   100K were stored on the USAPTI server?

20   **A.**   (Witness examines document.)  I'm not sure that I quite

21   remember.

22   **Q.**   Okay.  Can you describe for the jury, what is an RFQ?

23   **A.**   Request for quote.

24   **Q.**   And what did that mean within the context of your work at

25   USAPTI?

CHANG - CROSS / LOVETT

1   **A.**   So for -- for some of the equipment, we would -- we would

2   need to purchase it from an outside vendor.  And when we

3   request a quote from a vendor, typically we do it in

4   conjunction with requesting a quote from multiple vendors to

5   try to get the best quality and price.

6   **Q.**   What would vendors send you in response to an RFQ?

7   **A.**   They would send us specifications on, you know, either a

8   specific piece of equipment and their price or also, like, just

9   the price and, like, how they would, you know, proceed on

10   making the equipment.

11   **Q.**   Thank you.

12      You were involved in, as you said, the designing and

13   sizing of specific equipment for both the 30K project and the

14   100K project; correct?

15   **A.**   Yes.

16   **Q.**   And you performed some detailed design work on the

17   aluminum chloride generator; right?

18   **A.**   Yes.

19        **MS. LOVETT:**  Your Honor, may I approach with

20   Exhibit 1927?

21        **THE COURT:**  Yes, you may.

22   **BY MS. LOVETT:**

23   **Q.**   Mr. Chang, do you recognize this document?

24   **A.**   I believe so.

25   **Q.**   What is it?

CHANG - CROSS / LOVETT

1   A.   It seems to be an email correspondence asking for --

2   Mr. Liew asking for .pdf drawings of designs of certain pieces

3   of equipment.

4   Q.   And at the top of the email chain, who wrote that email?

5   A.   That would be me.

6   Q.   And who did you write the email to?

7   A.   Mr. Liew.

8   Q.   And who else?

9   A.   I seem to have also copied Thongchai Thongthawee, Tony

10  Duong, and Phillip Ilagan.

11  Q.   And those were some of your colleagues at USAPTI; correct?

12  A.   Yes.

13  Q.   And when was this email sent?

14  A.   It looks like December 20th, 2010.

15  Q.   Was this email sent during the normal course of your

16  duties at USAPTI?

17  A.   Yes.

18          MS. LOVETT:   Your Honor, I move to admit Exhibit 1927

19  into evidence.

20          MR. AXELROD:   No objection, Your Honor.

21          THE COURT:   Admitted.

22       (Trial Exhibit 1927 received in evidence)

23  BY MS. LOVETT:

24  Q.   Mr. Chang, in this email you were sending Mr. Liew and

25  your other colleagues a .pdf of the equipment detail design for

CHANG - CROSS / LOVETT

1    the aluminum chloride generator; correct?

2    **A.**   Correct.

3    **Q.**   Mr. Guevara, can you turn to page 2 of this exhibit?

4         Mr. Chang, is page 2 an example of that detailed design

5    that you sent to your colleagues?

6    **A.**   Yes.

7    **Q.**   You worked on the design of this piece of equipment;

8    right?

9    **A.**   Yes.

10   **Q.**   Doing these kind of designs involved many revisions as

11   different people review the designs; right?

12   **A.**   Correct.

13   **Q.**   And that included the clients; correct?

14   **A.**   To a degree, yes.

15   **Q.**   And a change in one element of a design like this would

16   affect many other pieces of equipment potentially; correct?

17   **A.**   Yes.

18   **Q.**   Thank you.

19        You also performed detailed 3D design work on the

20   oxidation reactor; right?

21   **A.**   Yes.

22   **Q.**   And you also performed similar work on the slurry tank;

23   correct?

24   **A.**   I believe so, yes.

25        **MS. LOVETT:**   Your Honor, may I approach with

1    Exhibit 2927?

2              **THE COURT:**  Yes.

3    **BY MS. LOVETT:**

4    **Q.**   Mr. Chang, you can take a moment to look at this exhibit,

5    but do you recognize this document?

6    **A.**   Yes.

7    **Q.**   What is it?

8    **A.**   It appears to be a drawing details for the oxidation

9    reactor.

10   **Q.**   And did you do design work on this document?

11   **A.**   I believe so, yes.

12   **Q.**   And did the design work you did on the drawings in this

13   document take place in the ordinary course of your duties at

14   USAPTI?

15   **A.**   Yes.

16             **MS. LOVETT:**  Your Honor, I --

17   **Q.**   Oh, go ahead.

18   **A.**   Sorry.  Yes.  I don't recall specifically, but I think for

19   this specific reactor, I worked in tandem with Thongchai.

20             **MS. LOVETT:**  Your Honor, I move to admit Exhibit 2927

21   into evidence.

22             **MR. AXELROD:**  No objection, Your Honor.

23             **THE COURT:**  Admitted.

24         (Trial Exhibit 2927 received in evidence)

25

1   BY MS. LOVETT:

2   Q.   Looking at page 1 of this exhibit, Mr. Chang, what does

3   this page depict?

4   A.   It's a title block for -- that summarizes the piece of

5   equipment with the company name.

6   Q.   What kind of information is this supposed to tell a reader

7   of this document?

8   A.   The title block mostly serves to just say, like, what --

9   what the drawing is, information about the company, like,

10  revisions and who worked on it.

11  Q.   And, Mr. Guevara, can you please turn to page 2 of this

12  document?

13       Mr. Chang, what does this drawing depict?

14  A.   It looks like it's an isometric view of the oxidation

15  reactor.

16  Q.   And this is a 3D drawing; correct?

17  A.   Yes.

18  Q.   Thank you.

19       MS. LOVETT:  Your Honor, may I approach with

20  Exhibit 2979?

21       THE COURT:  Yes, you may.

22  BY MS. LOVETT:

23  Q.   Mr. Chang, do you recognize this document?

24  A.   Yes.

25  Q.   What is it?

CHANG - CROSS / LOVETT

1   A.   This is an Excel -- well, this is a collection of

2   screenshots of an Excel file.

3   Q.   Okay.  And do you know what this Excel file concerned?

4   A.   Yes.

5   Q.   What is that?

6   A.   It's mostly to house specifications and calculations for

7   determining the materials and other specifications for our

8   tanks.

9   Q.   And were you involved in the drafting of this document?

10  A.   Yes.

11  Q.   Was the drafting of this document part of your normal job

12  responsibilities at USAPTI?

13  A.   Yes.

14        MS. LOVETT:  Your Honor, I move to admit Exhibit 2979

15  into evidence.

16        MR. AXELROD:  No objection, Your Honor.

17        THE COURT:  Admitted.

18      (Trial Exhibit 2979 received in evidence)

19  BY MS. LOVETT:

20  Q.   This first page is related to the solid removal condenser

21  tank; correct, Mr. Chang?

22  A.   Yes.

23  Q.   And which project was this for?

24  A.   The 100K.

25  Q.   This is yet another example of some of the design work

CHANG - CROSS / LOVETT

1   that you were involved in while you were at USAPTI; correct?

2   **A.**   Yes.

3   **Q.**   Thank you.

4           **MS. LOVETT:**  Your Honor, may I approach with

5   Exhibit 2980?

6           **THE COURT:**  Yes.

7   **BY MS. LOVETT:**

8   **Q.**   Mr. Chang, do you recognize this document?

9   **A.**   Yes.

10  **Q.**   What is it?

11  **A.**   It appears to be the screenshot of the Excel page of the

12  fume disposal system tank.

13  **Q.**   And were you involved in the drafting of this document?

14  **A.**   Yes.

15  **Q.**   Was the drafting of this document part of your normal

16  responsibilities at USAPTI?

17  **A.**   Yes.

18          **MS. LOVETT:**  Your Honor, I move to admit Exhibit 2980

19  into evidence.

20          **MR. AXELROD:**  No objection, Your Honor.

21          **THE COURT:**  Admitted.

22      (Trial Exhibit 2980 received in evidence)

23  **BY MS. LOVETT:**

24  **Q.**   You mentioned that this is related to the fume disposal

25  system; correct?

CHANG - CROSS / LOVETT

1    **A.**    Correct.

2    **Q.**    And which project was this for?

3    **A.**    The 100K.

4    **Q.**    And this is another example of the design work that you

5    were involved in during your time at USAPTI; correct?

6    **A.**    Correct.

7    **Q.**    You sometimes referred to the DuPont process in your work

8    at USAPTI; correct?

9    **A.**    I believe so, yes.

10   **Q.**    And when you mentioned that term, you understood it to be

11   a generic term for the titanium dioxide process; right?

12   **A.**    Yes.

13   **Q.**    You received some specifications and guidance from

14   Mr. Maegerle, as we discussed earlier; right?

15   **A.**    Correct.

16   **Q.**    And you were aware that Mr. Maegerle once worked for

17   DuPont; correct?

18   **A.**    Yes.

19   **Q.**    Mr. Liew told you that Mr. Maegerle had written permission

20   to work outside of DuPont on TiO2; correct?

21           **MR. AXELROD:**  Objection.

22           **THE COURT:**  Sustained.

23   **BY MS. LOVETT:**

24   **Q.**    You were involved in contacting different equipment

25   vendors for quotations on pieces of equipment for USAPTI;

CHANG - CROSS / LOVETT

1  correct?

2  **A.**  Yes.

3          **MS. LOVETT:**  Your Honor, may I approach with

4  Exhibit 1681.

5          **THE COURT:**  Yes, you may.

6  **BY MS. LOVETT:**

7  **Q.**  Mr. Chang, do you recognize this document?

8  **A.**  Yes.

9  **Q.**  What is it?

10  **A.**  It seems to be a collection -- this is a collection of

11  different quotes for different pieces of equipment and

12  comparing the different vendors.

13  **Q.**  Is this a document you were involved in maintaining?

14  **A.**  Yes.

15  **Q.**  And did you maintain this document in the ordinary course

16  of your job responsibilities at USAPTI?

17  **A.**  Yes.

18          **MS. LOVETT:**  Your Honor, I move to admit Exhibit 1681

19  into evidence.

20          **MR. AXELROD:**  No objection.

21          **THE COURT:**  Admitted.

22      (Trial Exhibit 1681 received in evidence)

23  **BY MS. LOVETT:**

24  **Q.**  Exactly what information were you tracking in this chart,

25  Mr. Chang?

1  **A.**    So for the -- for the pieces of equipment that we were

2  looking for quotes, I -- I created this Excel sheet to be able

3  to summarize the contact information, the dates that I relayed

4  stuff to them, but mainly to be able to show, like, what

5  their -- what their quotes were and any certain events relating

6  to it.

7  **Q.**    And what did the color coding mean to you?

8  **A.**    Oh, just to help separate the different types of

9  equipment.

10  **Q.**    And, so, your chart tracked the equipment type in the left

11  column; correct?

12  **A.**    Correct.

13  **Q.**    And then the vendors that you had reached out to with your

14  RFQs; right?

15  **A.**    Correct.

16  **Q.**    And a little bit of information about the contact people

17  there, the location of the vendor, and then the status of what

18  you had sent them; correct?

19  **A.**    Correct.

20  **Q.**    And the pricing information, was that provided by the

21  vendor back to you?

22  **A.**    Yes.

23  **Q.**    And what kind of information did you keep in the Notes

24  column?

25  **A.**    (Witness examines document.)  I guess it was just anything

**CHANG - CROSS / LOVETT**

1    that I thought was relevant that didn't quite fit into any

2    other columns.

3    **Q.**   Mr. Guevara, can you display the second page of this

4    document, please?

5         This was a multipage spreadsheet that you were

6    maintaining; correct?

7    **A.**   Yes.

8    **Q.**   And over what period of time did you keep track of this

9    kind of information?

10   **A.**   Just when I -- when I started to reach out to vendors.

11   **Q.**   Thank you.

12   **A.**   Yeah.

13   **Q.**   One vendor that you were in touch with was called Benicia

14   Fabricators; correct?

15   **A.**   Correct.

16   **Q.**   Do you recall what kind of equipment Benicia Fabricators

17   supplied?

18   **A.**   They -- they were -- they were a machine shop that could

19   fabricate pressure vessels.

20         **MS. LOVETT:**  Your Honor, may I approach with

21   Exhibit 1283?

22         **THE COURT:**  Yes, you may.

23   **BY MS. LOVETT:**

24   **Q.**   Mr. Chang, do you recognize this document?

25   **A.**   Yes.

CHANG - CROSS / LOVETT

1   **Q.**   What is it?

2   **A.**   It seems to be an email correspondence that I wrote to --

3   to one of the head people at Benicia Fab.

4   **Q.**   And what was the name of that person?

5   **A.**   Carmelo.  I don't recall his last name.

6   **Q.**   Does Carmelo Santiago sound right?

7   **A.**   I believe so.

8   **Q.**   And when -- what is the date on this document?

9   **A.**   August 9th, 2010.

10  **Q.**   And did you write this email in the normal course of your

11  job responsibility to reach out and contact vendors at USAPTI?

12  **A.**   Yes.

13          **MS. LOVETT:**  Your Honor, I move to admit Exhibit 1283

14  into evidence.

15          **MR. AXELROD:**  No objection, Your Honor.

16          **THE COURT:**  It's admitted.

17      (Trial Exhibit 1283 received in evidence)

18  **BY MS. LOVETT:**

19  **Q.**   Mr. Chang, can you please read this email for the jury?

20  **A.**   Yes.

21          "Hi, Carmelo.

22          "I am the new mechanical engineer here at USAPTI

23      under Walter Liew who you have worked with before in the

24      past.  We have clients from our 100K project over from

25      China who would like to do a tour of the Benicia

**CHANG - CROSS / LOVETT**

```
 1        Fabrication facility and ask questions regarding the
 2        facility and its fabrication process.  Ideally, we would
 3        like to schedule this for Thursday, August 19th.  Please
 4        let me know if this can be arranged.
 5            "Thank you."
 6   Q.   Thank you.  And you and your colleagues from USAPTI did,
 7   in fact, visit Benicia Fabricators; correct?
 8   A.   Yes.
 9   Q.   And some clients from the 100K project went along with
10   you; right?
11   A.   I believe so.  Sorry, my memory is a little hazy.
12   Q.   That's fine.
13        Do you recall taking a tour of the fabrication facilities
14   when you were there?
15   A.   Yes.
16   Q.   And do you recall meeting in the conference room at their
17   facilities there?
18   A.   Yes.
19   Q.   Do you recall that there was a photograph of a chlorinator
20   on the walls of that conference room?
21   A.   I can't say that I recall the photographs inside the
22   conference room.
23        MS. LOVETT:  Your Honor, may I display for the witness
24   previously admitted Exhibit 1726?
25        THE COURT:  Yes, you may.
```

CHANG - CROSS / LOVETT

1   BY MS. LOVETT:

2   Q.   Do you recall seeing this photo at Benicia Fabricators up

3   on the wall of the conference room?

4   A.   I can't say that I -- I can't say that I remember any of

5   the photos in the conference room.  Sorry.

6   Q.   That's fine.  Thank you.

7        Mr. Guevara, may I display for the witness previously

8   admitted Exhibit 2602.

9        Do you see here in this exhibit, sort of in the upper left

10  quadrant, it says, "BFM chlorinator pic," Mr. Chang?

11  A.   I see it.

12  Q.   Did you ever use this file?

13  A.   I can't say that I remember using it.  If I did, it must

14  not have been very much.

15  Q.   Do you know what was in that file?

16  A.   It appears to be a collection of pictures of the

17  chlorinator.

18  Q.   Thank you.

19       MS. LOVETT:   Your Honor, may I approach the witness

20  with Exhibit 1728?

21       THE COURT:   Yes.

22  BY MS. LOVETT:

23  Q.   Mr. Chang, do you recognize this document?

24  A.   Yes.

25  Q.   What is it?

1  **A.**   It appears to be an email that I sent to Mr. Santiago at

2  Benicia Fab.

3  **Q.**   And who else is cc'd on this email?

4  **A.**   Thongchai, Mr. Walter Liew, Mr. Robert Maegerle.

5  **Q.**   And what is the date on this email?

6  **A.**   February 25th, 2011.

7  **Q.**   And did you write this email in the ordinary course of

8  your job responsibilities at USAPTI?

9  **A.**   Yes.

10       **MS. LOVETT:**  Your Honor, I move to admit Exhibit 1728

11  into evidence.

12       **MR. AXELROD:**  No objection, Your Honor.

13       **THE COURT:**  It's admitted.

14       (Trial Exhibit 1728 received in evidence)

15  **BY MS. LOVETT:**

16  **Q.**   You mentioned that you sent this email to Carmelo Santiago

17  of Benicia Fabricators; correct?

18  **A.**   Correct.

19  **Q.**   And you, in this email, were seeking a quote for the

20  micron grinder; correct?

21  **A.**   Correct.

22  **Q.**   Mr. Guevara, can you turn to page 2 of this exhibit,

23  please?

24       Mr. Chang, this is an example of some of the detailed

25  design information you sent to vendors; correct?

CHANG - CROSS / LOVETT

1   **A.**   Correct.

2   **Q.**   And is this the sort of information that you would send as

3   part of the RFQ process?

4   **A.**   Yes.

5   **Q.**   And this particular drawing is of the micron grinder;

6   correct?

7   **A.**   Correct.

8   **Q.**   Thank you.

9           **MS. LOVETT:**  Your Honor, may I approach with

10  Exhibit 1948.

11          **THE COURT:**  Yes, you may.

12  **BY MS. LOVETT:**

13  **Q.**   Mr. Chang, do you recognize this document?

14  **A.**   I do.

15  **Q.**   What is it?

16  **A.**   It seems to be an email from one of our vendors, Mr. Chris

17  Toomey.

18  **Q.**   And the top email, who is that from?

19  **A.**   Mr. Walter Liew.

20  **Q.**   And who is it addressed to?

21  **A.**   Chris Toomey at --

22  **Q.**   Go ahead.

23  **A.**   Chris Toomey at FLSmidth.

24  **Q.**   And who's on the cc line there?

25  **A.**   That would be me.

1   **Q.**   And what was the date of this email?

2   **A.**   March 8th, 2011.

3   **Q.**   And did you review this sort of email to and from vendors

4   as part of the normal course of your job responsibilities at

5   USAPTI?

6   **A.**   Yes.

7        **MS. LOVETT:**   Your Honor, I move to admit Exhibit 1948

8   into evidence.

9        **THE COURT:**   Any objection?

10       **MR. AXELROD:**   No objection, Your Honor.

11       **THE COURT:**   Admitted.

12       (Trial Exhibit 1948 received in evidence)

13  **BY MS. LOVETT:**

14  **Q.**   Mr. Chang, can you please read the second email down for

15  the jury?

16  **A.**   Sure.

17       "Hi, Allen and Walter.

18       "I received a request from ESI Equipment &

19       Engineering in China for the exact same proposal I

20       provided to you for your project in Changshou.  It seems

21       they are asking for the proposal to procure the equipment

22       on your behalf.  Before I send them the proposal, I want

23       to check with you to ensure you are aware.  Do you have

24       any problems if I send them the same proposal I sent you?"

25  **Q.**   And now can you read Mr. Liew's reply at the top of the

CHANG - CROSS / LOVETT

1   email there for the jury, please?

2   **A.**   Yes.

3          "Hi, Chris.

4          "Please forward the proposal to ESI Equipment &

5      Engineering since they will be acting as our buying agent

6      for the project."

7   **Q.**   Great.  And this is the ESI Equipment & Engineering

8   correspondence that you were referring to on direct examination

9   with Mr. Axelrod; correct?

10  **A.**   Yes.

11  **Q.**   Thank you.

12         **MS. LOVETT:**  Your Honor, may I approach with

13  Exhibit 1813?

14         **THE COURT:**  Yes, you may.

15  **BY MS. LOVETT:**

16  **Q.**   Mr. Chang, take a moment to look at this document if you

17  need it, but do you recognize it?

18  **A.**   I believe so.

19  **Q.**   What is it?

20  **A.**   It looks like it's a -- it's a proposal description for a

21  transport pump.

22  **Q.**   And if I can direct you to the second page of the exhibit,

23  who was this proposal sent to?

24  **A.**   It was sent to me.

25  **Q.**   And did you receive this document in the ordinary course

1    of your job responsibilities at USAPTI?

2    **A.**   Yes.

3          **MS. LOVETT:**   Your Honor, I move to admit Exhibit 1813

4    into evidence.

5          **MR. AXELROD:**   May I have a moment, Your Honor?

6          **THE COURT:**   Yes.

7                    (Pause in proceedings.)

8          **MR. AXELROD:**   No objection, Your Honor.

9          **THE COURT:**   Admitted.

10         (Trial Exhibit 1813 received in evidence)

11   **BY MS. LOVETT:**

12   **Q.**   So you mentioned that this is a quote that you received;

13   correct?

14   **A.**   Yes.

15   **Q.**   And it's a quote for the pneumatic pump; right?

16   **A.**   Correct.

17   **Q.**   Mr. Guevara, can you turn to page 5 of this exhibit,

18   please?

19        You mentioned that quotes included pricing information;

20   right?

21   **A.**   Correct.

22   **Q.**   And sometimes they also included some specifics about

23   whatever device or equipment was being provided; correct?

24   **A.**   Correct.

25   **Q.**   And is the data on this page, page 5, an example of the

CHANG - CROSS / LOVETT

1   kinds of specifications that you would sometimes be provided

2   from a vendor for a quote?

3   A.   Correct.

4   Q.   And, so, these are technical details about the pneumatic

5   pump here; correct?

6   A.   Correct.

7   Q.   Thank you.

8          MS. LOVETT:   Your Honor, may I approach with

9   Exhibit 1819?

10          THE COURT:   Yes, you may.

11  BY MS. LOVETT:

12  Q.   Mr. Chang, do you recognize this document?

13  A.   Yes.

14  Q.   What is it?

15  A.   It seems to be a quotation description from Quantum

16  International.

17  Q.   And did you work with Quantum International in your

18  interactions with vendors as well?

19  A.   Yes.

20  Q.   And what's the date on this document?

21  A.   December 10th, 2010.

22  Q.   Is this a document that you reviewed in the ordinary

23  course of your job responsibilities at USAPTI?

24  A.   Yes.

25          MS. LOVETT:   Your Honor, I move to admit Exhibit 1819

CHANG - CROSS / LOVETT

1   into evidence.

2           **MR. AXELROD:**  No objection, Your Honor.

3           **THE COURT:**  It's admitted.

4       (Trial Exhibit 1819 received in evidence)

5   **BY MS. LOVETT:**

6   **Q.**   This is a quote that USAPTI received for chlorinator

7   bricks; correct?

8   **A.**   Yes.

9   **Q.**   And it came, as you mentioned, from a company called

10  Quantum; right?

11  **A.**   Correct.

12  **Q.**   The president of that company was Gary Stewart; right?

13  **A.**   Yes.

14  **Q.**   Mr. Guevara, can you turn to page 2 of this document,

15  please?

16      Again, this quote included some information about pricing

17  for this equipment; right?

18  **A.**   Correct.

19  **Q.**   And it also included some different sizing information for

20  the bricks that could be supplied; right?

21  **A.**   Correct.

22  **Q.**   Thank you.

23          **MS. LOVETT:**  Your Honor, may I approach with

24  Exhibit 1971?

25          **THE COURT:**  Yes, you may.

1   BY MS. LOVETT:

2   Q.   Mr. Chang, do you recognize this document?

3   A.   (Witness examines document.)  Not -- not as much.

4   Q.   Okay.  Who is the document from?

5   A.   This is from Robert O'Connor at Petro-Chem.

6   Q.   And who is it addressed to?

7   A.   It was directed to Mr. Liew.

8   Q.   And who's on the cc line there?

9   A.   Mr. Maegerle, myself, Ruth Oduca, someone at CALCO,

10  Patrick S. Chang from Petro-Chem, Sandeep Dandekar at

11  Petro-Chem.

12  Q.   Do you recall receiving this email?

13  A.   Not -- not as much, but....

14  Q.   Okay.  Were you involved in interacting with Petro-Chem?

15  A.   Not -- I think I have, but I think it might have just been

16  that my interaction was not as much.

17  Q.   We'll move on then.

18  A.   Sure.

19  Q.   Thank you, Mr. Chang.

20       MS. LOVETT:  Your Honor, may I approach with

21  Exhibit 1766?

22       THE COURT:  Yes.

23  BY MS. LOVETT:

24  Q.   Mr. Chang, do you recognize this document?

25  A.   Yes.

CHANG - CROSS / LOVETT

1  **Q.**   What is it?

2  **A.**   It's an email from -- it's an email regarding the rotary

3  valves with Delta Ducon.

4  **Q.**   And who's the email from?

5  **A.**   Walter Liew.

6  **Q.**   And who is it to?

7  **A.**   Mr. Maegerle.

8  **Q.**   And who's included on the cc line here?

9  **A.**   Jian Liu and myself.

10  **Q.**   And what's the date on this email?

11  **A.**   February 18th, 2011.

12  **Q.**   And were you involved in communications with Delta Ducon

13  about these rotary valves?

14  **A.**   Yes.

15  **Q.**   And did you review this email in the ordinary course of

16  your job responsibilities at USAPTI?

17  **A.**   Yes.

18         **MS. LOVETT:**  Your Honor, I move to admit Exhibit 1766

19  into evidence.

20         **MR. AXELROD:**  No objection, Your Honor.

21         **THE COURT:**  Admitted.

22      (Trial Exhibit 1766 received in evidence)

23  **BY MS. LOVETT:**

24  **Q.**   You mentioned that this involves a quote that you received

25  from a company called Delta Ducon; correct?

1    A.    Correct.

2    Q.    Do you recall what kind of things Delta Ducon supplied?

3    A.    Yes.  They were one of our bidders for a specialty rotary

4    valve.

5    Q.    And what does a rotary valve do?

6    A.    Essentially a rotary valve is a piece of equipment that

7    turns; and when it turns, it pushes the equipment along to push

8    equipment from one side of a pipe to another.

9    Q.    Thank you.

10          MS. LOVETT:  Your Honor, may I approach with

11   Exhibit 1802?

12          THE COURT:  Yes.

13   BY MS. LOVETT:

14   Q.    Mr. Chang, do you recognize this document?

15   A.    (Witness examines document.)  I believe so.

16   Q.    What is it?

17   A.    It looks to be an email with regards to the bag filters.

18   Q.    And who is this email from?

19   A.    From Mr. Walter Liew.

20   Q.    To who?

21   A.    Mr. Robert Maegerle.

22   Q.    Who else is cc'd here?

23   A.    Jian Liu and myself.

24   Q.    And what's the date on this email?

25   A.    March 22nd, 2011.

CHANG - CROSS / LOVETT

1    **Q.**   And does this email, again, concern vendors?

2    **A.**   Yes.

3    **Q.**   Which vendor does this concern?

4    **A.**   Fisher-Klosterman.

5    **Q.**   And was this another vendor you kept track of during your

6    job responsibilities at USAPTI?

7    **A.**   Yes.

8          **MS. LOVETT:**   Your Honor, I move to admit Exhibit 1802

9    into evidence.

10         **MR. AXELROD:**   No objection, Your Honor.

11         **THE COURT:**   Admitted.

12       (Trial Exhibit 1802 received in evidence)

13   **BY MS. LOVETT:**

14   **Q.**   You mentioned that this concerned oxidation bag filters;

15   correct?

16   **A.**   Yes.

17   **Q.**   Mr. Guevara, can you turn to the second page of this

18   exhibit, please?

19        This is an email that you wrote, correct, at the second

20   half of this second page?

21   **A.**   Oh, yes.

22   **Q.**   And you can take a minute to look at your email.  It's on

23   page 2 and page 3 of the document, but here you were comparing

24   two different vendor quotes, MikroPul and Fisher-Klosterman;

25   correct?

CHANG - CROSS / LOVETT

1   **A.**   Correct.

2   **Q.**   Thank you.

