MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

JOHN H. HEMANN (CABN 165823)
PETER B. AXELROD (CABN 190843)
Assistant United States Attorneys

RICHARD S. SCOTT (DCBN 502455)
Trial Attorney, National Security Division

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    john.hemann@usdoj.gov
    peter.axelrod@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> WALTER LIEW; USA PERFORMANCE TECHNOLOGY, INC.; AND ROBERT MAEGERLE, <br><br> Defendants. | CASE NO. CR 11-0573 JSW <br><br> GOVERNMENT'S OPPOSITION TO DEFENDANTS WALTER LIEW'S AND USAPTI'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 |

Defendants' motion for acquittal under Fed. R. Crim. P. 29 should be denied. Set forth below are evidentiary citations and very limited argument in response to the specific points raised by defendants. The government will supplement the record as requested by the Court.

I.    LEGAL STANDARD

A motion for judgment of acquittal tests "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt, viewing the evidence in the light favorable to the

1

Government." *United States v. Figueroa-Paz*, 468 F.2d 1055, 1058 (9th Cir.1972). In ruling on a Rule 29 motion, a district court must bear in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Rojas*, 554 F2.d 938, 943 (9th Cir.1977). Only when the government's evidence presented at trial fails to establish any reason to believe that an innocent explanation of the evidence was any less likely than the incriminating explanation advanced by the government, is acquittal warranted. *United States v. Vasquez-Chan*, 978 F.2d 546, 551 (9th Cir.1992).

II. ARGUMENT

For purposes of resolving the defendants' Rule 29 motion, the United States accepts the legal standards set forth in the jury instructions as proposed by the Court on February 6, 2013. (Dkt. 744) Although the government may propose minor changes at the charge conference, the government agrees in the main with the instructions as articulated by the Court and believes that the legal standards articulated should be applied to the Rule 29 motion.

### A. Counts 1 and 3 – Conspiracy and Attempt to Commit Economic Espionage

#### 1. Defendants Intended to Benefit a Foreign Government or Instrumentality

There is sufficient evidence that defendants Liew and USAPTI intended to benefit *both* a foreign government (the PRC) and a foreign instrumentality (the Pangang Group companies). Proof of either would be sufficient to convict the defendants.

##### a. Foreign Government

Although it is included in the Indictment, defendants do not address the foreign government language in the Rule 29 motion. There is evidence in the record to of intent to benefit the government of the People's Republic of China.

- Defendant Walter Liew's 2004 letter to Hong Jibi, the Chairman of the Pangang Group makes multiple references to Chinese government officials and clearly shows Liew's intent to benefit the Chinese government. Various individuals with whom Liew met in 1991 are set forth in the body of the letter. Liew states in the letter that a banquet was held in his honor to thank him "for being a patriotic overseas Chinese who has made contributions to China; and who has provided key technologies with national defense

2

implications . . . ." Liew also notes that China needs titanium dioxide technology and writes that he "has always hoped that China can soon successfully build a production line for titanium white by chlorination, and [he has] always worked towards completion of that mission." Exhibit 350T at 0003-0004.

- 2005 email from Walter Liew to Nora Lam explains Liew's interest in the titanium dioxide business began at the request of the Chinese government. He notes that China wants the titanium dioxide technology "badly," as "they have been trying to develop the technology for many years but they have realized that they have to buy the technology." Liew then states that he "got into this because of the request form State Council." Exhibit 374 at 0001.

- Walter Liew's 2008 letter to Fan Zhengwei, Chairman of the Pangang Group, explains USAPTI's possession of the titanium dioxide technology "in its entirety" and expresses a belief that together USAPTI and Pangang "can successfully establish China's production of titanium white by chlorination." Exhibit 342T.

- A number of business cards from Chinese government officials were located in the search of the Liew residence and USAPTI office. These cards include individuals associated with various Chinese ministries as well as local and provincial entities. Exhibits 403, 404, 405, 407, and 410.

- An address list was located in the Liew residence. This list includes various Chinese government officials referenced in Walter Liew's 2004 letter to Hong Jibi. The individuals listed include: Lou Gan, Secretary General of the State Council, Tan Zhuzhou, the Vice Minister of the Ministry of Chemical Industry, Zhang Yujie, Deputy Director of the State Administration of Foreign Experts Affairs, and Qiao Shichang, Director Comprehensive Planning Department of the State Administration of Foreign Experts Affairs. Exhibit 418T at 0003

- A personalized New Year's card from, Zhang Yujie, a Chinese government official, was located in the Liew residence. The name of the Chinese government's State Administration of Foreign Experts Affairs is found on both the envelope and card. Zhang

3

Yujie is one of the officials listed in the 2004 letter in Exhibit 350T, and his name is also located in the address list found in Exhibit 418T. Exhibit 396T at 0002-0003.

