1                 UNITED STATES DISTRICT COURT

2                 NORTHER DISTRICT OF CALIFORNIA

3     Before The Honorable Nathanael Cousins, Magistrate Judge

4

5     UNITED STATES OF AMERICA,      )
                                     )
6              Plaintiff,            )
                                     )
7     vs.                            )    No. CR 11-00573 JSW-01
                                     )
8     WALTER LIEW,                   )
                                     )
9              Defendant.            )
      _____)

10

                                     San Francisco, California
11                                   Thursday, January 23, 2014

12    <u>TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND</u>
                              RECORDING
13    _____

14    <u>APPEARANCES</u>:

15    For Plaintiff:
                                  Assistant United States
16                                  Attorney
                                  450 Golden Gate Avenue
17                                San Francisco, California
                                    94102
18                        BY:   JOHN H. HEMANN, Esq.
                                PETER B. AXELROD, Esq.
19
                                  United States Department of
20                                  Justice
                                  600 East Street NW
21                                Washington, DC 20004
                          BY:   RICHARD S. SCOTT,  Esq.
22

23

                       (APPEARANCES CONTINUED ON FOLLOWING PAGE)
24

25

ii

1  APPEARANCES: (Cont'd.)

2

3  For Defendants:
                              Keker & Van Nest, LLP
                              633 Battery Street
4                             San Francisco, California
                                94111
5                             (415) 391-5400
                        BY:   STUART L. GASNER, Esq.
6                             SIMONA A. AGNOLUCCI, Esq.
                              KATHERINE LOVETT, Esq.
7

8  Transcribed by:            Echo Reporting, Inc.
                              Contracted Court Reporter/
9                               Transcriber
                              echoreporting@yahoo.com
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

1

1  <u>Thursday, January 23, 2014</u>                    <u>2:12 p.m.</u>

2                        P-R-O-C-E-E-D-I-N-G-S

3                            --oOo--

4            THE CLERK: Criminal 11-0573-01.  United States

5  versus Walter Liew.

6            MR. HEMANN: Good afternoon, your Honor.  John

7  Hemann, Pete Axelrod and Richard Scott for the United

8  States.  Your Honor, Mr. Scott is an attorney at Bay Justice

9  (phonetic).

10            THE COURT: Good afternoon to you all.

11            UNIDENTIFIED SPEAKER: Good afternoon.

12            THE COURT: You brought reenforcements.

13            MR. HEMANN: We did.  We're actually going to leave

14  and let Mr. Scott take a swing.

15            THE COURT: Very good.

16            Good afternoon, Mr. Liew.

17            THE DEFENDANT: Good afternoon, your Honor.

18            MS. AGNOLUCCI: Good afternoon, your Honor.  Simona

19  Agnolucci and Stuart Gasner and Katie Lovett from Keker and

20  Van Nest for Water Liew.

21            THE COURT: Good afternoon to you all.  And Mrs.

22  Liew is here as well, I see?

23            UNIDENTIFIED SPEAKER: Yes, your Honor.

24            THE COURT: And her Counsel.

25            UNIDENTIFIED SPEAKER: Her Counsel, Mr. Weinberg

2

1    and an interpreter as well.

2         THE COURT: All right.  We'll get to --

3    (indiscernible) Please be seated, thank you for being here.

4         Mr. Liew.

5         MR. LIEW: Good afternoon, your Honor.  Allen Liew

6    (phonetic) with the U.S. Pretrial.  No relation to Mr.

7    Walter Liew.

8         THE COURT: Thank you.  And we're continuing the

9    hearing from yesterday on the requested release of Mr. Liew

10   on conditions of release.

11        Have there been any developments in the district

12   court that should be within my consideration?

13        MR. HEMANN: I don't believe so, your Honor.

14        THE COURT: And from the defense?

15        MS. AGNOLUCCI: No, your Honor.

16        THE COURT: So no further commentary made by the

17   district court judge as to the specifics as to what he

18   anticipated and was requesting the parties to do?

19        MR. HEMANN: No, your Honor.

20        THE COURT: All right.  Between yesterday and

21   today, I did go back to review my prior order of release,

22   which is document 255 from February 26th.  That did identify

23   a number of particular conditions of release on a $2,000,000

24   secured bond and we had some discussion yesterday about if

25   the Court were going to set a bond amount, how it would set

3

1  a bond amount, what would it be based on.  I don't think the

2  Government ultimately recommended a particular amount, or

3  the opportunity to tell me what the amount was that you

4  would be requesting, if you take me up on that -- on the

5  question, and the defense recommended a $1,000,000 unsecured

6  bond and when -- when I pressed as to why that amount was

7  the right amount, there wasn't, as I recall, any -- to make

8  a response as to why that and not something a little bit

9  less or a something a little be more would be the right

10 amount.  And of course it's not a -- an exact science, but I

11 do need to have my rulings made on some basis of the facts

12 of law, and in thinking about it further, the fact that I

13 previously ordered a $2,000,000 bond, which was an amount

14 recommended by the defense as -- back at that time, might be

15 a principle of reason to have the bond be $2,000,000 now,

16 even if it's not secured, at least it's an amount the

17 defense recommended and I ordered, based on a review of the

18 Defendant's financial circumstances.

19          So to inform all of you, my tentative view would

20 be to release Mr. Liew on a $2,000,000 unsecured bond with

21 his wife as a co-signer, with the conditions of release I

22 previously ordered, borrowing some further argument from the

23 parties as to why that would not be just.

