Volume 15

Pages 2971 - 3189

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
   VS.                              )        NO. CR 11-00573 JSW
                                    )
WALTER LIEW; ROBERT MAEGERLE;       )
and USA PERFORMANCE TECHNOLOGY,     )
INC.,                               )
                                    )
            Defendants.             )
_____)
                          San Francisco, California
                          Wednesday, February 5, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

                    MELINDA HAAG
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:  **PETE AXELROD**
                 **JOHN H. HEMANN**
                 **ASSISTANT UNITED STATES ATTORNEYS**

                    U.S. DEPARTMENT OF JUSTICE
                    600 E Street NW
                    Washington, D.C.  20044
            BY:  **RICHARD S. SCOTT**
                 **ASSISTANT U.S. ATTORNEY**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant Walter Liew and USA Performance Technology, Inc.:
                        KEKER & VAN NEST LLP
                        633 Battery Street
                        San Francisco, California  94111
                BY:   **STUART L. GASNER**
                      **SIMONA A. AGNOLUCCI**
                      **KATHERINE M. LOVETT**
                      **CHRISTINA BLAIS**
                      **ATTORNEYS AT LAW**

For Defendant Robert J. Maegerle:
                        MCKENNEY & FROELICH
                        1349 West Peachtree Street
                        Two Midtown Plaza - Suite 1250
                        Atlanta, Georgia  30309
                BY:   **JEROME J. FROELICH, JR.**
                      **ATTORNEY AT LAW**

1        **I N D E X**

2    Wednesday, February 5, 2014

3    <u>**GOVERNMENT'S WITNESSES**</u>                         <u>**PAGE**</u>   **VOL.**

4    <u>**ROMETO, CECILY (RECALLED)**</u>
     (PREVIOUSLY SWORN)                                  3004    15
5    Direct Examination resumed by Mr. Scott            3004    15
     Cross-Examination by Ms. Agnolucci                 3046    15
6    Redirect Examination by Mr. Scott                  3067    15
     Recross-Examination by Ms. Agnolucci               3083    15

7
     <u>**JIANG, MEIQIN**</u>
8    (SWORN)                                             3088    15
     Direct Examination by Mr. Axelrod                  3089    15
9    Cross-Examination by Mr. Gasner                    3156    15

10                       **E X H I B I T S**

11   <u>**TRIAL EXHIBITS**</u>                        <u>**IDEN**</u>   <u>**EVID**</u>   **VOL.**

12     266                                                3072    15

13     266T                                               3072    15

14     311                                                3034    15

15     314                                                3036    15

16     318                                                3039    15

17     320                                                3038    15

18     321                                                3040    15

19     323                                                3039    15

20     324                                                3037    15

21     325                                                3033    15

22     325T                                               3033    15

23     329                                                3041    15

24     330                                                3041    15

25

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 332 | | 3041 | 15 |
| 435 | | 3024 | 15 |
| 436 | | 3026 | 15 |
| 439 | | 3030 | 15 |
| 439T | | 3030 | 15 |
| 447 | | 3042 | 15 |
| 471 | | 3072 | 15 |
| 471T | | 3072 | 15 |
| 517 | | 3100 | 15 |
| 518 | | 3100 | 15 |
| 519 | | 3100 | 15 |
| 543 | | 3100 | 15 |
| 544 | | 3100 | 15 |
| 545 | | 3101 | 15 |
| 546 | | 3101 | 15 |
| 547 | | 3101 | 15 |
| 548 | | 3101 | 15 |
| 549 | | 3101 | 15 |
| 550 | | 3101 | 15 |
| 551 | | 3101 | 15 |
| 552 | | 3101 | 15 |

2975

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 553 | | 3101 | 15 |
| 574 | | 3102 | 15 |
| 576 | | 3102 | 15 |
| 577 | | 3102 | 15 |
| 579 | | 3102 | 15 |
| 580 | | 3102 | 15 |
| 581 | | 3102 | 15 |
| 582 | | 3102 | 15 |
| 590 | | 3101 | 15 |
| 623 | | 3101 | 15 |
| 624 | | 3101 | 15 |
| 625 | | 3101 | 15 |
| 626 | | 3101 | 15 |
| 627 | | 3101 | 15 |
| 628 | | 3101 | 15 |
| 631 | | 3032 | 15 |
| 632 | | 3103 | 15 |
| 644 | | 3136 | 15 |
| 645 | | 3136 | 15 |
| 646 | | 3136 | 15 |
| 647 | | 3136 | 15 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 648 | | 3136 | 15 |
| 649 | | 3136 | 15 |
| 650 | | 3136 | 15 |
| 651 | | 3136 | 15 |
| 652 | | 3136 | 15 |
| 653 | | 3136 | 15 |
| 654 | | 3136 | 15 |
| 825 | | 3043 | 15 |
| 867 | | 3104 | 15 |
| 868 | | 3104 | 15 |
| 906 | | 3011 | 15 |
| 907 | | 3016 | 15 |
| 908 | | 3021 | 15 |
| 919 | | 3105 | 15 |
| 920 | | 3137 | 15 |
| 921 | | 3140 | 15 |
| 922 | | 3147 | 15 |
| 923 | | 3153 | 15 |
| 932 | | 3014 | 15 |
| 933 | | 3019 | 15 |
| 936 | | 3006 | 15 |

1          **I N D E X**

2        **E X H I B I T S**

3   <u>**TRIAL EXHIBITS**</u>                           <u>**IDEN**</u>   <u>**EVID**</u>   <u>**VOL.**</u>

4     937                                              3009   15

5     940                                              3020   15

6     942                                              3015   15

7     1767                                             3049   15

8     1974                                             3051   15

9     2885                                             3061   15

10    2886                                             3062   15

11    2895                                             3055   15

12    2897                                             3052   15

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1    <u>Wednesday - February 5, 2014</u>                      <u>7:45 a.m.</u>

2                        P R O C E E D I N G S

3                           ---oOo---

4          (Proceedings were heard out of the presence of the jury:)

5              THE COURT:  Good morning.  Please call the case.

6              THE CLERK:  Calling Case Number CR-11-573,

7    United States versus Walter Liew, United States versus Robert

8    Maegerle, and United States versus USAPTI.

9          Counsel, please state your appearances.

10             MR. HEMANN:  Good morning, Your Honor.  John Hemann,

11   Pete Axelrod, and Richard Scott for the United States.

12             THE COURT:  Good morning.

13             MR. AXELROD:  Good morning, Your Honor.

14             MS. AGNOLUCCI:  Good morning, Your Honor.  Simona

15   Agnolucci and Stuart Gasner for USAPTI and Walter Liew.

16             THE COURT:  Good morning.

17             MS. AGNOLUCCI:  And Mr. Liew is here with us.

18             THE COURT:  Good morning, everybody.

19             MR. FROELICH:  Good morning, Your Honor.  Jerry

20   Froelich for Mr. Maegerle, and Mr. Maegerle is present in

21   court.

22             THE COURT:  Good morning.

23          All right.  So the first order of business -- and I

24   apologize for the delay, but I was reading all this stuff.

25          What is the Government's response to the offer of proof

1    with respect to the Sherwin-Williams contract?

2         **MR. HEMANN:**  Your Honor, we don't believe that the

3    Sherwin-Williams contract should be admitted into evidence.  I

4    didn't have a chance until this morning myself to look at the

5    brief that Ms. Lovett filed last night on the issue.  I thought

6    about it a little bit.

7         I think that the main issue with the Sherwin-Williams

8    contract is that it concerns a period of time well before the

9    trade secrets that are alleged in the Complaint, and it also

10   doesn't go to the core issues in the statute.  The statute asks

11   whether -- or imposes an element of whether the technology is

12   public.

13        What the contract appears to say -- and I think that

14   there's some dispute on the actual legal effect of the

15   contract -- what the contract appears to say is that

16   Sherwin-Williams may make the information public if it wishes.

17   They could have an open house at Ashtabula and have people come

18   in and look around.

19        **THE COURT:**  Remind the Court, when was Mr. Maegerle

20   at -- when did he leave DuPont?

21        **MR. HEMANN:**  He left DuPont in 1991.

22        **THE COURT:**  All right.

23        **MR. HEMANN:**  And I believe that there is some

24   evidence --

25        **THE COURT:**  So he was there at the time this contract

 1    was entered into?

 2         **MR. HEMANN:**  He was employed by DuPont at the time the

 3    contract was entered into, and he did work at some point in

 4    time at the Ashtabula factory.

 5         **THE COURT:**  I'll hear from you Mr. Froelich.  I

 6    know -- I'm going to give you a full opportunity.

 7         **MR. HEMANN:**  So it doesn't really reach the core issue

 8    of whether, in fact, the technology was public or not.  And I

 9    would proffer to the Court that were a witness from the

10    companies that purchased Ashtabula subsequent to

11    Sherwin-Williams were to testify, that testimony would be

12    categorical that the -- that the technology is not public and

13    has never been made public.

14         **THE COURT:**  All right.  Let me kind of back off.  No,

15    finish your argument.

16         **MR. HEMANN:**  So just a couple more things.

17         I think more importantly, though, I think what the Defense

18    argument is, fairly, is that this supports the objective

19    reasonableness of their belief that the technology was public.

20         The problem is that there's no evidence that either of

21    these defendants read the contract ever or --

22         **THE COURT:**  But if it's an objective standard, is that

23    necessary?

24         **MR. HEMANN:**  No, I don't think it is, but that gets

25    into the second issue, which is the contract does not say in

1  anything approaching plain English that the -- that the

2  technology is public, made public by this contract.

3           THE COURT:  Let me tell you what my thought is --

4           MR. HEMANN:  Sure.

5           THE COURT:  -- before you -- obviously, I've been

6  giving this a lot of thought since it was filed last night, and

7  those of us who have no life other than trials read this stuff

8  at night and, you know, fall asleep reading it; but I have been

9  thinking about it seriously for quite a bit of time.

10      And, you know, the standard under 401 is pretty liberal.

11  If it has any tendency to prove any relevant fact, you know,

12  then it comes in.

13      And it strikes the Court that, number one, to the extent

14  that Mr. Maegerle was at DuPont when this contract was entered

15  into and he was an engineer working on this technology, you

16  know, a reasonable trier of fact could find that this

17  information would be available to him.  The Government could

18  certainly argue to the contrary.

19      And the other thing that it would tend to show, in the

20  absence of any other evidence, just on its face, is that at a

21  time in roughly 1982 -- I don't know when the first sale,

22  commercial sale, of pigment was made -- but let's assume it was

23  close in time to '67.  So by 1982, you know, Sherwin-Williams

24  had the right to treat this information as no longer

25  confidential, which would then be relevant to an issue as to

**PROCEEDINGS**

1   the definition of trade secret.

2       It strikes me that the arguments that the Government is

3   making about Sherwin-Williams is the stuff that rebuttals are

4   made out of.  You could certainly -- I mean, the Defense is

5   taking a big risk, I assume they've done their due diligence,

6   but the Government would be free to come back and say whatever

7   competent evidence it could say about this contract and whether

8   it impacts, you know, the ultimate issue.

9       And that could basically -- you know, again, I'm not

10  telling the defense how to try their case, but it could

11  backfire.  But, on the other hand, it's a very central part of

12  the defense in this case.

13      And I'm concerned that -- I believe that the defendant and

14  the Government should have a right to try their case.  And I

15  don't think that this would be a 403 issue because, you know, I

16  would not allow, you know, a week's worth of testimony on

17  Sherwin-Williams because then we would have a minitrial on the

18  legal effect or the practical effect of the Sherwin-Williams

19  contract.  But it is out there, and it does tend to put a

20  different spin on things than what, for example, Dr. Diemer was

21  saying.

22      So my view is this contract -- and I'm not -- and, by the

23  way, I don't believe with respect to this issue, this document,

24  that authenticity or hearsay issues would preclude putting the

25  document in.

1          So my strong inclination is to let it in and then give the

2   Government a chance to argue whatever it wants to argue or put

3   in evidence as to whatever relevant fact it believes meets this

4   testimony or this evidence, because that's the stuff that

5   rebuttal cases are made of.

6          So that's my view.

7               MR. HEMANN:  And we'll submit, Your Honor --

8               THE COURT:  All right.  So you don't need to argue,

9   unless you want to --

10              MR. GASNER:  Thank you, Your Honor.

11              THE COURT:  -- say you're really right and here's why.

12              MR. GASNER:  No.  This has been an issue for a long

13  time.  It was obviously a focus of the 17(c) subpoena.  And,

14  so, we'll see what the Government wants to put on, if anything,

15  in rebuttal, but we would object to that because it's been an

16  issue for a long time.  It was in my opening.  It's --

17              THE COURT:  Well, but it wasn't -- it wouldn't have

18  been crystallized.  I mean, if you had tried to put this in

19  through Dr. Diemer or the other expert -- I forget his name at

20  this point --

21              MR. AXELROD:  Mr. Dayton.

22              THE COURT:  Pardon me?

23              MR. AXELROD:  Mr. Dayton.

24              THE COURT:  Yeah.

25          -- that would have certainly been -- then it would have

 1   been clearly raised, and I would say the Government would have

 2   been required at that point.

 3        But I think in fairness to the Government, they would have

 4   no way of knowing.  They probably -- they may have reasonably

 5   believed this wasn't coming in.  So I'm not going -- I have a

 6   lot of issues to bite off, but your purported -- your future

 7   objections are not something that I'm going to deal with now.

 8        **MR. GASNER:**  Just while it's fresh in my mind, I did

 9   try with both Gibney and Dayton, and the objections were

10   sustained because the Government assiduously avoided giving the

11   Sherwin-Williams document.  Their plan all along has been to

12   just pretend it doesn't exist, sweep it under the rug.

13        So we will object to that.

14        **THE COURT:**  Okay.  That's fair.  And, again, I'm

15   not -- I'm not ruling anything in or out at this point other

16   than that document.

17        Now, I want to talk about the partnership agreement that

18   was the subject of the second submission.  And let me tell you,

19   Ms. Agnolucci, what my concerns are about this.

20        Putting aside some of the other issues, first of all, this

21   was entered into in 2004.

22        **MS. AGNOLUCCI:**  Correct.

23        **THE COURT:**  The tax year, the bankruptcy, et cetera,

24   was after this.  So who or what is going to connect this up to

25   the issues in this case?

**PROCEEDINGS**

1          **MS. AGNOLUCCI:**  Well, there's no -- I mean, the -- we

2     think that there's an automatic connection with the issues in

3     this case because it shows a partnership that continued over

4     time that started in 2004.

5          **THE COURT:**  What's the evidence of it continuing past

6     August of 2004?

7          **MS. AGNOLUCCI:**  The evidence is the money transfers

8     that continued to occur throughout the -- throughout the course

9     of the case that are consistent with this agreement, and that's

10    really going to be the subject of Mr. Klein's testimony.

11         **THE COURT:**  All right.  So that's the first point.

12    I'll get to the Government on that in a second.

13         Now it says party A shall be responsible for the project's

14    market promotion, and then it keeps talking about the project.

15    In the draft that I have, there's no definition of "project."

16    So how do we know what the project is?  And that -- we're

17    talking about something that occurred in a foreign country.

18         **MS. AGNOLUCCI:**  Well, Your Honor, I think that the

19    interpretation of this agreement is something that the jury

20    should decide.  It's -- you know, to us it seems apparent that

21    this is a reference to the TiO2 project because it is the

22    project Mr. Liew was working on during the time at issue, but

23    that certainly is something that the Government can probe

24    during cross-examination and that the jury should be entitled

25    to decide.

**PROCEEDINGS**

1          **THE COURT:**  All right.  Now, the third issue is the

2    hearsay issue, and you're asking that this be admitted under

3    residual exception.  You were the one that argued -- not you

4    personally, but your side argued, and I read your brief on the

5    other issue, when the Government wanted to get something in,

6    you said this is something that is rarely used, should be used

7    with great caution and, et cetera, et cetera.

8          **MS. AGNOLUCCI:**  Yes.  And let me address that,

9    Your Honor.

10         First of all, there are three ways to get this in.  One is

11   that it's a legally operative fact because it's a contract.

12         The second is that it goes to Mr. Liew's state of mind and

13   to his intent.

14         **THE COURT:**  Well, let me -- I don't mean to interrupt

15   you, but I do want to deal with that because this comes up a

16   lot.

17         And, again, Mr. Liew has a right to testify or not

18   testify.  If he were to testify, of course, anything that he

19   reasonably relied upon or anything that he felt prudent -- if

20   he said, "Hey, this money was not mine and, you know, it

21   belonged to -- it was not reportable income, and here's this

22   contract and I signed it," that's a different story.

23         But when you try to bring up this defense in the absence

24   of any testimony to support it, whether it's the defendant's or

25   not, then I think you get into issues of -- we're sort of

 1  bordering on -- we're talking about now more relevance than

 2  anything else.

 3       To say it's a legally operative document, then assumes the

 4  next problem, which is the authenticity.  And what I see here

 5  is some attorney certifying that this -- the person -- somebody

 6  came into an office and verified that this is their signature.

 7       It wasn't in the U.S. Embassy, which could have been done,

 8  which is the way it's generally done.  You have a hearsay

 9  statement to prove authenticity, and it strikes the Court that

10  that is something that is not normally the way these contracts

11  are authenticated.

12       The way they're authenticated is the way this was done

13  with respect to, for example, the FBI agent who's testifying

14  about the Singaporean corporate documents.

15       So what's your response on that issue?

16       MS. AGNOLUCCI:  Well, and I want to address the

17  residual hearsay issue --

18       THE COURT:  Okay.

19       MS. AGNOLUCCI:  -- and the authenticity issue.

20       Your Honor, if we had the choice as to how this had been

21  done, this is not what we would have chosen.  We were referred

22  to this attorney, and that's the -- that is the only person who

23  was willing to communicate with us, and this is how she did it,

24  presumably because this is how they believe that it's done in

25  China.

1    The Government has her contact information and her

2  license, and is free to speak with her themselves and confirm

3  what she told us.

4    Now, on the issue of the residual hearsay exception, we

5  may have argued against it under other circumstances, but this

6  is a very unique circumstance that really is what the residual

7  hearsay exception is for, which is when there's a very material

8  fact and this is the only proof of that fact and it would be an

9  injustice not to allow the evidence.

10    Mr. Liew has made his best efforts to obtain a copy of

11  this agreement.  We have done everything within our power for

12  almost two years now to obtain this evidence, and this is what

13  we have.

14    **THE COURT:**  May I suggest to you that -- you know,

15  again, I'm not criticizing you because there are always

16  restraints to what one can do.  But, you know, I allowed the

17  Government to do a Rule 15 subpoena deposition.  You could have

18  done a deposition.  We could have done video testimony.  You

19  could do a certification in the United States Embassy.  They

20  have facilities for doing that.  That's the way it's typically

21  done.

22    So there are all -- so to say, you know, this is really

23  crucial to our defense, yes, that's -- you know, that's

24  certainly an argument, but then we have rules of evidence.  We

25  have -- you know, that have been -- that the Court has to

**PROCEEDINGS**

 1    follow for both sides.

 2        Yes, you might say there's a fact out there that proves,

 3    you know, categorically that either the defendants are guilty

 4    or that they're not guilty; but if it's not admissible, it begs

 5    the question to say, "But this is really important to my case."

 6        That's a factor, but it's not -- it's not dispositive, and

 7    the Court has to -- again, I'm not indicating at this point how

 8    I'm going to rule on this.

 9        **MS. AGNOLUCCI:**  Yeah.

10        **THE COURT:**  It may be -- and I want to hear from the

11    Government -- to the extent that this is going to be relied

12    upon by Dr. Klein -- it's Dr. Klein; right?

13        **MS. AGNOLUCCI:**  Professor Klein.

14        **THE COURT:**  Professor Klein, excuse me.

15        -- it may be a different kettle of fish.  But to get this

16    document in the way it is, I will say, without -- but my

17    inclination is not to allow it in.

18        **MS. AGNOLUCCI:**  And may I just address what Your Honor

19    just said about depositions?  We did attempt to get both video

20    testimony and a Rule 15 deposition, and those requests were

21    declined.  So although we could file a motion for a Rule 15

22    deposition with the Court and the Court could grant it, we've

23    looked into this; and when the -- first of all, there would be

24    no way to enforce it; second of all, when we can't make a

25    representation that the witness is available, it's -- you know,

**PROCEEDINGS**

 1    it's a high standard; and, third of all, even if Your Honor

 2    granted a Rule 15 deposition, the witness has declined to

 3    participate in any of this.

 4         So this is really the only way that we were able to get

 5    this information.

 6              THE COURT:  All right.

 7              MS. AGNOLUCCI:  And I think that the hurdle of

 8    Rule 901, in terms of authenticity, is not as high as the

 9    Government would like it to be.  It's really -- you know, it

10    can be met with circumstantial evidence, and I think any

11    question about this document would certainly be elicited in

12    cross-examination, and it would be for the jury to decide what

13    weight to give the document.

14              THE COURT:  Cross-examination of whom?

15              MS. AGNOLUCCI:  They could certainly cross-examine

16    Mr. Klein, for example, and say, "Well, did you -- what other

17    evidence is there?  Is this the only evidence?"  And, you know,

18    I'm not going to write their cross-examination for them, but

19    I'm sure that they would do it skillfully.

20              THE COURT:  All right.  Let me hear from you,

21    Mr. Hemann.

22              MR. HEMANN:  So I dare say, Your Honor, that admitting

23    this document would violate probably every rule of evidence

24    other than privilege rules; and, so, it's a little hard to know

25    where to start.  But if you look at the --

**PROCEEDINGS**

1          **THE COURT:**  Give me your top three.

2          **MR. HEMANN:**  I'll give you my top -- I can go down the

3     contract itself.

4          First of all, Party A is the investment partners

5     represented by Qiao Ning -- or Ning Qiao in the document.  It

6     doesn't identify who those people are, and there's a grand

7     total of one payment over the 28 that we can trace into China

8     that went to Qiao Ning.  It wasn't until 2010, and it went

9     through a Singapore entity rather than directly to Qiao Ning.

10         Number two, I agree with the Court's observation regarding

11    the project.  The first sentence of the contract itself says,

12    "Party A shall be fully responsible for the project's market

13    promotion."

14         At the time that this was signed, there were multiple

15    projects that Mr. Liew was involved in in China, including this

16    ACR project that the Court heard testimony from Michael Marinak

17    about.  Mr. Marinak testified that Mr. Liew had a list of

18    projects that he was working on.  Mr. Zisko testified about

19    other projects that Mr. Liew was working on in China.

20         This contract does not have -- mention titanium dioxide or

21    the Pangang Group or Panzhihua or Jinzhou anywhere in the

22    contract.  Indeed, it is dated two months before Mr. Liew's

23    letter to Hong Jibi seeking the Jinzhou contract in the first

24    instance.

25         So there's no -- in fact, the evidence would suggest,

1  quite to the contrary, that this has to do with a different
2  project, given Mr. Marinak's testimony and the documentary
3  evidence with regard to the ACR project that was going on at
4  the time.
5      Second of all, there is a -- there's a break -- third of
6  all, there's a breakdown in the contract with regard to the
7  way -- the responsibilities that the parties would undertake.
8  There is not a single piece of evidence in the record or, as
9  far as the Government knows, anywhere that the partners
10 represented by Qiao Ning undertook any of the responsibilities
11 that he was supposed to, which involve the middle stage within
12 Party A's purview.
13     The middle stage of what is a good question, but the
14 middle stage would seem to suggest the actual work on the
15 contract.  The evidence has been uniform and undisputed that to
16 the extent that work was done, it was done by Walter Liew in
17 the United States.
18     There's a breakdown 60/40 in terms of the contract
19 amounts.  The evidence before the Court is that it's about over
20 80 percent of the money earned by Mr. Liew, taken in by
21 Mr. Liew, went to China.  There's not a 60/40 breakdown;
22 there's about an 83/17 breakdown.
23     And according to Professor Lewis' -- I'm sorry --
24 Professor Klein's testimony, a breakdown of profits within a
25 partnership would be post expenses.  And all that happened in

1  this case is Mr. Liew took the expenses in the United States,

2  and all the profits went overseas, to whom we do not know.

3      So those are the relevance problems with this, because

4  this does not, on its face, show any connection to the actual

5  project that was contemplated or occurred.

6      **THE COURT:** Let me ask, has the Government done any

7  investigation -- you've known about this document for a

8  while -- as to the authenticity of this document?

9      **MR. HEMANN:** So just on the topic of when we knew

10 about it, we did not receive this until after the trial had

11 started. It was from -- or very close to -- certainly after

12 trial -- after the documents in the trial -- or I can find the

13 dates. Apparently, Mr. Weinberg, Christina Liew's lawyer,

14 obtained it. It was faxed to us at some point, and I want to

15 say maybe in December or January, from Mr. Weinberg -- or from

16 defense counsel through Mr. Weinberg.

17     We are under the same constraints that the Defense is

18 under in terms of going into China and dealing with a witness,

19 particularly a represented witness. We have no ability to do

20 that. We've done a great deal of investigation into whether or

21 not there is an actual agreement of any kind with Qiao Ning.

22     And I point out to Your Honor that we have pored over the

23 evidence that was discovered in the office and in the Liew

24 residence. There is not a single piece of paper that suggests

25 that there is any joint venture contract, that there is any

 1   partnership agreement.

 2       **THE COURT:**  Were there any emails found in the myriad

 3   of materials that were obtained from the defendants' various

 4   places?

 5       **MR. HEMANN:**  No.  This is the only -- and this goes to

 6   Ms. Agnolucci's argument, I presume, under the residual

 7   exception.  The only piece of evidence in this case that there

 8   is any kind of agreement between Mr. Liew and some joint

 9   venture partner in China is this piece of paper.

10       **THE COURT:**  All right.

11       **MS. AGNOLUCCI:**  May I briefly respond, Your Honor?

12       **THE COURT:**  Yes.  I get your argument.  Let me hear

13   final --

14       **MS. AGNOLUCCI:**  First of all --

15       **THE COURT:**  Because I don't have to resolve this at

16   this moment, because this will become more relevant -- not more

17   relevant -- this will become -- this will be crystallized, I

18   assume, sometime tomorrow when the Defense begins.

19       **MR. HEMANN:**  I agree with that, Your Honor.  I might

20   make the point that we do renew our *Daubert* motion as to

21   Professor Klein and Mr. Cox to the extent that either of them

22   are going to testify about the possibility of some ambiguous

23   agreement overseas.

24       **THE COURT:**  All right.  We'll get to that.  We'll get

25   to that.

1          **MR. HEMANN:**  Okay.

2          **THE COURT:**  That's a remedy, and that's a scope-of-

3    ruling issue, not an issue on the merits.

4       I'll give you the last word.

5          **MS. AGNOLUCCI:**  First of all, Your Honor, we did

6    produce this document in November.  There are three versions

7    of -- there are two versions of it.  The version we got from

8    Mr. Weinberg we gave to the Government in November.

9          **THE COURT:**  All right.

10         **MS. AGNOLUCCI:**  We then, immediately after receiving

11   it, started taking steps to authenticate it through deposition,

12   et cetera.  And then we produced it again with the declaration

13   that sort of authenticates it in January.  But the Government

14   has had it since November.

15      The second point is that there is ample circumstantial

16   evidence of this partnership with Qiao Ning.  First of all,

17   Your Honor heard Peter Zisko testify that in 2006 he and Walter

18   Liew had a falling out because Walter Liew told him that he had

19   to transfer a certain share of the profits from one of their --

20   I believe it related to a micronizer to Qiao Ning.

21      Second of all, the individual who owns at least two, if

22   not three or four, of the companies is Qiao Ning's wife,

23   Li Rue.  So there is a connection there that would support

24   this.

25         **THE COURT:**  All right.

PROCEEDINGS

1          MS. AGNOLUCCI:  And the last point I would make,

2     Your Honor, is that if Your Honor is not persuaded that this

3     document should be admissible, at the very least, under

4     Rule 703, Mr. Klein is entitled to rely on it.

5          THE COURT:  Okay.  Well, a couple of things.  You want

6     to --

7          MR. HEMANN:  One very brief point, Your Honor.  Qiao

8     Ning is Christina Liew's brother-in-law, and the Defense

9     purports --

10         MR. GASNER:  Brother.

11         MR. HEMANN:  Brother.  And the Defense purports that

12    he is Mr. Liew's joint venture partner.  He is a -- he could

13    not be more affiliated with the Defense, and they've been

14    unable to procure his testimony.

15        We have attempted to, just like they have, get Rule 15

16    depositions in Singapore that would have been very

17    illuminating.  We were unable.  We ran into the same problem.

18         THE COURT:  All right.  All right.

19         MS. AGNOLUCCI:  And I think Your Honor can understand

20    why he wouldn't want to associate himself with a criminal

21    matter and, you know, retained counsel and said, "Talk to my

22    lawyer."

23         THE COURT:  Okay.  My tentative view is that this

24    document is not admissible.  It's not authentic.  I've reviewed

25    carefully Rule 901 and Weinstein's treatise on 901, which I'm

**PROCEEDINGS**

 1   very familiar with.  And there are ways, there are

 2   illustrations that Congress and the committee has given to

 3   authenticating foreign documents.  This doesn't come close to

 4   any of those, not even close.

 5       I also believe that, given the nature of the charges in

 6   this case and the issue about foreign transfers, that the

 7   reliability of this document, without any testimony, is

 8   extremely suspect.  It's extremely prejudicial to the

 9   Government to not be able to cross-examine in any way any of

10   the makers of this contract.

11       So I think it's both -- it's both unreliable; the Defense

12   hasn't shown its authenticity; and to go to your last point,

13   Ms. Agnolucci, with respect to Rule 70-  -- it's actually 703,

14   which, as it relates to evidence that might otherwise be

15   inadmissible, which the Court is inclined to rule is

16   inadmissible, it says, Rule 703 says, quote:  (reading)

17           "The facts or data in the particular case upon which

18       an expert bases an opinion or inference may be those

19       perceived by or made known to the expert at or before the

20       hearing."

21       And here's the key language continuing the quote:

22   (reading)

23           "If of a type reasonably relied upon by the

24       experts -- by expert in the particular field in forming

25       opinions or inferences upon the subject, the facts or data

1      need not be admissible in evidence in order for the

2      opinion or inference to be admitted."

3      And then it goes on to say:  (reading)

4          "Facts or data that are otherwise inadmissible shall

5      not be disclosed to the jury by the proponent of the

6      opinion or inference unless the Court determines that

7      their probative value in assessing -- in assisting the

8      jury to evaluate the expert's opinion substantially

9      outweighs their prejudicial effect," unquote.

10     So what I'm focused on is of a type reasonably relied upon

11   by experts in the particular field; and a nonauthentic document

12   like this, I would believe, as a matter of law, is not

13   something that any competent expert would reasonably rely upon.

14   They could rely upon partnership agreements, but not ones that

15   are not authentic and ones that were issued under these

16   circumstances.

17     So I'm not inclined to let Professor Klein rely on this

18   because I think it then bootstraps an otherwise unreliable

19   document.

20     And I think, frankly, that, you know, there might have

21   been -- and I don't know what they are, and it doesn't really

22   matter that there are other ways from which -- by which the

23   Defense could have given some indicia of reliability, some

24   indicia of authenticity.  But if it's unavailable, the Court

25   deals with the facts as it finds them.

**PROCEEDINGS**

1          And the fact that a particular -- there are rules that

2     deal with admissibility of evidence where a witness or evidence

3     is unavailable, but this is not one of them.  This is not one

4     of those circumstances.

5          So I don't think this document comes in at all.  It

6     doesn't come in through Klein.  And unless some other evidence

7     is forthcoming, that would be my ruling.  So that's going to be

8     the basis.

