**Volume 16**

**Pages 3190 - 3348**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

```
UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )
                             )
  VS.                        )        NO. CR 11-00573 JSW
                             )
WALTER LIEW; ROBERT MAEGERLE;)
and USA PERFORMANCE TECHNOLOGY,)
INC.,                        )
                             )
          Defendants.        )
_____)
```

San Francisco, California
Thursday, February 6, 2014

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**
For Plaintiff:

MELINDA HAAG
United States Attorney
450 Golden Gate Avenue
San Francisco, California  94102
BY:  **PETE AXELROD**
     **JOHN H. HEMANN**
     **ASSISTANT UNITED STATES ATTORNEYS**

U.S. DEPARTMENT OF JUSTICE
600 E Street NW
Washington, D.C.  20044
BY:  **RICHARD S. SCOTT**
     **ASSISTANT U.S. ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

 1   **APPEARANCES**:   **(CONTINUED)**

 2   For Defendant Walter Liew and USA Performance Technology, Inc.:
                            KEKER & VAN NEST LLP
 3                          633 Battery Street
                            San Francisco, California  94111
 4                  **BY:   STUART L. GASNER**
                        **SIMONA A. AGNOLUCCI**
 5                      **KATHERINE M. LOVETT**
                        **CHRISTINA BLAIS**
 6                      **ATTORNEYS AT LAW**

 7   For Defendant Robert J. Maegerle:
                            MCKENNEY & FROELICH
 8                          1349 West Peachtree Street
                            Two Midtown Plaza - Suite 1250
 9                          Atlanta, Georgia  30309
                    **BY:   JEROME J. FROELICH, JR.**
10                      **ATTORNEY AT LAW**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2    Thursday, February 6, 2014

 3    GOVERNMENT'S WITNESSES                        PAGE  VOL.

 4    JIANG, MEIQIN (RECALLED)
      (PREVIOUSLY SWORN)                            3205  16
 5    Cross-Examination resumed by Mr. Gasner       3205  16
      Redirect Examination by Mr. Axelrod           3233  16
 6    Recross-Examination by Mr. Gasner             3238  16

 7    JIAO, YUPING
      (SWORN)                                       3240  16
 8    Direct Examination by Mr. Axelrod             3241  16
      Cross-Examination by Mr. Gasner               3253  16
 9
      DARLING, ANTONIA
10    (SWORN)                                       3267  16
      Direct Examination by Mr. Axelrod             3268  16
11    Cross-Examination by Mr. Gasner               3303  16

12    THOMPSON JUNIOR, TEVIS TAYLOR
      (SWORN)                                       3324  16
13    Direct Examination by Mr. Axelrod             3325  16
      Cross-Examination by Ms. Agnolucci            3332  16
14
                          E X H I B I T S
15
      TRIAL EXHIBITS                         IDEN  EVID  VOL.
16
         403                                       3263  16
17
         404                                       3263  16
18
         405                                       3263  16
19
         407                                       3263  16
20
         410                                       3263  16
21
         506                                       3265  16
22
         507                                       3265  16
23
         508                                       3265  16
24
         509                                       3265  16
25
```

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 510 | | 3265 | 16 |
| 511 | | 3265 | 16 |
| 676 | | 3265 | 16 |
| 779 | | 3244 | 16 |
| 827 | | 3249 | 16 |

1    **Thursday - February 6, 2014**                              **7:53 a.m.**

2                          **P R O C E E D I N G S**

3                              **---000---**

4         (Proceedings were heard out of the presence of the jury:)

5         **THE COURT:**  Good morning, everybody.  Please be

6    seated.

7         Please call the case, Ms. Ottolini.

8         **THE CLERK:**  Calling Case Number CR-11-573, United

9    States versus Walter Liew, United States versus Robert

10   Maegerle, and United States versus USAPTI.

11        Counsel, please state your appearances.

12        **MR. HEMANN:**  Hi.  Good morning, Your Honor.  John

13   Hemann, Pete Axelrod, and Richard Scott on behalf of the

14   United States.

15        **THE COURT:**  Good morning.

16        **MR. GASNER:**  Good morning, Your Honor.  Stuart Gasner

17   and Simona Agnolucci for USAPTI and Walter Liew.  Mr. Liew is

18   present.

19        **THE COURT:**  Good morning.

20        **MS. AGNOLUCCI:**  Good morning.

21        **MR. FROELICH:**  Good morning, Your Honor.  Jerry

22   Froelich for Mr. Maegerle, and Mr. Maegerle is standing next to

23   me.

24        **THE COURT:**  Good morning, everybody.

25        All right.  What's the issue du jour?

1    **MR. HEMANN:** Fortunately, I think there's just minor

2 issues this morning, Your Honor.

3    **THE COURT:** All right.

4    **MR. HEMANN:** We wanted to advise the Court that we are

5 going -- we will be resting this morning probably. We are

6 going to call -- Mr. Gasner's continued cross of Ms. Jiang. We

7 then have a short witness, a former employee of the company;

8 and then two witnesses regarding the bankruptcy allegations.

9    Depending on the length of cross, we could be done

10 before -- you know, around noon today is my guess, if we move

11 along.

12    **THE COURT:** Okay.

13    **MR. HEMANN:** We have a short demonstrative, which is

14 the -- in the bankruptcy proceeding Mr. Liew testified. We're

15 going to have -- we have a transcript of that. We have the

16 audio of that. And we're going to play the audio, you know,

17 scrolling over the screen as the audio plays. And, so, we're

18 going to have to move the computer up here and hook it up.

19    **THE COURT:** All right.

20    **MR. HEMANN:** It takes about eight and a half

21 minutes --

22    **MR. AXELROD:** That's right, yeah.

23    **MR. HEMANN:** -- for the audio.

24    **THE COURT:** Okay.

25    **MR. HEMANN:** And then, you know, I don't know whether

**PROCEEDINGS**

```
 1   the Court wants to make some accommodation for the juror -- for
 2   Juror Number 1 in terms of where the screen is.  She did have
 3   that comment several weeks ago.  This is fairly short, and so
 4   it may not be worth having.  And it's not really something that
 5   needs to be watched as much as listened to.
 6               THE COURT:  Okay.
 7               MR. HEMANN:  So I just wanted to advise the Court of
 8   that --
 9               THE COURT:  Okay.
10               MR. HEMANN:  -- as a matter of scheduling.
11          There's, I think, a small evidentiary issue.  The Court
12   will recall that Special Agent Ho --
13               THE COURT:  Are you recalling the special agent that
14   testified yesterday?
15               MR. HEMANN:  No, we're not going to do that,
16   Your Honor.
17               THE COURT:  Okay.  All right.
18               MR. HEMANN:  Special Agent Ho testified in her direct
19   examination that she located certain business cards during the
20   searches of Mr. Liew's residence.  The Court had asked the
21   parties to go back and talk about the business records that
22   Special Agent Ho had extracted from the larger collection, and
23   we have done that.
24          The Defense has objected to our introduction of these,
25   which are the extracted business records.  We have -- we're
```

PROCEEDINGS

1    happy to put in the entire set of business records, which is

2    in --

3                    THE COURT:  You started out with saying business

4    cards.

5                    MR. HEMANN:  I'm sorry.  I'm sorry, Your Honor.

6                    THE COURT:  Are they cards?

7                    MR. HEMANN:  They're business cards.

8                    THE COURT:  Oh, cards.  Okay.

9                    MR. HEMANN:  Cards, yes.

10       We're happy to put in the entire collection.  They were

11   found in some pretty large chunks.  And we're happy to do it

12   either way.  We can put in the whole set, and then we can argue

13   over the ones that are significant or not; or we could put in

14   the sets that Special Agent Ho testified were significant to

15   her based on her assessment.

16       It's fine either way with us.  I communicated to

17   Mr. Gasner and Ms. Agnolucci that it was, essentially, their

18   election as to which they preferred.  We don't have a

19   preference, and so I wanted to just raise that issue.  And the

20   foundation having been laid by Special Agent Ho, we'd like to

21   offer these into evidence either in the pared-down form or in

22   the larger form, as the Court wishes.

23                    THE COURT:  All right.  Mr. Gasner?

24                    MR. GASNER:  We prefer the pared-down form; that is,

25   the business cards that were actually discussed in evidence.

PROCEEDINGS

1        THE COURT:  All right.

2        MR. GASNER:  We stand on our earlier objections, but

3   as between what documents we're objecting to and which are

4   being offered, we prefer the pared-down version.

5        THE COURT:  All right.  Okay.  So let's put it -- you

6   know, I'll admit those in front of the jury, then.

7        MR. HEMANN:  Okay.  So Mr. Axelrod will be doing some

8   examinations this morning, and we'll have a number of exhibits,

9   primarily bankruptcy and court record exhibits that are going

10  to be offered pursuant to stipulation.  We'll include these in

11  that offer.  They won't be with a witness, but they'll be

12  between witnesses that we'll be offering them pursuant to --

13  pursuant to stipulation before the witnesses testify.

14       And then there are some short excerpts from the actual

15  stipulation that the parties entered into that we'd like to

16  read to the jury.  I think there's maybe four or five factual

17  stipulations, and then we'd like to actually -- we feel like we

18  should read to the jury those portions of the stipulations that

19  have to do with Mr. Liew's writing and handwriting as to only

20  admitted exhibits.

21       THE COURT:  Okay.

22       MR. HEMANN:  I would estimate that it will take five

23  to seven minutes to read that -- those portions of the

24  stipulation.

25       THE COURT:  All right.  Any other issues from the

PROCEEDINGS

```
1   Government's perspective?

2           MR. AXELROD:  No, Your Honor.

3           MR. HEMANN:  I don't think so, Your Honor.

4           THE COURT:  Mr. Gasner?

5           MR. GASNER:  None here, Your Honor.

6           THE COURT:  All right.  So my intention would be,

7   then, given, if the estimate holds correct, to, whenever the

8   Government rests, dismiss the jury for the weekend; and then we

9   would argue any renewed Daubert motions, as we discussed

10  yesterday, and then see where we go from there.

11      And then we can at least start the argument, kind of

12  introduce the arguments with respect to any motions that the

13  defendants wish to make, and then continue those and complete

14  them Friday morning starting at nine -- tomorrow morning

15  starting at 9:30.

16      I don't think it would take more than an hour or so.  I

17  have to leave for the East Bay, for Oakland calendar.  So I'd

18  have to be out of here by 11:00 o'clock.

19          MR. GASNER:  Your Honor, if we might, on the schedule

20  for the Daubert motions, we've talked to Mr. Hemann.  We are

21  still making efforts to satisfy the Court's ruling.  We think

22  it would be more productive to argue the Daubert motions

23  tomorrow.  And I talked to Mr. Hemann about that, and that's

24  his preference as well.  I think it will crystallize the issues

25  better than arguing it today.
```

PROCEEDINGS

1      **THE COURT:**  All right.  That's fine.  But then I

2   also -- maybe I should ask Ms. Agnolucci or Ms. Lovett -- she's

3   not here -- about when you expect your outline to be filed with

4   respect to your JMOL motions.

5      **MR. GASNER:**  If it suits the Court, we'd prefer to

6   file it midafternoon rather than my trying to review and edit

7   it while we're in court; and then, you know, right upon the

8   Government resting, hand it up.

9      The way the schedule has worked out, I think it would be

10  more orderly for me to get back to the office, review it, and

11  then we can simply file it electronically.

12     **THE COURT:**  All right.  The earlier the better so I

13  can start looking at it.  Because my intention would be to at

14  least -- and that will give the Government a heads-up of what

15  the argument is going to look like, so they can prepare as

16  well.

17     And then we would at least -- then I would -- we'll see

18  where we go tomorrow, how much time we need; but I would hope

19  to be able to complete the oral arguments on the JMOL tomorrow

20  between 9:30 and about 11:00, if that's possible.

21     If not, you know, we'll continue that at a later time.  I

22  don't want to rush it through, but I'm trying to be efficient

23  with everybody's time.  So I think we'll do that.

24     **MR. HEMANN:**  Your Honor, I have one just -- on that

25  point, which --

PROCEEDINGS

