**Volume 17**

**Pages 3349 - 3411**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

```
UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )      NO. CR 11-00573 JSW
                               )
WALTER LIEW; ROBERT MAEGERLE;  )
and USA PERFORMANCE TECHNOLOGY,)
INC.,                          )
                               )
          Defendants.          )
_____)
```
San Francisco, California
Friday, February 7, 2014

**<ins>TRANSCRIPT OF PROCEEDINGS</ins>**

**<ins>APPEARANCES:</ins>**
For Plaintiff:

        MELINDA HAAG
        United States Attorney
        450 Golden Gate Avenue
        San Francisco, California  94102
   BY:  **PETE AXELROD**
      **JOHN H. HEMANN**
      **ASSISTANT UNITED STATES ATTORNEYS**

        U.S. DEPARTMENT OF JUSTICE
        600 E Street NW
        Washington, D.C.  20044
   BY:  **RICHARD S. SCOTT**
      **ASSISTANT U.S. ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
           Official Reporter

3350

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant Walter Liew and USA Performance Technology, Inc.:
                          KEKER & VAN NEST LLP
 3                        633 Battery Street
                          San Francisco, California  94111
 4                 BY:   STUART L. GASNER
                         SIMONA A. AGNOLUCCI
 5                        KATHERINE M. LOVETT
                         CHRISTINA BLAIS
 6                        ATTORNEYS AT LAW

 7   For Defendant Robert J. Maegerle:
                          MCKENNEY & FROELICH
 8                        1349 West Peachtree Street
                          Two Midtown Plaza - Suite 1250
 9                        Atlanta, Georgia  30309
                   BY:   JEROME J. FROELICH, JR.
10                        ATTORNEY AT LAW

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    <u>Friday - February 7, 2014</u>                                    <u>8:07 a.m.</u>

2                          <u>P R O C E E D I N G S</u>

3                              ---o0o---

4        (Proceedings were heard out of the presence of the jury:)

5        **THE COURT:**  Good morning.  Please be seated.

6        And please call the case.

7        **THE CLERK:**  Calling Case Number CR-11-573,

8    United States versus Walter Liew, United States versus Robert

9    Maegerle, and United States versus US Performance Technology.

10       Counsel, please step forward to the podiums and state your

11   appearances.

12       **MR. HEMANN:**  Good morning, Your Honor.  John Hemann,

13   Pete Axelrod, and Richard Scott for the United States.

14       **THE COURT:**  Good morning.

15       **MS. AGNOLUCCI:**  Good morning, Your Honor.  Simona

16   Agnolucci, Katie Lovett, and Stuart Gasner for Walter Liew and

17   USAPTI; and Mr. Liew is present at counsel table.

18       **THE COURT:**  Good morning.

19       **MR. FROELICH:**  Your Honor, Jerry Froelich here for

20   Mr. Maegerle who's standing next to me.

21       **THE COURT:**  Good morning.

22       All right.  The first thing before we get into the morning

23   business we talked about, I just wanted to thank the parties

24   for their briefs.  I know these things aren't created by

25   immaculate conception, that they take a lot of work.  The Court

**PROCEEDINGS**

1    was here early in the morning reviewing the materials, the

2    cases and the like.  The Court appreciates the parties helping

3    the Court to crystallize the issues and make progress toward,

4    you know, resolving the motions.  So thanks to the parties.

5         And I wanted to start by giving the defendants an

6    opportunity to make their motion formally for the record, and

7    then I will tell you the way I would like to proceed.

8              **MS. LOVETT:**  Thank you, Your Honor.

9         As stated in the brief filed for the Court, Mr. Liew and

10   USAPTI move for a judgment of acquittal on Counts 1, 2, 3, 4,

11   5, 6, 7, 8, 9, 10, 11, 13, and 20.

12             **THE COURT:**  All right.  For the grounds set forth in

13   Rule 29; is that correct?

14             **MS. LOVETT:**  Yes.

15             **THE COURT:**  All right.  Thank you.

16        Mr. Froelich?

17             **MR. FROELICH:**  Yes, Your Honor.  I would move for

18   acquittal on all the counts against my client, and I would make

19   an oral argument.  I didn't have time, quite frankly, being

20   here in California without my staff to file a written brief;

21   but I have some oral arguments, not long.

22             **THE COURT:**  All right.  You also want to make a motion

23   with -- renew your motion with respect to severance and

24   mistrial?

25             **MR. FROELICH:**  I was going to do that separately,

**PROCEEDINGS**

1    Your Honor.

2          **THE COURT:**  Yes.

3          **MR. FROELICH:**  I wanted to renew two motions,

4    Your Honor, a motion for severance, and -- my motion for

5    severance and also my motions for mistrial.

6          **THE COURT:**  All right.  Very well.  Those will be

7    taken under advisement.

8        So I assume the Government has no motions.

9          **MR. HEMANN:**  We move to go home, Your Honor.

10         **THE COURT:**  That's right.  Okay.  Well, be careful

11    what you wish for.

12                        (Laughter)

13         **MS. LOVETT:**  Your Honor, briefly?

14         **THE COURT:**  Yes.

15         **MS. LOVETT:**  We would also like to renew our motion

16    for severance.

17         **THE COURT:**  Very well.  Thank you.

18        Would that be severance of your two clients from

19    Mr. Maegerle?

20         **MS. LOVETT:**  Severance of the financial counts from

21    the trade secret claims.

22         **THE COURT:**  I got you.  Okay.  Very well.  So those

23    are duly noted.

24        So the way I would like to proceed is to kind of tell you

25    maybe what I don't want to hear argument on, because I have

1  enough information to make a ruling based upon the briefs and

2  the Court's own, you know, research and thought; and that is

3  with respect to the bankruptcy counts, I have enough

4  information.  The issues are well briefed, and I don't really

5  need argument on the bankruptcy counts.

6       The other thing -- the way I thought I would deal with

7  this is to give, with one exception where I have a question of

8  the defendants, at least with respect to -- yeah, all the

9  defendants, principally Mr. Liew and the corporate defendant, I

10 would give the defendants the opportunity to reply to what the

11 Government filed, because they didn't have a chance to reply.

12 The Government had an opportunity to respond to what the

13 defendants wrote in writing.  And then, of course, I'll give

14 the Government a chance to respond to any other argument.

15      And one sort of procedural question or one thought I have

16 is, subject to hearing from, mainly from Mr. Froelich, I would

17 think that I should hear the arguments with respect to -- by

18 Mr. Liew and USAPTI, and then give Mr. -- I assume that a lot

19 of the arguments or some of the arguments that Mr. Maegerle

20 will make will overlap with those arguments.

21      And, so, what I would suggest is giving you an

22 opportunity, Mr. Froelich, to go second or after the other

23 defendants.  Is that what you would --

24           MR. FROELICH:  That's what I expected, Your Honor, and

25 that's what I've prepared.  I have -- some of my arguments

**PROCEEDINGS**

1  overlap and some of them are distinct and separate.

2       **THE COURT:**  I understand.  Okay.  So that's what we'll

3  do.

4       So the first thing I want to start off with is the

5  question with respect to the obstruction charge involving

6  Jian Liu.  And the question I have is this, for the defendants

7  principally, and that is:

8       There is argument about whether there was -- whether there

9  existed a proceeding that could be potentially obstructed by

10  the alleged activities of the defendants.  And I wanted to know

11  why the pendency of the civil lawsuit, which had been --

12  there's no dispute that it had been filed as of the time of the

13  alleged activities involving Jian Liu, would not qualify as an

14  official proceeding for purposes of the obstruction statute.

15       **MS. LOVETT:**  Yes, Your Honor.  I'm happy to address

16  that concern.

17       Under *Arthur Andersen*, as the Court is probably aware, a

18  proceeding, an official proceeding, must be foreseeable to the

19  defendant at the time of the alleged obstructive conduct in

20  order for there to be obstructive intent.  And this alleged

21  obstructive intent happened -- or conduct happened a week, less

22  than a week, five days, after the filing of the civil

23  Complaint.

24       The evidence showed that it was directly related to the

25  fact that a DuPont private investigator showed up at Jian Liu's

 1    house, asked him some questions, shook Jian Liu up; and Walter

 2    Liew was responding to that event, not to any upcoming trial,

 3    upcoming deposition, upcoming anything related to a civil

 4    proceeding.

 5         **THE COURT:**  But Mr. Liew knew about or a jury could

 6    find that he knew about the lawsuit, and then he is discussing

 7    with Mr. Jian Liu issues about not mentioning consultants'

 8    names, or whatever he was told, you know, not to mention; and

 9    then Mr. Liu, Jian Liu, said he refrained from giving that

10    information based upon, in part at least, on what Walter Liew

11    said.

12         So why couldn't a jury find that the civil proceeding was

13    foreseeable because it actually existed and the papers were

14    served?

15         You're making a very good jury argument, but my question

16    is:  How can the Court, as a matter of law, rule that there was

17    no proceeding foreseeable and that that proceeding was the

18    civil lawsuit?

19         **MS. LOVETT:**  Well, I think there are sort of two

20    distinct communications that we're talking about with regards

21    to Walter Liew here.

22         There was evidence that Walter Liew told Jian Liu, "Don't

23    tell anyone about these two consultants."  But there was also

24    evidence that Walter Liew told Jian Liu, "You should talk to an

25    attorney before you speak to anyone any further."

**PROCEEDINGS**

1      And this speaking to an attorney was directly related to

2  this civil proceeding.  The "don't talk about the two

3  consultants" was related to this DuPont investigator and was

4  directly responsive to what happened with the DuPont

5  investigator.  So it's just two distinct interactions there.

6      **THE COURT:**  Well, wouldn't it have been reasonable --

7  could a jury find that the investigator was investigating or

8  conducting his activities at least in part in connection with

9  the lawsuit; and to the extent that the instructions or

10  suggestions that were allegedly made by Walter Liew to Jian Liu

11  were in some way to affect that proceeding?

