**Volume 18**

**Pages 3412 - 3609**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

```
UNITED STATES OF AMERICA,        )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )        NO. CR 11-00573 JSW
                                 )
WALTER LIEW; ROBERT MAEGERLE;    )
and USA PERFORMANCE TECHNOLOGY,  )
INC.,                            )
                                 )
          Defendants.            )
_____)
```

San Francisco, California
Monday, February 10, 2014

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES:</u>**
For Plaintiff:

                    MELINDA HAAG
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
          **BY:  PETE AXELROD**
                    **JOHN H. HEMANN**
                    **ASSISTANT UNITED STATES ATTORNEYS**

                    U.S. DEPARTMENT OF JUSTICE
                    600 E Street NW
                    Washington, D.C.  20044
          **BY:  RICHARD S. SCOTT**
                    **ASSISTANT U.S. ATTORNEY**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant Walter Liew and USA Performance Technology, Inc.:
                         KEKER & VAN NEST LLP
 3                       633 Battery Street
                         San Francisco, California  94111
 4                  BY:  STUART L. GASNER
                         SIMONA A. AGNOLUCCI
 5                       KATHERINE M. LOVETT
                         CHRISTINA BLAIS
 6                       ATTORNEYS AT LAW

 7   For Defendant Robert J. Maegerle:
                         MCKENNEY & FROELICH
 8                       1349 West Peachtree Street
                         Two Midtown Plaza - Suite 1250
 9                       Atlanta, Georgia  30309
                    BY:  JEROME J. FROELICH, JR.
10                       ATTORNEY AT LAW

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                       **I N D E X**

2    Monday, February 10, 2014

3    **DEFENDANTS' WITNESSES**                      **PAGE**  **VOL.**

4    **LEWIS, DONALD J.**
     (SWORN)                                        3439   18
5    Direct Examination by Ms. Agnolucci            3440   18
     Cross-Examination by Mr. Hemann                3508   18
6    Redirect Examination by Ms. Agnolucci          3587   18
     Recross-Examination by Mr. Hemann              3592   18
7
     **SANGHI, SUDHA**
8    (SWORN)                                        3593   18
     Direct Examination by Ms. Lovett               3594   18
9
                        **E X H I B I T S**
10
     **TRIAL EXHIBITS**                       **IDEN**  **EVID**  **VOL.**
11
       316                                            3482   18
12
       387                                            3497   18
13
       395                                            3546   18
14
       395T                                           3546   18
15
       960                                            3514   18
16
       1202                                           3483   18
17
       2538                                           3598   18
18
       3025                                           3604   18
19
       3077                                           3605   18
20
       3360                                           3470   18
21
       3504                                           3601   18
22
       3507                                           3602   18
23

24

25

PROCEEDINGS

1   **<u>Monday - February 10, 2014</u>**                                **<u>7:32 a.m.</u>**

2                        **P R O C E E D I N G S**

3                              **---oOo---**

4        (Proceedings were heard out of the presence of the jury:)

5            **THE COURT:**  Good morning.  Please be seated.

6        Call the case.

7            **THE CLERK:**  Calling Case Number CR11-573,

8   United States versus Walter Liew, United States versus Robert

9   Maegerle, and United States versus Performance Technology,

10  USA Performance Technology.

11       Counsel, please state your appearances.

12           **MR. AXELROD:**  Good morning, Your Honor.  Pete Axelrod,

13  John Hemann, and Richard Scott for the United States.

14           **THE COURT:**  Good morning.

15           **MR. GASNER:**  Good morning, Your Honor.  Stuart Gasner,

16  Simona Agnolucci, Katie Lovett for defendants USAPTI and for

17  Mr. Liew, who is present.

18           **THE COURT:**  Good morning.

19           **MR. FROELICH:**  Your Honor, Jerry Froelich with

20  Mr. Liew -- excuse me -- Mr. Maegerle, who's standing present.

21           **THE COURT:**  Good morning.  Good morning, Mr. Maegerle.

22       All right.  So please be seated, everybody.  And just one

23  or two household items here.

24       With respect to the order that the Court issued Friday

25  afternoon regarding the Government's renewed *Daubert* motions

 1   regarding Klein, the Court transposed a couple of numbers; and

 2   the trial exhibit that was the subject of that order should be

 3   3479 and not 3749.  So that should be noted.  I think it's

 4   obvious what the exhibit was, which is the joint venture

 5   agreement, but I transposed the numbers in the course of

 6   finalizing the order.

 7        So the next order of business is, unless the parties have

 8   some other matter, is to hear from Mr. Froelich with respect to

 9   his motions.  He wanted further argument to the Court.

10        So is there anything before that that the Government

11   wishes to bring up?

12        **MR. AXELROD:**  I had a couple issues about the

13   testimony of Mr. Cooper.  That will be later in the day.  You

14   know, we can take it up now, but it was some follow-up on some

15   requests that were made.

16        One of Mr. Cooper's bases for opinion about the fact

17   there's public information about this process was that

18   employees leave various companies and they disclose information

19   when they go to their new employers.  And one of the things

20   that he indicated was that he had received information from a

21   DuPont employee about what that DuPont employee, former DuPont

22   employee, thought he could share after a certain period of

23   time.

24        I asked for the specific identity of that individual and

25   other individuals back in November, and it was not provided.

1    We renewed that request.  I don't know if it was in December or

2    January, but I don't believe it is appropriate for him -- and I

3    believe he's here in court now -- to testify about that sort of

4    anecdote, period.  I mean, I just --

5             **THE COURT:**  Well, first of all, the witness should not

6    be in the courtroom during this argument.  So if he's here, he

7    needs to leave.  Please leave.

8                         (Pause in proceedings.)

9             **THE COURT:**  Thank you, sir.

10            **MR. GASNER:**  And, Your Honor, I trust that as an

11   expert, he is allowed to be here for testimony.

12            **THE COURT:**  He is for testimony, but not -- for

13   argument about him, I don't think it's appropriate.

14            **MR. GASNER:**  Very well.  I wasn't aware this was

15   coming up.

16            **THE COURT:**  Yeah.  Okay.  Well, you wouldn't have

17   known that that's what I prefer because it hasn't come up

18   before.

19       So you want the -- you requested the identity of the

20   individual that he's going to be alluding to?

21            **MR. AXELROD:**  Yeah.  I think that there's really two

22   issues.  One is, you know, what's the basis?  I don't think

23   it's competent testimony for him to give anecdotes about what

24   unidentified people have said.  Even if he discloses them, I'm

25   not sure that -- his expertise is a technical expert in TiO2,

1    not a collector of hearsay statements about, you know, how

2    people behave.

3         But on top of that, we made this request months ago.  It

4    wasn't just for -- it was in particular the DuPont employee,

5    but also any other person, because he mentioned other types of

6    people.  That information was never provided.  At this point we

7    don't have the opportunity to now research whatever names that

8    may be.  And, so, I think that type of testimony should be

9    excluded.

10        THE COURT:  All right.  Mr. Gasner?

11        MR. GASNER:  Just a short answer, Your Honor.  I

12   wasn't planning to elicit individual anecdotes from Mr. Cooper.

13   So we didn't produce the names because we just abandoned that

14   concept.

15        THE COURT:  All right.

16        MR. AXELROD:  Okay.  And along the same lines,

17   Mr. Cooper in his report indicated that, talking about the sale

18   of the Ashtabula plant, that -- which, to my knowledge, he had

19   no involvement in, that he was assured there were scores of

20   buyers who got to come to the plant and look at it.

21        I don't know what the basis of that is.  Now, perhaps

22   they're not planning to elicit that testimony, but that's a

23   different kind of concern because, obviously, the Defense is

24   making the public release of Ashtabula a big part of the

25   defense.  And to my knowledge, this individual has no personal

PROCEEDINGS

1   knowledge of anything surrounding the sale of that plant; so

2   for him to testify that he's assured that lots of people came

3   to look at it seems improper.

4            THE COURT:  All right.  What about it?

5            MR. GASNER:  So there, Your Honor, Mr. Cooper did work

6   at the Ashtabula plant and became very familiar with the

7   circumstances under which it was acquired, and that was part of

8   his job.

9        I don't intend to elicit hearsay about visits to the plant

10  that are outside his personal knowledge, but I do intend to

11  show him the Sherwin-Williams agreement that the Court ruled

12  upon, and I do think that it's part of what he came to know in

13  his year working at that very plant and dealing with issues

14  surrounding that agreement.

15       So I do intend to ask him about the agreement, which will

16  be in front of him, but not hearsay statements about years

17  before the plant had been open and available for inspection.

18           THE COURT:  All right.  Well, I'll take the questions

19  as I find them, but I feel -- I think it's appropriate to alert

20  the Court; and as with any witness, the proper foundation has

21  to be laid, or the Court will sustain an objection.

22           MR. AXELROD:  Understood.  I really just want to front

23  this coming up.

24           THE COURT:  Yes.  All right.

25           MR. AXELROD:  Thank you, Your Honor.

**PROCEEDINGS**

1          THE COURT:  Yes, Ms. Agnolucci?

2          MS. AGNOLUCCI:  Yes.  We have one issue relating to

3    the testimony of Donald Lewis, who's going to be the first

4    witness.

5          Last night the Government produced additional exhibits to

6    be shown to him.  These weren't on the exhibit list or in the

7    Rule 16 disclosure.  In general, we're trying to kind of be

8    courteous to each other and allow these things, but three of

9    these are in Chinese, and I have no idea what they say.  There

10   was no translation produced.  So, you know, I object to these

11   being used because --

12         THE COURT:  Does Mr. Lewis speak Chinese?

13         MS. AGNOLUCCI:  He reads some Mandarin Chinese, but,

14   you know, like Special Agent Ho, you know, people may read some

15   Chinese, but, you know, if you put a 10-page dense document in

16   front of them, I mean, it would take some time for them to

17   figure it out.

18         THE COURT:  All right.

19         MS. AGNOLUCCI:  So, you know, I don't know what these

20   say.

21         THE COURT:  Let's find out from Mr. Hemann what --

22         MR. HEMANN:  A couple of things, Your Honor.  These

23   are documents that were attached to the declaration of

24   Mr. Szamosszegi -- and I will provide the spelling later --

25   back when we were litigating the service issues regarding the

**PROCEEDINGS**

 1   Pangang entities.

 2        Mr. Lewis relied -- reviewed the declaration of

 3   Mr. Szamosszegi and the attachments in connection with

 4   preparing for his testimony.  So he has, in fact, seen these

 5   documents before, number one.

 6        Number two, portions of these very documents were actually

 7   translated by the defendants leading up to the trial.  Not all

 8   of the documents, but portions of some of these documents were

 9   translated.

10        Number three, in his CV, Mr. Lewis describes his Chinese

11   proficiency as advanced.  His reading -- both his oral

12   proficiency in Mandarin Chinese and his reading proficiency in

13   Mandarin Chinese.

14        So I think for all of those reasons, these are appropriate

15   documents to show him.  The documents in question are documents

16   that are reliable.  And, of course, the Court would take them

17   one at a time, documents of the sort that attorneys in China

18   and elsewhere would rely on in the normal course of business.

19   And, of course, Mr. Lewis is testifying as an attorney.

20        If he testifies that he is unable to read them

21   proficiently, I think it's fair for me to cross-examine him on

22   the representation he made in his CV that was provided to the

23   Government in connection with this case.  I think that he will

24   be able to read the very few characters that I would refer him

25   to in the document.

1        **MS. AGNOLUCCI:**  If portions of these were translated,

2   I don't know which ones.  We don't have them matched up and,

3   you know, I can honestly say to the Court that I can't read

4   these.

5        So Mr. Lewis probably can, but the issue that I have right

6   now is I wouldn't even know how to object to this document

7   because I don't know what it says.  I got it last night.

8        **THE COURT:**  All right.  Well, I'll listen to the

9   testimony, and I'll decide based upon the foundation.  If it

10  goes to credibility, you know, I -- the ways to deal with it is

11  that you can call another witness to testify about the document

12  if you feel that the Government is misrepresenting it.

13       But at this point I'm not going to categorically exclude

14  it.

15       All right.  Anything else at this point?

16       **MS. AGNOLUCCI:**  One other issue, Your Honor.  The

17  Government has stamped all of Mr. Lewis' invoices, which

18  contained detailed descriptions of the work that we did with

19  him, as exhibits.  I assume that the Government intends to ask

20  Mr. Lewis about how much he was paid and how many hours he

21  billed to this case.

22       This raises a bit of a tricky issue because a very

23  substantial portion of the work that Mr. Lewis did was in

24  combing through all of the Wikipedia entries that were pasted

25  into Professor Feinerman's report and researching the

**PROCEEDINGS**

1  accuracies and, more importantly, the inaccuracies in those

2  entries in assisting us to prepare for voir dire.

3      So I don't think it's proper.  The Government certainly

4  can inquire about his hourly rate; but if they start getting

5  into how many total hours he worked, a very substantial portion

6  of that time was in responding to Professor Feinerman.  And we

7  feel that we would be entitled to bring that up and bring up

8  the Wikipedia as well.

9      **MR. HEMANN:**  I suggest that the Court make an inquiry

10  of the Defense as to what percentage of time that is, because

11  we may be able to sort it out if the percentage -- depending on

12  what the percentage is.

13      I looked at the bills.  It wouldn't be our intention to

14  actually introduce the bills themselves into evidence, but I

15  think it would be -- I think the total amount that he has been

16  paid is, obviously, a relevant area of cross-examination.  It

17  was about $137,000 to date.

18      **THE COURT:**  What percentage is going through the

19  Wikipedia?

20      **MS. AGNOLUCCI:**  Your Honor, I wouldn't be comfortable

21  representing an exact percentage to you because the way that

22  his invoices are done is that they're monthly.  There's a block

23  description of everything that he did in a month.

24      I can tell you that several pages of his expert report

25  were responding to Professor Feinerman that, certainly in that

**PROCEEDINGS**

1    initial month, he did a lot of work responding to Professor

2    Feinerman.

3         After that, it was -- you know, it was a significant

4    amount of time.  I won't -- I can't give a percentage because I

5    have a feeling it would be --

6         **THE COURT:**  Well, but the point is -- the more

7    important point is that any compensation that a witness

8    receives from one side or the other is fair game.  So I think

9    it's perfectly appropriate for the Government to say that the

10   witness has been paid or expects to be paid, you know, a

11   certain amount of money.

12        I don't think it would be proper for the Government, you

13   know, to go into -- to infer in the cross-examination that it

14   was to prepare his testimony that he's giving in court, because

15   I think that gets very problematical.

16        And I also don't think it's -- I mean, it's certainly --

17   you can bring up on redirect or even the Government can bring

18   up on cross that a significant portion of the money was not

19   related to the testimony that he's giving in court, but to

20   other matters that are not relevant.  And I would allow that.

21        But I'm not going to get into the fact that he did work to

22   rebut an expert, a Government expert, who's not been called.  I

23   think that gets too complicated and confusing for the jury.

24        **MS. AGNOLUCCI:**  Well, Your Honor, I think the jury is

25   entitled to hear that the Government had its own expert that it

**PROCEEDINGS**

 1   paid and that that's why Mr. Lewis had to spend, you know, a

 2   significant number of hours, and we're talking tens of

 3   thousands of dollars.

 4        **THE COURT:**  If we go down that trail, then the

 5   Government's entitled to get from you every penny that you

 6   spent on every expert in this case or any other witness so that

 7   they can bring that out as well.

 8        **MS. AGNOLUCCI:**  We've already given that to them.

 9        **THE COURT:**  Well, I wouldn't allow them to bring it

10   out.  But the point is you can see if we start getting into

11   that situation, that certain experts may have been called or

12   prepared on certain topics and then they weren't called.  It

13   just allows the jury to speculate about that.

14        So I'm -- I don't -- I think the Government's entitled to

15   bring out the total amount paid.  When we get below that to

16   specifics, you know, I'll certainly take each question as I

17   find it; but I think if the Government's going to do that with

18   the implication that, you know, the guy only testifies a few

19   hours and he gets, you know, six figures, I think it would be

20   appropriate to say that a substantial portion of the work did

21   not relate to his direct testimony, but matters are not -- that

22   are unrelated to that.  And I think a jury can handle that.

23        But I'm not going to allow him to go into what it was that

24   he did, and I'm certainly not going to allow him to allude to

25   experts that have not been called by either side.

**PROCEEDINGS**

1      So I'll listen to the testimony, and I may change my mind,

2   but that's my initial thought.

3          **MR. HEMANN:**  Thank you.

4       **THE COURT:**  All right.  Let's hear from Mr. Froelich,

5   and then I'm going to ask counsel for some updated estimates

6   here based upon where we are this morning.

7          **MR. FROELICH:**  Good morning, Your Honor.

8       **THE COURT:**  Good morning.

9          **MR. FROELICH:**  I'll make it short, Your Honor.

10      My objections and motion for mistrial and basically the

11   motion for severance is all based on the same thing.  We're in

12   a situation here where, particularly, the Chinese and China

13   Government -- and I know, Your Honor, there's been instructions

14   as to -- as to particular witnesses that it doesn't relate.

15   But the jury are human beings, and it's very tough for them to

16   segregate evidence out.  And we've heard a lot of evidence and

17   a lot of fighting over the -- and we're going to hear more even

18   in Mr. Liew's case about the Chinese government and the Chinese

19   government involved and this was helping the Chinese

20   government.

21      Second of all, there's been an awful lot of evidence

22   about -- there's been allegations of bankruptcy fraud and also

23   allegations concerning tax fraud, and the numbers are very,

24   very large.  They're $20 million or so.

25      And I think, Your Honor, that, as I've said, the

 1   United States Supreme Court case, it's Kotteakos or Kotteakos,

 2   something along those lines, where the Court refers to "birds

 3   of a feather" prosecutions.  And that's what I'm afraid of,

 4   that that type of evidence, even with instructions, is

 5   overflowing into my client and we'll get a "birds of a feather"

 6   prosecution.

 7        And also, Your Honor, I should add, there's other things

 8   that my client clearly was not involved in, like the Diemer

 9   code and other -- and that, I think, also affects my client.

10             **THE COURT:**  All right.  Mr. Axelrod?

11             **MR. AXELROD:**  Yes, Your Honor.

12        First of all, with respect to the evidence related to the

13   Chinese motivation and Chinese government, that was a part of

14   the case that was presented early on, you know, I think

15   primarily through the testimony of Agent Ho, but it was made

16   clear that that piece of the case did not involve Mr. Maegerle.

17   And I think that -- so I think that that issue is not an issue

18   in reality with respect to Mr. Maegerle.

19        With respect to the financial case -- and, in fact, you

20   know, on the technology front, we actually made several -- we

21   had several specific discussions with the jury about the fact

22   that Dr. Diemer's testimony relating to his Accession Report

23   and this correlation was not directed towards Mr. Maegerle.  So

24   there's a specific advisement in that regard.

25        And I think that, finally, with respect to the tax and

**PROCEEDINGS**

1    bankruptcy charges, it was very clear that all of that evidence

2    related solely to Walter Liew and USAPTI.  There wasn't a -- I

3    don't even think Mr. Maegerle's name was mentioned during the

4    testimony of the revenue agent or the bankruptcy -- Toni

5    Darling, Antonia Darling was our bankruptcy expert.  And I

6    think we've been very clear with the jury about what the

7    financial case is about and who it involves and that it does

8    not involve Mr. Maegerle.

9         So I think that the record does not support the arguments

10   that Mr. Froelich is making.

11            THE COURT:  All right.

12            MR. FROELICH:  Your Honor, I have one other that I

13   forgot.  And I had objected to Mr. Gibney as an expert.

14   Mr. Gibney, I believe, and I think the evidence showed, was a

15   salesman.  And I think he gave a lot of what the Government has

16   objected to as anecdotal evidence, such as, "Well, you know, we

17   had DuPont people come and see us and they wouldn't give us

18   information," those type of things.

19        And I didn't believe it was expert testimony, and I

20   believe that his background really was sales.  And that was the

21   other thing that I had objected to right away.

22            THE COURT:  All right.  Well, the Court got extensive

23   argument, both pretrial and during the trial, about Mr. Gibney.

24   And as I reviewed the testimony, which I did after it was

25   concluded, where there were objections made and appropriate

**PROCEEDINGS**

 1    objections made based upon lack of foundation or lack of

 2    expertise, I sustained several of those objections.

 3        So that part of it is not going to be a basis for a

 4    mistrial.

 5        What I've decided to do, I've been going through these

 6    motions over the weekend, and I'm not through with my work and

 7    my thought process.  So I am going to reserve ruling on all of

 8    the motions until after the verdict comes in -- verdicts come

 9    in in this case because I don't want to -- these are very

10    complicated, some of them.  There's not a whole lot of

11    authority, and there's a lot to cover.

12        So I have decided, which is my -- I have the right to do

13    that under Rule 29 and other code sections.  So I'm going to

14    reserve.  And, so, any ruling that the Court makes will be

15    based upon, even after the verdict comes in, if it's still

16    relevant, the adequacy of the Government's case.  In other

17    words, the defendants are not waiving any of their rights or

18    arguments by virtue of the Court specifically reserving ruling

19    on those motions.

20        So the motions are taken under advisement.

21        I'd like to hear from Mr. Gasner and Ms. Agnolucci about

22    what your current thought process is about scheduling so we can

23    get a sense of what's going to happen this week and following.

24        **MR. GASNER:**  Thank you, Your Honor.

25        The first witness is Mr. Lewis, the China expert, to be

**PROCEEDINGS**

 1  followed by Sudha Sanghi a former USAPTI employee, and then

 2  Paul Cooper, our technical expert.  We'll start and probably

 3  not finish his direct today, I would think.  I think we'll

 4  probably finish him tomorrow depending on the cross and

 5  redirect, but it will take a substantial portion of tomorrow.

 6      And then after that, we -- one issue for the Court.  We

 7  have a lot of documents that we may need to get into evidence,

 8  as to which there are stipulations as to where they were

 9  obtained, but we need a witness on the stand to be admissible

10  and for context for the jury.

11      We had asked long ago and expected to have the case agent

12  or Mr. White available in our case.  But one suggestion from

13  the Prosecution was, why shouldn't the Defense simply call a

14  paralegal to do that job?

15      So we've identified Ms. Hernandez, who has been in court.

16  We would ask for relief from the rule on witnesses for the

17  purposes -- she's been in and out of court throughout the

18  trial -- for the purposes of simply taking the stand,

19  identifying documents, and serving the same function, if you

20  will, as the case agent.

21          THE COURT:  All right.  Do you have any objection to

22  that?

23          MR. HEMANN:  Your Honor, we don't have any objection

24  to Ms. Hernandez in particular and agree that the usual rule

25  with regard to witnesses being in the courtroom should be

1    waived in her case.

2         The bigger concern that we have is there are 180 documents

3    that have been identified by the Defense to come in through

4    Ms. Hernandez.  Some of them have already been admitted into

5    evidence.  We don't think it would be appropriate to have her

6    re-read, essentially, or reintroduce admitted exhibits.

7         We have some significant evidentiary objections beyond

8    authenticity as to these exhibits that we don't think would be

9    cured by either a case agent or by Ms. Hernandez, neither of

10   whom would have firsthand knowledge of the contents of the

11   documents.

12        And, so, I'm a little bit concerned about the arduousness

13   of the process, given the number of documents and, I think, the

14   merit of some of our evidentiary objections.  If there were a

15   smaller number, it is certainly possible that we could get to

16   some agreements or stipulations with regard to the documents;

17   but at 180 -- I think Mr. Scott was up for -- later than he

18   should have been last night reviewing all of these documents

19   and noting some of the objections.  And we can probably work

20   through them pretty quickly, but there are an awful lot.

21        THE COURT:  All right.  So I think that's sort of --

22   it sounds like that's towards the end of the defendants' case.

23        MR. GASNER:  Yes.

24        THE COURT:  So what I would expect the parties to do

25   is continue to talk to each other.  I'm not going to have --

**PROCEEDINGS**

1   allow documents already admitted to come in through a

2   nonpercipient witness just to read them.  You can do that

3   during closing argument.

4        To the extent that there are substantive objections, then

5   we need to work through those in a way that makes it efficient

6   for the Court by the parties agreeing on what they can agree

7   on.  And as to those documents that are objectionable, I'm

8   going to need to have some sort of an offer of proof and

9   response, and then I can look at them in a deliberative fashion

10  and rule on their admissibility.

11       So I appreciate the parties bringing it up, but other than

12  just, you know, giving them to the Court and saying, "We have

13  objections.  We don't think they should be admitted," and the

14  Defense saying, "We should," that's not going to be very

15  helpful to the Court.  So please work out a procedure so I can

16  rule on those efficiently.

17       **MR. GASNER:**  We've made a lot of progress, Your Honor,

18  and as I've told Mr. Hemann and Mr. Axelrod before, we would

19  prefer stipulations as to many of these documents.  It's a

20  tribute to Mr. Hemann's diligence that he's found ones on our

21  list that have already been admitted.  That's really more

22  mistake on our part, but we'll look forward to further

23  progress.

24       After Ms. Hernandez, I'm not sure about exact order, but

25  in terms of other witnesses, Mr. Cox, our expert, still has

 1  some areas of testimony that aren't covered by the Court's

 2  ruling.  Mr. Maegerle may testify.  Mr. Klein, there is a small

 3  piece of the bankruptcy case that he's still expected to

 4  testify to.  And we've got to, then, kind of look at everything

 5  we've got and decide what else we have.

 6      But I think, you know, those are the witnesses on the

 7  radar screen now.  I think we're on track to get done this

 8  week.

 9          **THE COURT:**  Okay.

10          **MR. GASNER:**  And that's where we are.

11          **THE COURT:**  All right.  So the same thing that I said

12  before holds true, which is given -- if you're asked -- if the

13  Defense estimate holds true, I would expect at least to be

14  through all the testimony and evidence this week; and then we

15  could work later in the week with the charging conference,

16  finish the jury instructions, and then with an eye toward

17  starting fresh on Tuesday with jury instructions and closing

18  arguments so the jury will get the case next week.

19          **MR. HEMANN:**  Your Honor, if I may.  So I appreciate

20  how hard this is identifying witnesses to call and when to call

21  them and whether to call them, having been through that process

22  for five weeks with Mr. Axelrod and Mr. Scott.

23      What I just heard Mr. Gasner say, though, is that

24  Mr. Cooper will finish tomorrow.  We have a -- their paralegal

25  with an unknown number of documents who may or may not testify

**PROCEEDINGS**

 1   depending on stipulations.  That testimony could go for five

 2   minutes or four hours, given the number of documents involved.

 3   And then we don't know.

 4        And that puts us -- including we don't know whether

 5   Mr. Maegerle might testify tomorrow.  I mean, that puts us in

 6   really a complicated position in terms of preparation.

 7        Mr. Gasner mentioned two possible experts who might

 8   testify tomorrow, an unknown number of other people, and one of

 9   the defendants.  And it is Monday afternoon -- or it's Monday

10   morning, talking about getting to this on Tuesday upon the

11   completion of Mr. Cooper's testimony.

12        That's contrary -- and, again, I'm not trying to be

13   critical, because I know it's hard.  But that seems to be

14   contrary to the spirit of the Court's order in terms of

15   preparation, and it's also something that -- I mean, these are

16   weighty witnesses.  They're experts of the defendant.  They

17   require a great deal of preparation.  And I would say that at

18   least one of us on the Prosecution team is starting to wear

19   down from age, if nothing else.

20        So I would just request from the Court that the Court

21   require a little bit more particularity, given the closeness of

22   time.

23             **THE COURT:**  All right.  Mr. Gasner, I think Mr. Hemann

24   has a point.

25             **MR. GASNER:**  Fair enough, Your Honor.  We did disclose

**PROCEEDINGS**

1    Mr. Maegerle last Wednesday or Thursday.  I think we're in

2    compliance with the Court's standing order.  We have until

3    4:00 o'clock today to provide another fine-tuning, but I think

4    we -- I've fine-tuned as much as I can.  I think we're in

5    compliance with the Court's order.

6        And I know it's difficult, especially with Mr. Maegerle

7    not knowing whether he's actually going to testify or not, but

8    we disclosed him.  And I think I've done the best we can do.

9    We'll do more at 4:00 o'clock today.

10       And we're not hiding any balls.  We are in compliance with

11   the Court's order, and we will do our best to improve upon that

12   just as a matter of courtesy.

13           **THE COURT:**  All right.

14           **MR. HEMANN:**  Your Honor, I guess I would -- I don't

15   understand who the witnesses -- I do not know who the witnesses

16   are going to be tomorrow.  Mr. Cooper --

17           **THE COURT:**  All right.  Well, I'm ordering the Defense

18   to disclose by 4:00 o'clock today who the witnesses are

19   tomorrow and for the rest of the case and in what order.  And

20   if they don't, I'm going to preclude them.  That's the Court's

21   rule and that's what I'm going to do.

22       So this is not going to be voluntary anymore, it's

23   mandatory.  It's disclosed at 4:00 or the witnesses are

24   excluded or any evidence not disclosed for the rest of the case

25   is going to be excluded.

**PROCEEDINGS**

 1    So make it happen is all I can tell you.

 2    Yes, Mr. Froelich?

 3        **MR. FROELICH:**  Your Honor, I have told Mr. Hemann that

 4   right now we're leaning towards Mr. Maegerle testifying, but he

 5   would be the last witness in the case.  And I've been

 6   disclosing this.

 7        **MR. HEMANN:**  And we agree.  It's just do we prepare

 8   for him tonight or do we prepare for him tomorrow?

