Case4:11-cr-00573-JSW Document823 Filed03/19/14 Page1 of 29

KEKER & VAN NEST LLP
STUART L. GASNER - # 164675
sgasner@kvn.com
SIMONA A. AGNOLUCCI - # 246943
sagnolucci@kvn.com
KATHERINE M. LOVETT - # 276256
klovett@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188

Attorneys for Defendants WALTER LIEW and USA PERFORMANCE TECHNOLOGY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

WALTER LIEW, USA PERFORMANCE TECHNOLOGY, INC., and ROBERT MAEGERLE,

Defendants.

Case No. CR 11-0573-JSW (NC)

**DEFENDANTS WALTER LIEW AND USA PERFORMANCE TECHNOLOGY INC.'S NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 AND FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33**

Date: June 3, 2014
Time: 1:00 p.m.
Place: Courtroom 5, 2nd Floor
Dept.: Hon. Jeffrey S. White

DEFENDANTS WALTER LIEW AND USAPTI'S NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 AND FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33
Case No. CR 11-0573-JSW (NC)
808289.02

Case4:11-cr-00573-JSW Document823 Filed03/19/14 Page2 of 29

# TABLE OF CONTENTS

Page

**NOTICE OF MOTION** .......... 1

**MEMORANDUM OF POINTS AND AUTHORITIES** .......... 1

I. INTRODUCTION .......... 1

II. LEGAL STANDARD .......... 3

III. ARGUMENT .......... 4

A. No reasonable juror could find beyond a reasonable doubt that Mr. Liew and USAPTI reasonably believed that alleged Trade Secret 1 was a DuPont trade secret. .......... 5

B. No reasonable juror could find beyond a reasonable doubt that the conduct of Mr. Liew and USAPTI was intended to injure DuPont. .......... 10

C. No reasonable juror could have found beyond a reasonable doubt that defendants intended or knew that the alleged conspiracy would benefit a foreign government or foreign instrumentality. .......... 10

D. The government failed to prove possession of stolen trade secrets (Counts 6, 7 and 9) as to Walter Liew and USAPTI. .......... 16

E. The government failed to prove Count 8 (copying stolen trade secrets with respect to Trade Secret 5) as to Walter Liew and USAPTI. .......... 18

F. The government failed to prove Count 10 (conspiracy to obstruct justice as to the answer in the civil case) as to Mr. Liew and USAPTI. .......... 19

G. The government failed to prove Count 11 (witness tampering as to Jian Liu) as to Mr. Liew. .......... 21

H. The government failed to prove Counts 13 and 14 (concerning statement about safety deposit box keys during search of Liew home) as to Mr. Liew .......... 23

I. The financial charges should have been severed, warranting a new trial as to all counts of the Indictment. .......... 24

IV. CONCLUSION .......... 25

i

DEFENDANTS WALTER LIEW AND USAPTI'S NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 AND FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33
Case No. CR 11-0573-JSW (NC)

808289.02

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Arthur Andersen LLP v. United States*
544 U.S. 696 (2005) .......... 21

*Imax Corp. v. Cinema Techs., Inc.*
152 F.3d 1161 (9th Cir. 1998) .......... 9

*Sosa v. DirectTV, Inc.*
, 437 F.3d 923 (9th Cir. 2006) .......... 20

*United States v. Delgado*
357 F.3d 1061 (9th Cir. 2004) .......... 3, 23

*United States v. Hsu*
155 F.3d 189 (3d Cir. 1998) .......... 10, 12, 13

*United States v. Kellington*
217 F.3d 1084 (9th Cir. 2000) .......... 3, 4

*United States v. Lan Lee*
No. CR 06-0424-JW, 2010 WL 8696087 (N.D. Cal. May 21, 2010) .......... 11, 14, 15, 16

*United States v. Lan Lee*
No. CR-06-0424-JW (N.D. Cal. Nov. 13, 2009) .......... 15

*United States v. Lange*
312 F.3d 263 (7th Cir. 2002) .......... 7

*United States v. Lopez*
484 F.3d 1186 (9th Cir. 2007) .......... 3, 23

*United States v. McCormick*
72 F.3d 1404 (9th Cir. 1995) .......... 3

*United States v. Nevils*
598 F.3d 1158 (9th Cir. 2010) (en banc) .......... 3

*United States v. Nosal*
CR-08-0237-EMC (N.D. Cal. April 19, 2013) .......... 16, 18

*United States v. Watters*
717 F.3d 733 (9th Cir. 2013) .......... 20

**Federal Statutes**

18 U.S.C. § 1512 .......... 19, 21

18 U.S.C. § 1515 .......... 19

18 U.S.C. § 1831 .......... 10, 11, 13, 14, 15

18 U.S.C. § 1832 .......... 16, 18

18 U.S.C. § 1839 .......... 11

**State Statutes**

California Code of Civil Procedure § 2019 .......... 9

Civil Code § 47(b)(2) .......... 20

**Federal Rules**

Fed. R. Crim. P. 29 .......... *passim*

Fed. R. Crim. P. 33 .......... 3, 4, 5, 13, 25

**Other Authorities**

142 Cong. Rec. S12201-03 (1996) .......... 11, 12, 13

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on June 3, 2014, at 1:00 p.m. or as soon as the matter may be heard before the Honorable Jeffrey S. White, defendants Walter Liew and USA Performance Technology, Inc. ("USAPTI") will and hereby do move the Court for an order granting their renewed motion for judgment of acquittal Counts 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 13 and 14 of the Indictment or, in the alternative, their motion for a new trial. This motion is based upon the instant notice, the memorandum of points and authorities below, the records in this case, and upon such arguments made at the hearing. Defendants respectfully incorporate by reference all grounds for acquittal and/or new trial raised by counsel for co-defendant Robert Maegerle, as well as all grounds previously raised by the defense prior to and during the trial.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The trial of this case presents a textbook example of the dangers of criminalizing trade secret law. The government started with an overbroad definition of "Trade Secret 1," the supposed trade secret at the heart of this case, claiming in the Second Superseding Indictment that not only was "[t]he DuPont chloride-route process to manufacture TiO2" a protectable trade secret, but so were the "ways and means in which proprietary and non-proprietary components were compiled and combined by DuPont to form substantial portions of the TiO2 manufacturing process," as well as "Trade Secrets 2 through 5 set forth below." Second Superseding Indictment (Dkt. 269) ("Indictment") at ¶ 14(a). When the Court granted the defendants' motion for a bill of particulars, the government did little more than reiterate its overbroad contentions. *See* Dkt. 363.

At trial, the evidence destroyed the notion that "Trade Secret 1" could ever be a protectable trade secret. It was undisputed at trial that the typical process for manufacturing TiO2 consists of thousands of "components." *See*, *e.g.*, Trial Transcript ("Tr.") at 3688:5-3699:23. The evidence showed beyond question that large portions of the process had been disclosed in DuPont patents (many of them long expired),[1] had been licensed to Sherwin Williams in the 1967

[1] *See*, *e.g.*, Trial Exhibit ("Exh.") 2252, Exh. 2256, Exh. 2285, Exh. 2290, Exh. 2299, Exh. 2318.

