MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

JOHN H. HEMANN (CABN 165823)
PETER B. AXELROD (CABN 190843)
Assistant United States Attorneys

RICHARD S. SCOTT (DCBN 502455)
Trial Attorney, National Security Division

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
FAX: (415) 436-7234
john.hemann@usdoj.gov
peter.axelrod@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WALTER LIEW,<br><br>Defendant. | CASE NO. CR 11-0573 JSW<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Date: June 24, 2014<br>Time: 1:00 p.m. |

Walter Liew stands before the Court convicted of economic espionage, tax fraud, and bankruptcy fraud arising from his effort to sell stolen DuPont technology to Chinese state-owned entities. At each stage of this long-running saga – from his procurement and marketing of the stolen technology through his encounters with law enforcement and up through his disclosures to this Court for sentencing – Walter Liew has proven that he is a fundamentally dishonest person who says and does whatever suits him in the moment. Given the breadth, duration, and significance of his crimes, together with his refusal

to accept any responsibility for his actions, the United States ask the Court to impose the following sentence on Walter Liew: a custodial term within the applicable Guideline range of 210 to 262 months, three years of supervision, a fine as determined by the Court, restitution to the victims of Walter Liew's offenses, and a special assessment of $2,000.

Given the Court's familiarity with record in this case, the United States offers the following observations in order to assist the Court in the exercise of its sentencing discretion.

## ARGUMENT

### 1. The Presentence Report Properly Calculates Defendant's Sentencing Range and the Court Should Sentence within that Range.

The United States agrees with the loss calculation contained in the Presentence Report, which concluded that $28 million, the gain from the trade secret theft and economic espionage offenses, was the appropriate figure to use in calculating the loss for purposes of the Sentencing Guidelines. *See* PSR at ¶¶ 44-45. This finding is consistent with the approach set forth in the Application Notes to Section 2B1.1 of the Sentencing Guidelines, which state that, "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." See U.S.S.G. § 2B1.1, App. Note 3(B).

Here, DuPont, the victim of the trade secret theft, and the entity in the best position to calculate the loss, has informed the government that the loss cannot be reasonably determined. That DuPont reached such a conclusion is hardly surprising, as placing a dollar value on the trade secrets stolen by Liew and sold to the Chinese companies is a significant challenge due to the breadth of the information stolen. Indeed, the Application Notes in the Sentencing Guidelines expressly contemplate the calculation of loss of proprietary information. They provide that the loss estimate should be based upon "the cost of developing that information or the reduction in the value of that information that resulted from the offense." *See* U.S.S.G. § 2B1.1, App. Note 3(C)(ii). The best possible way for DuPont to measure loss in this case was to look at the research and development costs associated with the titanium dioxide (TiO2) technology misappropriated by Liew and subsequently sold to the Chinese companies.

The trial testimony of government expert Robert Gibney, as well as the testimony of current and former DuPont employees Rick Olson, Bert Diemer, and Dan Dayton all suggest an extremely large

dollar value for the research and development costs associated with the stolen trade secrets. A look just at Trade Secret 5 illustrates both the significant investment in the technology at issue as well as the difficulty in accurately estimating the loss. Trade Secret 5, the Basic Data Document, is a compilation of information more than 400 pages in length that provided the process and equipment information to design what became Kuan Yin, a greenfield TiO2 plant in Taiwan that operates on a world-class production scale. This document was classified as "Confidential - Special Control," DuPont's highest security classification, and, according to Dayton, contained information derived from the operating data at all of DuPont's then-existing TiO2 plants. Testimony at trial repeatedly established that the Basic Data Document contained DuPont's best available TiO2 technology, utilizing various design components from DuPont plants:

- "The Basic Data Document is -- and experience is -- we're trying to take experience from all of our DuPont sites for TiO2 and come up with the best plant we possibly can come up with. So if we have experience at Johnsonville or Edgemoor or DeLisle or Altamira that would lead us to modify the design for Kuan Yin, we want to put that in this document so that the engineers give us the best possible facility that we can get." Dayton Testimony (Tr. at 1595).
- "So the engineer who wrote this particular section, after looking at all the pieces that we had in our various lines, determined that the design used at the JV-I line was the best." Dayton Testimony (Tr. at 1628).
- Noting that for the Kuan Yin project, DuPont was "starting based on all of our experience. We're utilizing the best information from every site we could get." Dayton Testimony (Tr. at 1678).
- Describing the need for 15-25 engineers of various types for the conceptual design of a TiO2 plant with an output of approximately 60,000 MTPY. Dayton Testimony (Tr. at 1880).

