KEKER & VAN NEST LLP
STUART L. GASNER - # 164675
sgasner@kvn.com
SIMONA A. AGNOLUCCI - # 246943
sagnolucci@kvn.com
KATHERINE M. LOVETT - # 276256
klovett@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

RIORDAN & HORGAN
DENNIS P. RIORDAN - # 69320
dennis@riordan-horgan.com
523 Octavia Street
San Francisco, CA 94102
Telephone:     (415) 431-3472
Facsimile:     (415) 552–2703

Attorneys for Defendants WALTER LIEW and
USA PERFORMANCE TECHNOLOGY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>      v.<br><br>WALTER LIEW, USA PERFORMANCE TECHNOLOGY, INC., and ROBERT MAEGERLE,<br><br>             Defendants. | Case No. CR 11-0573-JSW (NC)<br><br>**DEFENDANTS WALTER LIEW AND USAPTI'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM AND REQUEST FOR EVIDENTIARY HEARING**<br><br>Date:        July 10, 2014<br>Time:        10:00 a.m.<br>Place:       Courtroom 5, 2nd Floor<br>                 1301 Clay Street, Oakland, CA<br>Dept.:       Hon. Jeffrey S. White |

I. **INTRODUCTION**

The government relies upon two unproven and erroneous assertions to urge a massive sentence for Mr. Liew: (1) that he "stole" valuable trade secrets belonging to DuPont worth $28 million or more, and (2) that Mr. Liew is a "fundamentally dishonest" person. Neither of these spurious grounds justifies the effective life sentence that the government seeks.

There was no proof at trial of any trade secret used by Mr. Liew or USAPTI in any of the work they did over many years. There was no proof of any loss to DuPont. The government's sentencing memorandum cites no evidence of either. Although Mr. Liew was convicted of conspiracy and attempt, those inchoate crimes required no proof that any trade secret even existed, let alone that they had value. And while Mr. Liew was convicted of possession of Trade Secrets 2, 3, and 4, mere possession of those inert pieces of paper could cause no loss to DuPont sitting in Mr. Liew's closet or as an image preserved in the depths of a hard drive. Likewise with Trade Secret 5: this so-called "basic data" document was never in Mr. Liew's possession, and there was scant evidence that he was aware of its existence and no evidence that he was aware of its significance. While Mr. Liew was convicted of crimes relating to Mr. Maegerle's apparent possession of and occasional reliance on small portions of that document, the government's sentencing memorandum provides no evidence that any of its content was used in USAPTI or Performance Group work-product or conveyed to customers or that that it harmed DuPont.

The government further attempts to justify a massive sentence by relying on a Guideline Application Note that if loss cannot be calculated, the "gain" should be used. Dkt. 857 (Govt. Mem.) at 4. This notion is unsupportable in the circumstances of this case. There was nothing inherently illegal about contracting with Chinese companies to design chloride route titanium dioxide plants. There was a vast amount of work done on the projects that touched on no trade secrets whatsoever.[1] There was no evidence that any actual trade secrets were ever conveyed to Pangang or Jinzhou, nor of payments "for" trade secrets. To the contrary, payments were made over many years pursuant to milestones that corresponded to concrete design deliverables and that

---

[1] Trial Tr. 3809:6-12; Dkt. 508-2 (Am. Expert Report of Paul Cooper) at 2, 14-15.

indisputably involved large amounts of work far removed from any trade secrets.[2]  It is illogical and unpersuasive for the government to argue (on one hand) that it is "impossible" for DuPont to calculate loss, while blithely arguing (on the other hand) that it *is* possible to attribute *all* of the gain from multiple contracts over many years to trade secrets.  In the post-*Booker* era, the Court is not required slavishly to follow a Guideline Application Note to such an illogical and extreme conclusion.

