1  MELINDA HAAG (CABN 132612)
   United States Attorney

2
   J. DOUGLAS WILSON (DCBN 412811)
3  Chief, Criminal Division

4  PETER B. AXELROD (CABN 190843)
   JOHN H. HEMANN (CABN 165823)
5  Assistant United States Attorneys

6  RICHARD S. SCOTT (DCBN 502455)
   Trial Attorney, National Security Division
7
           450 Golden Gate Avenue, Box 36055
8          San Francisco, California 94102-3495
           Telephone: (415) 436-6774
9          FAX: (415) 436-7234
           peter.axelrod@usdoj.gov
10
   Attorneys for United States of America
11

12                    UNITED STATES DISTRICT COURT

13                    NORTHERN DISTRICT OF CALIFORNIA

14                       SAN FRANCISCO DIVISION

15

16  UNITED STATES OF AMERICA,          )  CASE NO. CR-11-0573-JSW
                                       )
17          Plaintiff,                 )  GOVERNMENT'S REPLY TO DEFENDANTS'
                                       )  SENTENCING MEMORANDUM
18      v.                             )
                                       )  Date:  July 10, 2014
19  WALTER LIEW AND USA PERFORMANCE    )  Time:  10:00 am
    TECHNOLOGY, INC.,                  )
20                                     )
            Defendants.                )
21                                     )
                                       )
22  _____ )

23          Vast swaths of defendant Walter Liew's sentencing memorandum are devoted to rearguing,

24  recasting, and reimagining the evidence at trial – despite the fact that the jury completely and decisively

25  found against him at trial.  The "factual background" and the "nature and circumstances of the offense"

26  sections of defendant's memorandum, Def. Sent. Mem. at 3-8 and 29-33, spin the tale of a poor,

27  misunderstood engineer from a Malaysian dirt farm who was just trying to earn an honest living – the

28  very fantasy the jury rejected after a two month trial.

1    The truth is that Walter Liew agreed in 1991 to search for technologies the Chinese government

2    told him it needed.  In the years that followed, he stayed in touch with several of the government

3    officials he first met in 1991.  He cozied up to two former DuPont employees in the late 1990s and paid

4    them to give him DuPont trade secret information.  He used that trade secret information to persuade

5    Chinese government-owned companies to hire him – a completely unqualified electrical engineer with

6    no relevant experience – to build enormous TiO2 factories, and then used the information itself in doing

7    the design work.  He was paid almost $28 million, $22 million of which he laundered through shell

8    companies in Singapore.  When DuPont found him out, he started lying about what he had done – and

9    kept lying to the Court and the FBI when legal proceedings began.  As much as Walter Liew and his

10   defense team dislike the way this sounds, it is what the evidence proved and the jury found beyond a

11   reasonable doubt.

12   The government will not, in this reply, attempt to address each one of Liew's arguments, but

13   intends to focus on the issues that are most important, as well as those that reflect most pointedly on

14   Liew's poor character.

15   **A.  The Offense Conduct**

16   Liew's factual recitation is, for the most part, not worthy of a response.  The Court sat through

17   the trial, heard the jury's verdict, and denied the post-trial motions.  Liew now reimagines the "nature

18   and circumstances of the offense" and attempts to portray himself as a run of the mill Silicon Valley

19   businessman.  He continues to pretend that he was not responsible for the letter, Exhibit 350T,

20   describing his meeting with Luo Gan in 1991, referring to "the author" in the third person as if it was

21   someone other than Liew.  Def. Sent. Mem. at 30:19.  He continues to describe the contents of the letter

22   as "puffery" – apparently a result of what he offensively argued at trial was part of his genetic

23   disposition to dishonesty.  He ignores the pile of evidence that he continued to interact with the

24   government officials he met in 1991 during the years he was selling TiO2 technology to the Pangang

25   Group.  Exhibits 291T; 396T at 0002-0003; and 418T at 0003.  He disregards the fact that he dealt

26   directly with the chairmen of the Pangang Group even though he was an electrical engineer with no

27   experience in TiO2.  Exhibits 342T; 291T at 0003; Testimony of Cynthia Ho, RT 321:10-325:9; see also

28   Testimony of Hu Shaocong, RT 795:9-803:3.  He claims that a masters degree in electrical engineering

1   and two years of reading patents in 1997 and 1998 qualified him to design a TiO2 factory that legions of

2   Chinese engineers were unable to design on their own.

3          Liew's attempt to recast the narrative may be intended for some other audience, but it has no

4   place in this place in the current proceedings.  Two of his points, however, provide such clear insight

5   into Liew's incorrigibly dishonest character, which *is* relevant to sentencing, that some amount of

6   discussion is worthwhile.

7                    **1.     Information Provided by Spitler's Attorney**

8          Incredibly, the defense claims that the testimony of a deceased co-conspirator, Tim Spitler, as

9   recalled by his former counsel would *help* Walter Liew.  Specifically, the defense contends that Mr.

10  Spitler did not admit to being in a conspiracy with Walter Liew to steal trade secrets from DuPont and

11  any DuPont documents that Spitler provided were ones given to him by DuPont when he retired from

12  DuPont's facility at Altamira, Mexico.  Def. Mem. at 6:2-7, 12, 29:25-26; Houston Decl, at ¶¶3-5.  To

13  advance these claims, the defense relies on the declaration of Spitler's former counsel, David Houston.

14  The Court should disregard as inherently unreliable Mr. Houston's declaration and reject the defense

15  argument.

