Pages 1 - 64

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jeffrey S. White, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. CR 11-00573-JSW** |
| | ) | |
| Pangang Group Company, Ltd., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Oakland, California
Tuesday, August 13, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

> **DAVID L. ANDERSON**
> United States Attorney
> 450 Golden Gate Avenue
> San Francisco, California  94102
> **BY:  JOHN HEMANN**
> **COLIN SAMPSON**
> **ASSISTANT UNITED STATES ATTORNEYS**
>
> UNITED STATES DEPARTMENT OF JUSTICE
> 950 Pennsylvania Avenue, NW
> Washington, DC  20530
> **BY:  JENNIFER GELLIE**
> **ASSISTANT UNITED STATES ATTORNEY**

For Defendants:

> QUINN EMANUEL URQUHART & SULLIVAN, LLP
> 50 California Street -- 22nd Floor
> San Francisco, CA  94111
> **BY:  JOHN M. POTTER, ESQUIRE**

Reported By:  Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
Official Reporter

```
APPEARANCES CONTINUED:

For Defendants:
                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                        555 Twin Dolphin Drive - 5th Floor
                        Redwood Shores, CA  94065
                  BY:   ROBERT P. FELDMAN, ESQUIRE

                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                        1300 I Street NW - Suite 900
                        Washington, DC  20005
                  BY:   ALEC ASHER LEVY, ESQUIRE
```

1   <u>**Tuesday - August 13, 2019**</u>                              <u>**1:32 p.m.**</u>

2                        **P R O C E E D I N G S**

3                              ---oOo---

4           **THE CLERK:**  Calling case number CR 11-573, Pangan

5   Group, Ltd.; United States vs. Pangan Group Steel Vanadium &

6   Titanium Company, Ltd.; United States vs. Pangang Group

7   Titanium Industry Company, Ltd; and United States vs. Pangang

8   Group International Economic & Trading Company.

9       Counsel, come to the podium and state your appearances.

10          **MR. HEMANN:**  Good afternoon, Your Honor.  John Hemann,

11  Jennifer Gellie, and Colin Sampson on behalf of the

12  United States.

13          **MR. POTTER:**  Good afternoon, Your Honor.  John Potter,

14  Mr. Feldman, and Mr. Levy on behalf of the Defendants.

15          **THE COURT:**  Good afternoon, everybody.

16      All right.  So we have a number of matters -- we have a

17  few matters on calendar in this case today.  I'm going to start

18  with the motion to dismiss the Indictment filed by the

19  Defendants.

20      I have received and reviewed the respective additional

21  authorities submitted by the parties in response to the Court's

22  questions, and if you wish -- it's clear to me -- it's pretty

23  clear to me why you're citing those authorities, with one

24  exception, which I'll get into a little later.

25      But if you wish, in the course of responding to the

1    Court's questions, to incorporate briefly the additional

2    authorities and why you rely on them to answer those specific

3    questions, please feel free to do so.

4        I just wanted to say, just in light of previous arguments

5    before the Court -- just remind counsel that this is a

6    law-and-motion proceeding and not a jury trial, and so please

7    refrain from jury arguments or, as I call them, 4th of July

8    speeches.  I don't need any of those at this point.  I just

9    want to hear your legal arguments in response to the questions.

10        All right.  So let's start immediately with Question No.

11    1, which starts out with a "yes" or "no" question.

12          **MR. POTTER:**  It's an easy one to answer, Your Honor.

13    The Pangang Defendants --

14          **THE COURT:**  Can you speak into the microphone,

15    Mr. Potter?

16          **MR. POTTER:**  Sorry, Your Honor.

17          **THE COURT:**  Thank you very much.

18          **MR. POTTER:**  The Pangang Defendants will accept as

19    true the allegation that they are foreign instrumentalities for

20    the purposes of this motion.

21          **THE COURT:**  All right.  So I assume the Government

22    doesn't have -- other than disagreeing to the ultimate reality,

23    you don't have any objection to that representation?

24          **MR. HEMANN:**  No, Your Honor.

25          **THE COURT:**  All right.  So let's move on to the next

1   question, which is more substantive.  And I don't intend to

2   repeat questions because they're already in the record, so you

3   can just go launch into your answer, starting with Defendants.

4             **MR. POTTER:**  Thank you, Your Honor.

5        Your Honor, the answer to the first question is that the

6   FSIA exception only applies in civil cases.  And there are

7   three clear grants of authority that drives home that

8   conclusion:  The statute itself, the FSIA; secondly, the

9   Supreme Court decision in *Amerada Hess*; and, thirdly, the Sixth

10  Circuit opinion in *Keller* where the court found that the

11  commercial exception was applied, was unwilling to apply it in

12  a criminal matter.

13       So let me just walk the Court through the analysis with

14  respect to these three sources of authority.  Obviously the

15  starting point with any case involving an analysis of a statute

16  is the statute itself.  And I think the most important thing

17  for the Court to embrace and recognize is that while the Court

18  cites 28 U.S.C. 1605(a), it's important for the Court to

19  appreciate that that statute, that provision, does not exist in

20  isolation.

21       The Supreme Court has counseled that the provisions

22  associated with the FSIA are integrated, and it's a

23  comprehensive statutory scheme, and they all work together in

24  tandem to bestow jurisdiction on courts in a limited civil

25  setting.

1        And so with that understanding, Your Honor, you start

2   with -- we submit there are really only three provisions that

3   matter to resolve this issue.  The starting point of the

4   analysis is obviously Section 1604, and Section 1604 is the

5   immunity section which states that, "Foreign states shall be

6   immune from the jurisdiction of the courts of the United States

7   subject to the exceptions contained in Section 1605," et seq.

8        Section 1605, which is the second applicable statute that

9   the Court has to consider, lays out the exceptions to FSIA

10  immunity.  But significantly, Your Honor, that statute doesn't

11  confer any jurisdiction upon the Court.  It identifies certain

12  exceptions.  And then the next step in the analysis is, of

13  course, the jurisdictional grant at 1330.  And 1330 is the

14  statute that provides jurisdiction to this Court.

15       Under 1330, a district court can obtain jurisdiction over

16  a foreign state pursuant to a Section 1605 exception, like the

17  commercial activity, but only for a non-jury civil action.

18       So the statute, which is an integrated statute -- the

19  statute with those three constituent parts makes very clear

20  from a reading of the statute that the exceptions do not apply

21  in a criminal prosecution.

22       And the *Amerada Hess* opinion, the Supreme Court opinion,

23  the leading case on the interpretation of the FSIA, reinforces

24  this proposition because in the *Amerada Hess* decision, the

25  Court recognized that the FSIA was an integrated and

1    comprehensive -- the court's word -- statutory scheme.  The

2    court emphasized that the FSIA's immunity provision works in

3    tandem -- again, the Supreme Court's own words.  And

4    significantly the court held in *Amerada Hess* that the FSIA was

5    the sole basis -- direct quote -- by which a court can exercise

6    jurisdiction over a foreign state.

7         And so taken together, this is the sole basis for

8    jurisdiction under 1330, and 1330 only attaches to Section 1605

9    exceptions in a civil context.  It all necessarily means that

10   the exceptions do not apply in a criminal proceeding.

11        And, Your Honor, apropos of that, that is precisely what

12   the Sixth Circuit found in the *Keller* decision because the

13   *Keller* decision is a very interesting decision in that the

14   court was considering whether or not the plaintiff in that case

15   had found the applicability of a commercial exception, and the

16   court found that, yes, there was commercial activity in that

17   particular case giving rise to the exception.

18        But the court ultimately concluded that with respect to

19   RICO, which necessarily requires proof of an indictable

20   offense, even though there was an applicable commercial

21   activity exception, immunity still attached because the

22   commercial activity exception was not appropriate for a

23   criminal prosecution.

24        So I think, Your Honor, if you look at these three cases,

25   these three sources of authority -- the statute, the Supreme

1  Court in *Amerada Hess*, and the *Keller* decision -- they all

2  drive to the same conclusion, namely, that the commercial

3  activity exception does not attach in criminal prosecutions.

4        **THE COURT:**  All right.

5     Mr. Hemann?

6        **MR. HEMANN:**  So the short answer to that, Your Honor,

7  is that if Congress had meant that complicated thing to have

8  happened, then Congress would have said that complicated thing

9  should be the case.  Congress simply didn't say that.  That is

10 plucking different things together, and interestingly, plucking

11 them from civil cases because neither in *Amerada Hess* or *Keller*

12 did 18 U.S.C. Section 13 -- or 3231 apply.

13    In a criminal case, 18 U.S.C. Section 3231 provides

14 jurisdiction to the district courts.  The jurisdiction is

15 there.  So -- and this is what the D.C. Circuit in the federal

16 *Grand Jury Subpoena* case from last year, or I think this year,

17 said.  You don't need to look at all these civil cases when you

18 have a criminal case.  And although those two cases -- or the

19 *Keller* case involved civil RICO, it was still a civil case, so

20 the court could not find jurisdiction based on 18 U.S.C.

21 Section 3231, and the parties clearly didn't raise that to the

22 court, and the court didn't even talk about 3231.

23    *Keller* and the United States in this case direct the

24 Court's attention -- or the *Grand Jury Subpoena* and the

25 United States in this case direct the Court to the original

1   jurisdiction statute, which is 18 U.S.C. Section 3231.

2       The *Grand Jury Subpoena* case from the D.C. Circuit also

3   pretty much definitively responded to the rather convoluted

4   argument that the Defendants are making in this case and made

5   in that case, which is that Congress said in 1605 that the

6   exceptions apply to any case in which 1604 applies.  The court

7   pointed out that "any case" means any case, and Congress

8   certainly knows how to say "a civil case" when Congress means a

9   civil case or "a criminal case" when Congress means a criminal

10  case.