3          **MS. LOVETT:**  Your Honor, may I approach with

4   Exhibit 1776.

5          **THE COURT:**  Yes.

6   **BY MS. LOVETT:**

7   **Q.**   Mr. Chang, do you recognize this document?

8   **A.**   Yes.

9   **Q.**   What is it?

10  **A.**   It looks like it is an email from Mr. Dave Luzan with

11  regards to a jet mill.

12  **Q.**   And who is it addressed to?

13  **A.**   To Mr. Walter Liew.

14  **Q.**   And who's copied here?

15  **A.**   Myself and Afshin Nayeri from Sturtevant.

16  **Q.**   And did you work with Mr. Luzan in looking for equipment

17  vendors?

18  **A.**   I believe so.

19  **Q.**   And did you review this email as part of your ordinary job

20  responsibilities at USAPTI?

21  **A.**   Yes.

22          **MS. LOVETT:**  Your Honor, I move to admit Exhibit 1776

23  into evidence.

24          **MR. AXELROD:**  No objection, Your Honor.

25          **THE COURT:**  Admitted.

1          (Trial Exhibit 1776 received in evidence)

2    BY MS. LOVETT:

3    Q.   This, according to the cover email, relates to a brochure

4    that USAPTI was provided; correct?

5    A.   Correct.

6    Q.   Mr. Guevara, can you display page 2?

7         This is a brochure about micronizers; correct?

8    A.   Correct.

9    Q.   And you received this from a vendor; right?

10   A.   Correct.

11   Q.   Mr. Guevara, can you display the third page of this

12   exhibit?

13        This brochure includes drawings of micronizers; correct?

14   A.   Images, yes.  Yeah, images.

15   Q.   Thank you.

16        MS. LOVETT:  Your Honor, may I approach with

17   Exhibit 1826?

18        THE COURT:  Yes.

19   BY MS. LOVETT:

20   Q.   Mr. Chang, do you recognize this document?

21   A.   Yes.

22   Q.   What is it?

23   A.   It seems to be a detail -- a section-view detail of a ball

24   valve.

25   Q.   And is this a document that you reviewed as part of your

CHANG - CROSS / LOVETT

1    role in reviewing vendor quotes?

2    **A.**   Yes.

3              **MS. LOVETT:**  Your Honor, I move to admit Exhibit 1826

4    into evidence.

5              **MR. AXELROD:**  Ms. Lovett, can I just take a look?

6         May I have a moment, Your Honor?

7              **THE COURT:**  Sure.

8              **MR. AXELROD:**  No objection, Your Honor.

9              **THE COURT:**  Admitted.

10        (Trial Exhibit 1826 received in evidence)

11   **BY MS. LOVETT:**

12   **Q.**   This is a drawing provided to USAPTI by a vendor called

13   Mayer; correct?

14   **A.**   Correct.

15   **Q.**   And it depicts the chlorinator draw-off valve; right?

16   **A.**   I believe -- I believe so.  I don't recall exactly.

17   **Q.**   Okay.  What do you recall about what this drawing depicts?

18   **A.**   This is -- this drawing seems -- it describes the

19   mechanism of how -- of how the ball valve works.  And looking

20   at the cross-section, you can see the various chambers and

21   inputs that allow for it to function.

22   **Q.**   And, so, it includes some technical details here on the

23   drawing; right?

24   **A.**   Correct.

25   **Q.**   Thank you.

**CHANG - CROSS / LOVETT**

1        We spoke a little bit earlier about your handwritten

2   notes; right?

3   **A.**   Yes.

4   **Q.**   And you would keep handwritten notes of information that

5   you learned from vendors when you talked to them about

6   equipment; right?

7   **A.**   Yes.

8           **MS. LOVETT:**   Your Honor, may I approach with

9   Exhibit 1926?

10          **THE COURT:**   Yes.

11          **THE CLERK:**   1926?

12          **MS. LOVETT:**   1926.

13  **Q.**   Mr. Chang, do you recognize this document?

14  **A.**   I believe so.

15  **Q.**   What is it?

16  **A.**   It looks like handwritten notes that I took during

17  meetings.

18  **Q.**   And if you can just flip quickly through all the pages.

19  Is the handwriting on every page your handwriting?

20  **A.**   (Witness examines document.)   Looks like, yes.

21  **Q.**   And you kept these notes in the ordinary course of your

22  job responsibilities at USAPTI; correct?

23  **A.**   Yes, when I did keep notes.

24          **MS. LOVETT:**   Your Honor, I move to admit Exhibit 1926

25  into evidence.

1       **MR. AXELROD:**  No objection, Your Honor.

2       **THE COURT:**  Admitted.

3       (Trial Exhibit 1926 received in evidence)

4   BY MS. LOVETT:

5   **Q.**   The first page here is meeting notes from a meeting with

6   Gary Stewart; correct?

7   **A.**   Correct.

8   **Q.**   And he was the individual we talked about earlier who was

9   involved in Quantum; right?

10  **A.**   Correct.

11  **Q.**   And it mentions bricks at the top here; right?

12  **A.**   Yes.

13  **Q.**   And if you look at the second line down in the page, you

14  see that it says Millennium arrow Cristal Global group.  Do you

15  recall what that was about?

16  **A.**   I think to my -- to my understanding it meant that

17  Millennium was -- possibly either owned Cristal Global or

18  changed their name to Cristal Global or had some relation to

19  Cristal Global.

20  **Q.**   And did you understand that Millennium and Cristal Global

21  were competitors with DuPont?

22  **A.**   No.

23  **Q.**   Mr. Guevara, can you turn to page 3 of this document?

24       This, if you look at the top of the page here, is notes

25  from a meeting with Alfa Laval.  Correct me if I'm reading your

CHANG - CROSS / LOVETT

1    handwriting wrong, but it looks like Alfa Laval Inc.?

2    A.   I believe so.  And pardon my handwriting.  I believe it's

3    Laval.

4    Q.   And you spoke to them about heat exchangers; correct?

5    A.   It looks like, yes.

6    Q.   And if you go about halfway down the page, below the sort

7    of spirally drawing there, it says, "Used in Millennium group";

8    correct?

9    A.   Yes.

10   Q.   And were these notes you took of things that vendors told

11   you?

12   A.   I believe so, yes.

13   Q.   Thank you.

14        MS. LOVETT:  Your Honor, may I approach with

15   Exhibit 1946?

16        THE COURT:  Yes.

17   BY MS. LOVETT:

18   Q.   Mr. Chang, do you recognize this document?

19   A.   Yes.

20   Q.   What is it?

21   A.   It looks like handwritten notes that I made to help with

22   design.

23   Q.   And is your handwriting on every page of this document?

24   There are many, but take a quick flip through.

25   A.   Yeah, it appears so, yes.

1  Q.   And did you take these notes and create these notes in the

2  ordinary course of your job responsibilities at USAPTI?

3  A.   Yes.

4        MS. LOVETT:  Your Honor, I move to admit Exhibit 1946

5  into evidence.

6        THE COURT:  Any objection?

7        MR. AXELROD:  No objection, Your Honor.

8        (Trial Exhibit 1946 received in evidence)

9        THE COURT:  All right.  Before we move on, let's take

10  a stretch break, ladies and gentlemen.

11                    (Pause in proceedings.)

12        THE COURT:  All right.  Please be seated.

13     You may continue, Ms. Lovett.

14        MS. LOVETT:  Thank you, Your Honor.

15  Q.   Mr. Chang, did you write this title page here that we're

16  looking at on the screen?

17  A.   The title page?  That doesn't look like my handwriting.

18  Q.   Okay.  But --

19        THE COURT:  Counsel, please use the exhibit numbers.

20  When you say "this page" --

21        MS. LOVETT:  Yes.  Page 1 of Exhibit 1946.

22        THE COURT:  Thank you.

23        MS. LOVETT:  Mr. Guevara, you can you please turn to

24  page 15 of Exhibit 1946?

25     And for the record, this exhibit is Bates-stamped in the

**CHANG - CROSS / FROELICH**

1  bottom right corner, and it's Bates-stamped 033-Spiral

2  Notebook-000015.

3            **THE COURT:**  All right.

4  **BY MS. LOVETT:**

5  **Q.**   Are these notes that you took on the flue pond?

6  **A.**   Yes.

7  **Q.**   And you and Mr. Axelrod discussed your flue pond design a

8  little bit yesterday; correct?

9  **A.**   Correct.

10 **Q.**   And can you read the first line of this page, please?

11 **A.**   Sure.  "Elbows square because you can brick it and the

12 bricks -- the brick is needed at U-turns."

13 **Q.**   So these were notes that you took about why you needed to

14 square the elbows of the flue pond; correct?

15 **A.**   Correct.

16            **MS. LOVETT:**  No further questions, Your Honor.

17            **THE COURT:**  Thank you, Counsel.

18       Any redirect?

19            **MR. AXELROD:**  Yes, Your Honor.

20            **MR. FROELICH:**  Your Honor, I have --

21            **THE COURT:**  Oh, I'm sorry.

22            **MR. FROELICH:**  That's quite all right, Your Honor.

23            **THE COURT:**  Again, my mistake, Mr. Froelich.  Thank

24 you for keeping me in the game here.

25

 1                          <u>**CROSS-EXAMINATION**</u>

 2     **BY MR. FROELICH:**

 3     **Q.**    Mr. Chang, I'm Jerry Froelich.  How are you?

 4     **A.**    Hello.

 5     **Q.**    I represent Mr. Maegerle.

 6     **A.**    Uh-huh.

 7     **Q.**    We haven't had an opportunity to talk before this, have

 8     we?

 9     **A.**    I don't believe so.

10     **Q.**    You've said you have an engineering degree from Berkeley;

11     is that right?

12     **A.**    Yes.

13     **Q.**    And when you're in engineering school, when you're in

14     college learning to be an engineer, they just teach you the

15     basics; isn't that right?

16     **A.**    Correct.

17     **Q.**    And what you -- you really become a competent engineer and

18     an efficient engineer, you learn on the job; isn't that right?

19     **A.**    Yes.

20     **Q.**    And as you learn, you become a better and better engineer;

21     isn't that right?

22     **A.**    Yes.

23     **Q.**    And when you get your jobs, or particularly your first

24     jobs, you may not know anything about the subject matter; isn't

25     that correct?

**CHANG - CROSS / FROELICH**

1    **A.**   Correct.

2    **Q.**   And that's not unusual.  You have to learn about the

3    subject matter in that particular area; isn't that right?

4    **A.**   That is correct.

5    **Q.**   And the longer you stay in an area, you become more

6    proficient in it?

7    **A.**   Correct.

8    **Q.**   And your experience is very important as an engineer?

9    **A.**   Yes.

10   **Q.**   All right.  And that's what you carry with you for the

11   rest of your life, your experience.  And that's how you learn

12   and thus become a better engineer?

13   **A.**   Yes.

14   **Q.**   And you thought Mr. Maegerle was a very good engineer,

15   didn't you?

16   **A.**   Yes.

17   **Q.**   And while you were working, as you testified on direct,

18   what you were doing, or part of the things you were doing, you

19   were upscaling a 30-ton Jinzhou plant up to 100-ton Pangang

20   plant; is that correct?

21   **A.**   For the equipment, yes.

22   **Q.**   Now, you also had help doing that, didn't you?  Didn't you

23   have chemical engineers there at USAPTI?

24   **A.**   Yeah.  They would provide input that would relate to the

25   design, yes.

**CHANG - CROSS / FROELICH**

1  Q.   Okay.  And you also had mechanical engineers that were

2  helping you?

3  A.   I was -- I was working alongside with Thongchai, who was

4  also doing CAD work.

5  Q.   Okay.  How about process engineers?  Did you have process

6  people helping you?

7  A.   Oh, yeah.  That would be Ruth and Ken also.

8  Q.   Okay.  Now, when you were -- you were able to upscale --

9  you were doing -- you were able to do some of the upscaling; is

10  that correct?

11  A.   Yes.

12  Q.   All right.  But at certain places, because you didn't have

13  the experience, you needed some help?

14  A.   Yes.

15  Q.   All right.  And some of that you got from Mr. Liew; isn't

16  that correct?

17  A.   Yes.

18  Q.   And some of it you got from Mr. Maegerle?

19  A.   Yes.

20  Q.   And also there were -- you had materials there at USAPTI

21  that you could -- weren't there memorandums and documents or

22  folders of documents you could go to?

23  A.   Yes.

24  Q.   And when you were -- you talked to -- first of all, is

25  there a difference -- there's a difference between basic data

**CHANG - CROSS / FROELICH**

1   and design; isn't there?

2   **A.**   What are you saying?

3   **Q.**   Well, a design -- to have a design, don't you need flow

4   sheets?

5   **A.**   Yes.

6   **Q.**   Okay.  You need P&I drawings?

7   **A.**   Yes.

8   **Q.**   You need electrical drawings?

9   **A.**   Eventually, yes.

10  **Q.**   Okay.  And how about logic diagrams?

11  **A.**   For programming?

12  **Q.**   Well, for -- yeah, for the programs, for the design.  Do

13  you need that?

14  **A.**   Yeah.

15  **Q.**   Okay.  Now, you were shown Exhibit -- if we can pull it

16  up, Exhibit 38, page 17, please.  I thought it was -- well, let

17  me go back.

18       You were shown an exhibit -- oh, there it is.  That's

19  right.

20       Do you remember you were shown that yesterday?

21  **A.**   Yes.

22  **Q.**   Okay.  And that was what you believed -- you were told it

23  was a flue pond?

24  **A.**   Yes.

25  **Q.**   That's -- all you're seeing there is the cement that goes

**CHANG - CROSS / FROELICH**

1  into a flue pond; isn't that correct?

2  **A.**  Yes.

3  **Q.**  All right.  And that's all that is -- that, basically, is

4  just a retainer wall to hold in water?

5  **A.**  Yes.

6  **Q.**  It doesn't take any great engineering to do the retainer

7  wall to hold in water, does it?

8  **A.**  Not -- not particularly, I don't think.

9  **Q.**  Right.  Now, there were some other things I wanted to talk

10  to you about, and I won't take a lot of your time, but you --

11  you met Mr. Maegerle.  Mr. Maegerle would help you out

12  occasionally; isn't that correct?

13  **A.**  Correct.

14  **Q.**  All right.  And he was able to answer your questions

15  pretty quickly, wasn't he?

16  **A.**  Yes.

17  **Q.**  All right.  And he told you -- you knew -- you learned

18  what his background was; isn't that correct?

19  **A.**  Yes.

20  **Q.**  That he had worked at DuPont?

21  **A.**  Yes.

22  **Q.**  And that he was retired?

23  **A.**  Yes.

24  **Q.**  All right.  And he also told you that he had permission to

25  consult for DuPont, didn't he?

1          MR. AXELROD:  Objection.

2          THE COURT:  Sustained.

3    BY MR. FROELICH:

4    Q.  Well, you had a discussion with Mr. Maegerle about the

5    lawsuit, didn't you?  Do you remember you talked to

6    Mr. Maegerle after the lawsuit was filed by DuPont?

7    A.  A little bit, yes.

8    Q.  All right.  He wasn't concerned about it, was he?

9          MR. AXELROD:  Objection.

10         THE COURT:  Sustained.

11         MR. FROELICH:  Your Honor, may we be heard for a

12   minute?

13         THE COURT:  No.

14   BY MR. FROELICH:

15   Q.  Did Mr. Maegerle -- did you -- you discussed the lawsuit

16   with him?

17   A.  A little bit.

18   Q.  Okay.  And did he tell you that he had permission to be a

19   consultant?

20         MR. AXELROD:  Objection.

21         THE COURT:  Sustained.

22   BY MR. FROELICH:

23   Q.  Did he express any concern to you about the lawsuit at

24   all?

25         THE COURT:  Just a moment.

 1            MR. AXELROD:  Objection.

 2            THE COURT:  Sustained.

 3                         (Pause in proceedings.)

 4            MR. FROELICH:  That's all I have, Your Honor.  I'd

 5    like to be heard eventually.

 6            THE COURT:  All right.

 7        Any redirect?

 8            MR. AXELROD:  I do.

 9            THE COURT:  All right.

10            MR. AXELROD:  Thank you.

11        Your Honor, may I approach to take some of those exhibits

12    back from Mr. Chang?

13            THE COURT:  Yes, you may.

14            MR. AXELROD:  Thank you.

15                     <u>**REDIRECT EXAMINATION**</u>

16    **BY MR. AXELROD:**

17    **Q.**   Mr. Chang, on cross-examination you were asked by both

18    counsel about the design process for this -- these TiO2

19    projects and your role in that; right?

20    **A.**   Sure.  Yes.

21    **Q.**   And you indicated that there were some -- for chemical

22    engineering advice, you went to certain people at USAPTI;

23    right?

24    **A.**   I -- I guess -- sorry.  I -- for chemical engineering

25    information, yeah.

**CHANG - REDIRECT / AXELROD**

1  **Q.**   Okay.

2  **A.**   But, yeah.  But I -- but not really for advice, I guess.

3  **Q.**   And that's a bad question on my part.

4       To design a TiO2 facility, how many engineers do you need?

5  **A.**   I would say that, you know, you need -- you need engineers

6  of certain -- of certain types, to my understanding.  I guess

7  the exact number I couldn't really say because my experience

8  really was just with USAPTI.

9  **Q.**   Okay.  And Ms. Lovett showed you some of your notes that

10 you had taken at various meetings with vendors.

11      Do you recall that?

12 **A.**   Sure, yeah.

13 **Q.**   And at some of those meetings, Mr. Maegerle was present;

14 right?

15 **A.**   Mostly on, like, conference calls.

16 **Q.**   Okay.  And I want to look with you at a couple of the

17 notes that have been admitted, and I'm going to start with

18 1946.  And this is the first page of those notes.

19      Do you see that?

20 **A.**   Yes.

21 **Q.**   Okay.  And we're going to go back a little bit further in

22 the notes.

23      And can you see those -- can you see those notes?  Or is

24 that visible?

25 **A.**   Yeah.  I can see it, yes.

**CHANG - REDIRECT / AXELROD**

1    Q.   I can sort of zoom in.

2          **MS. LOVETT:**  Mr. Axelrod, what page is this?

3          **MR. AXELROD:**  That's page 20 of the notes.

4    Q.   Can you make out -- that's your handwriting?

5    A.   Yes.

6    Q.   And does this reflect a conversation that included

7    Mr. Maegerle?

8    A.   I believe so.

9    Q.   Okay.  At the top it says, "Shutdown maintenance notes";

10   right?

11   A.   Yes.

12   Q.   And then could you describe for the jury what information,

13   in general terms, follows?

14   A.   Just some guidelines for maintenance of pieces of

15   equipment.

16   Q.   And is one of those pieces the chlorinator?

17   A.   I believe so, yes.

18   Q.   And provides some guidance about when to shut it down, how

19   often, things like that?

20   A.   Yes.

21   Q.   Was that information provided by Mr. Maegerle?

22   A.   Yes.

23   Q.   Okay.  And to your knowledge, had he worked at any other

24   TiO2 manufacturers other than DuPont?

25   A.   Other than -- other than DuPont?

CHANG - REDIRECT / AXELROD

1   **Q.**   Yeah.

2   **A.**   Yeah, I can't say that I know.

3   **Q.**   Okay.  You only knew about his experience at DuPont?

4   **A.**   Yes.

5   **Q.**   Okay.  And then a little bit further down in the bottom

6   there, and I'm going to put my finger there, do you see that?

7   **A.**   Yes.

8   **Q.**   Okay.  Is that more information about the chlorinator?

9   **A.**   Yes.

10  **Q.**   And is that more information provided by Mr. Maegerle?

11  **A.**   Yes.

12  **Q.**   And I'm going to turn the page.  And you were talking with

13  Ms. Lovett about the aluminum chloride generator; right?

14  **A.**   Yes.

15  **Q.**   And do you see those notes at the bottom about the

16  aluminum chloride generator?

17  **A.**   Yes.

18  **Q.**   And is that also information that was provided to you by

19  Mr. Maegerle?

20  **A.**   I believe so.

21  **Q.**   So when you were working on these pieces of equipment, I

22  gather -- first of all, you were asked by Ms. Lovett whether

23  Mr. Maegerle gave you general engineering advice; right?

24  **A.**   I think so, yeah.

25  **Q.**   Yeah.  But he gave you more than that; didn't he?

1   A.   As, like -- sorry.  Like what?

2   Q.   Well, did he provide you specific information with respect

3   to the particular projects that you worked on at USAPTI?

4   A.   Oh.

5          MS. LOVETT:  Objection.

6          THE COURT:  Sustained.

7   BY MR. AXELROD:

8   Q.   Can you describe the kind of information that Mr. Maegerle

9   provided to you --

10  A.   Uh-huh.

11  Q.   -- to fulfill your duties in equipment design?

12  A.   Sure.  Like he would -- he would give me, you know,

13  information with regards to also how to maintain, like, the

14  equipment, like -- like, for example on this document, like --

15  like, how often to perform maintenance on certain pieces of

16  equipment.

17  Q.   Did he provide you with design criteria?

18  A.   Yes.  Yeah.

19  Q.   Could you have done your work without his design criteria

20  guidance?

21         MS. LOVETT:  Objection.

22         THE COURT:  Sustained.

23  BY MR. AXELROD:

24  Q.   Was the design criteria that he provided you helpful in

25  doing your work?

 1   **A.**    Yes.

 2   **Q.**    How so?

 3   **A.**    Like, you know, like, there was a lot of information that

 4   I didn't know how to -- how to even, you know, start to even

 5   determine on my own, and, you know, getting design criteria

 6   would fill in the gaps.

 7   **Q.**    Was that information that you could get by looking at a

 8   textbook?

 9          **MS. LOVETT:**  Objection.

10          **THE COURT:**  Sustained.

11   BY MR. AXELROD:

12   **Q.**    Other than talking with Mr. Maegerle, how else would you

13   identify that information?

14   **A.**    I could go online, try to find, you know, manuals and

15   reference materials with regards to similar processes and that

16   sort of stuff.

17   **Q.**    And did you do that in this case?

18   **A.**    I think I did for some things, yes.

19   **Q.**    Okay.  But when it comes to, for example, working on the

20   design of the oxidation reactor, did you rely on information

21   provided by Mr. Maegerle?

22   **A.**    Yes.

23   **Q.**    And for the chlorinator?

24   **A.**    Yes.

25   **Q.**    Okay.  You were also asked about a picture of a

**CHANG - REDIRECT / AXELROD**

1   chlorinator.  Do you recall that?  At Benicia Fabrication?

2   **A.**   I'm sorry.  Do I recall the question or --

3   **Q.**   Yeah.  Do you recall that picture that was shown to you of

4   the chlorinator?

5   **A.**   Oh, just now?

6   **Q.**   Yeah.  Earlier during Ms. Lovett's examination.

7   **A.**   Yes.

8   **Q.**   Did you design a chlorinator based on that photograph?

9   **A.**   No.

10  **Q.**   Okay.  Could you?

11  **A.**   Not really.

12  **Q.**   I want to also clear up with you this question.  You were

13  asked, initially by me on direct and then by Ms. Lovett on

14  cross-examination, about ESI.  Do you recall that?

15  **A.**   Yes.

16  **Q.**   And this is the email.  This is Exhibit 1948.  Do you

17  recognize that?

18  **A.**   Yes.

19  **Q.**   Okay.  And when you and I spoke, I was asking you about a

20  company in Singapore called ESI.  Do you recall that?

21  **A.**   Yes.

22  **Q.**   Do you have any knowledge of ESI in Singapore?

23  **A.**   I guess just that they are related to the project, the

24  equipment and procurement of equipment.

25  **Q.**   So let me step back with you.  Let's look at this email

**CHANG - REDIRECT / AXELROD**

1   together.

2   **A.**   Sure.

3   **Q.**   That bottom email, it says -- do you see the one from

4   Mr. Toomey to you on March 8th, 2011?

5   **A.**   Yes.

6   **Q.**   And it says (reading):

7           "Hi, Allen and Walter.

8           "I received a request from ESI Equipment &

9       Engineering in China...."

10          Do you see that?

11  **A.**   Yes.

12  **Q.**   Okay.  And I asked you about ESI in Singapore.

13  **A.**   Oh, okay.

14  **Q.**   Were you confused about China and Singapore?

15  **A.**   I suppose.

16          **MS. LOVETT:**  Objection.

17          **THE COURT:**  Sustained.

18  **BY MR. AXELROD:**

19  **Q.**   Okay.  So you understand the ESI that I asked you about

20  was a ESI company in Singapore; right?

21  **A.**   I'm sorry.  Yeah.  If that's what you said, then sorry.  I

22  misunderstood.

23  **Q.**   Okay.  Are you familiar with a company called ESI in

24  Singapore having any involvement in any of the TiO2 projects

25  that you worked on?

**CHANG - REDIRECT / AXELROD**

1   **A.**    I can't say that I can recall.

2   **Q.**    Okay.  Putting aside this ESI in China that's referenced

3   in this Exhibit 1948 --

4   **A.**    Sure.

5   **Q.**    -- I'm asking you --

6   **A.**    Uh-huh.

7   **Q.**    -- about a company in Singapore called ESI, and I'm asking

8   you whether you have any knowledge of that company having

9   anything to do with the TiO2 projects that you worked on when

10  you were at USAPTI.

11  **A.**    Yeah, I can't recall.

12          **THE COURT:**  I think we need to wrap it up soon,

13  Counsel.

14          **MR. AXELROD:**  I have no further questions.  Thank you.

15          **THE COURT:**  Great.  That will wrap it up.  Thank you

16  very much.

17      Do you have anything else, Ms. Lovett?

18          **MS. LOVETT:**  No, Your Honor.

19          **THE COURT:**  Great.

20      Thank you, sir.  You're excused.

21          **MR. FROELICH:**  Excuse me, Your Honor.  I'd like --

22          **THE COURT:**  I'm sorry.  I do that to you all the time.

23          **MR. FROELICH:**  That's all right.

24          **THE COURT:**  Go ahead.

25          **MR. FROELICH:**  No, Your Honor.  I'd like not to excuse

 1   him.

 2          THE COURT:  You'd like not to excuse him?

 3          MR. FROELICH:  Yes, Your Honor.

 4          THE COURT:  You mean subject to call at a later time?

 5          MR. FROELICH:  That's correct.

 6          THE COURT:  You're still under subpoena and subject to

 7   recall.  We'll notify if we need you during the course of the

 8   trial.  But you can leave the courtroom now.  Thank you.

 9       I assume that's okay, Mr. Froelich?  He can leave now?

10          MR. FROELICH:  Yes, Your Honor.

11          THE COURT:  Yes.  You're excused for the moment.

12              (Witness excused subject to recall.)

13          THE COURT:  All right.  Next witness.

14          MR. HEMANN:  Your Honor, the United States calls

15   Phillip Guan.

16          THE COURT:  All right.  Come forward, sir.  Right over

17   here, please, Mr. Guan, to be sworn.  Welcome, sir.

18          THE WITNESS:  Thank you.  Where shall I sit?

19          THE COURT:  Just turn around.  Come here.  No, no.

20   Right over here by the chair.

21          THE CLERK:  Raise your right hand, please.

22                        **PHILLIP GUAN**,

23   called as a witness for the Government, having been duly sworn,

24   testified as follows:

25          THE WITNESS:  Yes.

GUAN - DIRECT / HEMANN

1          **THE CLERK:**  Thank you.  Please be seated and state and

2     spell your full name for the record.

3          **THE WITNESS:**  Okay.  My name is Phillip Guan.  My

4     first name is Phillip, spelled P-H-I-L-L-I-P, double L.  My

5     last name is Guan, G-U-A-N.

6          **THE CLERK:**  Thank you.

7                      <u>**DIRECT EXAMINATION**</u>

8     **BY MR. HEMANN:**

9     **Q.**   Good morning, Mr. Guan.

10    **A.**   Yes.

11    **Q.**   What do you do for a living?