- A handwritten note to Walter Liew from Qiao Shichang of the State Administration of Foreign Experts Affairs was located in the Liew residence. The note references a meeting with Liew in 1992 at the Diaoyutai State Guesthouse in Beijing. The note includes a specific reference to the State Administration of Foreign Experts Affairs and seeks a meeting with Liew. Exhibit 398T at 0002-0003.

- In a 2004 memo to the Jinzhou company, Walter Liew attaches a list of Performance Group's "strengths" in the titanium dioxide manufacturing process as well as a statement as to the "company's track record in key Chinese projects." The list includes projects for the Ministry of National Defense, the Ministry of Aeronautics and Astronautics, and the 47th Institute of the Ministry of Electronic Industry. Exhibit 351T at 0004, 0006.

- Defendants argue that Walter Liew's list of technology priorities for the Chinese government was publicly available. Def's Mot. at 6. Whether the list itself was available on the internet is in no way relevant to whether Liew was intending to benefit the Chinese government. Moreover, Liew's possession of such a list would allow a reasonable finder of fact to conclude that he was working on the titanium dioxide project in order to benefit the Chinese government. The testimony of Michael Marinak also establishes that Liew was in possession of such a list on a "handwritten piece of paper." Marinak, Tr. 834:15-835:13.

### b. Foreign Instrumentality

Defendants' myriad citations to the Congressional Record – specifically to the manager's statement to the House version of the bill – do not reflect the law. The Court's jury instruction properly states the law. There is ample evidence of state ownership of the Pangang Group and the ownership described meets the standard of control set forth in the definition of "foreign instrumentality" in 18 U.S.C. § 1839(1).

- The testimony of Hu Shaocong and Richard Olson both address state ownership of the Pangang Group. Hu, Tr. 786:1-787:1; 787:21-788:5; Olson, Tr. 1037:24-1038:25.

4

- Waler Liew in his own words describes Pangang Group as controlled by the State-owned Assets Supervision and Administration Commission (SASAC) in a handwritten draft letter to Minster Tan Zhuzhou. Liew's notes state that, "Chairman of the Board of Pangang, Fan Zhengwei . . . hosted a luncheon for us and told me that Secretary Li . . . of the SASAC asked Fan to meet with us as per the instruction of a senior minister." Exhibit 291T at 0003; Ho, Tr. 321:10-325:9.

- The testimony of Hu Shaocong also discusses an interest expressed at the highest levels of the Chinese government concerning Walter Liew's company's proposal on the titanium dioxide project. Hu testified that Hong Jibi, the Pangang Chairman, called him in the United States concerning the USAPTI work. Hu subsequently learned that Jibi's call was prompted by an inquiry from the Premier's office. Hu, Tr. 795:9-803:3.

- Various chairmen and directors of the Pangang Group are also listed as secretaries and deputy secretaries of the Communist Party of China (CPC). Chairman of the Board Fang Zhengwei is listed as a CPC Secretary, and General Manager Yu Zisu is listed as a CPC Deputy Secretary. Exhibit 347T at 0002.

- A document located in the Liew residence, and admitted into evidence for Walter Liew's state of mind, describes a "meeting of the cadres" held at Pangang. The document explains how the Director of the Second Bureau for the Administration of Corporate Executives of SASAC of the State Council gave a speech in which various members of the Pangang Group were assigned to certain positions. Included in these government-directed assignments was that of Fan Zhengwei as Pangang (Group) Company Party Committee Secretary and Vice Chairman of the Board of Directors of Pangang (Group) Company.

- Another document located in the Liew residence, and admitted into evidence for Walter Liew's state of mind, provides a summary of a 2010 meeting in which the Angang and Pangang companies were reorganized. The Director of SASAC was present to give a speech. The companies are described as state-owned and the reorganization is said to be

5

an effort "to optimize the composition of the State-owned economy, to motivate the structural adjustment of the country's iron/steel industry."

### 2. Defendants Reasonably Believed that Trade Secret 1 was a DuPont Trade Secret.

The evidence is sufficient to prove that defendants Liew and USAPTI reasonably believed that Trade Secret 1 was an actual trade secret. Paragraph 14(a) defines Trade Secret 1 as follows: "Trade Secret 1: The DuPont chloride-route process to manufacture TiO2. Trade Secret 1 includes ways and means in which proprietary and non-proprietary components were compiled and combined by DuPont to form substantial portions of the TiO2 manufacturing process, and Trade Secrets 2 through 5 set forth below."