24          Things that also the parties argued and I

25 considered at that time were whether a private security

4

1  service would be something that was appropriate, or some

2  other type of supervision beyond the ordinary electronic

3  supervision would be appropriate.  At that time I -- the

4  suggestion for a private security service, finding it was

5  not appropriate.  We didn't have any discussion about that

6  yesterday.  My inclination would still be that that would

7  not be appropriate, but the district court judge did use the

8  term "extreme security measures" in his -- in the transcript

9  that I read, without any further explanation as to what that

10 means.

11          So if having a further day to think about it has

12 given anyone any further ideas, I'm receptive to those

13 ideas, but my tentative would be to release Mr. Liew on a

14 $2,000,000 unsecured bond today.

15          MR. HEMANN: So we have had some ideas, your Honor.

16 Bearing in mind the district court's instructions, with

17 regard to the extreme nature of the -- of the release

18 conditions.  And I'd just like to share some of those ideas.

19 There are no particular order.

20          One idea has to do with security on -- on the

21 bond.  And the Government's position continues to be that it

22 is important that some amounts of the bond -- first of all,

23 we agree with the $2,000,000, but we believe that some

24 amount should be secured and there should be some effort to

25 determine what amount is potentially available and

5

1  appropriate.

2          We believe that a provisional release, pending

3  some security, might -- would address the due process issues

4  that the district court identified, as well as the -- the

5  advisability that the Court previously found with regard to

6  the securities.  So that's one thought.

7          Also, the three ideas that we explored that are

8  somewhat more extreme, if you will, and I'm not -- maybe a

9  better word to use -- more stringent, are again, the issue

10 of having sureties.  So somebody who the Defendant wouldn't

11 want to let down by -- or hurt -- by leaving.  The issue of

12 the guard, which the Court just mentioned, which is -- would

13 be an extreme and unusual measure, but it may fit into that

14 rubric that Judge White was referring to.

15         And then finally -- and I didn't have a chance,

16 and I meant to speak with Allen Liew at pretrial about this

17 before court -- electronic monitoring as it's typically

18 done, as we understand, involves an ankle bracelet and a

19 device at the home that measure -- that determines when the

20 person being monitored leaves the home, but doesn't really

21 follow them around.  We were wondering whether there is the

22 -- the availability of a GPS, and the circumstance under

23 which a GPS might be implemented.  And I just -- we were

24 brainstorming ideas, I don't know what the feasibility is.

25 The hearsay is that in other places, wherever those places

6

1  are, GPS is an available technology for this.

2       So those were the ideas, in addition to home

3  detention, the standard conditions.  And then there's a --

4  one matter that we'd like to take up with the Court, as a

5  condition of release, related to Mr. Liew's ability to take

6  confidential information out of the court and out of his

7  lawyer's offices to his home.  Confidential information

8  that's coming out during the trial, and we'd just like the

9  condition to be that that information stays in the custody

10 of his attorneys'.

11      THE COURT: When you say "information" do you mean

12 documents, or –

13      MR. HEMANN: Both documents and notes, his own

14 notes -- there's a -- confidential information is being

15 displayed and talked about in court, and particularly

16 displayed, and notes are being taken, and we just want --

17 obviously he's allowed to take notes, he needs them for

18 preparation with his lawyer.  We'd like those to stay in his

19 attorneys' custody.

20      THE COURT: All right.  And are there any trial

21 rulings governing notes that are in existence right now?

22      MR. HEMANN: There are not.  It has not really been

23 that much of an issue because he's been in custody and

24 there's been -- we know where the notes are, if you will.

25 But that is something we certainly are happy to take up with

7

1  Judge White, if you think that would be more appropriate for

2  us to do.  We thought that we could potentially work out a

3  condition of release that wasn't onerous on him.  We're not

4  trying to cause a problem, but we do have some concerns

5  about confidential information floating around.

6           THE COURT: All right.  I'll hear what the –

7           MR. HEMANN: But I don't want the tail to wag the

8  dog on that though, it's just something that –

9           THE COURT: Yeah.  I'll hear what the defense has

10  to say about –

11           MR. HEMANN: It's the last thing on my notes.

12           THE COURT: -- that, but my initial reaction is

13  that, if it's an issue about notes taken during trial, that

14  that's an issue that's not really a release issue, it's more

15  of a protective order over trial information, but that's --

16  not to say that it can't be a condition of release, but

17  that's my reaction.