9          You've got your point for appeal well preserved, and if

10    I'm wrong, the Ninth Circuit knows how to tell me that I'm

11    wrong.  They've done it before.

12          **MR. HEMANN:**  Your Honor, so we need to come up with a

13    time, and now probably isn't the time, Your Honor, to -- we've

14    been notified that Mr. Klein and Mr. Cox will be testifying

15    tomorrow.  We don't believe, particularly in light of the

16    Court's ruling just now, that any of Mr. Klein's testimony and

17    part of Mr. Cox's testimony is admissible under Rule 702.

18          We'd like to address that with the Court.  Obviously, the

19    Court's preference is, appropriately, to respect the time of

20    the jury.  So I want to notify Your Honor that it is going to

21    come up tomorrow, and it is something that we're going to have

22    to deal with.

23          **THE COURT:**  All right.  I'll reserve time if we need

24    it.  If the defendants still wish to call either or both of

25    these experts, they believe they can lay a proper foundation,

**PROCEEDINGS**

```
 1  I'll certainly -- I'll certainly allow them the opportunity

 2  to -- well, first, let's find out -- so a little bit of a

 3  chicken-and-egg kind of a situation.  We need the time.  The

 4  question would be who goes forward first.  Does the Defense go

 5  forward and attempt to lay a foundation outside the presence of

 6  the jury, the Government gets to cross-examine; or does the

 7  Government just get to voir dire the witness outside the

 8  presence of the jury?

 9       But I think both sides need to sort of take a sober look

10  at the state of the record as it may relate to the expert

11  testimony to see whether it's even -- it's viable or not.

12       I'm not going to rule out at this point on this record any

13  expert.  I just ruled on what's been presented to me and gave

14  you my -- since the issue of 702 and 703 were raised, I gave

15  you my view about how 703 would apply in this case.

16       So one possibility is we meet tomorrow morning early at

17  7:00 o'clock, get the experts in here.  But I think -- I think

18  both sides need to talk to each other about what's going to

19  happen so at least you can frame the issue for the Court, both

20  procedurally and substantively, what is going to happen so I

21  can make an appropriate ruling.

22            MR. HEMANN:  Maybe we'll talk during the course of

23  some breaks today or -- and advise the Court either at a break

24  or just at the very end.

25            THE COURT:  Yes.  That will be great.
```

1        **MR. HEMANN:**  Okay.  And, Your Honor, looks like

2   there's one other matter, if it's appropriate, and it will take

3   me 30 seconds.

4        I just want to make a record that the United States

5   subpoenaed two employees of the Pangang Group through their

6   attorneys here in the United States, Mr. Arguedas and

7   Mr. Niespolo.  Both of them have been released as material

8   witnesses on bond issued by Judge Corley.  Judge Corley had

9   ordered them to appear during the Government's case in chief.

10       We were advised yesterday that neither of them may come to

11  the United States.  So we will not be calling them, and the

12  Government intends to initiate bond revocation proceedings as

13  to two of them.

14       I just wanted to make the record in front of Your Honor.

15       **THE COURT:**  All right.  For whatever it's worth, you

16  made your record.

17       **MR. HEMANN:**  For whatever it's worth, but I felt it

18  was appropriate that we had let the Court know that we had

19  called them and that they had not appeared.

20       **THE COURT:**  Very well.  Thank you -- let's bring --

21       **MS. AGNOLUCCI:**  Just so Your Honor knows, we're going

22  to reattempt to obtain some other means of authenticating this

23  document.

24       **THE COURT:**  Yes.

25       **MS. AGNOLUCCI:**  You know, we've done everything

**PROCEEDINGS**

1    possible, I can assure Your Honor, but we will try again and

2    would like to reserve the right to --

3         **THE COURT:**  Absolutely.

4         **MS. AGNOLUCCI:**  -- reopen this issue.

5         **THE COURT:**  Absolutely.  I've only ruled on the

6    record, and I think you did a very good job, Ms. Agnolucci, of

7    crystallizing.  I think you gave it your best shot and I really

8    thought about it, and you won me over with respect to the

9    contract with Sherwin-Williams.  And I really noodled over this

10   issue, and I don't -- it doesn't hit any of the bells and

11   whistles.

12        I feel your pain as far as there's evidence out there that

13   could help your client, but it may not be -- you may not have

14   the link to get it in, and that happens frequently in trials.

15   And that's the reality of the law, and that's what we have to

16   follow.

17        All right.  Let's get the jury in.

18        **MR. HEMANN:**  Thank you, Your Honor.

19   (Proceedings were heard in the presence of the jury:)

20        **THE COURT:**  Please be seated.

21        Good morning, everybody.  Just to let you know that we are

22   starting a little later, but just to kind of let you know some

23   of the things that kind of go on is that, you know, we all,

24   counsel and the Court, have been working really hard late at

25   night, early in the morning on legal issues that are important

 1   to make sure that you hear proper evidence in the case.  So

 2   it's not like we're saying, "Oh, we're going to start late and

 3   keep the jury waiting."  We've been working really hard, late

 4   at night and in the morning.

 5        And it ties into -- the process ties into the instruction

 6   that the Court gives you every night, which is that the

 7   admissibility of evidence and other legal matters is something

 8   that is very, very important and the rules that apply because,

 9   you know, countless generations in our country have taught us

10   that certain kinds of evidence are not appropriate for any

11   trier of fact to consider.  And these are the things that the

12   Court has to look into, discuss with the parties, to make sure

13   that what it's doing is legally correct and it's the type of

14   evidence you can hear.

15        And it ties into the instruction that I give you at the

16   end of the day; that is, if you obtain any information outside

17   of that, the chances are that it would be inadmissible and it

18   would automatically be -- corrupt the process because the

19   parties wouldn't know about it.  They couldn't cross-examine

20   the source of the information.

21        So it's not just sort of rules for the sake of rules.  It

22   ties into everything that we do here when you're not here to

23   make sure that the evidence that you hear is what the Court

24   believes the law allows you to hear to make a proper decision.

25        So I wanted you to hear that little homily for the

1    morning, if you will, as we proceed with the agent's testimony.

2        And, as I do with all witnesses, I want to remind you that

3    you're still under oath.

4        **THE WITNESS:**  Yes, Your Honor.

5                        <u>**CECILY ROMETO**</u>,

6    called as a witness for the Government, having been previously

7    duly sworn, testified further as follows:

8        **THE COURT:**  All right.  You may proceed.

9        **MR. SCOTT:**  Thank you.

10                   <u>**DIRECT EXAMINATION**</u>   **(resumed)**

11   BY MR. SCOTT:

12   **Q.**   Special Agent Rometo, you recall when yesterday when we

13   broke, we were talking about a company called ESI Equipment and

14   Engineering?

15   **A.**   Yes.

16   **Q.**   And you recall that the company was registered on

17   June 22nd, 2008?

18   **A.**   Yes.

19   **Q.**   And it's owned by Qiao Mu?

20   **A.**   Yes.

21   **Q.**   And who is Qiao Mu?

22   **A.**   Qiao Mu is Christina Liew's brother.

23   **Q.**   During the course of your investigation, did you also

24   locate bank account information associated with the ESI

25   company?

1    A.   Yes, I did.

2            MR. SCOTT:   Your Honor, permission to approach with

3    Exhibit 936.

4            THE COURT:   Yes, you may.

5    BY MR. SCOTT:

6    Q.   Do you recognize that document, Special Agent Rometo?

7    A.   Yes.

8    Q.   What is it?

9    A.   These are -- these are records that originally came from

10   Lorraine Lee and BSP Management, which was the incorporating

11   company, and they contain information about the striking off of

12   the company.  They contain some information regarding the

13   articles of association, and they also contain information

14   regarding some of the accounts and other administrative matters

15   related to ESI.

16   Q.   And did these documents come from Singapore?

17   A.   Yes, they did.

18   Q.   And yesterday we discussed records provided by the

19   Singapore government; correct?

20   A.   Yes.

21   Q.   And were these documents produced under the Mutual

22   Assistance in Criminal Matters Act?

23   A.   That's correct.

24   Q.   Is that also called MACMA?

25   A.   Yes.

1    **Q.**   Is that the method by which the U.S. Government obtains

2    these documents from the Singaporean Government?

3    **A.**   Yes, it is.

4    **Q.**   So going forward, when you describe documents coming from

5    Singapore, is that the method under which they were obtained?

6    **A.**   It is.

7              **MR. SCOTT:**  Your Honor, the United States offers into

8    evidence Exhibit 936.

9              **THE COURT:**  Any objection?

10             **MS. AGNOLUCCI:**  No objection.

11             **THE COURT:**  Admitted.

12        (Trial Exhibit 936 received in evidence)

13             **MR. SCOTT:**  Mr. Hemann, if you could bring up page 20

14   of Exhibit 936, please.

15                       (Pause in proceedings.)

16             **THE COURT:**  Do we have our system turned on?

17             **THE CLERK:**  It is.  I'll clear it and start over.

18        **MR. HEMANN:**  I'm up on my screen here.

19             **THE CLERK:**  Is your --

20        **MR. HEMANN:**  Projector.

21             **THE CLERK:**  Everything is plugged in totally?

22        **MR. HEMANN:**  It appears to be plugged in.

23                       (Pause in proceedings.)

24             **THE CLERK:**  I'll clear it again.

25                       (Pause in proceedings.)

1          **MR. HEMANN:**  If I could just have one moment,

2     Your Honor.  We're trying to sort out why.

3                    (Pause in proceedings.)

4          **MR. HEMANN:**  There we go.

5          **THE COURT:**  I think we need Ms. Mahoney back.

6                    (Laughter)

7          **THE COURT:**  All right.  You may please put that up.

8     Would you give the number again for the record, please?

9          **MR. SCOTT:**  Page 20 of Exhibit 936, please.

10         **THE COURT:**  All right.

11         **MR. HEMANN:**  There we go.  Thank you, Your Honor.

12    **BY MR. SCOTT:**

13    **Q.**  Special Agent Rometo, do you see that page?

14    **A.**  It actually isn't on my screen.  My screen must be out of

15    range.

16         **THE CLERK:**  Is it up there now?

17         **THE COURT:**  It is, thank you.

18         **THE CLERK:**  Is it on the jurors' screen?

19         **THE JURORS:**  Yes.

20         **THE COURT:**  Okay.  Thank you.

21    **BY MR. SCOTT:**

22    **Q.**  Special Agent Rometo, what information is provided on that

23    page?

24    **A.**  So this information includes just some of the registration

25    information associated with ESI.  It includes the name of the

1  director, which is Qiao Mu, his nationality, his occupation,

2  date of birth and such.  It also includes an email address

3  listed for him, which is hong888usa@yahoo.com.

4  Q.   And from your investigation, are you familiar with that

5  email address?

6  A.   Yes.

7  Q.   And whose email is that?

8  A.   It's Christina Liew's email address.

9  Q.   Mr. Hemann, if you could go to page 35 of the same

10  exhibit, please.

11       Special Agent Rometo, what information do you see on

12  page 35?

13  A.   This information contains a resolution from the directors

14  that the Overseas Chinese Banking Corporation will be the bank

15  associated with ESI, and that the authorized signatories are

16  Qiao Mu as well as Christina Liew.

17  Q.   And as authorized signatories, those two individuals

18  control the bank account?

19  A.   Yes.

20       **MR. SCOTT:**  Your Honor, permission to approach the

21  witness with Exhibit 937?

22       **THE COURT:**  Yes.

23  BY MR. SCOTT:

24  Q.   Special Agent Rometo, do you recognize that document?

25  A.   Yes, I do.

1    Q.    What is it?

2    A.    This is a -- this is documentation from the OCBC Bank, the

3    bank of Singapore associated with ESI.  It includes a summary,

4    as well as information about the signatories, customer

5    information, and it also contains transactional records

6    associated with the account.

7    Q.    And from where was that document obtained?

8    A.    This was obtained from Singapore via MACMA.

9          MR. SCOTT:  Your Honor, the United States offers

10   Exhibit 937.

11         THE COURT:  Any objection?

12         MS. AGNOLUCCI:  No objection.

13         THE COURT:  It's admitted.

14        (Trial Exhibit 937 received in evidence)

15         MR. SCOTT:  Mr. Hemann, if you could turn to page 4,

16   please.

17   Q.    Special Agent Rometo, on page 4 do you see information

18   regarding the opening of the account?

19   A.    Yes.

20   Q.    And what do you see?

21   A.    The opening information includes the registered name of

22   the customer, which in this case is ESI Equipment and

23   Engineering.  It also includes the fact that the account would

24   be in U.S. dollars, and it includes an address and the contact

25   person regarding the account, which is Christina Liew.

1  Q.   Could you turn to page 5, please, Mr. Hemann?

2       Special Agent Rometo, is there also additional information

3  regarding the signature authority on the account?

4  A.   Yes.  This page contains information reaffirming that the

5  account was for ESI Equipment and Engineering and that the two

6  signatories will be Qiao Mu and Christina Liew.

7  Q.   And Qiao Mu is Christina Liew's brother?

8  A.   Yes.

9  Q.   Special Agent Rometo, did you become familiar with a

10  company during your investigation called Huan Qu Process

11  Equipment Pte. Limited?

12  A.   Yes, I did.

13       MR. SCOTT:  Your Honor, permission to approach the

14  witness with Exhibit 906.

15       THE COURT:  Yes.

16  BY MR. SCOTT:

17  Q.   Do you recognize that document?

18  A.   Yes.

19  Q.   What is it?

20  A.   These are ACRA records obtained from Singapore regarding

21  Huan Qu Process Equipment Pte. Limited.  They contain

22  information regarding the opening of the company, its

23  registration, and its management.

24       MR. SCOTT:  Your Honor, the United States offers

25  Exhibit 906.

1          THE COURT:  Any objection?

2          MS. AGNOLUCCI:  No objection.

3          THE COURT:  It's admitted.

4       (Trial Exhibit 906 received in evidence)

5          MR. SCOTT:  Mr. Hemann, if you could go to page 2,

6    please.

7    Q.   Special Agent Rometo, what information do you see on

8    page 2?

9    A.   So page 2 lists the name of the company, which was Huan Qu

10   Process Equipment Pte. Limited.  It lists the type of company,

11   the stated activities of the company, as well as the director

12   and shareholder of the company, which is Li Rue, who is listed

13   as being the director as well as the shareholder.

14         MR. SCOTT:  And, Your Honor, the parties have

15   stipulated that Li Rue is Christina Liew's sister-in-law and

16   resides in China.

17         THE COURT:  Is that correct?

18         MS. AGNOLUCCI:  Correct.

19         THE COURT:  So stipulated.

20   BY MR. SCOTT:

21   Q.   Turning to page 3, please, Mr. Hemann.

22        Is there information on page 3 regarding an additional

23   director of the company?

24   A.   Yes.  The second director is listed at the bottom and is

25   listed as Elaine Shu Peng Chin.

1    **MR. SCOTT:**  And, Your Honor, the parties have

2    stipulated that Elaine Shu Peng Chin is Walter Liew's niece.

3            **THE COURT:**  Is that correct?

4            **MS. AGNOLUCCI:**  That is correct, Your Honor.

5            **THE COURT:**  So stipulated.

6    BY MR. SCOTT:

7    **Q.**  Turning to page 4, please, Mr. Hemann.

8        Special Agent Rometo, is there information regarding the

9    registration date of this company?

10   **A.**  (Witness examines document.)  Oh, I do see it.  Yes.  So

11   the date that the registration was lodged by Casey Lin &

12   Company, so it looks like the date it would have been entered

13   into ACRA, it's listed as June 30th, 2009.

14   **Q.**  And turning to page 5, please, Mr. Hemann.

15       Is there an office address listed for the company?

16   **A.**  (Witness examines document.)  Yes.

17   **Q.**  What is that address?

18   **A.**  So the address that's listed is 10 Anson Road,

19   Number 35-11, International Plaza.  And that's the same address

20   of Casey Lin & Company, which is the company that incorporated

21   Huan Qu.

22   **Q.**  Mr. Hemann, go to page 64 of this exhibit, please.

23       Special Agent Rometo, is there information regarding the

24   ownership of this Huan Qu company?

25   **A.**  Yes.  This page lists the sole owner as being Li Rue with

1    a thousand shares.

2    **Q.**   And Li Rue is the sole owner?

3    **A.**   That's correct.

4    **Q.**   And finally, Mr. Hemann, if you could turn to page 36,

5    please.

6        Special Agent Rometo, do you see information on page 36

7    regarding the "business ceased" date for this company?

8    **A.**   Yes.  This page lists the business as having ceased on

9    August 20 of 2010.

10   **Q.**   Special Agent Rometo, during your investigation did you

11   also locate bank information associated with Huan Qu Process

12   Equipment?

13   **A.**   Yes, I did.

14           **MR. SCOTT:**  Your Honor, permission to approach with

15   Exhibit 932.

16           **THE COURT:**  Yes.

17   BY MR. SCOTT:

18   **Q.**   Do you recognize this document?

19   **A.**   Yes.

20   **Q.**   What is it?

21   **A.**   So these are records from Singapore regarding the -- this

22   is further backup information regarding the incorporation of

23   the company and other details regarding the director and the

24   shares.

25   **Q.**   And this information was provided by whom?

```
 1    A.   This information was provided by Casey Lin Consultants,

 2    which is the incorporating entity of Huan Qu and it was

 3    provided pursuant to a MACMA request to Singapore.

 4         MR. SCOTT:  Your Honor, the United States offers

 5    Exhibit 932.

 6         THE COURT:  Any objection?

 7         MS. AGNOLUCCI:  No objection.

 8         THE COURT:  It's admitted.

 9         (Trial Exhibit 932 received in evidence)

10         MR. SCOTT:  Mr. Hemann, if you could go to page 28 of

11    this document, please.

12    Q.   Special Agent Rometo, what information do you see on

13    page 28?

14    A.   Page 28 reflects the approval by Huan Qu directors that a

15    U.S. dollar account be opened with the Development Bank of

16    Singapore, which is also known as DBS, and that that account be

17    signed only by Ms. Li Rue.

18    Q.   And Li Rue is Christina Liew's sister-in-law?

19    A.   That's correct.

20         MR. SCOTT:  Your Honor, permission to approach the

21    witness with Exhibit 942.

22         THE COURT:  Yes.

23    BY MR. SCOTT:

24    Q.   Do you recognize that document?

25    A.   Yes.
```

1   **Q.**   What is it?

2   **A.**   These are records from DBS Bank that were obtained

3   pursuant to a MACMA request from Singapore regarding the bank

4   account associated with Huan Qu.

5           **MR. SCOTT:**  Your Honor, the United States offers

6   Exhibit 942.

7           **MS. AGNOLUCCI:**  No objection.

8           **THE COURT:**  Admitted.

9       (Trial Exhibit 942 received in evidence)

10          **MR. SCOTT:**  Mr. Hemann, if you could go to page 16,

11  please.

12  **Q.**   Special Agent Rometo, do you see information on page 16

13  regarding the closing of the account?

14  **A.**   Yes.

15  **Q.**   And what do you see?

16  **A.**   So these records show that at that time, the balance was

17  approximately $46,000, $47,000; and then subsequently in that

18  month, money was withdrawn to account holder Li Rue, and then

19  the account balance was subsequently zero.  The account was

20  closed on October 13th, 2010 -- 2010.

21  **Q.**   And the account was closed by Li Rue?

22  **A.**   That's my understanding.

23  **Q.**   Special Agent Rometo, during the course of your

24  investigation, did you become familiar with a company called

25  Dongbei Process Engineering Pte. Limited?

1    A.    Yes.

2          MR. SCOTT:  Your Honor, permission to approach the

3    witness with Exhibit 907.

4          THE COURT:  All right.

5                    (Pause in proceedings.)

6    BY MR. SCOTT:

7    Q.    Do you recognize that document?

8    A.    I do.

9    Q.    What is it?

10   A.    These are ACRA records obtained from Singapore regarding

11   the opening and ownership of Dongbei Process Engineering Pte.

12   Limited.

13         MR. SCOTT:  Your Honor, the United States offers

14   Exhibit 907.

15         MS. AGNOLUCCI:  No objection, Your Honor.

16         THE COURT:  Admitted.

17      (Trial Exhibit 907 received in evidence)

18         MR. SCOTT:  Mr. Hemann, if we could go to page 2,

19   please.

20   Q.    What information is provided on page 2, Special Agent

21   Rometo?

22   A.    So this page summarizes the company information.  So the

23   name of the company, Dongbei Process Engineering; the stated

24   company activity, which is engineering activities; as well as

25   the company director and shareholder, which is listed as

1  Li Rue, who is Christina Liew's sister-in-law.

2  **Q.**   If we could turn to page 3, please, Mr. Hemann.

3       Towards the bottom of the page, is there additional

4  information regarding directors of the company?

5  **A.**   Yes.  So this section of the page lists the second

6  director, which is Elaine Shu Peng Chin, who is Walter Liew's

7  niece.

8  **Q.**   Go to page 5, please, Mr. Hemann.

9       Special Agent Rometo, is there information on this page

10 regarding the office address of the Dongbei company?

11 **A.**   Yes.

12 **Q.**   What is that address?

13 **A.**   So this address is, again, the same address that's listed

14 for Casey Lin & Company, which also incorporated Dongbei.

15 **Q.**   If we can go to page 8, please, Mr. Hemann.

16      Looking first at the bottom of this page, do you see a --

17 excuse me.  Looking first at the -- towards the top of the

18 page, is there information regarding the ownership of the

19 company?

20 **A.**   Yes.  So it looks like there are a thousand shares

21 allocated, all of which are allotted to Li Rue.  So she would

22 be the sole owner of the company.

23 **Q.**   And towards the bottom of the page do you see a date that

24 the company was registered?

25 **A.**   (Witness examines document.)  Yes.  The company was lodged

1    into ACRA on July 1st, 2009.

2    **Q.**   Mr. Hemann, if you would go to page 38, please.

3         Special Agent Rometo, on this page do you see information

4    regarding the date on which business ceased for the Dongbei

5    company?

6    **A.**   Yes.  It looks like -- sorry.  It's just a little bit

7    small.  I believe it says August 20th, 2010, is the date that

8    the business ceased.  Yes.

9    **Q.**   August 20th, 2010?

10   **A.**   Yes.

11   **Q.**   During your investigation, did you also locate bank

12   account information associated with this company?

13   **A.**   Yes, I did.

14        **MR. SCOTT:**  Your Honor, permission to approach with

15   Exhibit 933 and 940.

16        **THE COURT:**  All right.

17                 (Pause in proceedings.)

18   **BY MR. SCOTT:**

19   **Q.**   Looking first at Exhibit 933, do you recognize that

20   document?

21   **A.**   Yes.

22   **Q.**   What is it?

23   **A.**   So this is a document, documentation provided by Casey Lin

24   Consultants, regarding Dongbei regarding its ownership.  It

25   looks like articles of association and other information

```
 1   pertinent to the company.

 2          MR. SCOTT:  Your Honor, the United States offers

 3   Exhibit 933.

 4          MS. AGNOLUCCI:  No objection.

 5          THE COURT:  Admitted.

 6       (Trial Exhibit 933 received in evidence)

 7          MR. SCOTT:  Mr. Hemann, could you go to page 24,

 8   please.

 9   Q.   Special Agent Rometo, what information is provided on

10   page 24?

11   A.   This page lists information regarding the opening of the

12   bank account associated with this company.  It would be at the

13   United Overseas Bank in Singapore, and the account would be

14   signed on to only by Christina Liew or Ms. Li Rue.

15   Q.   Ms. Li Rue is Christina Liew's sister-in-law?

16   A.   That's correct.

17   Q.   And those two individuals have control of the bank

18   account?

19   A.   Yes.

20   Q.   Can you turn your attention to Exhibit 940, please?  And

21   what is that document?

22   A.   This is documentation provided pursuant to the MACMA

23   customs Singapore.  This is from the United Overseas Bank,

24   Limited or Eastern Bank, Limited, and this is bank account

25   information related to Dongbei.
```

1          **MR. SCOTT:**  Your Honor, the United States offers

2    Exhibit 940.

3          **MS. AGNOLUCCI:**  No objection.

4          **THE COURT:**  It's admitted.

5        (Trial Exhibit 940 received in evidence)

6          **MR. SCOTT:**  Mr. Hemann, if we could bring up page 1,

7    please.

8    **Q.**   Special Agent Rometo, do you see information on page 1

9    regarding the signatories on this account?

10   **A.**   Yes.

11   **Q.**   And who are they?

12   **A.**   There are two signatories to the account.  The first

13   listed signatory is Li Rue, and the second listed signatory is

14   Christina Liew.

15   **Q.**   Does it list the name of the company at the top of the

16   page?

17   **A.**   Yes.  The top of the page lists Dongbei Process

18   Engineering Pte. Limited.

19          **MR. SCOTT:**  Your Honor, permission to approach the

20   witness with Exhibit 908.

21          **THE COURT:**  All right.

22   **BY MR. SCOTT:**

23   **Q.**   Do you recognize this document?

24   **A.**   Yes.

25   **Q.**   What is it?

 1   **A.**   These are ACRA incorporation records related to LHV

 2   Equipment and Services Pte. Limited, which is another company

 3   registered in Singapore.

 4          **MR. SCOTT:**   Your Honor, the United States offers

 5   Exhibit 908.

 6          **MS. AGNOLUCCI:**   No objection.

 7          **THE COURT:**   Admitted.

 8      (Trial Exhibit 908 received in evidence)

 9          **MR. SCOTT:**   Turning to page 2, please, Mr. Hemann.

10   **Q.**   What information is provided on page 2?

11   **A.**   Page 2 provides, again, the name of the company, which is

12   LHV Equipment and Services Pte. Limited.  The listed company

13   activity is wholesale of service establishment, equipment, and

14   supplies; and it lists the first director as being Li Rue, who

15   is Christina Liew's sister-in-law.

16   **Q.**   And turning now to page 3, please, Mr. Hemann.

17      Is there additional information about directors on that

18   page?

19   **A.**   Yes.  The second director and the shareholder is listed as

20   Elaine Shu Peng Chin, who lives in Singapore and is Walter

21   Liew's niece.

22   **Q.**   And is there also information on that page towards the

23   bottom regarding the date the company was registered?

24   **A.**   (Witness examines document.)  Yes.  The date it was lodged

25   into ACRA and registered is May 4th, 2011.

1    Q.    Turning to page 4, please, Mr. Hemann.

2          The top section of page 4, do you see information

3    regarding the address of the LHV Equipment company?

4    A.    Yes.   The address is listed as 637 Veerasamy Road,

5    Number 02-107, and this is the same address as

6    Ocean Consulting, which is the company that registered LHV.

7    Q.    Turning to page 7, please, Mr. Hemann.

8          Special Agent Rometo, is there information concerning the

9    ownership of the LHV company?

10   A.    Yes.   This page actually differs from the first page in

11   that it lists Li Rue as being the shareholder of the company,

12   as the sole shareholder, with 2,000 Singapore dollars.

13   Q.    And turning to page 26, please, Mr. Hemann.

14         In the second section of this page towards the top, is

15   there information regarding the date on which business ceased

16   for this company?

17   A.    Yes.   The date listed is September 30th, 2011.

18   Q.    During your investigation, did you also become familiar

19   with bank account information related to LHV Equipment and

20   Services?

21   A.    Yes.

22   Q.    I'd like to show you Exhibit 937, which is already in

23   evidence.

24         Mr. Hemann, if you could bring up page 62, please.

25         Special Agent Rometo, do you see information related to

**ROMETO - DIRECT / SCOTT**

1  LHV on that page?

2  **A.**   Yes, I do.  These are records from OCBC, and the

3  registered customer information in this instance is LHV

4  Equipment and Services Pte. Limited.

5  **Q.**   And is there a contact person listed for the account

6  towards the bottom?

7  **A.**   Yes.  The contact person is listed as being Li Rue.

8  **Q.**   Turning to the next page, Mr. Hemann, page 63.

9     Is there information concerning the signature authority on

10  this account?

11  **A.**   Yes.  The sole signature authority on this account is

12  listed as being attributed to Li Rue.

13  **Q.**   And Li Rue is Christina Liew's sister-in-law?

14  **A.**   That's correct.

15     **MR. SCOTT:**  Your Honor, permission to approach the

16  witness with Exhibit 435.

17     **THE COURT:**  All right.

18  **BY MR. SCOTT:**

19  **Q.**   Special Agent Rometo, I'm going to switch gears now.

20  We're going to talk about some records related to an HSBC

21  account we discussed yesterday.

22     Looking at that document, do you recognize it?

23  **A.**   Yes, I do.

24  **Q.**   What is it?

25  **A.**   This is a collection of materials related to HSBC account.

1    This is the same account that we saw yesterday.  It begins in

2    the prefix 503, associated with Qiao Hua.

3    **Q.**   And remind the jury, who is Qiao Hua?

4    **A.**   Qiao Hua is Christina Liew's father.

5    **Q.**   And where were these records found?

6    **A.**   Let me double-check.

7         (Witness examines document.)  These were located in the

8    Liew residence.

9    **Q.**   And did these documents include statements from this HSBC

10   Bank account?

11   **A.**   Yes.

12   **Q.**   And do these statements show financial transactions

13   related to Huadong Equipment Solutions?

14   **A.**   Yes.

15         **MR. SCOTT:**  Your Honor, the United States offers

16   Exhibit 435.

17         **MS. AGNOLUCCI：**  No objection.

18         **THE COURT:**  Admitted.

19      (Trial Exhibit 435 received in evidence)

20         **MR. SCOTT:**  Mr. Hemann, if you could go to page 22,

21   please.

22   **Q.**   Special Agent Rometo, do you see information here

23   regarding a deposit?

24   **A.**   Yes.  It looks like there was an amount credited of, looks

25   like, $359,972.94.

ROMETO - DIRECT / SCOTT

1   **Q.**   And what's the date of that?

2   **A.**   25th of June, 2008.

3   **Q.**   Do you see towards the bottom it says, "By the order of"?

4   **A.**   (Witness examines document.)  Oh, yes.  I'm sorry.  "By

5   the order of Huadong Equipment Solutions Pte. Limited."

6   **Q.**   And if you could turn to page 23, please, Mr. Hemann.

7        Do you recognize the information on this page?

8   **A.**   Yes.

9   **Q.**   And what do we see?

10  **A.**   So this page includes the same account number, the listed

11  customer name of Qiao Hua.  There's a deposit amount for

12  670,000 U.S. dollars.

13  **Q.**   And turning to the next page, Mr. Hemann, page 24.

14       Is there a signature on that page?

15  **A.**   Yes.

16  **Q.**   What's the name?

17  **A.**   The name is Walter Liew.

18  **Q.**   And is there a date associated with this deposit?

19  **A.**   Yes.  The date is May 30th, 2008.

20       **MR. SCOTT:**  Your Honor, permission to approach the

21  witness with Exhibit 436.

22       **THE COURT:**  Yes.

23  BY MR. SCOTT:

24  **Q.**   Do you recognize that document, Special Agent Rometo?

25  **A.**   Yes.

1   Q.   What is it?

2   A.   These are records associated with the same HSBC account,

3   including some communications and transactions.

4   Q.   And where was this document found?

5   A.   (Witness examines document.)  This document was also found

6   in the Liew residence.

7   Q.   Do these documents show financial transactions related to

8   Huadong Equipment Solutions?

9   A.   Yes.

10          MR. SCOTT:  Your Honor, the United States offers

11  Exhibit 436.

12          THE COURT:  Any objection?

13          MS. AGNOLUCCI:  May I have one moment, Your Honor?

14          THE COURT:  Of course.

15                  (Pause in proceedings.)