```
1          THE COURT:  Let me raise one point --
2          MR. HEMANN:  Sure, Your Honor.
3          THE COURT:  -- which may be even better, to ensure
4    that we get done, is we could start on at our regular time
5    tomorrow at 8:00 o'clock.  Court has a scheduled 30-minute law
6    and motion at 9:00.  Would counsel be available to start at
7    8:00 tomorrow?  And that would ensure that we would take a
8    break -- I just have two short matters on law and motion -- and
9    finish midmorning, and then we'll be done for the weekend.
10   Would that be acceptable with the Government?
11         MR. HEMANN:  Maybe even by 9:30, Your Honor, we could
12   be finished.  But, yes, that would be absolutely fine with us.
13         THE COURT:  All right.  Is that fine with you,
14   Ms. Agnolucci?
15         MS. AGNOLUCCI:  Yes, Your Honor.
16         MR. GASNER:  Yes, Your Honor.
17         THE COURT:  And, Mr. Froelich, I should ask you.
18         MR. FROELICH:  Yes, Your Honor.
19         THE COURT:  All right.  So let's say no argument
20   today.  We'll give everybody an early day off, and you can go
21   back and edit the submission.  I'm not precluding the
22   Government from filing.  If you want to file something later on
23   not so that -- not so late that it's not, you know, usable to
24   the Court, I would certainly, you know, encourage that.
25         MR. HEMANN:  Could I ask, Your Honor?  I don't know
```

**PROCEEDINGS**

1   that Your Honor set a time deadline for -- and I'm not trying

2   to jam up Mr. Gasner in terms of getting back to the office,

3   but I think it would be very helpful to everybody if we had

4   time to actually respond to their points in a more methodical

5   way.  So I don't know what time we could get that filing.

6           THE COURT:  Let me ask.  What's your -- again, I don't

7   want to jam you, but I'm trying to get as much, you know,

8   submitted in advance to make it a more usable time period.

9           MR. GASNER:  I think we could get it filed by

10  4:00 p.m., Your Honor.

11          THE COURT:  4:00.  So how much time would you need to

12  respond?

13          MR. GASNER:  I'm not sure, Your Honor, not knowing how

14  many points there will be to respond to.  I mean, if every

15  element of every charge is challenged, that puts it, you know,

16  like, 300-in-the-morning kind of response.

17          THE COURT:  All right.

18          MR. HEMANN:  If it's one element, we could probably be

19  done by 5:00.

20          THE COURT:  All right.  Let's say -- I get in here at

21  6:00, so before -- let's say by 6:00 o'clock a.m.

22          MR. HEMANN:  We'll get --

23          THE COURT:  Not great for sleeping habits, but it's

24  sort of encouragement to get it done sooner.

25      And, again, it may be that you choose to respond initially

**PROCEEDINGS**

1   in a more outline-type form with just citations because the

2   Court has the transcript as well and the exhibit numbers.  I

3   don't need a whole lot of argument.  I need marshaling of the

4   evidence, really, and any key legal issues because, although

5   the Court has begun to work through the next iteration of the

6   instructions in order to update itself on what the law is

7   that's applicable, if there's any -- if you have sort of any

8   late-breaking, you know, views on the key elements as it

9   relates to the motions, then that would be helpful as well.

10       So let's just say, you know, by 6:00 a.m., you know, no

11   later than 6:00 a.m., so at least when I get in, I can start

12   reviewing it.  And I'll have overnight with the defendants.

13       And, Mr. Froelich, I didn't ask you, but is that schedule

14   okay with you?

15       **MR. FROELICH:**  Yes, Your Honor, the schedule is fine.

16   I was not going -- if Your Honor does, I'll file something

17   short.  But I have just short, two very short -- you know, an

18   oral argument to make.

19       **THE COURT:**  That's fine.  That's fine.

20       The key, again, is to marshal the evidence.  Just to

21   simply say, "Well, there's absolutely no evidence against my

22   client," is not going to help me.

23       **MR. FROELICH:**  No, I understand.

24       **THE COURT:**  If you say, "Well, you know, the only

25   evidence is X and it's not adequate, and here are the exhibits

1    that exonerate my client," even under the liberal standard for

2    a JMOL, you know, that would be much better.  So just be

3    prepared.

4        Because what I intend to do is listen to the arguments,

5    take good notes -- I'll have a transcript -- and then go back

6    and deliberate on what I'm going to do, and then issue a ruling

7    at the appropriate time.  I don't expect to rule directly from

8    the bench, although hopefully, I'll have some interesting

9    provocative questions to ask both sides.  I typically do.

10       But, anyway, so that's the way to go.  The jury is here.

11   We're ready to get started?

12           MR. HEMANN:  Yes, Your Honor.

13           MR. GASNER:  Yes, Your Honor.

14           THE COURT:  All right.  Very well.  Let's bring the

15   jury in, and I won't tell them anything about the schedule

16   today, because I don't want to -- if anything happens, I don't

17   want to say, oh, you're going to be getting out at 12:00 and

18   then keep them until 1:30.  So we'll just keep them in the dark

19   on that.  All right.

20       (Proceedings were heard in the presence of the jury:)

21           THE COURT:  Maybe we can get Agent Jiang on the stand.

22           MR. HEMANN:  She's on her way, Your Honor.

23           THE COURT:  Oh, there she is.

24       All right.  Please be seated.

25       Good morning, everybody.  Thank you again for your

1  punctuality.  We're going to start.  We did get you some -- not

2  the highest tech cushions, but they're actually pretty

3  comfortable.  So, again, at any time if anybody needs -- feels

4  like their back is acting up or any other part of their

5  anatomy, then raise your hand and we can take a break, or

6  whatever you need to have done.  We just want you to be

7  comfortable so you can listen to the evidence.

8       All right.  So just to remind you, we're on

9  cross-examination of Agent Jiang from the Internal Revenue

10 Service.

11      Jiang?  Did I say that right?

12           **THE WITNESS:**  Yes.

13           **THE COURT:**  And I just remind you that you're under

14 oath, Agent.

15      And you may continue with your cross-examination.

16           **MR. GASNER:**  Thank you, Your Honor.

17                **MEIQIN JIANG,**

18 called as a witness for the Government, having been previously

19 duly sworn, testified further as follows:

20           **CROSS-EXAMINATION**   (resumed)

21 BY MR. GASNER:

22 **Q.**  Ms. Jiang, when we -- good morning, first of all.

23 **A.**  Good morning.

24 **Q.**  When we broke yesterday, we were talking about

25 Exhibit 525, which is one of the wire transfers on the

1    Government's summary.  So let's put that up on the screen.

2         And then if we could also put, Mr. Guevara, 919 up, which

3    was admitted yesterday, and that is the incoming wires for

4    2006.

5         Do you see those on the screen?

6    A.   Yes.

7    Q.   And what we were talking about is that if you look on the

8    upper document, on 525, there's the letter of credit

9    negotiation amount up at the top.  Do you see that?

10   A.   Yes.

11   Q.   And that's the $1.394 million; right?

12   A.   Yes.

13   Q.   And then if you go and look at the summary exhibit, 919,

14   the August 6 entry on there, that has a different number,

15   $1.310 million.  Do you see that?

16   A.   Yes.

17   Q.   And then if you go -- look at the top part of the screen.

18   There's a thing that says, "LC transfer for Thayer Scale" and

19   "LC transfer for Delta Ducon."  Do you see that?

20   A.   Yes.

21   Q.   Okay.  And those were transfers that the bank made

22   directly from the letter of credit proceeds to third parties;

23   true?

24   A.   Yes.  After approval of the owner of the Performance

25   Group.

1    Q.    And those went directly from the correspondent bank,

2    Mega Bank, to those third parties; right?

3    A.    Yes.

4    Q.    You, however, didn't include those in gross receipts;

5    true?

6    A.    Yes.

7    Q.    When we were talking yesterday, you thought -- you said

8    several things, one of which was that you didn't include them

9    because you wanted to be conservative.

10         Do you remember saying that?

11   A.    Yes.

12   Q.    Have you had a chance to think more about why you didn't

13   include these particular numbers in the summary chart that you

14   testified to yesterday?

15   A.    Yes.  When you asked me the question, it's a yes-or-no

16   question, I just -- yesterday I just feel like responding yes

17   or no cannot under -- I don't want -- I want everybody

18   understand these transactions.  That's why answering yes or no

19   may not clarify the transaction.  So that's why I kind of

20   hesitate there to think about it.  But, yes, I'm clear on this

21   transaction, as always.

22   Q.    Okay.  And now that you've had a chance to think about it,

23   why didn't you include the transfers to Thayer Scale and Delta

24   Ducon?

25   A.    So for this particular transaction, I picked the lower

1    number at the bottom instead of the gross amount.  As we can

2    see, this advice of payment, the amounts of gross --

3    Performance Group is entitled to the higher amount, the gross

4    amount.  And when I'm doing this -- when I was working on this

5    analysis, I want to explain about my scope of this examination.

6         First of all, my main responsibility for this case is

7    doing the book reconciliation, reconcile the books to the tax

8    return.  So that's part of what I do, and mainly the issue I'm

9    focusing on is the gross receipts.

10        So for the other business expenses, I did not request the

11   books and records from the corporation to examine the business

12   expenses.

13        So with that said, it's very important to me to determine

14   the accuracy of the gross receipts amount.

15        Also, what's very -- it's equally important to me to

16   determine the accurate -- the corrected tax for the

17   corporation.  So the corporation should pay tax -- should pay

18   the corrected amount of tax, no more, no less.  So that's why I

19   allowed some of this business deductions here, because I --

20   according to the information available -- available to me in

21   this particular transaction, I can see that it's a legitimate

22   deduction.  That's why I did not include them on my analysis.

23   Q.   So based on what you looked at and you saw that these LC

24   transfers, you thought it was appropriate not to include those

25   in the gross receipts; true?

1    **A.**    Yes.  And if you allow me to explain why, I will.

2    **Q.**    Well, your counsel can ask you more questions if they

3    wish.

4    **A.**    No problem.

5    **Q.**    Let's see if we can stay on point, if we might.

6          So --

7              **THE COURT:**  If at any point you feel you need to

8    explain your answer that's directly relevant to the question to

9    respond to the question, you may ask permission to do so, and

10   then I'll decide whether you can.  Okay?

11             **THE WITNESS:**  So may I at this point?

12             **THE COURT:**  Well, is it responsive to Mr. Gasner's

13   question?

14             **THE WITNESS:**  Because he was asking me about this

15   LC -- whether this LC transfers to be a deduction for the

16   corporation, so --

17   **BY MR. GASNER:**

18   **Q.**    Well, why don't you go ahead and explain.  Why did you

19   view these as legitimate deductions?

20   **A.**    Okay.  So let's start with the smaller amounts first.

21   Those are the handling costs that are charged by the bank.

22         So because this document is provided by the bank -- and

23   when I'm doing the examination, I consider the $1,394, $70,

24   $20, $43.  So in terms of the scope of examination compared to

25   the gross receipts, it's immaterial to me.

1    So -- and because -- with approval of the corporation.  So

2 they allowed the bank to take these handling costs.  So that's

3 why I allowed the deduction here for those four small amounts.

4 **Q.**   Okay.  So let's pause there.

5    Mr. Guevara, can you take away the highlights that are on

6 the screen now, and instead highlight what Ms. Jiang just

7 talked about, which are those four items.

8    So you didn't include those as part of gross receipts

9 because you could tell from the face of this document that

10 those were somewhat routine administrative costs; true?

11 **A.**   Yes.

12 **Q.**   So it's fair to say that the initial amount that is

13 received by the correspondent bank doesn't automatically count

14 as gross receipts for tax purposes; true?

15 **A.**   On this particular transaction.

16 **Q.**   Okay.  So you need to look at the particular transaction

17 and decide whether the amounts initially received are or aren't

18 the amount of the gross receipts; true?

19 **A.**   I need to consider the amounts, the frequency.  You know,

20 when I'm doing the examination, there's some of the scope and

21 some of the determination I need to make.

22 **Q.**   Okay.  So you can't simply look at the LC negotiation

23 amount, $1.394 million, and just say because that was received

24 by the correspondent bank, that that's the number that should

25 go on the Performance Group tax return; true?

JIANG - CROSS / GASNER

1   **A.**   Can you repeat your question one more time?

2   **Q.**   It's true, is it not, Ms. Jiang, that you can't simply

3   take the $1.394 million that was received by Mega Bank and say

4   that's the amount that ought to go on the Performance Group tax

5   return; true?

6   **A.**   On the letter of credit there's a reference -- there's

7   some reference that's information available for me to determine

8   who's the owner of the -- who's entitled to the money, who's

9   entitled to the funds.

10  **Q.**   Okay.  And it's clear here that Performance Group is

11  entitled to the funds; true?

12  **A.**   The corporation is entitled to the funds, yes.

13  **Q.**   Okay.  And in determining what the corporation should put

14  on its tax return under the gross receipts line, you can't just

15  take $1.394 million and say, "That's the amount that they

16  should have put on the gross receipts line"; true?

17  **A.**   No.  They should be.  For the taxpayer, the gross receipts

18  amount, it's always -- for them the definition is always the

19  same.  What the gross receipt amount, according to the law, is

20  the total amount or the gross amount of the income they receive

21  from the cost -- sorry -- from the goods they sold or for the

22  service performed.

23      The reason for my analysis here is because -- it's because

24  my scope of the examination, you know, is mainly focused on the

25  income, not the deduction.  I'm not examining deduction.  But I

1    want to give a fair treatment to the taxpayer, to the

2    corporation and by allowing the deduction I think is

3    legitimate.  So I should -- if I put -- if I include the gross

4    amount, the higher amount of the gross on the tax return but

5    ignoring the other items, I don't think that's fair to the

6    corporation.  So that's why I include the lower amount.

7          But for the scope of other business deduction, if there is

8    some other amounts or some other transaction like this incur, I

9    would need to determine whether I need to change scope of my

10   examination.  It's determining the materiality and how often it

11   happen, et cetera.

12   **Q.**   Okay.  I'm sorry.  I'm a little confused now.

13         If you could take a look at the summary exhibit below, you

14   testified yesterday that the proper amount of gross receipts

15   from this transaction was $1.310 million; true?

16   **A.**   That's the amount included on my analysis, yes.

17   **Q.**   Okay.  And if you look at the document up above, the

18   actual amount received at the correspondent bank pursuant to

19   the letter of credit was higher.  It was 1.394; true?

20   **A.**   That's true.  That's the --

21   **Q.**   Just answer my question.  That's true; right?

22   **A.**   Yes.

23   **Q.**   Okay.  And you felt it appropriate to deduct the items

24   that are highlighted here because those were routine

25   administrative expenses; true?

JIANG - CROSS / GASNER

1   A.   Yes.

2   Q.   And you thought it appropriate to deduct the transfers

3   that went to vendors like Thayer Scale and Delta Ducon because

4   those are proper business deductions; true?

5   A.   On this transaction, yes.

6   Q.   Okay.  And if we wanted to get really technical,

7   Ms. Jiang, the right way to do this -- if we could take a look

8   at Exhibit 637.

9            MR. GASNER:  May I approach, Your Honor?

10           THE COURT:  Yes.

11  BY MR. GASNER:

12  Q.   This is the 2006 tax return.  And if you could take a look

13  at the front page.

14       If we could put that up on the screen, Mr. Guevara.

15       Line 1a is gross receipts.  Do you see that?

16  A.   Yes.

17  Q.   And that's the $1.852 million; right?

18  A.   Yes.

19  Q.   And then if you go to page 7 of Exhibit 637, that is

20  Statement 1, other deductions; right?

21  A.   Yes.

22  Q.   And is it fair to say that, if we want to get

23  hypertechnical about this, the right way to have done this tax

24  return is to include the full 1.394 million in gross receipts

25  and then to list as deductions the payments to Delta Ducon and

1   Thayer Scale?  Is that right?

2   **A.**   For the corporation, this is not -- did you say

3   hypertechnical?  Is that what you said?

4   **Q.**   Well, I'm just getting down to -- I understand the way you

5   did your analysis, what you felt was appropriate; right?  On

6   the summary exhibit that you and Mr. Axelrod went through,

7   you --

8   **A.**   For that particular transaction.

9   **Q.**   Yes.  Okay.

10       But if we want to get more precise about the right way for

11  corporations to do their taxes, would it have been better to

12  put the $1.394 million in the gross receipts and then included

13  the vendor expenses as deductions?  Is that the right way to do

14  it?

15  **A.**   That's the right way to do it, and that's always --

16  they're required to do it that way.

17  **Q.**   But the taxable income is the same in either case, whether

18  you simply don't include it in the gross receipts because it

19  went straight from the letter-of-credit bank or if you put it

20  on Schedule 1, the taxable income is the same; true?

21  **A.**   For that particular transaction, yes.

22  **Q.**   Okay.  And have you ever heard of the expression, "tax

23  return geography"?  Have you ever heard that?

24  **A.**   I never heard of it.

25  **Q.**   Okay.  You haven't heard of the idea that you can put

3215

**JIANG - CROSS / GASNER**

1    things in different parts of the tax return, and as long as the

2    taxable income is the same, it doesn't matter?  Have you ever

3    heard that?

4    **A.**    Mmm, like for -- it can be true at some point.  Like for

5    the one exhibit we talk about here on the other deduction, if

6    we -- so the first line is auto and truck, and the second line

7    is bank charges.  If we switch these two items, yes, it's

8    right; you can do it, like, that way.

9    **Q.**    Okay.  And are there IRS regulations or other things that

10    you look to to decide when something is an appropriate business

11    deduction?

12    **A.**    Many of them are an appropriate business deduction.

13    **Q.**    But are there regulations that you look to as a revenue

14    agent to decide those issues?

15    **A.**    Yes.

16    **Q.**    Did you have to study those regulations as part of your

17    training?

18    **A.**    Internal Revenue Code and regulation, yes.

19    **Q.**    And we're talking about the number of documents.  So how

20    big is the Internal Revenue Code and the set of regulations?

21    Is that like a whole library of material?

22    **A.**    It's a lot.  I don't know how much.

23    **Q.**    Okay.  So just --

24    **A.**    And I mean -- yes.

25    **Q.**    Just to wrap up on this particular document, in terms of

1  what happened in this particular transaction that was on your

2  summary chart that you went through in some detail, there's a

3  contract that you looked at between Jinzhou and Performance

4  Group; true?

5  **A.**   Yes.

6  **Q.**   And then the Everbright Bank is the correspondent bank in

7  China that Jinzhou used for the purposes of transferring money

8  under the letter of credit; true?

9  **A.**   Yes.

10  **Q.**   All right.  And when the instructions came from Jinzhou

11  that they were ready to pay, Everbright Bank sends money to

12  Mega Bank; true?

13  **A.**   Yes.

14  **Q.**   Okay.  And then you showed a letter that Walter Liew wrote

15  to Mega Bank saying, "Disburse the money in the following

16  ways"; true?

17  **A.**   Yes.

18  **Q.**   And on this particular transaction, the payees were Delta

19  Ducon and Thayer Scale; true?

20  **A.**   Yes.

21  **Q.**   And your sense, looking at that, was that those were

22  legitimate business expenses, and it was appropriate to simply

23  pay those out of Mega Bank in this particular transaction;

24  true?

25  **A.**   Can you repeat your question one more time?

JIANG - CROSS / GASNER

1  Q.  In your calculations on the summary chart, you basically

2  didn't include the payments to Delta Ducon and -- Delta Ducon

3  and Thayer Scale in gross receipts because your sense was that

4  those were legitimate business deductions; true?

5  A.  That's some -- I have some thought process about that

6  transaction.  It's not just sense.  I don't know what you mean

7  by "sense."

8  Q.  Okay.  Well, your conclusion was that it was appropriate

9  not to include those payments in gross receipts because you

10  determined that they were proper business deductions; true?

11  A.  On that specific transaction, yes.

12  Q.  Okay.  And that the rest of that money -- did you figure

13  out where the rest of the $1.394 million went?  Did you -- was

14  that part of the scope of your assignment?

15  A.  Yes.

16  Q.  Okay.  So where did that particular money go?

17  A.  Small portion -- after receiving the 1,394,000, the amount

18  was received by the corporation, and it wired out to two

19  different parties.

20  Q.  Okay.  That was Delta Ducon and Thayer Scale?

21  A.  Sorry.  I got confused.  You're talking about the whole

22  1.9 million or --

23  Q.  Yeah.  Just in terms of tracing the 1.394 million, we know

24  from Exhibit 525 that about a hundred thousand dollars went to

25  Delta Ducon and Thayer Scale; right?

1  **A.**   A small portion of 1.9 -- 1.3 million went to these two

2  companies separately, yes.

3  **Q.**   And did you trace where the rest of it went of the

4  1.394 million?  Do you know?

5  **A.**   According to the information that I review, about 38,000,

6  it went to the wife, Christina Liew; and the rest of it went to

7  Huadong, as I remember -- if I remember correctly.

8  **Q.**   Okay.  So that was part of the other work that you did,

9  was to show that some of that money went to other third

10  parties; true?

11  **A.**   Yeah, that's what I do.  But at this point, I don't think

12  they have effects for me to determine the accuracy of the gross

13  income.

14  **Q.**   Okay.  Because you just don't have enough information;

15  true?

16  **A.**   I have -- I think I have enough information to determine

17  the accuracy -- the corrected amount of gross receipts.  And

18  how the corporation disbursed the funds, it's their choice how

19  to disburse the funds after collecting them from the customer.

20  **Q.**   Okay.  I'd like to show you another exhibit.

21        **MR. GASNER:**  If I might approach, Your Honor.  535.

22        **THE COURT:**  Yes.

23        **MR. GASNER:**  This has been admitted into evidence.

24  And, Mr. Guevara, could you put it on the screen?

25  **Q.**   So this is another transaction in 2006; true?

JIANG - CROSS / GASNER

1    **A.**   (Witness examines document.)   Yes.

2    **Q.**   This is something you reviewed in connection with your

3    summary chart?

4    **A.**   Yes.

5    **Q.**   Mr. Guevara, if you could put up the summary chart,

6    please, alongside it.

7          Okay.  So this is the -- let's see if -- yeah.  Can you

8    just get them?  There we go.  Perfect.  Thank you.

9          So the top exhibit is 535, and that's another incoming

10   wire transfer along the same lines as I have up on the

11   whiteboard now; right?

12   **A.**   Yes.

13   **Q.**   Okay.  So that's -- Everbright Bank is the correspondent

14   bank in China sending $819,000 to the correspondent bank in the

15   United States, Mega Bank; true?

16   **A.**   Yes.

17   **Q.**   All right.  And if we go to your summary chart, you've got

18   a lower number there right, 707,000?  True?

19   **A.**   Yes.

20   **Q.**   And if we go back and look up at 535, there are deductions

21   in relatively small amounts for all those administrative

22   charges; right?

23   **A.**   Yes.

24   **Q.**   And you effectively deducted those from what you thought

25   should be the gross receipts of the company; true?

JIANG - CROSS / GASNER

1    **A.**    To the conclusion, yes.

2    **Q.**    And then below that, there's LC transfer for Claudius

3    Peters in the amount of $111,020.  Do you see that?

4    **A.**    Yes.

5    **Q.**    And that's an amount that you also didn't feel was

6    appropriate to include on the gross receipts calculation for

7    Performance Group; true?

8    **A.**    On my analysis, yes.

9    **Q.**    And you know, don't you, that Claudius Peters is a company

10   that sells pumps and does engineering for pumps?  Do you know

11   that?

12   **A.**    I'm not familiar with that company.

13   **Q.**    Okay.  But you determined that that was a legitimate

14   business expense that wouldn't necessarily have to go on the

15   gross receipts line of the company; true?

16   **A.**    For this particular transaction, yes.

17   **Q.**    Okay.  And this same pattern, it's true, is it not,

18   Ms. Jiang, for many of the other transactions that were on your

19   summary chart?  Isn't that true?

20   **A.**    As I remember correctly, these are the LC transfer that I

21   see on the -- on my -- on the course of my review.  I don't see

22   any others like this --

23   **Q.**    Okay.

24   **A.**    -- with the LC transfer to third parties.  This is the

25   only one -- this is only two -- I think this is the only two

1    advice-of-payment transaction that I see out of the 28

2    transactions.

3    **Q.**    Okay.  In the -- so in the other ones, you believe there

4    were later transactions where money went to some Singapore

5    companies; is that true?

6    **A.**    Sorry.  One more time, please.

7    **Q.**    Okay.  So your best sense is that this pattern where money

8    was directed to vendors like Delta Ducon, Thayer Scale, and

9    Claudius Peters, these are the only examples of that, do you

10    think?

11    **A.**    With the LC -- with this LC transfer transaction, just the

12    three of them -- these three transaction I see.

13    **Q.**    Okay.  But in many other transactions that you talked

14    about, the money went from Mega Bank, the correspondent bank,

15    to Singapore companies; right?  Didn't you and Mr. Axelrod talk

16    a lot and show a lot of exhibits with money going to some

17    Singapore companies?

18    **A.**    Yes.

19    **Q.**    Okay.  Did you analyze how long a period of time it was

20    between the money coming to Mega Bank and it going to

21    Singapore?

22    **A.**    For most of them, it's in very short periods of time.

23    **Q.**    So the money was in Mega Bank for very short periods of

24    time; true?

25    **A.**    Yes.

1   **Q.**   All right.  And the other big point that you made

2   yesterday is this idea of control of the money.  Do you

3   remember talking about that yesterday?

4   **A.**   Yes.

5   **Q.**   And your point is that even though the money that went to

6   Singapore was in Mega Bank for very short periods of time, your

7   conclusion was that Walter Liew controlled that money and sent

8   it to Singapore, which means that it really should appear on

9   the gross receipts line of Performance Group.  Did I understand

10   that correctly?

11   **A.**   The -- yes.  Walter Liew representing the Performance

12   Group and USAPTI and the funds that's paid to these two U.S.

13   corporations.

14   **Q.**   Did you consider whether Mr. Liew, as president of

15   Performance Group, in directing that the money go to these

16   particular Singapore companies, was obligated to send it so

17   that he really didn't have any choice?

18   **A.**   I have no evidence -- I don't see -- I see no evidence

19   about that.

20   **Q.**   And would it affect this sense of power to control if

21   Mr. Liew, as the president of Performance Group, was required

22   by other agreements to send the money to Singapore as he did?

23   Would that affect your analysis?

24          **MR. AXELROD:**  Objection.

25          **THE COURT:**  Sustained.

1          THE WITNESS:  Can you --

2          THE COURT:  I sustained the objection, Agent Jiang.

3   So when I sustain it, then you don't get to answer.

4          THE WITNESS:  Okay.

5          THE COURT:  All right.  Thank you.

6          THE WITNESS:  Sorry.

7          THE COURT:  It's okay.

8   BY MR. GASNER:

9   Q.   But if I understand you correctly, the key factor in

10  deciding whether money, even if it just stays in the

11  correspondent bank for a little period of time, the key is the

12  ability of the president of Performance Group to control the

13  direction of those funds.  Is that the key of your analysis?

14  A.   Can you repeat one more time, please?

15  Q.   Yes.  That, if I understand your analysis, you are

16  attributing the funds sent to Singapore as properly going on

17  the gross receipt lines of the Performance Group tax return.

18       That's your opinion; right?

19  A.   Yes.  Before the -- before the company -- before the --

20  before Walter Liew sending the money to Singapore, the total

21  amount received by the -- by both corporations should be

22  recognized as gross receipts on the books as well as on the

23  return.

24  Q.   Okay.  And that's true under your view of the law and

25  regulations even though, basically, the money has gone from

1   here (indicating) and back to Singapore very quickly?

2   **A.**   For many transactions, yes, it's, like, just very short

3   period of time.

4   **Q.**   So it, basically, just kind of bounced through Mega Bank

5   without ever going into the Performance Group bank account;

6   true?

7   **A.**   For some of the money -- for some of the funds received

8   from the Chinese customer, the corporations received small

9   portion amounts.

10  **Q.**   Okay.  So some money went from Mega Bank into the

11  Performance Group bank account; true?

12  **A.**   Yes.

13  **Q.**   And do you know whether the amounts that went into the

14  Performance Group bank account match the amounts that were

15  reported as taxes?  Do you know that?

16  **A.**   For many of them, I see it matches; but for some of them,

17  they -- I don't know why they recognize the transfer as gross

18  receipts.

19  **Q.**   Okay.  But in many of the tax years the amount that went

20  into the U.S. corporation bank account is the amount that was

21  reported as taxes; true?

22  **A.**   That's -- yeah, that's amount deposit -- the amount

23  deposit into the bank is the amount that they reported on the

24  tax return.

25  **Q.**   Okay.  And your opinion is this money that was briefly at

1    Mega Bank and then directed to Singapore, that that really

2    should have been on the gross receipts line of the USAPTI -- or

3    the Performance Group tax return or USAPTI, depending on the

4    year; right?  That's your opinion?

5    **A.**   Yes, it should be recognized as the time they received.

6    **Q.**   Okay.  Would your opinion be different, hypothetically, if

7    the money went straight from Jinzhou to these Singapore

8    entities and never went through Mega Bank?

9    **A.**   I don't see transaction like that.  So you said

10   hypothetical question?

11   **Q.**   That's why I said hypothetically.  I understand that

12   that's not what you saw.  But just to understand your

13   opinion --

14   **A.**   Okay.

15   **Q.**   -- if, hypothetically, the money went straight from

16   Jinzhou to the Singapore companies, would that still have to be

17   reported on the Performance Group United States gross receipts

18   line?

19   **A.**   That depends on the discussion, the agreements between

20   these three parties we're talking about here.

21   **Q.**   It depends on the contract or something else?

22   **A.**   Contract or other agreements.

23   **Q.**   Now, is there a body of law or regulation that you look

24   to, as a revenue agent, in deciding if the money went directly

25   from Jinzhou to the Singapore companies, whether that's

1    supposed to still go on a United States gross receipts line?

2    A.    Can you say your question one more time, please?

3    Q.    Certainly.

4    A.    Because it's a hypothetical question, I need to think

5    about it clearly.

6    Q.    No, this one isn't hypothetical.

7    A.    So this one isn't?  Okay.

8    Q.    This is -- and let me ask it a different way.

9          Have you studied, as part of your training as a revenue

10   agent, regulations or law that determines when, if a foreign

11   company pays another foreign company money, whether it still

12   has to go on a United States corporation's tax return as gross

13   receipts?

14            MR. AXELROD:  Objection.

15            THE COURT:  Sustained.

16   BY MR. GASNER:

17   Q.    In your practice as a revenue agent, have you ever looked

18   at a situation like this involving a contract between a foreign

19   company and a United States company?  Let's start there.  Is

20   that part of your experience?

21   A.    Part -- sorry.  I don't quite get it.

22   Q.    I understand that most of what you do is dealing with

23   United States taxpayers; true?

24   A.    I do have some -- I examine some corporations.  They are

25   multinational corporations or they are foreign or subsidiary

1    corporations.  I have --

2    **Q.**   So you do have experience in this area?

3    **A.**   Yes.  Yes.

4    **Q.**   And do you, from time to time, have to evaluate whether

5    the foreign operations of a multinational corporation need to

6    result in gross receipts reported by the United States

7    corporation?

8    **A.**   For the foreign corporation, if they can -- if they

9    receive the gross income in the United States, the income is

10   coming from the United States, yes, there's a filing

11   requirement on that.  They need to file W-8, W-9, yes.

12   **Q.**   Okay.  So let's take, hypothetically, an American

13   corporation, Apple.  If Apple has foreign operations, have you

14   ever, in your experience, looked at situations as to what Apple

15   is supposed to put on its United States tax return with respect

16   to its foreign operations?

17          **MR. AXELROD:**  Objection.

18          **THE COURT:**  Sustained.

19   **BY MR. GASNER:**

20   **Q.**   Let me change topics a little bit.  Did you look at

21   whether any of these Singapore companies paid taxes in

22   Singapore on the money that they received?

23          **MR. AXELROD:**  Objection.

24          **THE COURT:**  Overruled.

25          **THE WITNESS:**  I reviewed some of the foreign entities'

1  balance sheet and profit statement, but I did not examine those

2  returns, but I reviewed them.  I see they pay very -- they

3  likely have loss or they pay little tax.

4  **BY MR. GASNER:**

5  **Q.**   Did you examine, as part of your analysis, how long money

6  that went from Mega Bank to Singapore stayed in those accounts

7  before being transferred elsewhere?  Did you look at that?

8  **A.**   Do you mean by receiving -- receiving by the foreign

9  corporation?

10  **Q.**   Yes.

11  **A.**   Yes, I reviewed some of the transactions according --

12  related to those.

13  **Q.**   And did you have all the records that you needed to fully

14  understand what happened to the money once it got to Singapore?

15  **A.**   I reviewed the information that's available to me to

16  show -- you know, just trying to track where the funds received

17  by the U.S. corporation, where the funds goes; but it doesn't

18  affect my analysis, or it doesn't change my opinions about

19  how -- what's the exact gross receipts should be reported on

20  the tax return.

21  **Q.**   Did you determine where the money went from Singapore in

22  the next series of transactions; that is, money that went out

23  of the Singapore companies to other places?  Did you analyze

24  that?

25  **A.**   Based on the information available to me, yes, I did some

1  analysis that showed my last set of summary charts that I did.

2  That --

3  **Q.**   And -- I'm sorry.

4  **A.**   So after receiving the funds from the U.S. corporation,

5  the Singapore entities transferred the funds back to -- to

6  China to -- I believe it's to -- sorry.  It's to -- a portion

7  of it is to Christina's father, Qiao Hua, and then that's,

8  like, close to 3 million, if I remember correctly.

9  **Q.**   You showed that on your summary charts; right?

10  **A.**   That's right.

11  **Q.**   Okay.

12  **A.**   And then the other portion is to Christina's brother, Qiao

13  Ning.

14  **Q.**   Okay.  And of the money that was transferred to the

15  Singapore companies but wasn't sent to Christina's family

16  members, did you have adequate documentation to determine where

17  the rest of the money went?

18  **A.**   I do not have the complete records, and I don't think

19  those further transactions affects my analysis.

20  **Q.**   Hypothetically, just to understand your opinion, what if

21  money went from Singapore to a vendor in China for the business

22  of Performance Group?  Would that affect your analysis?

23  **A.**   First of all, I don't know whether the foreign entities,

24  whether they provide service to the Performance Group, whether

25  they are legitimate to receive this money from -- from the

1   Performance Group.  If they do, they should recognize as

2   income; but for the information that I see, they receive, like,

3   tens of millions from the Performance Group or USAPTI, but for

4   many of them I see only they recognize a couple thousands as

5   revenues.

6   **Q.**   I didn't follow that.  What recipients were you just

7   referring to in your answer?

8   **A.**   I do not remember the exact entity, but for, like, a

9   couple -- two or three of them they very -- they did not have

10  many business activity, based on what I review, because

11  there's -- based on the information on their profit and loss

12  statement and the balance sheet.

13  **Q.**   So did you determine that money that went through

14  Singapore to entities or people in China, how long it stayed in

15  the Singapore account?  Did you do that analysis?

16  **A.**   I cannot give you the exact time frame for this particular

17  transaction.

18  **Q.**   Now, hypothetically, Agent Jiang --

19  **A.**   Uh-huh.

20  **Q.**   -- if the money just went through Singapore as kind of a

21  pass-through, it just went through there to other people or

22  entities in China, would that affect your analysis?

23  **A.**   I have no controls on how the -- how the foreign entities

24  send the funds.  I cannot give any opinions about those because

25  I'm not examining their returns.

JIANG - CROSS / GASNER

1   **Q.**    That wasn't part of your assignment?

2   **A.**    That's true.

3   **Q.**    And in terms of the recipients of this money in China, do

4   you know whether or not they paid taxes in China on that money?

5   **A.**    I do not know.

6   **Q.**    Are there procedures that you follow, as a revenue agent,

7   if money is not reported on a U.S. corporation tax return but

8   passes through to people in foreign countries who then pay tax

9   on it?  Are there procedures for that?

10  **A.**    There is procedure for that.  As we remember yesterday,

11  clearly, even though you -- you also repeat my words about the

12  C corporation pay its own tax, not -- C corporation, it's not a

13  flow-through entity.  For -- they need to pay the tax based on

14  their taxable income.

15  **Q.**    Okay.  But it's not the way it works, is it, that if the

16  money comes into Mega Bank on a letter of credit, that

17  Performance Group pays taxes on it, and then it passes through

18  Singapore companies and then they pay taxes on it, and then it

19  goes to further recipients in China and they pay taxes on it?

20  Is that the way this system works?

21  **A.**    Again, C corporation, it's not a flow-through entity.  So

22  by receiving the gross, they need to pay tax on the gross

23  receipts.  So -- and for the funds that's disbursed to the

24  owner, the shareholder of the corporation, they need to pay

25  the -- they need to pay tax on the dividend distributed to

1    them.

2        And then I did not examine the shareholders' tax return.

3    I don't know whether they paid their tax on the dividend that's

4    distributed to them.

5    **Q.**   You mentioned the flow-through entity.  So if,

6    hypothetically, Performance Group was a Sub S corporation, then

7    it would be treated as a flow-through entity where you would

8    look to the ultimate recipients for the tax responsibility;

9    true?

10   **A.**   Can you repeat your question one more time?

11   **Q.**   If, hypothetically, Performance Group was a Sub S instead

12   of a C corporation, then you would look to the ultimate

13   recipients for the tax liability; true?

14           **MR. AXELROD:**  Objection.

15           **THE COURT:**  Sustained.

16                   (Pause in proceedings.)

17   **BY MR. GASNER:**

18   **Q.**   So if I understand you correctly, Agent, you've got to do

19   some analysis that requires your skill and training in order to

20   analyze gross receipts.  Is that fair to say?

21   **A.**   Yes.

22           **MR. GASNER:**  Nothing further, Your Honor.

23           **THE COURT:**  All right.  Thank you.

24       Any redirect, Mr. Axelrod?

25           **MR. AXELROD:**  Yes, Your Honor.