12      **MS. LOVETT:**  I don't believe that five days after a

13  civil lawsuit is filed it's foreseeable to a normal, average

14  person that this case will definitely go to trial, or that it

15  will even proceed, you know, beyond a few weeks after that.

16      **THE COURT:**  But does there have to be a trial or could

17  it just be a lawsuit?  Let's say --

18      **MS. LOVETT:**  There has to be some sort of appearance

19  before the District Court or before some legislative or

20  judicial body, and that would involve, you know, a deposition,

21  trial, some official filing; and that was far down the line,

22  five days into this.

23      **THE COURT:**  All right.  What's the Government's

24  response, Mr. Hemann?

25      **MR. HEMANN:**  Very briefly, Your Honor.

1    There was an actual -- there was more than a foreseeable

2  proceeding.  There was an actual proceeding.  And one had been

3  filed, and the chronology -- this is a bit from memory,

4  Your Honor -- was the day that the lawsuit was filed, Walter

5  Liew called Jian Liu and advised him of the lawsuit while he

6  was with Christina Liew on the way to the office.  It caused a

7  stir.

8    Over the next several days, there was activity jointly

9  suggested by Christina Liew to obtain a lawyer and, obviously,

10  related to the lawsuit.

11    Walter Liew went to Singapore on the 7th of April,

12  returned on the 11th; and the first thing he did, it appears,

13  having returned on the 11th, is meet with Jian Liu to talk

14  about the lawsuit and in the same conversation mentions, "Don't

15  talk about the old men," referring to Mr. Spitler and

16  Mr. Maegerle.

17    Jian Liu's recollection is corroborated by Walter Liew's

18  handwritten notes, which is Exhibit 687, which at the top says,

19  "Ask Jian Liu what he had told his lawyer," and then

20  immediately below that refers to "old men."

21    So I don't think they're two separate.  I think they're

22  intertwined.  There's an actual proceeding, and I think that is

23  easily sufficient underneath the statute.

24    Obviously, *Arthur Andersen*, which is really sort of the

25  seminal and the few cases on this, dealt with a situation where

 1   there was not an actual proceeding; and there was a great deal

 2   of debate in that case, as Your Honor will recall, about when a

 3   proceeding or whether a proceeding would ever be instituted

 4   when the shredding that was alleged against Andersen took

 5   place.

 6         THE COURT:  All right.  Anything further on that

 7   point, Ms. Lovett?

 8         MS. LOVETT:  Yes, Your Honor, just to say that

 9   revealing or not revealing information to a DuPont investigator

10   would not be the sort of action that triggers the statute.  If,

11   as the evidence showed, Walter Liew told Jian Liu not to speak

12   to a DuPont investigator, that would not be obstructive of a

13   civil case.

14         THE COURT:  All right.  Well, let's move on.  I have

15   the information I need on that count.

16       Let's move on to the other sort of big-ticket issues from

17   the Government's -- from the Court's perspective that the

18   Government responded to; and the first big one, because it

19   permeates a lot of the counts -- and, by the way, I will take

20   up, I did change the order that I had told you, I will take up

21   the *Daubert* issue before we break today, because I think it's

22   important to do that, so I'm going to allow time for that --

23   has to do with the issue of the foreign instrumentalities or

24   foreign government because there's two.  The statutes have

25   alternatives.

**PROCEEDINGS**

```
 1        And I did, you know, read the authorities the parties
 2   cited to the Court, especially the *Lan Lee* case which
 3   Judge Ware decided, which relates to this issue, although the
 4   facts were different in that case.
 5        So having -- and what I want, Ms. Lovett, you to respond
 6   to really is, not to repeat your arguments or the generalized
 7   arguments, but the Government has given the Court their
 8   examples, at least, of specific evidence in the record that
 9   ties -- both ties Pangang to the Chinese government and also,
10   from the Government's perspective, argues that on the second --
11   on the alternative prong, that the conspirators were attempting
12   to benefit a foreign government or an entity of a foreign
13   government; i.e., SASAC and the other -- and the Chinese
14   Communist Party, and the like.
15        And my question to you is:  Why don't those exhibits and
16   that testimony raise issues -- make this a jury question?
17        MS. LOVETT:  Yes, Your Honor.  If I may address those
18   in reverse order.
19        THE COURT:  Please do.
20        MS. LOVETT:  The benefit to a foreign government,
21   *Lan Lee*, as the Court is aware, stated -- and I should mention
22   that *Lan Lee* is one of the very few cases that discussed this
23   issue -- and the Court in *Lan Lee* stated that benefit to a
24   foreign government is not synonymous with benefit to a foreign
25   country.
```

**PROCEEDINGS**

 1          So simple benefit to China would not be enough to satisfy

 2     the statute.  You need to intend or know that you will benefit

 3     the Chinese government.

 4          **THE COURT:**  Okay.  No, I understand that.  But aren't

 5     all these communications and other evidence dealing with -- I

 6     mean, one might make sort of a philosophical argument that

 7     there's really no difference with China because, unlike in this

 8     country, sometimes we don't know who's running the country, who

 9     the Government is, or whether we even have a Government.  But

10     in China, you know, the communications are with these State

11     entities:  SASAC, Communist Party.  There's even a

12     communication from the Premier of China.

13          And, so, I guess, my question is:  Yes, I understand that

14     that's the law, and I agree I think you've made that point, but

15     why wouldn't the evidence that was adduced by the Government

16     satisfy that government prong as opposed to country prong?

17          **MS. LOVETT:**  Yes, I understand, Your Honor.

18          **THE COURT:**  All right.

19          **MS. LOVETT:**  The sort of star of the Government's

20     response to our brief was this letter to Hong Jibi that we

21     consider puffery, but they presented it; and the letter refers

22     repeatedly to China, patriotic to China.  It does not

23     explicitly refer to any loyalty to the Communist Party, to the

24     Chinese government.

25          And the focus here is on Mr. Liew's intent and Mr. Liew's

1  knowledge, not whether, you know, to most people the Chinese

2  government and China are the same thing.

3      And there hasn't been evidence that Mr. Liew intended and

4  knew that he would benefit the Communist Party of China.  He

5  knew that his actions would benefit China, the country,

6  perhaps.  That's what the evidence may have shown.  But

7  intending to benefit a country and its people and provide

8  something that is a benefit to that country is not the same

9  thing as intending to benefit the Communist Party or the

10  Democratic Party or any party.

11      You can benefit the people of a country and know you'll

12  benefit the people of the country without intending to benefit

13  the government of that country.  And the puff letter only shows

14  an intent to benefit China as a whole.

15      THE COURT:  All right.  Now, please address, before I

16  hear from the Government, the instrumentality issue.  Because

17  the Government points to evidence, additional evidence, by

18  Mr. Hu about where he said, you may take issue with it, but he

19  did testify that the Chinese government appoints directors or

20  officers, or whatever it was, agents of Pangang group, and

21  there's evidence of this interplay between the Chinese

22  government and Pangang that the Government points to.

23      So why wouldn't that evidence be adequate to show, at

24  least for a jury question, with respect to the foreign

25  instrumentality?

1          **MS. LOVETT:**  That evidence is not sufficient to show

2    that there was substantial control or domination by the Chinese

3    government.  The main reason that this issue is entirely

4    insufficiently addressed by the Government's cases, they chose

5    not to call Professor Feinerman.  They chose not to provide any

6    context about whether it would be substantially controlling to

7    appoint officers of a company or whether minority ownership of

8    a company is substantial control.

9          The jury has no context to judge how much control the

10   Government actually had in the day-to-day operations of these

11   Pangang entities.  And there are many Pangang entities here,

12   and it's not clear which the Government contends were

13   State-controlled and which weren't based on the evidence that

14   was presented.

15         **THE COURT:**  But help me with the following sort of

16   structural issue, which is, from your perspective, the

17   Government -- and I'm not disparaging what the Government did,

18   but I'm taking this for the moment from the defendants'

19   perspective.  They threw a lot of stuff in there, and there's a

20   lot of stuff that, you know, was thrown against the wall about

21   the interplay of Pangang and the government, and there's the

22   business cards that came in late in the trial and the like.

23         And the question is:  The jury is going to be given, at

24   least in the Court's proposed instructions, and there will be

25   an instruction on the definition of "foreign instrumentality,"

1   and why wouldn't it be a jury question about whether the

2   Government has satisfied the element of proof?

3        They're going to be told -- the jury is going to be given

4   the definition.  They're going to look at all this stuff that

5   the Government has adduced, and they're going to decide

6   whether, and both sides would argue to the jury, that either

7   they have or they haven't proved it.  So why wouldn't this be,

8   at some level, a jury question, factual disputes to be resolved

9   as to, for example, the relationship between the government and

10  the Pangang and the other entities?

11       MS. LOVETT:  Your Honor, since the statute requires

12  that the jury find that there's substantial control,

13  substantial ownership, substantial dominion, something along

14  those lines, they need a context in which to judge whether that

15  control was substantial and, given how acontextual this is,

16  whether it was substantial, minimal.  This just isn't a jury

17  question.  There legally is not enough evidence that there was

18  substantial control.

19       THE COURT:  All right.  Mr. Hemann?

20       MR. HEMANN:  Just a couple of points, Your Honor.

21       First of all, *Lan Lee*, of course, did go to the jury and

22  was not -- he was acquitted.  The case did go to the jury on

23  the standard that Judge Ware articulated.

24       And the second legal point is that the Government may

25  prove this element by proving either intent to benefit the

1   Chinese government -- and we agree with the Defense's statement

2   that it doesn't have to be a government benefit but also

3   acknowledge that the government country thing with China, as

4   the Court observed, is a little bit more difficult to parse

5   than it is here in the United States -- but we can satisfy it

6   with either proof of intent to benefit the government, or --

7   and/or proof of intent to a government instrumentality.

8        There's proof of both, and I'm only going to refer to two

9   documents, one for each.  And the question is Mr. Liew's

10  understanding.  I think Ms. Lovett's correct about that.