 9        **MR. FROELICH:**  He's going to be the last witness, so I

10   can't --

11        **THE COURT:**  Apparently -- apparently from what --

12   Mr. Gasner will finalize his list by 4:00 o'clock in accordance

13   with the Court's order, so you'll have a sense then of the

14   order.  And then you just put Mr. Maegerle, if he does

15   testify -- and he may decide at the last minute not to -- at

16   the end of your preparation.

17        **MR. HEMANN:**  Yes, Your Honor.

18        **THE COURT:**  Because that's the representation, and I

19   won't allow him to testify before the end of the case -- before

20   the end of the case.  I mean, he has a right to testify or not.

21   I have the right to control when he makes that decision, and it

22   sounds like you're okay with that.

23        **MR. FROELICH:**  Your Honor, that's what we've all

24   talked about.  That's always been -- and I've told Mr. Hemann

25   that in emails, that he will be the last witness in the case.

PROCEEDINGS

1          **THE COURT:**  Right.  And I understand that when you get

2     to the end of a case and the Defense is reacting, they're in a

3     reactionary mode, that they -- and I appreciate the Defense has

4     fine-tuned.  But I do think given the complexity and the heft

5     of the testimony, we don't typically have defendants putting on

6     a case of this substance.  So I think there comes a time when

7     you have to fish or cut bait, and that's going to be this

8     afternoon at 4:00.

9          So are we ready for the jury?

10         **MR. HEMANN:**  Can we take a quick restroom break,

11    Your Honor?

12         **THE COURT:**  Oh, sure.  Let's take about five minutes,

13    and then we'll get the jury in.

14         **MR. HEMANN:**  Wonderful.  Thank you, Your Honor.

15                    (Recess taken at 8:03 a.m.)

16               (Proceedings resumed at 8:13 a.m.)

17       (Proceedings were heard out of the presence of the jury:)

18         **THE COURT:**  I just want to remind the parties, please

19    use only the actual exhibits.  Don't use copies when you're

20    questioning witnesses.  It gets very, very confusing.  So if

21    either side has an exhibit, they should give it to the clerk so

22    that the other side can use it with the witness.  I don't want

23    copies being used.

24         I have one other point.  Can you tell at this point,

25    Mr. Hemann, whether the Government will be planning any

 1   rebuttal?

 2       **MR. HEMANN:**  We are thinking about potential rebuttal,

 3   depending on the testimony of Mr. Cooper, and possibly a

 4   rebuttal point with regard to Mr. Maegerle were he to testify.

 5       We don't know yet.  We anticipate that were we to call --

 6   we've got two people in mind, and were we to do it, it would be

 7   short.

 8       **THE COURT:**  Okay.

 9       **MR. HEMANN:**  It would not be, you know, hours and

10   hours and hours.

11       **THE COURT:**  All right.  Because the current plan is,

12   barring testimony spilling over into next week, is to have a

13   charging conference on Friday morning and getting the case

14   ready to go.  So we'll see how events unfold.

15       **MR. HEMANN:**  Yeah.  I would certainly assume, given

16   what Mr. Gasner and Mr. Froelich have had to say, that we would

17   be able to do that on Thursday.

18       **THE COURT:**  Okay.

19       **MR. HEMANN:**  At the latest.

20       **THE COURT:**  All right.  Let's get the jury in.

21     (Proceedings were heard in the presence of the jury:)

22       **THE COURT:**  Please be seated.

23       Good morning, ladies and gentlemen.  I hope you had a

24   pleasant weekend and are ready to start fresh.

25       As you will recall, on Thursday when we broke, the

PROCEEDINGS

1   Government had just rested their case and now we will hear the

2   Defense case.

3        So, Mr. Gasner, you may call your first witness.  Or

4   Ms. Agnolucci.

5            **MS. AGNOLUCCI:**  Defendants Walter Liew and USAPTI call

6   Professor Donald Lewis.

7            **THE COURT:**  Please step forward, Professor.

8            **THE CLERK:**  Raise your right hand, please.

9                        **DONALD J. LEWIS**,

10  called as a witness for the Government, having been duly sworn,

11  testified as follows:

12           **THE WITNESS:**  Yes, I do.

13           **THE CLERK:**  Thank you.  Please be seated and state and

14  spell your full name for the record.

15           **THE WITNESS:**  My full name is Donald J. Lewis,

16  D-O-N-A-L-D, J, initial, L-E-W-I-S.

17           **THE CLERK:**  Thank you.

18           **THE COURT:**  You may proceed.

19           **THE WITNESS:**  May I simply get a glass of water first?

20           **THE COURT:**  Oh, yes.  Any time you want.  You don't

21  have to ask permission.  Go ahead and do so.

22           **THE WITNESS:**  Thanks a lot.

23                   (Pause in proceedings.)

24

25  ///

1                          <u>**DIRECT EXAMINATION**</u>

2    **BY MS. AGNOLUCCI:**

3    **Q.**   Good morning, Professor Lewis.

4    **A.**   Good morning.

5    **Q.**   How are you employed?

6    **A.**   Well, I'm currently engaged in work with the Monterey

7    Institute of International Studies in Monterey, California.

8    We're pursuing on the development and implementation of an

9    economic and trade diplomacy program, which has a strong China

10   element.

11         Previously, I was with Stanford Law School -- with

12   Stanford Law School for some four years, first as a visiting

13   associate professor, then as a lecturer in law and as a

14   research fellow.

15         And prior to that, I was an associate professor of law at

16   the University of Hong Kong, Faculty of Law in Hong Kong,

17   China, for some 23 years.

18         At both Stanford Law School and at University of

19   Hong Kong, I taught Chinese law, as well as international trade

20   and economic law.

21         Prior to being at Hong Kong University, I was a Fulbright

22   law professor for the U.S. Government in China in the early

23   years of opening up in China, 1984 to '86.

24         And prior to that, I was a research fellow working on

25   Chinese law at the East-West Center with the president of the

 1  East-West Center at that time, Victor Hao Li.

 2  **Q.**   Can you please describe more specifically your scholarship

 3  while at University of Hong Kong?

 4  **A.**   Yes.  My period at the University of Hong Kong, the

 5  Faculty of Law, was a very fruitful and productive period.  I

 6  served as the director of Chinese law programs for a time.  I

 7  was also director of our East Asian International Economic Law

 8  and Policy Program, which dealt with issues related to China's

 9  WTO accession, and then larger issues of trade and investment

10  in the East Asian arena.

11      I worked in that capacity closely with the World Trade

12  Organization, the WTO, and acted as the academic coordinator

13  for the World Trade Organization for their Regional Trade

14  Policy Course, the RTPC, for -- which is a training program in

15  the WTO disciplines working with the WTO secretary to Geneva,

16  and this was for government officials for all the governments

17  of Asia Pacific, including the Chinese government.

18  **Q.**   It helps to speak directly closely to the microphone.

19  **A.**   Very good.

20  **Q.**   While you were employed as a professor at Hong Kong

21  University and while you were working at Stanford University,

22  did you do work outside of the academic sphere, and

23  specifically any consulting work?

24  **A.**   Yes.  I have considerable experience in consultancy over

25  many years.  I have acted as a consultant to law firms,

1  particularly U.S. law firms operating out of Hong Kong, but

2  also the offices of Beijing and elsewhere in China on Chinese

3  law matters.

4      I was, for some three years, a consultant specifically to

5  White & Case out of their Hong Kong office, working on very

6  large Chinese projects with Fortune 50 companies.

7      I've also acted as adviser in the capacity of working with

8  firms to investment banks and to arrange multinational

9  corporation -- corporations.

10     I've also been retained by multinational corporations

11 directly, for example, Royal Dutch Shell.

12     So, yes, I have a large bank of consultancy experience.

13 **Q.**  And did that consultancy experience relate to matters of

14 Chinese law and business?

15 **A.**  Yes, almost exclusively.

16 **Q.**  Have you published any books or articles?

17 **A.**  To date I've published as editor or coauthor some seven

18 books on Chinese trade investment law in particular,

19 encompassing Chinese corporate law.

20     I have also published a book in relation to China's WTO

21 accession with Cameron May in London.

22     I have written copious numbers of articles on Chinese law

23 over many, many years.  I was the founder of the *Hong Kong Law*

24 *Journal's* Chinese law section, which provides for publications

25 in Chinese law developments.

1      I was also cofounder of *China Law & Practice*, which is the

2  world's leading periodical on the Chinese legal developments.

3      So, yes, I've published in the *Hong Kong Law Journal*.

4  I've published in Sweet & Maxwell publications in Europe.  I

5  have published in the *International Comparative Law Quarterly*,

6  among others.

7  **Q.**  Other than as part of teaching university and law school

8  courses, do you have any experience lecturing?

9  **A.**  Yes.  I have lectured globally on issues of contemporary

10  Chinese law.

11      I've been a visiting scholar at Harvard Law School in the

12  East Asian Legal Studies Program.  I've been a visiting

13  professor at the University of Wisconsin at Madison School of

14  Law.  I have been a visiting lecturer at the University of

15  Zurich, Faculty of Law, in Switzerland.  I have lectured at

16  institutions, such as the World Trade Institute in Bern,

17  Switzerland.  I have been on Microsoft programs where I've

18  presented and been a lead speaker at their government leaders

19  fora in Singapore and in New Dehli in India.

20      So, yes, I've spoken widely.

21  **Q.**  Have you served or testified as an expert witness before?

22  **A.**  Yes.  I have served as an expert or expert witness with

23  regard to litigation and arbitration on some four continents.

24  I have served in this capacity in the jurisdictions of the

25  United States, Canada, China, Australia, Hong Kong, and South

1    Africa.

2         Within the United States, I have acted as an expert in the

3    Ninth, Fifth, and D.C. circuits.  And in terms of testimony,

4    most recently I testified in the Fifth Circuit in the

5    Northern District of Texas in Dallas, again in relation to

6    Chinese law matters, and specifically Chinese corporate law

7    matters.

8    Q.   And do the other expert witness engagements you've spoken

9    about also relate to Chinese business matters and Chinese law

10   matters?

11   A.   Indeed they do.

12   Q.   Have you done any other outside work that is relevant to

13   your testimony today?

14   A.   Well, yes.  I have been engaged in, you know, a whole

15   range of activities that relate to China and to the China

16   exchanges, building up closer relationships with China.  And in

17   this regard in particular, over the past year or so I've worked

18   closely with the Bay Area Council and with the -- and

19   indirectly with the California-China Trade and Investment

20   Office, specifically in relation to Governor Brown's historic

21   trade mission to China just last year.

22        I've also continued to work with the Bay Area Council and

23   the China-California office on intensifying California-China

24   relations.

25   Q.   Where did you obtain your education and in what did you

**LEWIS - DIRECT / AGNOLUCCI**

1    obtain any degrees you have?

2    **A.**   My first degree was a Bachelor's degree in international

3    relations from the University of Southern California, the von

4    KleinSmid School of International Relations, where I was the

5    George Moore scholar in 1976.

6        I then received my juris doctorate degree from Emery

7    University in Atlanta, Georgia, and pursued postgraduate legal

8    studies, receiving my Masters of law, my LLM degree, in Chinese

9    law, principally in Chinese law, from the School of Oriental

10   and African Studies, the University of London, London, England.

11   **Q.**   Do you read or speak Mandarin Chinese?

12   **A.**   I both read and speak Mandarin Chinese.

13        **MS. AGNOLUCCI:**  Your Honor, Mr. Liew and USAPTI offer

14   Professor Lewis as an expert on Chinese business structures,

15   Chinese business practices, and Chinese law.

16        **THE COURT:**  Any objection or do you wish to voir dire

17   the witness?

18        **MR. HEMANN:**  No objection; and, no, Your Honor.

19        **THE COURT:**  All right.  You may proceed.

20        **MS. AGNOLUCCI:**  And I should add that this testimony

21   relates only to Walter Liew and USAPTI.

22        **THE COURT:**  Thank you very much.

23   **BY MS. AGNOLUCCI:**

24   **Q.**   Professor Lewis, in connection with your testimony today,

25   have you reviewed documents?

1    **A.**    Yes, copious amounts of documents.

2    **Q.**    Can you generally describe what types of documents you

3    reviewed?

4    **A.**    Well, I have reviewed contracts.  I have reviewed

5    correspondence.  I have reviewed a whole range of articles,

6    including, of course, those derived from online sources.  I

7    have reviewed Chinese laws and relations.  So, yes, a whole

8    range of sources.

9    **Q.**    Have you been paid for your testimony today?

10   **A.**    Yes, I have.

11   **Q.**    And, more generally, have you been paid for your services

12   as an expert?

13   **A.**    Yes.

14   **Q.**    What is your rate?

15   **A.**    My rate is $500 per hour.

16   **Q.**    How does that rate compare, in your experience, to others

17   in your field?

18   **A.**    I would say it's comparable.

19   **Q.**    How many hours did you spend working on this case?

20   **A.**    I think some 280 hours to date, approximately.

21   **Q.**    What did that equate to in payment?

22   **A.**    Approximately $138,000.

23   **Q.**    Why did you need to spend so much time preparing for this

24   case?

25   **A.**    This is a complex case, and the issues are complicated as

1    well.  It is difficult, as I think perhaps everyone here

2    appreciates, to fully explore and understand what is happening

3    in China and a need to access information and Chinese sources

4    that are authoritative.

5        So, yes, a great deal of investigation was necessary in

6    this particular case.

7    **Q.**    And of those 280 hours that you spent working on the case,

8    was some portion of that time unrelated to the testimony that

9    you're giving here today?

10   **A.**    Yes.

11           **MR. HEMANN:**  Objection, Your Honor.

12           **THE COURT:**  Overruled.

13           **THE WITNESS:**  Yes.

14   **BY MS. AGNOLUCCI:**

15   **Q.**    What portion would you say was unrelated to the testimony

16   that you're giving today?

17           **MR. HEMANN:**  Objection, Your Honor.

18           **THE COURT:**  All right.  Are you asking quantitatively?

19           **MS. AGNOLUCCI:**  Yes.  I'm asking him to estimate what

20   percentage.

21           **THE COURT:**  All right.  Overruled.

22           **MR. HEMANN:**  No objection to the quantitative,

23   Your Honor.

24           **THE COURT:**  All right.  Thank you very much.

25           **THE WITNESS:**  Approximately 30 percent of my time,

1  billable time, was devoted to matters that were not directly

2  related to my testimony.

3  **BY MS. AGNOLUCCI:**

4  **Q.**   Thank you, Professor Lewis.

5       Through your training, experience, and research, have you

6  become familiar with the Chinese political system?

7  **A.**   Yes.

8  **Q.**   How is China governed today?

9  **A.**   Well, China presents a very complex picture of

10  contemporary political governance.  You know, it's a -- it is

11  an economy in transition.  It is a polity in transition.  It is

12  a very large country that operates both at the national level

13  and, of course, very broadly throughout the country.

14       But I think what I can say succinctly, is that when we

15  look at political governance in China, the way that China is

16  governed, essentially, in order to understand Chinese

17  governance, you need to understand that China has the, really,

18  parallel structures of governance where one structure is the

19  state.

20       You have the state government and the state government is

21  a government that is familiar, I think, to most of us here, and

22  I'll describe that in a moment.  There's another parallel

23  structure, which is the Communist Party structure.  And they

24  interrelate to each other.  They intersect at various points.

25       With regard to the Chinese state, the Chinese government

 1   itself, it is governed by the 1982 Constitution, which has been

 2   revised and amended over a number of times up to the present;

 3   and it consists of essentially three branches of government,

 4   very much like our government here.  So you have an executive

 5   branch, you have a legislative branch, you have a judicial

 6   branch.  So three distinct branches of government.

 7        And I would say that, if anything, China tends to be more

 8   administratively driven; that is to say, that the executive

 9   branch tends to dominate.

10        The Communist Party does not have branches per se.  It

11   operates more on a committee-based structure.  And as far as

12   the Communist Party is concerned, it is not simply concerned,

13   as is the government, in matters related primarily to the

14   economy.  The Communist Party is pervasive.  It's in -- it

15   impacts or interacts with almost every aspect of Chinese life,

16   from neighborhoods all the way up to the pinnacle of political

17   power and interactions with the national government in Beijing.

18        So it's a very comprehensive organization.  But, again,

19   it's outside of the state.  It is a political party.  I mean,

20   there are certain resonances with our own democratic and

21   republican parties, with political parties generally.  It is

22   not involved in direct governance of the country.  The

23   government is more important, clearly, in that regard, but it

24   is certainly a potent force.

25   Q.   Has the Chinese government changed recently?

1    **A.**    The Chinese government?  Or the Chinese government --

2    well, yes.  I mean, I think you can say that the Chinese

3    government, in terms of its role, has become more assertive.

4    And, of course, one of the important ways in which the

5    Government has changed vis-a-vis the Chinese economy is that

6    the Government has, by and large, stepped away from direct

7    command control over the Chinese economy.

8         And this has been part of a program that has been ongoing

9    since 1992 at least; and that is the Socialist market economy

10   program, basically with a view to removing the government from

11   the economy, setting up a market economy very similar to the

12   U.S. economy; and, indeed, today we can talk about China being

13   a mixed economy.

14        So that the role of the government has diminished

15   substantially in terms of at least the way in which the economy

16   operates.  It's operating more in terms of a regulator.  At the

17   same time the role of the government in the running of

18   companies, of enterprises in China has reduced substantially as

19   a result of economic reforms going back, really, to the early

20   1980s.

21   **Q.**    Are you familiar with a law called the PRC Enterprises

22   State-Owned Assets Law?

23   **A.**    Yes, I am.

24   **Q.**    Can you describe generally how that law relates to the

25   Chinese economy?

1    **A.**   Yes.  The State-Owned Assets Law was promulgated in 2009

2    and, indeed, solidifies practices dating back to the late

3    1980s.

4         Essentially, this law is meant to define what are the

5    characteristics of state-owned assets and, indeed, who has

6    operational rights over state-owned assets and what external

7    government bodies have a role in terms of monitoring and

8    supervising those state-owned assets.

9         And I might add that state-owned assets -- the State-Owned

10   Assets Law specifically talks about state-owned enterprises and

11   state-invested enterprises.

12   **Q.**   I'm going to take the blackboard for a moment so that we

13   can write down some of these terms that you've mentioned.

14        Professor Lewis, you mentioned state-owned enterprises and

15   state-invested enterprises; correct?

16   **A.**   Correct.

17   **Q.**   And are those referred to by any kind of abbreviation?

18   **A.**   Yes.  The state-owned enterprise, we typically call it an

19   SOE.

20   **Q.**   An SOE.  That stands for state-owned enterprise?

21   **A.**   Correct.  And then state-invested enterprise is SIE.

22   **Q.**   SIE.

23        And are there different types of state-owned enterprises?

24   **A.**   Yes.  Certainly we can think of state-owned enterprises --

25   I mean, there are a number of different ways we can approach

1   this, but a very simple way to look at it is in terms of

2   central versus noncentral SOEs.

3   **Q.**   Can you describe generally what an SOE is?

4   **A.**   Well, an SOE, as the name suggests, is an enterprise that

5   is state-owned.  That is to say, that the assets of that

6   enterprise or company are entirely owned by the Chinese state

7   or by the whole Chinese people.  So I think that's perhaps

8   clear enough.

9   **Q.**   Are there many state-owned enterprises in China today, and

10  specifically Central versus non-Central?

11  **A.**   No.  I mean, one of the points that I was trying to make

12  just a moment ago in terms of economic reforms in China dating

13  back to the early 1980s is that we've seen a very, very

14  substantial contraction of the state's sector in China; and

15  that, indeed, in terms of the overall percentage of the economy

16  that may be associated with state production, we're only

17  talking about perhaps 30 percent of the economy is production

18  related to the business activities of the state-owned

19  enterprises.

20      Beyond that, because of the economic reforms from the

21  1980s accelerating into the 1990s and into the 2000s, we have

22  seen a reduction in the number of state-owned enterprises.

23  Many have been merged or acquired, amalgamated into larger

24  corporate groups called *jituan*.  These are corporate groups,

25  *jituan*.  That's J-I-T-U-A-N.  Others have, because they have

1    been loss-making enterprises, have been simply wound up,

2    declared bankrupt.

3        And indeed what we have seen at the same time is we've

4    seen these enterprises that have continued to exist, have

5    continued their operations, many have come under the control of

6    local governments in China, local governments.

7        And one of the points that I would like to stress is that

8    because of economic reforms, there has been a tremendous

9    decentralization of both political power and economic power

10   down to local levels in China.  And by that I mean the

11   provinces and municipalities in China, so that some 80 percent

12   of all economic activity in China is generated at local levels.

13   It is not generated at the national level.

14       At the same time what we need to appreciate here is that

15   state-owned enterprises have -- there are a much smaller number

16   of them today.  They are largely situated under local

17   governments, and that they operate because of corporatization

18   reforms and corporate government reforms, they operate as

19   independent corporate entities.

20   Q.   Is there a way to tell if a company is a Central SOE?

21   A.   Yes.  There are lists of central SOEs that are -- that are

22   posted, among other places, but posted on the SASAC -- that's

23   S-A-S-A-C, SASAC -- website.

24   Q.   And are there similar lists for non-Central SOEs?

25   A.   No.

**LEWIS - DIRECT / AGNOLUCCI**

1  **Q.**   And are there similar lists for state-invested

2  enterprises?

3  **A.**   No.

4  **Q.**   What is a state-invested enterprise as opposed to a

5  state-owned enterprise that you just described?

6  **A.**   Right.  Well, we can look at the 2009 PRC State-Owned

7  Assets Law, which gives a fairly clear definition or

8  description of what is a state-invested enterprise.

9      And a state-invested enterprise is essentially an

10  enterprise which is not entirely state-owned.  All right.  So

11  this is the distinction that I'm drawing.  This is an

12  enterprise that is not entirely state-owned.  It is an

13  enterprise where there is some state property, some state

14  investment, but there are other investors as well, nonstate

15  investors, private investors.  And these are now very common in

16  China.

17  **Q.**   You mentioned earlier that SOEs have been reformed over

18  the last few decades starting in the 1980s.  Can you describe

19  generally the effect of these reforms on SOEs?

20  **A.**   Yes.  Well, I just mentioned that as far as the SOEs

21  themselves, that, you know, there are a much smaller number

22  now; that they operate largely at the local level because of

23  decentralization processes.  But I think one of the key points

24  to appreciate is that, you know, SOEs, like all Chinese

25  corporate entities, are independent corporate entities.

1    This is enshrined in really the key law in this area,

2 which is the PRC Company Law.  And the company law stresses and

3 puts into clear, you know, legal provisions the full enterprise

4 autonomy of Chinese enterprises, including state-owned

5 enterprises.

6 **Q.**    And how is that autonomy expressed in the way that the

7 state-owned enterprises operate?

8 **A.**    Well, okay.  I mean, as far as the operational autonomy,

9 the business autonomy of state-owned enterprises, one can

10 look -- one can go back a number of years, but this is not

11 simply what we find in the PRC Company Law; it also is

12 expressed in various ways as far back as the 1998 Enterprises

13 by the Whole People Law or State-Owned Enterprise Law.

14    But in terms of operational autonomy, SOEs can essentially

15 do almost anything that you would expect a U.S. corporation to

16 do, and this is because China is moving very rapidly towards a

17 market economy.

18    What we find is that state-owned enterprises can and do

19 engage in independent business decision-making.  They put

20 together their own business plans.  They engage in marketing

21 and selling independently.  They have full powers to contract

22 independently.  They can even engage in overseas investment

23 today.  And they have a right to hire workers freely and

24 dismiss them relatively freely.  At the same time they can

25 price products as they wish.

1          So a full panoply of what we normally associate with

2     corporate business practice.

3     Q.   You mentioned an entity called SASAC.  I'm going to write

4     that acronym up on the board.  Is that -- can you tell me the

5     letters of the acronym, please?

6     A.   S-A-S-A-C.

7     Q.   Can you please explain what SASAC is?

8     A.   Yes.  Well, SASAC is the, as the name itself indicates, it

9     is the State Assets Supervision and Administration Commission.

10         Now, SASAC has a relatively humble origin, certainly when

11    we compare it to other ministries and commissions in China

12    which are much more powerful than SASAC.  But SASAC actually

13    dates back to the late 1980s under the guise of the State Asset

14    Administration Bureau or SAAB.  And its primary role at that

15    point in time, and indeed even today, is to be a custodian of

16    state-owned assets.  It's the custodian.

17         Moving forward to SASAC's creation in 19 -- sorry -- 2003,

18    SASAC, again, is a custodian of state-owned assets.  It is

19    responsible for the preservation of state-owned assets so that

20    they are not dissipated by state-owned enterprises, because

21    state-owned enterprises have full operational rights to do

22    whatever they like with state property, the state assets under

23    their control.  They have full control; they have full

24    operational rights over those state-owned assets.

25         So SASAC is there to make sure that these state-owned

1  enterprises that have enterprise autonomy don't misuse that
2  autonomy, don't sell off assets more cheaply than they should,
3  don't engage in mergers and acquisitions on terms which are a
4  disadvantage -- disadvantage to the state as a whole.

5      So this is a very important role.  SASAC also plays roles
6  as -- under the 2009 PRC State Asset Law.  They play a role as
7  an investor.  They are legally treated as the state's
8  representative, the investor in state-owned enterprises.
9  Again, they're looking after these state-owned assets.

10     They also perform a role as a regulator.  So they are a
11 regulator, or what I would say is a partial regulator, of
12 state-owned enterprises.

13     And in that regard they are involved in a limited range of
14 activities.  And, indeed, there's substantial resistance from
15 state-owned enterprises in terms of SASAC's involvement in
16 their independent business activities, and this is particularly
17 true amongst the Central SOEs.

18     But in terms of what SASAC does as a regulator, SASAC is
19 really responsible for a limited range of activities.  Largely,
20 these relate to the implementation of the modern enterprise
21 system in China and, indeed, moving state-owned enterprises
22 towards essentially the same kind of status, the same internal
23 corporate conditions that we see for U.S. corporations, that
24 China wants to get state-owned enterprises into essentially the
25 mold of U.S. corporations so that they can compete effectively

**LEWIS - DIRECT / AGNOLUCCI**

1    domestically and, importantly, internationally.

2    **Q.**   Are there laws that govern SASAC's involvement with the

3    SOEs?

4    **A.**   Yes, indeed.   The key laws I have mentioned is the 2009

5    State-Owned Assets Law.   There are earlier 2003 interim

6    regulations that also are of relevance here, as is the PRC

7    Company Law.

8    **Q.**   And do those laws describe whether and to what degree

9    SASAC and the Chinese government may control the day-to-day

10   activities of these SOEs?

11   **A.**   Yes, indeed.   It's perfectly clear in both the 2003

12   state-owned asset interim regulations, as well as in the 2009

13   State-Owned Assets Law, that SASAC has to keep hands off, hands

14   off the independent enterprise autonomy of state-owned

15   enterprises.   All right?   That's not their role.   They are

16   there to monitor state-owned assets and how they're used.

17       So we have clear proscriptions, proscriptions,

18   prohibitions on SASAC in any way interfering with the

19   independent business activities of state-owned enterprises.

20   **Q.**   These Central SOEs that you mentioned, can you explain

21   generally what size and type of company they tend to be?

22   **A.**   The SOEs?

23   **Q.**   The Central SOEs.

24   **A.**   Oh, the Central SOEs.   Yes, I mean, the Central SOEs are

25   really the largest corporate groups in China today.   I mean, as

**LEWIS - DIRECT / AGNOLUCCI**

1    I mentioned before, they're corporate groups.  It's not just

2    one company.  It's a conglomerate.  These are conglomerates.

3    They're what we call *jituan*.  They're similar to the Japanese

4    *keiretsu*, the Korean *chaebols*, if you know about that.

5        So these are very large corporate groupings.  They're

6    sophisticated.  They're involved in China's outward push in

7    terms of ODI or outbound direct investment.  They are leaders.

8    They are stars of the Chinese economy.

9        What else can I say about them?

10       They are also -- you know, they're similar -- I mean, if

11   you were looking for parallels, I mean, if we think about

12   Procter & Gamble, General Motors in the U.S. or Mitsubishi in

13   Japan, these are comparable types of companies.  These are very

14   large companies or corporate groups.

15   **Q.**   Thank you, Professor Lewis.

16       I want to now ask you specifically about the companies at

17   issue in this case.  Are you familiar with a company called

18   Pangang Group Company, Ltd.?

19   **A.**   Yes, I am.

20   **Q.**   How are you familiar with that company?

21   **A.**   Well, I'm familiar with them because they are one of the

22   leading corporate groups in China and particularly have been in

23   the recent past prior to their merger with Angang, one of the

24   leading players in the iron and steel industry; and, of course,

25   they are centrally important to this litigation.

1   **Q.**   Where would you say they rank in terms of the other big

2   companies in China?

3   **A.**   Well, they are one -- they have been ranked as one of the

4   top 100 corporate groups or enterprises, companies, in China.

5   **Q.**   Is the Pangang Group an SOE, an SIE, a Central SOE, a

6   non-Central SOE?  Where does it fall in this spectrum you've

7   described?

8   **A.**   Well, currently it's a non-Central SOE.  At earlier points

9   in time it has been a central SOE.  It's unclear exactly what

10  time it ceased to be a Central SOE.  I have certainly seen at

11  least one report that indicated that it ceased to be a

12  Central SOE as early as 2009; and, indeed, I believe there's

13  also an exhibit to the effect that as a result of the

14  Angang-Pangang merger, that Pangang Panzhihua Iron & Steel

15  Group Company ceased to be a Central SOE as of mid-July 2010.

16  **Q.**   You mentioned the Angang-Pangang merger.  Can you please

17  describe generally what that merger was?