Ashtabula transaction with a 15-year time fuse on any confidentiality obligation,[2] were common to all chloride-route processes,[3] or were otherwise inconsistent with trade secret protection. Faced with overwhelming evidence that its central allegation was (at best) an exaggeration, the government artfully bobbed and weaved.  Its proof alternated between two ends of the evidentiary spectrum, focusing either on the minutiae of alleged Trade Secrets 2, 3, and 5 (on the one hand) or on DuPont's *efforts* to protect the entirety of its chloride-route process (on the other hand). When all else failed, the government argued in closing that the mere use of "DuPont's stuff" was wrongful in light of the defendants' alleged proclivity to "lie, cheat and steal."[4]

The government's trade secret theory became all the more troubling at trial when coupled with its accusations of espionage.  The evidence of any intention by Mr. Liew or USAPTI to benefit the Chinese government consisted largely of isolated portions of two Word files – purportedly letters written to top executives at Pangang entities, which the government admitted it could not show were ever sent – claiming attendance at a banquet in 1991 at which Mr. Liew received a list of priorities from a Chinese government official.  The evidence that the Pangang entities themselves were "foreign instrumentalities" was even thinner.  The government called no expert qualified to discuss the issue of governmental control of these entities, and relied principally on a minor U.S. employee of a Pangang subsidiary, who was incapable of shedding any real light on the relevant issues.

In the end, an array of financial and obstruction charges apparently succeeded in convincing the jury of the defendants' guilt across the board.  Those charges, however, were either lacking in evidentiary support themselves, or were so inflammatory that they should have been tried separately, as defendants urged in their motion for severance.

---

[2] *See* Exh. 900 (Sherwin-Williams agreement).

[3] *See, e.g.,* Tr. 3696:5-20, Tr. 3707:15-24, Tr. 3704:22-24, Tr. 3705:8-10; Tr. 3765:24-3766:8, Tr. 3699:23-24, Tr. 3706:21-3707:3, Tr. 1783:20-1784:7.

[4] *See* Tr. 4627:14-4628:1 ("What can't you do?  You cannot take DuPont's stuff and walk out the door and give it to somebody else, whether that stuff is in your head or whether that stuff is in your hands. . . . You can't take their stuff.  And, again, it's so basic Mr. Axelrod described it as something you learn in kindergarten.  Of course.  This isn't some complicated concept.  You're not allowed to take somebody else's stuff.").

Case4:11-cr-00573-JSW Document823 Filed03/19/14 Page7 of 29

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 29 provides that the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). If, viewing the evidence in the light most favorable to the government, any rational juror would have "at the least a reasonable doubt" as to whether the defendant committed a particular crime, then the evidence is insufficient to sustain a conviction. *See United States v. Lopez*, 484 F.3d 1186, 1200-01 (9th Cir. 2007). Entry of judgment of acquittal is required where the record evidence, construed in favor of the government, is "insufficient to establish every element of the crime," which can happen "where mere speculation, rather than reasonable inference, supports the government's case, or where there is a total failure of proof of a requisite element." *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc) (internal citations and brackets omitted). Additionally, the Court may consider evidence presented during the defense case when determining what rational inferences can be drawn from the prosecution's evidence for purposes of a Rule 29 motion. *See, e.g.*, *United States v. McCormick*, 72 F.3d 1404, 1410-11 (9th Cir. 1995). "[W]hen there is an innocent explanation for a defendant's conduct as well as one that suggests that the defendant was engaged in wrongdoing, the Government must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the latter explanation is the correct one." *United States v. Delgado*, 357 F.3d 1061, 1068 (9th Cir. 2004).

Moreover, under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The trial court's "power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal" and it "need not review the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. Kellington*, 217 F.3d 1084, 1094-95 (9th Cir. 2000) (quoting *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992)). Even if there may be an "abstract sufficiency of the evidence to sustain the verdict," a new trial is warranted where "the evidence preponderates sufficiently

3

DEFENDANTS WALTER LIEW AND USAPTI'S NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 AND FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33
Case No. CR 11-0573-JSW (NC)

808289.02

Case4:11-cr-00573-JSW Document823 Filed03/19/14 Page8 of 29

heavily against the verdict that a serious miscarriage of justice may have occurred." *Id.* at 1097 (quoting *Alston*, 974 F.2d at 1211-12). In such cases, the trial court "may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Id.*

## III. ARGUMENT

Careful Rule 29 and Rule 33 scrutiny is particularly important in this case because of the manner in which it was tried. The government devoted a great deal of time at trial to "character"-based evidence, starting with several witnesses whose only function was to suggest that the Liews were "hiding something" from the start, continuing with numerous witnesses devoted to alleged financial dishonesty, and culminating with a closing argument claiming a pattern of "lying . . . cheating and stealing." *See, e.g.*, Tr. 4343:11-12, Tr. 4354:16-17, Tr. 4427:23-4428:20. While much of this character-oriented evidence was relevant to the obstruction, tax, and bankruptcy charges, its potential for "spillover" effect on the trade secret and espionage charges is undeniable.

Virtually all of the government's "lying and cheating" evidence was focused on the financial and obstruction allegations. The trade secret "stealing" allegations against Mr. Liew and USAPTI centered largely on the three tangible items found at the Liew residence and USAPTI office (Trade Secrets 2, 3, and 4). The government's argument with respect to Trade Secret 1 – the supposed object of the conspiracies alleged in Counts 1 and 2 and the attempts alleged in Counts 3 and 5 – was based almost entirely on isolated quotations from three documents mentioning the "DuPont process." Little was said in the government's closing about who exactly was in the conspiracy (other than the defendants on trial) or how the evidence showed its object was illegal until the rebuttal closing, when the government claimed (for the first time in the trial) that the central conspiracy alleged in Counts 1 and 2 of the Indictment was formed between Walter Liew and Tim Spitler during a trip to Reno in 1997, which Bob Maegerle supposedly joined at a later time.

The government's charging decisions and trial strategy proved effective in leading the jury to its verdicts. The question now is what evidence truly supported those verdicts, especially

4

DEFENDANTS WALTER LIEW AND USAPTI'S NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 AND FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33
Case No. CR 11-0573-JSW (NC)

808289.02

as to the trade secret allegations. As discussed below, the answer is that there was insufficient evidence, and defendants should either be acquitted under Rule 29 or a new trial should be granted under Rule 33.

**A. No reasonable juror could find beyond a reasonable doubt that Mr. Liew and USAPTI reasonably believed that alleged Trade Secret 1 was a DuPont trade secret.**

An essential element of Counts 1, 2, 3, and 5 under the Court's instructions is that defendants reasonably believed that alleged Trade Secret 1 was in fact a DuPont trade secret. Given the undisputed and overwhelming evidence that significant portions of the so-called "DuPont chloride-route process" were publicly disclosed and/or known to DuPont's competitors, no reasonable juror could find that defendants thought it was a trade secret.

At the outset, it bears noting that the government made no effort at trial to prove that Trade Secret 1 is, in fact, a trade secret. It made no effort to define Trade Secret 1 beyond the vague language of the Indictment. It adduced no proof as to what DuPont's process actually is or has been at any of its numerous plants around the world. It adduced no proof as to what aspects of the chloride-route process are common to all of DuPont's plants but that would still meet the criteria for trade secret protection. Whether because of a desire not to "complicate" the case or for other reasons, it appears that the government chose *not* to prove what "the DuPont chloride-route process" *is*, or how it differs from other chloride-route plants around the world, or which components of it are "proprietary" and which "non-proprietary," or the particular "ways and means in which proprietary and non-proprietary components were compiled and combined by DuPont to form substantial portions of the TiO2 manufacturing process." It follows necessarily that the government failed to prove that Trade Secret 1 is, in fact, a trade secret.

Instead, the government relied heavily on the Court's instructions that Trade Secret 1 need not actually *be* a trade secret to be the object of an illegal conspiracy or attempt, but that the defendants merely needed to have reasonably believed as much. *See* Dkt. 338 at 11-12. Even under that standard (to which the defense objected), the government failed to adduce sufficient evidence to meet Rule 29 or Rule 33 muster.