The evidence introduced at trial emphasizes the difficulty inherent in calculating loss in such a case, as the design parameters provided in the Basic Data Document are the product of decades of research and design at DuPont. It is not merely a matter of calculating the research and development for the plant to be built (in this case Kuan Yin) but the research and development that went into each of the

existing plants from which design information is obtained, often after years of operating data is acquired and analyzed.

The concept of improvement over time was not unique to Trade Secret 5. Bert Diemer testified extensively about Trade Secret 3, the DuPont Accession Report, which contained the so-called "Diemer Correlation." This report, also a confidential DuPont document, was similarly based upon operating data from existing DuPont TiO2 plants:

- Diemer noted that the data provided in the report was from DuPont TiO2 plants and could be very useful to someone designing an oxidation reactor "[b]ecause this is actual operating data; and if you know that this represents something that is in existence and operating and functioning, you would be well on your way to be able to duplicate that particular aspect of a plant and have some confidence that it would run as you hope." Diemer Testimony (Tr. at 2359-60).
- Information on the mixing length at multiple DuPont plants would be similarly useful to someone designing a new plant. Diemer Testimony (Tr. at 2361-62).
- Information on the flow rates from Line II at DuPont's Edgemoor plant would also be useful to someone designing the oxidation process for a TiO2 plant. Diemer Testimony (Tr. at 2363-64).

The difficulty inherent in estimating the research and development costs for the design specifications of an entire plant (the Basic Data Document) or even for a document concerning a certain portion of a TiO2 plant (the Accession Report, which focuses on oxidation) is evident from the testimony of the DuPont employees who addressed the foundation of those documents. Because the basis for both documents was existing data acquired through the development and operation of other DuPont plants, it would be necessary to account for costs associated with the development of DuPont's entire TiO2 business. Even if such a number could be calculated, it would be significantly higher than the gain number on which the PSR relies. DuPont executive Rick Olson testified that during his time in the TiO2 business approximately $150 million was spent annually to improve TiO2 facilities. *See* Tr. at 1082. This money was utilized across the existing TiO2 plants in an effort to share technology and improve output at all facilities. *See* Tr. at 1081-82 ("So we have five plants. We have a global

technology network. We take the different unit operations, the reactionary, the purification, the oxidation, the wet treatment, the finishing, and we have technology teams that work across all our plants, do research, improve the processes, make things -- you know, if it makes 18 tons an hour, can we get it to 18.2? How did we do that? We had a successful approach. We share that technology across our circuit."). A detailed examination of the Basic data Document and Accession Report thus demonstrates an inherent difficulty in assessing research and development costs for the trade secrets and supports the PSR's reliance upon gain, the measure of loss expressly provided for in the Sentencing Guidelines under such circumstances.

Notwithstanding the jury's rejection of the substance of defense expert Paul Cooper's testimony on the technology at issue in the case, Walter Liew has again turned to Mr. Cooper in an attempt to argue that the trade secrets stolen by Liew had little or no value. *See* Cooper Decl. at ¶ 4. Much like his opinions concerning the public availability of DuPont's TiO2 technology, Cooper's opinions concerning loss should be seen for what they are – outcome-driven and illogical positions seeking to minimize significant criminal activity.

Cooper argues that it is easy to quantify the loss related to Trade Secrets 2 through 5, as it merely requires a calculation of the time and money DuPont spent in assembling the physical materials that constituted the trade secrets. First, this runs afoul of the loss estimation process set forth in the Application Note 3(C)(ii), which, as noted above, specifically looks to research and development related to the trade secrets. Second, Cooper's proposed estimate suggests a sort of mechanical calculation based upon hours spent drafting documents. This method completely fails to capture the loss suffered by DuPont, ignoring the research and development underlying the work of DuPont employees like Bert Diemer and failing to capture the decades of improvement in various TiO2 plants captured in the Kuan Yin Basic Data Document.