Unable to show loss to DuPont or gain attributable to the use of trade secrets, the government resorts principally to rhetoric, using the word "stole" or "stolen" numerous times in their sentencing memorandum.[3]  But the sole support for that characterization is a single document (the "even with stolen prints" note) that the government continues to mischaracterize even though the FBI's 302 memorandum of the Spitler interviews makes clear that the "prints" in question were not stolen, but voluntarily provided to Mr. Spitler by DuPont.  Dkt. 854 (Lovett Decl.), Ex. U at C2-000825 Dkt. 854 (Lovett Decl.), Ex. V.

Finally, the government relies on "character" issues to justify its proposed exorbitant sentence.  It is at this point that the government's sentencing memorandum seems to lose all perspective.  Practically all of the examples in the government's brief are already encompassed by the obstruction and fraud counts of conviction, which, even under the Guidelines, yield a sentence of 63-78 months once the trade secrets are valued in accordance with the evidence.  The other alleged examples of supposed "bad character" are unsupported by the evidence or represent undisguised fury that Mr. Liew has protested his innocence and persisted in his view that no trade secrets were involved in his work.

A calm and reflective view of the evidence and Mr. Liew's behavior does not support a lifetime of incarceration.  The "parsimony provision" of the federal sentencing statute urges the least amount of incarceration needed to satisfy the Section 3553 factors.  A sentence for Mr. Liew of 63-78 months is warranted and appropriate.

---

[2] *Id. See, e.g.*, Trial Exs. 919, 313 at 313-0008-313-0010, 926.
[3] Dkt. 857 (Govt. Mem.) at 4, 5, 7, 9.

## II. ARGUMENT

### A. The government has failed to meet its burden of proving "loss" to DuPont or "gain" to the defendants attributable to the misappropriation of trade secrets.

The government's brief completely ignores the government's burden to prove loss to DuPont by clear and convincing evidence (which is the proper standard), or, for that matter, by a preponderance of the evidence.[4] Instead, the government follows a line of reasoning that is faulty from start to finish.

*First*, the government erects the straw man that defendants "stole" demonstrable trade secrets from DuPont and "sold" them to their Chinese customers, thereby causing loss to DuPont. This is untrue on several levels. The only actual trade secrets that the government can claim it proved at trial were Trade Secrets 2 through 5.[5] There was no evidence that Mr. Liew "stole" any of these items. There was, moreover, no evidence that *any* information from Trade Secrets 2 through 5 was actually incorporated into work-product sent to Mr. Liew's customers or otherwise conveyed to them. Indeed, none of the government's witnesses ever *looked* at any USAPTI or Performance Group work-product, so Mr. Cooper's expert opinion that Mr. Liew's work was trade-secret-free stands unrebutted. Mere possession of trade secret materials effects no demonstrable harm on DuPont. Nor does awareness that Mr. Maegerle possessed a trade secret. The rhetoric of "stealing" and "selling" serves only to erect a straw man that does nothing to meet the government's burden of demonstrating loss to DuPont.

*Second*, the government claims that in order to evaluate this supposed (but nonexistent) loss to DuPont, it would be necessary to calculate the development costs behind the entirety of the DuPont chloride route technology. Dkt. 857 (Govt. Mem.) at 4-8. This is nonsensical in light of the wealth of evidence at trial that much of the chloride route process has been well-known for over 60 years,[6] and that some of the Basic Data document is publicly available and none of it

---

[4] *See* Dkt. 853 (Defs' Sentencing Memorandum) at 16-17.

[5] The jury was never asked to determine, and so did not determine, that Trade Secret 1 was a real trade secret, nor that Walter Liew stole the entire DuPont chloride-route process. *See* Dkt. 792 at 27:12-14 (Final Jury Instructions) ("For purposes of this Count, it also is not necessary for the government to prove that the information regarding DuPont's TiO2 process that the alleged conspirators intended to convert was, in fact, a trade secret.")

[6] Trial Tr. 3710:15 – 3712:22.