16         First, while Mr. Houston states in his declaration that "Mr. Spitler denied any knowing

17  involvement in a criminal conspiracy with Mr. Liew . . . to steal trade secrets from his former employer,

18  DuPont," he overlooks the fact that he had negotiated a plea agreement in which Spitler agreed to plead

19  guilty to a conspiracy to commit theft of trade secrets in violation of 18 U.S.C. §  1832(a)(5) and aiding

20  and abetting the possession of trade secrets in violation of 18 U.S.C. §§ 1832(a)(3) and 2, all based on

21  his involvement with Walter Liew.  Axelrod Decl., Ex. A at ¶1.

22         The plea agreement – which is entirely consistent with the FBI 302 that memorializes the

23  interviews of Spitler and Spitler's employment records (admitted as Exhibit 774 at trial) – provided a

24  clear acknowledgement that Spitler knowingly provided DuPont trade secrets to Walter Liew in

25  furtherance of Liew's projects in the PRC.  *Id*. at ¶ 2; *see also* FBI 302 of Spitler Interview, Ex. U to

26  Lovett Decl. at C2-000833 (Spitler "immediately regretted" providing Walter Liew with "the protected

27  DuPont TiO2 blueprint in the late 1990s [e.g., Trade Secret 2]" and repeatedly asked for Liew to return

28  it and Liew refused).    Specifically, the plea agreement stated:

From 1977 to 1997, I worked for E.I. du Pont de Nemours & Company (DuPont) as an engineer involved in the production of titanium dioxide (TiO2) at various DuPont plants. In connection with my employment at DuPont, I was given access to DuPont trade secrets regarding the company's TiO2 manufacturing process. DuPont invented a process in which TiO2 is manufactured by using chlorine gas to separate titanium from the ore in which it is found and then oxidizing that titanium to produce TiO2. The process is complex, and DuPont has spent many years and hundreds of millions of dollars refining and improving that process.

When I started working for DuPont in 1977, I signed an employment agreement in which I promised to protect DuPont trade secrets. The agreement states that, without permission from DuPont, "Employee shall not disclose or use at any time either during or subsequent to said employment, any secret or confidential information of Employer of which Employee becomes informed during said employment, whether or not developed by Employee, except as required in Employee's duties to Employer." The agreement further states that upon leaving DuPont, "Employee shall promptly deliver to Employer all drawings, blueprints, manuals, letters, notes, notebooks, reports, and all other materials of a secret or confidential nature relating to Employer's business and which are in the possession or under the control of Employee." When I retired from DuPont in 1997, I represented to DuPont in writing that I had returned all such information to the Company. In truth, I had not returned all secret and confidential information in my possession.

In or about 1997, I met Walter Liew and he stated that he was working on a TiO2 project in the People's Republic of China (PRC). I advised him that I had worked in TiO2 at DuPont. In or about 1998, at Walter Liew's request, I attended a meeting in Oakland, California, with one of his clients from the PRC who was developing a chloride route TiO2 project. During that meeting, and in the presence of the Chinese client and Christina Liew, I provided Walter Liew with a blueprint, DuPont Drawing No. W1245258, titled "Edge Moor Plant Oxidation W/RPS System Drawing." Christina Liew later paid me with cash for that blueprint, which I knew contained proprietary DuPont information that was not publicly available.

Over the years, Walter Liew informed me about his efforts to develop chloride route TiO2 technology in the PRC and he regularly asked me questions about my TiO2 experience at DuPont. Liew also asked me to provide him with the names of former Dupont employees who had TiO2 experience relevant to his projects in the PRC. In one of those conversations, I explained to Walter Liew that stolen plans were not enough to make a successful project and he would need people with experience in plant operations.

In 2010, Walter Liew asked me to attend a meeting with his clients from Pangang Group regarding a 100,000 metric ton per year project in the PRC. At Liew's request, I attended a meeting in July 2010 at the Hilton Hotel in San Francisco with representatives from the Pangang Group to review drawings and plans prepared by Liew's company, USA Performance Technology, Inc. (USAPTI). Another former DuPont employee, Robert Maegerle attended the meeting on behalf of USAPTI. Christina Liew paid me $5,000 in cash for my participation in that meeting.

On two separate occasions in late 2010, I contacted Walter Liew after I found several boxes of DuPont materials at my residence, and Walter Liew came to my house, reviewed the materials, took the information of interest and paid me – $10,000 in cash on the first trip and $5,000 in cash on the second trip. One of the documents Liew took was DuPont Accession Report No. 18135, which contained a proprietary equation known as the "Diemer correlation," and related Fortran computer code. I knew that report contained proprietary DuPont information that was not publicly available. I also knew that Walter Liew intended to use all of the proprietary Dupont information that I provided

to him to further his projects in the PRC.

Neither Mr. Houston nor defense counsel address the existence of this agreement or the factual basis for it that is contained in the FBI 302.  Instead, Mr. Houston claims, without any factual support, that "Mr. Spitler committed suicide . . . shortly before he was to give testimony before the grand jury." Yet, the government never asked Spitler to testify before the grand jury and had no intention of doing so. Axelrod Decl., ¶ 7.  Rather, Mr. Houston and the government had planned for Spitler's guilty plea, which they worked to schedule for the very week of Spitler's suicide.  Axelrod Decl., ¶¶5-6, Ex. A.  The fact that Spitler killed himself the very day he was due to execute the plea agreement that his lawyer had negotiated and agreed to speaks volumes about the far-reaching impact of Walter Liew's criminal conduct.