11      So the answer is found very clearly in the language of the

12  statute at issue, which is that the exceptions apply to any

13  case in which the Foreign Sovereign Immunity Act is implicated.

14          **THE COURT:**  All right.

15      I'll give you a chance to reply, Mr. Potter.

16          **MR. POTTER:**  Thank you, Your Honor, just briefly.

17      1605 says "any case," but 1605 does not confer

18  jurisdiction on the Court.  1605 effectively acts as a

19  definitional component to the jurisdictional statute, which is

20  1330, because the definitional statute -- excuse me -- the

21  jurisdictional statute at 1330 says there is jurisdiction for a

22  civil case involving a 1605 exception.  1605 itself does not

23  confer any jurisdiction on this Court.  The Supreme Court says

24  clearly that the sole basis for jurisdiction over foreign state

25  is 1330, and we rest our argument on that.

1          **THE COURT:**  All right.

2      Anything further?

3          **MR. HEMANN:**  No, Your Honor.

4          **THE COURT:**  All right.  Let's move on to the next

5  question, and I may have some, as I call it, pop-quiz questions

6  to follow up on that weren't on the take-home exam here.

7      So let's start with 3, and I'm asking for the

8  Government -- giving the Government an opportunity to respond

9  to the Defendants' argument on reply.  This has to do with the

10  commercial activity exception, and then I may have some

11  additional follow-up questions regarding commercial activity.

12          **MR. HEMANN:**  Sure.

13      So I think the place to start, Your Honor, is on who

14  ultimately bears the burden of demonstrating whether the

15  commercial exception -- any of the commercial activity

16  exceptions apply.  And the law is that the Defendants bear the

17  burden of persuasion on whether any of the commercial activity

18  exceptions apply.

19      The courts appear to be entirely unanimous on that.  The

20  Ninth Circuit in the *Meadows* case, *Meadows vs. Dominican*

21  *Republic*, which is 817 F.2d 517 at 523, talks about it

22  specifically.

23      And what the *Meadows* court says is that when a defendant

24  raises the issue of foreign sovereign immunity, the plaintiff

25  has the burden of identifying commercial activity.  The

1    defendant does -- the plaintiff does not have to prove that the

2    exception applies.  The defendant has to simply identify

3    commercial activity involved in the case.  All of the cases

4    that follow require the plaintiff to do that.

5        The burden then shifts to the defendant, the party

6    alleging sovereign immunity, to persuade the court by a

7    preponderance of the evidence that the exceptions do not apply.

8    This is the law.

9        The Government's first response to the Court's question is

10   that the Defendants in this case, the four Pangang Defendants,

11   did not even attempt to prove that, by a preponderance of the

12   evidence or in any way, that the three commercial activity

13   exceptions in the statute apply.

14       So the Defendants have not maintained their burden.  The

15   Government having identified commercial activity both in the

16   Indictment and in its brief, the Defendants haven't sustained

17   their burden.

18       So that should be the --

19       **THE COURT:**  How does that work in a criminal case,

20   though?  I mean, you're using, necessarily because of the way

21   the cases have evolved "plaintiff/defendant."  Does your

22   paradigm work in a criminal case?

23       **MR. HEMANN:**  Well, if the statute applies in a

24   criminal case, then the paradigm applies in a criminal case.

25   And the question is one not of a proof of an element but as to

1    the Court's jurisdiction, and it is an affirmative defense.

2        I mean, this does go -- I mean, we're sort of operating

3    here under the assumption that the Court has asked us to

4    operate under, that the Foreign Sovereign Immunity Act applies

5    in a criminal case.  As the Government has argued, it doesn't

6    apply, and we stand by -- we stand by that argument.

7        Much of this discussion doesn't make -- and as we delve

8    into the weeds, it just shows that it doesn't make any sense in

9    a criminal case.

10       The point of the Foreign Sovereign Immunity Act was to

11   define circumstances under which a civil case pending in a

12   court of the United States would interfere with the Executive

13   Branch's foreign relations.  That's why the Doctrine of Foreign

14   Sovereign Immunity exists, to allow the Executive to manage the

15   Executive's foreign relations.

16       Well, the Executive in a federal criminal case is standing

17   before your court and has made that decision, that this is the

18   appropriate forum in which to deal with what is a commercial

19   issue.

20       However, that's not the question that the Court asked us.

21   There is no case that says that the paradigm, the

22   burden-shifting paradigm, doesn't -- isn't the same in a

23   criminal case as it is in a civil case.  The only criminal case

24   to really discuss it is the *Grand Jury Subpoena* case, and in

25   the *Grand Jury Subpoena* case, what the court said is usually

the burden is on the party asserting foreign sovereign immunity

to prove it.  It doesn't apply in a case where there are grand

jury materials because the party asserting sovereign immunity

doesn't have access to the materials at issue.  That is not the

case here.

The Defendants in this case have access to all of the same

information relevant to the question of commercial activity

that the United States has access to.  So the Court should

follow the case law in the Ninth Circuit with regard to burden

shifting and should follow the suggestion that the D.C. Circuit

hinted at that would apply in a case that wasn't -- a criminal

case that wasn't involving grand jury materials not available

to the foreign instrumentalities.

And so there just simply isn't a reason of which the

Government is aware that this burden shifting should not apply.

And the exceptions certainly aren't addressed by the Defendant

in this case.

So if you get to the exceptions -- which I think are

important for the Court to focus on.  Under 1605(a)(2), there

are three clauses.  And in the *Nelson* case, the Supreme Court

made clear that each of the three mean something different, and

the Court has to look at each of the three differently.

And the three of them are as follows --

**THE COURT:**  Let me ask you -- this is going to be one

of my pop-quiz questions.

1      Does the Government rely on a particular clause of

2  1605(a)(2) or on all three clauses?

3           MR. HEMANN:  So repeating the point I just made, the

4  Government believes that it's the Defendants' burden to prove

5  the absence of each of the three.  The Government relies on

6  each of the three because each of the three appear to apply in

7  this case.

8           THE COURT:  Okay.  You may proceed.

9           MR. HEMANN:  So, number one is the one -- you know,

10  spoiler alert -- that the Defendants appear to rely on.  The

11  Government -- the Defendants do not say in their papers we

12  believe -- don't distinguish between the three.  But they

13  appear, because of the cases that they rely on, to be focusing

14  on the first one, which is that "A foreign state shall not

15  be" --

16           THE COURT:  Slow down.

17           MR. HEMANN:  Sure.

18           THE COURT:  Thank you.

19           MR. HEMANN:  "A foreign state shall not be immune in

20  any case that is based on a commercial activity carried on in

21  the United States."

22      And so that's *Nelson*, that's the *OBB* case where the focus

23  was on was a commercial activity carried on in the

24  United States.

25      There are other -- there are two others.  The second one

is "a case that is based upon an act that is performed in the United States in connection with a commercial activity of the foreign state elsewhere."

And that is probably the exception that is easiest to apply in this case, because it doesn't say -- and the Supreme Court says it clearly doesn't say so on purpose -- it doesn't say a commercial act performed in the United States; it says an act performed in the United States in connection with a commercial activity that takes place elsewhere.  And then the third clause says, "Immunity does not apply in any case where the action is based upon an act outside the United States in connection with a commercial activity elsewhere that has a direct effect on the United States."

So each one of the three of those provides a separate valid basis for finding that the commercial activity exception exists.

The Defendant focuses, I believe again -- not specifically but at least implicitly -- on the first because the focus is on the commercial activity, and the Defendants say, "Listen, the commercial activity that the United States is arguing is espionage."  That's not commercial activity.  That's a crime, and the Defendants go on to say, "Well, only a government can engage in espionage."

First of all, that's not true.  It's not true, as this Court knows, because this Court just had a whole trial with

1  Mr. Liew and his company USA PTI and Mr. Maegerle, in which the

2  three of them were accused and found guilty and affirmed on

3  appeal of espionage.  So espionage is not a quintessentially

4  government act.  Espionage is something that both governments

5  and companies and individuals all engage in.

6       But what the courts say -- so putting that aside, what the

7  courts say in terms of figuring out whether there is that first

8  clause, "commercial activity based in the" -- "based on

9  commercial activity," the court says -- this is the Supreme

10  Court in *Nelson* -- that "the issue is whether the particular

11  actions of the foreign state" -- "the foreign state performs,

12  whatever the motive behind them, are the type of actions by

13  which a private party engages in trade and traffic or

14  commerce."

15       And the Supreme Court in *Nelson*, *Weltover* which *Nelson* is

16  based on, and the *OBB* case, which follows *Nelson*, goes to great

17  pains to say that the court needs to pull apart the actions and

18  the motive, the purpose, and the court says purpose and motive

19  are irrelevant to this discussion.  It's whether the foreign

20  entity is acting as a player in Congress -- in commerce would

21  act.

22       The Defendant argues that espionage -- this case is all

23  about espionage.  Well, espionage is clearly the motive, it's

24  the purpose of some of the conduct in this case, but the

25  conduct itself is commercial.  And the Supreme Court in *Nelson*

1    directs the district courts to focus repeatedly on the core of

2    the suit.  Justice -- Chief Justice Roberts said that, "The

3    district court should zero in on the core of the suit."  And he

4    says that the court needs to -- he quoted Justice Holmes to say

5    you have to look at the place where the boy -- at the activity

6    where the boy got his fingers pinched.  What is the case really

7    about?