12    **A.**   I am a CPA accountant.  I have my CPA practice in

13    San Francisco.

14    **Q.**   Where is it located?

15    **A.**   2805 San Bruno Avenue, San Francisco, California 94134.

16    **Q.**   How long have you been a CPA accountant?

17    **A.**   I've been a CPA since 2002.

18    **Q.**   And have you been in business at the same location since

19    2002?

20    **A.**   It was established in the same street, not the same

21    location in the first places.  And then I moved to the current

22    location, I cannot remember exactly what date.  It's about

23    three, four years.

24    **Q.**   And could you describe for the jury a little bit about

25    your business, whether you employ people, sole proprietorship?

1    What sort of business do you have?

2    **A.**   I first start my business by myself, my wife, and also one

3    or two staff temporary; and later on I hire more people working

4    with me and for me.

5    **Q.**   When did you expand the business, hire more people?

6    **A.**   I think I -- when I start with the first year, I begin to

7    hire one, and then later on increased as needed in the

8    business.

9    **Q.**   About how many people do you employ today?

10   **A.**   My business is seasonal because I do tax preparation.  So

11   during the tax season, there would be more people; and during

12   nontax season, there would be less people.

13   **Q.**   Okay.  What's the range, roughly?

14   **A.**   Mmm, the range roughly on the regular nontax season, we

15   have two people besides me and my wife.

16   **Q.**   Okay.

17   **A.**   And one is -- so they are helping me doing bookkeeping,

18   payroll, and some similar tax preparations.

19       And then during the tax season, we have somewhere from

20   eight to ten temporary people during the tax season, like right

21   now.

22   **Q.**   Do the people you employ, are they -- are they CPA

23   accountants, too?

24   **A.**   The people that I employ are not necessarily a CPA, and

25   they come from a different branch.  Some people are CPA or

**GUAN - DIRECT / HEMANN**

1   revenue agent and working with me for part-time or full-time or

2   temporary; and then some of them, they are accounting college

3   graduated and working for me; and some of them is not

4   accountants, completely finish.  They're probably still student

5   and doing internship with my firms.

6   **Q.**   What sort of services do you provide to your clients?

7   **A.**   We provide tax service.  We provide tax service for

8   individual and also business, such as corporation and

9   partnerships.  We also provide bookkeeping.  We -- our client

10  provides financial information, and we produce and publish an

11  income statement.

12       And then the other portion of it, some of our clients do

13  their own bookkeeping.  So where they provide their finished

14  bookkeeping, which is means balance sheet and income statement,

15  and give it to us and we prepare the tax return.  And we also

16  provide a payroll service and sell tax service as well.

17  **Q.**   Do you provide any audit services?

18  **A.**   No, I don't.  As a matter of fact, my license does not

19  allow me to do audit service.

20  **Q.**   How are audit services different than the services that

21  you provide?

22  **A.**   The -- when we talk about audit, there are two kind of

23  audit.  We just split it.  And one kind of audit, as the

24  average individual understand in the IRS audits or payroll

25  audit, which we do provide.  And that does not requires

1  financial audit, CPA license.

2  **Q.**   So that's a situation in which somebody gets audited by

3  the IRS and you help them through that process?

4  **A.**   I do.  I do provide the service.  But we're -- let's say

5  the public company need an audited financial statement, and

6  that requires another CPA license, which I don't have it.  And

7  I -- I have a G license, which I don't provide the financial

8  audit.

9  **Q.**   Was Mr. Walter Liew a client of yours?

10  **A.**   Yes.

11  **Q.**   Can you describe what sort of relationship, business

12  relationship, you had with Mr. Liew?

13  **A.**   Mr. Liew first come to my office around the year of

14  2006 -- for the tax year 2006, which means come in the year of

15  2007.  And I cannot remember exactly how he first get into my

16  company.  So we first interview Mr. Liew, and he provides the

17  bookkeeping and financial information provided by QuickBooks;

18  and we provide the first year tax return for the year 2006 tax

19  year.

20  **Q.**   Let me stop you there for a moment, Mr. Guan.  The

21  services that you provided to Mr. Liew, were they personal

22  services or services for his business?

23  **A.**   I have never do the individual tax return, which means

24  like 1040, for Mr. Liew.  And I only prepare the corporation

25  tax returns.

1   Q.   What about for anybody in Mr. Liew's family?  Have you

2   provided individual tax services?

3   A.   Not that I know of.

4   Q.   You mentioned that you started for tax year 2006 when he

5   came to your office in 2007; is that correct?

6   A.   That is correct.

7   Q.   Okay.  When -- and these -- this was for only the tax

8   preparation service as opposed to bookkeeping services at that

9   time; is that correct?

10  A.   That is correct.

11  Q.   Could you explain to the jury a little bit about how the

12  tax preparation service works, what information you receive and

13  use, and then how you use it, in particular with Mr. Liew?

14  A.   Yes, sir.

15       As I provide tax preparation service, my client, like

16  Mr. Liew, provides me a financial statement where -- means

17  income statement and balances.  They do their own bookkeeping,

18  and then they provide financial information and support.  And

19  then I, based on the finished balance sheet and income

20  statement, prepare the tax returns.

21  Q.   So you mentioned two items, and I'm going to test you a

22  little bit, I guess, your explaining ability.

23       You mentioned an income statement and a balance sheet.  Do

24  you remember those?

25  A.   That's correct.

1   **Q.**   Can you -- we're going to be looking at a few, so could

2   you please just orient the jury a little bit about what an

3   income statement and a balance sheet are?

4   **A.**   Sure.   Income statement, in general, average individual,

5   is a profit and loss statement.   It's -- basically, the first

6   line of income statement is the total revenue of that whole

7   year, the company, the revenue.   And then we'll be minus each

8   and every deductible business expenses.   And in the bottom

9   line -- a lot of time we refer to bottom line, which is called

10  net income, which means, like, the whole year of the booked net

11  income, what it is.

12      Okay.   Where the balance sheet is where at December 31st

13  of 2006 -- let's say for the year 2006 -- of the last day of

14  that year the company, how much they own and how much they owe.

15  How much they own is their asset, like a computer, a bank

16  account.   How much they owe means like they may owe a bank some

17  money or they owe somebody the loan from -- to the company, and

18  those are liability.   And they will report it in the balance

19  sheet.

20      But the balance sheet item, you're not really affecting

21  the tax return.   The tax return, in terms of taxable income, is

22  really coming from the profit and loss, which is the same work

23  as income statement.

24          **MR. FROELICH:**   Your Honor, excuse me.   Before he asks

25  the next question, I don't believe this has anything to do with

1    me.

2         **MR. HEMANN:**  That is absolutely correct.  Thank you,

3    Mr. Froelich.

4         I should have said that at the beginning, Your Honor.

5    This testimony relates to USAPTI and Mr. Liew only and not to

6    Mr. Maegerle.

7              **THE COURT:**  All right.  Thank you very much.

8         **MR. HEMANN:**  Thank you, Jerry.

9    **Q.**   So, Mr. Guan, when you first started working with

10   Mr. Liew, did you play any role in the preparation of the

11   profit and loss statement or the balance sheet?

12   **A.**   We first -- we reviewed the income statement and balance

13   sheet.  We will make any adjustment if they're not reflected

14   correctly according to the law.  Such as, for example, mmm,

15   when we correct payroll, the company issued payroll, the W-2,

16   and then a lot of time the payroll will be get a net income.

17   For example, like the payroll gross amount is a thousand and

18   minus all the -- all the different taxes, and then it maybe

19   ends up 800 bucks.  It's a net.

20        And then sometimes if they're not -- like they not do it

21   right, they're supposed to -- the gross payroll should be a

22   thousand, not 800.  So, therefore, if we see there's a

23   difference, we will suggest you need to be adjusted according

24   to what it is.  So -- and we make those necessary adjustments.

25   **Q.**   Okay.  So let's try to paint a little bit of a picture of

1  how it actually worked with Mr. Liew.

2      How long during, when you were the tax preparer at the

3  beginning, how long a process -- how long would you spend

4  working on Mr. Liew's tax returns?

5  **A.**   The tax return for his situation normally takes about one

6  whole morning or one whole afternoon.  But if we need it, we'll

7  go further --

8  **Q.**   Okay.

9  **A.**   -- for the preparation process.

10  **Q.**   So would Mr. Liew come to your office?

11  **A.**   Yes.

12  **Q.**   And who -- when you were acting as the tax preparer, who

13  would he meet with?

14  **A.**   He actually meet with me personally.

15  **Q.**   What would he bring with him to the office?

16  **A.**   He bring the profit and loss, balance sheet, and also a

17  binder where have bank statement, and also some support

18  document of what he provides -- produce the income statement

19  and profit and loss statement.

20  **Q.**   Before he came into the office to work with you on a

21  particular tax return, did you have any responsibility for

22  collecting information regarding Mr. Liew's company and its

23  finances?

24  **A.**   When in the scope of prepare tax return, and I do not

25  provide a bookkeeping service, and it's the client's

1  responsibility to provide bookkeeping, done bookkeeping, and

2  also support documents.  And then we base on the balance sheet,

3  income statement, profit and loss, and balance sheet, to

4  produce the tax return.  And we do not do the bookkeeping.

5  **Q.**  So during the period of time that you were the

6  bookkeeper -- I mean, the tax return preparer for Mr. Liew's

7  corporate returns, did you do all of the work in the morning or

8  afternoon that he would come in and work with you?

9  **A.**  Yes.

10  **Q.**  So let's -- and just to clarify that:  You didn't go to

11  Mr. Liew's office and look through his files or anything like

12  that?

13  **A.**  No.  It actually happened in my CPA office.

14  **Q.**  It all happened in your CPA office.

15  **A.**  Inside my CPA office.  And Mr. Liew bring his information

16  to my office and sit in front of me, face to face.  And in

17  front of computer, we do it.

18  **Q.**  And with regard to the information that Mr. Liew provided

19  to you --

20  **A.**  Uh-huh.

21  **Q.**  -- did you do any investigation to determine whether the

22  transactions that were reported on the balance sheets and the

23  profit and loss statement really happened?

24  **A.**  I did not do the investigation because I did not provide

25  the audit service.  And I provided tax preparation service, and

**PROCEEDINGS**

1    I -- based on the financial statement provided by the client.

2    And we asked -- and we also in front of me and Mr. Liew, and we

3    base on the financial statement, the balance sheet, and loss

4    statement, and we transfer the information from the financial

5    statement to the tax return.

6    **Q.**   Great.

7         **MR. HEMANN:**  Your Honor, may I approach the witness

8    with Exhibit 656?  And the parties have stipulated that this

9    document was produced by Mr. Guan.

10        **THE COURT:**  Why don't we, before we do that, maybe

11   we'll take our break five minutes early, a couple minutes

12   early, so we can do that fresh.

13        All right, ladies and gentlemen, we're going to take our

14   first break in the morning.  Remember the Court's usual

15   admonition.  Keep an open mind, don't discuss the case, don't

16   obtain any outside information.  And we'll see you in 15

17   minutes.

18        (Proceedings were heard out of the presence of the jury:)

19        **THE COURT:**  Okay.  15 minutes.

20        **MR. HEMANN:**  Thank you, Your Honor.

21             (Recess taken at 9:39 a.m.)

22             (Proceedings resumed at 9:59 a.m.)

23        (Proceedings were heard out of the presence of the jury:)

24        **THE COURT:**  All right.  We're back on the record.

25   Mr. Froelich, did you have a matter you want to bring up

1    before we begin?

2        **MR. FROELICH:**  Yes, Your Honor, I have a motion for

3    mistrial.  The last two days particularly, maybe the last three

4    days, the Government has been hammering on Mr. Liew and

5    everybody's concerned about the civil case; and that, you know,

6    Mr. Liew's telling people, you know, not to say anything and

7    there's concern about it.

8        And I was trying to elicit, the Government's interviewed

9    twice, that my client wasn't concerned about it, and he had

10   told them that he had gotten permission from DuPont and told

11   Chang, and that he wasn't concerned about the case.

12       And I think that goes to state of mind, and I also think

13   it rebuts this everybody else running around worried about the

14   case.  My client isn't.

15       **THE COURT:**  Well, the motion is denied.  Statements of

16   a party opponent are not hearsay and they come in.  Statements

17   of a party opponent which is brought in by the party opponent

18   himself are hearsay and no exception applies.

19       So the remedy is he has a right, if he wishes, to testify,

20   and he can testify and talk about all he wants his state of

21   mind; but having it come in through a witness who's going to

22   talk about an out-of-court statement when there's no

23   opportunity to cross-examine the speaker of the statement is

24   classic hearsay and no exception applies.

25       So the motion is denied.  You have your issue for appeal.

GUAN - DIRECT / HEMANN

1      Let's bring the jury in.

2      (Proceedings were heard in the presence of the jury:)

3           THE COURT:  All right, please be seated.

4      You may continue with your direct examination.

5           MR. HEMANN:  And, Your Honor, may I approach the

6  witness with Exhibit 656?

7           THE COURT:  Yes.

8           MR. HEMANN:  And the parties have stipulated that this

9  was produced by Mr. Guan.

10          THE COURT:  Is that correct?

11          MR. GASNER:  Yes, Your Honor.

12  BY MR. HEMANN:

13  Q.   Mr. Guan, I'm handing you what has been marked as

14  Exhibit 656.  Do you recognize that?

15  A.   Yes.

16  Q.   What is it?

17  A.   This is the profit and loss for the year of 2006 tax

18  return.

19  Q.   And for what company?

20  A.   Performance Group USA, Inc.

21  Q.   And whose company was Performance Group USA, Inc.?

22  A.   Mr. Liew.

23          MR. HEMANN:  Your Honor, the United States moves 656

24  into evidence.

25          MR. GASNER:  No objection.

1          **THE COURT:**  Admitted.

2          (Trial Exhibit 656 received in evidence)

3    **BY MR. HEMANN:**

4    **Q.**   That document is from your records, Mr. Guan?

5    **A.**   Yes.

6    **Q.**   How did you come to obtain that document?

7    **A.**   This document was provided by Mr. Liew to give it to me

8    when -- during the tax preparation time.

9    **Q.**   And was it provided to you on the day that you assisted

10   Mr. Liew in preparing his taxes for the year 2006 as you

11   described earlier?

12   **A.**   Yes.  It's -- actually on the left-hand side is

13   December 5th, '07, was the date.

14          **MR. HEMANN:**  Your Honor, may we publish this?

15          **THE COURT:**  Yes.

16          **MR. HEMANN:**  And if you can blow up on the top

17   left-hand side.

18   **Q.**   Are you looking, Mr. Guan?

19   **A.**   Yeah.

20   **Q.**   Thank you.

21   **A.**   Yeah, that was the date that I get the information.

22   **Q.**   Okay.  And if you could just blow up sort of the first --

23   yeah, the whole block there, Ms. Mahoney, please.  Thank you.

24          This is the profit and loss statement you mentioned; is

25   that correct?

GUAN - DIRECT / HEMANN

1    **A.**    That's correct.

2    **Q.**    And could you just explain to the jury the numbers at the

3    very top under "Income"?

4    **A.**    Okay.   Under "Income," there's two portions of it, the

5    first portion is construction income, 1,852,799.21, and the

6    second one is the interest income.

7    **Q.**    And, Mr. Guan, you said "construction."   Did you mean

8    consulting?

9    **A.**    Oh, I'm so sorry.   I meant consulting.

10   **Q.**    That's okay.

11   **A.**    It is consulting income.   I misread.

12   **Q.**    And that's the $1,852,799.21?

13   **A.**    That is correct.

14   **Q.**    And is that the number, Mr. Guan, that you ended up using

15   as the top line receipts number on Mr. -- on the Performance

16   Group tax return for 2006?

17   **A.**    That's correct.

18   **Q.**    Mr. Guan, this is a document that is approximately 52

19   pages long.   Were all of the pages in this document -- you can

20   leave it up, Ms. Mahoney, sorry -- were all the pages of this

21   document provided to you by Mr. Liew?

22   **A.**    (Witness examines document.)   Yes, it is.

23   **Q.**    Accountants can turn pages faster than anybody in any

24   other profession.

25                           (Laughter)

1  Q.   And let me ask you one more question about the first page,

2  the profit and loss statement.  There's another very large

3  number, $1,291,335.14.  Do you see that?

4  A.   Yes.

5  Q.   And what does that number correspond to?

6  A.   It's called consulting costs of goods sold, C-O-G-S,

7  stands for cost of goods solds.

8  Q.   And what is that, what is cost of goods sold just very

9  generally?

10 A.   Okay.  Cost of goods sold stands for when you produce the

11 consulting revenue, that is the portion of the money that it

12 will cost to produce that consulting.

13 Q.   And what is the effect of cost of goods sold on revenue

14 for the purposes of preparing an income tax return?

15 A.   It would be subtracted from the consulting income minus

16 the cost of goods sold.  It would become the gross profit.

17       MR. HEMANN:  Your Honor, may I approach the witness

18 with Exhibit 637?

19       THE COURT:  Yes.

20       MR. HEMANN:  And I'd like to inform the Court that the

21 parties have stipulated to the admissibility of this document

22 as a public record.

23       THE COURT:  Is that correct?

24       MR. GASNER:  Yes, Your Honor.

25       THE COURT:  All right.  So stipulated, and it's

```
 1    admitted.

 2            (Trial Exhibit 637 received in evidence)

 3    BY MR. HEMANN:

 4    Q.   I'm handing you, Mr. Guan, what's been marked as

 5    Exhibit 637.  Do you recognize that document?

 6    A.   Yes, I do.

 7    Q.   And what is it?

 8    A.   This is an extra tax return that was filed at December 6th

 9    of 2007 for year of 2006.

10            MR. HEMANN:  And, Your Honor, did the Court say that

11    the document is admitted?

12            THE COURT:  Yes, without objection.

13            MR. HEMANN:  Thank you.

14        And if you could put this up, Ms. Mahoney.

15    Q.   And I'd like to ask you just a few initial questions about

16    this, Mr. Guan.

17        Up at the top there is a name on the tax return.  Do you

18    see that, a company name?

19    A.   Yes.

20    Q.   And that was -- that's Performance Group USA, Inc.; is

21    that correct?

22    A.   That's correct.

23    Q.   And that's Mr. Liew's company?

24    A.   That is correct.

25    Q.   Okay.  Down at the bottom -- if you could blow up the
```

1  signature blocks, that large block at the bottom.  Thank you,

2  Ms. Mahoney -- there's some signatures.  Do you see those?

3  **A.**    Yes, I do.

4  **Q.**    Do you see a signature for Walter Liew?

5  **A.**    Yes, above my signature.

6  **Q.**    Okay.  And there's -- signature is next to your name at

7  Phillip Guan there?

8  **A.**    That's correct.

9  **Q.**    And did Mr. Liew sign the tax return in your presence?

10  **A.**    For the year of 2007, yes.  For this one, yes.

11  **Q.**    And did he sign it -- at what point in time did he sign

12  it?

13  **A.**    When I finally finished the tax return, we both agreed

14  this is the tax return we are going to file it, and I signed

15  first and he signed it.

16  **Q.**    Ms. Mahoney, if you could blow up the numbers -- actually,

17  maybe the first block under "Income."  Not just the numbers.

18  The whole block.  Good.  To the left, great, all the way

19  through the numbers.  Could you blow it up, sorry, using the

20  one that makes it a little bit larger than that?  Thank you.

21        As to the income numbers, Mr. Guan, I would like you to

22  orient the jury a little bit as to some of the entries.

23        Number one is what?

24  **A.**    Number 1, 1 little A, is gross receipts or sales, which is

25  corresponding from the profit and loss, which we just get it

1  from the consulting income.  It's exactly the same.

2  **Q.**   So you're looking at the profit and loss statement that we

3  looked at a few minutes ago, Exhibit 656 you have in front of

4  you?

5  **A.**   Yes.

6  **Q.**   And the number at the top of that provided by Mr. Liew, is

7  that the same number that you used for receipts in line one of

8  the tax return?

9  **A.**   That's correct.

10  **Q.**   And then, also, we talked about costs of goods sold, and

11  you were provided a number by Mr. Liew.  What was that number

12  that you were provided?

13  **A.**   1,291,335.

14  **Q.**   And that's the number that you used in the preparation of

15  the tax return; correct?

16  **A.**   That is correct.

17          **MR. HEMANN:**  Your Honor, we have a non -- we have a

18  demonstrative chart that we shared with the defense that we'll

19  not be seeking to admit, but we're going to use to illustrate

20  testimony as we go.

21          **THE COURT:**  Very well.

22          **MR. HEMANN:**  Thank you.

23  **Q.**   There's two pieces of information, the sort of top and

24  bottom-line numbers that I want to provide with this chart,

25  Mr. Guan.  The gross receipts number, can you read that to me,

1  please, for the 2006 return?

2  **A.**    1,852,799.

3  **Q.**    So on this return, Mr. Guan, after you subtract costs of

4  goods sold, what are you left with?

5  **A.**    Subtract cost of goods sold and add the interest income on

6  line 5, as you can see, which is also additional income,

7  interest income; and then we go to total income of 570,250.

8  **Q.**    And that's on line 11?

9  **A.**    Yeah, that's line 11.

10  **Q.**    So once, Mr. Guan, you get to total income, what's the

11  next step in the process?

12  **A.**    The next step in the process will be minus all the

13  expenses for the company besides the cost of goods sold.

14  **Q.**    And those -- who provided those expenses to you?

15  **A.**    From Mr. Liew's profit and loss statement.

16  **Q.**    Ms. Mahoney, could you expand the section below on

17  deductions and expenses or deductions -- yes, deductions?

18         And when you said you subtract the deductions, is this the

19  section of the return that you're talking about?

20  **A.**    That is correct.

21  **Q.**    The top line, number 12, says, "Compensation of Officers."

22  Do you see that?

23  **A.**    Yes.

24  **Q.**    On this -- for this tax year, who were the officers of

25  Performance Group?

1    **A.**    They are Mr. and Mrs. Walter Liew.  Walter Liew.

2    **Q.**    And from what section of the return are you obtaining that

3    information?

4    **A.**    In page 2, Schedule E, compensation of officers.

5    **Q.**    So this line would refer to the payments that were made to

6    Mr. and Mrs. Liew as officers of the company in 2006?

7    **A.**    That's correct.

8    **Q.**    And as you go down further, there's a couple of other

9    numbers.  There's the 69,680-dollar number.  What's that for?

10   **A.**    That's rent.  It's line 16.  Line 16 is rent, which the

11   company paid the rent.

12   **Q.**    And both compensation of officers and rent, are they

13   deductible from total income?

14   **A.**    That's correct.

15   **Q.**    And then there's another larger number down below on line

16   26 for other deductions.  Do you see that?

17   **A.**    Yes, I do.

18   **Q.**    Can you explain to the jury what "other deductions" means?

19   **A.**    There's a Statement 1.  I think you need to look at

20   Statement Number 1 attached to the tax return.

21   **Q.**    Okay.  We'll do that.

22   **A.**    Okay.

23   **Q.**    Ms. Mahoney, could you please turn to page 7 of this

24   document?

25        And while she's doing that, Mr. Guan --

**GUAN - DIRECT / HEMANN**

1   **A.**   Yes.

2   **Q.**   -- could you tell the jury what the -- what Statement 1

3   is?

4   **A.**   Statement 1 is the detail of the other deductions, which

5   is line -- the total 378,490.  So it's the detail that lists

6   how each and every item, how it comes out with this total.

7   **Q.**   So when we were looking at the first page of the return at

8   line 26, was that number $378,490?

9   **A.**   That is correct.

10  **Q.**   And the way you get that number is by adding up the

11  various deductions that are listed on Statement 1?

12  **A.**   That is correct.  And that number -- those numbers come

13  from the profit and loss statements.

14  **Q.**   Okay.  So the numbers that are listed here are reflected

15  in the profit and loss statement that Mr. Liew provided to you?

16  **A.**   That's correct.

17  **Q.**   There's one particularly large number, $264,980.  Do you

18  see that?

19  **A.**   Yes, I do.

20  **Q.**   And what is that for?

21  **A.**   That's for subcontractor, subcontractor of his company,

22  which means this company hire independent subcontractor which

23  normally pays 1099.

24  **Q.**   Okay.  Could you go back to the first page, please,

25  Ms. Mahoney?

1       Now, there's -- you mentioned that there's subcontractors,

2   there's a line for subcontractors.  Is there a line, an expense

3   line, for salaries and wages of employees?

4   **A.**   That is correct.

5   **Q.**   And what line is that?

6       If you can blow up that deduction box.

7   **A.**   Line 12 is for the compensation for employee -- I mean,

8   for officer.  And then line 12 is for compensation for officer.

9   And line 26 is the company expenses, where inside of it there

10  is the subcontractor where the company pay to third party.

11  **Q.**   And is there a line for salaries and wages of employees?

12  **A.**   Yes.

13  **Q.**   What line is that?

14  **A.**   For the employee -- I mean, in this tax year -- in this

15  tax year there is no -- there is a line 13.

16  **Q.**   And is there any salaries and wages for 2006 that were

17  paid?

18  **A.**   No.

19  **Q.**   So after you calculate the various appropriate deductions,

20  what number do you end up with?

21  **A.**   For the year of 2006, the net income for taxable income is

22  in line 26 -- line -- I'm so sorry, line 28.

23  **Q.**   Okay.  And that is --

24  **A.**   July 28, which is $68,518.

25  **Q.**   Okay.  And then that same number appears immediately below

1   in line 29C.  Do you see that?

2   A.   That is correct.

3   Q.   And what is that line for?

4   A.   That is the net operating loss deduction carryover from

5   2005.

6   Q.   So after you calculate on a corporate tax return the

7   taxable income, what's the next step?

8   A.   In the year 2005, this company have -- I cannot remember

9   exactly -- it actually is --

10  Q.   Can you go down to the next large box, Ms. Mahoney, under

11  "tax and payments"?

12       And you can feel free to look at the original that's in

13  front of you, Mr. Guan.

14  A.   Okay.

15  Q.   So the next step after calculating taxable income is what?

16  A.   The tax -- so in line 30, because there is a net income --

17  there's a net income 68,518 for year 2006; however, this

18  company in the year 2005 have an operating loss, and they

19  offset each other.  And, therefore, for the year 2006 will

20  be -- the taxable income in line 30 will be zero.

21  Q.   Okay.  There's a -- if you could go back to the first

22  page -- or the whole page.  Sorry.

23       There's a stamp in red on the left-hand side of the page.

24  Do you see that?  Do you see that, Mr. Guan?

25  A.   Yes, I do.

**GUAN - DIRECT / HEMANN**

1    **Q.**    What does that stamp represent?

2    **A.**    That is the stamp from IRS.  Is it December?  December 10?

3    I cannot see very clear.  Is it December 10?  It looks like

4    December 10 of 2007.

5    **Q.**    And is that the stamp showing that the IRS received the

6    tax return?

7    **A.**    That's correct.

8    **Q.**    So that was for the first year that you worked for

9    Mr. Liew and his company Performance Group; is that correct?

10   **A.**    Yes.

11   **Q.**    Did you work for him again as a tax preparer for the tax

12   year 2007?

13   **A.**    Yes, I do.

14        **MR. HEMANN:**  Your Honor, may I approach the witness

15   with Exhibit 658?  And 658, it's been stipulated that Mr. Guan

16   produced this document.

17        **THE COURT:**  All right.

18        **MR. HEMANN:**  And with Exhibit 638, and for this

19   document it has been stipulated that it is admissible.

20        **THE COURT:**  All right.  Is that correct, Mr. --

21        **MR. GASNER:**  Yes, Your Honor.

22        **THE COURT:**  -- Gasner?

23   Thank you.

24        **THE CLERK:**  So 638 is admitted?

25        **MR. HEMANN:**  And may 638 be admitted based on the

GUAN - DIRECT / HEMANN

1    stipulation, Your Honor?

2              **THE COURT:**  Yes.