Two preliminary points bear emphasis. First, as the Court's proposed jury instructions reflect, the proof must be of a "reasonable" belief, not of a "reasonable and *firm*" belief, whatever it is that "firm" would mean in this context. Second, the Indictment does not allege that defendants believed that the "entire" DuPont TiO2 process was a trade secret and, indeed, alleges that portions of the process were not proprietary. Defendants' argument is misleading as to the description of Trade Secret 1.

The evidence that defendants reasonably believed that Trade Secret 1 was an actual secret includes:

- Liew repeatedly asserted that the DuPont TiO2 process was a trade secret. Ex. 350T-0006 (letter to Hong Jibi) ("DuPont has the most advanced titanium white by chlorination technology, but DuPont's technology has always been highly monopolized, and absolutely not transferrable"), 350T-0007; Ex. 374-0014 (email to Nora Lam with attachment) (slide titled "Value of TiO2 Technology," "DuPont: Technology not for sale").

- Liew described the plans he received from former DuPont engineer Tim Spitler as "stolen." Ex. 199-0001 ("Notes from Tim Spitler 2/2/2000 . . . Even with the best technology with stolen prints, but without the startup people and maintenance experienced people, the plant won't be successful"), Ex. 208-0005.

6

- Liew acknowledged that DuPont maintained the confidentiality of its process. Ex. 201-0001 ("DuPont did a good job of keeping the secret since then . . .DuPont make its people work on restricted area so that no single person can know enough to leak all the secrets.").
- Liew understood DuPont's specialized process knowledge allowed it to "maintain its number one position in the industry for over forty years." Ex. 243T-0002, 342T-002; Ex. 392T-0002 ("DuPont Company in America has more than 30 years of history in the steady production of chlorinated titanium white. We possess the complete technology.").
- Messrs. Gibney, Diemer, and Dayton also said the process was secret and not known. Gibney, Tr. 2198:8 to 2199:23, 2237:9-18; Dayton, Tr. 1564:16-18, 1586:21 to 1587:2.
- The Ashtabula technology is not, in fact, public. Gibney, Tr. 2282:6-25, 2212:4-21; Dayton, Tr. 1740:11-23).
- Performance Group did not own the DuPont technology it provided. Ex. 239T-0005.
- Walter Liew obviously believed that the process was secret because he was not forthcoming about what he did – he concealed his employment of former DuPont employees during his interview with DuPont investigator Jim Jubb (Tr. 2702:22 – 2704:10); he attempted to hide from the FBI the existence of a bank safe deposit box that contained confidential DuPont documents (Bozeman, Tr. 123:14-19); he directed Tony Duong to remove DuPont documents from the company server (Duong, Tr. 2488:4-17, 2490:1-3); and he changed the USAPTI reference to eliminate references to DuPont (Hubbard, Tr. 959:21 – 965:5). The jury can reasonably infer that he took each of those actions because he understood that he was in possession of confidential information that he was not entitled to possess or use.
- The Basic Data Document covers the entire process for building a new green field plant, and Walter Liew knew they were using that document. Liew asked Maegerle to check it during their work on the project. Ex. 67-0001.

///
///
///
///

7

**B. Counts 2 and 5 – Conspiracy and Attempt to Commit Trade Secret Theft**

Defendants incorporate by reference their arguments regarding the evidence that they reasonably believed that the DuPont TiO2 process, alleged as Trade Secret 1, was a trade secret. The government incorporates, here, the evidence set forth in the preceding sections.

**C. Counts 6, 7, and 9 – Possession of Stolen Trade Secrets**

The evidence is sufficient to prove that defendants knew that Trade Secrets 2, 3, and 4 were actual DuPont trade secrets, knew they had been converted, and knew that use of those trade secrets would injure DuPont.

- Each of the documents – Trade Secrets 2, 3, and 4 – is clearly marked DuPont and contains very clear confidential markings on the face of the documents. The confidential markings on each include warnings that the documents are for DuPont use only and are to be returned when they are no longer being used by the recipients. Exs. 1, 7, & 162.
- Walter Liew uses precisely the same sort of warning language on the USAPTI documents he produces, showing that he knows and understands the confidentiality language used by DuPont. E.g., Ex. 164.
- Liew described the flowsheets – Trade Secrets 2 and 3 – as "stolen plans" in notes of his conversations with Tim Spitler, from whom he received the flowsheets. Exs. 199 & 208. Spitler also was one of the named recipients of the Accession Report, Ex. 162.
- Liew actually used the stolen Edgemoor flowsheets with the Pangang Group customers. Ex. 719.
- Liew researched trade secrets and understood what they were. The definitions he researched clearly covered the DuPont documents he had in his possession. Ex. 243.
- Liew knew that the Chinese market was valuable and was attempting to cut into DuPont's market advantage in China. Ex. 374. He was doing so by misappropriating DuPont trade secrets and attempting to gain an advantage in designing a DuPont plant.