18           All right.  Let me hear from the defense, Ms.

19  Agnolucci.

20           MS. AGNOLUCCI: Yes, your Honor.  I think to begin

21  with, looking at the transcript of what was said yesterday,

22  Judge White said, you know, a way of releasing Mr. Liew with

23  the most extreme measures of security that we can impose

24  while out of custody, meaning signing appearance bonds.  And

25  I think it's clear that he had in mind the type of unsecured

8

1  appearance bond that we're offering here, as that sort of

2  extreme security measure.

3          Now it is true that at the time of our initial day

4  of proceedings, we had put $2,000,000 on the table.  Since

5  then this case has gone on for well over a year, probably 16

6  months.  We've retained four experts and there have been

7  very significant costs associated with taking the case to

8  trial, which is the rationale behind lowering that amount to

9  $1,000,000.

10          We would have no objection to a GPS device, and we

11  would have no objection to reasonable restrictions on

12  confidential documents.  We think that those restrictions

13  should really follow the protective order that's in place.

14  The protective order says that, so-called C-1 documents,

15  which are the highly confidential ones, cannot be left in

16  the presence of the Defendant, but that he may retain C-2

17  level documents to assist in the preparation for trial.

18  Like Mr. Hemann, we don't want that to be the tail that wags

19  the dog here, and are certainly open to hearing the Court's

20  suggestions.

21          And by way of sureties, we think that, you know,

22  trying to get together sureties at this stage would create a

23  delay, and everyday that goes by –

24          THE COURT: What they're suggesting is a

25  provisional release without additional -- as I understand

9

1  it, they're suggesting a provisional release without

2  additional sureties so that the due process concern is

3  addressed immediately today, but that we reconvene in some

4  short period of time with potential additional sureties who

5  could appear to provide further incentive for Mr. Liew to

6  make future appearances.  That's, as I understand, their

7  proposal.

8           So what's your response to that?

9           MS. AGNOLUCCI: I mean we would really prefer not

10 to have that distraction in the middle of this eight week

11 trial of having to go out and find sureties while preparing

12 for trial, and Mrs. Liew has offered to be a surety and she

13 would be co-signing the bond.  She is a defendant in this

14 case who is under the Court's jurisdiction, who has an

15 extreme interest in complying with the conditions of Mr.

16 Liew's release and of her release, and we submit that that

17 should be sufficient, your Honor.

18          THE COURT: And there could be -- and I have time,

19 so there could be some debate about her appropriateness as a

20 surety, given that she is a co-defendant.  You make a good

21 argument that she is a better -- it warrants (indiscernible)

22 a co-defendant, who has yet to be tried.  And I think the

23 Government might have some argument that she's not

24 appropriate as a defendant, that they might have some common

25 incentive to flee together.

10

1        And let me hear from the Government as to -- more

2   on the surety question.

3        MR. HEMANN: Yes, your Honor.  And just -- we won't

4   interpret it -- interpret Judge White using the term

5   "appearance bond" to mean a -- an OR bond, or an unsecured

6   bond.  The title of the document is "Conditions of Release

7   and Appearance" and it provides for sureties in some cases,

8   secured in some cases, and unsecured in some cases.  I'm not

9   sure that he was intending -- there's no reason to believe

10  he's intending one thing or the other.  I think that would

11  be inconsistent with his use of the term "extreme".

12       We don't believe that an unsecured bond signed by

13  the Defendant's co-defendant wife, is in any world an

14  extreme condition.  I don't think that anybody would

15  consider that to be an extreme condition, regardless of the

16  amount of the bond, particularly in the situation where

17  neither the husband nor the wife has money in the United

18  States that would come close to securing a bond in that

19  amount.  So we don't -- we don't agree with the defense that

20  that satisfies the directions that Judge White has -- has

21  provided.

22       We do, in order to effect the balancing that we

23  think Judge White did intend, agree with the Court's

24  comments about our position on the provisional release, with

25  the intention to come up with some real skin in the game to

1  secure future -- and I do understand how busy we all are

2  with the trial.  We have a short week next week, and a

3  couple of days, and Mrs. Liew is not on trial right now and

4  I'm guessing that she could work on making the arrangements

5  for sureties, or cash, or a loan on the house in Singapore,

6  and get going on some of that, separate and apart from

7  Counsel, as we've got some flexibility ongoing.

8          And again, we're not suggesting that this needs to

9  happen tomorrow before he gets released, or Monday before he

10 gets released.  The provisional idea is something we'd like

11 to explore.

12         THE COURT: And, Ms. Agnolucci, one of the things I

13 hear you suggesting is as to why $1,000,000, rather than

14 $2,000,000 is appropriate, is that his financial

15 circumstances have changed over the last year.  He's been

16 spending money on experts and so forth, and that's the

17 rationale to have it be lower than what it might have been

18 at one point?