16          MS. AGNOLUCCI:  No objection, Your Honor.

17          THE COURT:  Admitted.

18      (Trial Exhibit 436 received in evidence)

19          MR. SCOTT:  Mr. Hemann, if you could go to pages --

20  page 3, please.

21  Q.   Special Agent Rometo, do you see some emails on page 3?

22  A.   Yes.

23  Q.   Do they continue onto the following pages?

24  A.   (Witness examines document.)  Yes.  There appears to be an

25  email chain of a few pages.

1    Q.   And what does this email chain concern?

2    A.   So this email chain is correspondence between a

3    representative of HSBC and Walter Liew regarding the account.

4    Q.   And, Mr. Hemann, if you could go to page 5, please.

5         There's a message there dated July 1st, 2008.  Do you see

6    that?

7    A.   Yes.

8    Q.   And who is that email from?

9    A.   So this email is from Mr. Alex Leung, who is a

10   representative of HSBC, HSBC Bank; and it is correspondence

11   regarding a meeting that had taken place in Hong Kong last

12   month and Mr. Liew's correspondence regarding Mr. Liew's

13   activities with this account, including a deposit for $674,817.

14   Q.   And did we just look at a transfer for $670,000 into that

15   account?

16   A.   Yes, that would have been the approximate amount.  I think

17   this has to do with the fact that there are two different

18   currencies being used.

19   Q.   Mr. Hemann, if you could go back to page 3, please.

20        Do you see an email towards the bottom from Mr. Liew to

21   the HSBC representative?

22   A.   Yes.

23   Q.   And is that email referencing the same HSBC account?

24   A.   (Witness examines document.)  I'm assuming so, since all

25   of these are on the same email chain and they're all pertinent

1    to this account.

2    **Q.**    Turning to page 30, please, Mr. Hemann.

3          Special Agent Rometo, what information do you see on

4    page 30?

5    **A.**    So this is a handwritten note that's noted being to HSBC.

6    It's dated November 13th, 2008, and it lists request for

7    notations for transfer.   The first is for 2.1 million U.S.

8    dollars to the Bank of China in the name of Qiao Hong, who is

9    Christina Liew.   And the second notation regards -- also

10   regards a transfer -- there it is; I'm sorry -- for $1,850,000

11   to a different bank in China in the name of Qiao Hong, who is

12   Christina Liew.

13   **Q.**    And is there a signature on that page?

14   **A.**    I believe there is, yes.

15   **Q.**    And whose signature is that?

16   **A.**    Walter Liew.

17   **Q.**    And is that the same HSBC account at the top that we've

18   been talking about earlier?

19   **A.**    I'm sorry.   Can you scroll up one more time so I can

20   double-check?

21         (Witness examines document.)   Yes, that's the same account

22   number.

23   **Q.**    So this page concerns transfers from that HSBC account to

24   accounts in China?

25   **A.**    Yes.

1          **MR. SCOTT:**  Your Honor, permission to approach the

2   witness with Exhibits 439 and 439T.

3          **THE COURT:**  All right.

4   **BY MR. SCOTT:**

5   **Q.**   Special Agent Rometo, do you recognize those documents?

6   **A.**   Yes, I do.

7   **Q.**   What are they?

8   **A.**   These -- this is an original document in Chinese and a

9   translation of that document.  The translation -- so the logo

10  HSBC appears on both; and these concern information regarding

11  the same account that we just referenced, this account with the

12  prefix of 503.  And it's correspondence between HSBC -- it's

13  addressed to Qiao Hua, and it lists his authorized

14  representative as being Mr. Liew.

15  **Q.**   And is Exhibit 439 in Chinese?

16  **A.**   Yes, it is.

17  **Q.**   And is Exhibit 439T a translation of Exhibit 439?

18  **A.**   It is.

19          **MR. SCOTT:**  Your Honor, the United States offers

20  Exhibits 439 and 439T.

21          **MS. AGNOLUCCI:**  May we have one brief moment, Your

22  Honor?

23          **THE COURT:**  Of course.

24                   (Pause in proceedings.)

25          **MS. AGNOLUCCI:**  Objection, Your Honor.

1        **THE COURT:**  May I see the document, please?

2                    (Pause in proceedings.)

3        **MR. SCOTT:**  Your Honor, I should also mention that the

4    parties have stipulated that this was found in the Liew

5    residence.

6                    (Pause in proceedings.)

7        **THE COURT:**  The objection is overruled.  It's

8    admitted.

9        (Trial Exhibits 439 and 439T received in evidence)

10       **MR. SCOTT:**  Mr. Hemann, could you put up page 2 of

11   Exhibit 439T, please?

12   **Q.**   Special Agent Rometo, do you see page 2?

13   **A.**   Yes.

14   **Q.**   And is it a piece of correspondence?

15   **A.**   Yes, it is.

16   **Q.**   Who is it directed to?

17   **A.**   It's directed to Mr. Qiao Hua in China.

18   **Q.**   And who is it from?

19   **A.**   It is from HSBC.

20   **Q.**   And could you read the first paragraph, please?

21   **A.**   (reading)

22            "Mr. Qiao:

23            "Thank you for the visit of Mr. Liew, your authorized

24        representative to the HSBC Premiere Center in Hong Kong to

25        make known matters related to our bank staff's service

1          regarding your high-interest investment deposit."

2     Q.   And scrolling down the page, there's a third paragraph, I

3     believe, begins with "According."

4     A.   Yes.

5     Q.   Read that, too, please.

6     A.   (reading)

7              "According to (our) records your authorized

8          representative, Mr. Liew, personally came to the HSBC

9          Premiere Center at our bank's main office in Hong Kong on

10         May 30th, 2008, to meet with a premiere customer service

11         manager (hereinafter service manager).  During the

12         meeting, the service manager provided Mr. Liew the

13         relevant interest rates for fixed-term deposits as a

14         reference."

15    Q.   You don't have to read the whole paragraph, but do you see

16    a reference in that paragraph to a $670,000 deposit?

17    A.   Yes.

18    Q.   We already discussed the $670,000 deposit to that account?

19    A.   Yes.

20         **MR. SCOTT:**  Your Honor, permission to approach the

21    witness with Exhibit 631.

22         **THE COURT:**  All right.

23    BY MR. SCOTT:

24    Q.   Special Agent Rometo, do you recognize that document?

25    A.   I do.

1   **Q.**   What is it?

2   **A.**   This is correspondence from East West Bank to

3   USA Performance Technology, Inc., regarding the notification of

4   an incoming wire transfer from the Bank of China for $119,385.

5         **MR. SCOTT:**  Your Honor, the United States offers

6   Exhibit 631.

7         **THE COURT:**  Objection?

8         **MS. AGNOLUCCI:**  No objection.

9         **THE COURT:**  Admitted.

10       (Trial Exhibit 631 received in evidence)

11  **BY MR. SCOTT:**

12  **Q.**   And where was this document found?

13  **A.**   (Witness examines document.)  This document was found in

14  the USAPTI office.

15  **Q.**   And towards the bottom of the large paragraph there, does

16  it say from where the money came?

17  **A.**   Yes.  It specifies that the sender bank was the Bank of

18  China, and I believe there's a wire that has to come through a

19  correspondent bank in the United States, which is why it's

20  listed as New York, by the order of PITT -- PIETC, Panzhihua

21  Company, Limited.

22        **MR. SCOTT:**  Your Honor, permission to approach the

23  witness with Exhibit 325 and Exhibit 325T.

24        **THE COURT:**  All right.

25

BY MR. SCOTT:

Q.   Special Agent Rometo, do you recognize those documents?

A.   (Witness examines document.)  Yes.

Q.   What are they?

A.   This is a -- there's an original fax transmittal as well
as a translation, and it lists as the fax from Walter Liew to
Pangang Group, Jinzhou Titanium Industry Company, Limited, to
the attention of Wang Yanfu.

          MR. SCOTT:  And the parties have stipulated this was
located in the USAPTI office.  Your Honor, the United States
offers Exhibits 325 and 325T.

          MS. AGNOLUCCI:  Your Honor, we're looking at 345.  I
misheard.  May we have a moment to look at 325?

          THE COURT:  Sure.  Of course.

          MS. AGNOLUCCI:  Thank you.

                    (Pause in proceedings.)

          MS. AGNOLUCCI:  No objection.

          THE COURT:  Admitted.

     (Trial Exhibits 325 and 325T received in evidence)

BY MR. SCOTT:

Q.   Turning to page 3 of Exhibit 325T, Special Agent Rometo,
would you tell us what this document says?

A.   So this is correspondence from Walter Liew to manager
Wang, and it's regarding invoice needed for advance payment on
the listed contract and regarding payment pursuant to that

1    contract.

2    **Q.**    Is there a signature on that page?

3    **A.**    There is.

4    **Q.**    Whose signature is it?

5    **A.**    Walter Liew.

6             **MR. SCOTT:**   Your Honor, permission to approach with

7    Exhibit 311.

8             **THE COURT:**   All right.

9    **BY MR. SCOTT:**

10   **Q.**    Special Agent Rometo, do you recognize that document?

11   **A.**    I do.

12   **Q.**    What is it?

13   **A.**    So these are a collection of documents.  These are

14   receipts related to the same contract that we saw in the

15   previous exhibit, this PJTY prefix contract that's related to

16   the 30,000-megatons-per-year project.

17            **MR. SCOTT:**   And, Your Honor, the parties have

18   stipulated that these documents were found in both the

19   residence and the USAPTI office, and the United States offers

20   Exhibit 311.

21            **THE COURT:**   Objection?

22            **MS. AGNOLUCCI:**   No objection.

23            **THE COURT:**   Admitted.

24        (Trial Exhibit 311 received in evidence)

25            **MR. SCOTT:**   Mr. Hemann, if we could just bring up the

 1   first page of Exhibit 311, please.

 2   **Q.**   Is this one of the receipts you described?

 3   **A.**   Yes.

 4   **Q.**   Do all of the pages following this contain similar

 5   receipts?

 6   **A.**   Yes, they do.

 7         **MR. SCOTT:**  Your Honor, permission to approach the

 8   witness with Exhibit 314.

 9         **THE COURT:**  Yeah.  Before we do that, let's take a

10   stretch break.

11      You can stand up as well, Agent, if you'd like.

12                     (Pause in proceedings.)

13         **THE COURT:**  All right.  Please be seated.

14      You may continue.

15         **MR. SCOTT:**  May I approach with Exhibit 314, please?

16         **THE COURT:**  Yes, you may.

17   BY MR. SCOTT:

18   **Q.**   Special Agent Rometo, do you recognize that document?

19   **A.**   I do.

20   **Q.**   What is it?

21   **A.**   This is a document that was found in the safety-deposit

22   box hard drive, and it is an attachment to the 2005 contract,

23   the 05USSCY2 contract.

24         **MR. SCOTT:**  Your Honor, the United States offers

25   Exhibit 314.

```
 1                THE COURT:  Any objection?

 2                MS. AGNOLUCCI:  No objection, Your Honor.

 3                THE COURT:  It's admitted.

 4           (Trial Exhibit 314 received in evidence)

 5   BY MR. SCOTT:

 6   Q.   Special Agent Rometo, you said this is an amendment to the

 7   2005 contract?

 8   A.   That's correct.

 9   Q.   Looking at the first page at the top, could you read that

10   full contract number, please?

11   A.   The contract number is 05USSCY32PGJZ185.

12                MR. SCOTT:  Your Honor, permission to approach the

13   witness with Exhibits 324 and 320.

14                THE COURT:  All right.

15   BY MR. SCOTT:

16   Q.   Looking first at Exhibit 324, do you recognize that

17   document?

18   A.   Yes.

19   Q.   What is it?

20   A.   This is correspondence between Mega International Bank and

21   Walter Liew regarding negotiation of letter of credit.

22   Q.   And does this letter of credit concern payment under the

23   100,000-ton contract?

24   A.   (Witness examines document.)  Yes.

25                MR. SCOTT:  And, Your Honor, the parties have
```

1    stipulated Exhibit 324 was located in the Liew residence and

2    the United States offers Exhibit 324.

3              **THE COURT:**  Any objection?

4              **MS. AGNOLUCCI:**  No objection, Your Honor.

5              **THE COURT:**  It's admitted.

6         (Trial Exhibit 324 received in evidence)

7    **BY MR. SCOTT:**

8    **Q.**   Just looking quickly at page 1, please, of Exhibit 324.

9    **A.**   (Witness examines document.)

10   **Q.**   Special Agent Rometo, do you see the -- about three lines

11   down, the letter of credit number?

12   **A.**   Yes.

13   **Q.**   And what is that?

14   **A.**   LC571917/2009D.

15   **Q.**   And does it have an amount listed to the right of that?

16   **A.**   Yes.  The amount is listed as 15,130,000 U.S. dollars.

17   **Q.**   Turning your attention now to Exhibit 320, do you

18   recognize that document?

19   **A.**   (Witness examines document.)  Yes.

20   **Q.**   What is it?

21   **A.**   So these are two documents to Walter Liew from Mega

22   International Bank from Joseph Chan concerning amendments to

23   two different letters of credit.

24             **MR. SCOTT:**  Your Honor, the --

25   **Q.**   Did you say where that document was found?

1   A.    (Witness examines document.)

2         MR. SCOTT:  Your Honor, the parties have stipulated

3   that this was located in the safe-deposit box, and the

4   United States offers Exhibit 320.

5         THE COURT:  Objection?

6         MS. AGNOLUCCI:  No objection.

7         THE COURT:  It's admitted.

8         (Trial Exhibit 320 received in evidence)

9   BY MR. SCOTT:

10  Q.    Special Agent Rometo --

11        MR. SCOTT:  Actually, Your Honor, permission to

12  approach with Exhibits 323 and 318?

13        THE COURT:  All right.

14  BY MR. SCOTT:

15  Q.    Special Agent Rometo, do you recognize Exhibit 323?

16  A.    (Witness examines document.)  Yes.

17  Q.    What is it?

18  A.    This is a commercial proposal from USA Performance

19  Technology, Inc., to Pangang Group international Economic and

20  Trading Corporation for Pangang 100K megaton per year of TiO2

21  bichloride process project.

22        MR. SCOTT:  And the parties have stipulated that this

23  was located in the safe-deposit box, and the United States

24  offers Exhibit 323.

25        THE COURT:  Any objection?

1          **MS. AGNOLUCCI:**  No objection, Your Honor.

2          **THE COURT:**  Admitted.

3       (Trial Exhibit 323 received in evidence)

4    **BY MR. SCOTT:**

5    **Q.**   Special Agent Rometo, now turning your attention to

6    Exhibit 318, do you recognize that document?

7    **A.**   Yes.

8    **Q.**   What is it?

9    **A.**   This is a document on USA Performance Technology

10   letterhead regarding the clarification of engineering design

11   fee for Contract Number 09USSCT32PGTY24.

12   **Q.**   Is there a signature on that page?

13   **A.**   There is.

14   **Q.**   Whose signature is it?

15   **A.**   Walter Liew.

16          **MR. SCOTT:**  Your Honor, the parties have stipulated

17   that this was located in the residence, and the United States

18   offers Exhibit 318.

19          **THE COURT:**  Any objection?

20          **MS. AGNOLUCCI:**  No objection, Your Honor.

21          **THE COURT:**  It's admitted.

22       (Trial Exhibit 318 received in evidence)

23          **MR. SCOTT:**  Your Honor, permission to approach with

24   Exhibit 321.

25          **THE COURT:**  All right.

1  BY MR. SCOTT:

2  Q.    Special Agent Rometo, do you recognize that document?

3  A.    (Witness examines document.)  Yes.

4  Q.    What is it?

5  A.    So there are two components to the document.  One is

6  documentation from Mega International Bank regarding the advice

7  of documentary credit to USAPTI from the Bank of China; and the

8  second is supporting documentation regarding the same contract.

9          MR. SCOTT:  Your Honor, the parties have stipulated

10  that this was located in the safe-deposit box, and the

11  United States offers Exhibit 321.

12          THE COURT:  Any objection?

13          MS. AGNOLUCCI:  No objection.

14          THE COURT:  It's admitted.

15     (Trial Exhibit 321 received in evidence)

16          MR. SCOTT:  Your Honor, permission to approach with

17  Exhibits 329, 330, and 332.

18          THE COURT:  Very well.

19  BY MR. SCOTT:

20  Q.    Special Agent Rometo, do you recognize these documents?

21  A.    Yes, I do.

22  Q.    And what's contained in them?

23  A.    These are a series of commercial invoices from

24  USA Performance Technology, Inc., to PIETC Panzhihua Company,

25  Limited.

1  **Q.**  And do all three exhibits, Exhibits 329, 330, and 332,

2  contain commercial invoices?

3  **A.**  Yes, they do.

4  **MR. SCOTT:**  Your Honor, the parties have stipulated

5  that all three of these exhibits were located in the residence.

6  The United States offers Exhibits 329, 330, and 332.

7  **MS. AGNOLUCCI:**  No objection.

8  **THE COURT:**  Admitted.

9  (Trial Exhibits 329, 330, and 332 received in evidence)

10  **MR. SCOTT:**  Your Honor, permission to approach with

11  Exhibit 447.

12  **THE COURT:**  All right.

13  **THE CLERK:**  I'm sorry.  The number?

14  **MR. SCOTT:**  447.

15  **THE CLERK:**  Thank you.

16  **BY MR. SCOTT:**

17  **Q.**  Special Agent Rometo, do you recognize that document?

18  **A.**  I do.

19  **Q.**  What is it?

20  **A.**  This is a document from Walter Liew to Joseph Chan at Mega

21  International Bank on Performance Group letterhead regarding

22  confirmations that transactions pursuant to a letter of

23  guaranty had been completed.

24  **Q.**  Is there a signature on that page?

25  **A.**  There is.

1    **Q.**    Whose signature is it?

2    **A.**    Walter Liew.

3    **Q.**    Mr. Hemann, if you could just put up Exhibit 447 -- or --

4          **MR. SCOTT:**    Excuse me, Your Honor.   The parties have

5    stipulated that Exhibit 447 was located in the USAPTI office,

6    and the United States offers Exhibit 447.

7          **THE COURT:**    Any objection?

8          **MS. AGNOLUCCI:**    No objection.

9          **THE COURT:**    It's admitted.

10         (Trial Exhibit 447 received in evidence)

11         **MR. SCOTT:**    Mr. Hemann, if you could bring up page 1,

12   please.

13   **Q.**    Is there a date on this document, Special Agent Rometo?

14   **A.**    Yes.

15   **Q.**    And is there also a number on the letter of guaranty?

16   **A.**    Yes.   The letter of guaranty number is JZCBO8LG00001.

17         **MR. SCOTT:**    Your Honor, permission to approach the

18   witness with Exhibit 825.

19         **THE COURT:**    All right.

20   **BY MR. SCOTT:**

21   **Q.**    Special Agent Rometo, do you recognize that document?

22   **A.**    Yes.

23   **Q.**    What is it?

24   **A.**    This is -- this is information -- there's an envelope, a

25   handwritten note, as well as some printed information listed as

1   being sent to Walter Liew in Alameda from the IRS.

2   **Q.**   And what information is contained in this document?

3   **A.**   This information contains a handwritten note regarding

4   Mr. Liew's request for this information from the IRS, as well

5   as the associated documentation requested.

6        **MR. SCOTT:**  And, Your Honor, the parties have

7   stipulated that this document was found in the Liew residence,

8   and the United States offers Exhibit 825.

9        **THE COURT:**  Any objection?

10       **MS. AGNOLUCCI:**  No objection.

11       **THE COURT:**  It's admitted.

12      (Trial Exhibit 825 received in evidence)

13       **MR. SCOTT:**  Mr. Hemann, if you could bring up page 1.

14  **Q.**   Is that the envelope?

15  **A.**   It is.

16  **Q.**   And page 2, please, Mr. Hemann.

17      Could you read that handwritten note, please?

18  **A.**   (reading)

19          "Dear Mr. Liew:

20          "I've tried several times to reach you by telephone

21      but have been unsuccessful.  Per your request, I've

22      enclosed a copy of the Tax Treaty between the People's

23      Republic of China and the United States.  I've also

24      enclosed Publications 514 and 901."

25  **Q.**   And there's a signature of an individual, and does it

1   provide a title?

2   **A.**    Yes.   The title is listed as Taxpayer Services Specialist.

3   **Q.**    And there are a couple dates on the top of the page.

4   What's the date of the note?

5   **A.**    The date of the note is December 3rd, 1998; and the date

6   of the inquiry is November 6, 1998.

7   **Q.**    And the following pages in this exhibit, does that contain

8   the information described in the handwritten note?

9   **A.**    Yes.   It contains information about the Tax Treaty between

10  the People's Republic of China and the United States.

11              **MR. SCOTT:**  Your Honor, may I have one moment?

12              **THE COURT:**  Yes.

13                        (Pause in proceedings.)

14              **MR. SCOTT:**  Your Honor, no further questions.

15              **THE COURT:**  All right.   Thank you.

16        Cross-examination, Ms. Agnolucci?

17              **MS. AGNOLUCCI:**  Yes, Your Honor.

18                        (Pause in proceedings.)

19              **MS. AGNOLUCCI:**  Your Honor, may we have a one-minute

20  sidebar?

21              **THE COURT:**  Sure.   Of course.   You may stand up.

22        (The following proceedings were heard at the sidebar:)

23              **THE COURT:**  Yes, Counsel?

24              **MS. AGNOLUCCI:**  Yeah, there's one issue that I want to

25  raise.   I just want to alert the Court to the reasons why I'm

 1   going into it on cross-examination, and I'm going to ask about

 2   one of the companies, which is called ESI.

 3        Yesterday during the testimony of Mr. Chang, Mr. Axelrod

 4   suggested that there was no connection between an ESI China and

 5   the ESI Singapore that we've all been hearing about.  However,

 6   there's evidence in the documents about that, and it's come to

 7   our attention that one of the witnesses who was interviewed by

 8   the FBI told the FBI that the Singapore -- the Singapore office

 9   was the headquarters for the China office.

10        So I intend to go into that with the agent, and I just

11   want to, you know, alert Your Honor because there are three or

12   four documents that cover that, and that's why this is

13   relevant, is because yesterday the suggestion was made that

14   there was no connection, and, you know, we think that's

15   inaccurate based on what the FBI knew and learned.

16             **THE COURT:**  All right.

17             **MR. SCOTT:**  That's fine.

18             **THE COURT:**  Fine?  Okay.  Great.

19             **MS. AGNOLUCCI:**  Great.

20             **THE COURT:**  All right.  Thank you.

21        (The following proceedings were heard in open court:)

22             **THE COURT:**  You may proceed whenever you're ready,

23   Ms. Agnolucci.

24             **MS. AGNOLUCCI:**  Thank you, Your Honor.

25

<u>**CROSS-EXAMINATION**</u>

**BY MS. AGNOLUCCI:**

**Q.**  Good morning, Special Agent Rometo.

**A.**  Good morning.

**Q.**  You said that you have been working with the FBI for about three years?

**A.**  That's right.

**Q.**  Are you one of the main case agents on this case?

**A.**  Assigned to this case.  I wouldn't say I'm the main case agent.

**Q.**  You work with other agents on this case?

**A.**  That's correct.

**Q.**  Special Agent Ho?

**A.**  Yes.

**Q.**  And Special Agent Bozman?

**A.**  I actually haven't worked with Mr. Bozman, but I've worked with Special Agent Ho and Special Agent White.

**Q.**  And do you generally keep apprised of what each other are doing in the course of your investigation?

**A.**  In general.

**Q.**  You testified today that sums of money went to various entities in Singapore; correct?

**A.**  Yes.

**Q.**  One of those companies is called ESI Equipment and Engineering Pte.; correct?

1  **A.**    Yes.

2  **Q.**    For our purposes, I'm just going to abbreviate that to

3  ESI.

4  **A.**    Okay.

5  **Q.**    Did the FBI obtain documents relating to ESI's business

6  activities?

7  **A.**    Not beyond the ACRA records that were referenced this

8  morning.

9        **MS. AGNOLUCCI:**  Your Honor, may I approach the witness

10  with Exhibit 1787?

11       **THE COURT:**  Yes, you may.

12       **MS. AGNOLUCCI:**  Thank you.

13  **Q.**    Special Agent Rometo, this is a document that the FBI

14  obtained pursuant to a search warrant; correct?

15  **A.**    Just let me double-check.

16    (Witness examines document.)  I don't have that listed

17  here, but I would assume so.

18       **MS. AGNOLUCCI:**  Your Honor, the document has been

19  admitted, Ms. Ottolini is informing me.  May we publish it,

20  please?

21       **THE COURT:**  Yes, you may.

22       **MS. AGNOLUCCI:**  Thank you, Your Honor.

23  **Q.**    Can you please take a look, Special Agent Rometo, at the

24  bottom of the email chain on page 2 of the document?

25       **THE CLERK:**  Something happened to the system.

1        MS. AGNOLUCCI:  I'm sorry.

2                    (Pause in proceedings.)

3        THE COURT:  There we go.

4        MS. AGNOLUCCI:  67.  1767.

5        THE CLERK:  1767?

6        MS. AGNOLUCCI:  Yes.

7        THE CLERK:  1787 is in.  1767 is not.

8        MS. AGNOLUCCI:  I apologize.  It's not up on the

9    screen.

10        THE COURT:  All right.

11        MS. AGNOLUCCI:  So let me ask Special Agent Rometo

12   about it.

13   Q.   Is this a document that you seized from Mr. Liew's Yahoo!

14   account?

15   A.   It might be.  I don't have that listed on the list, but

16   I'm aware that Walter Liew used this address at USAPTI.

17   Q.   And is this correspondence between Walter Liew and an ESI

18   China regarding the purchase of equipment?

19   A.   There is information about that, yes.

20   Q.   And does that --

21        MR. SCOTT:  Excuse me.  Does the witness have the

22   proper numbered exhibit in front of her?

23        THE WITNESS:  I have 1767.

24        MR. SCOTT:  Okay.

25        THE COURT:  Thank you.

1    BY MS. AGNOLUCCI:

2    **Q.**   And does that relate generally to the titanium dioxide

3    project?

4    **A.**   (Witness examines document.)  It lists the titanium

5    tetrachloride process of Pangang Group.

6          **MS. AGNOLUCCI:**  Your Honor, I move to admit

7    Exhibit 1767.

8          **THE COURT:**  Objection?

9          **MR. SCOTT:**  No objection.

10         **THE COURT:**  Admitted.

11        (Trial Exhibit 1767 received in evidence)

12         **MS. AGNOLUCCI:**  Mr. Guevara, can you please blow up

13   the second page of the document, the bottom of the email chain

14   there?

15   **Q.**   And, Special Agent Rometo, can you please read that?

16   **A.**   (reading)

17         "Dear Mr. DelPizzo:

18         "We are ESI Equipment and Engineering Pte. Limited,

19         glad to contact with you.  Regarding titanium

20         tetrachloride project of Pangang Group in China, the

21         USA Performance Technology, Inc., Dr. Liew, in charge of

22         relevant technical problems and engineering designs.  They

23         forwarded your quotation of rotary valves MD11C848 to us.

24         We will follow up relevant commercial business.  We hope

25         we can establish a good relationship with you in future.

1          "Best regards.

2          "Sherry."

3    **Q.**   Did the FBI interview Sherry from ESI Equipment and

4    Engineering Pte. Ltd.?

5    **A.**   No.

6    **Q.**   Did the FBI investigate this Shenzhen office listed in the

7    email?

8    **A.**   Yes.

9    **Q.**   And did the FBI determine that that was a branch of a

10   Singapore company?

11   **A.**   No.

12          **MS. AGNOLUCCI:**  Your Honor, may I approach the witness

13   with Exhibit 1974, please?

14          **THE COURT:**  Yes.

15   **BY MS. AGNOLUCCI:**

16   **Q.**   Special Agent Rometo, is this a document that was seized

17   from Mr. Liew's email account?

18   **A.**   (Witness examines document.)  It isn't listed, but I guess

19   my assumption is yes because of the address listed at the top

20   of Walter Liew at USAPTI.

21   **Q.**   And it's an email exchange between Walter Liew and an

22   individual named Gary Stewart?

23   **A.**   Yes.

24   **Q.**   That's someone the FBI interviewed during its

25   investigation?

1   **A.**   That's correct.

2   **Q.**   Does this relate to the purchase of bricks for a

3   chlorinator?

4   **A.**   (Witness examines document.)   Yes.

5   **Q.**   And does it also relate to ESI Equipment and Engineering

6   Pte. Ltd.?

7   **A.**   That's what's listed, yes.

8           **MS. AGNOLUCCI:**   Your Honor, I move to admit

9   Exhibit 1974.

10          **THE COURT:**   Objection?

11          **MR. SCOTT:**   No objection.

12          **THE COURT:**   Admitted.

13      (Trial Exhibit 1974 received in evidence)

14          **MS. AGNOLUCCI:**   Mr. Guevara, if you could please go to

15   the page ending in 367.

16   **Q.**   Does this appear, Special Agent Rometo, to be an agreement

17   regarding the purchase of chlorinator bricks?

18   **A.**   Yes.   It's an agreement between Quantum International and

19   ESI Equipment and Engineering.

20   **Q.**   And do you see where it says, "Party B, ESI Equipment and

21   Engineering Pte. Ltd."?

22   **A.**   Yes.

23   **Q.**   There's an address there in Singapore?

24   **A.**   Yes.

25   **Q.**   And then it says that the Shenzhen office is in China?

1    **A.**   That's what's listed, yes.

2    **Q.**   Thank you.

3        **MS. AGNOLUCCI:**  Your Honor, may I approach the witness

4    with Exhibit 2897?

5        **THE COURT:**  Yes, you may.

6        **MS. AGNOLUCCI:**  Thank you.

7    **Q.**   Special Agent Rometo, is this another signed copy of the

8    agreement we were just looking at?

9    **A.**   Yes.

10   **Q.**   And is this a document that the FBI obtained from Gary

11   Stewart when the FBI interviewed Mr. Stewart?

12   **A.**   Yes.

13       **MS. AGNOLUCCI:**  Your Honor, I move to admit

14   Exhibit 2897.

15       **THE COURT:**  Objection?

16       **MR. SCOTT:**  No objection.

17       **THE COURT:**  Admitted.

18       (Trial Exhibit 2897 received in evidence)

19       **MS. AGNOLUCCI:**  Mr. Guevara, if you could just blow up

20   the section that says "Party B" again.

21   **Q.**   Special Agent Rometo, does this, again, list for ESI

22   Equipment and Engineering Pte. Ltd. an address in Singapore and

23   then a China office in Shenzhen?

24   **A.**   Yes.

25   **Q.**   You testified that the FBI interviewed Gary Stewart;

1    correct?

2    **A.**   Yes.

3    **Q.**   Do you recall that Gary Stewart told the FBI that ESI

4    China is headquartered in Singapore?

5    **A.**   Yes.

6              **MR. SCOTT:**   Objection.

7              **THE COURT:**   It's a little late.   Overruled.

8              **MS. AGNOLUCCI:**   Your Honor, may I approach the witness

9    with Exhibit 2895, please?

10             **THE COURT:**   Yes.

11   **BY MS. AGNOLUCCI:**

12   **Q.**   Do you recognize this document as a document the FBI

13   seized from Mr. Liew's email account?

14   **A.**   Yes.

15   **Q.**   And is it an email from an individual named Zhou Yonggui?

16   **A.**   Yes.

17   **Q.**   Is Zhou Yonggui employed by Pangang?

18   **A.**   Yes.

19   **Q.**   And is this an email from Zhou Yonggui to ESI China with

20   cc to Walter Liew?

21   **A.**   Yes.

22   **Q.**   And does this email pertain to the purchase of refractory

23   bricks?

24   **A.**   (Witness examines document.)   Yes.