```
 1              THE COURT:  All right.

 2                     REDIRECT EXAMINATION

 3  BY MR. AXELROD:

 4  Q.   Good morning, Ms. Jiang.

 5  A.   Good morning.

 6  Q.   Mr. Hemann, can you bring up Exhibit 525?  And could you

 7  blow up that whole middle section?

 8  A.   Sorry.  It's not on my screen.

 9              THE COURT:  All right.  There's usually a delay, so --

10  is it up there?

11              MR. AXELROD:  All the way down to --

12              THE COURT:  Agent Jiang, is it up there?

13              THE WITNESS:  Not yet.

14              THE COURT:  Agent Jiang?

15              THE WITNESS:  Not yet.

16              THE COURT:  Just give us the high sign.

17              THE WITNESS:  Yes.  Now, yes.

18              THE COURT:  All right.  Thank you.

19  BY MR. AXELROD:

20  Q.   Thank you.  Agent Jiang, on cross-examination, Mr. Gasner

21  asked you a lot of questions about this particular transaction.

22  Do you recall that?

23  A.   Yes.

24  Q.   And you indicated -- and this is a circumstance where a

25  wire came in for Performance Group, and the initial amount was
```

1    the 1.394 million; right?

2    A.   Yes.

3    Q.   Okay.  And then -- and, ultimately, you determined that

4    the gross receipts that were required to be declared on

5    Performance Group's tax return was the 1.310 million at the

6    bottom; right?

7    A.   Yes.  That's the amount included in my analysis.

8    Q.   Right.  And one of the factors in your analysis is who

9    actually controls the funds coming in; right?

10   A.   Yes.

11   Q.   Okay.  And when the 1.394 million came in, that whole

12   amount was not -- was not available to Mr. Liew to control, was

13   it?

14   A.   Can you repeat your question?

15   Q.   Sure.  When the 1.394 million came in, was that available

16   at Mr. Liew's control?

17   A.   Yes, it's available to his control.

18   Q.   Well, but there were certain funds that were moved off

19   pursuant to these letters of credit to vendors; right?

20   A.   Yes, after his approval.

21   Q.   Okay.  Have you reviewed the letters of credit related to

22   the vendor payments?

23   A.   It's -- I don't think it's available to me for these two

24   letter of credits.  The way I made the determination on my

25   scope for this particular transaction, first of all, if we add

1  up these two amount together, it's close to 83,000 -- 83,000.

2  So compared to the gross receipts of, like -- the actual gross

3  receipts not reported on -- sorry -- the actual gross receipts

4  they receive, 27 million, it's immaterial to me.

5      And there are some other factors I need to consider.  I

6  don't see many patterns like this.  And also, more importantly,

7  is for the LC -- for these foreign transactions, I understand

8  how the LC credit works.  So the bank needs to come in to

9  verify whether the services is performed it -- whether the

10  service is performed by these third-party contractors.

11      So that's why I kind of gave some credibility on the

12  banks, because they are the one who verifies service in order

13  to disburse the funds to these third parties.

14  **Q.**  Okay.  So there's -- with respect to the vendor

15  transactions displayed there for Thayer Scale and Delta Ducon,

16  there's some verification that service was provided before the

17  bank will release the funds to those entities?

18  **A.**  That's true.

19  **Q.**  Okay.  So in a sense, if the vendors provide that, that

20  money goes to the vendors directly from the bank without

21  Mr. Liew's control?

22  **A.**  Sorry.  Can you repeat?

23  **Q.**  Sure.

24      The -- well, let me step back.

25      There is -- with respect to the vendors, they provide

1    verification that a service was provided?

2              **MR. GASNER:** Objection.  Leading.

3              **THE COURT:** Sustained.

4    **BY MR. AXELROD:**

5    **Q.**  In the records you reviewed, did you identify information

6    from the vendors indicating that they had provided service?

7    **A.**  Yes.

8    **Q.**  And this was just a couple of -- you said there were two

9    instances -- and I think Mr. Gasner asked you about both of

10   them -- where funds went directly to vendors; right?

11   **A.**  Yes.

12   **Q.**  And those vendors were here in the United States; right?

13   **A.**  I think so.

14   **Q.**  Okay.  Did you ever review any records indicating that any

15   of the Singaporean entities had provided services?

16   **A.**  No, I don't -- I see no evidence.

17   **Q.**  And if we -- could we step out, Mr. Hemann, to

18   Exhibit 919?  And let's go back here.

19        So what you testified about yesterday was you went through

20   a whole series of transactions and made a determination that

21   these funds received were gross receipts; right?

22   **A.**  Yes.

23   **Q.**  And how many transactions did you look at in the course of

24   that work?

25   **A.**  For the wire-in transactions between '06 through '11,

**JIANG - REDIRECT / AXELROD**

1   that's about 28 transactions.

2   **Q.**   Okay.  And of those 28 transactions, there were two that

3   involved direct payment to vendors?

4   **A.**   Yes.

5   **Q.**   So let's put those aside for the moment.  The rest of

6   them, the funds come into Mr. Liew's control; right?

7   **A.**   Yes.

8   **Q.**   And once they're in his control, they're required to be

9   declared because they're for services provided; right?

10  **A.**   Yes.

11  **Q.**   And if we could go to 922 and go to page 3.

12       Do you see that?

13  **A.**   Yes.

14  **Q.**   Okay.  Those all relate to the Huadong Equipment company;

15  right?

16  **A.**   Yes.

17  **Q.**   Who owns Huadong Equipment?

18  **A.**   It's owned by Walter Liew.

19  **Q.**   And who controls the bank account for Huadong Equipment?

20  **A.**   Both Walter Liew and Christina Liew.

21       **MR. AXELROD:**  May I have a brief moment, Your Honor?

22       **THE COURT:**  Sure.

23            (Pause in proceedings.)

24       **MR. AXELROD:**  I have no further questions.

25       **THE COURT:**  Thank you.

JIANG - RECROSS / GASNER

1    Anything further?

2          MR. GASNER:  Yes, Your Honor, briefly.

3          THE COURT:  All right.

4          MR. GASNER:  If we could perhaps keep that slide up.

5    Is that possible?  Thank you.

6                    **RECROSS-EXAMINATION**

7    BY MR. GASNER:

8    Q.   The Singapore companies that are shown on Exhibit 922, you

9    were just talking about Huadong Equipment Solutions?

10   A.   Yes.

11   Q.   And the other companies, ESI Equipment and Huan Qu Process

12   Equipment, do you see those names?

13   A.   Yes.

14   Q.   They all have "equipment" in the name; right?

15   A.   Yes.

16   Q.   Are you familiar with what kinds of equipment are needed

17   to build a titanium dioxide plant?

18   A.   I'm not familiar with them.

19   Q.   Have you studied -- of the 30K and 100K projects where you

20   looked at the contracts, did you look at what equipment was

21   going to be manufactured in China and what was going to be

22   manufactured in the United States?

23         MR. AXELROD:  Objection.

24         THE COURT:  Sustained.

25

**JIANG - RECROSS / GASNER**

1   **BY MR. GASNER:**

2   **Q.**   Was any part of the documentation that you looked at

3   technical information about what equipment would be

4   manufactured for this plant?

5           **MR. AXELROD:**  Objection.

6           **THE COURT:**  Overruled.

7           **THE WITNESS:**  Can you repeat your question?

8   **BY MR. GASNER:**

9   **Q.**   Of the 10 or 20 or however many boxes it was that you went

10  through, was any of that technical material about the equipment

11  that was to be built for either the 30K or the 100K plant?

12  **A.**   Yes.

13  **Q.**   And in that, were you able to determine what equipment was

14  going to be made in China and what was going to be made in the

15  United States or elsewhere?

16  **A.**   I'm not familiar with those.  I reviewed the documents,

17  and I know there's equipment need to be shipped or built either

18  from United States or from China.  I see some of the proposals,

19  and the proposals were provided by you, the defense team.

20          And, like I said, I mainly focused on the income.  I did

21  not request any supporting documents for the taxpayer to

22  substantiate the equipment costs.  So I did not review those

23  documents closely.

24  **Q.**   Have you had occasion to review the tax returns of

25  companies that do business with China?

1           **MR. AXELROD:**  Objection.

2           **THE COURT:**  Sustained.

3           **MR. GASNER:**  No further questions.  Thank you,

4    Your Honor.

5           **THE COURT:**  All right.  You're excused, Agent.  Thank

6    you very much.

7        We'll take care of the exhibits.  You can leave them

8    there.  Thank you.

9                        (Witness excused.)

10          **THE COURT:**  Next witness, please.

11          **MR. AXELROD:**  Thank you, Your Honor.  The

12   United States calls Yuping Jiao.

13          **THE COURT:**  All right.  Let's take a stretch break.

14                        (Pause in proceedings.)

15          **THE CLERK:**  Raise your right hand, please.

16                        <u>**YUPING JIAO**</u>,

17   called as a witness for the Government, having been duly sworn,

18   testified as follows:

19          **THE WITNESS:**  Yes.

20          **THE CLERK:**  Thank you.  Please be seated and state and

21   spell your full name for the record.

22          **THE WITNESS:**  My name is Yuping Jiao.  First name is

23   spelled Y-U-P-I-N-G.  Last name J-I-A-O.

24          **THE CLERK:**  Thank you.

25

**JIAO - DIRECT / AXELROD**

1                        <u>**DIRECT EXAMINATION**</u>

2       **BY MR. AXELROD:**

3       **Q.**   Good morning, Ms. Jiao.

4       **A.**   Good morning.

5       **Q.**   Did you work at USAPTI?

6       **A.**   Yes.

7       **Q.**   When did you work there?

8       **A.**   I started in March 2011.

9       **Q.**   And when did you stop working there?

10      **A.**   I got the employment termination letter in October 2011.

11      **Q.**   Okay.  And how did you come to work at USAPTI?

12      **A.**   So USAPTI, the job for USAPTI, it was the first job after

13      I graduated from my college.  I saw the job post on Craigslist

14      and sent them my résumé and a cover letter.  And then about,

15      like, two weeks or three weeks later, I got a call from Tony.

16      He asked me to go into the office and have interview with

17      Mr. Walter Liew.

18      **Q.**   And what did you learn -- did you have an interview with

19      Mr. Liew?

20      **A.**   Yes.

21      **Q.**   And what was the position that you were applying for?

22      **A.**   Process engineer.

23      **Q.**   And what's your educational background?  I know you said

24      you had just finished college.

25      **A.**    Yes.  I have -- I have my bachelor's degree from

JIAO - DIRECT / AXELROD

1    University of Wisconsin in Madison.

2    **Q.**    Okay.  And when you interviewed with Mr. Liew, what did he

3    tell you about the company or the assignment?

4    **A.**    So he told me the business for the company was doing

5    process development and -- for the chemical called TiO2,

6    titanium dioxide.

7    **Q.**    And did he tell you anything about himself, his

8    background?

9    **A.**    Yes, a little bit.

10   **Q.**    What did he tell you?

11   **A.**    He told me he had his Ph.D. from Stanford University, and

12   he is the head for the company and also the head for the

13   technical part, I think.  Yeah.

14   **Q.**    And did he tell you what the Ph.D. was in, what subject

15   matter?

16   **A.**    I remember it's electrical engineering.

17   **Q.**    Okay.  And the position that you were hired into was

18   process engineer?

19   **A.**    Yes.

20   **Q.**    And could you describe what your responsibilities were?

21   **A.**    At the company during my working period, I was doing the

22   training process.  So I was entitled to study the P&ID for the

23   process and help other engineers on their projects.

24   **Q.**    How did you -- first of all --

25   **A.**    Sure.

JIAO - DIRECT / AXELROD

1   **Q.**   -- when you got to USAPTI, had you ever heard of titanium

2   dioxide before you went to work there?

3   **A.**   No.

4   **Q.**   Okay.  And when you got there, who were you helping?  What

5   was your sort of -- who were you working with and what were you

6   doing?

7   **A.**   So I worked close with -- as a process engineer of the

8   company and helped on their design projects.  And one of the

9   projects I did is to check the P&ID for individual components,

10  individual instruments, and check the table for each component,

11  each instrument's specification.

12  **Q.**   And who were the other people that you worked with?

13  **A.**   Ken and Ruth.

14  **Q.**   Okay.  And do you know their last names?

15  **A.**   Ken's last name I remember is Chan.  And, I'm sorry.  I

16  don't remember Ruth's last name.

17  **Q.**   And did either one of -- they were engineers working

18  there?

19  **A.**   Yes.

20  **Q.**   Did either one of those engineers have prior experience in

21  TiO2?

22  **A.**   I don't know.

23  **Q.**   When you started, did you sign a confidentiality agreement

24  regarding your work at USAPTI?

25  **A.**   Yes.

1          **MR. AXELROD:**  Your Honor, may I approach with

2    Exhibit 779?

3          **THE COURT:**  Yes.

4                    (Pause in proceedings.)

5    **BY MR. AXELROD:**

6    **Q.**   Ms. Jiao, I'm approaching and handing you Exhibit 779.

7    **A.**   Okay.

8    **Q.**   And do you recognize that document?

9    **A.**   (Witness examines document.)  Yes.

10   **Q.**   What is it?

11   **A.**   So the first page is my offer letter, and the second and

12   the third page is the confidential agreement I signed.

13   **Q.**   And was that signed by Mr. Liew as well?

14   **A.**   Yes.

15         **MR. AXELROD:**  Your Honor, the United States offers

16   Exhibit 779.

17         **MR. GASNER:**  No objection.

18         **THE COURT:**  Any objection?

19       Admitted.

20       (Trial Exhibit 779 received in evidence)

21         **MR. AXELROD:**  And, Mr. Hemann, if you could bring that

22   up.

23         **THE CLERK:**  It's Ms. Mahoney.

24         **MR. AXELROD:**  Excellent.  My life's improving.

25   Ms. Mahoney.

1              **MS. MAHONEY:**  Good morning.

2              **MR. AXELROD:**  Could you please bring up 779.  I feel

3      better already.

4                              (Laughter)

5                        (Pause in proceedings.)

6              **THE CLERK:**  It's on.  I didn't switch it over because

7      Mr. Hemann was using it for the Defense last time.

8                        (Pause in proceedings.)

9              **THE CLERK:**  Maybe the wire's not....

10                       (Pause in proceedings.)

11             **MR. GUEVARA:**  Ms. Ottolini, it appears that my input

12     is still on.

13             **THE CLERK:**  Really?  It says prosecution.

14        Here we go.

15             **MR. AXELROD:**  Super.  Thank you.

16             **THE CLERK:**  Is it on the witness stand?  Do you see

17     the document?

18             **THE WITNESS:**  Yes.

19     BY MR. AXELROD:

20     Q.   Do you see the document?

21     A.   Yes.

22     Q.   So, Ms. Jiao, the first page, that's the employment offer

23     letter from Mr. Liew?

24     A.   Yes.

25     Q.   Okay.  And then the second page, if we could go to the

**JIAO - DIRECT / AXELROD**

1    second page of that agreement or that document --

2    **A.**   Okay.

3    **Q.**   -- is that the confidentiality -- oh, I'll wait until you

4    get there on page 2.

5    **A.**   Yes.

6    **Q.**   Thank you.  And did you have a conversation -- this is an

7    agreement that you executed with Mr. Liew?

8    **A.**   I'm sorry?

9    **Q.**   Did you -- the confidentiality agreement, is it something

10   that you executed with Mr. Liew?

11   **A.**   When you say "executed," what do you mean?

12   **Q.**   Did you sign it?

13   **A.**   Yes.

14   **Q.**   And did you sign it in his presence?

15   **A.**   I don't remember how exactly I signed it.  It's either in

16   Mr. Liew's office or on my desk.

17   **Q.**   And did you have discussions with him about

18   confidentiality?

19   **A.**   I don't remember that either, so maybe yes, maybe no.  I

20   don't remember.  I'm sorry.  It was two years ago, and there --

21   there's -- there has been lots going on over the past two

22   years.

23   **Q.**   Understood.

24        At some point in time during the time that you worked at

25   USAPTI, did you learn that the company and Mr. Liew had been

**JIAO - DIRECT / AXELROD**

1    sued by DuPont?

2    **A.**    Yes.

3    **Q.**    After that, you became aware of that lawsuit, did Mr. Liew

4    ask you to research patents?

5    **A.**    Yes.

6    **Q.**    Can you describe what he asked you to do?

7    **A.**    So he asked me to search patents related to the TiO2

8    process.

9    **Q.**    And did he explain why he wanted you to do that?

10   **A.**    Yes.

11   **Q.**    What did he say?

12   **A.**    It is -- it was for a lawsuit, and he wanted me to put

13   together, like, a family tree for those patents, like, which

14   patent came out first, what process unit or instrument or

15   process method, and then what patent came after that and based

16   on that patent.  Sort of like a family tree for those patents.

17   **Q.**    And did he provide you any patents for that work?

18   **A.**    I don't remember.  Maybe he give me one or two to start

19   with or maybe he give me some keywords to start the search.

20   **Q.**    What were those keywords?

21   **A.**    I don't remember, like, what exactly they are, but they

22   are related to the process.

23   **Q.**    So how did you go about that research project?

24   **A.**    It was an ongoing project for, like -- probably, like, two

25   to three hour per week.  And then I just went on the official

1    website for U.S. patent, government.  And there was a software

2    that Mr. Walter Liew got installed in my desktop, so I just

3    used that software and searched the keyword and pull out all

4    those patents that related.

5    **Q.**    And what did you do once you collected those patents?

6    **A.**    So I did an Excel spreadsheet putting in patents number,

7    their topic, which company published that or which person

8    published that, and some key information about that patent.

9    And then I printed the patent out and put it into a binder -- a

10   binder.  Sorry.

11   **Q.**    And how -- what was the time period over which you worked

12   on this?  I know you said it was about two or three hours a

13   week.  Is that what you said?

14   **A.**    Yes.

15   **Q.**    For how many weeks?

16   **A.**    I don't remember exactly how many week -- how many weeks.

17   My guess will be about four to five.  So it was one hour,

18   maybe, in the middle of June and then stop after Mr. Walter

19   Liew got arrested.

20        **MR. AXELROD:**  And, Your Honor, may I approach with

21   Exhibit 827?

22        **THE COURT:**  Yes.

23              (Pause in proceedings.)

24        **MR. AXELROD:**  I'm sorry.  We just need -- there's not

25   a sticker on it.  I just want to make sure it's got the

JIAO - DIRECT / AXELROD

```
 1   sticker.

 2                    (Pause in proceedings.)

 3            THE CLERK:  Are you changing it from 827?

 4            MR. AXELROD:  No, no, no.  It was missing the sticker,

 5   so I was just making sure it's on there.

 6            THE CLERK:  Thank you.

 7            MR. AXELROD:  I'm approaching with what's been marked

 8   as Trial Exhibit 827.

 9            THE WITNESS:  Thank you.

10   BY MR. AXELROD:

11   Q.   Do you recognize that document?

12   A.   Yes.

13   Q.   What is it?

14   A.   So the first couple pages are the Excel -- the printout

15   for the Excel spreadsheet I talked about.  So putting together

16   all those patent numbers, the year, title.

17        (Witness examines document.)  Yes.  I think this is the

18   printout for that Excel sheet I talked about before --

19   Q.   Okay.

20   A.   -- how I organized those patents.

21            MR. AXELROD:  Your Honor, the United States offers 827

22   into evidence.