11       In this regard, the Hong Jibi letter is not so important

12  as the Nora Lam email, which is Exhibit 374, in which Mr. Liew

13  states he got into this because of the request from the

14  State Council.

15       This is a direct link to not a country but a particular

16  government entity; and it, again, happens to be the government

17  entity that is the chief executive organ of the Chinese

18  government.

19       I think that is corroborated by the Hong Jibi letter and

20  significant other pieces of evidence that show this connection

21  and an ongoing connection.

22            **THE COURT:**  Was the Hong Jibi letter, though, a letter

23  to a government or to a country?

24            **MR. HEMANN:**  I think that the Hong Jibi letter refers

25  to a request from a government entity.  Again, it's the, "We

**PROCEEDINGS**

1   met with this group of Government officials; and, as a result,

2   I received a list."  That's not a list from a country.  That's

3   not a request from a country.  That is a request from four

4   named government officials, at least two of whom Mr. Liew

5   maintains a relationship with over many years; and, in

6   particular, Minister Tan and this fellow from the Foreign

7   Economic -- Foreign Expert Agency with whom he corresponds over

8   the years.

9       So I think that from a sufficiency perspective, him

10   writing in 2005 that he got into this at the request of the

11   State Council is sufficient to go to the jury on the intent to

12   benefit the Government's prong as corroborated by the other

13   evidence.

14       As to the control by the State's -- the foreign

15   instrumentality prong of this, I do think that there is

16   sufficient evidence from Mr. Hu and Mr. Olson as to the State

17   ownership of the Pangang Group.  I think that -- and that's one

18   way we could prove it.

19       We could also prove control.  Again, it's different.  It's

20   in the disjunctive.  And there's an exhibit, Exhibit 291, in

21   which Mr. Liew writes of a meeting:  (reading)

22           "Fan Zhengwei hosted a luncheon for us and told me

23       that Secretary Lee of the SASAC asked Fan to meet with us

24       per the instruction of a Senior Minister."

25   I think that that probably, Your Honor, proves both the

**PROCEEDINGS**

1   government part of this but also the control of Pangang Group

2   by SASAC and a Senior Minister as acknowledged by Mr. Liew in

3   his own hand.

4         So I think that, Your Honor, those pieces of evidence are

5   certainly sufficient to go to the jury with.

6         **THE COURT:**  Ms. Lovett?

7         **MS. LOVETT:**  Your Honor, first to just briefly clarify

8   what I said earlier.  Intent and knowledge is the focus here;

9   but I believe, under the statute, that the Government must

10  prove that what -- Pangang or any of these other entities were

11  actually foreign instrumentalities.

12        Mr. Liew's subjective belief that they were foreign

13  instrumentalities is not enough to satisfy the statute.  And,

14  so, they must show some evidence that there was actual

15  substantial control, actual substantial ownership, and that

16  standard has not been met here.

17        **THE COURT:**  All right.  What's your -- and that's an

18  interesting point because the defendants may have believed

19  anything they wanted to believe.  They may believe, for example

20  that, you know -- well, whatever they want -- whatever anyone

21  wants to believe about our Government, but it may be totally

22  irrational and may be not factually true.

23        So is there any evidence in the record from which a jury

24  could find that, indeed, on the instrumentality point, that

25  there actually was this relationship that the statute requires

PROCEEDINGS

1    between the government and -- you know, this relationship of

2    control over Pangang Group by the government?

3         **MR. HEMANN:**  So I guess I have two responses.  Number

4    one is, it raises -- there's an interesting legal question in

5    the argument that Ms. Lovett just made as to whether the

6    Government does need to prove the actual nature of the

7    ownership or control; and it goes to the line of cases that we

8    discussed in connection with the Bill of Particulars and the

9    line that began with the *Shiu* (phonetic) case in the

10   Third Circuit with which the Court is familiar, which is that

11   both conspiracy and intent are crimes of the mind.

12        And there could be -- this could be an FBI sting case

13   where there is no foreign government at all; and there are such

14   cases in both the -- in the economic espionage arena, in the

15   FCPA arena, where there's not a foreign government and there's

16   not an instrumentality that is of the foreign government.  It's

17   the creation of the agents who are investigating and create the

18   situation that the defendant believes there's one.

19        So I don't agree with the premise that where there is

20   evidence that the defendant reasonably believed and acted on

21   those reasonable beliefs under the intent and conspiracy

22   statutes such proof is required.

23        I don't think we need to hash that out at this point

24   because we still have the testimony of both Mr. Hu and

25   Mr. Olson, which is sufficient to go to the jury with, because

**PROCEEDINGS**

1    both of them had personal knowledge based on their own

2    activities in China of what was transpiring.

3         And, again, I certainly would say that the Court need not

4    resolve this because of the information available with regard

5    to the intent to benefit the Chinese government.

6         **THE COURT:**  All right.  Do you want to respond to that

7    at all?

8         **MS. LOVETT:**  Only to say, Your Honor, that I'm not

9    aware of any case where it has been held that the foreign

10   instrumentality or foreign government can be completely made up

11   or, you know, the government of Freedonia could be seeking

12   certain information, and a person could be found guilty of

13   selling trade secrets.

14        **THE COURT:**  All right.  The other issue that I want to

15   hear the defendants' response on is particularly on Trade

16   Secret Number 1.  Because in reviewing the arguments of the

17   parties, reviewing the testimony, the evidence, and the

18   Indictment, the Government does not charge that the entire

19   process we're talking about here was a trade secret or that the

20   defendants misappropriated that trade secret.  It's a part of

21   it.  And there was testimony from Diemer, Dr. Diemer, Gibney,

22   and Dayton about that.

23        So what's the defendants' best argument with respect to

24   the proof -- the existence of a trade secret as it relates to

25   Trade Secret 1?

PROCEEDINGS

1    **MS. LOVETT:** Yes, Your Honor. As the jury

2    instructions that will probably be read to the jury, based on

3    the instructions the Court filed last night --

4    **THE COURT:** Well, you can talk me out of it, though,

5    if you disagree. I'm going to hear from you.

6    **MS. LOVETT:** On the basis of those instructions and

7    the instructions both parties proposed, the jury will hear that

8    Trade Secret 1 is the entire DuPont chloride-route process

9    which includes subparts, ways and means, Trade Secrets 2

10   through 5; but the jury will hear the phrase "entire DuPont

11   chloride-route process," and that is the focus of what Trade

12   Secret 1 encompasses.

13       And there has been overwhelming plentiful evidence from

14   the Government's witnesses that the entire process is not a

15   trade secret, that Mr. Liew did not believe that the entire

16   process was a trade secret; and that's the real focus of what

17   the jury is going to be deciding on.

18       **THE COURT:** So you're saying if the jury were to find

19   that elements of the DuPont chloride-route process to

20   manufacture TiO2, that the jury, a reasonable jury, could not

21   find that that constituted Trade Secret Number 1?

22       **MS. LOVETT:** No, Your Honor.

23       **THE COURT:** Because it says, "Trade Secret 1

24   includes." I'm reading from the Indictment, paragraph 14A:

25   (reading)

1              "The DuPont Chloride-Route Process to Manufacture

2        TiO2.  Trade Secret 1 includes ways and means in which

3        proprietary and nonproprietary components were compiled

4        and combined by DuPont to form substantial portions of the

5        TiO2 manufacturing process and Trade Secrets 2 through 5

6        set forth below."

7        So doesn't that, even by its plain terms, talk about -- I

8   mean, I know in patent cases "includes" means everything; but

9   the real world, fortunately, doesn't function on the language

10  of patents.  Why isn't it a partial -- and that's sort of the

11  way the case was tried.

12            **MS. LOVETT:**  Your Honor, the Government should be

13  limited by the language in the Indictment, and the Indictment

14  charges the entire chloride-route process followed by a number

15  of things that that may or may not include, and that is how

16  both parties have approached this case.

17        And the Government shouldn't be allowed to just throw in

18  any particular thing that they can flag as a trade secret and

19  call that Trade Secret 1 at this point in the case.

20            **THE COURT:**  Do you want to confer on this, Mr. Gasner?

21            **MR. GASNER:**  Your Honor, if I may --

22            **THE COURT:**  Please do.  Absolutely.

23            **MR. GASNER:**  -- address the Court directly, I would

24  appreciate it.

25            **THE COURT:**  Yes, please do.

PROCEEDINGS

1          **MR. GASNER:**  As the Court knows from civil practice

2    with trade secrets and patents, it is possible to allege a

3    trade secret that is a combination of things; but if one

4    element of that is missing, there's no infringement in the

5    civil context.

6          **THE COURT:**  Right.

7          **MR. GASNER:**  So what the Government did here was to

8    allege a combination of proprietary and nonproprietary

9    elements.  That was part of our vagueness and indefiniteness

10   motion on the face of the Indictment.  We've renewed that as

11   applied as well.

12        And that's exactly the problem, is that they alleged this

13   combination trade secret that is kind of the entirety of

14   everything that DuPont does in combination.  There was no

15   evidence of exactly what DuPont does, what the combination was.

16   They had no technical expert, other than Mr. Gibney, who

17   testified in a vague way as to Trade Secrets 2, 3, 4, and 5

18   being valuable to Tronox or Kerr-McGee.

19        The Government chose to try this case without getting into

20   any technicalities.  So what we're concerned about is that they

21   alleged in the Indictment, and we'll argue that the entirety of

22   the chloride-route process, including this kind of unique

23   combination of proprietary and nonproprietary, is the secret.

24        And there was lots of evidence about emulating the DuPont

25   process or the DuPont type of process; and I think it would be

1    unfair and unjustified by the evidence for the Government to

2    say, you know, the whole process is a trade secret when they

3    didn't prove that, when the evidence shows lots of

4    commonalities with other chloride-route manufacturers, and that

5    there are many of them in the world.