18  **A.**   Yes.  I mean, this was a major corporate restructuring

19  within the Chinese iron and steel industry.  It occurred --

20  well, it began I guess as early as 2008.  There was fierce

21  competition amongst a number of the major players in the iron

22  and steel industry for the acquisition of the Pangang Group.

23  This included China's largest steel producer, Baosteel.  It

24  also included Angang or Anshan Iron & Steel.  And also one

25  other major player.

 1        This was a fierce competition.  SASAC initially favored

 2   Baosteel, which is China's largest steel producer.  It was felt

 3   by SASAC that this would be an appropriate marriage, if you

 4   like, in that Baosteel had the financial resources to acquire

 5   and to integrate Pangang's business operations into its

 6   corporate structure.

 7        However -- and this tells you how market forces operate in

 8   China today.  SASAC, as the government agency here, was

 9   favoring, perhaps not surprisingly, the largest player in the

10   steel industry for this acquisition.  However, Angang, a

11   smaller player, was more proactive.  And what they did was they

12   realized that Pangang needed cash in order to pursue its

13   corporate reorganization, its internal corporate reorganization

14   plan, which involved basically buying out minority interests in

15   subsidiaries of Pangang's listed company in Shenzhen and having

16   enough cash to do that.

17        Angang, recognizing that stock prices had dropped in

18   Shenzhen, the Shenzhen Stock Exchange, moved into the market

19   rapidly, bought up shares in Pangang's listed company, acquired

20   some 10 percent or more of the shares in that listed company,

21   and helped Pangang achieve its internal corporate

22   reorganization goals.

23        As a result, because of its pro market -- its proactive

24   market strategy, Angang was able to put itself in an

25   unassailable position and became the front runner for the

1   eventual merger, beating out the number one player, the

2   government's favorite, Baosteel.

3   **Q.**   So did the government eventually -- or did SASAC

4   eventually approve Angang even though it had wanted Baosteel

5   initially?

6   **A.**   Yes.

7   **Q.**   You mentioned subsidiaries of the Pangang Group.  Does the

8   Pangang Group have subsidiaries that relate to this case?

9   **A.**   Indeed.

10  **Q.**   What are they?

11  **A.**   Well, there are a number of subsidiaries.  There is

12  Panzhihua Iron & Steel Corporation, also known as PISCO.  There

13  is the listed company that I've just mentioned, which we go

14  by -- goes by the acronym of PGS -- what is it? -- SVTC.  This

15  is also known as a New Steel Vanadium & Titanium Company.  It's

16  the listed company on the Shenzhen Stock Exchange that I just

17  referred to.

18       And then there are two other very important subsidiaries.

19  One is PIETC.  This is the Pangang International Economic &

20  Trade Corporation, essentially the trading arm of the

21  Pangang Group.  And then a very important company involved in

22  the production of titanium dioxide; that's the Pangang Titanium

23  Company, Limited.

24  **Q.**   Let's start with Panzhihua Iron & Steel Co., which you

25  abbreviated as PISCO.  What is its relationship to the

1    Pangang Group?

2    **A.**   Well, as I've indicated, my understanding is that it would

3    be a subsidiary of the Pangang Group or certainly an important

4    subordinate company within the Pangang Group.

5    **Q.**   Does a subsidiary mean that the Pangang Group owns PISCO?

6    **A.**   Yes, that's my understanding.  Certainly all of the

7    information I've seen by reference to annual reports and other

8    documents presented to me, PISCO is largely owned by the

9    Pangang Group, and certainly in some cases it suggests it would

10   be 100 percent owned.  But that's a very -- I've seen varying

11   percentages on that.

12   **Q.**   So it's safe to say a large percent, maybe 100 percent?

13   **A.**   Yeah.

14   **Q.**   You also mentioned PGSVTC.  Where does that company fall

15   in this organizational chart?

16   **A.**   That would fall under PISCO.  PISCO is an investor in

17   PGSVTC.

18   **Q.**   You mentioned that PISCO is an investor in PGSVTC.  Do you

19   know what percent of PGSVTC PISCO owns?

20   **A.**   Approximately 30 percent.

21   **Q.**   If PISCO only owns 30 percent of PGSVTC, who owns the rest

22   of it?

23   **A.**   Well, again, in annual reports and other documents that

24   I've been provided with, it would appear that over 64 percent

25   of the stock is owned by others, by other shareholders.  Again,

1    bearing in mind that this is a listed company on the Shenzhen

2    Stock Exchange that provides A shares that are available to the

3    general public.  This is not a closed corporation; this is a

4    publicly traded company on the Shenzhen Stock Exchange, which

5    is similar, of course, to our own New York Stock Exchanges.

6    It's a huge exchange.  It's obviously not as big, but still

7    very active.  And, so, there are a lot of other shareholders in

8    this listed company.

9         So that would include, you know, other Chinese entities

10   investing, which can be state-owned or non-state-owned.  It can

11   include Chinese investment funds, including Chinese private

12   investors; and importantly, and certainly the evidence suggests

13   there was a substantial amount of activity in this area, even

14   investment by foreign investors through what are called

15   qualified foreign institutional investors.  These are QFIIs.

16        Now, as far as the QFIIs are concerned, there are a

17   large -- a significant number of these.  This is controlled by

18   the Chinese government in terms of who is a qualified foreign

19   institutional investor in China's A-share market.  And among

20   these -- and certainly when I've looked at the documents

21   related to PGSVTC, we see qualified foreign investors,

22   institutional investors including Citibank, Morgan Stanley,

23   UBS, Hong Kong and Shanghai Banking Corporation all being

24   qualified institutional investors allowing for foreign

25   investors, through certain funds, to invest in A-share

**LEWIS - DIRECT / AGNOLUCCI**

1   companies.

2   **Q.**   Is this entity PGSVTC an SOE?

3   **A.**   No, it's not.  It's an SIE.  It's a state-invested

4   enterprise, because although -- because you can see there's a

5   percentage of ownership here.  There's, what?  30 percent there

6   or a little bit more than 30 percent that is state ownership.

7   Those are state shares.  They are known as state shares.

8        When we talk about A-share listings, there are state

9   shares, there are legal personal shares, there are national

10  personal shares.  But, in any case, this is, you know, is a

11  company that has some amount of state shares, but it also has

12  these other shares.

13  **Q.**   What about PISCO?  Is that a Central SOE, non-Central SOE?

14  **A.**   Well, I mean, PISCO is part of the Pangang Group.  I

15  wouldn't say it itself is, you know, what is identified on the

16  Central -- the Central SOE list as the Central SOE.  I think

17  we're talking about the Pangang Group is on the Central SOE

18  list.

19  **Q.**   So it's fair to say that because PISCO is a hundred

20  percent owned by the Pangang Group, it has the same status as

21  the Pangang Group?

22  **A.**   Yes.  I mean, that's essentially -- those are state shares

23  that are -- that 30 percent or plus, a little bit plus

24  30 percent are state shares that are going into PGSVTC.  All

25  right?  But, you know, some 64 percent of shares are nonstate

1   shares or are some other type of investment that doesn't relate

2   to the state shares owned by the Pangang Group.

3   **Q.**   You also mentioned a subsidiary called PIETC.  Where does

4   that fall on this chart?

5   **A.**   Well, certainly as of 2009, PIETC, because of the

6   corporate restructurings that went on there in anticipation of

7   the Angang-Pangang merger, PIETC became a wholly owned

8   subsidiary of the listed company here.

9   **Q.**   By the listed company, do you mean PGSVTC?

10  **A.**   Correct.  Now, I want to also mention one other point

11  about PGSVT -- SVTC; and that is, when I say it's a listed

12  company, this is a particular type of company.  It's known as a

13  joint-stock limited company.  It's a joint-stock limited

14  company.  It's basically like a public company in the U.S.

15      And this is the vehicle, under the Chinese company law,

16  that is permitted to invest in China's stock markets and,

17  indeed, can even go offshore in certain cases and list on the

18  New York Stock Exchange, the Hong Kong exchanges, and what have

19  you.

20      So this is a very, very important, critically important

21  vehicle for purposes of raising equity finance, both

22  domestically and internationally, for this company.

23      Also, there was a special governance structure for this

24  company under the PRC Company Law.  All right?  And it gets

25  fully audited.  It has -- it has a board of directors.  It has

1    shareholders, shareholders annual meetings.  So the corporate

2    structure is very, very similar to what we find for publicly

3    traded companies.  And, of course, this is a publicly traded

4    company in China.

5         So understand that this is something that's very

6    transparent.

7    **Q.**  Going back to --

8         **THE COURT:**  Before we continue, I'd like to take a

9    stretch break.

10         **MS. AGNOLUCCI:**  Yes, Your Honor.

11         **THE COURT:**  Ladies and gentlemen, you may stand.

12         You may stand too, Dr. Lewis.  Do you prefer Doctor or

13    Professor?

14         **THE WITNESS:**  Professor.

15                     (Pause in proceedings.)

16         **THE COURT:**  All right.  You may be seated, ladies and

17    gentlemen.

18         You may continue.

19         **MS. AGNOLUCCI:**  Thank you, Your Honor.

20    **Q.**  Professor Lewis, you mentioned PIETC is a subsidiary of

21    PGSVTC.  Is that 100 percent owned by PGSVTC?

22    **A.**  Yes, it is.

23    **Q.**  You mentioned one other entity called Pangang Group

24    Titanium Industry Company.  Where does that fall on this chart?

25    **A.**  It was also 100 percent wholly owned subsidiary as of 2009

1  of the listed company.  And, of course, Pangang Titanium is

2  important because it is the company that is responsible for the

3  development of titanium dioxide, particularly with reference to

4  the 100,000, or 100K plant, in Changsho, Sichuan Province, the

5  big titanium dioxide plant.  That's the company in charge of

6  that.  So, again, an important subsidiary.

7      I want to mention, there is also one other company that I

8  haven't mentioned but was very important early on in terms of

9  U.S. Performance's business dealings with relation to titanium

10  dioxide with Pangang Group, and that's a joint venture that's

11  called Pangang Jinzhou.

12  Q.  You mentioned that it's a joint venture.  So it wouldn't

13  go under Pangang Group; right?

14  A.  No.  It's a joint venture between Pangang at the group

15  level and a company in Jinzhou, the Liaoning Province, called

16  Jinzhou Iron Alloy Company, Limited.

17  Q.  Is Jinzhou Iron Alloy Company one of the types of

18  companies you described earlier:  SOEs, SIEs?

19  A.  Yes.  I would -- my understanding is that it is a local

20  non-Central SOE.

21  Q.  And you mentioned that there's a joint -- a company that

22  is a result of this marriage between Pangang Group and Jinzhou

23  Iron.  What's the name of that venture?

24  A.  That is Pangang Jinzhou.

25  Q.  Pangang Jinzhou.  And where does that company fall on the

**LEWIS - DIRECT / AGNOLUCCI**

1  spectrum of types of state-owned companies or state-invested

2  companies that you described?

3  **A.**   Well, I mean, it is a joint -- it's a joint venture

4  company.  It can also -- it also is described as, and indeed in

5  its articles of association or bylaws, as a limited liability

6  company, an LLC.  But, again, it would be in the nature of an

7  SOE.

8  **Q.**   Would that be a non-Central SOE?

9  **A.**   Yes.

10       **MS. AGNOLUCCI:**  Your Honor, may I please approach the

11  witness with Exhibit 3360, which has not been admitted?

12       **THE COURT:**  Yes, you may.

13       **MS. AGNOLUCCI:**  Thank you.

14  **Q.**   Do you recognize this document, Professor Lewis?

15  **A.**   Yes, I do.

16  **Q.**   What is it?

17  **A.**   These are the bylaws of the Pangang Jinzhou joint venture

18  company that we just described.

19  **Q.**   Where would one obtain these bylaws if one wanted to?

20  **A.**   Well, I think they're actually even available on the

21  Internet.  But because these are legal documents in the nature

22  of incorporation documents for a limited liability company in

23  China, they would be readily and publicly available at all

24  times through the relevant local Administration for Industry

25  and Commerce.

1   Q.   So are these a matter of public record?

2   A.   They are, indeed.

3        MS. AGNOLUCCI:   Your Honor, I move to admit

4   Exhibit 3306.

5        THE COURT:   Any objection?

6        THE CLERK:   3360?

7        MS. AGNOLUCCI:   3360.   My apologies.

8        MR. HEMANN:   Objection.   Foundation, Your Honor.

9        THE COURT:   Overruled.   They're admitted.

10       (Trial Exhibit 3360 received in evidence)

11       MS. AGNOLUCCI:   Can we please publish page 9 of the

12  document?

13  Q.   And, again, these are the bylaws of Pangang Jinzhou, the

14  joint venture; correct?

15  A.   Correct.

16  Q.   Professor Lewis, can you please read Article 36?

17  A.   Yes.   Article 36 --

18  Q.   And you'll see it up on your screen as well.

19  A.   Very good.   Article 36 is dealing with the board of

20  directors, and it reads as follows:   (reading)

21       "The company shall have a board of directors.   The

22       board of directors shall consist of nine directors, where

23       Pangang shall recommend five candidates for directors; Jin

24       Tie" -- that's Jinzhou Iron Alloy Company, Limited --

25       "shall recommend three candidates for directors," and then

1          there is another participant here that we haven't

2          mentioned, a smaller participant, "Chengde Xinxin Vanadium

3          & Titanium shall recommend one candidate for director.

4          The company may, based on its needs for operations and

5          development, hire professionals to serve as senior

6          advisers."

7    **Q.**   So these two entities, Pangang Group and Jinzhou Iron and

8    Alloy, are choosing the directors of the joint venture, Pangang

9    Jinzhou?

10   **A.**   Correct.

11   **Q.**   Is that typical of a non-Central SOE, that the directors

12   are chosen internally?

13   **A.**   Yes.

14          **MR. HEMANN:**  Your Honor, just for the record, we

15   withdraw the objection.  I was looking at the wrong exhibit.  I

16   was looking at 3356, not 3357.

17          **THE COURT:**  All right.  Very well.  Thank you.

18          **MS. AGNOLUCCI:**  All right.  Mr. Guevara, you can

19   remove that document.

20   **Q.**   Now, we've talked about a number of subsidiaries here, and

21   just to clarify the record, is PIETC an SIE?

22   **A.**   Yes, it would be an SIE.

23   **Q.**   And what about Pangang Titanium?

24   **A.**   Yes, an SIE.

25   **Q.**   So these three entities here that are SIEs -- PGSVTC,

1  PIETC, and Pangang Titanium -- would the government and SASAC

2  have involvement in these companies?

3  **A.**   Typically no.

4  **Q.**   Would the government have any control over the day-to-day

5  activities of these companies?

6  **A.**   Clearly no.

7  **Q.**   What about for Pangang Group which, at times, has been a

8  Central and non-Central SOE?  What would the government and

9  SASAC's role be with these companies?

10 **A.**   The SASAC's role, again, as I have mentioned, is to ensure

11 that, you know, the group's state-owned assets are preserved,

12 that the value is, if anything, added to those state-owned

13 assets.  And in pursuit of that function, what SASAC seeks to

14 do with a group company -- and this could even extend to

15 PISCO -- is to essentially create the conditions for very good

16 internal corporate governance and, as I've said, the

17 institution of this modern enterprise system so that these

18 companies become even more independent, become more profitable,

19 can operate just like U.S. corporations.

20      So what SASAC is doing here is that it will -- it seeks to

21 implement the modern enterprise system.  One of the ways it

22 seeks to do this is -- and it has done this, actually, with the

23 Pangang Group -- is to introduce directors and suggest

24 appointments of directors to the Pangang Group Company.

25      And the interesting thing about this is that this occurred

1   in 2006 and that what was being introduced was the U.S.-style

2   independent director system.  So at that time a number -- I

3   don't know if it was five or six -- independent directors were

4   suggested by SASAC, and those directors then joined the board

5   with a view to providing greater accountability as far as the

6   business operations of Pangang were concerned.

7   Q.   You mentioned that SASAC recommended a number, five or

8   six, independent directors for Pangang Group.  Were there other

9   directors of Pangang Group who were not recommended by SASAC?

10  A.   Correct.  Yes.

11  Q.   How many?

12  A.   Again, I think it was four or five.  It was somewhere in

13  that area.

14  Q.   And as we just looked at in the bylaws that you read, for

15  Pangang Jinzhou, the joint venture, those directors were chosen

16  internally; correct?

17  A.   Correct.

18  Q.   Not by SASAC?

19  A.   No.

20  Q.   I want to ask you about the contracts at issue in this

21  case.  Are you familiar with those contracts?

22  A.   Yes, I am.

23  Q.   And can you generally describe the contracts?

24  A.   Yes.  Well, there are -- I mean, if we -- we can think of

25  them as bunches of contracts, two bundles of contracts.  One is

1    the group of contracts that relate to the 30,000, or 30K,

2    titanium dioxide project through the Pangang Jinzhou joint

3    venture and Pangang Jinzhou transacting business with the

4    Performance Group or Performance Company.

5        And then a second group of contracts, that's the 100K or

6    100,000 megaton -- or metric ton project, titanium dioxide

7    project, in Changsho in Sichuan Province, and that is a

8    separate group of contracts involving, among others, Pangang

9    Titanium.

10   Q.   So you mentioned first a group of contracts relating to a

11   30K project.  Have you reviewed documents relating to that --

12   have you reviewed the contracts relating to that 30K project?

13   A.   Yes, I have.

14       MS. AGNOLUCCI:  Your Honor, may I approach the witness

15   with Exhibit 1208, which has not been admitted?

16       THE COURT:  Yes, you may.

17   BY MS. AGNOLUCCI:

18   Q.   Professor Lewis, have you reviewed this document?

19   A.   Yes, I have.

20   Q.   And what is it?

21   A.   Well, it is the contract between PIETC, the trading

22   company of the Pangang Group, with Performance Group,

23   Incorporated.

24   Q.   And is that contract signed on every page?

25   A.   Yes, it is.

LEWIS - DIRECT / AGNOLUCCI

1  **Q.**    When is that contract dated?

2  **A.**    November 25th, 2005.

3  **Q.**    And it relates to the 30K titanium dioxide project?

4  **A.**    Yes.

5           **MS. AGNOLUCCI:**  Your Honor, I move to admit

6  Exhibit 1208.

7           **MR. HEMANN:**  Your Honor, can I have one moment,

8  please?

9           **THE COURT:**  Sure.

10          **MR. HEMANN:**  Thank you.

11                    (Pause in proceedings.)

12          **MR. HEMANN:**  Your Honor, the Government would object.

13  This document is already in evidence as Exhibit 313.  We don't,

14  obviously, object to the document coming in, but I just think

15  it might be confusing to have two copies of the same document.

16          **THE COURT:**  Why don't you use the previous -- is it a

17  different version, Ms. Agnolucci?

18          **MS. AGNOLUCCI:**  I haven't checked it page for page,

19  but I'll take the Government at its word that it's the same

20  document.

21          **THE COURT:**  So let's get 313 and show the witness that

22  one.

23          **MS. AGNOLUCCI:**  May we publish Exhibit 313, please?

24          **THE COURT:**  Yes, you may.

25

LEWIS - DIRECT / AGNOLUCCI

1    BY MS. AGNOLUCCI:

2    Q.   Do you recognize this document, Professor Lewis?

3    A.   Yes.  It looks like the same document.

4    Q.   And you mentioned that there were parties to the contract

5    and specifically that there was a buyer.  Who is listed as the

6    buyer of the contract?

7    A.   As I recall, the buyer is PIETC.

8    Q.   And, Mr. Guevara, if you could go to page 23 of the

9    contract so Mr. Lewis can look at the relevant page.  That's

10   22.  There we are.

11        The buyer is listed as PIETC.  And who is listed as the

12   end user?

13   A.   The end user is Pangang Jinzhou, the joint venture company

14   we've been talking about.

15   Q.   Okay.  And can you remind us what the date of this

16   contract is?

17   A.   Yes.  November 25th, 2005.

18        MS. AGNOLUCCI:  Your Honor, may I approach the witness

19   with Exhibits 1203 and 1204?

20        THE COURT:  All right.  But just for the record, I

21   believe the witness is looking at Exhibit 1208, not 313,

22   although 313 was on the screen.  So let's use -- continue to

23   use only the preexisting exhibit.  All right?

24        THE WITNESS:  Yes.

25        THE COURT:  Okay.  You may approach with --

1          MS. AGNOLUCCI:  Thank you, Your Honor.

2          THE COURT:  What number is this one?

3          MS. AGNOLUCCI:  1203 and 1204.

4          THE COURT:  All right.

5          MS. AGNOLUCCI:  Your Honor, the parties have

6   stipulated that the Chinese version of this document was seized

7   from the defendant and that it is authentic.

8          THE COURT:  Is that correct, Mr. Hemann?

9          MR. HEMANN:  Yes, it is, Your Honor.

10         THE COURT:  All right.  So stipulated.

11  BY MS. AGNOLUCCI:

12  Q.   Mr. Lewis, do you recognize this document?

13  A.   Yes, I do.

14  Q.   What is it?

15  A.   Again, it is a contract involving the 30,000-metric-ton

16  titanium dioxide project in Jinzhou.  Here we have -- and, as I

17  understand, this really involves the same subject matter as the

18  2005 contract, but we have a substituted buyer here for PIETC.

19  It is the Pangang Jinzhou that is now the substituted buyer,

20  and the seller remains the same.

21  Q.   Does it appear to be an amendment to the contract we were

22  just discussing?

23  A.   Yes.

24         MS. AGNOLUCCI:  Your Honor, I move to admit

25  Exhibit 1203 and its translation, Exhibit 1204.

1          **THE COURT:**  Any objection?

2          **MR. HEMANN:**  Your Honor, I think essentially the same

3     objection, which I believe both of these are already in as

4     Exhibits 310 and 310T.

5          **THE COURT:**  All right.  So let's use the -- I'll -- I

6     won't rule on the offer.  Let's use the actual exhibits.  And

7     if the Government is wrong and it's a later version or a

8     different version, you can move it in.  But for now let's use

9     the preexisting exhibit at least.

10         **MS. AGNOLUCCI:**  Absolutely, Your Honor.  And may we

11    please publish the translation?

12         **THE COURT:**  Yes.  Let's get the right exhibit.

13         **MS. AGNOLUCCI:**  310T.

14    **Q.**   And, Professor Lewis, you should look at your screen,

15    please.

16         Please take a look at the blowup on your screen.  You

17    mentioned that some of the parties appear to have been

18    substituted.

19         Can you tell us, who is the buyer of the 2007 contract?

20    **A.**   It's Pangang Jinzhou, the joint venture company in

21    Jinzhou, Liaoning.

22    **Q.**   And is the end user substituted?

23    **A.**   I would have to look at the contract.

24    **Q.**   Let me give you a copy of Exhibit 310T.

25         **MS. AGNOLUCCI:**  May I approach, Your Honor?

 1                THE COURT:  Yes, you may.

 2                THE WITNESS:  (Witness examines document.)  I think

 3     the end user is the same end user.

 4     BY MS. AGNOLUCCI:

 5     Q.    Thank you, Professor Lewis.

 6     A.    Because this is the contract that ultimately is for the

 7     benefit of Pangang Jinzhou.

 8                MS. AGNOLUCCI:  Your Honor, may I approach the witness

 9     with Exhibit 315, which has been admitted?

10                THE COURT:  Yes, you may.

11     BY MS. AGNOLUCCI:

12     Q.    Professor Lewis, do you recognize this document?

13     A.    Yes.  This represents a further amendment to the original

14     contract.

15     Q.    And what is the effect of the amendment?

16     A.    This amendment seems to detail further payment

17     arrangements under the original contract, so providing further

18     details regarding payment.  And there seems to have been a

19     problem with full payment under the original contract.  That's

20     the way I read this document.  And, therefore, there was a

21     need, as of December 21st, 2009, to firm up specific payment

22     arrangements in order for Performance Group Company to receive

23     full payment under the original contract.

24     Q.    Does this amendment to the contract substitute the buyer?

25     A.    (Witness examines document.)  The buyer has -- certainly

1  by reference to the 2007 document, I think the buyer is the

2  same.

3  **Q.**    And who is the buyer?

4  **A.**    Pangang Jinzhou.

5  **Q.**    Pangang Jinzhou.  And is there also an agent under this

6  contract?

7  **A.**    Yes.  Now, there's an additional gloss here, the *dalifang*.

8  That's Chinese for the agent party, D-A-L-I-F-A-N-G.  That's in

9  Pinyin Chinese.

10     Anyway, the agent here is Pangang -- is PIETC.

11  **Q.**    And what is the date of this contract?

12  **A.**    The date is, as I just mentioned, December 21st, 2009.

13  **Q.**    And the buyer remains the same, Pangang Jinzhou?

14  **A.**    Yes.

15  **Q.**    We've now discussed PIETC and Pangang Jinzhou as parties

16  to or beneficiaries of the 30K contract.  Under Chinese law,

17  are there any other parties to the 30K contract that we've

18  discussed?

19  **A.**    No, not as a matter of Chinese law.  I mean, the point

20  that needs to be appreciated here is that under relevant

21  Chinese laws, including, of course, the China's contract law,

22  under China's foreign trade law and under 1991 foreign trade

23  agency provisions, that it is really only the parties that are

24  signatories to this contract that are bound by it.

25  **Q.**    You also mentioned a second bundle of contracts for the

1    100K project.  Have you reviewed documents relating to that

2    contract?

3    **A.**   Yes, I have.

4    **Q.**   What is the nature of the 100K project?

5    **A.**   Well, it is a -- it's a further development and expansion.

6    It's a larger, significantly larger project, more ambitious

7    project than the Pangang Jinzhou 30K project.  It's a more --

8    in technology, the processes seem to be more advanced, and it's

9    just on a significantly larger scale.

10          **MS. AGNOLUCCI:**  Your Honor, may I please approach the

11   witness with Exhibit 316?

12          **THE COURT:**  Yes, you may.

13   **BY MS. AGNOLUCCI:**

14   **Q.**   Do you recognize this document, Professor Lewis?

15   **A.**   Yes, I do.

16   **Q.**   What is this?

17   **A.**   This is, again, a contract between PIETC and in this case

18   USAPTI regarding their cooperation with respect to the 100,000

19   megaton $TiO_2$ process -- project in Changsho in the Sichuan

20   Province.

21          **MS. AGNOLUCCI:**  Your Honor, the parties have

22   stipulated that this document was seized from the USAPTI office

23   and is authentic.

24          **MR. HEMANN:**  No objection.

25          **THE COURT:**  All right.  So stipulated.

1          **MS. AGNOLUCCI:** I move to admit the document.

2          **MR. HEMANN:** No objection.

3          **THE COURT:** It's admitted.

4       (Trial Exhibit 316 received in evidence)

5          **MS. AGNOLUCCI:** Mr. Guevara, if you could please

6    publish page 18 of the document.

7    **Q.** And, Professor Lewis, you said this document is dated

8    May 2009?

9    **A.** I don't know if I said that, but, yes, it is dated

10   May 16th, 2009.

11   **Q.** Who is the buyer in this contract?

12   **A.** It's PIETC.

13   **Q.** And who is the end user in this contract?

14   **A.** It is Panzhihua Iron & Steel Group Company.

15   **Q.** Is that PISCO?

16   **A.** It may well be, yes.

17   **Q.** Did you review evidence that this first 100K contract was

18   supplemented by other contracts?

19   **A.** Yes.

20          **MS. AGNOLUCCI:** Your Honor, may I approach the witness

21   with Exhibit 1202?

22          **THE COURT:** Yes, you may.

23   **BY MS. AGNOLUCCI:**

24   **Q.** Professor Lewis, do you recognize this document?

25   **A.** Yes, I do.

1   **Q.**   What is it?

2   **A.**   Again, it's an amendment to the previous contract that

3   we've just discussed, the original contract for 1,000 --

4   100K -- 100K titanium dioxide project in Changsho, an amendment

5   to that contract essentially substituting a party again,

6   substituting the end user in this case from Panzhihua

7   Iron & Steel Company to Pangang Titanium.

8   **Q.**   And what is the date of this amendment?

9   **A.**   October 24th, 2010.

10          **MS. AGNOLUCCI:**   Your Honor, I move to admit

11   Exhibit 1202.

12          **MR. HEMANN:**   No objection.

13          **THE COURT:**   Admitted.

14       (Trial Exhibit 1202 received in evidence)

15          **MS. AGNOLUCCI:**   If we could please publish it.   Thank

16   you.

17   **Q.**   So you said that the buyer of the 100K contract is PIETC;

18   correct?

19   **A.**   Correct.

20   **Q.**   So that's not a substitution; right?

21   **A.**   Correct.

22   **Q.**   And you said the end user was Pangang Titanium.   Is that

23   this entity down here (indicating)?

24   **A.**   Correct.

25          **MS. AGNOLUCCI:**   Your Honor, may I please approach the

 1   witness with Exhibit 319?

 2            **THE COURT:**  Yes, you may.

 3   **BY MS. AGNOLUCCI:**

 4   **Q.**   Do you recognize this document, Professor Lewis?

 5   **A.**   Yes, I do.

 6            **MS. AGNOLUCCI:**  And this document has been admitted.

 7   Your Honor, may we publish this document?

 8            **THE COURT:**  Yes.

 9   **BY MS. AGNOLUCCI:**

10   **Q.**   What is this document, Professor Lewis?

11   **A.**   This is a contract regarding consultation for the

12   procurement of equipment and materials related to the 10,000 --

13   sorry -- the 100,000 megaton or kiloton TiO2 project.

14   **Q.**   You mentioned equipment.  Does this amendment relate to

15   equipment purchases?