For one, the evidence established beyond question that the chloride-route process, as a general matter, has been well-known for many years. Tr. 3709:8-11, Tr. 3710:15-3711:2. So, too, have large portions of DuPont's processes in particular. The government's expert witness, Robert Gibney, admitted that substantial portions of the DuPont-type of process were well known to him and others in the industry when he was employed at competitor Kerr-McGee/Tronox. Tr. 2237:9-22. Dr. Bert Diemer, a DuPont employee, admitted that many companies that use the chloride-route process, including DuPont, have the same aspects for parts of the process. Tr. 2430:6-12. Defendants' technical expert, Paul Cooper, testified that many elements of the so-called DuPont process are public and well-known.[5] Internal DuPont documents stated that at least one competitor was aware of substantial portions of its chloride route process as embodied in the Antioch plant, which was DuPont's state of art when built in the 1960s.[6] And the government failed to adduce any proof whatsoever that many aspects of what it claimed in its bill of particulars to be trade secrets were such.[7]

Second, the evidence at trial conclusively demonstrated that DuPont did not take "reasonable measures" to maintain the secrecy of its chloride-route process as a whole. In the later 1960s and early 1970s, DuPont built and sold the Ashtabula titanium dioxide plant to Sherwin-Williams, which later sold the plant to a direct competitor of DuPont, SCM.[8] The

---

[5] *See, e.g.,* Tr. 3705:4-7 (information about the DuPont process, such as use of a cyclone, can be found in patents); Tr. 3757:2 ("Essentially, chlorinators in the industry are the same."); Tr. 3812:19-3813:8 ($TiCl_4$ heater and $O_2$ heater are standard pieces of equipment from a supplier); Tr. 3820:19-22 (Mr. Maegerle's information was publicly available or readily ascertainable); Tr. 3864:22-3872:17 (one can calculate the area of DuPont's flue ponds from Google Earth and from patents); Tr. 4065:17-23 (the vast majority of titanium dioxide technology is commonly available).

[6] Tr. 1568:12-22, Exh. 847, Tr. 1749:6-8.

[7] *See* Dkt. 363. Defendants are not aware of admitted exhibits or testimony substantiating the government's claims that Mr. Liew or USAPTI reasonably believed that the following components and subparts listed in the bill of particulars were DuPont trade secrets: (g) SR condenser design; (h) non-reversing cyclone design; (i) SR condensate tank; (l) flash tank design; (n) fume scrubbers; (p) oxidation screw conveyors; or (r) chlorine handling facilities.

[8] *See* Exh. 900 (1967 DuPont/Sherwin-Williams contract); Tr. 1751:10-1753:2 (Daniel Dayton testifying that DuPont built the Ashtabula plant for Sherwin-Williams before 1970, that it was sold to SCM, and that the plant is still operated by Cristal Pigments today).

Ashtabula plant was a copy of DuPont's Antioch plant.[9] The contract included a fifteen-year limit on Sherwin-Williams' confidentiality obligations concerning the Ashtabula technology. *See* Exh. 900 at 14 (Article XI). DuPont was therefore aware that the Ashtabula sale provided a competitor (and potentially a vast array of subsequent competitors or even the general public) with complete knowledge of the technology at Antioch, including many elements of the "DuPont process." *See* Exh. 847 ("[O]ne of our competitors knows about our Antioch technology[.]").[10] As Samuel Livingston, a vice president for DuPont competitor Cristal, testified, once the Antioch technology was in Cristal's hands, Cristal's board of directors was free to sell or license the technology or even publish it in the newspaper because they own it and "can do what they want." *See* Tr. 4200:18-4201:6. Sitting back and trusting one's competitors not to disclose or license a particular process, as DuPont did, surely does not qualify as a "reasonable measure" to protect one's trade secret, especially when it is as broadly defined as Trade Secret 1. This is plain as a matter of law from the face of the contract. *See* Exh. 900. No reasonable juror could conclude otherwise.

Indeed, it is so clear that the entirety of the DuPont chloride route process is *not* a trade secret that the defendants' subjective belief is irrelevant. As Judge Easterbrook aptly noted in *United States v. Lange*, 312 F.3d 263, 269 (7th Cir. 2002), some things are so obviously not trade secrets that the defendant's belief is simply beside the point: "Selling a copy of *Zen and the Art of Motorcycle Maintenance* is not attempted economic espionage, even if the defendant thinks that the tips in the book are trade secrets; nor is sticking pins in voodoo dolls attempted murder." The idea that Trade Secret 1, as alleged, could actually be a trade secret after thousands of public

[9] *See* Exh. 900 at 8 (stating that the Ashtabula plant would produce Antioch-grade pigment and would "incorporate the technology utilized by DU PONT at DU PONT's Antioch plant as of the date of this agreement"); Tr. 1753:9-17 (Daniel Dayton testifying that DuPont built a "carbon copy" of the Antioch site in Ashtabula and licensed it to Sherwin-Williams). Importantly, DuPont continued to refer to and use Antioch technology, including in alleged Trade Secret 5, the Basic Data Document dating to the 1980s. *See* Tr. 1871:18-1872:12 (Mr. Dayton testifying about various Antioch plant references in Trade Secret 5).

[10] In addition, the sale was common knowledge to DuPont employees such as Mr. Dayton and Mr. Maegerle. *See* Tr. 1753:18-20 (Mr. Dayton testifying that he became aware of the details of the Ashtabula sale through his jobs at DuPont).

disclosures in patents, textbooks, and elsewhere is, on the evidence presented at trial, as fanciful as Judge Easterbrook's examples.

In any event, even if one takes subjective belief into account, the undisputed evidence demonstrated that Mr. Liew was well aware that portions of the process (if not the entirety) were publicly available in patents and elsewhere.[11] The evidence also showed that vendors told Mr. Liew and his employees that they had previously supplied to DuPont the exact same equipment they were offering to Mr. Liew's company.[12] In addition, the evidence demonstrated that Mr. Liew's employees understood the phrase "DuPont process" to be a generic term for the titanium dioxide process. *See*, *e.g.*, Tr. 2786:7-12 (Allen Chang testified that he sometimes referred to the "DuPont process" as a generic term for the titanium dioxide process).

In its opposition to defendants' earlier Rule 29 motion, the government relied on a handful of quotations to claim that Mr. Liew subjectively believed that Trade Secret 1 was in fact a trade secret,[13] but those snippets fall far short of Rule 29 sufficiency. Several of the government's excerpts focus, for example, on language noting that DuPont generally refused to license its technology to third parties.[14] This is a far cry from a statement of belief that the DuPont process was *in fact* a trade secret. Likewise with excerpts noting that DuPont has taken measures to protect whatever trade secrets it has[15] or that DuPont has been successful because of a superior

---

[11] *See* Exh. 1132 at 2 (handwritten list of patents concerning titanium dioxide provided to Mr. Liew by Mike Marinak); Tr. 848:1-7 (Mr. Marinak testifying that, in the late 1990s, there were a number of patents available on cooling titanium dioxide, ways of treating the walls of the reactor, collecting titanium dioxide, and drying it); Tr. 882:6-12 (Mr. Marinak testifying that publicly available information on titanium dioxide included DuPont patents); *see also* Exhs. 1130, 1131, 1133.

[12] *See, e.g.*, Exh. 1918 (email from Mr. Amerine to Mr. Maegerle and Mr. Liew reporting that a vendor "hooted when I mentioned TiO2 because he has worked closely with DuPont and SCM/Millenium [sic] on their TiO2 plants in past years"); Exh. 3389 (email to Mr. Amerine from a vendor: "Here is the budget quote for the Parkson Lamella. We have sold a bunch of our Lamella's [sic] to DuPont for this type of application. The Lamella has been a standard for the industry for over 30 years.").