Despite Cooper's misleading suggestion to the contrary, the value of the trade secrets is not properly measured by the time taken to design and draw the specific plans and reports but instead by the research and development over time that made the DuPont technology the envy of the TiO2 industry. *See* Gibney Testimony (Tr. at 2196-97; 2205-07). And to the extent Cooper's declaration suggests that the loss value is *de minimis* because the plans and documents at issue "contained equipment and process

concepts well known in the field," Cooper Decl. at ¶ 6, he again ignores the inherent value in DuPont's ability to compile both public and non-public information in a proprietary process that has allowed it to capture the largest market share in a more than $12 billion annual industry.

The government's position on loss recognizes the difficulties inherent in calculating the value of a decades-long effort at refining an extremely complicated chemical manufacturing process. The number utilized is an accurate assessment by Jinzhou and Pangang -- large, sophisticated Chinese companies – of the market value of state-of-the-art TiO2 technology. Walter Liew entered into contracts with these companies for the creation of TiO2, and the $28 million constitutes the payments received by Liew over the course of these contracts. Though the true research and development costs for the trade secrets misappropriated by Liew would be significantly higher than $28 million, perhaps in the hundreds of millions of dollars, the uncertainty in such an estimate suggests that the proper course is to utilize the $28 million gain from the offense as the loss for purposes of sentencing. See U.S.S.G. § 2B1.1, App. Note 3(B).

**2. A Downward Variance Is Not Warranted for the Reasons Stated in the Probation Officer's Sentencing Recommendation.**

The Probation Officer recommends a downward variance of 42 months from the low-end of the advisory guideline range, from 210 months to 168 months. This would be a 20% variance from the low-end of the range. This recommendation is based on two considerations: (1) the significant impact of Liew's $28 million gain on the offense level calculation; and (2) Liew's family circumstances, in particular his relationship with his son.

The Probation Officer's recommendation is thoughtful, articulate, and motivated, it appears, by a sense of compassion for a man with a family who is looking at a long prison term. This motivation is understandable, but should be resisted by the Court for several reasons. First, the $28 million figure used in determining the offense level is far lower than the number that would be used if the Guideline loss figure could be calculated accurately. Second, the $28 million figure very accurately represents both how the market valued the information Liew stole and the benefit to Liew. This, the government submits, is a case in which the loss number determined by Probation provides a very appropriate measure of harm and does not overstate the seriousness of the offense. Third, Liew's family

circumstances are sad, to be sure; but they are not at all unusual. Fourth, Liew is not deserving of any variance because he has proven himself to be pathologically dishonest.

a. Loss/Gain.

The Probation Officer points out that "by using the $28 million gain, Liew receives a 22-level increase." She asserts that this is "not necessarily the most accurate representation of the nature and seriousness of the offense . . . ." The government disagrees.

In trade secret case, the Guidelines call for the loss calculation to be based on "the cost of developing that information or the reduction in the value of that information that resulted from the offense." U.S.S.G. § 2B1.1, cmt. 3(C)(ii). The Probation Officer properly concluded that this number could not be reasonably estimated for sentencing purposes. However, the truth is that any attempt to calculate it would result in a number in the hundreds of millions of dollars. The testimony at trial was the DuPont spends billions of dollars per year on research and development. (RT 1-15:13-18) Titanium dioxide plants cost hundreds of millions of dollars to build. (RT 1556:22-23; 2200:13-18) As discussed above, the information Liew obtained from Spitler and Maegerle contained years and years of DuPont know-how and learning as to how these plants are built -- information into which DuPont invested countless millions of research and development money, time, and effort. The $28 million number that the Probation Officer concluded was appropriate is a small fraction of the number that would have resulted from following the Guidelines direction on estimation of loss.

Moreover, the number is really a very accurate measure of the economic impact of Liew's crimes. The Pangang Group consumers of the information misappropriated by Liew were willing to pay him a total of $28 million. Of this $28 million, Liew spent under $7 million on business expenses in the United States. The rest – well over $20 million – was profit that Liew laundered through his Singapore shell companies. The $20 million profit can fairly be said to represent the amount the market was willing to pay for the DuPont information. It does not include the work of Liew's employees (including Maegerle) actually producing drawings and design; it is the amount Pangang Group was willing to pay for the intellectual property.