3

used.[7] If the government or DuPont was truly trying to value the loss to DuPont from the misappropriation of real trade secrets, it would have to (a) identify the alleged trade secrets with specificity, (b) distinguish them over that which has been publicly disclosed over the past 60 years or that is readily ascertainable or that is already in the hands of a competitor, and (c) make some effort to establish the development costs behind the (presumably narrowed) trade secrets. Such a calculation would need to take into account, among other things, that before Mr. Liew even started his project, Chinese competitors already had what a DuPont witness described as a replica of DuPont's chloride route plant at Antioch, California;[8] scores of disclosures in DuPont and other industry patents, both expired and unexpired; and those features that Bob Maegerle could have designed based upon his 30 years of engineering experience skill, given the government's admission at trial that Mr. Maegerle was entitled to work on the Pangang and Jinzhou projects so long as he didn't misappropriate trade secrets.

The government makes no effort to do any of this. Instead, it offers DuPont's self-serving claim that it cannot reasonably estimate its loss, cites vague testimony that the entirety of DuPont's process cost a lot to develop,[9] and tries to leave the impression that $28 million is a reasonable compromise. This is insufficient to impose a 22-level enhancement that is supposed to be proven by "clear and convincing" evidence.

***Third***, the last faulty step in the government's and DuPont's syllogism is to throw up their hands based on their purported inability to calculate development costs, and to jump to "gain" in supposed deference to the Guideline Application Note. This is a convenient way to avoid any real analysis. It is inappropriate because under the circumstances of this case, the "gain" to the defendants bears no logical relationship to DuPont's loss. Importantly, the Court may ***only*** adopt gain as a measure of a victim's loss if "the defendant's gain is a reasonable estimate of the actual or intended loss." *See United States v. Galloway*, 509 F.3d 1246, 1252 (10th Cir. 2007). It is the

---

[7] Trial Tr. 1798:5-8.

[8] Trial Ex. 3417.

[9] *See, e.g.*, Dkt. 857 (Govt. Mem.) at 7; 6-7 ("DuPont executive Rick Olson testified that during his time in the TiO2 business approximately $150 million was spent annually to improve TiO2 facilities.").

1  government's burden to show some amount of loss to the victim and yet it cites not a single case
2  supporting the notion that, where a victim cannot show that they have been harmed in any
3  tangible way whatsoever, the Court should look to gain as a reasonable alternative measurement
4  of harm.

5  The government suggests that Mr. Liew's Chinese customers overpaid by $20 million,
6  and that this amount somehow equates to "gain" within the meaning of the Guidelines or to a
7  market valuation of the trade secrets at issue, and thus serves as a fair approximation of loss to
8  DuPont. *See* Dkt. 857 (Govt. Mem.) at 10. This argument plainly requires expert knowledge of
9  the industry, but the government cites none. Nor could they. As Mr. Cooper explains in his
10 declaration, $28 million is a reasonable amount to pay front-end engineers for contracts of this
11 size. *See* Dkt. 854 (Lovett Decl.), Ex. X, ¶ 11(b). There is simply no evidence that a $20 million
12 premium was paid to Mr. Liew for trade secrets. There is, in contrast, considerable evidence that
13 the alleged trade secrets were worth little or nothing. For example, as Mr. Houston explains in
14 his declaration, Mr. Spitler thought Trade Secrets 2 and 3 were "obsolete and without value." *Id.*,
15 Ex. V, ¶ 5.[10] A government witness called Trade Secret 2 a worthless "cartoon."[11] Trade Secret 4
16 was a draft that was completely blank in the relevant section, and was barely mentioned during
17 the trial.[12] The government relies extensively on Trade Secret 5 (the "basic data" document),
18 but, again, there was no evidence at trial that anything from that document was used or provided
19 any valuable benefit to USAPTI or Mr. Liew.