Mr. Houston is also wrong in claiming that Spitler advised the FBI that he received all of the documents from DuPont that he subsequently gave to Walter Liew from DuPont upon his retirement from its Altamira, Mexico facility and that Spitler "went directly from Mexico to Reno (where he planned to retire)."  Houston Decl., Dkt. 854-2.  Spitler worked at DuPont from 1977 to 1997, and he worked at DuPont's Altamira facility between 1986 and 1988.  *See* Declaration of Brian McLaughlin ¶¶2-4; Trial Exhibit 774 (admitted).  After he left Altamira, Spitler worked at a number of different DuPont facilities in the United States over the next nine years, including New Jersey (1988 - 1992), Delaware (1992 - 1996), and New Jersey again (1996-end).  In other words, far from retiring from DuPont in Mexico and moving to Reno, as claimed by Mr. Houston, Spitler worked for another nine years for DuPont at several different domestic locations before his retirement.

Given the inherent unreliability of Mr. Houston's declaration, the Court should reject it. Moreover, far from supporting Liew's request for a lesser sentence, the evidence of Spitler's involvement only highlights the efforts Liew undertook to bring others into his criminal activities and the lengths to which he remains willing to go to avoid responsibility for it.

Finally, we note that it is despicable that Liew continues to try to take advantage of Spitler, even in death.  There is no doubt that Spitler was a vulnerable soul Liew used in life.  That Liew remains willing to play fast and loose with the truth about Spitler provides significant insight into Liew's poor character.

## 2.    The Qiao Ning Evidence

Liew also tries to sell the story that there are "mitigating circumstances surrounding Mr. Liew's financial offenses" involving Christina Liew's brother Qiao Ning.  Def. Sent. Mem. at 31-32.  This effort is an obvious effort to deceive the Court and should result in a higher sentence.

Liew claims that during "periods of financial instability" in the late 1990s and early 2000s, Christina Liew's family provided significant financial assistance to him.  This ultimately resulted in what he claims is a 2004 contract under which he was required to repay his debts to them and give them 60% of whatever he earned in the future.

There are so many obvious problems with this fantasy that it is difficult to know where to start, but fortunately the always dishonest Walter Liew provides a good launching point.  During the bail proceedings in this case, Liew averred under penalty of perjury as follows:

> 37.  I have in-laws living in China.  I have not had regular contact with them.  I have no other familial contact to China. . . .  (A) I understand that my mother-in-law, Shu Hua Zuo, prior to her recent passing, was a retired physician in private practice at her own clinic in Yongning, a small town in Liaoning Province.  (B) I understand that my father-in-law is also a retired physician. . . .  (C)  I understand that my brothers-in-law are a retired food storage manager, a medical doctor, and an artist who now owns a small gallery in Liaoning Province. . . ."

Dkt. 48-7 at 8.

*Now*, years later, he says that these people who he has some "understanding[s]" about gave him millions of dollars and had a joint venture with him.  Which is it?  Random relatives that he knows little about or business partners for over 10 years?  Liew does not now tell the Court that he attempted to mislead Magistrate Judge Cousins, but he cannot have been telling the truth then and telling the truth now.  Whatever the murky truth, it is clear that Liew is perfectly comfortable lying to the Court and his sentence should reflect that.

Liew told the Probation Officer that from 1996 to 2006 Christina Liew's family in China loaned him "approximately $200,000 per year for living and business expenses . . . for a total of $2 million." PSR ¶ 102.  When the family became frustrated with him after eight years, they "insisted" that he sign an agreement with them under which he would pay them back *and* give them 60% of the proceeds from any successful business.  Def. Sent. Mem. at 31:15-20.  Liew has produced a document dated August 2004 that he claims is this agreement.

Liew has also submitted a declaration from Qiao Ning, executed in China, in which Qiao provides support for Liew's story. He says that a "investor group" "comprised mainly of family members" funded Liew's business ventures and supported his family beginning in 1997. Qiao says that this funding involved "several projects" prior to 2004 when the group entered into a contract with Liew under which Liew would repay them the "great sum of money" they had given him and receive a 60% split of future profits. When the money started rolling in in 2006, Liew sent funds to the investor group "through various companies in Singapore."

The yarn spun by Qiao Ning is not supported by a single detail or scrap of paper, other than a single 2004 document that does not refer to any particular project and appears to bear no relationship whatsoever to the Pangang deals. There is nothing approaching an accounting for the money. None of the investors are identified other than Qiao.

Qiao does not offer any explanation as to where he and his investor group came up with $2 million over ten years to send to their hapless brother-in-law in America who had continually come up dry in his quest for entrepreneurial riches. Given the other evidence in this case, this lack of explanation should give the Court great pause. Is Qiao Ning the food storage manager, the doctor, or the artist? Even if he is the doctor, Chinese doctors generally do not make enough money to send $200,000 a year for ten years to family in the United States to squander on a meandering business. See *China's Doctors Not Part Of Society's Elite*, http://www.ft.com/intl/cms/s/0/35a081ae-2653-11e3-8ef6-00144feab7de.html#axzz35oFYd9pN (October 6, 2013) ("low salaries are one reason medicine does not attract China's best students"); *China Doctors Earning $300 a Month Flock to Drug Companies*, http://www.bloomberg.com/news/2011-07-10/china-doctors-earning-300-a-month-flock-to-drug-companies-tripling-wages.html (July 10, 2011).

Where did all of this money come from? With no documented explanation from Qiao, it is fair to suspect that if any money did flow through him to Liew it came from the Chinese government. Liew maintained contacts with government officials through the 1990s and 2000s. It makes no sense that Qiao, even if he had the money, would squander it in this way, but it is completely reasonable to believe that Liew's Chinese government contacts funded his activities.

1    Of course, this assumes that money actually went to Liew.  There is not a single scrap of
2    corroborating documentation for this alleged $2 million investment in Liew and his business.   The idea
3    that this sort of money would change hands without a *single record of any kind* is preposterous.