8         As the Court knows, this case -- and the Indictment

9    alleges and the Liew trial proved -- that this case is about a

10   company in China that was put together for the purpose of

11   manufacturing titanium dioxide commercially to sell into the

12   market.  That company contracted with Walter Liew and USA PTI

13   in the United States in a series of written contracts.  Had

14   many, many, many business meetings for the purpose of Walter

15   Liew designing the plans for the factories that were going to

16   be used in commerce.  And part of those plans -- and we allege

17   that the Defendants knew this -- part of those plans were based

18   on stolen trade secrets.

19        That is a -- so the core of this suit is about commercial

20   activity.  This is economic espionage we're talking about.  So

21   if the Court focuses on that, then it is easy quickly to reach

22   the conclusion that the case is based on commercial activity,

23   because that really is what it is based on.  And as the Court

24   knows, the Government put in contracts -- so it's not -- we're

25   not hiding behind -- we're not -- we never hid the fact that

1    this is a commercial deal, as almost all economic espionage is.

2    We're not -- it's just based on contracts.  It's based on

3    business meetings.  This is based on plans and designs and

4    drawings, which included stolen trade secrets.

5         The Ninth Circuit has been very clear on this point to say

6    that just because a contract is illegal or the activity is

7    illegal does not make it non-commercial activity, and that is

8    the *Adler* case at 219 F.3d 875.  The *Adler* case says very

9    clearly, explicitly, that commercial conduct can be illegal.

10        Now, a part of this may have been legal, but certainly

11   part of it was illegal, but it certainly all was commercial.

12        So our argument is that as to the first clause of

13   1605(a)(2), we're talking about conduct that is inherently,

14   quintessentially commercial that is motivated in part by the

15   desire to commit economic espionage.

16        Now, there are two other clauses that have not gotten any

17   talk at all in this case, and it is the two -- the second two

18   clauses where the exceptions are based upon acts performed

19   either in the United States or outside of the United States

20   that are in connection with a commercial activity elsewhere.

21        So the second one requires an act in the United States in

22   connection with a commercial activity.  The commercial activity

23   here is building a factory to make $TiO_2$ to sell to the market.

24   That's the commercial activity.  Around that commercial

25   activity are all sorts of purchasing and contracts, the normal

things that one would have to do to build a factory and sell things into commerce.

There are acts in the United States, dozens of acts alleged in the Indictment, and many, many more that were proved in the Liew trial and will be proved in this trial, that are in connection with or that are -- sorry -- that are in connection with that commercial activity for the purpose of advancing that commercial activity.

It is impossible to read that without seeing exactly this case. There is commercial activity. The case does not have to be based on that commercial activity for the second clause of 1602 -- 1605(a)(2) to apply. There needs to be an act in the United States in connection with activity.

And then finally, the third clause applies, which is based on an act outside the territory of the United States, and a good example that is, again, in connection with a commercial activity -- a good example of that is the computer hacking. There was hacking, and the Pangang employees received, you know, lists of hacked DuPont files in connection with the commercial activity in which they were engaged, and they brought those into the United States and possessed those in the United States. And those activities, the hacking activity, had a direct effect on the United States, which is required by the third clause, in that it was DuPont's servers in the United States, we can allege and can prove at trial, that were

1    hacked.  So there is an effect to the United States, there is

2    commerce elsewhere, commercial activity elsewhere, and there is

3    an act, and our case is based in part on that act.

4        Or altogether -- I mean, I think that the Indictment

5    sufficiently proves this.  The evidence from the Liew trial

6    sufficiently proves this, which for the purposes of this, the

7    Court can -- can -- of this motion, the Court can take notice

8    of, but at the end of the day, I think the Court should go back

9    to the fact that the Defendants haven't come close to

10   satisfying their burden of establishing any of this by a

11   preponderance of the evidence.

12           **THE COURT:**  All right.

13       Mr. Potter.

14           **MR. POTTER:**  Well, Your Honor, let me take up that

15   last point first because it was also, I think, the Government's

16   first point.

17       The burden is different than has been described to the

18   Court, and I'm relying on the case that the Government

19   submitted to the Court I guess at 11:00 today, *Meadows*.  And in

20   there, the court lays out what the appropriate burden shifting

21   is and what the methodology is for evaluating and analyzing

22   this issue.  And what the *Meadows* court says is as follows:

23       "Thus, whereas here, the plaintiff alleges in his

24   Complaint that his claim is based on a foreign state's strictly

25   commercial acts, the defendant must establish a prima facie

1    case that it is a sovereign state and that the plaintiff's

2    claims arise out of a public act.  This proof establishes a

3    presumption that the foreign state is protected by immunity.

4    The plaintiff then has the burden of going forward with

5    evidence by offering proof that one of the FSIA exemptions

6    apply.  Once the plaintiff has presented this evidence, the

7    defendant must prove its entitlement to immunity by a

8    preponderance of the evidence."

9        So the standard is a little bit more complicated, I think,

10   and a little bit more involved than may have been suggested to

11   the Court.  There is a shifting back and forth, and I think

12   certainly we have made the prima facie case by virtue of the

13   fact that we've referenced the Indictment and the allegations

14   in the Indictment, and we've also assumed, for the sake of this

15   argument, that we are a foreign instrumentality, and that is

16   the record before the Court.

17       Your Honor, where this ultimately is going to be resolved

18   is whether or not the Government -- or whether the Court --

19   putting aside all these burdens and shifting back and forth,

20   the bottom line is does this case implicate commercial

21   activity?  Does the Government's case -- the gravamen of the

22   Government's case fall within the commercial activity exception

23   of the FSIA?

24       And, Your Honor, we would submit to you that this

25   exception, first of all, obviously doesn't apply because then

1    it doesn't apply in a criminal case, but even assuming that

2    you're going to apply the -- that test here, there are a number

3    of reasons why the exception doesn't apply.

4         And I think the first point, Your Honor, is quite simply

5    that the Supreme Court has made clear that what the Court is

6    expected to do is to look at the activity and make a

7    determination whether the activity at issue is customary

8    private business enterprises, customary and common business and

9    trade.  That is the fundamental prism by which the Court

10   evaluates this issue.

11        And consistent with that overarching theme and that

12   overarching analysis, there have been two cases that I think

13   are very much on point and very analogous to this case where

14   courts have looked at similar fact settings and determined that

15   the allegations in the case -- the gravamen of the case did not

16   give rise to the commercial activity exception.

17        And the first case that we'd call the Court's attention to

18   is the case of *Democratic National Committee vs. Russian*

19   *Federation* in which the Russian government sponsored hacking

20   and theft of the DNC's information, and the court concluded

21   that transnational cyber attacks are not the types of actions

22   by which a private party engages in trade, traffic, or

23   commerce.  And we just heard the Government lodge an accusation

24   that one of the things that the Pangang companies did was to

25   engage in cyber attacks for the purposes of stealing --

1  computer hacking for stealing information, which is exactly

2  what was the issue, the core issue, in the *Democratic National*

3  *Committee* decision, and the court there said that's not

4  traditional private enterprise.

5      And the *Broidy* decision, which was rendered by a district

6  court in the Central District of California, reached the same

7  conclusion.  In that California case, the court held that

8  hacking by Qatar and its alleged agents was not the type of

9  action by which private commercial enterprises typically engage

10 in trade or commerce.

11     And I would note for the Court that in *Qatar*, the

12 plaintiffs in that case made precisely the same argument that

13 the Government is making here.  What the -- what the plaintiff

14 in that case argued was that there are instances where private

15 companies will engage in hacking and cyber attacks, so private

16 parties can engage in that activity, and the court rejected

17 that formulation saying that's not the test.  The test is

18 whether the underlying activity is one that could be fairly

19 characterized as a traditional standard, ordinary business

20 activity, and concluding obviously that it wasn't, the court

21 ultimately concluded that the commercial activities did not

22 apply.

23     And obviously this case -- I mean, the gravamen of this

24 case is not a breach of contract.  The gravamen of this case,

25 as laid out in the Indictment in exquisite detail, is an

1   organized scheme by the People's Republic of China to engage in

2   espionage for the benefit of the state with the full sanction

3   of the highest members of the Communist Party as part of that

4   activity.

5           **THE COURT:**  Let me interrupt you for a second because

6   I want to have you join issue with what the Government argued,

7   which is -- and I'll sort of put it in the context of the way

8   the Government asserts it rather than the Court saying it.

9       So does the argument of the Pangang Defendants that the

10  Government is essentially contending that the Defendants

11  engaged in espionage conflate the issue of the purpose of the

12  motive for the activity with the nature of the activity, and if

13  not, why not?

14          **MR. POTTER:**  Your Honor, that's a very fair question,

15  and the courts have grappled with this precise issue because a

16  lot of courts have recognized that sometimes it's a very

17  ephemeral distinction between purpose and motive.  It's very

18  difficult in many instances to ascertain where that dividing

19  line is.

20      But suffice it to say, putting motive out of the equation

21  entirely, at the end of the day, there is tangible activity

22  related to espionage in which materials are stolen allegedly by

23  a foreign state, and that in and of itself removes this case

24  out of the commercial exception.

25          **THE COURT:**  Well, the problem I have is the plain -- I

1    understand the cases that you've cited, but the plain language

2    of the statute seems to belie your argument because the

3    statute -- and we're talking about 16 -- 28 U.S.C. Section

4    1605(a)(2).   Two of the -- two of the bases for commercial --

5    for commercial activity exception, the second and the third,

6    deal with an act performed in connection with commercial

7    activity or an act outside, etc., etc.   Only the first one

8    deals with the action based upon commercial activity.

9         Your argument might be more pertinent to the first

10   exception, that the gravamen of this case is espionage.   But

11   how do you get around the other two possible exceptions?