3         (Trial Exhibit 638 received in evidence)

4              **THE CLERK:**  Thank you.

5    **BY MR. HEMANN:**

6    **Q.**   First, if you could go to 658 --

7    **A.**   Okay.

8    **Q.**   -- Mr. Guan, the first one, which is not yet in evidence.

9         Do you recognize this document, Mr. Guan?

10   **A.**   Yes, I do.

11   **Q.**   What is it?

12   **A.**   This is a profit and loss statement for the year of 2007.

13   **Q.**   For what company?

14   **A.**   For Performance Group USA, Inc.

15   **Q.**   And did you receive this document in your job as a tax

16   preparer for Performance Group?

17   **A.**   Yes, I do.

18   **Q.**   And from whom did you receive it?

19   **A.**   From Mr. Liew.

20             **MR. HEMANN:**  Your Honor, the United States moves 658

21   into evidence.

22             **MR. GASNER:**  No objection.

23             **THE COURT:**  Admitted.

24        (Trial Exhibit 658 received in evidence)

25             **MR. HEMANN:**  If you could put the first page of this

1  up, Ms. Mahoney.

2  **Q.**   Is there a signature on this document, Mr. Guan?

3  **A.**   Yes, I do -- yes, there is.

4  **Q.**   And whose signature is that?

5  **A.**   It's Mr. Liew's signature.

6  **Q.**   And do you know when Mr. Liew signed this document?

7  **A.**   Yes.

8  **Q.**   When did he sign it?

9  **A.**   He signed it in front of me.

10 **Q.**   In front of you?

11 **A.**   Yes.

12 **Q.**   During the -- did you meet with him in 2008 to prepare the

13 2007 return?

14 **A.**   Yeah, on the date of June 9, 2008.

15 **Q.**   And is that the date that is next to his signature?

16 **A.**   Yes.

17 **Q.**   Does this document -- was this document provided to you by

18 Mr. Liew?

19 **A.**   Yes.

20 **Q.**   And did you play any role in the preparation of this

21 document before Mr. Liew brought it to your office?

22 **A.**   No.

23 **Q.**   We talked about a few numbers earlier with regard to

24 consulting income and cost of goods sold.  Are these numbers --

25 are those entries on this document as well?

1   **A.**   Yeah.

2   **Q.**   If you could, please, turn to Exhibit 638, the one to your

3   right.

4   **A.**   Uh-huh.

5   **Q.**   Do you know what that is?

6   **A.**   638.  That's the tax return for -- that's the tax return

7   for year of 2007.

8   **Q.**   And did you assist Mr. Liew in preparing this tax return?

9   **A.**   Yes, I do.

10  **Q.**   Ms. Mahoney, if you could put this up on the screen,

11  please, 638, page 1.

12        What company was this prepared for, Mr. Guan?

13  **A.**   Performance Group USA, Inc.

14  **Q.**   And there's signatures at the bottom.  Whose signatures

15  are those?

16  **A.**   Both Mr. Liew's signature and my signatures.

17  **Q.**   Were they signed on June the 9th, 2008?

18  **A.**   Yes.

19  **Q.**   What was the income, the gross income, that was reported

20  on this tax return?

21  **A.**   In line 29 -- 28 --

22  **Q.**   I'm sorry, the gross receipts.  I'm sorry, gross receipts.

23  **A.**   Oh, gross receipts will be in line 1A, first reported in

24  line 1A, and then same line 1C is 449,911.

25  **Q.**   449,911?

GUAN - DIRECT / HEMANN

1    **A.**    That's correct.

2    **Q.**    Did you, Mr. Guan, go through the same process of making

3    adjustments to gross receipts by reducing it by cost of goods

4    sold and then by deductions with this return as you did with

5    the 2006 return that you just described?

6    **A.**    Yes.

7    **Q.**    And what were those -- what information were those

8    adjustments based on?

9    **A.**    Could you rephrase the question one more time?

10   **Q.**    Sure.  How did you know what -- how did you know what

11   numbers to put in the tax return?

12   **A.**    Okay.  Well, line number 1 is the gross revenue, is the

13   consulting income from the profit and loss that exactly comes

14   from the profit and loss statements.

15   **Q.**    Okay.

16   **A.**    And then the cost of goods sold, we make one adjustment

17   from cost of goods sold in there, because in the original

18   document there's a cost of goods sold equipment and 48,043 --

19   **Q.**    Mr. Guan, let me stop you for one second.

20        Ms. Mahoney, could you please put up 658, page 1?

21        And you were explaining there was an adjustment made on

22   the profit and loss statement.

23   **A.**    That is correct.

24   **Q.**    And what was that adjustment?

25   **A.**    It just -- as you can see in the middle of the screen --

1  **Q.**   Yes.

2  **A.**   -- the cost of goods sold -- the cost of goods sold a

3  little bit below.  Just a little bit below.  Yeah.  Right

4  there.

5       And there's a cost of goods sold, consulting cost of goods

6  sold down below, $68,873.88; and then there is another cost of

7  goods sold equipment above, which is $45,043.60.  So I just add

8  those two together as a total cost of goods sold.

9  **Q.**   Okay.  And that became the total number that was put into

10  the tax return?

11  **A.**   That is correct.

12  **Q.**   Could you go back to the tax return, please, Ms. Mahoney,

13  638, page 1?

14       The numbers in the tax return, Mr. Guan, under

15  "deductions," and you don't have to go through them

16  individually, but where did those numbers come from?

17  **A.**   The number come from the profit and loss statements.

18  **Q.**   And did you reduce, just as you had done for the 2006

19  return, the total income by the total amount of deductions?

20  **A.**   That's correct.

21  **Q.**   And what was the taxable income for the year 2007?

22  **A.**   Year 2007 the total income is in line 29 is $663.

23  **Q.**   And based on that 663-dollar total income, what was the

24  tax paid for 2000 -- for the tax year 2007?

25  **A.**   Because they still have a carryover from 2005 and 2006,

1   had not used all of them, so they are entitled by -- as tax

2   law, to offset the carryover.  So in 29, letter A, $663 will be

3   carried over.  So ends up will be zero taxable income for the

4   year of 2007.

5   **Q.**   I want to stay with Performance Group.  Did you prepare --

6   did you do tax preparation services for the Performance Group

7   company for the year 2008 as well?

8   **A.**   Yes.

9         **MR. HEMANN:**  Your Honor, may I approach the witness

10  with Exhibits 664 and 639?

11        **THE COURT:**  Yes.

12                    (Pause in proceedings.)

13        **MR. HEMANN:**  Your Honor, I believe I have the wrong

14  exhibit in my box; and, so, what I'm going to do is I'm going

15  to skip for a moment.

16     I'm just going to approach with 639 at this point,

17  Your Honor.

18        **THE COURT:**  All right.

19        **MR. HEMANN:**  And the parties have agreed by

20  stipulation that Exhibit 639 is admissible as a public record.

21        **THE COURT:**  Is that correct, Mr. Gasner?

22  **MR. GASNER:**  It is, Your Honor.

23        **THE COURT:**  All right.

24        **MR. HEMANN:**  May it be admitted?

25        **THE COURT:**  Yes, it may.

1          (Trial Exhibit 639 received in evidence)

2          **MR. HEMANN:**  Thank you.

3      And the issue has been rectified, Your Honor, and I'd also

4  now like to approach with Exhibit 664.

5          **THE COURT:**  Very well.

6          **MR. HEMANN:**  Thank you.

7  **Q.**   Handing you Exhibit 664, and you have in front of you

8  Exhibit 639.

9      What is Exhibit 664, Mr. Guan?

10  **A.**   664 is the profit and loss statement of Performance Group

11  USA, Inc., for the year 2008.

12  **Q.**   And is this a document that you kept in your records and

13  produced to the Government?

14  **A.**   That is correct.

15  **Q.**   Is it signed by somebody?

16  **A.**   It's signed by Mr. Liew.

17  **Q.**   On what date?

18  **A.**   The year of February 2nd of 2009.

19          **MR. HEMANN:**  Your Honor, the United States moves

20  Exhibit 664 into evidence.

21          **MR. GASNER:**  No objection.

22          **THE COURT:**  Admitted.

23          (Trial Exhibit 664 received in evidence)

24          **MR. HEMANN:**  If you could put this up on the screen,

25  Ms. Mahoney.  And if you could rotate it and highlight the

**GUAN - DIRECT / HEMANN**

1  signature at the bottom.

2  **Q.**   We talked about a couple of profit and loss statements

3  that you were provided, Mr. Guan.  Were you provided with this

4  one for Performance Group in the same way as the earlier ones?

5  **A.**   Yes.

6  **Q.**   And did you do any work prior to Mr. Liew coming to your

7  office with this profit and loss statement to -- did you do any

8  work to prepare this before Mr. Liew brought it to your office?

9  **A.**   No.

10  **Q.**   The tax return for Performance Group for the year 2008 is

11  Exhibit 639.  Do you see that?

12  **A.**   Yes, I do.  Yes, I do.

13  **Q.**   And could you put 639, page 1, on the screen, please,

14  Ms. Mahoney?

15      Is it -- you see Performance Group up at the top; do you

16  not?

17  **A.**   Yes, I do.

18  **Q.**   And below that, just below that, there is a box that says,

19  "Final Return," that is not checked.  Do you see that?

20  **A.**   Yes.

21  **Q.**   Mr. Liew met with you on February 2nd, 2009?

22  **A.**   Yes.

23  **Q.**   At that time, Mr. Guan, did he say anything to you about a

24  bankruptcy that had been filed for Performance Group?

25  **A.**   Not that I remember.

1   **Q.**   Down at the bottom there are two signatures.  Could you

2   please identify those signatures?

3   **A.**   Yes.

4   **Q.**   Whose are they?

5   **A.**   They are Mr. Liew and my signatures.

6   **Q.**   The numbers that are reported for income, deductions, and

7   tax, were those prepared, those numbers calculated or

8   determined in the same way as you determined the numbers for

9   2006 and 2007?

10  **A.**   Yes.

11  **Q.**   Could you please tell me what the gross receipts number

12  for 2008 is?

13  **A.**   Okay.  The gross receipt is 368,581.

14  **Q.**   Oops, I made a mistake already.

15       And I wrote that in the wrong -- I wrote that in the

16  USA Performance box rather than the Performance Group box.

17       Could you tell me, Mr. Guan, what the total tax for the

18  year 2008 was?

19  **A.**   The 2008 tax year there's a loss of 45 -- it's a negative

20  45904 in the line of 28.

21  **Q.**   And, Mr. Guan, let me stop you there.  Is the reason that

22  there is a loss there because the amount of deductions exceeded

23  the total income?

24  **A.**   That is correct.

25  **Q.**   So based on a loss of $45,904, what was the total tax for

GUAN - DIRECT / HEMANN

1  that year?

2  **A.**   It's zero.

3  **Q.**   At the time that Mr. Liew came to see you on February the

4  second, 2009, about Performance Group USA, did he tell you

5  about another company that he would need some tax return

6  preparation help for?

7  **A.**   2000 -- in the time of February of 2009...  Yes.

8  **Q.**   Do you know what the name of the other company was?

9  **A.**   The two names are very -- let me....

10  **Q.**   If you don't remember exactly, that's okay.

11  **A.**   I cannot remember exactly, yeah.

12  **Q.**   Okay.

13         **MR. HEMANN:**  Your Honor, may I approach the witness

14  with Exhibits 668 and 641?

15         **THE COURT:**  Yes.

16         **MR. HEMANN:**  And I proffer to the Court that

17  Exhibit 668, it's been stipulated that that document came from

18  Mr. Guan; and as to 641, the parties have stipulated that it is

19  admissible as a public record.

20         **THE COURT:**  Is that correct?

21         **MR. GASNER:**  That's true, Your Honor.

22         **THE COURT:**  All right.  Are you offering it?

23         **MR. HEMANN:**  Yes, Your Honor.  Thank you.

24         **THE COURT:**  It's admitted.

25       (Trial Exhibit 641 received in evidence)

BY MR. HEMANN:

Q.   You see the Exhibit Numbers at the bottom.

A.   Okay, thank you.

Q.   First, Mr. Guan, as to Exhibit 668, what is that?

A.   (Witness examines document.)  I cannot identify which is which exhibit numbers.

Q.   Oh, I'm sorry.  At the bottom or you can look on the back, there should be a blue sticker --

A.   Oh, okay.

Q.   -- on the back that says, "668."  Do you see that?

A.   Oh, yeah, I see it now.

Q.   Okay.  What is that document?

A.   That is a profit and loss statement from the year 2008 for --

Q.   For what company?

A.   For the company called USA Performance Technology, Inc.

Q.   Did this document come from your records?

A.   Yes.

Q.   Is there a signature on the document?

A.   Yes.

Q.   Whose signature is it?

A.   Mr. Liew's signature.

Q.   And a date?

A.   February 27, 2009.

          MR. HEMANN:  Your Honor, the United States moves

1    Exhibit 668 into evidence.

2              **MR. GASNER:**  No objection.

3              **THE COURT:**  Admitted.

4          (Trial Exhibit 668 received in evidence)

5    **BY MR. HEMANN:**

6    **Q.**    There's the new company -- the company name,

7    USA Performance Technology, was that the new company that

8    Mr. Liew talked to you about?

9    **A.**    Yes.

10   **Q.**    Where did you get this document, the profit and loss

11   statement for USA Performance Technology?

12   **A.**    I received it from Mr. Liew.

13   **Q.**    And did he sign the first page of this document in your

14   presence?

15   **A.**    Yes.

16   **Q.**    There's a little note right up above the signature that

17   says, "This profit and loss used for 2008 tax returns."  Whose

18   handwriting is that?

19   **A.**    That is my handwriting.

20   **Q.**    Did you prepare a tax return for USA Performance

21   Technology based on this profit and loss statement and the

22   attached balance sheet?

23   **A.**    Yes, I do.

24   **Q.**    Did Mr. Liew tell you anything about the formation or the

25   fact of the new company?

1  A.   He just let me know there's a new company formed, and also

2  provide me the profit and loss statements.

3  Q.   Okay.

4  A.   Then I prepared the tax return based on the informations.

5  Q.   And this company, USAPTI, let's look at the tax return at

6  page 600 -- Exhibit 641.

7  A.   (Witness examines document.)

8  Q.   Is that the tax return that you prepared, Mr. Guan?

9  A.   Yes, I do.

10 Q.   And if you could just highlight the box and the line under

11 it at the top, Ms. Mahoney.  There we go.

12     It says up above, just up above this, it has the company

13 name.  What's the company name, Mr. Guan?

14 A.   USA Performance Technology, Inc.

15 Q.   And underneath it there's a box checked for initial

16 return.  Do you see that?

17 A.   That's correct.

18 Q.   What were the gross -- well, let me ask you sort of a

19 foundational question first.

20     Did you prepare this tax return in the same way that you

21 prepared the previous tax returns that we've discussed?

22 A.   Yes.

23 Q.   And did you use, in preparing this tax return, the profit

24 and loss statement and balance sheet that Mr. Liew provided to

25 you?

1   **A.**   Yes.

2   **Q.**   Mr. Guan, what was the -- what were the gross receipts or

3   sales in line 1 for USA Performance Technology for the year

4   2008?

5   **A.**   500,000.

6   **Q.**   500,000?

7   **A.**   Yes.

8   **Q.**   And where did that number 500,000 come from?

9   **A.**   Profit and loss statement.

10   **Q.**   Ms. Mahoney, could you put up, briefly, Exhibit 668,

11   page 1?

12        Do you see that $500,000 on the first page of the profit

13   and loss statement?

14   **A.**   Yes, I do.

15   **Q.**   And where is it?

16   **A.**   That is the consulting income.

17   **Q.**   Do you also see a line here for compensation of officers?

18   **A.**   Compensation of officers... Yeah.  In the middle of the

19   thing, in the middle of the page there's payroll expenses.

20   **Q.**   Yes.

21   **A.**   $91,028.

22   **Q.**   Okay.

23   **A.**   And then as you can see, I -- there's my handwriting

24   there.  If you can make it a little bigger.

25   **Q.**   Yes.

1    **A.**    Yeah.

2    **Q.**    Can you expand that, please, Ms. Mahoney, the handwriting,

3    blow it up a bit.

4          Okay.

5    **A.**    Okay.  In the total in here that includes the gross

6    payroll as well as payroll tax.  So I separate because in the

7    tax return there's a payroll and payroll tax.  They're two

8    different lines.  So that's why I separate it.  So the total

9    payroll would be 84,000, the payroll tax is $7,028.

10   **Q.**    And, Ms. Mahoney, if you could go to Exhibit 641 again,

11   page 1.

12         Is there a line on this that reflects that 84,000-dollar

13   number?

14   **A.**    Yes.  It's in line 12 of the tax return.

15   **Q.**    And what is that -- what is line 12 for?

16   **A.**    Line 12 is the compensation for the officer for Mr. and

17   Mrs. Liew.

18   **Q.**    Okay.  And in that year, who were the officers of the

19   company?  Was it Mr. and Mrs. Liew?

20   **A.**    Let me look at it.  Yes, it's on page 2, Schedule E, yes.

21         **MR. HEMANN:**  Your Honor, can I reapproach the witness

22   with Exhibit 639, which is already in evidence?

23         **THE COURT:**  Yes.

24         **MR. HEMANN:**  Thank you.

25   **Q.**    Mr. Guan, I've handed you, again, the 2008 tax return for

1   Performance Group that was also prepared in February of 2009.

2   Do you remember looking at that a moment ago?

3   **A.**   Yes, I do.

4   **Q.**   And, Ms. Mahoney, can you please put up Exhibit 639,

5   page 1?

6        Was there any officer compensation paid by Performance

7   Group for the tax year 2008?

8   **A.**   There's no.

9   **Q.**   Did Mr. Liew offer you any explanation or information

10  regarding why there was no compensation of officers for

11  Performance Group but there was compensation of officers for

12  USAPTI?

13  **A.**   The tax return, as you saw in the other year, the loss is

14  45,904.  So the company for this year has lost money.  So there

15  was not -- and, also, when I received the profit and loss

16  statement, there is no payroll for this company for 2008.

17  **Q.**   But there was income and a payroll for USAPTI in 2008; is

18  that correct?

19  **A.**   That is correct.

20  **Q.**   Okay.  Ms. Mahoney, could you put 641 back up on the

21  screen?  Thank you.

22       On Exhibit 641, the 2008 return for USAPTI, what was

23  the -- ultimately what was the taxable income and what was the

24  tax paid?

25  **A.**   For 2008, USAPTI?

1   **Q.**   A little lower, Ms. Mahoney.

2         Yes.

3   **A.**   The year of 2008, USAPTI in line 28 is negative $259.

4   **Q.**   And what was the taxable -- the total tax?

5   **A.**   The tax would be zero because of the negative.

6   **Q.**   Now, did your role change slightly for the services that

7   you provided to Mr. Liew and his companies after this return?

8   **A.**   Yes.  We begin to provide a bookkeeping service for the

9   year of 2009.

10  **Q.**   Okay.  Could you describe for the jury what bookkeeping

11  services entail for your company?

12  **A.**   The bookkeeping service means the client.  In this

13  situation Mr. Liew provides the bank statement, canceled check,

14  as well as the support document, to produce profit and loss,

15  and as well as the balance sheet.

16  **Q.**   Can you break that down a little bit?  Go through again

17  the documents that Mr. Liew provided to you.

18  **A.**   He will provide the bank statement, as well as the

19  canceled check.  As there's a binder that Mr. Liew provides to

20  me and, kind of like, helps me to understand some of the checks

21  what it goes to.  So then I get those information from

22  Mr. Liew, and then my staff help me to input it and then I

23  review it with Mr. Liew together.

24  **Q.**   And when you say the staff -- did you actually participate

25  in inputting the information yourself or was it just your

**GUAN - DIRECT / HEMANN**

1   staff?

2   **A.**   The input will be my staff to input it.

3   **Q.**   How long before you prepared the tax return -- did you

4   also continue as a tax preparer?

5   **A.**   Yes, I do.

6   **Q.**   And how long would it take to input the information that

7   was provided by Mr. Liew?

8   **A.**   That depends on I do not -- I do not keep track myself,

9   because it's done by my staff to the input portion of it.  So

10  my staff input it on a monthly basis, and then I review it with

11  Mr. Liew.  At the time that I do the bookkeeping, as well as

12  the tax return, normally longer than just doing tax return,

13  because we have -- we go through the reviewing of the

14  bookkeeping together first.

15  **Q.**   So it sounds like the information was provided by Mr. Liew

16  on a monthly basis, the bank statements and the canceled

17  checks?

18  **A.**   I cannot remember is -- there's two kind of clients.  One

19  kind of client provides us a monthly basis and one kind of

20  client give me like the whole year, okay, together.  And I

21  cannot remember -- I cannot recall whether or not Mr. Liew give

22  me one time or on a monthly basis.

23  **Q.**   How long would it take you, when Mr. Liew would then come

24  in, to review the bookkeeping entries that your staff had

25  prepared with him?

1   **A.**   It normally takes about a day for -- when I review the

2   book, for about half a day, okay, and then we do the tax

3   preparation for another half a day.  Normally, but not like

4   exactly, so depends on the -- on the situation.

5   **Q.**   Do you remember with Mr. Liew how long it took to go

6   through the bookkeeping records?

7   **A.**   I would say approximately half a day.

8   **Q.**   And then would you prepare the tax return on that same

9   day?

10  **A.**   Normally I do.

11  **Q.**   And did you do so with Mr. Liew?

12  **A.**   In this year, yes.

13  **Q.**   And that year that you're referring to is 2000 --

14  **A.**   '9.

15  **Q.**   -- '9?

16  **A.**   Yeah.

17          **MR. HEMANN:**  Your Honor, may I approach the witness

18  with Exhibit 670 and 642?

19          **THE COURT:**  Yes.

20          **MR. HEMANN:**  And, Your Honor, I would offer that 670

21  the parties have agreed was provided by Mr. Guan, and 642 the

22  parties have stipulated to its admissibility as a public

23  record.

24          **THE COURT:**  Is that correct?

25          **MR. GASNER:**  That's true, Your Honor.

1                THE COURT:  All right.  So are you offering both of

2      those?

3                MR. HEMANN:  I will offer the -- and may I approach?

4                THE COURT:  Yes.

5                MR. HEMANN:  Thank you.

6          I will offer the -- I'm sorry, I will offer 670 after I

7      lay a bit of foundation with Mr. Guan.

8                THE COURT:  Okay.

9                MR. HEMANN:  And I do offer 642 at this time.

10               MR. GASNER:  No objection.

11               THE COURT:  It's admitted.

12          (Trial Exhibit 642 received in evidence)

13     BY MR. HEMANN:

14     Q.   If you can look at 670 first, Mr. Guan, what is that?

15     A.   That is the profit and loss statement, as well as the

16     balance sheet statement for the year 2009 for the USAPTI.

17     Q.   Okay.  And for USAPTI, this document that we're looking

18     at, who actually generated the form that we're looking at?

19     A.   My office.

20     Q.   And did your office do so based on the process that you

21     described a few moments ago of inputting the bank information

22     provided by Mr. Liew?

23     A.   That is correct.

24     Q.   There is a signature --

25               MR. HEMANN:  And, Your Honor, the United States offers

GUAN - DIRECT / HEMANN

1    Exhibit 670.

2              **MR. GASNER:**  No objection.

3              **THE COURT:**  It's admitted.

4         (Trial Exhibit 670 received in evidence)

5    **BY MR. HEMANN:**

6    **Q.**   There's a signature down at the bottom of page -- or

7    Exhibit 670.  Whose signature is that?

8    **A.**   Mr. Liew's signatures.

9    **Q.**   And at what point in time did Mr. Liew sign that document?

10   **A.**   After we review the profit and loss statement, and both we

11   agree -- excuse me, he agree to the profit and loss statement,

12   then he will sign this profit and loss statement.

13   **Q.**   Did you use this profit and loss statement and balance

14   sheet to prepare a tax return for 2009 for USAPTI?

15   **A.**   Yes.

16   **Q.**   Can you please turn to the -- to Exhibit 642, a 2009

17   corporate tax return?  Do you have that in front of you?

18   **A.**   Yes, I do.

19   **Q.**   For what company is -- if you could put 642 up, please,

20   Ms. Mahoney.

21   **A.**   USAPTI.

22   **Q.**   There's a signature down at the very bottom -- or two

23   signatures down at the bottom.  Whose signatures are those?

24   **A.**   Both my signature and Mr. Liew's signatures.

25   **Q.**   And did Mr. Liew sign this after you and he had reviewed

1  the balance sheet and the profit and loss statement?

2  **A.**    Yes.  Yes.

3  **Q.**    There are a number of items on -- listed under "Income"

4  and "Deductions."  Are those based on the profit and loss

5  statement and the balance sheet that your office had generated?

6  **A.**    That's correct.

7  **Q.**    In generating the profit and loss statements as a

8  bookkeeper --

9  **A.**    Yes.

10  **Q.**    -- did you do any investigation or due diligence beyond

11  just inputting the information that Mr. Liew provided to you?

12  **A.**    We do that as we sit down with Mr. Liew to review the

13  tax -- review the profit and loss before we input it in the tax

14  return.

15  **Q.**    So other than talking to Mr. Liew, do you do any

16  investigation or due diligence to make sure that the numbers

17  that have been reported to you by Mr. Liew are correct?

18  **A.**    We do not do additional investigation.  We do the review,

19  face-to-face review, based on the draft that my staff prepare

20  it and then we sit down together in the same -- in my office at

21  a table and we look through the profit and loss, and I ask him

22  whether or not that reflects it right.

23  **Q.**    Did you talk to any employees of USAPTI or officers of

24  USAPTI other than Mr. Liew?

25  **A.**    Not that I remember of.

1   **Q.**   And did you talk to any customers of USAPTI?

2   **A.**   Not that I remember of.

3   **Q.**   And did you talk to any banks of USAPTI?

4   **A.**   No, not that I remember of.

5   **Q.**   Did you talk to any of the individuals or businesses that

6   received money from USAPTI during the year 2009?

7   **A.**   Not that I remember of.

8   **Q.**   Was it your practice, Mr. Guan, to ask Mr. Liew if he had

9   provided all of the relevant information to you?

10  **A.**   Yes.

11  **Q.**   Could you describe that a little bit to the jury?

12  **A.**   As we taking the role of the bookkeeper, then we ask our

13  client to provide the necessary financial information, which

14  include the bank statement, the canceled check, and all

15  necessary support documentation necessary for us to produce a

16  profit and loss and balance sheets.

17  **Q.**   Did Mr. Liew tell you about any monies that had been

18  directed by him or USAPTI to companies in Singapore?

19  **A.**   I never -- I do not know any of that.

20  **Q.**   And during your meetings with Mr. Liew, both before and

21  after this year, did it ever come up that Mr. Liew had a

22  business arrangement with anybody in China?

23  **A.**   Business -- could you rephrase the question?

24  **Q.**   A partnership or anything like that with anybody in China.

25  **A.**   I -- no.

GUAN - DIRECT / HEMANN

1  Q.   So looking at Exhibit 642, the 2009 corporate return for

2  USAPTI, what was the gross receipts or sales number that was

3  reported to the Internal Revenue Service?

4  A.   713,685.

5  Q.   And after taking into account reductions of income and

6  deductions, what was the taxable income that was reported to

7  the IRS for 2009?

8  A.   In the line 28, 4553; 4,553.

9  Q.   And based on that taxable income, what was the total tax

10  for USAPTI for 2009?

11  A.   Which is in line 31, 644.

12  Q.   $644?

13  A.   Yes.

14  Q.   After 2009, after the 2009 return -- and I guess I should

15  ask.  You met with Mr. Liew to do the 2009 return when?

16  A.   2009 tax return was done by July 25th of 2010.

17  Q.   Okay.  And that's the date that appears next to the

18  signatures on the bottom of the return?