///

///

8

**D. Count 8 – Copying Stolen Trade Secrets**

There is sufficient evidence for a reasonable juror to conclude that defendants Liew and USAPTI knew that the Basic Data Document, Trade Secret 5, was a trade secret and that its use would injure DuPont. At a minimum, the evidence is clear that Liew and USAPTI aided and abetted defendant Maegerle in misappropriating the Basic Data Document.

The evidence includes the following:

- As set forth above, Liew asked Maegerle to check information from the Basic Data Document. Ex. 67. Maegerle repeatedly provided Liew with citations from the Basic Data Document. *See, e.g.*, Ex. 78 ("What was used to size the Chlorinator diameter, and number of jets, was the Basic Data for the Taiwan, 60k T/Y Plant. That data states . . ."), Ex. 108 ("I checked Quan Yin design").

- The information set forth in Section E below, Count 10 – Conspiracy to Obstruct Justice.

- Liew knows that detailed information about Kuan Yin is not publically available. Liew emailed a contact to look for Kuan Yin information. Ex. 171-001 ("That is the main reason I want to learn from Kuan Yin to see how they have modified their design"). He also sought out a meeting with a former contractor for the Kuan Yin facility. Ex. 878-001. A jury could reasonably infer that – unlike the detailed references provided by Maegerle from the Basic Data Document, those efforts demonstrate the difficulty of finding out other information about Kuan Yin.

- As set forth elsewhere, the jury could reasonably infer Liew's knowledge from his efforts to conceal his employment of former DuPont employees and his other obstructive conduct.

**E. Count 10 – Conspiracy to Obstruct Justice**

The evidence is sufficient to prove that defendant Liew conspired with defendant Maegerle to file a false answer in the DuPont civil action.

- The DuPont civil complaint was filed on April 6, 2011. Defendant Maegerle was *not* a party to the lawsuit when it was filed (contrary to defendants' characterization as a "co-defendant," Def. Mem. at 14:24).

9

- Walter Liew sent the complaint to Maegerle and solicited his advice regarding the answer to the complaint. Maegerle informed Liew that he was going to use a different email for his correspondence regarding the civil suit. Ex. 678. A reasonable juror could conclude that this suggests knowledge of wrongdoing.

- Maegerle wrote to Liew that "[n]o Kwan Yin design information has ever been obtained for our current design." Ex. 678. This statement is false.

- Maegerle made the following comments on the complaint (Ex. 679): (1) "Trade secret materials have not been wrongfully obtained. DuPont detailed specifications have not been obtained." The Kuan Yin Basic Data Document contained "DuPont detailed specifications," as both Maegerle and Liew knew. (2) "It is standard industry practice to mark proprietary and confidential documents with owner and restrictive information." The flowsheets that Liew had sent to Maegerle (Exs. 5 & 10), had such restrictive marks on them. (3) "USA-PTI design contains no Kuan Yin technology, but has similarities to the Ashtabula facility." Both Liew and Maegerle knew that they had used Kuan Yin basic data in their deisgn work.

- Maegerle wrote to Liew: "I would like to be referred to as your 'consultant on Ashtabula TiO2 technology' in discussions with DuPont lawyers, Chevron personnel or private investigators. When the court requests my name feel free to identify me at that time." Ex. 682.

- The answer filed by Liew to the complaint states: "Defendants have never misappropriated any information from DuPont or any of its locations, whether the Kuan Yin facility or otherwise." Ex. 676-0006. This statement reflects the discussions between Maegerle and Liew regarding how to answer the complaint and deny the use of Kuan Yin information.

- Defendants contend that this is taking an "aggressive position in an answer at the urging of a co-defendant." Def. Mem. at 14:23-24. Not so. This is lying in an answer after discussions with a co-conspirator who was not a defendant at the time. The government doubts that "many members of the civil litigation community" would countenance this, let alone engage in it.

### F. Count 11 – Witness Tampering

The evidence is sufficient to prove that Walter Liew corruptly persuaded Jian Liu to lie – which is wrongful and immoral – about Tim Spitler's and Robert Maegerle's work for USAPTI. He did so only after the DuPont civil suit had been filed and he would have forseen that Jian Liu's lies would be asserted in response to that lawsuit – an official proceeding.

- The DuPont civil suit was filed on April 6, 2011, and defendant Liew told Jian Liew about it the same day. Tr. 2600:17 – 2601:14.