19         MS. AGNOLUCCI: Yes, your Honor.  That is the

20 rationale, and we do think that going out and looking for

21 sureties is going to be a sideshow that's going to distract

22 from trial.  And I can tell you, having gone through this

23 the last time, that obtaining a loan on the house in

24 Singapore will take a very long time and will almost

25 certainly not be done before this trial is over.  This trial

12

1   is scheduled to end at the end of February.

2        THE COURT: There were, during very early

3   appearance in the case, a number of community members who

4   were considered as potential sureties on a bond amount that

5   was much less, and of course that was much earlier in the

6   case, and I don't know -- there was not a determination made

7   if those other people were appropriate sureties, but we'd

8   begin that process, and of course it begins with the

9   pretrial services.

10        If I were to follow this provisional release

11   approach on a unsecured bond today, which is what I'm going

12   to do, but then to set it in another week for -- to give

13   pretrial time to contact some of those community sureties,

14   to see if there might be something which is less cumbersome

15   than going to Singapore and doing a property process, but to

16   see if there might be some more incentive vocally that could

17   assure future court appearances.  Might that accomplish the

18   task of both finding an appropriate surety, while still

19   accomplishing the immediate release of Mr. Liew to allow him

20   to prepare a defense?

21        MR. HEMANN: May I inquire about something, your

22   Honor –

23        THE COURT: Yes.

24        MR. HEMANN:  -- ask the Court to inquire about

25   something?  Listening to Ms. Agnolucci's arguments, it

13

1  occurs to me that I'd like the Court to inquire as to

2  whether or not the -- any interests in the property in

3  Singapore has been diluted over the course of last year?

4  Has a loan been taken out?  Has any of the equity been

5  removed from the property in Singapore since we were last

6  here?  Because what I'm hearing is that money -- that there

7  is -- there are available funds that have been used over the

8  course of the last year, that has reduced Mr. Liew's access

9  to money.  If that's the case, I think the Court should

10  know, in fashioning a release order, what money is

11  available.  If the -- if there's an equity line on the home,

12  if a loan has been taken.  I think these are all relevant

13  considerations.

14          My understanding yesterday was that we were static

15  from last year, in terms of assets.  My understanding from

16  the defense argument now is that we are not static, that his

17  net worth has reduced from $2,000,000 to $1,000,000 -- or

18  his –

19          THE COURT: Be careful.  I never made a finding his

20  net worth was $2,000,000.  That was -- that was a bond

21  amount.

22          MR. HEMANN: I know.  I understand that.  I am

23  saying it the wrong way, but his -- his available cash --

24  his available assets to post have gone from $2,000,000 to

25  $1,000,000 is what I'm hearing.  And if that is from some

14

1  source other than a dilution of the equity or the interest

2  in the home in Singapore, I think that's highly relevant to

3  the Court's ascertaining what money is available to post

4  today, and where that money might come from, and who might

5  be able to stand up and say, "I will guarantee his

6  appearance."

7           THE COURT: I understand your question, and of

8  course, that -- a response to it could intertwine with

9  issues going on at trial, trial which I'm not present for,

10 so I might -- maybe not wish to respond; but do you wish to

11 respond?

12          MS. AGNOLUCCI: We can respond and say that Mr.

13 Liew's assets that he has titled to him have remain static.

14          Your Honor, this is not a discovery expedition.

15 We're in the middle of a trial that involves financial

16 charges, as the Government well knows, and we don't see this

17 an opportunity for them to request information that they

18 don't have the right to request right now.

19          THE COURT: Well the Court has an independent

20 obligation in setting a bond amount to decide it in a way

21 that's going to incentivize future court appearances.  And

22 my challenge is that my information on this topic is now

23 quite dated, and as I said yesterday, I was relying upon

24 what I assessed more than a year ago, and I haven't received

25 an update on that.  But at the same time, because of the due

15

1  process issues, I'm going to order Mr. Liew released today.

2  The question is, should I come back in a week to have a

3  further evaluation of -- to get more information during that

4  period of his release?  And I don't want to create more work

5  for all of you.  I know you're very busy, but at the same

6  time, that process could help to assure Mr. Liew continues

7  to appear.

8              MR. HEMANN: And your Honor –

9              THE COURT: Yes.

10             MR. HEMANN: -- we strongly advocate that the Court

11  do that.

12             Last year -- there's a willingness by the defense

13  to be transparent about the Singapore -- the ownership in

14  the Singapore property, and the available assets in the

15  Singapore property.  There's been a representation today

16  that it went from the $2,000,000 then to $1,000,000 now,

17  which suggests to me –

18             THE COURT: You don't need to give your

19  interpretation of that.  It could be alternate

20  interpretations.

21             MR. HEMANN: There could be alternate

22  interpretations, but I think that those are relevant and I

23  think that it is worth coming back with the provisional

24  release and having some of these questions explored and

25  answered.

16

1          THE COURT: What's the trial schedule next week?

2          MR. HEMANN: The trial schedule, your Honor, is

3    Monday 9:30 to -- 9:30 to 1:30 and then Tuesday and

4    Wednesday, I think, 8:00 to 2:00, and then we're off

5    Thursday and Friday.

6          THE COURT: All right.  So I think we're going to

7    do some further -- that's why, Judge White is not available.