25             **MS. AGNOLUCCI:**   Your Honor, I move to admit

1    Exhibit 2895.

2            **THE COURT:**  Objection?

3            **MR. SCOTT:**  Yes, objection.  Hearsay.

4            **THE COURT:**  May I see it, please, Ms. Ottolini?

5                    (Pause in proceedings.)

6            **MS. AGNOLUCCI:**  And I would note, Your Honor, that the

7    author is one of the Pangang individuals the FBI interviewed.

8                    (Pause in proceedings.)

9            **MR. SCOTT:**  Ms. Agnolucci, for the Court, I don't

10   believe the FBI interviewed this individual.

11                   (Pause in proceedings.)

12           **MS. AGNOLUCCI:**  We've established that the FBI did, in

13   fact, interview him.

14           **THE COURT:**  All right.  Do you still object?

15           **MR. SCOTT:**  Yes.

16           **THE COURT:**  Where was this document found, Agent?  It

17   was found in the Liew residence?

18           **THE WITNESS:**  Can you remind me of the number?

19           **MS. AGNOLUCCI:**  Yes.

20           **THE COURT:**  It's Exhibit 2895.

21           **THE WITNESS:**  Thank you, Your Honor.

22           **THE COURT:**  I'll give this back to the witness so she

23   can look at the document itself.

24           **THE WITNESS:**  There's no origin listed here on the

25   exhibit list.

1          THE COURT:  All right.  Well --

2          MS. AGNOLUCCI:  I believe it was seized from

3   Mr. Liew's email account.  That's how it was produced to us.

4          THE COURT:  Is that correct, Mr. Scott?

5          MR. SCOTT:  There's no indication of where the

6   document was found on the exhibit list, Your Honor.

7          THE COURT:  Well, let's do this.  I'll conditionally

8   admit the exhibit, and counsel should meet and confer to iron

9   this fact out.  I'll admit it based upon counsel's

10  representation as to the way this was produced; and if we need

11  to do anything later on with it, we'll figure that out.  But

12  I'll overrule the objection for now based upon counsel's offer

13  of proof as to the way this document was produced.

14         MS. AGNOLUCCI:  Thank you, Your Honor.  And that's

15  based on the fact that the email address on this document is

16  the same email address from which all of the documents produced

17  from Mr. Liew's email accounts came.

18         THE COURT:  All right.  Well, it's conditionally

19  admitted.

20      (Trial Exhibit 2895 received in evidence)

21         THE COURT:  You may proceed.

22         MS. AGNOLUCCI:  Thank you, Your Honor.

23      May we publish the exhibit, please?

24         THE COURT:  Yes, you may.

25

1    BY MS. AGNOLUCCI:

2    **Q.**   And, Special Agent Rometo, can you please read the content

3    of this email?

4    **A.**   (reading)

5              "Dear Lucy:

6              "According to our inquiry and your technical

7    quotation, we have made the following arrangements for the

8    equipment purchasing for our TiO2 project.

9              "A delegation from Pangang Group, as the buyer, shall

10   visit U.S.A. to purchase the equipment stated in the

11   enclosed draft technical annexes with the help of the

12   USA Performance Technology, Inc., the process technology

13   provider.  The agenda of this visit shall be as follows:

14             "1.  Firstly, to visit your workshop.

15             "2.  Secondly, to discuss and finalize the technical

16   annexes.

17             "3.  Then to discuss and agree the commercial terms

18   and conditions, and

19             "4.  Finally, to have the price discussion and

20   contract signing.

21             "In order to shorten the technical discussion time

22   and improve the efficiency of our work, we have made the

23   draft technical annexes.  Please make your review and

24   study.

25             "If you have any comments or any additions or any

1    changes to the annexes, please let us know by email before

2    July 1 so that a preliminary agreement on the technical

3    annexes can be reached between us before we depart for

4    U.S.A.  But, in any case, please make no change to the

5    format and structure of the annexes.

6         "The visit time of the delegation shall be between

7    July and August.  If any change, we will inform you in

8    advance.  The specific departure date of the delegation

9    for U.S.A. depends on the time of the preliminary

10   agreement on the technical annexes to be reached between

11   you and us.

12        "Since we have many firms to visit in U.S.A., the

13   specific time to have the meeting with you or to visit

14   your workshop cannot be fixed now.  But, in any case, you

15   shall be informed ahead of schedule.

16        "Your earliest reply will be appreciated very much."

17   Q.   And who is it signed by?

18        Mr. Guevara, could you show that part of it?

19   A.   "Best regards, Zhou Yonggui."

20   Q.   Did the FBI interview a number of individuals from Pangang

21   at the Roadway Inn?

22   A.   Yes.

23   Q.   And did the FBI interview Mr. Zhou Yonggui?

24   A.   I did not interview him, but I understand from the

25   previous conversation that we did.

1  **Q.**   Is the previous conversation the first time that you've

2  come to learn that the FBI interviewed this individual?

3  **A.**   Yes, from Mr. Zhou.

4  **Q.**   Is investigation of the financial allegations in this case

5  your responsibility?

6  **A.**   No.

7  **Q.**   Whose responsibility is it?

8  **A.**   Meiqin Jiang.

9  **Q.**   Is that an IRS auditor?

10 **A.**   It is.

11 **Q.**   But in terms of the investigation of the financial facts,

12 in terms of the FBI agents, would you say that that's in your

13 wheelhouse?

14 **A.**   I would say it's in my bailiwick, among other things.

15 **Q.**   And did you wonder whether the FBI should have asked

16 Mr. Yonggui about ESI, in light of this document?

17 **A.**   Based on the entirety of the information that I know from

18 this investigation, it was not important that I review this

19 302, no.

20 **Q.**   Was it important that you investigate ESI China?

21 **A.**   Yes.

22 **Q.**   And was it important that you investigate through Yonggui,

23 who wrote this email, whether ESI China was involved in the

24 purchasing of equipment for the TiO2 project?

25 **A.**   We did review that information.

1    Q.   But you didn't ask Mr. Yonggui about it?

2    A.   I was not present when this individual traveled to the

3    United States.

4    Q.   So whoever interviewed him didn't ask him about it?

5    A.   I don't know.

6            MS. AGNOLUCCI:   Your Honor, may I approach the witness

7    with Exhibit 1948?

8            THE COURT:   Yes, you may.

9            MS. AGNOLUCCI:   Thank you.

10           THE CLERK:   1948 was admitted yesterday.

11           MS. AGNOLUCCI:   Thank you, Ms. Ottolini.

12       Mr. Guevara, can we please publish the exhibit, since it's

13   been admitted?

14   Q.   Can you please read the top part of the email?

15   A.   (reading)

16           "Hi, Chris.

17           "Please forward the proposal to ESI Equipment and

18       Engineering since they will be acting as our buying agent

19       for the project."

20   Q.   And can you read below that, please?

21   A.   The --

22   Q.   The thread below that, starting with "Hi, Allen and

23   Walter."

24   A.   (reading)

25           "Hi, Allen and Walter.

1          "I received a request from ESI Equipment and

2      Engineering in China for the exact same proposal I

3      provided to you for your project in Changshou.  It seems

4      they are asking for a proposal to procure the equipment on

5      your behalf.  Before I send them the proposal, I want to

6      check with you to be sure you are aware.  Do you have any

7      problems if I send them the same proposal I sent you?"

8  **Q.**    Thank you.

9          **MS. AGNOLUCCI:**  Your Honor, may I now approach the

10  witness with Exhibit 2885?

11          **THE COURT:**  Yes, you may.

12          **MS. AGNOLUCCI:**  Thank you.

13  **Q.**    Special Agent Rometo, is this a document that the FBI

14  seized from Christina Liew's email account?

15  **A.**    Yes.

16  **Q.**    And is it an email from ESI to Christina Liew regarding

17  TiCl pumps?

18  **A.**    Yes.

19          **MS. AGNOLUCCI:**  Your Honor, I move to admit

20  Exhibit 2885.

21          **MR. SCOTT:**  Objection, Your Honor.  Hearsay.

22          **THE COURT:**  May I see it, please, Ms. Ottolini?

23              (Pause in proceedings.)

24          **THE COURT:**  The objection is overruled.

25          **MS. AGNOLUCCI:**  Thank you.

1          **THE COURT:**  It's admitted.

2          (Trial Exhibit 2885 received in evidence)

3          **MS. AGNOLUCCI:**  Can we publish the document, please,

4    Mr. Guevara?

5    **Q.**   Special Agent Rometo, can you please read the text of the

6    email?

7    **A.**    (reading)

8                 "Dear Mr. Papadeas:

9                 "We are ESI Equipment and Engineering Pte. Limited.

10        We are glad to contact you to inquire TiCl4 pumps, which

11        used for Pangang's Spong Titanium Project in China.  The

12        Dr. Liew from USA Performance Technology, Inc., who in

13        charge of relevant technological matters and engineering

14        services.  We are entrusted by end user to follow up the

15        trading business.

16                 "Please offer us your best price.  Thanks."

17   **Q.**   Thank you.

18        **MS. AGNOLUCCI:**  Your Honor, I have one last document

19   along these lines.  May I please approach the witness with

20   Exhibit 2886?

21        **THE COURT:**  Yes, you may.

22        **MS. AGNOLUCCI:**  Thank you.

23   **Q.**   Special Agent Rometo, is this also an email that the FBI

24   seized from Christina Liew's email account?

25   **A.**    Yes.

1   **Q.**   And is it an email from ESI China to Christina Liew, or to

2   someone with copy to Christina Liew?

3   **A.**   Yes.

4   **Q.**   And does it relate to screw conveyors for the titanium

5   dioxide project?

6   **A.**   Yes.

7              **MS. AGNOLUCCI:**  Your Honor, I move to admit

8   Exhibit 2886.

9              **THE COURT:**  Any objection?

10             **MR. SCOTT:**  No objection.

11             **THE COURT:**  Admitted.

12      (Trial Exhibit 2886 received in evidence)

13  **BY MS. AGNOLUCCI:**

14  **Q.**   Special Agent Rometo, can you please read the text of the

15  email?

16  **A.**   (reading)

17           "Dear Mr. Porterfield:

18           "We are ESI Equipment and Engineering Pte. Limited.

19  We were entrusted by end user Pangang Group to inquire

20  screw conveyors and degassing screw, which used at their

21  titanium tetrachloride project in China.

22           "The USA Performance Technology, Inc., is responsible

23  for relevant technology and engineering design.  We mainly

24  assist them to follow up the trading business.

25           "We need manufacturer's detailed quotation to make

ROMETO - CROSS / AGNOLUCCI

1          prepare for future procurement.  So please offer us your

2          best price of corresponding products with technical

3          specification.  Thanks."

4   Q.    Thank you.

5          We've been talking up to now about a company called ESI;

6   correct?

7   A.    Yes.

8   Q.    Did Walter Liew own that company?

9   A.    I know Walter Liew authorized money to be sent to that

10  company.

11  Q.    Did Walter Liew own that company?

12  A.    Not to my knowledge.

13  Q.    And you would know because you've done a thorough

14  investigation; correct?

15  A.    That's correct.

16  Q.    Did he have signatory authority over that company's bank

17  accounts?

18  A.    No.

19  Q.    You also testified regarding a company called Huan Qu

20  Process Equipment Pte. Ltd.; correct?

21  A.    Yes.

22  Q.    Did Mr. Liew own that company?

23  A.    No.

24  Q.    And did he have signatory authority over any of its bank

25  accounts?

1  A.  No.

2  Q.  You testified regarding a company called Dongbei Process

3  Engineering Pte. Ltd.

4  A.  Yes.

5  Q.  Did Mr. Liew own that company?

6  A.  No.

7  Q.  Did he have signatory authority over its bank accounts?

8  A.  No.

9  Q.  You testified about a company called LHV Equipment and

10  Services Pte. Ltd.

11  A.  Yes.

12  Q.  Did Walter Liew own that company?

13  A.  No.

14  Q.  Did he have signatory authority over its bank accounts?

15  A.  No.

16  Q.  You testified regarding a number of bank accounts

17  belonging to the four companies we just talked about; correct?

18  A.  Yes.

19  Q.  Including bank accounts in Singapore in the name of those

20  companies?

21  A.  Yes.

22  Q.  It's true, is it not, that very little of the money that

23  went to those companies ultimately went to Mr. Liew?

24  A.  I can't know that information.

25  Q.  So you don't know where the money went?

1   A.   I don't know where the money ended up.

2   Q.   During the course of your investigation, did you attempt

3   to get overseas bank records evidencing where the money went

4   after it went to Singapore?

5   A.   I believe we did, but it's very difficult.  We don't have

6   a similar agreement with China that we do with Singapore, and

7   we don't have those records from Singapore.

8   Q.   It's fair to say that it's very difficult to get

9   information from China?

10   A.   Yes.

11   Q.   And the FBI can't compel banks to give information?

12   A.   That's right.

13   Q.   And the FBI can't compel people to talk to it?

14   A.   That's correct.

15   Q.   Did the FBI speak with any of the individuals listed on

16   these companies' charts?

17   A.   Yes.

18   Q.   Did the FBI speak with Li Rue?

19   A.   No.

20   Q.   Did the FBI speak with Mu Qiao?

21   A.   No.

22   Q.   Did the FBI speak with Ning Qiao?

23   A.   No.

24   Q.   Did all three of those individuals decline to speak to the

25   FBI?

1  **A.**    I don't believe we were even able to attempt to speak with

2  them because they are in China.

3          **THE COURT:**  Ms. Agnolucci, is this a good time for a

4  break?

5          **MS. AGNOLUCCI:**  I can be done in two minutes,

6  Your Honor.

7          **THE COURT:**  Okay.

8  **BY MS. AGNOLUCCI:**

9  **Q.**    Did the FBI obtain those individuals' bank account

10  records?

11  **A.**    No.

12  **Q.**    Did the FBI, from the records it obtained in Singapore,

13  see any evidence that the money went to Mr. Liew?

14  **A.**    Not directly, no.

15          **MS. AGNOLUCCI:**  I have no further questions.

16          **THE COURT:**  Thank you.

17      Are you going to have redirect, Mr. Scott?

18          **MR. SCOTT:**  Yes.

19          **THE COURT:**  All right.  Let's take our first break of

20  the morning.

21      Please remember the Court's usual admonitions, keep an

22  open mind, don't get outside information.  And we'll see you in

23  15 minutes.

24      And you may step down.

25      (Proceedings were heard out of the presence of the jury:)

1      **THE COURT:**  15 minutes, Counsel.

2      **MR. AXELROD:**  Thank you, Your Honor.

3              (Recess taken at 9:44 a.m.)

4          (Proceedings resumed at 10:01 a.m.)

5      (Proceedings were heard out of the presence of the jury:)

6      **THE COURT:**  Let's bring the jury in.

7      (Proceedings were heard in the presence of the jury:)

8      **THE COURT:**  Okay.  Please be seated.

9      You may resume the stand, Agent.

10     You may conduct your redirect examination, Counsel.

11     **MR. SCOTT:**  Thank you, Your Honor.

12                  <u>**REDIRECT EXAMINATION**</u>

13     BY MR. SCOTT:

14     Q.   Special Agent Rometo, do you recall on cross-examination

15     you were asked about an email from someone named Zhou Yonggui?

16     A.   Yes.

17     Q.   That is Exhibit 2895, which is in evidence.

18          **MR. SCOTT:**  And, Ms. Ottolini, I'd like to put it on

19     the ELMO, if I could.

20     Q.   Special Agent Rometo, can you see that?

21     A.   Yes.

22     Q.   And what's the date of that email?

23     A.   The date is June 24th, 2011.

24     Q.   And you discussed already that it was an email sent to

25     Walter Liew?

1   **A.**   Yes.

2   **Q.**   Concerning refractory bricks, and you were asked questions

3   about the company ESI?

4   **A.**   Yes.

5   **Q.**   Are you familiar with the date that the ACRA records from

6   Singapore said that business ceased for the ESI company?

7   **A.**   Yes, I am.

8   **Q.**   What is that date?

9   **A.**   It is May 31st, 2011.

10  **Q.**   So this email was sent after business ceased at the ESI

11  entity in Singapore?

12  **A.**   Yes, it was.

13  **Q.**   You were also asked on cross-examination about the

14  interview of Mr. Zhou --

15  **A.**   Yes.

16  **Q.**   -- by the FBI?

17  **A.**   Yes.

18  **Q.**   Do you recall that that occurred on July 19th, 2011?

19  **A.**   That sounds right, yes.

20  **Q.**   And you were asked why the FBI didn't discuss the issues

21  in this email with Mr. Zhou; correct?

22  **A.**   That's correct.

23  **Q.**   Did the FBI have this email at that time?

24  **A.**   No.

25  **Q.**   And why not?

**A.**    I think a couple of different reasons.  The investigation
is an ongoing process.  When the individuals were here in the
U.S., they were interviewed at the time they were here; but
there are requests for email search warrants and additional
activities that go on on an ongoing basis.  So at that time
that activity had not taken place.

And, in addition, the information that we discussed today
had not been brought to light, so there was no questions
related to any ESI.

**Q.**    You were also asked questions about an ESI address in
Shenzhen, China?

**A.**    Yes.

**Q.**    Are you familiar with that address?

**A.**    I am.

**Q.**    Is there a business at that address?

**A.**    Not -- I have no way of knowing that.  I've looked it up.
There is a point on the street, but I've not located the actual
office.

**Q.**    Have you located any other records suggesting there was an
actual office there?

**A.**    No.

**Q.**    During the course of your investigation, did you find
evidence that ESI in China and USAPTI were the same company?

**A.**    I have seen evidence to suggest that USAPTI had some
ambitions to move into China and to take their business there,

1    but I have no information suggesting that ESI China was an

2    actual company.

3    **Q.**   Are there any documents that describe the company that

4    showed that it was actually doing -- trying to do the same kind

5    of work that USAPTI was?

6    **A.**   I haven't.

7         **MR. SCOTT:**  Your Honor, permission to approach the

8    witness with Exhibits 471 and 471T.

9         **THE COURT:**  All right.

10        **MR. SCOTT:**  And 266 and 266T.

11        **THE COURT:**  All right.

12        **THE CLERK:**  These are not admitted exhibits; correct?

13        **MR. SCOTT:**  Not yet, no.

14        **MS. AGNOLUCCI:**  Mr. Scott, which documents did you

15   say?

16        **MR. SCOTT:**  471 and the translation and 266 and the

17   translation.

18   **Q.**   Special Agent Rometo, looking first at Exhibit 471, do you

19   recognize that?

20   **A.**   (Witness examines document.)  Yes.

21   **Q.**   What is it?

22   **A.**   So this is information obtained pursuant to a search

23   warrant of Christina Liew's Yahoo! email.  It contains an email

24   from the email address ESI China, and it's to Christina Liew's

25   email address Hong888USA.  There's an email and then there is

1    also an attachment.

2    **Q.**    Can you describe generally what that attachment is?

3    **A.**    Sure.  The attachment is a, looks like potentially a

4    PowerPoint or a type of document.  It looks like it's a

5    template for sort of a brochure regarding ESI

6    Equipment and Engineering PTE, Limited.

7    **Q.**    And is Exhibit 471T -- is Exhibit 471 in Chinese?

8    **A.**    Yes, it is.

9    **Q.**    And is Exhibit 471T a translation of that document?

10   **A.**    Yes.

11   **Q.**    Turning your attention now to Exhibit 266T.

12   **A.**    (Witness examines document.)

13   **Q.**    Do you recognize that document?

14   **A.**    Yes.

15   **Q.**    What is it?

16   **A.**    This is also a series of emails to -- to and from, an

17   email chain, Hong Liew at -- hongliew@hong888USA.com, and then

18   there is an attached document, a couple of attached documents

19   and brochures.

20   **Q.**    And from where was that document obtained?

21   **A.**    I believe this was obtained from Christina Liew's email

22   address.  Yes.

23   **Q.**    And is Exhibit 266 in Chinese?

24   **A.**    Yes, it is.

25   **Q.**    And is Exhibit 266T a translation of that document?

**A.**    Yes, it is.

      **MR. SCOTT:**  Your Honor, the United States offers Exhibits 471 and 471T and 266 and 266T.

      **MS. AGNOLUCCI:**  I would object to both, Your Honor.  I note that 266 was not disclosed as a document to be used with the agent.

      **THE COURT:**  Is that correct?

      **MR. SCOTT:**  I decided to use the document after the discussion on cross.

      **THE COURT:**  All right.  So the objection is with respect to 266.  What about with respect to the other document?

      **MS. AGNOLUCCI:**  With respect to the other document the objection is hearsay.

      **THE COURT:**  Okay.  Let me see the documents.
Ms. Ottolini, would you retrieve the documents from the special agent?

                  (Pause in proceedings.)

      **THE COURT:**  The objections are overruled.

      **MR. SCOTT:**  They're admitted, Your Honor?

      **THE COURT:**  They are admitted.

    (Trial Exhibits 471, 471T, 266, and 266T received in evidence)

      **MR. SCOTT:**  Mr. Hemann, if you could put up Exhibit 471T and Exhibit 266T, if that's possible.

**Q.**    And if you could first, Special Agent Rometo, if you look

1    at Exhibit 471, do you see the email at the top.

2    **A.**   Yes.

3    **Q.**   Could you read that and tell the jury who it's from and

4    who it's to?

5    **A.**   So the email is from the email address esi.china@163.net,

6    and it's to hong888USA@yahoo.com.  And the email reads:

7    (reading)

8              "Director Liu and Director Qiao:

9              "Hello.  Please review the two attachments to the

10       email, ESI company profile and required information.  The

11       areas marked yellow in the (company) profile are the areas

12       which need supplement and amendment based on the required

13       information.  Please correct any mistakes.  Thanks."

14   **Q.**   And after that email, is there an attachment?

15   **A.**   Yes.

16       **MR. SCOTT:**  Mr. Hemann, if you'd go to Exhibit 471 at

17   page 3 and 266T at page 7.  I'm sorry, 471T at page 4, please.

18

19                   (Pause in proceedings.)

20       **MR. SCOTT:**  I'm testing Mr. Hemann's computer skills.

21   I apologize.

22   **Q.**   Special Agent Rometo, do you see page 4 of Exhibit 471T?

23   **A.**   Yes.

24   **Q.**   And do you see page 3 of 266?

25   **A.**   I see page 7 of 266, yes.

1   **Q.**   Excuse me, page 7.

2        Looking at the content of those pages, can you compare

3   them for me?

4   **A.**   These pages are very similar.  They have two columns of

5   information listing subcategories:  Company profile,

6   technology, engineering.  One lists brand for agent, major

7   achievement, major clients, and contact.

8        The second lists company profile, technology, engineering,

9   technology and design experiences, major clients, and contact

10  us.

11       These documents are very similar and one seems to be -- it

12  seems to be a consistent template that's used.

13  **Q.**   And if we could step back, Mr. Hemann, one page on each

14  document, so it would be 471T at 3 and 266T at page 6.

15       I jumped the gun and skipped the cover page.  Could you

16  compare the cover pages of those documents?

17  **A.**   The cover pages are also similar.  They contain a company

18  title at the top, a photograph of an area; and then contact

19  information on the front page.

20  **Q.**   And the document on the left, 260 -- 471T relates to ESI

21  Equipment and Engineering?

22  **A.**   Yes.

23  **Q.**   And the document on the right, 266T, is USA Performance

24  Technology?

25  **A.**   Yes.

**ROMETO - REDIRECT / SCOTT**

1    **Q.**    Mr. Hemann, if we could go to page 8 of 266 and page 6 of

2    471.

3          Again, Special Agent Rometo, can you look at the

4    information on these pages and compare them?

5    **A.**    The information on these pages is very similar.  I think

6    almost verbatim the information is the same with the exception

7    of the replacement of USA Performance Technology, Inc., with

8    ESI Equipment and Engineering PTE, Limited.

9    **Q.**    And, Mr. Hemann, if you'd go to the next page, page 7 on

10   471T and page 10 on Exhibit 266T.

11         Special Agent Rometo, do you see those pages?

12   **A.**    Yes.

13   **Q.**    And can you compare the information between them?

14   **A.**    Yes.  Again, this information is almost verbatim the same.

15   There is a replacement of information regarding USA Performance

16   Technology, Inc., with ESI Equipment and Engineering PTE,

17   Limited.

18   **Q.**    Mr. Hemann, if you'd go to 266, page 12, and 471, page --

19   actually, strike that.

20         Special Agent Rometo, in the email that you read that

21   was -- attached to which was the ESI presentation, do you

22   recall that?

23   **A.**    Yes.

24   **Q.**    The substance of the email concerned a creation of that

25   PowerPoint?

**ROMETO - REDIRECT / SCOTT**

1   **A.**    Yes.

2   **Q.**    And, so, items were being added to it?

3   **A.**    Yes.  It was being added to and/or edited by the

4   individuals listed here.

5   **Q.**    And the date of that email was?

6   **A.**    December 13th, 2010.

7   **Q.**    And having -- have you had an opportunity to compare these

8   presentations?

9   **A.**    Yes, I have.

10  **Q.**    And the content, can you speak to the content of the

11  presentations throughout?

12  **A.**    The content is almost exactly the same.  This

13  USA Performance Technology PowerPoint template and the type of

14  information that's contained in it, including business

15  information and claims thereto is duplicated in this ESI

16  Equipment and Engineering PowerPoint.

17  **Q.**    Do you recall on cross-examination you were asked

18  questions about emails from vendors related to ESI in China?

19  **A.**    Yes.

20  **Q.**    I'd like to use the ELMO again, if I could, Ms. Ottolini.

21          I'm putting up what's Exhibit 1948, which is in evidence.

22          And do you recall that email, Special Agent Rometo?

23  **A.**    Yes.

24  **Q.**    And the email on the bottom of the page, on the screen as

25  you see it, what does that concern?

1  **A.**  So this is correspondence between a Christopher Toomey and

2  Allen Chang and Walter Liew.  Mr. Toomey is expressing that

3  he's received a request from an ESI Equipment and Engineering.

4  It seems to be that this is the first he's heard, and it isn't

5  clear as to whether he knows what that company is.  It reads

6  that it seems they are asking for a proposal to procure the

7  equipment on your behalf.

8  **Q.**  And they're acting as -- the email on the top references

9  ESI acting as the buying agent for USAPTI?

10  **A.**  Yes.

11  **Q.**  Okay.  I'd like to show you what's also in evidence,

12  Exhibit 2886.  Do you see that email?

13  **A.**  Yes.

14  **Q.**  And is that an email to a vendor concerning screw

15  conveyors from that same ESI China address?

16  **A.**  Yes.

17  **Q.**  And while we're talking about it, do you see that it says,

18  "ESI.China@163.net?

19  **A.**  Yes.

20  **Q.**  Do you know what 163.net is?

21  **A.**  Yes.  163.net, it's very similar to a Hotmail or Yahoo! or

22  Google gmail account.  It's a service through which anyone can

23  register an email address and select the name.

24  **Q.**  Going back to the substance of the email, this concerns

25  ESI China acting as a -- in some role in the equipment

1  procurement area?

2  **A.**   Yes.

3  **Q.**   And could you read the first sentence under, "Dear

4  Mr. Porterfield"?

5  **A.**   (reading)

6        "We are ESI Equipment and Engineering PTE, Limited.

7        We were entrusted by end user Pangang Group to inquire

8        screw conveyors and degassing screw, which used at their

9        titanium tetrachloride project in China."

10 **Q.**  So this email suggests that ESI Equipment and Engineering

11 is entrusted by the end user?

12 **A.**  That's correct.

13 **Q.**  Which is Pangang Group?

14 **A.**  Right.

15 **Q.**  Not by USAPTI?

16 **A.**  Right.

17 **Q.**  I'm going to show you what's already in evidence as

18 Exhibit 2885.  Do you see that document?

19 **A.**  Yes.

20 **Q.**  Is this very similar to the one we just looked at?

21 **A.**  It is.

22 **Q.**  And it deals with just a different type of component?

23 **A.**  Yes.

24 **Q.**  And, again, who -- could you read that first sentence?

25 **A.**  (reading)

1           "We are ESI Equipment and Engineering PTE, Limited.

2      We are glad to contact with you to inquire TiCl4 pumps

3      which used for Pangang Spong Titanium Project in China."

4  **Q.**   And, again, the end user -- the end user information, I

5  suppose, it's in the last sentence, could you read that, too,

6  "we are entrusted"?

7  **A.**   (reading)

8           "We are entrusted by end user to follow up the

9      trading business."

10 **Q.**   And, again, that's the end user Pangang Group?

11 **A.**   It isn't listed here.  I would assume so, yes.

12 **Q.**   And there's a cc line on that email?

13 **A.**   There is.

14 **Q.**   Do you recognize that email address?

15 **A.**   I do.  That's Christina Liew's email address.

16 **Q.**   And, quickly, I didn't ask you, but do you also see that

17 email address on the document we just looked at, 2886, the same

18 cc line?

19 **A.**   Yes.  Her email address is also on this document.

20 **Q.**   Do you recall on cross-examination you were asked

21 questions about the signatory authority on the bank accounts

22 affiliated with certain companies?

23 **A.**   Yes.

24 **Q.**   And the signature authority for ESI, do you recall which

25 individuals have signature authority on those accounts?

1  **A.**   Christina Liew and Qiao Mu.

2  **Q.**   Christina Liew has power over the bank account affiliated

3  with ESI?

4  **A.**   That's correct.

5  **Q.**   And do you know whether Christina Liew entered into an

6  agreement to buy property in Singapore around the time that

7  we've been discussing these ESI China emails?

8  **A.**   Yes.

9  **Q.**   And do you know how much that property cost?

10  **A.**   It was worth, I think, over 3 million Singapore dollars.

11  At the time -- I can't recall off the top of my head what the

12  exchange rate would have been.  I think the exchange rate is

13  slightly less, so it would have been between 2 and 3 million

14  U.S. dollars.

15  **Q.**   And was that approximately June of 2011?

16  **A.**   Yes.

17  **Q.**   You were also asked questions about Huan Qu company and

18  who had power over those accounts?

19  **A.**   Yes.

20  **Q.**   And did you speak to who had power over the bank account

21  associated with Huan Qu?

22  **A.**   So the signature authority for that bank account was

23  Li Rue.

24  **Q.**   And remind the jury who Li Rue is?

25  **A.**   It's Christina Liew's sister-in-law.

1   **Q.**   And who owned that company?

2   **A.**   That company was owned by Li Rue and Elaine Shu Peng Chin.

3   **Q.**   And who's Elaine Shu Peng Chin?

4   **A.**   Elaine Shu Peng Chin is Walter Liew's niece.

5   **Q.**   And you were also requested questions about who controlled

6   bank accounts related to Dongbei.  Do you remember that?

7   **A.**   Yes.

8   **Q.**   And did you speak to who controlled the bank accounts

9   affiliated with that company?

10  **A.**   Those bank accounts were controlled by Christina Liew and

11  Li Rue, Christina Liew's sister-in-law.

12  **Q.**   And who owned that company?

13  **A.**   The company was owned by Li Rue and Elaine Shu Peng Chin,

14  Walter Liew's niece and Christina Liew's sister-in-law.

15  **Q.**   Finally, you were asked some questions about control of

16  bank accounts affiliated with LHV company?

17  **A.**   Yes.

18  **Q.**   Do you recall that?

19  **A.**   Yes, I do.

20  **Q.**   And who controls the bank accounts associated with LHV?

21  **A.**   Christina Liew's sister-in-law, Li Rue.

22  **Q.**   And do you recall who owns that company?

23  **A.**   The company is owned by Christina Liew's sister-in-law,

24  Li Rue, and Walter Liew's niece, Elaine Shu Peng Chin.

25  **Q.**   During the course of the trial -- first of all, do you

1   recognize Christina Liew?

2   **A.**   Yes.