23            MR. GASNER:  No objection.

24            THE COURT:  Admitted.

25        (Trial Exhibit 827 received in evidence)
```

1    **MR. AXELROD:**  If, Ms. Mahoney, if you could just bring

2    up the first page of 827.

3    **Q.**  And, Ms. Jiao --

4    **A.**  Yes.

5    **Q.**  -- could you just describe to the jury what we're looking

6    at on this first page?

7    **A.**  So the first page, the first -- so it's a printout from an

8    Excel sheet, so the first column is the patent number.  So

9    that's the patent number I got from the actual patent.  And

10   each patent has a published year.  So the second -- that's what

11   the second column is.

12       The third and the fourth column might be their -- I'm

13   sorry.  I don't remember what the third and fourth column are.

14       And the next one is the title.  So the column labeled as

15   "Hide" might be their -- just their group or some general

16   information for that patent.

17   **Q.**  And then the document goes on for many pages.

18   **A.**  Yes.

19   **Q.**  If we could go to page 3.  Is this just sort of more of

20   the same type of information?

21   **A.**  Yes.

22   **Q.**  And on the right side, does it indicate who -- there's

23   information about various entities.  Do you see that?

24   **A.**  Yes.

25   **Q.**  What's that?

1    **A.**    That should be the company or the person who published the

2    patent or who have the patent.

3    **Q.**    And did you discuss the results of your project with

4    Mr. Liew?

5    **A.**    I'm sorry.  I don't know what you -- so --

6    **Q.**    Did you have conversations -- as you were working on this

7    project, did you have conversations with Mr. Liew about it?

8    **A.**    I don't remember.  Maybe it's just Mr. Liew came over to

9    my desk and had a quick look at what I did, what I printed out

10   for the patent.  I never give -- as far as I remember, he -- I

11   never give him the Excel spreadsheet, because it's an ongoing

12   project, and he was not asking for it at that time.  And I

13   never give him the binder for that patent I printed out because

14   he was never -- he has never requested it.

15   **Q.**    Okay.  Now, at some point in time, did the FBI conduct a

16   search of the USAPTI business?

17   **A.**    Yes.

18   **Q.**    And were you present when that occurred?

19   **A.**    So when the FBI agent came into the office, I was not

20   there, but I was -- I went to the office in the middle of the

21   search.

22   **Q.**    Okay.  After that, did you continue to work for USAPTI?

23   **A.**    Yes.

24   **Q.**    And that was July; right?

25   **A.**    Yes.

**JIAO - DIRECT / AXELROD**

1   Q.   And you said you worked until October?

2   A.   Yes.

3   Q.   So can you describe the nature of the work you did sort of

4   post-FBI search until October?

5   A.   So right after that search, we still have meeting going on

6   with clients.  So we just continued on those meetings until the

7   client decided they will terminate the meetings, and they would

8   go back -- they would go back.

9        And then we just finish what's hanging over our heads,

10  finish projects.  And then we just run out of things to do.

11       But then -- but then it was mainly Tony, Ken, and I, we

12  keep going to the office because we have not received any

13  official employment termination letters from the company.

14  Q.   Were you paid for the work that you did through the time

15  that you left the company?

16  A.   No.

17  Q.   How much were you owed?

18  A.   I don't remember the exactly number, but it would be about

19  $10,000 before tax.

20  Q.   At some point in time, did Mrs. Liew offer you other work?

21  A.   Yes.  It was not an official offer.  So after I got the

22  termination letter and we helped -- we helped Christina move --

23  move -- empty the office and everything, so I had a phone

24  conversation with her.  I was mainly expressed my concern about

25  her and their child, their kids, their son, Michael.  And

1   Christina asked me if I can be their babysitter for their son,

2   Michael.

3   **Q.**   And did you discuss payment?

4   **A.**   Yes.  She did say that "I can pay you," but I rejected

5   because I was doing job hunting, and I cannot guarantee my

6   time.

7            **MR. AXELROD:**  I have no further questions.

8            **THE COURT:**  Mr. Gasner?

9            **MR. GASNER:**  Thank you, Your Honor.

10                    <u>**CROSS-EXAMINATION**</u>

11  **BY MR. GASNER:**

12  **Q.**   Good morning, Ms. Jiao.

13  **A.**   Good morning.

14  **Q.**   I'm Stuart Gasner, and I represent Mr. Liew and USAPTI.

15  **A.**   Okay.

16  **Q.**   Thank you for being here.

17       You attended the University of Wisconsin in Madison; is

18  that right?

19  **A.**   Yes.

20  **Q.**   When did you graduate?

21  **A.**   December '09 when I graduated.

22  **Q.**   Did you manage to find work when you graduated?

23  **A.**   No.

24  **Q.**   Were you looking mostly in the Madison, Wisconsin, area or

25  looking all over the United States?

**JIAO - CROSS / GASNER**

1  **A.**   So after graduation, I moved to the Bay Area, and I just

2  look for job in the Bay Area.

3  **Q.**   Were you looking for a job as a chemical engineer?

4  **A.**   Yes.

5  **Q.**   And I take it this was not a good time to be graduating

6  college and looking for a job?

7  **A.**   Definitely, it was not a good time.

8  **Q.**   Okay.  So I take it you were pretty excited when you got

9  the job with USAPTI?

10  **A.**   Yes.

11  **Q.**   When you started, how did you go about learning anything

12  about titanium dioxide?

13  **A.**   So before -- before I worked for USAPTI, I have no

14  knowledge for TiO2 and its process.  So before I started, I

15  just do, like, a website search for the compound and its

16  process for manufacturing.  So I get some very basic knowledge

17  on that.

18      And then I was on the training on USAPTI -- USAPTI

19  provided.

20  **Q.**   Who trained you at USAPTI?

21  **A.**   So I was -- I was -- everybody in the office, but majorly,

22  it was Ken and Ruth.

23  **Q.**   Do you remember Ruth's last name being Oduca?

24  **A.**   Yes.

25  **Q.**   That refreshes your memory?

1   A.   Yes.   Thank you.

2   Q.   And what was your impression -- I know this was your first

3   job as a chemical engineer, but what was your impression of

4   Ruth in terms of her competence as a chemical engineer?

5              MR. AXELROD:   Objection.

6              THE COURT:   Overruled.

7        You may answer.

8              THE WITNESS:   Oh.   She is a very smart and

9   professional chemical engineer.   She has -- has a very deep and

10  wide knowledge for the process and for chemical engineering.

11  BY MR. GASNER:

12  Q.   How did she compare to your professors at Wisconsin?

13  A.   She has more, like, real work experience, like, real

14  industrial experience compared to the professors.

15  Q.   How about Ken Chan?   How did he strike you in terms of his

16  competence as a chemical engineer?

17  A.   So he's also a very smart and intelligent and professional

18  engineer I worked with, and he also has very deep and wide

19  knowledge for the work he was doing.

20  Q.   Did Mr. Liew assist in your training as well?

21  A.   Yes, from time to time.

22  Q.   So you started on March 5, 2011; right?

23  A.   Yes.

24  Q.   And do you recall that the lawsuit that DuPont brought was

25  brought on April 6, 2011?   Does that sound about right?

1   **A.**   So I was not aware of the date when the lawsuit was --

2   went out.   So it was one morning probably in June or in late

3   June, beginning of July or in the middle of July -- I don't

4   recall, like, exactly when -- that Mr. Walter Liew brought each

5   one of us into his office separately, and he just told us --

6   told me that there was a lawsuit going on between USAPTI --

7   with USAPTI and DuPont.

8   **Q.**   Did you think that just because DuPont had sued, that your

9   job was going to be over?

10  **A.**   So at that time Mr. Walter Liew told me, "Do not worry.

11  We did not do anything wrong.   And you should just go and

12  continue your work.   It will be fine."

13  **Q.**   So you thought your job --

14          **THE COURT:**   Wait a minute, Mr. Gasner.

15          **MR. AXELROD:**   Your Honor, I'm going to object and ask

16  to have that answer stricken.

17          **THE COURT:**   All right.   The objection is sustained.

18  The answer is stricken.   The jury will disregard the last

19  answer.

20  **BY MR. GASNER:**

21  **Q.**   So, Ms. Jiao, my question was directed at your

22  impressions, not anything that Mr. Liew said.

23      So I take it, though, that you didn't think that your job

24  was going to end just because DuPont had brought a lawsuit;

25  true?

**JIAO - CROSS / GASNER**

1    **A.**    Yes.

2    **Q.**    Was -- Mr. Axelrod showed you Exhibit 827.  Do you have

3    that in front of you?

4    **A.**    Yes.

5    **Q.**    Was that something that you were doing in connection with

6    the lawsuit or was it a separate research project or something

7    else?

8    **A.**    This project was -- I got the direction from Mr. Walter

9    Liew after he told me there was a lawsuit.

10   **Q.**    Did you ever meet a lawyer by the name of Dan Mount?

11   **A.**    I'm sorry.  I don't remember.

12   **Q.**    Did you meet with anybody that you understood to be a

13   lawyer representing USAPTI in the civil lawsuit that DuPont

14   brought?

15   **A.**    So I met with a couple lawyers, but that's all after the

16   FBI agent has searched the office and after Mr. Walter Liew got

17   arrested.

18   **Q.**    Looking at Exhibit 827, you mentioned that you used some

19   software.  Is that the software that you just get on the

20   U.S. PTO, Patent Office, website?  Is that right?

21   **A.**    Yes.

22   **Q.**    And that allows you to use search terms; true?

23   **A.**    Yes.  So that website is open to public.

24   **Q.**    And the -- looking for anything having to do with titanium

25   dioxide, do you recall roughly how many patents that revealed

**JIAO - CROSS / GASNER**

1  if you just searched for that?

2  **A.**   Oh, I would say thousands or tens of thousands, many of

3  them.

4  **Q.**   So you had to narrow your search?

5  **A.**   Yes.  So I have -- I was not even close to the end of my

6  search.  It was only the beginning.  I only did the search,

7  like, two hours -- two to three hours a week, and about like

8  three, four, or five weeks.

9  **Q.**   So Exhibit 827 is just a partial selection of patents that

10  you narrowed down from the thousands or tens of thousands that

11  you saw reviewing the U.S. PTO website; true?

12  **A.**   Yes.

13  **Q.**   Did you read any of the patents on Exhibit 827?

14  **A.**   No.  I --

15  **Q.**   Were you planning to?

16  **A.**   No, because I was busy doing other projects because this

17  one is not the main project I got my focus on.  And since it's

18  an ongoing project, what I did is whenever something caught my

19  interest, I just download it from the website -- again, the

20  website is open to the public, so anyone can install the

21  software and download the patent and then extract the summary

22  information from that patent and organize them into the Excel

23  spreadsheet.

24       And to your question, I'm not planning to read any of the

25  patents because they're -- there are too many.

**JIAO - CROSS / GASNER**

1    **Q.**   And a little boring?

2    **A.**   Yes.

3    **Q.**   Okay.  Even to a chemical engineer such as yourself?

4    **A.**   Yes.

5    **Q.**   Did you grow up in Wisconsin?

6    **A.**   No.  I was born and raised in Shanghai, China; and when I

7    was 18, I moved to New York City with my parents and stayed in

8    New York City for two years before I went to Wisconsin for

9    college.

10   **Q.**   Is English your first language?

11   **A.**   No.

12   **Q.**   What's your first language?

13   **A.**   Mandarin Chinese.

14   **Q.**   Your English is wonderful.  Where did you learn it?

15   **A.**   So I studied English when I was in Shanghai about 10

16   years.  So it's a second-language course I got from school.

17          **MR. GASNER:**  No further questions.  Thank you,

18   Ms. Jiao.

19          **THE WITNESS:**  Thank you.

20          **THE COURT:**  Anything further?

21          **MR. AXELROD:**  No, Your Honor.

22          **THE COURT:**  Thank you, Ms. Jiao.  You're excused.

23          **THE WITNESS:**  Thank you.

24          **THE COURT:**  You may leave the exhibits there.

25                      (Witness excused.)

 1        THE COURT:  Please call the next witness.

 2        MR. HEMANN:  Your Honor, we'd like to read a portion

 3   of the stipulation to the jury and offer a number of exhibits

 4   outside the presence of a witness.

 5        THE COURT:  All right.  You may do so at this point.

 6        MR. HEMANN:  Your Honor, the United States and the

 7   Defense have entered into several stipulations.  It will take

 8   me about probably less than five minutes to read them.

 9        THE COURT:  All right.  Just read them slowly, please.

10        MR. HEMANN:  I will, Your Honor.  Thank you.

11        THE COURT:  Thank you.

12        MR. HEMANN:  Defendants Walter Liew, USA Performance

13   Technology, Inc., and Robert Maegerle, collectively defendants,

14   and the United States, collectively the parties, by and through

15   their undersigned counsel stipulate and agree that the

16   following facts are stipulated as true and correct:

17        Walter Liew was born in Malaysia in 1957.  Walter Liew

18   became a United States citizen in 1993.

19        Walter Liew graduated from National Taiwan University in

20   1980 with a B.S.E.E. degree and earned a master's degree from

21   the University of Oklahoma in E.E.

22        Walter Liew does not have any degree from Stanford

23   University.

24        Walter Liew was the president and sole shareholder of

25   LH Performance.  He was president of Performance Group and

1   USA Performance Technology, Inc.

2       Walter Liew and Christina Liew were the sole shareholders

3   in Performance Group, Inc., and USA Performance Technology,

4   Inc., and each owned 50 percent of those companies, except that

5   in 2006 Christina Liew owned 100 percent of Performance Group.

6       The handwriting in the following exhibits is Walter

7   Liew's:  Exhibit 46, pages 24, 50 and 51, 67 and 73 only;

8   Exhibit 205; Exhibit 208, all pages except 3 and 4, 9 through

9   16, and 33 through 35; 209, all pages except 140; 211, all

10  pages except 3 and 128; 243, 244, all pages except 4 through 7;

11  249, pages 17 through 31 and 32; 291; 296, all pages except 7

12  through 50; 356, all pages except 6; 373; 375; 388; 393, except

13  pages 43 through 46 and 50 contain Walter Liew's handwriting as

14  well as the handwriting of at least one other person who is not

15  Christina Liew; 398; 418; 714; 784; 875, all pages except 1

16  and 4.

17      The signatures and/or initials on the following exhibits

18  are Walter Liew's:  308; 310; 313; 315; 317; 318; 319; 322;

19  337; 339; 342; 383; 392; 658, the signatures on pages 1 and 2,

20  14 and 29; 664, only the signatures on pages 1 and 2, 10 and

21  19; 668 only signatures or initials on pages 1, 6, 12, 15, and

22  20; 670, only signatures on pages 1 and 10; 673; 782, along

23  with the signature of another individual; 783, along with the

24  signatures of other individuals; 786, along with the signature

25  of another individual; 835, along with the signature of another

JIAO - CROSS / GASNER

1  individual.

2      The following exhibits contain the signatures of both

3  Walter Liew and Phillip Guan:  637 through 642; and 672,

4  pages 1 through 3 and 15.

5      As to other individuals, Christina Liew was born on

6  April 25th, 1962, in the People's Republic of China.  She

7  married Walter Liew in the United States on April 8th, 1991,

8  and became a naturalized United States citizen in 1997.

9          **MR. AXELROD:**  John, October 8th.

10          **MR. HEMANN:**  I'm sorry.  October 8th, 1991.  Thank

11  you.

12      Ning Qiao is Christina Liew's brother and resides in the

13  People's Republic of China.  Mu Qiao is Christina Liew's

14  brother and resides in the People's Republic of China.  Li Rue

15  is Christina Liew's sister-in-law and resides in the People's

16  Republic of China.  Shu Hua Zuo is Christina Liew's mother.

17  Qiao Hua is Christina Liew's father.  Elaine Shu Peng Chin is

18  Walter Liew's niece and resides in Singapore.  Shirley Sue Lan

19  Chin is Walter Liew's niece and resides in Singapore.

20      The handwriting in the following exhibits are Christina

21  Liew's:  Exhibit 249, except for pages 17 and 31 through 32;

22  and 875, pages 1 through 4.

23      Finally, Your Honor, during the time relevant to this

24  case, Timothy Spitler, a former DuPont employee, lived outside

25  Reno, Nevada, and worked for companies call BHP and Altair

**JIAO - CROSS / GASNER**

1    Nanotechnologies. He passed away prior to the trial in this

2    case.

3         And then, Your Honor, pursuant to the discussion this

4    morning before the jury came in, the United States moves into

5    evidence the business cards in Exhibit 403, 404, 405, 407, 410

6    that were addressed during the testimony of Special Agent Ho.

7              **THE COURT:**  Any objection?

8              **MS. AGNOLUCCI:**  Yes, Your Honor.  We object on the

9    basis of relevance, hearsay, and 403.

10             **THE COURT:**  All right.  May I see the proposed

11   exhibits, please?

12        Is there any problem with taking these out of the

13   envelopes since they're covered up by the exhibit tags?

14             **MR. HEMANN:**  No, Your Honor.

15             **THE COURT:**  Okay.

16                       (Pause in proceedings.)

17             **THE COURT:**  The objection is overruled.  These are

18   admitted.

19        (Trial Exhibits 403, 404, 405, 407 and 410 received in

20   evidence)

21             **MR. HEMANN:**  Thank you, Your Honor.

22             **THE COURT:**  Do you have your next witness ready?

23             **MR. AXELROD:**  We do, Your Honor.  We have a few more

24   exhibits just to move in.

25             **THE COURT:**  All right.  Fine.

1          MR. AXELROD:  So at this point in time, Your Honor,

2   the United States would offer Exhibits 506 through 511.

3   That's -- and the parties have stipulated that those documents,

4   which are related from the bankruptcy proceedings, are

5   admissible in this matter.

6          MR. FROELICH:  They don't concern my client.

7          THE COURT:  And they don't concern --

8          MR. AXELROD:  And they do not concern --

9          THE COURT:  -- Mr. Maegerle.

10         MR. AXELROD:  That's correct, Your Honor.

11         THE COURT:  All right.

12         MR. GASNER:  No objection.

13         THE COURT:  All right.  Could you, for the record,

14  briefly identify what the exhibits are?

15         MR. AXELROD:  I will, Your Honor.

16         THE COURT:  Just enough so the record's clear in case

17  the numbers get messed up.

18         MR. AXELROD:  Absolutely.

19      Exhibit 506 is the docket sheet for a bankruptcy action;

20  Exhibit 507 is a filed petition and related pleadings in a

21  bankruptcy action; 508 is notes of a trustee meeting calendar;

22  509 is an order entitled "Final Decree" in a bankruptcy action;

23  510 is a disc of an audio recording of a bankruptcy hearing on

24  February 4th, 2009; and Exhibit 511 is a transcript of that

25  hearing on February 4th, 2009.

 1          THE COURT:  All right.  Why don't we, before we call

 2   the next witness or have the next -- is the next matter --

 3   order of business additional exhibits or a witness or something

 4   else?

 5          MR. AXELROD:  So I have one additional exhibit to

 6   admit, and then maybe it's a good time to take a break, and

 7   then we start with the next witness.

 8          THE COURT:  All right.  Go ahead.

 9          MR. AXELROD:  So the other --

10          THE CLERK:  Were those admitted?

11          THE COURT:  Those are admitted by stipulation;

12   correct?

13          MR. GASNER:  Yes, Your Honor.

14          THE COURT:  Yes.

15       (Trial Exhibits 506 through 511 received in evidence)

16          MR. AXELROD:  And then the other exhibit that the

17   United States offers at this time is 676, and the parties have

18   stipulated, and that is an Answer to the civil suit filed on

19   April -- excuse me -- on May 11, 2011.  The parties have

20   stipulated to the admissibility of that document as well.

21          MR. GASNER:  That's true.

22          THE COURT:  All right.  That's admitted.

23       (Trial Exhibit 676 received in evidence)

24          THE COURT:  All right.  So, ladies and gentlemen, just

25   in terms of these exhibits, most of the exhibits that have been

1    introduced by either side have been shown to you immediately.

2    The fact that it's not shown -- they're not shown to you

3    immediately doesn't mean you won't see them.  Quite the

4    contrary.  You may see them at other parts of the case.  You

5    may see them during closing argument if counsel wishes to refer

6    to them.  And you definitely will see them in some form, either

7    paper form or electronic form, when you are deliberating.

8         So we're not hiding anything from you.  Sometimes it's

9    convenient simply to put an exhibit in and have counsel use it

10   as appropriate.  But in all cases you're entitled to see all

11   the exhibits, and you'll have ample opportunity to review them

12   all.

13        So at this point we're going to take a 15-minute break.

14   Remember the Court's usual admonitions, keep an open mind,

15   don't discuss the case, don't get any outside information.  And

16   we'll see you soon.

17        Are those chairs any better with those -- yes.

18             **JUROR NO. 9:**  Much better.

19        **THE COURT:**  Thank you very much.  Glad we can

20   accommodate you.

21        Fifteen minutes.

22        (Proceedings were heard out of the presence of the jury:)

23             **THE COURT:**  All right.  15 minutes, everybody.

24        **MR. HEMANN:**  Thank you, Your Honor.

25                  (Recess taken at 9:43 a.m.)

JIAO - CROSS / GASNER

```
 1                    (Proceedings resumed at 10:02 a.m.)

 2          (Proceedings were heard out of the presence of the jury:)

 3              THE COURT:  All right.  Please be seated.  And let's

 4      bring the jury in.

 5          (Proceedings were heard in the presence of the jury:)

 6              THE COURT:  All right.  Please be seated.

 7          Will you please call your next witness.

 8              MR. AXELROD:  Thank you, Your Honor.  The

 9      United States calls Antonia Darling.

10              THE COURT:  All right.  Please come forward and be

11      sworn.

12                          (Pause in proceedings.)

13              THE CLERK:  Raise your right hand, please.

14                          ANTONIA DARLING,

15      called as a witness for the Government, having been duly sworn,

16      testified as follows:

17              THE WITNESS:  I do.

18              THE CLERK:  Thank you.

19          Please be seated and state and spell your full name for

20      the record.