6         So that's our concern, is that they didn't really prove a

7    unique combination in the way you would in a civil trade secret

8    case and that there's simply a complete failure of proof.

9         In fact, as Ms. Lovett said, overwhelming evidence to the

10   contrary.  There are many, many commonalities between the

11   chloride-route manufacturers.

12        So that's our problem, is they alleged the big trade

13   secret; and then the evidence showed, well, that's just not

14   true.

15             THE COURT:  Okay.  Mr. Axelrod?

16             MR. AXELROD:  Yes.  First, Your Honor, just in

17   discussing Trade Secret 1, it's important to focus on it's a

18   charge in a conspiracy and attempt, and the issue is what

19   Mr. Liew reasonably believed about the DuPont process; and his

20   own words, and I'm not going -- the Court has the record about

21   his belief and his representations about the secrecy of that

22   process and his possession of the complete process.

23        I think what the other point here is the Defense seems to

24   be sort of misreading what was indicted and what was tried,

25   which was not that the entire DuPont -- everything that DuPont

**PROCEEDINGS**

 1   does in its chloride-route process is a secret.  It's a

 2   combination of things.

 3        And actually there was evidence presented of that when

 4   there was the testimony of Mr. Dayton and Mr. Diemer --

 5   Dr. Diemer about, you know -- and particularly in the Basic

 6   Data Document.  Some information is secret, some information is

 7   public; but it's these unique compilations of things that are

 8   protected, and that's the theory we've had throughout.  That's

 9   been -- that's what's alleged in the Indictment, and there's

10   been no failure of proof there.  So there's ample evidence to

11   support that.

12             THE COURT:  All right.  Ms. Lovett?

13             MS. LOVETT:  Yes, Your Honor.

14        Only to raise the fact that the undisputed evidence shows

15   that Ashtabula was a plant modeled entirely on the Antioch

16   plant; that the Antioch plant had the, quote/unquote, entire

17   chloride-route process because it could make titanium dioxide

18   by the chloride route; and that DuPont knew, in Exhibit 847,

19   DuPont knew that one of their competitors had the full Antioch

20   technology through Ashtabula.

21        And the evidence showed that Cristal Global, SCM,

22   Millennium, all of these competitors had owned Ashtabula at one

23   point or another, and they had the full DuPont chloride-route

24   process and understood all the parts of that process.

25             THE COURT:  All right.

PROCEEDINGS

1    **MR. AXELROD:** Well, first of all, I think that that

2    overstates the evidence because, remember, the Ashtabula

3    technology -- first of all, SCM, Millennium, and

4    Cristal Global, that's one company. They just -- it had

5    different iterations.

6        But, most importantly, this case isn't about the Ashtabula

7    technology. There was technology built and provided to SCM in

8    the early '70s. It has nothing to do with the Edgemoor

9    drawings from the '90s, or the Basic Data Document from 1985,

10   or the Diemer Correlation in the '90s. And there's this almost

11   a willful blindness about the state of the technology.

12       And I think that there's -- the fact that DuPont licensed

13   a particular component, I actually believe there's

14   technology -- they didn't give them everything, they gave them

15   whatever they gave them from one facility, that doesn't speak

16   to all the other technology that is out there.

17       And there's certainly no evidence in the record right now

18   that the Ashtabula technology was public. And, in fact, we

19   cited in our pleading sort of the state of the record with

20   respect to Ashtabula. So that argument is a red herring.

21       **THE COURT:** All right. Do you want to respond to

22   that?

23       **MS. LOVETT:** Yes, Your Honor, just to say that the

24   Government continues to point to specific evidence that they've

25   adduced about Trade Secrets 2 through 5, but that doesn't

PROCEEDINGS

1    necessarily show the entire DuPont chloride-route process.

2         MR. AXELROD:  I'm confused by this use of the word

3    "entire."  It's not in our Indictment.  It's not what we have

4    said to the jury.  It's not in the way we presented the

5    evidence.  And they keep saying, "It's the entire this.  The

6    entire that."  Where is it?  Where are they coming from with

7    that?

8         MS. LOVETT:  Your Honor, the Indictment reads, "The

9    DuPont chloride-route process."

10        THE COURT:  But then it goes on to say it includes

11   ways and means in which proprietary and nonproprietary

12   components were compiled and combined by DuPont to form

13   substantial portions of the process.

14        So I think, although you certainly litigated, you know,

15   whether that's adequate and the Court ruled on that, and there

16   may someday be disagreement by a higher authority, but that's

17   the state of -- you know, the law of the case, if you will, and

18   the Court's view of the Indictment.

19        It is pretty broad, but I think it's adequate; and I think

20   with the Bill of Particulars, you know, the defendants had

21   adequate notice.

22        And the way the case was tried by both sides, I know the

23   defendants tried to parse specific portions of what the

24   Government claims is the TiO2 process and say, "Well, isn't

25   this public?  Isn't that public?  Aren't there patents on this

1    and that?"

2          But as the instruction and the law says, it can be -- a

3    trade secret can be a compilation of different items; some

4    public, some not public.  That's the definition of "trade

5    secret" in the statute.

6          So I'm not sure that -- I think the argument that the

7    defendants are making, it may be very persuasive to the jury,

8    it may be a winning argument, but it seems to the Court that

9    the Court can't find, as a matter of law, that the

10   Government -- that no reasonable jury could find the existence

11   of a trade secret.

12         I think it's hotly disputed, and there's facts on both

13   sides; but that's the stuff that jury verdicts are made out of.

14   I don't think this is a question of law at this point, but I'll

15   think about it some more.

16         What I'd like to do now, by the way, is, I'd like to give

17   Mr. Froelich a chance to argue because I don't -- I will tell

18   you specifically what I'm not hearing argument about, because I

19   think I have enough in the record on which to make a judgment.

20         For example, and this is only with respect to Walter Liew

21   and USAPTI because I haven't heard from Mr. Froelich yet, but I

22   think I have enough information on the issue of knowledge and

23   intent by Mr. Liew and USAPTI to resolve the issue on the

24   papers.  I don't need to hear further argument on that.  I have

25   the exhibits that both sides -- and the testimony that both

**PROCEEDINGS**

```
 1   sides rely on, but I'd like to hear now from Mr. Froelich on
 2   Mr. Maegerle's position.
 3            MR. FROELICH:  Yes, Your Honor.
 4        Your Honor, there is overwhelming amount of evidence in
 5   the record noncontradicted that Mr. Maegerle believed that what
 6   he produced had been revealed.  There's dozens of emails.
 7        But I want to go -- what I really want to concentrate on,
 8   Your Honor -- and you're almost going to think I'm arguing for
 9   Mr. Liew, but I'm not; I'm arguing for my client -- is the
10   conspiracy counts.  Because what you have to say, there was an
11   agreement to violate the law, basically.
12        And if you look at all the evidence, there's no evidence
13   that Mr. Liew and Mr. Maegerle agreed or conspired to violate
14   the law.  In fact, the evidence is to the opposite.
15        The evidence is that Mr. Maegerle consistently told
16   Mr. Liew that he believed that the information that he had and
17   provided was proper; and that he believed that he was only
18   bound by a five-year statute -- five-year agreement, the same
19   as the consultants, the outside contractors that DuPont hired.
20        That he also believed that because the Ashtabula was the
21   basis of all of DuPont's technology, TiO2 technology, and that
22   was sold and then allowed, and that Sherwin-Williams then had
23   the ability to do what it want with it and did what it want
24   with it; that it had sold it to SCM, and then SCM had spun it
25   off to some other company, and then it became Millennium, and
```

1    then it spun it off to Cristal.  And, so, that it had been

2    spread.

3         And those are consistent throughout the emails.  There

4    is -- for example, Agent Ho put in -- was put in Exhibit 1008

5    where Mr. Liew is repeating what he had heard from not only

6    Mr. -- my client, Mr. Maegerle, but what he heard from McIntosh

7    and what he heard from Spitler, that there was five years and

8    that they were permitted to do it.

9         So the essence of a conspiracy is an agreement that both

10   people have to believe violate the law.  I think that the

11   evidence is overwhelming what my client's belief was, and

12   there's nothing to the contrary that he was doing it with a

13   wink and a nod.

14        But, more importantly, in a conspiracy, if he's not

15   conspiring with Mr. Liew, he's not guilty.  And, so, he's

16   consistently telling Mr. Liew, "What I'm giving you is legal,"

17   and what it is.  And that, therefore, Your Honor, as far as the

18   conspiracy, the conspiracy fails.  My client is not guilty

19   because he didn't agree with Mr. Liew.

20        And whether they have a conspiracy with Mr. Liew doing

21   things with other people, Mr. Spitler or other -- or other

22   individuals, they do not have the conspiracy with my client.

23        And, so, that's my argument on that.  If you have any

24   questions, Your Honor --

25            THE COURT:  No.  Go ahead.

PROCEEDINGS

1          **MR. FROELICH:**  As to the obstruction of justice, as to

2     the counts dealing with the theft of trade secrets, one of the

3     things I do think, there is a problem here in the trade secret;

4     and we've made the objection as to, you know, it's overly

5     broad.

6          It's like what has come in is if I had -- I'm Ford and I

7     build a -- and I build a car; and I have a V8 in it, and I

8     happen to have a supercharger that changes it from everybody

9     else, and they say it contains everything.  And my client gives

10    them everything -- my client's an engineer for Ford, and my

11    client gives them everything but the supercharger.  He hasn't

12    sold or hasn't gotten rid of a trade secret because everybody

13    can take a V8 apart.

14         And, also, when Ford sells that automobile and sells it

15    with the V8 in it and the supercharger in it, then if I buy the

16    automobile, I have a right to break it down and find out

17    exactly what Ford did.