16   **A.**   Yes.

17   **Q.**   If you look at the first page of the document, who's

18   listed as the buyer?

19   **A.**   Again, it's PIETC.

20   **Q.**   So same entity as before?

21   **A.**   Yes.

22   **Q.**   And who is listed as the end user?

23   **A.**   USA Performance Technology and USAPTI -- sorry.  That's

24   the seller.  Sorry.  The end user is Pangang Titanium.

25   **Q.**   That's this entity down here on this chart (indicating)?

 1   **A.**   Correct.  Correct.

 2   **Q.**   Thank you.  Mr. Guevara, you may remove the exhibit.

 3        Are these contracts that we've looked at standard

 4   contracts in your experience with Chinese business law?

 5   **A.**   Very much so.  They are in the nature of what we call

 6   standard form contracts that are frequently used in respect to

 7   international sales, as well as in terms of various forms of

 8   technology cooperation.  So these have a very, very long

 9   history in China.  They've done the rounds in China for many,

10   many years.

11        And typically it is very difficult to modify the terms of

12   these contracts.  They are standard form contracts, originally

13   developed by the government that further elaborated upon by

14   foreign trade corporations in China and now used widely in

15   various industries with regard to international cooperation.

16   **Q.**   You said that it's difficult to modify the terms of the

17   contract.  Does that mean that it's difficult to modify the

18   terms that were proposed by the drafting party?

19   **A.**   That's correct.

20   **Q.**   And who would the drafting party of these contracts be?

21   **A.**   Well, it would be the Mainland Chinese side.

22        **MR. HEMANN:**  Objection, Your Honor.  Calls for

23   speculation.

24        **THE WITNESS:**  No, it does not.

25        **THE COURT:**  Whoa.  Whoa.  All right.  Professor,

LEWIS - DIRECT / AGNOLUCCI

1    you're in my court, so I make those decisions.

2         THE WITNESS:  Sorry.

3         THE COURT:  In a classroom, you might make those

4    decisions.

5         Sustained.

6         THE WITNESS:  Thank you.

7         THE COURT:  You might get detention if you do that

8    again.

9         THE WITNESS:  Thank you, Your Honor.  Yes.

10        THE COURT:  All right.

11   BY MS. AGNOLUCCI:

12   Q.   Professor Lewis, in your experience, would the Chinese

13   government be involved in these contracts that we've just

14   looked at?

15   A.   Well, I mean, not necessarily, no.

16   Q.   Well, can you say a little bit more about whether, from

17   the documents that you've analyzed and from your experience,

18   you have an understanding about whether the Chinese government

19   and SASAC were involved in these contracts and to what degree?

20   A.   No, I don't see any involvement, clearly no involvement of

21   SASAC, or the Chinese government here.

22   Q.   Would there be any regulatory involvement by the Chinese

23   government in some of these contracts?

24   A.   Yes.  From a regulatory point of view, that is correct.

25   What we would see is at the -- in terms of what is called

1   verification or, more simply put, a kind of approval of these

2   projects, typically these are fairly significant projects; they

3   involve fixed-asset investment; they involve an important area

4   for economic development in China in terms of titanium dioxide;

5   and, therefore, there would be a need to apply for a project

6   verification.

7           This project verification, I am presuming, would have

8   come.  And indeed this is not just presumption; this is based

9   on Chinese law.  There are laws related to project

10  verifications, project approvals for fixed-asset investment

11  projects in China.  There's copious documentation on this, and

12  I have reviewed that.

13          But the point here is that project verification would be

14  necessary from, in this case, the NDRC, the National

15  Development and Reform Commission, which is China's top

16  planning body in Beijing.

17          So a project application would be submitted by the parties

18  to both the 30 -- you know, 30,000 and 100,000 kiloton or what

19  have you projects.  Those parties would submit project

20  applications to the NDRC in Beijing for project verification,

21  and a project verification document would be then forthcoming

22  so that they could proceed with the project.

23          Now, that's a regulatory aspect.  That's not NDRC getting

24  involved in the project at all.  The NDRC in this capacity in

25  terms of, you know, large project approvals is performing a

1   role very, very similar to what we see here in the

2   United States being performed, for example, by the FTC and

3   other government agencies.  This would include, you know,

4   infrastructure projects or other types of projects that would

5   typically be approved by the FTC, by our Federal Trade

6   Commission.

7         So equivalent functionality here and, you know, again

8   something that would normally have to be done for these types

9   of projects in China.

10        **THE COURT:**  Would this be a good time to break?

11        **MS. AGNOLUCCI:**  Yes, Your Honor, it would.

12        **THE COURT:**  All right.  Ladies and gentlemen, we're

13  going to take our first 15-minute break.  Remember the Court's

14  usual admonitions.  Keep an open mind.  Don't discuss the case.

15  And we'll see you in 15 minutes.

16        (Proceedings were heard out of the presence of the jury:)

17        **THE COURT:**  15 minutes, Counsel.

18              (Recess taken at 9:45 a.m.)

19              (Proceedings resumed at 10:03 a.m.)

20        (Proceedings were heard out of the presence of the jury:)

21        **THE COURT:**  Let's bring in the jury, please.

22        (Proceedings were heard in the presence of the jury:)

23        **THE COURT:**  All right.  Please be seated.

24  You may resume the stand, Professor.

25  And you may proceed, Ms. Agnolucci.

1            **MS. AGNOLUCCI:**  Thank you, Your Honor.

2    **Q.**    Professor Lewis, you testified earlier that you've seen

3    evidence that SASAC recommended for appointment some, but not

4    all, directors of the Pangang Group; correct?

5    **A.**    Correct.

6            **MS. AGNOLUCCI:**  Your Honor, may I publish

7    Exhibit 347T, which has already been admitted?

8            **THE COURT:**  Yes, you may.

9    **BY MS. AGNOLUCCI:**

10   **Q.**    Please take a look at your screen, Professor Lewis.  Do

11   you recognize this document?

12   **A.**    Yes, I do.

13   **Q.**    At the top under P.1, what is this document referring to?

14   **A.**    Pictures of the leaders of the company.

15   **Q.**    Which company?

16   **A.**    The Pangang Group Company.

17   **Q.**    Do you see there where it lists for the first two

18   individuals CPC Secretary and CPC Deputy Secretary?

19   **A.**    Yes, I do.

20   **Q.**    Does that refer to the Communist Party of China?

21   **A.**    It does not refer to the external Communist Party at

22   large.  This refers to an internal committee within the

23   Pangang Group Company and also at lower levels within the group

24   structure.

25   **Q.**    So Fan Zhengwei is not the Secretary of the Communist

**LEWIS - DIRECT / AGNOLUCCI**

1    Party of China?

2    **A.**   No.  And I think Xi Jinping, who is the ruler of China

3    would have something to say about that if he knew.

4    **Q.**   And Yu Zisu, I apologize if I'm butchering the

5    pronunciation, is not the Deputy Secretary of the Communist

6    Party of China?

7    **A.**   No.  These are internal committees within the Pangang

8    company.

9    **Q.**   Thank you.

10          **MS. AGNOLUCCI:**  Your Honor, may I approach the witness

11   with Exhibits 350 and 350T, which already have been admitted?

12          **THE COURT:**  Yes.

13          **MS. AGNOLUCCI:**  And, Mr. Guevara, if you could publish

14   350T.

15   **Q.**   Do you recognize this document, Professor Lewis?

16   **A.**   Yes, I do.

17   **Q.**   And what is it?

18   **A.**   This is the well-known puff letter, if we can put it that

19   way.  This is a letter to certain corporate leaders in the

20   Pangang Group from Walter Liew basically trying to put his best

21   foot forward and, indeed, get his company into -- get in

22   through the door into Pangang and to conduct business with

23   them.

24   **Q.**   Mr. Guevara, if you could go to the next page, please.

25   Thank you.

1          Professor Lewis, based on your experience with Chinese

2    business practice, does this letter reflect Chinese business

3    norms?

4    **A.**   Yes, it does.

5    **Q.**   What norms?

6    **A.**   Well, essentially what I see the writer of this letter

7    doing is seeking to ingratiate himself with certain important

8    people in China with a view to obtaining benefits.  And in

9    doing so is seeking to establish a *guanxi* relationship with

10   these corporate leaders in the Pangang Group.

11   **Q.**   You mentioned *guanxi*.  How is that spelled?

12   **A.**   That's G-U-A-N-X-I, *guanxi*.

13   **Q.**   What is *guanxi*, Professor Lewis?

14   **A.**   *Guanxi* translated from the Chinese literally means

15   relationships or connections; and, indeed, in order to do

16   business in China, it is essential to have *guanxi*, to have

17   business and personal relationships.

18         Indeed, when one side, one person meets another person,

19   frequently you want to let that other person know that you have

20   a *guanxi* network and who is part of that *guanxi* network,

21   because that will then provide a basis for, in fact, developing

22   a relationship with this new contact and developing a *guanxi*

23   relationship where each side can obtain mutual benefit from

24   each other.

25   **Q.**   Are preexisting relationships or connections normally and

**LEWIS - DIRECT / AGNOLUCCI**

1   ordinarily necessary in order to obtain business in China?

2   **A.**   Yes, absolutely essential.  You have to have a track

3   record in order to -- and to be known within China and to be

4   known by the right people in China; and, indeed, be able to

5   operate within this larger *guanxi* culture, this relationship

6   culture.

7         And there are many foreigners who go to China who just

8   don't know this; and then are, even if they know it, they're

9   not able to enter into the *guanxi* milieu and, as it were, to

10  play the game effectively.  So it's absolutely essential.

11  **Q.**   And are there other business norms reflected in this

12  letter?

13  **A.**   Yes.  I mean, I think that what we see here as well is the

14  notion of *mian zi* -- *mian zi*, that's spelled M-I-A-N Z-I, *mian*

15  *zi*, which literally means face -- and a critically important

16  concept in China.  One must give the other side in an encounter

17  or in a negotiation, in an interaction face, give to --

18  basically to honor them, to respect them.

19        And, likewise, one wants to also inflate one's own

20  self-importance and give oneself face, particularly when one is

21  trying to develop a *guanxi* relationship.  So there's an idea of

22  self-inflation, overexaggeration, you know, providing various

23  forms of largesse to the other side, perhaps entertainment.

24  Basically showing, you know, the worth of that individual.

25        And, again, this is all predicated, this idea of face,

1    this idea of self-inflation, both sides respecting each other

2    is a basis for developing this all-important *guanxi*

3    relationship, and then plugging into each other's *guanxi wang*

4    as they're called, W-A-N-G, *guanxi* networks, from which both

5    sides can obtain substantial mutual advantage.

6         And the writer of this letter, I mean, by referencing

7    people, important people in China is showing his worth to the

8    other side.  He's showing that he, the writer, is someone who

9    is worthy to do business with and who can be of benefit --

10   sorry, can be of benefit to the counterparties.

11   **Q.**   And in showing your worth, is it ordinary business

12   practice that someone might inflate their credentials and claim

13   to have connections that they don't actually have?

14   **A.**   Yes.  It's actually quite common.

15   **Q.**   If an individual were to write a letter to a top corporate

16   executive in China saying, "We've never met.  I've never really

17   done business in China.  I'm not even Chinese.  I'm Malaysian,

18   but I'd like to do business with you," could they have gotten

19   their foot in the door that way?

20   **A.**   I don't think they'd get a reply to even the message.

21   They certainly would not be able to get their foot in the door.

22        Again, you have to be able to operate within this *guanxi*

23   milieu.  You have to operate within the cultural milieu.  You

24   have to indicate your value, your self-worth, your connections.

25        So simply being honest and straightforward in your typical

1    American way, or even a typical Malaysian way, is just not

2    going to do it.  You have to -- you have to sell yourself

3    appropriately.

4    Q.   The first paragraph of this letter mentions a banquet.  In

5    your experience, is it likely that somebody like Mr. Liew would

6    have been invited to such a banquet?

7    A.   You know, with all respect to Walter Liew, I mean, if he

8    did not have an established track record in China and was not a

9    known entity in China, and this is true for anyone --

10             THE COURT:  Excuse me.  Excuse me.

11             MR. HEMANN:  Your Honor, objection.  This is all

12   speculation.

13             THE COURT:  Sustained.  The last answer is stricken.

14   The jury will disregard it.

15   BY MS. AGNOLUCCI:

16   Q.   Would you need a track record in China in order to attend

17   and be invited to a banquet like the one described here?

18   A.   That is my understanding.  In fact, I have considerable

19   experience, personal experience, with this.  You know, I have

20   been to several banquets as an invited guest, and sometimes as

21   a guest of honor, a foreign guest of honor.  Most recently in

22   November of 2013 when I was speaking in Beijing.  And, you

23   know, the only reason these things happen is because one is a

24   known entity, one has an established track record, and one is

25   respected.

**LEWIS - DIRECT / AGNOLUCCI**

1  **Q.**  This letter at the bottom of the paragraph we're looking

2  at refers to a list of key task projects by a Chinese agency.

3  Are you aware of any such lists?

4  **A.**  Yes.  Key task projects are frequently, regularly being

5  promulgated by various authorities in China from national

6  levels to provincial levels to municipal levels.  You find

7  project lists, you know, everywhere you turn in China.  This is

8  very, very common.  It has been common for decades.  All right.

9  These project lists are known as *Lixiang*.  *Lixiang*.  That's

10  L-I-X-I-A-N-G, *Lixiang*.  And literally those are project lists.

11  They're coming out all the time.

12      All right.  As I've said, you know, various agencies in

13  China promulgate these lists, and these are projects that may

14  not be generated by the government.  They may actually be

15  generated by the private sector, but then have been supported

16  or promoted by the government.  And, indeed, they often seek

17  foreign investors.  That's one of the reasons for these

18  projects.

19      I mean, China has been very successful with publicizing

20  its projects and getting foreign investment.  China has been

21  the number one or number two destination in the entire world

22  for foreign direct investment for well over a decade now

23  because they have these project lists.

24          **MS. AGNOLUCCI:**  Your Honor, may I please approach the

25  witness with Exhibit 387, which has not been admitted?

1           **THE COURT:**  Yes, you may.

2           **MS. AGNOLUCCI:**  Thank you.

3    **Q.**   Professor Lewis, do you recognize this document?

4    **A.**   Yes, I do.

5    **Q.**   Is it an example of the types of lists that you have been

6    talking about?

7    **A.**   Yes, it is.  It's one of the types of lists.

8           **MS. AGNOLUCCI:**  Your Honor, the parties have

9    stipulated that this document was seized from Walter Liew's

10   residence and is authentic under Rule 901.

11          **THE COURT:**  Do you agree?

12          **MR. HEMANN:**  I agree, Your Honor.

13          **THE COURT:**  All right.  So stipulated.

14   **BY MS. AGNOLUCCI:**

15   **Q.**   And is this list publicly available on the Internet?

16   **A.**   Yes, it would appear to be so.

17          **MS. AGNOLUCCI:**  Your Honor, I move to admit

18   Exhibit 387.

19          **MR. HEMANN:**  Objection.  Foundation.

20          **THE COURT:**  Sustained.

21   **BY MS. AGNOLUCCI:**

22   **Q.**   Professor Lewis, are you familiar with this list?

23   **A.**   Yes.

24   **Q.**   What is it?

25   **A.**   It is a list of major technology projects scheduled for an

**LEWIS - DIRECT / AGNOLUCCI**

1    earlier period, from 1993 to 2000.

2    **Q.**    And is this an example of one of the *Lixiang* lists that

3    you were testifying about?

4    **A.**    It's in the nature of a *Lixiang*, yes.  It's a consolidated

5    *Lixiang* is what it is.

6    **Q.**    And is this list available on the Internet?

7    **A.**    It would appear so because we have actually a link here

8    from CC-Link.  There actually is a website there and

9    information on that website.  So I'm presuming that it does

10   come from an Internet source.  And, moreover, this is the China

11   information service section.

12       So I would imagine that, you know, this is something that

13   has been obtained from the Internet.  Not that I think that

14   that is, you know, necessarily essentially important, but it

15   does appear to have been derived from the Internet and --

16   **Q.**    Thank you, Professor Lewis.

17       **MS. AGNOLUCCI:**  Your Honor, I move to admit

18   Exhibit 387.

19       **MR. HEMANN:**  Your Honor, I don't think adequate

20   foundation has been laid, but we do not object.

21       **THE COURT:**  I'm sorry, I didn't hear the first part.

22       **MR. HEMANN:**  I don't think that's an adequate

23   foundation, but I think we don't object.

24       **THE COURT:**  All right.  It's admitted then.

25       (Trial Exhibit 387 received in evidence)

1          **MS. AGNOLUCCI:**  Thank you.

2      Mr. Guevara, if you could go to page 11 of the list.

3  **Q.**   Item 144 on that list mentions titanium dioxide.  Do you

4  see that, Professor Lewis?

5  **A.**   Yes, I do.

6  **Q.**   Does the fact that titanium dioxide is on this list mean

7  that China made it a priority to steal titanium dioxide trade

8  secrets?

9          **MR. HEMANN:**  Objection.

10         **THE COURT:**  Sustained.

11  BY MS. AGNOLUCCI:

12  **Q.**   What does it mean that titanium dioxide was on this list,

13  Professor Lewis?

14  **A.**   Well, it means that from the point of view of Nanning, an

15  important city in the Autonomous Region, the Guangxi Autonomous

16  Region of China, that the development of titanium dioxide is an

17  important project priority.

18  **Q.**   Is that similar to an infrastructure project in the

19  United States?

20  **A.**   Yes.  I mean, all of these -- I mean, when you look at

21  these projects and the fact that, you know, they're being

22  published or advertised in China and, indeed, in many cases

23  calling for bids, that these are actually very similar to what

24  we see here in the United States in terms of, you know, bidding

25  for infrastructure projects, you know.

1      And, of course, as we know, the Obama Administration has

2   made it a very important priority to revamp and reinvigorate

3   our infrastructure throughout the country; and, of course, we

4   have seen an increase in infrastructure projects here.  There

5   are bidding procedures.  These are publicized projects here in

6   the U.S., and they're very similar to what we find on this

7   list.

8   **Q.**   And based on your experience and training, do these

9   *Lixiang* lists that we're discussing have anything to do with

10  illegitimate purposes?

11  **A.**   No, not at all.

12  **Q.**   Do they have anything to do with the theft of information?

13  **A.**   No.

14  **Q.**   Going back for a minute to the letter that we were

15  discussing, the letter describing the banquet, have you

16  reviewed evidence that other individuals assisted in the

17  drafting of the letter?

18  **A.**   Yes, that is my understanding.

19      **MS. AGNOLUCCI:**  Your Honor, may I approach the witness

20  with Exhibits 1056 through 1059, which have been admitted?

21      **THE COURT:**  Yes, you may.

22      **MS. AGNOLUCCI:**  Thank you.

23  And may we please publish Exhibit 1057 --

24      **THE COURT:**  Yes, you may.

25      **MS. AGNOLUCCI:**  -- which has been admitted?

1          **THE COURT:**  Yes.

2          **MS. AGNOLUCCI:**  Thank you.

3    **Q.**    Professor Lewis, who is this email from?

4    **A.**    That is from Liu Changhe.

5    **Q.**    And what is the attachment described in the attachment

6    line of the email?

7    **A.**    The attachment line --

8    **Q.**    It's highlighted there for you.

9    **A.**    You mean HTP --

10   **Q.**    If you look at your screen, Professor Lewis --

11   **A.**    Oh, I'm sorry.

12   **Q.**    -- it's highlighted on the screen.

13   **A.**    Okay.  You mean the letter to Liu Changhe on TiO2 second

14   version document?  I believe that's a reference to a book.

15   **Q.**    Can you please read the text of this email?

16   **A.**    Sure.  (reading)

17          "President Liew:  How are you?  The letter has been

18       revised, but may not be suitable.  Please review and make

19       a final decision yourself.  On the 18th this month, the

20       company Worloy [sic] will come to Beijing to continue

21       discussing technology issues, hopefully you will try your

22       best to mail out the letter in the next day or two.  Wish

23       everything goes well.  Changhe Liu."

24   **Q.**    Have you reviewed documents in the course of your work on

25   this case relating to who Changhe Liu is?

1    **A.**    Yes.

2    **Q.**    And what is your understanding of who he is?

3    **A.**    Well, he seems to have been an authority on titanium

4    dioxide processes and, indeed, had published a book on this.

5    He was also involved in the Pangang Jinzhou joint venture.

6    **Q.**    Is that this entity here (indicating)?

7    **A.**    That is correct, yes.  And, indeed, certainly seems to be

8    someone that was very familiar with the Pangang Group's

9    activities, the development of the titanium dioxide industry in

10   China, in fact throughout China and various parts of China.

11        He does a comparison at one point between, you know,

12   various different titanium dioxide projects in different parts

13   of China.  So certainly well-informed, quite knowledgeable,

14   certainly an expert in this field in China, and appears to be a

15   consummate insider.

16   **Q.**    You mention an insider.  Is this an example of somebody

17   who would have had *guanxi* or relationships and connections?

18   **A.**    Yes, invariably and certainly must have had extensive and,

19   indeed, high-level *guanxi* relationships with the government,

20   with, you know, state-owned enterprises, with private sector

21   players in the industry as well.

22   **Q.**    And in your experience, would it have made sense that an

23   insider with *guanxi*, such as Changhe Liu, would assist in the

24   writing of an introductory letter like the one we've been

25   discussing?

**LEWIS - DIRECT / AGNOLUCCI**

1    **A.**    Yes, that would make perfect sense.

2    **Q.**    Thank you.

3         Mr. Guevara, you can remove that exhibit.

4         Professor Lewis, have you, during the course of your work

5    on this case, reviewed business cards seized from the Liew

6    residence?

7    **A.**    Yes, I have.

8    **Q.**    Do these business cards show that Walter Liew had *guanxi*?

9    **A.**    Not necessarily and not at all.  And, again, I'm speaking

10   from personal experience.  I have thousands of cards, business

11   cards, from China at home, perhaps more than thousands; but, in

12   any case, my wife tries to keep track of them.  I mean, there

13   are boxes of them.

14        You receive business cards in China.  It's a [Chinese

15   spoken] ritual of receiving a business card.  Whenever you meet

16   anyone in China, they, you know, bow and often with their two

17   hands present the business card because it's so important,

18   status is such an important aspect of face and one's worth.

19        So the presenting, the exchange of business cards is an

20   important part of doing business in China.  It's also simply a

21   social activity.  So, for example, when I go to conferences, I

22   collect cards.  If I go to receptions in China, I receive

23   cards.  In various business contexts I receive cards.  I have

24   thousands and thousands of cards.  I don't know who most of

25   these people are.

1    Q.   And by "most of these people," do you mean the people on

2    the thousands of business cards in your residence?

3    A.   Correct.

4         MS. AGNOLUCCI:  Your Honor, may I publish previously

5    admitted Exhibit 375?

6         THE COURT:  Yes, you may.

7         MS. AGNOLUCCI:  Mr. Guevara, if you could blow up the

8    top part.  Perfect.

9    Q.   Professor Lewis, look at your screen and please read the

10   text starting with, "Please contact."

11   A.   (reading)

12        "Please contact Mr. Tan Zhuzhou (Chairman of CPCIA)

13        by phone," and then there's a Beijing telephone number,

14        "before 5:00 p.m. (Beijing time).  He has some issues very

15        important to discuss with you."

16   Signed, "Zhou Hongda."

17   Q.   Mr. Tan Zhuzhou is listed in the excerpt you just read as

18   Chairman of the CPCIA.  Is that a reference to the agency

19   listed on the letterhead at the top?

20   A.   It is, indeed.  That's the China Petroleum and Chemical

21   Industry Association.

22   Q.   Is that a government entity?

23   A.   No.

24   Q.   What is it?

25   A.   It is an association of manufacturers, other industrial

1    companies, in the petroleum and chemical fields.

2    **Q.**    Have you seen other documents referring to this individual

3    Tan Zhuzhou as Minister Tan?

4    **A.**    Yes, I have.

5    **Q.**    And did you review testimony regarding the fact that Tan

6    Zhuzhou was a mentor to Mr. Liew?

7    **A.**    Yes, I have.

8    **Q.**    At the time of the writing of this document in 2004, was

9    Tan Zhuzhou a government official?

10    **A.**    That is entirely unclear.

11    **Q.**    Why would he be referred to as a minister if he was not a

12    government official?

13    **A.**    Because an honorific, again, as a sign of respect in

14    China.  Even after one has served as a minister or as some

15    higher-level official or as a professor, it is typical to

16    continue to address, as a matter of respect, such individuals

17    by these same honorifics.  So he would still be known as

18    Minister Tan even though he had ceased to be Minister Tan for a

19    number of years.

20    **Q.**    So he may --

21    **A.**    And, in fact, I understand he was never a minister.  He

22    was a vice minister at best.

23    **Q.**    So he may have been a retired vice minister, but in 2004

24    at the time of the writing of the letter we were just looking

25    at and at the time of this document, he was the Chairman of a

1    nongovernmental entity; correct?

2    **A.**    Correct.

3    **Q.**    Thank you.

4         **MS. AGNOLUCCI:**  Your Honor, may I approach the witness

5    with Exhibits 396 and 396T you?

6         **THE COURT:**  All right.

7         **MS. AGNOLUCCI:**  Thank you.  These have already been

8    admitted.

9         **THE COURT:**  All right.

10        **MS. AGNOLUCCI:**  And may we please publish 396T, the

11   translation.

12        **THE COURT:**  All right.

13   **BY MS. AGNOLUCCI:**

14   **Q.**    Do you see on the first page there -- well, first of all,

15   what is this document, Professor Lewis, that you have in your

16   hand?

17   **A.**    It looks like a greeting card.  It's a Chinese --

18   apparently a Chinese New Year card.

19   **Q.**    And on the screen do you see the State Administration of

20   Foreign Expert Affairs?

21   **A.**    Yes.

22   **Q.**    That's not the same as SASAC; right?

23   **A.**    No.  No relation.

24   **Q.**    Okay.  What is this entity that you're -- that is

25   described on the card?

1   **A.**   Well, this is an entity that has sort of rough

2   affiliations with the Ministry of Education in China.  It's

3   responsible for, you know, recruiting and supervising so-called

4   foreign experts that come to China.  And typically these are

5   foreign experts -- I mean, I have to preface this because

6   "foreign expert" is a term in Chinese that is applied to almost

7   anyone who is recruited to, you know, to work in universities

8   from overseas.

9        And I've met some of these people.  They typically stay in

10  the foreign expert guesthouse at universities, for example.

11  These are often people that can't get a job anywhere else in

12  the world, and they end up in China and they're teaching

13  English at the university; but they're foreign experts.

14  **Q.**   Were you such a foreign expert, Professor Lewis?

15  **A.**   Well, fortunately I was a Fulbright law professor for the

16  U.S. Government; but, indeed, I stayed in these foreign expert

17  guesthouses at the university and, yes, I was considered a

18  foreign expert.

19  **Q.**   Can we please scroll to the next page, Mr. Guevara?

20       Professor Lewis, do you know who Zhang Yujie, the sender

21  of this greeting card, is?

22  **A.**   I've seen his name in some of the other documents, some of

23  the documents related to the litigation; and I gather that he

24  has a position in the State Administration of Foreign

25  Experts -- Foreign Expert Affairs, SAFEA.  But as far as I'm

1    aware, that's -- his position is not of critical importance.

2    **Q.**   And you say it's not of critical importance.  Is he a

3    high-ranking government official?

4    **A.**   I wouldn't necessarily say he's high-ranking.  He's

5    apparently a government official.

6    **Q.**   And he works for a government agency that is responsible

7    for bringing English teachers and university professors and

8    other similar experts to China; correct?

9    **A.**   Correct.

10           **MS. AGNOLUCCI:**  Thank you.  I have no further

11   questions at this time.

12           **THE COURT:**  Thank you very much, Ms. Agnolucci.

13       Mr. Hemann?

14           **MR. HEMANN:**  Yes, Your Honor.  Thanks.

15       I've got some logistics to deal with here, Your Honor, in

16   terms of boxes and things.  Can we have a moment, please?

17           **THE COURT:**  Sure.

18           **MR. HEMANN:**  Thank you.

19           **THE COURT:**  If you want to stand, ladies and

20   gentlemen, you can while they're clearing stuff out.

21       You can stand, too, Professor, if you'd like.

22                         (Pause in proceedings.)

23           **THE COURT:**  Are you ready, Mr. Hemann?

24           **MR. HEMANN:**  I am, Your Honor.

25           **THE COURT:**  All right.  You may be seated, ladies and

1  gentlemen.

2          **MR. HEMANN:**  Your Honor, may I proceed?

3          **THE COURT:**  Yes, you may.

4          **MR. HEMANN:**  Thank you.

5                  <u>**CROSS-EXAMINATION**</u>

6  **BY MR. HEMANN:**

7  **Q.**   Mr. Lewis, you are a -- would you describe yourself as a

8  career academic?

9  **A.**   Yes.

10 **Q.**   You've never been employed by a Chinese company, have you?

11 **A.**   No.

12 **Q.**   And you've never been an officer of a Chinese company?

13 **A.**   No.

14 **Q.**   Nor a director of a Chinese company?

15 **A.**   No.

16 **Q.**   In your academic endeavors, would it be accurate to say

17 that your principal focus has been on trade policy over the

18 years?

19 **A.**   No, it would not be accurate.

20 **Q.**   What would be the accurate way to describe your principal

21 focus?

22 **A.**   My principal focus has been on trade and investment law in

23 China; and, of course, investment law invariably includes

24 corporate law.