[13] *See* Exhs. 350T, 393T, 201, 374.

[14] *See* Exhs. 350T-0006; Exh. 374-0014.

[15] *See* Exh. 201-001.

Case4:11-cr-00573-JSW Document823 Filed03/19/14 Page13 of 29

process.[16] Placing a copy of the San Francisco Chronicle in a locked vault does not make its contents any more a trade secret than when it was available on the newsstand. Moreover, the government's excerpts are often taken out of context: in Exh. 350T, the government's marquee example, portions of the document (that the government does not cite) make the point that USAPTI had people with sufficient expertise that it could *legally* emulate the "DuPont process." Exh. 350T at 6. In short, the government's snippets are not sufficient to allow a reasonable jury to conclude that Mr. Liew and USAPTI reasonably believed "the DuPont process" as a whole to be a trade secret.

The other evidence claimed by the government to support the jury's verdict does no such thing. That Messrs. Gibney, Diemer and Dayton claimed at trial "the process was secret and not known," Dkt. 745 at 7, is of zero consequence without an explanation of what "the process" is, which was nowhere in evidence. That subsequent acquirers of the Ashtabula plant allegedly chose not to disclose the Ashtabula technology, *id.*, has nothing to do with reasonable belief that DuPont abandoned its rights by virtue of its contract. The mention in a Pangang document that "Performance Group does not own the DuPont technology it provided," is thoroughly irrelevant: one need not own that which is not a trade secret.

If alleged as a trade secret in a civil case, Trade Secret 1 would be laughed out of court. Its infinite permutations of "combinations and compilations" of "proprietary and non-proprietary" technology would plainly fail to meet the statutory requirements of California Code of Civil Procedure Section 2019 or similar requirements under the Uniform Trade Secret Act or elsewhere.[17] Few, if any, federal courts would accept such a broad statement as adequate to guide discovery or motions practice. And if a plaintiff was foolish enough to insist on the language of Trade Secret 1 as the basis for their action, it would surely fail on summary judgment in a field as crowded and longstanding as titanium dioxide manufacture. This is not, of course, a

---

[16] *See* Exh. 243-002, Exh. 342T-002, Exh. 392T-002.

[17] *See, e.g.*, *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998) ("The plaintiff 'should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.").

9

DEFENDANTS WALTER LIEW AND USAPTI'S NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 AND FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33
Case No. CR 11-0573-JSW (NC)

808289.02

civil action. But in enacting 18 U.S.C. § 1831, Congress did not intend so far a departure from trade secret practice as to allow a trade secret so vaguely worded as Trade Secret1, and so obviously *not* a secret, to be the crux of a criminal prosecution.

If legal impossibility is not a defense to claims of conspiracy and attempt (as the Court has ruled over defendant's objection), and the "reasonableness" of defendant's belief is the thin line between a criminal conspiracy and a legitimate engineering contract, then surely the evidence of reasonable belief had to be stronger than what the government adduced here. A judgment of acquittal as to Counts 1, 2, 3 and 5 is warranted. In the alternative, a new trial should be ordered, with the government directed to specify the object of the conspiracy in sufficient detail that the defense can respond to specific allegations, rather than the impossibly vague language that the defense faced in the trial recently concluded.

**B. No reasonable juror could find beyond a reasonable doubt that the conduct of Mr. Liew and USAPTI was intended to injure DuPont.**

In addition, the government presented no proof at trial that Mr. Liew or USAPTI intended or knew that their actions would injure DuPont, as required for Counts 2 and 5 of the Indictment. "The legislative history [of Section 1832] indicates that this requires 'that the actor knew or was aware to a practical certainty that his conduct would cause such a result.'" *United States v. Hsu*, 155 F.3d 189, 196 (3d Cir. 1998). To the contrary, ample evidence showed that Mr. Liew (and others at USAPTI) believed that his consultants had permission from DuPont itself to disclose information to him and use their expertise. *See, e.g.*, Exh. 694 ("Bob Maegerle said that he talked to Du Pont in regard to doing some work for us and got a permission verbally . . . . After 5 year, that employee would not be accountable anymore."); Exh. 1008 ("After 5 years, you are a free man as far as Du Pont concerns."); *see also* Dkt. 745 at 8 (making no argument that there was sufficient evidence presented that defendants intended or knew that the alleged offense would injure DuPont).

**C. No reasonable juror could have found beyond a reasonable doubt that defendants intended or knew that the alleged conspiracy would benefit a foreign government or foreign instrumentality.**

In order to prove Mr. Liew and USAPTI guilty of Counts 1 or 3—conspiracy or attempt to

commit economic espionage under 18 U.S.C. § 1831(a)(5) or (4)—the government was required to prove, amongst other things, that Mr. Liew and USAPTI intended or knew that the offense would benefit a foreign government, namely the Chinese government, or a foreign instrumentality. The government failed to introduce sufficient evidence: (1) that any of the real parties to Mr. Liew's contracts were foreign instrumentalities; (2) that Pangang Group was a foreign instrumentality; or (3) that Mr. Liew and USAPTI intended or knew that their actions would "benefit" the government of China or any foreign instrumentality.

***First,*** turning to the issue of benefit to a foreign instrumentality, the government has alleged that four Chinese companies charged in the Indictment—Pangang Group Company, Ltd. ("Pangang Group"), Pangang Group Steel Vanadium & Titanium Company, Ltd. ("PGSVTC"), Pangang Group Titanium Industry Company, Ltd. ("Pangang Group Titanium"), and Pangang Group International Economic & Trading Company ("PIETC")—were foreign instrumentalities. In order to be a "foreign instrumentality," the government was required to prove that these specific entities were substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government, namely China. *See* 18 U.S.C. § 1839(1). In order to be "substantial," a foreign government's ownership, control, sponsorship, command, management, or dominion of a foreign company must be material and significant, not technical or tenuous. *See* 142 Cong. Rec. S12201-03, 12212 (1996).

A company is not a "foreign instrumentality" just because it is based or operates in a foreign country. *See United States v. Lan Lee*, No. CR 06-0424-JW, 2010 WL 8696087, at *6-7 (N.D. Cal. May 21, 2010). In addition, the fact that the majority of the stock of a foreign company is owned by a foreign government does not prove substantial ownership, control, sponsorship, command, management, or dominion. 142 Cong. Rec. S12201-03, 12212 (1996). In order to be a "foreign instrumentality," the activities of the foreign company must have been, from a practical and substantive standpoint, directed by a foreign government. *Id.* "Enforcement agencies should administer [Section 1831] ... with its principle [sic] purpose in mind and therefore should not apply section 1831 to foreign corporations when there is no evidence of

Case4:11-cr-00573-JSW Document823 Filed03/19/14 Page16 of 29

foreign government sponsored or coordinated intelligence activity." 142 Cong. Rec. S12201-03, 12212 (1996); *see also Hsu*, 155 F.3d at 195 ("The legislative history indicates that § 1831 is designed to apply only when there is 'evidence of foreign government sponsored or coordinated intelligence activity.'").