It is also Liew's actual gain. There is no dispute that Liew controlled the money and sent over $20 million to his Singapore companies. Liew claims that it was partially his debt repayment to

relatives in China – but that means that it was his money that he was using to repay his personal debts. The 22-level increase under U.S.S.G. § 2B1.1(b)(1)(L) applies to gains over $20 million. It is eminently fair to hold Liew responsible for his actual gain.

b. Age and Family Circumstances.

The Probation Officer also recommends a downward variance based on Liew's family circumstances. Her focus is on Liew's son Michael. The Probation Officer also mentions Liew's age in connection with the variance recommendation.

To be clear, this situation is a genuine tragedy for Michael Liew. Michael Liew is innocent and does not deserve the hand he has been dealt *by his father*. It is understandable to feel sympathy for the heartbreaking circumstances Liew has placed Michael in.

But neither Liew's family circumstances nor his age are at all unusual. *Compare United States v. Tosti*, 733 F.3d 816 (9th Cir. 2013) (affirming reasonableness of this Court's 12% downward variance based on unusual age (76) and myriad serious health issues). Liew is 56, which is not an unusual age for a white collar criminal. He has one teenage son, which is not unusual for defendants before the Court. Michael Liew has a supportive and attentive mother and he appears to be well-adjusted and well-educated, which, frankly, is perhaps the most unusual family circumstance present in this case.

There is nothing unusual or note-worthy about Liew's family circumstances beyond the unfortunately routine tragedy in criminal cases of a father's sins being visited on his children. If Liew's family circumstances warrant a downward variance, every defendant who has one child should have time shaved off his sentence, and defendants with multiple children should have more time shaved off. This is blunt and cold, as the truth sometimes is, but the Court should not reduce Liew's sentence based on a circumstance he shares with many, if not most, of other defendants who come before this Court.

c. Walter Liew's Character.

A downward variance from the guideline range should be reserved for defendants who deserve some mercy at sentencing; defendants who have shown some character trait worthy of sympathetic consideration. Walter Liew is not that person.

- Liew has shown no remorse or acceptance of responsibility. Liew either does not believe or will not admit that he did anything wrong at all.

- Liew described himself in 2004 as a "patriotic overseas Chinese" who had agreed to seek technology in the United States that would benefit the Chinese government.
- Liew is an inveterate liar. When it suits his immediate needs, Liew lies. See below.
- Liew's declaration regarding his in-laws that he filed during the bail proceedings, described in more detail below, would warrant an upward, not a downward, variance.
- Liew used Tim Spitler and appealed to Spitler's weaknesses to extract DuPont information from him.
- Liew and his wife Christina used Michael in an effort to cause Spitler to feel guilt and sympathy for Liew the month before Spitler killed himself. Supporting documentation will be provided in response to defendant's sentencing memorandum.

Walter Liew has not done anything to earn a break. He has done nothing to demonstrate normal, human remorse for the harm he has caused. A downward variance would reward Liew by giving him something for nothing.

**3. The Court Should Strike Defendant's Factual Assertions that are Inconsistent with the Jury's Verdict**

Liew's argument at sentence is based almost entirely on a version of the facts that was rejected by the jury. The Court should strike from the PSR all the references requested by the defense that are inconsistent with the jury's verdict. Multiple circuit courts have held that a district court, when sentencing a defendant, cannot rely on a finding that directly conflicts with the jury's verdict. *See, e.g., United States v. Weston*, 960 F.2d 212, 218 (1st Cir.1992) ("Although an acquittal is not always conclusive on an issue for sentencing purposes due to differing standards of proof, a guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict"); *United States v. Curry*, 461 F.3d 452, 461 (4th Cir. 2006) ("The court erred ... in sentencing [the defendant] based on a conclusion that contravened the jury's verdict."); *United States v. Reed*, 264 F.3d 640, 648 (6th Cir. 2001); *United States v. Cockett*, 330 F.3d 706, 711 (6th Cir. 2003); *United States v. Rivera*, 411 F.3d 864, 866 (7th Cir. 2005) ("Once the jury has spoken, its verdict controls unless the evidence is insufficient or some procedural error occurred; it is both unnecessary and inappropriate for the judge to reexamine, and resolve in the defendant's favor, a factual issue that the jury has resolved in the

prosecutor's favor beyond a reasonable doubt."); *United States v. Campos*, 362 F.3d 1013, 1015-16 (8th Cir. 2004) ("It is axiomatic that a fact proved beyond a reasonable doubt cannot simultaneously be disproved by a preponderance of the evidence."); *United States v. Bertling*, 611 F.3d 477, 480 (8th Cir. 2010) (the Eighth Circuit agreed with the Government that the district court improperly substituted its view of the evidence concerning the defendants' criminal intent for the jury's verdict, "which should have been conclusive on that issue."); *United States v. Renner*, 648 F.3d 680, 689 (8th Cir. 2011) ("It is... improper for the judge in sentencing to rely on facts directly inconsistent with those found by the jury beyond a reasonable doubt.").