20 In short, there is simply no connection between the trade secrets at issue and any gain to
21 the defendants. Surely there was no connection established to the procurement of the various
22 contracts with the Chinese customers. There were no witnesses at trial from Jinzhou or Pangang,
23 or anyone with knowledge of the negotiations. The only evidence that came close to showing the

---

[10] The government argues that this factual assertion is contrary to the jury's verdict, Dkt. 857 (Govt. Mem.) at 11-12, but that is not so. Even though the jury concluded that Trade Secrets 2 and 3 had *some* value, they did not determine *what* value. Mr. Spitler's assessment of the value of those two documents is relevant to determining their fair-market value, DuPont's loss, and any "intended loss" to DuPont of the conspiracy.

[11] Trial Tr. 1248:11-18.

[12] Trial Ex. 1. *See also* Trial Tr. 695:3-12.

motivations behind the contracts was the internal memos seized from the laptops of the visiting Pangang executives, and those showed routine engineering concerns and the desire to build a chloride route titanium dioxide plant that met the customer's needs and parameters.[13] The much-touted Trade Secrets 2 and 3 were apparently provided to Mr. Liew by Spitler *in 2010*, long after the contracts were executed, and could have formed no part of the supposed consideration for the $28 million. *See* Gasner Decl. Exh. 3 at DH00038.

Even if the Court determines that there was some loss to DuPont, there are ways to reasonably estimate that loss, which yield much more moderate conclusions. *See* Def. Mem. (Dkt. 853) at 16-23. $28 million is a vast overestimation, unsupported by evidence or any serious analysis. Mr. Cooper's methodology is the proper one to use with a "compilation," in which the individual elements are not trade secrets, but effort was expended to compile the information into a collection. *United States v. Nosal*, 2014 WL 121519, at *8-10 (N.D. Cal. Jan. 13, 2014).

### B. The government's attempts at character assassination should be rejected.

The Court should take the government's inflammatory characterization of Mr. Liew's character with a generous helping of salt. While it is not surprising that emotions may run high after three years of vigorous litigation, the government's vitriol is undeserved.

A fair examination of Walter Liew's character and his life reveals that he is not the man portrayed in the government's brief. As demonstrated at trial and in the many letters written in support of Mr. Liew and submitted to the Court, Mr. Liew is a kind and decent man.[14] He came from humble beginnings and worked hard to make a life for himself in America.[15] His employees, often immigrants or minorities like himself, knew him as a smart, hard worker and a devoted mentor. Dkt. 854 (Lovett Decl.), Exs. K, L.

---

[13] *See, e.g.*, Trial Exhibit 369T (containing extensive analysis of intellectual property issues and requirement that seller guarantee that "the technology in this project . . . is true, valid, and does not infringe upon the intellectual property rights of any third party"); 326T (analyzing adequacy of detailed design materials submitted by USAPTI); 296T (extensive memorandum of meeting with Pangang and USAPTI examining, in great technical detail, the adequacy of USAPTI's project deliverables; raising questions about the project; and laying out steps for the future).

[14] *See* Dkt. 854 (Lovett Decl.), Exs. A-T; Dkt. 853 (Mr. Liew and USAPTI's Sentencing Memorandum) at 30-32.

[15] *See, e.g.*, *id.*, Exs. C, E, F.

But what truly shines through in the letters is that Mr. Liew is a loving, attentive, and devoted father to his son.  *See id.*, Exs. A, H, I, K, M–P, R–T; Dkt. 848 (Mr. Liew's PSR) at 34 & ¶ 88.  The relationship between Mr. Liew and his son is something the Probation Officer specifically remarked upon after her home visit with Mrs. Liew and the Liews' son.  *See* Dkt. 848, ¶ 88.  While the government correctly points out that it is not unusual for an individual facing criminal punishment to have children, Dkt. 857 (Govt. Mem.) at 10-11, Mr. Liew's parenting has clearly gone above and beyond, such that it is considered remarkable to those observing Mr. Liew with his child.  Not every defendant facing sentencing has such a special, strong bond with his or her children.