4    And where did all the money go?  Qiao says that it was paid to the investor group through
5    Singapore companies.  But why and where are the records of all these payments?  If this all operated at
6    the height of legitimacy, as Liew piously claims, why run the money through Singapore shell
7    companies?  Why not pay it directly?  Joseph Chan of the Mega International Bank testified that he was
8    not aware of any limitations on sending money into China (despite defense counsel's claim in opening
9    statements that this was what motivated Liew).

10   Even in the unlikely event that everything Qiao Ning says is true, who cares?  In fact, one could
11   easily argue that it makes Liew's conduct even worse and more culpable.  According to Qiao, he loaned
12   Walter Liew money and agreed to invest in future business.  There is no mention of USAPTI or
13   Performance Group, and no evidence that they were parties to the claimed contract.  Neither USAPTI
14   nor Performance Group revealed joint ventures to the IRS, as they would have been required to do.  If
15   Walter Liew owed a personal debt to Qiao Ning, he could not pay it out of his companies' pre-tax
16   income and not report it to the IRS.

17   All of this Qiao Ning business should form the basis for a higher, not a lower, sentence.  Liew
18   clumsily is attempting to play the Court – again.  The Qiao Ning-Joint Venture story is just as
19   implausible as everything else that comes out of Walter Liew's mouth.  Qiao's detail-free,
20   uncorroborated declaration should be considered only for what it says about Liew's character:  He is
21   willing to say whatever he thinks will help him at the moment, without regard for the truth.

22   **B.  The Loss Calculation**

23   Liew's argument on loss suffers the defect that runs through his entire position on sentencing:
24   He asks the Court to reconsider the jury's verdict and reinvent the evidence that was admitted at trial.

25   Liew's basic premise is that DuPont was not harmed by his conduct.  However, that Liew
26   intended to harm DuPont and intended to benefit a third party was found beyond a reasonable doubt by
27   the jury.  Liew was found guilty of conspiracy to commit trade secret theft (count two), attempted trade
28   secret theft (count five), possession of stolen trade secrets (counts six, seven, and nine), and copying

1   stolen trade secrets (count eight).  In finding Liew guilty of counts two and five, the jury necessarily

2   found that he conspired and attempted to harm DuPont and to benefit a third party.  Dkt. 786 at 28 & 33

3   and RT 4322:11-17 & 4326:11-14 (jury instructions).  In finding Liew guilty of counts six through nine,

4   the jury necessarily found that Liew intended to convert the trade secrets to the economic benefit of

5   someone other than the owner, and that he intended to harm the owner.  Dkt. 786 at 34-35.

6          Thus, the finding that Liew intended to economically benefit a third party and intended to

7   economically harm DuPont has been resolved.  Defendant's desperate attempts to rewrite history at

8   sentencing must be ignored.

9          The question, then, is what was the economic harm or *intended* economic harm and how can it

10  be valued.  The italicized word – *intended* – is important.  Under the Guidelines the Court is to set the

11  loss amount either by actual or intended loss, whichever is higher.  Under the Guidelines as a "general

12  rule," "loss is the greater of actual loss or intended loss."  USSG § 2B1.1, cmt. 3(A).  "'Intended loss' (I)

13  means the pecuniary harm that was intended to result from the offense; and (II) includes intended

14  pecuniary harm that would have been impossible or unlikely to occur . . . ."  *Id.*, cmt. 3(A)(ii).  This is

15  appropriate for the obvious reason:  In assessing culpability, the question is as much the harm the

16  defendant intended to harm as the harm itself.

17         The Sentencing Guidelines offer two approaches in trade secret cases:  (1) the cost of developing

18  the misappropriated information or (2) the reduction in the value of the information that resulted from

19  the offense.  USSG § 2B1.1, cmt. (C)(ii).  Either approach is almost impossible to calculate precisely in

20  this case, but both would result in stratospheric numbers.

21         Amazingly, defendant Liew proposes that the Court ignore both of these measures and, instead,

22  substitute his claim that there was no loss for the jury's beyond a reasonable doubt verdict that DuPont

23  was harmed for the benefit of a third party.  Def. Sent. Mem. at 11-14.  Defendant's argument at

24  sentencing is the same argument that he lost, decisively, at trial and should consequently be rejected by

25  the Court at sentencing.

26         Defendant does not even attempt to analyze either of the approaches suggested by the

27  Guidelines.  Instead, he suggests without any authority that the Court base loss on "the cost of

28  assembling the 'compilations,' the market value paid for the intellectual property, or the amounts

1    allocated under the contract."  Def. Sent. Mem. at 14:16-17.  The first suggestion is absurd because it is

2    entirely disconnected from the actual value of the trade secrets.  The value of the misappropriated trade

3    secrets did not come from the administrative time spent typing them into documents that were stolen – it

4    comes from the fact that the *information contained in those documents* had value because it was not

5    available to the public, as the jury found.  In advocating the "costs of assembling" approach, the essence

6    of Paul Cooper – that of an outrageously over-compensated hired mouthpiece – wafts through these

7    proceedings once again.

8            Liew's second and third approaches, in theory, are close to being in line with the gain approach

9    advocated by the Probation Officer and the government, though his analysis of the "market" is wrong.

10    Liew contends that the "market value" of the trade secrets is what he paid Spitler and Maegerle, or what

11    he received under the Pangang contracts (which he does not actually discuss in his memorandum).  The

12    market for the information Liew was selling was competitors of DuPont that were looking – as Pangang

13    was – for information about DuPont's process.  Liew was paid a total of $28 million, of which he used

14    about $6 million to pay business expenses.  The rest was his profit, which is what best represents the

15    market value of the intellectual property.