12         MR. POTTER:   Well, Your Honor, first of all, the

13   Government hasn't cited any case that draws a distinction

14   between the operative test for the first clause and the second

15   two.   And I would submit to you, Your Honor, that there would

16   not be a case that would draw a distinction because the

17   overarching aim of this statute is to determine whether a

18   foreign state is entitled to immunity, and it is done against

19   the backdrop of the common law where foreign states are vested

20   with immunity.

21         So, Your Honor, the phrase to me, I think consistent with

22   the reading of the statute, is less important than the linchpin

23   test that if a foreign state is engaging in commercial

24   activity, immunity ends.   There is no immunity.   And that

25   approach, Your Honor, is consistent with the federal common

law.

I think what those other provisions attach to Your Honor
is a slightly different consideration, that if you have a
foreign state engaging in activity outside the United States
and that activity can be felt in the United States, there's a
jurisdictional hook by which that party can be pursued.  And we
don't disagree with that concept.  But --

**THE COURT:**  So let me hone in on one thing then on
that.  So to the extent that the Government is relying on the
third clause and if the Court -- let's assume the Court deems
the activity of the Defendants to be commercial in nature -- do
the Defendants contest that the commercial activity at issue --
again, the Court's hypothetical -- quote, "caused a direct
effect in the United States," unquote?

**MR. POTTER:**  I'm sorry?

**MR. FELDMAN:**  We do.

**MR. POTTER:**  We do.

Mr. Feldman advises me --

**THE COURT:**  Well, if Mr. Feldman says it, it's the
gospel, but --

**MR. POTTER:**  I'm going to cite Feldman on --

**THE COURT:**  That's right.

**MR. POTTER:**  But, Your Honor, we do.  But I think,
again, Your Honor, what I really want to draw the Court to,
because I think this is the key consideration of these clauses,

1    I would like the Court to recognize or I would ask the Court to

2    recognize and consider that what the FSIA is doing is it is

3    the -- it's essentially providing a statutory scheme consistent

4    with the federal common law.

5        And at federal common law, it was recognized by 1952 that

6    for a commercial activity, a state would not be entitled to

7    immunity.  Everything in 1605 essentially says that.  The only

8    thing that's different is some of the clauses as to where the

9    activity is taking place, whether it's in the United States,

10   outside the United states, or felt in the United States.

11       **THE COURT:**  So are you arguing in effect that in --

12   let's say a hypothetical case; let's keep it out of this

13   case -- where a foreign entity commits espionage by using

14   commercial means, commercial activity, that they would be

15   immune under the FSIA?

16       **MR. POTTER:**  From criminal prosecution, yes.

17       **THE COURT:**  All right.  What do you base that on?

18       **MR. POTTER:**  The text of the statute.  The text of the

19   statute says that a foreign state is immune from the courts,

20   the jurisdiction of the courts, except for civil litigation.

21       Now, the foreign state in what you just described could

22   potentially be amenable to jurisdiction for a civil lawsuit,

23   but under the text of the statute, that foreign state is not

24   amenable to jurisdiction for a criminal prosecution.

25       **THE COURT:**  Let me ask you this.  The Government cites

1    the *Adler* case.   How do the Defendants distinguish the *Adler*

2    case?

3          **MR. POTTER:**  Easily.   *Adler* is not relevant to this

4    case, and I'll explain why, Your Honor.

5          What *Adler* is is a situation where a party enters into a

6    contract with another party and alleges a breach of that

7    contract.   The parties were in privity with one other, and

8    *Adler* brings a breach of contract claim against the opposing

9    party to whom he was in privity with.

10         That's not this case at all.   The Government is not in

11   privity with Pangang or even Walter Liew.   The Government is

12   asserting a governmental interest relating to espionage.

13         So we're not taking the position that -- well, the bottom

14   line is, Your Honor, *Adler* is a very different situation where

15   there is a clear contract, where there is a clear claim based

16   upon the failure to perform the contract, and that is

17   quintessentially a commercial activity.

18         **THE COURT:**  All right.

19         Mr. Hemann.

20         **MR. HEMANN:**  In *Adler*, the plaintiff sued in fraud.

21   There is a fraud claim, which is quintessentially a criminal

22   theory.   So *Adler* does apply.   *Adler* is exactly on point.

23         And *Adler* says -- and *Adler* uses the word "illegal."  So a

24   commercial activity does not become a non-commercial activity

25   simply because it is illegal.   And the court talked, just like

1    all the courts talk about, about the need to distinguish the

2    conduct, signing a contract, from the purpose, fraud.  And that

3    is the distinction that we have here, which is conduct,

4    commercial; purpose, espionage.

5        And so *Adler* is right down -- right over the plate in

6    terms of this.  And all of the other cases, *OBB* and *Nelson* and

7    those cases, show what the other side of it looks like.

8        A couple of points.  The -- the *DNC* case and the *Qatar*

9    case are instructive because in neither of those cases was

10   there commercial activity going on.  The Russians weren't

11   stealing the information from the Democratic -- the

12   United States Democratic National Committee in order to create

13   a commercial -- or to support a commercial venture in Russia.

14   They were doing it for alleged -- alleged to be doing it for

15   political reasons.

16       The Qatar government wasn't stealing secrets for the

17   purpose of -- or wasn't hacking, sorry, for the purpose of

18   doing something commercial.  So there is no commercial activity

19   in either of those cases.

20       Those cases were motivated, the courts found, by

21   political, not commercial, activity.

22       Here the actions were taken to advance a clearly

23   commercial activity, i.e., the production of titanium dioxide.

24       It's important, as Mr. Potter mentioned earlier, to talk

25   about all of the parts of Section 1602, and Mr. Potter sort of

1    harkened back to 1952 and what motivated all of this.

2         What motivated all of this, as the cases talk about, was

3    the change that the government started to see in the way other

4    governments were approaching business in commerce.  And other

5    governments, in particular the Chinese government, began to get

6    directly -- particularly government-directed economies -- were

7    getting directly into traditionally commercial processes,

8    traditionally commercial manufacturing activity.

9         And Section 1602, 28 U.S.C. Section 1602, says, "Under

10   international law, states are not immune from the jurisdiction

11   of the foreign courts insofar as their commercial activities

12   are concerned."  And then it goes on in the exceptions to talk

13   about how those various commercial activities can impact the

14   United States.  And that's what you see in Section 1605(a)(2).

15        So Congress' point here was pretty darn clear, which is we

16   see governments getting into commerce.  That is fair game in

17   the courts in the United States, because it's commercial

18   activity.

19        And I guess the last point I'd make, Your Honor, is again,

20   you know, Mr. Potter's argument about what the impact on this

21   is in a civil case depends on this, what I think is a tortured

22   analysis, of -- of when the exceptions apply.  The Court is

23   asking about whether the commercial activity exception applies

24   in the context of 1831 and 1832.  If the Court holds that it

25   does not, I don't see how a private plaintiff is going to sue

1    the Pangang group for 18 -- for espionage because the Court

2    here is interpreting the applicability of the exception.  And

3    what the Defendants are proposing here is some form of absolute

4    immunity in both criminal cases and civil cases -- I think

5    they're proposing it for criminal cases, but they are -- but

6    the impact of it would be felt on civil cases as well -- for a

7    company engaged in something for the purpose of espionage, and

8    then they're going to say, "No, no, the purpose of this is

9    espionage.  The gravamen is espionage.  The fact that we were

10   doing it through buildings and contracts and purchase orders

11   and all this other stuff, that's just sort of a sideshow."

12        This is a radical suggestion that the Defendants are

13   making that you can -- that -- that a government

14   instrumentality can engage in commercial conduct, and because

15   it is motivated by fraud or malintent or espionage, they say,

16   "We're out of it.  It doesn't count.  It's radical."

17             THE COURT:  All right.

18          MR. POTTER:  Briefly, Your Honor.

19             THE COURT:  Yes.

20          MR. POTTER:  I don't think what we're proposing is

21   radical.  I would respectfully submit what the Government is

22   proposing is radical because as we point out in our reply, in

23   the 234 year history of the United States, no court has ever

24   presided over a foreign state in a criminal prosecution, and

25   the Government's request that you be the first court to do that

1    is, to us, a very radical proposition.

2         The other thing I would say, just very briefly,

3    Your Honor, is we're not taking the position that foreign

4    sovereigns are immune from civil litigation if one of the

5    applicable exceptions apply.  By the terms of the statute, they

6    are subject to jurisdiction.

7         With respect to the criminal prosecution of a foreign

8    sovereign, that's a different story.  The statute says that

9    that's not authorized, and, again, the 234 year history of the

10   United States reinforces the position of that statute in that

11   it extended long-standing common law tradition.

12        **THE COURT:**  All right.  Do you know of any case in

13   which a foreign entity has been charged with economic

14   espionage?

15        **MR. HEMANN:**  There are cases in the United States.

16   There are pending cases right now, cases pending in this

17   district where foreign entities have been charged, foreign

18   instrumentalities.

19        There -- let me -- I don't know of any published

20   decisions, Your Honor.

21        **THE COURT:**  I understand that.  And, again, this is

22   totally off -- you know, off the subject, because even if there

23   were, obviously those defendants might make the same

24   arguments -- maybe they will even hire Mr. Feldman as an expert

25   and Mr. Potter, and they will be doing it, but just out of

1    curiosity.

2            **MR. HEMANN:**  So the United Microelectronics

3    Corporation case is pending before Judge Chesney right now in

4    this district.

5        If it would help Your Honor, we could identify other

6    pending cases.

7            **THE COURT:**  No.  It's not -- I just -- just off the

8    cuff.

9        Let's take a 10-minute break before we move on to Question

10   No. 4 to give everybody a little bit of a breather.  We will

11   come back in 10 minutes.