19  A.   Yes.

20  Q.   Did you continue with your responsibilities as bookkeeper

21  for USAPTI for the tax year 2010, the next year?

22  A.   Yes.

23  Q.   Were your responsibilities as bookkeeper the next year the

24  same as they were for tax year 2009?

25  A.   Yes.

1    Q.   Did you follow the same procedure that you just described

2    to the jury?

3    A.   Yes.

4    Q.   Did you do any additional investigative or due diligence

5    work for 2010 that you did not do for 2009?

6    A.   No.

7              MR. HEMANN:  Your Honor, may I approach the witness,

8    please, with Exhibits 673, 643, and 672?

9              THE COURT:  Yes.  And before we do that, let's take a

10   stretch break, ladies and gentlemen.

11                      (Pause in proceedings.)

12             THE COURT:  Please be seated when you're ready.

13       You may continue, Mr. Hemann?

14             MR. HEMANN:  Thank you very much, Your Honor.

15       If you could first, please, look at -- and, Your Honor, I

16   can tell the Court that the parties have stipulated that

17   Exhibit 673 was produced to the Government by Mr. Guan and that

18   643 is admissible as a public record.

19             THE COURT:  All right.

20             MR. HEMANN:  The United States will move 643 into

21   evidence.

22             THE COURT:  Any objection?

23             MR. GASNER:  Yes, Your Honor, no objection.

24             THE COURT:  Thank you.  It's admitted.

25         (Trial Exhibit 643 received in evidence)

GUAN - DIRECT / HEMANN

1   BY MR. HEMANN:

2   Q.   If you could first look at Exhibit 673, Mr. Guan.  What is

3   that?

4   A.   That is the profit and loss statement for USAPTI for year

5   2010.

6   Q.   And is this a document that you kept in your records?

7   A.   Yes.

8   Q.   And whose signature is it on the bottom of the document?

9   A.   Mr. Liew.

10       MR. HEMANN:  Your Honor, the United States moves 673

11  into evidence.

12       MR. GASNER:  No objection.

13       THE COURT:  It's admitted.

14       (Trial Exhibit 673 received in evidence)

15       MR. HEMANN:  If you could put that up on the screen,

16  please, Ms. Mahoney.

17  Q.   You said there's a signature down at the bottom for

18  Mr. Liew?

19  A.   Yes.

20  Q.   And there's a date next to it.  What is that date?

21  A.   It's April 6 of 2011.

22  Q.   Did you meet with Mr. Liew on that date to review his

23  profit and loss statement?

24  A.   Yes.

25  Q.   Based on his profit and loss statement, did you assist

**GUAN - DIRECT / HEMANN**

1  Mr. Liew in preparing a tax return for USAPTI for the tax year

2  2010?

3  **A.**   Yes, I do.

4  **Q.**   Now, this year did you do something slightly differently

5  with the tax return than you had done in previous years?

6  **A.**   No, I don't.

7  **Q.**   Well, did you file it differently?  Was it filed

8  differently with the IRS?

9  **A.**   Yeah.  The previous year was filed in paper form.  The

10  year 2010 was filed in electronic format, e-filed.

11  **Q.**   E-filed?

12  **A.**   Yeah.

13  **Q.**   And when you act as a tax preparer for somebody and you

14  e-file something, what process do you follow?

15  **A.**   I go through the normal procedure to review a tax return

16  and sign the paper tax return.  I also need the e-filer

17  authorized form from the client to sign before I submit it.

18  **Q.**   And do you ask the client to sign the documents, the

19  original tax return as well, to keep in your files?

20  **A.**   It's not required for the tax return signed by my client.

21  Sometimes I do, sometimes I don't.  But for the support

22  document it's required, and also the e-filing form is required

23  to sign.

24  **Q.**   If you could please look at Exhibit 672, which is in front

25  of you.

1    **A.**    600 -- excuse me?

2    **Q.**    672.

3    **A.**    672, okay.

4    **Q.**    What is that document, Mr. Guan?

5    **A.**    This is the 2010 tax return for USAPTI.

6    **Q.**    And is that a document you kept in your files, Mr. Guan?

7    **A.**    Yes, I do.  Yes, it is.

8    **Q.**    And is it signed in several places by Mr. Liew?

9    **A.**    Yeah, it was signed by both of us.

10   **Q.**    And was that signed during the course of your preparation

11   of Mr. Liew's 2010 USAPTI tax return?

12   **A.**    Yes.

13          **MR. HEMANN:**  Your Honor, the United States will move

14   672 into evidence.

15          **MR. GASNER:**  No objection.

16          **THE COURT:**  Admitted.

17      (Trial Exhibit 672 received in evidence)

18          **MR. HEMANN:**  Ms. Mahoney, if you could please put up

19   672, page 1, and blow up the text in Part II all the way down

20   through the signatures.  No, Part II up above.  There you go.

21   Thank you.  All the way down to the signatures at the bottom.

22   Thanks.

23   **Q.**    So could you tell the jury what document we're looking at

24   here in Exhibit 672, Mr. Guan?

25   **A.**    This is an e-filing authorized form that, before I submit

1    the e-filing, both me and Mr. Liew sign this paper for me to

2    submit the e-file.

3    **Q.**   And attached to this document is another document -- is an

4    actual draft of the tax return; is that correct?

5    **A.**   It is.

6    **Q.**   If you could go to 672, page 3, Ms. Mahoney, please.

7         In the third page, Mr. Guan, of this document there

8    appears to be a 2010 U.S. corporation income tax return for

9    USAPTI; is that correct?

10   **A.**   Yes.

11   **Q.**   Can you tell the jury how this document was prepared?

12   **A.**   This document was prepared based on the profit and loss

13   statement of 2010.

14   **Q.**   Is it signed at the bottom?

15   **A.**   It is.

16   **Q.**   By whom?

17   **A.**   By both Mr. Liew and me.

18   **Q.**   Was this document prepared and signed before you actually

19   e-filed the tax return for 2010?

20   **A.**   Yes, it is.

21   **Q.**   And is the e-filing, the actual e-filing of the tax return

22   with Mr. Liew, duplicated, if you will, from this -- from the

23   information on this document?

24   **A.**   Excuse me, could you repeat your question?

25   **Q.**   Sure.

GUAN - DIRECT / HEMANN

1    A.    I'm so sorry.

2    Q.    Sure.  It was a silly question.

3          The information that was contained on the e-filed 2010 tax

4    return, was that based on the information that you went over

5    with Mr. Liew in this tax return?

6    A.    Yes.

7    Q.    So if we could go to the actual e-filed version, which is

8    Exhibit 643.  Is that the e-filing of the 2010 USAPTI return,

9    Mr. Guan?

10   A.    Yes.  Give me a minute and let me compare the two of them.

11   Q.    Sure.

12   A.    (Witness examines documents.)  Yes, they appear to be the

13   same.

14   Q.    And could you tell the jury what the gross receipts or

15   sales number, the top line number, for 2010 for USAPTI was?

16   A.    The gross receipt is 895,448.  The net income is 22,606.

17   Q.    Okay.  And then based on a net income -- and, Ms. Mahoney,

18   if you could go to, first -- let me just step back real

19   quickly, Mr. Guan -- to 643, page 2.

20   A.    643, page 2.  Okay.

21   Q.    The computer page is going to look a little bit different,

22   Mr. Guan, so --

23   A.    Okay.

24   Q.    -- there's a number under "Income" there on the screen,

25   Mr. Guan, that I think you just mentioned, 695 -- or 895,448?

GUAN - DIRECT / HEMANN

1    **A.**    Yes.

2    **Q.**    Do you see that number?

3    **A.**    Yes.

4    **Q.**    And that's the gross receipts on line one?

5    **A.**    Yes, it is.

6    **Q.**    And you mentioned earlier, was this number derived from

7    the information that Mr. Liew provided to you?

8    **A.**    Yes.

9    **Q.**    If you could go to the second page or the next page,

10   Ms. Mahoney, page 3, and blow up just the top of that document.

11       There are two lines at the top of the document.  What do

12   they show, Mr. Guan?

13   **A.**    Line 30 is net income, 22,606; and then line 31 is total

14   tax is 3,391.

15   **Q.**    And that was the total tax paid by USAPTI for the tax year

16   2010; is that correct?

17   **A.**    That's correct.

18   **Q.**    At some point in time, Mr. Guan, did you assist Mr. Liew

19   in filing a tax return for USAPTI for the tax year 2007?

20   **A.**    USAPTI, yes.

21       **MR. HEMANN:**  Your Honor, may I approach the witness

22   with Exhibit 640?  And the parties have stipulated that this

23   document is admissible as a public record.

24       **THE COURT:**  You may approach.

25       **MR. HEMANN:**  Thank you, Your Honor.

1   Q.   I'll just collect these from you.

2   A.   Okay.

3          MR. HEMANN:   I'm handing the witness Exhibit 640,

4   Your Honor.   And may it be admitted into evidence?

5          THE COURT:   Any objection.

6          MR. GASNER:   None.   None, Your Honor.

7          THE COURT:   It's admitted.

8       (Trial Exhibit 640 received in evidence)

9          MR. HEMANN:   Would you please put up 640, page 1,

10   Ms. Mahoney.

11   Q.   Mr. Guan, can you tell the jury what that document is?

12   A.   This document is the USAPTI for the year of 2007 with a

13   zero income and zero expenses tax return.

14   Q.   When was this document prepared?

15   A.   July 8 of 2011.

16   Q.   And did you assist Mr. Liew in preparing this document in

17   July of 2011?

18   A.   Yes, I do.

19   Q.   And how did you come to be involved in the preparation of

20   this document?

21   A.   When I prepared 2008, which is the year later, when I

22   first prepared it, I was told the business, it actually start

23   at, I believe, June.   So, therefore, when we filed the 2008 tax

24   return, we mark it as initial and this was not -- 2007 was not

25   filed.

1   **Q.**   Did Mr. Liew explain to you why he did not ask you to

2   prepare a 2007 tax return for USAPTI?

3   **A.**   He explain it to me for year 2007 this company was not

4   active, was not doing business.

5   **Q.**   So was there some requirement that you go back and

6   prepare -- that he go back and prepare a tax return for the

7   year 2007?

8   **A.**   Yes.  I believe probably the Franchise Tax Board requires,

9   like, $800 requirement minimum per year.  And then to send a

10  notice to us to file the year of 2007 tax return; so,

11  therefore, we do 2007 tax return in the later years.

12  **Q.**   In discussing this with Mr. Liew in 2011 and also back in

13  2008 -- I'm sorry, 2009 when you first did the 2008 return, did

14  Mr. Liew tell you when USAPTI first started receiving revenue?

15  **A.**   USAPTI, in the middle of 2008.

16  **Q.**   So Mr. Liew told you that in the middle of 2008 USAPTI

17  started receiving revenue?

18  **A.**   Yes.

19  **Q.**   And did he tell you what the source of that revenue was?

20  **A.**   I did not -- I did not ask that question.

21  **Q.**   So what was the revenue and sales for USAPTI for 2007,

22  gross receipts?

23  **A.**   2007?

24  **Q.**   Yes.

25  **A.**   It's zero.

1   **Q.**   Zero?

2   **A.**   Yes.

3   **Q.**   And the total tax paid was?

4   **A.**   Obviously zero.

5          **MR. HEMANN:**  Your Honor, I have no further questions

6   at this time.

7          **THE COURT:**  All right.

8          **MR. HEMANN:**  Your Honor, may I collect the --

9          **THE COURT:**  Yeah, why don't you collect the exhibits

10   while Mr. Gasner is getting in position for cross-examination.

11                    (Pause in proceedings.)

12          **MR. HEMANN:**  May I approach, Your Honor?

13          **THE COURT:**  Yes.

14          **THE CLERK:**  May I have the exhibits, please, Counsel?

15          **MR. HEMANN:**  I was going to put them in order for you.

16          **THE CLERK:**  That's okay.  Thank you.

17          **MR. GASNER:**  Your Honor, I believe that Mr. Axelrod

18   took a picture already of the whiteboard.

19          **THE COURT:**  Is that correct?

20          **MR. AXELROD:**  That is correct, and we can move that

21   in.

22          **MR. GASNER:**  No objection.

23          **THE COURT:**  All right.  It's admitted.  Do you know

24   the number?

25          **MR. AXELROD:**  It's 4,000 -- and let me just check

1    here.

2              THE COURT:  So, therefore, you may erase that.

3              MR. GASNER:  Thank you.

4              THE CLERK:  And what are you calling it?

5              MR. HEMANN:  What number?

6              THE CLERK:  No, what are you calling it?

7              MR. HEMANN:  Drawing of an oxidation reactor.

8              THE CLERK:  Thank you.

9              MR. GASNER:  May I proceed, Your Honor?

10             THE COURT:  Yes, you may.

11                        **CROSS-EXAMINATION**

12   BY MR. GASNER:

13   Q.    Good morning, Mr. Guan.

14   A.    Good morning.

15   Q.    My name is Stuart Gasner.  I represent Walter Liew and

16   USAPTI, and it's my job to ask you a few questions about your

17   testimony on direct.

18         I'd like to first focus on your experience and skills as a

19   CPA.  You became a CPA in 2002; is that right?

20   A.    Yes.

21   Q.    You mentioned that there are different kinds of CPAs.

22   Could you explain that to the jury, please?

23   A.    There are two different kind of CPA license.  One is the G

24   license, G like George, which means you're not allowed to do

25   tax -- you're not allowed to do audit of financial statement.

1  You can't sign audit financial statement.  And there's another

2  one that you could sign the financial statements.

3       So the one that I have it is without signing the

4  financial -- audit financial statements.  So my company do not

5  provide the audit service.

6  **Q.**   And there are other kinds of financial planning

7  certifications, is that true, in your field, in terms of

8  financial planning and the like?

9  **A.**   May I ask, could you repeat the question?

10 **Q.**   Are there other certifications that one can get in terms

11 of financial planning in your general field of practice?  Is

12 there a certified financial planner, for example?

13 **A.**   There is, but I'm not -- I'm not one of them.

14 **Q.**   Do you have any of those other initials that people put

15 after their name on their business card other than CPA, or CPA

16 is your one credential?

17 **A.**   CPA is my one.

18 **Q.**   Okay.  Did you go straight -- when you got your CPA

19 credential, did you go straight into private practice?

20 **A.**   Yes.

21 **Q.**   That was in 2002?

22 **A.**   I -- before that, I worked for Andersen.

23 **Q.**   For Andersen?

24 **A.**   Yeah.

25 **Q.**   And that's one of the, I think it's, Big 3 or Big 4?

GUAN - CROSS / GASNER

1    A.    Uh-huh.

2    Q.    How long were you at Andersen?

3    A.    About two years.

4    Q.    Any other accounting firms that you had worked with before

5    Arthur Andersen?

6    A.    And then I began to open my own CPA firm, yeah.

7    Q.    Okay.  Mr. Liew came to you, I believe you said, in end of

8    2007?

9    A.    Somewhere in the 2007 we prepare the year of 2006 tax

10   return.  The date that appear in the tax return, that's the

11   date.  So in those days that I'm seeing him.

12   Q.    You had your own accounting practice for about five years

13   at that point?

14   A.    I start my practice in 2002.

15   Q.    At that point, roughly, how many clients did you have when

16   Mr. Liew came to your door?

17   A.    2007 -- 2007 I would like to say somewhere about 800 to a

18   thousand.

19   Q.    A hundred to a thousand?

20   A.    800 to a thousand.

21   Q.    800 to a thousand.  Thank you.

22   A.    Somewhere around there, yeah.

23   Q.    Okay.  So let's just draw a circle, a pie, and we're going

24   to put "2007" above it.

25         Of the 800 to a thousand clients that you had in 2007, how

1    many were businesses and how many were individuals,

2    percentage-wise, in very rough terms?

3    **A.**    I would say about a hundred -- about a hundred of them are

4    business.

5    **Q.**    And the other 700 would be individuals?

6    **A.**    Yeah, the last would be individuals.

7    **Q.**    Okay.  So we'll draw a small slice of the pie, and that's

8    corporations or other kinds of businesses.

9    **A.**    That's correct.

10   **Q.**    And the rest are individuals?

11   **A.**    That's correct.

12   **Q.**    Okay.  Of the smaller slice of the pie, of those

13   businesses, how many were local businesses here in the Bay Area

14   whose business was generated all locally would you say?

15   **A.**    Primarily my practice are local, local small business in

16   the Bay, yeah.

17   **Q.**    Did you have any large corporations as clients in 2007?

18   **A.**    Not -- 2007...  Not that I remember.

19   **Q.**    Did you have any clients that had a substantial amount of

20   their business coming from foreign countries?

21   **A.**    No.  No.

22   **Q.**    Did you have any businesses as clients who transacted

23   international business using letters of credit?

24   **A.**    No.  No.

25   **Q.**    Did you have any clients who had businesses where the

1    corporation here in the United States was a joint venture

2    partner with a company in a foreign country?  Did you have that

3    kind of client, to your knowledge?

4    **A.**    To the best of my knowledge, I don't.

5    **Q.**    Okay.  Let's take a look at when Mr. Liew first -- that

6    time period when he first came to visit you.

7         Do you know another accountant by the name of Mary Liu,

8    L-I-U?

9    **A.**    I know by name because I have a copy of the tax return

10   that was produced by Mary Liu, but I do not know Mary Liu

11   personally.  I never meet Mary Liu.

12   **Q.**    Did she, to the best of your recollection, refer

13   Mr. Walter Liew, L-I-E-W, to you?

14   **A.**    I do not know if -- it has been so long and my clients

15   come into my office from different sources, and I do not know

16   how he first come in my office.  And, also, I personally do not

17   know Mary.

18   **Q.**    Okay.

19   **A.**    Yeah, I do not know Mary.

20   **Q.**    Do you recall when Mr. Walter Liew first became a client

21   or, more properly, USA Performance Group first became a

22   client --

23   **A.**    Yeah.

24   **Q.**    -- whether you had an opportunity to look at the prior tax

25   returns that Mary Liu, L-I-U, had prepared?

GUAN - CROSS / GASNER

1   A.    Yes, I do.

2   Q.    Do you recall that there were a variety of loans that were

3   reflected on the books of Performance Group USA at that time?

4   A.    2005 are you talking about?  Are you referring to the year

5   2005 tax return?

6   Q.    Yes.

7   A.    May I look at it?  Because it has been too long.  May I

8   look at a copy of the 2005 tax return?

9   Q.    I don't happen to have that.

10        MR. GASNER:  But if I may approach, Your Honor, with

11  Exhibit 2039, this may refresh his recollection.

12        THE COURT:  All right.

13        THE WITNESS:  Yeah.

14        THE COURT:  You may do so.

15                (Pause in proceedings.)

16        MR. HEMANN:  And, Your Honor, if the record could

17  reflect that this is part of Exhibit 421, which is not in

18  evidence, pages 80 to -- I'm sorry, 75 to 80.

19        THE COURT:  All right.  It will so reflect.

20        MR. GASNER:  May I approach, Your Honor?

21        THE COURT:  Yes.

22        THE CLERK:  I'm sorry.  Can I have the number again,

23  please?

24        MR. GASNER:  It's Trial Exhibit 2039 and 421.

25        THE CLERK:  Okay.  Thank you.

 1          THE COURT:  All right.

 2          THE WITNESS:  Thank you.

 3   BY MR. GASNER:

 4   Q.   Directing your attention, Mr. Guan, to 421.  Is that the

 5   2005 tax return --

 6   A.   Uh-huh.

 7   Q.   -- that you received when you took on Performance Group as

 8   a client in 2007?

 9   A.   Uh-huh.

10          THE COURT:  Is that a yes?  You can't say "uh-huh."

11   You have to say "yes" or "no."

12          THE WITNESS:  Okay.  Could you rephrase your question

13   one more time?  So sorry.

14   BY MR. GASNER:

15   Q.   Certainly.

16       Is Exhibit 421 that you have in front of you a copy of the

17   tax return for 2005 for Performance Group USA that you received

18   when you first took on Performance Group USA as a client?

19   A.   Yes, I do.

20          THE COURT:  Mr. Gasner, 421 appears to be a binder

21   labeled "Performance Group Corporate Information Filing

22   Records," et cetera.

23          MR. HEMANN:  And, yes, Your Honor, these are just

24   several pages from that binder.

25          THE COURT:  Oh, all right.  So we'll need to mark

1    those separately, then, so that we have a record of those.

2             **MR. GASNER:**  Yes.

3             **THE COURT:**  All right.

4             **MR. GASNER:**  May I approach, Your Honor?

5             **THE COURT:**  Yes.

6             **THE CLERK:**  So what are we going to call them, 421A?

7             **THE COURT:**  How many are there, Mr. Gasner?

8             **THE CLERK:**  And what pages are they?

9             **MR. GASNER:**  So, for the record, Your Honor, I'm

10   showing the witness 421, pages 75 through 80.

11            **THE COURT:**  All right.

12            **MR. GASNER:**  And perhaps we could call that 421A.

13            **THE COURT:**  All right.  Very well.

14        (Trial Exhibit 421A, pages 75 through 80, marked for

15   identification)

16   **BY MR. GASNER:**

17   **Q.**   Mr. Guan, directing your attention to 2039, do you

18   recognize that document?

19   **A.**   (Witness examines document.)  2039....

20   **Q.**   That's the other one to your right with the blue label on

21   it.

22   **A.**   2039....

23   **Q.**   And if you could take a look at page 3 in particular,

24   that's what I want to ask you about.  It says "Cash Deposits"

25   and "Salary" on it.  Do you see that?

GUAN - CROSS / GASNER

1    A.    (Witness examines document.)   Page 3?

2              MR. GASNER:  May I approach, Your Honor?

3              THE COURT:  Yes.

4    BY MR. GASNER:

5    Q.    So this is the -- this is the page (indicating) that I'm

6    looking at.  This one right here (indicating).

7    A.    Oh, okay.

8    Q.    Thank you.

9    A.    Thank you.

10              THE COURT:  Do you want to ask the question again?

11              MR. GASNER:  Yes, Your Honor.

12   Q.    Mr. Guan, do you remember that when you took on

13   Performance Group USA, there were a variety of loans that the

14   company had received from various people?  Do you recall that?

15   A.    Yes, I do.

16   Q.    Do you recall a variety of loans from Eddie Lee?

17   A.    Uh-huh.

18              THE COURT:  Is that a yes?

19              THE WITNESS:  Yes.

20   BY MR. GASNER:

21   Q.    Do you recall loans from Mu Qiao?

22   A.    Yes.

23   Q.    And can you tell the members of the jury how one treats

24   loans to a corporation?  Is that on the P&L or the balance

25   sheet or somewhere else?

1   **A.**    Okay.  The loan from the third party or the loan from the

2   shareholder, they both showing up in the balance sheet, not in

3   the income statement.

4         So if you can see in the tax return, page 4 of the tax

5   return --

6              **MR. GASNER:**  Your Honor, it might help if I move the

7   admission of 421A at this time.

8              **THE COURT:**  Any objection?

9              **MR. HEMANN:**  Not to 421A, Your Honor.

10             **THE COURT:**  All right.  It's admitted.

11         (Trial Exhibit 421A received in evidence)

12             **MR. GASNER:**  Mr. Guevara, if you could display 421A.

13  **Q.**   And, Mr. Guan, perhaps you can tell us what part of the

14  tax return you were referring to in your answer.

15  **A.**   On page 4.

16  **Q.**   Okay.  Mr. Guevara, if we could display page 4, please.

17  **A.**   Let's see...  Oh, yeah.  Right there in the middle.

18  **Q.**   Okay.

19  **A.**   Line 18 and 19.

20  **Q.**   So that shows "Loans and Current Liabilities."  Am I

21  reading that correctly?

22  **A.**   Yes, that is correct.

23  **Q.**   And then if we go to Statement 3, Mr. Guevara, on

24  Exhibit 421A, do you recognize --

25         It's going to be a statement a little further on,

1    Mr. Guevara.

2    **A.**    A statement --

3    **Q.**    There we go.

4    **A.**    Yeah.  It's called "Loan Payable" on the document.

5    **Q.**    All right.  So is there a difference between money that

6    you get as a loan and money that you get as revenue in your tax

7    practice?

8    **A.**    Yes.

9    **Q.**    Can you explain the difference?

10   **A.**    The loan -- okay.  The loan the corporation received is

11   not income.  It is where the corporation doesn't have enough

12   funds to run the operation, you need to loan the money from

13   either the third party or the shareholder.

14        As you can see in here, there are two lines.  One is loan

15   from a third party.  This is 100,000 even.  This is loan from

16   the third party.  And the second line is loan from a

17   shareholder, 89,100.

18   **Q.**    So, Mr. Guevara, could you go back to the first page of

19   the tax return?  And --

20   **A.**    I believe page 4.

21   **Q.**    Page 4.  I'm sorry.

22   **A.**    Yeah.

23   **Q.**    Thank you, Mr. Guan.

24   **A.**    You're welcome.

25        One page up.  This is the statement.

1    **Q.**    One page back.

2    **A.**    Yeah, right there.

3    **Q.**    There we go.

4          Okay.  If you could blow up the part that shows the --

5    **A.**    Which is lines 17 and 18.

6    **Q.**    Okay.  So we've got those on the screen now.  And this

7    shows up on the liabilities and shareholder equity section of

8    the return; true?

9    **A.**    That is correct.

10   **Q.**    And do you think that you received Exhibit 2039 in the

11   course of your tax preparation responsibilities?

12   **A.**    2039....

13         (Witness examines document.)  2039, yeah.  This one

14   normally is in the binder.  Yeah, this one is -- yeah.  Yes.

15             **MR. GASNER:**  Your Honor, I'd move the admission of

16   2039.

17             **MR. HEMANN:**  Your Honor, object, and ask if I can

18   voir dire the witness on this document.

19             **THE COURT:**  All right.  You may do so.

20             **MR. HEMANN:**  Thank you, Your Honor.

21                        <u>**VOIR DIRE EXAMINATION**</u>

22   BY MR. HEMANN:

23   **Q.**    The document that you're looking at, Exhibit 2039 --

24   **A.**    Uh-huh.

25   **Q.**    -- is that from your files?

1   A.   2039...  This is the -- no, this is not from my file.

2   This is the -- this is where -- because I do not prepare the

3   year 2005 tax return.  I prepared the 2006 tax return.

4   Q.   And that document relates to 2005; correct?

5   A.   This is 2005 documentation when they prepared the 2005 tax

6   return.

7              MR. HEMANN:  Your Honor, the United States would

8   object based on foundation and hearsay.

9              MR. GASNER:  May I proceed to lay additional

10  foundation, Your Honor?

11             THE COURT:  Yes, of course.

12             **CROSS-EXAMINATION**   (resumed)

13  BY MR. GASNER:

14  Q.   So, Mr. Guan, when you started your tax preparation work

15  for Performance Group USA, I believe you said earlier that you

16  received the 2005 tax materials from Mary Liu; true?

17  A.   I get -- I received a copy of the tax return, but I'm not

18  remember for sure do I receive this information or not.

19  Q.   Is Exhibit 2039 in the format of the materials that you

20  typically receive from Walter Liew in the course of your tax

21  preparation responsibilities?

22  A.   Say one more time.  I'm so sorry.

23  Q.   Is Exhibit 2039 in the same format as the documents that

24  you typically received from Walter Liew when you were doing

25  taxes for Performance Group?

1   **A.**    (Witness examines document.)  I don't get your -- I don't

2   get your answer [sic].  Could you repeat your question?

3   **Q.**    Yes.  I'm just asking you about the format, the way the

4   document is structured.

5   **A.**    Uh-huh.

6   **Q.**    Do you have Exhibit 2039 in front of you?

7   **A.**    Yeah.

8   **Q.**    So my question is whether this document is in the same

9   format as others you received from Mr. Liew when you were doing

10  taxes for his companies.

11  **A.**    You are referring for the year 2006 -- 2006, 2007, 2008,

12  2009?