- Jian Liu met Walter Liew at a Ranch 99 on April 11, 2011, after Walter Liew had returned from a two day trip to Malaysia. During the meeting, Walter Liew discussed the lawsuit and told Jian Liu that he should not reveal the names of Tim Spitler and Robert Maegerle. Tr. 2604:2-20. Liew and Liu knew this would be false as both of them knew that Spitler and Maegerle had in fact worked for USAPTI as consultants.

- Notes in Walter Liew's handwriting corroborate that he had this conversation with Jian Liu regarding the "old men." Ex. 687 and Tr. 2691:12 – 2692:3.

- Jian Liu testified that he lied because he "promised Walter's family I would not tell them." Tr. 2619:10-11.

- Walter Liew persuaded Jian Liu to lie only after and in response to the DuPont civil suit. A reasonable juror could conclude that the sole purpose of doing this was to influence the testimony of Jian Liu in the DuPont action. At the time Walter Liew undertook to persuade Jian Liu to lie, no meetings had been scheduled or were contemplated between Jian Liu and DuPont. Accordingly, the *only* events involving Jian Liu that would have been forseeable to Walter Liew would have been deposition or trial testimony in connection with the civil action.

- The threat on which defendants focus need not be proven by the government. As the Court's proposed jury instructions make clear, "[t]he government need only prove intimidation, threat, or corrupt persuasion, no all three." Here, the knowing attempt to convince Jian Liu to lie was corrupt persuasion.

11

### G. Count 13 – Conspiracy to Obstruct Justice

As defendants recite in their brief, there are two avenues for the government to prove Count 13. Either will suffice to obtain a conviction.[1] The first is to prove a violation of 18 U.S.C. § 1512(b)(3), which, as defendants acknowledge, prohibits misleading conduct with the intent to hinder, delay, or prevent the communication of information to a law enforcement officer or judge. This violation does not require proof of any official proceeding.

- The evidence cited by defendants demonstrates that Mr. Liew told his wife to deny knowledge of the safe deposit box when asked by the FBI. Tr. 123:14-19. The testimony of Special Agent Bozman, the three surveillance agents (Tr. 167-183, 204-217) and bank employee Angela Ng (Tr. 218-232) proceeded to show that Mrs. Liew almost immediately left the Liew residence saying she was going to get breakfast, drove to the Bank of East Asia, and attempted to access the safe deposit box, in which existed a trove of evidence linking the Liews to both DuPont and the Pangang Group entities (e.g., Exhibits 199, 201, 350, 384 and many others).

- A reasonable juror could easily find that the Liews' misleading conduct was intended to hinder, delay, or prevent the communication of information regarding the safe deposit box and the evidence it contained.

### H. Count 20 – False Statements in Bankruptcy

There is sufficient evidence for a reasonable juror to conclude that defendant Liew knowingly lied in the Performance Group bankruptcy petition when he denied that Performance Group had any executory contracts, intending to deceive the bankruptcy court.

- Defendant Liew entered into six different contracts on behalf of Performance Group and USAPTI. See Exs. 313, 314, 315, 317, 318, and 319. The jury could conclude from this volume alone that he was knowledgeable regarding contracts.

---

[1] The government believes there is sufficient evidence to prove both objects of the conspiracy, but will address only the § 1512(b)(3) object at this time.

12

- Performance Group received twenty-one payments under three separate contracts with Pangang Jinzhou between January 2006 and July 2011. (Ex. 919) Fourteen of these payments were before the January 14, 2009, bankruptcy petition; seven were after, including one within a month and a half. (Ex. 919)
- Defendant Liew understood the idea of progress payments and milestones tied to contract performance. Tr. 1098:9 – 1099:20.
- Liew went to China to meet with Jinzhou in both October 2008 (Tr. 1096:21-24), after which he received a progress payment (Ex. 919), and late-December 2008/early-January 2009 (Tr. 2295:16 – 2296:3), after which he received another progress payment (Ex. 919).
- Assistant U.S. Trustee Darling testified that, in her experience with thousands of bankruptcies, business people understand the term executory contract.
- Defendant Liew testified at the bankruptcy creditors meeting that he had reviewed the petition and its attachments. Ex. 511-0004 at lines 1-3. He affirmatively raised the issue of contracts during the hearing and testified that Performance did not have any more contracts, Ex. 511-0004 at 11-15, an obvious lie.

Respectfully submitted,

MELINDA HAAG
United States Attorney

JOHN H. HEMANN
PETER B. AXELROD
Assistant United States Attorneys

RICHARD S. SCOTT
Trial Attorney