8          MS. AGNOLUCCI: Your Honor, if we aren't going to

9    do anything further, I would submit that we should follow

10   the same process that we followed last time this came up.

11   We would be more than happy to submit to your Honor a list

12   of what money has been spent on this trial since the last

13   in-camera declaration that we submitted, but we would ask

14   that it be in-camera and under seal.

15         THE COURT: All right.  Well, two components to

16   that.  So the in-camera part is appropriate, and I'll grant

17   that.  As far as what I'm wanting, it's not just what you've

18   spent on defense in the case.  I need to have an assessment

19   of his current financial circumstances and use that to set

20   an amount of bond that's going to be sufficient to motivate

21   him to continue to appear in court.

22         That, in some ways, seems like an academic

23   exercise, but it's not academic.  it has to be based on the

24   actual facts, and in court we've been using a -- we're

25   backing down from $2,000,000, but even that number is a

17

1  rough estimate, and it may be that some lesser number is

2  appropriate.

3       And pretrial services has a role in this too,

4  which is if they make recommendations and work on every case

5  to make the amount be one that's fair, in consideration to

6  other cases, and it's not just a number that's pulled out of

7  the sky.

8       So you say you're done at 1:30 on Wednesday?

9       MR. HEMANN: I believe it –

10      UNIDENTIFIED SPEAKER: It's actually 2:00 o'clock.

11      MR. HEMANN: Two o'clock on Wednesday.

12      MS. AGNOLUCCI: If I just may add, your Honor, last

13 time we went through this exercise, it took a very long

14 time –

15      THE COURT: It took longer -- it took longer

16 than –

17      MS. AGNOLUCCI:  -- to contact overseas banks and

18 get information.  It was extremely challenging and I think,

19 you know, that it will take at least a couple of out of

20 court days for us to be able to put this together.

21      MR. HEMANN: Your Honor, I'd make the observation

22 that if Mr. Liew's assets have been static, and we

23 understood what they were last year -- or I guess two years

24 ago, based on the initial bail form -- my understand is that

25 they're not significant, and certainly not significant to

18

1  cover court costs and the kinds of monies that it would take

2  to try this case.  But again, the money is coming from

3  somewhere, and based on the defense's argument, it appears

4  that money, and not insubstantial sums, are coming from

5  somewhere for Mr. Liew's benefit.  Whether that goes to the

6  Court in-camera -- I think that we're comfortable that

7  representations be made to the Court in-camera at this point

8  in time as to the source of that money, whether it is Mrs.

9  Liew or some other third party.

10         And, again, we're -- we're not taking the vision

11 that we need to see that.  I think that does get a little

12 bit close to us, you know, knowing what the defense camp is

13 doing, but is appropriate for the Court to know what the

14 source of the money that has been represented to have been

15 spent is, and I think that last year the Court did order

16 there to be information provided, with regard to Mrs. Liew's

17 assets as well.   We obviously are in a community property

18 state.  We obviously are talking about Mrs. Liew's assets

19 being used and Mrs. Liew being a security (sic) -- or a

20 surety.

21         So I think it's appropriate that the order extend

22 to that, again, with the caveat that it should go to the

23 Court in-camera, under the circumstances, obviously

24 reserving our right to ask some judge in some future

25 proceeding, either your Honor or someone else –

1          THE COURT: You don't need to say that reservation,

2   because you have the right to object and appeal everything I

3   do to Judge White.

4          MR. HEMANN: And I'm not saying appeal,

5   necessarily.  But even ask your Honor to release those, or

6   at least release them in part, depending on developments.

7   But what I'm trying to say and articulate is we don't object

8   to your Honor looking at them in-camera now, particularly

9   for the purpose of expediting this process.

10          THE COURT: All right.  Here's my (indiscernible).

11   You remind me, Ms. Agnolucci that it did take quite some

12   time the last time in order to achieve that information, and

13   now you're in trial.  So what I have in mind now is to set a

14   further hearing on Thursday, February 6th.  It doesn't give

15   you a lot more time, but a little more time to assess the

16   appropriateness of either co-signers or a different bond

17   amount, or a secured bond amount, rather than the $2,000,000

18   unsecured bond I'm going to do today, and to ask you to

19   submit to me in-camera by February 5th, and to pretrial

20   services, whatever information you'd like me to rely upon.

21          MS. AGNOLUCCI: That's fine, your Honor.  We're

22   happy to do that.

23          THE COURT: I'm not going to -- as a result of that

24   process, because I agree, it does involve an evaluation of

25   Mrs. Liew and whether she's an appropriate surety.  I'm not

20

1  going to make her a co-signer on the bond today, because I'm

2  not even sure that she's really an appropriate surety, and

3  she's already governed by her own release conditions and so

4  I'm going to leave her out of it for today and we'll

5  consider whether she should be included as a -- in some sort

6  of a surety, with some property to be included on that date.