3   **Q.**   And have you seen her here in the courtroom during the

4   course of the trial?

5   **A.**   During the course of the trial, yes.

6   **Q.**   And can you say where she's been sitting, generally, in

7   the courtroom during the trial?

8   **A.**   She's not here today, but she's generally been sitting

9   really straight at my 12:00 o'clock about the second or third

10  row towards the wall.

11  **Q.**   Thank you.  You were also asked some questions on

12  cross-examination about money being transferred to Singapore,

13  and you answered that you knew that Walter Liew had directed

14  the transfer of money to Singapore; is that right?

15  **A.**   That's correct.

16  **Q.**   And do you know that Walter Liew transferred $22 million

17  to these six companies we've talked about in Singapore?

18  **A.**   I think it was over $22 million.

19          **MR. SCOTT:**  Nothing further, Your Honor.

20          **THE COURT:**  Ms. Agnolucci?

21          **MS. AGNOLUCCI:**  Yes, briefly, please, Your Honor.

22          **THE COURT:**  All right.

23                  (Pause in proceedings.)

24          **MS. AGNOLUCCI:**  May I proceed?

25          **THE COURT:**  Oh, yes.  Please do.

1            **MS. AGNOLUCCI:**  Mr. Guevara, could you please publish

2    Exhibit 2895?

3                          **<u>RECROSS-EXAMINATION</u>**

4    BY MS. AGNOLUCCI:

5    **Q.**   Special Agent Rometo, on cross-examination you testified

6    regarding this document, Exhibit 2895; correct?

7    **A.**   Yes.

8    **Q.**   And you stated that you didn't have that email at the time

9    that you interviewed Mr. Zhou; correct?

10   **A.**   I did not interview Mr. Zhou.

11   **Q.**   At the time the FBI interviewed Mr. Zhou?

12   **A.**   Not to my knowledge.

13   **Q.**   And that's why you believe the FBI did not ask Mr. Zhou

14   about ESI?

15   **A.**   I was not present during that interview.  I can't

16   ascertain what the agents were thinking at the time.  I don't

17   believe we had this email at the time, but I don't know that

18   for sure.

19   **Q.**   You later obtained this email, though?

20   **A.**   Yes.

21   **Q.**   And did you follow up with Mr. Zhou once you received the

22   email?

23   **A.**   Mr. Zhou was in China so, no.

24   **Q.**   And that's because the FBI allowed him to return to China?

25   **A.**   Mr. Zhou returned to China.

1    **Q.**    Because the FBI allowed him to?

2    **A.**    I don't think we can compel people to return or not.

3    **Q.**    You can compel people to remain, though?

4              **MR. SCOTT:**  Objection.

5              **THE COURT:**  Sustained.

6    **BY MS. AGNOLUCCI:**

7    **Q.**    You also testified on cross-examination that you didn't

8    locate the business of ESI China at a Shenzhen address that was

9    listed; correct?

10   **A.**    I did not find an online reference to that company at that

11   address.

12   **Q.**    An online reference.  Do you mean a Google Street View

13   search?

14   **A.**    I did look around sort of Google views.  I did not see an

15   indication that that company was at that address.

16   **Q.**    Did anybody travel to China to look specifically at that

17   address?

18   **A.**    No.

19   **Q.**    No.  Special Agent Rometo, you did a side-by-side

20   comparison of Exhibits 471T and 266T; correct?

21   **A.**    Yes.

22   **Q.**    Both appear to be PowerPoints regarding companies in the

23   TiO2 business?

24   **A.**    Yes.

25   **Q.**    And the ESI PowerPoint appears to state that ESI has

1    business related to TiO2; correct?

2    **A.**    That's the statement.

3    **Q.**    You testified that -- Mr. Guevara, can we please publish

4    Exhibit 1948?

5         Special Agent Rometo, you testified that this email shows

6    ESI acting as a buying agent for USAPTI; correct?

7    **A.**    That's the statement within the email.  We've received no

8    evidence that ESI was an actual buying agent.

9    **Q.**    But the statement in the email is that ESI had business

10   activities?

11   **A.**    That's Walter Liew's statement, yes.

12   **Q.**    And the statement in the other emails you reviewed with

13   Mr. Scott are that the Chinese customer Pangang entrusted ESI

14   to purchase its equipment; correct?

15   **A.**    Those are the statements, but they're contrary to other

16   documentation that I've seen which directly conflicts with

17   those statements.

18   **Q.**    You testified that Christina Liew purchased a house in

19   Singapore; correct?

20   **A.**    Yes.

21   **Q.**    That property is titled in her name alone and not in

22   Mr. Liew's name; correct?

23   **A.**    That's correct.

24   **Q.**    You also testified that Christina Liew has signatory

25   authority over various bank accounts; correct?

1   A.   Yes.

2   Q.   Do you know anything about the specifics of the financial

3   arrangement the Liews have within their marriage?

4   A.   I do not.

5   Q.   During the course of your investigation, didn't you come

6   to learn that they don't have any joint bank accounts?

7   A.   I've seen records for, I think, between 70 and 80

8   different bank accounts controlled by the Liews, so I'm very

9   unsure of their financial relationship.

10  Q.   Have you seen records of any joint bank accounts between

11  the Liews, any current joint bank accounts that the Liews have?

12  A.   I'm not sure.  I've seen so many records, I'm just not

13  sure.

14  Q.   Was it important to your investigation to determine

15  whether they held money separately or whether they shared

16  money?

17  A.   The financial situation was so confusing.  We attempted

18  but it was very difficult to unfurl the web of bank accounts.

19  Q.   So you couldn't conclude that they shared any money?

20  A.   That was not my conclusion yet, no.

21  Q.   One more set of questions regarding the companies that

22  Mr. Scott asked you about.

23       LHV Equipment and Services Pte. Ltd., the owner is a

24  relative of Christina Liew, not Walter Liew; correct?

25  A.   That's right.

1  Q.  And the signature authority is with a relative of

2  Christina Liew, not Walter Liew; correct?

3  A.  That's correct.

4  Q.  Dongbei Process Engineering, the owner is a relative of

5  Christina Liew, not Walter Liew; correct?

6  A.  That's correct.

7  Q.  And the signatory authority is with Christina Liew and

8  Christina Liew's sister-in-law; correct?

9  A.  That's right.

10  Q.  Huan Qu Process Equipment, Pte. Ltd., the owner is a

11  relative of Christina Liew; correct?

12  A.  That's right.

13  Q.  And the signature authority is with the sister-in-law of

14  Christina Liew; correct?

15  A.  Correct.

16  Q.  ESI Equipment, the owner is Christina Liew's brother;

17  correct?

18  A.  That's right.

19  Q.  And the signature authority is for Christina Liew and for

20  her brother; correct?

21  A.  That's right.

22       MS. AGNOLUCCI:  Thank you.  I have no further

23  questions.

24       THE COURT:  All right.  You're excused.  No more

25  questions.  No more questions.

1          **MR. SCOTT:**  May we have --

2          **THE COURT:**  No.

3          **MR. SCOTT:**  I don't want to ask any more questions.  I

4    want to have a quick --

5          **THE COURT:**  No, you can't have it.  You're excused.

6                          (Witness excused.)

7          **THE COURT:**  Thank you.  Call the next witness, please.

8          **MR. AXELROD:**  Thank you, Your Honor.  The

9    United States calls Meiqin Jiang.

10          **THE CLERK:**  Can you collect the exhibits?

11          **MR. AXELROD:**  And if I may have a moment to collect

12    all those exhibits?

13          **THE COURT:**  Yes.

14          **MR. AXELROD:**  Thank you, Your Honor.

15                          (Pause in proceedings.)

16          **THE COURT:**  Please step forward, ma'am.

17          **THE CLERK:**  Raise your right hand, please.

18                          **MEIQIN JIANG**,

19    called as a witness for the Government, having been duly sworn,

20    testified as follows:

21          **THE WITNESS:**  Yes, I do.

22          **THE CLERK:**  Thank you.  Please be seated and state and

23    spell your full name for the record.

24          **THE WITNESS:**  My name is Meiqin Jiang, first name

25    M-E-I-Q-I-N; last name Jiang, J-I-A-N-G.

1      **THE CLERK:**  Thank you.

2                      <u>**DIRECT EXAMINATION**</u>

3   **BY MR. AXELROD:**

4   **Q.**   Good morning, Ms. Jiang.

5   **A.**   Good morning.

6      **MR. AXELROD:**  I just need one moment, Your Honor, to

7   get in place.

8                      (Pause in proceedings.)

9   **BY MR. AXELROD:**

10  **Q.**   Ms. Jiang, where are you employed?

11  **A.**   I work as a revenue agent at Internal Revenue Service.

12  **Q.**   Can you describe --

13     **MR. FROELICH:**  Your Honor, may we just get a

14  direction?

15     **MR. AXELROD:**  And, Your Honor, I want to thank

16  Mr. Froelich for reminding the Government to advise the jury

17  and the Court that the testimony of Ms. Jiang relates solely to

18  Mr. Liew and USAPTI.

19     **THE COURT:**  All right.  Thank you very much.

20     Proceed.

21  **BY MR. AXELROD:**

22  **Q.**   Can you describe what your responsibilities are, in

23  general terms, as a revenue agent?

24  **A.**   As a revenue agent, I perform accounting and tax-related

25  work.  I conduct tax return examinations for the returns that

1   are assigned to me by applying the accounting theories and the

2   tax law.

3   **Q.**   How long have you been a revenue agent?

4   **A.**   I started this job in June 2009.

5   **Q.**   So that's about four and a half years?

6   **A.**   That's right.

7   **Q.**   Okay.  Can you describe the training you've had as a

8   revenue agent?

9   **A.**   When I started this job back in June, sometime June and

10  July of 2009, I completed my 1040 tax return trainings.

11  **Q.**   And what did that consist of?

12  **A.**   That consists of the instructions how to prepare 1040

13  returns, instruction how to examine 1040 tax returns.  Also,

14  that consists of the procedures, how to communicate with the

15  taxpayer, as well as the audit -- audit techniques.  Also, the

16  tax laws associated with the 1040 tax returns.

17  **Q.**   And that training that you received, how long was that?

18  **A.**   That's about four weeks classroom training with one week

19  workshop.

20  **Q.**   Okay.  So you've got four weeks in the class and then one

21  week with a workshop?

22  **A.**   That's right.

23  **Q.**   And at the conclusion of that, do you take an examination?

24  **A.**   Yes.  I finished some tests during the trainings in order

25  to be classified as a revenue agent who can examine the 1040

**JIANG - DIRECT / AXELROD**

1   tax returns.

2   **Q.**   And did you pass that examination?

3   **A.**   Yes.

4   **Q.**   After that -- you mentioned 1040s.  Does that include --

5   are those just for individuals, or do those include some types

6   of businesses?

7   **A.**   What I mean by 1040 tax return, that includes nonbusiness

8   tax returns and business tax returns.  So they may be

9   applicable to individuals.  For the business tax returns, it

10  mainly consists of Schedule C, the sole proprietorship.

11  **Q.**   Okay.  After the training that you successfully completed

12  for the 1040s, did you subsequently receive additional training

13  on C corporations?

14  **A.**   Yes.  I took advanced trainings on the C corporations back

15  in July 2011.

16  **Q.**   And can you describe briefly what that training was, how

17  long it was and what it consisted of?

18  **A.**   Sure.  The training consists of the instructions how to

19  prepare the C corp. tax returns, instruction how to examine

20  C corp. tax returns, the applicable tax laws associated with

21  the C corporation returns, the audit procedures, how to work

22  with the taxpayers, how to -- the audit techniques, how to

23  examine C corp. tax returns, et cetera.

24       And for this trainings about three weeks in classroom

25  trainings with one-week workshops, and I passed the test.  I

1  passed all the tests during the training in order to be

2  certified as a revenue agent who can work on the C corporation

3  returns.

4  **Q.**   Could you briefly describe for the jury what -- we're

5  going to be talking more about C corporations, so could you

6  talk, in general terms, and explain what take C corporation is,

7  what its characteristics are?

8  **A.**   Sure.  A C corporation is a legal entity that is

9  established to conduct business activities and other associated

10  activities.  A C corporation is separated from the -- its

11  owner.  The owners of the C corporation, we call them

12  stockholders or shareholders, so the C corporation pay its own

13  tax based on the taxable income that they earned from the

14  business.

15  **Q.**   And that type of corporation where the corporation pays

16  its own taxes is different than, like, a flow-through-type

17  entity; right?

18  **A.**   That's right.

19  **Q.**   Okay.  And are those S corps.?

20  **A.**   C corp. is different from the S corp.

21  **Q.**   Right.  So -- and let me switch gears then.

22      At some point in time did you receive training on

23  S corporations?

24  **A.**   Yes.

25  **Q.**   And can you describe?

1   **A.**   Sure.  Back in January of 2012, I had another advanced

2   trainings that includes S corporation and partnership returns

3   trainings.

4        For that training, I learned about the instruction how to

5   prepare and how to examine the S corporation return and the

6   partnership returns.

7        Also, I learn about the applicable tax laws relating to

8   these two entities.  I learn about the audit procedures, how to

9   work with the taxpayers, as well as the audit techniques, how

10  to examine these business entities.

11  **Q.**   How long was that training?

12  **A.**   That training took about three weeks in classroom training

13  and one week workshop.

14  **Q.**   And at the conclusion of that training, did you have an

15  examination?

16  **A.**   Yes.  I passed all of the tests during the training in

17  order to be certified as a revenue agent to work on the

18  S corporation return, as well as the partnership tax return.

19  **Q.**   Okay.  So with respect to the training that you've

20  described and the certifications you've described so far, you

21  had an initial training that was four weeks of classwork, plus

22  one week of workshop; right?

23  **A.**   Yes.

24  **Q.**   That's five weeks.

25       Then you had additional training on the C corporations,

**JIANG - DIRECT / AXELROD**

1  and that was three weeks of course work and one week of

2  workshop; right?

3  **A.**  Yes.

4  **Q.**  Okay.  So that's another four weeks.

5      And then on the S corporations, you had three weeks of

6  course work and one week of workshop?

7  **A.**  S corp. and partnership together.

8  **Q.**  Excuse me, S corp. and partnership.  And that was another

9  four weeks total; right?

10  **A.**  Yes.

11  **Q.**  Okay.  So in addition to that training as an IRS revenue

12  agent, do you receive separate annual training?

13  **A.**  Yes.  I receive enhanced trainings every year to keep

14  myself updated to the tax laws.  So that's about 40 hours every

15  year.

16  **Q.**  And in the course of your four and a half years at the

17  IRS, how many of those trainings have you had?

18  **A.**  About four of them.

19  **Q.**  Okay.  So it's another four weeks of training?

20  **A.**  That's right.

21  **Q.**  Okay.  Can you describe briefly for the jury the types of

22  cases that you handle in your -- maybe you can describe your

23  day-to-day work as a revenue agent and the kinds of cases you

24  handle.

25  **A.**  Okay.  As a revenue agent, I work closely with the

1  taxpayers and/or their representative.  So I conduct my

2  examination in the fields.  I conduct interview with the

3  taxpayer or their representative.  I learn about their business

4  practice.  I tour their business locations; and with the

5  information gathered during the tour, during the interview, as

6  well as learning their business practice, I closely examine

7  their books and records they use to prepare the tax returns.  I

8  prepare returns based on my findings during the examinations.

9  **Q.**  And could you describe -- give the jury a sense of sort of

10  the volume of cases that you handle on a regular basis?

11  **A.**  Okay.  I have about -- for every four-week cycle, I have

12  about between 25 to 30 cases I need to work on.  So what that

13  means is about 25 to 30 tax returns I work on during the

14  four-week cycle that consists mainly of the business tax

15  returns.  That includes the sole proprietorship, C corporation,

16  S corporation, as well as the partnership.

17  **Q.**  And can you give an estimate of the numbers over your four

18  and a half years of different types of cases, like roughly how

19  many C corporation returns have you handled and S corporation

20  returns and sole proprietorships?

21  **A.**  Okay.  For the sole proprietorship, so I worked on

22  possibly about 150 tax returns, 150 tax years.

23  **Q.**  Okay.

24  **A.**  For C corp. I started working on the C corp. since 2000 --

25  sometime August 2011, right after the training.  So that's

about, possibly, 60 tax returns that I work on.  That's 60 tax
years.

     For the S corp. and the partnership, I started working on
those returns sometime February 2012, right after the training.
I worked about approximately 50 tax returns relating to those
entities.

**Q.**   And on all those returns you've examined, are you required
to look at the issue of gross receipts?

**A.**   Yes.  For every business tax returns that I work on, I'm
required to examine the gross receipt issue.

**Q.**   And could you describe what gross receipts are for a
business?

**A.**   Sure.  Gross receipts generally is the total amount or
gross amount of incomes that receive from the service provided
or from the goods sold.

**Q.**   And, so, in the course of your work as an IRS agent,
you've looked at gross receipts of how many different tax
returns, roughly?

**A.**   That's close to -- if I add up all the business tax
returns together, that's close to 150 sole proprietorship, 60
C corp., 50 returns for entities, so that's close to 260.

**Q.**   And prior to joining the IRS, can you describe your -- the
educational background that you have?

**A.**   I graduated at San Francisco State University back in
May 2009, and I obtained a Bachelor of accounting.

1          **MR. AXELROD:**  Your Honor, at this point in time, the

2    United States would offer Ms. Jiang as an expert in income

3    taxation.

4          **MR. GASNER:**  No objection.

5          **THE COURT:**  All right.  Thank you very much.

6       You may proceed.  And, again, ladies and gentlemen, I will

7    instruct you further at the end of the case.

8       Generally, people -- most witnesses are not allowed to

9    testify as to their opinions, only what they perceive with

10   their five senses.  The exception has to do with expert

11   witnesses who the law allows to express their opinions.

12   However, as I'll tell you later in the case, you're not bound

13   by any expert's opinion, and you should treat the expert's

14   opinion with the same level of scrutiny as you would any other

15   witness and determine for yourselves how much, if any, of the

16   witness' testimony you wish to believe and find persuasive.

17   But I'll give you more information on that when we get to the

18   final instructions.

19       And with that you may proceed.

20         **MR. AXELROD:**  Thank you, Your Honor.

21   **Q.**  Ms. Jiang, in the course of your duties at the IRS, were

22   you assigned to assist in this prosecution?

23   **A.**  Yes.

24   **Q.**  And can you describe what you were asked to do?

25   **A.**  I serve as assisting revenue agent on this case.  So for

1    this case, I reviewed different types of records.  That

2    includes the records that are prepared by -- the records of the

3    Performance Group corporation, as well as the USAPTI's

4    corporation's information.  I also reviewed the records that

5    are prepared by the -- these two corporations return preparer.

6         I reviewed -- I reviewed records from various financial

7    institutions, as well as the information provided from some

8    foreign entities, including ACRA, as well as the entities who

9    assist corporations of the Singapore entities.

10   **Q.**   And did that review also involve looking at the tax

11   returns that were filed by USAPTI and Performance Group over

12   time?

13   **A.**   Yes.  I review all of the returns that are prepared by

14   those two corporations.  Based on the information and the

15   documents that I reviewed, I prepare my -- I prepared the

16   examiner -- the examination reports and summary charts based on

17   my findings.

18   **Q.**   Okay.  And as part of your work, were you asked to review

19   various financial records from financial institutions related

20   to Performance Group and USAPTI?

21   **A.**   Yes.

22   **Q.**   And in particular were you asked to review records from

23   Cathay Bank?

24   **A.**   Yes.

25        **MR. AXELROD:**  Your Honor, may I approach --

1          THE COURT:  Yes.

2          MR. AXELROD:  -- with Exhibits 517, 518, 519, 543, and

3  544?

4          THE COURT:  Yes.

5          MR. GASNER:  Your Honor, can I ask Mr. Axelrod to

6  repeat those numbers, please?

7          THE COURT:  Please do.

8          MR. AXELROD:  Of course.  I'm going to be handing

9  Ms. Jiang Exhibits 517, 518, 519, 543, and 544.

10          THE COURT:  All right.  Do you have it, Mr. Gasner?

11          MR. GASNER:  Thank you, Your Honor.

12          THE COURT:  All right.  Proceed.  You may approach.

13          MR. AXELROD:  Thank you, Your Honor.

14  Q.  Ms. Jiang, I'm handing you these Exhibits 517, 518, 519,

15  543, and 544.  And if you could just take a brief moment to

16  review those.

17  A.  (Witness examines documents.)  Yes.

18  Q.  Okay.

19          MR. AXELROD:  And, Your Honor, I would advise the

20  Court that the parties have stipulated that these records are

21  authentic records from Cathay Bank and are admissible.

22          THE COURT:  Is that correct?

23          MR. GASNER:  That's true, Your Honor.

24          THE COURT:  All right.  So stipulated.  They are

25  admitted.

1           (Trial Exhibits 517, 518, 519, 543, and 544 received in

2    evidence)

3           **MR. AXELROD:**  Thank you, Your Honor.

4    **Q.**  Ms. Jiang, were you also asked to review records from Mega

5    International Commercial Bank?

6    **A.**  Yes.

7           **MR. AXELROD:**  And, Your Honor, may I approach with the

8    following records:  545, 546, 547, 548, 549, 550, 551, 552,

9    553, 590, 623, 624, 625, 626, 627, and 628?

10          **THE COURT:**  Did you get those numbers, Mr. Gasner?

11          **MR. GASNER:**  Yes, Your Honor.

12          **MR. AXELROD:**  I'm hoping Mr. Gasner heard me.

13          **THE COURT:**  I think he did.

14     All right.  You may do so.

15          **MR. AXELROD:**  Thank you.

16                    (Pause in proceedings.)

17   **BY MR. AXELROD:**

18   **Q.**  Ms. Jiang, I'm handing you Exhibits 545, 546, 547, 548,

19   549, 550, 551, 552, 553, 590, 623, 624, 625, 626, 627, and 628.

20   If you can just take a moment to review those.

21   **A.**  (Witness examines documents.)  Okay.

22   **Q.**  Are those all records from Mega International Commercial

23   Bank?

24   **A.**  Yes.

25          **MR. AXELROD:**  Your Honor, the parties have stipulated

1    that these records are from Mega Bank and admissible.

2                **MR. GASNER:**  That's true, Your Honor.

3                **THE COURT:**  All right.  Are you offering them?

4                **MR. AXELROD:**  I am.

5                **THE COURT:**  All right.  They're all admitted.

6           (Trial Exhibits 545 through 553, 590, and 623 through 628

7    received in evidence)

8                **MR. AXELROD:**  Thank you, Your Honor.

9    **Q.**   Ms. Jiang, were you also asked to review records from

10   California Pacific Bank?

11   **A.**   Yes.

12               **MR. AXELROD:**  And, Your Honor, may I approach to show

13   Exhibits 574, 576, 577, 579, 580, 581, and 582?

14               **THE COURT:**  Yes.

15               **THE CLERK:**  What was the last one?

16               **MR. AXELROD:**  582.

17               **THE CLERK:**  Thank you.

18   **BY MR. AXELROD:**

19   **Q.**   Ms. Jiang, I'm handing you those exhibits and ask if you

20   recognize those.

21   **A.**   (Witness examines documents.)

22               **THE COURT:**  Let's take a stretch break while the

23   witness is looking at the records.  You can take a stretch

24   break, too.

25                         (Pause in proceedings.)

1        **THE COURT:**  All right.  Please be seated whenever

2   you're ready, ladies and gentlemen.

3        And you may proceed.

4        **MR. AXELROD:**  Thank you, Your Honor.

5   **Q.**   Do you recognize those exhibits as from California Pacific

6   Bank?

7   **A.**   Yes.

8        **MR. AXELROD:**  Your Honor, the parties have stipulated

9   that Exhibits 574, 576, 577, 579, 580, 581 and 582 are

10  authentic records from California Pacific Bank and admissible.

11       **MR. GASNER:**  That's true.

12       **THE COURT:**  Are you admitting them?

13       **MR. AXELROD:**  Yes.

14       **THE COURT:**  They're all admitted.

15       (Trial Exhibits 574, 576, 577, 579, 580, 581, and 582

16  received in evidence)

17  **BY MR. AXELROD:**

18  **Q.**   Ms. Jiang, were you also asked to review records from East

19  West Bank?

20  **A.**   Yes.

21       **MR. AXELROD:**  And Your Honor, may I approach with

22  Exhibit 632?

23       **THE COURT:**  Yes.

24  **BY MR. AXELROD:**

25  **Q.**   Ms. Jiang, I'm handing you what's been marked as

1   Exhibit 632.  Do you recognize that document?

2   **A.**   Yes.

3   **Q.**   Is that a record from East West Bank?

4   **A.**   Yes.

5          **MR. AXELROD:**  Your Honor, the parties have stipulated

6   that that is an authentic record from East West Bank and

7   admissible.  The United States offers it.

8          **MR. GASNER:**  That's true.

9          **THE COURT:**  All right.  Admitted.

10      (Trial Exhibit 632 received in evidence)

11  **BY MR. AXELROD:**

12  **Q.**   Ms. Jiang, were you also asked to review records from the

13  Bank of China?

14  **A.**   Yes.

15         **MR. AXELROD:**  And, Your Honor, may I approach with

16  Exhibits 867 and 868?

17         **THE COURT:**  Yes.

18  **BY MR. AXELROD:**

19  **Q.**   Ms. Jiang, I'm handing you 867 and 868.  Do you recognize

20  those documents as records obtained from the Bank of China?

21  **A.**   (Witness examines documents.)  Yes.

22         **MR. AXELROD:**  Your Honor, the parties have stipulated

23  that these are authentic records from the Bank of China and

24  admissible, and the United States offers them.

25         **MR. GASNER:**  That's true.

**JIANG - DIRECT / AXELROD**

1    **THE COURT:**  All right.  They're admitted.

2    **MR. GASNER:**  No objection.

3    **THE COURT:**  I'm sorry.  They're admitted.

4    (Trial Exhibits 867 and 868 received in evidence)

5    **MR. AXELROD:**  Thank you.

6    **Q.**  Now, Ms. Jiang, you indicated earlier that one of the

7    things you worked on was developing some summary charts related

8    to the information you reviewed in this case.  Do you recall

9    that?

10   **A.**  Yes.

11   **Q.**  And based on your review, did you identify certain wire

12   transfers into the United States, coming into the

13   United States, for the benefit of Performance Group and USAPTI

14   related to TiO2 projects?

15   **A.**  Yes.

16   **Q.**  And did you prepare a summary of those transfers?

17   **A.**  Yes.

18   **Q.**  And is the chart or the summary that you created based on

19   the records that you just identified and other records that

20   have been admitted into evidence?

21   **A.**  That's true.

22   **MR. AXELROD:**  Your Honor, may I approach with

23   Exhibit 919?

24   **THE COURT:**  Yes.

25

1  **BY MR. AXELROD:**

2  **Q.**  Ms. Jiang, I'm handing you what's been marked as

3  Exhibit 919 and ask if you recognize that document.

4  **A.**  (Witness examines document.)  Yes.  I prepared these

5  charts.

6  **Q.**  Okay.  And that's based on the exhibits we just discussed?

7  **A.**  Yes.

8       **MR. AXELROD:**  Your Honor, the United States offers

9  Exhibit 919.

10       **THE COURT:**  Any objection?

11       **MR. GASNER:**  None, Your Honor.

12       **THE COURT:**  Admitted.

13       (Trial Exhibit 919 received in evidence)

14  **BY MR. AXELROD:**

15  **Q.**  Okay.  So the chart or charts we're about to look at, can

16  you describe what they contain, Ms. Jiang?

17  **A.**  So this is the first set of the charts that I prepared.

18  This is the -- it shows the wire-in transactions.  I prepared

19  it for each year from 2006, 2007, 2008, 2009, 2010, 2011.

20  **Q.**  Okay.  What I'd like to do -- Mr. Hemann, if you could go

21  to the second page of that exhibit.

22       And, Ms. Jiang, do you see on the screen before you the

23  incoming wires for 2006?

24  **A.**  Yes.

25  **Q.**  So can you describe for the jury what it is that we are

1    looking at?

2    **A.**    This wire-in transaction shows the funds that received

3    from China to the United States, and I have -- I prepared six

4    columns.  So the first column it shows the exhibit numbers.  So

5    those are the -- those are the supporting documents to show why

6    there's a wire transfers and how they occurred.

7        The second column shows the dates the funds came into the

8    United States.

9        The third column is the beneficiaries of the funds

10   transferred in.

11   **Q.**    And I see that, right, for 2006 it says PGUSA?  Right,

12   that's what we're talking about under name?

13   **A.**    Yes.

14   **Q.**    Does that stand for Performance Group?

15   **A.**    That's right, Performance Group USA.

16   **Q.**    And are there other entries we'll see for later years

17   where it says USAPTI?

18   **A.**    Yes.

19   **Q.**    And are those the -- are those designations based on the

20   identification in the bank financial records relating to that

21   particular transfer?

22   **A.**    That's true.

23   **Q.**    Okay.  Sorry, I interrupted.  You were about to go, I

24   think, to the next column.

25   **A.**    That's fine.

1      The next column is the reference contract.  So that

2   will -- that's related to the business engagements that

3   Performance Group USA or USAPTI were involved in with the

4   Chinese customer.

5      The next column, it's called "Incoming Wire Receiving

6   Financial Institution."  So that's the banks who received the

7   funds on behalf of the PGUSA or USAPTI.

8      Then the last column shows the amount of the funds that

9   were wired in.

10  **Q.**   Now, so, if I'm tracking you, for the year 2006, what

11  you're showing is $4.46 million coming in to the benefit of

12  Performance Group on those particular transactions?

13  **A.**   That's true.

14  **Q.**   That's the sum at the bottom?

15  **A.**   Yes.

16  **Q.**   Okay.  What I'd like to do is go through just one of these

17  transactions with you, we're not going to go through all of

18  them, but go through some of the backup documentation for one

19  of these transactions.  Okay?

20  **A.**   Okay.

21  **Q.**   And what I'd like to do is, the largest transaction there

22  is, do you see that, on August 8th, 2006?

23  **A.**   Yes.

24  **Q.**   And that's a 1.3-million-dollar transaction?

25  **A.**   Yes.

1   Q.   And it references in the Exhibit Number 527 on the left

2   column.  Do you see that?

3   A.   Yes.

4   Q.   And, Mr. Hemann, could you bring up -- this is an admitted

5   exhibit -- if you could bring up Exhibit 527, page 1.

6        And, Ms. Jiang, what are we looking at right there?

7   A.   This is a letter of credit prepared by the bank.  So the

8   bank issue this letter to guarantee the payments for the

9   seller.  So in this case, the applicant is Pangang Group

10  International.

11  Q.   And, Mr. Hemann, if you could highlight that.  It looks

12  like it's around line 50 there it says "Applicant."

13  A.   So in here shows that Pangang Group is the customer of

14  this bank, of this China Everbright Bank.

15  Q.   Okay.

16  A.   So the bank issue this credit letter on the benefit -- for

17  the benefits of the seller who provided service to

18  Pangang Group.

19  Q.   And who is that beneficiary?  I think that's the next item

20  down in the letter of credit.

21  A.   The beneficiary is Performance Group USA, Inc.

22  Q.   Okay.  And, so, they're the seller in the contractual

23  arrangement?

24  A.   Yes.

25  Q.   Okay.  And if you look at the bottom of that page, 527-1,

1  does it indicate what contract this relates to?  It kind of

2  carries over on to page 2 at the very bottom where it says

3  "contract equipment."

4  A.   Yes.

5  Q.   And could you read that line and the top of the next page?

6  A.   Okay.  On 45, line 45A, it says:  (reading)

7           "Contract equipment and spare parts for fluid-bed

8       chlorination and purification of 30K MTPY TiO2 by chloride

9       route project of Pangang Group Jinzhou Titanium Industry

10      Company, Limited.  Total amount:  3,108,800 U.S.A.

11      dollars."