21              THE WITNESS:  My name is Antonia G. Darling; Darling,

22      D-A-R-L-I-N-G.

23              THE CLERK:  Thank you.

24              THE COURT:  You may proceed.

25              MR. AXELROD:  Thank you, Your Honor.
```

1                        <u>DIRECT EXAMINATION</u>

2    **BY MR. AXELROD:**

3    **Q.**   Good morning, Ms. Darling.

4    **A.**   Good morning.

5    **Q.**   Where are you employed?

6    **A.**   I work for the Department of Justice in the Office of the

7    U.S. Trustee.

8            **MR. FROELICH:**  Excuse me, Your Honor.  Again, I hate

9    to interrupt.

10           **THE COURT:**  No, please, do interrupt.

11           **MR. AXELROD:**  And, Your Honor, I thank Mr. Froelich.

12   The testimony of Ms. Darling relates only to USAPTI and

13   Mr. Liew, and not to Mr. Maegerle.

14           **THE COURT:**  All right.  Thank you very much.

15   **BY MR. AXELROD:**

16   **Q.**   You said you work at the U.S. Trustee.  Could you just

17   explain what the U.S. Trustee is?

18   **A.**   Yes, the Office of the U.S. Trustee is a watchdog agency.

19   It was created 25 years ago for the sole purpose of watching

20   bankruptcy cases to make sure that everyone plays by the rules

21   and the procedures are followed.

22       We took over some administrative functions that the court

23   used to have, the Bankruptcy Court.  We appoint trustees, we

24   supervise trustees; and by statute, we have standing to raise

25   and be heard on any issue in any bankruptcy.

**DARLING - DIRECT / AXELROD**

1   Q.   And what's your position?  What's your title?

2   A.   I am the Assistant United States Trustee for the

3   Sacramento Division of Region 17 of the Office of the

4   U.S. Trustee.

5   Q.   So what does that -- in practical terms, what does that

6   mean?

7   A.   I manage the office.  I have a staff of 15 people -- 14

8   people, attorneys, CPAs, paralegals and clerical people; and we

9   are responsible for ensuring compliance in all 20 to 30,000

10  bankruptcy cases that are filed every year.

11  Q.   And how long have you held that position?

12  A.   23 years.

13  Q.   And prior to that, what did you do?

14  A.   I have seven years as an Assistant U.S. Attorney in the

15  Criminal Division in the Western District of Louisiana, and six

16  years as a trial prosecutor for the State Bar of California.

17  Q.   And in your experience as an Assistant United States

18  Trustee, do you handle cases yourself?

19  A.   I do on occasion --

20  Q.   Okay.

21  A.   -- depending on my administrative load.

22  Q.   Okay.  Do you teach bankruptcy?

23  A.   I do, regularly.  I've taught at -- extensively at the

24  National Advocacy Center in South Carolina, which is the

25  Department of Justice's Training Center.  I've also lectured at

1  numerous seminars, workshops, and for various organizations,

2  such as the Association of District Attorneys.  I've trained

3  ATF agents.  I've done training for FBI, many agencies on

4  bankruptcy law and procedure.

5  **Q.**  And have you previously testified as an expert witness in

6  bankruptcy procedure -- an expert in bankruptcy procedure?

7  **A.**  Yes, I have.

8  **Q.**  How many times?

9  **A.**  I've testified about five or six times.  I've been

10 qualified as an expert in two of those, and they were all in

11 the Eastern District of California.

12 **Q.**  And could you explain, if we could just step back, if you

13 could explain what bankruptcy is and how the system works.

14 **A.**  Certainly.  Bankruptcy is a statute, a federal statute,

15 that allows people who are unable to currently pay their debts

16 to either walk away from them with a discharge or reorganize

17 the debts, or pay them off over a period of time depending on

18 their financial situation.

19      It is highly regulated, and there are different versions

20 of bankruptcy.  There's a Chapter 7, which is a liquidation;

21 and in that case, a trustee is automatically appointed to

22 administer any possible assets.  Then there are the plan

23 chapters, we call them 13 -- 11, 12, 13, in which someone makes

24 a plan to repay some or all of their debts over a period of

25 time.

1   **Q.**   So, are there -- and is there, like, a separate court

2   system for bankruptcy?

3   **A.**   Yep.  We have a whole Bankruptcy Court system.  It's part

4   of the Federal Court system.

5   **Q.**   Okay.  And, so, there are judges that preside over

6   bankruptcy matters?

7   **A.**   Yes, bankruptcy judges.

8         **MR. AXELROD:**  And, Your Honor, at this point the

9   United States would offer Ms. Darling as an expert in

10  bankruptcy procedure.

11        **MR. GASNER:**  No objection.

12        **THE COURT:**  All right.  You may proceed as such.

13  **BY MR. AXELROD:**

14  **Q.**   Could you describe the role of the U.S. Trustee in the

15  Bankruptcy Court system?

16  **A.**   We -- but for the statute that created us, we would

17  actually have no role because we don't represent any of the

18  parties.  If a federal agency is a creditor in a bankruptcy,

19  they have the U.S. Attorney's Office, the civil division, to

20  represent them.  Other entities have their own attorneys.

21        We are simply there to make sure that everyone does what

22  they're supposed to do and they follow the rules.  To do that

23  we also are the people responsible for appointing trustees, in

24  Chapter 7s, 13s, 12s, and any 11 where a trustee is ordered.

25  We appoint them, and then they are required to report to us,

**DARLING - DIRECT / AXELROD**

1  such as giving us their bank statements and accounting for

2  things; and although they don't work for us, they have their on

3  fiduciary duty, they are accountable to us, and we do train

4  them as well.

5      So -- and the other functions that we have are, we are

6  required to make sure that everyone is in compliance; and our

7  third function is we are statutorily charged with identifying,

8  actually they call it ferreting out fraud and referring it to

9  appropriate agencies for prosecution.

10  **Q.**   Okay.  So with respect to the U.S. Trustee, you oversee --

11  or you appoint trustees to handle specific matters; right?

12  **A.**   Yes.

13  **Q.**   And then you sort of provide oversight of the system to

14  make sure everyone's complying with the rules?

15  **A.**   Yes.

16  **Q.**   And then there's -- a component of it is trying to look

17  for fraudulent activity?

18  **A.**   Correct.

19  **Q.**   And we're going to talk today about Chapter 7 bankruptcy.

20  **A.**   Yes.

21  **Q.**   Can you describe -- you mentioned that it's a liquidation,

22  but could you describe -- oh, let me step back.

23      You said bankruptcy applies to persons.  Does it apply to

24  corporations as well?

25  **A.**   It does.  Our laws believe that corporations and

 1   partnerships and LLCs, a lot of entities are, in fact, treated

 2   as persons.

 3        In bankruptcy, however, a corporation cannot file a

 4   Chapter 13.  That's limited to human beings.  But a corporation

 5   or a partnership or another entity like that can file in a 7 or

 6   an 11.

 7   **Q.**   Okay.  So now we're going to talk about Chapter 7

 8   bankruptcy.  Could you explain in a little bit more detail what

 9   that is?

10   **A.**   Yes.  In a Chapter 7, a trustee is immediately appointed.

11   It's done randomly because we have a large panel of trustees.

12   And the purpose of a Chapter 7 is usually to discharge the

13   debts at the end; but, in fact, what it's all really about is,

14   liquidating whatever available assets are there and equally

15   distributing to the creditors so that one creditor who's faster

16   on the draw doesn't get all of the money that's left.  So it's

17   an attempt to make things fairer.

18        So the Chapter 7 trustee's primary duty is to investigate

19   the financial affairs of the debtor, figure out if there's any

20   assets left that have any value, liquidate them, and then pay

21   them out to the creditors.

22   **Q.**   And, so, if a business goes into Chapter 7, is that

23   typically the termination of that particular business?

24   **A.**   Usually, although it does not affect corporate status or

25   partnership status.  Those still can be out there.  But the

**DARLING - DIRECT / AXELROD**

1   trustee will normally liquidate everything that's of value, so

2   what you're left with is maybe a shell corporation that might

3   start back up again.

4   **Q.**   Okay.  So let's talk about the steps of the bankruptcy

5   process.  What is the first step to initiate a bankruptcy

6   proceeding?

7   **A.**   The very first step is that a debtor files a petition.

8   They might also file all their schedules, but all they actually

9   have to file is a three-page piece of paper called a petition

10  that has their name and address and Social Security number or

11  tax ID number and is signed.  And that's a petition literally

12  asking the Bankruptcy Court, "Please enter the most powerful

13  injunction that any court in the world can enter called an

14  automatic stay."

15       And as soon as that petition is filed, there is instantly

16  an automatic stay issued, which is an injunction as to the

17  entire world that says, "Keep your hands off this guy's money,

18  his stuff, don't take any actions against him in court.  Let's

19  everybody just halt so the trustee can sort things out."  So

20  that's the automatic stay, which is, in fact, an injunction.

21  **Q.**   Okay.  So a petition is filed, there's an injunction.  You

22  mentioned there's an appointment of a trustee?

23  **A.**   Right.  That happens instantly.

24  **Q.**   And --

25  **A.**   And then at the same time they schedule what's called the

1  first meeting of creditors, which is 20 to 40, maybe 50 days

2  out, and that is then noticed to all of the creditors that are

3  listed, and then certain agencies like the IRS always gets

4  notice, and a few other agencies automatically get notice; and

5  they're told, "This person has filed bankruptcy, and there will

6  be a meeting on this date and this time at this place where if

7  you want to ask questions about their financial affairs, you

8  can."

9  Q.   What is -- and, again, we're going to be talking about a

10  corporation.

11  A.   Right.

12  Q.   If a corporation or when a corporation files a bankruptcy

13  petition, what is -- what becomes -- what's sort of the legal

14  status of the corporation's property and holdings and anything

15  that would belong to the corporation?

16  A.   It's exactly the same as with an individual.  The day of

17  filing every single thing that is owned outright by the entity

18  that is filing and everything they have a right to, even if

19  they don't own it but they have a right to receive something or

20  a right to benefit from something, all of those rights kind of

21  get put into a little black bag called the property of the

22  estate; and title to that transfers over to the trustee.  He

23  now owns it all.  So if it's a person, it's their house, their

24  car, their clothes, you know, the laundry soap, technically all

25  of that's property of the estate and the trustee owns it.  It

1    doesn't always keep it all.

2         For an individual, they get to claim what are called

3    exemptions saying, "Hey, I need my clothes."  I mean, there are

4    a few things that are set forth so that a person who files

5    bankruptcy isn't left penniless and out on the street.  So your

6    normal household goods can be claimed exempt, your car, certain

7    equity in your house.

8         A corporation, not being a human being that needs to eat

9    or have a house, doesn't get exemptions.  So in a corporate or

10   LLC or a partnership, everything that is owned or has a right

11   to becomes property of the estate, and the trustee now is the

12   actual owner of it.

13   **Q.**  Now, you mentioned that one of the things that happens is

14   this injunctive relief where, you know, I think, you said,

15   hands off.  What does it require from the debtor, the person or

16   entity filing the petition?  What's the requirement for them

17   when they file the petition?

18   **A.**  The quid pro quo for this massive injunction is simple,

19   complete and total honesty and transparency.  That's what we

20   expect.  We expect them to tell the truth about everything that

21   has happened to them financially in the last couple of years,

22   about everything they own or have a right to, whether it has a

23   value or not, their duty is to tell the trustee everything.

24        And if the trustee asks questions, they're to answer them

25   completely and truthfully.  If the trustee asks them to turn

1    something over, they're supposed to deliver it to the trustee

2    because the trustee really technically owns it already.  So

3    it's total transparency is the price you pay for this

4    injunction.

5    **Q.**   What's the sort of purpose of obtaining all this

6    information about the assets and items for the debtor?

7    **A.**   So that the trustee, who's a trained professional, can

8    evaluate whether they have any value to liquidate.  And they're

9    very good at selling things that a lot of us wouldn't have any

10   idea how to sell.

11        So something that might not appear to have any value, they

12   often know people who will buy things.  They sell life

13   insurance policies.  They sell future contract rights.  They

14   sell all kinds of things.  So the trustee's job is to evaluate

15   and say, "Hey, can I squeeze some money out of this for the

16   creditors?"

17   **Q.**   And in anticipation of your testimony here today, did you

18   review a petition that was filed for Performance Group by its

19   president, Walter Liew?

20   **A.**   Yes, I did.

21        **MR. AXELROD:**  Your Honor, may I approach with

22   Exhibit 507, which has been admitted?

23        **THE COURT:**  Yes, you may.  Yes.

24   **BY MR. AXELROD:**

25   **Q.**   Ms. Darling, I'm handing you what's been marked as

DARLING - DIRECT / AXELROD

1    Exhibit 507.

2    **A.**    Thank you.

3    **Q.**    And I'm going to ask Ms. Mahoney to bring that document up

4    on the screen, and hopefully that will appear.

5    **A.**    I'll see this better.

6    **Q.**    Feel free to look at whatever is more convenient, but just

7    let me know when it shows up on the screen.

8    **A.**    It's up there.

9    **Q.**    Okay.  Great.

10    Do you recognize that document?

11    **A.**    Yes, I do.

12    **Q.**    Okay.  And what is it?

13    And if we could blow up the top half of that, Ms. Mahoney.

14    **A.**    This is the bankruptcy petition, schedules, statement of

15    financial affairs, and some summary documents that were filed

16    in the Performance Group USA, Inc., bankruptcy in the

17    Northern District of California in the Oakland Division.

18    **Q.**    Okay.  And I want to ask you about it.  So on the top here

19    it shows who the debtor is; right?

20    **A.**    Yes.

21    **Q.**    And that's Performance Group?

22    **A.**    Right.

23    **Q.**    And we talked about -- and it says, "Type of Debtor" down

24    in the lower part there, a corporation?

25    **A.**    Yes.

1  Q.   And it identifies the type of bankruptcy over on the right

2  side where it says, "Chapter 7."  Do you see that?

3  A.   Yes.

4  Q.   And this is a document that was filed in Bankruptcy Court?

5  A.   Yes.

6  Q.   When was it filed?

7  A.   It was filed on January 14th, 2009, at looks like

8  5:32:01 p.m.

9  Q.   If we could go -- Ms. Mahoney, actually, just briefly, if

10  you could blow up the bottom third of that page, that first

11  page.

12       And, Ms. Darling, it identifies assets for the company.

13  Do you see that?

14  A.   Yes.

15  Q.   What are the -- what are the estimated assets that are

16  identified?

17  A.   The box checked is zero to $50,000.

18  Q.   Okay.  And what are the liabilities of the company?

19  A.   The box checked is 101,000 to 500,000.

20  Q.   Okay.  And then if we could go to page 3, Ms. Mahoney.

21       So, Ms. Darling, the first couple of pages that we're

22  looking at right now, this is the actual petition part; right?

23  A.   Correct.

24  Q.   Could you describe in general terms what else is included

25  in this particular filing?  So there's a petition and --

1    **A.**    I said there's schedules.  There's a statement of

2    financial affairs.  There are also some summary schedules and

3    the creditor matrix sheet, which is the list of all the

4    creditors.

5    **Q.**    Okay.  So now we're still in the petition part, and there

6    are signatures.

7         And, Ms. Mahoney, if you could blow up the bottom half of

8    that document starting -- yeah, right in the middle.  Actually,

9    a little bit above where it says "Signature of Attorney."  Yep,

10   and then all the way down to the bottom.

11        And, Ms. Darling, could you describe what is -- what we're

12   looking at here?

13   **A.**    You're looking at a convention called the /s/ name

14   convention that's used in electronic filing of bankruptcy

15   petitions and other documents in bankruptcies.

16        We're in an electronic age.  People file bankruptcy cases

17   or other cases now through their computers.  They don't have to

18   trot down to the court and hand it over.

19        The problem is that if you sign it, then you have to

20   either scan the document in again with the signature instead of

21   simply going from your computer screen and pushing turn it into

22   a .pdf.  So the Court has allowed this provision where you just

23   use this typed name convention.  And under the local rules,

24   you, the attorney who are electronically filing this case, are

25   swearing, when you file it, that you already have that real

**DARLING - DIRECT / AXELROD**

1    signature on the original document in your possession; and,

2    therefore, the Court will accept this typed signature.

3         The technical reason for why we do this is, because these

4    are actually smart forms and the computer goes and steals the

5    information out of it, all of the data, and populate all these

6    different fields so someone doesn't have to program it.  And if

7    you scan it in, it can't do that.  So it's actually for the

8    court's benefit to not have the signature page on there.

9    **Q.**   So I want to focus for a moment on the bottom quadrant

10   there where it says "Signature of Debtor."

11   **A.**   Yes.

12   **Q.**   And it says, "/s/ Walter Liew"?

13   **A.**   Correct.

14   **Q.**   So is that the same as an actual wet signature by

15   Mr. Liew?

16   **A.**   Yes.  It's the equivalent of it.  It is Mr. Paul Liu, the

17   attorney, swearing to the Court that Walter Liew actually

18   signed this in his presence and he has that signature.

19   **Q.**   And for the Bankruptcy Court's purposes, Mr. Walter Liew's

20   signature is made by this electronic filing?

21   **A.**   Right.

22   **Q.**   And could you read where it says "signature of debtor,"

23   the declaration?

24   **A.**   (reading)

25            "I declare, under penalty of perjury, that the

1          information provided in this petition is true and correct,

2          and that I have been authorized to file this petition on

3          behalf of the debtor."

4          This is a corporation.

5     Q.   Okay.

6     A.   (reading)

7               "The debtor requests relief in accordance with the

8          Chapter of Title 11, United States Code, specified in this

9          petition."

10    Q.   Now, we're going to look, as we go along, but this is the

11    first signature of Mr. Walter Liew in this document; right?

12    A.   Correct.

13    Q.   And as we go along, we'll see two others; right?

14    A.   Yes.

15    Q.   All right.  So let's move on to the next page.

16         Ms. Mahoney, if you could go to the next page, 507-0004.

17    And if you could blow up from the top of the box.  Sort of,

18    yeah, the box of information down at the bottom.

19         And, Ms. Darling, could you describe to the jury what it

20    is that we're looking at there?

21    A.   This is the summary of schedules.  I mentioned that there

22    are schedules filed in the case.  They are Schedules A through

23    I, and this simply captures, like, the last number on each one

24    of those schedules.

25         So it's the total amount of real property, the total

**DARLING - DIRECT / AXELROD**

1   amount of personal property contained on Schedule B, the total

2   amount of secured or unsecured or priority claims, total amount

3   of income of the debtor, total amount of expenses of the debtor

4   are all there, so you can get sort of a snapshot or an overview

5   of the bankruptcy.  So that information is automatically

6   carried over from the other pages.

7   **Q.**   And this is -- this was filed on January 14th, 2009.  So

8   is it reflective of the corporation's status on that date?

9   **A.**   It's supposed to be.  It's supposed to be a snapshot.  All

10  of the schedules are a snapshot of exactly what is owned or

11  owed or held as of that exact day.

12  **Q.**   Okay.  So here that summary would be assets totaling $1200

13  and liabilities of $135,900?

14  **A.**   Correct.

15  **Q.**   Okay.  If we could go to page 6, to 507-0006.

16       And, Ms. Mahoney, could you blow up just the top text from

17  Schedule B, personal property?  Right there.  Exactly.  Thank

18  you.

19       Ms. Darling, could you explain what Schedule B is?

20  **A.**   Schedule B is where the debtor lists every piece of

21  personal property and every interest that they possess as of

22  the date of filing.

23  **Q.**   And with respect -- and that applies to a corporation as

24  well?

25  **A.**   Yes.

**DARLING - DIRECT / AXELROD**

1    Q.    Okay.  And there's a provision in there that's in the

2    middle.  It says, "Do not list interests in executory

3    contracts."  Do you see that?

4    A.    Yes.

5    Q.    Could you read that and explain what that means?

6    A.    Right.  Well, the first part is talking about that all

7    personal property of whatever kind is supposed to be listed

8    here, but this is an exception.  It says:  (reading)

9              "Do not list an interest in an executory contract or

10          unexpired leases on this schedule.  List them on Schedule

11          G, which is executory contracts and expired leases."

12    Because those still are interests that the estate holds,

13    and it could be on Schedule B, but they've chosen to pull them

14    out separately.

15    Q.    Okay.  So I'd like to -- Ms. Mahoney, if we could blow up

16    now the chart that's below.

17          So this document or this section requires the debtor to

18    identify particular types of property or assets?

19    A.    Yes.

20    Q.    And could you walk through the first two?

21    A.    Yes.  The first category is, "Do you have any cash on

22    hand?"  And the "none" box is checked.

23          The second is, "Do you have any checking, savings, or

24    other financial accounts, certificates of deposit or shares in

25    banks, savings and loans, thrifts, building and loan, homestead

1    associations, credit unions, brokerage houses, or

2    cooperatives?"  And that box also is checked "none."

3    **Q.**   And then if you could go down to the last item, Number 14.

4         And, Ms. Mahoney, could you blow that up?

5    **A.**   Question 14 is:  (reading)

6              "List any interest in partnerships or joint

7              ventures."  And then it says, "Itemize."

8         So if they had said there were any, they would have to

9    specify what they were; but, again, the box "none" is checked.

10   **Q.**   Okay.  And that would be a requirement irrespective of

11   where the joint venture partners were, meaning in the

12   United States or elsewhere?

13   **A.**   Yes.  This has to do with all of your property anywhere in

14   the world.

15   **Q.**   Okay.  And what if --

16   **A.**   Whether it has value or not.

17   **Q.**   Thank you.  That was my next question.  Maybe you could

18   explain.  Why does it matter whether something has value or

19   not?

20   **A.**   Because the trustee needs to know what the full financial

21   picture is, and because trustees are capable of selling things

22   that other people don't think can be sold.  If they don't know

23   about them, how can they fully examine the financial affairs.

24        The trustee also can kind of follow back from -- let's say

25   there's a partnership, the other partners might have some

1    liability to help pay some of the debts.  There may be assets

2    that the partnership has that can be liquidated.  So even

3    though the debtor doesn't think it has any money, it still has

4    to be disclosed.

5    **Q.**   And if we could go to the next page of this schedule on

6    page 7.  And if we could -- Ms. Mahoney, could you blow up

7    lines 15 through 22?

8         Okay.  So do you see line 16 where it says "Accounts

9    Receivable"?

10   **A.**   Yes.  That says there are no accounts receivable, just

11   like there are no bonds or negotiable or nonnegotiable

12   instruments in the category before.

13   **Q.**   What are accounts receivable?  Can you explain that?

14   **A.**   That would be any money that's owed to the debtor for

15   any -- I mean, it's a business, so it's probably some kind of a

16   business thing, but any money that someone has an account with

17   them and still hasn't paid it all.

18   **Q.**   And then if you look at paragraph 22, do you see that?

19   **A.**   Yes.

20   **Q.**   There's a listing.  Could you read that category?

21   **A.**   22 asks for listing any patents, copyrights, or other

22   intellectual property; and then, again, it also says, "Give

23   particulars," but the "none" box is checked.

24   **Q.**   Okay.  So is the idea here that if a company in this case

25   has any intellectual property, that's the place to disclose it?

**DARLING - DIRECT / AXELROD**

1   **A.**   Correct.

2   **Q.**   Okay.  And would that include things like design, trade

3   secrets, things of that nature?

4   **A.**   Yes.

5   **Q.**   Now, if we go down to line 28 -- and if you could go

6   across, Ms. Mahoney, and blow that up -- it identifies -- can

7   you see what that category is?

8   **A.**   Yes.  Category 28 lists any office equipment, furnishings,

9   or supplies.  And this is the only thing that's listed on

10  Schedule B:  A Cannon printer worth a hundred dollars; two HP

11  desktops, I'm presuming computers, for a thousand; and an HP

12  printer for a hundred dollars.

13  **Q.**   So if -- so the only assets identified in this document so

14  far, and I think this is on the schedule in the beginning, is

15  $1200 worth of office equipment?

16  **A.**   Correct.

17  **Q.**   And if you could go, Ms. Mahoney, to the next page,

18  page 8.  And if you could blow up item 35.  You can blow them

19  all up.  That's fine.

20      Ms. Darling, could you explain -- first of all, can you

21  read category 35 and then explain what it's for?

22  **A.**   Category 35 is other property, personal property of any

23  kind not already listed, itemize.

24      It's what we call the catchall.  If you can't figure out

25  where something goes in all the other questions and you know

**DARLING - DIRECT / AXELROD**

1    you own it or have a right to it, that's where you put it.  If

2    you -- if you're not quite sure if it's in this category or

3    that category, you can put it here to try to make it easier on

4    people to try to be fully transparent.

5    **Q.**   And I'd like to move ahead a couple of schedules.  So

6    we're now in the section of the document where we're looking at

7    various schedules of assets --

8    **A.**   Correct.

9    **Q.**   -- or obligations?

10        Could you -- I want to look briefly at -- Ms. Mahoney,

11   could you go to 507, page 12, which is Schedule E?

12        Ms. Darling, what are we looking at here?

13   **A.**   Schedule E asks for any creditors that hold unsecured

14   priority claims.  And under the Bankruptcy Code, certain kind

15   of debts get a priority in the trustee's repaying them.  A lot

16   of them are like payments to employees, payments, again, to

17   taxing authorities, spousal and child support gets a priority.

18   So these are priority claims; and what's listed here is a claim

19   owed to or money owed to EDD, the Employment Development

20   Department of the State of California, for a thousand dollars.

21   **Q.**   Okay.  And according to the Schedule, that's an estimate;

22   right?

23   **A.**   Correct.

24   **Q.**   Okay.  And then if we could go to the next page, 507-13,

25   that's Schedule F.

DARLING - DIRECT / AXELROD

1  **A.**    Yes.  And that would be creditors holding unsecured

2  nonpriority claims.

3  **Q.**    And, Ms. Mahoney, could you blow up that -- the box at the

4  bottom half there?  Yeah.  Thank you.

5         So what are we looking at here, Ms. Darling?

6  **A.**    Schedule F is usually the biggest, because that's

7  everybody else that's owed money but doesn't have any kind of

8  priority and isn't secured.  So it's where you throw, usually,

9  lawsuits and credit card debts and trade creditors, and anybody

10  you just owe money to, and they don't really have a lot of

11  other recourses.

12  **Q.**    Okay.  So this categorizes and identifies those

13  particular -- these would be the creditors; right?

14  **A.**    Right, unsecured, nonpriority creditors.

15  **Q.**    Okay.  So in this instance there are three:  Adecco,

16  Michael Brook Carroll Law Offices, and Stantec.  Do you see

17  that?

18  **A.**    Yes.

19  **Q.**    And the total amount of those claims are how much?

20  **A.**    $134,900.

21  **Q.**    And are you aware of the fact that there was -- Stantec

22  had brought a lawsuit against Mr. -- against Performance Group?

23  **A.**    Not from here.  That would be listed in the statement of

24  financial affairs if there was.