18         So those are my arguments as to the conspiracy and as to

19    trade secrets.  I believe that the evidence is clear.  There

20    must be 15 -- and I gave you 1008, but there must be -- for

21    example, Your Honor, this flowing over into the obstruction of

22    justice charge, which I think is totally unsupported because

23    they lock that in with the Answer that was filed; and the

24    Answer that was filed in this case, all they do is -- excuse

25    me, Your Honor, it's 626 I believe it is -- all they do is deny

**PROCEEDINGS**

1    the -- what they say is they deny that they have proprietary --

2    they improperly got proprietary information.

3        So the evidence is that my client believed what he was

4    doing, and also that he consistently told Mr. Liew that, "I

5    believe I have the authority to do this.  Not only do I believe

6    I have the authority to do this, but that DuPont has given me

7    permission to do it."

8        And there's a letter in evidence, which the Government put

9    in evidence, of Mr. Liew writing to Mr. Dakin and saying, "This

10   is what I'm going to do."  And the evidence is that

11   Mr. Dakin -- the evidence which is undisputed in the record is

12   that Mr. Dakin responded and said that, "We're not going to put

13   it in writing, but you have permission."  And that is in --

14   that is in several documents, including the 1008.

15       And, so, that's what's -- that's the issue -- that's

16   what's in the record.  There is nothing in this record that

17   disputes my client's statements that are throughout the record

18   that he got permission from DuPont.

19       And, so, there's no one that came in and said my client

20   never got permission, and that Mr. Dakin didn't give him

21   permission and the Legal Department.

22       And the document itself, the very document that the

23   Government got in and put into evidence says -- my client

24   writes to him and he says, "In the various emails that I wrote

25   to DuPont, I got permission.  They didn't put it in writing,

PROCEEDINGS

1   but they gave me permission."

2        And, again, as to the obstruction, falling into the

3   obstruction of justice, they rely, I believe, on 690 -- and I

4   don't want to speak too much for the Government, I no longer do

5   that -- but 690, 678, 679, 680.  Those are -- there's a series

6   there of my client responding in how to answer the Complaint.

7        And he goes through the same thing.  He says, "Ashtabula,

8   five years they sold it, and everything else, and we don't have

9   proprietary information."  And that's what they say in the

10  Answer.  They don't say, "We don't have -- we don't have

11  anything at all."  They say, "We don't have proprietary

12  information."

13            THE COURT:  All right.  Thank you very much.

14            MR. HEMANN:  Just very briefly, Your Honor.

15       The central premise of Mr. Froelich's argument, I believe,

16  is that -- there's evidence that Mr. Maegerle thought he was

17  free to provide any information that he wanted to to Mr. Liew.

18  There's nowhere in this record that there is that information.

19       The evidence is that there's some evidence, and very

20  little, that Mr. Maegerle took the position that after five

21  years, he was free to work for Mr. Liew.  That is undisputed.

22            THE COURT:  But wasn't there also a letter or a note

23  that Mr. Maegerle sent to DuPont saying, "Hey, I'm going to

24  work for this other consultant.  You know, do I have any

25  problem?"  And they said, "As long as you don't disclose..."

1      **MR. HEMANN:**  I'm getting exactly to that point,

2  Your Honor.

3          Yes, he wrote to -- and I'm looking for it right now.  It

4  was a letter that I believe was written in the late '90s or

5  mid-'90s to a company in Georgia called Kimera, in which this

6  is a letter from Mr. Maegerle to DuPont, and it was located in

7  Mr. Maegerle's home.  It was addressed to Mr. Dakin who is, I

8  can proffer to the Court, has passed away, which is why he's

9  not a witness in this case.

10         And the letter asks for permission to -- the letter asks

11  for permission to work for this other company, and the

12  permission is -- there's no word back from DuPont as far as was

13  located in Mr. Maegerle's home or in the files of DuPont.

14         Importantly, Mr. Maegerle in that letter shows his

15  understanding of two things.  Number one, that he had to ask

16  permission to work for this company.

17         Number two, that he understood that he was not permitted

18  to share DuPont confidential information, and that's the point

19  of this case.  He's not charged with working for Mr. Liew.

20  He's charged with providing Mr. Liew with confidential

21  information.  And, so, it's that distinction that I think is

22  the important distinction as the Court resolves this issue of

23  intent.

24         He, of course, can work for Mr. Liew.  He equally, of

25  course, cannot provide confidential information of the type

1    that is in the Basic Data Document, and the evidence is

2    undisputed that he understood that distinction as he was going

3    forward.

4         There's no evidence in the record that Mr. Dakin ever

5    responded to this letter in the affirmative or otherwise.  The

6    only evidence that he responded, or that somebody from DuPont

7    responded, is in Exhibit 701, which is in only for Walter

8    Liew's state of mind; and it suggests that Bob, Mr. Maegerle,

9    has written a letter to DuPont and followed up with a phone

10   call and got a verbal okay.  Bob said DuPont wouldn't put

11   anything in writing on this kind of issue; and it's an okay to

12   work but not an okay to provide information, assuming it

13   happened.

14        I'd also like to say that this "DuPont won't put anything

15   in writing on this kind of issue" is belied by Mr. Maegerle's

16   employment agreement and the practices described by

17   Mr. McLaughlin, the HR witness, which is that the only way

18   DuPont will approve of any of this is in writing.

19   Mr. Maegerle, who is a long-time DuPont employee and worked on

20   information secrecy issues understood this from his work on

21   protecting information.

22        The only way you get permission from DuPont, or any other

23   company, to share their information is to get it in writing.

24   Mr. Maegerle never got anything in writing from DuPont.

25   There's not a stitch of evidence that he did.  There's not a

**PROCEEDINGS**

1    stitch of evidence he ever got any kind of permission or asked

2    for permission to share information with Mr. Liew.

3        So I think that that's a -- the Ashtabula issues, I think,

4    as the Court has previously observed, there's argument on both

5    sides of that, but that's really a jury argument.

6        And, finally, as to Mr. Maegerle's state of mind, I think

7    one of the more important pieces of evidence is in

8    Mr. Maegerle's response to the civil Complaint when he was

9    corresponding with Mr. Liew.  And in that civil Complaint -- in

10   that response, which is Exhibit 682, Mr. Maegerle says, "Please

11   call me your Ashtabula consultant."  And this is on the heels

12   of all of these communications regarding the Kuan Yin Basic

13   Data Document.

14       And that really shows that both -- certainly that

15   Mr. Maegerle is concerned about being thought of as a Kuan Yin

16   consultant, and it shows his state of mind, his guilty state of

17   mind, with regard to Kuan Yin.

18       Just for the Court's reference, the letter to Mr. Dakin

19   that was located in Mr. Maegerle's files is Exhibit 54.

20           **THE COURT:**  All right.  Yes?

21           **MR. FROELICH:**  Your Honor, first of all, that letter

22   is about Kimera, and it's totally different.  But what I'm

23   saying is:  One, it is a letter that shows that there was a

24   writing.

25       But, importantly, there's the five years is mentioned in

**PROCEEDINGS**

1    that, and it's coming up to five years.  So that's part of his

2    understanding.  He even says, "I can't believe it's not five

3    years," basically in the letter.  So that supports him.

4        But there's numerous documents.  They cited 710.  I quoted

5    1008.  It says, "Maegerle" -- and they're talking now, this is

6    about -- this is about Jinzhou, and he's talking and he says,

7    "Maegerle checked with DuPont, wrote a letter, followed up with

8    a telephone call, and got a verbal okay."

9        What -- there's nothing that -- there's nothing that

10   contradicts that in this record.  That is -- it's said two or

11   three times, and there's no --

12           THE COURT:  Verbal okay to do what?

13           MR. FROELICH:  To consult on Jinzhou.  That's what --

14           THE COURT:  Well, to consult.  So does that mean --

15   sure, using your theory, he can consult using his skills that

16   he has and he remembers, he can consult on nontrade secret

17   matters; but that's like "consult" meaning, "Go to work for

18   them.  That's fine."

19           MR. FROELICH:  That's fine.  But what I'm saying to

20   Your Honor is, that shows a lack of conspiracy, what he's

21   telling people.  That's my point.  Do you understand what I'm

22   saying?

23           THE COURT:  I understand the point.

24           MR. FROELICH:  My point is, it's a lack of a

25   conspiracy.  It's a lack of an agreement.  That's what's

1    consistently told.  I believe it also goes to his belief.

2        The other thing we have is they say through this letter,

3    "Call me Ashtabula."  How is that an obstruction of justice?

4    If you read everything he says, "Identify me as an expert."

5    That's what he's saying.  That's what he tells them in response

6    to when Liew sends him the Complaint.  He says, "Identify me as

7    an expert.  Identify me as an Ashtabula expert."

8        And he goes through, "Because I'm going to tell them that

9    Ashtabula was sold."  And that's what -- and that's what's put

10   in the Complaint.  Ashtabula was sold and -- I mean, in the

11   Answer.  It's Ashtabula was sold and, therefore, DuPont gave up

12   all its TiO2 secrets.

13       **THE COURT:**  All right.

14       **MR. FROELICH:**  That's consistent what he says.  How is

15   that an obstruction of justice?  There is nothing in this that

16   says, "We didn't get anything from Kuan Yin or the Basic Data

17   Book."  It says, "We did not get any proprietary information,"

18   and that's consistent with what he believed.

19       **THE COURT:**  All right.  I want to take a short break,

20   and then I'll hear -- I may have some additional questions.

21              (Recess taken at 9:02 a.m.)

22              (Proceedings resumed at 9:04 a.m.)

23       (Proceedings were heard out of the presence of the jury:)

24       **THE COURT:**  I was going through my notes.  That's why

25   I took a break because I didn't want to be rude when you were

1   arguing and look at my notes, but I did have a question for

2   either Ms. Lovett or Mr. Gasner about the obstruction charge as

3   it relates to the whole safety-deposit box issue.

4          **MS. LOVETT:**  Uh-huh.

5          **THE COURT:**  And, so, this is not -- the Government, to

6   some extent, you know, backed off on arguing proceeding, in

7   their brief at least, and talked about a law enforcement agent

8   or a judge; but my question, based upon the record as I

9   understand it, the search took place in July.  The civil suit

10  was filed in around April.