25 **Q.**   Of your published works, what percentage would you say has

1  been focused on trade-related issues?

2  **A.**   Oh, that's difficult to calculate.  I mean, over the

3  course of my entire academic career, which I guess is over 30

4  years now, I would say in terms of publications, probably

5  certainly less than half.  Less than half.

6  **Q.**   You mentioned the WTO several times --

7  **A.**   Yes.

8  **Q.**   -- during your direct examination.  What does that stand

9  for?

10  **A.**   World Trade Organization.

11  **Q.**   Ms. Agnolucci asked you about your Chinese language

12  skills.  Do you remember that?

13  **A.**   I do.

14  **Q.**   How would you describe your skill in speaking Chinese?

15  **A.**   I would say reasonably fluent.

16  **Q.**   Your CV describes it as advanced.  Would you --

17  **A.**   I would say so, yes.

18  **Q.**   And would that apply to both reading and speaking?

19  **A.**   Yes.  Essentially, yes.

20  **Q.**   When you say "essentially" --

21  **A.**   I speak and read Chinese both, yes.

22  **Q.**   Your testimony today concerned in part the relationship

23  between the organization that you described as SASAC and the

24  Pangang Group related entities.  Do you remember that?

25  **A.**   Yes.

1  Q.   I'd like to start with just a little bit about the

2  Pangang Group related entities.

3       Pangang Iron & Steel Group Company was founded in about

4  1965; is that correct?

5  A.   I believe so.

6  Q.   And the formal name of the company that was founded was

7  Panzhihua Iron & Steel Group Company; correct?

8  A.   When it was originally founded, I'm not sure that it had

9  the "group" association.  I think it was just Panzhihua

10  Iron & Steel Company Limited.

11  Q.   And the "group" was added as the company grew larger?

12  A.   Later, yes.

13  Q.   And then sometime in the 2000s, the name Panzhihua

14  Iron & Steel Group Company sort of morphed into the

15  Pangang Group Company; correct?

16  A.   Yes.  That's my understanding.

17  Q.   Although, sometimes the Pangang Group Company is still

18  referred to as Panzhihua; is that correct?

19  A.   Yes.

20  Q.   And then the Pangang Group Company was merged into Angang

21  in about 2010; correct?

22  A.   Yes.  I mean, the process began earlier.  I mean, but the

23  actual culmination of the merger occurred in 2010.

24  Q.   And we're going to talk a little bit more about Pangang in

25  a little bit, but let's talk about SASAC first.

1          SASAC is a government entity that reports up to the

2     State Council; correct?

3     **A.**    Correct.

4     **Q.**    And SASAC performs investor responsibilities?

5     **A.**    Correct.

6     **Q.**    And SASAC supervises and manages the state-owned assets of

7     the enterprises under the supervision of the Central

8     Government; correct?

9     **A.**    Well, it is part of the Central Government.  So, I mean,

10    it supervises and to some extent manages, although I would be

11    very careful there.  Perhaps "supervision" is probably the

12    better word of state-owned assets in the state-owned sector of

13    the Chinese economy.

14    **Q.**    So "supervises" you agree with, "manages" not so much?

15    **A.**    Correct.

16    **Q.**    You are aware, are you not, that, Mr. Lewis, that that is

17    how SASAC, in describing its own responsibilities, uses the

18    word "manages"; correct?

19    **A.**    Well, are you relying on an English translation?

20    **Q.**    Does SASAC in describing its own responsibilities use the

21    term "manages"?

22    **A.**    In the English translation, it does; but the point is that

23    "supervision" and "management" are almost interchangeable terms

24    in Chinese.  So, you know, there can be some -- some merging or

25    free association between those terms.

1        But what I want to say is that simply, too, that a general

2    description on a website, including the SASAC website, if

3    that's where, in fact, this information is derived from, is not

4    an entirely reliable source.  One has to look at the laws in

5    terms of what are the actual investor responsibilities of

6    SASAC.

7    **Q.**   So let's break this down a little bit.

8        First of all, your testimony is that "supervision" and

9    "management" are essentially interchangeable?

10   **A.**   No.  I'm saying that there can be a gloss between the two,

11   and the point here is that my view is that supervision --

12   **Q.**   Let me stop you there because I didn't ask you for your

13   view.

14       You just testified that the terms "supervision" and

15   "management" are essentially interchangeable; correct?

16   **A.**   What I --

17   **Q.**   Just answer yes or no.

18   **A.**   No.

19   **Q.**   Okay.  You did not just say under -- in Chinese

20   "supervision" and "management" are essentially interchangeable?

21   Yes or no.

22   **A.**   Can we have that read back?  I mean, I can't recall.

23   **Q.**   Is it your recollection that you just testified that

24   you -- that "supervision" and "management" are essentially

25   interchangeable?

1   **A.**   I said that there was a relationship in terms of the

2   Chinese language between "supervision" and "management."  All

3   right.  And, so, in an English translation, there can be an

4   extension there which would not exist in Chinese.

5   **Q.**   So if you said the word "interchangeable," that was a

6   mistake?

7   **A.**   I'm trying to elaborate further here.  The --

8   **Q.**   So let me ask another question.

9           **MR. HEMANN:**  Let me actually ask, Your Honor, may I

10   approach the witness with Exhibit 960?

11           **THE COURT:**  Yes.

12           **MR. HEMANN:**  I've handed the witness Exhibit 960.

13   **Q.**   And this is a printout from the SASAC website; is it not?

14   **A.**   Yes, it is.

15   **Q.**   And this is not a -- this is a translation that was

16   performed by SASAC; is that correct?

17   **A.**   Yes, it is.

18   **Q.**   And it is a document that -- and SASAC keeps a website you

19   testified earlier; yes?

20   **A.**   Yes.

21           **MS. AGNOLUCCI:**  Objection.

22           **THE COURT:**  Overruled.

23   BY MR. HEMANN:

24   **Q.**   And this is a document that describes, according to SASAC,

25   the main functions and responsibilities of SASAC; correct?

```
1              MS. AGNOLUCCI:  Objection.

2              THE COURT:  Overruled.

3   BY MR. HEMANN:

4   Q.   Yes?

5   A.   Could you repeat the question?

6   Q.   This is a document that describes the main functions and

7   responsibilities of SASAC; correct?

8   A.   That's the way the document is entitled.

9   Q.   And SASAC, as you testified earlier, is a government

10  entity; correct?

11  A.   Correct.

12             MR. HEMANN:  Your Honor, the United States moves this

13  document in under Rule 803(8) as a public record showing the

14  activities of the office.

15             THE COURT:  Any objection?

16             MS. AGNOLUCCI:  Yes.  Lack of foundation that it's a

17  public record.

18             THE COURT:  Overruled.  It's admitted.

19       (Trial Exhibit 960 received in evidence)

20             MR. HEMANN:  May I have the ELMO, please,

21  Ms. Ottolini?

22             THE CLERK:  Yes.  You have to wait a minute.

23                      (Pause in proceedings.)

24  BY MR. HEMANN:

25  Q.   And this is a document, Mr. Lewis, as you testified, that
```

1   comes from the SASAC website; correct?

2   A.   Correct.

3   Q.   And you testified earlier, I asked you whether SASAC

4   supervises and manages the state-owned assets of the

5   enterprises under the supervision of the Central Government;

6   correct?

7   A.   You asked me that question, yes.

8   Q.   And you said that you did not agree with the "manages"

9   component to that; correct?

10  A.   Yes.   I sought to qualify it.

11  Q.   But you don't agree with the "manages" component?

12  A.   Yeah.   I think that "supervision" is probably closer to

13  the Chinese.

14  Q.   This is how SASAC describes its responsibilities; correct?

15  A.   In English, yes.

16  Q.   And in English translation that SASAC did itself; correct?

17  A.   Correct.

18  Q.   This also says, a little bit further down, that SASAC

19  appoints and removes the top executives of the supervised

20  entities -- enterprises and evaluates their performances

21  through legal procedures and either grants, rewards, or

22  inflicts punishments based on their performance.

23       Do you see that?

24  A.   Which item is that?

25  Q.   That is Number 4.

1   **A.**   Number 4.  Yes, I do see that.

2   **Q.**   And that is one of SASAC's responsibilities; correct?

3   **A.**   I mean, I wish to take respectful -- you know, I

4   respectfully disagree to the approach here, because this is not

5   the law.  All right.  And these are simply statements made by

6   SASAC on its website.

7        What you should be going -- because these are all derived,

8   and I have to point out, as a matter of Chinese law, these are

9   derived from laws and regulations of the People's Republic of

10  China, and that is the authority on which SASAC exercises

11  investor responsibilities.  It is not sufficient to simply, it

12  is not sufficient from my point of view, to rely simply on a

13  summary on a website.

14  **Q.**   So SASAC, one of SASAC's responsibilities, is to interpret

15  the laws that it follows in conducting its responsibilities;

16  correct?

17  **A.**   I'm not sure that's a correct statement of how government

18  agencies in China follow laws and regulations, including

19  administrative laws and regulations.

20  **Q.**   So do government agencies in China always follow the law

21  as it is written down in the statutes that you referred to?

22  **A.**   In terms of administrative laws and regulations, they must

23  do so.  If they do not, then they are subject to the

24  possibility of administrative litigation under the

25  administrative litigation law.  They are also subject to

1    possible -- a whole range of punishments under other

2    administrative statutes.

3    **Q.**    So it sounds like, Mr. Lewis, that your testimony is that

4    your interpretation of the statutes that SASAC must follow is

5    different than SASAC's interpretation of the statutes that it

6    must follow.

7    **A.**    No, I'm not saying that.  I'm saying that what should be

8    done in an American court of law, and this is simply my view,

9    my opinion, is that we should be looking at the primary source

10   material, which are the laws and regulations that define and

11   set forth what are the investor responsibilities of SASAC.  We

12   should not be looking simply at a summary.

13   **Q.**    And your interpretation -- your testimony is that your

14   interpretation of those laws is correct; whereas, SASAC's

15   interpretation is incorrect?

16   **A.**    No, that is not what I'm saying at all.  I am not

17   interpreting Chinese law.  In my -- for example, in my report

18   what I am stating is the verbatim provisions of the relevant

19   laws and regulations as they appertain to SASAC.  I am not

20   relying on a website.

21   **Q.**    Is this just a website or is this SASAC's website?

22   **A.**    This is SASAC's website, but it is not law.

23   **Q.**    And do you believe that SASAC's interpretation of the law,

24   as articulated by SASAC on its website, is incorrect?

25   **A.**    This is not a statement of the law.

1  **Q.**   Do you believe that SASAC's interpretation of its main

2  functions and responsibilities as set forth on its website by

3  SASAC is incorrect?

4  **A.**   I would say that it is an expanded view of its

5  responsibilities, which go perhaps beyond the scope of certain

6  laws and regulations that are meant to regulate SASAC.

7  **Q.**   Number 8 of this document says:  (reading)

8        "SASAC is responsible for the fundamental management

9        of the state-owned assets of enterprises."

10       Do you agree or disagree with that statement?

11 **A.**   I would say I would agree with that.

12 **Q.**   As to SASAC, Mr. Lewis, have you ever taught a course on

13 SASAC?

14 **A.**   I have certainly discussed SASAC and its functions, its

15 position within the Chinese economy in courses, including at

16 Stanford -- including at Stanford Law School.

17 **Q.**   But never a course specifically on SASAC; correct?

18 **A.**   I think you would be hard-pressed to find anywhere in the

19 country where someone teaches a course only on SASAC.

20 **Q.**   Have you ever written or edited a book focused on SASAC?

21 **A.**   No.  Because, again, SASAC --

22 **Q.**   We'll be here for a long time.

23 **A.**   Sorry.  Sorry.

24 **Q.**   Have you ever written a book chapter on SASAC?

25 **A.**   No, I have not.

1    **Q.**    Have you ever written an article on SASAC?

2    **A.**    No, I have not.

3    **Q.**    Have you ever provided before today expert testimony with

4    regard to SASAC?

5    **A.**    No, I have not.

6    **Q.**    SASAC was formed in the year 2003; correct?

7    **A.**    Correct.

8    **Q.**    And since 2003 you've edited one book; correct?

9    **A.**    Correct.

10   **Q.**    And that was on China's participation in the WTO?

11   **A.**    Correct.

12   **Q.**    And since 2003, you've written four articles; is that

13   correct?

14   **A.**    That may be the number.  I'm not sure.

15   **Q.**    And since then, they've been focused on trade policy

16   issues; correct?

17   **A.**    To a greater or lesser extent, that's true.  Although, I

18   have to say that my most recent publication is actually more

19   based on current economic reforms in China and in relation to

20   indigenous innovation policies and strategic emerging

21   industries.  So that's my most -- my most recent research is in

22   those areas.

23   **Q.**    And the most recent article is "Rio+20 and Beyond"?

24   **A.**    Correct.

25   **Q.**    And what is "Rio"?

1  **A.**    Rio -- well, it's "Rio+20," actually, was the UN

2  conference organized by the UN Environmental Protection Agency.

3      Basically, it's the Second Earth Summit looking at what

4  the future will be for particularly the green economy, for

5  green tech, for renewables, and how that is situated within the

6  international climate change negotiations, as well as in terms

7  of the national economic development strategies.

8  **Q.**    So not about SASAC?

9  **A.**    Not about SASAC.

10  **Q.**    I want to talk a little bit about these state-owned

11  entities, state-owned enterprises that you spoke with

12  Ms. Agnolucci about.

13      And you mentioned that there are -- there are state-owned

14  entities that are under both Central SASACs and more local

15  SASACs; is that correct?

16  **A.**    Correct.

17  **Q.**    And that would be Central SASAC and then there would be

18  provincial SASACs?

19  **A.**    And further local SASACs as well.

20  **Q.**    Sort of citywide SASACs?

21  **A.**    Citywide and then provincial level as well.

22  **Q.**    Would it be accurate to say that the key Chinese companies

23  are maintained as Central SOEs?

24  **A.**    Sorry.  Could you repeat the question?

25  **Q.**    That the key Chinese companies are maintained as Central

1    SOEs.

2    **A.**   Well, I mean, I think that statement -- I mean, I would be

3    willing to answer in the affirmative subject to a

4    qualification.  I mean, there are a lot of very important

5    companies in China, as I mentioned in my report, which are not,

6    you know, Central SOEs or part of these Central SOE corporate

7    groups.

8        I mean, Huawei is just one example, which I think a lot of

9    us are familiar with.  I mean, that's a private company in

10   China.  So there are a lot of big private companies.  Lenovo,

11   which owns, you know, IBM's PC business; Geely that owns Volvo.

12   I mean, these are large private companies in China.  They're

13   not state owned.

14       So, I mean, it's not really accurate to say that, you

15   know, that all of the key, you know, Chinese corporate players

16   are, you know, on the Central SOE list or even SOEs at all.

17   **Q.**   Are you familiar with a person by the name of Li Rongrong?

18   **A.**   Yes.

19   **Q.**   And Mr. Li was the head of SASAC from 2005 to 2010;

20   correct?

21   **A.**   Correct.

22   **Q.**   Would you agree that there are two groups of industries,

23   strategic industries, and fundamental and pillar industries in

24   China?

25   **A.**   Indeed there are, yes.

**LEWIS - CROSS / HEMANN**

1  Q.  And that the SASAC -- that SASAC is interested or SASAC

2  does, as a matter of policy, maintain control, investor control

3  I think you described it as earlier, over both the strategic

4  industries and the pillar industries; correct?

5  A.  I don't call it "control."  I mean, they have certain

6  investor responsibilities.  All right.  That's not control.

7      All right.  And I thought I made it perfectly clear in my

8  testimony today that these Central SOEs have tremendous power.

9  The *jituan* in China, the corporate groups are similar to the

10  Korean *chaebols*.  The Japanese *keiretsu*, and they have their

11  own independent corporate powers, that are, you know, respected

12  under the PRC Company Law and in many, many other ancillary

13  enactments of the Chinese government.

14      So, you know, to talk about investor control by an

15  organization that's only been in existence since 2003 and is a

16  weak bureaucracy vis-a-vis many other bureaucracies in China,

17  it's just -- it's an untenable position actually.

18  Q.  Well, so you'd agree that Mr. Li, Li Rongrong, was

19  probably a pretty authoritative figure on SASAC, wouldn't you

20  say?

21  A.  Yeah, I suppose.

22  Q.  The head of SASAC?

23  A.  Yes.

24  Q.  He was an -- originally he was a -- he participated in

25  SASAC from its founding in 2003; correct?

1  **A.**    I believe so.

2  **Q.**    Would you agree with the statement that SASAC identified

3  two groups of industries, strategic industries for which the

4  government must maintain absolute control; and fundamental and

5  pillar industries or heavy-weight industries, for which the

6  government should maintain relatively strong control over their

7  principal enterprises?  Do you agree with that?

8  **A.**    Yes.

9  **Q.**    And those are the companies that make up the Central SOEs;

10  correct?

11  **A.**    Essentially now, I think, that's probably a relatively

12  fair statement.  But I, again, want to qualify because we have

13  to remember that even some of the pillar industries in China,

14  including one might say the iron and steel industry, is not one

15  that is necessarily going to remain under firm SOE control.

16       Already we see substantial private players in the iron and

17  steel industry in China.  Jiangsu Shagang is one of the leading

18  iron and steel producers in China.  It is a private company.

19  They're in the titanium dioxide field.  We have seen a number

20  of private companies emerge in China.

21       And, indeed, the entire direction for the iron and steel

22  industry, if you read the policy pronouncements, the current

23  policy pronouncements in China, is that this is an industry

24  that is likely to move towards full privatization in the near

25  future.

**LEWIS - CROSS / HEMANN**

1  **Q.**   In the future?

2  **A.**   Yes.  But it's been moving in that direction for many

3  years now.

4  **Q.**   And our case involves events that took place between 2004

5  and 2011; correct?

6  **A.**   Correct.

7  **Q.**   Okay.

8  **A.**   But even at that point in time there was no government --

9  already because of reforms that occurred in the iron and steel

10  industry, there was no effective regulator of that industry.

11  **Q.**   Well, are we talking about regulation or ownership?

12  **A.**   We're talking about regulation.  As I think I made it

13  perfectly clear in my testimony, I talked about SASAC being

14  both an investor --

15  **Q.**   If I may stop you.

16          **MR. HEMANN:**  Your Honor?

17          **THE COURT:**  Just a moment.  Wait for the question,

18  Professor.

19          **THE WITNESS:**  Sorry.

20  **BY MR. HEMANN:**

21  **Q.**   I'm talking about ownership.

22  **A.**   Okay.

23  **Q.**   And we're going to talk a little bit more about ownership

24  as we progress.

25       Let's talk first about the Luo Gan letter that you refer

1   to as the puff letter.  Do you remember that?

2   **A.**   Yes, I do.

3   **Q.**   Let me put this up.

4          **MR. HEMANN:**  Sorry, Your Honor.  May I grab an easel?

5          **THE COURT:**  Sure.

6                (Pause in proceedings.)

7          **MR. HEMANN:**  And can you please put up 350T, page, I

8   believe it's page 3.

9   **Q.**   And I don't know if you can see it from there, Mr. Lewis,

10  but that's the page that you were referring to earlier from the

11  letter; correct?

12  **A.**   Correct.

13  **Q.**   It's now up on your screen.

14  **A.**   Thank you.

15  **Q.**   I'd first like to talk a little bit about the authorship

16  of the letter.  And you said that you had seen some documents

17  that suggest that another individual may have assisted in the

18  drafting of this letter.  Yes?

19  **A.**   Yes.

20  **Q.**   And you don't know what parts, if any, of this letter any

21  other individual assisted in drafting; correct?

22  **A.**   Well, no, I have actually seen a document which is

23  highlighted in red.  Some parts of this letter that may have

24  been drafted by, you know, one or more third parties.

25  **Q.**   May have?

1   **A.**    Yeah, may have.  I mean --

2   **Q.**    And explain to the jury what your knowledge is about --

3   what your knowledge base is about the authorship of this

4   letter?

5   **A.**    I have seen the correspondence that was referred to on

6   direct where we have correspondence from this -- is it Li or

7   Liu Changhe -- this author of a textbook on titanium dioxide

8   and essentially involved in the Pangang Jinzhou joint venture

9   where he seems to be suggesting that he's involved, he's made

10  changes to the draft letter.  So there's that.

11       There's another document that I've examined that I just

12  indicated that shows highlighted in red areas which are

13  suggested additions to the puff letter.  So, I mean, those are

14  documents that I clearly have seen myself.

15  **Q.**    Any other documents?

16  **A.**    Not that I'm aware of, no.

17  **Q.**    And with whom have you spoken about the letter?

18  **A.**    I've spoken to counsel about it.

19  **Q.**    In particular?

20  **A.**    Simona Agnolucci and, perhaps, Katie -- Katherine Lovett.

21  **Q.**    Anybody else?

22  **A.**    No.

23  **Q.**    Have you spoken to Mr. Liew?

24  **A.**    No, I have not directly spoken to him.

25  **Q.**    Have you spoken to any other person about who may or may

1    not have written what parts of this letter?

2    **A.**    I believe I may have spoken to also Stuart Gasner.

3    **Q.**    So only counsel for Mr. Liew?

4    **A.**    Yes.

5              **MR. HEMANN:**  Could you please put up on the screen,

6    Ms. Mahoney, Exhibit 393, page 32.

7         This is admitted in evidence, Your Honor.

8              **THE COURT:**  All right.

9              **MR. HEMANN:**  32, please.  Page -- yeah.

10             **THE COURT:**  Can we take a stretch break while we're

11   doing that?

12             **MR. HEMANN:**  Yes, Your Honor.

13             **THE COURT:**  All right.  Let's take --

14             **MR. HEMANN:**  Sorry.  393, page 32.

15                  (Pause in proceedings.)

16             **THE COURT:**  All right.  You may be seated, please.

17             **MR. HEMANN:**  Thank you, Your Honor.

18             **THE COURT:**  You may proceed.

19             **MR. HEMANN:**  May I proceed?

20             **THE COURT:**  Yes.

21   **BY MR. HEMANN:**

22   **Q.**    Mr. Lewis, have you seen this document?

23   **A.**    I'm not sure I have.

24   **Q.**    The parties have stipulated, Mr. Lewis, this document is

25   in Walter Liew's handwriting.

**LEWIS - CROSS / HEMANN**

1   **A.**   Right.

2   **Q.**   Could you read the first line of this document?

3          **THE COURT:**  Do you want him to read it in Chinese or

4   English?

5          **MR. HEMANN:**  In English.

6   **Q.**   Tell the jury what it says in English.

7   **A.**   Well, basically it's talking about in December of 1991,

8   someone related -- I mean, someone in the State Council, Luo

9   Gan, in December of 1991, Luo Gan associated with the

10  State Council -- it's difficult to make out the scribble

11  here -- I mean, the writing.  But has -- yeah, I mean, it's

12  difficult for me to make out the last couple of paragraphs.

13  **Q.**   Sure.

14      Ms. Mahoney, could you put up 393T, page 0029?

15      This is a -- this will be a translation, and this is in

16  evidence, of this page.

17      And the top of it says:  (reading)

18          "December 1991.  Secretary Luo Gan of the

19      State Council representing the State Council hosted Liu

20      Yuanxuan at the Diaoyutai State Guesthouse expressed to

21      Luo gratitude for his patriotism and contributions to

22      China."

23      Have you seen this document before today?

24  **A.**   (Witness examines document.)  I believe so.  I believe so,

25  yes.

1  **Q.**  And when was this written?

2  **MS. AGNOLUCCI:**  Objection.

3  **THE COURT:**  Sustained.

4  **BY MR. HEMANN:**

5  **Q.**  Do you know when this was written?

6  **A.**  No, I'm not sure.

7  **Q.**  Could you please, Ms. Mahoney, put up Exhibit 841.

8  Were you shown this document in your endeavor to learn

9  about who wrote the letter?

10  **A.**  I'm not sure that I was.

11  **Q.**  And were you shown metadata associated with this document

12  that shows it was created in March of 2004?

13  **A.**  No, I have not been shown that.

14  **Q.**  So it would be accurate to say, Mr. Lewis, that you did

15  not look at all of the documents related to the authorship of

16  the Luo Gan letter, and in particular related to the authorship

17  of the first paragraph on the board that is facing the jury?

18  **A.**  I've looked at a number of documents.  I do not know if

19  I've looked at all of them.

20  **Q.**  This letter -- and, Ms. Mahoney, could you go to 350T,

21  page 2, and just blow up the text, please?

22  This is the first page, Mr. Lewis, of the letter that

23  we've been discussing; correct?

24  **A.**  Correct.

25  **Q.**  And it is addressed to Mr. Hong Jibi; correct?

**LEWIS - CROSS / HEMANN**

1  **A.**   Correct.

2  **Q.**   And he was the Chairman of the Pangang Group at the time;

3  correct?

4  **A.**   Correct.

5  **Q.**   I want to do a little drawing on the board.  We talked a

6  little bit earlier about SASAC, and this is Central SASAC,

7  okay?  Yes?

8  **A.**   Yes.

9  **Q.**   And the Pangang Group -- the Pangang Group Company is

10  100 percent owned by SASAC; is that correct?

11  **A.**   Yes.

12  **Q.**   And under the Pangang Group is a company that you

13  abbreviated as PISCO; correct?

14  **A.**   Correct.

15  **Q.**   And that is also -- that is 100 percent owned by the

16  Pangang Group; correct?

17  **A.**   It appears to be so, yes.

18  **Q.**   The other name for the Pangang Group is the Panzhihua

19  Iron & Steel Group Company.  We discussed that earlier;

20  correct?

21  **A.**   Yes.

22  **Q.**   That is not the name of PISCO; correct?

23  **A.**   No, because PISCO does not have a group assignation.

24  **Q.**   And Pangang Group, as it was 100 percent owned by SASAC,

25  was a Central SOE; correct?

1   **A.**   It was at certain times a Central SOE, correct.

2   **Q.**   It was until it merged into Angang in 2010; correct?

3   **A.**   I -- I'm not entirely sure about that.  I mean, my -- you

4   know, I did see a report, and you have to recall that it was --

5   there were developments, as it were.  I had seen at least one

6   report where it was indicated that, and this was a Mainland

7   source, that Pangang had -- or the Pangang Group Company had

8   fallen off of the Central SOE list as early as, you know,

9   mid-July 2009.  But it does appear later than that; but as I've

10  also -- as I've already testified, it does appear from exhibits

11  that we have submitted that it was delisted from the

12  Central SOE or Central -- yeah, Central SOE list as of

13  mid-July 2010.

14  **Q.**   So have you had the opportunity to look at -- you

15  testified about some lists that SASAC produces annually;

16  correct?

17  **A.**   Correct.

18  **Q.**   And those lists show the Central SOEs?

19  **A.**   They do at certain -- they're, like, photographs at

20  certain points in time.  They don't necessarily give you, you

21  know, a continuous timeline in terms of who was on the list and

22  who was not.

23  **Q.**   And it is true that from 2004 through 2009, Pangang Group

24  Company appears on those lists?

25  **A.**   I believe so.

1   **Q.**   And it actually refers -- appears on those lists as the

2   Panzhihua Iron & Steel Group Company; correct?

3   **A.**   Correct.  Correct.

4   **Q.**   Now I'd like to turn for a moment to the body of the

5   letter.  And it reports, the letter reports to this meeting

6   between -- the meeting with Luo Gan in 1991; correct?

7   **A.**   Correct.

8   **Q.**   And Luo Gan was the Secretary General of the State Council

9   in 1991; is that correct?

10  **A.**   Yes.

11  **Q.**   And Mr. Luo had an impressive political career following

12  that position in 1991?

13  **A.**   Yes, he did.

14  **Q.**   And he ended up on the Politburo of the Communist Party;

15  correct?

16  **A.**   Not just the Politburo, the Standing Committee of the

17  Politburo.

18  **Q.**   So he was one of the, how many most powerful people of the

19  Communist Party?

20  **A.**   Eight or nine.

21  **Q.**   And that was by 2004; correct?

22  **A.**   I believe so.

23  **Q.**   He also maintained his position as a State Councilor

24  throughout much of that period of time?

25  **A.**   That's correct.

LEWIS - CROSS / HEMANN

1  **Q.**   So as you discussed earlier, there is the party and there

2  is also the government; correct?

3  **A.**   Correct.

4  **Q.**   And they exist, I don't know if parallel is the right

5  word, but they exist next to each other in many respects?

6  **A.**   Yes.

7  **Q.**   And Mr. Luo had his feet in both ponds, if you will?

8  **A.**   That's correct.

9  **Q.**   And that's not uncommon?

10  **A.**   It's not that uncommon, correct.

11  **Q.**   The State Council is the highest executive organ in the

12  Chinese government; correct?

13  **A.**   Correct.

14  **Q.**   It runs the government?

15  **A.**   Under the Constitution of the People's Republic of China,

16  yes, it is the highest organ of executive power.

17  **Q.**   And the State Council is run by a Premiere?

18  **A.**   Yes.

19  **Q.**   And there are Vice Premieres?

20  **A.**   Correct.

21  **Q.**   And there are State Councilors?

22  **A.**   Yes.

23  **Q.**   And the Secretary General of the State Council sort of

24  runs the day-to-day affairs of the State Council?

25  **A.**   That's right.

1   **Q.**   So that's Luo Gan.

2       You talked also -- or we talked earlier about

3   Minister Tan.  Do you remember that?

4   **A.**   Yes.

5   **Q.**   Now, Minister Tan was the vice minister of the Ministry of

6   Chemical Industries at one period of time; correct?

7   **A.**   Correct.