In the end, the government conceded that PGSVTC, Pangang Group Titanium, and PIETC are not foreign instrumentalities, and instead focused its fire on the Pangang Group in its closing. *See* Tr. 4380:13-14 ("He's also benefiting a foreign instrumentality. And in this case the foreign instrumentality is the Pangang Group Company."). This is because undisputed evidence was presented through defendants' expert, Professor Donald Lewis, that PGSVTC, Pangang Group Titanium, and PIETC were not substantially controlled or owned by the Chinese government. Professor Lewis testified that PGSVTC is listed on the Shenzhen Stock Exchange and that 64 percent of its stock is publicly owned by shareholders, including foreign investors like Citibank and Morgan Stanley. *See* Tr. 3463:21-3465:1. He further testified that PIETC and Pangang Group Titanium became wholly-owned subsidiaries of PGSVTC in 2009. *See* Tr. 3466:3-8 (PIETC); Tr. 3467:23-3468:6 (Pangang Group Titanium). Finally, he explained that the Chinese government and the State Assets Supervision and Administration Commission ("SASAC") were not involved in PGSVTC, PIETC, and Pangang Titanium and that the government would not have control over the day-to-day activities of these companies. *See* Tr. 3471:20-3472:6. The government elected not to present evidence to the contrary through its own expert on Chinese businesses, Professor Feinerman, and none of the government's lay witnesses presented evidence that PGSVTC, PIETC, or Pangang Titanium were ***substantially*** controlled, owned, or dominated

12

DEFENDANTS WALTER LIEW AND USAPTI'S NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 AND FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33
Case No. CR 11-0573-JSW (NC)

808289.02

by the Chinese government.[18]

The government presented evidence that only a single entity—the Pangang Group—was a foreign instrumentality. Even that evidence did not amount to sufficient proof that Pangang Group is a foreign instrumentality within the meaning of Section 1831. While Professor Lewis testified that Pangang Group is a state-owned enterprise,[19] he further explained that, under Chinese law since 2003, the Chinese government and SASAC are required to keep "hands off the independent enterprise autonomy of state-owned enterprises." Tr. 3458:2-19. Professor Lewis explained that SASAC's role in the Pangang Group is to help Pangang Group institute a modern enterprise system so that Pangang Group can become more independent and operate like an American company and that SASAC only recommends some of the directors of the Pangang Group. *See* Tr. 3472:7-3473:13. There was an absence of evidence that Pangang Group engages in "foreign government sponsored or coordinated intelligence activity," as required to trigger Section 1831. *See* 142 Cong. Rec. S12201-03, 12212 (1996); *Hsu*, 155 F.3d at 195. In fact, Professor Lewis compared state-owned enterprises like Pangang Group to large American companies, like Procter & Gamble or General Motors. *See* Tr. 3459:10-14.

Even if the Court finds that there was sufficient evidence to show Pangang Group was a foreign instrumentality, the government failed to present sufficient evidence that, by entering into the contracts at issue in this case, Mr. Liew intended or knew he was conferring a benefit on the Pangang Group, rather than one of its non-state-owned or non-state-controlled subsidiaries. The buyer signatories of all of the relevant contracts were the subsidiaries, ***not*** Pangang Group. *See*

[18] The government called a single witness from a Pangang-related company, Hu Shaocong, who worked as a translator for PIETC in China in 1987-1992, then came to U.S. and did not work for Pangang again until 2004. Tr. 784:6-785:16. From 2004-2008, he worked in a satellite sales office of PIETC in Petaluma. Tr. 789:1-790:1. Mr. Hu testified in a conclusory fashion that PIETC was "state-owned," Tr. 786:19-788:5, but he admitted that his only basis of knowledge was living in China and working at the companies (during a time frame irrelevant to the Indictment), and he admitted to not understanding the ownership structures of PIETC or Pangang Group. Tr. 821:1-825:6. Critically, he did not testify as to the degree of state ownership, merely to "state ownership" at large, and his testimony was equally consistent with a minority state ownership stake. The Court should exercise its Rule 33 prerogative to weigh the credibility of witnesses and discount the second-hand, double-hearsay testimony of Hu Shaocong.

[19] Tr. 3460:5-15.

Exh. 310T (contract with buyer identified as Pangang Group Jinzhou); Exh. 313 (contract with buyer identified as PIETC); Exh. 315 (contract with buyer identified as Pangang Group Jinzhou); Exh. 316 (contract with buyer identified as PIETC); Exh. 319 (contract with buyer identified as PIETC); Exh. 1202 (contract with buyer identified as PIETC). In addition, Pangang Group was only once an end-user of the 100K contracts, for only a year and a half, and was not the final end-user of the contractual agreement. *Compare* Exh. 316 (May 16, 2009 contract with Panzhihua Iron & Steel (Group) Company as end-user)[20] *with* Exh. 1202 (amendment dated October 24, 2010, changing end-user to Pangang Group Titanium). In other words, the final end-user of the 100K contract was ***not*** Pangang Group and Pangang Group was never an end-user of the 30K contract. In addition, Mr. Liew's business interactions after entering into the contracts were focused on employees of the subsidiary companies, not employees of Pangang Group. *See, e.g.*, Exh. 337 (inviting "Panzhihua Iron and Steel (Group) Company" to visit USAPTI, but listing only employees from subsidiaries PIETC and Pangang Group Titanium). Moreover, it is not apparent that Walter Liew understood that Pangang Group was a state-controlled company. *See* Exh. 367 (email from Mr. Liew to Mr. Maegerle in 2004 stating, "The parent company, Pangang Iron & Steel (Group) Corp. is a public company with stock traded in the Shenzen Stock Exchange.").

***Second,*** the government failed to present sufficient evidence that Walter Liew and USAPTI intended to confer or knew they were conferring a benefit on the government of China. "Foreign government" under Section 1831 does not mean "foreign country;" it means "the entity that constitutes the governing body of any foreign country." *Lan Lee,* No. CR 06-0424, 2010 WL 8696087, at *6. Moreover, if mere knowledge that one's actions would have an incidental benefit to the government of China were enough to satisfy Section 1831, the Economic Espionage Act

[20] The testimony at trial was unclear concerning whether the end-user over this period was Pangang Group or PISCO, a subsidiary of Pangang Group. *See* Tr. 3482:4-16 (Prof. Lewis testifying that end-user of contract at Exh. 316 was PISCO); Tr. 3591:11-15 (same); Tr. 3592:19-3593:1 (Prof. Lewis testifying that end-user of Exh. 316 was not PISCO). Given the confusing state of Prof. Lewis' testimony on this point, there is even more reason to doubt whether Mr. Liew and USAPTI ever intended to benefit or knew of a benefit to Pangang Group, rather than other subsidiaries of that company.

would surely be unconstitutionally vague and overbroad. "Section 1831 does not penalize a defendant's intent to personally benefit or an intent to bestow benefits on the economy of a country that might be realized from operating a company in a foreign country. The defendant must intend to benefit a foreign government, instrumentality or agent. […] The Court does not construe benefitting a 'foreign government, instrumentalities or agent' to be synonymous with benefitting a 'foreign country' or benefitting a 'foreign corporation.'" *Lan Lee*, No. CR 06-0424, 2010 WL 8696087, at *6-7; *see also* instructions given in *United States v. Lan Lee*, No. CR-06-0424-JW (N.D. Cal. Nov. 13, 2009) (Instruction re Count One: Conspiracy to Commit Economic Espionage).

The government's evidence that Mr. Liew intended to confer a benefit to the government of China was weak, circumstantial, and insufficient. The government suggested that Mr. Liew had possession of a "list" of technology priorities of the Chinese government. However, both Agent Ho and Professor Lewis testified that these types of lists are published publicly and are available on the internet, and Professor Lewis added that these lists often include private sector priorities. *See* Tr. 667:3-18 (Agent Ho admitting that she is not aware of whether Mr. Liew was ever actually handed a list by a Chinese agency and that such lists can be found on the internet); Tr. 3495:1-3499:13 (Prof. Lewis testifying that key task project lists are common in China; that such lists include projects generated by the private sector; that Exh. 387 includes titanium dioxide and is available on the internet; and that these lists are similar to infrastructure projects in the United States). Mere possession of a publicly-available list of Chinese priorities does not show an intent to benefit the Chinese government within the contemplation of the Economic Espionage Act. If it did, the Economic Espionage Act would be triggered every time an individual brought business into a country knowing that that country's government wants business. In addition, Exh. 350T, the letter to Hong Jibi, was relied upon almost exclusively in the government's closing argument and in its opposition to defendants' earlier Rule 29 motion in order to show Mr. Liew's subjective intent. *See* Dkt. 745 at 2-4. But undisputed evidence showed that other people contributed to the drafting of the Hong Jibi letter. *See* Exh. 1057; Tr. 3499:14-3501:5 (Prof.