Notwithstanding this well-established principle, defendant advocated to the Probation Officer dozens of factual assertions that conflict with the jury's verdict and therefore should be stricken, including the following:

- Trade Secret 3 had no value. (PSR at ¶11)
- Former DuPont engineer Tim Spitler reported that the DuPont materials he sold to Walter Liew were worthless and sent to Spitler by DuPont after he retired.[1] (PSR at ¶21)
- Claim advanced by defense expert Paul Cooper that "there was nothing in USAPTI's work that was not generally known by the public or that was not readily ascertainable." (PSR at ¶22)
- Liew's claim that, in his contact with Jian Liu that resulted in a witness tampering conviction (Count 11), he "simply wanted to delay the introduction into a lawsuit any information about Maegerle or Spitler in order to protect them." (PSR at ¶26)
- Liew's claim with respect to the safe deposit obstruction convictions (Counts 13 and 14) that "he was simply advising his wife not to divulge any information voluntarily to the FBI agents in the middle of a search." (PSR at ¶28)

[1] The factual inaccuracies of defendant's claims about the statements of Tim Spitler, who killed himself on the day he was due to execute the plea agreement negotiated between his counsel and the United States, will be addressed in the United States' separately filed response to defendant's anticipated motion for a continuance and the anticipated motion of Mr. Spitler's former counsel, David Houston, to quash his subpoena.

- Liew's claim that with respect to his tax fraud convictions (Counts 15 through 19) that "the business banking was handled by his wife" and that he entered into a joint venture agreement with his brother-in-law, Qiao Ning. (PSR at ¶31)
- Liew's claim with respect to his bankruptcy fraud convictions (Counts 20 through 22) that "he made the mistake of treating the bankruptcy form and hearing before the United States Trustee as mere formalities." (PSR at ¶34)
- Liew's claim that "he made no profit with [Performance Group], and he was borrowing money from his in-laws to build his business and for travel costs and living expenses." PSR at ¶¶97, 102.

Liew's position appears to be that this sentencing proceding should be divorced from what happened at trial – that sentencing is a "do-over" in which he can pretend that the trial simply did not happen. Throughout the PSR, Liew asserts self-serving claims that reflect his own revisionist views of what he purportedly intended, meant, or did, none of which were tested by cross-examination or rebuttal at trial. Because they are not supported by the evidence and contrary to the jury's verdict, the Court should strike all of those comments from the PSR and ignore them in reaching a decision on what the sentence should be.

**4. Defendant's Character Demonstrates the Need for an Substantial Sentence under 18 U.S.C. § 3553(a)**

From the time he set out to procure chloride route TiO2 technology in 1991 through his most recent filings in conjunction with this sentencing, the defendant has proven himself to be dishonest in every respect.

a. <u>Walter Liew's Pattern of Dishonesty</u>

Throughout his efforts to obtain DuPont's technology and sell it to Chinese state-owned entities, Walter Liew knew that technology was secret and sought to exploit that fact for his own financial benefit. *See, e.g.*, PSR at ¶¶ 14-20, Ex. 350T (DuPont's TiO2 technology is the "most advanced, but DuPont has never transferred that technology to China"), Ex. 374-014 ("DuPont . . . Technology not for sale!"), Ex. 393T-0042 (main reason DuPont is number one: "they do an excellent job at keeping it

secret"). He targeted former DuPont employees, such as Maegerle and Spitler, and obtained DuPont trade secrets from them to develop his TiO2 business in China.