In addition, it is important to note that Mr. Liew has been a model prisoner, working hard to become a better person during his incarceration.  *See* Declaration of Stuart L. Gasner in Support of Response to Government's Sentencing Memorandum ("Gasner Decl.,"), Ex. A.  During Mr. Liew's release on bail during trial in this matter, he obeyed all conditions of release.  A lengthy period of incarceration will not be necessary for purposes of Mr. Liew's rehabilitation.

The government's hyperbolic attempts to smear Mr. Liew should be given little credence.  His effort to present evidence of a joint venture defense to the tax charges was unsuccessful because his relatives in China were unwilling to give live testimony, but Ning Qiao, Mr. Liew's brother-in-law, has now twice confirmed in a sworn declaration, certified in the presence of Chinese counsel, the existence of the joint venture agreement with Mr. Liew and its application to the titanium dioxide project.  *See* Dkt. 853-3 (Rief Decl.), Ex. 1; Trial Ex. 3479.  There is nothing in Mr. Liew's bail declaration that is inconsistent with the existence of a joint venture agreement.  *See* Dkt. 48-7.  The bail declaration states that Mr. Liew has not had "regular contact" with his in-laws in China and that his in-laws are not "high-ranking Chinese officials," but ordinary people with normal jobs.  *See id.*, ¶ 37.  A lack of regular contact is not fundamentally inconsistent with the existence of a joint venture relationship.

The government's other attacks on Mr. Liew's character are amply covered by Guideline calculations on other counts of conviction, or are inaccurate, petty, or inconsistent with his

1  constitutional rights.[16]  Indeed, the government's central gripe with Mr. Liew seems to be that he
2  has steadfastly maintained that his work did not involve any real trade secrets, but that position
3  was supported by a great deal of evidence at the trial. The government's other gripe is that Mr.
4  Liew insisted on his constitutional right to a jury trial, and deserves no mercy because he has not
5  adequately shown contrition.  Dkt. 857 (Govt. Mem.) at 11: 21-22, 27-28.  Mr. Liew deeply
6  regrets the pain he has caused to his family, employees, and others affected by his conduct.  But
7  the Guidelines have already accounted for his insistence on a jury trial and his protestations of
8  innocence by not granting him any credit for acceptance of responsibility.  It is "piling on" for the
9  government to claim that additional punishment is required.

10  The government reaches a new low when it attempts to suggest that Mr. Liew contributed
11  to Mr. Spitler's suicide by allegedly manipulating Mr. Liew's son.  Dkt. 857 (Govt. Mem.) at 11:
12  18-19.  Their evidence appears to be a Christmas card written by Mr. Liew's son to Mr. Spitler
13  that refers to the fact that Mr. Liew was in jail.  Gasner Decl. at ¶ 6.  This is a slender reed upon
14  which to attack Mr. Liew, especially given that there is no evidence of his involvement in the
15  card. *Id*. It is also contradicted by Mr. Houston's declaration, correspondence with the
16  prosecutors after the Christmas card, and a wealth of circumstantial evidence as to the cause of
17  Mr. Spitler's suicide.  Dkt. 854 (Lovett Decl.), Ex. V, ¶ 4; Gasner Decl. at ¶ 8.  It is callous and
18  inaccurate for the prosecution to suggest that it is somehow remarkable that Walter Liew's son is
19  "well-adjusted and well-educated," *see* Dkt. 857 (Govt. Memo.) at 10, especially given the many
20  letters demonstrating Mr. Liew's love and nurturing of his son.  This is character assassination
21  that simply goes too far, and that the Court should disregard in sentencing.