16            The Court should first look at cost of developing the information, the first metric proposed by the

17    Sentencing Guidelines.  DuPont has provided information, uncontroverted by the defense, that the costs

18    of developing this information would run into the hundreds of millions of dollars.  The defense calls this

19    speculative, but that ultimately is why the government proposes using a harder – and much smaller –

20    number.  But the evidence at trial proved that DuPont invested consistently and heavily into TiO2

21    manufacturing technology over many years.  Whatever the number is, it is far in excess of Walter

22    Liew's $28 million gain.

23            The other metric proposed by the Sentencing Guidelines is the reduction in the value of the

24    information that resulted from the offense.  In this case, we have very concrete information about what

25    Liew *intended*.  Liew knew that DuPont and other western TiO2 manufacturers had refused to share

26    their technology with Chinese companies "for the obvious reasons," Ex. 374-0001, *i.e.,* because the

27    technology would be stolen and the value destroyed.  Liew went on to explain precisely what he

28    believed to be the "value" of the information he had procured and was attempting to sell.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17   Ex. 374-0015.

18        It is clear from Liew's own words in the powerpoint slide he created the harm he intended to do

19   to DuPont and the benefit he intended to confer to the Pangang Group.  Liew understood that "1 million

20   tons/year" created "Revenue: >2 Billions/year" for DuPont.  Thus, in designing a 100,000 tonne factory

21   for Pangang Group using DuPont technology, Liew intended to help Pangang create $200 million in

22   *annual* revenue, at DuPont's expense, given that DuPont's "Technology [is] not for sale!"  *Id.*

23        Though he now tries to claim the technology he stole was without value, it is clear from the

24   Liew's title for the slide that he understood this to estimate the "Value of TiO2 Technology."  The

25   government does not contend that these numbers are precise, but they conclusively reveal Liew's intent

26   and support DuPont's assertion that the value of this technology runs quickly into the hundreds of

27   millions of dollars.

28

1    As the Probation Office concludes, however, there is a precise way to arrive at a number that
2    accurately measures Liew's true culpability and requires no estimation or guesswork whatsoever.  This
3    metric is the money Liew received from his Pangang Group customers – customers he had only because
4    he possessed DuPont trade secrets.  From 2006 to 2011, Liew received a total of $27.8 million from the
5    Pangang Group.  Ex. 919-0008.  Of this amount, he used about $6 million to pay business expenses in
6    the United States (deducting and thus avoiding income taxes on this money) and sent the rest, $22.5
7    million, to his Singapore shell companies.  Ex. 922-0008.  This $22.5 million was Liew's profit and
8    represents the market value of the intellectual property in that it is what was left after Liew subtracted
9    the expenses for the work that was done by his employees and "contractors" in the United States.
10   Whether the Court uses the gross amount ($27.8 million) or the net profit ($22.5 million), the 22-level
11   enhancement under USSG § 2B1.1(b)(1)(L) is the same, which provides further support for the
12   appropriateness of the enhancement.

13   These numbers are not speculative and they were proven at trial beyond any reasonable doubt.  It
14   does not matter whether the proper standard is preponderance or clear and convincing, Def. Sent. Mem.
15   at 9-10, because the amount of Liew's gain, as calculated by Revenue Agent Jiang, is not disputed and
16   satisfies either standard by a wide margin.

17   A final reason for relying on Liew's profit to set the sentence:  It is eminently fair to Liew and
18   thus comfortably consistent with the mandate of 18 U.S.C. § 3553 to impose sentences that are
19   fundamentally just.  Liew set out to make millions of dollars and did so.  He should be required to live
20   with the consequences of his intentions.

21   Liew's request for an evidentiary hearing should be denied because there is no factual dispute
22   that has not been already resolved against Liew by the jury.  Liew's desire for an evidentiary hearing for
23   the purpose of presenting evidence that contradicts the verdict is improper.  An evidentiary hearing to
24   offer evidence supporting Paul Cooper's "assembling" theory is likewise improper.   An evidentiary
25   hearing in which Liew hopes to adduce facts that he did not believe the value of the information he was
26   selling to be hundreds of millions of dollars is unnecessary because there is evidence, shown above, that
27   shows precisely what Liew believed at the time.
28

### C.  Organizer/Leader and Sophisticated Means

The PSR properly applied a 4-level enhancement for Liew's role as an organizer or leader of this criminal activity pursuant to U.S.S.G. § 3B1.1(a).  The evidence demonstrated that Liew "was responsible for organizing others for the purpose of carrying out the crime."  *United States v. Avila*, 95 F.3d 887, 889 (9th Cir. 1996).

- Liew sought out former DuPont engineers and paid them to provide DuPont trade secrets, including Robert Maegerle and Tim Spitler.

- Together with his wife, Liew owned and controlled businesses – first Performance Group and then USAPTI – that he used in furtherance of his criminal objective of transmitting that stolen DuPont technology to the Chinese.  In the course of that work, he provided those trade secrets to his employees, including Jian Liu, Thongchai Thongthawee, Allen Chang, and others, so that they could assist him in performing the work.

- While over a dozen employees of USAPTI and Performance Group worked on these projects under the direction of Walter Liew, many of them were unwitting players in Liew's criminal scheme.

- Liew executed all of the contracts with the Chinese customers and received and controlled $27,829,893 in payments on those projects.