12                    (Recess taken at 2:19 p.m.)

13                (Proceedings resumed at 2:35 p.m.)

14           **THE COURT:**  All right, Counsel.  Let's move on to

15   Question No. 4.

16           **MR. HEMANN:**  And, Your Honor, just briefly, Ms. Gellie

17   needs to leave to catch her flight to D.C. --

18           **THE COURT:**  That's okay.

19           **MR. HEMANN:**  -- if that's okay with Your Honor.  In

20   about 15 minutes?

21           **THE COURT:**  Yes.  Sure.

22       Have a good flight back.

23           **MR. HEMANN:**  Thank you.

24           **MR. FELDMAN:**  Mr. Levy's flight is at 11:00 p.m., so

25   we're good to go.

1          **THE COURT:**  Okay.  We're not going to be going

2     anywhere near that, I can assure you.

3          So Question No. 4, so the first part of that question --

4     well, the question is addressed to the Defendants in the first

5     instance.

6          **MR. POTTER:**  Thank you, Your Honor.

7          Your Honor, the Court's question references the *Campa*

8     decision, and the Court's question also subsumes the

9     parenthetical from the *Campa* decision which relies on the Third

10    Restatement of Foreign Relations, and under the Third

11    Restatement, there is a suggestion by the Restatement that an

12    action without challenge to the jurisdiction is waived if it's

13    not made upon the appearance of the parties.

14         And I think it's important for the Court to know that that

15    Third Restatement has been superseded by the Fourth

16    Restatement.

17         So under the Third Restatement, there is a contemplation

18    that this type of immunity has to be raised upon appearance.

19    That is no longer the case.  Under the Fourth Restatement,

20    there is a much more stringent test with respect to waiver, and

21    it makes clear that the appearance is not sufficient to trigger

22    an implied waiver.  Instead, under the Fourth Restatement --

23    and also, frankly, under Ninth Circuit law -- a waiver can be

24    occasioned only in three limited instances in terms of the

25    Restatement, and those instances would be a foreign state has

1    agreed to arbitrate in another country, a foreign state has

2    agreed that a contract is governed by the law of a particular

3    country, or a foreign state has filed a responsive pleading in

4    a case without raising the defense of sovereign immunity.

5         So none of the criteria spelled out in the Fourth

6    Restatement would give rise to a waiver in this particular

7    case.

8         **THE COURT:**  So are you saying that there is no amount

9    of litigation-related activity that an entity can engage in

10   that would constitute a waiver?  And I ask that question

11   because one of the cases recently cited by the Government -- I

12   don't remember the name of it -- but in that case, the district

13   court found there wasn't waiver by certain activity, but then

14   the court of appeals said that the district court can find in

15   its discretion that the totality of the litigation activity was

16   tantamount to an implied waiver, and if the court made that

17   determination, it would be subject to an abuse of discretion

18   standard.

19        So are you saying -- is your argument that only in those

20   circumstances that the Fourth Restatement states can the Court

21   find a waiver and that no amount of litigation activity, even

22   with -- arguably a party gains a benefit from that activity,

23   that that could constitute an implied waiver?

24        **MR. POTTER:**  Your Honor, let me work through the

25   analysis.

1      I think in the first instance, Your Honor, the test that

2   I've just described for you is the Ninth Circuit test.  That is

3   the traditional Ninth Circuit test.

4      And the other thing I want to present to the Court is that

5   this is a different setting than a situation that the Court may

6   typically consider the possibility of waiver in litigation.

7      There is case law holding that under the FSIA, waivers

8   should be strictly construed and narrowly confined.  So with

9   respect to the FSIA, the statute and the case law under it

10   suggests that a court should be cautious in finding a

11   particular waiver.

12      In the context of this case, Your Honor, I just want to

13   sort of revisit where we are because I think it's very

14   important as the Court considers this motion or this argument.

15      As the Court is aware, the Government filed this -- this

16   Indictment a while back, tried to serve the companies.  The

17   Court found that that service was not in accordance with the

18   law.  The Government again served the companies.  The Court

19   found again that that service was not in compliance with the

20   law.

21      Thereafter, the Government sought to and did amend Federal

22   Rule 4 for the purposes of effectuating service, which

23   occurred.

24      And then with respect to that, Your Honor, once the

25   service was finalized and once the service was achieved and

1  recognized, the Court set a briefing schedule by which we had

2  to, on a particular date, file a motion attacking the

3  litigation.  And the Defendants, in an appropriate way, filed

4  their motion attacking the Indictment pursuant to the order set

5  by the Court.

6          **THE COURT:**  Did the Defendants ever, in this lawsuit,

7  indicate to the Court or the Government in any way, shape, or

8  form that it intended to rely upon the FSIA or any other

9  statute in an effort to dismiss the Indictment?

10          **MR. POTTER:**  I don't think that we indicated it to

11  either party, Your Honor.  I think that we --

12          **THE COURT:**  Is that relevant?

13          **MR. POTTER:**  I beg your pardon?

14          **THE COURT:**  Is that relevant to the Court's analysis?

15          **MR. POTTER:**  No.  And the reason it's not, Your Honor,

16  is because at no point in time did the Defendants ever try to

17  abuse the system, to abuse the process, to take advantage of --

18          **THE COURT:**  Well, wait a minute.  You guys got all

19  this discovery that the Government contends is helping some

20  other activity, inappropriate activity.  You got the benefit of

21  discovery.  You could have moved to stay discovery and say,

22  "We're not going to engage in discovery until we litigate the

23  validity of the Indictment."

24       So to say that you didn't do anything at all I think is

25  maybe -- I would think maybe a stretch.

1        **MR. POTTER:**  Your Honor, I'm not saying we didn't do

2   anything at all.  We certainly did things.  What I'm saying is

3   we didn't waive our right to make this argument.  We made this

4   argument at the first available opportunity set by Court by the

5   Court's deadline.

6        And I'd ask the Court to consider one other consideration,

7   to sort of look beyond the litigation, look behind the

8   litigation.  We're in a situation representing a company based

9   in China which allegedly is a foreign instrumentality of China,

10  and we are in a process in which, as counsel for that company,

11  there are a lot of things that the company has to consider

12  vis-à-vis the litigation.

13       We have to review the evidence.  We have to consider

14  whether or not there are potentially presentations that could

15  be made to the Government to dissuade the Government from going

16  forward.  We have to consider the possibility of plea

17  negotiations.  We have to consider the possibility of

18  diplomatic channels.  And I'm not waiving any privileges.  But

19  this is a complicated case with a lot of dimensions associated

20  with the case.

21       And at no point in time, Your Honor, did we ever -- like

22  the defendant did in the *Campa* decision -- did we flout or

23  disregard the Court's decision as to when a motion challenging

24  the Indictment should be filed.  When the Court gave us a date

25  to file it, we filed it on that date.

1    And, remember, in *Campa*, Your Honor, that was a case that

2    the Government relies on in which the party brought a motion to

3    dismiss raising this argument after previously bringing a

4    motion to dismiss on another theory after the close of evidence

5    in the trial.  I think in that setting where the party had the

6    opportunity to raise it earlier before the trial and when

7    there's a court-ordered motion-to-dismiss deadline, there's an

8    argument that that is a legitimate waiver, but that's not what

9    happened here.

10        **THE COURT:**  All right.

11    Mr. Hemann.

12        **MR. HEMANN:**  So I think the actual answer to the

13    Court's question about whether there is any limit as to how far

14    you can go, I think Mr. Potter is saying no, there is no limit

15    as to how far.

16        If he's not saying that, he's saying that the test that

17    the Court articulated a moment ago that the Government is

18    advancing is the appropriate test.  And the test is from the

19    *Canadian Overseas Ores* case, which is "District courts have

20    discretion to determine that the conduct of a party in

21    litigation does constitute a waiver of foreign sovereign

22    immunity in light of the circumstances of a particular case."

23        So I don't think that the Defendants can have it both

24    ways.  Either there is no limit ever or there has got to be

25    some test, and this is the appropriate test and this is the

1    appropriate case for the Court to say there has been a waiver.

2    And why is that?  Because the litigation has been going on for

3    over seven years.  The Defendants pled guilty.  The Defendants

4    have filed three motions to quash.  The Defendants have filed

5    an appeal.  The Defendants have filed a writ.  They have filed

6    a motion for a Bill of Particulars, which was granted, giving

7    them more information.

8         **THE COURT:**  You said they pled guilty?

9         **MR. HEMANN:**  Pled not guilty.

10        **THE COURT:**  I was going to say what case are we

11   talking about --

12        **MR. HEMANN:**  We wouldn't all be here today, yes,

13   Your Honor, correct.  Pled not guilty.

14        There have been, I think, ten court appearances in this

15   case.  There have been two protective orders.  There has been

16   much litigation and negotiation over discovery, an enormous

17   amount of discovery.  Terabytes of discovery have been

18   produced, and the United States has given five safe passage

19   letters to Defendants' employees to go examine the discovery.

20        So, you know -- and as Mr. Potter said, the Defendants did

21   file -- I guess this is a motion attacking the Indictment.

22   This isn't really a motion attacking the Indictment.  This is a

23   motion attacking the Court's jurisdiction.

24        The defendants filed on the last possible day.  This isn't

25   a case where -- certainly nothing precluded the Defendants from

1    filing this when they filed their motion to quash seven years

2    ago or almost seven years ago.

3        And so the Government urges the Court to consider all of

4    the circumstances of this case and to find that there has been

5    a waiver.