13  **Q.**    Yes.

14  **A.**    The information I cannot say for sure exactly same format

15  because I have to look at the documentation to see whether or

16  not it is exactly the format; but all the information, if I

17  have -- if I see it, it would be in my file, if the necessary

18  information I copied in my file or I returned it to the

19  clients.  So I cannot remember for sure whether or not exactly

20  same format, same thing.  Okay.

21  **Q.**    Okay.  Let's move instead to Exhibit 656, which has been

22  admitted.

23          **MR. GASNER:**  May I approach, Your Honor?

24          **THE COURT:**  Yes.

25          **MR. GASNER:**  Do you have your copy of Exhibit 656?

 1              **MR. HEMANN:**  Pardon?

 2              **MR. GASNER:**  Do you have your copy of Exhibit 656?  Or

 3    I'm happy to use --

 4              **MR. HEMANN:**  The Court has it.

 5              **MR. GASNER:**  The Court has it?

 6              **MR. HEMANN:**  Yeah.

 7              **THE COURT:**  I prefer you use the actual exhibit,

 8    please.

 9              **MR. GASNER:**  I understand, Your Honor.

10              **THE CLERK:**  It's in the box.  It's admitted today so

11    it should be in the box.

12              **MR. GASNER:**  It should be in this box, okay.

13                        (Pause in proceedings.)

14              **MR. GASNER:**  May I approach, Your Honor?

15              **THE COURT:**  Yes.

16              **THE WITNESS:**  Thank you.

17    **BY MR. GASNER:**

18    **Q.**  Thank you.

19         Mr. Guan, do you have Exhibit 656 in front of you?

20    **A.**  (Witness examines document.)  Yes, I do.

21    **Q.**  And if you could take a look at page 656-0016.

22    **A.**  0016.

23    **Q.**  Those are the little numbers in the lower right.

24         And, Mr. Guevara, if you could blow up the part under

25    "Liabilities" where it says "Loan from Mu Qiao" and "Short-term

GUAN - CROSS / GASNER

1    Borrowing"?

2    **A.**    Okay.

3    **Q.**    So under "Current Liabilities," it shows a loan from

4    Mu Qiao.  Do you see that?

5    **A.**    I saw it on the screen, yeah.

6         **MR. GASNER:**  And, Your Honor, it's been stipulated

7    that Mu Qiao is Christina Liew's brother.

8         **THE COURT:**  All right.  Is that correct?

9         **MR. HEMANN:**  That is correct, Your Honor.

10        **THE COURT:**  All right.  So stipulated.

11        **MR. GASNER:**  And it's further stipulated that he

12   resides in China.

13        **THE COURT:**  All right.  Okay?

14        **MR. HEMANN:**  Agreed, Your Honor.

15        **THE COURT:**  All right.

16   **BY MR. GASNER:**

17   **Q.**    Do you recall any discussions with Walter Liew about loans

18   from his wife's brother, Mu Qiao, in China?

19   **A.**    I recall discussions from Mu Qiao.  I do not ask -- I not

20   discuss the relationship between those two people.  I just know

21   he's a person is Mu Qiao.

22   **Q.**    Do you recall having discussions with Mr. Liew about how

23   to treat short-term borrowing into Performance Group USA?  Do

24   you recall that topic?

25   **A.**    Short-term...  May I look for the --

1    THE COURT:  Well, he's asking if you recall, not what

2    the documents say.

3    THE WITNESS:  No.  Say what -- could you repeat your

4    question?

5    BY MR. GASNER:

6    Q.   Just looking back on your relationship with Mr. Liew, can

7    you recall any discussions with him about how to treat

8    borrowing from his relatives?

9    A.   Yeah.  When we -- when we do the book of -- when we review

10   the book of the short-term, obviously I ask, "What is this?"

11   And those are the short-term borrowing to run the business.

12   So, yes, I do ask that.

13   MR. GASNER:  Your Honor, may I approach the witness

14   with Exhibit 2036?

15   THE COURT:  Yes, you may.

16   MR. GASNER:  I'll represent that this is a document

17   from Mr. Guan's work papers.

18   THE COURT:  All right.

19   BY MR. GASNER:

20   Q.   Does Exhibit 2036 refresh your memory as to discussions

21   you had with Mr. Liew about short-term borrowing?

22   A.   Short-term borrowing....

23   (Witness examines document.)  That is the same thing --

24   THE COURT:  What he's asking you, sir, is:  Does it

25   refresh your memory so that you can testify without looking at

1   the document?  Not what the document says, but does the

2   document refresh your memory so you can testify what counsel's

3   asking you without looking at the document?

4           THE WITNESS:  Okay.

5           THE COURT:  So the answer is "yes" or "no."  Do you

6   remember?

7           THE WITNESS:  I cannot remember.  I cannot remember

8   for sure.

9   BY MR. GASNER:

10  Q.   If you take a look at Exhibit 656 at page 16 under

11  "Current Liabilities," it shows short-term borrowing of

12  $89,100.  Do you see that?

13  A.   Oh, okay.  Yeah.

14  Q.   Okay.

15  A.   Yeah.

16  Q.   And then if you look at Exhibit 2036, do you see where

17  that same figure appears in the middle of the page?

18  A.   Yes.

19  Q.   Was it your practice, Mr. Guan, to keep in your work

20  papers documents that supported items that were on the tax

21  return?

22  A.   If it is the year that I prepared the tax return because

23  this is the year not prepared by me.

24  Q.   But the -- we're looking at Exhibit 656, which I believe

25  Mr. Hemann questioned you about in relation to the 2006 tax

GUAN - CROSS / GASNER

1  return.

2  **A.**   Yeah, that's correct.

3  **Q.**   Okay.  So I am asking you about a tax return that you did

4  prepare.

5  **A.**   Okay.

6  **Q.**   You understand that; right?

7  **A.**   Okay.

8  **Q.**   And Exhibit 2036 appears to relate to an entry on a tax

9  return that you did prepare.  Do you see that?

10  **A.**   Okay.

11  **Q.**   Do you believe that Exhibit 2036 is something that you

12  retained in your files to support something that was on the tax

13  return?

14  **A.**   (Witness examines document.)  Yes, it may -- this one --

15  this one is in the balance sheet of 2005, which is in the year

16  2006 tax return, at the beginning balance of the short-term

17  borrowing.

18        **MR. GASNER:**  Your Honor, I'd move the admission of

19  2036.

20        **MR. HEMANN:**  I don't have an objection, Your Honor.

21        **THE COURT:**  It's admitted.

22     (Trial Exhibit 2036 received in evidence)

23  BY MR. GASNER:

24  **Q.**   So just to ask you some questions about your general

25  procedure on tax returns with Mr. Liew.

**GUAN - CROSS / GASNER**

1        I believe you said that he would, in the outset, he would

2   bring you a binder of materials along with the profit and loss

3   statement and the balance sheet; is that right?

4   **A.**   Yes.

5   **Q.**   The document that we just looked at, Exhibit 656 -- and,

6   Mr. Guevara, if we could put that up, just the front page of

7   that -- is this a report essentially from QuickBooks?

8   **A.**   Yes, it is.

9   **Q.**   Is that typical of the way you deal with your clients?  Do

10  many of them bring you QuickBooks reports?

11  **A.**   Yes.

12  **Q.**   And if you can just -- the front page of this is a summary

13  that is built up from all the entries later in the document; is

14  that right?

15  **A.**   That is correct.

16  **Q.**   And one printout is profit and loss; true?

17  **A.**   That is true.

18  **Q.**   And then if you go back to where we were talking about the

19  loans from Mu Qiao at page 16, that's a balance sheet; right?

20  **A.**   Yes.

21  **Q.**   And that's another report that QuickBooks can generate

22  from the particular entries; true?

23  **A.**   That is correct.

24  **Q.**   And the rest of this document has every little detail of

25  each entry; right?

**GUAN - CROSS / GASNER**

1   A.   That is correct.

2   Q.   Okay.  So in 2006 when you started working with Mr. Liew,

3   he would bring you the QuickBooks report; true?

4   A.   Yes.

5   Q.   And he would also bring you the backup; right?

6   A.   Yes.

7   Q.   And I believe you said that you would meet with him for

8   either a morning or an afternoon; is that true?

9   A.   Yes.

10  Q.   That would be about four or five hours or so?

11  A.   Yeah.  Depends on the process, yeah.

12  Q.   Is that typical of the amount of time you would spend with

13  your business clients?

14  A.   Yes.

15  Q.   And I believe you said that you'd fill out the tax return

16  right then and there and have Mr. Liew sign it; is that true?

17  A.   That is true.

18  Q.   Were there times where you needed two meetings, one to go

19  over the materials and another for him to come back and sign

20  it?

21  A.   I cannot recall whether or not we need two meetings or

22  not.  I cannot recall.

23  Q.   But your typical practice was everything in one meeting?

24  A.   Because he not live in San Francisco, he live across the

25  bridge; so, therefore, I try to have one meeting with him.

**GUAN - CROSS / GASNER**

1  **Q.**   I believe you said your office is at 2850 San Bruno

2  Avenue?

3  **A.**   My office, 2805 San Bruno.  2805 San Bruno Avenue,

4  San Francisco, California 94134.

5  **Q.**   That's just off of 101 outside of 280 --

6  **A.**   That's correct.

7  **Q.**   -- where it crosses over?

8  **A.**   That's correct, uh-huh.

9         **MR. GASNER:**  Your Honor, may I approach the witness

10  with Exhibit 420?

11         **THE COURT:**  Perhaps we can take our break now.

12         **MR. GASNER:**  Very well.

13         **THE COURT:**  All right.  We're going to take our second

14  and last break.  We're going to end about 1:15 today.

15      Please remember the Court's usual instructions.  Keep an

16  open mind.  Don't obtain outside information.  And we'll see

17  you in 15 minutes.

18      (Proceedings were heard out of the presence of the jury:)

19         **THE COURT:**  All right.  Fifteen minutes, everybody.

20         **MR. GASNER:**  Thank you, Your Honor.

21               (Recess taken at 11:41 a.m.)

22            (Proceedings resumed at 11:59 a.m.)

23      (Proceedings were heard out of the presence of the jury:)

24         **THE COURT:**  All right.  Please bring in the jury, and

25  let's get the witness back on the stand.

```
 1        (Proceedings were heard in the presence of the jury:)

 2            THE COURT:  All right.  Please be seated.

 3        You may continue your cross-examination.

 4            MR. GASNER:  Thank you, Your Honor.

 5        May I approach the witness with Exhibit 420, Your Honor?

 6            THE COURT:  Yes.

 7            THE WITNESS:  Thank you.

 8            MR. GASNER:  Thank you.

 9                        (Pause in proceedings.)

10   BY MR. GASNER:

11   Q.   Mr. Guan, do you have Exhibit 420 in front of you?

12   A.   Yes.

13   Q.   Could you take a look at page 420, page 11?

14   A.   Page 11.  Okay.

15            MR. GASNER:  May I approach, Your Honor, to direct the

16   witness, because there's no pagination --

17            THE COURT:  Yes.  Yes, you may.

18            MR. GASNER:  -- in the original?

19                        (Pause in proceedings.)

20            MR. GASNER:  I've directed the witness to the page in

21   the original that corresponds to 420-0011.

22   Q.   Do you recognize the handwriting on that Post-it sticker,

23   Mr. Guan?

24   A.   Yes.

25   Q.   Is that yours?
```

1    **A.**    Yeah, that's my handwriting.

2    **Q.**    Take a look at the outside of Exhibit 420.  Does that

3    appear to be the kind of binder that Mr. Liew would bring to

4    you in connection with the preparation of the Performance Group

5    USA tax returns?

6    **A.**    (Witness examines document.)  Yes.

7              **MR. GASNER:**  Your Honor, move the admission of 420.

8              **THE COURT:**  Any objection?

9              **MR. HEMANN:**  Yes, Your Honor.  Objection.  Hearsay.

10             **THE COURT:**  May I see the document, please?

11             **MR. GASNER:**  Yes, Your Honor.

12             **THE COURT:**  Get it from the witness.

13                        (Pause in proceedings.)

14             **MR. GASNER:**  Your Honor, the clerk is handing the

15    Court the page that Mr. Guan identified as having a Post-it

16    sticker with his dated signature on it.

17                        (Pause in proceedings.)

18             **MR. HEMANN:**  We have no objection to this page,

19    Your Honor, with Mr. Guan's handwriting on it.

20             **THE COURT:**  All right.  So what is the --

21             **MR. GASNER:**  And this is also -- it's stipulated this

22    was seized from the Liew residence.

23             **THE COURT:**  All right.  So which of the --

24             **MR. GASNER:**  I would move the admission of the entire

25    document because the witness did identify it as the kind of

 1   binder that Mr. Liew brought to him, and it's -- it's got his

 2   signature on one page.

 3           **THE COURT:**  Oh, you're moving for the admission of the

 4   entire binder?

 5           **MR. GASNER:**  I am.

 6                      (Pause in proceedings.)

 7           **MR. GASNER:**  I would urge the business records

 8   exception as well, Your Honor.

 9           **THE COURT:**  All right.

10                      (Pause in proceedings.)

11          **MR. HEMANN:**  Your Honor, I think there will be several

12   of these.  It may -- there will be several of these.

13          **THE COURT:**  All right.  Let's come to the sidebar,

14   please.

15       Ladies and gentlemen of the jury, you may stand if you

16   like.

17       (The following proceedings were heard at the sidebar:)

18          **THE COURT:**  All right.  So your objection is hearsay?

19          **MR. HEMANN:**  It's hearsay.  I think it's also --

20   there's a relevance objection to the entirety of the documents,

21   Your Honor; but the primary objection is hearsay.  These are

22   statements of Mr. Liew, both in certain aspects of these

23   documents appear to have actually been prepared by Mr. Liew or

24   by somebody at his direction; other parts are compilations of

25   documents that Mr. Liew apparently collected, some of which he

1  kept at his house.

2      I think you'll hear about some others which he did give to

3  Mr. Guan, but we'd object to those, too, because I think those

4  are asserted conduct by Mr. Liew as to statements he believes

5  that Mr. Guan should rely on.  I think they are statements of

6  the defendant and they are hearsay.  I don't believe that

7  there's an exception that applies.

8          **THE COURT:**  All right.

9          **MR. GASNER:**  So, Your Honor, the witness -- I think

10  we've laid an adequate foundation that this is the type of

11  document that Mr. Liew would give him.  It's not offered for

12  the truth of the matter asserted, but as part of the

13  information that he received in the course of preparing tax

14  returns.

15      It's also to show just an act, if you will, that these are

16  the documents given to him to prepare the tax returns.  And to

17  the extent that any of them are offered for the truth of the

18  matter asserted, they're business records.  They're bank

19  statements and things of that nature.

20          **THE COURT:**  Well --

21          **MR. HEMANN:**  Your Honor, may I just add one thing?  I

22  think that the important -- an important issue is with regard

23  to this document and several of the like, it's the type of

24  document.  It's not this document.  And this one's located in

25  the Liew residence.  He can't say, and he didn't say, that this

was the information that was provided. And I believe that we're going to hear references to certain items in this document.

**THE COURT:** Well, my ruling is I'm going to sustain the objection. If there's a specific document -- my concern is authenticity, first of all, and relevance because I don't know the extent this is relevant to the tax counts. This may be relevant to sole general relationship that this witness has with Mr. Walter Liew.

If you want to show a particular document and get him to authenticate it, you can; but when we start getting into things that are types of things that are looked at, like the tax return, the 2005, I think, tax return, he said, well, it looks like the type of return, but I'm not sure I ever saw it, that's not adequate foundation for authenticating this document.

So I'm concerned about not just the hearsay issue, but the authenticity. And, also, I'd like to see a better showing of relevance to the specific acts of evasion that the Government is alleging as opposed to just throwing a bunch of documents and numbers at the jury.

So I'm not saying I won't admit any of this material or even the substance of it, but in this form, to put an entire binder in based upon the testimony "this is the kind of document" or "it looks like it might be the kind of document" is not adequate. So I'll --

1    **MR. HEMANN:**  And, Your Honor, if I can just offer

2    one -- I may be making --

3         **THE COURT:**  Ms. Agnolucci has a killer point to make.

4         **MS. AGNOLUCCI:**  No, I'm here on another matter when

5    you're all done.

6         **THE COURT:**  All right.

7         **MR. HEMANN:**  And, Your Honor, I may be making

8    relevance objections to information about loans because of the

9    point Your Honor just made.  The loans don't appear on the tax

10   returns at all.  He would testify, I'm sure, if asked that

11   loans don't appear in any line on the tax returns that he

12   prepared.

13        **THE COURT:**  Didn't he already identify many so lines?

14        **MR. HEMANN:**  No, no, no.  On cross-examination he

15   identified --

16        **THE COURT:**  That's what I mean, on cross.

17        **MR. HEMANN:**  He said that in the balance sheet, there

18   are loans, but he didn't say that he relied on those loans for

19   any part of the work that he did.

20        **THE COURT:**  That's part of redirect.  I'm not going to

21   get into that level of hypermanagement.  I think the entire

22   return was put in -- returns.  I think to the extent that there

23   is a theory -- and I can guess the theory, what it might be,

24   with Defense expert about how loans might impact on tax

25   liability and maybe even state of mind.  So I'm not going to

1    exclude that entire subject matter.  So we'll take it an

2    objection at a time.

3        Yes, Ms. Agnolucci.

4        **MS. AGNOLUCCI:**  I just wanted to alert Your Honor that

5    there is one issue that we don't need to discuss now but that I

6    would like to raise before Ms. Rometo, who's the next witness,

7    testifies on direct examination.

8        **THE COURT:**  Okay.

9        **MS. AGNOLUCCI:**  So I wanted to alert the Court.

10   Should we address it now or do you want to have a sidebar

11   before her direct?

12       **THE COURT:**  No, not now.  Let's see how far we get

13   today, and you'll give me your sort of best estimate, and I'll

14   tell you when I want to hear it.

15       **MS. AGNOLUCCI:**  Okay.  Thank you, Your Honor.

16       **MR. HEMANN:**  Thank you, Your Honor.

17       **THE COURT:**  So here's this back.

18       **MR. GASNER:**  Thank you.

19       (The following proceedings were heard in open court:)

20       **MR. GASNER:**  May I proceed, Your Honor?

21       **THE COURT:**  The objection is sustained.  Yes, you may.

22   BY MR. GASNER:

23   **Q.**   Mr. Guan, directing your attention back to 420, on the

24   front page of that document, do you recognize the Post-it

25   sticker there?

GUAN - CROSS / GASNER

1   **A.**    Uh-huh.  Yes.

2   **Q.**    Whose handwriting is that?

3   **A.**    I think it's my handwriting.  Yeah.

4        **MR. GASNER:**  And, Your Honor, I'd move the admission

5   of the front page -- the two pages with Mr. Guan's handwriting

6   on them.

7        **THE COURT:**  Any objection to those two?

8        **MR. HEMANN:**  Just for the record, Your Honor, that

9   would be the first page and what is Bates-numbered 420-0011.

10  So with that, no objection.

11       **THE COURT:**  Admitted.

12       **THE CLERK:**  Does the first page have anything

13  identifying its number?

14       **MR. HEMANN:**  Yes.  It says "Performance Group USA,

15  Inc., bank statements, checks, and summary for 2006 tax

16  returns."

17       **THE COURT:**  All right.  It's admitted.

18        (Trial Exhibit 420, pages 1 and 11, received in evidence)

19       **MR. GASNER:**  May I publish the front page, Your Honor?

20       **THE COURT:**  Yes.

21  **BY MR. GASNER:**

22  **Q.**   So the front page that is on the screen doesn't have the

23  Post-it sticker on it.  So could you read the Post-it sticker

24  to the jury, please?

25       That's not the portion, Mr. Guevara.  Thank you, though.

GUAN - CROSS / GASNER

1          Can you read the Post-it that you have?

2    **A.**   "Reconcile done" and then with my initial on it.  So that

3    doesn't mean I do the reconciliation.  It just mean I check it,

4    and the reconciliation is done.

5    **Q.**   But you wrote on there "Reconciled PG."  Is that what your

6    Post-it note says?

7    **A.**   No, it's not done by me.  So I look at -- as you look in

8    the inside --

9    **Q.**   Yes.

10   **A.**   -- there is a reconciliation.  So as I -- as a tax

11   preparer, I actually see the record, the reconciliation is

12   done.  So that doesn't mean it's done, the reconciliation, by

13   me.

14   **Q.**   So when you put "Reconciled PG," it just means that you

15   saw that it had been reconciled by somebody else?

16   **A.**   Yeah.  Yeah.  It's done.

17   **Q.**   Okay.  Thank you.

18          Let me show you --

19   **A.**   I check it has been done.

20   **Q.**   Let me show you what has previously been marked and

21   admitted as Exhibit 637.

22              **MR. GASNER:**  May I approach, Your Honor?

23              **THE COURT:**  Yes, you may.

24              **THE WITNESS:**  Thank you.

25

GUAN - CROSS / GASNER

1   BY MR. GASNER:

2   Q.   Thank you.

3        This is the 2006 tax return for Performance Group USA?

4   A.   Yes.

5   Q.   Do you believe, Mr. Guan, that based on the information

6   that you had, that you did anything wrong in preparing these

7   tax returns?

8   A.   No.  Based on the information provided by the client, and

9   I prepared this tax return.

10  Q.   If you'll take a look --

11       Mr. Guevara, if you could highlight in on the tax and

12  payment section and a little bit above that and blow that up

13  where it says 68,518, and above that as well.  Just take a --

14  that's perfect.  Thank you.

15       So do you see, Mr. Guan, at line 28, it talks about --

16  A.   I don't --

17            THE COURT:  Wait just a moment.  Let him finish his

18  question, please.

19            THE WITNESS:  I'm so sorry.

20  BY MR. GASNER:

21  Q.   At line 28 it says "Taxable income," and that's 68,518.

22  Do you see that?

23  A.   Yes, I saw that.

24  Q.   And below that there's a special deduction in exactly that

25  same amount.  Do you see that?

1    **A.**    Yes, it is.

2    **Q.**    And it ends up with total tax being zero.  Do you see

3    that?

4    **A.**    Yes.

5    **Q.**    Is that a coincidence, based on your memory of preparing

6    this tax return, that the -- that net operating loss that

7    carried forward is exactly the same?

8    **A.**    No, that's not true.  If you see the statement --

9    Statement 2 of the tax return, then you will see the carryover

10   in the Statement 2 of the tax return.

11   **Q.**    Okay.  If we could go to page 7, Mr. Guevara, at

12   Statement 2 in the middle of the page.

13        Is that what you're referring to, Mr. Guan?

14   **A.**    Yeah, that's correct.  So as you can see, the carryover

15   loss from year 2005 was $77,239, but the law only allow you to

16   deduct up to the taxable income.

17   **Q.**    Okay.  So is it fair to say that the fact that the taxable

18   income here was exactly zero is simply a function of a net loss

19   carryforward that is perfectly appropriate?  Isn't that true?

20   **A.**    According to the tax return that I prepared for year

21   2008 -- 2006 -- excuse me -- which produced the line 28 number

22   68,518 net income, because the company has 77,239, the law only

23   allow the corporation offset the net operating loss up to the

24   income.

25        So, therefore, as that result, as you can see, there will

1   be a carryover, the remaining balance for the year of 2007.

2       So as the law allow it for the tax law, the corporation

3   only could offset up to the income.  So, therefore, it is

4   correct.

5   **Q.**   So I take it the short answer to my -- I appreciate your

6   long answer, but the short answer is, there's nothing wrong

7   with ending up on that tax return with zero as the taxable

8   amount; true?

9   **A.**   That is correct.

10  **Q.**   Thank you.

11      Let me ask you, if I might -- let's go to 2007.  And I

12  take it that the procedure that you used with Mr. Liew was the

13  same in 2007?

14  **A.**   That's correct.

15  **Q.**   He would bring you a binder of materials; you would go

16  over it in person; you'd fill out the tax return right there;

17  is that right?

18  **A.**   That's correct.

19  **Q.**   Do you recall any issues coming up that you would discuss

20  with Mr. Liew in preparing the 2007 return?

21  **A.**   May I look at it?  I cannot recall right at this moment if

22  any issues.

23  **Q.**   Certainly.

24          **MR. GASNER:**  May I approach, Your Honor?

25          **THE COURT:**  Yes.

1          THE CLERK:  What exhibit number?

2          MR. GASNER:  Approaching with Exhibit 638.

3          THE WITNESS:  Thank you.

4   BY MR. GASNER:

5   Q.   Thank you.

6   A.   (Witness examines document.)  Yes.  When I prepare the

7   2007 tax return for Performance Group USA, I compared 2006 and

8   2007.  There's a difference, and there's difference from

9   1.8 million to 400.  So -- and also, at the same time, I noted

10  that there is another entity which is in the same years.

11  Q.   Okay.  So as issues came up in the course of your roughly

12  four-hour meetings, you would discuss them with Mr. Liew; true?

13  A.   Approximately.

14  Q.   And you would give him the benefit of your accounting

15  experience on the issues that came up in your discussions;

16  true?

17  A.   That is correct.

18  Q.   In 2008, do you recall any issues that came up in the

19  preparation of those tax returns?

20  A.   May I look at the 2008 tax return?

21  Q.   Certainly.

22          MR. GASNER:  May I approach, Your Honor?

23          THE COURT:  Yes.

24          MR. GASNER:  I'm approaching with Exhibit 641.

25          THE WITNESS:  Thank you.

GUAN - CROSS / GASNER

1   BY MR. GASNER:

2   Q.    Thank you.

3   A.    (Witness examines document.)

4   Q.    In 2008, looking at the tax return, do you recall any

5   particular issues that arose that year?

6   A.    (Witness examines document.)  Not that I remember.  You

7   give me the USA Performance -- USAPTI, the tax return just

8   given to me.

9   Q.    Yes.

10  A.    Okay.

11  Q.    That's the exhibit you have in front of you.

12        And did you follow the same procedure in 2008?  That is,

13  Mr. Liew would bring you binders and materials; you'd sit down

14  for a morning?  Same procedure?

15  A.    Yes.

16        MR. GASNER:  May I approach with Exhibit 659,

17  Your Honor?

18        THE COURT:  Yes, you may.

19        MR. GASNER:  I'm showing the witness what's been

20  marked as 659.  And it's been stipulated that this is from

21  Mr. Guan's own files.

22        THE COURT:  Is that correct?

23        MR. HEMANN:  That is correct, Your Honor.

24  BY MR. GASNER:

25  Q.    Do you recognize Exhibit 659, Mr. Guan?

1    **A.**    Yes, I do.  Yes, I do.

2    **Q.**    What is it?

3    **A.**    It is Performance Group USA.  It's a bank statement,

4    check, and summary for 2007 tax return.

5    **Q.**    Would you, from time to time, keep the materials that

6    Mr. Liew brought to you for the preparation of your tax

7    returns?

8    **A.**    For the year that I do not do the bookkeeping, I normally

9    do not maintain this information.  And this information was

10   brought to me later down the year when there is a payroll audit

11   and then I request information.  This happened to be in my

12   office because it was during the same period of time.

13   **Q.**    There was later an audit by the IRS of the status of

14   people that worked with Mr. Liew as to whether they were

15   independent contractors or employees; is that right?

16   **A.**    That is correct.

17   **Q.**    And you maintained these records for that purpose?

18   **A.**    Because I request those information from Mr. Liew for

19   respond to the -- whether or not it's independent contractor or

20   payroll audit, I respond.

21   **Q.**    And at the time that this case that we're in right now

22   proceeded, these documents were in your files at your office?

23   **A.**    Well, in --

24         **THE COURT:**  Let him finish the question, please,

25   before you answer.

1          Please finish your question.

2    **BY MR. GASNER:**

3    **Q.**   At the time when the FBI approached you to gather

4    documents for this case, Exhibit 659 was part of the documents

5    in your files; true?  It's been stipulated that they were

6    obtained from you, Mr. Guan.