7  So it will leave us all a little time for further evaluation

8  of her and leave this as to Mr. Liew today.

9           Mr. Allen (sic), would the GPS device the party

10 seem to agree upon, is that logistically –

11          MR. LIEW: It is, your Honor.  We had not

12 originally provided that condition to Judge White, because

13 he had requested stringent conditions.  But as all of the

14 parties have quoted him as saying extreme conditions.  GPS

15 is available.  Even if there are, at this juncture, a lack

16 of any viable co-signer and sureties, it might be

17 appropriate means of reasonably (indiscernible).

18          THE COURT: All right.

19          MR. LIEW: We have a sense of where he'll be when

20 he is (indiscernible).

21          THE COURT: Very well.  So I think that we are then

22 evolving today to the following conditions.  A $2,000,000

23 unsecured bond, signed only by Mr. Liew, with no travel

24 outside the district, supervision by pretrial services, a

25 surrendering of passports and visas, not discussing the case

1  with any co-defendant outside the presence of counsel, no

2  firearms or weapons, not changing residence without the

3  advanced approval of pretrial services, in fact it will be

4  home detention with permission only to leave for court and

5  meetings with counsel.

6          In my February 2013 order, there's also permission

7  for medical leave.  Is there any reason not to have

8  permission to go to medical appointments?

9          UNIDENTIFIED SPEAKER: That will be fine, but we

10  just ask that it's only for necessary medical appointments.

11          THE COURT: Any objection to that?

12          MS. AGNOLUCCI: No objection, your Honor.

13          THE COURT: The Government?

14          MR. HEMANN: No objection, your Honor.

15          THE COURT: All right.  And a further hearing set

16  for February 6th at 2:00 o'clock; is that a good time?  Or

17  are you guys done –

18          MR. HEMANN: We are operating on the assumption

19  that we'll be done at 1:30.  If we're dollying along, Judge

20  White may keep us later, but I think that we're relatively

21  safe if we tell him we have a meeting with you.

22          THE COURT: I'm not so -- anyway so February 6th

23  2:00 o'clock.  You've got a jury so that takes precedence.

24  February 6th at 2:00 o'clock for further proceedings.

25  That's what I'm contemplating doing.

22

1           Are there any additional -- and on issue of access

2   to confidential information of trial, that's going to be

3   covered by the protective order and not by my conditions of

4   release.

5           MR. HEMANN: Yes, your Honor.  And then the -- just

6   -- there's a slight ambiguity with the not travel outside

7   the northern district.  It probably should be not travel

8   outside Contra Costa, Alameda and San Francisco, and there

9   only for the purpose of those conditions that the Court has

10  permitted, in terms of legal and medical.

11          I understand that Mr. Liew will be living in

12  Walnut Creek?

13          MS. AGNOLUCCI: Yes.

14          MR. HEMANN: And so that would cover Walnut Creek,

15  the freeway between here and there, and San Francisco.

16          THE COURT: What do you think about that?

17          MS. AGNOLUCCI: That's fine with us, your Honor.

18          THE COURT: And from an administrative perspective,

19  is that a –

20          MR. LIEW: Your Honor, the restrictions imposed,

21  based on the GPS, it would trump any travel outside of those

22  counties anyway, unless the Defendant needed to travel to

23  another county for purposes of preparing for trial.

24          MR. HEMANN: Which we would ask that he obtain

25  permission where that happens, which sounds fairly unlikely.

1        MS. AGNOLUCCI: We don't foresee that happening.

2        THE COURT: All right.  And I mentioned that -- the

3   electronic monitoring will be GPS monitoring, as directed by

4   pretrial services.

5        With that and with the further proposed

6   restriction of limiting travel to Contra Costa, Alameda and

7   San Francisco counties, are there any other proposed

8   conditions of release from the Government?

9        MR. HEMANN: I do not think so, your Honor.

10       THE COURT: And for the defense, are there any

11  modifications of those conditions that you think are

12  appropriate?

13       MS. AGNOLUCCI: No, your Honor.

14       THE COURT: If you have a bond form before you

15  there, I don't know if you do, I'd mark those boxes and

16  we'll get that issued.  In fact, if you'd like to start with

17  the information on the top there.

18       Mr. Gasner, while she works on that, yesterday I

19  didn't have time, because I thought Mr. Liew might be being

20  released and so I didn't respond to something you said.  One

21  of the things you said was that the earlier detention of Mr.

22  Liew was following hysteria, that's a word that you used,

23  and I wanted you to elaborate on what hysteria you were

24  referring to.  Was that by the Grand Jury?  By the Court, by

25  the FBI?  What did that mean?

24

1        MR. GASNER: What I was referring to, your Honor,

2   was somewhat inflammatory language by the Government

3   throughout the bail process, which I thought was somewhat

4   xenophobic and tied to a lot of anti-China news, and I stand

5   by that characterization of where we were two years ago, and

6   that's what I referred to.  But I think that in the two

7   years of trial preparation, and with Judge White's oversight

8   of the trial, things have been far more restrained.