12  Q.   And let me just stop you there.  Then a little bit further

13  down does it have a specific contract number?

14  A.   Yes.

15  Q.   And is that the same contract number that you have in your

16  chart under the reference?

17  A.   That's right.  That's the contract number that I also

18  referenced on my summary chart.

19  Q.   Okay.  And we'll go -- you're familiar with that contract?

20  A.   Yes.

21  Q.   Okay.  And, actually, if we could just briefly bring it

22  up, Mr. Hemann.  That's Exhibit 313.  If we could just briefly

23  look at the first page of the actual contract.  313.

24       Okay.  So that's the contract for which these payments are

25  being made?

**JIANG - DIRECT / AXELROD**

1  **A.**   Yes.

2  **Q.**   And if you look in the bottom there, it actually has that

3  same specific contract number?

4  **A.**   Yes.

5  **Q.**   Okay.  Now, you also referenced in your chart -- if we

6  could go back to the summary exhibit, 919 -- other exhibits.

7  And what I want to do is briefly look at those.

8       Mr. Hemann, if you could go to Exhibit 526.

9       And can you describe, Ms. Jiang, for the jury what this

10  record is that we're looking at?

11  **A.**   This is the wire confirmations that -- the wire

12  confirmation shows the wire-in transaction was completed.  So

13  the wire amount is -- shows on the top, it's one point -- about

14  1.3 million.

15  **Q.**   Okay.  And it's actually -- and we'll get to this.  If you

16  can see -- Mr. Hemann, if you can blow up on that exhibit, the

17  top half.

18       That shows a transaction occurring on what day?

19  **A.**   That's on August 1st, 2006.

20  **Q.**   Okay.  And it's an amount of 1.394 million?

21  **A.**   That's right.

22  **Q.**   And that's a little different than the number on your

23  chart; right?

24  **A.**   Yes.

25  **Q.**   Okay.  And why is that?

**JIANG - DIRECT / AXELROD**

1    **A.**    Pangang Group wires in this amount of money to the U.S.,

2    to the Performance Group USA.  So through this transactions

3    some of the amounts were deducted that includes the -- that

4    includes the handling cost charged by the bank, as well as some

5    of the -- looks like some of the small amount of payment to a

6    third party.

7    **Q.**    Right.  And, so, the other exhibit that you identified on

8    your chart is Exhibit 525.  Could we go to 525?

9        And, Mr. Hemann, if you could blow that up from the top.

10   Yeah.

11       What is Exhibit 525, Ms. Jiang?

12   **A.**    Can you go to the top a little bit?  It shows the advice

13   of -- advice of payment.  So that's the advice of payment

14   prepared by the bank to notify the Performance Group they

15   received this amount of money from China.

16   **Q.**    Okay.  And you can see a moment ago when we were looking

17   at the wire transfer, it said it was 1.394 million, and that's

18   the number on the top of that payment advice; right?

19   **A.**    That's right.

20   **Q.**    But then below that there's a line "net proceeds."  Do you

21   see that?

22   **A.**    Yes.

23   **Q.**    And that's the 1.3 million that's referenced on your

24   chart; right?

25   **A.**    Yes.

**JIANG - DIRECT / AXELROD**

1   Q.   Why did you -- why is it that number that's on the chart?

2   A.   Okay.  As I briefly discussed earlier, some of the amounts

3   it's handling costs charged by the bank; and then there are

4   other small portion of them is the payments paid to some third

5   parties, which can be the subcontractors.  So -- but for this

6   particular payments, it shows that the -- can you go up the

7   amount a little?  Can you go to the top?  Thank you.

8        So as you can see, the LC negotiation amount, that's

9   1,394,000.  So Performance Group is entitled to these payments,

10  and that's the -- that's their payment received from the

11  Pangang Group.

12       And then after the handling costs and the small portion of

13  the amount to the third party, so 1.3 million, that's the --

14  that's the net proceeds to Performance Group.

15  Q.   Okay.  And this payment was pursuant to a letter of

16  credit; right?

17  A.   Yes.

18  Q.   And you're familiar with the letters of credit in this

19  case?

20  A.   Yes.

21  Q.   And for this letter of credit, did it require Performance

22  Group to present documents to the bank in order to actually get

23  this payment?

24  A.   Yes.  It's a requirement to issue a credit.  In this case,

25  it's one of the requirements in their contracts.

**JIANG - DIRECT / AXELROD**

1  Q.  And Mr. Liew is the person who would provide those

2  documents to the bank?

3  A.  That's right.

4  Q.  So what I'd like to do is look -- and did he do so in this

5  particular case?

6  A.  Yes.

7  Q.  And I'd like to look at Exhibit 926 with you briefly.

8      Mr. Hemann, if you could bring that up.

9      And, Ms. Jiang, do you recognize this Exhibit 926?

10 A.  Yes.  This is the package of the documents prepared by the

11 bank.

12 Q.  Okay.  So this is what the bank in the U.S. gets to then

13 send over to ensure payment on the letter of credit?

14 A.  That's true.

15 Q.  Okay.  And in the top it says, "Amount negotiated 1.394."

16 Do you see that write below the letter of credit?

17 A.  Yes.

18 Q.  Okay.  So we're looking at the documents that relate to

19 this particular payment that we've been talking about; right?

20 A.  Right.

21 Q.  And if you go -- Mr. Hemann, could you go to the second

22 page of that document?

23      And, Ms. Jiang, do you recognize that?

24      And maybe you could blow up the top half of that,

25 Mr. Hemann.

1          Do you recognize that document?

2   A.    Yes.

3   Q.    What is it?

4   A.    This document is called "Bill of Exchange."  So this is a

5   financial instrument prepared by the bank, by, in this case,

6   it's Chiao Tung Bank.  Chiao Tung Bank issued this document to

7   order China Everbright Bank to make payments to Performance

8   Group.

9   Q.    And who signed that?

10  A.    Walter Liew.

11  Q.    Now, we're looking at Chiao Tung Bank.  Chiao Tung was

12  later bought up by -- or, excuse me, became Mega International

13  Commercial Bank; is that right?

14  A.    That's right.

15  Q.    Okay.  And if we could go to the next page, to 926-3.

16         Do you recognize that document?

17  A.    Yes.

18  Q.    What is it?

19  A.    This is a commercial invoice issued by Performance Group

20  USA, and it's billed to Pangang Group international for the

21  service provided or the equipment sold to Pangang Group.

22  Q.    Okay.  And, so -- and who signed that document?

23  A.    Walter Liew.

24  Q.    And, so, this is Performance Group's invoice that they

25  need to submit to then get paid on the contract; right?

1  **A.**    That's true.

2  **Q.**    Okay.  Now, if we could step back out to your summary

3  chart, to 919, page 2.

4       And we were looking at this transaction on August 8th,

5  2006; right?

6  **A.**    Yes.

7  **Q.**    And what I want to do is talk to you about after those

8  funds came in for the benefit of Performance Group, what

9  Performance Group did next with it.

10      So can you briefly describe what the next step was once

11  this money came to the bank in the United States?

12  **A.**    Okay.  After receiving these funds, Walter Liew as the

13  president of the Performance Group USA, instructed the bank to

14  wire out these funds to, in this case, it's to two different

15  parties.

16  **Q.**    Okay.  And, so, Mr. Hemann, could you bring up

17  Exhibit 528?

18      And, Ms. Jiang, do you recognize this document?

19  **A.**    Yes.

20  **Q.**    Are these the instructions that you were just talking

21  about?

22  **A.**    Yes.

23  **Q.**    Okay.  And, Mr. Hemann, could you blow up the letter from

24  "Dear Joseph" down to the signature block?

25      And, first of all, Ms. Jiang, the amount received by

1   Performance Group was $1.3 million, give or take; right?

2   A.   Yes.

3   Q.   If you add up those two payments that are now being

4   disbursed, is that the total of the amount that was received?

5   A.   Yes.

6   Q.   And the first payment, could you describe what the

7   instructions were?  Actually, if you could just read the wire

8   transfer amount for payment one and then where it was going.

9   A.   After receiving the funds, Walter Liew directed the bank

10  to wire out total amount of $38,031 to Bank of China, and the

11  beneficiary of -- beneficiary name of that account is Qiao

12  Hong.

13  Q.   And who is Qiao Hong?

14  A.   Qiao Hong is Christina Liew, Walter Liew's wife.

15  Q.   And where did those funds go?

16  A.   To Bank of China.

17  Q.   Okay.  So they went to an account at the Bank of China in

18  China?

19  A.   Right, to the account that's owned by Qiao Hong.

20  Q.   Now, there's another payment down there as well; right?

21  A.   Right.

22  Q.   So how much is that payment and where did that go?

23  A.   After receiving the funds from the Chinese customer,

24  Walter Liew directed the bank to wire out total amount of

25  1,272,000 to Huadong Equipment Solutions company.

**JIANG - DIRECT / AXELROD**

1  Q.   Now, I want to ask you some questions about that transfer,

2  and in particular I'm going to use this demonstrative board,

3  which is marked -- actually, it's not marked with a number

4  right now, but this is a board -- have you seen this board

5  before?

6  A.   Yes.

7  Q.   Okay.  During the testimony of Mr. Guan?

8  A.   Yes.

9  Q.   Okay.  And this has information about Mr. Liew's tax

10  returns -- the tax returns that Mr. Liew filed on behalf of

11  USAPTI and Performance Group?

12  A.   Yes.

13  Q.   Okay.  And it identifies gross receipts for various years?

14  A.   Yes.

15  Q.   Okay.  So going back to this 1.3-million-dollar transfer

16  in August of 2006, did Mr. Liew declare those funds that his

17  business received on his tax return?

18  A.   I don't think so.

19  Q.   Okay.  Well, when you say you don't think so, why not?

20  A.   The funds that -- after having control of this

21  1.3 million, this 1.3 million, it's not on -- it's not reported

22  as gross receipts or gross income on the company's books.

23  Q.   And let me step back and ask you.

24       Mr. Hemann, if we can go back to 919, page 2.

25       And just focusing on that particular transaction for a

 1  moment, does that transaction constitute gross receipts for

 2  Performance Group for that tax year?

 3  **A.**    Yes.

 4  **Q.**    And why do you say that?

 5  **A.**    Because Performance Group got paid for the service they

 6  provided to Pangang Group for the goods they sold to

 7  Pangang Group.  So they got paid for the service they

 8  provide -- they provided.

 9  **Q.**    And they got paid under the contract that we briefly

10  looked at, Exhibit 313; right?

11  **A.**    That's true.

12  **Q.**    And, Mr. Hemann, if you could bring up 313 again,

13  Exhibit 313.  And if we could go to page 4.

14          And, Ms. Jiang, could you read -- we'll blow up the top

15  paragraph there.

16          And could you please read that?

17  **A.**    (reading)

18              "Pangang Group International Economic and Trading

19          Company Limited, Chengdu City, Sichaun, China, as

20          entrusted by Pangang Group Jinzhou Titanium Industry

21          Company, Limited, as one party (hereinafter referred to as

22          the Buyer) and Performance Group USA, Inc. as another

23          party (hereinafter referred to as the Seller) agree to

24          enter into the present contract for fluid-bed chlorination

25          and purification of a 30K MTPY TiO2 by chloride route

1        project of Pangang Group Jinzhou Titanium Industry

2        Company, Limited, under the following terms and

3        conditions."

4   **Q.**   So in this contract Performance Group is the seller;

5   right?

6   **A.**   That's true.

7   **Q.**   And no other party is identified as the seller?

8   **A.**   No.

9   **Q.**   And the seller and buyers have certain obligations and

10  responsibilities that are identified in this contract; don't

11  they?

12  **A.**   Yes.

13  **Q.**   And if we could go look at -- if we could go to page 5.

14  Mr. Hemann, if you could go to the next page.  And if we could

15  highlight paragraph 2.1.

16       And, Ms. Jiang, could you please read that?

17  **A.**   Okay.  (reading)

18            "2.1.  The Buyer agrees to purchase from the Seller

19       and the Seller agrees to sell and supply to the Buyer the

20       Contract Equipment, the Seller's Engineering and Technical

21       Documentation, Service and Training in order to

22       successfully construct fluid-bed chlorination and

23       purification of a 30K MTPY TiO2 by chloride route project

24       at the end user's site all under the conditions and terms

25       as stipulated in the present Contract and its

1            Attachments."

2   **Q.**   And could you go, Mr. Hemann, to the next page, to

3   paragraph 2.5?

4        And, Ms. Jiang, could you please read that paragraph?

5   **A.**   (reading)

6            "2.5.  The Seller shall have the overall and general

7        technical sole responsibility for the complete, correct,

8        and quality performance of his obligations in the Design,

9        Service, Training supply of the Contract Equipment and the

10       Technical Documentation all in accordance with the

11       stipulations of the Contract and its Attachments."

12  **Q.**   And, Mr. Hemann, if you could go to page 22, and highlight

13  paragraph 14.7.

14       And, Ms. Jiang, could you please read that paragraph?

15  **A.**   (reading)

16           "14.7.  No assignment, cession, or transfer of any

17       rights or obligation arising under the present Contract

18       shall be made by one party to a third party without the

19       previous written consent of the other party."

20  **Q.**   So, Ms. Jiang, under this agreement, was any party

21  entitled to payment under the contract other than Performance

22  Group?

23  **A.**   No.

24  **Q.**   As part of your investigation, did you look at tax returns

25  filed by Mr. Liew on behalf of Performance Group?

1    **A.**    Yes.

2    **Q.**    And, Mr. Hemann, could you bring up Exhibit 637?

3          And, Ms. Jiang, do you recognize that document?

4    **A.**    Yes.  This is 1120 C corporations filed by Performance

5    Group for tax year 2006.

6    **Q.**    Okay.  And I want to go -- Mr. Hemann, could you blow up

7    the gross receipts line?

8          Now, the gross receipts for that year is identified in the

9    tax return as $1,852,799.  Do you see that?

10   **A.**    Yes.

11   **Q.**    Okay.  That amount did not include the transactions that

12   we just discussed, did it?

13   **A.**    No, it didn't include.

14   **Q.**    And, in fact, if we could back out and go back to the

15   summary chart at page 2, I want to ask you about -- I want

16   to -- so that identifies a whole series of wires for the year

17   2006; right?

18   **A.**    Yes.

19   **Q.**    And for each of those transactions, did Walter Liew

20   control the incoming wires received on behalf of Performance

21   Group that are identified in those transactions?

22   **A.**    Yes.

23   **Q.**    And did all of those wire transfers constitute gross

24   receipts for Performance Group for the year 2006?

25   **A.**    Yes.

1  **Q.**  So the gross receipts received by Performance Group that

2  you identified based on these records is $4,461,702.09?

3  **A.**  That's true.

4  **Q.**  Okay.  And that is different than the gross receipts that

5  were identified by Mr. Liew in the 2006 tax return?

6  **A.**  Yes.

7  **Q.**  Okay.  And it's also different -- well, we'll talk about

8  how it relates to the taxes later.

9     Now, let's -- so we just -- we kind of went in detail for

10  the year -- for this particular transaction 2006.  What I'd

11  like to do is ask you about the year 2007.

12     So if we could go to the next page of your chart.  And

13  could you describe for the jury what we're looking at?

14  **A.**  So this shows the wire-in transactions for 2007, and there

15  are four transactions.  And it shows that the funds transferred

16  from the U.S. customer -- sorry, the Chinese customer, the

17  Pangang Group, to the Performance Group.

18     So the Performance Group got paid for the service they

19  provided, and the total actual gross receipts income that

20  identify the total amount is $772,540.

21  **Q.**  Okay.  So that's gross receipts for tax year 2007?

22  **A.**  Yes.

23  **Q.**  And if we look at the tax return for 2007 that Mr. Liew

24  had filed, did he identify all of those gross receipts on his

25  return?

**JIANG - DIRECT / AXELROD**

1   **A.**   Not all of them.

2   **Q.**   Now, he did identify, if we look at your chart, the two

3   transfers in the Cathay Bank.  Those were identified as gross

4   receipts; right?

5   **A.**   Yes.

6   **Q.**   But the funds that were received at Mega Bank were not

7   identified as gross receipts?

8   **A.**   That's true.

9   **Q.**   And for that year, for 2007, did -- again, did Mr. Liew

10   control all of the incoming wires received on behalf of

11   Performance Group that we're looking at on your chart?

12   **A.**   Yes.

13   **Q.**   And let's move on to 2008 on your chart.

14   And if Mr. Hemann could advance us.

15   So, Ms. Jiang, again, could you describe for the jury what

16   it is that we're looking at?

17   **A.**   Okay.  So this is a similar chart that I prepared, but

18   it's for 2008.  That shows the wire-in transaction, the funds

19   transferred from Pangang Group to the Performance Group USA.

20   So the total amount of gross receipt income that I identify is

21   4.6 million; and according to the information that I reviewed,

22   the sales transaction has -- was completed based on the

23   information that I reviewed.

24   So in here Performance Group is the seller and the

25   Pangang Group is the buyer.

**JIANG - DIRECT / AXELROD**

1   Q.   And, so, in 2008, Performance Group received $4,619,906?

2   A.   Yes.

3   Q.   And does that constitute gross receipts for Performance

4   Group for that year?

5   A.   Yes.

6   Q.   And did you look at Mr. Liew's -- the return that he filed

7   on behalf of Performance Group for 2008?

8   A.   Yes.

9   Q.   And he identified $368,581 as his gross receipts for that

10  year?

11  A.   Yes, instead of 4 million.

12  Q.   Now, did he control all of the wires that came in that are

13  identified on your chart?

14  A.   Yes.

15  Q.   Now, I want to ask you about 2008, because -- you're aware

16  of the fact that Mr. Liew filed bankruptcy on behalf of

17  Performance Group on January 14th of 2009; right?

18  A.   Yes.

19  Q.   And you've reviewed materials related to that bankruptcy?

20  A.   Yes.

21  Q.   And you are aware of the fact that he testified in a

22  bankruptcy proceeding in February of 2009, February 4th, 2009?

23  A.   Yes.

24  Q.   And are you aware of the fact that he had told the trustee

25  that Performance Group had closed down since the beginning of

**JIANG - DIRECT / AXELROD**

1    November 2008?

2    **A.**    Yes.

3    **Q.**    Okay.  Now, if you look at your chart here, we can see on

4    October 22nd, 2008, there was actually a receipt of one

5    point -- $1,359,980 on a particular contract?

6    **A.**    Yes.

7    **Q.**    Okay.  Now, let's move forward to 2009.

8    **A.**    So for this chart that I prepared, again it shows the

9    wire-in transactions that the transfers come from Pangang Group

10   to PGUSA or USAPTI.  So the total amount of gross receipts are

11   received by these two corporations.  The total amount is 4.9

12   millions.

13   **Q.**    Okay.  So -- and let me -- let's -- this is the first time

14   we're seeing a transaction where the funds are going to USAPTI;

15   right?

16   **A.**    Yes.

17   **Q.**    And it references a particular contract; right?

18   **A.**    Yes.

19   **Q.**    And you're familiar with that contract?

20   **A.**    Yes.

21   **Q.**    And, Mr. Hemann, could you bring up Exhibit 317?  And if

22   you could blow that up.

23        Is this the contract that is referred to in your summary

24   chart?

25   **A.**    Yes.  That's related to the 100K TiO2 project.

**JIANG - DIRECT / AXELROD**

1   Q.   Okay.  And if you look -- if you look on the contract in

2   the bottom, there's a contract number in 317.  Is that the same

3   number that you've identified as a reference in your chart?

4   A.   That's true.

5   Q.   Okay.  And I'm not going to go through all the terms of

6   that contract with you; but under the terms of that contract,

7   was anyone other than USAPTI entitled to payment of those fees?

8   A.   No.

9   Q.   And for 2009, going back to your chart, Mr. Liew

10  controlled all of -- the disposition of the funds that came in

11  from those wires?

12  A.   Yes.

13  Q.   And you indicated there's almost $5 million of funds.  Did

14  those all constitute gross receipts for the two businesses that

15  are identified?

16  A.   Yes.

17  Q.   Okay.  And you've reviewed the tax returns filed by

18  Mr. Liew on behalf of USAPTI and Performance Group for the year

19  2009; right?

20  A.   Yes.

21  Q.   Okay.  So if we look here at 2009, the Performance Group

22  return is for -- excuse me, the USAPTI return is $713,685;

23  right?

24  A.   Yes.

25  Q.   Okay.  So that's a lot less than 5 million?

**JIANG - DIRECT / AXELROD**

1   **A.**   That's true.

2   **Q.**   Let's move on to 2010.  Can you describe for the jury what

3   we're looking at with 2010?

4   **A.**   Okay.  So this chart shows the wire-in transactions for

5   2010.  So the transactions represent the funds transferred from

6   Pangang Group to USAPTI or Performance USA.  So the total

7   amount of gross receipts they collected is 7.7 million.

8   **Q.**   Okay.  So for 2010, there's -- it looks like there's one

9   payment in August of 2010 to USAPTI for 6.2 million; right?

10  **A.**   Yes.

11  **Q.**   And then the rest of the payments are to Performance

12  Group; right?

13  **A.**   That's true.

14  **Q.**   And that totals the 7.7 million.

15       For that year did Mr. Liew control the disposition of

16  those funds that were received on behalf of Performance Group

17  and USAPTI?

18  **A.**   Yes.

19  **Q.**   And looking at his return for 2010 -- first of all, there

20  was no return filed for Performance Group in 2010; was there?

21  **A.**   No.

22  **Q.**   Okay.  And no return for Performance Group filed in 2009

23  either; right?

24  **A.**   No.

25  **Q.**   Okay.  So for 2010 for performance, he identified gross

1    receipts of $895,448?

2    **A.**    Yes.

3    **Q.**    Okay.  How does that compare to $7,753,009.64?

4    **A.**    A lot less.

5    **Q.**    Okay.  I want to ask you to look -- so all of these funds

6    are gross receipts for the business -- businesses?

7    **A.**    Yes.

8    **Q.**    Okay.  And then let's look -- you also did the year 2011?

9    **A.**    Right.

10   **Q.**    Okay.

11          **THE COURT:**  Before we get to that, maybe this would be

12   a good time to take our break.

13          **MR. AXELROD:**  Yes, Your Honor.

14          **THE COURT:**  All right.  So, ladies and gentlemen,

15   we're going to take our second and last break of the morning.

16       Please remember the Court's admonitions and keep an open

17   mind, and don't receive any outside information.  And we'll see

18   you in 15 minutes.

19       And you may step down, Agent.

20                     (Pause in proceedings.)

21       (Proceedings were heard out of the presence of the jury:)

22          **THE COURT:**  Before we start our break, what's your

23   updated estimate now, because I want to tell them before they

24   leave what we're looking like in terms of schedule.

25          **MR. AXELROD:**  Yes, Your Honor.  We will not finish

**PROCEEDINGS**

1    today.  I think, you know, things have slowed down a little

2    bit, and we will finish tomorrow at some point in the morning,

3    depending on how much cross-examination there is of this

4    witness.

5        We have at least three more witnesses after this witness

6    and, you know, I would expect that we'll take up probably a

7    couple hours tomorrow morning with testimony.

8            THE COURT:  All right.  So you all should discuss the

9    matter with Defense counsel after we break in the afternoon so

10   they'll have a sense of when, if at all, they need to have a

11   witness available tomorrow.

12       And I plan on telling the jury that the Government is

13   likely to rest tomorrow, and then if there's going -- if the

14   defendants choose to put on a defense, they'll start right

15   away, and we expect testimony to be completed -- to fill in the

16   blank.  Do you imagine that would be next week?

17           MR. GASNER:  That we would rest, Your Honor?

18           THE COURT:  Yes.

19           MR. GASNER:  It depends.  We have -- if Mr. Maegerle

20   testifies, that could be lengthy.

21           THE COURT:  Okay.

22           MR. GASNER:  Mr. Cooper is our technical expert.  He's

23   going to be lengthy.  So a lot depends.  And over the weekend

24   we're going to be working to assess whether Mr. Maegerle's

25   going to testify and also to work with Mr. Cooper to see how

**PROCEEDINGS**

1  long.  So it's a little -- it could be done during the week.

2  It might go a little bit into the following week, but I don't

3  think much.

4      **THE COURT:**  All right.  Well, the likelihood is, then,

5  still there's a high likelihood the jury will get this case in

6  this calendar month --

7      **MR. GASNER:**  Absolutely.

8      **THE COURT:**  -- if not -- if not sometime the week

9  after next depending upon how things unfold here.

10      **MR. GASNER:**  Yes.  And, Your Honor, I would just point

11  out I think we're probably not going to get past the revenue

12  agent today.  I probably have 45 minutes or an hour of cross.

13  We may go longer tomorrow than just the two hours that

14  Mr. Axelrod predicted.

15      It would be of great assistance to the Defense to have the

16  weekend to get organized and not just have to throw up a

17  witness late in the day.

18      **THE COURT:**  All right.

19      **MR. GASNER:**  And especially in light of the Court's

20  ruling, we had planned on Mr. Klein and Mr. Cox, and now I've

21  learned that the Government thinks that they have nothing to

22  say.  So we may be a little short of witnesses late in the day.

23  I know the Court has a rule you rest and you're done, or you

24  don't have a witness and you're done.

25      **THE COURT:**  I know that, but I will -- I will -- we'll

**PROCEEDINGS**

1  break when the Government's done.

2      **MR. GASNER:**  That would be fantastic.  Thank you,

3  Your Honor.

4      **THE COURT:**  And perhaps, perhaps in terms of under the

5  heading of be careful what you wish for, we might use that time

6  to start the arguments.

7      **MR. GASNER:**  I'd rather do that.  Ms. Lovett is back

8  at the office, and she'll be ready for that; but getting

9  witnesses here in light of a change in the landscape --

10      **THE COURT:**  I understand.  So let's -- on the

11  assumption the Government will rest tomorrow, we'll have

12  motions.  We'll start, depending on when it is, I'm not

13  going -- the Court has a criminal calendar starting at 1:30,

14  but there's a possibility, I'm just alerting you, that we might

15  fill in that time to at least begin the arguments.  I'm looking

16  forward to getting the outline that you all -- Ms. Agnolucci

17  committed to.

18      **MS. AGNOLUCCI:**  If I did, Your Honor --

19      **THE COURT:**  I assume she at least had apparent

20  authority to do that, if not actual.

21      **MR. GASNER:**  We're ready to make good on that promise.

22      **THE COURT:**  Okay.  So that's what I think we'll start

23  doing.

24      Yes, Mr. Hemann?

25      **MR. HEMANN:**  Well, we have an imaginary associate back

1   in the office, Your Honor, working on the Rule 29 motion.

2        **THE COURT:**  I thought it was the entire people of the

3   United States.

4        **MR. HEMANN:**  The entire people of the United States

5   are working on it.  We have Doug Wilson down there pounding

6   away.

7        So we would probably be inclined to ask the Court to sort

8   of stick for the Rule 29 purposes with the Friday morning idea

9   just so that we could be a little bit more prepared on the Rule

10  29; but I do think it would be useful to raise and discuss the

11  *Daubert* issue tomorrow when we're done.  It will give the

12  Defense time to plan and us time to address it.  So that would

13  be our suggestion.

14       I did want to raise one other issue that we can take up

15  either at the beginning or the end of the break.  One of the

16  questions that Ms. Agnolucci asked Special Agent Rometo was

17  whether the FBI was aware of joint checking accounts, and

18  Ms. Rometo's, Special Agent Rometo's response was there are

19  about 60 or 70, I don't know, and there was a couple of

20  follow-up questions.

21       And she had in her mind that there were, but she couldn't

22  say definitively.  There are, and we're up to about five now.

23  They've gone down to check.  We'd like to recall Special Agent

24  Rometo to answer that question, or alternatively call another

25  agent.  We have an IRS CID agent who's capable of answering the

1    question.  It was an important point that the Defense made

2    regarding commingling of funds.  It was the last point that the

3    jury heard, and the answer came out in a way that was not --

4    doesn't assist the jury in the truth-seeking function.

5         **THE COURT:**  All right.  I understand the argument.

6    I'm sure you're a hundred percent in favor of that; right?

7         **MS. AGNOLUCCI:**  Yes -- Well, Your Honor, we -- if the

8    Government wanted to recall a witness, that would be fine;

9    however, we're not aware of any currently opened joint bank

10   accounts.  So --

11        **THE COURT:**  I think you should meet and confer.

12        **MS. AGNOLUCCI:**  Yeah, we would want --

13        **THE COURT:**  Because we don't want a bell to be rung,

14   if you will, in front of the jury.  So at least let's get an

15   agreement as to whether documents exist that would tend to

16   support that; and if the Defense says, "Well, wait a minute,

17   you're mistaken, here's why," and you can't agree on that, I'd

18   like to be able to resolve that.

19        **MR. HEMANN:**  We will, Your Honor.  And I would just

20   like to point out that the question wasn't:  Are there any

21   currently opened joint bank accounts?  The question was:  Are

22   you aware of any joint bank accounts.  The response was:  There

23   have been about 60 or 70 over time.  And over time there

24   certainly have, including for some of the Singapore entities.

25        **THE COURT:**  All right.  Why don't you all talk to each

**PROCEEDINGS**

1    other.

2            **MR. HEMANN:**  We'll talk.

3            **THE COURT:**  Let's take our break, and then we'll see

4    where we go.  Thank you.

5                    (Recess taken at 11:44 a.m.)

6                 (Proceedings resumed at 12:05 p.m.)

7        (Proceedings were heard out of the presence of the jury:)

8            **THE COURT:**  All right.  Let's bring in the jury,

9    please.

10       (Proceedings were heard in the presence of the jury:)

11           **THE COURT:**  All right.  Please be seated.

12       Just one moment.

13                    (Pause in proceedings.)

14           **THE COURT:**  Proceed.

15           **MR. AXELROD:**  Thank you, Your Honor.

16   **Q.**  Ms. Jiang, I think we were just about to talk about the

17   year 2011.

18       Mr. Hemann, could you bring up the next page in that

19   exhibit?

20       And, Ms. Jiang, could you describe what we're looking at?

21   **A.**  So this is the wire-in transactions.  There are five

22   transactions shows that the funds transfer from Pangang Group

23   to USAPTI and Performance Group USA.  So both U.S.

24   corporations, they got paid for the service they provided, and

25   the total amount of gross receipts they collected from the

**PROCEEDINGS**

1    Chinese customer is about 5 million.

2    **Q.**    And then did you actually kind of summarize all this year

3    information in another chart?

4    **A.**    Yes.  I prepared a summary chart to show the actual gross

5    receipts that received from the Chinese customer.

6    **Q.**    Okay.  And if you could go to page 8, Mr. Hemann, the next

7    page.

8         Is this that summary on the screen?

9    **A.**    Yes.

10   **Q.**    Okay.  So could you describe to the jury what we're

11   looking at?

12   **A.**    Okay.  So this is the total wire-in funds.  At the bottom

13   it shows the total actual gross receipts, the Performance Group

14   USA and USAPTI.  The total amount they receive from the

15   customer was about 27 million.

16   **Q.**    Okay.

17   **A.**    And this is the actual gross receipts they collected, and

18   this should be reported before any business deductions or any

19   applicable credits.

20   **Q.**    And I want to talk a little bit about some of the other

21   work that you've done.

22        As part of your investigation, I think earlier you

23   testified that you reviewed the returns filed by Mr. Liew on

24   behalf of the two companies; is that right?

25   **A.**    Yes.

**PROCEEDINGS**

1    **Q.**   And did you also look at other records that were

2    maintained by the IRS?