25  **Q.**    Oh, okay.  And we'll get to that.

**DARLING - DIRECT / AXELROD**

1    **A.**    Right.

2    **Q.**    Is Schedule F the place where if you owe employees money,

3    that you would identify that?

4    **A.**    It would show up in two places often.  They would probably

5    be as a priority claim under Schedule E for I think it's 100 --

6    wages owed for 120 days before the date of filing; and trust

7    fund taxes, which like this EDD is what's called a trust fund

8    tax.  It's where the employer takes the money out of the

9    employee's paycheck and holds it in trust until they pay it

10   over to the State of California.  So if there were other

11   benefits that were owed to the debt -- to the employees, that

12   might show up on Schedule E.

13        If they were owed more than that 120 days before or if

14   there was a lot of vacation time they were owed or a bonus or

15   anything, that would be a general unsecured.  So employees

16   might show up in two different categories.

17   **Q.**    Okay.  And if we could go, Ms. Mahoney, to page 14, which

18   is Schedule G.  And, Ms. Mahoney, could you blow up that top

19   quarter of the document?

20        And, Ms. Darling, could you just read the first sentence?

21   **A.**    Schedule G:  (reading)

22             "Describe all executory contracts of any nature and

23        all unexpired leases of real or personal property."

24   **Q.**    And then could you also actually just read the next two

25   sentences?  Sorry.

1    **A.**    Certainly.  (reading)

2        "State the nature of the debtor's interest in the

3        contract; i.e., purchaser agent.  State whether the debtor

4        is the lessor or lessee of the lease.  Provide the names

5        and complete mailing addresses of all other parties to

6        each lease or contract described.  If a minor child is a

7        party, don't list them," basically.

8    **Q.**    And can you -- I know we touched on this earlier, but can

9    you explain what executory contracts are?

10   **A.**    You can get a nice long Black's Law dictionary

11   description; but really what it means is, it's a contract

12   that's still open, that there's still work to be performed on

13   it or somebody is still supposed to do something.  If everybody

14   had performed on a contract, it's done and it's no longer

15   executory.  So this would be basically an open contract where

16   somebody still has to do something or else they'll be in

17   default.

18   **Q.**    And I want to ask, and what box is checked here on this

19   form?

20   **A.**    The box is checked saying, "Check this box if debtor has

21   no executory contracts or unexpired leases."

22   **Q.**    And, Ms. Mahoney, could you please bring up Exhibit 313,

23   just the first page.  And if you could just sort of blow up the

24   text of that.

25        Ms. Darling, do you recognize that document?

3292

1   **A.**   Yes, I do.

2   **Q.**   And could you just briefly describe what it is?

3   **A.**   It's the first page of a contract between Pangang Group

4   and Performance Group USA, Inc., who's a debtor in this

5   bankruptcy.

6   **Q.**   Okay.  And the date of that contract is 2000 -- the

7   signing date is November 2005; right?

8   **A.**   I think so.  It's a little below my view.

9   **Q.**   Okay.

10  **A.**   I can see the top half of the 5, I think, or something.

11  **Q.**   Is this an executory contract at the time of the

12  bankruptcy filing?

13  **A.**   If it was still ongoing, yes, it would be.  You can't tell

14  by looking at it; but if each party still had things to

15  perform, money to be paid, then it would be an executory

16  contract.

17  **Q.**   And I'd also, Ms. Mahoney, like to -- if you could bring

18  up Exhibit 310T and go to page 2.

19      Ms. Darling, do you recognize this document?

20  **A.**   Yes.

21  **Q.**   Okay.  And is this another contract?

22  **A.**   This is the front page of another contract signed in 2007,

23  again between Pangang Group and Performance Group.

24  **Q.**   And is this an executory contract?

25  **A.**   Assuming -- if, in fact, it hasn't been completed, if

1    there was still things to perform on each side or one side,

2    even a last payment still to be made, it would be an executory

3    contract, yes.

4    **Q.**    And if these were executory contracts, they'd have to be

5    disclosed on this schedule?

6    **A.**    Yes, they would be.

7    **Q.**    Ms. Mahoney, can we go back to the petition and go to 507,

8    page 16?

9         And, Ms. Darling, are you there?  Is it up on --

10   **A.**    Yes.

11   **Q.**    Okay.  Can you -- and, Ms. Mahoney, could you just blow up

12   for a moment the top -- or actually the bottom third of that

13   page?

14        Ms. Darling, could you please read the text of the

15   declaration?  First of all, before that, could you explain what

16   it is that we're looking at.

17   **A.**    This is a declaration under penalty of perjury that

18   everything is true and correct, every document, major document

19   that's filed in a bankruptcy has to be submitted under penalty

20   of perjury.  That's part of the full transparency.

21   **Q.**    Okay.  So this is a declaration with respect to the

22   schedules that we've been looking at?

23   **A.**    Correct.  There's a separate one if it's an individual.

24   This is the one for a corporation or a partnership.

25   **Q.**    And could you please read the text?

1  **A.**   It says:  (reading)

2          "I, the President," and then in paren, "(the

3      President or other officer or authorized agent of the

4      corporation or a member or an authorized agent of a

5      partnership) of the Performance Group USA, Inc.,

6      Corporation, named as the debtor in this case, declare

7      under penalty of perjury that I have read the foregoing

8      summary and schedules consisting of the previous 14 pages,

9      and that they are true and correct to the best of my

10     knowledge, information, and belief."

11         It's dated January 13th, 2009, and signed by Walter Liew.

12 **Q.**   Okay.  And, again, this is the same electronic signature

13 convention?

14 **A.**   Correct.

15 **Q.**   Okay.  So let's go to the next page, which is 507-17.

16         Could you describe what this document is that we're

17 looking at?

18 **A.**   This document is the statement of financial affairs; and

19 unlike the schedules, which are a snapshot as of the day of

20 filing, this collects more historical financial information

21 about the debtor to help the trustee evaluate the financial

22 affairs.  So many of these questions ask for a time period

23 going back prior to the bankruptcy, maybe six months to two

24 years.

25 **Q.**   Ms. Mahoney, could you please blow up the first -- in the

**DARLING - DIRECT / AXELROD**

1    middle of the page there's a section number 1 with text, can

2    you blow up that whole thing.

3        And, Ms. Darling, can you please read the first two

4    sentences of that?

5    **A.**    Certainly.  The first one is "Income from the operation of

6    a business," and it describes it as:  (reading)

7            "State the gross amount of income the debtor has

8            received from employment, trade, profession, or the

9            operation of the debtor's business, including part-time

10           activities, either as an employee or an independent trade

11           or business, from the beginning of this calendar year to

12           date the case was commenced.  State also the gross amounts

13           received during the two years immediately preceding the

14           calendar year."

15   **Q.**    Okay.  So what's the -- so this petition was filed in the

16   beginning of January -- January 14th, 2009; right?

17   **A.**    Correct.

18   **Q.**    So how far -- what's the purpose of this provision?

19   **A.**    Again, it's to give the trustee information about where to

20   look for assets and whether -- a lot of these questions are

21   sort of tests and balances so he can check and make sure things

22   are accurately being disclosed.

23       So if he has information of what the income was for the

24   previous couple of years, then he's going to have a better idea

25   of what he's looking for.

1   Q.   Okay.  And if the corporation received funds in the last

2   couple of years, those would have to be disclosed on that form?

3   A.   Exactly.

4   Q.   Okay.

5   A.   Every penny they got.

6   Q.   And in the course -- I want to show you -- Ms. Mahoney,

7   could we please -- could you bring up page -- Exhibit 922,

8   page 3?  Page 3, I'm sorry, 919.

9        The preceding two years would be 2007-2008; right?

10  A.   Yes.

11  Q.   So if the company had gross receipts of $772,000 in 2007,

12  they would have to disclose that right there?

13  A.   Right.  They should not be putting $663.  They should be

14  putting $772,540.94.

15  Q.   And, Ms. Mahoney, could you go to page 4 of 919?

16       And if the business had gross receipts of $4,619,000 in

17  2008, they'd have to disclose that on this form; right?

18  A.   Yes.  That would be very different than zero.

19  Q.   Okay.  I want to go to -- if we could go back,

20  Ms. Mahoney, to Exhibit 507 and go to page 19.  And if you

21  could blow up the top, that number 10.  It's at the very top of

22  the page there.  That first section.

23       And, Ms. Darling, could you read this Section 10?

24  A.   (reading)

25            "Other transfers.  List all other property, other

1      than property transferred in the ordinary course of

2      business or financial affairs of the debtor, transferred

3      either absolutely or as security within the two years

4      immediately preceding the commencement of the case."

5  **Q.**   So what's the purpose of this provision?

6  **A.**   There are some special rules in bankruptcy called

7  preferences, and it's a clawback provision.  And, basically, a

8  debtor is not allowed to prefer one creditor over another and

9  pay them more money than they're entitled to, and then file

10 bankruptcy and stiff everybody else.  So the trustee has this

11 clawback power -- I love that word -- to go and get that money

12 back and spread it out evenly.  Again, it's all about trying to

13 treat everybody fairly.  So he needs to know what kind of

14 transfers were made.

15     The other thing, too, is sometimes there are fraudulent

16 transfers made, which means assets are transferred to someone

17 for less than fair value, and the trustee has a right to say,

18 "You know, you've got that million dollar house for a dollar.

19 I want the other $999,000."  So it's the trustee's job to make

20 sure that the debtor is not playing around with the money.

21 **Q.**   And if we could go down to number 11 where it says,

22 "closed financial accounts."  And, Ms. Mahoney, if you could

23 blow that up.

24     And could you, please, read the first two lines of that

25 section, Ms. Darling?  Thank you.

**DARLING - DIRECT / AXELROD**

1  **A.**   Yes.  (reading)

2        "List all financial accounts and instruments held in

3     the name of the debtor or for the benefit of the debtor

4     which were closed, sold, or otherwise transferred within

5     one year immediately preceding the commencement of the

6     case."

7     And that includes savings accounts, checking accounts,

8  other financial accounts, certificates of deposits, other

9  instruments, shares, share accounts held in different kinds of

10 associations.

11 **Q.**   Would that include letters of credit and letters of

12 guarantee?

13 **A.**   Yeah, if it was closed.  If it was open, it would have

14 been back on the schedules, under Schedule B, under personal

15 property.  Remember, these are closed accounts.

16 **Q.**   And what's the purpose of getting the information about

17 closed accounts?

18 **A.**   Again, the schedules were what do you have right this

19 moment.  The sofa is historical.  The statement of financial

20 affairs is historical.  So what are your closed accounts?

21 Because a trustee might want to go and look at those records,

22 and make sure that there wasn't money they didn't know about.

23        There are a lot of banks in the world.  A trustee couldn't

24 really contact every bank and say, "Gee, did this debtor have

25 an account once?"  So the idea is full transparency, "Where did

1  you used to bank so I can check those records?"

2  **Q.**   And, Ms. Mahoney, could we go to page 20, 507-20, the next

3  page?  And I want to focus for a moment on paragraph 18.  Could

4  you blow that up, Ms. Mahoney?

5       And, Ms. Darling, you'll see there's information in the

6  bottom that goes across Performance Group, and it talks about

7  the nature of the business and beginning and endings dates.  Do

8  you see that?

9  **A.**   Yes.

10 **Q.**   Can you explain -- I guess could you -- it has beginning

11 and ending dates of March 2005 to December 2008.  Do you see

12 that?

13 **A.**   Right.

14 **Q.**   Could you explain what that means?

15 **A.**   Well, the question asks if the debtor is a corporation, to

16 list all the names and addresses of the -- and the taxpayer

17 identification number, the nature of the business, and all the

18 partners.

19      But basically what this says is, that Performance Group,

20 the debtor, gives its tax ID number, where it was located, what

21 kind of a business it was, and this purports that the business

22 started in March of 2005 and ceased to operate on December --

23 in December of 2008.

24 **Q.**   Okay.  So is that a representation that after

25 December 2008, there's no more business being conducted by that

1  company?

2  **A.**    That is definitely what it says.

3  **Q.**    If we could go down to 19C.  If you could just blow up,

4  Ms. Mahoney, paragraph 19 at the bottom there, and all the way

5  down to -- actually through C, so through the bottom.  Yes.

6  Great.  Thank you.

7        Ms. Darling, this paragraph 19 says, "Books, records, and

8  financial statements."

9  **A.**    Yes.

10  **Q.**    What's this designed to capture?

11  **A.**    Again, source of information for the trustee to be able to

12  investigate the financial affairs of the debtor.  The debtors

13  sometimes have their own books and records at their office, but

14  they may also have an outside CPA or accounting firm that has

15  books and records that the trustee may wish to look at because

16  the trustee now owns them.  Their lawyer may have some

17  financial records.  Again, the trustee needs to know where to

18  go and find these things.

19        Or in the second one, D, there it seeks a list of

20  financial institutions to whom financial statements were issued

21  in the previous two years.

22        The trustee might want to look at that because, in a

23  financial statement, you're usually trying to get credit; and,

24  so, your motivation is to make yourself look as good as

25  possible, so you're going to disclose as many assets and things

1    of value as possible.

2        People's motivations in filing bankruptcy are maybe not to

3    make themselves look so good, so it's a good check and a

4    balance.  If you've issued a financial statement within the two

5    years of filing bankruptcy, the trustee wants to see it because

6    it might be a little different than what you said in the

7    bankruptcy.

8    Q.   And, so, if you provided those types of records to an

9    accountant or a return preparer, that's something that would be

10   called for in paragraph 19?

11   A.   Yes, it would.

12   Q.   And if we could go to page 21.  And if you could highlight

13   paragraph 21, "Current partners, officers, directors, and

14   shareholders."  And if you could go down -- I'm sorry,

15   Ms. Mahoney, could you go down through -- all the way to 22?

16   Thank you.

17       Ms. Darling, who are identified as the corporation's

18   officers?

19   A.   It says that Walter Liew is the president and owns

20   50 percent of the stock and Christina Liew is the secretary who

21   owns the other 50 percent of the stock of the corporation.

22   Q.   And if we go to the next page, page 22, there's another

23   signature block there.  And, Ms. Mahoney, could you bring that

24   up on the top of page 22 and blow that up?

25       Ms. Darling, what are we looking at here?

**DARLING - DIRECT / AXELROD**

1  **A.**    Another declaration under penalty of perjury attesting

2  that all of the documents in the statement -- all the answers

3  in the statement of financial affair are true and correct.

4       And it says: (reading)

5            "I have read the answers contained in the foregoing

6       statement of financial affairs and any attachments

7       thereto, and that they are true and correct to the best of

8       my knowledge, information, and belief."

9  **Q.**    Now, earlier you had testified -- so step one was going to

10  be filing -- is filing the petition; right?

11  **A.**    Correct.

12  **Q.**    And we've now gone through that document?

13  **A.**    Right.

14  **Q.**    And step two is the creditor hearing?

15  **A.**    Yeah, meeting of creditors.

16  **Q.**    Okay.  And that's something that the trustee appointed

17  would set up and conduct?

18  **A.**    Right.

19  **Q.**    And you've reviewed the docket for this matter; right?

20  **A.**    Yes.

21  **Q.**    Was there a trustee appointed?

22  **A.**    Yes.  Tevis Thompson, who is on the panel of the Oakland

23  U.S. Trustee's Office, was appointed as the Chapter 7 trustee

24  in this case.

25  **Q.**    And did he conduct a creditor hearing?

DARLING - CROSS / GASNER

1   A.   Yes, he did.

2   Q.   And did that occur on February 4th, 2009?

3   A.   To the best of my recollection, that was the date, yes.

4   Q.   Okay.  And after that hearing, was this case closed?

5   A.   Yes.  I recall reviewing the docket, and it said he filed

6   a report of no asset, meaning he couldn't find any assets of

7   any value and, therefore, he closed the case.

8           MR. AXELROD:  I have no further questions, Your Honor.

9           THE COURT:  Let's take a stretch break while

10  Mr. Gasner is getting ready.

11                  (Pause in proceedings.)

12          THE COURT:  All right.  Please be seated.

13      You may proceed with your cross-examination.

14          MR. GASNER:  Thank you, Your Honor.

15                  **CROSS-EXAMINATION**

16  BY MR. GASNER:

17  Q.   Good afternoon, Ms. Darling.  Stuart Gasner is my name.  I

18  represent Walter Liew and USAPTI.

19  A.   Thank you.

20  Q.   You're a lawyer?

21  A.   Yes, I am.

22  Q.   Graduated in 1977 from Golden Gate Law School here in the

23  city?

24  A.   Yes.  Yep.

25  Q.   After that, you worked as senior trial counsel in

1   disciplinary enforcement with the State Bar; is that right?

2   **A.**   Correct.

3   **Q.**   So that's kind of like a prosecutor job?

4   **A.**   Yes.

5   **Q.**   Then you became an Assistant United States Attorney in the

6   Criminal Division, white-collar, in the Western District of

7   Louisiana; true?

8   **A.**   Yes.

9   **Q.**   So that's the same job as Mr. Hemann and Mr. Axelrod and

10  Mr. Scott as well; true?

11  **A.**   Yes.

12  **Q.**   So you were a federal prosecutor for about how many years?

13  **A.**   I think it was about eight years.  Seven years, '83 to

14  '90.

15  **Q.**   After that -- so you were a prosecutor effectively for 15

16  years or so?

17  **A.**   Yes.

18  **Q.**   You then went to become an Assistant United States Trustee

19  in Sacramento; true?

20  **A.**   Correct.

21  **Q.**   Can you tell me a little bit more what are your day-to-day

22  responsibilities in that office currently?

23  **A.**   Currently?  Well, I have two offices right now.  I also

24  have Fresno.  But I manage the office.  I make sure the cases

25  are assigned out.  I set policy.  I help -- I work with

 1    Washington in enforcing policy or making sure we comply with

 2    it.

 3         I consult on more complicated cases.  The Diocese of

 4    Stockton just filed and, so, I've had to work very closely with

 5    my trial attorney who has that case because it's kind of

 6    sensitive.

 7         I do a lot of reports to Washington.  I often consult with

 8    other agencies that we work with or compare information with.

 9    I do a lot of speaking.

10         When I'm only doing one office, I usually carry a small

11    caseload; but the assistant who ran the Fresno office retired,

12    and as you might have heard lately, the Government doesn't have

13    a lot of money, so I get to run that office right now.  So I do

14    the same thing down in Fresno.

15         But mostly, I make sure that the 20 to 30,000 bankruptcies

16    that are filed every year in the Stockton -- Sacramento

17    Division are adequately vetted through our office.

18         We have -- we review every Chapter 7 that goes through to

19    find flaws or indicias of fraud.

20         I review all pleadings that are filed by attorneys.  We're

21    a civil agency.  We don't do anything criminally, other than

22    make referrals.  So we take a lot of positions in Bankruptcy

23    Court.  We'll file motions to dismiss or convert or appoint a

24    trustee in a Chapter 11 or to compel people to do things they

25    need to do.

**DARLING - CROSS / GASNER**

Q.   I take it, though -- did you say 25,000 bankruptcies in Sacramento?

A.   20 to 30,000 a year.

Q.   So I take it your responsibilities in any one bankruptcy are pretty limited; fair?

A.   Right.

Q.   I can't let this one pass.  Did you say there's a diocese in Stockton that has gone bankrupt?

A.   Yes, it has.  It's the 10th in the country.

Q.   This is the Catholic church?

A.   Yes, the Roman Catholic Diocese in Stockton.  Yes.  So we get some big case.

Q.   I won't venture into that.  But there are bankruptcies that are absolutely enormous, Lehman Brothers for example?

A.   Right.

Q.   And then there are bankruptcies that are very, very small; true?

A.   Absolutely.

Q.   And most of the 25,000, or whatever the exact figures, are of the smaller variety; true?

A.   Right.  At least 80 percent are these Chapter 7s, like this, and they're really handled in volume.

Q.   There's very little time that the trustee can spend with each particular bankruptcy?

A.   You're talking about the U.S. Trustee or the case trustee?

**DARLING - CROSS / GASNER**

1    Q.    Okay.  Well, let's get clear on that.

2    A.    Okay.

3    Q.    What's the difference?

4    A.    The U.S. Trustee, the Department of Justice, a federal

5    employee, and we have overall responsibility for all of the

6    cases but we don't actually administer any of those cases.

7    Those are the individual private trustees who we appoint.

8          So, like Mr. Thompson, Chapter 7 panel trustee, they will

9    get between a hundred, when things are really high, maybe 150

10   cases in a month and they, obviously, do a lot more detail work

11   on those cases.

12         We tend to do a fairly superficial evaluation of most

13   Chapter 7s unless something comes to our attention or what we

14   call the "ex" factor comes in, which is usually an ex-wife,

15   ex-partner, ex-employee, ex anything, gives us a call and says,

16   "Hey, this guy filed bankruptcy, and he's got a car he didn't

17   tell you about," or something like that.

18   Q.    Okay.

19   A.    So we operate a lot on tips.

20   Q.    All right.  Thank you for that clarity.

21         You mentioned that part of what the U.S. Trustee does is

22   ferreting out fraud.  Do you remember saying that?

23   A.    Correct.

24   Q.    Now, in this case the U.S. Trustee wasn't involved in

25   ferreting out any fraud; true?

1  **A.**    No.  They were completely unaware of anything.  They read

2  it at face value.  There was apparently nothing -- there are no

3  red flags in here.  I looked through this, and it looks like a

4  business that went out of business, and there's nothing to

5  indicate that there would be anything else.

6  **Q.**    So this was -- you're here as an expert at the invitation

7  of the prosecutors; true?

8  **A.**    Right.

9  **Q.**    So let me ask you a little bit about your expert

10  testimony.

11        Mr. Axelrod went through Exhibit 507, the voluntary

12  petition.  Do you have that in front of you?

13  **A.**    Yes, I do.

14  **Q.**    Do you think this is a clear form?

15  **A.**    I think it's clear.  I've been working with it for almost

16  30 years.

17  **Q.**    Okay.  Easy for you.  You're a lawyer.  You're a former

18  prosecutor.  Easy for you to understand; true?

19  **A.**    True.

20  **Q.**    Do you agree with me that this is not that easy a form for

21  the average person to understand?

22  **A.**    Actually, I don't, and I will tell you why.  At least in

23  the Eastern District of California, we have almost 30 percent

24  of our Chapter 7 cases are filed by pro se debtors, meaning

25  they don't have an attorney and somehow they get through it.  I

1    think the questions are fairly simple.

2    **Q.**   Okay.  And if you take a look at the last page, or

3    second-to-the-last page, Exhibit 507-23, there's another form

4    there that's called disclosure of compensation of attorney for

5    debtor.  Do you see that?

6    **A.**   Yes, I do.

7    **Q.**   And the lawyer here got paid $1400; true?

8    **A.**   Yes.

9    **Q.**   And for that $1400 he says, in paragraph 5 -- if we could

10   blow that up, Mr. Guevara -- that he's going to analyze the

11   debtor's financial situation and render advice to the debtor in

12   determining whether to file a petition.  Do you see that?

13   **A.**   Yes, I do.

14   **Q.**   And he also said for his $1400 he was going to prepare and

15   file the petition, schedule, statement of affairs, and plan,

16   which may be required.  Do you see that?

17   **A.**   Yes.

18   **Q.**   And he also said that he was going to represent the debtor

19   at the meeting of creditors and confirmation hearing and any

20   adjourned hearings thereof.  Do you see that?

21   **A.**   Yes.

22   **Q.**   Now, it struck out he's not going to represent the debtor

23   in adversary proceedings; do you see that?

24   **A.**   Correct.

25   **Q.**   So for big bankruptcies there can be big proceedings in

**DARLING - CROSS / GASNER**

1   Federal Court and all of that; right?

2   **A.**    Small bankruptcies can, too, because an adversary is any

3   particular lawsuit.  So if we're bringing an adversary to deny

4   a debtor's discharge because they didn't tell the truth, that

5   would be, you know, in a small case.

6        So any adversary.  And it also says "Contested Matters."

7   So that means any time anybody opposes anything, the attorney

8   has said, "I'm not going to do that for you."

9   **Q.**    Have you ever represented small businesses as a bankruptcy

10  attorney?

11  **A.**    No.

12  **Q.**    Have you ever learned about the normal practices of small

13  bankruptcy lawyers that get paid a flat fee and how they handle

14  their cases?

15  **A.**    Yes, I know a lot about them.

16  **Q.**    Okay.  They don't spend much time on them, do they?

17  **A.**    They spend a couple of hours usually.

18  **Q.**    Okay.  And if you take a look at the front page of this

19  Exhibit 507, on the left side, and it's sideways.  I don't know

20  if you can rotate this, Mr. Guevara so that we can read the

21  part up -- no, up at the top.  There we go.

22  **A.**    You're talking about the EZ-Filing software notation.

23  **Q.**    Yes, that's what I'm trying to get to.  What is EZ-Filing

24  software?

25  **A.**    It's one of the two software companies that bankruptcy

 1   attorneys usually subscribe for the service, and they fill out

 2   these forms online.  Actually, laypeople can do the same thing.

 3   They just go to the court's website and all of those forms are

 4   fillable .pdfs that they can type right into their computer.

 5       But this is a commercial service -- I talk too fast,

 6   sorry.  It's a commercial service that keeps things updated for

 7   the attorneys so they don't have to do as much research.  When

 8   amounts change, it updates that.

 9   **Q.**   So this is a template that can be filled out using the

10   software; true?

11   **A.**   Yes.

12   **Q.**   And is it your experience that sometimes attorneys use a

13   template in which lots of these checkmarks are already there?

14   Do you know whether that happens?

15   **A.**   I would -- that would not be a best practice, and I do

16   lecture on best practices.  A best practice would have no

17   defaults.

18   **Q.**   Okay.

19   **A.**   Because it's too easy to say, "Oh, I made a mistake.  I

20   didn't do it."  So really a better attorney would never use

21   defaults like that.

22   **Q.**   But of the not so better attorneys, sometimes they do have

23   a default in which the typical bankruptcy entries are already

24   prechecked; true?

25   **A.**   That is true.

1   Q.   And if we can go to page 3, Mr. Guevara.

2        And, Ms. Darling, if you could turn there.  That's the

3   page that has the signature of the attorney on it; true?

4   A.   Yes.

5   Q.   It's a Paul Liu.  Do you know Mr. Liu?

6   A.   No, I do not.

7   Q.   And that's L-I-U, no relation.

8        And it goes on to say, there's an asterisk and then a

9   footnote to the asterisk that says:   (reading)

10          "In a case in which Section 707(b)(4)(D) applies,

11        this signature also constitutes a certification that the

12        attorney has no knowledge after an inquiry that the

13        information in the schedules is incorrect."

14        Do you see that?

15  A.   Yes, I do.

16  Q.   Okay.  And that means that the attorney is saying that

17  he's done a decent inquiry; right?

18  A.   Correct.

19  Q.   And the attorney is vouching for having spent enough time;

20  true?

21  A.   He is saying that he made a reasonable inquiry into the

22  representations made to him by his client.  That usually means

23  they've looked at a bank statement, last tax return, asked for