11         **MS. LOVETT:**  That's correct.

12         **THE COURT:**  So the defendants argue that there was no

13  proceeding because there was only a criminal investigation; but

14  at the time of the house search, the civil case was on file.

15  So why can't the jury find that Mr. Liew, together with

16  Mrs. Liew, were attempting to obstruct the civil case?  Because

17  the evidence in the safety-deposit box, some of it from the --

18  now we'll talk about from DuPont's perspective and maybe the

19  Court's perspective, would have been relevant to the civil

20  proceeding.

21         **MS. LOVETT:**  Your Honor, I don't think there's any

22  evidence in the record that Mr. Liew or Mrs. Liew acted with

23  intent to obstruct the civil proceeding with respect to the

24  safety-deposit box.  The evidence, as it came out at the start

25  of trial, indicated that Mr. Liew made statements during the

1  search and after the search.  Mrs. Liew took actions.  That's

2  directly related to the FBI search, and any conduct related to

3  that FBI search just doesn't bear any relation to the civil

4  suit.

5          THE COURT:  All right.  Do you want to say anything in

6  response?

7          MR. HEMANN:  Your Honor, I don't.

8          THE COURT:  Are you adopting that argument or are you

9  not adopting the argument?

10          MR. HEMANN:  I am not doing either yet, Your Honor.  I

11  want to think about it a little bit more.  We did not --

12  candidly, we weren't thinking about that.  I was just looking

13  over Mr. Axelrod's shoulder at the language of the statute, and

14  it might fit.

15      We didn't address it.  It was getting a little closer to

16  1:30 than I had liked it last night when we got to the end of

17  the brief.

18      But I think that on the official-proceeding prong, what

19  the statute says is, "Intended to impair the availability of

20  records or documents for use in an official proceeding."

21      I think it's fair to say that when you've got a dozen or

22  so FBI agents standing in your, house searching your house for

23  evidence related to trade secrets as to which there's a pending

24  civil proceeding, it is reasonably foreseeable that in the

25  future, there will be a criminal proceeding.  That's what

1    happens after FBI agents conduct searches.

2           **THE COURT:**  But doesn't that fly in the face of the

3    *Andersen* decision about the existence of a criminal

4    investigation?

5           **MR. HEMANN:**  I think that it's different with the

6    *Andersen* decision because when the Andersen conduct took place,

7    the shredding took place before Andersen -- before there was,

8    in fact, a criminal investigation at all.

9           What happened was, through Enron's internal investigation,

10   Andersen had learned that there was the possibility of a

11   problem, and set about to shred before a criminal investigation

12   began; and the argument was:  Well, when there's not even an

13   investigation, the foreseeability of a criminal case is a

14   bridge too far, although the courts said with regard to that,

15   that there still are circumstances under which -- even before a

16   criminal investigation begins, that a criminal case is

17   reasonably foreseeable.

18          Here we're one step closer to that where you've got FBI

19   agents searching a house for records related to an allegation

20   that the defendants knew about of trade secret theft.  I think

21   it was reasonably foreseeable from the Liews' perspective,

22   particularly given their conduct, that the evidence in the

23   safe-deposit box could be used in a future criminal proceeding.

24          So I think it meets that.  We focused on the earlier one

25   primarily because of the late hour.

1    **THE COURT:**  Do you want to say anything further on

2    that point, Mrs. Lovett?

3    **MS. LOVETT:**  Your Honor, I think it's just important

4    to note that the normal way of getting evidence for a civil

5    proceeding isn't through FBI agent seizure, so I don't think

6    the civil proceeding is linked here.

7    In terms of a future criminal proceeding, the cases like

8    *Arthur Andersen* and, forgive my pronunciation, but the *Ermoian*

9    case that we cite, deal with the fact that when you're at the

10   stage of an FBI investigation, you're quite far out from

11   actually being arrested and prosecuted; and we believe that at

12   that point, that was not foreseeable.

13   **THE COURT:**  All right.  I'll read that case.

14   All right.  I've exhausted my questions.  I'm not going to

15   allow closing argument.  If there's a point of order that

16   somebody has that directly relates to what we've been

17   discussing, I'll hear it; but I want to get to the *Daubert*

18   issue.

19   Go ahead.

20   **MR. GASNER:**  Thank you, Your Honor.

21   I just want to supplement our Rule 29 motion with respect

22   to the bankruptcy charges.  I know it was the last day of

23   testimony.  Ms. Lovett was back at the office writing the

24   brief.  She did address the executory contract.

25   **THE COURT:**  You didn't have a cast of thousands back

PROCEEDINGS

```
1    there?

2              MR. GASNER:  Cast of one.  A very capable one.

3         THE COURT:  Just as good it appears.

4              MR. GASNER:  Yes.  Ms. Lovett is worth a thousand.

5         THE COURT:  Yes.  Yes.

6              MR. GASNER:  But with respect to -- as the Court

7    knows, the evidence was, basically, the form that was submitted

8    as part of the bankruptcy, and then what was said at the

9    hearing.  That was really the thrust of the evidence.

10        And if the Court looks at Count 21, it talks about many

11   other things that we think there's just a failure of proof

12   because it was kind of the stub end of the case.

13        And, for example, in Count 21, sub (b), the focus is

14   question 10, which requested that the debtor list all other

15   property other than property transferred in the ordinary course

16   of business or financial affairs of the debtor, et cetera.  And

17   then Mr. Liew checked "None" in response to that.  There was no

18   evidence that that isn't true.

19        Secondly, the next question, 11, it basically faults

20   Mr. Liew for failing to disclose the existence of letters of

21   guarantee; and there was no evidence, I believe, that he

22   thought that that wasn't the case.

23        The evidence really showed that a form was submitted that

24   could have had precheckmarks on it, and the Indictment is very

25   specific as to certain things.
```

1        **THE COURT:**  All right.  Well, I'll look at those

2   paragraphs.

3        **MR. GASNER:**  Okay.  Thank you, Your Honor.

4        And then the same issue we'd like to go on as to Count 22

5   where there are a variety of assertions that were asked on the

6   record that I believe on their face the evidence is equally

7   consistent with those statements and answers being true.

8        And, so, we believe that there's been a failure of proof

9   on those specific questions.

10       So, for example, in Count 22, item (b), the Indictment

11  alleges:  (reading)

12           "In response to the question from the presiding

13       trustee, 'How long had Performance Group, Inc., been

14       closed down,' Liew responded, 'Since the beginning of

15       November 2008.'"

16       Well, there's no evidence at all about, you know, what

17  "closed down" means or when exactly it closed down or why that

18  would be untrue.  So I think if the Court takes a careful look

19  at the Indictment and the questions and answers and compares it

20  to the fairly cursory proof that was presented, you know,

21  yesterday, that the Court will find there's been a failure of

22  proof on several of these specifics.

23       **THE COURT:**  All right.  Anything you want to say on

24  that?

25       **MR. AXELROD:**  Well, Your Honor, I actually think that

**PROCEEDINGS**

1    Mr. Gasner's reading the fulsome record relating to the

2    activities of the business.  For example, this notion that it

3    was true that the business was closed down since the beginning

4    of November, the Court may recall the testimony of Mr. Amerine

5    who was working there that December and got a call that he was

6    being let go, you know, right around the holidays.  The

7    business was operating.  There's lots of evidence to show that

8    Performance Group and the contracts of Performance Group --

9         **THE COURT:**  I don't really need to hear that.  I'm

10   familiar with it.

11        **MR. AXELROD:**  Understood.

12        **THE COURT:**  The matter is submitted.

13        Let's talk about any *Daubert* issues.  Have you all --

14   Ms. Agnolucci, have you been talking to the Government about,

15   possibly, how to crystallize the issue here?

16        **MS. AGNOLUCCI:**  Well, Your Honor, there have been some

17   developments on our end since we all last spoke about it.

18        **THE COURT:**  Yes.  Yes.

19        **MS. AGNOLUCCI:**  And we've continued to persevere in

20   trying to obtain additional evidence that would satisfy

21   Your Honor as to the partnership agreement that we have offered

22   and that we think both should be admitted and that Mr. Klein

23   should be entitled to rely on under Rule 703.

24        So I'd like to make an offer of proof --

25        **THE COURT:**  Go ahead.

PROCEEDINGS

1           **MS. AGNOLUCCI:**  -- as to what has developed since we

2    last spoke.

3           We arranged for a conference call last night and the

4    participants in that call were Mr. Klein and ourselves; and

5    Mr. Ning Qiao, the signatory to the joint venture agreement.

6    Walter and Christina Liew were also present at the time of the

7    call.

8           We called the telephone number of Mr. Qiao's home that was

9    on documents that were produced to us in discovery in this

10   case, and Christina Liew identified his voice on the telephone.

11   And we arranged a conversation so that Mr. Klein could gather

12   additional information regarding the agreement, all of which we

13   think he is entitled to rely on under Rule 703.  And to make

14   the offer of proof to Your Honor, I'd like to talk about what

15   was said during that conversation.

16          First of all, Mr. Ning identified his handwriting on

17   Exhibit 3497.  All of us had copies of Exhibit 3497 with the

18   exhibit tag on it in front of us.  We faxed it to him prior to

19   the call just to make sure that we were all looking at the

20   document with the same exhibit tag.

21          And --

22          **THE COURT:**  Where was Mr. Ning located?

23          **MS. AGNOLUCCI:**  In Shengyang, China.

24          **THE COURT:**  Okay.

25          **MS. AGNOLUCCI:**  We went through the exhibit page by

1    page.  The first page he identified as the cover page to the

2    exhibit, and confirmed that it was his handwriting on that

3    cover page.

4        The second page he confirmed was a declaration that was

5    signed by him in his attorney's office on the date indicated on

6    the document.

7        He stated that the law license on the third page was a

8    copy of his attorney's law license, and that that was in fact

9    the individual who represented him.