8   **Q.**   And the Ministry of Chemical Industries eventually,

9   sometime between 1991 and 2004, was disbanded and this Chemical

10  Petroleum Institute was created?

11  **A.**   It's an industrial association.  But, I mean, you're

12  absolutely right.  I mean, what we see, again, as we see a

13  deepening of economic reforms in China and, of course, related

14  corporate and corporate governance reforms, there is an

15  elimination of the line ministries in many of the sectors of

16  the Chinese economy.

17      In other words, getting rid of government control over

18  these sectors and allowing them to operate in a market economy.

19  Remember, that's what China has been trying to build for many

20  years now, a market economy.  So these reforms are related to

21  that very, very large program, the vision of the Chinese on all

22  this.

23      So what we see there is, you know, an elimination of the

24  ministry, that bureaucratic structure, and it being replaced by

25  simply an industrial association of the manufacturers.  Almost

1  self-regulation, if you like.

2          THE COURT:  All right.  Ask another question, please.

3          MR. HEMANN:  Thank you, Your Honor.

4  Q.   But as to Minister Tan, he was an important official;

5  correct?

6  A.   Correct.

7  Q.   And the China Petroleum and Chemical Industry Association

8  was an influential organization; correct?

9  A.   Yes.

10  Q.   And Minister Tan and the other officials who are listed on

11  this document were associated with the recruitment of

12  high-level foreign experts; correct?

13          MS. AGNOLUCCI:  Objection.

14          THE COURT:  Overruled.

15      You may answer.

16          THE WITNESS:  Could you repeat the question, please?

17  BY MR. HEMANN:

18  Q.   Minister Tan and the other officials who are listed in the

19  first paragraph of the letter were associated with the

20  recruitment of high-level foreign experts?

21  A.   Can I look at -- the letter is here, right.  Okay.  So I

22  would not agree, respectfully, because a vice minister in the

23  Ministry of Chemical Industry is not someone who is normally

24  associated with the recruitment of experts.  All right.  That

25  falls, yes, to people like this Zhang Yujie, who is clearly

1   with the State Bureau of Foreign Expert Affairs, SAFEA.  Okay?

2           MR. HEMANN:  Your Honor, may I approach the witness

3   with a copy of his expert report?

4           THE COURT:  Yes, you may.

5   BY MR. HEMANN:

6   Q.   Handing you, Mr. Lewis, a copy of your expert report, do

7   you have that in front of you?

8   A.   I do.

9   Q.   Can you please turn to page 27?

10  A.   All right.

11  Q.   And I'm going to read the last sentence of the first

12  paragraph:  (reading)

13          "Vice Minister Tan and the other officials were

14      associated with recruitment of high-level foreign experts

15      but it bolstered the author's technical credibility in the

16      eyes of the Panzhihua leaders."

17      Is that what it says?

18  A.   Yes, but this is in the context of explaining why these

19  personages may have been clumped together in a puff letter.

20  We're not talking about necessarily the reality.  I'm talking

21  about the reality in China.  All right.  That's different from

22  what I'm seeing in this paragraph.

23  Q.   So the reality in China is that Hong Jibi would have

24  believed that these individuals were associated with the

25  recruitment of high-level foreign experts?

**LEWIS - CROSS / HEMANN**

1   **A.**    No, no.   I'm talking about the reality when I look at the

2   document, what I was talking about when trying to answer your

3   question.   This is the puff letter, all right, and that's

4   what's being communicated here.

5         But what I am saying, and you're asking my opinion, but I

6   don't think that typically a vice minister of the Ministry of

7   Chemical Industry would be particularly relevant from the point

8   of view of the recruitment of foreign experts or having a close

9   relationship with the State Bureau of Foreign Expert Affairs.

10  **Q.**    So this letter was addressed to Hong Jibi; correct?

11  **A.**    Yes.

12  **Q.**    Probably a pretty serious guy; right?

13  **A.**    Indeed.

14  **Q.**    And Hong Jibi would have read these names just as you

15  have; correct?

16  **A.**    Hmmm.

17  **Q.**    Yes?

18  **A.**    Yes.

19  **Q.**    And, so, your testimony is that Hong Jibi would have seen

20  right through this and known that these are not people who are

21  associated with the recruitment of high-level foreign experts?

22  **A.**    No.   I mean, what I'm giving you is my opinion.   I'm

23  not -- how can I speak for Hong Jibi?   I don't even know the

24  man.

25         So -- but the point --

1    **Q.**    Let me ask you -- let me stop you there.

2    **A.**    Yeah.

3    **Q.**    How can you speak for Walter Liew?

4    **A.**    I'm not speaking for Walter Liew.

5            **MS. AGNOLUCCI:**  Objection.

6            **THE COURT:**  Sustained.

7    **BY MR. HEMANN:**

8    **Q.**    So you can't get into the mind of either Hong Jibi or

9    Walter Liew; is that correct?

10           **MS. AGNOLUCCI:**  Objection.

11           **THE COURT:**  Overruled.

12           **THE WITNESS:**   I -- you know, according to the rules

13   that have been laid down by Judge White, no, I cannot get into

14   state of mind.

15   **BY MR. HEMANN:**

16   **Q.**    If we took you out of the courtroom, could you get into

17   the mind of Hong Jibi or Walter Liew?

18           **MS. AGNOLUCCI:**  Objection.

19           **THE COURT:**  Sustained.

20   **BY MR. HEMANN:**

21   **Q.**    So after this letter, which is addressed to Hong Jibi of

22   the Pangang Group Company, Mr. Liew enters into contracts with

23   the Pangang Jinzhou Titanium Company; correct?

24   **A.**    Yes.

25   **Q.**    Let's draw a little bit of that.

1      So there's -- do you know whether Pangang Jinzhou or

2  Pangang -- or, I'm sorry, Jinzhou Iron Alloy Company was owned

3  by a provincial or a local SASAC?

4  A.   In terms of the -- I have to take issue with the notion of

5  ownership.  I mean, because I don't think that that's accurate.

6      In terms of having an investor role, okay, investor

7  role --

8  Q.   Let me just -- we'll go back to that in a moment.

9  A.   Okay.  But I want to try to answer your question.

10  Q.   I'm just trying to figure out whether the role is a

11  provincial or a local SASAC.

12  A.   I would imagine that it would be a -- it certainly would

13  be a local SASAC.  That could be at the provincial level or

14  probably, more likely in this case with Jinzhou, at the

15  municipal level.

16  Q.   Okay.  So this is a, can we just call it a local --

17  A.   SASAC.

18  Q.   -- SASAC?  That's fine; right?

19  A.   Yes.

20  Q.   And this is the Jinzhou Iron Alloy Company; correct?

21  A.   Correct.

22  Q.   And this is sometimes known as Jinzhou Feralloy; correct?

23  A.   Yes.

24  Q.   Okay.  Now, on the chart, I'm just checking Mr. Axelrod's

25  photograph, you have Jinzhou Iron Alloy under the local SASAC;

**LEWIS - CROSS / HEMANN**

1  correct?

2  **A.**   Well, on our chart or the chart that was constructed by

3  Ms. Agnolucci, there was no mention, of course, of SASAC, local

4  SASAC.

5  **Q.**   But that is, in fact, this relationship; correct?

6  **A.**   Well, I mean, we would have to look into that.  I mean, we

7  have no facts regarding any role of local SASACs in any of

8  these transactions.

9      One of the things that I do want to -- I want to clarify

10  is that, when we're talking about these contracts, local SASACs

11  have absolutely nothing to do with them.

12  **Q.**   So you looked into this (indicating), but you didn't look

13  into the ownership of Jinzhou Iron Alloy Company?

14  **A.**   There were no documents presented providing information on

15  the nature of the company in question.  We have assumed, and I

16  think correctly assumed, that this is a state-owned enterprise,

17  a local SOE.

18  **Q.**   Okay.  And a local SOE is going to have the stock owned by

19  the local SOE; correct?

20  **A.**   By local SASAC.

21  **Q.**   Local SASAC.  I'm sorry.

22  **A.**   Yeah.  But that is -- again, that's a presumption, but one

23  has to -- we need to have evidence of that.  We don't have any

24  evidence of that.

25  **Q.**   That is your assumption based on your expertise?

1   **A.**   That's not my assumption.  I think that's your assumption.

2   I mean, the point is that I'm saying that we don't have any

3   evidence of what the relationship is between the local SASAC

4   and the Jinzhou Iron Alloy Company Limited.  There simply isn't

5   any evidence.

6   **Q.**   Did you look for evidence?

7   **A.**   I tried, yes.  But, I mean, I'm an expert.  I'm typically

8   relying on, you know, investigative authorities, I mean,

9   counsel and, indeed, even from the Department of Justice to

10  provide this information, but I didn't find any information.

11  **Q.**   So your testimony was that these two companies entered

12  into a joint venture; correct?

13  **A.**   Correct.

14  **Q.**   And that joint venture bore the Pangang Jinzhou Company;

15  correct?

16  **A.**   Correct.

17  **Q.**   And Mr. Liew and his companies received contracts or

18  entered into contracts with the Pangang Jinzhou Company

19  subsequent to his communication with Hong Jibi of the

20  Pangang Group Company; correct?

21  **A.**   I believe so.

22  **Q.**   Now, you talked a little bit about, in addition to the

23  Pangang Jinzhou Company, you talked during your direct

24  testimony about the role of the Chinese Communist Party.  Do

25  you remember that?

LEWIS - CROSS / HEMANN

1    **A.**    Yes.

2    **Q.**    And you testified that the Party is pervasive and involved

3    in every aspect of Chinese life; is that correct?

4    **A.**    Yes.

5    **Q.**    And that it is -- but that it does not interfere in the

6    business operations of the Chinese enterprises and companies,

7    including the Central SOEs?

8    **A.**    Correct.

9          **MS. AGNOLUCCI:**  Objection.

10          **THE COURT:**  Overruled.

11    Go ahead.

12    **BY MR. HEMANN:**

13    **Q.**    In fact, it's your opinion that the Chinese Communist

14    Party and the SOEs have been delinked; is that correct?

15    **A.**    It's not just my --

16          **MS. AGNOLUCCI:**  Objection.

17          **THE COURT:**  Overruled.

18          **THE WITNESS:**  It is not just my opinion.  As you will

19    note from my report, there is a high-level decision of both

20    the, I believe, the State Council and the Communist Party

21    counterpart.  This was in 1998.  It's in the report.  But this

22    is a decision which clearly provides for delinkage between,

23    among others, Communist Party organizations and enterprises,

24    including those at the Central level.

25

1  BY MR. HEMANN:

2  Q.   And your testimony is that that's what the law says;

3  correct?

4  A.   Yes.

5  Q.   And, nevertheless, remember we looked at -- Ms. Agnolucci

6  showed you a document that described Fan Zhengwei, the Chairman

7  of the Pangang Group, as a CPC Secretary?  Do you remember

8  that?

9  A.   Correct.

10  Q.   And of course he's not the Secretary General of the

11  Chinese Communist Party; right?

12  A.   Correct.

13  Q.   But he is the Secretary of the Communist Party

14  organization within the Pangang Group; correct?

15  A.   Correct.

16  Q.   And Chinese state-owned companies have Party organizations

17  within the company itself; correct?

18  A.   Yeah.  There's typically a Party committee within

19  state-owned enterprises.

20  Q.   And those Party committees have a role vis-a-vis the

21  company itself; correct?

22  A.   They have some role.  I mean, it's a kind of a formalistic

23  leadership role, and it has to do more with Party discipline

24  these days than it does with the communication of policies.

25       I mean, policies, again, when they are economic in nature,

 1   come down through the state.  They typically are not

 2   communicated via the Communist Party.

 3   **Q.**   The Party organizations within a company, such as the one

 4   that Chairman Fan was involved in, have organizational

 5   principles; don't they?

 6   **A.**   Yes.

 7   **Q.**   And they're managers, bylaws may be the right word,

 8   manuals, there's a way to run the Party organization within a

 9   particular company; correct?

10   **A.**   I wouldn't say that it has to do with -- I mean, I

11   wouldn't agree with that.  I mean, the bylaws of a company are

12   those of the company itself.  There's not a separate set of

13   Communist Party bylaws for running a Chinese SOE.  We have one

14   set of bylaws only.  All right.

15   **Q.**   But there are regulations that apply to the running of the

16   Communist Party structure within a particular SOE; correct?

17   **A.**   Well, I mean, I am not familiar with such regulations.  I

18   mean, the point here is that I want to stress that there has

19   been a delinking of Communist Party organs and policies from

20   the Communist Party to Chinese state-owned enterprises,

21   including those at the center, the Central SOEs.

22        So, I mean, the fact that there is a Party committee

23   within SOEs, including Pangang, doesn't mean that there is some

24   kind of framework for the Communist Party to subvert or

25   overtake management of an SOE.  That simply doesn't exist.

1    **MR. HEMANN:**  Your Honor, may I approach the witness

2    with Exhibits 395 and 395T?

3            **THE COURT:**  Yes, you may.

4            **MR. HEMANN:**  Your Honor, the parties have stipulated

5    that 395 and 395T -- well, 395 was located in the offices of

6    USAPTI.

7            **MS. AGNOLUCCI:**  That's correct, Your Honor.

8            **THE COURT:**  All right.  So stipulated.

9    **BY MR. HEMANN:**

10   **Q.**  And you can look at -- 395 is a Chinese language document,

11   Mr. Lewis.  Do you see that?

12   **A.**  Yes.

13   **Q.**  And 395T is a translation of that document.  Do you see

14   that?

15   **A.**  Yes.

16   **Q.**  And you can look at whichever one you're more comfortable

17   with.

18   **A.**  Uh-huh.

19   **Q.**  The title of this document is "Panzhihua Iron & Steel

20   Group Company Limited, Jinzhou Titanium" -- and that's this

21   company (indicating); correct, Mr. Lewis?

22   **A.**  Yes.

23   **Q.**  -- "Enterprise, Standard Party Committee Operations,

24   Department Operational Standard."  Do you see that?

25   **A.**  Yes.

1    **MR. HEMANN:**  Your Honor, the United States would move

2  Exhibit 395 and 395T into evidence.

3    **MS. AGNOLUCCI:**  Objection.  Hearsay and lack of

4  foundation.

5    **THE COURT:**  May I see the document, Ms. Ottolini?

6    **MR. HEMANN:**  T is probably the better one,

7  Ms. Ottolini.

8    And, Your Honor, I just note that we're not offering it

9  for the truth.

10    (Pause in proceedings.)

11    **THE COURT:**  The objection is overruled.

12    (Trial Exhibits 395 and 395T received in evidence)

13    **MS. AGNOLUCCI:**  Your Honor, may we request a limiting

14  instruction be given?  Mr. Hemann represented it's not being

15  offered for the truth.

16    **THE COURT:**  Yes.  Thank you very much.

17    Ladies and gentlemen, as I told you before, certain

18  documents because they may be hearsay and, therefore,

19  themselves not admissible to prove the truth of the

20  statement -- remember I gave you the red light example -- this

21  document that Government counsel has just showed the professor

22  is of that kind; and it's offered not for the truth of the

23  matter, but simply the fact that it's said.

24    And I think counsel, when they're dealing with an expert,

25  can question the expert about whether he did or should have

1  taken this document into account in reaching his opinions.  So

2  that's the limited purpose for which you can consider this

3  document.

4      Proceed.

5          **MR. HEMANN:**  Thank you very much, Your Honor.

6  **Q.**  This is a relatively long document.  I'm not going to have

7  you look at all of it, Mr. Lewis.

8      But, Ms. Mahoney, if you could put up 395T, pages 000 --

9  page 0003.  And if you could blow up the top half of that

10  document down through "Scope."

11      And this says, Mr. Lewis, under 1.1:  (reading)

12          "The enterprise's party committee's operation

13          department is responsible for important missions, such as

14          the organization, promotion, disciplinary inspection,

15          grass root party branch development, ideological and

16          political work of the enterprise party committee and

17          enterprise cultural development.  In order to adequately

18          exert the political core influence of the party

19          organization and the effect of the pioneer model, actively

20          propel the company's production operation, deepen reform

21          and development, this Standard is specifically

22          formulated."

23      Do you see that?

24  **A.**  Yes.

25      Can I comment?

1    Q.   I'll ask you a question in a moment.

2         If you could go, please, to 395T, page 0026.  This goes to

3    Party Branch Operational Management Standard.  Do you see that?

4    A.   (Witness examines document.)

5    Q.   Up at the top under Number 1, "Goal and Scope."

6    A.   Uh-huh.

7    Q.   And it says:   (reading)

8         "The enterprise's grass root party branch is the

9         operational basis of the party organization, the bridge

10        and link between the party and the broad employee masses,

11        combat fort of the party in enterprise production

12        development.  In order to develop the Titanium Industry

13        Company grass root party branch into a strong fort with

14        combat strength, propel and promote the development and

15        progress of the company production, this Standard is

16        specifically formulated."

17        And if you look two pages along to page 28 at the top,

18   there are a number of obligations that this -- that the party

19   branch is charged with that include, to monitor the thorough

20   implementation of the correct decisions by the administrative

21   leadership, support the administrative leadership in order that

22   they can normally exercise their authority in production,

23   command, administrative management, and technological

24   development.

25        This document is a document that describes the Party's

1  role within Pangang Jinzhou Titanium Company; is that correct?

2  **A.**    It does describe the Party's role, correct.

3  **Q.**    Thank you.

4      Could you please put up on the screen, Ms. Mahoney,

5  Exhibit 342T?

6      And I'd like to turn, Mr. Lewis, to a letter that

7  Mr. Liew, Walter Liew, wrote to Chairman Fan Zhengwei in 2008.

8          **MR. HEMANN:**  And this is in evidence, Your Honor, and

9  the parties have stipulated it was found in the Liew's

10 residence.

11         **THE COURT:**  Is that correct, Ms. Agnolucci?

12         **MS. AGNOLUCCI:**  It is correct, Your Honor.

13         **THE COURT:**  All right.  So stipulated.

14 **BY MR. HEMANN:**

15 **Q.**    Have you seen this letter before, Mr. Lewis?

16 **A.**    (Witness examines document.)  I believe I have.

17 **Q.**    You believe you have?

18 **A.**    I'm not sure.

19 **Q.**    In any event, by 2008, the date on this letter, Mr. Fan

20 was the Chairman of the Board of the Pangang Group Company;

21 correct?

22 **A.**    Correct.

23 **Q.**    And we looked at -- Ms. Agnolucci showed you some --

24 showed a document to you regarding pictures.  Let me just put

25 in front of you the document with pictures.

1          Exhibit 347, please, Ms. Mahoney, page 1.

2          You looked at the translation of this.  This is the

3      original Chinese with the photographs; is that correct?

4      A.   I've also looked at the original Chinese, correct.

5      Q.   I was going to ask you.  Did you also look at this

6      document when you were preparing?

7      A.   Yes, I did.

8      Q.   And that's Chairman Fan up at the top; correct?

9      A.   Correct.

10     Q.   And he was appointed by SASAC to replace Hong Jibi in

11     December of -- or, I'm sorry, in 2008; is that correct?

12     A.   I believe so.

13     Q.   Could you please put up Exhibit 390, please, Ms. Mahoney?

14         You mentioned when you testified earlier that you had

15     reviewed numerous newspaper and other media articles; correct?

16     A.   Correct.

17     Q.   And have you seen this document, Exhibit 390?

18     A.   Yes, I have.

19     Q.   Could you put up 390T, please, Ms. Mahoney?

20         And this document is the announcement by Panzhihua

21     Iron & Steel Group of the replacement by SASAC of Hong Jibi

22     upon his retirement with Chairman Fan; correct?

23     A.   Correct.

24     Q.   And the announcement by the company was that the Director

25     of the Second Bureau for the Administration of Corporate

1   Executives of State-Owned Assets Supervision and Administration

2   of the State Council announced this appointment of

3   Chairman Fan; yes?

4   **A.**   Yes.

5   **Q.**   And in the normal course, Chairman Fan would have been

6   formally appointed by the sole investor, the Pangang Group --

7   or, I'm sorry, SASAC; correct?

8   **A.**   Well, yes.  I mean, typically SASAC does have appointment

9   rights, yes.

10  **Q.**   After Chairman Fan's appointment, Mr. Liew's company,

11  USAPTI, entered into a series of contracts to build a

12  100,000-ton titanium dioxide plant; correct?

13  **A.**   Correct.

14  **Q.**   Could you please put up on the screen, Ms. Mahoney,

15  Exhibit 317, page 1?

16       And this is one of the contracts, and specifically it's

17  the contract dated May 16th, 2009; correct?

18  **A.**   Correct.

19  **Q.**   And you have seen this contract before?

20  **A.**   Yes.

21  **Q.**   The end user of this contract is the Panzhihua

22  Iron & Steel Group Company; is that correct?

23  **A.**   It is.

24  **Q.**   And that is the company of which Fan Zhengwei was the

25  Chairman; correct?

1   **A.**    (Witness examines document.)  I believe so.

2   **Q.**    Okay.  If you could look at -- please turn to the next

3   page, Ms. Mahoney.

4        And the end user is -- I'm sorry.  The first page of text,

5   page 3.

6        The end user, and you testified to this with regard to the

7   Jinzhou contract, is the beneficiary under the contract;

8   correct?

9   **A.**    One has to be very careful about using that kind of

10  language in Chinese law.  All right?

11  **Q.**    I'm going to ask you about what you said.

12       When you were testifying with regard to the Pangang

13  Jinzhou contract where Pangang Jinzhou was defined as the end

14  user -- do you remember that?

15  **A.**    Yes.

16  **Q.**    -- you said ultimately the contract is for the benefit of

17  Pangang Jinzhou?

18  **A.**    That is right, but that is not necessarily a third-party

19  beneficiary contract as we understand under Chinese --

20  **Q.**    Fair enough.

21  **A.**    -- under U.S. or California law.

22  **Q.**    Fair enough.  And the question was wrong.

23       So the contract, then, the end user -- the contract is for

24  the benefit here of the Pangang Iron & Steel Group Company;

25  correct?

1  **A.**    Yes.

2  **Q.**    And the end user is, as we've just mentioned, the

3  Panzhihua Iron & Steel Group Company.  If you look down at

4  paragraph 1.5, the contract is for the end user's project of

5  100,000 MTPY TiO2 by chloride process; is that correct?

6  **A.**    Correct.

7  **Q.**    Did you have an opportunity, during your preparation to

8  testify, to look at invitation letters that were addressed by

9  Mr. Liew, Walter Liew, to Panzhihua Iron & Steel Group Company

10  and the Pangang Group Company?

11  **A.**    I don't recall them.  I may have seen them, but I don't

12  recall.

13  **Q.**    Ms. Mahoney, could you please put up Exhibit 337, page 1?

14         **THE COURT:**  After this exhibit, Counsel, we'll take

15  our break.

16         **MR. HEMANN:**  This would be a perfect time.  Thank you,

17  Your Honor.

18         **THE COURT:**  Okay.  All right.

19      We're going to take our second break, ladies and

20  gentlemen.  Remember the Court's usual admonitions.  Keep an

21  open mind.  Don't discuss the case.  And I'll see you all in 15

22  minutes.

23      You may step down, Professor, as well.

24      (Proceedings were heard out of the presence of the jury:)

25         **THE COURT:**  Fifteen minutes.

1              (Recess taken at 11:43 a.m.)

2              (Proceedings resumed at 11:58 a.m.)

3         (Proceedings were heard out of the presence of the jury:)

4              THE COURT:  All right.  Let's bring in the jury.

5         (Proceedings were heard in the presence of the jury:)

6              THE COURT:  All right.  Please be seated.

7         You may continue with your examination.

8              MR. HEMANN:  Thank you, Your Honor.

9         Could you please put up, Ms. Mahoney, Exhibit 337, page 1?

10   Q.   And I was asking you before the break, Mr. Lewis, whether

11   you had seen these documents in the course of your work on this

12   case.

13   A.   This particular document?

14   Q.   Yes, or any documents like it.

15   A.   (Witness examines document.)  Oh, yes.  I mean, the -- no,

16   I haven't really seen the invitation letters.  I do not recall

17   invitation letters, per se.

18   Q.   And this document in particular is on USA Performance

19   Technology, Inc., letterhead, and is directed to Panzhihua

20   Iron & Group Steel Company -- Iron & Steel Group Company; yes?

21   A.   Yes.

22   Q.   And that, again, is the same as the Pangang Group Company;

23   yes?

24   A.   Yes.

25   Q.   You testified on direct that it is clear under the law in

1    China that SASAC needs to be hands-off with regard to the

2    operations of its companies; is that correct?

3    **A.**    Correct.

4         **MR. HEMANN:**  Ms. Mahoney, could you please put up

5    Exhibit 291T-0003?

6         This is in evidence, Your Honor, and the parties have

7    stipulated that it was located in the Liew residence, and the

8    handwriting on the original is that of Walter Liew.

9         **THE COURT:**  Agreed?

10         **MS. AGNOLUCCI:**  That is correct, Your Honor.

11         **THE COURT:**  All right.  It's so stipulated.

12    **BY MR. HEMANN:**

13    **Q.**    Have you seen this document, Mr. Lewis?

14    **A.**    (Witness examines document.)  I do not recall this

15    document.

16    **Q.**    And might you have seen it, read it in the Chinese?

17    **A.**    I do not recall this document.

18    **Q.**    This document, as you just heard me inform the Court, it's

19    been stipulated that this was located in the Liews' house, and

20    it is in the handwriting, originally, of Mr. Liew.

21         There are a number of names here I'd like to just review

22    with you.  The first paragraph of the letter or of the note

23    says:  (reading)

24              "Chairman of the Board of Pangang, Fan Zhengwei, at

25         noon on the 12th of March hosted a luncheon for us and

 1          told me that Secretary Li, of the SASAC, asked Fan to meet

 2          with us as per the instructions of a senior minister.

 3          Both of us had discussions on the project and both of us

 4          were very happy.  Many thanks for your help."

 5          Secretary Li of the SASAC would refer to Li Rongrong; is

 6     that correct?

 7     A.   It would appear so.

 8     Q.   And then the last paragraph of this letter says:

 9     (reading)

10          "I hereby briefly report to Minister Tan about our

11          work scenarios and request Minister Tan's attention."

12          Do you see that?

13     A.   Yes, I do.

14     Q.   Would you agree, Mr. Lewis, that this is contrary to the

15     notion of SASAC being hands-off with regard to this particular

16     Pangang contract?

17     A.   I don't -- I certainly don't reach that conclusion simply

18     looking at a very short personal letter from Walter Liew to the

19     chairman of the board of Pangang, namely Fan Zhengwei.  This

20     seems a very personal letter.  It doesn't seem to suggest

21     anything to do with the business operations between SASAC and

22     Pangang.

23     Q.   This letter refers to a communication between Fan Zhengwei

24     and Secretary Li; correct?

25     A.   Yes.

LEWIS - CROSS / HEMANN

1   Q.   And it refers to instructions from a senior minister.  Do

2   you see that?

3   A.   (Witness examines document.)  To meet with us as per the

4   instruction of a senior minister.  Okay.  I see that.

5   Q.   And it refers to the project with Pangang, does it not?

6   A.   Yes, but this is a very short little note.  I mean, how

7   can you imply, really, much of anything from such small amount

8   of language?  And it's in personal terms.  I mean, I just don't

9   see --

10  Q.   Mr. Lewis, in terms of the number of words and the ability

11  to infer anything from this number of words, would you agree

12  that the number of words in this short letter is approximately

13  the same number of words that is in the first paragraph of the

14  Luo Gan letter that we've been talking about?

15  A.   Actually, I mean, the Luo Gan letter is a fairly extensive

16  narrative.  I mean, so it's certainly longer than this.

17  Q.   I'm asking about the first paragraph of the Luo Gan letter

18  referring to the meetings with the individuals in 1991.

19  Roughly the same number of words as the paragraph that you're

20  looking at on the screen; correct?

21  A.   I suppose.

22  Q.   I'd like to turn, Mr. Lewis, to the discussion of *guanxi*

23  that you had with Ms. Agnolucci.  Do you remember that?

24  A.   *Guanxi*?  Yes.

25  Q.   *Guanxi*.

1          Have you taught a course on *guanxi*?

2   **A.**   I always include an extended discussion of *guanxi* in my

3   courses on Chinese law.  So, yes, over many, many years.

4   **Q.**   Have you ever taught a course that focused on *guanxi*?

5   **A.**   No, but I've delivered conference papers on *guanxi*.

6   **Q.**   Have you written a book on *guanxi*?

7   **A.**   As I repeat, I have presented papers at academic

8   conferences on *guanxi*.

9   **Q.**   So other than presenting papers at academic conferences on

10  *guanxi*, have you done any academic work on *guanxi*?

11  **A.**    In some of my texts, in some of the books that I have

12  published there are discussions of *guanxi*, yes.

13  **Q.**   And can you name the article that you wrote that -- I'm

14  sorry -- the paper that you presented on *guanxi*, or papers?

15  **A.**   Yes.  I wrote -- I mean, specifically there's a

16  groundbreaking paper on the *guanxi zhidu*, on the *guanxi*

17  system -- *zhidu*, Z-H-I-D-U -- *guanxi zhidu* means *guanxi*

18  system -- groundbreaking paper at the Conference on the

19  Revolution of Man at the University of Hong Kong as early as

20  1986, and that is specifically on the *guanxi* system.

21          I also, in my book that I coauthored with John Kuzmik on

22  drafting and negotiating joint venture contracts in China,

23  which was published by Euromoney, discuss notions of *guanxi*.

24  **Q.**   The article that you're referring to is written in 1986;

25  correct?