Lewis discusses evidence that other individuals assisted in the drafting of the letter); Tr. 670:18-20 (Agent Ho testifies that Exh. 393 contains handwriting from people other than Walter Liew). Even more strikingly, the government has never presented ***any*** evidence that the letter was signed or sent or that there was any reply to the letter.

In sum, the government failed to present sufficient evidence that Mr. Liew and USAPTI intended to confer or knew they were conferring a benefit on a foreign government or foreign instrumentality.

**D. The government failed to prove possession of stolen trade secrets (Counts 6, 7 and 9) as to Walter Liew and USAPTI.**

In order to prove Mr. Liew and USAPTI's guilt of Counts 6, 7, and 9, possession of stolen trade secrets under 18 U.S.C. § 1832(a)(3), the government was required to prove, amongst other elements, that: (1) Mr. Liew and USAPTI knew that alleged Trade Secrets 2, 3, or 4 were ***actually*** trade secrets; (2) Mr. Liew and USAPTI knew those items had been stolen or appropriated, obtained, or converted without authorization; and (3) Mr. Liew and USAPTI knew or intended that use of those items would injure DuPont, the alleged owner of Trade Secrets 2, 3, and 4. *See* 18 U.S.C. § 1832(a)(3); instructions given in *United States v. Nosal*, CR-08-0237-EMC (N.D. Cal. April 19, 2013) (Instruction 41) and *United States v. Lan Lee*, CR-06-0424-JW at 10 (N.D. Cal. Nov. 13, 2009). No reasonable juror could find these elements satisfied beyond a reasonable doubt.

To begin with, the government failed to prove that Mr. Liew subjectively knew the documents had value. In particular, Peter Zisko, one of Mr. Liew's collaborators, testified that he told Mr. Liew that Trade Secret 2 was a "cartoon" and completely "unusable in and of itself." *See* Tr. 1248: 11-18; *see also* Tr. 3910:6-20 (Paul Cooper testifying that Trade Secret 2 would only be useful to make "rutile paper slurry," a process not covered by Mr. Liew's contracts).[21] Trade Secret 4 was largely blank, and the government failed to show that it had any value. *See,*

[21] The government has argued that Exh. 719T shows that Mr. Liew showed Trade Secrets 2 and 4 to his Chinese customers. However, Agent Ho admitted on cross-examination that neither she nor her colleagues checked to see whether the height, diameter, and length numbers listed in Exh. 719T actually appear on either Trade Secret 2 or 4. *See* Tr. 725:25-726:15.

*e.g.*, Tr. 3748:8-3749:4, Tr. 3751:12-14. The government has presented no evidence that Mr. Liew knew what DuPont internally considers a trade secret or proprietary or that his consultants communicated those policies to him. Moreover, the government has presented no evidence that Mr. Liew knew the meaning or legal significance of DuPont stamps or confidentiality markings. The government's own witnesses testified that DuPont's confidentiality practices are themselves confidential and not publicly known. *See* Tr. 1802:20-1803:8 (Daniel Dayton testifying that DuPont's confidentiality procedures are not public and are classified "DuPont internal use.").

In contrast, plentiful evidence was presented that Mr. Liew hired former DuPont employees, such as Mr. Maegerle, with the understanding that they would use their judgment, not divulge confidential information, and only provide him with materials they were permitted to use. *See, e.g.*, Exh**.** 221 (Arbogast letter to Maegerle: "Because your expertise was obtained while working for DuPont, Marinak would expect that you not divulge any process, product, scientific or engineering information that you feel is still proprietary. However, for those areas that are currently in the public domain, I'm sure that you can improve on literature generated information, and that is what Marinak is looking for."). No evidence was presented that ***any*** former DuPont employee, or any other individual, specifically told Mr. Liew that Trade Secrets 2, 3, or 4 were DuPont trade secrets or that they had been misappropriated or taken without DuPont's consent. There has been no evidence presented that Mr. Liew knew that DuPont employees were not allowed to take DuPont publications and drawings with them when they left DuPont.[22]

Finally, there has been no evidence that Mr. Liew intended for his use of any information contained in Trade Secrets 2, 3, or 4 to injure DuPont. There has been no evidence that Mr. Liew knew whether DuPont was still using, or in fact ever used, any of the information contained in Trade Secrets 2, 3, or 4. Many witnesses testified that Trade Secrets 2 and 4 were drafts or

[22] The government has repeatedly pointed to Exhs. 199 and 208, mentioning "[e]ven with the best technology with stolen prints!" as the pieces of evidence that demonstrate that Mr. Liew knew Trade Secrets 2 and 4 were "stolen." The statement in these documents is hypothetical, does not mention Trade Secrets 2 or 4, and is far too flimsy to prove beyond a reasonable doubt that Mr. Liew knew that Trade Secrets 2 and 4 were valuable to DuPont and acquired wrongfully, given the great deal of other evidence supporting his good faith reliance on his consultants, and the lack of evidence connecting this handwritten note with any particular "print" (whatever "print" means).

lacking in expected details. *See* Tr. 1248:8-10 (Mr. Zisko testifies that he knew Trade Secret 2 was a draft when he looked at it); Tr. 3748:8-3749:4 (Mr. Cooper testifying that Trade Secret 4 does not have details or specific numbers). There has been no evidence that DuPont was competing for the same contracts as Mr. Liew or that he specifically intended to harm the company.

**E. The government failed to prove Count 8 (copying stolen trade secrets with respect to Trade Secret 5) as to Walter Liew and USAPTI.**

In order to prove that Mr. Liew and USAPTI are guilty of Count 8, copying stolen trade secrets under 18 U.S.C. § 1832(a)(2), the government was required to prove, amongst other elements, that: (1) Mr. Liew and USAPTI knew that the Basic Data Document (Trade Secret 5) was an actual trade secret, and (2) Mr. Liew and USAPTI knew or intended that use of the Basic Data Document would injure DuPont. 18 U.S.C. § 1832(a)(2); instruction given in *United States v. Nosal*, CR-08-0237-EMC (N.D. Cal. April 19, 2013) (Instruction 40). Similarly, in order to prove that Mr. Liew or USAPTI aided or abetted the offense of copying stolen trade secrets, the government was required to demonstrate that Mr. Liew or USAPTI knowingly and intentionally aided, counseled, commanded, induced, or procured Mr. Maegerle to commit the offense of copying, duplicating, sketching, drawing, altering, photocopying, replicating, transmitting, delivering, sending, communicating or conveying the Basic Data Document. *See* Ninth Cir. Crim. Jury Instr. 5.1.