In furtherance of his criminal objectives to sell DuPont's technology, defendant lied to many different people over a long time including the following:

- His tax return preparer, Phillip Guan. In the years that he worked with Guan to prepare the taxes for the companies he used to further his crimes, Performance Group and USAPTI, Liew concealed millions and millions of dollars of gross receipts from Guan. He never shared with him the fact that he was moving large sums of money out of the United States and into Singapore and China. PSR at ¶30.
- The IRS. For tax years 2006 through 2010, Liew filed numerous returns in which he failed to disclose all of his gross receipts. Specifically, he concealed $17,775,175 in gross receipts from the IRS. PSR at ¶29.
- The bankruptcy court. In his 2009 filings with the bankruptcy court, Liew made numerous false statements under penalty of perjury in order to conceal his illicit profiteering – he failed to disclose the Jinzhou contract, his gross receipts, and the millions of dollars in transfers to Singapore that he personally directed. PSR at ¶33.
- The bankruptcy court's appointed trustee, Tevis Thompson. After he filed his false declarations with the bankruptcy court, Liew appeared at a bankruptcy court proceeding, took an oath to tell the truth, and then repeatedly lied to Mr. Thompson about the accuracy of his filings and the status and financial health of his business. *Id*.
- The bankruptcy fraud victims, including Stantec Consulting, Inc. ($52,356), the Law Offices of Michael Brooks Carroll ($49,973), and Adecco ($32,571). Walter Liew represented that he did not have assets from which to satisfy their claims against Walter Liew. PSR at ¶38.
- The employees at Performance Group and USAPTI that he did not pay because he claimed to be in financial distress. Yet, during the same time that he failed to pay them, he was receiving millions of dollars that he concealed from them. These include the following trial witnesses –Brijesh Bhatnagar, Steve Amerine, and Yuping Jiao.

- The authorities in Singapore who allowed the registration of his shell companies. Liew and his wife also caused accountants and others to register companies in Singapore that had no legitimate business purpose.

Liew's response to the collapse of his scheme in 2011 provided further evidence of his character. Liew doubled down on dishonesty – he corruptly persuaded Jian Liu to conceal from DuPont the participation of two former DuPont employees in the project, he hid in Liu's basement when DuPont investigator Jim Jubb came to the house, and he directed Tony Duong to erase DuPont documents from USAPTI's server. He also conspired to cause and did cause false statements to be made to this Court in the form of the answer to the civil suit filed by DuPont. PSR at ¶¶23, 25. Then, when law enforcement executed a search warrant at his house, he conspired with his wife to obstruct justice and he lied to FBI agent Eric Bozman, all in an effort to keep law enforcement from locating a safe deposit box containing a trove of evidence related to his scheme including copies of DuPont trade secrets and contracts with his Chinese customers. PSR at ¶27.

Most disturbingly, Liew's dishonesty has continued in these criminal proceedings. Last fall, two years after he was initially charged and in anticipation of his criminal trial, Liew produced a handwritten Chinese language document that purported to be an agreement dated August 8, 2004 between himself and one of his brothers-in-law, Qiao Ning. PSR at ¶31. A copy of this document is attached as Exhibit A to this memorandum. The agreement itself is remarkably vague and ill-defined – it does not identify any specific subject matter, but rather "the project," and it describes three undefined "stages," "early, middle, and late," and describes a 60/40 breakdown between Party A and Party B on a "contract," which is also not identified or described. While defendant claims that this agreement governs his pursuit of TiO2 business, there is no evidence, none, to support that assertion. *Id*. In fact, the evidence presented at trial suggests otherwise.[2] Peter Zisko discussed the fact that Liew was pursuing other projects in China at that time including ACR and a micronizer project at Zhenjiang, and the financial records introduced at trial do not substantiate a 60/40 split.

---

[2] Although the agreement makes no reference to TiO2, defense counsel represented to the probation officer that it was for Liew's TiO2 ventures. Yet, when asked to provide corroborating records, defense counsel refused. PSR at ¶31. Moreover, it is unclear how or why this contract for a project contemplated in 2004 would in any way relate to the 100k Pangang contract that Walter Liew entered into in May 2009.