22  **III.   AN EVIDENTIARY HEARING IS WARRANTED ON THE ISSUE OF LOSS, BUT THE TESTIMONY OF MR. DAVID HOUSTON IS NOT NEEDED**
23
   Ironically, the government apparently opposes an evidentiary hearing on the issue of
24  DuPont's loss (which could result in a massive increase in Mr. Liew's incarceration) but has
25

---

[16] Just by way of example, the government claims that Mr. Liew deserves extreme punishment for failing to pay employees while transferring money to Singapore, including to YuPing Jiao. Ms. Jiao left USAPTI after Mr. Liew was already incarcerated, and the Court will recall that her testimony was generally favorable in terms of Mr. Liew's character.

1   unilaterally decided (by issuing a subpoena) that Mr. Houston's live testimony is required at the
2   sentencing hearing.  This is precisely backwards.  The issue of loss to DuPont bristles with factual
3   issues that are directly relevant to sentencing, and that could impose a 22-level increase in Mr.
4   Liew's Guideline calculation.  In contrast, the declaration of Mr. Houston was submitted as
5   background information on the circumstances of the offense, to defuse the Government's
6   expected rhetorical claim that this case centers on valuable trade secrets that were "stolen." While
7   Mr. Houston's recollection of Mr. Spitler's opinion of the value of the trade secrets is important,
8   the government has not controverted that statement in a way that would warrant an evidentiary
9   hearing.

The former issue (loss to DuPont) warrants an evidentiary hearing; the latter (rebutting the Houston Declaration) does not. To the extent the Court wishes to resolve any factual issues raised by Mr. Houston's Declaration, the documentary record should suffice.  *See* Gasner Decl. at ¶¶ 3-8. [17]

### IV.  A NEW TRIAL IS WARRANTED BASED ON THE MATERIALS SUPPLIED BY MR. HOUSTON OR, IN THE ALTERNATIVE, PRODUCTION OF THE FBI NOTES OF THE SPITLER INTERVIEWS

As the Court will recall, a centerpiece of the government's rebuttal closing was the accusation that "Flowsheet Tim" was a central conspirator who enabled the defendants' entire enterprise.  Based on the declaration and materials provided by Mr. Houston today, it appears that Mr. Spitler was no such person, but rather, a quiet engineer who believed that he had provided nothing of value to Mr. Liew or that would harm DuPont.  The government also failed to disclose exculpatory information that Mr. Spitler and his counsel had emphasized in their plea negotiations.  *See* Gasner Decl. at ¶ 4.  Instead, the government produced a highly sanitized "composite" FBI 302 that glossed over or disregarded important exculpatory information that Mr. Spitler and his counsel had conveyed.  Then, to add insult to injury, the government emphasized Mr. Spitler in rebuttal closing when there was no opportunity to rebut their inaccurate and inflammatory argument.

---

[17] Upon request, the defense can supply the Court with the entirety of the file as to the Spitler representation that Mr. Houston produced in response to the government's subpoena.

The defense respectfully requests that the Court order a new trial in light of this newly discovered evidence. In the alternative, the defense asks that Court reconsider its order denying the previous defense request for the FBI's rough notes of all the Spitler interviews, and to order them produced in light of the inconsistencies revealed by the Houston production.

## V.     CONCLUSION

For the reasons laid out above, and for all of the reasons explained in Mr. Liew and USAPTI's Sentencing Memorandum, Mr. Liew respectfully requests a sentence of 63-78 months imprisonment. This is the appropriate sentence to meet 18 U.S.C. § 3553(a)'s requirement that a sentence be sufficient, but no greater than necessary, to comply with the purposes of punishment. In the alternative, the defense asks that its renewed motion for a new trial be granted or that the FBI notes of Mr. Spitler's interviews be produced so that a renewed new trial motion can be prepared.

Respectfully submitted,

Dated:  June 26, 2014                    KEKER & VAN NEST LLP

By:  */s/ Stuart L. Gasner*
STUART L. GASNER
SIMONA A. AGNOLUCCI
KATHERINE M. LOVETT

Attorneys for Defendants WALTER LIEW and USA PERFORMANCE TECHNOLOGY, INC.