In their sentencing memo, the defendants claim that merely managing a business does not qualify Liew as an organizer, but that argument overlooks the evidence of the purpose of Liew's business, *e.g.*, to transfer DuPont's technology to his Chinese customers.  *See* Ex. 350T-0003, 720T-0002, 719T-0002 (showing blueprint of DuPont oxidation reactor to Pangang).  Liew also claims that Pangang and not he should be considered the leader.  Yet, the Guidelines expressly provide, "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy," thus this argument is without merit.  U.S.S.G. §3B1.1, App. N. 4.  Finally, the factors identified in Application Note 4, which were cited by the defense, support the PSR's determination that Liew was an organizer/leader.  After all, the evidence demonstrated that Liew  decided who to hire, he recruited former DuPonters, and he received $27,829,893 for these projects, and directed the transfer of

1   $22,573,137 to companies in Singapore that he, his wife, or their family members controlled.  Ex. 922-

2   0008.

3          The defense also objects to the two-level enhancement for use of sophisticated means.  PSR at

4   ¶54.  The Court should reject this claim as the application note explicitly provides that "[c]onduct such

5   as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or

6   offshore financial accounts ordinarily indicates sophisticated means."  U.S.S.G. §2T1.1, App. N.5.  The

7   evidence showed that is precisely what Liew did here – he used shell companies in Singapore to secret

8   his profits, which he hid from his return preparer (Phillip Guan) and the IRS.  In fact, defense counsel

9   acknowledged that the Singaporean companies were shells.  Tr. 90:21 – 91:4 ("You can call them a shell

10  company if you will").  The Court should reject this argument and apply the enhancement.

11         **D.  Comparison With Other Cases**

12         Liew and USAPTI make much of the sentences imposed in prior cases involving theft of trade

13  secrets and economic espionage, arguing that virtually all such sentences have been under 10 years.

14  They also provide a chart, attached as Appendix 1 to their sentencing memorandum, listing multiple

15  cases with sentences between 97 months' imprisonment and home detention.  Defendants also attempt to

16  distinguish *United States v. Chung*, 659 F.3d 815 (9th Cir. 2011), in which the defendant was sentenced

17  to 188 months' imprisonment after being convicted of, *inter alia*, economic espionage, in a bench trial.

18  Of course, what defendants' sentencing memorandum fails to reference is the truly unique array of

19  criminal activity engaged in by Walter Liew.  A jury convicted Liew of not just economic espionage and

20  theft of trade secrets but also tax fraud, bankruptcy fraud, obstruction of justice, and false statements.

21  As noted in the Government's sentencing memorandum, the "breadth, duration, and significance of

22  [Liew's] crimes, together with his refusal to accept any responsibility for his actions" justify the United

23  States' requested sentence.  Dkt. 857 at 1.  Liew's conduct constitutes an astounding range of criminal

24  behavior that merits the Guidelines sentence sought by the United States.

25         Focusing first on Appendix 1, the chart attached to defendants' sentencing memorandum, it is

26  clear that none of the cases involved criminal conduct comparable to that of Walter Liew.  Of the eight

27  cases listed that resulted in sentences of 60 months or more, only one involved charges of economic

28  espionage under 18 U.S.C. § 1831.  The significance of a conviction under section 1831 should not be

1   underestimated in assessing comparable sentences, as the difference between § 1832 and § 1831 goes

2   beyond the two-level enhancement under the United States Sentencing Guidelines ("U.S.S.G.") for

3   misappropriation of a trade secret to benefit a foreign instrumentality.[1]  Indeed, the legislative history of

4   the Economic Espionage Act specifically noted the distinction between domestic trade secret theft and

5   theft of trade secrets on behalf of a foreign government.  *See* 142 Cong. Rec. S10885 (daily ed. Sept. 18,

6   1996) (statement of Sen. Kohl) ("The principle purpose of this second (foreign government) provision is

7   not to punish conventional commercial theft and misappropriation of trade secrets (which is covered by

8   the first provision).").  The statement by President Clinton in signing the Economic Espionage Act calls

9   attention to the risk to national security posed by the theft of American intellectual property, a risk that

10  is more serious when the theft is undertaken for the benefit of a foreign government, foreign agent, or, as

11  in this case, a foreign instrumentality.  *See* Presidential Statement on Signing the Economic Espionage

12  Act of 1996, 2 Pub. Papers 1814-15, 1996 WL 584924 (Oct. 11, 1996) ("Trade secrets are an integral

13  part of virtually every sector of our economy and are essential to maintaining the health and

14  competitiveness of critical industries operating in the United States. Economic espionage and trade

15  secret theft threaten our Nation's national security and economic well-being.").

16          The only 1831 case cited in defendants' appendix that went to trial was *Jin* in the Northern

17  District of Illinois.  And while defendants note the sentence of 48 months in that case, they fail to

18  explain that Jin was acquitted of the 1831 charges and only sentenced on the 1832 counts.  The *Jin* case

19  was also a bench trial, and the court's findings of fact focused on the dated nature of the technology at

20  issue, a conclusion that clearly affected the ultimate sentence.  Another § 1831 case in defendants'

21  appendix was the *Huang* case in the Southern District of Indiana.  *Huang* was resolved by plea, and the

22  agreement included a stipulated loss range resulting in a 20-level increase.  Huang's guideline

23  calculation was 30 with a three-level reduction to 27 and a range of 70-87 months.  The sentence of 87

24  months' imprisonment was thus at the top end of the Guidelines range.

25

26  ───────────────
    [1] The current version of the Sentencing Guidelines provides for a four-level increase for an
27  offense benefitting a foreign government, foreign instrumentality, or foreign agent.  U.S.S.G. §
    2B1.1(b)(13)(B).  As noted in the United States objections to the PSR, only the two-level increase
28  applies to defendant Liew, since the 2010 edition of the Guidelines is to be used.  *See* U.S.S.G. §
    2B1.1(b)(5).