6            MR. POTTER:  If I may briefly, Your Honor?

7            THE COURT:  Sure.

8            MR. POTTER:  Your Honor, I think there are two

9    linchpins to the Court's resolution of this issue.  One I

10   touched on earlier, which is that under the FSIA, the waiver

11   exception is to be narrowly construed.

12       But the second observation that I would share with the

13   Court is that the decision cited by the Government where they

14   rely on this dicta, *Canadian Overseas*, the court actually did

15   not find a waiver.

16       And the larger point, Your Honor, is that the Government

17   is unable to point to any case in which a court has found a

18   waiver under even remotely analogous circumstances to this.

19   Certainly the *Campa* decision is radically different.  So there

20   really is no -- the statute counsels that this is a

21   narrowly-construed waiver.  The Government has provided the

22   Court with no case law authority that would recognize that a

23   waiver would be appropriate in this particular case.

24       And I would just -- I know the Court knows this, but the

25   Court's minute order was clear that any motions challenging the

1    Indictment was due on July 9th -- July 9th, 2019.  The Pangang

2    Defendants complied with that order, filed it in a timely

3    fashion, and proceeded in good faith throughout the litigation.

4         There has been no waiver.  We never sought to waive it,

5    and we don't think it would be appropriate to find a waiver.

6              THE COURT:  Very well.  All right.  Let's move on to

7    the next question, Question No. 5(a);  (a) asks for the

8    Government's response in the first instance.

9              MR. HEMANN:  So, Your Honor, I think that the basic

10   answer to the Court's question is found in the Court's

11   subsequent question to the Defendants, which is that "whoever"

12   includes business organizations, and business organizations

13   that are also foreign instrumentalities are the defendants in

14   this case.

15        The cases that the Defendant is relying on for its

16   position that "whoever" doesn't include foreign sovereigns all

17   deal with cases where a sovereign is the defendant.

18        So the United States did not here charge the People's

19   Republic of China.  The People's Republic of China is a

20   sovereign.  It is not a business organization.  Business

21   organizations, as Mitt Romney famously said, are in fact people

22   under the law.  And here --

23             THE COURT:  I hope you're not relying on --

24             MR. HEMANN:  I would rely on Mr. Feldman before

25   Mr. Romney, Senator Romney.

1          But the cases rely on situations where the -- the

2     "whoever" at issue is, in fact, a sovereign.  The *Singleton*

3     case, which is the case that the Defendant focused on most

4     heavily, is a case where the "whoever" in the bribery

5     statute -- the defendant said well, the government, the

6     prosecutor offered a deal that was tantamount to bribery, and

7     the statute covers the prosecutor because the prosecutor says

8     whoever commits this sort -- or does this sort of act is -- is

9     committing bribery.  And the court of appeals said, "No, no,

10    no.  'Whoever' is not the United States of America."

11         Well, a foreign sovereign is not a defendant here.  A

12    business organization is, and as a matter of statutory

13    construction, "whoever" covers people, you know, natural people

14    and business organizations.  And there's one billion cases that

15    say that.

16         **THE COURT:**  Before I hear the Defendants' response, I

17    was wondering if the difference in definition of "foreign

18    instrumentality" in the Economic Espionage Act versus the FSIA

19    has any impact on the issues that the Court is deciding because

20    they're close but not exactly the same.  Do you have any

21    argument on --

22         **MR. HEMANN:**  I don't, Your Honor.  I haven't looked at

23    that.  I could look quickly now and tell the Court what I

24    think.

25         I need the statute here.

1          **THE COURT:**  And I'll give you a full opportunity to

2     respond.

3          **MR. POTTER:**  Certainly, Your Honor.  Thank you.

4          **MR. HEMANN:**  So the FSIA --

5          **THE COURT:**  I didn't realize this was a pop-quiz

6     question, but it just appeared to the Court.

7          **MR. HEMANN:**  1603 are the definitions; right?

8          **THE COURT:**  1603(b), I think it is, is the FSIA.

9          **MR. HEMANN:**  Yes, 1603(b), (1), (2) and (3), yes.

10     And then it is 1839, I think is the -- it is -- okay.

11     So, first of all, I would say that the -- that for the

12     purpose of deciding the question that the Court asked, which is

13     what does -- does "whoever" in the -- in 1831 and 1832 cover

14     foreign instrumentalities themselves, I don't know that the

15     difference between these two statutes is relevant because I

16     don't know that the Court's question about the statutory scope

17     of -- the meaning of the word "whoever" in 1831 and 1832 calls

18     on the Court to look at the definition --

19          **THE COURT:**  It's a separate question.  I should have

20     told you -- I wasn't necessarily linking it to that question.

21          **MR. HEMANN:**  Does the difference in -- I think that

22     1839.1, the definition "foreign instrumentality" is simply a --

23     it appears to me to be simply a broader way to articulate.

24     There is the "substantially owned" component, which is probably

25     a matter of proof for the Government at trial, whereas the

1    foreign state here -- let's see.  "The foreign instrumentality

2    is just a separate legal person, corporate or otherwise, of the

3    agent."

4        So I don't think that for resolving the matters before the

5    Court here I see that the language that is used in defining

6    "instrumentality" under the Economic Espionage Act and the FSIA

7    is significant.

8        **THE COURT:**  All right.

9        Mr. Potter, we've been talking about both (a) and (b), so

10   you can certainly respond.

11       **MR. POTTER:**  Certainly, Your Honor.  I will be very

12   brief.

13       Your Honor, you know, at the end of the day, what the

14   Court has before it is making a determination as to what these

15   Defendants are, the status of these individuals, these parties.

16   And under the FSIA, which the Court obviously can consider --

17   it's instructive, it's a federal statute -- these federal

18   instrumentalities are the functional equivalent of the foreign

19   state.

20       I mean, the statute connotes upon them a foreign

21   instrumentality as equivalent to a foreign state.  And under

22   the Section 1831, "whomever" doesn't capture sovereigns.  These

23   entities are sovereigns, and on that basis, the statute doesn't

24   apply.

25       **THE COURT:**  All right.

1        Do you want to say anything further on that?

2            MR. HEMANN:  Yeah.  I would quibble with the term

3    "functional equivalent," because the definition is specifically

4    under the FSIA "a separate legal person that is an organ of the

5    foreign state or subdivision thereof."

6        And I would say that the foreign sovereign, just like any

7    foreign sovereign, or any body, has the ability to create a

8    separate business organization, and as the Court sees here, the

9    Pangang Defendants went so far as to create several --

10   intentionally, obviously -- several different organizations

11   that are not -- I mean, the -- the government of the People's

12   Republic of China could, if it wanted to, open a factory owned

13   by the government of the People's Republic of China or the

14   Party.  It didn't.  It created a separate legal entity, and, in

15   fact, a series -- relevant to this case -- a series of four

16   different relevant legal or separate legal entities, but the

17   Pangang group has hundreds of separate legal entities.

18       And so this is a conscious decision to create a standalone

19   legal entity that is controlled by the government which brings

20   it under the -- under both statutes, but they are separate

21   legal entities, and those -- that separation legally should

22   have some effect.

23           THE COURT:  All right.

24       Anything further?

25           MR. POTTER:  Just very briefly.

1          1603(a) defines a foreign state as "subsuming an

2     instrumentality of a foreign state," which is the presumed

3     status of the Pangang Defendants in this particular hearing.

4               **THE COURT:**  All right.  Thank you.

5               **MR. POTTER:**  Thank you, Your Honor.

6               **THE COURT:**  So the matter is submitted.

7          I want to deal with the other issues now that we have to

8     deal with, having heard argument on the motion to dismiss.

9          So first I want to say what the Court does not need to

10    hear argument on, and that is the Defendants' motion to

11    reconsider the ruling regarding Wang Rongkai because the Court

12    intends to, now that the matter is at issue, issue a written

13    ruling on that motion in due course, which will be sooner

14    rather than later.

15         The Court does wish to address the issues raised regarding

16    the designation of confidential materials and the list of

17    individuals and entities that the Government submits -- by the

18    way, Mr. Hemann, could you come up for a second?

19         You cited either a case or a statute that talked about

20    discovery being stayed in a civil case in deference to -- in

21    light of a criminal case.  What relevance does that have to any

22    of the questions that were asked?  You submitted that as recent

23    or new -- supplemental authority, and I couldn't understand.

24    That is what I was --

25              **MR. HEMANN:**  Oh, it goes to the waiver argument,

1    Your Honor, which is I think the point that the Court made,

2    which is that the Defendants could have suggested that there be

3    a stay of discovery --

4         **THE COURT:**  I've got it.  Okay.  That's why I asked

5    the question.  All right.

6         So I'm going to deal with the list of individuals and the

7    entities that the Government submits also should not be

8    permitted to review confidential materials.

9         The Court is concerned that the manner in which the

10   Government has designated confidential materials has led some

11   non-confidential materials to be subsumed within the

12   confidential designations.

13        It also notes that although the Government alleges that

14   there are 50- to 60,000 employees within the relevant

15   organizations, the size of the organizations does not sway the

16   Court to believe that it -- because it does not take into

17   account the number of employees who may have knowledge that is

18   relevant to the case.  However, the parties agreed to a

19   procedure for challenging the confidentiality designations, and

20   the Court is not going to make any blanket rulings about the

21   manner in which the Government has designated material or the

22   number of individuals and entities it contends cannot review

23   confidential information.

24        And so what I'm going to do this afternoon is order that

25   the parties, as onerous as it may seem, once again meet and

1    confer in person about the Government's list so that the

2    Pangang Defendants may identify individuals or entities on that

3    list who they contend they need to review confidential

4    materials in order to adequately to present a defense to these

5    charges.