7    **A.**   Yes.

8    **Q.**   Okay.

9          **MR. GASNER:**  Your Honor, I'd move the admission of

10   659.

11         **MR. HEMANN:**  Objection, Your Honor.  Relevance.

12         **THE COURT:**  Let me see it, please.  Can you get it,

13   Ms. Ottolini?

14         **MR. HEMANN:**  If I may ask one question of the witness

15   regarding this document, Your Honor.

16         **THE COURT:**  All right.  Before I rule on it, you may

17   voir dire the witness.

18         **MR. HEMANN:**  Thank you, Your Honor.

19                    **VOIR DIRE EXAMINATION**

20   **BY MR. HEMANN:**

21   **Q.**   The document, Mr. Guan, that you're looking at, was that a

22   document that you used in the preparation of Mr. Liew's 2007

23   corporate tax return?

24   **A.**   (Witness examines document.)  During the time I prepare

25   the tax return, Mr. Liew bring a binder of this one and also

1    the balance income statement.  But I did not make a photocopy

2    of this documentation.  I make a photocopy of the balance

3    income statement in my file.  And then this one was brought to

4    my office at a later time for -- to respond to the audit.

5    **Q.**   But you had it with you at the time you did the tax

6    return?

7    **A.**   (Witness examines document.)  I have -- he brought -- he

8    brought this one in, and also he take this binder with him when

9    he finished the tax return.  During the time when I prepared

10   the tax return, this binder was with me.

11            **MR. HEMANN:**  Then, Your Honor, the United States does

12   not have an objection.

13            **THE COURT:**  Great.  All right.  It's admitted.

14        (Trial Exhibit 659 received in evidence)

15            **MR. GASNER:**  Thank you, Your Honor.

16               <u>**CROSS-EXAMINATION**</u>   (resumed)

17   BY MR. GASNER:

18   **Q.**   And, again, later in your relationship with Mr. Liew and

19   his company, you followed the same process:  You would bring a

20   binder in; you'd spend a morning or an afternoon; prepare the

21   tax returns together; and then he would sign them on the spot?

22   **A.**   Uh-huh.  Well, when we do the bookkeeping and tax return,

23   we would spend more time because we need to review the tax --

24   the bookkeeping before we do the tax return.

25   **Q.**   I believe you said that when you started doing the

1   bookkeeping, that was in 2009.  Is that correct?

2   **A.**   I believe so.

3   **Q.**   And if I understood your testimony correctly, Mr. Guan,

4   you basically did the same thing, except that your personnel

5   did the QuickBooks entries; true?

6   **A.**   Yeah.  My personnel, yeah, my staff to input into the

7   QuickBooks.

8   **Q.**   So rather than bring a nice, neat binder with the

9   QuickBooks reports already done, I take it Mr. Liew brought a

10  big pile of checks and statements and things of that nature?

11  **A.**   Yeah, bring the -- yeah, the bank statement and a copy of

12  the canceled checks, yes.

13  **Q.**   Back in the early days when you were simply preparing the

14  tax returns, do you recall roughly how much you charged

15  Performance Group USA for your services on each tax return?

16  **A.**   That, I cannot remember.  I have to look at the file.

17  **Q.**   What's the range of your typical charges back in 2006?  Do

18  you recall?

19  **A.**   I -- I cannot remember.  I have to look at the file.  But

20  in my file there would be a copy of the charge -- what I

21  charge.

22  **Q.**   Do you think it was more than a thousand dollars or less?

23  **A.**   Sir, I cannot remember.

24  **Q.**   But for your -- we talked about your corporate clients.

25  It sounds like they're mostly small businesses here in the

1  Bay Area.  What would be your typical charge currently for a

2  tax return for a small business?

3  **A.**    The corporation?

4  **Q.**    Yes.

5  **A.**    Just for the tax return?

6  **Q.**    Yes.

7  **A.**    Somewhere from $500 to 2,000 depending complications --

8  depends on how complicated are the tax return.

9  **Q.**    Just based on your memory, do you think that Mr. Liew's

10  returns were at the less complicated or more complicated end of

11  the spectrum?

12  **A.**    It's -- it's a medium.  It's, like, in the average -- in

13  the average -- in average corporation.

14  **Q.**    Average end of the range for a corporation?

15  **A.**    Yeah, toward the average.  A little bit more complicated,

16  yeah.  Average, a little more complicated, yeah.

17  **Q.**    Did you ever discuss with Mr. Liew ways that he could

18  structure his business so as to minimize his taxes?

19  **A.**    No.

20  **Q.**    Do you do that from time to time with your business

21  clients?

22  **A.**    Not for -- not for Mr. Liew.

23  **Q.**    But you have given that advice for other corporate clients

24  of yours; true?

25  **A.**    If my client request and then my time permitted, yes.

**GUAN - CROSS / GASNER**

1   Q.   There's nothing wrong with giving tax planning advice; is

2   there?

3   A.   That is correct.

4   Q.   As a CPA, are you authorized to give tax planning advice

5   to corporations?

6   A.   Yes.

7   Q.   If a corporation came to you with a business that had

8   international aspects, would it be appropriate for you to give

9   advice on how to structure their business so as to minimize

10  their tax exposure?

11              MR. HEMANN:  Objection.

12              THE COURT:  Sustained.

13  BY MR. GASNER:

14  Q.   Do you have occasion, from time to time, to refer your

15  clients who want tax planning advice to lawyers or other

16  specialists?

17  A.   I normally don't do it, except, like, when they do living

18  trust, and then I will, like, refer to the lawyer to ask them

19  for a lawyer to establish a living trust.

20  Q.   If you're trying to figure out the taxes for somebody that

21  has a living trust, you might refer some details of that to an

22  estate lawyer; is that fair to say?

23  A.   Just refer -- I just refer my client to look for a lawyer,

24  and they would discuss according two of them.

25  Q.   Was there any point in your relationship with Mr. Liew and

1    his businesses in which you changed your method of dealing with

2    him?

3    **A.**   Could you make clear the question?

4    **Q.**   Fair enough.  Other than when you did the bookkeeping

5    services in 2009, were there any other changes in the

6    relationship that you had with Mr. Liew and his companies, or

7    did you follow basically the same pattern you've been talking

8    about today?

9    **A.**   Same.

10         **MR. GASNER:**  Your Honor, if I can just consult with

11   counsel briefly.

12         **THE COURT:**  Please.  Take your time.

13         **MR. GASNER:**  Thank you.

14                   (Pause in proceedings.)

15         **MR. GASNER:**  No further questions, Your Honor.

16         **THE COURT:**  Thank you.

17      Any redirect, Mr. Hemann?

18         **MR. HEMANN:**  Briefly, Your Honor.

19                   (Pause in proceedings.)

20         **THE CLERK:**  Do you want to get your exhibits,

21   Mr. Gasner?

22         **THE COURT:**  Are you going to need the exhibits,

23   Mr. Hemann, that the witness has?

24         **MR. HEMANN:**  No.  I'm just going to refer to some

25   specific pages, Your Honor, that are already on the system and

 1   admitted, if that's okay.

 2           **THE COURT:**  All right.  Would you mind -- all right.

 3   We'll retrieve them afterwards, then.  It's okay.  I just don't

 4   want to have his place there messed up.

 5           **MR. HEMANN:**  Certainly, Your Honor.

 6           **MR. GASNER:**  I'm done unless you need something.  I'll

 7   stop puttering around.

 8               (Pause in proceedings.)

 9                  **REDIRECT EXAMINATION**

10   BY MR. HEMANN:

11   **Q.**   Mr. Guan, did Mr. Liew ever tell you anything about

12   letters of credit that he had with his customers in China?

13   **A.**   No.

14   **Q.**   Did he ever ask you for your advice on how to treat money

15   coming to the United States based on those letters of credit

16   for tax purposes?

17   **A.**   No.

18   **Q.**   Mr. Gasner asked you a series of questions regarding some

19   loans that appear in the balance sheets that you reviewed with

20   Mr. Liew.  Do you remember those?

21   **A.**   Yes.

22   **Q.**   Do loans have any impact on the gross sales or receipts

23   that show on line 1 of a tax return?

24   **A.**   No.

25   **Q.**   Why not?

GUAN - REDIRECT / HEMANN

1   **A.**   They're not.

2   **Q.**   Why not?

3   **A.**   The loan is not an income.  The loan is a liability for a

4   company.  It's not an income.

5   **Q.**   So, Ms. Mahoney -- do we have Ms. Mahoney?  Hi.

6        Ms. Mahoney, could you please put Exhibit 637, page 1, up

7   there?  And just highlight the top, the income section of the

8   return.

9   **A.**   My screen is out.

10  **Q.**   It usually comes on pretty quickly.  Do you see it?

11  **A.**   Okay.  Yes, I see it.

12  **Q.**   Okay.  So if Performance Group had obtained a loan in --

13  this is for the year 2006, would that loan have had any impact

14  on the $1,852,799 figure that is reflected in line 1?

15  **A.**   I'm so sorry.  Could you repeat your question?

16  **Q.**   Certainly.  It was a long question.

17       If Performance Group had received a loan during the year

18  2006, would that money received have impacted in any way the

19  $1.8 million number on line one?

20  **A.**   No.  If it's a loan, it will not report any gross income.

21  It will report in the balance and will increase the loan

22  liability amount, not in gross revenue.

23       **MR. HEMANN:**  Thank you, Your Honor.  No further

24  questions.

25       **THE COURT:**  Anything else?

1        **MR. GASNER:**  Just one other question, Your Honor.

2        **THE COURT:**  Sure.

3                        <u>**RECROSS-EXAMINATION**</u>

4   BY MR. GASNER:

5   **Q.**   So it's fair to say, Mr. Guan, that not every dollar

6   received by a corporation goes on the gross receipts line of

7   its tax return; true?

8   **A.**   That is true.  If it's income, there would be gross

9   revenue in line 1; if it's loan, then you report it in page 4,

10  balance sheet, in the liability, either loan from a third party

11  or loan from shareholders.

12       **MR. GASNER:**  Thank you.  Nothing further.

13       **THE COURT:**  All right.  Thank you very much.

14    Thank you, sir.  You're excused.

15       **THE WITNESS:**  Thank you.

16                    (Witness excused.)

17       **THE COURT:**  Ms. Agnolucci, did you want to approach

18  the bench before we -- before the next witness?

19       **MS. AGNOLUCCI:**  Your Honor, in light of the hour, I

20  don't think that will be necessary.

21       **THE COURT:**  All right.

22       **MS. AGNOLUCCI:**  Thank you.

23       **THE COURT:**  Okay.  You're excused.  Thank you, sir.

24       **THE WITNESS:**  Thank you.

25       **THE COURT:**  Let's call the next witness then.

1              MR. GASNER:  Your Honor, may I approach and retrieve

2     my exhibits?

3              THE COURT:  Please do.  Thank you.

4              MR. SCOTT:  Your Honor, the United States calls Cecily

5     Rometo.

6              THE COURT:  All right.

7              THE CLERK:  Raise your right hand, please.

8                            CECILY ROMETO,

9     called as a witness for the Government, having been duly sworn,

10    testified as follows:

11             THE WITNESS:  Yes, I do.

12             THE CLERK:  Thank you.  Please be seated and state and

13    spell your full name for the record.

14             THE WITNESS:  My name is Cecily Rometo; C-E-C-I-L-Y,

15    R-O-M-E-T-O.

16             THE CLERK:  Thank you.

17                         DIRECT EXAMINATION

18    BY MR. SCOTT:

19    Q.   Good afternoon, Ms. Rometo.

20    A.   Good afternoon.

21    Q.   How are you currently employed?

22    A.   I'm a special agent with the FBI.

23    Q.   And how long have you been a special agent with the FBI?

24    A.   Just about three years.

25    Q.   And where are you currently assigned?

1   **A.**   The San Francisco field office, Palo Alto resident agency.

2   **Q.**   And did you undergo training when you started with the

3   FBI?

4   **A.**   Yes, I did.

5   **Q.**   Where was that?

6   **A.**   At Quantico, Virginia.

7            **MR. FROELICH:**   Your Honor, I'm not sure --

8            **THE COURT:**   Oh, yes.   Would you make the announcement?

9            **MR. SCOTT:**   Oh, yes.   We always seem to forget,

10  Your Honor.

11       The testimony of Special Agent Rometo will apply to

12  defendant Walter Liew and defendant USAPTI only.

13           **THE COURT:**   Very well.   Thank you, Counsel.

14       Proceed.

15       Thank you, Mr. Froelich.

16  **BY MR. SCOTT:**

17  **Q.**   How long was your training at Quantico?

18  **A.**   It was just over 20 weeks.

19  **Q.**   And in the course of your time -- during your time with

20  the FBI, have you worked on an investigation of Walter Liew and

21  USAPTI?

22  **A.**   Yes, I have.

23  **Q.**   Over the course of this investigation, did you become

24  familiar with various corporate entities in Singapore to which

25  funds were sent at the direction of Walter Liew?

ROMETO - DIRECT / SCOTT

1    **A.**    Yes, I did.

2    **Q.**    Have you become familiar with a company called Lawrence

3    Process Engineers, Pte, Limited?

4    **A.**    Yes.

5         **MR. SCOTT:**  Your Honor, during Special Agent Rometo's

6    testimony, we're going to use some demonstratives on the easel,

7    which I've shown to counsel.

8         **THE COURT:**  All right.  Very well.

9              (Pause in proceedings.)

10        **MR. SCOTT:**  Your Honor, permission to approach the

11   witness with Exhibit 904?

12        **THE COURT:**  All right.

13             (Pause in proceedings.)

14   **BY MR. SCOTT:**

15   **Q.**    Special Agent Rometo, do you recognize that document?

16   **A.**    Yes, I do.

17   **Q.**    What is it?

18   **A.**    These are Accounting and Corporate Regulatory Authority

19   records, or ACRA records, related to Lawrence Process

20   Engineers.

21   **Q.**    What's the Accounting and Corporate Regulatory Authority?

22   **A.**    It is an entity in Singapore with which companies are

23   registered, much the way you'd register a company here with the

24   Secretary of State in the state.

25   **Q.**    And do you know where this document came from?

1  **A.**   Yes.  It was provided pursuant to a legal agreement

2  between the United States and Singapore.

3  **Q.**   And does this document reference the company Lawrence

4  Process Engineers?

5  **A.**   Yes, it does.

6  **Q.**   And what general information is provided in this document?

7  **A.**   This document provides the details of the proposed

8  company, the details of the registering entity or authority,

9  details of the directors, and associated dates and other

10  information.

11       **MR. SCOTT:**  Your Honor, the United States moves the

12  admission of Exhibit 904.

13       **MS. AGNOLUCCI:**  No objection, Your Honor.

14       **THE COURT:**  It's admitted.

15    (Trial Exhibit 904 received in evidence)

16       **MR. SCOTT:**  Mr. Hemann, if you could put up page 2.

17  **Q.**   And, Special Agent Rometo, does page 2 in the bottom half

18  of that page, does that show the name of the company?

19  **A.**   Yes, it does.

20  **Q.**   And at the top of the page does it list information

21  regarding the applicant?

22  **A.**   Yes.

23  **Q.**   What is the applicant?

24  **A.**   The applicant is the individual who helped to incorporate

25  the company.  So in this instance it was Casey Mee Huat Lin.

ROMETO - DIRECT / SCOTT

1   Q.   Does that individual take care of the paperwork and the

2   actual registration process?

3   A.   That's my understanding.

4   Q.   Turning your attention to page 3 of this document, do you

5   see information regarding the directors of this company?

6   A.   Yes.

7   Q.   And who is the first director listed?

8   A.   Just really quickly, I'm on page 3, but I don't think the

9   screen is on page 3.

10  Q.   I'm sorry.

11  A.   Okay.

12  Q.   And looking towards the top of the page, do you see

13  there's a first director listed?

14  A.   Yes.

15  Q.   And who is that director?

16  A.   The first listed director is Christina Hong Qiao Liew.

17  Q.   And is there a second director listed on that page?

18  A.   Yes, there is.

19  Q.   And who is that?

20  A.   The second director is Elaine Shu Peng Chin.

21       MR. SCOTT:   And, Your Honor, the parties have

22  stipulated that Elaine Shu Peng Chin is Walter Liew's niece and

23  resides in Singapore.

24       MS. AGNOLUCCI:   That's correct, Your Honor.

25       THE COURT:   All right.   So stipulated.

1          **MR. SCOTT:**  Mr. Hemann, if you could go to page 4,

2    please.

3    **Q.**   In the middle of the page, Special Agent Rometo, do you

4    see a date of registration?

5    **A.**   Yes.

6    **Q.**   And what is that date?

7    **A.**   It looks like July 25th, 2006.

8    **Q.**   And is that the date of the incorporation of the company?

9    **A.**   Yes.

10   **Q.**   Mr. Hemann, could you turn to page 5, please?

11         Again, in the middle of the page, Special Agent Rometo, is

12   there a category for the address of the registered office?

13   **A.**   (Witness examines document.)  I have page 5 here, but I

14   don't think it's quite up on the screen yet.

15   **Q.**   If you look in the middle of the page, I think you'll see

16   the heading.

17   **A.**   Yes.

18   **Q.**   And what is that address?

19   **A.**   The listed address is 10 Anson Road, Unit 35-11,

20   International Plaza.

21   **Q.**   And are you familiar with that address?

22   **A.**   Yes, I am.

23   **Q.**   What is that address?

24   **A.**   That address matches the address for Casey Lin & Company

25   which is the office address of the -- that's the company that

1  helped to register and file the paperwork for Lawrence Process

2  Engineers.

3  **Q.**   So the registered address of Lawrence Process Engineers is

4  actually the same as the company that did the incorporation?

5  **A.**   That's correct.

6  **Q.**   Mr. Hemann, if you could turn to page 11 of this document,

7  please.

8       And, Special Agent Rometo, if you could focus on the

9  section of the page that says "Particulars of Allottee."  Do

10 you see that?

11 **A.**   I do.

12 **Q.**   And does it show who the shareholder of the company is?

13 **A.**   Yes.

14 **Q.**   And who is that?

15 **A.**   Christina Hong Qiao Liew.

16 **Q.**   And is Christina the sole owner of the company?

17 **A.**   Yes.

18 **Q.**   Mr. Hemann, could you turn to page 45 of the same

19 document, please?

20      And if you look at the bottom part of the page, there's a

21 section called "Application for Striking Off."

22      What is the date of that application?

23 **A.**   The date is July 4th, 2008.

24 **Q.**   And are you familiar with the term "striking off"?

25 **A.**   Yes.

1   **Q.**   What does that mean?

2   **A.**   It basically means to deregister the company.

3   **Q.**   Special Agent Rometo, during your investigation, did you

4   also become familiar with bank account information related to

5   the company Lawrence Process Engineers?

6   **A.**   Yes.

7          **MR. SCOTT:**  Your Honor, permission to approach with

8   Exhibit 939?

9          **THE COURT:**  Yes.

10  **BY MR. SCOTT:**

11  **Q.**   Special Agent Rometo, do you recognize that document?

12  **A.**   Yes, I do.

13         **THE CLERK:**  Excuse me.  You said 939?

14         **MR. SCOTT:**  939.

15         **THE CLERK:**  Do you want to say what it is since it's

16  not in the record?

17         **MR. SCOTT:**  Sure.

18  **Q.**   Special Agent Rometo, what is that document?

19  **A.**   These are banking records for United Overseas Bank Limited

20  pertinent to Lawrence Process Engineers.

21  **Q.**   And what type of information is provided in that document?

22  **A.**   This document provides particulars of the applicant,

23  particulars of signatories, as well as the actual tran -- it

24  does provide actual transactional records as well.

25         **MR. SCOTT:**  Your Honor, the United States moves the

1  admission of Exhibit 939.

2          **MS. AGNOLUCCI:**  No objection.

3          **THE COURT:**  Admitted.

4      (Trial Exhibit 939 received in evidence)

5          **MR. SCOTT:**  Mr. Hemann, if you could pull up page 1,

6  please.

7  **Q.**  And, Special Agent Rometo, what's the name of the bank

8  affiliated with Lawrence Process Engineers?

9  **A.**  United Overseas Bank Limited or Far Eastern Bank Limited.

10  **Q.**  And does this page also show the date that the application

11  was filed to open an account?

12  **A.**  (Witness examines document.)  The signatures are dated

13  July 26th, 2006.

14  **Q.**  And the signatures are next to a category that says

15  "Particulars of Signatories"; correct?

16  **A.**  Yes.

17  **Q.**  And who are the signatories listed?

18  **A.**  The first listed signatory is Christina Hong Qiao Liew,

19  and the second listed signatory is Walter Lian-Heen Liew.

20  **Q.**  And do you see signatures on the right side of the page?

21  **A.**  I do.

22  **Q.**  And do you know whose signatures those are?

23  **A.**  Yes.

24  **Q.**  And whose signatures are they?

25  **A.**  The first signature is what I understand to be Christina

1    Liew's signature, and the second signature is Walter Liew.

2    **Q.**   Mr. Hemann, could you turn to page 2 of Exhibit 939?

3         And what information is provided on page 2?

4    **A.**   Page 2 lists -- lists the two directors.  Again, this

5    looks like Christina Liew's signature, and I recognize the

6    passport number; and it also lists Elaine Shu Peng Chin as the

7    second director.

8    **Q.**   And those were the two directors we saw from the ACRA

9    records earlier?

10   **A.**   Yes.

11   **Q.**   Mr. Hemann, could you turn to page 3, please?

12        Special Agent Rometo, do you recognize this information?

13   **A.**   Yes.

14   **Q.**   And what is shown here?

15   **A.**   This is acknowledgment from the bank regarding the

16   signatories of the bank.  It lists the signatories.

17   **Q.**   And when it says "signatories," we've mentioned that once

18   already.  What do you understand that to mean?

19   **A.**   I understand that to mean individuals who have control of

20   the bank account.

21   **Q.**   And is this information on page 3 consistent with what we

22   saw on page 1 with respect to the signatores?

23   **A.**   Yes, it is.

24   **Q.**   Special Agent Rometo, during the course of the

25   investigation, did you also become familiar with a company

1    called Huadong Equipment Solutions, Pte, Limited?

2    A.    Yes.

3             MR. SCOTT:  Your Honor, permission to approach the

4    witness with Exhibit 905?

5             THE COURT:  Yes.

6    BY MR. SCOTT:

7    Q.    Special Agent Rometo, do you recognize that document?

8    A.    Yes, I do.

9    Q.    What is it?

10   A.    This -- these are also ACRA records, so Accounting and

11   Corporate Regulatory Authority records, associated with Huadong

12   Equipment Solutions, Pte, Limited.

13   Q.    And are those documents from Singapore?

14   A.    Yes, they are.

15   Q.    And what general information is provided in that document?

16   A.    This document provides the company and the individual who

17   helped to register Huadong, as well as details of Huadong

18   directors and other associated information.

19            MR. SCOTT:  Your Honor, the United States moves the

20   admission of Exhibit 905.

21            THE COURT:  Any objection?

22            MS. AGNOLUCCI:  No objection, Your Honor.

23            THE COURT:  It's admitted.

24       (Trial Exhibit 905 received in evidence)

25            MR. SCOTT:  Mr. Hemann, if you would bring up page 2,

1    please.

2    **Q.**   And, Special Agent Rometo, is the full name of the company

3    listed on this page?

4    **A.**   Yes, it is.

5    **Q.**   And, again, do we see information regarding the applicant?

6    **A.**   Yes.

7    **Q.**   And, again, that's the company that effected the

8    incorporation of the company in Singapore?

9    **A.**   Yes.

10   **Q.**   Turning to page 3, please, Mr. Hemann.

11        Special Agent Rometo, do you see information on page 3

12   regarding the directors of Huadong Equipment Solutions?

13   **A.**   Yes, I do.

14   **Q.**   And who are the listed directors?

15   **A.**   The first listed director is Walter Lian-Heen Liew, and

16   the second listed director is Sue Lan Chin.

17        **MR. SCOTT:**   And, Your Honor, the parties have

18   stipulated that Shirley Sue Lan Chin is Walter Liew's niece and

19   resides in Singapore.

20        **MS. AGNOLUCCI:**   That's correct.

21        **THE COURT:**   All right.  So stipulated.

22        **MR. SCOTT:**   Mr. Hemann, if you could turn to page 5,

23   please.

24   **Q.**   In the middle of that page, Special Agent Rometo, is there

25   an office address for the company?

**ROMETO - DIRECT / SCOTT**

1    **A.**    Yes.

2    **Q.**    And do you recognize that address?

3    **A.**    Yes, I do.

4    **Q.**    What is it?

5    **A.**    That is the address for -- I believe it's Express Co,

6    which is the registration company who helped to incorporate

7    this company in Singapore.

8    **Q.**    And, Mr. Hemann, turning to the next page, page 6, please.

9         In the top right of page 6, Special Agent Rometo, do you

10   see the date of registration of Huadong Equipment Solutions?

11   **A.**    Yes.

12   **Q.**    What is that date?

13   **A.**    July 27th, 2006.

14   **Q.**    Now, Mr. Hemann, if you would go to page 11, please.

15        Special Agent Rometo, what information is provided on

16   page 11?

17   **A.**    This provides the particulars of the LIT, so the

18   individual who holds the shares associated with this company.

19   **Q.**    And who's the owner of Huadong Equipment Solutions?

20   **A.**    Walter Lian-Heen Liew.

21   **Q.**    And is he the sole owner of the company?

22   **A.**    Yes.

23   **Q.**    Mr. Hemann, if you could turn to page 50, please.

24        The top part of page 50, that second category, is there

25   some information about the closing of the business?

1   **A.**   Yes.

2   **Q.**   And what does it say?

3   **A.**   Under the category "Reasons for Striking Offer," it's

4   listed that business ceased on October 31st, 2008.

5   **Q.**   Special Agent Rometo, during the course of your

6   investigation, did you also locate bank account information

7   related to this company Huadong Equipment Solutions?

8   **A.**   Yes.

9   **Q.**   Mr. Hemann, if you could bring up previously admitted

10  Exhibit 528, please.

11          Special Agent Rometo, do you recognize this document?

12  **A.**   Yes.

13  **Q.**   And what's in this document?

14  **A.**   This document contains instructions for wire transfers and

15  includes the beneficiary of Huadong and associated bank

16  account.

17  **Q.**   And what's the listed associated bank with Huadong?

18  **A.**   The listed bank is DBS Bank Limited in Singapore, and the

19  bank account number is 0029-001211-01-0-022.

20  **Q.**   And if you could slide up a little bit, Mr. Hemann.

21          Special Agent Rometo, how much was that transfer for?

22  **A.**   $1,272,100.18.

23  **Q.**   And, Mr. Hemann, could you also bring up Exhibit 529,

24  which is also in evidence?

25          Special Agent Rometo, do you recognize this document?

1    **A.**    Yes.

2    **Q.**    What information is provided on this page?

3    **A.**    This information provides a wire transfer confirmation

4    sent from FedLine, and it lists that same amount, $1,272,100.18

5    from Performance Group to Huadong.

6    **Q.**    Thank you.

7                **MR. SCOTT:**  Your Honor, permission to approach the

8    witness with Exhibit 929.

9                **THE COURT:**  All right.

10   **BY MR. SCOTT:**

11   **Q.**    Do you recognize that document?

12   **A.**    Yes.

13   **Q.**    What is it?

14   **A.**    These are records provided by Express Co, which is the

15   company that helped incorporate Huadong Equipment Solutions.

16   It provides details regarding that incorporation, including

17   directors and the paperwork that was completed at the time.

18               **MR. SCOTT:**  Your Honor, the United States moves the

19   admission of Exhibit 929.

20               **MS. AGNOLUCCI:**  No objection.

21               **THE COURT:**  Admitted.

22         (Trial Exhibit 929 received in evidence)

23               **MR. SCOTT:**  Mr. Hemann, if you could bring up page 36

24   of this document, please.