9        THE COURT: All right.

10       MR. GASNER: Rhetorically from the Government, that

11  is.

12       THE COURT: All right.  And it was also following

13  the trial, so I thought maybe your emotions were thinking

14  you were in front of a jury, but to be clear, since I

15  originally detained Mr. Liew, nothing that I did was a

16  result of any hysteria on my part.  It's a word that has

17  some connotations of insanity, or deafness, or blindness,

18  and any order I made was based on evidence presented here in

19  court, both by you and your client, as well as the

20  Government.  So I wanted to make that clear on the record.

21       MR. GASNER: I didn't mean to suggest otherwise,

22  your Honor, and the one bail motion we filed before your

23  Honor, your Honor granted it.  So certainly no suggestion of

24  insanity or hysteria against the Court was intended.  It was

25  really a reference to the initial rhetoric of the Government

25

1  at the (indiscernible).

2          THE COURT: All right, thank you.

3          MR. HEMANN: And certainly, I would like to have

4  any particular instances of rhetoric that are unsupported by

5  the record -- or any instances of rhetoric identified

6  specifically, because we certainly believe that we have

7  confined our remarks to that which we believe we can prove.

8  The suggestion that either the United States Department of

9  Justice, or the FBI, has engaged in xenophobia is offensive.

10          THE COURT: Both of you have made a record, but it

11  was a particularly charged word.

12          As soon as you're done, I will –

13          MR. GASNER: I may have been fresh off the field of

14  battle and somewhat charged up, and I apologize to your

15  Honor if the Court took it the wrong way.

16          THE COURT: Well it sounds like maybe I took it the

17  way you intended, but I did want to hear further what you

18  meant.

19          Is Mr. Liew – let me as a question of the marshals

20  -- ready to be released immediately upon court today?

21          THE MARSHAL: Yes, your Honor.

22          THE COURT: Thank you very much for making that

23  happen.  And he's to report to pretrial services immediately

24  upon release?

25          MR. LIEW: Yes, your Honor.

26

1          THE COURT: Very good.

2          MS. AGNOLUCCI: Mr. Liew, do I need to add a

3 custodian here?

4          MR. LIEW: Not yet.

5          MS. AGNOLUCCI: Okay.

6          MR. LIEW: (Indiscernible) evaluating –

7          MS. AGNOLUCCI: All right.

8          THE COURT: All right.  You got it all completed

9 there?

10          MS. AGNOLUCCI: I think so.  I'm just verifying --

11 just to clarify this part here, it says,

12               "Defendant shall comply with the

13               following curfew.  Lock down for court

14               attorney appearance and necessary

15               medical."

16 Is there a time by which he needs to leave our offices in

17 the evenings –

18          UNIDENTIFIED SPEAKER: Your Honor, originally I had

19 spoken with defense counsel and she had mentioned that he

20 might need to be there later in the evening, but that was

21 before all of the parties agreed to GPS.  As he's on GPS --

22 obviously, we don't necessarily want him out all night, but

23 at least we'll know that he's at the law firm and when he's

24 on route.  So we'll still need to know the time, but we

25 don't have any reason to require a certain time unless the

27

1 parties feel different.

2           MR. HEMANN: This isn't a case where we're worried

3 about late night activities.

4           THE COURT: All right.  Then there will be no time

5 specified.  It will be as written.  So there's no time

6 limitations.

7           MS. AGNOLUCCI: Okay.

8           THE COURT: It's the permission to leave home for

9 the specified purposes.

10          MS. AGNOLUCCI: This is fine. Thank you, your

11 Honor.

12          MR. GASNER: Thank you, your Honor.

13          THE COURT: All right.  If you could show it to

14 Government counsel so that they can –

15          MS. AGNOLUCCI: Yes.

16          THE COURT:  -- review it as well.

17          MR. HEMANN: Your Honor, the representation from

18 the defense -- the Defendants that he has not -- we have the

19 -- we understand we possess currently -- the FBI possesses

20 his current passports -- current passport, and that he has

21 not obtained another passport, or any travel documents,

22 subsequent to the seizure of his.  I think that we are --

23 we're fine with this.

24          THE COURT: I'm adding the box for no contact of

25 co-defendant outside of the presence of counsel, except for

28

1    his wife.

2            MR. HEMANN: Thank you, your Honor.

3            THE COURT: And what time do you start tomorrow,

4    8:00 a.m.?

5            MR. HEMANN: We're not -- we're dark on Fridays.

6            THE COURT: You're off -- dark.  So what time is

7    your next court appearance?

8            MR. HEMANN: Beginning at 9:30 on Monday morning.

9            THE COURT: I've added that to the release order as

10   well.

11           All right.  Mr. Liew, we've had a lot of

12   discussion and I'm going to summarize with you the

13   conditions of release.