3    **A.**   Yes.

4          **MR. AXELROD:**  And, Your Honor, may I approach with

5    Exhibits 644 through 654?

6          **THE COURT:**  Yes, you may.

7    **BY MR. AXELROD:**

8    **Q.**   Ms. Jiang, I'm going to hand you a series of Exhibits 644,

9    645, 646, 647, 648, 649, 650, 651, 652, 653, and 654, and ask

10   if you recognize those documents.

11   **A.**   (Witness examines documents.)  Yes.

12   **Q.**   Do you recognize those as IRS records?

13   **A.**   Yes.

14         **MR. AXELROD:**  And, Your Honor, the parties have

15   stipulated that these exhibits are records of the IRS and

16   admissible.

17         **MR. GASNER:**  That's true.

18         **THE COURT:**  Admitted.

19     (Trial Exhibits 644 through 654 received in evidence)

20         **MR. AXELROD:**  Thank you, Your Honor.

21   **Q.**   Ms. Jiang, did you prepare a chart reflecting the tax

22   return information that you have?

23   **A.**   Yes.

24         **MR. AXELROD:**  And, Your Honor, may I approach with

25   Exhibit 920?

**PROCEEDINGS**

1          **THE COURT:**  Yes.

2    **BY MR. AXELROD:**

3    **Q.**   Ms. Jiang, I'm handing you what's been marked as

4    Exhibit 920, and ask if you recognize that document.

5    **A.**   (Witness examines document.)  Yes.  That's another set of

6    charts that I prepared based on the review of the records.

7    **Q.**   Okay.  So that's based on the exhibits that have been

8    admitted in this case?

9    **A.**   Yes.

10          **MR. AXELROD:**  Your Honor, the United States offers

11   Exhibit 920.

12          **MR. GASNER:**  No objection, Your Honor.

13          **THE COURT:**  Admitted.

14      (Trial Exhibit 920 received in evidence)

15   **BY MR. AXELROD:**

16   **Q.**   And we're going to go -- so what's this chart that we're

17   about to look at, Ms. Jiang?

18   **A.**   This chart will show that -- the total amount of gross

19   receipts reported by both corporations and the unreported gross

20   receipts amount that was not claimed -- was not reported on the

21   return.

22   **Q.**   Okay.  And, so, now on the screen is the chart, and if you

23   could explain to the jury what it is and how it works.

24   **A.**   Okay.  So there are two charts on this sheet.  The top --

25   the top portion of the chart, it shows the total amount of

1   gross receipts reported by Performance Group USA or USAPTI.

2       And as we know, that for Performance Group they only

3   prepare returns for 2006, '7, and '8; and we can see the

4   amounts on the second column.

5       And for USAPTI they receive -- or they filed returns and

6   reported the gross receipts amount as indicated in this chart.

7   So they filed return for '08, '09, and '10, as well as '07; but

8   for '07 there's no income or expenses information on the

9   returns.

10  **Q.**   So let me just stop you there.

11      So on this top portion of the chart that we're looking at,

12  you combined the receipts that were reported in the Performance

13  Group return and in the USAPTI return to come up with sort of

14  like a total reported gross receipts?

15  **A.**   Yes.  The reason I combined them together is because

16  during the time I was reviewing the tax return for the gross

17  receipt amount received by these two corporations, and I see

18  some of the gross receipts they reported, it was not reported

19  on the correct tax return.

20      For example, for during 2008, in 2008 the gross receipts

21  that received from -- that should be received from Performance

22  Group, but they reported on the other corporation's tax return.

23  They reported the 500,000 on the USAPTI's tax return, and they

24  are separate entities, and I don't know why they did it.

25      But for the purpose of the tax calculation and the report

**PROCEEDINGS**

1  preparation, I combined them together because it will give the

2  taxpayer, the corporation, some tax benefits of paying less tax

3  liability of about 170,000 if I combine the entities together.

4  **Q.**  Okay.

5  **A.**  So there's some tax benefits there.

6  **Q.**  So then if you could walk us through.  So the top part is

7  the total reported gross receipts.  That's what's on the

8  returns.  What's the bottom part?

9  **A.**  The bottom part shows the amount they reported and the

10  amount they did not reported, but we identify earlier as shown

11  on my previous chart that I identified.

12      So here it's just from the second column, total actual

13  gross receipts less the total amount of gross receipts they

14  reported, and that's equals to the unreported gross receipts

15  that they not -- they did not report on the tax returns.

16  **Q.**  Okay.  So you take what was reported, you subtract out --

17  excuse me.

18      You take the total amount, which you identified in the

19  summary chart, Exhibit 919; right?

20  **A.**  Yes.

21  **Q.**  And then you subtract out what they reported, what was

22  reported in the returns by Mr. Liew; right?

23  **A.**  Right.

24  **Q.**  And then that gives you this figure on the right side,

25  which is the total unreported gross receipts?

1    **A.**    Yes.   The total amount unreported income between 2006 to

2    2010 is close to 17 million.

3    **Q.**    Okay.   And based on those figures, did you determine the

4    corrected taxable income based on the actual gross receipts?

5    **A.**    Yes.

6          **MR. AXELROD:**   Your Honor, may I approach with

7    Exhibit 921?

8          **THE COURT:**   Yes.

9    **BY MR. AXELROD:**

10   **Q.**    Ms. Jiang, I'm handing you what's been marked as

11   Exhibit 921, and ask if you recognize that document.

12   **A.**    (Witness examines document.)   Yes.   This is another set of

13   summary chart that I prepared based on the records I review.

14   **Q.**    And what does that summary chart describe?

15   **A.**    This will show that -- the corrected tax computation, what

16   corrected tax amount should be based on the actual gross

17   receipts and other adjustments that I identified during my --

18   by reviewing the records.

19          **MR. AXELROD:**   Your Honor, the Government offers

20   Exhibit 921.

21          **MR. GASNER:**   No objection.

22          **THE COURT:**   Admitted.

23       (Trial Exhibit 921 received in evidence)

24          **MR. AXELROD:**   And, Mr. Hemann, could you go to the

25   second page of that?

**PROCEEDINGS**

1  Q.   And did you do these calculations or computations for each

2  of the tax years that we're talking about?

3  A.   Yes.

4  Q.   And, so, now before you is the computation for 2006.   Can

5  you please describe to the jury what it is that we're looking

6  at?

7  A.   Okay.  So here it shows two portions.  The top portion

8  shows the corrected taxable income that I calculated, and

9  the -- yes.

10      So taxable income, what I mean taxable income, that's on

11  the return there's a line called "Taxable Income."  Basically,

12  it's from the gross income, and then minus all of the

13  deductions and applicable credit, so that arrives to the

14  taxable income.

15  Q.   So let me just stop you there.

16      So the claimed taxable income means that on the tax return

17  for 2006 for Performance Group, Mr. Liew had identified that as

18  zero?

19  A.   That's right.

20  Q.   Okay.  And that's Exhibit 637?

21  A.   Yes.  It's on the return.

22  Q.   And then you add in the unreported gross receipts that you

23  identified?

24  A.   Yes.

25  Q.   And then that gives you the taxable income that's

**PROCEEDINGS**

1   adjusted; right?

2   **A.**   Yes.

3   **Q.**   And then could you explain the rest of your analysis?

4   **A.**   Yes.  So after adding the unreported gross receipts, then

5   we got to the taxable income adjusted.  And also we allowed

6   additional net operating loss that carried forward from 2005.

7   So there's adjustments of $8,721.

8   **Q.**   So you applied the adjustments that were on the tax

9   return; right?

10  **A.**   Yes.

11  **Q.**   Okay.

12  **A.**   So it shows the corrected taxable income for 2006, it

13  should be 2.6 million.

14  **Q.**   And then from that did you determine what the actual tax

15  liability should be?

16  **A.**   Yes.  So in order to calculate the corrected tax based on

17  the corrected taxable income, so the applicable -- the tax rate

18  in this case of 2.6 million taxable income, the tax rate should

19  be close to 34 percent.  So we used the 2.6 million times

20  34 percent.  So that will give us the corrected tax liability.

21  And I generated and determined this amount by using the

22  software.

23  **Q.**   Okay.  And, so, that results in the $884,061.91?

24  **A.**   Yes.  That should be the corrected tax they should pay.

25  **Q.**   And then did you do this same analysis for each of the tax

**PROCEEDINGS**

1    years based on the same kinds of records?

2    **A.**   Yes.

3    **Q.**   So if we could go to the next page.

4         And we don't need to go through the analysis again, but

5    can you describe sort of what the bottom line is for 2007?

6    **A.**   Okay.  So for 2007, the corrected tax liability should be

7    109,000 based on the corrected taxable income of 322,000.

8         So in here we see the tax per return amount is zero.  So

9    the difference compared to the corrected tax liability and the

10   tax per return, that will give us the additional tax due and

11   owing.  So that's 109,000.

12   **Q.**   And, Mr. Hemann, can we go to the next page and look at

13   2008?

14        And, Ms. Jiang, can you briefly describe that slide?

15   **A.**   Okay.  So this is for 2008, the tax computation.  As we

16   see, this year's a little bit different since on the return

17   they claim negative -- on the top bottom -- I'm sorry, on the

18   top, the first line they claim negative 46,000.  So, basically,

19   according to their return, they have a loss.

20        But applying -- by adding the unreported gross receipts

21   amount of 3.7 million, so that will give us the 2008 corrected

22   taxable income.  It should be 3.7 million.

23   **Q.**   And from that, what was the tax due and owing?

24   **A.**   The tax due and owing, it's about 1.2 million.  That's

25   about -- also it's close to 34 percent of tax rate.

**PROCEEDINGS**

1  **Q.**  And this 2008 was the last year, last full year, of the

2  operation of -- the last year before Performance Group went

3  into bankruptcy; right?

4  **A.**  Yes.

5  **Q.**  Okay.  Let's look at 2009.

6  **A.**  Okay.  So for 2009, the 2009 corrected taxable income

7  should be 4.2 million as we can see at the top portion of my

8  analysis, because I made adjustments of the unreported gross

9  receipt amount by adding the 4.2 million as taxable income.  So

10 it gets to the corrected taxable income is 4.2 million.

11      So based on that, the corrected tax liability should be

12 1.4 million.  And in this case on their return they only

13 claimed taxes for -- sorry, $644.  That's the amount they

14 claimed on their return as tax.

15 **Q.**  And you say "they."  You're talking about the

16 corporations, right, USAPTI --

17 **A.**  I'm sorry.  Yes, the corporations.

18 **Q.**  That's okay.

19      But all of those returns were filed by Mr. Liew?

20 **A.**  Yes.

21 **Q.**  Okay.  And let's go to 2010.

22 **A.**  So for 2010 they had -- sorry, the corporations, the

23 USAPTI, they claimed taxable income is 22,000.  So we -- I add

24 back the unreported gross receipts of 6.8 million.  It gets to

25 the 2010 corrected taxable income in total of 6.8 million.

1      So based on that amount, the corrected -- the additional

2  tax due and owing should be 2.3 million, and on their return

3  the total amount of the tax they declared is only $3,391.

4  **Q.**   And then did you do a summary?  I think the next page is a

5  summary of all of these taxes?

6  **A.**   Yes.  This is a summary chart that shows the additional

7  tax due and owing, what it should be for each year, and the

8  bottom shows a total due and owing for a total -- for five

9  years it's about 6 million tax.

10  **Q.**   So let me ask you, that's what was due and owing based on

11  your analysis; right?

12  **A.**   Yes.

13  **Q.**   How much -- for those same tax years, for 2006 through

14  2010, how much did Mr. Liew declare on behalf of Performance

15  Group and USAPTI if you totaled it up?

16  **A.**   That's close to about 4,000.

17  **Q.**   It's close to about $4,000?

18  **A.**   Yes.

19  **Q.**   Now, you also went through what the businesses' actual

20  taxable income would be for those years; right?

21  **A.**   Yes.

22  **Q.**   And what were the actual taxable income?  You know, what

23  was that figure?

24  **A.**   The difference it's about 17 million in total.

25  **Q.**   So if the actual taxable income was about 17 million and

**PROCEEDINGS**

1    they paid about 4,000, what's that work out to for the actual

2    tax rate of those businesses?

3    **A.**   That's about -- I did a calculation on that.  That's about

4    .02 percent.

5    **Q.**   Okay.  So two tenths of a percent?

6    **A.**   Yes.

7    **Q.**   And if the companies had paid taxes on their actual

8    taxable income, would that be that 6-million-dollar figure on

9    the screen?

10   **A.**   Yes.

11   **Q.**   And what would that work out to as in tax rate?

12   **A.**   As I described earlier, the average tax rates, it should

13   be about close to 34 percent.

14   **Q.**   Okay.  I want to ask you about the work you did -- I want

15   to switch gears a little bit and talk about the transfers.  We

16   talked about this a little bit in the beginning.  We looked at

17   some wires that were -- the funds came into the United States,

18   and then Mr. Liew directed funds to go to China and Singapore.

19   Do you recall that?

20   **A.**   Yes.

21   **Q.**   So in the course of your work, did you review records

22   related to Mr. Liew's transmission of funds on behalf of

23   Performance Group and USAPTI to entities in Singapore?

24   **A.**   Yes.

25        **MR. AXELROD:**  And, Your Honor, may I approach with

**PROCEEDINGS**

1    Exhibit 922?

2              **THE COURT:**  Yes.

3    **BY MR. AXELROD:**

4    **Q.**   And, Ms. Jiang, I'm handing you what has been marked as

5    Exhibit 922, and ask if you recognize that document.

6    **A.**   Yes.  That's another set of summary charts that I

7    prepared.

8    **Q.**   Okay.  And did you prepare those based on records that had

9    been admitted into evidence in this case?

10   **A.**   Yes.

11   **Q.**   And what does that chart describe?  What does it show?

12   **A.**   That will show the wire-out transactions which the funds

13   transfer from Performance Group USA, USA Performance

14   Technology, to various Singapore entities.

15             **MR. AXELROD:**  Your Honor, the Government offers

16   Exhibit 922 into evidence.

17             **MR. GASNER:**  No objection.

18             **THE COURT:**  It will be admitted.

19        (Trial Exhibit 922 received in evidence)

20   **BY MR. AXELROD:**

21   **Q.**   Okay.  So this is the first page.  Could we go to the next

22   page?

23        And, Ms. Jiang, could you describe what it is that we're

24   looking at?

25   **A.**   Okay.  So this is -- will show the two parties on the

**PROCEEDINGS**

1   left, that's the Performance Group USA and USAPTI; and then the

2   entities on the right, those are the Singapore entities either

3   owned by Walter Liew, Christina Liew, or the companies

4   associated with the Liews.

5   **Q.**   Okay.  Meaning their relatives?

6   **A.**   Yeah.  Meaning -- yes.

7   **Q.**   And what's depicted on this particular slide, this slide

8   that we're looking at?

9   **A.**   Okay.  So as you remember earlier, after receiving the

10  funds from the Chinese customer called Pangang Group, so after

11  having control of the funds, Mr. Liew transfer out these two

12  funds to Lawrence Process Engineer, the company owned by

13  Christina Liew.

14  **Q.**   And there's a bank account for Lawrence Process Engineers;

15  is that right?

16  **A.**   That's right.

17  **Q.**   Okay.  And who has signature authority over that

18  particular account?

19  **A.**   Both Walter Liew and Christina Liew.

20  **Q.**   Okay.

21  **A.**   And for -- so we can see two transactions here:  The

22  901,000 in July '06 and 707,000 in November '06.  So those

23  funds were wired out to the Singapore entities, but without

24  claiming -- without reporting these two amounts as gross

25  receipts on the Performance Group's tax return.

**PROCEEDINGS**

1  **Q.**   Okay.  And did you go through a similar summary for each

2  one of these entities?

3  **A.**   Yes.

4  **Q.**   So, Mr. Hemann, could we go to the next slide, please?

5  **A.**   So this one shows the wire-out transactions, the funds

6  transferred from Performance Group to Huadong Equipment

7  Solutions.  And Huadong Equipment Solutions, it's owned by

8  Walter Liew.

9  **Q.**   And was there a bank account associated with that company?

10  **A.**   Yes.

11  **Q.**   And who had authority over that bank account?

12  **A.**   Both Walter Liew and Christina Liew.

13  **Q.**   And I'm not going to ask you to go through each one of

14  those transactions, but at the end is there a summary slide

15  that sort of captures all the transactions depicted on that

16  slide?

17  **A.**   Yes.  In later years 2008, both Performance Group and

18  USAPTI, they also wire out funds to other foreign entities,

19  which is shown on the rest four entities.

20  **Q.**   Okay.  So let's go to the next slide.

21     And what are we looking at here?

22  **A.**   Okay.  So that's just -- we can see Performance Group

23  transfer out the funds to ESI, and also the USAPTI also wired

24  out funds to ESI; and none of these funds were reported on the

25  corporations' tax returns.

**PROCEEDINGS**

1   Q.   So the first -- so these are funds -- and this looks like

2   the first slide where we're seeing some funds coming from

3   Performance Group and some coming from USA Performance

4   Technology; right?

5   A.   Yes.

6   Q.   Okay.  And those transfers begin in February of 2009?

7   A.   Yes.

8   Q.   And they continue all the way through till April of 2011?

9   A.   Yes.

10  Q.   And ESI is -- who owns ESI?

11  A.   ESI is owned by Christina's brother, Qiao Mu.

12  Q.   So that's Walter Liew's brother-in-law?

13  A.   Yes.

14  Q.   Okay.  And --

15  A.   Can I point out the last transaction here?

16  Q.   Yes.

17  A.   Because I want to point it out.  Because I prepared this,

18  I want to just present it real quick.

19  Q.   Yes.

20  A.   Okay.  So for the last transaction, the ones on

21  April 15th, 2011, so that's 1.3 million wired out to the ESI.

22  And as we can see, the originator is Performance Group; but as

23  we know, that the Performance Group at that time it went

24  bankrupt.  So they still have the funds to wire out to the ESI.

25  So that's the point I want to make.

**PROCEEDINGS**

1    Q.   Okay.  Did ESI have a bank associated with it?

2    A.   Yes.

3    Q.   And was Christina Liew one of the -- have signature -- was

4    she one of the people that had signature authority over that

5    account?

6    A.   Yes.

7    Q.   Let's go to the next slide.

8         And can you describe what we're looking at here?

9    A.   So this shows two transactions, the wire-out transactions

10   that the funds transfer from USA Performance Technology to

11   Huan Qu Process, the company located in Singapore.

12   Q.   And is that company owned by Mr. Liew's brother-in-law?

13   A.   This -- Huan Qu is owned by Christina's sister-in-law --

14   Q.   Okay.

15   A.   -- Li Rue.

16   Q.   Rue, excuse me.

17        Then let's go to the next slide.

18        And what are we looking at there?

19   A.   So here shows the wire-out transactions, that the funds

20   transfer from USAPTI/USA Performance Group to Dongbei Process

21   Engineering, the entity that's located in Singapore.

22   Q.   And the next slide.

23   A.   This one it shows the -- again, it's wire-out transactions

24   that the funds transfer from USA Performance Technology to LHV

25   Equipment.  So this is the company located in Singapore.

PROCEEDINGS

```
 1        And after this, I prepare a summary --

 2   Q.   So let's look at the next chart.

 3   A.   -- a summary chart to show --

 4   Q.   Okay.  So this shows -- can you describe what we're --

 5   what this shows?

 6   A.   Yes.  So as we can see in the prior analysis that I did,

 7   it shows the amounts of specific transactions that transferred

 8   from both U.S. corporations to the Singapore entities.

 9        And here it shows the total amounts that wire out to the

10   Singapore entities, the companies either owned by Walter Liew,

11   Christina Liew, or their relatives.

12   Q.   And when it came to directing these funds out of the

13   accounts in the United States, whether it be Performance Group

14   accounts or USAPTI accounts, who was making that direction?

15   A.   Walter Liew.

16   Q.   Okay.  Now, did you also look into the downstream

17   activity, the transfers once they got to these accounts in

18   Singapore, where they went into China?

19   A.   Yes.

20   Q.   And did you review records associated with that activity

21   and prepare a chart?

22   A.   Yes.

23        MR. AXELROD:  Your Honor, may I approach with

24   Exhibit 923?

25        THE COURT:  Yes.
```

PROCEEDINGS

1    BY MR. AXELROD:

2    **Q.**   Ms. Jiang, I'm handing you what's been marked as

3    Exhibit 923.  Do you recognize that document?

4    **A.**   Yes.  This is another set of summary charts that I

5    prepared.

6    **Q.**   And is it based on the records that have been admitted in

7    this case?

8    **A.**   Yes.

9          **MR. AXELROD:**  Your Honor, the Government offers

10   Exhibit 923.

11         **MR. GASNER:**  No objection.

12         **THE COURT:**  Admitted.

13      (Trial Exhibit 923 received in evidence)

14         **MR. AXELROD:**  And can we go to the second page,

15   Mr. Hemann?  Thank you.

16   **Q.**   Ms. Jiang, can you describe what we're looking at?

17   **A.**   Yes.  So after receiving the funds from the U.S.

18   corporations, Performance Group or USAPTI, so it shows the

19   three Singapore entities; and after very short periods of time,

20   they wire out the funds to China.

21       So we can see the beneficiaries who receiving this money

22   is Qiao Hua.  Qiao Hua is Christina Liew's father.  And this is

23   the HSBC account that's owned by Qiao Hua, but Walter Liew has

24   signature authority on this account.

25   **Q.**   Okay.

1  A.    And then the next one, the next one -- the next two

2  transactions shows the funds transfer from the Singapore

3  entities to China, the account of -- the Bank of China, the

4  bank account owned by Qiao Ning; and Qiao Ning is Christina

5  Liew's brother.

6  Q.    Okay.  And, so, just the first one, the Huadong transfers,

7  they go to that HSBC account in the name of Qiao Hua; right?

8  A.    Yes.

9  Q.    The Huadong Equipment account that they're coming from,

10  who controls that account?

11  A.    Huadong account is -- the bank account is controlled by

12  both Walter Liew and Christina Liew, and the sole -- the

13  share -- it's a corporation.  The shareholder of this company

14  is Walter Liew.

15  Q.    Okay.  And were you able to develop, with respect to that

16  HSBC account, where some of the funds went after that?

17  A.    Yes.  I see some further activities after reviewing this

18  transaction.

19  Q.    Could we go to the next slide?

20       Okay.  So can you describe what we're looking at in this

21  slide?

22  A.    Okay.  So the first top portion of the chart is just the

23  one that we review it in the previous chart that shows the

24  Huadong Equipment that wire out the funds to the HSBC account,

25  the account owned by Christina's -- Christina Liew's father.

PROCEEDINGS

1      So after that, we can see the bottom portion of the chart

2  it shows that Walter -- there's instructions that are prepared

3  by Walter Liew, and shows that -- how he wanted it to disburse

4  these funds after some of this is mature.  So the information

5  will show how he wanted it to disburse the funds.

6  **Q.**    Okay.  And then is there a final sort of summary of this

7  information?

8  **A.**    Yes.

9  **Q.**    And, so, could you describe, we're now looking at that,

10  what this chart shows?

11  **A.**    This chart gives us ideas on after receiving the funds

12  from Performance Group USA and USAPTI, so four of the -- four

13  of the Singapore entities, they wire the funds from Singapore

14  and to China to the account owned by Qiao Hua, Christina Liew's

15  father, and also to wire out the funds to Qiao Ning, Christina

16  Liew's brother.

17      And we can see that at the bottom it shows the total

18  amount wired out to these two individuals, it's about -- it's

19  8 million.  And, again, none of this were -- these funds were

20  received initially by the Performance Group or USAPTI, and none

21  of these were reported on the return.

22          **MR. AXELROD:**  I have no further questions, Your Honor.

23          **THE COURT:**  Thank you.

24      Let's take a stretch break, ladies and gentlemen, while

25  Mr. Gasner is getting ready.

1                    (Pause in proceedings.)

2          **THE COURT:**  For the jurors who had questions about the

3    chair comfort, we're going to bring some back supports

4    tomorrow.  I hope they will fit; but if you want to bring

5    pillows, your own pillows from home, you can do that.

6          This is sort of the best we have.  We can't put rolling

7    chairs up there because we have liability issues if you slide

8    off.  So bring a pillow if you want and bring whatever support

9    you want.

10         We're going to have some back supports.  I'm not sure if

11   they'll fit, but hopefully they will work.  Thanks for your

12   note.

13         All right.  Whenever you're ready, Mr. Gasner, you can

14   commence.

15         **MR. GASNER:**  Thank you, Your Honor.

16                    <u>**CROSS-EXAMINATION**</u>

17   BY MR. GASNER:

18   **Q.**   Good afternoon, Ms. Jiang.

19   **A.**   Good afternoon.

20   **Q.**   My name is Stuart Gasner, and I represent Walter Liew and

21   USAPTI.  Good to see you.

22   **A.**   Okay.

23   **Q.**   You said, I think, that you had been a revenue agent for

24   about four years; is that right?

25   **A.**   Four and a half years.

1    **Q.**   Is most of your activity as a revenue agent doing audits

2    with individuals?

3    **A.**   With individuals, the taxpayer, or their representatives.

4    **Q.**   In terms of those interactions with taxpayers, do you meet

5    here in San Francisco typically?

6    **A.**   We're in Oakland office.  So the taxpayer I mainly working

7    with, they are mainly in the East Bay area, but some of them in

8    San Francisco.

9    **Q.**   Is this what people think of when they get a letter from

10   the IRS and it says, "You're going to be audited"?  Is that the

11   process that you are typically involved in on the IRS side?

12   **A.**   For the revenue agent, it's a little bit different from

13   the tax officer.  Usually with the tax officer, the taxpayer

14   will get the letter from IRS; but for us, for IRS agent, we --

15   normally it's -- the initial contact with the taxpayer will be

16   a phone call; and if we cannot reach them, then there will be a

17   letter sent out to them.

18   **Q.**   Let me just get clear on just what the kind of hierarchy

19   of personnel is at the IRS.

20        So in what most people think of as an audit, who would

21   they be typically dealing with?  Is that called a tax officer?

22   **A.**   The tax officers conduct the examination in the office.

23   What that means, the taxpayer will come into the IRS office and

24   bring in the documents to support their return information.

25   **Q.**   And there's a back-and-forth dialogue with the taxpayer

1    about what the situation was?

2    **A.**    Yeah.  Yes.

3    **Q.**    And sometimes there is an adjustment to the tax return,

4    things like that?

5    **A.**    Yes.

6    **Q.**    The taxpayer will offer their explanations, and they're

7    either accepted or rejected by the tax officer; is that the way

8    it works?

9    **A.**    Yes.

10   **Q.**    How does a revenue -- in your job as a revenue agent, are

11   you involved in that same process or a different one?

12   **A.**    A similar process, but I mainly work with the taxpayer or

13   their representative at their business location or their rep's

14   office.

15   **Q.**    And are these situations where you go to the actual

16   business and then look at their records on site?

17   **A.**    That's true.

18   **Q.**    Is that most of what your job is?

19   **A.**    Yes.

20   **Q.**    Okay.  And then just continuing with our education about

21   how the IRS works, are there people called special agents at

22   the IRS?

23   **A.**    Yes.

24   **Q.**    They have gold badges; is that right?

25   **A.**    I think so, but I'm not a special agent.

1  Q.  When did you get involved as, what I think you called,

2  you're the assisting revenue agent on this case; is that right?

3  A.  Yes.

4  Q.  When did you first get involved, Ms. Jiang?

5  A.  That's sometime in June 2013.

6  Q.  Prior to that point, was there any IRS agent assigned to

7  this case as far as you knew?

8  A.  The IRS agent?  Yes.

9  Q.  And who is that?

10  A.  That's a special agent that I work with, Justin Fletcher.

11  Q.  Okay.  So you've only been involved since June of 2013;

12  true?

13  A.  Yes.

14  Q.  Your sources of information for all the charts and

15  documents you went through with Mr. Axelrod has been primarily

16  from the FBI; is that right?

17  A.  You mean where are they found -- where the documents were

18  found or --

19  Q.  Well, it sounds like in your usual practice as a revenue

20  agent, you would go to the business and gather all the

21  information yourself; true?

22  A.  Yes.  Most of the time, yes.

23  Q.  In this case, you didn't visit with USAPTI at all, did

24  you?

25  A.  No, not the office.

1  Q.  Because there had been search warrants in July of 2011 and

2  the business was long since closed; true?

3  A.  Yes.

4  Q.  Okay.  And you've never talked to Walter Liew?

5  A.  No.

6  Q.  You never talked to Christina Liew?

7  A.  No.

8  Q.  Have you talked personally to anybody at USAPTI?

9  A.  No.

10 Q.  So that's what I'm kind of trying to get at.  In terms of

11 the source of the information that you're relying upon as an

12 expert here, can you tell us what your sources of information

13 were?

14 A.  The source of information, I guess I cover it in the

15 direct examination, and that includes the records of what both

16 corporation has.  So that was provided -- that were provided to

17 me, and also the books and records prepared by the

18 corporations' return preparer or the accountants.

19     And the other information I review is the information that

20 we received from various Singapore -- sorry, various financial

21 entities.

22     And the other type of records that I review is from the

23 foreign entities, which including ACRA or some of the companies

24 who help with incorporation of those foreign entities.

25 Q.  Thank you for that explanation.

1      Are you aware, though, that the FBI seized many, many

2  documents, both hard copy and electronic, from USAPTI?

3  **A.**  Yes.

4  **Q.**  Do you have some sense of the quantity of those documents?

5  **A.**  Compared to my -- compared to my individual case, that's a

6  lot.

7  **Q.**  Okay.  But are you aware that it's electronic evidence

8  measured in terabytes of data, many computer servers, thumb

9  drives, laptops, things of that nature?

10  **A.**  I don't know exactly how many of them.  I'm sorry.  I just

11  know the information some are hard copy, some are from the

12  disks or thumb drive, yeah, that's true; but I don't know

13  exactly how much the quantity were.

14  **Q.**  Did you do your review over at your offices in Oakland?

15  **A.**  I did it both places.  I did some of the works in the

16  attorneys' office; and then I did some of the works in my

17  Oakland office.

18  **Q.**  And by "attorneys," you mean the legal team from the

19  Department of Justice?

20  **A.**  Yes.

21  **Q.**  And the rest of it was back at your tax offices in

22  Oakland; right?

23  **A.**  Yes.

24  **Q.**  In terms of what you worked with, did you have some boxes

25  of documents that you yourself reviewed?

1  **A.**   I did not get the boxes.  They did not provide me the

2  boxes.  The boxes is available to me in their office, so I

3  reviewed them at their office.

4  **Q.**   And what was the quantity of documents that you actually

5  reviewed in terms of number of boxes, bankers boxes, for

6  example?

7  **A.**   I'm sure it's over 10 or 20, but I did not count.

8  **Q.**   All right.  So in getting, though, from everything that

9  was seized, both at USAPTI and at the Liew residence, to get

10  those many terabytes of data down to 10 or 20 bankers boxes,

11  who did that selection?

12  **A.**   Don't get me wrong on the 10 to 20, because, like I said,

13  that's not the exact number.

14  **Q.**   All right.

15  **A.**   I did not count them.

16  **Q.**   Fair enough.

17  **A.**   And then the terabyte, I'm not sure that's the exact

18  quantity.

19  **Q.**   Okay.  But, whatever, it was a quantity of boxes that you

20  could see in one place in a conference room, for example?

21  **A.**   Yes.

22  **Q.**   And I won't hold you to 10 or 20, but my question is:  Of

23  the quantity that you actually worked with, who selected those?

24  **A.**   I have no idea.

25  **Q.**   Did you work with anybody other than the lawyers for the

1   Department of Justice in reviewing those documents?

2   **A.**   And the special agent and FBI.