24  pay advices for an employee.  They've confirmed what's easily

25  confirmable.  They usually will go on to PACER and make sure

**DARLING - CROSS / GASNER**

1   their client hasn't filed bankruptcy before.

2       My reading of 526, which this comes out of, does not mean

3   that they've gone out and done deep investigative work.  It's

4   they've taken the information that they've gotten; and when it

5   raises questions, they follow up on it, yes.

6   **Q.**   So we've all been here for weeks hearing about Performance

7   Group and USAPTI.  What the attorney is saying is they've

8   learned enough.  It's not going to be weeks, it's going to be

9   roughly two hours' worth of what you just described; is that

10  normal practice?

11  **A.**   Correct.  Yes, that's normal.

12  **Q.**   Now, let's take a look at Schedule B, if we might,

13  page 507 -- or Exhibit 507, page 6.

14      So this is a schedule of personal property; right?

15  **A.**   Correct.

16  **Q.**   And in the law there's a difference between personal

17  property and real property; true?

18  **A.**   Right.

19  **Q.**   And then there's intangible property as well; right?

20  **A.**   Correct.  But intangible property can be personal

21  property.

22  **Q.**   Okay.  So you studied that in law school?

23  **A.**   Yes, many years ago.

24  **Q.**   Not that many, I'm sure.

25      But this is a form that's used for all kinds of

**DARLING - CROSS / GASNER**

1  businesses; right?

2  **A.**    And individuals, yes.  Same form.

3  **Q.**    So if you look at item 7, it's got furs and jewelry; true?

4  **A.**    Correct.

5  **Q.**    Usually not that applicable to a small business; right?

6  **A.**    Right.

7  **Q.**    And on page 7, if we could go there, at the bottom it's

8  got animals; right?

9  **A.**    Yes.

10  **Q.**    And then if you go to page 8, it's got crops, growing or

11  harvested; right?

12  **A.**    Yes.

13  **Q.**    And farming equipment and implements; true?

14  **A.**    Correct.

15  **Q.**    So this is a form that is used for every conceivable type

16  of business; true?

17  **A.**    Yes.  It's even used in Chapter 11s, which are often --

18  you know, American Airlines filled out this same form.

19  **Q.**    All right.  Now, you -- they had an enormous bankruptcy;

20  right?

21  **A.**    Yes, they did.

22  **Q.**    And their flights are still late, even after coming out of

23  bankruptcy; true?

24  **A.**    I haven't flown them lately.

25  **Q.**    Okay.  Now, if you take a look at page 13, that's

**DARLING - CROSS / GASNER**

1  Schedule F, creditors holding unsecured nonpriority claims.  Do

2  you see that?

3  **A.**   Yes.

4  **Q.**   So it's in debtor's interest to list creditors, because

5  part of the relief you get is the stay of proceedings; right?

6  **A.**   Correct.

7  **Q.**   And Adecco is for technical services rendered in 2008.

8  Are you aware that's an employment agency?

9  **A.**   No, actually, I'm not.

10  **Q.**   And then Law Offices of Michael Brook Carroll, it says

11  that that's for attorney's fee to solve a dispute between

12  debtor and an equipment debtor between 2007 and 2008.  Do you

13  see that?

14  **A.**   Yes.

15  **Q.**   And it goes on to say debtor paid over 40,000 but other

16  creditor claims balance.  Do you see that?

17  **A.**   Yes.

18  **Q.**   And then there's another creditor, Stantec, which are you

19  aware that that's another engineering service firm?

20  **A.**   No.  It just says consulting.

21  **Q.**   Okay.  So if a company is short on cash but is getting

22  sued right and left by different people, it's fairly common to

23  see bankruptcy in that circumstance; is it not?

24  **A.**   Yes.

25  **Q.**   Because that automatically stays the litigation and gives

1   you some breathing room; true?

2   A.   Correct.

3   Q.   Now, it's also appropriate, is it not, to try to wrap up

4   the affairs of one corporate entity and then to start a new

5   corporate entity with a fresh start; right?

6   A.   I don't know what you mean by "appropriate."  It has

7   nothing to do with the bankruptcy process.

8   Q.   Well, that happens all the time with companies that go

9   bankrupt; true?

10  A.   I couldn't say.  I only see the bankruptcy part.  I don't

11  know what happens afterwards.

12  Q.   Okay.  But, really, after all these years, you don't know

13  that some companies declare bankruptcy, and then they set up a

14  new corporation and they stay in more or less the same line of

15  work?  You've never seen that?

16  A.   Oh, no, I've seen it.  It happens occasionally, especially

17  because they often come back and file bankruptcy again.

18  Q.   Okay.

19  A.   So, no, it does happen.  I just couldn't say how often it

20  happens.

21  Q.   A fresh start doesn't guarantee a successful conclusion;

22  true?

23  A.   Correct.

24  Q.   And those situations where you start a new company, what

25  do you do if you owe money to the old employees and you want to

**DARLING - CROSS / GASNER**

1    have them keep working for the new corporation?  Have you faced

2    that situation before?

3    **A.**    No, but there is -- even if a debt is discharged, a person

4    could still pay it if they wanted to.

5    **Q.**    Okay.  But if you wanted to not discharge that debt to the

6    old employees, one way to do it would be to not -- I think

7    Mr. Axelrod asked you something about there not being any

8    unpaid wages to employees on this form.  Do you remember him

9    asking you that?

10   **A.**    That is absolutely incorrect.  You may not do that.  You

11   may choose to pay a debt, but you must list every single debt.

12   Because, again, it has to do with the financial affairs of the

13   debtor.  You don't get to pick and choose anything.  You tell

14   everything, 100 percent of the truth, every penny you pay, even

15   if it's money you owe your mom and you know you're going to pay

16   it because she'll disown you if you don't, you still have to

17   list it.

18   **Q.**    Okay.

19   **A.**    It makes people uncomfortable.

20   **Q.**    Even if mom would be upset to see that son is trying to

21   discharge the debt to her?

22   **A.**    That's right.  You're still required --

23   **Q.**    You've got to put it on there?

24   **A.**    -- every debt.

25   **Q.**    Take a look at Schedule G, executory contracts.

**DARLING - CROSS / GASNER**

1    A.   Yes.

2    Q.   You mentioned Black's dictionary.

3    A.   Yes.

4    Q.   What's that?  I know what it is.  Tell the jury what it

5    is?

6    A.   It's a dictionary of legal words.  And it's about that fat

7    (indicating), and it's like Webster's but it defines legal

8    terms.

9    Q.   You studied contracts in law school?

10   A.   Yes.

11   Q.   And you studied the difference between executory and other

12   kinds of contracts; true?

13   A.   Presumably, yes.

14   Q.   All right.  And you still think this is pretty clear, that

15   you can say, "Describe all executory contracts of any nature

16   and all unexpired leases of real or personal property, include

17   any timeshare interests," et cetera, you think the average

18   person can read that and know what kinds of contracts they're

19   supposed to disclose and not disclose?

20   A.   Probably not, but the average person doesn't have

21   executory contracts.  They do have unexpired leases, and an

22   attorney should pretty much know what an executory contract is.

23   Q.   So --

24   A.   And a businessperson would know what an executory contract

25   is.

**DARLING - CROSS / GASNER**

1    **Q.**   Is that part of what you expect the attorney to give the

2    debtor advice on, is what kinds of contracts really ought to go

3    on this form and whatnot?

4    **A.**   And a businessperson, I would expect them to know it.

5    It's a business term.

6    **Q.**   Okay.  Fair enough.  That's your opinion, and we

7    appreciate it.

8         Let's take a look at page 17.  That's the statement of

9    financial affairs.

10        Mr. Axelrod asked you about paragraph 2.  Could we blow

11   that up, Mr. Guevara?

12        And I believe he asked you whether that question was

13   supposed to elicit from the debtor all funds received over the

14   last two years.  Do you remember him asking you that question?

15             **MR. AXELROD:**  Objection.

16             **THE WITNESS:**  Actually, I believe --

17             **THE COURT:**  Just a moment.

18             **MR. AXELROD:**  Objection.  It misstates the evidence.

19             **THE COURT:**  Well, overruled.  The witness can correct

20   counsel if he's incorrect.

21             **MR. GASNER:**  I wrote it down as best I could.  The

22   record --

23             **THE WITNESS:**  It's question one that he was asking me

24   about.  I don't believe we talked about question 2.

25

DARLING - CROSS / GASNER

1   BY MR. GASNER:

2   Q.   Okay.  Oh, I'm sorry.  But he asked you that is supposed

3   to show the gross amount of income from operation of the

4   debtor's business, and then it showed numbers below that.

5   A.   Correct.

6   Q.   Do you remember him asking you about that?

7        And you said, "Exactly, that's what it's supposed to

8   disclose."  Do you remember that?

9   A.   Yes.

10  Q.   And then the next line 2 talks about the amount of income

11  received by the debtor other than from employment, trade,

12  profession, operation of the debtor's business during the two

13  years preceding that, and the answer there is it's checked

14  "none."  Do you see that?

15  A.   Correct.

16  Q.   Okay.  And you think that this ought to be clear to the

17  average businessperson what's being asked for here?

18  A.   I would think the average person.

19  Q.   Okay.  Let's take a look at some other items that

20  Mr. Axelrod asked you about, and this is on page 19.  And I

21  believe he asked you about paragraph 10, other transfers.

22  A.   Yes.

23  Q.   List all property, other than property transferred in the

24  ordinary course of the business or financial affairs of the

25  debtor..."  Do you see that?

3321

1   **A.**   Yes.

2   **Q.**   Do you think that that's clear to the average businessman

3   what's being asked for there?

4   **A.**   It should be.  They should know what their ordinary course

5   of business is and what they ordinarily -- that would be, "I

6   have a shop.  I sell pens."  That's a transfer in the ordinary

7   course.

8       If I sell my furniture, I'm not in the business of selling

9   furniture, so that would be a transfer not in an ordinary

10  course.

11  **Q.**   Okay.  And, likewise, paragraph 10 -- 11, sorry, closed

12  financial accounts, you think it's clear that this is calling

13  for letters of credit?

14  **A.**   (Witness examines document.)  It is general enough that it

15  includes it, yes.

16  **Q.**   Take a look, if you would, at page 20, item 19c, which

17  Mr. Axelrod asked you about.  And it says:  (reading)

18          "List all firms or individuals who at the time of the

19      commencement of this case were in possession of the books

20      of account and records of the debtor.  If any of the books

21      of account and records are not available, explain."  Do

22      you see that?

23  **A.**   Yes.

24  **Q.**   And that's checked "none"?

25  **A.**   Right.

**PROCEEDINGS**

1  Q.   So literally if you read this, it is saying that the

2  company has no books and records; true?

3  A.   It's saying it has no books and records somewhere else

4  other than at its principal business location.  This is list

5  the firms or individuals who have it.

6  Q.   Okay.  So you think that's clear that that's asking for

7  books and records other than those that the debtor has?

8  A.   Yes.

9          MR. GASNER:  No further questions, Your Honor.

10          THE COURT:  Thank you, Counsel.

11     Any redirect?

12          MR. AXELROD:  No, Your Honor.

13          THE COURT:  Very well.  You may be excused.

14          THE WITNESS:  Thank you, Your Honor.

15                    (Witness excused.)

16          THE COURT:  How long is your next witness going to

17  take do you think?

18          MR. AXELROD:  I'm guessing about 20 minutes to a half

19  an hour.

20          THE COURT:  All right.  Why don't we take our break a

21  little early today.  Just I think it's a good time to do that.

22     And remember the usual admonition.  Keep an open mind and

23  don't obtain outside information, don't discuss the case with

24  anyone.  And we will see you in 15 minutes.

25     (Proceedings were heard out of the presence of the jury:)

**PROCEEDINGS**

1       **THE COURT:** Are we still on schedule for you think a

2  noon completion?

3       **MR. AXELROD:** Yes. The next witness is our last

4  witness.

5       **THE COURT:** And then we have the audio?

6       **MR. AXELROD:** That will be part of this witness'

7  testimony.

8       **THE COURT:** So you expect the whole thing to be 20

9  minutes with the audio?

10       **MR. AXELROD:** I mean, 20 minutes, half an hour, yes.

11       **THE COURT:** Okay. So we're probably on schedule for

12  close to noon then.

13       **MR. AXELROD:** I think so, Your Honor, yes.

14       **THE COURT:** All right. And if we're not, we're not.

15  See you in 15 minutes.

16       **MR. AXELROD:** Thank you, Your Honor.

17          (Recess taken at 11:21 a.m.)

18          (Proceedings resumed at 11:44 a.m.)

19    (Proceedings were heard out of the presence of the jury:)

20       **THE COURT:** So are we ready for the jury, Mr. Axelrod?

21       **MR. AXELROD:** Yes, we are, Your Honor. Thank you.

22       **THE COURT:** Please bring the jury in.

23    (Proceedings were heard in the presence of the jury:)

24       **THE COURT:** All right, please be seated.

25    Please call your next witness.

PROCEEDINGS

1              **MR. AXELROD:**  Thank you, Your Honor.  The

2   United States calls Tevis Thompson.

3              **THE COURT:**  All right, Mr. Thompson, please come

4   forward.

5              **THE CLERK:**  Raise your right hand, please.

6                        **TEVIS TAYLOR THOMPSON JUNIOR**,

7   called as a witness for the Government, having been duly sworn,

8   testified as follows:

9              **THE WITNESS:**  I do.

10             **THE CLERK:**  Thank you.  Please be seated, and state

11  and spell your full name for the record.

12             **THE WITNESS:**  Tevis Taylor Thompson, Jr.

13             **THE CLERK:**  Spell it, please.

14             **THE WITNESS:**  What's the question?

15             **THE CLERK:**  Spell it, please.

16             **THE COURT:**  Please spell your name.  Spell your name,

17  please.

18             **THE WITNESS:**  T-E-V-I-S, T-A-Y-L-O-R, T-H-O-M-P-S-O-N,

19  Jr.

20             **THE COURT:**  Thank you.

21             **THE CLERK:**  Thank you.

22             **MR. AXELROD:**  May I proceed, Your Honor?

23             **THE COURT:**  Yes, you may.

24             **MR. FROELICH:**  Excuse me, Your Honor.

25             **THE COURT:**  Yes, we have the usual announcement,

1    please.

2              MR. AXELROD:  Yes, Your Honor.  The testimony of

3    Mr. Thompson relates to Mr. Liew and USAPTI only and not to

4    Mr. Maegerle.

5              THE COURT:  Thank you.

6              MR. AXELROD:  Thank you.

7                        DIRECT EXAMINATION

8    BY MR. AXELROD:

9    Q.    Good morning, Mr. Thompson.

10   A.    Good morning.

11   Q.    Do you currently serve as a bankruptcy trustee?

12   A.    I do.

13   Q.    How long have you served as a bankruptcy trustee?

14   A.    I was selected in 1988, and I was appointed -- I was

15   assigned my first cases in 1989.

16   Q.    Can you describe your responsibilities as a bankruptcy

17   trustee?

18   A.    When people file Chapter 7 bankruptcy, they're sent to the

19   U.S. Bankruptcy Court in Oakland, in my case.  My territory is

20   Oakland -- Alameda County and Contra Costa County.

21         They're assigned randomly to the different people on the

22   panel, and I'm one of that group.  And I receive the assets,

23   and my role is to determine if there are any assets to be

24   liquidated for the benefit of unsecured creditors.

25   Q.    And in that capacity -- so you've been doing this since

1    1988?

2    **A.**   Yes.

3    **Q.**   And in that capacity, how many cases -- well, how many

4    cases do you handle sort of at one time?

5    **A.**   I wouldn't have the slightest idea what the total would

6    be, but for a while we were getting about 2,000 cases a year.

7    Recently we've been getting less than that, but it's something

8    like a hundred a month at this point.

9    **Q.**   Can you describe your background -- prior to becoming a

10   trustee what your background is?

11   **A.**   I graduated from the University of California at Berkeley

12   with a degree in finance, and I went out into the corporate

13   environment and went through the chairs with that and was in

14   a -- got up to a management position of VP of treasurer in

15   finance.

16        And then I went out on my own, and -- I got an MBA at

17   Golden Gate University in management, and then went out on my

18   own and I was a consultant for a number of years.

19        And then I noticed that I was the last person getting

20   paid, and I found out that a bankruptcy trustee is someone that

21   does all the things I was doing as a consultant, but I was the

22   first person to get paid if anybody got paid.

23        But in -- each of the bankruptcy estates are entities;

24   they're business units.  And, so, my role is to take on these

25   business entities and to try and use all of my skills to take

1   any assets that are available in the bankruptcy estates, like

2   property -- real property, accounts receivables, agreements,

3   contracts, sell personal property, and convert them into cash,

4   and along the way getting court orders to -- from the

5   bankruptcy judges to proceed with this process, notice all of

6   the activities to parties of interest, who would be creditors,

7   and anyone else.

8       And then at some point we file with the court a permission

9   to administer the -- to close the case by distributing the

10  money that we've developed -- determined were there.

11  **Q.**   And the case that we're going to talk about is a

12  Chapter 7; right?

13  **A.**   Just Chapter 7s.  I could be appointed to be a Chapter 11,

14  and I have had one or two, but that's a different process.

15  **Q.**   Okay.  Once you're assigned a Chapter 7 bankruptcy matter,

16  can you briefly describe the steps you take to fulfill your

17  responsibilities?

18  **A.**   Well, prior to a few years ago, everything was paper; and,

19  so, I would be sent the petition, which is a legal document,

20  and then the schedules that included everything that the debtor

21  had to share with us.  And I would go from top to bottom, read

22  every -- all the schedules, determine what -- you know, what

23  the values were.  Sometimes, let's say, it had real property; I

24  would send somebody out to confirm if the values were there.

25      I might ask someone to take a look at the value of the

1    personal properties, make a determination of what was there and

2    what the debtor had included in their schedules and documents.

3    That would indicate to me what strategy to take or which ones

4    to pursue.

5        But I would take notes so that when I ultimately got to

6    what we call a 341 hearing where the debtors are present, then

7    I would have questions for them to clarify what I'd seen and

8    whether -- what steps to take.

9    **Q.**   And --

10   **A.**   One of the most important steps is sometimes there's

11   nothing, and so I needed to know that.  If there was no assets

12   in excess of the exemptions that they might be entitled to or

13   any kind of secured debt, we call that a no asset case.

14   **Q.**   At some point in time, were you assigned to serve as the

15   trustee in the bankruptcy proceedings related to Performance

16   Group USA, Inc.?

17   **A.**   Yes.

18        **MR. AXELROD:**  Your Honor, may I approach with

19   Exhibit 507?

20        **THE COURT:**  Yes, you may.

21   **BY MR. AXELROD:**

22   **Q.**   And, Mr. Thompson, I'm handing you what's been marked as

23   Exhibit 507, and ask if you recognize that.

24   **A.**   Ask if I read it?

25   **Q.**   Ask if you recognize it.

**THOMPSON - DIRECT / AXELROD**

1    **A.**    I do.

2    **Q.**    Okay.  And is that the petition and schedules for

3    Performance Group?

4    **A.**    Yes, it is.

5    **Q.**    Okay.  So in the process you were describing, you would

6    receive that prior to having the creditor hearing?

7    **A.**    Correct.

8    **Q.**    And you would review that?

9    **A.**    Yes.

10   **Q.**    And with respect to Performance Group, after you reviewed

11   that, did you, indeed, set up a creditor hearing?

12   **A.**    The setting was -- the hearing is set at the time this is

13   filed; and, so, at some point that is calendared, and we meet

14   at the date it's signed.

15   **Q.**    And did you conduct a creditor hearing on February 4th,

16   2009, in this matter?

17   **A.**    Yes.

18   **Q.**    And could you describe in general terms what the purpose

19   is of a creditor hearing?

20   **A.**    The purpose is to examine the debtors with respect to the

21   petitions that were filed with the Court, the petition and

22   schedules that were filed with the Court, so that we can

23   determine if everything is included and if the information is

24   complete.

25        And also we provide an opportunity -- and, so, I go

1    through a series of questions.

2          And then there's the opportunity for creditors or parties

3    of interest -- parties of interest could be potential creditor

4    or someone that's upset about something -- and provide them an

5    opportunity to examine the debtor or the debtor's

6    representative under oath.  And, so, those two things are there

7    for that.

8    Q.   And at the conclusion -- what's -- at the end of the

9    creditor hearing, then, do you -- what are the next steps you

10   take?

11   A.   If I feel that there is more for me to know, then I might

12   adjourn the meeting and schedule another meeting so we could

13   come back and talk about something; or I might continue it to

14   allow debtors to provide us information, and I would waive

15   the -- I would schedule the meeting, but I might excuse their

16   appearance if certain -- some things were done.

17         But if I have no further questions and we conclude the

18   meeting, then I would go home, and I would make a determination

19   that there are no assets and file a report with the court; or I

20   would begin to administer the assets, selling them, maybe --

21   just some way converting them from whatever form they are to

22   cash.

23   Q.   And prior to coming to court and testifying today, have

24   you had a chance to review the audio transcript of that

25   creditor hearing for Performance Group?

1    **A.**    I have.

2    **Q.**    And does it accurately reflect what occurred on that day?

3    **A.**    Yes.

4    **Q.**    And have you had a chance to review a transcript from that

5    hearing as well?

6    **A.**    I have.

7    **Q.**    And does that transcript actually reflect what occurred

8    that day?

9    **A.**    Yes.

10          **MR. AXELROD:**  Your Honor, may I approach with

11    Exhibits 510 and 511?

12          **THE COURT:**  Yes, you may.

13   **BY MR. AXELROD:**

14   **Q.**    And, Mr. Thompson, I'm handing you 510 and 511.  Is 511 a

15   copy of the transcript of the February 4th, 2009, proceedings?

16   **A.**    (Witness examines document.)  Yes.

17          **MR. AXELROD:**  And, Your Honor, at this time I'd like

18   to play -- we have the transcript, those two exhibits, synced

19   up, and I'd like to play that for the jury.

20          **THE COURT:**  All right.  Is that acceptable?

21          **MS. AGNOLUCCI:**  We have no objection, Your Honor.

22          **THE COURT:**  All right.  You may do so.

23       So you're saying that the transcript is going to scroll on

24    the screen while the audio is playing?

25          **MR. AXELROD:**  Exactly.

1          THE COURT:  And how long is it, so the jury knows?

2          MR. AXELROD:  It's, I think, about eight or nine

3   minutes.

4          THE COURT:  Very well.

5          THE CLERK:  Let's wait till everybody's screens come

6   on.

7       Okay.

8          MR. AXELROD:  Can I proceed?

9          THE CLERK:  Yes.  Thank you.

10          THE COURT:  Yes.

11              (Audio was played but not reported.)

12          THE COURT:  All right.

13   BY MR. AXELROD:

14   Q.   Mr. Thompson, after that hearing, did you determine that

15   there were no assets to collect for Performance Group?

16   A.   Yes, I did.

17          MR. AXELROD:  I have no further questions, Your Honor.

18          THE COURT:  Thank you.

19       Ms. Agnolucci?

20          MS. AGNOLUCCI:  Yes, Your Honor.

21                     CROSS-EXAMINATION

22   BY MS. AGNOLUCCI:

23   Q.   Good afternoon, Mr. Thompson.

24   A.   How do you do.

25   Q.   My name is Simona Agnolucci, and I represent Mr. Walter

1  Liew.

2      You mentioned during your testimony a 341 hearing?

3  **A.**  (Pause)  Yes.

4  **Q.**  You have to answer "yes" or "no."

5  **A.**  Yes.

6  **Q.**  And is what we heard the recording of the 341 hearing

7  relating to the bankruptcy of Performance Group?

8  **A.**  Yes.

9        **MS. AGNOLUCCI:**  Your Honor, may I approach the witness

10  with Exhibit 508?

11        **THE COURT:**  Yes, you may.

12        **MS. AGNOLUCCI:**  Thank you.  And that's been admitted.

13        **THE COURT:**  All right.

14  **BY MS. AGNOLUCCI:**

15  **Q.**  And, Mr. Thompson, do you recognize that document?

16  **A.**  Yes.

17  **Q.**  Is this a 341 hearing calendar?

18  **A.**  Yes.

19  **Q.**  In other words, it's a list of all of the matters that

20  came before you during a certain period of time?

21  **A.**  I don't know if this has all of the -- that day, but this

22  is very typical of the sheet I take with me.

23  **Q.**  Okay.  Let's look at the very last page.  Do you see there

24  in line item Number 46, "Performance Group USA, Inc."?

25  **A.**  Yes.

**THOMPSON - CROSS / AGNOLUCCI**

1    **Q.**    That would be the entry for Performance Group?

2    **A.**    Yes.

3    **Q.**    And that corresponds to the transcript that we just

4    listened to?

5    **A.**    Yes.

6    **Q.**    And do you see right next to that entry a column for

7    "Attorney," and then the name of a Paul B. Liu?

8    **A.**    Say that again?

9    **Q.**    Right next to the words "Performance Group" -- and you can

10   look at your screen.  It may be easier for you to see it there

11   because it's highlighted.

12   **A.**    I'm still not understanding what you're saying, ma'am.

13   **Q.**    Take a look at your screen, please, sir.

14   **A.**    Okay.

15   **Q.**    Do you see next to "Performance Group" a name, Paul B.

16   Liu?

17   **A.**    Yes.

18   **Q.**    And that's in a column labeled "Attorney"; correct?

19   **A.**    It is, but that's just the way it came through the

20   bankruptcy system.

21   **Q.**    Walter Liew is L-I-E-W.  Paul Liu, L-I-U, do you

22   understand him to be the attorney who represented Walter Liew?

23   **A.**    This information comes from the bankruptcy filing.  Let me

24   take a look at some other place.

25        (Witness examines document.)  In the petition on page 3,

THOMPSON - CROSS / AGNOLUCCI

1   it says, "Signature of Attorney," Paul B. L-I-U, Paul B. --

2   Attorney Offices of Paul B. L-I-U.  That's where that

3   information comes from, is from this petition.

4   Q.   Understood.  And what that means is that Mr. Walter Liew

5   was represented by an attorney named Paul Liu, correct,

6   according to this information here?

7   A.   Yes.

8   Q.   Is it -- when an individual is represented by counsel, are

9   you allowed to ask them questions without the counsel present?

10  A.   You know, that's a -- we normally do not.

11  Q.   So is it fair to say from this piece of paper that we're

12  looking at up on the screen, that Mr. Liew's attorney was

13  present at the hearing that day?

14  A.   I don't recall that.

15  Q.   The fact that his name is on this meeting calendar, does

16  that mean that he was there?

17  A.   No.  That's typed there?  No, it doesn't.

18  Q.   All it means is that Mr. Liew was represented by that man,

19  but whether he actually attended the hearing, you don't know?

20  A.   I don't recall.

21  Q.   But it --

22  A.   But the other thing I will tell you is that normally

23  that -- and it would -- if he had been there, I would normally

24  have him state his appearance.

25  Q.   So it's fair to say that we don't know whether his

1    attorney came or not; correct?

2    **A.**    That's correct.  I don't recall.

3    **Q.**    But your testimony is that, generally, if someone is

4    represented by counsel, counsel would attend this type of

5    hearing?

6    **A.**    Yes.

7    **Q.**    Yet there's no indication on the record, at least on the

8    audio record we listened to, that anyone was there with

9    Mr. Liew?

10   **A.**    That's correct.

11   **Q.**    What is --

12             **THE COURT:**  Sir, sir, please take your hand away.

13             **THE WITNESS:**  Pardon me?

14             **THE COURT:**  Please take your hand away from your face.

15             **THE WITNESS:**  Sure.

16             **THE COURT:**  Thank you very much.

17             **THE WITNESS:**  Thank you.

18   **BY MS. AGNOLUCCI:**

19   **Q.**    When an attorney is present at a hearing for the debtor,

20   what is the attorney's role, typically?

21   **A.**    As far as I'm concerned, they have no role.  But what I've

22   observed is that sometimes the attorney will bring up issues or

23   remind the debtor of something that they've forgotten or bring

24   up any changes that need to be made.  But for the most part,

25   they're silent.