10       And he stated that the fourth page is a true and correct

11   copy of a contract that he signed with Walter Liew in August of

12   2004.

13       He said that Party A to the contract was investment

14   partners represented by him.  He was the main investor and then

15   there were other partners that were Party A to the contract.

16   And Party B to the contract was Walter Liew.

17       And he confirmed that this contract was signed in 2004,

18   and that it related to the 30K titanium dioxide project at

19   Jinzhou.

20       He confirmed that he and his investment group under the

21   contract would get 60 percent of the contract proceeds, and

22   that Party B would get 40 percent.  And he said that the spirit

23   of the contract was as friends and collaborators; and that they

24   understood that Mr. Liew's company was small, and that

25   shortcomings may have to be eaten, and that the money would

**PROCEEDINGS**

1   even itself out in the end, but the expectation was that that

2   would be at least initially the division of that contract.

3       He then stated that when later, around 2009, Mr. Liew

4   obtained the 100K Pangang contract, he went to look for

5   additional investors.  "He" being Ning Qiao.  He felt,

6   Ning Qiao again, felt that it had a lot of potential, and he

7   established additional companies for the purpose of sharing the

8   profits of that project.

9       The understanding was that Mr. Liew and Ning Qiao and the

10  group of investors would work out the details of the proceeds

11  of the 100K contract later; but that there definitely was an

12  agreement to share the profits of that contract, and for those

13  profits to be sent to companies set up by Mr. Ning Qiao and his

14  investors.  And that the arrangement was similar with the 100K

15  project to the 30K project arrangement.

16      And, again, Party B was Walter Liew as president of

17  Performance Group.

18      Mr. Qiao stated that he was the main investor but there

19  were other investors, including family members; and that --

20          **THE COURT:**  Whose family members?

21      **MS. AGNOLUCCI:**  Including his family members.

22  Mr. Qiao's family members.

23          **THE COURT:**  Okay.

24      **MS. AGNOLUCCI:**  And, again, that those companies were

25  intended to share the proceeds of those contracts.

**PROCEEDINGS**

1      After speaking with Mr. Qiao, we had a separate

2  conversation with Mr. Klein who said that he felt comfortable

3  with the information that he had received, that he felt that it

4  was the type of information that an expert, such as himself,

5  would rely on in opining on a partnership and a partnership

6  agreement.

7      And we believe, Your Honor, that under Rule 703, this

8  information that we have received absolutely passes muster.

9  You know, although we haven't briefed the issue, I believe

10  there are cases out there that say that experts can rely on

11  statements.  And certainly in the context of a partnership

12  where an agreement between and/or among partners can be oral as

13  well, it's absolutely commonplace for an expert such as

14  Mr. Klein to rely on oral statements.

15      Finally, I would say that Mr. Qiao stated that his lawyer

16  had advised him at the time that he signed the declaration on

17  page 2 of that exhibit, that that was all he had to do to

18  comply with Chinese law; and that he understood that signing

19  that declaration was sufficient to authenticate his agreement.

20  He declined, however, to participate in a deposition.

21          **THE COURT:**  All right.

22          **MR. HEMANN:**  Just preliminarily, Your Honor, I wonder

23  if the Court would inquire as to what language this

24  conversation took place in.

25          **THE COURT:**  Oh, yes.

1          **MS. AGNOLUCCI:**  Yes, Your Honor.  We had a certified

2    interpreter on the line with us.  Mr. Qiao spoke in Chinese,

3    and we spoke in English.

4          **THE COURT:**  All right.

5          **MR. HEMANN:**  I think it would be hard to contemplate a

6    circumstance under which this was less reliable.  Mr. and

7    Mrs. Liew were present during the conversation.  The

8    conversation took place in Chinese.

9          This goes to Mr. Qiao Ning's subjective interpretation of

10   a contract that is entirely vague on its face.  There is

11   information that Ms. Agnolucci is relying on that goes well

12   beyond even the written contract and goes to these sort of

13   vague understandings that may or may not have existed between

14   individuals.

15         I think one thing that's very important is just to tie it

16   back to what we're looking at here.  We're talking about an

17   analysis of the gross receipts of a company, Mr. Liew's

18   company.  Nothing Mr. Ning said suggested that he would be

19   doing any work, that he would be earning the money, that he

20   would be receiving the money.  All of the work that took place

21   took place in the United States.

22         This is an investment apparently.  It appears to be merely

23   an investment by Mr. Ning, if true.  At best, it's an

24   investment by Mr. Ning in Mr. Liew's company.

25         That has nothing to do whatsoever with the receipt of

**PROCEEDINGS**

1    money by Mr. Liew's company for things that Mr. Liew did.

2    Whether earned properly or earned illegitimately, the money was

3    taken in by Mr. Liew.  It was not taken in by Mr. Ning.

4    There's not a stitch of evidence, nor did Mr. Ning say, that he

5    was doing any work in order to earn the money.  The money

6    wasn't sent to him.  None of the contracts with Panzhihua or

7    Jinzhou mention, acknowledge, contemplate, hypothesize Mr. Ning

8    or his investment partnership.

9        The money split, it was entirely unrelated to the evidence

10   before the Court on how Mr. Liew handled the money.

11       So both as to the substance and its utter lack of relation

12   to the allegations in the Indictment, and as to the

13   unreliability of these statements, both under the circumstance

14   in which they were tied -- the circumstances under which they

15   were obtained, and their lack of relation to the charges, this

16   is not something that should be mentioned.

17       It's also not the kind of information that either a lawyer

18   or a businessperson, which is what Mr. Klein appears to be --

19   or I don't know whether he's being offered as a professor --

20   but the testimony goes to some very practical issues about law

21   and accounting.

22       Lawyers and accountants never, ever would rely on this

23   kind of information to make a decision about gross receipts.

24   It is so far afield from what a tax lawyer or an accountant

25   would rely on that it's not worth talking about.

1          **MS. AGNOLUCCI:**  May I respond briefly, Your Honor --

2          **THE COURT:**  Please.

3          **MS. AGNOLUCCI:**  -- just to add to the additional

4    details of the offer of proof.

5          The document itself says the early stage expenses of the

6    project are high; and that after the project is secured,

7    Party B would first pay back those early-stage expenses.

8          And Mr. Qiao confirmed with us on the telephone that he,

9    indeed, made various efforts to secure the project in China;

10   and that those efforts cost him a lot, and that that's what

11   this provision of the contract was about.

12         You know, as to whether this information is reliable and

13   as for whether this information is the type of information that

14   Mr. Klein should rely on, I think that Mr. Klein should be the

15   one who, you know, sort of makes that statement to the Court.

16         And, so, what we'd like to offer is for him to be

17   voir dired by the Court at some point early next week, either

18   Monday, he said he could appear by videoconference, or Tuesday

19   morning in person.  And after speaking with him, and he's a

20   professor at the UCLA Business School and also an attorney, and

21   I think his expert statement makes very clear what his opinions

22   are in case there's any doubt; but he would then be in the

23   position to inform the Court about whether this is the type of

24   information that somebody in his field would rely on.

25         **THE COURT:**  All right.  I'm going to need to take this

 1   under advisement, obviously, and check the authorities on what

 2   is proper for an expert to rely on.

 3       I will only observe that there's absolutely no dispute

 4   that this information -- a couple of things.  Number one, just

 5   even assuming hypothetically that the Court would allow

 6   Mr. Klein, the expert, to testify as an expert, Rule 702 would

 7   not mandate the substance anyway.  He would simply say, "One of

 8   the things I took into account was X conversation I had on the

 9   phone"; but the Court has the discretion to exclude the

10   substance of it.  And, in fact, that's the better,

11   jurisprudentially, the better thing to do.

12       But putting that aside, this is clearly based upon -- just

13   sort of structurally looking at this, he is relying on hearsay.

14   It's hearsay because it's an out-of-court statement

15   quintessentially offered for the truth of the matter, so it's

16   hearsay.

17       And then the question is, the Court has to make a

18   determination under 702/703 whether, as a matter of law, this

19   information is something that an expert appropriately relies

20   on, which may be more of an objective standard than what some

21   expert says is the case.

22       The Court has to be -- we're talking -- we're in *Daubert*

23   land now.  We're talking about gatekeeper function here and,

24   so, the Court is not bound by what the expert says.  I'm just

25   thinking out loud with you.

1     But I want to know, are there any other -- was this the

2   only -- not that this is a small issue, but any other *Daubert*

3   issues that we need to resolve before -- and I will resolve

4   this one today, but I need to think about it and consult some

5   authorities.  But are there any other *Daubert* issues?  I mean,

6   any -- I should ask the Government really.

7          **MR. HEMANN:**  So, Your Honor, yeah.  I mean, it's a

8   related issue.  I think both Mr. Klein and Mr. Cox throughout

9   their written disclosures refer to these kind of -- some

10  hypothetical agreements or agreements that might exist.  The

11  joint venture is one of them.

12    They both talk about, you know, money received in a

13  representative capacity, a party acting on behalf of another

14  party, directing or controlling funds on behalf of other

15  people.  That all -- the concrete example of that is this joint

16  venture agreement.

17    The reality is that there simply is no evidence of any

18  third-party agreements other than the argument that

19  Ms. Agnolucci's making about the joint venture.

20    So both Professor Klein and Mr. Cox, as part of their

21  opinions, are going to say, "Well, if there was some other

22  arrangement that I don't know about, then I would have this

23  opinion."  That, under Rule 702, that's exactly what Rule 702

24  says is inadmissible because it is an opinion not based on

25  sufficient facts or data, and that's Rule 702(b).

PROCEEDINGS

 1          And as the Court knows, coming in with an expert opinion

 2     that is based on nothing other than a hypothetical situation is

 3     not a proper expert opinion.  And, so, I understand that

 4     Mr. Cox would come in and talk about the QuickBooks

 5     reconciliation that flows from Mr. Guan's work.  I think that's

 6     an appropriate topic.  I don't know that it's -- I don't know

 7     that I believe that it's relevant.  I don't know that it's so

 8     irrelevant that it shouldn't be admitted if the defendants want

 9     to, but that's appropriate.