1   **A.**   Yes, but the book -- I mean, *guanxi* figures -- sir, *guanxi*

2   figures in everything I have ever done.  All right?  And I also

3   practice *guanxi* in China.  Okay?  And in Hong Kong.

4        So the point is, though, that if you look at my 1997

5   publication, as I've just referred to, on joint ventures, we

6   discuss in the book how important *guanxi* is.

7   **Q.**   And, so, let's talk about *guanxi*, then.

8   **A.**   Okay.

9   **Q.**   *Guanxi* means something akin to a relationship network;

10  correct?

11  **A.**   It literally means "relationship."

12  **Q.**   But, as you said, it's got a more specific meaning in the

13  context of China?

14  **A.**   It has a more comprehensive meaning than simply

15  "relationship," yes.  I mean, there's -- *guanxi* is a term

16  freighted with a huge amount of meaning and really describes

17  the culture of China.

18  **Q.**   The culture of China?

19  **A.**   Yeah, the cooperative culture of China.

20  **Q.**   And you deduce from the Luo Gan letter, Exhibit 350, that

21  Walter Liew was seeking a mutually beneficial personal

22  relationship, or a *guanxi* relationship, with Luo Gan -- or with

23  Hong Jibi?

24  **A.**   Yes.

25  **Q.**   Okay.  And this conclusion, this deduction, comes only

1    from the letter itself; correct?

2    **A.**   Well, as interpreted through the lens of my experience

3    with *guanxi* in the Chinese culture over many years and my own

4    scholarship on the subject, yes.

5    **Q.**   So your conclusion that Mr. Liew was seeking a mutually

6    beneficial personal relationship, that's not something that you

7    knew about from your own personal scholarship and years of

8    living in Hong Kong; correct?

9    **A.**   Could you repeat the question?

10   **Q.**   Your conclusion that Mr. Liew was seeking a *guanxi*

11   relationship with Hong Jibi did not come from your experience

12   in Hong Kong or your academic research; correct?

13   **A.**   My conclusion, of course, it's predicated on that.  I

14   mean, I'm applying my experience to reach a conclusion.

15   **Q.**   As to Mr. Liew's intent?

16   **A.**   Well, I mean, I'm not supposed to get into state of mind,

17   so I'm not --

18           **THE COURT:**  All right.  Next question.

19   **BY MR. HEMANN:**

20   **Q.**   Your conclusion, though, is that Walter Liew was seeking a

21   *guanxi* relationship with Hong Jibi?

22   **A.**   I am -- you know, I'm looking at what the writer is saying

23   here, and then I am, you know, looking at how that would be

24   interpreted through the prism, through the lens of Chinese

25   culture.

LEWIS - CROSS / HEMANN

1   Q.   And your source material that you are applying your

2   background to is this letter; correct?

3   A.   Correct.

4   Q.   No other materials?

5   A.   Well, there were a couple of other versions, right, that

6   I've looked at, so....

7   Q.   Other versions of the same letter?

8   A.   Yes.  We've discussed that.  Or at least -- I mean, one

9   other version of the letter, which has, as I mentioned before,

10  highlighted in red certain passages that may have been added by

11  this third party; and then the, you know, the communications

12  from that third party to Walter Liew.

13  Q.   But not Mr. Liew's handwritten notes?

14  A.   I didn't -- I didn't pay particular attention to that

15  written note, no.

16  Q.   Other than drafts or excerpts of this particular letter,

17  have you relied on any other source material other than your

18  interpretation of the letter itself?

19  A.   I don't think so, no.

20  Q.   Has counsel for Mr. Liew provided you with any

21  interpretation of the letter?

22          MS. AGNOLUCCI:  Objection.

23          THE COURT:  Overruled.

24          THE WITNESS:  I mean, there has been some discussion

25  of the puff letter between myself and counsel.

1    BY MR. HEMANN:

2    Q.   On how many occasions?

3    A.   Maybe -- maybe two or three occasions.

4    Q.   And the term "puff," is that your term?

5    A.   It's a general term that we mutually agreed on.

6    Q.   You and whom?

7    A.   I discussed the matter with -- I discussed this

8    phraseology with counsel.  So it was mutually agreed that we

9    could use that term.

10   Q.   And who was the first person to suggest the use of the

11   word "puff"?

12   A.   I believe it was counsel.

13   Q.   You believe, Mr. Lewis, that the purpose of this letter

14   was to set the table so that Mr. Liew could ask Hong Jibi for

15   favors and benefits; correct?

16   A.   Correct.

17   Q.   And the favors and benefits that he wanted were with what

18   you describe as Panzhihua cadres; correct?

19   A.   Correct.

20   Q.   And by Panzhihua cadres, what does that mean?

21   A.   Well, we can -- I mean, essentially members of the party.

22   And typically, these are meeting people in the party, but also

23   will typically have leading positions also in the government or

24   in a company.

25   Q.   So -- and I am no expert on this.  So let's -- but let me

1    try my hand at this.

2         If you have Walter Liew at one corner of a triangle and

3    you have Hong Jibi at another corner and you have Luo Gan,

4    et cetera, and the other gentlemen mentioned in the letter, is

5    it accurate to say that Mr. Liew, in your opinion, is

6    attempting to -- his goal is to establish a relationship along

7    this line of the triangle with Hong Jibi?

8    A.   Yes.

9    Q.   And is it additionally accurate to say that Walter Liew is

10   attempting to leverage what he describes as a relationship with

11   Luo Gan, et cetera, in order to influence or affect the goal of

12   establishing a *guanxi* relationship with Hong Jibi?

13   A.   Yes.

14   Q.   And is it further the design that the prominence of

15   Luo Gan, et cetera, will provide -- which I'm going to write

16   "influence" -- influence Hong Jibi's ultimate decision as to

17   who should get the contract?

18   A.   Yes.

19        MS. AGNOLUCCI:  Objection as to "the design."

20        THE COURT:  Overruled.

21   BY MR. HEMANN:

22   Q.   Yes?

23   A.   Yes.

24   Q.   Now, Mr. Luo was important; correct?

25   A.   Mr. Luo, yes.

1   Q.   And Mr. Tan was another important person; correct?

2   A.   Yes.

3   Q.   Mr. Tan, by 2004, was in the -- and I can't remember the

4   name -- the industry association?

5   A.   That's right.

6   Q.   Chemical industry association.

7   A.   Petrol -- Petroleum and Chemical Industry Association.

8   Q.   And that is an association of companies in China in the

9   chemical industry; correct?

10  A.   And the petroleum industry.

11  Q.   And the petroleum industry.

12       Hong Jibi is the chairman of one of the 100 largest

13  companies in the country; correct?  Yes?

14  A.   Yes.

15  Q.   And somebody who is also in that industry; correct?

16  A.   Indeed.

17  Q.   And, so, it is hoped -- Mr. Liew's hope, your conclusion,

18  is that the juice, if you will, of Luo Gan and Minister Tan

19  will help him with the Hong Jibi contract?

20  A.   And with the overall relationship, understanding the

21  contracts really flow from higher-level *guanxi* relationships.

22  Q.   You believe that Mr. Liew needed this assistance here

23  (indicating) because he had been previously unsuccessful in

24  wedging his foot inside Pangang's door; is that correct?

25  A.   Yes.

1   **Q.**   How do you know that?

2   **A.**   In terms of, certainly, discussions I've had with counsel

3   regarding Walter Liew's previous attempts at developing

4   relationships.  Also, there are documents that indicate, for

5   example, that there were competitors in the wings.  So Worley,

6   Cierra, these were companies that were competing and trying to

7   get into the titanium dioxide field in China, and Walter Liew

8   was feeling the heat.

9   **Q.**   That's not what I'm talking about.  I'm talking about

10   previously unsuccessful in wedging his foot inside Pangang's

11   door.  That's part of your opinion; correct?

12   **A.**   That's my view, yes.

13   **Q.**   And where is that from?

14   **A.**   Again, discussions with counsel.

15   **Q.**   Have you seen any documents or other evidence that

16   Mr. Liew had made a previous attempt to get into Pangang's

17   door?

18   **A.**   I can't recall offhand, but -- there may be documents but

19   I cannot recall offhand.

20   **Q.**   Had Pangang Group previously sent out a request for quotes

21   on a TiO2 contract?

22   **A.**   For quotes on a -- well, I mean, at the time that this

23   approach is made, my understanding is that the -- you know, the

24   original Pangang Jinzhou titanium dioxide plant, if you like,

25   is already up and running.  Right?  There is already a plant or

1    a factory there, and they need to beef up.  So certainly there

2    are activities afoot in China.

3    **Q.**  Activities involving Mr. Liew attempting to get into

4    Pangang?

5    **A.**  Well, I have seen documents where, you know, Walter Liew

6    is basically trying to hustle.  He's trying to -- he's trying

7    to find openings in a number of places in China in the titanium

8    dioxide field.  I mean, you know, he's approaching companies in

9    Hubei and elsewhere.

10        So, I mean, there's a hustle going on here, and he's

11   trying to get -- I mean, if he can land Pangang, of course,

12   more power to him.  But, you know, there are other fish that he

13   apparently was pursuing.

14   **Q.**  So the answer, Mr. Lewis, is that you've not seen any

15   evidence that he had been unsuccessful in wedging his foot

16   inside Pangang's door?

17   **A.**  I don't recall any specific document in terms of previous

18   efforts by Walter Liew.

19   **Q.**  Now, you talked on direct about the task list.  Do you

20   remember this list of key task projects by the appropriate

21   Chinese agency?  Do you see that?

22   **A.**  I sure do, yeah.

23   **Q.**  And the last sentence of the letter is:  (reading)

24            "Titanium white by chlorination was one of the more

25        important projects."

1           Do you see that?

2    **A.**    This is the puff letter, are we referring to?

3    **Q.**    I'm referring to Exhibit 350.

4    **A.**    Yes.  Well, I have nothing on the screen.

5    **Q.**    I'm looking at the board.  The last -- if you can put,

6    please -- there you go.

7    **A.**    Thank you.

8           So this is the last paragraph?

9    **Q.**    First paragraph, last sentence.

10   **A.**    The first paragraph, last sentence.  Okay.  Fine.

11          (Witness examines document.)  Yeah.  "Titanium white by

12   chlorination was one of the more important projects," yes.

13   **Q.**    Okay.  And you looked at a list with Ms. Agnolucci.  Do

14   you remember that?

15   **A.**    Correct.  Yes.

16   **Q.**    You said there's all manner of these kinds of lists around

17   China; correct?

18   **A.**    That is correct.

19   **Q.**    Could you please put up Exhibit 387?

20          And you looked at a reference to titanium dioxide in this

21   list; correct?

22   **A.**    I certainly did.

23   **Q.**    If you could please turn, Ms. Mahoney, to -- do you

24   remember where that was?  I'll look here.

25                         (Pause in proceedings.)

1    BY MR. HEMANN:

2    Q.    There's a reference here to a titanium dioxide company.  I

3    need to find the reference.  Do you remember what the name of

4    the company was?

5    A.    It was Nanning in Guangxi Autonomous Region.

6    Q.    Okay.  It's page 11, Mr. Axelrod tells me, Number 144.

7          You're going to see that on the screen in a moment.

8          Do you see this referenced to the Nanning titanium dioxide

9    plant?

10   A.    I do indeed.

11   Q.    Now, these were projects that were already in progress;

12   correct?

13   A.    I'm not entirely sure.  Yes, they certainly had been

14   approved at that point.  Whether they're actually operational

15   is another question because, I mean, if you're trying to get

16   technology and engage in technology transfer, as apparently is

17   true under this consolidated list.

18   Q.    And Nanning titanium dioxide plant, Guangxi Zhuang

19   Autonomous Region, that is not a chloride-route plant; is it?

20   A.    Unclear.  I mean, perhaps not at that point in time.

21   Q.    No.  It was not a chloride-route plant at that time, was

22   it?

23          MS. AGNOLUCCI:  Objection.

24          THE COURT:  Sustained.

25

LEWIS - CROSS / HEMANN

**BY MR. HEMANN:**

Q.   Do you know whether it was a chloride-route plant at that time?

A.   I do not.

Q.   Okay.  And, so, you don't know that titanium white by chlorination was one of the more -- in fact, you can say titanium white by chlorination was not one of the more important projects on this list, can you?

A.   Again, I don't know whether this was a chlorination-route project or not.

Q.   So your testimony is not that this list is the list that Mr. Liew referred to in the letter to Hong Jibi, is it?

A.   Well, can we look at the language again --

Q.   Sure.

A.   -- of the letter?

     (Witness examines document.)  Okay.  (reading)

          "I was given a list of key task projects by the
     appropriate Chinese agency."

     Well, I mean, I'm certainly not in a position to say.

Q.   So you don't know?

A.   I do not know.  I mean, it's possible, but it's not conclusive.  I mean, certainly the language is similar to what we see in terms of key task projects.

Q.   But not at all similar in terms of titanium-white-by-chloride route?

1    A.    Well, again --

2              MS. AGNOLUCCI:  Objection.

3              THE COURT:  Sustained.

4    BY MR. HEMANN:

5    Q.    Your hypothesis regarding the letter is that Mr. Liew

6    fabricated his contacts with Luo Gan and Minister Tan in a

7    desperate attempt to establish a *guanxi* relationship with Hong

8    Jibi?

9    A.    No, I wouldn't say fabricated necessarily, although that's

10   possible.

11         I mean -- I mean, again, I'm not supposed to get into his

12   state of mind.  But the point is, too, that, I mean, it needs

13   to be appreciated that Chinese that are seeking to develop a

14   *guanxi* relationship will often engage in hyperbole.  They will

15   engage in exaggeration.  They will blow things out of

16   proportion to give, you know, an exaggeratedly positive

17   impression to the other side.  So that's what I see here, yes.

18   Q.    So is your hypothesis that the meeting happened or didn't

19   happen?

20   A.    I think it's not at all clear that it happened at all -- I

21   mean, that it happened.  It's not at all clear that it

22   happened.

23   Q.    And if it didn't happen at all --

24   A.    I mean, you know --

25   Q.    Let me ask a question.

1   **A.**   -- was it a dinner?

2   **Q.**   Mr. Lewis --

3   **A.**   -- was it a meeting?

4   **Q.**   -- Mr. Lewis.

5          If it didn't happen at all, it would be more than an

6   exaggeration; correct?  It would be a lie.

7   **A.**   I mean --

8   **Q.**   Yes or no.

9   **A.**   Well, again, it's a question of how you characterize it.

10  I mean, again, it's exaggeration in the Chinese cultural

11  context.  I mean, if you want to say it's fabrication --

12          **THE COURT:**  Professor, he's asking how you would

13  characterize it.

14          **THE WITNESS:**  Okay.  Well, again, I need to know,

15  because the point here is that, you know, there may have been a

16  meeting and it may not have involved all of these people.  So

17  from that point of view, there wasn't a dinner.  You know,

18  that's an exaggeration from my point of view.  I mean --

19  **BY MR. HEMANN:**

20  **Q.**   So let me ask the question again then.

21  **A.**   Okay.

22  **Q.**   I think the same question.  If the meeting did not happen

23  at all, it would be a lie, not an exaggeration; correct?

24  **A.**   Yeah, I guess it would be, as you put it, a fabrication.

25  **Q.**   And if the meeting happened but they had lunch and not

1   dinner, it would be an exaggeration?

2   A.   Yes.

3   Q.   Okay.  But what he did, the way he articulated it, was a

4   desperate ploy on the part -- on his part to get the attention

5   of the Pangang Group.  Is that your hypothesis?

6   A.   What language are you referring to?

7   Q.   I just want to know what your hypothesis is.  Is your

8   hypothesis that this was an almost desperate ploy on the part

9   of the author to get the attention of Pangang?

10  A.   Well, it does seem -- there does seem to be some degree of

11  desperateness in that it seems to be -- it seems to be

12  overblown here.

13  Q.   So the answer is yes?

14  A.   Yes.

15  Q.   And he's trying to create some sort of -- it's almost a

16  fake *guanxi*; correct?

17  A.   Yes.  I mean, it may simply be fake *guanxi*, correct.

18  Q.   Because real *guanxi* is totally legitimate; right?

19  A.   Yes.

20  Q.   Real *guanxi* is, "I'm going to tell you what a great guy I

21  am and all the great people I know, so that you take me more

22  seriously"?

23  A.   Correct.

24  Q.   And you really are a great guy, and you really know all

25  these great people; right?

1  A.   Yes.

2  Q.   But if you didn't have a meeting with Luo Gan or

3  Minister Tan and you didn't get treated to a banquet and you

4  weren't thanked for being an patriotic overseas Chinese, that's

5  fake *guanxi* or something.  It's not real *guanxi*?

6  A.   That's correct.  And I want you to know that that's very

7  common in Chinese culture.

8  Q.   We'll talk about that in a moment.

9  A.   This is called, you know, self-inflation, which may not

10  bear a direct relationship to reality.  All right?  I mean, the

11  point is that you are trying to -- you know, you are trying to

12  inflate yourself and inflate your *guanxi*.  And, you know, the

13  way --

14  Q.   So let's talk a moment about --

15  A.   Okay.

16  Q.   Let's talk about reality then for a moment.

17       You have reviewed the testimony of Mr. Hu, correct,

18  Hu Shaocong?

19  A.   Yes.

20  Q.   And Mr. Hu testified that somebody from the Premiere's

21  office called Hong Jibi regarding Mr. Liew; correct?

22  A.   Right.

23  Q.   And if Mr. Hu was telling the truth and that really

24  happened, that would be real *guanxi*; correct?

25  A.   I beg to differ.  I don't believe -- you know, that

1  seems -- he seemed to be involved in a farfetched fantasy, in

2  my view.  But that's just my own view.

3  **Q.**   I'm asking a different question.

4  **A.**   Yes.

5  **Q.**   If Mr. Hu sat in the seat that you're sitting in and told

6  the truth -- I'm asking you to assume that.

7  **A.**   Okay.

8  **Q.**   -- and somebody from the Premiere's office called Hong

9  Jibi, that would be real *guanxi*; right?  That's how it's

10  supposed to work?

11  **A.**   Yeah.

12  **Q.**   Okay.  Minister --

13      Could you please put up Exhibit 375, Ms. Mahoney?

14      And this is the fax that you looked at, Mr. Lewis, and

15  this is a communication between an important person,

16  Minister Tan, and Mr. Liew directly regarding some issues very

17  important to discuss; correct?

18  **A.**   Uh-huh.  Yes.

19  **Q.**   And this is 2004; correct?

20  **A.**   (Witness examines document.)  Can I see the date on that?

21  I presume it is.

22  **Q.**   There's a date up at the top in the fax line, Ms. Mahoney.

23  **A.**   Oh, in the fax.  Oh, yes.  2004.  I see that.

24  **Q.**   Okay.  This is real *guanxi*; right?  This is a real contact

25  with a real human being who is really important; correct?

1  **A.**  Well --

2          **MS. AGNOLUCCI:**  Objection.

3          **THE COURT:**  Overruled.

4          **THE WITNESS:**  I mean, the point here, I suppose, is

5  that we have to ascertain what aspects of the original Luo Gan

6  letter are factual and what parts are overblown hyperbole or

7  even, as you put it, fabrication.

8  **BY MR. HEMANN:**

9  **Q.**  So that's not --

10 **A.**  What would appear in this element is --

11          **MR. HEMANN:**  Your Honor, I move to strike.  That's not

12 the question that I asked.

13          **THE COURT:**  The motion is granted.  The jury will

14 disregard the last answer.

15      Please answer the question.

16          **THE WITNESS:**  Would you please reask the question.

17 **BY MR. HEMANN:**

18 **Q.**  Let me ask the question again.

19 **A.**  Thank you.

20 **Q.**  The connection that is reflected in this letter is a real

21 *guanxi* connection.  It's a connection between Mr. Tan and

22 Mr. Liew.

23 **A.**  It would appear so.

24 **Q.**  Ms. Mahoney, could you put up Exhibit 211T, page 2?

25      Have you seen this document before, Mr. Lewis?

1          **MR. HEMANN:**  And, Your Honor, this is in evidence.

2    This is the English translation of a document that is written

3    in Chinese.

4          **THE COURT:**  All right.

5          **THE WITNESS:**  I may have seen this document.  It looks

6    vaguely familiar.

7    **BY MR. HEMANN:**

8    **Q.**   These are directions written by Mr. Liew to Minister Tan's

9    home; correct?

10         **MS. AGNOLUCCI:**  Objection.

11         **THE COURT:**  Sustained.

12         **MR. HEMANN:**  Your Honor, the parties have stipulated

13   that this is in Mr. Liew's handwriting.

14         **MS. AGNOLUCCI:**  That part of it is correct,

15   Your Honor.

16         **THE COURT:**  All right.  Well, phrase it in terms of

17   what the parties have stipulated to, please.

18   **BY MR. HEMANN:**

19   **Q.**   Mr. Lewis, the parties have stipulated that this is in

20   Mr. Liew's handwriting.  Were you aware of that?

21   **A.**   No, I did not know that.

22   **Q.**   And these are directions or what appear to be directions

23   to the home of Minister Tan in Beijing; correct?

24         **MS. AGNOLUCCI:**  Objection.

25         **THE COURT:**  Overruled.

1         **THE WITNESS:**  (Witness examines document.)  Okay.

2    Well, there's Dongzhimen.  That's certainly an important street

3    in Beijing.  So, yeah, I can see how that would be directions

4    to an address in Beijing.  I don't know if it's Minister Tan's

5    home.

6    **BY MR. HEMANN:**

7    **Q.**   But if it's Minister Tan's, this would be an indication of

8    real *guanxi*; correct?

9         **MS. AGNOLUCCI:**  Objection.

10        **THE COURT:**  Overruled.

11        **THE WITNESS:**  Yes.

12        **MR. HEMANN:**  Can you please put up Exhibit 396,

13   page 4.

14   **Q.**   And you've looked at this document a moment ago.  This is

15   the New Year's card from Zhang Yujie from the Bureau of Foreign

16   Experts; correct?

17   **A.**   Correct.

18   **Q.**   Could you please put up 3 --

19        Are you able to read this, Mr. Lewis?

20   **A.**   Yes, but it would be helpful to have the --

21   **Q.**   Translation?

22   **A.**   Yes.

23   **Q.**   Could you put up 396T, page 3?

24        And this is a holiday card, and it is to Mr. Liew and his

25   wife, and it wishes a Happy New Year; and it says that he hopes

1    they can strengthen their contact, promote cooperation, and

2    make strides together.  Do you see that?

3    **A.**   Yes.

4    **Q.**   Now, we should talk for a moment about the State

5    Administration of Foreign Expert Affairs.  You mentioned that

6    it has a fairly wide net in terms of the kind of foreign

7    experts that it may be involved with.  Is that fair to say?

8    **A.**   That's correct.

9    **Q.**   Are you aware that by the time this letter was sent,

10   Mr. Liew had already been paid $5 million by the Pangang

11   Jinzhou group?

12   **A.**   No, I was unaware of that.

13   **Q.**   So he's not an English teacher living in a dormitory;

14   correct?

15   **A.**   No, he's not.

16   **Q.**   This communication with Mr. Zhang, if it's real, would be

17   an indication of real *guanxi* with one of the people on this

18   list; correct?

19   **A.**   It is indicative of, you know, the fact that there is some

20   degree of a *guanxi* relationship here.  I can't say that it

21   necessarily means that there's a very deep relationship.  I

22   mean, I have to say that, you know -- you know, Happy New Year

23   cards being exchanged amongst Chinese, I've been in -- I

24   receive them every year, too.  I mean, doesn't really mean a

25   lot.

1   Q.   Would you go back to page -- 396, page 4, the original,

2   Ms. Mahoney?

3        This is a handwritten card directed to Mr. Liew and his

4   wife; correct?

5   A.   Yes.

6        MR. HEMANN:  And could you put up 398T, page 2?

7        And, Your Honor, the United States -- the parties have

8   stipulated this is a document that was located in the Liew

9   residence.  And it's in evidence.

10       MS. AGNOLUCCI:  That's correct, Your Honor.

11       THE COURT:  All right.

12  BY MR. HEMANN:

13  Q.   Have you seen this note in your work on the case?

14  A.   Yes, I have.

15  Q.   And this is a note from an individual by the name of Qiao

16  Shichang; is that correct?

17       MS. AGNOLUCCI:  Objection.

18       THE COURT:  Sustained.

19       MR. HEMANN:  Could you go to the next page, please,

20  Ms. Mahoney?

21  Q.   Do you see the name down there, Mr. Lewis?

22  A.   I see the name.

23  Q.   Can you please -- and my pronunciation is terrible, I'm

24  sure.  Qiao Shichang.  Is that fair enough?

25  A.   Not bad.

1    **Q.**   And he's one of the names of the people on Exhibit 350;

2    correct?

3    **A.**   Yes.

4    **Q.**   I'm sorry.  Could you put up 350?

5    **A.**   (Witness examines document.)  Yes, he is.  Yes.

6    **Q.**   And his note is to Mr. Liew saying, "I was at a meeting

7    with you at the State Guesthouse in 1991."

8        Why don't you put the note back up.  I'm sorry,

9    Ms. Mahoney.  398T, page 2.

10       **MS. AGNOLUCCI:**  Objection, Your Honor.  The parties

11   have stipulated that this is Mr. Liew's handwriting.  It's not

12   a note from the individual Mr. Hemann is referring to.  That's

13   a misstatement.

14       **THE COURT:**  All right.  That's the stipulation then.

15       **MR. HEMANN:**  One second, Your Honor.

16                   (Pause in proceedings.)

17       **MR. HEMANN:**  We're going to clear that up in a moment,

18   Your Honor.  It is in evidence, and we'll look at it.

19   **Q.**   The writing at the top is State Administration of Foreign

20   Expert Affairs; correct?

21   **A.**   Right.

22   **Q.**   And this note, I believe -- why don't we move on rather

23   than get bogged down with this particular one.

24       **THE COURT:**  All right.

25

1  BY MR. HEMANN:

2  Q.    So there's a couple of examples here, wouldn't you say,

3  with regard to Minister Tan and Mr. Zhang of what would appear

4  to be, what you just said, is legitimate *guanxi*; correct?

5  A.    I mean, it's limited, you know, incidents of -- or

6  evidence of a *guanxi* relationship.  If they are true, then they

7  would point, perhaps, in the direction that there is some

8  significant *guanxi* relationship.

9        But I have to say that, you know, I've been over to

10  high-level people's homes in Beijing that I don't really know

11  very well.  So I'm not sure how that really ties into there

12  being some kind of a deep, warm *guanxi* relationship here.

13  Q.    So you don't believe that he had a *guanxi* relationship?

14  Your theory, your hypothesis is that he did not have a real

15  *guanxi* relationship; and you believe that, instead, he was

16  exaggerating his credentials to impress Hong Jibi?

17  A.    That's my view, yes.

18  Q.    And you believe that this is extremely commonplace, indeed

19  expected amongst the Chinese, as a means of establishing

20  business relationships?

21  A.    Inflating one's own self-worth is highly advisable, yes.

22  Q.    And this sort of exaggeration is a unique, in your

23  opinion, aspect of the Chinese people?

24  A.    I would say it is -- we see it throughout East Asia.  It's

25  not limited only to China.

1          You have to understand that, you know, the United States

2    and the West have different cultural values than the East, and

3    these values extend to how one presents oneself.  And, again,

4    this relates to notions of face and developing relationships.

5          So, you know, strict reliance on, you know, veracity and,

6    you know, your word is your bond and all that, I mean, these

7    are Western cultural norms, and I wouldn't apply them, and I

8    don't think it's wise for you -- for us to generally apply them

9    to other people.

10   **Q.**  So can you identify some writing, some academic piece,

11   that says that exaggerating one's own -- and let's pull back.

12         Exaggerating in the sense of saying that something

13   happened that didn't happen is commonplace amongst the Chinese?

14   **A.**  Well, I'd have to give that some thought.  I mean -- but I

15   think I could direct you.

16   **Q.**  Can you direct me now?

17   **A.**  As I said, I would have to give it some thought.  I

18   mean --

19   **Q.**  Did your report cite any authority for the proposition

20   that the Chinese are exaggerators?

21              **MS. AGNOLUCCI:**  Objection, Your Honor.

22              **THE COURT:**  Overruled.

23              **THE WITNESS:**  Well, I mean --

24              **THE COURT:**  He's an expert.  Overruled.

25              **THE WITNESS:**  So I should answer that, Your Honor?

1          **THE COURT:**  Yes, you may, Professor, please.

2          **THE WITNESS:**  Thank you.

3      I mean, I don't think it's appropriate to engage in any

4  form of labeling.  I mean, I think that we see elements of

5  exaggeration amongst some people; you see very honest behavior

6  amongst others in China.  So, you know, it's not something that

7  is necessarily inherent in every person in China.

8  **BY MR. HEMANN:**

9  **Q.**   How does that square with your opinion that exaggerating

10  one's credentials is extremely commonplace, indeed expected,

11  amongst the Chinese?

12  **A.**   I'm saying that this is a cultural expression that is

13  prevalent, but is not practiced necessarily by everyone,

14  because I don't want to engage, I think unfairly, in

15  pejorative, you know, statements about the Chinese people, who,

16  you know, I have a great deal of admiration for.

17  **Q.**   You believe, do you not, Mr. Lewis, that this letter is a

18  classic example of Chinese puffery; correct?

19  **A.**   Yes, I do.

20  **Q.**   And by "puffery," you mean lying; correct?

21  **A.**   No.  I mean overexaggerating or blowing things out of

22  proportion in order to, you know, as I've indicated, try to

23  establish, ultimately, certain advantages which can lead to a

24  beneficial *guanxi* relationship.