Again, it is important to note at the outset what the evidence did and did not show. The "Basic Data Document" introduced at trial (Exh. 161) was a lengthy collection of memoranda and other materials that was produced by DuPont to the government for the purposes of this case. No copy of it was found in Mr. Liew's or USAPTI's possession, nor was there any evidence that it ever was. Much of the government's proof – and most of Mr. Dayton's testimony – consisted of demonstrating that portions of emails from Mr. Maegerle to Mr. Liew contained verbiage identical or near-identical to passages in the Basic Data Document. *See, e.g.*, Exh. 918, Tr. 1587:3-1612:17. But the government's witnesses admitted (and the government conceded in argument) that the Basic Data document contained publicly available information, as well as

outside vendor information. *See, e.g.*, Tr. 1856:6-18. While some of the emails referred to "basic data" (lower case), there was no evidence that Mr. Liew knew that a "Basic Data Document" comparable to Exh. 161 ever existed at DuPont, that Mr. Maegerle ever had a copy or notes from it, or that such a document was confidential or contained alleged trade secrets. In stark contrast, there *was* evidence that Mr. Liew hired former DuPont employees such as Mr. Maegerle with the understanding that such former employees would use their judgment to ensure that confidential information from prior employers would not be divulged to him and that such consultants would only provide him with materials they were permitted to use. *See, e.g.*, Exh. 221.

Based on this evidence, no reasonable juror could conclude beyond a reasonable doubt that Mr. Liew and USAPTI knew that the Basic Data Document existed, let alone that it was an actual trade secret or that its use would injure DuPont. Likewise as to the "aiding and abetting" alternative theory, namely, that Mr. Liew and USAPTI knowingly and intentionally aided, counseled, commanded, induced, or procured Mr. Maegerle to commit the offense of copying the Basic Data Document. The government's entire aiding and abetting case relies on a single email sent by Mr. Liew in which he asked Mr. Maegerle to "[c]heck with . . . Kuanyin." Exh. 67. However, Mr. Liew's request that Mr. Maegerle use whatever Kuan Yin knowledge or resources he possessed does not prove or even suggest that Mr. Liew knew that that information was wrongfully acquired or a DuPont trade secret. In order to aid and abet Mr. Maegerle, Mr. Liew had to understand the wrongfulness of Mr. Maegerle's actions, and there is no evidence that he did.

**F. The government failed to prove Count 10 (conspiracy to obstruct justice as to the answer in the civil case) as to Mr. Liew and USAPTI.**

In order to prove Mr. Liew or USAPTI's guilt of Count 10, conspiracy to obstruct justice under 18 U.S.C. § 1512(k), the government was required to prove: (1) that there was an agreement between Mr. Liew, Mr. Maegerle, and/or USAPTI to corruptly obstruct, influence, or impede an official proceeding; and (2) that Mr. Liew or USAPTI joined the conspiracy knowing of its object and intending to help accomplish it. *See* 18 U.S.C. §§ 1512(c) & (k), 1515(a)(1)(A); Ninth Cir. Crim. Jury Instr. 8.21 (defining conspiracy). At the very least, a person does not act

"corruptly" unless he acts with the purpose of wrongfully impeding the due administration of justice. *See* Ninth Cir. Crim. Jury Instr. 3.15; *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (reserving ruling on a "full scale" definition of "corruptly" in 1512(c)).

The government failed to prove that Mr. Liew or USAPTI: (1) agreed with Mr. Maegerle to obstruct, influence, or impede an official proceeding; (2) agreed to do so with the purpose of wrongfully impeding the due administration of justice; or (3) joined the conspiracy knowing its object and intending to help accomplish it. The government presented no direct evidence that Mr. Liew "solicited [Maegerle's] advice regarding the answer to the complaint," as it argued in opposition to defendants' prior Rule 29 motion. *See* Dkt. 745 at 10. While the government has introduced into evidence emails written by ***Mr. Maegerle*** to Mr. Liew concerning Mr. Maegerle's view of the appropriate response to the civil complaint (*see, e.g.*, Exhs. 678, 679, 682, 683), it did not introduce any emails written by Mr. Liew in response or any evidence suggesting Mr. Liew's contemporaneous state of mind. The subsequent filing *by Mr. Liew's counsel* of an answer that incorporated Mr. Maegerle's stated position in part cannot alone be considered sufficient evidence that Mr. Liew acted with the purpose of wrongfully impeding the administration of justice.

The notion that discussing positions to be taken in a civil litigation pleading can be a conspiracy to obstruct justice is troubling from the start. Under California law, statements made in judicial proceedings are typically privileged. *See* Calif. Civil Code § 47(b)(2). Under federal law, First Amendment concerns are raised by restrictions on speech seeking redress in the courts. *Cf. Sosa v. DirectTV, Inc.*, 437 F.3d 923, 935 (9th Cir. 2006) (*Noerr-Pennington* "breathing space" doctrine applied to pre-litigation letters written in connection with RICO claims). These concerns are heightened when, as here, the alleged conspiracy to obstruct justice consists of statements from Mr. Maegerle that turned out to have substantial factual support in the record at trial. *See*, *e.g.*, Exh. 900 (DuPont/Sherwin-Williams agreement with long-expired confidentiality clause); Exh. 239T (internal Pangang memo summarizing outside consultant's opinion from TZPI and Zhi Hua that USAPTI designs appear based on old or mid-1970's DuPont technology).

Given the lack of evidence of Mr. Liew's state of mind with respect to these communications; the lack of any response from him other than the filing of a litigation pleading with assistance of counsel; and the fact that much of Mr. Maegerle's communications had support in the record, no reasonable jury could have found the elements of a conspiracy to obstruct justice beyond a reasonable doubt.

**G. The government failed to prove Count 11 (witness tampering as to Jian Liu) as to Mr. Liew.**

The government failed entirely to prove two essential elements of the crime of witness tampering under 18 U.S.C. § 1512(b)(1): (1) that Mr. Liew knowingly intimidated, threatened, or corruptly persuaded Jian Liu; and (2) that Mr. Liew acted with intent to influence, delay, or prevent Mr. Liu's testimony in an official proceeding. To "knowingly" "corruptly persuade" means to act with a wrongful, immoral or evil purpose to convince or induce another person to engage in certain conduct. *See Arthur Andersen LLP v. United States*, 544 U.S. 696, 704-08 (2005). In order to act with the intent to influence, delay, or prevent the testimony of a person in a particular "official proceeding," the official proceeding must have been foreseeable to the defendant at the time of the act. *See id.*

There was an utter absence of evidence at trial that Mr. Liew knowingly intimidated, threatened, or acted with a wrongful, immoral or evil purpose to convince or induce Jian Liu not to testify in the DuPont civil suit. To the contrary, the undisputed evidence showed that Mr. Liew merely asked Jian Liu not to volunteer unnecessary information about Mr. Maegerle and Mr. Spitler to DuPont investigators and provided Mr. Liu with advice that he should get an attorney. *See* Tr. 2675:9-2676:17 (Jian Liu testimony that Walter Liew was helping him exercise his right not to speak to DuPont investigators without an attorney). Jian Liu testified that he received the DuPont civil complaint against himself, Walter Liew, and USAPTI on April 6, 2011 and that he met with Walter Liew on April 11, 2011, only five days later**.** Tr. 2600:17-22; Tr. 2603:12-2604:1. No evidence was presented that Mr. Liew threatened Mr. Liu or that Jian Liu felt frightened, intimidated, or coerced at any point. At most, Mr. Liu's testimony revealed that he felt annoyed that Walter Liew was meddling with his family. *See* Tr. 2605:3-7: ("Q. And how

did you take the comment about your family?  A. I wasn't really too happy about that.  Q.  Why is that?  A. I was thinking, you know, he's already involved too much in my family because this case, you know.").  Mr. Liu did not testify that Walter Liew mentioned Mr. Liu's anticipated testimony in the civil suit or that anything about Mr. Liew's demeanor or statements showed that Mr. Liew was acting with an evil, wrong, or immoral purpose.  In fact, Mr. Liu admitted that he maintained that he knew of no wrongdoing by Walter Liew even after his April 11, 2011 conversation with Mr. Liew.  Tr. 2678:14-19 ("Q. Isn't it true that well after this conversation, you continued to maintain that you knew of nothing implicating Mr. Liew in any wrongdoing? A. That's true. Q. Including this conversation? A. That's true.").

Moreover, no reasonable juror could find beyond a reasonable doubt that Mr. Liu's hypothetical testimony in a DuPont civil suit was reasonably foreseeable to Mr. Liew on April 11, 2011, mere days after the DuPont civil complaint was filed.  In fact, it was unlikely that Mr. Liu would even be involved in the civil suit if it eventually came to trial.  Mr. Liu testified that he made serious efforts to get a lawyer in order to try to get out of the suit.  *See* Tr. 2602:6-2603:11 (Mr. Liu's testimony about efforts to get himself a lawyer); Tr. 2616:25-2617:21 (Mr. Liu testified that he understood that if he met with DuPont at a meeting arranged by his lawyer, he would be dismissed from the case); Tr. 2597:11-16 (Mr. Liu testified that Walter Liew told him to consult a lawyer before speaking to DuPont investigators); Tr. 2655:21-2656:10 (Mr. Liu testified that he and his newly-retained civil attorney attended a meeting with DuPont three weeks after the civil suit was filed).

The government's own closing argument revealed how weak its proof was on Count 11. Because the government was unable to get Mr. Liu to testify to anything that might have been sufficient to prove Mr. Liew's guilt, it had to fall back on flimsy observations about Mr. Liu's mannerisms during his testimony.  The government argued that Mr. Liu's "nervous" and "uncomfortable" demeanor during his testimony proved that he was "exploited corruptly" by Mr. Liew.  Tr. 4419:18-23; *see also* Tr. 4420:6-8 ("And I submit to you that his demeanor and nervousness on the stand reinforced that fundamental abuse from Walter Liew.").  There was no

Case4:11-cr-00573-JSW Document823 Filed03/19/14 Page27 of 29

basis for this implausible inference. As the Court will recall, nothing in Mr. Liu's demeanor at trial was directed at Mr. Liew, nor did Mr. Liew gesture or direct any undue attention at Mr. Liu. Suspicion and speculation do not rise to the level of sufficient evidence, especially where there is an equally plausible innocent explanation for a defendant's conduct. *Lopez*, 484 F.3d at 1201; *Delgado*, 357 F.3d at 1068. A much more plausible inference is that Mr. Liu was still afraid at the time of his testimony of government prosecution or a continuing civil lawsuit by DuPont should he err during his testimony. Accordingly, the government has presented insufficient evidence on Count 11 to support the jury's verdict.

**H. The government failed to prove Counts 13 and 14 (concerning statement about safety deposit box keys during search of Liew home) as to Mr. Liew**

The government's final obstruction charges relate to testimony from FBI Agent Bozman about a brief interaction during the search of the Liew home on July 19, 2011. Agent Bozman testified that when the Liews were asked jointly whether keys seized from Mrs. Liew's purse were for a safety deposit box, they gave each other a "dwelling look," and that Mr. Liew said to his wife "you don't know, don't know." Tr. 121:22-124:18. At the time, Mr. Liew had tried several times to reach his attorney by telephone. Tr. 141:20-142:5. Agent Bozman admitted that it would have been perfectly permissible for either Mr. or Mrs. Liew to have said that they preferred not to talk to the agent, to await legal advice, or to assert their Fifth Amendment rights. Tr. 142:24-143:11.

Under these circumstances, no reasonable jury could find the conspiracy or aiding and abetting charges asserted in Counts 13 and 14 beyond a reasonable doubt. The safety deposit box was in Christina Liew's name and the bank's records revealed that only she had ever visited it. 233:12-235:20. There was no evidence that Mr. Liew knew that the safety deposit box presently existed; to the contrary, the evidence was that he denied its existence, following which Christina Liew told him that they had had one *in the past*. Tr. 121:8-14. There was no evidence that Mr. Liew instructed Christina Liew to do anything with a safety box after leaving the residence; to the contrary, the evidence was that Christina Liew told Mr. Liew she had to keep an appointment with their Pangang customers. Tr. 124:19-125:6. On these facts, the "dwelling look" and Mr.

23

DEFENDANTS WALTER LIEW AND USAPTI'S NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29 AND FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33
Case No. CR 11-0573-JSW (NC)

808289.02

Liew's brief urging of his wife effectively to remain silent cannot be turned into a conspiracy or aiding and abetting. Nor was there sufficient linkage between Mr. Liew's behavior and the obstruction of any particular proceeding.

The Court's instructions on Counts 13 and 14 make clear the high degree of intentionality that the jury was required to find in order to convict on these counts. There was not enough evidence to do so.

**I. The financial charges should have been severed, warranting a new trial as to all counts of the Indictment.**

Given the lack of evidence on the charges described above, it is manifestly clear that the jury's verdict of guilty as to all charges was based on the "spillover" effect of the financial accusations. The government relied heavily on the large amounts of money that USAPTI and Mr. Liew received under the 30K and 100K contracts, repeatedly insinuating that there was no reason to pay so much money if not to obtain trade secrets illegally. *See* Tr. 4376:15-25, Tr. 4403:11-15, Tr. 4409:5-12.. The government made these arguments despite the lack of evidence as to how much money "should have been paid" for the engineering services that Performance Group and USAPTI performed. In a similar vein, the government made much of Mr. Liew's failure to pay his employees while declaring bankruptcy and continuing to send money to entities in Singapore, and repeatedly relied upon his financial dishonesty as support for its trade secret "scheme." *See* tr. 4406:13-20, Tr. 4409:7-16, Tr. 4412:19-4413:12. Again, the government made these arguments even though there was relatively little evidence adduced at the trial as to Performance Group's overall financial condition, and, as the government admitted, a severely limited capability to obtain records from either China or Singapore. Tr. 3065:2-10. The government knew that Mr. Liew would be unable to defend his financial conduct on the stand, because Mr. Liew had previously declared his intention not to testify as part of his wife's motion for a separate trial. *See* Dkt. 472-5.

As events played out, the trial of the financial and bankruptcy charges together with the trade secret charges made a fair trial on the trade secrets charges impossible. The evidence on the trade secret charges was thin. The tax and bankruptcy charges took a fatal hit when the Court

declined to allow the two defense financial experts to rely upon the handwritten joint venture agreement, which was the defendants' primary explanation for the allocation of funds between the U.S. corporations and the joint venturers, as well as the primary explanation for the transfers to the Singapore entities. The government exploited its tactical advantages to the fullest, conflating all of the charges into a simplistic mantra of "lying, cheating and stealing."

## IV. CONCLUSION

The Court should grant Mr. Liew and USAPTI's Rule 29(c) motion for judgment of acquittal on Counts 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 13 and 14 of the Indictment. Defendants further request that the Court conditionally determine that defendants' motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed, pursuant to Rule 29(d)(1). In the alternative, the Court should grant defendants' motion for a new trial on Counts 1 through 3, 5 through 11, and 13 and 14 pursuant to Rule 33 in the interest of justice based on the gross insufficiency of the evidence presented at trial. Further, because so much of the government's argument was unfairly based on "spillover" from the financial charges, a new trial should be granted on all charges, as well.

Respectfully submitted,

Dated: March 19, 2014

KEKER & VAN NEST LLP

By: */s/ Stuart L. Gasner*
STUART L. GASNER
SIMONA A. AGNOLUCCI
KATHERINE M. LOVETT

Attorneys for Defendants WALTER LIEW and USA PERFORMANCE TECHNOLOGY, INC.