While there are obvious red flags with the late-in-the-game production of this alleged 2004 document, including the fact that apparently no copy of it existed in the United States as it was never found in any of the numerous search warrants executed in this investigation, the most damning comes from Walter Liew's own declaration submitted under penalty of perjury in support of his request for bail in this case. *See* Declaration of Walter Liew, Dkt. 48-7 (filed January 18, 2012). In support of his bail motion, not only did Walter Liew make *no* reference to this agreement or to any financial arrangements with his brother-in-law, Qiao Ning, he essentially informed the Court that he did not know him. Back then, this is all Walter Liew had to say about his brothers-in-law, "I understand that my brothers-in-law are a retired food storage manager, a medical doctor, and an artist who now owns a small gallery in Liaoning Province." Liew Decl. at ¶37C. If what Liew now claims is true, *e.g.*, that he had a financial arrangement with his brother-in-law, then his prior declaration was fundamentally and intentionally misleading. Further, to the extent such a joint venture existed, it was never identified on any of the tax returns that Walter Liew filed on behalf of his companies.

Liew has taken an even more distressing set of positions with respect to his in-laws. In the PSR, Liew has now claimed for the very first time that between 1996 and 2006, he borrowed approximately $200,000/year for a total of $2,000,000 from his in-laws to cover living and business expenses. PSR at ¶¶97, 102. Yet, in his earlier bail declaration (Dkt. 48-7), he failed to advise the Court of any financial dealings with his in-laws. In fact, despite this apparently regular course of borrowing large sums of money, he stated then that he did "not have regular contact with them" nor did he even have personal knowledge of their professions, stating "I understand that my mother-in-law . . . was a retired physician," and "I understand that my father-in-law is also a retired physician." Liew Decl. at ¶37. Again, Liew's under oath declaration is both inconsistent with the positions he now asserts and misleading. Other evidence introduced at trial established that Liew operated bank accounts in China under the name of his father-in-law including an HSBC account that he used to transfer $3,950,000 in other Chinese bank accounts in his father-in-law's name. Ex. 923-0003.

In conjunction with this sentencing, the United States asks the Court to review the under seal *ex parte* filings that Liew made in conjunction with his 2013 bail motion before Judge Cousins, which was subsequently appealed to this Court. *See* Amended Order Granting Government's Motion for

Revocation, Dkt. 285. At the time, the Court noted that "much of the information presented [by Mr. Liew] is based upon information and belief, and Mr. Liew does not provide a satisfactory explanation of why he would not be able to establish personal knowledge of the facts discussed." Amended Order at 4:8-10. While the United States would welcome the opportunity to review and comment on those materials should the Court deem it useful, it believes a renewed examination by the Court is now warranted for purposes of sentencing Liew and in light of all of the information of which the Court is now aware.

b. Walter Liew's Failure to Accept Responsibility

To this day, Walter Liew refuses to accept any responsibility for his crimes. While it is certainly his right not to acknowledge the harm his conduct has caused, it is highly unusual to attempt to relitigate all of the issues at sentencing, which is exactly what he has attempted to do with the PSR. At every turn, Liew is still trying to ignore the jury's verdict and excuse, justify, and recast the conduct of which he has been convicted.[3] *See* Section 3 above. The lack of remorse speaks volumes about Walter Liew's character and why the Court needs to impose a substantial sentence.

**5. Sentencing Recommendation**

The Court is intimately familiar with this case and Walter Liew's conduct – it has ruled on countless motions and sat through the lengthy trial earlier this year. The United States believes that Walter Liew has earned a sentence within the Guideline range of 210 to 262, and it defers to the Court on the exact number within that range. The United States has identified numerous factors above that support such a sentence.

The United States also asks the Court to order Liew to: (a) pay restitution to DuPont and to the victims of his bankruptcy fraud; (b) serve three years of supervised release; (c) pay a fine as determined by the Court; and (d) pay a special assessment of $2,000.

With respect to restitution, the United States suggest that it may be appropriate to briefly defer resolution of any restitution issues pursuant to 18 U.S.C. § 3664(d)(5).

---

[3] In contrast, co-defendant Robert Maegerle has filed a declaration in which he stated that he "would waive any and all motions and appeals." Dkt. 843 at ¶9.

The United States believes the Court is in the best position to determine whether a fine is appropriate and if so, how much it should be. While the record regarding Liew's finances is uncertain, the Court has had the opportunity to review the sealed *ex parte* financial declarations Liew made in conjunction with his 2013 bail motion. Given the enormous financial gains generated by Liew's conduct, the United States believes he should be fined in an amount to be fixed by the Court.

Respectfully submitted,

MELINDA HAAG
United States Attorney

/S/

______________________________
JOHN H. HEMANN
PETER B. AXELROD
Assistant United States Attorneys

RICHARD S. SCOTT
Trial Attorney