Here, Walter Liew went to trial and, unlike Huang, should not receive the benefit of any loss calculation negotiated with the government.  Nor has there been any acceptance of responsibility – in fact quite the opposite, as evidenced by Liew's sentencing submissions  Despite defendants claims to the contrary, the fact that the loss calculation drives the sentence has not prevented courts from relying upon the guidelines in sentencing defendants convicted under the Economic Espionage Act.  The sentence in *Huang* is a clear demonstration of this principle.  *See also United States v. Aleynikov* (S.D.N.Y.) (97-month sentence after trial conviction; government contended guidelines range was 97 to 121 months' imprisonment); *United States v. Yu* (E.D. Mich.) (70-month sentence in case resolved by plea agreement stipulating to guidelines range of 63 to 78 months' imprisonment).

The sentences in other cases, whether convictions under 1831 or 1832, also demonstrate the distinction between guilty pleas and convictions at trial.  For instance, defendants cite the 24-month sentence in *United States v. Meng*, an 1831 case in the Northern District of California resolved by plea in 2008.  This conclusory entry in defendants' chart fails to capture the surrounding facts.  First, the plea agreement in that case stipulated a loss of between $400,000 and $1,000,000, an amount negotiated between the parties and not the situation in which Walter Liew finds himself.  Defendants also fail to note that Meng's 24-month sentence included substantial assistance to the government under U.S.S.G. § 5K1.1.  Similarly, the individual circumstances surrounding other guilty pleas affected the sentences imposed by the courts.  The defendants rely upon generic descriptions of cases followed by a simple recitation of the sentences imposed.  Thus, the 12-month sentence listed for the plea to 18 U.S.C. § 1831 in *United States v. Ye and Zhong* fails to mention defendants' substantial assistance under U.S.S.G. § 5K1.1.

Just as defendants summary of cases in Appendix 1 of their sentencing memorandum fails to explain the nuances underlying the specific sentences, their attempt, in the body of the memorandum, to distinguish Liew's conduct from that of Greg Chung offers a misleading characterization of the facts.  While, as defendants note, Chung was convicted of acting as an unregistered agent of China, he was not charged with transmitting classified information.  Thus, defendants' characterization of Chung as a spy based upon the conviction at trial is less than precise.  One key difference between Chung and Liew is the financial benefit to Liew stemming from his criminal conduct.  The large sum of money received by

Liew ($28 million paid by the Pangang companies) is unique in the cases prosecuted under the Economic Espionage Act, and the fraudulent conduct engaged in by Liew after receipt of these funds only underscores the significance of his criminal activity.  Moreover, the defendants focus on Chung's "spying" rings hollow after a careful look at Liew's own behavior.  As established at trial, Liew had significant contact with Chinese government officials and understood that his activities were benefiting both a Chinese state-owned enterprise and the Chinese government itself.  The technology he sought to acquire, titanium dioxide, was named in a targeting list provided by the Chinese government.  Liew was fully aware of the benefit he was providing both to Pangang and to China as a whole.

In addition, Liew's obstructive behavior also distinguishes him from Chung (and indeed from most other cases cited by defendants in their sentencing memorandum and appendix).  Liew was convicted of witness tampering concerning Jian Liu and also of obstruction of justice in relation to questioning by the FBI concerning the safety deposit box in which significant evidence in the case was located.  Liew's deception seemed to know no bounds, and, in addition to the tax fraud (concealing nearly $18 million in gross receipts), his bankruptcy fraud deprived employees of their paychecks while Liew was receiving millions of dollars in payments from the Chinese companies.  All of this fraudulent and obstructive behavior distinguishes Walter Liew's conduct from that of *Chung* and all of the other cases enumerated in defendants' sentencing memorandum.

In the end, Walter Liew's conduct cannot be boiled down to a simplistic and, as noted above, misleading, summary of sentences in various trade secret cases.  Liew's criminal actions must be recognized for their unique breadth and duration.  He received enormous financial benefits from his theft of DuPont trade secrets, and his fraudulent behavior continued as he failed to disclose these receipts to both the IRS and the bankruptcy court and trustee and moved the vast majority of the funds to front companies and bank accounts he and his family members controlled in Singapore and China.  Liew's obstructive behavior, including witness tampering and false statements, demonstrated his continued dishonesty.  For all of these reasons, Liew's criminal conduct merits a Guidelines sentence.

**E.  In Pleading For A Below-Guidelines Sentence, Liew Ignores Key Considerations Under 18 U.S.C. §  3553(a).**

Liew claims that the factors the Court is to consider under 18 U.S.C. §  3553(a) should result in leniency.  Beyond trying to rewrite the evidence, Liew provides little meaningful evaluation of the 3553(a) factors which, if properly evaluated, do not justify a sentence below the Guideline range.

First, as to his history and characteristics, Liew focuses on his "humble upbringing" on a farm in Malaysia and efforts to obtain an education and start a business.  They ignore the fact that he is fundamentally dishonest.   His lies range from telling business contacts he has a PhD from Stanford to perjuring himself in a declaration filed in United States District Court.  His dishonesty includes cheating creditors, evading $7 million in tax liability, and selling stolen trade secrets to Chinese state-owned companies.  He's not some kind of "good guy" who made some "bad judgments."  He's a one man crime spree.  His most distasteful conduct – even more than slying blaming his wife for their crooked banking practices – might be using his son like he uses everyone else.  When Liew wanted to try to guilt Tim Spitler into not cooperating against him, he had his son write Spitler a letter.  Axelrod Decl., Ex. B.  Now, instead of showing even the slightest modicum of humility at the jury's verdict, he invokes his son to try to avoid a Guideline sentence.

Second, the Court is directed by the statute to impose a sentence that reflects the seriousness of the offenses, to promote respect for the law, and to provide just punishment for the offenses. See 18 U.S.C. § 3553(a)(2)(A). Economic espionage and trade secret theft are serious offenses.  Congress enacted the Economic Espionage Act of 1996 (EEA), 18 U.S.C. § 1831 *et seq.*, out of a recognition that the protection of our nation's intellectual property and economic interests is directly related to the interests of national security.  As the House Report explained:

> There can be no question that the development of proprietary economic information [trade secrets] is an integral part of America's well-being. Moreover, the nation's economic interests are a part of its national security interests. Thus, threats to the nation's economic interests are threats to the nation's vital security interests.

H. Rep. No. 788, 104th Cong., 2d Sess. 4 (1996). See United States v. Hsu, 155 F.3d 189, 194-95 (3d Cir. 1998).

1   Additionally, in enacting the EEA, Congress underscored the seriousness of the misappropriation

2   of trade secrets from American companies and the impact of such conduct on the American economy.

3   The Senate Report noted:

4      In a world where a nation's power is now determined as much by economic strength as by
       armed might, we cannot afford to neglect to protect our intellectual property. Today, a
5      piece of information can be as valuable as a factory is to a business. The theft of that
       information can do more harm than if an arsonist torched that factory. . . . The value of
6      the information is almost entirely dependent on its being a closely held secret. It includes,
       but is not limited to, information such as production processes, bid estimates, production
7      schedules, computer software, technology schematics, and trade secrets. It is, in short, the
       very information that drives the American economy.   For many companies this
8      information is the keystone to their economic competitiveness. They spend many millions
       of dollars developing the information, take great pains and invest enormous resources to
9      keep it secret, and expect to reap rewards from their investment.

10  S. Rep. No. 359, 104th Cong. 2nd Sess. (1996).

11     In both the criminal and civil context, courts have expressly recognized the seriousness of the

12  theft of trade secrets:

13     This is an important case because trade secret protection is an important part of
       intellectual property, a form of property that is of growing importance to the
14     competitiveness of American industry. . . . The  future of the nation depends in no small
       part on the efficiency of industry, and the efficiency of industry depends in no small part
15     on the protection of intellectual property.

16
    *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 180 (7th Cir. 1991). *See also United*
17
    *States v. Williams*, 526 F.3d 1312, 1323 (11th Cir. 2008) (noting the district court properly considered
18
    the danger to the United States economy posed by the theft of trade secrets in considering the § 3553
19
    factors); *United States v. Hsu*, 155 F.3d 189, 194 (3d Cir. 1998) ("[S]tudies revealed that nearly $24
20
    billion of corporate intellectual property was being stolen each year.") (*citing* Richard J. Heffernan &
21
    Dan T. Swartwood, Trends in Intellectual Property Loss 4, 15 (1996)).
22
       The trade secret offenses for which the defendant was convicted are very serious. Defendant's
23
    conduct in this case represents a concrete threat to our nation's economic interests. The defendant led
24
    others in a scheme to steal information about a valuable DuPont manufacturing process worth hundreds
25
    of millions of dollars. He did so deliberately with the purpose of using the stolen information to develop
26
    manufacturing processes to sell to DuPont's competitors and the further purpose of enriching himself by
27
    millions of dollars, and with the knowledge that his conduct would harm DuPont financially. The
28

technology that the defendant stole also represented the distillation of years of painstaking work by teams of DuPont engineers, scientists, and operators. It could not be replicated from scratch without an enormous investment of time and money, nor without substantial risk that the project would fail. Not only did the defendant conspire to steal these valuable trade secrets, but also he tried to minimize his conduct when he was arrested.

Third, the Court is to impose a sentence that will deter similar criminal conduct and to protect the public from further crimes of the defendant. See 18 U.S.C. § 3553(a)(2)(B)-(C).  A Guideline prison sentence will satisfy the importance sentencing goal of deterrence, both specific and general, and promote respect for the law. It will serve notice that stealing valuable trade secrets is a serious offense, deserving of significant punishment. As the defendant stands convicted of serious and extensive criminal acts, he is without remorse and has yet to accept responsibility for his actions. A significant prison sentence will communicate to the defendant that his conduct was not only criminal, it was egregious.

A lengthy term of imprisonment would also send an important message to others. The need for general deterrence is significant in this type of case. First, as noted above, this is a significant crime that if not deterred could have serious consequences on the economy and employment. Trade secrets of United States companies must be protected in order to preserve their competitiveness and viability. Second, it is a matter at this point of common knowledge that the United States is a target of Chinese commercial espionage.  It is important to give others similarly situated as the defendant was, with access to trade secrets, significant pause before taking action to undermine the competitiveness of American companies.

1

**F.  Conclusion**

2      In the face of twenty counts of conviction, defendants insistently maintain their innocence and

3   arrogantly assert they did nothing wrong.  They have done nothing to warrant a sentence below the

4   Sentencing Guideline range of 210-262 months and the Court should impose such a sentence.

5

6                                          Respectfully submitted,

7                                          MELINDA HAAG
                                           United States Attorney
8
                                           *John H. Hemann*
9   Dated: June 26, 2014              _____

10                                         JOHN H. HEMANN
                                           PETER B. AXELROD
11                                         Assistant United States Attorneys

12                                         RICHARD S. SCOTT
                                           Trial Attorney
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28