6        Further, the Court will require the parties to follow the

7    procedures in the stipulated protective order that pertain to

8    the manner in which a confidentiality designation should be

9    challenged.  But it would urge the parties to carefully review

10   materials before they are designated as Confidential 1,

11   Confidential 2, or Attorneys' Eyes Only.

12       If the parties cannot reach agreement, they shall present

13   any disputes in the first instance to Magistrate Judge Cousins,

14   and the Court advises the parties that if they need to present

15   materials on an ex parte in camera basis, they should do so,

16   and I have so advised and instructed Judge Cousins to that

17   effect.

18       And the parties -- the Court also advises the parties that

19   the -- that if they object to any rulings by Magistrate Judge

20   Cousins, the Court will not look favorably on a motion for

21   review that presents materials to this Court that were not

22   presented to Judge Cousins.

23       And I want to just say overall that the Court advises the

24   Government that at some point, the Defendants' due process

25   rights to a fair trial and their ability to present a defense

may require the Court to determine that those concerns outweigh
the victims' concerns about confidentiality.

At the end of the day, if we get down to the point where
there is a direct conflict between those two issues, the
Constitution is going to win, and then the Government can
decide what it wants to do in light of that concept.

Again, that's a general statement, but I am getting
concerned to that effect.

Now I'm going to address the Discovery Status Report.  So
the disputes that are contained in Sections 2(a), 2(c), and
2(d) should be presented to Magistrate Judge Cousins.

With respect to the sealing procedures, which is Section
2(e) of the status report or the disputes, the Court explicitly
ordered the parties to modify the protective order as set forth
in the order resolving the Government's objections to Judge
Cousins' rulings.

As far as the Court is concerned, that is the end of the
matter, and the Court does not wish to hear further argument on
this issue.  Unless the parties mutually agree to a
modification, the parties shall follow the Court's order.

With that said, the Government's declaration regarding the
Pangang Defendant's motion to seal Exhibit B to the declaration
of Robert Feldman in support of the motion to reconsider, which
was Docket No. 1196, was due on August 5, 2019.  The Government
did not file a declaration and instead addressed this issue in

1  its opposition to the motion to reconsider.

2        Is the Court correct that the Government's position is

3  that the entirety of Exhibit B, including the translation to

4  Mr. Feldman's declaration, may be filed in the public record?

5        **MR. SAMPSON:**  Your Honor, Exhibit B being the disputed

6  Wang Rongkai email, as well as the Quinn Emanuel translation of

7  that email?  The Government does not object.  We indicated that

8  the final six pages of what had been marked Exhibit 50, which

9  included a memo that had -- I believe it had Pangang letterhead

10  as well as that email -- would not be considered C1, would not

11  be considered confidential.

12        **THE COURT:**  So that is now going to be filed in the

13  public record or shall be filed in the public record?

14        **MR. SAMPSON:**  Your Honor, I'm just looking for the

15  copy of that exhibit, but I believe we do not have an

16  objection, assuming that it is the Wang Rongkai email that was

17  discussed in the June hearing.

18        **THE COURT:**  Is that correct, Mr. Feldman?

19        **MR. FELDMAN:**  I believe it is.

20        **THE COURT:**  All right.  Well, that's the Court's

21  intention.

22        **MR. SAMPSON:**  Thank you, Your Honor.

23        I do want to be clear, the entire Exhibit 50, which was 69

24  pages, 60 of those pages the Government does assert and I

25  believe a review will reveal that it does contain trade secret

1   information.

2          **THE COURT:**  All right.  I'm talking about the -- as I

3   said, the -- the motion to seal Exhibit B to the declaration of

4   Mr. Feldman, which is docket --

5          **MR. SAMPSON:**  We do not object to that.

6          **THE COURT:**  All right.  Fine.  That resolves that

7   issue.

8       And the Court is going to remind the parties that when a

9   party files a motion to seal, the response to that motion shall

10  be filed as a separate document, not subsumed in some other

11  document.

12      With respect to the definition of "Attorneys' Eyes Only"

13  material, which is Section 2(b) of the status report, the Court

14  has rejected the Government's definition, and absent mutual

15  agreement on that definition, the Court will not revisit that

16  issue.  That is the law of the case.

17      To the extent that there are further disputes about how to

18  define that type of materials -- further disputes, not

19  inconsistent with the Court's ruling -- the parties shall

20  present issues to Judge Cousins.

21      Now, as a housekeeping matter, the Court would like the

22  Defendants to submit the following information in writing by no

23  later than six weeks before the pretrial date and six weeks

24  prior to trial, which is:  Will and how many of the Defendants'

25  client representatives will be present at trial or pretrial,

1    and do they speak English or will they need an interpreter?

2    Because this is purely a housekeeping matter.  If they need an

3    interpreter, what language and/or dialect will they speak?

4        And for the Defendants' witnesses, please provide the

5    language and/or dialect for which any given witness would need

6    interpretation and whether the interpreter is needed for half

7    or whole day because the Court needs to make those

8    arrangements.

9            **MR. FELDMAN:**  May I inquire of the Court?

10           **THE COURT:**  Yes.

11           **MR. FELDMAN:**  Let's assume that Mr. X will be the

12   client representative.  Mr. X, let's assume, barely speaks

13   English and first language is Mandarin.  He or she -- I believe

14   it's a "he" -- will have with him an interpreter who will sit

15   with him that he brings with him everywhere, anywhere I've ever

16   seen him to talk to us.

17       I believe that that would be -- I have to think this

18   through.  I hadn't thought about it.  But I believe that that

19   would be sufficient in that we would waive any right to have an

20   interpreter or translator for him for the proceedings, if that

21   process would be acceptable to Your Honor, to have someone

22   sitting next to him and translate.  And it might be several

23   people.

24           **THE COURT:**  Well, that's an interesting issue, which

25   is whether that right is waivable because I think of the

1    analogy with an individual defendant, and we would not even

2    raise -- it would be automatic that if that defendant were not

3    English speaking, he or she would have the benefit of a

4    court-certified interpreter.

5           **MR. FELDMAN:**  Yes.

6           **THE COURT:**  Do you have a position on that?

7           **MR. HEMANN:**  I think Mr. Feldman is correct, that that

8    process would be sufficient because Mr. Feldman is able to

9    make -- Mr. Feldman and Mr. Potter and Quinn Emanuel are able

10   to make an appearance on behalf of the company.  They are the

11   agents of the company for the court proceedings under the

12   rules.

13          **MR. FELDMAN:**  That's my belief as well.

14          **THE COURT:**  All right.  So we should assume that with

15   respect to the first question which is -- it becomes moot

16   because the Defendants, to the extent necessary, will have

17   their own interpreter?

18          **MR. FELDMAN:**  As long as Your Honor is comfortable

19   with somebody -- I will say this provocatively so that it's

20   okay, so that it's clear -- somebody in effect speaking at the

21   same time witnesses are speaking.

22          **THE COURT:**  That --

23          **THE CLERK:**  We have a system --

24          **THE COURT:**  We have a system where they can speak into

25   a microphone because hearing somebody talk will distract

1    everybody.  So we actually have a wireless facility to do that.
2    So --
3             MR. FELDMAN:  But what I'm -- I'm sorry.
4             THE COURT:  So basically what would happen is the
5    person could speak -- you know, not necessarily be right next
6    to this hypothetical witness but could be sitting --
7             MR. FELDMAN:  Excuse me.  I was not referring to
8    witnesses.  I was referring to --
9             THE COURT:  I'm sorry.  Defendant.
10            MR. FELDMAN:  I was referring to a corporate
11   representative.
12            THE COURT:  Corporate representative.
13            MR. FELDMAN:  Who I would envision sitting in the
14   gallery with one or more translators sitting next to that
15   person, and the translator will be, in effect, speaking
16   simultaneously with the witnesses.
17            THE COURT:  Okay.  So we will have to sort of play
18   that by ear.  I will tell you that if it's audible to the
19   Court -- and you are closer to them and Government counsel --
20   it's distracting.  There is a facility -- we have a wireless
21   transmitter where they could put that on so that the -- so that
22   the translator was actually transmitting silently because it's
23   a very sensitive microphone.
24            MR. FELDMAN:  I'm sorry that I'm -- I don't understand
25   what Your Honor said.

1    **THE COURT:**  What I'm saying is rather than having

2    somebody in realtime live whispering in the ear of --

3    **MR. FELDMAN:**  Oh, they whisper into that thing.

4    **THE COURT:**  Yes.

5    **MR. FELDMAN:**  Oh, sure.  But they will still be --

6    **THE COURT:**  Yes.  They will be able to talk.

7    **MR. FELDMAN:**  -- making some noise.

8    **THE COURT:**  That's okay.

9    **MR. HEMANN:**  They can whisper more softly because it

10   amplifies the voice.

11   **MR. FELDMAN:**  I get it, yes.

12       I believe that ought to -- from our perspective, I think

13   that would work, and I'm assuming that it will work for the

14   Court, and if it doesn't, we'll have to get a translator, but I

15   don't think that's necessary.

16   **THE COURT:**  All right.

17       And what about the next issue with the Defendants'

18   witnesses with respect -- I'm directing that you provide the

19   language and/or dialect so that we have an appropriate

20   interpreter.  There we do need an official court interpreter --

21   **MR. FELDMAN:**  Yes.

22   **THE COURT:**  -- to interpret for the jury.

23   **MR. FELDMAN:**  Yes.  And I will -- I believe I know

24   that the -- if we call any witnesses, I believe they will all

25   speak Mandarin.  I'm not sufficiently fluent -- no pun

1    intended -- to know whether there is any dialect issues.

2            THE COURT:  Yeah.  Because there are 800 different

3    dialects in China, so you might want to find out if some of

4    them might be from Lijiang or Kunming or places where they have

5    specific dialects.

6            MR. FELDMAN:  Which dialect does the Court speak?

7            THE COURT:  Yiddish.

8            MR. FELDMAN:  I actually told Mr. Levy that earlier

9    today.

10           THE COURT:  All right.

11           MR. FELDMAN:  There is one more thing.

12           THE COURT:  Ms. Ottolini, did you have an issue?

13           THE CLERK:  I'm a little concerned about the idea that

14   if it doesn't work, we would have to get a interpreter.  That's

15   the whole point of this process, because it will take us a good

16   long time to get an interpreter.

17           THE COURT:  I think what Mr. Feldman is undertaking is

18   that he will get an interpreter because Ms. Ottolini is

19   correct, if it devolves back to the normal, it takes a lot of

20   time and effort.

21           MR. FELDMAN:  My point was that I'm highly confident

22   it will be okay with us.  The only potential fly in the

23   ointment is if Your Honor finds that the interpreter who -- and

24   if it's the person I think it is, it will be a very soft-spoken

25   woman -- actually two soft-spoken women.  If they speak too

1    loudly for the Court, then we will have to do something else.

2          THE COURT:  Why don't you -- I will stick with the

3    order to notify the Court six weeks before the pretrial about

4    what the Defendants intend to do with respect to --

5          MR. FELDMAN:  Yes.

6          THE COURT:  -- making sure their clients can

7    meaningfully participate.

8          MR. FELDMAN:  Could I ask Your Honor to make a -- give

9    us a date for that?

10         THE COURT:  Yes.

11       Ms. Ottolini.  It does haven't to be exact but roughly six

12   weeks before the pretrial.

13         THE CLERK:  Give me one second.  If you want to move

14   on, I will come up with the date.

15         THE COURT:  And then the last matter would be at the

16   same -- well, at the same time, any such information with

17   respect to witnesses who might testify.  And, of course, if

18   there are Defendant representatives who are going to testify --

19   so they will be in a slightly different category -- we'll need

20   to know their dialect because for them we would definitely need

21   a court-appointed certified interpreter.

22         MR. FELDMAN:  Sure.

23         THE CLERK:  So, Your Honor -- I'm sorry.  So for

24   the -- first, for the pretrial conference date, that date would

25   be by 12/2.

1              **THE COURT:**  All right.

2              **THE CLERK:**  And for the actual start of trial, that

3    would be 12/18.

4              **THE COURT:**  Okay.  All right.  So that's all the Court

5    had.  You said you had another matter?

6              **MR. FELDMAN:**  Yes, I do.  I'm not attempting to

7    re-argue any of the protective order matters.

8         I do want to bring one thing to Your Honor's attention

9    which I think perhaps was lost in the papers.

10        Indeed, there is no question -- I don't think anybody here

11   would dispute that the Government did not make an effort to

12   determine which of the documents it designated were

13   confidential.  We knew that that would be the case, and I don't

14   think the Government would contend that they made even the

15   slightest effort to do that, certainly with respect to the

16   documents that were seized and the media that was seized from

17   my clients at the Rodeway Inn and most recently in their

18   production to us from the PTI-related defendants.  And I'm

19   telling you that we knew that that's what they would do.  And

20   we -- as we said in my declaration, we accepted that on the

21   condition that we would be able to show all but two people

22   those documents.

23        So I'm not re-arguing this.  But I want you to know

24   that -- and I was very conscious of the fact that you were not

25   probably going to like that very much because it would result

1    in what this -- you and every other judge in this district

2    despises, which is continual sealing motions, and we've

3    actually made an effort to avoid filing very many documents

4    specifically to avoid having Your Honor have to deal with

5    sealing motions.  And you wrote into the protective order --

6    the only thing you wrote was a handwritten note about basically

7    be careful with how you do that.  So I get that.

8         But given the nature of this case, the large volume of

9    documents, the fact that many of them are in Chinese and that

10   many of them are technical, it would have been -- oh, and we --

11   we agreed to that, A, because witnesses will be able to see

12   them, and, B, our consent, if you will, to not litigating that

13   was not a waiver of any substantive positions at any point in

14   the proceedings.

15        So you said -- you made some comments earlier today about

16   being careful about designations and so forth.  With all due

17   respect, that horse has long ago left the barn.  And I think

18   we're in a position now where if the Government were obligated

19   to go back and do that carefully, we'd have a trial four

20   Rosh Hashanahs from now, not in six months.

21        So we are in a position -- and I'm not, again, disagreeing

22   with anything that you said to us to do, which is to go back to

23   them and say, "Here is the dozen or so people that we have to

24   have," and we're going to do that, but I don't want you to

25   think that this situation can be salvaged by the Government

1   being careful and calculated about what it designates.  That

2   cannot happen anywhere near the kind of schedule that we all

3   want.

4           **THE COURT:**  All right.  Well, let me hear -- because

5   what Mr. Feldman says has -- certainly has some -- resonates

6   with the Court because we're at the point -- it is true that

7   the horse has -- that horse has already left the barn.  And

8   we're now at the point we're getting close to pretrial and we

9   need -- we can't have these generalized "throw it up against

10  the wall" -- I understand the issue of the alleged victim and

11  their concerns, but we have due process here, and I have a

12  trial to run, and we need to get to the point where the

13  Government carefully -- carefully -- according to the

14  protective order that I approved and without regard to the

15  generalities about analytical, work product and all that

16  amorphous stuff, gets to the point where it has to carefully

17  designate what it is it thinks has to be marked "confidential,"

18  and if you don't satisfy Judge Cousins, it's not going to be

19  confidential.  I'm telling you that right now.

20          Because at some point -- the Government chose to indict

21  this company -- these -- these entities.  They are entitled to

22  their day in court and due process, and I'm going to make sure

23  they have it.  And, again, to the extent that we have to err on

24  the side of production and non-confidentiality and more people

25  seeing it, I'm going to err on that side because due process is

1   going to win out against expedience and also the legitimate

2   concerns of the victim here.

3          **MR. SAMPSON:**  As it must, Your Honor.

4       The parties do have disagreements about what due process

5   means, whether it means that they have a right to take

6   confidential material outside of the United States, for

7   example.  The Government has never said that they couldn't

8   bring witnesses into the United States.

9          **THE COURT:**  But that maybe is not practical, though.

10  I mean, in the context of this case.  I'm not talking about

11  some theoretical -- we're talking about the reality of where

12  these companies are, where these individuals are located, the

13  issues about their ability to travel, and all those things, and

14  we need to accommodate all those things so that the Defendants

15  have the ability to defend themselves.

16      And that may mean that certain specific people who the

17  Government doesn't like -- and that may include Wang Rongkai,

18  even though the Government got has legitimate concerns -- gets

19  to review these documents, because there is no other way.

20  There is no other person -- I don't care if they have a million

21  people working for them -- who can meaningfully assist their

22  counsel.  So that's the mandate that I'm putting on you, and

23  that is what I have advised Judge Cousins.

24      And the Government may not like that and Chemours may not

25  like that, but that has got to be the way it is.  We're in a

1   constitutional democracy, and that's what we are going to do.

2          MR. SAMPSON:  We don't intend to do anything contrary

3   to that, Your Honor.  Your Honor has ordered us to meet and

4   confer in person, and we will continue to try to work out a

5   protective order that is better than the current one.

6          THE COURT:  Right.  And if at the end of the day -- I

7   will say to both sides -- let's talk about on the individual

8   witness side, the --

9          MR. FELDMAN:  May I interrupt you?  That's what I care

10  about.  I need to show the witnesses the documents.

11         THE COURT:  Right.  So I would envision -- and this is

12  what I envisioned when I talked to Judge Cousins about it --

13  there may be a situation where the Defendants may need to make

14  an ex parte in camera presentation to -- so they don't reveal

15  work product or attorney-client and say, you know, "Joe Dokes

16  is critical to assisting in the defense."  Now, that Joe Dokes,

17  for the same reasons, may be someone who may be able to

18  facilitate this ongoing conspiracy that the Government alleges

19  exists, but if those two -- if that -- in that narrow issue, in

20  that situation, Joe Dokes would be able to review -- my view is

21  he would be able to review the documents if he can convince --

22  the Defendants can convince the judge -- Judge Cousins and then

23  ultimately me -- and hopefully it won't get to me -- that

24  that's the only way to do it.

25         To simply say, "Oh, there has got to be somebody among

1    those 60,000 or so employees who can do the same thing as,"

2    let's say, you know, Wang Rongkai, just because he's a name

3    that I know -- so I'm not asking for a response.  I'm just

4    telling you that I'm not going to look kindly on this -- on

5    people just getting up and walking out of this session.  I want

6    it to bear fruit.  I want the issue, to the extent it needs to

7    be presented to Judge Cousins, to be specifically narrow.

8         You know, if this was a civil case or any other case, I

9    would -- I would require the parties to pay for a Special

10   Master to really sit down in a room and charging by the hour,

11   but because of my deference, number one, to not blowing up this

12   trial date and, number two, due process, and, number three,

13   legitimate confidentiality concerns, I'm not going to do that.

14   I'm putting that burden on the magistrate judge.  But I'm

15   telling you, it's going to be a very short string on this.  All

16   right?

17            MR. FELDMAN:  Thank you.

18            MR. SAMPSON:  That's very clear, Your Honor.

19            THE COURT:  The matter is submitted.  Thank you.

20                 (Proceedings adjourned at 3:18 p.m.)

21

22

23

24

25

1

2

3                    CERTIFICATE OF REPORTER

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Thursday, August 15, 2019

8

9    *Pamela Batalo Hebel*

10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25