25   **Q.**    Special Agent Rometo, what information is provided on

1    page 36?

2    **A.**    This information pertains to the opening of bank accounts

3    at the Development Bank of Singapore, a Singapore dollar and

4    U.S. dollar account to be signed singly either by Mr. Walter

5    Lian-Heen Liew or Ms. Christina Hong Qiao Liew.

6    **Q.**    So control of the account is with Walter Liew and

7    Christina Liew?

8    **A.**    That's my understanding, yes.

9    **Q.**    And do you understand the Development Bank of Singapore to

10   be also called DBS?

11   **A.**    Yes.

12         **MR. SCOTT:**    Your Honor, permission to approach the

13   witness with Exhibit 494?

14         **THE COURT:**    Yes.

15         **MR. SCOTT:**    And with Exhibit 505?

16         **THE COURT:**    Yes.

17   **BY MR. SCOTT:**

18   **Q.**    Special Agent Rometo, looking first at Exhibit 494, the

19   first page, do you recognize that document?

20   **A.**    Yes.

21   **Q.**    What is it?

22   **A.**    This is a telegraphic transfer application.  The applicant

23   is Huadong Equipment Solutions and beneficiary is Qiao Hua.

24         **MR. SCOTT:**    And, Your Honor, the parties have

25   stipulated that Qiao Hua is Christina Liew's father and resides

1    in China.

2              **THE COURT:**  Is that correct?

3              **MS. AGNOLUCCI:**  That's correct.

4              **THE COURT:**  All right.  So stipulated.

5    **BY MR. SCOTT:**

6    **Q.**    Special Agent Rometo, do you know where this document,

7    Exhibit 494, was located?

8    **A.**    (Witness examines document.)  This was found in the Liew

9    residence.

10   **Q.**    And you mentioned that it was a telegraphic transfer

11   application?

12   **A.**    Yes.

13   **Q.**    Is there an account number on the top right-hand part of

14   the document?

15   **A.**    There is.

16   **Q.**    Do you recognize that account number?

17   **A.**    I do.

18   **Q.**    And to what bank account is that?

19   **A.**    This is the same bank account for Huadong Equipment

20   Solutions at DBS Bank.

21             **MR. SCOTT:**  Your Honor, the United States moves the

22   admission of Exhibit 494, page 1 only.

23             **THE COURT:**  Any objection?

24             **MS. AGNOLUCCI:**  No objection.

25             **THE COURT:**  It's admitted.

ROMETO - DIRECT / SCOTT

```
1              (Trial Exhibit 494, page 1, received in evidence)

2    BY MR. SCOTT:

3    Q.   Special Agent Rometo, looking at the top of the document

4    first, does it have the name of the company?

5    A.   Yes.

6    Q.   And you already mentioned the bank account in the top

7    right-hand corner; correct?

8    A.   Yes.

9    Q.   Moving down the document, does it show a dollar amount for

10   the transfer?

11   A.   Yes.

12   Q.   And how much is it?

13   A.   750,000 U.S. dollars.

14   Q.   And is there a date on the document?

15   A.   (Witness examines document.)

16   Q.   On the bottom right-hand corner.

17   A.   Yes.  Yes.

18   Q.   What is it?

19   A.   May 29th, 2008.

20   Q.   And is there also a signature on the document?

21   A.   Yes.

22   Q.   And what does it say?

23   A.   Walter Liew.

24   Q.   And, finally, in the middle third of the page, it lists

25   the beneficiary?
```

ROMETO - DIRECT / SCOTT

1   A.   Yes.

2   Q.   And what name is provided there?

3   A.   Qiao Hua.

4   Q.   And the account to which that is going, does it show what

5   bank it's going to?

6   A.   It does not provide the bank, but I recognize the account

7   number.

8   Q.   And if you look in the category above under "Beneficiary's

9   Bank Details," do you see a bank listed?

10  A.   Yes.   It's HSBC, Hong Kong, and Shanghai Banking

11  Corporation Limited, Hong Kong, People's Republic of China.

12  Q.   Thank you.

13       Turning your attention now to Exhibit 505, do you

14  recognize that document?

15  A.   Yes.

16  Q.   What is it?

17  A.   This is a letter from Walter Liew to DBS Bank Singapore

18  regarding instruction for telegraphic transfer.

19  Q.   And where was that document found?

20  A.   This was found in the safety-deposit box on a hard drive.

21  Q.   And is there a date on that document?

22  A.   Yes.

23  Q.   What is it?

24  A.   November 4th, 2008.

25  Q.   And does it list a beneficiary?

1    A.    Yes.

2    Q.    Who is that?

3    A.    Qiao Hua.

4    Q.    And Qiao Hua is Christina Liew's father?

5    A.    That's correct.

6           MR. SCOTT:  Your Honor, the United States moves the

7    admission of Exhibit 505.

8           MS. AGNOLUCCI:  No objection.

9           THE COURT:  It's admitted.

10         (Trial Exhibit 505 received in evidence)

11   BY MR. SCOTT:

12   Q.    Special Agent Rometo, could you --

13         Looking at the first paragraph, Mr. Hemann, under "Dear

14   DBS."

15         Could you describe what this paragraph relates?

16   A.    It's a request for a telegraphic transfer for 1,250,000

17   U.S. dollars to benefit Qiao Hua.

18   Q.    And does it provide an account number where the money's

19   going?

20   A.    Yes, it does.

21   Q.    Do you recognize that number?

22   A.    Yes.

23   Q.    And is that associated with the HSBC account we just

24   talked about?

25   A.    Yes.

ROMETO - DIRECT / SCOTT

1    Q.   The signature block at the bottom of the page, whose name

2    do you see there?

3    A.   It lists Walter Lian-Heen Liew.

4    Q.   And does it provide a title for him?

5    A.   It provides the title of managing director, Huadong

6    Equipment Solutions.

7             MR. SCOTT:  Your Honor, permission to approach the

8    witness with Exhibit 446.

9             THE COURT:  Very well.

10   BY MR. SCOTT:

11   Q.   Special Agent Rometo, do you recognize that document?

12   A.   Yes.

13   Q.   What is it?

14   A.   This is a letter from Walter Liew to DBS Bank.

15   Q.   And is there a date on it?

16   A.   Yes.

17   Q.   What is it?

18   A.   November 21st, 2008.

19   Q.   And where was this document found?

20   A.   (Witness examines document.)  This document was found in

21   the USAPTI office.

22            MR. SCOTT:  Your Honor, the United States moves the

23   admission of Exhibit 446.

24            THE COURT:  Any objection?

25            MS. AGNOLUCCI:  May we have one quick moment,

1    Your Honor?

2                **THE COURT:**  Sure.

3                           (Pause in proceedings.)

4                **MS. AGNOLUCCI:**  Objection, Your Honor.

5                **THE COURT:**  May I see the document?

6                           (Pause in proceedings.)

7                **THE COURT:**  The objection is overruled.  Admitted.

8           (Trial Exhibit 446 received in evidence)

9                **MR. SCOTT:**  May we publish it, Your Honor?

10               **THE COURT:**  Yes, you may.

11   **BY MR. SCOTT:**

12   **Q.**   Special Agent Rometo, what's the date on this document?

13   **A.**   November 21st, 2008.

14   **Q.**   And, Mr. Hemann, starting with the part at "Dear

15   DBS Bank."

16        What information is conveyed there?

17   **A.**   It is a request to -- instruction to close two accounts at

18   DBS Bank.

19   **Q.**   And do you recognize those account numbers?

20   **A.**   Yes.

21   **Q.**   What are they?

22   **A.**   The first is a current account, which I understand to be

23   the Singapore dollar account for Huadong Equipment Solutions;

24   and the second number is the account referenced earlier, which

25   is the foreign currency current account for Huadong Equipment.

ROMETO - DIRECT / SCOTT

1   Q.   And is there a signature block at the bottom of the page?

2   A.   There is.

3   Q.   Whose name is there?

4   A.   It lists Walter Liew, director, Huadong Equipment

5   Solutions, Pte, Limited.

6           MR. SCOTT:   Your Honor, permission to approach the

7   witness with Exhibit 496.

8           THE COURT:   Yes.

9   BY MR. SCOTT:

10  Q.   Special Agent Rometo, do you recognize that document?

11  A.   Yes.

12  Q.   What is it?

13  A.   These are bank records, transactional records, for Huadong

14  Equipment Solutions at DBS Bank.

15  Q.   And what type of information do you see there?

16  A.   So it lists the name of the company, an address for the

17  company, as well as various transactional information and bank

18  statements.

19  Q.   And where was that document located?

20  A.   I believe it was in the house.  Let me double-check.

21       (Witness examines document.)

22       Yes, this was located in the Liew residence.

23  Q.   And the bank statements you mentioned have the name

24  Huadong Equipment Solutions on them?

25  A.   Yes.

1          **MR. SCOTT:**  Your Honor, the United States moves the

2    admission of Exhibit 496.

3          **THE COURT:**  Any objection?

4          **MS. AGNOLUCCI:**  No objection.

5          **THE COURT:**  Admitted.

6      (Trial Exhibit 496 received in evidence)

7    **BY MR. SCOTT:**

8    Q.   Special Agent Rometo --

9         Actually, Mr. Hemann, could you put up page 7, please?

10        The top left-hand corner, does that show the name of the

11   company affiliated with the account?

12   A.   Yes.

13   Q.   And the rest of the pages in this exhibit consist of bank

14   statements related to those accounts?

15   A.   Yes.

16         **MR. SCOTT:**  Your Honor, permission to approach the

17   witness with Exhibit 941?

18         **THE COURT:**  Yes.

19   **BY MR. SCOTT:**

20   Q.   Special Agent Rometo, do you recognize that document?

21   A.   Yes.

22   Q.   What is it?

23   A.   These are DBS Bank records associated with Huadong

24   Equipment Solutions.

25   Q.   And what information is contained in those documents?

ROMETO - DIRECT / SCOTT

1  **A.**   These documents contain transactional records, bank

2  statements, for the DBS account.

3  **Q.**   And for the same bank account numbers that we've been

4  talking about previously?

5  **A.**   Yes.

6  **Q.**   And where was that document -- from where was that

7  document obtained?

8  **A.**   This document was sent to the United States from Singapore

9  pursuant to mutual legal assistance agreement.

10       **MR. SCOTT:**  Your Honor, the United States moves the

11  admission of Exhibit 941.

12       **MS. AGNOLUCCI:**  No objection.

13       **THE COURT:**  Admitted.

14    (Trial Exhibit 941 received in evidence)

15       **THE CLERK:**  And, Counsel, can I have you tell me one

16  more time what that is, since it's not on your list?

17       **MR. SCOTT:**  DBS Bank records from Singapore.

18       **THE CLERK:**  Thank you.

19       **MR. SCOTT:**  And, Mr. Hemann, if you could bring up

20  page 29, please.  And if you could blow up the middle part with

21  the numbers.

22  **Q.**   Special Agent Rometo, do you see the account number there?

23  **A.**   Yes.

24  **Q.**   Is it the same account number we've been talking about?

25  **A.**   Yes.

ROMETO - DIRECT / SCOTT

1   Q.   On November 11th, do you also see a withdrawal of
2   $1,250,000?
3   A.   Yes.
4   Q.   And further down the page, do you also see information
5   regarding the closing of the account?
6   A.   Yes.
7   Q.   And is that information consistent with the requests we
8   looked at earlier in prior exhibits?
9   A.   Yes, it is.
10          MR. SCOTT:  Your Honor, permission to approach the
11   witness with Exhibit 909?
12          THE COURT:  Yes.
13          MR. SCOTT:  Your Honor, before I begin another
14   company, do you want me to continue for now?
15          THE COURT:  Yes, just continue a few more minutes, and
16   then we'll stop.
17          MR. SCOTT:  Okay.
18   Q.   Special Agent Rometo, do you recognize that document?
19   A.   Yes.
20   Q.   What is it?
21   A.   These are ACRA records associated with ESI Equipment &
22   Engineering Pte Limited.
23   Q.   And is there information regarding the incorporation and
24   organization of that company?
25   A.   Yes.

1   **Q.**   And where did that information come from?

2   **A.**   This information came to us pursuant to a legal agreement

3   between the United States and Singapore.

4          **MR. SCOTT:**  Your Honor, the United States moves the

5   admission of Exhibit 909.

6          **MS. AGNOLUCCI:**  No objection.

7          **THE COURT:**  Admitted.

8       (Trial Exhibit 909 received in evidence)

9          **MR. SCOTT:**  Mr. Hemann, if you could bring up page 2,

10  please.

11  **Q.**   And in the middle of the page, Special Agent Rometo, do

12  you see the name of the company?

13  **A.**   Yes.

14  **Q.**   And you also see information regarding the applicant at

15  the top -- towards the top of the page?

16  **A.**   (Witness examines document.)  Yes.

17  **Q.**   Mr. Hemann, could you go to page 3, please?

18  Special Agent Rometo, at the top of that page is there

19  information regarding the directors of the company?

20  **A.**   Yes.

21  **Q.**   And what's the name of the first director?

22  **A.**   The first listed director is Qiao Mu.

23         **MR. SCOTT:**  And, Your Honor, the parties have

24  stipulated that Qiao Mu is Christina Liew's brother and resides

25  in China.

1          **THE COURT:**  Is that correct?

2          **MS. AGNOLUCCI:**  That's correct.

3          **THE COURT:**  So stipulated.

4          **MR. SCOTT:**  And, Mr. Hemann, if you could also go to

5     page 4 for me, please.

6     **Q.**   Is there another director listed on page 4?

7     **A.**   Yes.

8     **Q.**   And if you could pronounce it, what is that name?

9     **A.**   I believe it's pronounced Joehan Tohkingkeo.

10    **Q.**   And do you know who that is?

11    **A.**   That is Lorraine Lee's husband.  She is the incorporator

12    of the company.

13    **Q.**   So that's the husband of the woman who worked on the

14    incorporation?

15    **A.**   That's my understanding, yes.

16    **Q.**   Mr. Hemann, if you could turn to page 6, please.

17          Is there, in the middle of that page, an address listed

18    for the company?

19    **A.**   This is an address listed for -- I believe it's -- oh, I'm

20    sorry.  Wrong page.  Yes.

21    **Q.**   Do you recognize that address?

22    **A.**   Yes, I do.

23    **Q.**   What is it?

24    **A.**   This is the address for the company that Elaine --

25    Lorraine Lee works for.  Excuse me.  I think it's BSP

**PROCEEDINGS**

1    Management.  I'm sorry.

2    **Q.**   Thank you.

3         Mr. Hemann, if you could turn to page 12, please.

4         Special Agent Rometo, is there information at the top of

5    that page regarding the ownership of the company?

6    **A.**   Yes.

7    **Q.**   And who is the owner of ESI Equipment & Engineering?

8    **A.**   Qiao Mu.

9    **Q.**   And Qiao Mu is Christina Liew's brother?

10   **A.**   Yes.

11   **Q.**   And is he the sole owner of the company?

12   **A.**   Yes.

13   **Q.**   Mr. Hemann, if you could turn to page 66, please.

14        And in sort of the top of the page, there's a section

15   called "Reasons for Striking Off."  Do you see that?

16   **A.**   Yes.

17   **Q.**   And is there a date listed for business ceasing for ESI?

18   **A.**   Yes.  It lists May 31st, 2011.

19   **Q.**   Special Agent Rometo, during the course of your

20   investigation, did you also locate bank account information

21   related to ESI?

22   **A.**   Yes.

23            **MR. SCOTT:**  Your Honor, permission to approach with

24   Exhibit 936?

25            **THE COURT:**  Now this would be the time to break.

**PROCEEDINGS**

1            **MR. SCOTT:**  That's fine.

2            **THE COURT:**  You may step down, Agent.

3       So if anybody wants to leave the courtroom, please do so

4  now before I instruct the jury.  We're going to lock the door.

5                    (Pause in proceedings.)

6            **THE COURT:**  All right.  So, ladies and gentlemen,

7  we're going to break until tomorrow, and I'll say a few words

8  about scheduling at that time.

9       I'm going to remind you of your proper conduct as jurors.

10  First, keep an open mind throughout the trial and do not decide

11  what the verdict should be until you and your fellow jurors

12  have completed your deliberations at the end of the case.

13       Second, because you must decide this case based only on

14  the evidence received in the case and on my instructions as to

15  the law that applies, you must not be exposed to any other

16  information about the case or to the issues it involves during

17  the course of your jury duty.

18       Thus until the end of the case, or unless I tell you

19  otherwise, do not communicate with anyone in any way and do not

20  let anyone else communicate with you in any way about the

21  merits of the case or anything to do with it.  This includes

22  discussing the case in person, in writing, by phone,

23  Smartphone, or electronic means, via email, text messaging, or

24  in or on any Internet chat room, blog, website, including such

25  social networking media like Facebook, Myspace, LinkedIn,

1   YouTube, and Twitter, or other feature.

2       This applies to communicating with your fellow jurors

3   until I give you the case for deliberation, and it applies to

4   communicating with everyone else, including your family

5   members, your employer, the media or press, and the people

6   involved in the trial, although you may notify your family and

7   your employer that you are continuing to sit as a juror in this

8   case.

9       But if you're asked or approached in any way about your

10  jury service or anything about this case, you must respond that

11  you have been ordered not to discuss the matter and to report

12  the contact to the Court.

13      Because you will receive all the evidence and legal

14  instruction you properly may consider to return a verdict, do

15  not read, watch, or listen to any news or media accounts or

16  commentary about the case or anything to do with it.  Do not do

17  any research, such as consulting dictionaries, searching the

18  Internet, or using other reference materials; and do not make

19  any investigation or in any other way try to learn about the

20  case on your own.

21      The law requires these restrictions to ensure the parties

22  have a fair trial based on the same evidence that each party

23  has had an opportunity to address.

24      A juror who violates these restrictions jeopardizes the

25  fairness of these proceedings and a mistrial could result that

**PROCEEDINGS**

1    would require the entire trial process to start over.

2        If any juror is exposed to any outside information, please

3    notify the Court immediately.

4        So tomorrow we're going to have our regular 8:00-to-1:30

5    day with two 15-minute breaks.  I'm going to check in with

6    counsel before then to see how we're doing schedulewise so I

7    can give you a little better sense of how we're doing vis-a-vis

8    our original estimates, but sort of the preview is that I think

9    we are on schedule.  So I'll have more to say about that

10   sometime tomorrow.

11       So have a very enjoyable evening.  Thank you for your

12   attention, and we'll see you tomorrow morning at 8:00 o'clock.

13       (Proceedings were heard out of the presence of the jury:)

14       **THE COURT:**  All right.  So the jury has left the

15   court.  Everyone may be seated.

16       I wanted to first address the issue that -- Ms. Agnolucci,

17   are you going to need some time tomorrow morning to discuss

18   some issue with respect to this special agent's testimony?

19       **MS. AGNOLUCCI:**  I don't think that we have to discuss

20   it as it pertains to this special agent's testimony, but we do

21   have to discuss the issue before the testimony of Mr. Klein,

22   who we expect we may be calling on Thursday, depending on how

23   things go.

24       So it probably would be a good idea to get this resolved

25   tomorrow morning.

1      **THE COURT:**  All right.  Well, let's plan on meeting.

2  How long do you think it will take to discuss this issue?

3      **MS. AGNOLUCCI:**  It depends on whether the Court has

4  concerns and what those concerns are.  I think we could at

5  least preliminarily raise it briefly and then the Court may

6  want --

7      **THE COURT:**  Yes.  Why don't we plan to meet about

8  7:30.  That will give us a good 30 minutes to at least start

9  the discussion.

10      **MS. AGNOLUCCI:**  Yes, Your Honor.

11      **THE COURT:**  All right.  Now let me get an updated

12  suggestion -- or not suggestion, but sense of where we are in

13  the schedule so that we can kind of think about scheduling some

14  other matters.

15      **MR. AXELROD:**  Yes, Your Honor.  I believe things

16  slowed down a little bit today, which means we may not be in a

17  position to close until Thursday morning.  I think we're

18  certainly on target for this week.  I think, you know,

19  depending on what we accomplish tomorrow, it's likely to spill

20  over at least into the first part of the day on Thursday before

21  we're in a position to close -- or rest.  Excuse me.

22      **THE COURT:**  All right.  So did you have any comment on

23  that?

24      **MR. GASNER:**  No, Your Honor.  We've got witnesses

25  lined up on that assumption for Thursday.

1    **THE COURT:**  All right.  So what I'm going to say is

2    that, as I mentioned before, I'm going to allow the defendants

3    the opportunity to make motions addressed to the Government's

4    case.  And to the extent we don't complete those discussions or

5    the Court doesn't rule by the time it's time for testimony or

6    evidence this Thursday, I will require the defendants to begin

7    their case, if they want -- it sounds like they are going to

8    present one -- and then we'll continue the argument, and we'll

9    except, E-X-C-E-P-T, out of our argument, obviously, anything

10   the defendants have brought forth in their case, because that's

11   the proper legal standard.

12       My thought now is the following:  What I would like to do

13   is this.  So let's assume, hypothetically, the Government rests

14   Thursday morning.  The Government would rest.  I would, just in

15   the interest of belt and suspenders, I'd have -- I guess I

16   shouldn't -- that's probably not politically correct to say

17   these days, but you know what I mean -- I care -- get everybody

18   to the sidebar, and if the defendants want to just make their

19   motion for the record, make absolutely sure that they preserve

20   all their rights, I'll do that briefly.

21       Then we'll begin with the defendants' case.  And then what

22   I'd like to do is meet with -- I have a law and motion calendar

23   starting at 9:00 on Friday, which should last probably no more

24   than 30 minutes, 45 at the outside.  I have to leave for a

25   calendar in Oakland late morning.  So we could take some time,

1    as much time as we can get in, Friday morning to discuss the

2    motions.

3         Now, on reflection, I did indicate that I want the parties

4    to marshal the evidence as much as possible, and I'm not

5    precluding the defendants from filing a written document if

6    they wish to do so.  Just don't hand it up to me at the time of

7    the argument, because I won't be able to look at it.

8         But if you wish to do that, if the defendants wish to do

9    that to crystallize their arguments, if there's some aspects

10   that you think would not lend themselves well to just an oral

11   presentation, you know, I probably -- if Ms. Lovett was here,

12   she'd probably be cringing at this, but that's kind of one of

13   the things that you have to do when you're in a law firm in

14   these kinds of cases in trial.

15        **MR. GASNER:**  What we're planning to do, Your Honor,

16   unless the Court would prefer otherwise, is during the sidebar

17   argument, what we might do is hand up to the Court an outline

18   of the argument with citations, both to the transcript and to

19   the law, which somewhere in between just a pure oral argument

20   and a full brief that we're -- just given the press of trial

21   matters, I don't want to impose on Ms. Lovett to do a polished

22   brief.  But I think it would be helpful to the Court to have at

23   least an outline with case citations and transcript citations.

24        Is that something the Court --

25        **THE COURT:**  I agree.  The only thing I'll say is in

PROCEEDINGS

```
 1   fairness, as soon as you've got that completed, please give it
 2   to the Government.
 3          MR. GASNER:  We will.
 4          THE COURT:  And, of course, it's without prejudice to
 5   either side filing a more fulsome legal brief at a later time,
 6   as ordered by the Court.  But that would certainly -- anything
 7   I can have in advance to sort of tee up your arguments and the
 8   Government's responses would be very helpful.  Even if the
 9   Government doesn't have time to file a written outline in
10   response, they'll at least know what they're looking -- what
11   they're looking at.
12          So that's what we'll do.
13          And the next thing, the thing that the Court is working on
14   is jury instructions, the next iteration of proposed jury
15   instructions, which will be filed at some unspecified time in
16   the future, but it will be filed nevertheless.  And then I'll
17   set some deadlines for getting your objections and requests for
18   additional instructions, which will lead us directly into the
19   charging conference.
20          And depending upon the scheduling, most likely we'll take
21   a significant amount of time for that, even if we have to take
22   a day off between.  Assuming the case goes further -- again,
23   I'm not in any way telegraphing how I'm going to rule on any
24   motions, but assuming the case goes forward, to take a break
25   both to argue -- finalize instructions, give the parties a
```

**PROCEEDINGS**

1  chance, you know, to catch their breath and prepare closing

2  arguments, and then move into closing arguments and

3  deliberation.

4      So it sounds to the Court like we should finish this case

5  in the month -- with the schedule we have, in the month of

6  February.  Is that correct?

7          **MR. AXELROD:**  Certainly from the Government's

8  perspective.

9          **THE COURT:**  Do you think so?

10         **MR. GASNER:**  I do.  We are cutting back on witnesses

11 as the case narrows.  We're still planning on calling our four

12 experts, and I think we will fill up all of next week, at a

13 minimum.  But I think it remains to be seen how much of the

14 following week we would need, if any.

15         **THE COURT:**  Okay.  And that will give us some

16 breathing room for instructions and the like.

17     And, Ms. Agnolucci, if you wish to file -- I'm not

18 ordering you to do so, but if you wanted to file some sort of

19 an outline, because I'm obviously familiar with Klein's

20 testimony from the *Daubert* in limines, but if there's a

21 specific issue that you think the Court should be thinking

22 about in advance, you know, and you want to file something,

23 you're entitled to do so.

24         **MS. AGNOLUCCI:**  Thank you, Your Honor.  And if we did

25 file something, it sounds like it would be acceptable to the

1   Court for it to be some kind of outline?

2          **THE COURT:**  Yes.

3          **MS. AGNOLUCCI:**  Thank you.

4          **THE COURT:**  I'm not ordering you to file a response,

5   but I'm sure you can pretty much anticipate -- I can't at this

6   point; it's hard enough to focus what's going on at this

7   moment -- what the issue might be.  And, so, we'll have a

8   discussion about that at 7:30 tomorrow morning.

9          **MR. HEMANN:**  And I think there are two documents that

10  are primarily at issue; correct?

11         **THE COURT:**  Are they documentary issues or are they

12  substantive testimony?

13         **MS. AGNOLUCCI:**  Both, Your Honor.

14         **THE COURT:**  All right.  So to be determined.  Let's

15  move quickly, because I've got a bunch of patent lawyers.

16         **MR. AXELROD:**  Just briefly a housekeeping matters.

17  The Court admitted the drawing that Dr. Diemer did.  It's been

18  marked as 4010.  I just want to hand it to the court clerk to

19  have it stamped.

20         **THE COURT:**  Yes.  And would you mind staying around

21  for a few minutes -- I'm going to delay my hearing -- so that

22  you can resolve with Ms. Ottolini any issues with respect --

23  administrative issues with respect to exhibits?

24         **MR. GASNER:**  That's fine.

25         **MR. AXELROD:**  Of course, Your Honor.

**PROCEEDINGS**

1    **THE COURT:**  And the other thing, sort of as you're

2    thinking down the road, or somebody is, on the presentation, if

3    this case gets to the jury, on the presentation to the jury in

4    an electronic format, how we're going to do that.  We have to

5    iron that out.

6        The other thing -- the other issue for you for,

7    Mr. Gasner, or your team, is to communicate with Mr. Curl about

8    the live feed.

9        **MR. GASNER:**  We're still deciding whether it's going

10   to be necessary.  Some of the witnesses that we're cutting are

11   ones that involve all the logistics of remote access and the

12   like.  That's figuring into our process.  But we will contact

13   Mr. Curl if we decide those are witnesses that we need.

14       **THE COURT:**  Great.

15       All right.  Counsel, thank you very much.

16       **MR. HEMANN:**  Thank you, Your Honor.

17       **MR. AXELROD:**  Thank you, Your Honor.

18           (Proceedings adjourned at 1:25 p.m.)

19               ---oOo---

20

21

22

23

24

25

1

2

3                    __CERTIFICATE OF REPORTER__

4         I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Tuesday, February 4, 2014

8

9

10

11    _____

12        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                  U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25