14           THE DEFENDANT: Okay.

15           THE COURT: If you have any questions about them,

16   now is an appropriate time to ask so there's no confusion

17   about what's expected.  All right?

18           THE DEFENDANT: Okay, your Honor.

19           THE COURT: It's been proposed that you be released

20   on a $2,000,000 unsecured bond, and the consequence of a

21   failure to follow any one of these conditions are serious.

22   You could be returned to custody and remain in custody for

23   the remainder of this case.  You could have additional

24   charges filed against you by the Department of Justice that

25   could result in a longer term upon condition for those new

29

1  charges.  Those charges might include obstruction of

2  justice.  You could also add a judgment against you in the

3  amount of $2,000,000 that the Government could seek to

4  collect from you, and any assets that you own.

5          The conditions of release are that you appear at

6  all future court proceedings, as ordered by the Court, and

7  that if you are sentenced upon conviction, that you

8  (indiscernible) your sentence.  The next court date is

9  January 27th at 9:30 a.m.

10          Upon release, you may not commit any federal,

11  state or local crime.  You may not harass, threaten,

12  intimidate, injure, tamper with or retaliate against any

13  witness, victim, informant, juror or judge.  And you may not

14  obstruct any criminal investigation.

15          You're going to be under home confinement, which

16  means you can leave only for coming to court, for meeting

17  with your attorney and for necessary medical appointments.

18  Even when you are leaving your home, the -- your travel is

19  restricted to the counties of Alameda, Contra Costa and San

20  Francisco counties.  Those are all in the Northern District

21  of California Federal Court.

22          When you are released, which will be this

23  afternoon, you're going to report to pretrial services in

24  San Francisco.  Mr. Allen Liew will coordinate that with

25  you, as to -- for purposes of arranging your supervision and

30

1  getting your GPS electronic monitoring established, and you

2  will be subject to electronic GPS monitoring while on

3  release.  And with all of the requirements of pretrial

4  services to make that GPS unit effective and operational.

5          You are to surrender any passports and visas to

6  pretrial services by today, and not apply for any passports

7  or other travel documents.

8          And what is Counsels' proffer as to whether Mr.

9  Liew possesses a current passport or visa to travel outside

10  of the United States?

11          MS. AGNOLUCCI: My understanding is that he does

12  not possess any travel documents of any kind.

13          THE COURT: All right.  Mr. Liew, I'm going to ask

14  you to declare, under penalty of perjury, that you do not

15  possess a passport or visa to travel outside of the United

16  States; is that true?

17          THE DEFENDANT: It is true, your Honor.

18          THE COURT: You may not apply for a passport or

19  other application to travel outside of the United States; do

20  you understand that?

21          THE DEFENDANT: Yes, I do.

22          THE COURT: You may have no contact with any of

23  your co-defendants outside of the presence of your attorney,

24  except your wife.  You may have contact with your wife, but

25  you may not discuss the case with her without your counsel

31

1  present; is that the agreement of counsel?

2          MS. AGNOLUCCI: Yes, your Honor.

3          THE COURT: There's not a curfew, but as I

4  mentioned, you're only allowed to leave home for certain

5  specified events.  Those are the conditions of release.

6          Mr. Liew, do you understand the conditions of

7  release?

8          THE DEFENDANT: Yes, I do, your Honor.

9          THE COURT: And do you agree to follow them?

10         THE DEFENDANT: (No response).

11         THE COURT: Do you agree to follow those

12  conditions?

13         THE DEFENDANT: Yes, I do.

14         THE COURT: All right.  I'm going to pass this

15  document back to you for your signature, and I will sign the

16  order of release.  We'll set a further hearing to perhaps

17  modify this condition, February 6th at 2:00 p.m.

18         MR. LIEW: Your Honor, at this point, I want to

19  make sure that all parties are fine that the Federal Bureau

20  of Investigation hangs onto the passport.  So that passport

21  will not come to us, the one the Government has.

22         THE COURT: Any objection to that?

23         MR. HEMANN: Fine with us, your Honor.

24         THE COURT: Any objection to the FBI retaining the

25  passport?

32

1          MR. GASNER: None, your Honor.

2          THE COURT: That's going to be on the record that

3 they retain possession of that so there will be no confusion

4 later.

5          MR. HEMANN: Thank you, your Honor.

6          THE COURT: I'm actually noting that on here.

7          All right.  I've witnessed Mr. Liew signing the

8 bond.  He's signed both as Defendant and surety.

9          Anything further today?

10          MR. HEMANN: No, your Honor.  Thank you.

11          MS. AGNOLUCCI: No.  Thank you, your Honor.

12          THE COURT: Thank you very much and we'll look

13 forward to seeing you on February 6th.

14      (Proceedings adjourned at 2:54 p.m.)

15

16

17

18

19

20

21

22

23

24

25

33

<u>CERTIFICATE OF TRANSCRIBER</u>

1

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16        Echo Reporting, Inc., Transcriber

17        Monday, February 3, 2014

18

19

20

21

22

23

24

25