3   **Q.**   The IRS special agent.  And who from the FBI did you work

4   with?

5   **A.**   Like, Cecily Rometo and Chris.  And, I'm sorry, I just

6   don't remember their last names exactly.

7   **Q.**   We met both of them.  Any others?

8   **A.**   Nathan and Cynthia Ho.

9   **Q.**   All right.

10  **A.**   I guess --

11  **Q.**   So you've worked, basically, with the legal team and the

12  FBI case agents in going over the documents that you reviewed;

13  true?

14  **A.**   Yes.

15  **Q.**   Okay.  And that's kind of a different process than what

16  you ordinarily do in your usual revenue agent function where

17  you're actually at the business and there's some back and forth

18  interaction with the taxpayer; true?

19  **A.**   That's -- for some of my cases, I don't necessarily meet

20  with them if they're not -- if they don't show up or if they're

21  not compliant.  I still can finish my examination without them.

22  **Q.**   All right.  So you're used to just having a big pile of

23  documents and digging in on your own; true?

24  **A.**   That -- yes, that can be true.

25  **Q.**   But most of the time as a revenue agent, there's some back

1   and forth with the taxpayer where you dig into the facts;

2   right?

3   **A.**   Yes.

4   **Q.**   Okay.  Now, Mr. Axelrod asked you some questions about

5   different kinds of corporations and training that you've had in

6   dealing with those.  Do you remember that in direct

7   examination?

8   **A.**   Yes.

9   **Q.**   Now, the one that you talked mostly about, I think you

10  called it a C corp.  And I'll just write that on the board.  So

11  that's the letter C corporation.  Do you remember talking about

12  that?

13  **A.**   Yes.

14  **Q.**   Why is it called a C corp.?

15  **A.**   A C corp. -- why is it called C corporation?

16  **Q.**   That's a section of the Internal Revenue Code; is it not?

17  **A.**   Yes.

18  **Q.**   Okay.  And in a C corp. there is a corporation that is an

19  entity that pays taxes on its own; right?

20  **A.**   Yes.

21  **Q.**   And the typical C corporation also has shareholders;

22  right?

23  **A.**   Yes.

24  **Q.**   And if the C corporation pays dividends, for example, to

25  the shareholders, the shareholders have to pay taxes on the

1   dividends as income; right?

2   **A.**    Yes.

3   **Q.**    So there's double taxation with a C corp.; true?

4   **A.**    Yes.

5   **Q.**    Okay.  And you mentioned also that there's an S corp.

6   That's another section of the Internal Revenue Code?

7   **A.**    Yes.

8   **Q.**    And I think that Mr. Axelrod talked about that a little

9   bit as a pass-through; is that right?  Do you remember him

10  saying that?

11  **A.**    Yes.

12  **Q.**    And an S corp. is more like a partnership or a joint

13  venture; true?

14  **A.**    Yes.

15  **Q.**    And it's like that because the corporation itself doesn't

16  pay any taxes, but all of its income passes through to the

17  partners or joint venturers or Sub S shareholders; true?

18  **A.**    The S corporation is similar like a partnership.

19  **Q.**    Okay.

20  **A.**    It's a flow-through entity that flow through the

21  distributed share to its shareholders or partners; but when you

22  mention the joint venture, I'm not sure what's the legal form

23  for joint venture you mean.

24       A joint venture is a very general term to me.  So it needs

25  to be a very specific tax entity in terms of the tax filing.

1    For tax filing purpose, they can be a partnership.  They can be

2    a C corporation.  They can be a limited liability.  So a joint

3    venture, it's very general term to me.

4    **Q.**    Okay.  And you mentioned limited liability.  That's called

5    an LLC, right, a limited liability corporation?

6    **A.**    Limited liability company.

7    **Q.**    Company.  Okay.

8         And that has -- that's taxed more like a partnership;

9    right?

10   **A.**    It can be a sole proprietorship or it can be a

11   partnership.

12   **Q.**    Okay.  So part of your analysis and your expert opinions

13   here today depends on the fact that we are dealing with

14   C corporations; right?

15   **A.**    Both -- yes, both Performance Group and USAPTI, both

16   corporations are -- they file with the State of California as a

17   C corporation.

18   **Q.**    Okay.  And just to be clear, if we were dealing with an

19   S corp. or a partnership, the entity itself wouldn't pay any

20   tax; you would just look at the pass-through to the partners?

21   True?

22            **MR. AXELROD:**  Objection.

23            **THE COURT:**  Sustained.

24            **THE WITNESS:**  That depends.

25            **THE COURT:**  Just a moment.  I sustained the objection.

1   That means you don't answer.

2          **THE WITNESS:**  Oh.  Sorry.

3   **BY MR. GASNER:**

4   **Q.**   Okay.  So let's just keep track.  In terms of the things

5   that you testified to that were important to your opinion, one

6   is the type of entity; true?

7   **A.**   State your question one more time, please.

8   **Q.**   So in order to look at how much tax is owed and how gross

9   receipts should have been handled, you've got to think about

10  the type of entity; don't you?  That's one important factor in

11  your analysis?

12  **A.**   Yes.  Most of the business or business entities, for their

13  return preparation purpose, there's a line called gross

14  receipts.

15  **Q.**   Now, another factor that you mentioned was you went

16  through in detail with Mr. Axelrod about a sample transaction

17  in 2006.  Do you remember talking about that?

18  **A.**   Yes.

19  **Q.**   Okay.

20  **A.**   Yes.

21  **Q.**   And this is when we were talking about the incoming wire

22  transfers and then the going into banks, and then being wire

23  transferred to Singapore.  Do you remember that line of

24  questioning?

25  **A.**   Yes.

1   Q.   Okay.  And in that regard, one of the things that

2   Mr. Axelrod asked you about was the contracts in particular.

3   Do you remember that line of questioning?

4   A.   Yes.

5   Q.   And he pointed out several provisions of the contract that

6   showed exactly who the seller is and the buyer.  Do you

7   remember that line of questioning?

8   A.   Yes.

9   Q.   Is it fair to say, Ms. Jiang, that another important part

10  of your analysis is the contracts at issue?  True?

11  A.   The contract is one of the source documents that we use to

12  determine how the sales were generated or how the services were

13  performed -- generated.

14  Q.   Now, if the contract had mentioned other parties as

15  sellers of the services, that would change your analysis; true?

16  A.   Can you speak your question one more time, please?

17  Q.   So Mr. Axelrod pointed out that the Singapore companies

18  like Huadong or ESI were not listed in the contract as sellers.

19  Do you remember him asking you about that?

20  A.   Yes.

21  Q.   Now, if ESI or Huadong, for example, had been listed in

22  the contract as a seller, would that change your analysis?

23  A.   That depends because based on the contract they signed,

24  Walter Liew signed as -- for the interest of Performance Group

25  and USAPTI, no other parties.

JIANG - CROSS / GASNER

1  Q.  Understood.

2      And had the contract been structured so that Performance

3  Group was one party but a Singapore company or Chinese company

4  was another party to the contract, that would change the

5  analysis; true?

6  A.  I didn't get a counter course to see that; and to my

7  understanding, if that happens, it shows other entities on the

8  contract, okay, it need to be notified by the buyer.  It need

9  to be disclosed to the buyer.

10 Q.  Okay.  But if in the negotiation -- you didn't review any

11 documents about the negotiation of the 30K contract, did you?

12         MR. AXELROD:  Objection.

13         THE WITNESS:  I didn't review --

14         THE COURT:  Wait.  Overruled.

15     You can answer that yes or no.  Did you review such

16 documents?

17         THE WITNESS:  I did review some of the proposals

18 before the contract were finally finalized.

19 BY MR. GASNER:

20 Q.  Did you come to understand that there was one business

21 deal involving a 30,000 metric tons per year contract --

22 A.  Yes.

23 Q.  -- in China?

24     Okay.  So let's call that the 30K contract.  Is that okay?

25 A.  Sure.

1   Q.   All right.  And did you come to know the details of how

2   the 30K contract was negotiated?

3   A.   From my understanding is there are some of the back and

4   forth communication between Walter Liew and the other

5   representative that represent the Pangang Group.

6   Q.   But in terms of the meetings in China and the verbal back

7   and forth in the negotiation, you didn't have access to that

8   kind of information, did you?

9   A.   I was not at their early meeting, but I see some of the --

10  I saw some of the written communication between the buyer and

11  the seller.

12  Q.   So is it fair to say, Ms. Jiang, that in your analysis,

13  the documents you looked at, you didn't see another seller

14  besides the Performance Group in the records you reviewed;

15  true?

16  A.   Performance Group and USAPTI.

17  Q.   Okay.  And if there were additional parties in those

18  contracts, that would -- you said it depends.  You'd have to

19  look at that separately; true?

20  A.   There were not -- I don't see -- are you particular -- are

21  you referring to the contract that's signed by the Performance

22  Group/USAPTI and the Pangang Group, or are you referring to

23  other contracts?  Because I have seen many contracts for this

24  case.

25  Q.   I'm asking you a hypothetical question.

JIANG - CROSS / GASNER

1    **A.**    Okay.

2    **Q.**    Okay.  And that is, if the contract for the 30K project

3    had different parties as sellers, that would be something you

4    would need to consider in your tax opinions; true?

5    **A.**    If the contract is signed by all the parties and they all

6    agree to the contract, yes, I need to consider that.

7    **Q.**    And that might change the taxation requirements if, for

8    example, a Singapore company had been listed as a party and

9    funds had been directed to that party pursuant to the contract?

10   **A.**    I need to -- in order to determine the gross receipts, I

11   need to -- I need to see who provided service and what type of

12   service provided by each party; and then for the other

13   individuals that it's not related to the Performance Group or

14   USAPTI, I don't think I have access to -- I don't think I -- I

15   did not -- I did not examine those returns, basically.

16   **Q.**    Okay.  So would it be fair to say that a second important

17   factor in the analysis that you did is the contract terms?

18   **A.**    That's an important -- that's an important contract, but

19   it may not necessarily, like, true without it.  There are some

20   cases there are no contracts between the seller and buyer.

21   **Q.**    But part of your analysis is the fact that either

22   Performance Group or the 30K contract or USAPTI with the 100K

23   contract were the official parties on the contracts; true?

24   **A.**    Yes.

25   **Q.**    Okay.  And then I think I heard you say a third thing,

1  which is the type of service provided.  Is that important in

2  the kind of analysis that you gave in court here today?

3  **A.**  Yes.  The type of service provided, and who has the

4  control, and who has the -- who provides the directions on

5  these services in terms of the, like, for example, like for the

6  subcontractors, they bind to -- if the sub -- for the

7  subcontractor of the corporation, they bind to the corporation.

8  The corporation provide them the instruction.

9      So for any income that received from the -- for any income

10  received by the corporation, they need to be recognized as

11  income on the corporation return.

12  **Q.**  But if I understand you correctly, you need to look at who

13  the parties are and exactly what they're doing; fair?

14  **A.**  Yes.

15  **Q.**  Okay.  And do you remember when Mr. Axelrod was

16  questioning you about the 2006 sample transaction, he showed

17  you Exhibit 526?  Do you have that in front of you, Ms. Jiang?

18  **A.**  I can look for it if you want me to.

19  **Q.**  Could you please?

20      And that's already been admitted.  And, Mr. Guevara, if

21  you could put that up on the screen.

22  **A.**  Then I just look at the screen then.

23  **Q.**  Fine, if you can see it.

24  **A.**  There's too many here.

25  **Q.**  Yeah.  Okay.  Whatever's easiest for you.

1          And this showed an amount wired --

2    **A.**    Sorry.  It doesn't show on my screen.  It's off.

3    **Q.**    It's not showing?

4    **A.**    It's out of range it says.

5               **THE COURT:**  Give it a couple seconds.

6               **THE WITNESS:**  Okay.

7               **THE COURT:**  We have a little bit of a hiccup on this.

8    **BY MR. GASNER:**

9    **Q.**    I can give you mine -- well, mine's got writing on it.  I

10   have another copy.

11         If you can find 526.

12   **A.**    526, okay.

13   **Q.**    Thank you.

14               **THE COURT:**  Agent Jiang, is it up there now?

15               **THE WITNESS:**  No.

16               **THE COURT:**  It's still not up there.  Okay.

17   **BY MR. GASNER:**

18   **Q.**    We can got with the paper copy.

19   **A.**    (Witness examines documents.)

20               **THE CLERK:**  You said 526?

21               **MR. GASNER:**  526.  Did that already land on your desk?

22               **THE CLERK:**  I've touched them all, and put them back

23   up there --

24               **MR. GASNER:**  Okay.

25               **THE CLERK:**  -- but I'm just checking to make sure.

1              MR. GASNER:  Your Honor, may I approach?  I've got a

2     copy of the exhibit.

3              THE COURT:  Yes.  Why don't we do that.

4              THE WITNESS:  Sorry.  I cannot find it.

5              MR. GASNER:  That's quite all right.

6              THE CLERK:  Counsel, actually, it would be in the box

7     over there because it was on January 16th that it was admitted.

8     BY MR. GASNER:

9     Q.   Agent Jiang, do you have a copy of 526 in front of you?

10    A.   Yes.  The first page, yes.

11    Q.   And that shows a net payment of one million three hundred

12    ninety-four dollars -- one million nine hundred ninety -- I'm

13    sorry; let me start all over again -- $1,394,773; true?

14    A.   Yes.

15    Q.   Okay.  And that was net of some wire transfer fees?

16    A.   (Witness examines document.)  I don't think so.

17    Q.   Okay.  That was the --

18    A.   I think that's the gross.

19    Q.   That's the gross amount?  I might have misheard you.

20         And Mr. Axelrod also asked you, in connection with the

21    next step of this transaction, about Exhibit 525, which has

22    been admitted.  And I can give you a copy of that, if it's okay

23    with the Court.

24              THE COURT:  Yes.

25              MR. GASNER:  Your Honor, if I may approach?

1              THE COURT:  That's fine.

2              THE WITNESS:  (Witness examines document.)

3    BY MR. GASNER:

4    Q.    Now, 525 you talked about as the next step in this

5    transaction after the 1.394 million was sent from China

6    Everbright Bank to Chiao Tung Bank?

7    A.    Yes.

8    Q.    And Chiao Tung Bank is what used to be Mega Bank.  Are you

9    familiar with that?

10   A.    Yes.

11   Q.    Okay.  So let's call it Mega Bank just for short.

12         So Mega Bank gets $1.394 million, and then on Exhibit 525

13   it talks about LC transfer for Thayer Scale.  Do you see that a

14   little bit further down?

15         If you could highlight that, Mr. Guevara, "LC transfer for

16   Thayer Scale, $66,092."

17         Do you see that?

18   A.    Yes.

19   Q.    All right.  Now, is it your understanding that Thayer

20   Scale is a third party that Mr. Liew directed that some of the

21   incoming money be paid to?

22   A.    Yes.

23   Q.    And right below that there's an LC transfer for Delta

24   Ducon.  Do you see that?

25   A.    Yes.

1  Q.   Did you become aware in your work of what Delta Ducon did

2  on the titanium dioxide project at issue here?

3  A.   I don't remember.

4  Q.   Does it sound right that both Thayer Scale and Delta Ducon

5  were vendors that provided equipment or services in connection

6  with the project?

7  A.   Possibly.

8  Q.   Okay.  And I believe that if we go to your summary chart

9  919 -- and if we can put that up, Mr. Guevara -- for 2006, that

10  if we focus in on the same transaction we're talking about on

11  August 8th, 2006, right in the middle -- perhaps you can

12  highlight that one, Mr. Guevara.  Put a box around it better

13  yet.

14      The wire amount is 1.310.  Do you see that?

15  A.   Yes.

16  Q.   And your opinion was that the correct amount that should

17  have been reported as gross receipts was that 1.310 million;

18  true?

19  A.   I want to explain these transactions here.

20  Q.   If you can just answer my question first, I'd appreciate

21  it.

22      Your testimony was that the 1.310 is the correct amount

23  that should have been reported as gross receipts by Performance

24  Group; true?

25  A.   Yes.  That's on my -- yes.  That's on my analysis.

1   Q.   So there's nothing wrong -- if a gross amount comes in and

2   then the business owner directs that it be transferred to

3   vendors with instructions to the bank, that's perfectly

4   appropriate; true?

5   A.   Can you state your question one more time, please?

6   Q.   Yes.

7        So on 525, just so that we're clear, on Exhibit 525, what

8   happened is that $1.394 million came in; true?

9   A.   Uh-huh.   Yes.

10  Q.   And roughly 66,000 went to Thayer Scale; right?

11  A.   Yes.

12  Q.   And roughly 17,000 went to Delta Ducon; right?

13  A.   Yes.

14  Q.   And those monies went to those vendors straight out of

15  Mega Bank; true?

16  A.   Yes.

17  Q.   And it's proper that those amounts weren't reported as

18  gross receipts; true?

19  A.   For those two amounts?

20  Q.   Yes, just those two.  That's all I'm talking about.  As

21  far as those go, you don't have a problem with those two being

22  deducted from the gross receipt by Mega Bank; true?

23  A.   Let me think about it, this question.

24  Q.   Okay.  Please do.

25       What are the factors that you're thinking about?

1   **A.**   When I work on this analysis, I consider the one point --

2   I want to just tell you the analysis because I don't know how

3   to answer your question.

4   **Q.**   Please.

5   **A.**   Okay.  So the amounts that -- the amounts that received --

6   received from the -- received from the Pangang Group, it should

7   be 1,394,000.  So that's the gross.  That's the -- that's the

8   amount.  That's the amount.  That's the amount they received it

9   for the service they provided.

10      And then for the deductions here, for the banking fees,

11  for the third-party deductions here, I don't see any of these

12  amounts claimed on the books or claimed on the return.  I,

13  basically, just gave the -- I did not examine this specific --

14  I don't see them on the books.

15      And then I just take a conservative way to recognize the

16  net proceeds as gross income.  But the actual amount they

17  received before deducting any deduction, the amount they

18  received is 1.1 million 395,000.  That's how I come up with my

19  analysis.  That's my thinking in working on this particular

20  transactions here.

21  **Q.**   Okay.  Wait.  Let's just break that down a little bit.

22      This transaction was in 2006; right?

23  **A.**   Yes.

24  **Q.**   Pangang was not involved at all with USAPTI at that point;

25  true?

1  **A.**   In '06, USAPTI did not exist.

2  **Q.**   And Pangang had no involvement in 2006, did they, at

3  either Performance Group or USAPTI?  True?

4  **A.**   Say that again, please.

5  **Q.**   Pangang had no involvement in this particular 2006

6  transaction; right?

7  **A.**   I don't think so, because on this advice of payment it

8  shows the issue is by China Everbright Bank.  So this is the

9  bank on behalf of the Pangang Group.  So there's some

10  relationship there.

11  **Q.**   Okay.  Well, let's just get clear on the parties here.

12       **THE COURT:**  Mr. Gasner, when you get to -- I don't

13  want to interrupt your train of thought; but when you get to a

14  convenient point, I'd like to break at some point.

15       **MR. GASNER:**  This is a fine time to break, Your Honor.

16       **THE COURT:**  Is that okay?

17       **MR. GASNER:**  Absolutely.

18       **THE COURT:**  All right.  You may step down, Agent,

19  until tomorrow.  Thank you very much.

20       **THE WITNESS:**  Thank you.

21       **THE COURT:**  Anybody who wants to leave, please do so.

22  I'm going to lock the door and giver the jury their

23  instructions.

24                    (Pause in proceedings.)

25       **THE COURT:**  All right.  Let's lock the door then.

**PROCEEDINGS**

```
 1                        (Pause in proceedings.)

 2           THE COURT:  Oh, let the agent leave.  She doesn't have

 3    to stay.

 4                        (Pause in proceedings.)

 5           THE COURT:  The door is locked.  I'm going to remind

 6    you of your proper conduct as jurors.  Then I'm going to give

 7    you an update on the schedule.

 8        First, keep an open mind throughout the trial and do not

 9    decide what the verdict should be until you and your fellow

10    jurors have completed your deliberations at the end of the

11    case.

12        Second, because you must decide the case based only on the

13    evidence received in the case and on my instructions as to the

14    law that applies, you must not be exposed to any other

15    information about the case or to the issues it involves during

16    the course of your jury duty.

17        Thus, until the end of the case, or unless I tell you

18    otherwise, do not communicate with anyone in any way and do not

19    let anyone else communicate with you in any way about the

20    merits of the case or anything to do with it.

21        This includes discussing the case in person, in writing,

22    by phone, Smartphone, or electronic means, via email, text

23    messaging, or in or on any Internet chat room, blog, website,

24    including such social networking media like Facebook, Myspace,

25    LinkedIn, YouTube, Twitter, or other feature.
```

1      This applies to communicating with your fellow jurors

2   until I give you the case for deliberation, and it applies to

3   communicating with everyone else, including your family

4   members, your employer, the media or press, and the people

5   involved in the trial, although you may notify your family and

6   your employer that you have been seated as a juror in the case.

7      But if you're asked or approached in any way about your

8   jury service or anything about this case, you must respond that

9   you have been ordered not to discuss the matter and to report

10  the contact to the Court.

11     Because you will receive all the evidence and legal

12  instruction you properly may consider to return a verdict, do

13  not read, watch, or listen to any news or media accounts or

14  commentary about the case or anything to do with it.

15     Do not watch -- do not do any research, such as consulting

16  dictionaries, searching the Internet, or using other reference

17  materials; and do not make any investigation or in any other

18  way try to learn about the case on your own.

19     The law requires these restrictions to ensure the parties

20  have a fair trial based on the same evidence that each party

21  has had an opportunity to address.  A juror who violates these

22  restrictions jeopardizes the fairness of these proceedings, and

23  a mistrial could result, which would require the entire trial

24  process to start over.

25     If any juror is exposed to any outside information, please

1    notify the Court immediately.

2        So tomorrow, again, all these are estimates, but we have a

3    reasonable estimate that tomorrow the Government will finish

4    its case and do what's called rest at the end of their case.

5        And then at that point the parties -- the Court has to

6    discuss matters, legal matters, with the parties, and that will

7    take a little bit of time or a lot of time; but it will not be

8    in your presence, so you don't have to worry about it taking up

9    your time.

10        And then after that, if the defendants wish, they're not

11    obliged to but if they wish to put on a defense in terms of

12    calling -- an affirmative case calling witnesses and,

13    et cetera, then they have a right to do so, and they have a

14    right not to do so if they wish; and they don't have to do

15    anything more in the case if they don't wish to do so.  It's up

16    to them.  We will find that out after the end of the case.

17        My guess is we'll start, if there's going to be a Defense

18    case, it's their option, we'll start that next week.  That

19    should take probably a week, maybe a little more; and after

20    that we'll be ready for deliberations, getting the case to you,

21    closing arguments, jury instructions, and the like, all of

22    which even if Murphy's law were to strike us, we'd still be

23    done in the schedule that we talked about and certainly finish

24    within this calendar month in terms of getting the case to you.

25    Then it's up to you as to what you would like to do.

1          As to the two jurors who are in those makeshift seats, we

2    are going to bring in pillows, or you can bring in your own

3    pillows; and feel free, if you wish, to have more breaks to

4    stand up.  Just raise your hand and we'll do it.  I mean, I'm

5    game for all the breaks I can get, so you don't have to fight

6    any resistance from me, and probably the parties as well.

7          So we'll do the best we can.  Those are soft seats.  This

8    is the Government.  You know, we don't have a lot to have

9    really cushy seats.  So we'll do the best we can.  Bring in

10   whatever you like to bring in in terms of cushions and

11   supports.  We'll bring in our own, and see if we can make it

12   more comfortable for you.

13         So we're going to start again tomorrow bright and early at

14   8:00.  We're going to have a regular trial day tomorrow, and

15   perhaps we'll go as long as we need to but no later than the

16   usual breaking time of 1:30.

17         Thank you very much for your attention, and I'll see you

18   tomorrow.

19         (Proceedings were heard out of the presence of the jury:)

20         **THE COURT:**  So, Counsel, obviously the note that we

21   got was a housekeeping note, but it's generally related.  You

22   heard what we talked about.  The two jurors on the end are

23   feeling some discomfort because of those seats.  So we'll try

24   to accommodate them as much as we can, but we're kind of

25   limited to do so.

1      And I think it would be inappropriate to, basically, take

2  two jurors who are in the box and move them out into the other

3  seats.

4          **MR. GASNER:**  No objection to pillows.

5          **THE COURT:**  Pardon me?

6          **MR. GASNER:**  No objection to pillows for the jurors.

7          **THE COURT:**  Okay.  We'll try pillows and maybe more

8  frequent breaks.

9      So just to recap, if we -- I don't know that -- if there's

10  any issues that we need to address tomorrow morning, and we can

11  certainly begin to address, perhaps, tomorrow morning the

12  *Daubert* issues after you all meet and confer on those, even

13  though it looks like the Defense won't be putting on their case

14  till next week.  They won't be because I'm not going to require

15  it.

16      We should -- if you wish to start discussing the issue, if

17  you feel like you're ready, then let us know and we can meet

18  with you earlier and at least start going over that.

19      We'll then continue the discussion, assuming we have time

20  between the end of the testimony and the Government's case and

21  the Court's need to go to the criminal calendar.  We'll use

22  that time, first, to discuss any outstanding evidentiary

23  issues; and then to go -- begin at least with the defendants'

24  presentation with respect to their motion for judgment of

25  acquittal or judgment as a matter of law.

**PROCEEDINGS**

```
 1        So is there anything the parties wish to bring up before
 2   we adjourn?
 3            MR. GASNER:  Yes, Your Honor, just very briefly.
 4            THE COURT:  Yes.
 5            MR. GASNER:  I got an email from Mr. Hemann last night
 6   in anticipation of Paul Cooper's testimony, one of our experts.
 7            THE COURT:  Remind me what his --
 8            MR. GASNER:  He's the technical expert.
 9            THE COURT:  Oh, yeah.  Okay.
10            MR. GASNER:  He wrote an 80-page report that I'm sure
11   the Court has poured over in detail --
12            THE COURT:  Yeah.  Every word.
13            MR. GASNER:  -- full of technical detail on titanium
14   dioxide.  And Mr. Hemann said that under a reverse Jencks, he
15   wanted all the correspondence and emails with the expert.
16        I talked to him this morning and I said that that was a
17   first for me, getting that kind of request, having reverse
18   Jencks apply to an expert.  And Mr. Hemann relented and said
19   really what he wants is the draft reports.
20        And I told him that I still -- I looked at the rule.  I
21   mean, the fact that it's new to me is not very persuasive, but
22   I did look at the rule.
23            THE COURT:  If it's new to Ms. Agnolucci, then we'd
24   have --
25            MR. GASNER:  Yes, exactly.
```

**PROCEEDINGS**

1     But I did look at the rule, 26.2 of the Federal Rules of

2  Criminal Procedure.

3          **THE COURT:**  Yes.

4       **MR. GASNER:**  And a statement under the reverse Jencks

5  rule is a written statement that the witness makes and signs or

6  otherwise adopts or approves.

7     And my view is a draft expert report is the exact opposite

8  of that.  It's necessarily tentative and not yet approved.

9     The other two statements under the reverse Jencks rule

10  clearly don't apply.  It's got to be a substantially verbatim

11  contemporarily reported recital of an oral statement, and then

12  the third is a statement to a Grand Jury.  So the only one

13  that's even in the ballpark is a statement the witness makes

14  and signs or otherwise adopts and approves.

15     And then there would be the irony that even in the civil

16  rules, where you've got lots more discovery, the parties don't

17  exchange drafts of the expert's report or -- and, so,

18  ironically, what Mr. Hemann is asking for is something that the

19  civil rules wouldn't require.

20     And I'll note also that Rule 16 of the Federal Rules of

21  Criminal Procedure provides for really a very truncated form of

22  expert disclosure.  It's simply a summary.  We went way above

23  that in our 80-page expert report, but I do think it's very

24  clear that we would not have to provide the draft reports of

25  our expert.

PROCEEDINGS

```
 1            THE COURT:  Everybody can sit down.  You don't have to
 2   be standing.  I'm sorry.  You may be seated.
 3            MR. GASNER:  So that's the issue, Your Honor; and if
 4   the Court has clear views on it, perhaps we can --
 5            THE COURT:  I don't because I've not been confronted
 6   with it before.  I think I'm going to need some authority on
 7   this because the plain language, it may -- the Defense may feel
 8   it helps their side; but there may be some other authority,
 9   either in the committee notes or cases even, but I'd like to
10   see that authority before I go that far.
11            Quite frankly, it's just never been an issue; and double,
12   quite frankly, I don't know that I've had very many cases where
13   I've had expert witnesses for the Defense in a criminal case.
14   So it's a little bit of a new experience for this Court.  I've
15   had it happen in civil cases.
16            So I'd like -- we don't have to resolve that now, but I'd
17   like to get some more authority, and I think the burden on this
18   is more on the Government than on the Defense.
19            MR. HEMANN:  Indeed, Your Honor.  We've got some
20   breathing room.  I wanted to make the request last night in
21   advance of potentially having the experts today and next week.
22   I think we've got a little bit of breathing room.  I'll get
23   some authority.  I will discuss it with Mr. Gasner.
24            My real concern is if there are substantial changes in the
25   expert's opinion from when they first looked at it to -- an
```

1    evolving opinion is obviously something that is probative of --

2        **THE COURT:**  Well, probity is not the issue, though, of

3    course.  There may be lots of stuff that's probative; but the

4    last time I looked, there's no such thing as, shall we say,

5    reverse *Giglio*.

6        **MR. HEMANN:**  Correct.  That's correct, Your Honor.

7        **THE COURT:**  Okay.  So, you know.

8        **MR. HEMANN:**  But there is this tie into the reverse

9    Jencks Act to the substance of the testimony.  And, so -- or

10   the reverse Jencks rule.  So we'll do -- we'll meet and confer.

11   I'll look at the authority.  I'll share it with Mr. Gasner, and

12   it may not end up being an issue that needs to be discussed

13   with the Court.

14       **THE COURT:**  Now, again, I'm not trying to make work

15   for anybody or certainly extend the trial, but I would imagine

16   that assuming you don't reach closure, and it's something that

17   the Government wants to pursue, I would imagine that the

18   Government could do an examination of the witness which may or

19   may not bring other writings within the scope of the reverse

20   Jencks Act.

21       **MR. HEMANN:**  Correct.

22       **THE COURT:**  I mean, I accept fully Mr. Gasner's

23   representation and offer of proof; but let's say the witness

24   says, "Hey, you know, I did a draft that's substantially

25   identical and I, actually, even signed it, but I just didn't

**PROCEEDINGS**

1   send it to the other side," that may well -- and, again, I'm

2   just making it up.  So I don't know that it I can make sort of

3   a categorical ruling at this point, but I'd still want to see

4   some authority on the point.

5        And what I'm trying to avoid, frankly, which you get,

6   frankly, in patent cases is, you know, having interminable belt

7   and suspenders -- whatever the appropriate term is, you'll have

8   to tell me someday -- long cross-examination where you said,

9   "You have a period here and you have a comma there."

10            **MR. HEMANN:**  Of course not, Your Honor.

11            **THE COURT:**  So, anyway, I'll see you all tomorrow and

12   then see where we go, and we'll do it in a very deliberative

13   fashion.

14        Thanks, everybody.

15            **MR. HEMANN:**  Thank you, Your Honor.

16            **MS. AGNOLUCCI:**  Thanks.

17                 (Proceedings adjourned at 1:30 p.m.)

18                        ---oOo---

19

20

21

22

23

24

25

1

2

3                        **CERTIFICATE OF REPORTER**

4           I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Wednesday, February 5, 2014

8

9

10

11   _____

12         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                   U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25