```
 1   Q.    Does sometimes -- if the creditor asks a question, can the

 2   attorney advise her client not to answer, for example?

 3   A.    I've heard that.

 4   Q.    And can the client consult with the attorney about how to

 5   answer certain questions?

 6   A.    I've never seen that done, but, yes, they could.

 7   Q.    And as far as you recall, and as far as you observed

 8   today, Walter Liew's attorney, Paul Liu, did not attend the

 9   hearing; correct?

10   A.    That's my understanding -- I think that's true, but I

11   don't recall.

12   Q.    But if he had been there, you would have noted that on the

13   record that we just listened to?

14   A.    I would -- I would not have noted on here, but I would

15   have probably looked over and said, "Please, you know, state

16   your appearance."

17   Q.    On the audio transcript that we just listened to, you

18   would have asked the attorney to state her appearance if

19   there --

20   A.    Yes.

21   Q.    -- had been an attorney there?

22   A.    I didn't hear my -- a question asking that.

23         MS. AGNOLUCCI:  Thank you.  No further questions.

24         THE COURT:  Anything further?

25         MR. AXELROD:  No, Your Honor.
```

1          **THE COURT:**  Thank you, sir.  You're excused.  Thank

2   you very much.

3                          (Witness excused.)

4          **THE COURT:**  All right.  Does the Government have any

5   more witnesses?

6          **MR. SCOTT:**  Your Honor, the United States rests.

7          **THE COURT:**  All right.  Ladies and gentlemen, the

8   Government, having rested their case, as I mentioned yesterday,

9   that concludes the Government's case.

10         Just to tell you what is going to happen next, the very

11  next thing that's going to happen is I'm going to release you

12  early, so that's the good news for you, after I give you your

13  usual instruction; and then we're going to be not sitting until

14  next Monday.

15         It is anticipated that next Monday, if the Defense wishes

16  to put on a case, which right now they've indicated they're

17  inclined to do, we'll start the Defense case, and that will go

18  as long as it needs to go.  It's expected it will go probably

19  more than a week, maybe a week and a half, maybe two trial

20  weeks.

21         And then after that, the Government has the right, if it

22  wishes, to bring in rebuttal evidence to rebut any case put on

23  by the Defense, and that would take up a shorter --

24  significantly shorter time if that were to occur.

25         And after that, we would be into giving you your

 1   instructions, closing argument by the attorneys, and then you

 2   finally will get the case for deliberation.

 3        So even with all of those activities, we're still

 4   anticipating finishing this case within the month of February.

 5   So we are on schedule.  And, so, we're pleased that counsel has

 6   cooperated with the Court, not to mention we're pleased that

 7   you have been so punctual in terms of your attendance and

 8   attention, that we're able to just move right through the

 9   schedule here as we've hoped.

10        So I'm going to give you your instruction as to your

11   conduct, and then when we break, we'll break until next Monday

12   at 8:00 a.m., and nothing will happen, obviously, tomorrow or

13   over the weekend.

14        So just to remind you about your conduct as jurors.

15        If anyone wants to leave, now would be a good time because

16   we're going to lock the door.

17        Okay.

18             THE CLERK:  The door is locked.

19             THE COURT:  Okay.  The door is locked.  Thank you.

20        First, keep an open mind throughout the trial, and do not

21   decide what the verdict should be until you and your fellow

22   jurors have completed your deliberations at the end of this

23   case.

24        Second, because you must decide this case based only on

25   the evidence received in the case and on my instructions as to

1    the law that applies, you must not be exposed to any other

2    information about the case or to the issues it involves during

3    the course of your jury duty.

4         Thus, until the end of the case, or unless I tell you

5    otherwise, do not communicate with anyone in any way, and do

6    not let anyone else communicate with you in any way, about the

7    merits of the case or anything to do with it.  This includes

8    discussing the case in person, in writing, by phone,

9    Smartphone, or electronic means, via email, text messaging, or

10   in or on any Internet chat room, blog, website, including such

11   social networking media like Facebook, Myspace, LinkedIn,

12   YouTube, or Twitter, or other feature.

13        This applies communicating with your fellow jurors until I

14   give you the case for deliberation, and it applies

15   communicating with everyone else including in your family

16   members, your employer, the media or press, or the people

17   involved in the trial, although you may notify your family and

18   your employer that you have been seated as a juror in the case.

19        But if you are asked or approached in any way about your

20   jury service or anything about this case, you must respond that

21   you have been ordered not to discuss the matter and to report

22   the contact to the Court.

23        Because you will receive all the evidence and legal

24   instruction you may properly consider to return a verdict, do

25   not read, watch, or listen to any news or media accounts or

**PROCEEDINGS**

1  commentary about the case or anything to do with it.  Do not do

2  any research, such as consulting dictionaries, searching the

3  Internet, or using other reference materials; and do not make

4  any investigation or in any other way try to learn about the

5  case on your own.

6      The law requires these restrictions to ensure the parties

7  have a fair trial based on the same evidence that each party

8  has had an opportunity to address.

9      A juror who violates these restrictions jeopardizes the

10  fairness of these proceedings and a mistrial could result that

11  would require the entire trial process to start over.

12      If any juror is exposed to any outside information, please

13  notify the Court immediately.

14      So you are excused until next Monday at 8:00, and the

15  Court thanks you again for your attention and punctuality,

16  which has enabled this trial to move along smoothly.

17      Thank you again.

18      (Proceedings were heard out of the presence of the jury:)

19      **THE COURT:**  All right.  Everybody may be seated, and

20  you can unlock the door.  Thank you, sir.

21      Just to kind of go over what I think should happen

22  chronologically here:  I've given you the deadlines for

23  additional filings with respect to at least an outline of any

24  motions by the Defense addressed to the Government's -- the

25  adequacy of the Government's case.  And, so, you'll share that

 1    with each other and with the Court.

 2        The other thing that should happen, I think, between now

 3    and tomorrow -- and this is not so much for the Court, but I

 4    think to make the next steps go more smoothly -- would be, to

 5    the extent that the Defense is changing their approach

 6    regarding expert witnesses, that ought to be shared.  I think

 7    the Government has a right to know that so that, number one,

 8    they could file any updated motions, any *Daubert* motions, or

 9    any other motions that they might have, because we have -- if

10    we have changed circumstances.

11        If not, if the expert is going to proceed as disclosed in

12    the previously served disclosures, then nothing need be done.

13        But what I want to happen -- that sort of leads into the

14    next point, which is that tomorrow I would anticipate that the

15    first thing that would happen, just to protect the rights of

16    the defendants, to do things in an orderly way, the defendants

17    would make, you know, would make their motion for -- whatever

18    motions they wanted to make addressed to the Government's case,

19    so that that's in the record and preserved.

20        What I'd like to turn to then is -- and this is why I

21    wanted to have a dialogue between counsel -- among counsel with

22    respect to expert witnesses -- would be a discussion of any

23    *Daubert* issues or any objections with respect to Defense

24    experts so that the Court can rule on those and -- because the

25    Court expects the trial, if the Court does not grant the

**PROCEEDINGS**

1  motions, to proceed, and I don't want anything to happen that's

2  going to prevent that from happening.  The Court can take under

3  advisement the motions as a matter of law.

4      And, so, in terms of an orderly way of doing things, I

5  want to have those -- any further motions with respect to

6  Defense experts resolved as the second order of business

7  tomorrow after the defendants make their motion for the record.

8  And then with whatever time we have left, I would like to at

9  least begin the process of the motions as a matter of law.

10      I will have read your submissions.  I'm sure I'll have

11  questions.  And it may well be, based upon the filings, that

12  the Court, having followed the case as it's been unfolding,

13  will want to hear argument on certain issues rather than

14  others, or at least have those emphasized more than any others.

15      So I would anticipate that that's the way we would go.  If

16  the case continues on Monday morning, we'll start the Defense

17  case.  I'll continue to get updates from the Defense as far as

18  their timing, so I can continue to keep the jury updated.

19      And also, of equal importance, the Court is relatively

20  close to filing the next round of its proposed jury

21  instructions.  And, so, I'd want to set a significant amount of

22  time for any charging conference -- for a charging conference

23  that I will have to finalize the jury instructions.

24      So with all that scheduling set in motion, is there

25  anything the Government wishes to say?

**PROCEEDINGS**

1          **MR. HEMANN:**  I don't think so, Your Honor.

2          **THE COURT:**  All right.  Mr. Froelich?

3          **MR. FROELICH:**  Yes, Your Honor, two things.  One, I

4   don't know if you want us to formally say we will have Rule 29

5   motions and have argument tomorrow, just to protect the record.

6   I don't know how you want to do that.

7          **THE COURT:**  No, I want to do that first thing tomorrow

8   morning.  Normally I do that now, but we're not going to do any

9   other official business that might be deemed to waive your

10  rights to do that.

11         **MR. FROELICH:**  That's what -- I was just trying to

12  protect the record.

13         **THE COURT:**  And the record will be reflecting that

14  you're intending to do it, I'm directing that you not do until

15  tomorrow morning, and all such motions are preserved.

16         **MR. FROELICH:**  Thank you, Your Honor.

17         **THE COURT:**  I'm just trying to save time and give us a

18  little --

19         **MR. FROELICH:**  I understand.

20     The other thing, Your Honor, I think the Defense case is

21  going to move much quicker.

22         **THE COURT:**  You mean your --

23         **MR. FROELICH:**  I think both.

24         **THE COURT:**  Okay.

25         **MR. FROELICH:**  I think.  We've been talking,

1  Your Honor, and we're going to meet today and everything.  I

2  think it's going to be -- I'm just trying to give the Court an

3  update.

4          **THE COURT:**  I appreciate it.

5          **MR. FROELICH:**  It's going to move much quicker, and we

6  could finish Wednesday or Thursday.  And, so, I wanted to give

7  Your Honor that notice because of your mention of the jury

8  instructions.  I just thought the Court should be aware that

9  it's moving quickly.

10          **THE COURT:**  All right.  Then, again, I don't know if

11  there's any rebuttal or anything, but that's very much

12  appreciated, because then the following week, we have a

13  holiday.  We have the presidents holiday.  So that will give

14  you even extra time to prepare.

15      But my hope would be that sometime during the latter part

16  of next week, we can then have our charging conference, and

17  then you'll have the weekend, including a long weekend, to

18  prepare your closing arguments and then go into closing

19  arguments the following week, which the jury will be delighted

20  to have that happen, and we'll go from there.

21      One of the things I wanted to just raise, because it's

22  something that different judges have different views upon, and

23  I want to ask Defense counsel, without -- you don't need -- you

24  shouldn't tell me, and I wouldn't be asking you to tell me

25  whether your respective clients are going to testify, but some

**PROCEEDINGS**

1  attorneys -- some judges actually conduct a voir dire of the

2  clients about whether they are or are not testifying.

3      I generally have not done that unless specifically asked,

4  especially with excellent lawyers here.  I normally would

5  assume that all that's been done.

6      But, Mr. Froelich, do you have a preference about that?

7          **MR. FROELICH:**  Your Honor, I'm out of the Eleventh

8  Circuit, and the Eleventh Circuit requires it, so I'm used to

9  it.  I mean, it's mandatory in my circuit.

10         **THE COURT:**  Not in this circuit.

11         **MR. FROELICH:**  I understand that.

12         **THE COURT:**  It's not mandatory.

13         **MR. FROELICH:**  I'm just saying.  So I will make a

14  decision, Your Honor, whether he's going to testify or not, and

15  I probably -- I'm more comfortable with the Court inquiring if

16  he's not going to testify.

17         **THE COURT:**  Okay.

18         **MR. FROELICH:**  I'm just --

19         **THE COURT:**  If he is going to testify --

20         **MR. FROELICH:**  -- then there's no need.

21         **THE COURT:**  Well, there would be a need to tell me he

22  doesn't have to testify if he doesn't want to.

23         **MR. FROELICH:**  That's correct, Your Honor.

24         **THE COURT:**  So I'll do it either way.

25      What about with respect to Mr. Liew and his company?

**PROCEEDINGS**

1    **MR. GASNER:**  Thank you, Your Honor.  As the Court will

2    recall, the Court granted a severance motion based on an *Echols*

3    declaration that Mr. Liew filed, stating that he did not plan

4    to testify.  That plan has not changed.

5        **THE COURT:**  All right.

6        **MR. GASNER:**  And I don't think that a colloquy is

7    necessary.

8        **THE COURT:**  Okay.  Then that's my practice, and I

9    certainly will do it with respect to Mr. Maegerle.  It

10   shouldn't take more than five minutes.

11       **MR. FROELICH:**  Your Honor, the other thing I wanted to

12   raise is that I will -- besides Rule 29, I will reraise my

13   issue of severance.

14       **THE COURT:**  Please do.

15       **MR. FROELICH:**  I just wanted to alert the Court.

16       **THE COURT:**  And, also, I assume a mistrial as well.

17       **MR. FROELICH:**  That's correct, Your Honor.

18       **THE COURT:**  Because I think you should do that just to

19   preserve the record.

20       All right.  So I'll see you all tomorrow.  We'll have some

21   robust argument, and I look forward to your filings, because I

22   will study those.

23       Did you want to say something?

24       **MR. HEMANN:**  8:00 a.m.  Correct, Your Honor?

25       **THE COURT:**  8:00 a.m., yes.  And what I think I'll do

PROCEEDINGS

1   is, in light of my afternoon calendar in Oakland, is probably

2   not go beyond 9:30.  So we'll have an hour and a half, and we

3   should be able to cover some ground.

4           **MR. HEMANN:**  Thank you, Your Honor.

5           **THE COURT:**  Have a good evening.

6               (Proceedings adjourned at 12:24 p.m.)

7                       ---oOo---

8

9

10              **CERTIFICATE OF REPORTER**

11          I certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13

14  DATE:  Thursday, February 6, 2014

15

16

17

18  _____

19          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

20

21

22

23

24

25