10          He can talk about his understanding of how the money came

11     into Mega Bank and was split, some of it going into the

12     accounts of USAPTI and some of it going somewhere.

13          But once you get to the somewhere, Mr. Cox doesn't know

14     anything, and he certainly doesn't know anything about any sort

15     of agreements that existed with regard to where the money was

16     going.

17          Mr. Klein's entire opinion is based on the idea that

18     there's these other agreements with other parties that affect

19     the nature of the receipts.  That's all entirely hypothetical.

20     It is not supported by any facts or data.

21          And I'd add for the Court that these are -- this is over

22     $20 million, and there is not a single record in the

23     United States of any sort of contract or agreement, any sort of

24     accounting.  There's not a journal.  There's not journal

25     entries.  There's not data.  There's nothing that shows any

**PROCEEDINGS**

1   evidence of these agreements other than this late-received

2   contract from Qiao Ning from 2004.

3       So to have two experts, let alone one, come in and say --

4   one expert, let alone two, come in and say, "Well, I think

5   there might be some other agreement.  This looks like there

6   might be some other agreement," that's highly prejudicial and

7   it's just sort of the -- and I'm not meaning to be pejorative

8   here, but it's kind of the junk opinion that *Daubert* and that

9   line of cases was designed to address where you cloak somebody

10  as an expert.  You bring them in.  The jury is going to think,

11  "Well, this guy's pretty smart.  He must know something or he

12  wouldn't be getting up and saying this," but they don't know

13  anything.

14      **THE COURT:**  All right.  I understand your argument.

15  Do you want to respond to that briefly?  Because I do have

16  another matter.

17      **MS. AGNOLUCCI:**  Yes, Your Honor.

18      I would just say there's ample evidence in the record that

19  corroborates the agreement and the conversation that Mr. Klein

20  had with Ning Qiao, most notably the fact that that is how the

21  money ended up being distributed.

22      **THE COURT:**  Well, no, we have to separate out, because

23  it's a separate issue, the conversation that you had last

24  night.  And the question is:  Is there any other evidence --

25      **MS. AGNOLUCCI:**  Sure.

1    **THE COURT:**  -- that would allow these witnesses to

2  opine on?

3    **MS. AGNOLUCCI:**  And aside from that conversation,

4  there's also the fact of the transfers and how it happened,

5  which is consistent with a joint venture or partnership.

6    **THE COURT:**  Well, if he wants to say, "I looked at

7  these transfers and these," as you call it, what the Defense

8  calls pass-throughs, and on that -- it may very well -- I can

9  infer that there's some sort of a relationship there or there

10  may be, that's one thing.

11    But if he says, you know, there must have been some kind

12  of an agreement pursuant to which this $28 million was, you

13  know, sent around the world, that is junk -- that's not even

14  science, much less junk science.  That's just pulling things

15  out of the air.

16    **MS. AGNOLUCCI:**  What I'm trying to speak to,

17  Your Honor, is the Government's assertion that there's no other

18  evidence of this arrangement.

19    **THE COURT:**  Well, here's what I think we need to do:

20  I think what we need to do is, I need, maybe outside the

21  presence of the jury, to hear -- again, I'm putting aside the

22  conversation last night, that's separate and distinct -- and I

23  would want to hear, this is central enough, unlike the issue

24  with some of the Government's experts -- or not the Government,

25  with Mr. Diemer, for example, about what the basis -- in

PROCEEDINGS

 1    summary form what's his opinions.  I've read the reports.  I

 2    understand what his opinions are.  And what are the bases.

 3         And if he says, "Well, I assumed certain things," I'm

 4    going to want to know chapter and verse, specifically line by

 5    line, where in the record it's supported.  And if it's

 6    conjecture or inference of some sort, it must have been or it

 7    could have been or if it were, then this is the proper tax

 8    treatment, that's not going to come before this jury.

 9         And I do have one question for you, Ms. Agnolucci.  Why

10    wasn't this guy Ning -- is that his name, Ning? -- contacted

11    earlier than last night?

12         MS. AGNOLUCCI:  We attempted to contact him earlier.

13    We were told that he did not -- he was represented by counsel,

14    and that we should talk to his lawyer.  And we made every

15    effort, Your Honor, to contact him.  We were -- we have been

16    trying for two years to contact this individual.

17         THE COURT:  But isn't this fundamentally -- although

18    the Government doesn't have a right to appeal, the Court has to

19    consider, you know, as a neutral judge here, both sides, and

20    isn't this fundamentally unfair to the Government?  They get no

21    chance to cross-examine this guy, no chance to do some

22    background check so that they can possibly attack the

23    credibility of the out-of-court declarant, all the things that

24    they would -- if they had been put on notice of this.

25         And I'm not faulting you, but it's a fact that the

**PROCEEDINGS**

1   Government has no chance to meet this evidence at all.  Isn't

2   that something the Court should consider?

3           **MS. AGNOLUCCI:**  Your Honor, the Government has been on

4   notice that this is our theory of the case for quite some time.

5   They also have Mr. Qiao's phone number.  It's in the discovery.

6   They certainly were free to call him, do their own

7   investigation.  They have his lawyer's phone number.  You know,

8   so the idea that this is something -- this is a theory that's

9   coming up at the last minute is simply not accurate.

10          Second of all, that's exactly what Rule 703 is for, is --

11   you know, it allows experts to rely on otherwise inadmissible

12   evidence, such as hearsay.

13          **THE COURT:**  All right.  Do you have anything further

14   on that?

15          **MR. HEMANN:**  Very briefly, Your Honor.

16          We're not actually allowed to call Mr. Ning in China.

17   It's against our law and their law for us to do that.

18          **THE COURT:**  Why is that?

19          **MR. HEMANN:**  It violates Chinese sovereign immunity

20   for a representative of the United States, law enforcement in

21   particular, to reach into China without going through the

22   Mutual Legal Assistance Agreement; and, so, we actually are not

23   in a position to do it.

24          We've known about Qiao Ning, his existence, for two years.

25   We found out last November of the existence of this agreement,

**PROCEEDINGS**

1   which does not on its face relate to TiO2, and we found out ten

2   minutes ago about this proffer.  So we're not in a position to

3   meet the evidence.

4        But more to the point, this is the defendant's

5   brother-in-law and Mrs. Liew's brother.  He's not somebody

6   who's available to the Government.  If he can't come in and

7   testify about these assertions, he ought not be able to

8   testify.

9        **THE COURT:**  All right.  I'm going to do some research

10  on this, and I really need to break.  Do you have anything last

11  minute?

12       **MR. GASNER:**  Yes.  This just relates to the scheduling

13  and how it hinges on the Court's ruling.  We'll look forward to

14  the Court's ruling later today.  If it would allow Klein and

15  Cox to testify, then they will probably be our witnesses on

16  Monday.

17       If the Court declines to allow them to testify or Mr. Cox

18  is very limited by virtue of the Court's ruling, we would

19  probably call our technical expert, Mr. Cooper.  We disclosed

20  him yesterday as potential, or possibly even the day before, as

21  a potential Monday witness.  There are a lot of documents that

22  we disclosed.  We need the cross-documents from the Government.

23       And I appreciate the problems, but most of our exhibits

24  were from his report and what he relied upon.  They've had the

25  report for many months now.  I've heard rumor that they are

**PROCEEDINGS**

1    subpoenaing a prior employer of Mr. Cooper, and I do think

2    we're entitled to notice.

3         **THE COURT:**  I understand.

4      Are you going to give them the cross stuff?

5         **MR. HEMANN:**  We will, Your Honor.  We have a practical

6    problem right now, which is that we have -- right now on

7    schedule for Monday are four expert witnesses and other

8    witnesses that have been noticed by the Defense.  We've got to

9    triage a little bit.  I don't want to --

10        **THE COURT:**  Well, here's what I'm going to do:  I'm

11   going to issue an order today on this discrete issue.  I

12   can't -- the Defense is going to have to decide, based upon the

13   Court's ruling, whether it wants to even call these folks.  And

14   if they don't, for example, I'm not saying what I'm going to do

15   if they don't, and, therefore, we're up to the technical

16   expert, at that point the Government needs to disclose,

17   pursuant to the Court's standing order, the cross-examination

18   evidence because that would potentially -- then you'd need to

19   have a conversation.  And it may very well be that the amount

20   of material and the amount of testimony for Cox and Klein are

21   limited.

22        **MR. HEMANN:**  We have disclosed -- the Defense don't

23   like our disclosure as to the cross-evidence, but I have a good

24   faith basis for doing it -- as to Cox and Klein.

25      We have not yet done so for the other experts because we

```
 1    don't know when they'll be testifying.  We've got -- I mean --

 2            THE COURT:  You're going to know that in a few hours.

 3            MR. HEMANN:  Yes, Your Honor, and we'll get right to

 4    it.

 5            THE COURT:  Okay.

 6            MR. HEMANN:  We will.

 7            THE COURT:  Thank you very much, everybody.

 8            MR. FROELICH:  Your Honor, I can do it Monday morning,

 9    but I just have a brief argument on severance and the mistrial,

10    but I can do it Monday morning.

11            THE COURT:  Let's do it Monday morning before the jury

12    comes in.  Thank you.

13            MR. FROELICH:  Yes.  I didn't want the record to think

14    I forgot about it.

15            THE COURT:  My apologies to counsel on the other

16    matter.  I'll be out shortly.

17            MR. HEMANN:  Thank you very much, Your Honor.

18            THE CLERK:  So 7:30 on Monday?

19            THE COURT:  7:30 on Monday, yes.  Thank you very much.

20                    (Proceedings adjourned at 9:39 a.m.)

21                            ---oOo---
```

1

2

3                    **CERTIFICATE OF REPORTER**

4           I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Friday, February 7, 2014

8

9

10

11    _____

12         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25