25  **Q.**   And if this is a classic example, Mr. Lewis, there must be

1    other examples; correct?

2    **A.**    Indeed.

3    **Q.**    Can you give the jury another example like this of a

4    classic example of Chinese puffery?  A real example, not a

5    hypothetical example.

6    **A.**    Well, I mean, certainly in the context of Hong Kong, where

7    I spent many, many years -- and I don't want to cast aspersions

8    on anyone individually, but certainly there were academics in

9    leadership positions within my university in Hong Kong who,

10   when foreign guests visited, would tend to exaggerate the

11   accomplishments -- and seriously, I mean, these were bordering

12   on fabrications -- of accomplishments of their particular

13   departments and, indeed, embellish hugely on their own

14   accomplishments, their own professional and academic

15   accomplishments.

16        So, I mean, I have certainly encountered this, yes.

17   **Q.**    And have you encountered this amongst non-Chinese people?

18            **MS. AGNOLUCCI:**  Objection, Your Honor.

19            **THE COURT:**  Overruled.

20            **THE WITNESS:**  Again, I'm speaking from the fact that I

21   spent a large portion of my life in the Chinese world, not in

22   the Western world.  I mean, so I feel more competent to speak

23   about the Chinese cultural -- the Chinese culture and behavior

24   within that culture than I would be to make definitive

25   statements about Western culture or California culture because,

1    actually, I've only been back here for a few years now.

2    BY MR. HEMANN:

3    Q.   So let me ask the question again.  Have you encountered

4    examples of Westerners, whether Chinese Westerners or

5    non-Chinese Westerners -- there are Chinese people who live in

6    the United States; correct?

7              MS. AGNOLUCCI:  Objection, Your Honor.

8              THE COURT:  Overruled.

9              THE WITNESS:  Of course, there are.

10   BY MR. HEMANN:

11   Q.   Have you encountered examples of Westerners exaggerating

12   their credentials for the purpose of obtaining business?

13   A.   I don't see it as much, no.

14   Q.   Have you ever been to a bar association meeting?

15   A.   No, I haven't.

16   Q.   Hong Jibi was in the position of an employer with a job to

17   give away; correct?

18   A.   He certainly had the means to, you know, bring Walter Liew

19   on board, yes.

20   Q.   And may I ask you a hypothetical question?

21   A.   Sure.

22   Q.   Assume right now that I am an employer with a job to give

23   away, and I receive a résumé from a Chinese person, and I

24   receive a résumé from a Westerner.

25        Should I scrutinize the résumé provided to me by the

1  Chinese person more carefully for fear of exaggeration?

2          MS. AGNOLUCCI:  Objection, Your Honor.

3          THE COURT:  Overruled.

4          THE WITNESS:  I -- I mean, I'm not -- I don't believe

5  you should.  I mean, certainly in the context of the

6  United States and the U.S. culture, we would be looking at

7  things in an evenhanded manner.

8  BY MR. HEMANN:

9  Q.   Because it would be wrong to assume that somebody's lying

10 simply because they're Chinese; correct?

11 A.   Correct, in the United States.

12 Q.   And, Mr. Lewis, you received, what?  A hundred thousand

13 dollars for your testimony here today?

14 A.   Something like that, yes.

15         MR. HEMANN:  I don't have any further questions,

16 Your Honor.

17         THE COURT:  All right.

18         MS. AGNOLUCCI:  Briefly, Your Honor, if I may.

19         THE COURT:  Sure.

20     Let's take a stretch break while Ms. Agnolucci is getting

21 ready.

22     You can stretch, too, if you want to.

23                 (Pause in proceedings.)

24         MR. HEMANN:  Your Honor, may I approach to get the

25 exhibits?

1    THE COURT:  Sure.  Please do.

2                    (Pause in proceedings.)

3    THE COURT:  All right.  Please be seated.

4    MS. AGNOLUCCI:  May I proceed, Your Honor?

5    THE COURT:  Yes, you may.

6                    REDIRECT EXAMINATION

7  BY MS. AGNOLUCCI:

8  Q.    Professor Lewis, Mr. Hemann just asked you if you received

9  approximately a hundred thousand dollars for your testimony

10  today.

11       Were you paid that sum of money for sitting here and

12  testifying?

13  A.    No, of course, not.

14  Q.    Have you been working with us over the course of many

15  months?

16  A.    Correct, I have been.

17  Q.    And the money you have received has been at your hourly

18  rate for reviewing hundreds of documents; correct?

19  A.    Correct.

20  Q.    And you've reviewed many laws as well; correct?

21  A.    Correct.

22  Q.    And you've reviewed scholarly publications and articles

23  and treatises; correct?

24  A.    Correct.

25  Q.    And that has taken you about 280 hours of time; correct?

1    **A.**    Yes.

2    **Q.**    You were just discussing two individuals with Mr. Hemann

3    on cross-examination with whom Mr. Liew may have had a

4    relationship.  One was Minister Tan and one was Zhang Yujie;

5    correct?

6    **A.**    Hmm.

7            **THE COURT:**  You need to say yes or no.

8            **THE WITNESS:**  Sorry.  Yes.

9            **THE COURT:**  Thank you very much.

10    **BY MS. AGNOLUCCI:**

11    **Q.**    The first one, Minister Tan, at the time of the document

12    that we looked at in 2004, did he work for a government agency?

13    **A.**    It appears he was no longer working for a government

14    agency.  He was associated with that industrial association

15    that we mentioned.

16    **Q.**    And we talked about Zhang Yujie, who worked for the State

17    Administration of Foreign Expert Affairs; correct?

18    **A.**    Correct.

19    **Q.**    And Mr. Hemann pointed out that at the time of the

20    Christmas card -- or, I'm sorry -- Chinese New Year card that

21    Mr. and Mrs. Liew received from this individual, Mr. Liew

22    already had a contract with China; correct?

23    **A.**    I believe so, yes.

24    **Q.**    The card was dated 2008.  Do you recall that?

25    **A.**    Oh, that's right.  Yes.

1   **Q.**   And Mr. Liew had been involved in contracts in the

2   titanium dioxide business for about three years by then?

3   **A.**   Yes.

4   **Q.**   Would it have been unusual, as an overseas person doing

5   business in China, for Mr. Liew to have received a New Year's

6   card from the State Administration of Foreign Expert Affairs?

7   **A.**   No, nothing unusual.

8   **Q.**   So Minister Tan and Zhang Yujie are people who Mr. Hemann

9   asked you whether Mr. Liew had real *guanxi* connections with;

10  correct?

11  **A.**   Yes.

12  **Q.**   And you also testified with Mr. Hemann on cross that

13  Luo Gan was a very important person; correct?

14  **A.**   Yes.

15  **Q.**   The people that Mr. Liew may have had real *guanxi*

16  connections with, were they anywhere near as important as

17  Luo Gan?

18  **A.**   No.

19  **Q.**   If Mr. Liew had an actual *guanxi* relationship with this

20  individual, Luo Gan, would he have needed to write a letter

21  like the one Mr. Hemann was asking you about?

22          **MR. HEMANN:**  Objection.  Calls for speculation.

23          **THE COURT:**  Sustained.

24          **MS. AGNOLUCCI:**  May I please publish side by side

25  Exhibits 291T and 291, Your Honor?

1          THE COURT:  Yes.

2          MS. AGNOLUCCI:  And if you could go to the actual --

3    to the next page, Mr. Guevara.  Thank you.

4    Q.   On cross-examination you testified regarding this

5    document, which appears to be a note to Minister Tan; correct?

6    A.   Correct.

7    Q.   Now, looking at these side by side, the Chinese original

8    on the right-hand side, that appears to be on a scrap of

9    notebook paper with words crossed out; correct?

10   A.   Correct.

11   Q.   Would it be proper Chinese business practice to send a

12   letter in this condition to a retired minister?

13   A.   Absolutely not.

14   Q.   Have you seen any evidence that this letter was ever sent?

15   A.   No.

16   Q.   You can take that down, Mr. Guevara.

17        You also discussed on cross-examination with Mr. Hemann

18   the appointment rights that SASAC has with respect to certain

19   entities; correct?

20   A.   Yes.

21   Q.   Now, those appointment rights are the right to appoint

22   some, but not necessarily all, directors on a board; correct?

23   A.   Yes, correct.

24   Q.   And those rights apply to Central SOEs?

25   A.   Yes.

1  Q.   The only company we have seen where there's evidence of

2  SASAC recommending directors was the Pangang Group; correct?

3  A.   Correct.

4  Q.   And that's the parent company at the top of the

5  organizational chart that we drew today; right?

6  A.   Right.

7  Q.   Was the Pangang Group a party to any of the contracts we

8  looked at today?

9  A.   They may have been a party to one of the contracts, the

10  2009 contract.

11  Q.   I believe you may be thinking of PISCO?

12  A.   Perhaps it is PISCO.

13  Q.   And PISCO was the end user of that contract for a brief

14  period and then was substituted; correct?

15  A.   Correct.

16  Q.   And the other parties to the contracts that we looked at

17  were PIETC?

18  A.   Correct.

19  Q.   PGSVTC?

20  A.   Correct.

21  Q.   And Pangang Titanium?

22  A.   Correct.

23  Q.   Did you see any evidence of SASAC appointing any directors

24  to those entities?

25  A.   No, not at all.

LEWIS - RECROSS / HEMANN

1   Q.   In fact, we looked at the bylaws of Pangang Jinzhou;

2   correct?

3   A.   Correct.

4   Q.   And was it not clear from those bylaws that the directors

5   of Pangang Jinzhou were appointed internally?

6   A.   Yes.

7        MS. AGNOLUCCI:  Thank you.  I have no further

8   questions.

9        MR. HEMANN:  One short series of questions,

10  Your Honor.

11       THE COURT:  All right.

12       MR. HEMANN:  One subject.

13       THE COURT:  All right.

14                    <u>RECROSS-EXAMINATION</u>

15  BY MR. HEMANN:

16  Q.   PISCO and Panzhihua Iron & Steel (Group) Company are not

17  the same company, are they?

18  A.   Sorry.  Repeat the question, please.

19  Q.   PISCO and Panzhihua Iron & Steel (Group) Company are not

20  the same company, are they?

21  A.   They would not appear to be the same company, correct.

22  Q.   The top-level company, the parent company --

23  A.   -- is that company, is the group company.

24  Q.   Is Panzhihua Iron & Steel (Group) Company, which is the

25  company that is on the contract that you looked at; correct?

**SANGHI - DIRECT / LOVETT**

1    **A.**    I believe so.

2            **MR. HEMANN:**  Thank you.

3            **THE COURT:**  All right.  You're excused, Professor.

4    Thank you very much.

5            **THE WITNESS:**  Thank you.

6                        (Witness excused.)

7            **THE COURT:**  Next witness, please.

8            **MS. LOVETT:**  Yes, Your Honor.  Defendants Walter Liew

9    and USAPTI call Sudha Sanghi.

10           **THE COURT:**  All right.

11                       (Pause in proceedings.)

12           **THE CLERK:**  Raise your right hand, please.

13                        **SUDHA SANGHI**,

14   called as a witness for the Defendant, having been duly sworn,

15   testified as follows:

16           **THE WITNESS:**  Yes.

17           **THE CLERK:**  Thank you.  Please be seated and state and

18   spell your full name for the record.

19       State and spell your name for the record, please.

20           **THE WITNESS:**  I'm sorry?

21           **THE COURT:**  Tell us what your name is and spell your

22   name, please.  Thank you.

23           **THE WITNESS:**  Sudha Sanghi; S-A-N-G-H-I, S-U-D-H-A.

24           **THE CLERK:**  Thank you.

25

SANGHI - DIRECT / LOVETT

1                        <u>DIRECT EXAMINATION</u>

2     BY MS. LOVETT:

3     Q.   Good afternoon, Ms. Sanghi.

4     A.   Good afternoon.

5     Q.   Was there a time that you were employed by a company

6     called Performance Group?

7     A.   Yes.

8     Q.   And when was that?

9     A.   2008 February.

10    Q.   And what was the position you were hired into at

11    Performance Group?

12    A.   CAD drafter.

13    Q.   And how did you come to work at Performance Group?

14    A.   I came -- I mean, BJ interviewed me.

15    Q.   An employee named BJ interviewed you?

16    A.   Yes, correct.

17    Q.   And do you recall what his position was?

18    A.   He's an engineer.  He's a designer there.

19    Q.   Who supervised you at Performance Group?

20    A.   BJ and Walter.

21    Q.   And what was Walter Liew's role at Performance Group?

22    A.   He was the manager there.

23    Q.   Prior to joining Performance Group, can you describe your

24    educational background?

25    A.   I did my mechanical engineering from India, and I worked

**SANGHI - DIRECT / LOVETT**

1   on CAD in India.

2   **Q.**   Where did you get your degree in India?

3   **A.**   In Andhra Pradesh, A-N-D-H-R-A P-R-A-D-E-S-H.  That's a

4   state name.

5   **Q.**   And when did you get that degree?

6   **A.**   In 2000.

7   **Q.**   You mentioned that after you got your degree, you worked

8   in CAD drawing.  Where did you do that?

9   **A.**   In Hyderabad, H-Y-D-E-R-A-B-A-D.

10   **Q.**   And how long did you have that job?

11   **A.**   I had for two and a half years.

12   **Q.**   And when did you leave India?

13   **A.**   April 2003.

14   **Q.**   And did you have any jobs between leaving India and

15   working at Performance Group?

16   **A.**   No.

17   **Q.**   What were your job responsibilities as a CAD drafter at

18   Performance Group?

19   **A.**   I have to design the drawings on autoCAD.

20   **Q.**   So you used the computer program autoCAD?

21   **A.**   Yes, correct.

22   **Q.**   Did you use any other computer programs in your work?

23   **A.**   Sometimes on Pro/E, but not much on Pro/E.

24   **Q.**   Pro/E?

25   **A.**   Yes.

SANGHI - DIRECT / LOVETT

1  Q.   And where did you get the information that you put into

2  the CAD drawings?

3  A.   I got information from Walter and BJ.

4  Q.   What projects did you work on while you were at

5  Performance Group?

6  A.   Initially I worked on 30K and there on 100K.  I'm sorry.

7  Q.   100K?

8  A.   Yes.

9  Q.   And did anyone else work on CAD drawings during the time

10  that you worked for Mr. Liew?

11  A.   Initially there was nobody, but later on Philipp joined,

12  so Philipp was also working on that.

13  Q.   Do you recall Philipp's last name?

14  A.   I'm sorry?

15  Q.   Do you recall Philipp's last name, his surname?

16  A.   Philipp Ilagan.

17  Q.   Thank you.

18        While you were working for Mr. Liew, did you keep a backup

19  of the work that you would create for him?

20  A.   Not much.  I did not keep up a backup, but always I had my

21  folder.  But Walter used to keep a backup in his computer, I

22  guess.

23  Q.   You would store your work in a folder?

24  A.   Yes.

25  Q.   And where was that folder kept?

1   **A.**    It was in my folder.  It's on my office lap -- desktop.

2   **Q.**    Okay.  And did you enjoy your job working for Mr. Liew?

3   **A.**    Yes.

4   **Q.**    When did you leave the job?

5   **A.**    In October 2009.

6   **Q.**    Why did you leave the job?

7   **A.**    Because I had a baby.  I was about to have a baby in

8   December.  So I had to quit.

9   **Q.**    And did you consider Mr. Liew to be a good engineer?

10  **A.**    Yes.

11  **Q.**    Can you give an example of why you thought Mr. Liew was a

12  good engineer?

13  **A.**    Because he's a very knowledgeable person, I felt, and

14  whenever I had any questions about technical questions and he

15  used to answer me.  And whenever I had the CAD drawings, I used

16  to take to him for verification, and he used to pick the

17  mistakes I have done very easily and quickly.

18  **Q.**    So he could identify mistakes very quickly, you said?

19  **A.**    Yes, uh-huh.

20      **MS. LOVETT:**  Your Honor, may I approach with

21  Exhibit 2538?

22      **THE COURT:**  Yes, you may.

23  **BY MS. LOVETT:**

24  **Q.**    Ms. Sanghi, you can take a moment to unfold that.  It's a

25  little large.  But do you recognize this document?

1   **A.**   (Witness examines document.)  Yes.

2   **Q.**   What is it?

3   **A.**   These are PFD drawings, process flow diagrams.

4   **Q.**   And did you do work on these process flow diagrams?

5   **A.**   Yes, I did.

6   **Q.**   Did you do work on every page of the packet that I just

7   handed to you?

8   **A.**   (Witness examines document.)  Yes, I did.

9   **Q.**   And was your work on those process flow diagrams part of

10  the ordinary course of your job responsibilities?

11  **A.**   Yes.

12       **MS. LOVETT:**  Your Honor, I move to admit Exhibit 2538

13  into evidence.

14       **THE COURT:**  Any objection?

15       **MR. SCOTT:**  One moment, Your Honor.

16       **THE COURT:**  Yes.

17            (Pause in proceedings.)

18       **MR. SCOTT:**  No objection.

19       **THE COURT:**  Admitted.

20       (Trial Exhibit 2538 received in evidence)

21  **BY MS. LOVETT:**

22  **Q.**   Ms. Sanghi, you'll see that the exhibit is now on the

23  screen next to you as well as in front of you.  So use whatever

24  you prefer.

25       Are these an example of CAD drawings that you worked on?

**SANGHI - DIRECT / LOVETT**

1   **A.**   Yes.

2   **Q.**   And you mentioned that these are process flow diagrams.

3   **A.**   Uh-huh.

4   **Q.**   Can you explain what a process flow diagram depicts?

5   **A.**   A process flow diagram is just a layout of the equipment,

6   as well as how the process flows from one equipment to another.

7   **Q.**   What project did these process flow diagrams relate to?

8   **A.**   I'm sorry?

9   **Q.**   Did these relate to the 30K project or the 100K project?

10  **A.**   It's for the 30K.

11  **Q.**   And what part of the process did these relate to?

12  **A.**   It's oxidation.

13  **Q.**   Do you see, if we turn to the first page that's also up on

14  the screen -- I guess it's the second page -- there's a legend

15  in the bottom right-hand corner?

16  **A.**   (Witness examines document.)  Yes.

17  **Q.**   What kind of information is in that legend in the bottom

18  right-hand corner?

19  **A.**   Those are the equipment names and the CAD for the

20  equipment.

21  **Q.**   Does it include information about who drafted this

22  diagram?

23  **A.**   Yes, uh-huh.

24  **Q.**   Does it include information about the title of this

25  diagram?

**SANGHI - DIRECT / LOVETT**

1   A.   Yes.

2   Q.   Thank you.

3        MS. LOVETT:  Your Honor, may I approach with

4   Exhibit 3504?

5        THE COURT:  Yes.

6        THE CLERK:  Can you describe 3504?  Because it's not

7   on the list.

8        MS. LOVETT:  3504 is a large diagram.

9        THE CLERK:  Thank you.

10  BY MS. LOVETT:

11  Q.   Ms. Sanghi, do you recognize this document?

12  A.   Yes.

13  Q.   What is it?

14  A.   These are also process flow diagrams, petroleum coke

15  handling system.

16  Q.   I'm sorry.  Can you say that again?

17  A.   Petroleum coke handling system.

18  Q.   Petroleum coke handling system.

19  A.   Yeah.

20  Q.   Did you work on these drawings?

21  A.   Yes, I did.

22  Q.   Did you work on each page of these drawings in the packet

23  I just handed to you?

24  A.   (Witness examines document.)  Yes.  Yes, I did.

25  Q.   And was your work on these drawings part of your normal

1   job responsibilities?

2   **A.**   Yes, correct.

3          **MS. LOVETT:**  Your Honor, I move to admit Exhibit 3504

4   into evidence.

5          **MR. SCOTT:**  No objection.

6          **THE COURT:**  Admitted.

7       (Trial Exhibit 3504 received in evidence)

8   **BY MS. LOVETT:**

9   **Q.**   You mentioned that these are process flow diagrams again;

10  right?

11  **A.**   Yes, correct.

12  **Q.**   And that you also mentioned these relate to the petroleum

13  coke handling system?

14  **A.**   Uh-huh.

15  **Q.**   Thank you.

16         **MS. LOVETT:**  Your Honor, may I approach with

17  Exhibit 3507?

18         **THE COURT:**  Yes.

19         **MS. LOVETT:**  And, Ms. Ottolini, the same description

20  for these.

21         **THE CLERK:**  Thank you.

22  **BY MS. LOVETT:**

23  **Q.**   Ms. Sanghi, do you recognize this document?

24  **A.**   Yes.

25  **Q.**   What is it?

1   **A.**   This is process flow diagrams for 30K.

2   **Q.**   For the 30K?

3   **A.**   Yes.

4   **Q.**   And did you work on these diagrams?

5   **A.**   Yes.

6   **Q.**   Did you work on each page of the diagrams?  There's quite

7   a few.

8   **A.**   (Witness examines document.)  Yes, I did.

9   **Q.**   And was your work on these diagrams part of your normal

10   job responsibilities?

11   **A.**   Yes.

12        **MS. LOVETT:**  Your Honor, I move to admit Exhibit 3507

13   into evidence.

14        **MR. SCOTT:**  No objection.

15        **THE COURT:**  Admitted.

16     (Trial Exhibit 3507 received in evidence)

17   **BY MS. LOVETT:**

18   **Q.**   Ms. Sanghi, you mentioned that these are further process

19   flow diagrams you worked on; right?

20   **A.**   Uh-huh.

21        **THE COURT:**  Is that a yes?

22        **THE WITNESS:**  Yes.

23        **THE COURT:**  Thank you.

24        **THE WITNESS:**  I'm sorry.

25

SANGHI - DIRECT / LOVETT

1   BY MS. LOVETT:

2   Q.   If you look at the bottom left-hand corner of this first

3   diagram, there's a legend there; right?

4   A.   Yes.

5   Q.   Did you do any work on the calculations in that bottom

6   left-hand-corner legend?

7   A.   Not much, but sometimes I used to do, yeah.

8   Q.   Thank you.

9        MS. LOVETT:   Your Honor, may I approach with

10  Exhibit 3025?

11       THE COURT:   Yes, you may.

12  BY MS. LOVETT:

13  Q.   Ms. Sanghi, do you recognize this document?

14  A.   Yes.

15  Q.   What is it?

16  A.   This is also process flow diagrams.

17  Q.   What does this process flow diagram relate to?

18  A.   This is for chlorination.

19  Q.   Did you do work on this process flow diagram?

20  A.   Yes.

21  Q.   And, again, I'll ask you to unfold those pages and let me

22  know, did you work on every page of those process flow

23  diagrams?

24  A.   (Witness examines document.)  Yes, I worked on every page.

25  Q.   And was your work on these diagrams part of your normal

1   job responsibilities?

2   **A.**   Yes.

3          **MS. LOVETT:**  Your Honor, I move to admit Exhibit 3025

4   into evidence.

5          **MR. SCOTT:**  No objection.

6          **THE COURT:**  Admitted.

7       (Trial Exhibit 3025 received in evidence)

8   **BY MS. LOVETT:**

9   **Q.**   Now, Ms. Sanghi, again these are process flow diagrams;

10  right?

11  **A.**   Yes.

12  **Q.**   If you look at the legend in the bottom right-hand corner,

13  or from your own memory, was this part of the 30K project or

14  the 100K project?

15  **A.**   (Witness examines document.)  100K.

16          **MS. LOVETT:**  Your Honor, may I approach with

17  Exhibit 3077?

18          **THE COURT:**  Yes.  After this exhibit, we're going to

19  adjourn.

20          **MS. LOVETT:**  Yes, Your Honor.

21  **Q.**   Ms. Sanghi, do you recognize this document?

22  **A.**   Yes.

23  **Q.**   What is it?

24  **A.**   Process flow diagrams.

25  **Q.**   And did you work on these process flow diagrams?

SANGHI - DIRECT / LOVETT

1    **A.**    Yes.

2    **Q.**    Did you work on each page of these process flow diagrams?

3    **A.**    Yes.

4    **Q.**    And was your work on each of these process flow diagrams

5    part of your ordinary job responsibilities?

6    **A.**    Yes.

7            **MS. LOVETT:**  Your Honor, I move to admit Exhibit 3077

8    into evidence.

9            **MR. SCOTT:**  No objection.

10           **THE COURT:**  Admitted.

11        (Trial Exhibit 3077 received in evidence)

12   **BY MS. LOVETT:**

13   **Q.**    And, Ms. Sanghi, just briefly, what part of the process do

14   these process flow diagrams relate to?

15   **A.**    Oxidation.

16           **MS. LOVETT:**  Thank you.  That's it for the day,

17   Your Honor.

18           **THE COURT:**  All right.  You may step down.  You may

19   step down.

20           **THE WITNESS:**  Thank you.

21           **THE COURT:**  Please come back tomorrow morning.

22        So we're going to take our -- we're going to adjourn for

23   the afternoon, and I will say -- remind you of your conduct as

24   jurors after anyone who wants to leave leaves and we close the

25   door and lock it.

1                    (Pause in proceedings.)

2          **THE COURT:**  Thank you very much.

3      First, keep an open mind throughout the trial and do not

4  decide what the verdict should be until you and your fellow

5  jurors have completed your deliberations at the end of the

6  case.

7      Second, because you must decide this case based only on

8  the evidence received in the case and on my instructions as to

9  the law that applies, you must not be exposed to any other

10  information about the case or to the issues it involves during

11  the course of your jury duty.

12      Thus, until the end of the case, or unless I tell you

13  otherwise, do not communicate with anyone in any way and do not

14  let anyone else communicate with you in any way about the

15  merits of the case or anything to do with it.  This includes

16  the -- discussing the case in person, in writing, by phone,

17  Smartphone, or electronic means, via email, text messaging, or

18  in or on any Internet chat room, blog, website, including such

19  social networking media like Facebook, Myspace, LinkedIn,

20  YouTube, and Twitter, or other feature.

21      This applies to communicating with your fellow jurors

22  until I give you the case for deliberations, and it applies to

23  communicating with everyone else, including your family

24  members, your employer, the media, or press, and the people

25  involved in the trial, although you may notify your family or

1   your employer that you are continuing to sit as a juror in this

2   case.

3       But if you're asked or approached in any way about your

4   jury service or anything about this case, you must respond that

5   you have been ordered not to discuss the matter and to report

6   the contact to the Court.

7       Because you will receive all the evidence and legal

8   instructions you properly may consider to return a verdict, do

9   not read, watch, or listen to any news or media accounts or

10  commentary about the case or anything to do with it.  Do not do

11  any research, such as consulting dictionaries, searching the

12  Internet, or using other reference materials; and do not make

13  any investigation or in any other way try to learn about the

14  case on your own.

15      The law requires these restrictions to ensure the parties

16  have a fair trial based on the same evidence that each party

17  has had an opportunity to address.

18      A juror who violates these restrictions jeopardizes the

19  fairness of these proceedings and a mistrial could result,

20  which would require the entire trial process to start over.

21      If any juror is exposed to any outside information, please

22  notify the Court immediately.

23      So we'll be adjourned until tomorrow morning our regular

24  time.  It is still -- or it is anticipated by the Court and the

25  parties that you will get this case for deliberations next

**PROCEEDINGS**

 1   week.  So we're right on schedule, and then the case will be in

 2   your hands at that point.

 3        So have a great evening, and we'll see you tomorrow

 4   morning.  Thanks for your attention and punctuality.

 5        (Proceedings were heard out of the presence of the jury:)

 6        **THE COURT:**  All right.  You may be seated.  The jury

 7   has retired.  You may open the door.

 8        One thing I wanted to say.  I've been thinking about the

 9   motions that were made and thinking about the arguments that

10   you made, and with respect to Mr. Maegerle's motion for

11   mistrial and/or severance, the motion is denied in its entirety

12   for the reasons stated in the previous order, and also because

13   I think the steps that have been taken during the trial have

14   mitigated any prejudice or significant prejudice to

15   Mr. Maegerle by virtue of there perhaps being different or more

16   evidence against one defendant than against -- other defendants

17   than against him.

18        So I don't think a mistrial is appropriate, and I don't

19   think a severance is appropriate at this point, as I didn't

20   think it was during the pretrial phase.

21        So with that said, is there anything further the

22   Government wants to raise this evening?

23             **MR. HEMANN:**  No, Your Honor.

24             **THE COURT:**  Ms. Agnolucci?

25             **MS. AGNOLUCCI:**  No, Your Honor.

PROCEEDINGS

1      **THE COURT:**  All right.  So you still think you'll

2  finish by sometime Thursday at the pace we're at, Mr. Gasner?

3      **MR. GASNER:**  This expert went longer than I thought,

4  and Mr. Cooper, I've always thought, would be longer than

5  Professor Lewis, so I'm a little in doubt now.  But same number

6  of witnesses, I think, Your Honor, as we were talking about

7  this morning.

8      **THE COURT:**  All right.

9      **MR. GASNER:**  But it may go longer.

10      **THE COURT:**  It's only relevant because if it looks

11  like we're not going to finish by the close of Thursday, then

12  there's no point in having a charging conference on Friday.

13  And we'll probably have to readjust whatever day you finish,

14  depending upon the time, we would have our charging conference

15  at that time and then move into closing arguments a day later,

16  just to give you the evening to prepare.

17      So we'll see you all at the regular time tomorrow morning.

18  Thank you very much, everybody.

19      **MR. HEMANN:**  Thank you, Your Honor.

20      **MR. GASNER:**  Thank you, Your Honor.

21          (Proceedings adjourned at 1:13 p.m.)

22              ---oOo---

23

24

25

## CERTIFICATE OF REPORTER

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    day          , month          date          ,

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter